IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

COLUMBIA DIVISION

| | | |
|---|---|---|
| Afraaz R. Irani, M.D., | ) | C/A No. 3:14-cv-03577-CMC-KDW |
| | ) | |
| Plaintiff, | ) | |
| | ) | **PLAINTIFF'S MEMORANDUM OF** |
| vs. | ) | **LAW IN OPPOSITION TO** |
| | ) | **DEFENDANTS KOON AND WALSH'S** |
| Palmetto Health; University of South | ) | **MOTION FOR JUDGMENT ON THE** |
| Carolina School of Medicine; David E. | ) | **PLEADINGS** |
| Koon, Jr., M.D., in his individual | ) | |
| capacity; and John J. Walsh, IV, M.D., | ) | |
| in his individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## I.  Introduction

Plaintiff, Afraaz R. Irani, M.D., by and through his undersigned counsel, hereby files this Memorandum of Law in Opposition to Defendants Koon and Walsh's Motion for Judgment on the Pleadings.  Defendants' arguments disregard the demanding standard required of a motion for judgment on the pleadings and ignore the command that all factual allegations in Plaintiff's Complaint must be accepted as true as this stage of the case.  Furthermore, Defendants' motion reflects a fundamental misapplication of the doctrine of qualified immunity, which simply does not apply in a case such as this, where Plaintiff has alleged deliberate or malicious conduct undertaken with an intent to harm Plaintiff or with deliberate indifference to Plaintiff's established constitutional and statutory rights.  As set forth in detail below, Defendants have failed to establish that any of Plaintiff's claims should be dismissed at this early stage in the case.  Accordingly, Defendants' motion for judgment on the pleadings should be denied.

## II.  Standard for Judgment on the Pleadings

Rule 12(c) of the Federal Rules of Civil Procedure provides, "After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c).  A motion for judgment on the pleadings requires a very high showing at such an early stage of the case: "Courts follow a 'fairly restrictive standard' in ruling on Rule 12(c) motions, as 'hasty or imprudent use of this summary procedure by the courts violates the policy in favor of ensuring to each litigant a full and fair hearing on the merits of his or her claim or defense.'" Lewis v. Excel Mech., LLC, No. 2:13-cv-281-PMD, 2013 WL 4585873, at *1 (D.S.C. Aug. 28, 2013) (emphasis added) (quoting 5C Charles A. Wright & Arthur Miller, Federal Practice and Procedure § 1368 (3d ed. 2011)) (unpublished decision attached hereto).  The underlying purpose behind a Rule 12(c) motion is "to 'dispos[e] of cases in which there is no substantive dispute that warrants the litigants and the court proceeding further.'"  Id. (emphasis added) (quotation omitted).

In considering a Rule 12(c) motion, like a motion to dismiss under Rule 12(b)(6), Fed. R. Civ. P., a court is required to accept all of the factual allegations in the complaint as true and must draw all reasonable factual inferences in plaintiff's favor as the nonmoving party. See Burbach Broad. Co. of Del. v. Elkins Radio Corp., 278 F.3d 401, 406 (4th Cir.2002).  Under this framework, "a motion for judgment on the pleadings under Rule 12(c) may be granted only if all material issues can be resolved on the pleadings by the district court."  5C Wright & Miller, Federal Practice and Procedure § 1368, at 223 (3d ed.2004) (emphasis added).  In sum, "[a] Rule 12(c) motion should only be granted if the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law." Park Univ. Enters. v. Am. Ca. Co., 442 F.3d 1239, 1244 (10th Cir.2006) (internal quotations omitted).

2

### III.  Facts

The facts of this matter are set forth in Plaintiff's Verified Complaint, which must be accepted as true at this stage of the case.

Plaintiff is a physician, having earned his medical degree from Stanford Medical School in June 2010.  On or about July 1, 2010, Plaintiff began has post-graduate medical education in the Orthopaedic Surgery Residency Program, which is jointly operated by Defendants Palmetto Health and the USC-School of Medicine.  His expected graduation date from the Program should have been in June 2015.  (Complaint, ¶ 14).  Plaintiff signed contracts of employment for the Program, which incorporated certain policies of the Program and the Program's accreditation board.  Although the actual contracts of employment were not attached to the Complaint, Plaintiff's causes of action for breach of contract set forth relevant provisions of the promises and policies that have been implicated by Defendants' conduct.  (Complaint, ¶¶ 52-56, 61-64).

Plaintiff received satisfactory performance evaluations from the various rotations during his internship year, or PGY-1 year, and was promoted to PGY-2 in July 2011, without any limitations, conditions, or probation.  Less than two months into his PGY-2 year, Plaintiff was called into a hostile and intimidating meeting by Defendant Koon, who was the Program Director for Orthopaedic Surgery.  The Orthopaedics Department practice manager was also present to serve as a witness to the meeting.  Defendant Koon began the meeting by informing Plaintiff that they had previously fired residents from the program, including a PGY-5 senior resident who was only six months away from his expected graduation date.  (Complaint, ¶¶ 15-16).

Dr. Koon notified Plaintiff of a list of alleged deficiencies in his job performance that were very vague and contained several generalized comments.  When Plaintiff requested clarification or

3

specific examples of his alleged shortcomings, Defendant Koon chastised him further and stated, "that just shows you lack insight." Plaintiff was not given a reasonable opportunity to defend himself or explain his side of the story in connection with the seven items in Defendant Koon's memorandum. Dr. Koon placed Plaintiff was placed on Level II academic remediation, or probation, which was supposed to run through December 1, 2011. (Complaint, ¶¶ 17-18).

Plaintiff filed a first-step grievance of his probation, which was summarily denied by Defendant Palmetto Health's Designated Institutional Official, Dr. Kathy Stephens. Plaintiff decided not to appeal his probation further to the grievance committee, but instead decided to accept his probation and move forward. (Complaint, ¶ 19). This decision was made at the specific urging of Defendant Walsh, the Chair of the USC Orthopaedic Surgery Department, who informed Plaintiff that both he and the attending physicians in the Department had better things to do than waste time on a grievance.

Plaintiff attempted to comply with his remediation plan and was informed by Defendant Koon in October that he appeared to be making satisfactory improvements. At a meeting on November 21, 2011, Defendant Koon stated that he would recommend Level I remediation once the probation ended on December 1, 2011. (Complaint, ¶¶ 20-21).

Shortly thereafter, at a faculty meeting of the Department, Defendant Koon confronted Plaintiff about taking two days of vacation during the probation period. He also blind-sided Plaintiff about an allegation that Plaintiff had disregarded the instruction of an attending physician to order an MRI for a patient who had a possible infection following a surgical procedure. Plaintiff was again not given a reasonable opportunity to present his version of events before the allegations were publicly made in front of Plaintiff's colleagues and the other attending physicians in the Department.

4

(Complaint, ¶ 22).

In addition, Plaintiff was accused of inappropriate treatment in the handling of a trauma patient. Plaintiff was never interviewed or allowed an opportunity to discuss the case or provide a written response during the purported investigation into that matter. Plaintiff was placed on Level III remediation, or suspension, effective December 9, 2011 through January 30, 2012. (Complaint, ¶ 23).

Plaintiff submitted a first-step grievance of his suspension to DIO Stephens, who denied his appeal on or about January 11, 2012. Thereafter, Plaintiff attempted to appeal the matter to the grievance committee of the Graduate Medical Education Committee ("GMEC") on or about January 26, 2012. Plaintiff's request for a grievance hearing was rejected, because his request was not filed within 10 business days, according to Defendant Palmetto Health's Human Resources Department. Plaintiff believed that the Martin Luther King, Jr. Holiday did not count as a "business day" under the resident handbook, because it is a national holiday, and the orthopaedic clinic was actually closed in observance of the holiday. Plaintiff's argument regarding the timeliness of his grievance was summarily rejected. (Complaint, ¶ 24).

Upon his return from suspension, on or about February 6, 2012, Plaintiff was again placed on Level II remediation (probation). Less than a month later, on or about March 5, 2012, Plaintiff was placed on Level III remediation and again suspended from the program, pending official action on the recommendation that he be terminated from the program. On or about April 15, 2012, Plaintiff was informed that the GMEC had accepted the recommendation to terminate him from the Program. (Complaint, ¶¶ 22-23).

Plaintiff appealed his termination through Palmetto Health's resident grievance policies,

5

which upheld the termination at every level.  (Complaint, ¶¶ 24-29).

Plaintiff is of Indian/Zoroastrian heritage.  (Complaint, ¶ 31).  He is of dark skin complexion and dark hair, and his name is obviously of Middle Eastern or Persian descent.

During Plaintiff's employment in the residency program, Defendant Koon, the Program Director, repeatedly referred to Plaintiff as "Achmed the Terrorist."  Defendant Koon also jokingly suggested that Plaintiff might "blow the place up" if he became upset or agitated.  Defendant Koon's remarks were outrageous and were clearly based on Defendant Koon's mistaken perception of Plaintiff's ethnicity or religion.  Plaintiff has alleged that Defendant Koon's comments directed towards Plaintiff and about Plaintiff created a hostile work environment based on Plaintiff's race, national origin, or religion. Defendant Koon's outrageous and insensitive comments were particularly hurtful to Plaintiff, because his Zoroastrian ancestors have historically been victims of religious persecution and terrorism in the middle eastern regions of ancient Persia near what is now Iran.  (Complaint, ¶¶ 32-33).  Defendant Koon also repeatedly singled Plaintiff out in group discussions and magnified every misstep that Plaintiff made, while similar mistakes and behaviors by his colleagues in the Program were overlooked or minimized.  (Complaint, ¶ 34).

Plaintiff has alleged that his treatment during his residency program, including his termination, amounts to unlawful discrimination under the statutes and Constitution of the United States.  (Complaint, ¶¶ 35-36, 40-41, and

During his participation in the program, Plaintiff also complained about being required to work in excess of the maximum duty-hour restrictions imposed by the Accreditation Council for Graduate Medical Education ("ACGME"), the accrediting body for medical residencies including those conducted by Defendants Palmetto Health and USC School of Medicine.  Plaintiff also

6

complained about inadequate supervision of residents within the program.  Plaintiff has alleged that his disciplinary actions and ultimately his termination were taken because of his complaining on significant issues of public concern impacting patient safety and resident well-being.

After Plaintiff's termination from Defendants' Orthopaedic Surgery Residency Program, he eventually found employment in another residency program in a different specialty.  He began the emergency medicine residency training program at Kern Medical Center in Bakersfield, CA, starting in June 2013.  In connection with his medical training in California, Plaintiff applied for his medical license there in 2013.  The California Medical Board contacted Defendant Koon during the application process, and Defendant Koon provided information about Plaintiff that caused Plaintiff's medical license in California to be denied.

Plaintiff filed this lawsuit in the Richland County Court of Common Pleas in June 2014.  The Verified Complaint contains twelve causes of action, each identifying one or more Defendants at issue in connection with specific clams.

Defendants timely removed the case to federal court.

The individual Defendants, Koon and Walsh, have now filed a motion for partial judgment on the pleadings, attacking four causes of action asserted against them in their individual capacity.

## IV.  Discussion

### A.  Defendant Walsh's Involvement

Defendant Walsh first asserts that he is entitled to judgment on the pleadings on all of Plaintiff's causes of action asserted against him in his individual capacity because Plaintiff's Complaint does not contain allegations the he acted personally in any misconduct against Plaintiff.  With all due respect, Defendants' has misread Plaintiff's allegations and is unfairly attempting to

7

limit the allegations of conduct attributed to Defendant Walsh.

Defendants would have the Court believe that the only allegations in the Verified Complaint that specifically relate to Defendant Walsh are contained in Paragraph 5. (Defs' Br., at 3). This is simply not correct. Defendant Walsh is the Chairman of the Department of Orthopaedic Surgery at USC School of Medicine (Complaint, ¶ 5). As such, he was undoubtedly involved in most of the conduct or actions towards Plaintiff that are the subject of this lawsuit. The Seventh, Eighth, Ninth, and Tenth Causes of Action are specifically brought against both Defendants Koon and Walsh in their individual capacities. Plaintiff uses the plural "Defendants" in Paragraphs 80, 82-86, 90-93, 101-104, and 110-112 of the Complaint to refer to both Drs. Koon and Walsh.

At this stage of the case, without the benefit of any discovery, Plaintiff is not exactly certain which individual Defendant (Koon, Walsh, or both) committed each of the unlawful acts against him as alleged in the Complaint, or what input each Defendant had on the adverse employment actions taken against Plaintiff. Much of the malfeasance underlying Plaintiff's Complaint took place at the Department level, behind an institutional curtain, outside of Plaintiff's presence and direct knowledge. A central theme of Plaintiff's Complaint is his exclusion from the meetings, discussions, memos, and overall process that led to his termination. While Plaintiff understandably does not have access to perfect information at this point, he reasonably believes, and has alleged in his Complaint, that Defendant Walsh was integrally involved in this process. Based on his position in the Department, his control over the Department, his relationship with Dr. Koon, and his overall institutional authority, all of which can be derived from the Complaint, Defendant Walsh's

8

involvement in the wrongs alleged is not speculative or implausible.[1] Plaintiff's allegations against Dr. Walsh are legally sufficient to establish the necessary connection at this stage of the proceedings.

Although Plaintiff's Complaint contains more detailed factual allegations specifically attributed to Defendant Koon, Defendant Walsh's individual culpability is not precluded by any allegations in the Complaint. The claims and allegations in the Complaint center around Plaintiff's overall mistreatment, which culminated in his being terminated from the Program and Department. Certainly, Defendant Koon was the more visible force behind many of the specific acts of mistreatment, which include openly discriminatory remarks to and about Plaintiff, the initial meeting that led to Plaintiff's first disciplinary action, and disparately harsh treatment towards Plaintiff compared to his co-residents; however, these direct interactions with Defendant Koon tell only part of the story.

The claims leveled against both Defendants Koon and Walsh cover a litany of alleged misdeeds, which are explicitly and impliedly attributed to both individual Defendants. For instance, Plaintiff's procedural due process claim alone alleges at least seventeen wrongful actions/inactions for which Defendant Walsh is alleged to be responsible at least in whole or in part (Complaint, ¶¶ 82-84). The same is true, for example, of Plaintiff's First Amendment retaliation claim, which alleges that Defendant Walsh was responsible for requiring Plaintiff to work excessive duty and on-

_____

[1]The United States Supreme Court has defined the court's inquiry on a preliminary, Rule 12 motion to dismiss as one of "plausibility." See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "The plausibility standard simply calls for enough fact [alleged in the complaint] to raise a reasonable expectation that discovery will lead to information supporting the plaintiff's claim." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 262 (4th Cir. 2009) (emphasis added). Stated in another way, Plaintiff's claims against Defendant Walsh must stand if the Plaintiff has "established a reasonably founded hope that discovery will reveal relevant evidence to support th[ose] claim[s]." Covert v. Stryker Corp., No. 1:08CV447, 2009 WL 2424559, at *10 (M.D.N.C. Aug. 5, 2009) (unpublished case attached).

call hours and for retaliating against Plaintiff when he objected to the same. (Complaint, ¶¶ 96, 101-102). Contrary to Defendant Walsh's argument that "[t]he Complaint lacks allegations" against him, Plaintiff has leveled a host of allegations against Defendant Walsh, and Plaintiff should have the opportunity to validate those allegations through the discovery process. Discovery will reveal the exact nature and extent of Defendant Walsh's involvement in wrongs alleged and whether Plaintiff's reasonable belief in Dr. Walsh's integral involvement is well-founded. See Manning v. Boston Med. Ctr. Corp., 725 F.3d 34, 48-49 (1st Cir. 2013) (holding that individual claims against the president of the medical center could be sustained where president's involvement in the alleged wrongdoing was based largely on implication from the nature and authority of her position); see also Tasciyan v. Med. Numerics, 820 F. Supp. 2d 664, 676 (D. Md. 2011) (denying dismissal on the basis that "it is plausible that discovery could reveal facts further substantiating the reasonableness of [plaintiff's] belief that her employer discriminatorily failed to promote her").

At this stage, the only question is whether the Complaint presents enough to "warrant[] the litigants and the court proceeding further" into discovery. Lewis, 2013 WL 4585873, at *1. Under this standard, Plaintiff certainly has earned the right to conduct discovery on these issues.

As a practical matter, Defendants' motion as to Defendant Walsh, even if successful in part, would not be dispositive of Plaintiff's entire case. Defendant Walsh will undoubtedly be one of the primary targets of Plaintiff's discovery efforts, whether or not he remains a named party as to all of Plaintiff's causes of action. Dismissing one or more causes of action against Defendant Walsh at this early stage of the case would serve little practical purpose, which strongly counsels against deciding the case on a piece-meal basis.

Plaintiff is not seeking to hold Defendant Walsh vicariously liable under 42 U.S.C. § 1983

for the wrongful actions of a subordinate employee under principals of <u>respondeat superior</u>, as argued by Defendants.  Instead, Plaintiff has leveled allegations that Defendant Walsh was directly and personally involved in many of underlying actions complained about.

Plaintiff was careful not to speculate in his Verified Complaint about events for which he was not present and to which he was not privy.  Plaintiff should not be punished for relying on his reasonable information and belief that Defendant Walsh was, and had to be, involved in the alleged actions of which he complains; nor should Defendant Walsh escape liability because his involvement did not include as extensive amount of personal interaction with the Plaintiff as did Defendant Koon. Especially in light of the fact that Defendant Walsh will be an integral part of the discovery process regardless, this Court must not dismiss Plaintiff's claims against Defendant Walsh before Plaintiff has access to the information needed to prove those claims.

### B.  Qualified Immunity

Defendants next assert that they are entitled to judgment on the pleadings based on the doctrine of qualified immunity.  Defendants' arguments in this regard are also unavailing.

Qualified immunity generally involves a situation where a state actor (often a law enforcement officer or executive-branch official), in the course of his or her duties, is required to make a discretionary call when faced with an issue of unsettled or unclear law.  The essence of qualified immunity is to shield state actors from individual liability when they act in good faith but ultimately make what turns out to be the wrong decision from a legal standpoint.  <u>See, e.g.,</u> <u>Pearson v. Callahan</u>, 555 U.S. 223 (2009) (Section 1983 action against police officers who engaged in warrant-less search of home where consent to enter home had previously been given to undercover officer who saw contraband in plain sight); <u>Hope v. Pelzer</u>, 536 U.S. 730 (2002) (Section 1983

11

action against prison guards who handcuffed inmate to hitching post, without bathroom or water breaks); Reichle v. Howards, 132 S. Ct. 2088 (2012) (Section 1983 action by arrestee against Secret Service agents, asserting that arrest was made in retaliation for constitutionally protected speech). As the Fourth Circuit stated in Willingham v. Crooke, 412 F.3d 553 (4th Cir. 2005), qualified immunity "protects law enforcement officers from 'bad guesses in gray areas' and ensures that they are liable only 'for transgressing bright lines.'" Id. at 558 (internal quotation omitted)).

Here, by contrast, Plaintiff's Complaint asserts that Defendant Koon and Walsh engaged in deliberate conduct, with a specific intent to harm Plaintiff or with reckless indifference, in violation of Plaintiff's well-established, basic rights to be free from unlawful discrimination and retaliation. Prohibition against discrimination based on race, religion, or national origin is a clear legal principal grounded in the Equal Protection Clause of the Fifth and Fourteenth Amendments and analogous portions of the S.C. Constitution, as well as state and federal laws like Title VII of the Civil Right Act of 1964. Similarly, the First Amendment's protection of free speech clearly prohibits state actors from retaliating against an individual for speaking out on a matters of public concern. These are not the types of unclear or unsettled legal principals that are protected by the qualified immunity defense.

The Court's analysis of Defendants' motion should begin with the recognition that Section 1983 is "remedial legislation," which must be "construed generously to further its primary purpose." Gomez v. Toledo, 446 U.S. 635, 639 (1980). The Supreme Court has recognized that qualified immunity is an affirmative defense on which Defendants bear the burden of proof. Id. at 640 ("Since qualified immunity is a defense, the burden of pleading it rests with the defendant."); Bailey v. Kennedy, 349 F.3d 731, 739 (4th Cir. 2003) ("The burden of proof and persuasion with respect to a claim of qualified immunity is on the defendant official."). The Supreme Court has also stated

that qualified immunity should only be applied in "certain limited circumstances." <u>Gomez</u>, 446 U.S. at 639.

   As noted previously, on a motion for judgment on the pleadings, the Court is constrained to decide the motion entirely on the pleadings themselves.  Defendants' Answer in this matter simply does not contain sufficient allegations to support judgment on the pleadings on the issue of qualified immunity, especially when the allegations in Plaintiff's Complaint are accepted as true and all other allegations in the pleadings are taken in the light most favorable to Plaintiff as the non-moving party. While Defendants have questioned the sufficiency and specificity of the allegations against Defendant Walsh in Plaintiff's Complaint, Defendants themselves attempt to assert an affirmative defense that has been insufficiently plead. Defendants' conclusory, boilerplate allegation of qualified immunity in their Answer is not enough to make that defense available here.

   In evaluating Defendants' motion, the Court should also remain cognizant of the latitude afforded Plaintiff at this stage of the proceedings.  While Defendants are correct in pointing out that qualified immunity is a legal question courts have been willing to address at the earliest stages of litigation, this inquiry does not increase Plaintiff's pleading obligations or diminish the Court's exacting demanding on a Rule 12(c) motion.  Defendants' arguments on qualified immunity generally lack recognition of this concept, reaching instead to construe factual and legal inferences against Plaintiff.

   As correctly stated by Defendants, qualified immunity generally involves a two-part inquiry: (1) whether Plaintiff's factual allegations make out a violation of a constitutional right, and (2) whether that constitutional right one that is "clearly established." <u>Saucier v. Katz</u>, 533 U.S. 194, 200

(2001).[2]  Critically, though, it is the <u>right</u>, and not the <u>violation</u> of that right, that must be "clearly established" in order to defeat qualified immunity.  <u>See</u> <u>Green v. Clarendon Cnty. Sch. Dist. Three</u>, 923 F. Supp. 829, 847 (D.S.C. 1996) ("At the time of  the <u>alleged violation, this right was clearly established</u>.") (emphasis added). In other words, if the implicated constitutional right is a clearly established one, Plaintiff's allegations that such right has been violated still need only satisfy the <u>Twombly</u> "plausibility" standard. <u>See</u> <u>Iqbal</u>, 556 U.S. 662.

As for what constitutes a "clearly established" right, that inquiry is typically made by reference to existing case law, though it is not necessary that "the very action in question has previously been held unlawful." <u>Hope v. Pelzer</u>, 536 U.S. 730, 739 (2002).  Defendants cite language indicating that, for a constitutional right to be clearly established, "<u>every</u> reasonable official" would have to understood the contours of that right.  (Defs' Br., at 5). Giving some context to this quoted language, it is clear that the relevant inquiry is "whether a reasonable person <u>in the official's position</u> would have known that his conduct would violate that right." <u>Taylor v. Waters</u>, 81 F.3d 429, 433 (4th Cir. 1996) (emphasis added).  In other words, it is not necessary that a reasonable police officer would have understood the constitutional rights at play in Plaintiff's termination, but rather, using Defendant Walsh as an example, that a reasonable hospital department chair, with the responsibilities and authority that position entails, would have possessed such an understanding.

With this framework of analysis established, Plaintiff will address the particular

_____

[2]The order in which the two elements of the <u>Saucier</u> test are considered is flexible.  <u>See</u> <u>Pearson v. Callahan</u>, 555 U.S. 223, 236 (2009) ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

constitutional violations alleged in his Complaint.

## 1. Equal Protection

Defendants' arguments for judgment on Plaintiff's equal protection claim demonstrate a misunderstanding, or at least a misapplication, of the applicable pleading standard. Defendants argue that to prevail on an equal protection claim, Plaintiff must "demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." (Defs' Br., at 6) (emphasis added). Defendants seemingly fail to grasp, however, that this case is not at the point of demonstration, but rather allegation. Defendants themselves cite allegations from the Complaint that are more than sufficient to support a viable equal protection claim at this stage. (Defs' Br., at 6). As pointed out at the beginning of this section, the qualified immunity inquiry does not amount to an enhanced pleading requirement.

Plaintiff plainly pleaded the basic elements of an equal protection claim: "Throughout his participation in the Program, Plaintiff was singled out for overly harsh treatment and criticism that was not provided to similarly situated individuals in the Program. . . . Plaintiff is informed and believes that his disparate treatment was motivated by discriminatory animus based on his race, religion, national origin, or ethnic background." (Complaint, ¶¶ 107-08). Plaintiff bolstered these basic elements with several, specific factual allegations that reasonably support the proposition that he was treated differently than other residents on account of discrimination: "Defendant Koon . . . repeatedly singled Plaintiff out in group discussions and magnified every misstep that Plaintiff made, while similar mistakes and behaviors by his colleagues in the Program were overlooked or minimized." (Complaint, ¶ 34). Indeed, the main premise of Plaintiff's Complaint is his

mistreatment in relation to the other Program residents. Plaintiff's equal protection claim consists of "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action" and is plainly sufficient to satisfy Twombly's plausibility standard. See Twombly, 550 U.S. at 555.

Defendants attempt to minimize Plaintiff's allegations regarding the outrageous, inflammatory comments that Defendant Koon made, which demonstrate a clear discriminatory animus and gross insensitivity on the part of Defendant Koon towards Plaintiff based on his race, ethnicity, national origin, and religion. Defendants' Brief implies that it was somehow acceptable for Defendant Koon to refer to Plaintiff as "Achmed the Terrorist" because that was merely the name of a puppet created by a well-known comedian/ventriloquist. (Defs' Br., at 2, n.1). Clearly, this is not a proper argument on a motion for judgment on the pleadings.

Defendants' first argument for attacking Plaintiff's equal protection claim is that Plaintiff has somehow failed to allege a similarly situated party. This argument takes every possible factual inference against Plaintiff and holds Plaintiff to a level of detailed pleading that is not supported by law. Plaintiff has clearly pleaded that he is a minority based on his race, religion, national origin, and ethnic background. (Complaint, ¶¶ 31-33). Plaintiff was one of the only, if not the only, minority resident in Defendants' orthopaedic surgery residency at the time. The context of the allegations of disparate treatment in the Complaint clearly indicate that Plaintiff was treated differently than other similarly situated colleagues (who were not from racial, religious, or ethnic minorities) because of his minority status. (Complaint, ¶¶ 34-35, 107-110).

Defendants' discussion of former resident Dr. Chad Lamoreaux is also misguided. Plaintiff's allegation about the first disciplinary meeting, which Defendant Koon began by informing Plaintiff

that they had previously fired residents from the program, including a PGY-5 senior resident who was only six months away from his expected graduation date (an unnamed reference to Dr. Lamoreaux) (Complaint, ¶ 16), was not a suggestion that Dr. Lamoreaux should be used as a similarly-situated comparator. Instead, that statement demonstrated the hostile nature of Dr. Koon's interactions with Plaintiff from the beginning of his PGY-2 year.

Defendant's second argument – that the constitutional right of equal protection is not "clearly established" in this context – quickly falls to common sense: any reasonable official would certainly understand the illegality of the race discrimination as alleged here. In addition, a cursory review of relevant case law beyond the single, unpublished Utah district court case cited and misconstrued by Defendants easily dispels the argument that Plaintiffs' equal protection claims are based on law that is unclear or unsettled. See, e.g., Wygant v. Jackson Bd. of Educ., 476 U.S. 267, 273 (1986) ("Decisions by faculties and administrators of public schools based on race or ethnic origin are reviewable under the Fourteenth Amendment."). A public official in Defendants' position cannot seriously argue that the right to be free from discrimination based on race, religion, national origin, or ethnicity in public employment or education is not a clearly established principal of law, especially since the adoption of the Equal Protection Clause of the 5th and 14th Amendments to the United States Constitution, analogous provisions of the South Carolina Constitution, the Civil Rights Act of 1866 (including 42 U.S.C. § 1981), the Civil Rights Act of 1964 (including Title VII), and the South Carolina Human Affairs Law.

The case of Halverson v. University of Utah School of Medicine, No. 2:06CV228 DAK, 2007 WL 2892633 (D. Utah Sept. 28, 2007), which is cited in Defendants' Brief, does not support the requested dismissal of Plaintiff's equal protection claims. In Halverson, the court quickly

17

dispensed with the plaintiff's alleged claim for "Deprivation of Equal Rights" because the plaintiff did not allege that she was a member of a minority or was otherwise discriminated against based on some protected characteristic: "There are no allegations in the Amended Complaint regarding how she was treated differently from others who were similarly situated." Id. at *15.

Here, Plaintiff has sufficiently pled an equal protection claim, and that claim is based on rights that are "clearly established." Therefor, the individual Defendants are not entitled to qualified immunity, and their motion for judgment on the pleadings as to this cause of action should be denied.

## 2.  Procedural Due Process

Plaintiff alleges procedural due process violations of his constitutionally protected property interests in continued employment with the Department and in graduating from the Program, and his constitutionally protected liberty interest in his good name and reputation in his professional field. (Complaint, ¶¶ 78-79).  Plaintiff's property interest in his continued employment stems from his contract, which specifically incorporates the policies and procedures of Defendant Palmetto Health and the ACGME that give rise to an entitlement or expectation to complete the residency program at issue.  This case is materially different from one where a resident's contract is simply non-renewed at the end of its term, or where the plaintiff is placed on administrative leave put paid for the remainder of his contract.

In asserting qualified immunity on this cause of action, Defendants first contend that Plaintiff's factual allegations do not make out a procedural due process violation of these interests on the basis that Plaintiff's "dismissal from the Residency Program was academic in nature, as opposed to disciplinary." (Defs' Br., at 7).  Even if Plaintiff's dismissal from the Program could be considered "academic," Plaintiff's procedural due process claims equally cover his termination from

18

employment. (Complaint, ¶¶ 15, 78, 82). The "academic dismissal" case relied on by Defendants involved a medical student in her first year of study. Board of Curators of Univ. of Mo. v. Horowitz, 435 U.S. 78, 80 (1978). The medical student was challenging her faculty's decision that she would not be allowed to "remain in school" so as to "graduate in June." Id. at 81. The medical student was not an employee, not under contract, not being paid, and not yet in her professional field.

In stark contrast, Plaintiff is a physician, having earned his medical degree from Stanford University, and was a paid employee under contract with the institutional defendants. (Complaint, ¶¶ 15, 52). See Ezekwo v. New York City Health & Hospitals Corp., 940 F.2d 775, 785 (2d Cir. 1991) ("While a medical residency program is largely an academic undertaking, it also is an employment relationship."). In short, even if the Court fully accepts the "academic dismissal" arguments in Defendants' motion, Plaintiff's procedural due process claim survives on the basis of his employment.

Even under an "academic dismissal" standard, Plaintiff is entitled to a level of procedural due process which he did not receive in this case. From the Horowitz case cited by Defendants, procedural due process in the academic dismissal context is satisfied if the following conditions are met: (1) the Defendants fully informed Plaintiff of their dissatisfaction with his progress, (2) Defendants notified Plaintiff of the dangerous consequences that such deficiencies posed to his continued enrollment, and (3) the ultimate decision to dismiss the student was "careful and deliberate." Id. 435 U.S. at 85. Plaintiff has presented multiple allegations that strike at the heart of each of these required elements. To provide just one example for each:

(1) fully informed of dissatisfaction: "The alleged deficiencies noted by Defendant Koon were very vague and contained several generalized comments. When Plaintiff requested clarification

19

or specific examples of his alleged shortcomings, Defendant Koon chastised him further and stated, 'that just shows you lack insight.'" (Complaint, ¶ 17).

(2) fully informed of dangerous consequences: Defendants failed "to provide adequate notice to him that termination was being considered by the GMEC as a possible disciplinary action." (Complaint, ¶ 82(b)).

(3) ultimate decision to dismiss was careful and deliberate: Defendants failed "to provide him with a reasonable amount of time in which to defend himself at the post-termination grievance hearing." (Complaint, ¶ 82(j)).

Importantly, Plaintiff has alleged that Defendants Koon and Walsh's discriminatory animus and unlawful retaliation tainted the process from the beginning.

Furthermore, even in the academic setting, where a student is suspended from a public school for disciplinary reasons, due process requires "that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." Goss v. Lopez, 419 U.S. 565, 581 (1975). Plaintiff has alleged that Defendant Koon failed to provide sufficient notice of the charges against him in the first disciplinary meeting, only informing Plaintiff that his request for examples of his alleged deficiencies showed that he "lack[ed] insight." (Complaint, ¶ 17). Plaintiff was not given reasonable notice or a meaningful opportunity to present his side of the story in the first episode or in any subsequent allegations of deficiencies on his part.

In arguing that "academic dismissal" due process has been satisfied, Defendants request that this Court discount these and many other allegations by engaging in factual weighing and adverse factual inferences against Plaintiff. (Defs' Br. at 7). Plaintiff has sufficiently alleged violations of

20

his procedural due process rights, even if those rights are evaluated in the context of an academic dismissal.

The next question, then, is whether Plaintiff's due process rights are "clearly established" in this context. Many courts have unequivocally held that medical residents possess a protected property right in continued enrollment in a residency program, especially where that enrollment is backed by a contract, as here.  See Stretten v. Wadsworth Veterans Hosp., 537 F.2d 361, 367 (9th Cir. 1976) ("Dr. Stretten's claim to his residency is a property interest deserving of appropriate due process before it is removed."); Adler v. Cnty. of Nassau, 113 F. Supp. 2d 423, 431 (E.D.N.Y. 2000) (resident possessed constitutionally protected property right not to be terminated without due process hearing in accordance with terms of the contract); Ezekwo v. New York City Health & Hospitals Corp., 940 F.2d 775, 783 (2d Cir. 1991) (position of Chief Resident constituted a constitutionally protected property right); Barsoumian v. University at Buffalo, No. 06-CV-831S, 2012 WL 930331, at *7 (W.D.N.Y. Mar. 19, 2012) ("Defendants do not dispute that Plaintiff had a constitutionally protected property right not to be terminated from the residency program without procedural due process.") (unpublished decision attached hereto).

Defendants are not entitled to qualified immunity on Plaintiff's procedural due process claim.

### 3.  Substantive Due Process

Plaintiff alleges that his substantive due process rights in the liberty and property interests described above were also violated by his termination from the residency program, because the adverse employment actions taken against him were  unreasonable, vindictive, malicious, arbitrary, and capricious.  (Complaint, ¶ 90).  Again, Plaintiff asserts that unlawful discrimination and retaliation dominated the decision-making process such the end result was an unconstitutional

21

deprivation of Plaintiff's property and liberty interests. This is not merely a disagreement over whether Plaintiff's performance in the program was deficient.

Defendants' motion includes little in the way of new argument as to why this claim should be dismissed. (Defs' Br. at 9: "Because Plaintiff's procedural due process and equal protection claims fail for the reasons stated above, Plaintiff's substantive due process claim also fails."). Defendants do point out that substantive due process entails reviewing the merits of the termination decision, rather than just the process, and that extreme deference is therefore due. (Defs' Br., at 7-8). This proposition, however, does not support judgment on the pleadings, but addresses the Court's review of the merits of the Plaintiff's claims.

Substantive due process is a commonly asserted, widely accepted claim in the context of public employment discrimination. See, e.g., Harrington v. Harris, 118 F.3d 359, 368 (5th Cir. 1997) (allegations of discrimination in employees' merit pay decisions forms basis of substantive due process claim); Bendel v. Westchester Cnty. Health Care Corp., 112 F. Supp. 2d 324, 327 (S.D.N.Y. 2000) (plaintiff's allegations of age discrimination in employment termination , "when liberally viewed, state a claim for a violation of substantive due process."); Murphy Taylor v. Hofmann, 968 F. Supp. 2d 693, 734 (D. Md. 2013) (plaintiff's allegations of sexual discrimination in employment termination survive motion to dismiss); Reed v. Town of Branford, 949 F. Supp. 87, 91 (D. Conn. 1996) (in age discrimination employment case:"Court cannot conclude that plaintiff can prove no set of facts that would rise to the level of arbitrary, or conscience-shocking, in the constitutional sense. Therefore, dismissal under Rule 12(b)(6) is inappropriate.").

Plaintiff has set out plain allegations of race and national origin discrimination that resulted in a biased, unjustified termination of his employment and residency. Certainly these types of

allegations strike at the core of substantive due process in the employment context. On the strength of these allegations and the many other courts that have chosen to consider substantive due process in this context, Plaintiff's substantive due process claim must stand.

### 4.  First Amendment Retaliation

Plaintiff's Ninth Cause of Action alleges that the Defendants violated his First Amendment rights by retaliating against him for expressing objections to the Program's failure to follow its own written policies on duty-hour limitations. (Complaint, ¶ 96). Plaintiff complained about working excessive on-duty hours beyond those prescribed for residents, a matter which Plaintiff alleges to be of public concern, and was retaliated against as a result. (Complaint, ¶¶ 97-102).

Defendants assert that they are entitled to qualified immunity on this claim for several reasons, none of which is valid.

First, Defendants contend that Plaintiff's allegations have not made out the violation of a constitutional right because "[r]etaliation for complaints about factors affecting only an individual plaintiff are not sufficient grounds for a claim of First Amendment retaliation." (Defs' Br., at 10). Plaintiff readily acknowledges that claims for First Amendment retaliation in the employment context must implicate speech on a matter of public concern. Brooks v. Arthur, 685 F.3d 367, 371 (4th Cir. 2012).  Plaintiff's complaints were not merely a "personal grievance about the conditions of employment" as asserted by Defendants.  (Defs' Br., at 10).  Rather, Plaintiff's complaints about duty-hour violations and inadequate resident supervision were matters of public concern because they directly implicate patient safety, as well as the health and well-being of other residents.

"[W]hether a public employee's speech touches on a matter of public concern rests on whether the public or the community is likely to be truly concerned with or interested in the

23

particular expression, or whether it is more properly viewed as essentially a private matter between employer and employee." Campbell v. Galloway, 483 F.3d 258, 270 (4th Cir. 2007) (internal quotations omitted). The Campbell court found that a female police officer's internal complaints were protected speech, because they included complaints about public safety and complaints about inappropriate conduct directed towards other female officers and female members of the public. Id. at 269-70.

The Brooks case relied upon heavily by Defendants is easily distinguished from the facts here. In Brooks, the court described the plaintiff's complaints to be "a series of personal differences" between the plaintiff prison guard and his supervisor, which merely indicated that the two simply "did not get along." The Brooks court concluded, "Were we to constitutionalize poor personal chemistry in the workplace, however, we would, as the district court recognized, elevate the infinitude of worker dissatisfactions with supervisors to a constitutional plane." Id. at 372-73. The employee's speech in Brooks was not protected because it conveyed no information to the public other than "that a single employee is upset with the status quo." Id. at 373.

Here, Plaintiff's protected speech as alleged in this case is plainly more than a "personal employment grievance" because it directly implicates the public in terms of patient care. As stated in the Complaint, the duty hour policy violations of which Plaintiff complained had the potential to have serious negative impacts on patient care. (Complaint, ¶ 97). This Court has no basis on which to conclude otherwise at this stage of the proceedings. Plaintiff's objections to duty-hour violations, while involving the conditions of his employment, are clearly a matter of public concern.

Next, Defendants contend that Plaintiff faces a "rigorous" causation burden on this cause of action that he cannot meet. Defendants have cited to no authority indicating that such burden is

24

applied to the Complaint at this stage of the case, prior to the opportunity for any factual development, on a motion to dismiss or for judgment on the pleadings.  Indeed, the single case cited by the Defendants on this point applies the "rigorous" standard to a completed trial record. See Goad v. Silverman, 121 F.3d 698 (4th Cir. 1997). Issues of causation and motive are quintessential questions of fact for the trial of this case, not a matter of law that can ben decided on a Rule 12 motion at the beginning of the case, before any opportunity for discovery.  Defendants' second argument is easily disposed of as not applicable to this stage of the proceedings.

Finally, Defendants cite a single, unpublished district court case from Illinois for the argument that Plaintiff's constitutional right to free speech is not "clearly established" in this context. On the contrary, the Fourth Circuit has a well-developed body of case law applying the First Amendment in the employment context, including to speech contained in employment grievances. See Ridpath v. Board of Governors of Marshall University, 447 F.3d 292 (4th Cir. 2006) (rejecting qualified immunity defense where Plaintiff alleged First Amendment retaliation claims after he was terminated from his position in defendant's athletic department after speaking out about a matter of public concern).

Defendants have submitted no basis on which to conclude that Plaintiff's First Amendment retaliation claim should not move forward.



*      *      *

## V.  Conclusion

For all of the foregoing reasons, Defendants' Motion for Judgment on the Pleadings should

be denied.

Respectfully submitted,


  s/ David E. Rothstein
David E. Rothstein, Fed. ID No. 6695
ROTHSTEIN LAW FIRM, PA
1312 Augusta Street
Greenville, South Carolina  29605
Office: (864) 232-5870
Facsimile: (864) 241-1386
E-mail: drothstein@rothsteinlawfirm.com

Attorney for Plaintiff, Afraaz R. Irani, M.D.

January 12, 2015

Greenville, South Carolina.