**Irani v. Palmetto Health**,
C/A No. 3:14-cv-03577-CMC-KDW

Index of Unpublished Decisions

Barsoumian v. University at Buffalo, No. 06-CV-831S, 2012 WL 930331 (W.D.N.Y. Mar. 19, 2012)

Covert v. Stryker Corp., No. 1:08CV447, 2009 WL 2424559 (M.D.N.C. Aug. 5, 2009)

Halverson v. University of Utah School of Medicine, No. 2:06CV228 DAK, 2007 WL 2892633 (D. Utah Sept. 8, 2007)

Lewis v. Excel Mech., LLC, No. 2:13-cv-281-PMD, 2013 WL 4585873 (D.S.C. Aug. 28, 2013)

2012 WL 930331
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Raffi BARSOUMIAN, M.D., Plaintiff,

v.

UNIVERSITY AT BUFFALO, the State
University of New York School of Medicine and
Biomedical Sciences, University Medical Resident
Services, P.C., Roseanne Berger, M.D., James
Hassett, M.D., Roger Seibel, M.D., Defendants.

No. 06–CV–831S.    |    March 19, 2012.

**Attorneys and Law Firms**

Andrew P. Fleming, Christen Archer Pierrot, Chiacchia &
Fleming, LLP, Hamburg, NY, for Plaintiff.

David J. Sleight, Office of the Attorney General, Earl K.
Cantwell, Hurwitz & Fine, P.C., Buffalo, NY, for Defendants.

**DECISION AND ORDER**

WILLIAM M. SKRETNY, Chief Judge.

## I. INTRODUCTION

*1 Plaintiff Raffi Barsoumian, M.D., commenced this action
in November 2006 seeking injunctive relief and damages for
Defendants' failure to reinstate him in a medical residency
program after he successfully grieved the non-renewal of
his employment agreement. Pending before this Court are
the Motion for Summary Judgment of Defendant University
Medical Resident Services, P.C. ("UMRS"), the Motion for
Summary Judgment of Defendants Roseanne Berger, M.D.,
and James Hassett, M.D., and Plaintiff's Motion for Partial
Summary Judgment. These motions are fully briefed and the
Court finds oral argument unnecessary. For the reasons that
follow, UMRS' motion is denied, the motion of Defendants
Berger and Hassett is granted in part and denied in part,
and Plaintiff's motion for partial summary judgment is also
granted in part and denied in part.

## II. BACKGROUND

### A. Factual Background

Plaintiff was admitted to the Surgical Residency Program
of University at Buffalo, the State University of New
York School of Medicine and Biomedical Science ("UB"),
in March 2002. (Complaint, Docket No. 1–4, ¶¶ 22–23;
Declaration of James Hassett, M.D., Docket No. 80, ¶ 9). The
post-graduate training program for a general surgery resident
is typically five years in length, with those training years
denominated as PGY1, PGY2, PGY3, PGY4 and PGY5.
(Comp. ¶ 9; Hassett Decl. ¶ 5). During each year a surgical
resident is required to participate in several hospital rotations.
(Compl. ¶ 10; Hassett Decl. ¶¶ 6, 10). UB does not operate
its own teaching hospital, but provides the necessary rotations
for residents by entering into Affiliate Agreements with area
hospitals, including Erie County Medical Center Corporation
("ECMC") and Kaleida Health. (Declaration of Defendant
Roseanne Berger, M.D., Docket No. 81, ¶¶ 8–10).

Plaintiff signed a Residency Employment Agreement with
UMRS, initially for the 2002–2003 PGY1 year, but
subject to successive renewals. (Compl. Ex. A (employment
agreement)). The UB Probation and Dismissal Policy requires
that non-renewal of the employment agreement be based
upon the same criteria established for dismissal. (Compl.Ex.
B). Dismissal "may be considered for residents who fail
to be removed from probation" if the residents were first
informed in writing of their performance problems, "given
the opportunity to remediate their deficiencies, and provided
feedback on their efforts." (Compl.Ex. B). Automatic
dismissal may also result based upon a resident's "[f]ailure to
comply with the bylaws and applicable rules, regulations, and
procedures at each [UB] affiliated hospital as outlined in the
employment contract." Compl. Ex. B. Plaintiff's employment
agreement also incorporates by reference, among other
things, the Employees' Grievance Procedure and the policy
on sexual harassment. (*Id.* at 4).

In June 2004, shortly after the commencement of Plaintiff's
PGY3 year, Plaintiff was placed on probation for six
months as a result of his "continued unprofessional
behavior." (Hassett Decl. ¶¶ 18, 20–21; Compl. ¶ 43). While
on probation, Plaintiff received unsatisfactory evaluations on
two of his trauma rotations at ECMC, and various concerns
were raised throughout the probationary period by faculty
regarding Plaintiff's professionalism, clinical ability, and
honesty. (Hasset Decl. ¶ 25–35, Ex. D; Compl. ¶ 44). At the

end of his probationary period, Plaintiff was informed that the ECMC surgical faculty had expressed reservations about allowing Plaintiff to return to that facility for completion of the rotations that he had failed to complete satisfactorily. (Hassett Decl. ¶¶ 35–36; Pl's St. Undisputed Facts, Docket No. 84, ¶ 29). Nonetheless, Plaintiff was taken off probation and restored to "good standing," purportedly due to his completion of the educational enhancement process. (Hasset Decl. ¶ 36 Ex D.; Pl's St. Undisputed Facts ¶ 30). Days later, by letter dated January 18, 2005, Defendant James Hassett, M.D., the Residency Program Director, informed Plaintiff that he would be recommending termination of Plaintiff's training at the end of the academic year because of the observations and concerns of the faculty. (Hassett Decl. ¶¶ 1, 37; Pl's St. Undisputed Facts ¶ 31–35).

**\*2** On February 4, 2005, Hassett was informed by Defendant Roger Siebel, M.D., that, despite having reservations, the consensus of the ECMC staff was to allow Plaintiff to return "and try to remediate him." (Hassett Decl. ¶ 39–40, Ex D; Pl's St. Undisputed Facts ¶ 38). Hassett asserts that "this confirmation was of no value" at that time, in part because Plaintiff could not remediate his trauma rotation at ECMC until after he completed the remaining required PGY3 rotations. (Hassett Decl. ¶ 40). On February 7, 2005, at a meeting which also constituted a Level I grievance meeting, the Executive Committee of the Department of Surgery agreed with the recommendation not to renew Plaintiff's training contract. (Hassett Decl. ¶ 41; Pl's St. Undisputed Facts ¶ 37, 39, 41). Plaintiff requested a Level II grievance hearing and, on July 12, 2005, the Level II Grievance Committee upheld the decision not to renew. (Compl. ¶¶ 66–67; Hassett Decl. ¶ 48 Ex D).

Plaintiff then requested and was granted a Level III review of the non-renewal decision, and a hearing was held on October 31, 2005. (Compl. ¶ 68; Hassett Decl. ¶ 49). During the hearing, the Level III Grievance Committee questioned why Plaintiff was determined to have successfully completed probation when he received two unsatisfactory evaluations. (Hassett Decl. Ex. OO). As reflected in the grievance decision, Hassett asserted that this was done to allow Plaintiff to apply to other programs while completing his PGY3 year in good standing. (Hassett Decl. Ex. OO). The Level III Committee found that because Plaintiff's "removal from probation could reasonably be construed to imply that [Plaintiff] successfully remediated all issues, ... the decision[ ] to then notify him of a non-renewal of his contract [was] inappropriate." (*Id.*). Although the "process of nonrenewal

decision making was flawed," the committee noted that its decision did not "imply, in either a positive or negative fashion, that the information contained within [Plaintiff's] file regarding [his] professionalism either supports or negates this conclusion." (*Id.*).

Plaintiff was restored to payroll in November 2005 and received back pay from June 2005. (Compl. ¶ 71; Hassett Decl. ¶ 50). Although Hassett objected internally to the Level III determination (Affirmation of Andrew P. Fleming, Esq., Docket No. 83, Ex. W), he "tried to clarify whether Plaintiff could indeed return" to ECMC or the Women and Children's Hospital of Buffalo ("WCHB"), a Kaleida Health hospital at which Plaintiff participated in rotations during the spring of 2005. (Hassett Decl. ¶¶ 51–52). According to Hassett, these are the only two UB affiliated hospitals at which the PGY3 trauma and pediatric assignments Plaintiff has not yet completed are available. (Hassett Decl. ¶ 65). At issue with Kaleida Health was a pending sexual harassment claim against Plaintiff for his conduct at WCHB, and Hassett therefore inquired as to whether Plaintiff would be allowed to return for training. (Hassett Decl. ¶¶ 51–53 Ex RR; see Docket No. 76 Exs. N, O). Following an investigation, Kaleida Health staff determined that there was probable cause to conclude that Plaintiff engaged in several inappropriate actions of a sexual nature in violation of Kaleida Health's Unlawful Harassment Policy, and Kaleida Health informed UB in June 2005 that Plaintiff's removal to another clinical assignment was warranted. (Docket No. 76 Exs. N, O). By letter dated February 20, 2006, Kaleida Health again asserted to Defendant Roseanne Berger, Senior Associate Dean for Graduate Medical Education at UB that it did not welcome Plaintiff's presence as a resident and requested that Plaintiff not be assigned to any rotations at a Kaleida Health hospital. (Docket No.76, Ex M).

**\*3** Similarly, on December 14, 2005, the ECMC surgical staff unanimously voted in Hassett's presence to not allow Plaintiff back for remediation. (Hassett Decl. Exs. TT, WW). Defendant Berger sent Plaintiff a letter dated February 21, 2006, informing Plaintiff that "UB affiliated hospitals advised the UB Office of Graduate Medical Education that they cannot commit to provide you access to their sites for continued residency training." (Docket No. 83 Ex. CC). ECMC correspondence also dated February 21, 2006, however, indicates the organization's understanding that Plaintiff "was removed from the Residency Program by [UB] and has not been reinstated. In the event [Plaintiff] is reinstated, [Defendant Seibel] can initiate a request for

corrective action." (Hassett Decl. Ex WW). In light of this, Hassett drafted a letter to Plaintiff indicating that training could be facilitated at ECMC, however, he was directed not to send the message by ECMC's chief executive officer, Michael Young. (Hassett Decl. ¶¶ 58–59 Ex YY). Young's email, dated February 24, 2006, stated that "your legal staff needs to work with our lawyer to understand our position. You may not comment on any action or position ECMC may or may [not] take in any situation." (Hassett Decl. Ex YY (capitalization removed)).

Plaintiff was never returned to residency training, and on July 26, 2006, he was removed from UMRS payroll. (Pl's Statement Undisputed Facts ¶ 64).

**B. Procedural Background**

Plaintiff commenced the instant action in New York State Supreme Court, Erie County, by filing an Order to Show Cause for Preliminary Injunction and a Summons and Complaint. In his Complaint, he asserted five causes of action alleging that (1) Plaintiff is entitled to preliminary injunctive relief enjoining Defendants from refusing to reinstate him; (2) Defendants Berger, Hassett, and Seibel deprived him of his Fourteenth Amendment Due Process rights in violation of 42 U.S.C. § 1983; (3) Defendants University of Buffalo and UMRS breached the employment contract; (4) Defendants Berger, Hassett, and Seibel tortiously interfered with Plaintiff's existent contractual relationship; and (5) Defendants Berger, Hassett, and Seibel tortiously interfered with Plaintiff's prospective economic advantage. (Compl.¶¶ 80–120). UMRS removed the action to this Court shortly thereafter, asserting federal question jurisdiction. (Notice of Removal, Docket No. 1, ¶ 5).

UMRS (Docket No. 8) and the UB Defendants (Docket No. 4) filed separate Motions to Dismiss. In a March 11, 2009 Decision and Order, at which time this Court also considered Plaintiff's Motion for a Preliminary Injunction (Docket No. 19), the Complaint was dismissed as to UB on the ground of Eleventh Amendment immunity. (Docket No. 43 at 6). For the same reason, the second, fourth and fifth causes of action were dismissed against Defendants Hassett, Seibel and Berger insofar as it sought monetary damages against those defendants in their official capacities. (Id.). This Court denied Plaintiff's Motion for a Preliminary Injunction, and dismissed the cause of action in the Complaint seeking the same, because, among other things, Plaintiff failed to establish that he would suffer irreparable harm absent immediate relief. (Id. at 11–12). This Court also rejected Defendants' argument that

ECMC and Kaleida Health were required parties pursuant to Rule 12(b)(7). (Id. at 7–8).

**\*4**  On October 6, 2009, a Statement Noting Death was filed indicating that Defendant Roger Seibel, M.D., passed away on February 13, 2007. (Docket No. 53). Plaintiff failed to move for substitution of Seibel's estate as defendant within 90 days after service of this statement, therefore any claims against Seibel must be dismissed pursuant to Fed.R.Civ.P. 25(a)(1). Plaintiff appears to concede this, inasmuch as no reference to claims against Seibel appears in his current motion papers. Defendants now move for summary judgment dismissing the complaint as against each of them (Docket Nos. 76 (UMRS) [1] ; 78 (Defendants Hassett and Berger) [2] ). Plaintiff moves for partial summary judgment on liability for his second and third causes of action, and also seeks specific performance of his employment agreement in the form of reinstatement. (Docket No. 83). [3]

---

[1]    In support of its Motion for Summary Judgment (Docket No. 76), Defendant UMRS submitted a Statement of Undisputed Facts (Docket No. 76–1), a supporting Memorandum of Law (Docket No. 76–2) with Exhibits A–Z (Docket Nos. 76–3 to 76–5). Plaintiff opposed this motion with the affirmation of Andrew P. Fleming, Esq., and Exhibits A–Q (Docket Nos. 94, 94–1 to 94–3), Declaration of Plaintiff Raffi Barsoumian, M.D. (Docket No. 94–4), an opposing Memorandum of Law (Docket No. 94–5), and Objections to UMRS' Statement of Undisputed Facts (Docket No. 94–6). UMRS filed a reply Memorandum of Law (Docket No. 98).

[2]    In support of their Motion for Summary Judgment (Docket N. 78), Defendants submitted a Statement of Undisputed Facts (Docket No. 79), the Declaration of Defendant James Hassett, M.D., with Exhibits A–DDD (Docket No. 80), the Declaration of Roseanne Berger, M.D., with Exhibits A–X (Docket No. 81), and a supporting Memorandum of Law (Docket No. 82). Plaintiff opposed the motion with the Fleming Affirmation and Exhibits, Plaintiff's Declaration (Docket No. 94–4), an opposing Memorandum of Law (Docket No. 94–7), and Objections to Defendants' Statement of Undisputed Facts (Docket No. 94–8). Defendants submitted the Reply Declaration of Kim S. Murphy, Esq. (Docket No. 99).

[3]    In support of his Motion for Partial Summary Judgment (Docket No. 83), Plaintiff submitted the Fleming Affirmation and Exhibits (Docket No. 83), Statement of Undisputed Facts (Docket No. 84), Plaintiff's Affidavits

(Docket Nos. 85, 88), and a supporting Memorandum of Law with Attachments 1–7 (Docket No. 86). Defendants Hassett and Berger responded with the Declaration of Delia D. Cadle, Esq. (Docket No. 91) and Objections to Plaintiff's Statement of Undisputed Facts (Docket No. 92). UMRS also responded with an opposing Memorandum of Law with one attachment (Docket No. 93). Plaintiff replied with his own affidavit (Docket No. 101), a reply Memorandum of Law against UMRS with Exhibits A–E (Docket No. 101–1 & 101–2) and a reply Memorandum of Law against Defendants Berger and Hassett with Exhibits A–F (Docket No. 101–3 & 101–4).

### III. DISCUSSION

Summary judgment is appropriate where the materials in the record, including depositions, documents, affidavits or declarations, and stipulations, show that there are no genuine issues regarding any material fact and that the movant is entitled to judgment as a matter of law. *see* FED.R.CIV.P. 56(a), (c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A court's function on a summary judgment motion "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Kaytor v. Electric Boat Corp.,* 609 F.3d 537, 545 (2d Cir.2010), *citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### A. Plaintiff's Third Cause of Action for Breach of Contract

Plaintiff alleges that UMRS breached Plaintiff's employment agreement by refusing to follow grievance procedures, refusing "to adhere to the 'binding' determination of the Level III Review Committee which required Plaintiff's timely [reinstatement]," and "unjustly depriving Plaintiff access to UB affiliated hospitals." Compl. ¶¶ 100–106. UMRS argues that it is entitled to summary judgment because Plaintiff failed to exhaust administrative remedies by either (1) requesting a Level II Grievance hearing with respect to the sexual harassment charge against him at the Kaleida Health facility (UMRS Mem. of Law, Docket No. 76–3, at 10–11); or (2) filing a complaint with the New York State Public Health Council "in order to regain or retain privileges as a physician" at ECMC and Kaleida Health. (UMRS' Mem of Law at 15). In order for either of these arguments to be colorable, however, this Court must first accept the asserted premise that ECMC and Kaleida Health are the only facilities where Plaintiff can participate in the required remediation training, and both

those facilities have categorically and, within the context of the Affiliation Agreements, permissibly precluded Plaintiff. In other words, as this Defendant recognizes (UMRS Mem of Law in Opp'n, Docket No. 93, at 8–11; UMRS Reply Mem of Law, Docket No. 98, at 2), UMRS must first establish its defense that performance in compliance with the employment agreement was impossible through no fault of its own. *See Pleasant Hill Dev., Inc. v. Foxwood Enters., LLC,* 65 A.D.3d 1203, 1206, 885 N.Y.S.2d 531 (N.Y.App.Div.2d Dep't 2009), *lv dismissed* 13 N.Y.3d 874, 912 N.Y.S.2d 562, 938 N.E.2d 969 (N.Y.2010) (performance is excused where fulfillment of contractual obligation is rendered impossible by unforeseeable events)

**\*5** "The vitiation of a contract based upon impossibility of performance is rarely imposed and will be applicable only in those circumstances 'when the destruction of the subject matter * * * or the means of performance makes performance objectively impossible. Moreover, the impossibility must be produced by an unanticipated event that could not have been foreseen or guarded against in the contract' " *Lagarenne v. Ingber,* 273 A.D.2d 735, 737, 710 N.Y.S.2d 425 (N.Y.App.Div.3d Dep't 2000), *quoting Kel Kim Corp. v. Central Mkts.,* 70 N.Y.2d 900, 902, 524 N.Y.S.2d 384, 519 N.E.2d 295 (N.Y.1987). As this Court previously found in its decision on the Motions to Dismiss, the evidence proffered by Defendants indicates that ECMC has not yet reached a decision regarding Plaintiff's return to its facility. (Docket No. 43 at 9). The summary judgment submissions similarly establish that Plaintiff has not yet been removed or withdrawn from ECMC within the meaning of the applicable Affiliation Agreement. The limited excerpts of the Affiliation Agreements submitted to this Court provide that ECMC and Kaleida Health *"shall accept"* all Residents who are assigned by the University." (Hassett Decl. Exs. B (Kaleida Health) and C (ECMC) (emphasis added)). These agreements delineate responsibility for the discipline of residents by providing that:

> Residents who fail to conform to the policies, By-laws, rules and regulations of ECMC, or who are unacceptable to ECMC for any reason involving patient safety or well-being or the operation of ECMC, may be removed from ECMC's premises and shall be reported by ECMC to the Residency Program Director and the Office of Graduate Education at the Medical School or at the Dental

Barsoumian v. University at Buffalo, Not Reported in F.Supp.2d (2012)

School for any appropriate corrective action in accordance with University rules, ACGME/CODA guidelines and subject to the terms of any applicable collective bargaining agreements. Any Resident so removed or withdrawn shall not be reassigned by the University to ECMC without the prior written consent of the CEO or his/her designee and the Program Director. If a Resident has been reported to and subject to corrective action by the Office of Graduate Medical Education at the Medical School [ ("OGME") ]or at the Dental School for corrective action by a hospital other than ECMC, and such Resident is scheduled to serve a rotation at ECMC, the University shall inform ECMC of the nature of the corrective action and the reasons therefor, subject to any applicable confidentiality laws or regulations.

(Docket No. 76–5, Ex G (ECMC), Ex H (Kaleida Health)). There is no dispute that Plaintiff failed to satisfactorily complete two surgical rotations at ECMC and that ECMC faculty have consistently expressed serious reservations with respect to allowing Plaintiff to return. (Hassett Decl. ¶¶ 25–35, Exs. TT, WW). Nonetheless, ECMC's chief medical officer stated that "a request for corrective action" could be made "in the event that [Plaintiff] is reinstated." Hassett Decl. Ex. WW. Further, contrary to the assertion that Plaintiff's return to ECMC was "emphatically nixed" by ECMC's CEO, (UMRS Reply Mem of Law, Docket No. 98, at 2), the email from Michael Young states that "your legal staff needs to work with our lawyer" and directs Hassett not to comment on any position ECMC "may take," not a position that entity had already taken. (Hassett Decl. Ex. YY). Defendant Berger even asserts in her declaration that, based upon her conversations with ECMC staff, ECMC "had not made a decision about being able to take Plaintiff back." Berger Decl., Docket No. 81, ¶ 34. Accordingly, Plaintiff has not yet been "reported to" the OGME by ECMC such that he would be "subject to corrective action" within the terms of the Affiliation Agreement. Docket No. 76–5, Ex G. Because Plaintiff has not yet been removed from ECMC in conformance with the Affiliation Agreement, then contrary to UMRS' contention, there is not yet an obligation to obtain the written consent of ECMC's CEO before reassigning Plaintiff to that facility.

(Hassett Decl Ex. B (ECMC "shall accept all Residents"). The fact that ECMC may at a future date choose to invoke the right to remove Plaintiff out of consideration for patient safety or the well-being of ECMC's operations is of no relevance to the issue of whether Plaintiff could be assigned to ECMC in the first place. *see Kel Kim Corp.,* 70 N.Y.2d at 902, 524 N.Y.S.2d 384, 519 N.E.2d 295 (a contracting "party must perform or respond in damages for its failure, even when unforeseen circumstances make performance burdensome"). UMRS does not dispute that an obligation to abide by the grievance determination and reinstate Plaintiff exists, and this Court concludes that it has failed to establish its defense that performance of that obligation was impossible. Accordingly, that part of Plaintiff's motion seeking partial summary judgment with respect to UMRS' liability for breach of contract is granted.

**\*6** It is therefore unnecessary for this Court to consider UMRS' exhaustion arguments. In any event, because the resolution of this breach of contract claim does not turn on the propriety of any hospital's factual determination to deny Plaintiff privileges, dismissal due to Plaintiff's failure to file a claim with the New York Public Health Council is unwarranted. *Fulton Cogeneration Assocs. v. Niagara Mohawk Power Corp.,* 84 F.3d 91, 97 (2d Cir.1996) (primary jurisdiction inappropriate where issues of contract interpretation are dispositive); *Franzon v. Massena Mem. Hosp.,* 977 F.Supp. 160, 165–166 (N.D.N.Y.1997) (primary jurisdiction is invoked when an administrative agency's superior fact find ability would assist in the judicial process). Similarly, the fact that the grievance process has not yet concluded with respect to Kaleida Health's determination that Plaintiff violated the sexual harassment policy is irrelevant to the present discussion where, based on the parties' submissions, ECMC is still a viable option for placement of Plaintiff. *See* Docket No. 76, Ex O.

The question remains as to what relief Plaintiff is entitled at this time. Plaintiff argues that specific performance-his reinstatement-is warranted in this case because monetary damages alone would be "wholly insufficient." Pl's Mem of Law at 24 (reserving right to seek monetary damages as well). An order of specific performance may be appropriate where the calculation of monetary damages would be speculative. *Nemer Jeep–Eagle, Inc. v. Jeep–Eagle Sales Corp.,* 992 F.2d 430, 433, 436 (2d Cir.1993) (doubts regarding the adequacy of monetary damages should be resolved in favor of specific performance); *see Van Wagner Adver. Corp. v. S & M Enters.,* 67 N.Y.2d 186, 194, 501 N.Y.S.2d 628, 492 N.E.2d 756

(N.Y.1986) (if damages cannot be calculated with reasonable certainty, then specific performance is warranted). Such is the case here. After the Level III Grievance determination in October 2005, Plaintiff was returned to payroll and received back pay and benefits from June 2005, and continued to receive the same until the end of July 2006 despite the failure to be returned to a hospital rotation. (Pl's Decl., Docket No. 94–4, ¶ 10–11; Pl's St. Undisputed Facts ¶ 64). By his own admission, Plaintiff has been able to work as a surgical assistant and has accepted by an accredited fellowship in Minimally Invasive Surgery, although he has been unable to secure a position with another surgical residency program. (Pl's Decl., Docket No. 85, ¶¶ 32–37). Plaintiff has submitted an Economic Loss Calculation report in which six different damages calculations are offered. (Fleming Aff. Ex FF). Each of those calculations, however, is based upon the premise that Plaintiff would become a surgeon if reinstated, necessarily presuming his successful completion of not only his PGY3 year, but the entire residency program. Such a result is speculative at this juncture. The Level III Grievance committee's decision was based upon a failure to abide by dismissal procedure, and the decision specifically indicated that the committee was evaluating Plaintiff's professional acumen. *See Fenje v. Feld,* No. 01 C 9684, 2002 WL 1160158, *3 (N.D.Ill. May 29, 2002) (plaintiff entitled to damages from procedurally improper termination only if he would not have been terminated but for the irregularities). Instead, the grievance committee recognized that continued probation was appropriate for outstanding issues such as the unsuccessful trauma rotations at ECMC. (Hasset Decl. Ex. OO). Accordingly, this Court finds that Plaintiff is entitled to an order directing UMRS to comply with the Level III Grievance determination by reinstating Plaintiff as a PGY3 resident on probation. This conclusion in no way limits ECMC's rights under the Affiliation Agreement to remove Plaintiff from its facility and report him for corrective action if warranted. Similarly, this conclusion also does not preclude Plaintiff's "[a]utomatic dismissal" pursuant to the applicable dismissal procedures should Kaleida Health's determination that Plaintiff failed to comply with that affiliated hospital's sexual harassment policies be upheld at the conclusion of the grievance procedure. (Compl. Ex. B (Probation and Dismissal Policy)).

## B. Plaintiff's Second Cause of Action for Violation of 42 U.S.C. § 1983

**\*7** Following this Court's determination on the prior motions to dismiss (Docket No. 43), Plaintiff's second cause of action remains against Defendants Hassett and Berger in their official capacities insofar as equitable relief is sought, and against them in their individual capacities insofar as monetary damages are sought. Plaintiff alleges that these Defendants deprived him of his protected property interest in his residency position without procedural due process, he was similarly deprived of his liberty interest to be free from "stigmatizing disciplinary action,"[4] and the decision not to renew his employment agreement without affording him an opportunity to remediate the unsatisfactory trauma rotations represented a significant deprivation of Plaintiff's right to substantive due process. (Compl.¶¶ 85–99). Plaintiff argues that Defendants are liable for these violations under 42 U.S.C. § 1983. Defendants assert that they are entitled to summary judgment because, in addition to the impossibility of performance, the non-renewal of Plaintiff's residency was an academic dismissal for which less stringent procedural safeguards are required, (Def's Mem of Law, Docket No. 82, at 4–9), Plaintiff was afforded more due process than constitutionally required regardless of whether or not his non-renewal was classified as an academic determination, (*Id.* at 9–12), and the non-renewal was not arbitrary and capricious. (*Id.* at 12–21). Defendants further argue that even if this Court does find that Plaintiff's due process rights were violated, Defendants are entitled to qualified immunity as any unlawfulness would not have been apparent in light of the less stringent safeguards for academic dismissals.

---

4      Plaintiff's Motion for Partial Summary Judgment fails to develop the liberty interest argument, and it will not be considered further here.

Initially, Defendants do not dispute that Plaintiff had a constitutionally protected property right not to be terminated from the residency program without due process. *See Adler v. County of Nassau,* 113 F.Supp.2d 423, 431 (E.D.N.Y.2000) (resident possessed constitutionally protected property right not to be terminated without due process hearing in accordance with terms of the contract). With respect to Defendants' argument that the non-renewal was purely an academic decision, this Court notes that "[w]hile a medical residency program is largely an academic undertaking, it also is an employment relationship." *Ezekwo v. NYC Health & Hosp. Corp.,* 940 F.2d 775, 785 (2d Cir.1991), *cert denied* 502 U.S. 1013, 112 S.Ct. 657, 116 L.Ed.2d 749 (1991). In any event, upon learning of the decision not to renew his residency, Plaintiff was afforded and took advantage of a three-step grievance procedure, which included a hearing before the Level III Grievance committee. (See Fleming Aff. Ex R). This process would have been sufficient to afford Plaintiff notice and an

opportunity to be heard. *See Adler,* 113 F.Supp.2d at 431. Plaintiff correctly argues, however, that such procedures were rendered meaningless by Defendants' failure to abide by the Level III Grievance committee's decision to reinstate Plaintiff. [5] *Adler,* 113 F.Supp.2d at 430; Pl's Mem of Law, Docket No. 86, at 11–13. Further, as concluded above, Defendants have failed to establish that compliance was impossible. [6]

[5]   Plaintiff also argues that the decision to "summarily" remove him from payroll in July 2006 was a further due process violation. (Pl's Mem of Law, Docket No. 86, at 13–14). Plaintiff fails to establish how he has a protected property interest in continued payment distinguishable from his protected property right in the residency position itself. This Court will therefore consider only the single violation.

[6]   Defendants Berger and Hassett have incorporated by reference all applicable UMRS arguments (Docket No. 99 ¶ 3).

**\*8** In order to establish a substantive due process claim, Plaintiff must establish that he was deprived of his property right in a manner "so outrageously arbitrary as to constitute a gross abuse of governmental authority." *Natale v. Town of Ridgefield,* 170 F.3d 258, 263 (2d Cir.1999) (such as a deliberate flouting of the law or racial animus); *Adler,* 113 F.Supp.2d at 430–431. Here, although based on this record Defendants erred in failing to restore Plaintiff as a probationary PGY3 resident following the Level III Grievance committee's determination, there is no evidence of conduct "so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection." *Southerland v. City of New York,* 667 F.3d 87, 112 (2d Cir.2012) (internal quotation marks omitted). Indeed, as discussed further below, there is nothing from which to infer that the failure to reinstate Plaintiff resulted from anything other than the mistaken, but reasonable, belief that any attempt to place Plaintiff would be futile.

Plaintiff has therefore established a procedural, but not substantive, violation of due process. Thus, with respect to this cause of action against Defendants in their official capacity, Plaintiff is, as concluded above, entitled to equitable relief in the form of reinstatement as a PGY3 resident on probation. *Board of Educ. of Pawling Central School Dist. v. Schutz,* 290 F.3d 476, 480 (2d Cir.2002) (prospective

equitable relief against state officials in their official capacity not barred by the Eleventh Amendment).

As a prerequisite to an award of damages against Defendants in their individual capacity, Plaintiff is required to establish that each defendant was personally involved in the deprivation of procedural due process. *Farid v. Ellen,* 593 F.3d 233, 249 (2d Cir.2010). Defendant Hassett does not dispute that he was responsible for "return[ing] Plaintiff to his clinical rotations," or that he did not do so following the Level III Grievance decision, thus his direct participation in the deprivation is clear. (Hassett Decl. ¶¶ 50, 52; see Pl's Decl. ¶ 11, Fleming Aff. Ex. F). Defendant Berger, as Senior Associate Dean, oversees all of UB's residency programs. The liability of a supervisor or person in position of authority can be established by "direct participation, or failure to remedy the alleged wrong after learning of it, or ... gross negligence in managing subordinates." *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). Dr. Berger concedes that she was aware both of the grievance determination and ECMC's indecision regarding Plaintiff, and as such it is arguable that Dr. Berger was in a position to "remedy the alleged wrong after learning of it." *Black,* 76 F.3d at 74.

Defendants argue that the are entitled to qualified immunity in this case because neither could objectively be said to have known that their actions, or more specifically, inactions were unlawful. This defense "shields a defendant official sued in his individual capacity from liability for civil damages." *Frank v. Relin,* 1 F.3d 1317, 1328 (2d Cir.1993), *cert denied* 510 U.S. 1012, 114 S.Ct. 604, 126 L.Ed.2d 569 (1993) (internal quotation marks omitted). The qualified immunity defense reflects the "concern that for the public benefit, public officials be able to perform their duties unflinchingly and without constant dread of retaliation." *Amore v. Novarro,* 624 F.3d 522, 530 (2d Cir.2010). Courts considering the applicability of this defense must consider "whether a reasonable person, acting under the circumstances then confronting a defendant, would have understood that the applicable law was being violated," *Vega v. Miller,* 273 F.3d 460, 466 (2d Cir.2001), and whether it was clear that an exception did not exist permitting the challenged action or inaction. *Robison v. Via,* 821 F.2d 913, 921 (2d Cir.1987); *Reynolds by Reynolds v. Strunk,* 688 F.Supp. 950, 956–957 (S.D.N.Y.1988) The applicable standard "is 'forgiving' and 'protects all but the plainly incompetent or those who knowingly violate the law.' " *Amore v. Novarro,* 624 F.3d at 530.

**\*9** As noted above, Defendants do not dispute that the Level III Grievance determination required Plaintiff to be reinstated for the purposes of remediating his unsatisfactory trauma rotations. The evidence establishes that Defendants took several steps to attempt to comply with this determination. Plaintiff was immediately restored to payroll and awarded back pay. Dr. Hassett communicated with ECMC as well as Kaleida Health about placement of Plaintiff, despite Kaleida Health's prior determination that Plaintiff had violated hospital policy. Dr. Hassett was about to place Plaintiff back at ECMC when he received an email from that facility's CEO directing him not to inform Plaintiff of the placement. This followed a history of concerns regarding Plaintiff's performance at ECMC, which related to both professionalism and patient care, as well as the violation the sexual harassment policies at Kaleida Health. (See Hassett Decl. ¶¶ 25–35; Pl's St. Undisputed Facts ¶ 29). Although he challenges the merit thereof, Plaintiff does not dispute that ECMC has consistently expressed such concerns or that Kaleida Health has determined the policy violation. (See e.g. Pl's St. Undisputed Facts ¶¶ 15, 23, 29, 32; Pl's Decl., Docket No. 85, ¶¶ 19, 23). Thus, despite Defendants failure to prove that reinstatement of Plaintiff was impossible due to the specific terms of the Affiliation Agreement, a person faced with these circumstances would have reasonably concluded that Plaintiff would not be accepted by the affiliated hospitals and any attempt to place him would be futile. *See Amore,* 624 F.3d at 530. Defendants Hassett and Berger are therefore entitled to summary judgment on Plaintiff's second cause of action as asserted against them in their individual capacities.

## C. Plaintiff's Fourth and Fifth Causes of Action for Tortious Interference

Plaintiff alleges in his Complaint that Defendants Hassett and Berger tortiously interfered with his employment agreement. Compl. ¶¶ 107–113. Defendants argue that, as a signatory to the employment agreement, Dr. Hassett was not a third party who can be held liable for tortious interference with that agreement. (Def's Mem of Law, Docket No. 82, at 22–25). Defendants further argue that there is no evidence of fraud or deceit on the part of Dr. Berger. *Id.* at 25. Plaintiff responds that Dr. Hassett's actions after the Level III Grievance decision were improper and outside the scope of his authority, and similarly that Dr. Berger's actions and inactions constituted a knowing and intentional inducement to the breach of Plaintiff's contract. (Pl's Mem of Law in Opp'n, Docket No. 94–7, at 19–23).

"Under New York law, the elements of a tortious interference claim are: (a) that a valid contract exists; (b) that a 'third party' had knowledge of the contract; (c) that the third party intentionally and improperly procured the breach of the contract; and (d) that the breach resulted in damage to the plaintiff." *Finley v. Giacobbe,* 79 F.3d 1285, 1294 (2d Cir.1996), *citing Israel v. Wood Dolson Co.,* 1 N.Y.2d 116, 120, 151 N.Y.S.2d 1, 134 N.E.2d 97 (N.Y.1956). Generally, a signatory may not be held liable for tortious interference with a contract, inasmuch as a plaintiff's cause of action against the signatory would be for the breach of the contract itself, not the inducement thereof. *Ryan v. Brooklyn Eye & Ear Hosp.,* 46 A.D.2d 87, 90, 360 N.Y.S.2d 912 (N.Y.App.Div.2d Dep't 1974) ("if one has an action for breach of contract, he should not also have a cause of action for inducement to breach against the same defendant"); *see Shea v. Hambro Am.,* 200 A.D.2d 371, 372, 606 N.Y.S.2d 198 (1st Dep't 1994). Plaintiff argues that Dr. Hassett signed the employment agreement as an agent of UB and/or UMRS. An agent or employee of a contracting party may be held liable for tortious interference with an existent contract where it is established that the agent acted outside the scope of his or her authority. *Finley,* 79 F.3d at 1295; *Kosson v. Algaze,* 203 A.D.2d 112, 113, 610 N.Y.S.2d 227 (N.Y.App.Div. 1st Dep't 1994), *affd* 84 N.Y.2d 1019, 622 N.Y.S.2d 674, 646 N.E.2d 1101 (N.Y.1995). Actions deemed to be outside the scope of authority include those that are committed independently for personal pecuniary gain, *Cohen v. Davis,* 926 F.Supp. 399, 405 (S.D.N.Y.1996); *BIBConstr. Co. Inc. v. City of Poughkeepsie,* 204 A.D.2d 947, 612 N.Y.S.2d 283 (N.Y.App.Div.3d Dep't 1994); *Bank of New York v. Berisford Int'l,* 190 A.D.2d 622, 622, 594 N.Y.S.2d 152 (N.Y.App.Div. 1st Dep't 1993) or are derived solely from malice. *Lerman v. Me. Assocs. of Woodhull, P.C.,* 160 A.D.2d 838, 839, 554 N.Y.S.2d 272 (N.Y.App.Div.2d Dep't 1990); *Bonanni v. Straight Arrow Publishers, Inc.,* 133 A.D.2d 585, 586–587, 520 N.Y.S.2d 7 (N.Y.App.Div. 1st Dep't 1987). In other words, there must be evidence from which the trier of fact can infer that a defendant "used fraud, misrepresentation, deceit or other tortious means, or that he acted purely from malice." *Bonanni,* 133 A.D.2d at 586–587, 520 N.Y.S.2d 7.

**\*10** Here, Dr. Hassett was at all relevant times the Residency Program Director for UB's Department of Surgery Residency Program. (Hassett Decl. ¶ 1). Pursuant to Plaintiff's employment contract, the Program Director has the power to terminate Plaintiff's employment, (Compl.Ex. A), and by all evidence in the record, has the authority to oversee Plaintiff's placement in an affiliated hospital for the relevant

training rotations. Plaintiff has not pointed to any action by Dr. Hassett in connection with the non-renewal of the employment agreement which would fall outside the scope of that authority or any evidence that would support an inference that Dr. Hassett acted solely out of malice. As previously noted, there is significant evidence in this record regarding the concerns expressed and discussed with Plaintiff regarding his professionalism and clinical skills that, although it does not excuse UMSR's failure to abide by the Level III grievance determination, nonetheless belies an argument that Dr. Hassett acted arbitrarily or with malice. Similarly, there is no evidence to support Plaintiff's assertion that Dr. Hassett's communications with ECMC and Kaleida Health were anything but a regular part of his duties as Program Director. (See Pl's Mem of Law in Opp'n, Docket No. 94–7, at 21). In the absence of evidence that Dr. Hassett did not act in good faith and instead committed independent torts or predatory acts, *BIB Const. Co. Inc.,* 204 A.D.2d at 948, 612 N.Y.S.2d 283, Plaintiff's remedy lies in his breach of contract cause of action. *see Shea,* 200 A.D.2d at 372, 606 N.Y.S.2d 198; *Ryan,* 46 A.D.2d at 90, 360 N.Y.S.2d 912.

The same conclusion must be reached with respect to Defendant Berger. Plaintiff alleges that Dr. Berger failed to direct Dr. Hassett to fully reinstate Plaintiff. Pl's Mem of Law in Opp'n at 22–23. Implicit in this argument is that Dr. Berger had the authority to do so, therefore that action or inaction would fall within the scope of her authority as the Senior Associate Dean for Graduate Medical Education at UB. Plaintiff points to no evidence from which it can be inferred that Dr. Berger intentionally and maliciously prevented Plaintiff's reinstatement, such that she could be found liable for tortious interference.

Plaintiff further claims that these Defendants tortiously interfered with his prospective economic relations by publishing false and misleading statements to the residency programs to which Plaintiff applied for transfer. (Compl. ¶¶ 114–120, Pl's Mem of Law in Opp'n, Docket No. 94–7, at 23–24). "[T]he tort of interfering with prospective contractual relationships has more demanding requirements for establishing liability than those required for existing contractual relationships." *Perry v. Int'l Transport Workers' Fed.,* 750 F.Supp. 1189, 1207 (S.D.N.Y.1990). Tortious interference with business relations arises in " 'those situations where the third party would have entered into or extended a contractual relationship with plaintiff but for the intentional and wrongful acts of the defendant.' " *Morrow v. MVP Health Plan, Inc.,* 307 A.D.2d 627, 628, 762 N.Y.S.2d 532 (N.Y.App.Div.3d Dep't 2003), *quoting M.J. & K. Co., Inc., v. Matthew Bender and Co., Inc.,* 220 A.D.2d 488, 490, 631 N.Y.S.2d 938 (N.Y.App.Div.2d Dep't 1995). To establish this cause of action a plaintiff has the burden of establishing that the motive for the interference was solely malicious. *M.J. & K. Co., Inc.,* 220 A.D.2d at 490, 631 N.Y.S.2d 938.

**\*11** Plaintiff argues that Dr. Hassett "falsely and maliciously claimed" that Plaintiff had been released from the residency program in letters of recommendation in support of Plaintiff's candidacy for other residency programs. (Pl's Mem of Law in Opp'n, Docket No. 94–7, at 24; Fleming Aff. Ex EE (recommendation letters)). Those recommendation letters state that Plaintiff's contract was not renewed "for a couple of reasons," including concerns regarding maturity, patient management, and clinical judgment. (Fleming Aff. Ex EE). These general statements are not only supported by the record here, but were also offset by Hasset's clear statement in those letters that he was supporting Plaintiff's candidacy for the residency programs. *Id.* Hassett also included additional paragraphs specifically detailing Plaintiff's successes such as publications and academic awards. *Id.* Moreover, even if these letters of recommendation were sufficient to raise an issue regarding malicious intent, summary judgment in Defendants' favor on this issue would still be warranted, inasmuch as Plaintiff failed "to submit evidence that there was 'a reasonable certainty' a contract would have been entered into but for the defendant's interference." *Long Island Univ. v. Grucci For Congress, Inc.,* 10 A.D.3d 412, 413, 781 N.Y.S.2d 148 (N.Y.App.Div.2d Dep't 2004), *citing Union Car Advertising Co. v. Collier,* 263 N.Y. 386, 401, 189 N.E. 463 (N.Y.1934). Accordingly, Defendants Hassett and Berger are granted summary judgment on Plaintiff's fourth and fifth causes of action against them for tortious interference.

## IV. CONCLUSION

For the forgoing reasons, the Complaint is dismissed in its entirety against Defendant Siebel due to Plaintiff's failure to timely move for substitution. Plaintiff is granted summary judgment on his second and third causes of action against UMRS and Defendants Hassett and Berger in their official capacities only, and that part of Plaintiff's motion seeking reinstatement is also granted. Defendants Hassett and Berger are granted summary judgment with respect to the second, fourth and fifth causes of action asserted against them in their individual capacities. UMRS' motion for summary judgment is denied in its entirety.

## V. ORDERS

IT IS HEREBY ORDERED that Defendant UMRS' Motion for Summary Judgment (Docket No. 76) is DENIED;

FURTHER, the Motion for Summary Judgment of Defendants Berger and Hassett (Docket No. 78) is GRANTED IN PART and DENIED IN PART;

FURTHER, Plaintiff's Motion for Partial Summary Judgment (Docket No. 83) is GRANTED IN PART and DENIED IN PART;

FURTHER, Defendants UMRS, Hassett, and Berger are directed to reinstate Plaintiff as a PGY3 resident on probation;

SO ORDERED.

**End of Document**                                      © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 2424559
Only the Westlaw citation is currently available.
United States District Court,
M.D. North Carolina.

Donald A. COVERT, Plaintiff,

v.

STRYKER CORPORATION and Howmedica
Osteonics Corporation, Defendants.

No. 1:08CV447.   |   Aug. 5, 2009.

**Synopsis**
**Background:** Patient sued, inter alia, the manufacturer of an allegedly defective artificial hip replacement device, asserting claims for failure to warn, defective manufacturing, defective design, negligence and recklessness, breach of express and implied warranties, breach of implied warranty of fitness, breach of implied warranty of merchantability and violations of North Carolina's Unfair and Deceptive Trade Practices Act (NCUDTPA). Defendants removed the action from state court, and the manufacturer moved to dismiss.

**Holdings:** The District Court, P. Trevor Sharp, United States Magistrate Judge, held that:

[1] state-law requirements of general import are subject to federal preemption under the Medical Device Amendments of 1976 (MDA) in the same way as those state-law requirements which specifically target the device in question;

[2] patient was not entitled to discovery prior to a ruling on the motion merely because the motion asserted preemption under the MDA;

[3] ordinary principles of federal preemption under the MDA applied even though the patient alleged fraud upon the Food and Drug Administration (FDA);

[4] the patient's tort claims were preempted under the MDA;

[5] patient failed to state a claim for breach of express warranty; and

[6] patient failed to state a claim under the NCUDTPA.

Motion granted.

West Headnotes (18)

**[1]    States**

 Congressional intent

When courts inquire into the scope of a statute's preemptive effect, their analysis should be guided by the rule that the purpose of Congress is the ultimate touchstone in every preemption case; Congress may indicate preemptive intent through a statute's express language or through its structure and purpose. U.S.C.A. Const. Art. 6, cl. 2.

Cases that cite this headnote

**[2]    States**

 Congressional intent

Even if a federal law contains an express preemption clause, the question of the substance and scope of Congress' displacement of state law still remains. U.S.C.A. Const. Art. 6, cl. 2.

Cases that cite this headnote

**[3]    States**

 Conflicting or conforming laws or regulations

**States**

Occupation of field

Preemptive intent may be inferred if the scope of a statute indicates that Congress intended federal law to occupy the legislative field, or if there is an actual conflict between state and federal law. U.S.C.A. Const. Art. 6, cl. 2.

Cases that cite this headnote

**[4]    States**

 State police power

When addressing questions of preemption, courts must begin their analysis with the assumption that the historic police powers of the States are not to be superseded by the federal act

unless that was the clear and manifest purpose of Congress; that assumption applies when Congress has legislated in a field traditionally occupied by the states, and thus, when the text of a preemption clause is susceptible of more than one plausible reading, courts ordinarily accept the reading that disfavors preemption. U.S.C.A. Const. Art. 6, cl. 2.

Cases that cite this headnote

**[5]**    **Products Liability**
   👉 Medical devices and appliances in general

**States**
   👉 Product safety; food and drug laws

State-law requirements of general import, which regulate a medical device only incidentally, are subject to federal preemption under the Medical Device Amendments of 1976 (MDA) in the same way as those state-law requirements which specifically target the device in question; fact that a state-law requirement, i.e., any common-law duty or positive enactment, may regulate a medical device only incidentally is too slight a distinction to merit excluding that requirement from preemption under the MDA, especially given the unusual breadth of the language Congress used in drafting the MDA. Medical Device Amendments of 1976, § 2(a), 21 U.S.C.A. § 360k(a); 21 C.F.R. § 808.1(d)(1).

7 Cases that cite this headnote

**[6]**    **Products Liability**
   👉 Medical devices and appliances in general

**States**
   👉 Product safety; food and drug laws

Where a plaintiff's claims sound in fraud, and exist solely by virtue of Federal Food, Drug, and Cosmetic Act (FDCA) disclosure requirements, those claims may not properly lie. Medical Device Amendments of 1976, § 2(a), 21 U.S.C.A. § 360k(a).

Cases that cite this headnote

**[7]**    **Products Liability**
   👉 Implants and prosthetic devices

**States**
   👉 Product safety; food and drug laws

State law tort claims relating to the labeling, safety and/or effectiveness of an allegedly defective artificial hip replacement device could escape preemption under the Medical Device Amendments of 1976 (MDA), so long as they were premised solely upon the manufacturer's non-compliance with an applicable federal requirement, but claims premised on anything other than such non-compliance were expressly preempted. Medical Device Amendments of 1976, § 2(a), 21 U.S.C.A. § 360k(a).

1 Cases that cite this headnote

**[8]**    **Products Liability**
   👉 Medical devices and appliances in general

**States**
   👉 Product safety; food and drug laws

State law tort claims based upon an alleged breach of a Food and Drug Administration (FDA) disclosure requirement, while not necessarily expressly preempted by the Medical Device Amendments of 1976 (MDA), were impliedly preempted. Medical Device Amendments of 1976, § 2(a), 21 U.S.C.A. § 360k(a).

2 Cases that cite this headnote

**[9]**    **Federal Civil Procedure**
   👉 Time of determination; reserving decision

Patient's entitlement to discovery prior to court's ruling on a defense motion to dismiss based on federal preemption under the Medical Device Amendments of 1976 (MDA) turned on whether he had sufficiently pled an entitlement to relief generally, and in particular whether his pleadings had established a reasonably founded hope that discovery would reveal relevant evidence to support his claim, despite his assertion that dismissal based on preemption was inappropriate without an examination of the complete factual record. Medical Device Amendments of 1976, § 2(a), 21 U.S.C.A. § 360k(a); Fed.Rules Civ.Proc.Rules 8, 12(b)(6), 28 U.S.C.A.

1 Cases that cite this headnote

**[10]    Products Liability**
👉 Medical devices and appliances in general

**States**
👉 Product safety;  food and drug laws

Ordinary principles of federal preemption under the Medical Device Amendments of 1976 (MDA) applied even though the plaintiff has alleged fraud upon the Food and Drug Administration (FDA). Medical Device Amendments of 1976, § 2(a), 21 U.S.C.A. § 360k(a).

1 Cases that cite this headnote

**[11]    Products Liability**
👉 Implants and prosthetic devices

**Products Liability**
👉 Proximate Cause

**States**
👉 Product safety;  food and drug laws

Patient failed to adequately plead state law tort claims against the manufacturer of an allegedly defective artificial hip replacement device as "parallel" to applicable federal requirements, and thus, the claims were preempted under the Medical Device Amendments of 1976 (MDA); while his complaint was rife with allegations of wrongdoing by the manufacturer in both the premarket approval (PMA) process and in subsequent manufacturing, he had not alleged any particular non-conclusory link between that alleged wrongdoing and his particular injuries, let alone a causal one. Medical Device Amendments of 1976, § 2(a), 21 U.S.C.A. § 360k(a).

10 Cases that cite this headnote

**[12]    Federal Civil Procedure**
👉 Insufficiency in general

Pleading rules require plaintiff, to stave off dismissal, to assert claims that cross the line from conceivable to plausible, which can only be accomplished by pleading enough facts to

state a claim to relief that is plausible on its face. Fed.Rules Civ.Proc.Rules 8, 12(b)(6), 28 U.S.C.A.

Cases that cite this headnote

**[13]    Federal Civil Procedure**
👉 Insufficiency in general

While a complaint attacked by a motion to dismiss for failure to state a claim does not need detailed factual allegations, a plaintiff's obligation to provide the ground of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Fed.Rules Civ.Proc.Rules 8(a)(2), 12(b)(6), 28 U.S.C.A.

1 Cases that cite this headnote

**[14]    Federal Civil Procedure**
👉 Insufficiency in general

To survive a motion to dismiss for failure to state a claim, complaint's factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true, even if doubtful in fact; the pleading must contain something more than a statement of facts that merely creates a suspicion of a legally cognizable right of action. Fed.Rules Civ.Proc.Rules 8(a)(2), 12(b)(6), 28 U.S.C.A.

Cases that cite this headnote

**[15]    Federal Civil Procedure**
👉 Insufficiency in general

To survive a motion to dismiss for failure to state a claim, a complaint must contain allegations plausibly suggesting, an entitlement to relief, not allegations which are merely consistent with that conclusion; where a complaint stops short of the line between the possibility and the plausibility of entitlement to relief, it must be dismissed, absent some further factual enhancement. Fed.Rules Civ.Proc.Rules 8(a)(2), 12(b)(6), 28 U.S.C.A.

Cases that cite this headnote

**[16]    Federal Civil Procedure**
👉 Insufficiency in general

To survive a motion to dismiss for failure to state a claim, plaintiff must cross two theoretical barriers: (1) he must cross the line between the conclusory and the factual, and (2) more importantly, he must cross the line between the factually neutral and the factually suggestive. Fed.Rules Civ.Proc.Rules 8(a)(2), 12(b)(6), 28 U.S.C.A.

Cases that cite this headnote

**[17]    Sales**
👉 Allegations of breach as cause of action

Patient failed to state a claim for breach of express warranty under North Carolina law against a manufacturer of an allegedly defective artificial hip replacement device where his complaint failed to identify any affirmation of fact or promise made by the manufacturer which related to the device and became part of the basis of the bargain between them. West's N.C.G.S.A. § 25–2–313.

Cases that cite this headnote

**[18]    Antitrust and Trade Regulation**
👉 Particular cases

Patient failed to state a claim under North Carolina's Unfair and Deceptive Trade Practices Act (NCUDTPA) against the manufacturer of an allegedly defective artificial hip replacement device where his complaint failed to identify any specific representations, omissions or deceptive or misleading acts that affected commerce and caused his injuries. West's N.C.G.S.A. § 75–1.1.

Cases that cite this headnote

**West Codenotes**

**Limitation Recognized**

21 C.F.R. § 808.1(d)(1)

**Attorneys and Law Firms**

Herbert Orlandah Phillips, IV, Phillips Law Office, PLLC, Asheville, NC, for Plaintiff.

Jeffrey Dean Patton, Spilman Thomas & Battle PLLC, Winston–Salem, NC, Robert M. Connolly, Stites & Harbison PLLC, Louisville, KY, for Defendants.

### ORDER AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

P. TREVOR SHARP, United States Magistrate Judge.

**\*1** This matter comes before the Court on the motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) filed by Defendant Howmedica Osteonics Corporation ("HOC" or "Defendant"). (Docket No. 8.) Plaintiff Donald A. Covert ("Plaintiff") has opposed the motion (Docket No. 13), and Defendant has filed a reply brief (Docket No. 16). For the reasons stated herein, the Court concludes that Defendant's motion should be granted.[1]

[1]    Also pending before the Court are various motions filed by both sides for leave to file certain supplemental authorities, as well as certain corresponding motions to strike. (*See generally* Docket Nos. 19, 24, 30, 32, and 39.) Having carefully considered these motions, as well as the underlying authorities, the Court **GRANTS** the motions to supplement (Docket Nos. 24, 30 and 39) and **DENIES** the motions to strike (Docket Nos. 19 and 32).

### I. FACTUAL AND PROCEDURAL BACKGROUND

The Trident Ceramic Acetabular System (the "Trident Ceramic System") is an artificial hip replacement device that is indicated for patients requiring primary total hip replacement. (Docket No. 4, Complaint ("Compl.") ¶¶ 4, 13, 14.) It consists of four basic components, including a ball and socket which is made of alumina ceramic. (*Id.* ¶¶ 14, 15.) On February 3, 2003, HOC received Premarket Approval ("PMA") for the Trident Ceramic System, a "Class III" device, from the Food and Drug Administration (the "FDA").[2] (Docket No. 9, Def.'s Mem. in Support of Mot. to Dismiss, Ex. B, PMA Letter at 1.)

2

"[T]he Court may take judicial notice of and consider the public records of the FDA ... without transforming this motion [to dismiss] into a motion for summary judgment." *Horne v. Novartis Pharms. Corp.,* 541 F.Supp.2d 768, 777 (W.D.N.C.2008).

On June 2, 2005, Plaintiff Covert had a Trident Ceramic System implanted at Alamance County Hospital in Burlington, North Carolina. (Compl.¶¶ 5, 18.) Following the surgery, Plaintiff detected "an audible sound emanating from the location" of the implant. (*Id.* ¶ 21.) As a result of the sound, Plaintiff experienced irritation, pain and discomfort. (*Id.* ¶ 22.) Plaintiff eventually had a "revision hip surgery" to remove the Trident Ceramic System and to insert a new hip replacement. (*Id.* ¶ 23.)

On or around May 22, 2008, Plaintiff filed this suit in the North Carolina Superior Court for Alamance County. (*Id.* at 36.) Plaintiff alleges eight counts, including: (1) failure to warn; (2) defective manufacturing; (3) defective design; (4) negligence and recklessness; (5) breach of express and implied warranties; (6) breach of implied warranty of fitness; (7) breach of implied warranty of merchantability; and (8) violations of North Carolina's Unfair and Deceptive Trade Practices Act (the "NCUDTPA"). (*Id.* ¶¶ 65–138.) Additionally, while the Complaint does not contain a specific cause of action for fraud-on-the-FDA, Plaintiff's briefing makes clear that he also alleges Defendant misrepresented and/or withheld facts from that agency. (Docket No. 13, Pl.'s Br. in Opp'n ("Pl.'s Br.") at 3.)

On July 1, 2008, HOC and Stryker Corporation removed the matter to this Court on the grounds of diversity jurisdiction. (Docket No. 1, Notice of Removal at 1–2.) On August 12, 2008, Plaintiff took a voluntary dismissal, pursuant to Fed.R.Civ.P. 41, as to Stryker Corporation. (Docket No. 17.) On July 9, 2008, HOC filed the motion to dismiss that is presently before the Court. (Docket No. 8.)

## II. DISCUSSION

Defendant HOC seeks dismissal of Plaintiff's complaint on the grounds that most or all of Plaintiff's claims are pre-empted by federal law and/or otherwise fail to state a claim upon which relief can be granted. Plaintiff opposes the motion on the merits. Both parties have filed briefs and other documents in support of their respective positions.

### A. *Express Federal Pre-emption*

**\*2** Article VI, Clause 2 of the Constitution provides that the laws of the United States "shall be the supreme Law of the Land; ... any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." *Altria Group, Inc. v. Good,* 555 U.S. 70, ——, 129 S.Ct. 538, 543, 172 L.Ed.2d 398 (2008). Consistent with that command, courts have long recognized that state laws that conflict with federal law are "without effect." *Id.* (citing *Maryland v. Louisiana,* 451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981)).

[1] [2] [3] When courts inquire "into the scope of a statute's pre-emptive effect," their analysis should be guided by the rule that " '[t]he purpose of Congress is the ultimate touchstone' in every pre-emption case." *Id.* (quoting *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996)). "Congress may indicate pre-emptive intent through a statute's express language or through its structure and purpose." *Id.* (citing *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977)). "If a federal law contains an express pre-emption clause, it does not immediately end the inquiry because the question of the substance and scope of Congress' displacement of state law still remains." *Id.* "Pre-emptive intent may also be inferred if the scope of the statute indicates that Congress intended federal law to occupy the legislative field, or if there is an actual conflict between state and federal law." *Id.* (citations omitted).

[4] When addressing questions of pre-emption, courts must begin their analysis "with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id.* (citing *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)). "That assumption applies ... when Congress has legislated in a field traditionally occupied by the States." *Id.* (citations omitted); *but cf. Buckman Co. v. Plaintiffs' Legal Comm.,* 531 U.S. 341, 347, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001) (Presumption does not arise where area of law being regulated is "inherently federal in character."). "Thus, when the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily 'accept the reading that disfavors pre-emption.' " *Good,* 129 S.Ct. at 543 (citing *Bates v. Dow Agrosciences LLC,* 544 U.S. 431, 449, 125 S.Ct. 1788, 161 L.Ed.2d 687 (2005)).

### B. *The Medical Device Amendments*

The Federal Food, Drug, and Cosmetic Act (the "FDCA"), 21 U.S.C. § 301 *et seq.,* has long required FDA approval for the introduction of new drugs to the market; however, until relatively recently, regulating the introduction of new medical devices was an issue left largely to the States to supervise as they deemed appropriate. *See, e.g., Riegel v. Medtronic, Inc.,* 552 U.S. 312, ——, 128 S.Ct. 999, 1002–03, 169 L.Ed.2d 892 (2008). In the 1960's and 1970's, the regulatory landscape underwent substantial changes, and certain states began adopting heightened safeguards, including provisions for premarket approval of medical devices. *Id.* at 1003. This, in turn, prompted Congress to pass the Medical Device Amendments of 1976 (the "MDA") (part of the FDCA), 21 U.S.C. § 360c *et seq.,* "which swept back some state obligations and imposed a regime of detailed federal oversight." *Id.*

**\*3** The regulatory scheme created by Congress establishes various levels of oversight for medical devices depending on the risks that they present. *Id.* Class III devices, such as the Trident Ceramic System, receive "the most federal oversight." *Id.* The MDA establishes a "rigorous regime of premarket approval for new Class III devices." *Id.* at 1004 (comparing the rigorous PMA process to the less stringent test for "substantial equivalence," which is used to bring products to market which are sufficiently similar to pre-existing products which predated the MDA and which had been grandfathered into its new regulatory regime). The PMA process includes a review of the device's proposed labeling, as well as a thorough evaluation of its safety and effectiveness. *Id.*

Congress also chose to include an express pre-emption clause in the MDA, which states in relevant part that:

[N]o State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—

(1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and

(2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

*Id.* at 1003 (citing 21 U.S.C. § 360k(a)).

In *Riegel,* the Supreme Court considered the pre-emptive effect of this language and adopted a test for determining

whether a state-law claim is expressly pre-empted by the MDA. *Id.* at 1006. *Riegel* stated that reviewing courts must first "determine whether the Federal Government [i.e., Congress or the FDA] has established requirements applicable to [the device]." *Id.* If such requirements exist, then the court must determine whether the state-law claims are based upon "requirements with respect to the device that are 'different from, or in addition to' the federal ones," and whether those state-law requirements relate to "safety and effectiveness," or any other matter included in a requirement applicable to the device under the FDCA.[3] *Id.* at 1006–07; *see also* 21 U.S.C. § 360k(a).

3    *Riegel* spent little time discussing the full breath of § 360k(a)(2), including its "relates to" language, which, as discussed below is quite broad, and its command that state-law claims "relat[ing] to ... any other matter included in a requirement applicable to the device" under the FDCA would be preempted. This is because the Court determined that "[s]afety and effectiveness are the very subjects" of Riegel's claims, and easily resolved the case on that basis. *Id.* at 1007.

The *Riegel* Court determined that the PMA process imposes "requirements" under the MDA because it is "specific to individual devices."[4] *Id.* at 1007. The Court then moved on to address the "critical issue" of whether Riegel's state common-law claims constituted "requirements," as that term is used in the MDA. *Id.* Relying upon *Bates,* 544 U.S. 431, 125 S.Ct. 1788 (state-law "requirements" include both positive enactments as well as common-law duties) and *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (same), *Riegel* determined that "[a]bsent other indication, reference to a State's requirements' includes its common-law duties." *Id.* at 1007–08. Indeed, the Court found that Riegel's suggestion that it draw a distinction between a State's common-law duties and its statutes and/or regulations to not be "required or even suggested by the broad language" of the MDA. *Id.* at 1008 ("[W]e will not turn somersaults" to create such a "perverse" distinction.).

4    As discussed *infra,* state-law "requirements" need not be specific to the device in question, whereas a federal "requirement" apparently must. *Id.* at 1010 ("Nothing in the statutory text suggests that the pre-empted state requirement must apply *only* to the relevant device....").

**\*4** In so doing, the majority rejected Justice Ginsburg's attempt in dissent to "narrow the pre-emptive scope of the term 'requirement' on the grounds that it is 'difficult

to believe that Congress would, without comment, remove [virtually] all means of judicial recourse' for consumers injured by FDA-approved devices." *Id.* at 1008–09. Indeed, the majority stated that "by its terms," that is exactly what the MDA's pre-emption clause does. [5] *Id.* at 1009.

[5]     The Court found Congress' intent to be so clear from the language that it used in the MDA pre-emption clause that it was "unnecessary to rely upon" the FDA's view of the statute. *Id.* at 1009 ("[W]e think the statute itself speaks clearly" to the meaning of the term "requirement.").

Accordingly, *Riegel* held that state common-law duties are "requirements," which in turn meant that state common-law claims based upon those duties are pre-empted by the MDA, at least to the extent that they seek to impose "different" or "additional" terms on the product in question than does federal law; however, the Court did not state that all state-law requirements are preempted. *Id.* at 1010–11 (discussing general requirements which regulate medical devices only incidentally and "parallel" claims).

## 1. State–Law Requirements Which Regulate Medical Devices Incidentally

[5]     In responding to Riegel's argument that state common-law claims are not pre-empted because they do not directly regulate the device in question, even if they may impose general "requirements," the Court was forced to examine the difference between state-law requirements that regulate directly, and those that regulate only indirectly. *Id.* at 1009–11. Ultimately, the Court found that "[n]othing in the statutory text suggests that the pre-empted state requirement must apply *only* to the relevant device, or only to medical devices and not to all products and all actions in general." *Id.* at 1010. However, before so deciding, the Court considered Riegel's arguments to the contrary, the *amicus curiae* brief of the FDA and certain specified FDA regulations.

Riegel's argument that the MDA only pre-empted state-law requirements which directly regulated the device in question "rest[ed] on the text" of 21 C.F.R. § 808.1(d)(1), "an FDA regulation which states that the MDA's pre-emption clause does not extend to certain duties, including '[s]tate or local requirements of general applicability where the purpose of the requirement relates either to other products in addition to devices (e.g., requirements such as general electrical codes, and the Uniform Commercial Code (warranty of fitness)), or to unfair trade practices in which the requirements are not limited to devices.' " *Id.* at 1010. The Court assumed,

*arguendo,* that "this regulation could play a role in defining the MDA's pre-emptive scope," yet nonetheless found that it could not save Riegel's claims from preemption. *Id. Inter alia,* one reason the Court gave for rejecting Riegel's claim was that, in the FDA's view, the regulation did not extend to "general tort duties of care." *Id.*

Having already found the support that it needed in both the plain text of the actual preemption statute and in the FDA's *amicus curiae* brief, the Court went on to criticize the purported "reasoning" underlying 21 C.F.R. § 808.1(d)(1). In its *amicus* brief, the FDA attempted to draw a distinction between tort duties of care, which it maintained should be pre-empted, and other general state-law requirements, which it maintained should be "exclude[d] from pre-emption" on the grounds that they "relate only incidentally to medical devices." *Id.* The Court found this distinction "*less than compelling,* since the same could be said of general requirements imposed by electrical codes, the Uniform Commercial Code, or unfair-trade-practice law, which the regulation specifically excludes from pre-emption." *Id.* (emphasis added).

**\*5** In the end, the Court determined that claims based on general tort duties of care should be pre-empted based not only on the clear language of the statute, but also on another regulation, 21 C.F.R. § 808.1(b), which "states that the MDA sets forth a 'general rule' pre-empting state duties 'having the force and effect of law (whether established by statute, ordinance, regulation, *or court decision* ).' " *Id.* Indeed, the Court resolved that § 808.1(d)(1) "add[ed] nothing ... but confusion" to the analysis; however, it did not explicitly strike the regulation down. *Id.* at 1011 ("Neither accepting nor rejecting the proposition that [§ 808.1(d)(1) ] c[ould] properly be consulted to determine the [pre-emption] statute's meaning," the *Riegel* Court found that the regulation "fail[ed] to alter [its] interpretation" of the pre-emption statute in that instance.).

Post-*Riegel,* the great majority of courts addressing state-law requirements which regulate medical devices only incidentally have found that *Riegel* requires pre-emption. *See, e.g., In re Medtronic, Inc. Sprint Fidelis Leads Prods. Liab. Litig.,* 592 F.Supp.2d 1147, 1161 (D.Minn.2009) ("In the [ ] months following *Riegel,* courts across the country have applied Section 360k(a) broadly, preempting all manner of claims ....") (finding breach of express and implied warranty claims, fraud claims and claims for deceptive trade practices pre-empted); *see also Heisner v. Genzyme Corp.,* No. 08–

C–593, 2009 WL 1210633 (N.D.Ill. Apr. 30, 2009) (breach of express warranty claim pre-empted); *Horowitz v. Stryker Corp.,* 613 F.Supp.2d 271 (E.D.N.Y.2009) (breach of warranty, implied warranty of fitness and implied warranty of merchantability claims, as well as state-law claim for deceptive trade practices pre-empted); *Parker v. Stryker Corp.,* 584 F.Supp.2d 1298 (D.Colo.2008) (breach of express warranty, implied warranty of fitness and implied warranty of merchantability claims pre-empted); *Adkins v. Cytyc Corp.,* No. 4:07CV00053, 2008 WL 2680474 (W.D.Va. July 3, 2008) (express and implied warranty claims pre-empted); *but cf. Hofts v. Howmedica Osteonics Corp.,* 597 F.Supp.2d 830 (S.D.Ind.2009) (no pre-emption found, despite *Riegel's* overt criticism of *§ 808.1(d)(1)).*

The Court believes that the position taken by these courts is bolstered by the central holding of *Riegel* itself. *See* 128 S.Ct. at 1006, 1011 (affirming dismissal of strict liability, negligence and breach of implied warranty claims on express pre-emption grounds). Indeed, despite the fact that *Riegel* declined to explicitly strike down 21 C.F.R. § 808.1(d)(1) *in toto,* it is apparent that the Court did, at the very least, significantly limit the effect of that regulation. *See id.* at 1011 (Rejecting the idea that "§ 808.1(d)(1) ... [c]ould allow a claim ... to escape pre-emption so long as such a claim could also be brought against objects other than medical devices."); *see also Horowitz,* 613 F.Supp.2d at 285 n. 6 (Discussing *Riegel's* treatment of § 808.1(d)(1) and resolving that the Supreme Court found the regulation inapplicable because it "would effectively swallow the preemption rule."). In point of fact, *Riegel* affirmed the lower court's finding that an implied breach of warranty claim, which was ostensibly based on a state-law requirement of general import, was pre-empted. 128 S.Ct. at 1006, 1011. [6]

[6]    This fact was somehow discounted by the *Hofts* court, which relied on § 808.1(d)(1) to justify denying dismissal of a breach of implied warranty claims. 597 F.Supp.2d at 839–40.

**\*6** While the Supreme Court has not definitively articulated the effect of § 808.1(d)(1) since limiting it in *Riegel,* it would seem that the Court's most recent elucidation on the pre-emptive effect of the MDA further erodes that regulation's potential applicability. Indeed, since *Riegel,* the Supreme Court has had at least one occasion to reflect on the MDA's pre-emption clause and its scope, which is, to say the least, broad.

In *Altria Group, Inc. v. Good,* discussed *supra,* the Court examined whether claims brought under the Maine Unfair Trade Practices Act (the "MUTPA") were pre-empted by the Federal Cigarette Labeling and Advertising Act (the "FCLAA"). 129 S.Ct. 538. The Court ultimately concluded that the MUTPA represented a state-law "requirement," *see id.* at 545 (the FCLAA pre-empts "common-law rules as well as positive enactments"), however, it determined that said "requirement" was not pre-empted because it was based on a general duty not to deceive, and not "based on smoking and health." *Id.* at 547.

In resolving that said claims were not pre-empted by the FCLAA, the Court was called upon to distinguish that Act's pre-emption statute from the pre-emption statutes found in the MDA and the Airline Deregulation Act (the "ADA"), respectively. *Id.* at 547–49. In so doing, the Court held that the language of both the MDA and the ADA was "much broader" than that of the FCLAA. *Id.* at 548. Indeed, the Court found that the "relating to" language Congress used in the MDA and the ADA was significantly more encompassing than the operative language of the FCLAA pre-emption statute, which pre-empted only state-law claims "based on smoking and health." *Id.* at 549.

Writing for the Court, Justice Stevens stated that the phrase "relating to" is "*unquestionably* " broader than the phrase "based on," because the former is "synonymous with 'having a connection with,' " whereas the latter "describes a more direct relationship." *Id.* at 548 (emphasis added). The Court stated that pre-emption statutes (like the MDA), which use "relating to" language have "unusual breadth [and scope]." *Id.* (discussing *Am. Airlines, Inc. v. Wolens,* 513 U.S. 219, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995)). The Court went on to liken the scope of the ADA's pre-emption clause (and by proxy the MDA's pre-emption clause, which uses the same language) to the scope of the pre-emption clause found in the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1144(a) ("ERISA"), and stated that where Congress utilizes the phrase "relating to," it is indicating its "intent to pre-empt a large area of state law." *Id.* (citing *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 383–84, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992)).

Having distinguished the FCLAA's pre-emption clause from that of the ADA and MDA, the Court stated that the "based on smoking and health" language of the FCLAA, did not encompass the plaintiff's MUTPA claims, which it had previously found to be a "requirement." *Id.* at 549. Implicit

in this finding is the fact that the "unusual breath" of both the ADA and/or MDA would likely encompass those same MUTPA claims. *Accord Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 8, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987) (the words "relate to" should be "construed expansively: '[a] law relates to [a federal requirement], in the normal sense of the phrase, if it has a connection with or reference to such [federal requirement].' ") (quoting *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 96–97, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983)).

**\*7** In any event, based on the above authorities, this Court joins *Horowitz* and *Parker* (both of which dealt with the Trident Ceramic System) in finding that state-law requirements of general import, which regulate a medical device only incidentally, are subject to federal pre-emption in the same way as those state-law requirements which specifically target the device in question. *Accord Riegel,* 128 S.Ct. at 1010 ("Nothing in the statutory text [of § 360k(a) ] suggests that the pre-empted state requirements must apply *only* to the relevant device, or only to medical devices and not to all other products and all actions in general.").

To be clear, this Court considers the fact that a state-law "requirement" (i.e., any common-law duty or positive enactment) may regulate a medical device only incidentally to be too slight a distinction to merit excluding that requirement from pre-emption under the MDA, especially given the "unusual breath" of the language Congress used in drafting the MDA, which is to be interpreted "expansively." Accordingly, all of Plaintiff's state-law claims are subject to pre-emption to the extent they "relate to" (i.e., "have a connection with" or "reference to") the labeling, safety or effectiveness of the Trident Ceramic System, as those issues were the subject of the FDA's PMA process, provided, of course, that those state-law claims are not "parallel," as discussed below.

### 2. "Parallel" Claims

In *Riegel,* the Court noted an exception to express pre-emption under § 360k(a) for "parallel" claims. 128 S.Ct. at 1011. This is because "State requirements are [expressly] pre-empted under the MDA only to the extent that they are 'different from, or in addition to' the requirements imposed by federal law." *Id.* (citing 21 U.S.C. § 360k(a)). The Court stated that the MDA "does not [expressly] prevent a State from providing a damages remedy for claims premised on a violation of FDA regulations," because in such an instance, the state law duties would "parallel" rather than "add to" the relevant federal requirements. *Id.* (citing *Lohr,*

518 U.S. at 495, 513, 116 S.Ct. 2240). Put another way, *Riegel* supports the proposition that where a claim asserts that a medical device "violated state [ ] law notwithstanding compliance with the relevant federal requirements," that claim is not "parallel," and therefore may be subject to express pre-emption under § 360k(a). *Riegel,* 128 S.Ct. at 1011 (discussing the district court's rationale for finding pre-emption under the MDA). [7]

[7]    The Court notes that *Riegel* did not provide an exhaustive discussion of "parallel" claims under the MDA because the plaintiff in that case failed to adequately preserve the issue on appeal. 128 S.Ct. at 1011. Notwithstanding this fact, the Court believes that the above-cited passages represent an accurate, if not technically binding, statement of the law on this issue. In point of fact, the Supreme Court recently examined the issue of "parallel requirements," albeit in the context of a different, yet similarly constructed statute, and reached largely consistent results. *See, e.g., Bates,* 544 U.S. 431, 125 S.Ct. 1788. In *Bates,* the Court addressed the pre-emptive power of the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), which contains an express pre-emption clause, 7 U.S.C. § 136v(b), not unlike that of the MDA. *See* 544 U.S. at 447–48, 125 S.Ct. 1788 (FIFRA pre-empts certain state-law "requirements" that are "in addition to or different from" the relevant federal ones). *Id.* at 447, 125 S.Ct. 1788. Specifically, the Court found that a state-law action which "seeks to enforce a federal requirement does not impose a requirement that is different from or in addition to, requirements under federal law." *Id.* at 448, 125 S.Ct. 1788 (citations omitted). Further, *Bates* stated that "[i]n undertaking a pre-emption analysis at the pleadings stage of a case, a court should bear in mind the concept of equivalence." *Id.* at 454, 125 S.Ct. 1788. In order to "survive pre-emption," the Court stated, a state-law requirement need be "genuinely equivalent" to the relevant federal requirement. *Id.* Moreover, since the Supreme Court's decision in *Bates,* at least one circuit court has applied this requirement of "genuine" equivalency to the MDA's pre-emption clause. *See, e.g., McMullen v. Medtronic, Inc.,* 421 F.3d 482, 488–89 (7th Cir.2005) ("[T]he plaintiff must show that the requirements are "*genuinely* equivalent.' ") ("State and federal requirements are not genuinely equivalent if a manufacturer could be held liable under the state law without having violated the federal law."). In any event, the Court believes *Riegel* controls this situation and will apply it in resolving the present controversy.

**[6]** However, while *Riegel* confirmed that, in accordance with § 360k(a), "*certain* state-law causes of action[ ]" can be brought which "parallel federal *safety* requirements," it is not the case that just "any violation of the FDCA [including the MDA] will support a [parallel] state-law claim." *See, e.g., Buckman,* 531 U.S. at 353, 121 S.Ct. 1012 (pre-empting state-law tort claims which alleged that a plaintiff was injured by a manufacturer's fraud on the FDA) (emphasis added). Indeed, where a plaintiff's claims sound in fraud, and "exist solely by virtue of the FDCA disclosure requirements," those claims may not properly lie. *Id.* at 347–48, 352–53, 121 S.Ct. 1012 (Where a manufacturer's "dealings with the FDA were prompted by the MDA, and the very subject matter of [that manufacturer's] statements were dictated by [its] provisions," a consumer may not sue that manufacturer for those misrepresentations or omissions, either under the MDA or state law, because the FDA is "amply" empowered to "punish and deter fraud" and because to allow such suits could "skew" the "delicate balance of statutory objectives" the FDA is charged with carrying out.).

**\*8** The Supreme Court's decision to completely pre-empt fraud-based claims on the one hand, while still giving plaintiffs the option to bring "certain" state-law claims which "parallel federal safety [and labeling] requirements" on the other, highlights the difference between the principles of express and implied pre-emption. *Cf. Geier v. Am. Honda Motor Co.,* 529 U.S. 861, 869, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000) (An express "pre-emption provision, by itself, does not foreclose (through negative implication) 'any possibility of implied [conflict] pre-emption' ") (citing *Freightliner Corp. v. Myrick,* 514 U.S. 280, 288, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995) (discussing *Cipollone,* 505 U.S. at 517–18, 112 S.Ct. 2608)).

*Riegel* relied on a different analytical framework to determine whether federal pre-emption was appropriate than did *Buckman.* Indeed, the analysis of the former is rooted in principles of express pre-emption, *see Riegel,* 128 S.Ct. at 1003 (looking to § 360k(a)(1) to determine that "parallel" state claims may survive pre-emption), whereas the latter looked to the "inherently federal" nature of the "relationship between a federal agency and the entity it regulates" to determine that fraud-based state-law claims should be impliedly pre-empted, *see Buckman,* 531 U.S. at 347–48, 352, 121 S.Ct. 1012 (fraud-on-the-FDA claims "impliedly" pre-empted) (no presumption against pre-emption arose as this is not a traditional area of state regulation).

**[7]  [8]** Accordingly, the Court finds that certain of Plaintiff's claims "relating to" the labeling, safety and/or effectiveness of the Trident Ceramic System may escape pre-emption under 21 U.S.C. § 360k(a), so long as they are premised solely upon HOC's non-compliance with an applicable federal "requirement," whereas such claims that are premised on anything other than said non-compliance are expressly pre-empted. Moreover, the Court finds that any claims which are based upon an alleged breach of an FDA disclosure requirement, while not necessarily expressly pre-empted, are impliedly pre-empted by federal law.

With this framework in mind, the Court must consider whether Plaintiff has sufficiently pled any claims which survive both express pre-emption under § 360k(a) and implied pre-emption under *Buckman,* and which state a cause of action upon which relief can be granted. *Accord Stevens v. Pacesetter, Inc.,* No. 3:07–cv–3812, 2008 WL 2637417, at \*1 (D.S.C. Apr. 1, 2008) (only a "narrow category" of claims survive *Riegel* ); *cf. In re Medtronic,* 592 F.Supp.2d at 1161 (In light of *Buckman* and *Riegel,* "nearly all types of claims concerning FDA-approved medical devices are preempted."). The Court concludes that under the complaint in this action, Plaintiff has not adequately pled any such claim.

### C. Motion to Dismiss Pursuant to Rule 12(b)(6)

A Rule 12(b)(6) motion tests the legal sufficiency of the complaint. *See, e.g., Randall v. United States,* 30 F.3d 518, 522 (4th Cir.1994). To survive such a motion, "the facts alleged 'must be enough to raise a right to relief above the speculative level' and must provide 'enough facts to state a claim to relief that is plausible on its face.' " *Robinson v. Am. Honda Motor Co.,* 551 F.3d 218, 222 (4th Cir.2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Courts must "construe factual allegations in the non-moving party's favor and will treat them as true, but the court is not bound by the complaint's legal conclusions." *Id.* (citations omitted).

**\*9** Here, Plaintiff has offered five reasons why HOC's motion to dismiss should be denied, namely that: (1) the motion is premature; (2) HOC has failed to prove that pre-emption applies; (3) a pre-emption defense cannot be founded upon fraud; (4) Plaintiff's tort claims are "parallel" claims; and (5) Plaintiff's remaining claims are outside the purview of pre-emption (Pl.'s Br. at 5–17). For the reasons stated herein, the Court finds Plaintiff's arguments unpersuasive.

**1. The Timing of HOC's Motion to Dismiss**

**[9]**    Without citing any pertinent authority, Plaintiff argues that "[d]ismissal based on alleged preemption is inappropriate without an examination of the complete factual record." (*Id.* at 7.) He states that his complaint is "replete with allegations" of HOC's violations of "pivotal federal regulations," which ostensibly relate to the alleged "parallel" nature of certain claims. (*Id.* at 6.) Indeed, he states that dismissing his case "without first allowing [it] to proceed through discovery in order to determine if there is in fact sufficient evidence" to support his claim that "Defendant has violated [federal law] is unjust at best." (*Id.* at 7.)

This argument seems to be premised on the fact that *Riegel* and a few other MDA pre-emption cases were decided on motions for summary judgment, rather than motions to dismiss. (*See id.* ("Most, if not all" MDA pre-emption cases are decided on summary judgment.) (citing *Goodlin v. Medtronic, Inc.,* 167 F.3d 1367 (11th Cir.1999); *In re Vioxx Prods. Liab. Litig.,* 501 F.Supp.2d 776 (E.D.La.2007); *In re Medtronic, Inc., Implantable Defibrillators Litig.,* 465 F.Supp.2d 886 (D.Minn.2006); *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.,* No. 05–1708 (DWF/AJB), 2007 WL 844683 (D.Minn. Mar. 19, 2007)).)

However, the Court notes that Plaintiff has failed to cite any authority which would indicate that it should apply any standard other than the normal "motion to dismiss" standard in resolving the present motion. Plaintiff has failed to show that a motion to dismiss based on MDA pre-emption should be treated any differently than any other motion to dismiss under Rule 12(b)(6). As such, the Court must look to well-established precedent to determine if Plaintiff's claim of entitlement to discovery has merit. [8]

[8]    Post-*Riegel,* more than a few courts have decided MDA pre-emption issues at the pleadings stage, rather than on summary judgment. *Accord In re Medtronic,* 592 F.Supp.2d 1147 (granting motion to dismiss); *Heisner,* 2009 WL 1210633 (same); *Horowitz,* 613 F.Supp.2d 271 (same); *Bausch v. Stryker Corp.,* No. 08 C 4248, 2008 WL 5157940 (N.D.Ill. Dec. 9, 2008) (same); *Parker,* 584 F.Supp.2d 1298 (same); *Adkins,* 2008 WL 2680474 (same); *Stevens,* 2008 WL 2637417 (same); *cf. Lohr,* 518 U.S. at 495, 116 S.Ct. 2240 ("[T]he pre-emption issue was decided on the basis of the pleadings.").

In *Bell Atlantic Corp. v. Twombly,* the Supreme Court examined "the practical significance" of what it called "the Rule 8 entitlement requirement." 550 U.S. 544, 557, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (discussing Fed.R.Civ.P. 8). The Court stated that "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court." *Id.* at 558, 127 S.Ct. 1955 (internal quotation marks, punctuation and citations omitted); *see also Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 346, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005); *Asahi Glass Co. v. Pentech Pharms., Inc.,* 289 F.Supp.2d 986, 995 (N.D.Ill.2003) (Posner, J., sitting by designation) ("[S]ome threshold of plausibility must be crossed ... before a ... case should be permitted to go into its inevitably costly and protracted discovery phase.") (cited favorably in *Twombly,* 550 U.S. at 558, 127 S.Ct. 1955).

**\*10**    Indeed, the *Twombly* Court explained that "something beyond the mere possibility of [a federal violation] must be alleged, lest a plaintiff with a largely groundless claim be allowed to take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value." 550 U.S. at 557–58, 127 S.Ct. 1955 (citing *Dura,* 544 U.S. at 347, 125 S.Ct. 1627) (internal quotation marks and punctuation omitted). In that vein, the Court stated that "a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed [to discovery]." *Id.*

"[I]t is only by taking care to require allegations that reach the [requisite] level [of specificity]," the Court reasoned, "that we can hope to avoid the potentially enormous expense of discovery in cases with no reasonably founded hope that the discovery process will reveal relevant evidence to support [the alleged] claim." *Id.* at 559, 127 S.Ct. 1955 (citing *Dura,* 544 U.S. at 347, 125 S.Ct. 1627) (internal quotation marks and brackets omitted). Gone are the days when a plaintiff could assert "a wholly conclusory statement of claim" and survive a motion to dismiss simply because his "pleadings left open the possibility that [he] might later establish some set of undisclosed facts to support recovery." *Id.* at 561–62, 127 S.Ct. 1955 (abrogating the "no set of facts" standard set forth in *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)) ("[A]fter puzzling the profession for 50 years, this famous observation has earned its retirement.") (internal quotation marks and punctuation omitted).

As the *Twombly* Court implied, "Mr. Micawber's optimism" is not enough to allow a plaintiff to survive a motion to

dismiss and proceed on to discovery. *Id.* at 562, 127 S.Ct. 1955. Thus, the Court concludes that Plaintiff's entitlement to discovery, or lack thereof, will turn on whether he has sufficiently pled an entitlement to relief under Rule 8 generally, and in particular whether his pleadings have established a "reasonably founded hope" that discovery "will reveal relevant evidence" to support that claim. *Accord Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1953–54, 173 L.Ed.2d 868 (2009) (*Twombly,* which applies to "*all civil actions,*" dictates that where a plaintiff's "complaint is deficient under Rule 8, he is not entitled to discovery, cabined or otherwise.") (emphasis added).

**2. The Burden to "Prove" Pre-emption**
Next, Plaintiff argues that Defendant has failed to establish pre-emption under the circumstances of this case, and that a "strong presumption" against pre-emption saves his claims from dismissal. (Pl.'s Br. at 8.) Relying on *Bravman v. Baxter Healthcare Corp.,* Plaintiff argues that HOC "bears the burden of proof and must establish that Congress has clearly and unmistakably manifested its intent to supersede state law." *Id.* (citing 842 F.Supp. 747, 753 (S.D.N.Y.1994)).

As discussed *supra,* it is apparent that Congress did "clearly and unmistakably" manifest an intent to supersede a large area of state law, including, but not necessarily limited to, any common law duty or positive enactment which "relates to" the labeling, safety and/or effectiveness of the Trident Ceramic System. Indeed, the only recognized exception to express MDA pre-emption that this Court is aware of relates to "parallel" claims; however, as discussed below, Plaintiff's complaint does not sufficiently plead any "parallel" claims. Moreover, even if certain of Plaintiff's claims were not expressly pre-empted, Plaintiff would have the additional hurdle of the doctrine of implied pre-emption, which would act to bar any claims based on an alleged violation of a disclosure duty established under the MDA. In any event, assuming, *arguendo,* that Plaintiff is correct in asserting that HOC bears the burden of establishing pre-emption, the Court finds that HOC has adequately carried that burden.

**3. Fraud and Pre-emption**
  **\*11**  [10]   Plaintiff's third argument against dismissal is that HOC should not receive the benefit of a federal pre-emption defense because Plaintiff has alleged that HOC engaged in certain "fraudulent violation[s] of key regulations of the [FDA]." (Pl.'s Br. at 10.) However, Plaintiff does not cite a single authority to support his position. His postulate appears to be that: (1) HOC has cited a number of cases which counsel in favor of finding federal pre-emption; (2) none of the plaintiffs in those cases alleged that the defendant committed a fraud on the overseeing agency; and (3) here, Plaintiff has alleged such a fraud. Thus, he reasons that pre-emption cannot be applied in this case. In addition to being wholly conclusory and unsupported, the argument evidences a misunderstanding of *Buckman* and federal preemption generally. *Accord In re Medtronic,* 592 F.Supp.2d 1147 (pre-empting a host of claims, despite alleged fraud and/or deceptive acts); *cf. Horowitz,* 613 F.Supp.2d 271 (same).

As stated above, *Buckman* makes clear that state-law claims based on a manufacturer's alleged breach of federal disclosure rules are impliedly pre-empted due to the "inherently federal character" of the relationship between the FDA and said manufacturer. 531 U.S. at 347–48, 121 S.Ct. 1012 ("Policing fraud against federal agencies is hardly a 'field which the States have traditionally occupied.' ") (citation omitted). Indeed, Congress adopted a "federal statutory scheme" that "amply empowers the FDA to punish and deter fraud" and this authority is used to achieve a "delicate balance" of statutory objectives, which can be "skewed" by allowing "fraud-on-the-FDA" claims under state law. *Id.* at 348–49, 121 S.Ct. 1012 (The FDA has "a variety of enforcement options ... to make a measured response to suspected fraud.").

It is this statutory scheme that gives the FDA the "flexibility" to "pursue [ ] difficult (and often competing) objectives" "without intruding upon decisions statutorily committed to the discretion of health care professionals." *Id.* at 349–50, 121 S.Ct. 1012. Further, the Supreme Court clearly stated some years ago that, in addition to being unduly burdensome on manufacturers and the FDA itself, allowing "State-law fraud-on-the-FDA claims" would "inevitably conflict with the FDA's responsibility to police fraud consistently with the Administration's judgment and objectives." *Id.* at 350–51, 121 S.Ct. 1012. Thus, the Court reasoned, because of the "extraneous pull" this "sort of litigation" would have on the scheme established by Congress, cases sounding in fraud-on-the-FDA are impliedly pre-empted. *Id.* at 353, 121 S.Ct. 1012. Plaintiff has failed to distinguish Buckman in any meaningful way, or to cite to any other authority which would indicate that the Court should not apply ordinary principles of federal pre-emption due to the simple fact that Plaintiff has alleged a fraud upon a federal agency.

**4. The "Parallel" Nature of Plaintiff's Claims**

**\*12** **[11]** In opposing HOC's motion to dismiss, Plaintiff also argues that his "tort" claims are "parallel" to the applicable federal requirements, and thus not pre-empted. (Pl.'s Br. at 12–16.) Indeed, Plaintiff states that HOC's failure to meet certain specific federal requirements, which were applicable to the Trident Ceramic System, as well as HOC's statements and omissions to the FDA, "directly and proximately" caused said system to be in violation of federal law, and proximately caused harm and injury to him. (*Id.* at 15.)

In support of this position, Plaintiff cites to, *inter alia,* two warning letters issued by the FDA to HOC, arising from inspections of its facilities in Ireland and New Jersey. (*Id.* at 13–15.) In particular, Plaintiff alleges that these inspections, which took place in 2006 and 2007 respectively, revealed violations of the FDA's Current Good Manufacturing Practices. (*Id.*) However, Plaintiff does not allege that the Trident Ceramic System, which was implanted in him in 2005, was manufactured in either facility, or that it was ever the subject of any FDA action or recall, or that it has ever been found by the FDA to be in violation of any particular regulation, or even that there is an independent reason to believe that *his particular system* violated a federal regulation in any way.

This Court is not the first to weigh in on the general facts presented in this case, or the legal questions they raise. Indeed, no less than four other federal courts have heard motions to dismiss litigation related to the Trident Ceramic System, and have evaluated virtually identical factual allegations as those levied by Plaintiff in the case at bar. *See, e.g., Horowitz,* 613 F.Supp.2d 271 (finding claims pre-empted); *Bausch,* 2008 WL 5157940 (same); *Parker,* 584 F.Supp.2d 1298 (same); *but cf. Hofts,* 597 F.Supp.2d 830 (claims not pre-empted based on pleadings). Accordingly, this Court is in the fortuitous position of being able to glean what lessons it can from the collective experiences of these courts, while at the same time, not being bound by any of their decisions. *See, e.g., Hanes Cos., Inc. v. Contractor's Source, Inc.,* No. 1:08CV334, 2008 WL 4533989, at \*13 n. 16 (M.D.N.C. Oct. 6, 2008) (citing *McCoy Lumber Indus., Inc. v. Niedermeyer–Martin Co.,* 356 F.Supp. 1221, 1225 (M.D.N.C.1973)).

In *Horowitz,* U.S. District Judge Trager of the Eastern District of New York became one of the most recent jurists to be heard on the issue of what constitutes a "parallel" claim under the MDA. 613 F.Supp.2d at 280–83. Relying in part on

*Bausch* and *Parker,* both of which had considered virtually identical facts, he found that "in order to survive preemption under the MDA a plaintiff must demonstrate a cognizable link between the defendant's [alleged] federal violations and plaintiff's [alleged] injury." *Id.* at 282; *accord Parker,* 584 F.Supp.2d at 1301–02 (plaintiff's complaint was deficient in that it failed to provide any factual detail substantiating her claim that the Trident system was defective as a direct result of defendants having manufactured it in violation of the PMA process); *cf. Bausch,* 2008 WL 5157940, at \*4 (simply alleging that the defendants violated federal regulations did not necessarily mean that the plaintiff's claims were premised on those violations).

**\*13** In finding the plaintiff's claims to be pre-empted, Judge Trager stated in *Horowitz* that a reviewing court should require factual "amplification as to how" a defendant's alleged federal violations relate to the putative plaintiff's claims. 613 F.Supp.2d at 283 n. 5 (discussing the Rule 8 pleading standard enunciated in *Twombly* ). In so doing, the court considered and expressly rejected the analysis utilized in *Hofts,* which considered the same facts and came to an opposite conclusion.

In *Hofts,* the court reasoned that a plaintiff's allegations that a manufacturer failed to meet FDA requirements were sufficient, in and of themselves, to withstand pre-emption on a motion to dismiss. 597 F.Supp.2d at 838 (It is an "unusually stringent application of *Twombly* " to require further specificity at the pleadings stage.). Indeed, the *Hofts* court reasoned that because claims relating to defective medical devices generally are not subject to the "particularity" pleading requirements of Rule 9, dismissal would be inappropriate. *Id.*

**[12]** In this Court's view, *Twombly* requires more from a plaintiff pleading a case such as that attempted by Plaintiff Covert than the *Hofts* court would demand. Rather, the *Horowitz, Bausch,* and *Parker* courts are found to be more persuasive with regard to the pleading standards of *Twombly* (which were recently confirmed by the Supreme Court in *Iqbal* ). *Twombly* abrogated the "no set of facts" standard set forth in *Conley* for construing Rule 8, and heralded a new standard for resolving motions to dismiss, which was based on the "plausibility" of a plaintiff's claims. 550 U.S. at 560–63, 127 S.Ct. 1955. Now, a plaintiff must "nudge[ ][his] claims across the line from conceivable to plausible," in order to stave off dismissal, which feat can only be accomplished by pleading "enough facts to state a claim to relief that is

plausible *on its face.*" *Id.* at 570, 127 S.Ct. 1955 (emphasis added).

**[13]** **[14]** As a starting point for analysis, it is essential to note that *Rule 8(a)(2)* "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is *and the grounds upon which it rests.*' " *Id.* at 555, 127 S.Ct. 1955 (citing *Conley,* 355 U.S. at 47, 78 S.Ct. 99) (emphasis added). "While a complaint attacked by a *Rule 12(b)(6)* motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (citations omitted). The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the ASSUMPTION THAT ALL THE allegations in the complaint are true (even if doubtful in fact)." *Id.* (internal citations omitted). Indeed, the "pleading must contain something more ... than ... a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." *Id.* (citation omitted).

**\*14** *Twombly* made clear that *Rule 8(a)* "contemplate[s] [a] statement of circumstances, occurrences, and events in support of the claim presented and does not authorize a pleader's bare averment that he wants relief and is entitled to it." *Id.* at 556 n. 3, 127 S.Ct. 1955. Without this factual "showing" of entitlement to relief, it is difficult to see how a complaint would provide the requirement that it provide the defendant not only with "fair notice" of the nature of the claim, but also the "grounds" upon which it rests. *Id.*

**[15]** This means that a complaint must contain "allegations plausibly suggesting," an entitlement to relief, not allegations which are "merely consistent with" that conclusion. *Id.* at 557, 127 S.Ct. 1955. Put another way, the plaintiff's "plain statement" of his claim must "possess enough heft" to "show" that, if all he says is true, he is "entitled to relief." *Id.* Indeed, where a complaint "stops short of the line between [the] possibility and [the] plausibility of entitlement to relief," it must be dismissed, absent "some further factual enhancement." *Id.*

**[16]** To be clear, the mere fact that a complaint comes "close to stating a claim" is not enough. *Id.* Indeed, the plaintiff must cross two theoretical barriers before he "enter[s] the realm of plausible liability." *Id.* n. 5. Most obviously, he must cross the

"line between the conclusory and the factual." *Id.* (citing *DM Research, Inc. v. College of Am. Pathologists,* 170 F.3d 53, 56 (1st Cir.1999)). More importantly, however, he must also cross the line "between the factually neutral and the factually suggestive." *Id.* For this very reason, *Twombly* stated that "a district court must retain the power to insist upon some specificity in pleading" when deciding a motion to dismiss. *Id.* at 558, 127 S.Ct. 1955 (citation omitted). [9]

[9]     In reaching this conclusion, the *Twombly* Court took care to state that it was "not apply[ing] any 'heightened' pleading standard," nor was it seeking "to broaden the scope" of *Rule 9 of the Federal Rules of Civil Procedure. Id.* at 569 n. 14, 127 S.Ct. 1955 (*Rule 9* deals with a specified group of claims subject to a high risk of abusive litigation, which require a plaintiff to "state factual allegations with greater particularity" than normally required under *Rule 8.*).

As discussed above, in order to avoid express pre-emption, Plaintiff must allege a state-law claim which is "genuinely equivalent" to a federal requirement, i.e., one which is premised upon the violation of a federal "requirement." Further, in order to ultimately show an entitlement to relief under any of his "tort" theories of recovery, he must also show that said violation caused his injury. *See generally City of Thomasville v. Lease–Afex, Inc.,* 300 N.C. 651, 656, 268 S.E.2d 190, 194 (1980) ("As in any action for negligence, the essential elements of a suit for products liability sounding in tort must include ... evidence of a standard of care owed ... breach of that standard of care ... injury caused ... by the breach, and ... loss because of the injury.").

Thus, in order to survive the present motion to dismiss, Plaintiff's complaint must put HOC on notice both of the nature of his claims (i.e., that they are "parallel" to federal requirements), as well as the grounds upon which he maintains he is ultimately entitled to relief (i.e., the factual basis for the allegations that his injuries were caused by HOC's violation of an identifiable federal requirement or requirements). Clearly, Plaintiff has adequately put HOC on notice, at least in argument, if not in pleadings, that he believes his claims are "parallel" in nature; however, he has failed to put HOC on notice of the grounds of his purported entitlement to relief in that it is not at all clear whether or how the alleged violations relate to his alleged injuries.

**\*15** Plaintiff is correct in stating that his complaint is rife with allegations of wrongdoing by HOC in both the PMA process and in the subsequent manufacturing of their

products; however, he has not alleged any particular non-conclusory link between that alleged wrongdoing and his particular injuries, let alone a causal one, as he would ultimately be required to do before he is entitled to recover anything from HOC. Thus, at this point, the Court is left with nothing more than a mere "suspicion" that Plaintiff may have a legally cognizable claim, which, as stated above is insufficient to survive a motion to dismiss.

While Plaintiff did not need to plead detailed or particularized facts to adequately state his claims, he nonetheless was obligated to allege enough facts, if taken as true, to show an entitlement to relief that is plausible on its face. This Court, after reviewing Plaintiff's complaint, should not have to speculate about how it is that Plaintiff believes he is entitled to relief. To be clear, without such a showing, it would be impossible for the Court to have a "reasonably founded hope" that Plaintiff "would be able to make [his] case," if allowed to proceed to discovery.

The clearest statement of Plaintiff's "parallel" claims appears at paragraph 53 of the Complaint. There, Plaintiff alleges that:

> The Defective Device is unreasonably dangerous and defective because: a. the manufacturing process for the acetabular hip implant device and certain of their components did not satisfy the Food and Drug Administration's Pre–Market Approval standards for the acetabular hip implant device; b. the failure of the manufacturing process for the acetabular hip implant device and certain of their components to satisfy the Food and Drug Administration's Pre–Market Approval standards for the devices resulted in unreasonably dangerous manufacturing defects; and c. the Defendant failed to warn of the unreasonable risks created by these manufacturing defects.

(Compl. ¶ 53.)

However, this allegation lacks any factual development and contributes nothing to the "plausibility" of Plaintiff's claims. Indeed, this paragraph is an example of why Plaintiff's complaint does not venture beyond mere speculation. *Accord*

*Iqbal,* 129 S.Ct. at 1951 (finding "bare assertions" of this sort too conclusory to be entitled to a presumption of truth).

After thoroughly reviewing all of Plaintiff's complaint, the Court finds that his allegations hardly cross the line from conclusory to factual (if at all), let alone the line from factually neutral to factually suggestive of a right to relief. Indeed, it would seem that Plaintiff has offered the Court little more than a formulaic recitation of the elements of a "parallel" claim, coupled with vague citations to generic allegations of wrongdoing by HOC, without any identifiable tie between the two. The mere allegation that HOC may have violated some federal "requirement" in one or more instances is not enough to "plausibly suggest" that it has violated any such federal "requirement" in this particular instance, let alone that such violation actually caused the harm that Plaintiff presently alleges.

**\*16** The Court concludes that *Twombly* requires more than the generalized, anecdotal and conclusory allegations offered by Plaintiff's complaint. Indeed, as one district court aptly stated, Plaintiff "cannot simply incant the magic words '[HOC] violated FDA regulations' in order to avoid preemption." *See, e.g., In re Medtronic,* 592 F.Supp.2d at 1158 (citing *Parker,* 584 F.Supp.2d at 1301 (conclusory allegations of federal violations are insufficient to save claim from pre-emption)). Accordingly, the Court joins *Horowitz, Bausch* and *Parker* in finding that Plaintiff has failed to adequately plead his "tort" claims as "parallel" under the standard set forth in *Twombly;* accordingly, these claims are pre-empted and must be dismissed. [10]

[10]    In order to "survive" MDA pre-emption under *Twombly,* a plaintiff must point to a specific federal requirement, show how it was violated, and in this case, show how said violation resulted in the injury complained of. *Cf. In re Medtronic,* 592 F.Supp.2d at 1158–59 (discussing *Rollins v. St. Jude Medical,* 583 F.Supp.2d 790 (W.D.La.2008)). For instance, where a plaintiff alleged that his injury resulted from a device being packed with the wrong size "guidewire," he adequately pled a "parallel" claim. *Id.* at 1159 (citing *Rollins,* 583 F.Supp.2d at 800). However, where the complaint fails to cross this minimal threshold of specificity, dismissal is appropriate. *Id.*

**5. The Scope of MDA Pre-emption**

Plaintiff's final argument against dismissal is that his breach of express warranty claims and/or his NCUDTPA claims fall outside of the scope of the MDA's pre-emption clause. Although HOC appears to concede that in some instances,

express breach of warranty claims may not be subject to MDA pre-emption, in this instance, as stated above, given the "unusual breath" of the "relating to" language used in § 360k(a), it would seem that these claims are subject to express pre-emption under that statute, just like his tort claims, *see, e.g., In re Medtronic,* 592 F.Supp.2d 1147 (dismissing breach of express and implied warranty claims, fraud claims and claims for deceptive trade practices as pre-empted); *see also Heisner,* 2009 WL 1210633 (breach of express warranty claim pre-empted); *Horowitz,* 613 F.Supp.2d 271 (breach of express and implied warranty claims, as well as claim for deceptive trade practices pre-empted); *Parker,* 584 F.Supp.2d 1298 (breach of express and implied warranty claims pre-empted); *Adkins,* 2008 WL 2680474 (breach of express and implied warranty claims pre-empted), and/or implied pre-emption under *Buckman,* to the extent they are based on an alleged violation of an FDA disclosure requirement.

[17] Moreover, these particular claims would also be subject to dismissal on the grounds that they fail to state claims upon which relief can be given. Indeed, as HOC has adequately argued, Plaintiff has failed to sufficiently plead a claim for breach of express warranty under North Carolina law because his complaint fails to identify "[a]ny affirmation of fact or promise ... made by [HOC] ... which relates to the [Trident Ceramic System] and bec[ame] part of the basis of the bargain" between Plaintiff and HOC. *See, e.g.,* N.C. Gen.Stat.

§ 25–2–313 (2008); *Pake v. Byrd,* 55 N.C.App. 551, 552, 286 S.E.2d 588 (1982).

[18] Further, Plaintiff's NCUDTPA claims are similarly deficient. Here again, as HOC has persuasively argued, Plaintiff has failed to identify any specific representations, omissions or deceptive or misleading acts that affected commerce and caused Plaintiff injuries. *See, e.g., First Atl. Mgmt. Corp. v. Dunlea Realty Co.,* 131 N.C.App. 242, 252, 507 S.E.2d 56 (1998); *accord Horowitz,* 613 F.Supp.2d 271 (dismissing plaintiff's breach of warranty and "deceptive acts or practices" claims on similar inadequate pleading grounds). Even if the Court were to assume, *arguendo,* that these claims were not pre-empted, they would nonetheless be dismissed for failing to state a claim upon which relief could be given.

### Conclusion

**\*17** For the foregoing reasons, **IT IS RECOMMENDED** that Defendant's motion to dismiss (Docket No. 8) be granted. Further, **IT IS ORDERED** that, consistent with the above, all pending motions to supplement the record (Docket Nos. 24, 30 and 39) be **GRANTED,** and all pending motions to strike (Docket Nos. 19 and 32) be **DENIED.**

---

**End of Document**      © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 2892633
Only the Westlaw citation is currently available.
United States District Court,
D. Utah,
Central Division.

Diana HALVERSON, M.D., Plaintiff,

v.

UNIVERSITY OF UTAH SCHOOL OF MEDICINE,
Michael K. Young, a Lorris Betz, M.D., David
Bjorkman, M.D., Stephen Hartsell, M.D., Susan
Stroud, M.D., Todd A. Allen, M.D., Judi Short,
Scott Smith, and John Does 1–5, Defendants.

No. 2:06CV228 DAK.    |    Sept. 28, 2007.

**Attorneys and Law Firms**

Stephen W. Cook, Daniel W. Morse, Cook & Associates,
April L. Hollingsworth, Erik Strindberg, Erika Birch,
Strindberg & Scholnick, Salt Lake City, UT, for Plaintiff.

Morris O. Haggerty, David V. Pena, William T. Evans,
Timothy D. Evans, Utah Attorney General's Office, Salt Lake
City, UT, for Defendants.

**MEMORANDUM DECISION AND ORDER**

DALE A. KIMBALL, United States District Judge.

 **\*1** This matter is before the court on (I) Defendant
University of Utah's Motion to Dismiss; (2) the Individual
Defendants' Partial Motion to Dismiss; and (3) Defendant
Scott Smith's Motion to Dismiss Claims Against Him in His
Individual Capacity. A hearing on the motions was held on
May 29, 2007. At the hearing, Plaintiff Diana Halverson,
M.D. ("Plaintiff" or "Dr. Halverson") was represented by
Stephen W. Cook and Erik Strindberg. Defendants University
of Utah School of Medicine (the "SOM"), Michael K. Young,
A. Lorris Betz, M.D., David Bjorkman, M.D., Stephen
Hartsell, M.D., Susan Stroud, M.D., Todd A. Allen, M.D.,
Judi Short, and Scott Smith in his official capacity only
(collectively, the "Individual Defendants") were represented
by Morris O Haggerty. Defendant Scott Smith ("Mr.Smith")
was represented in his individual capacity by Timothy D.
Evans. Before the hearing, the court carefully considered
the memoranda and other materials submitted by the parties.
Since taking the motions under advisement, the court has

further considered the law and facts relating to the motions.
Now being fully advised, the court renders the following
Memorandum Decision and Order.

# I. STANDARD OF REVIEW

## A. MOTION TO DISMISS STANDARD

In ruling on a motion to dismiss under Federal Rule of
Civil Procedure 12(bX6), a court must determine whether the
factual allegations in the Complaint, if true, would entitle the
plaintiff to a legal remedy. [1] See Conley v. Gibson, 355 U.S.
41, 45–46 (1957). Dismissal is appropriate only when "the
plaintiff can prove no set of facts in support of [her] claims
to entitle [her] to relief." Cottrell, Ltd. v. Biotrol Int'l, Inc.,
191 F .3d 1248, 1251 (10th Cir.1999); Seamons v. Snow, 84
F.3d 1226, 1231 (10th Cir.1996). "The court's function on a
Rule 12(b)(6) motion is not to weigh potential evidence that
the parties might present at trial, but to assess whether the
plaintiffs complaint alone is legally sufficient to state a claim
for which relief may be granted." Sutton v. Utah School for the
Deaf and Blind, 173 F.3d 1226, 1236 (10th Cir.1999) (quoting
Miller v. Glanz, 948 F.2d 1562, 1565 (10th Cir.1991)). The
court must accept all well-pleaded facts as true, construe
those facts liberally in a light most favorable to the plaintiff,
and "resolve all reasonable inferences in plaintiff's favor."
Moya v. Schollenbarger, 465 F .3d 444, 455 (10th Cir.2006);
Seamons, 84 F.3d at 1232. However, conclusory allegations
without supporting factual averments need not be accepted.
Tonkovich v. Kansas Bd. of Regents, 159 F.3d 504, 510
(10th Cir.1998); Hall v. Bellmon, 935 F.2d 1106, 1110 (10th
Cir.1991); Brooks v. Sauceda, 85 F.Supp.2d 1115, 1123
(D.Kan.2000), aff'd, 242 F.3d 387 (10th Cir.2000) (legal
conclusions, deductions, and opinions couched as facts not
presumed true). In addition, facts established by attachments
to the Amended Complaint and admissible for purposes of
a motion to dismiss. See Oxendine v. Kaplan, 241 F.3d
1272, 1275 (10th Cir.2001) ("in deciding a motion to dismiss
pursuant to Rule 12(b)(6), a court may look both to the
complaint itself and to any documents attached as exhibits
to the complaint"); GFF Corp. v. Associated Wholesale
Grocers, Inc., l30F.3d 1381, 1384 (10th Cir.1997) (court may
consider documents referenced in the complaint).

---

1    The court recognizes that Defendants, in opposing
     Plaintiff's Motion for a Temporary Restraining Order,
     had submitted significant evidence regarding the reasons
     for their nonrenewal of Plaintiff's residency contract. In
     the current posture of this litigation, however, the court is

precluded from relying on such evidence and must accept the factual allegations in Plaintiff's Amended Complaint.

## B. STANDARD FOR QUALIFIED IMMUNITY

**\*2** At the heart of the Individual Defendants' motion is a request that the court determine that they are entitled to qualified immunity. In the face of a qualified immunity defense raised in a motion to dismiss, a plaintiff must show that the well pleaded allegations of her complaint, if true, establish a constitutional violation. *Gomes v. Wood,* 451 F.3d 1122, 1134–1135 (10th Cir.2006), *cert. denied,* ––– U.S. ––––, (2006); *Moore v. Guthrie,* 438 F.3d 1036, 1039 (10th Cir.2006). If the allegations do not meet that standard, the court must dismiss the claim. *Gomes,* 451 F.3d at 1134–35. If the allegations do establish a constitutional violation, it is then the plaintiff's burden to show that there was clearly established law prohibiting the defendants' actions. *Id.; Walker v. City of Orem,* 451 F.3d 1139, 1151 (10th Cir.2006).

Qualified immunity is a powerful defense which summarily eliminates many claims like Plaintiff's because the immunity is not a mere defense to liability; rather it is an entitlement not to stand trial or face the other burdens of litigation, and it is effectively lost if a case is erroneously permitted to go to trial. *Roska ex rel. Roska v. Peterson,* 328 F.3d 1230, 1239 (10th Cir.2003). Qualified immunity is an important doctrine serving at least three purposes as identified by the United States Supreme Court. First, qualified immunity protects the public from unwarranted timidity on the part of public officials. *Gomes,* 451 F.3d at 1135 (quoting *Richardson v. McKnight,* 521 U.S. 399, 408 (1997)). Second, the doctrine helps "to ensure that talented candidates are not deterred by the threat of damages suits from entering public service." *Id.* (internal quotation marks omitted). Third, qualified immunity reduces the chance that lawsuits will distract from the performance of public duties. The doctrine seeks to balance the protection of constitutional rights and the substantial social costs of imposing liability on public officials. *Id.* (citing *Anderson v. Creighton,* 483 U.S. 635, 638 (1987)).

## II. ALLEGATIONS UPON WHICH THE COURT HAS RELIED FOR PURPOSES OF THIS MOTION

Plaintiff Diana Halverson, M.D., completed medical school at the University of Utah in 2005. In the spring of 2005, she applied for and was accepted into the University's newly created Emergency Medicine residency program— a program that teaches newly graduated medical students how to be emergency room doctors. The SOM entered into a Houseofficer Agreement (the "Agreement") with Plaintiff to provide post-graduate medical training in the field of emergency medicine, consistent with the standards of the "Essentials of Approved Residencies prepared by the Accreditation Council on Graduate Medical Education." The Agreement also required Plaintiff to perform certain medical services on behalf of the SOM for the stipend of $41,925.00 for the first year. The Agreement is specific, stating that it is for a "training program" for the resident. Numerous references are made in the Agreement to the training nature of the program. [2]

[2]      *See, e.g.,* Complaint Exhibit A, page 1 stating that the "Houseofficer" is appointed "as a trainee" in "Training Program Emergency Medicine," and "[a] suitable environment will be provided for educational experience and training in the areas of the above-named training program."

**\*3** Plaintiff alleges that she performed her services under the Agreement in a satisfactory manner and that she received evaluations that met or exceeded expectations. According to Plaintiff, at no time prior to February 22, 2006 did she receive notice of any negative evaluation that would adversely impact her residency, nor was she placed on corrective action or placed on probation for remediation. [3] On February 22, 2006, however, Dr. Hartsell and Dr. Stroud sent to Plaintiff the following letter: [4]

[3]      Such allegations, however, are contradicted by Exhibit D to Plaintiff's Amended Complaint, and, thus, the court need not accept such conclusory allegations as true. Nevertheless, the court's determinations below are based on an acceptance of Plaintiff's alleged facts, along with the statements in the February 22, 2006 letter. Plaintiff has not denied the veracity of the statements made in the letter, but rather, challenges the motivation behind the decision announced in the letter.

[4]      This letter is attached to Plaintiff's Amended Complaint as Exhibit D and therefore may be relied upon in this motion.

Diana

This letter is to inform you that we will not be renewing your University of Utah House Officer Agreement for 2006–2007. Your current House Officer Agreement expires on June 30, 2006. Your employment with the University of Utah School of Medicine will cease on

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

June 20, 2006. As described in further detail below, as of today, we are placing you on paid administrative leave until June 30, 2006 at which time your contract will end.

Although there are many reasons for this action, the following are some examples of your behavior which have led to our decision;

1. In November you came very late to our mandatory educational conference. When this issue was addressed with you, you were argumentative, insubordinate, and unwilling to take personal responsibility for your actions. Your behavior in dealing with this matter was extremely unprofessional.

2. In December during your ICU rotation your behavior was so difficult for the residents on the service with you that they felt the need to notify the chief resident and the internal medicine program director of their negative experiences. Both the residents themselves and their program director commented on your failure to have adequate interpersonal communication and professionalism skills. When we discussed these issues with you, you were again argumentative and unwilling to accept personal responsibility for your behavior. The perception of our program by other programs in the hospital was damaged both by your behavior on this rotation, and your behavior in dealing with the situation afterward.

3. During your semi-annual performance evaluation you were again insubordinate and displayed a great deal of open disrespect for your program director and for your program. You were very argumentative, and at one point you verbally threatened your program director. You continued to deny personal responsibility for any of your actions, even your grossly inappropriate behavior during that meeting. Your actions and attitude displayed an extreme lack of professionalism.

4. You have repeatedly stated to both of us that you are very dissatisfied with us as program directors, and that you have grave concerns about our ability to lead the program. You have also stated on numerous occasions that your are concerned that the program will fail under our leadership. We feel that this continued voicing of your lack of confidence in us, as well as many other actions on your part, has permanently damaged our ability to effectively continue your training in our program.

**\*4** 5. You failed to take the ABEM in-training examination today. This is a requirement of all residents in our program. This was also a mandatory attendance day for our educational conference, and you did not receive an excused absence from either the test or the educational conference. Once again, your actions have demonstrated an inexcusable lack of both professionalism and interpersonal communication skills.

6. In a January 19, 2006 email to Dr. Stroud, you resigned from the program and stated that you would "do your best to fulfill [your] obligations until the end of June." We discussed this resignation with you and gave you until February 15, 2006 to withdraw your resignation. You never contacted us to withdraw your resignation nor have you indicated any future willingness or interest in participating in this residency program. It is important to us to have residents in the program who actually want to be in the program and whom we can rely on to have regular and predictable attendance at educational and clinical functions. Your apparent ongoing desire to resign from the program casts serious doubt on your predictability and reliability.

As of today, we are placing you on paid administrative leave until June 30, 2006 at which time your contract will end. You will receive your regular salary and benefits while you are on leave. You will not be allowed to perform any clinical duties or attend any educational events associated with our residency program or the University of Utah School of Medicine during your administrative leave. You should not initiate contact with any of the patients, residents, faculty, or staff associated with the residency program except Stephen Hartsell or Susan Stroud. We do not want you to come to our administrative offices unless you are specifically invited to do so at an agreed upon time by Stephen Hartsell or Susan Stroud.

You should contact Stephen or Susan in order to arrange the return of any personal effects remaining at any of the hospitals associated with our residency program. We expect you to return all items noted on the checkout procedure list accompanying this letter to Judi Short in the GME office by March 1, 2006.

If you disagree wi this decision, you may file a grievance by contacting Judi Short in the GME office at 581–2401

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

by 5:00 p.m. on March 6, 2006. If you do not initiate the grievance process by this specified deadline, you will be deemed to have waived your right to file a grievance.
The letter was signed by Stephen Hartsell, M.D., Program Director, University of Utah Affiliated Residency in Emergency Medicine and Susan Stroud, M.D., Associate Program Director, University of Utah Affiliated Residency in Emergency Medicine.

Plaintiff contends that at no time prior to this letter was she provided with any form of notice or hearing before terminating her residency. Plaintiff believes that Dr. Hartsell, Dr. Stroud, Dr. Allen, Ms. Short, and Mr. Smith were motivated to summarily terminate her residency because she exercised her right to speech under the First Amendment to the United States Constitution.

**\*5** Specifically, she claims that she voiced concerns about the SOM Emergency Medicine Department's compliance with the ACGME Common Duty Hour Standards. Plaintiff refused to sign a verification that the SOM was in compliance with the ACGME standards. She also voiced concerns about a nurse dispensing medicine without authority and using equipment that was not properly sterilized. She also asserts that she voiced concerns about the newly created Emergency Residency Program itself, along with the leadership of the Department.

In addition, Plaintiff alleges that Dr. Hartsell, Dr. Stroud, Dr. Allen, Ms. Short, and Mr. Smith were angry and retaliated against her for exercising her right to obtain a copy of allegedly defamatory emails originating from two MICU residents within the MICU Department at the end of Plaintiff's rotation in December. Plaintiff claims that these emails were previously withheld by Defendants but were being used by them to personally criticize Plaintiff.

On March 6, 2006, Plaintiff filed an appeal of her termination pursuant to the Defendants' Due Process Policy. Plaintiff, however, believed that the Defendants' Due Process Policy failed to comply with the Utah and United States Constitutions and due process of law in that, among other things:

1. The policy did not afford a grievant the right to a prompt, full-blown adversarial hearing;

2. The policy did not afford a grievant the right to an impartial fact-finder;

3. The policy prohibited the right of a grievant to confront and cross-examine witnesses;

4. The policy did not afford a grievant the right to have witnesses testify under oath;

5. The policy prohibited the right of a grievant to effective legal counsel;

6. The policy failed to provide for appropriate findings of fact and conclusions of law;

7. The policy did not afford a grievant the right to subpoena witnesses; and

8. The policy did not afford a grievant the right to an adequate record of proceedings.

Accordingly, Plaintiff filed the instant lawsuit on March 17, 2006. On March 20, 2006, she filed a Motion for a Temporary Restraining Order. On the same date, the court temporarily denied Plaintiff's request for immediate reinstatement into the residency program, but it granted a Temporary Restraining Order, enjoining Defendants from proceeding with the grievance process pending the receipt of a response memorandum from Defendants. The court stated in the March 20, 2006 Order that after receiving Defendants' response memorandum, the court would then "take under advisement all other aspects of Plaintiff's Motion for a Temporary Restraining Order, including whether or not to continue this Provisional Temporary Restraining Order, for further ruling."

Three days later, on March 23, 2006, and prior to any further hearings before the court, Defendants unilaterally offered to reinstate Plaintiff into her residency program, effective April 1, 2006, and place her under a Corrective Action Plan. In addition, Defendants stated in their March 23, 2006 letter to Plaintiff's counsel that it would modify their existing grievance policies to provide additional rights to Plaintiff, such as allowing her counsel to actively participate in the hearing process, permitting the hearing to be tape recorded, providing to Plaintiff's counsel a copy of the tape, issuing a written report, permitting plaintiff's counsel to call and examine witnesses, requiring each witness to swear to tell the truth, and that the hearing committee would consist of an equal number of residents and faculty, with none of the residences being from the program.

**\*6** Plaintiff claims that Defendants-and Defendant Smith in particular-were obligated to insure in good faith that Plaintiff was provided the rights identified above. After having received the March 23, 2006 letter, Plaintiff withdrew her Motion for a Temporary Restraining Order and filed a second grievance over being placed on the Corrective Action Plan.

Plaintiff's first rotation back following April 1, 2006 was at the LDS Hospital Emergency Department under the direction of Dr. Allen. Plaintiff claims, however, that beginning on or about April 2, 2006, Dr. Allen and other conspirators commenced a systematic process of poisoning the possibility of succeeding in her rotation and under her Corrective Action Plan. For example, Plaintiff claims that:

1. Dr. Allen either solicited, encouraged, or allowed a resident of the Emergency Program to obtain a "letter of support" of all emergency medicine residents for Defendants Hartsell and Stroud, thereby poisoning Plaintiff's opportunity of having successful professional relationships with her fellow residents.

2. Dr. Allen advised the LDS Hospital Emergency Medicine Faculty and Staff that Plaintiff had legal issues with her residency rotation thereby undermining their willingness to actively instruct and train Plaintiff in the rotation.

3. Dr. Allen solicited "spies" to provide him with information regarding Plaintiff regarding each and every event involving Plaintiff.

4. After the hearing of the Program Grievance Committee, wherein Dr. Allen testified as a witness, he emailed and advised the faculty at LDS Hospital, individuals who would be providing evaluations regarding Plaintiff during her rotation there, that ".... This continues to be quite depressing and sad.... In my opinion, there is ample justification for both the corrective action letter and the non-renewal of contract. I will review my reasoning and evidence if you desire.... I continue to thank you for your efforts and teaching and hope that this will not unduly damage the progress we are making as educators and clinicians."

5. Thereafter, Dr. Allen and other conspirators systematically encouraged selected evaluators to file their rotation evaluations on time and in a specific manner that were unfavorable to Plaintiff, while not doing the same to those favorable to Plaintiff, in an effort

to justify the actions taken against her on February 22, 2006 and placing her on a Corrective Action Plan.

On April 26, 2006, a hearing was held before the Program Grievance Committee regarding the termination of the Plaintiff's residency and her having been placed on a Corrective Action Plan. Plaintiff claims that despite the fact that Mr. Smith was personally present and personally had an obligation to safeguard the rights to due process promised to Plaintiff, she was not afforded all of the federally protected rights to due process identified above. On or about May 9, 2006, the Program Grievance Committee upheld Plaintiffs suspension of residency and employment that occurred on February 22, 2006. On or about June 16, 2006, the Housestaff Grievance Committee upheld the decision of the Program Grievance Committee. On or about June 23, 2006, Defendant Bjorkman upheld the decision of the Program Grievance Committee. On or about July 10, 2006, Defendant Betz upheld the decision.

**\*7** As a result of Defendants' alleged wrongful conduct, Plaintiff asserts that her residency was interrupted for a period of February 22, 2006 through April 2, 2006, and then was terminated effective June 30, 2006. When her contract was not renewed, Plaintiff sought to transfer to another emergency medicine residency program for the 2006–2007 residency year. To transfer, Plaintiff needed a credentials letter to be prepared by Defendants in accordance with the policies and procedures of the ACGME.

On or about May 1, 2006, Plaintiff's counsel advised Mr. Smith that Plaintiff had learned of an opening at the University of Oregon, and that the Residency Director there, Dr. Brunett, was interested in placing Plaintiff in the program but needed the credentials letter and also wanted to speak to Drs. Hartsell and Stroud.

According to Plaintiff, Mr. Smith declined to allow Dr. Brunett to speak to Drs. Hartsell and Stroud and declined to have a credentials letter written, unless Plaintiff signed a complete waiver of liability. Plaintiff claims that nothing in the ACGME policies and procedures permits an institution to demand a waiver before issuing a credentials letter.

On or about May 24, 2006, Plaintiff's counsel advised Mr. Smith that the Defendants were violating ACGME policies by withholding a credentials letter. Plaintiff contends that only after a Complaint was formally filed with the ACGME did the Defendants provide an appropriate credentials letter.

She claims, however, that the delay in providing the letter prevented her from being able to interview or to be considered for the University of Oregon position for the 2006–2007 program year. Plaintiff alleges that as a result of Defendants' wrongful conduct, her ability to complete her residency was adversely impacted. Moreover, she claims, by terminating her residency program and failing to provide a credentials letter, she was not able to transfer to another program for the 2006–2007 year and that she would be required to reapply for another residency program for the 2007–2008 program as a first-year resident.

### III. DISCUSSION

#### A. MEDICAL SCHOOL'S MOTION TO DISMISS

The University claims that, as an arm of the state, it is immune from being sued in federal court pursuant to the Eleventh Amendment to the United States Constitution. Plaintiff, on the other hand, argues that the State System of Higher Education Act specifically states that "[t]hese institutions [including the University of Utah] are empowered to sue and be sued and to contract and be contracted with." Accordingly, Plaintiff argues, the Utah legislature has waived the University's immunity because the Act states that the University may be sued without qualification.

The court finds no merit to Plaintiff's argument. "The Tenth Circuit has repeatedly demonstrated 'a preference for an approach giving full effect to the Eleventh Amendment *absent some extraordinarily effective waiver.*' " *University of Utah v. Shurtleff,* 252 F.Supp.2d 1264, 1283 (D.Utah 2003) (quoting *Richins v. Industrial Constr., Inc.,* 502 F.2d 1051, 1055–56 (10th Cir.1974) (emphasis in original)). A state may waive its Eleventh Amendment immunity only where stated by the most express language or by such overwhelming implication from the text of a state statutory or constitutional provision as will leave no room for any other reasonable construction. *V–1 Oil Co. v. Utah State Dept. of Public Safety,* 131 F.3d 1415, 1421 (10th Cir.1997).

**\*8** The Utah legislature has not expressly and unequivocally waived the University's immunity from suit in federal court, and the state of Utah has not in any other way consented to this lawsuit. The Tenth Circuit has specifically found that the "University of Utah Medical Center, as a part of the University of Utah, is an arm of the state entitled to Eleventh Amendment immunity." *See Watson v. University of Utah Med. Ctr.,* 75 F.3d 569, 575–77; *Roach v. University*

*of Utah,* 968 F.Supp. 1446, 1451 (D.Utah 1997). The Supreme Court has consistently held that pursuant to the Eleventh Amendment, an unconsenting state is immune from suits brought in federal courts by its own citizens as well as by citizens of another state. *Edelman v. Jordan,* 415 U.S. 651, 662–663 (1974); *see Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100 (1984). Accordingly, Plaintiff's claims against the University are dismissed without prejudice. [5]

[5]    As noted below, however, Plaintiffs' civil rights claims against the SOM are dismissed with prejudice because the SOM is not a "person" amenable to suit under 42 U.S.C. § 1983.

#### B. DEFENDANTS' MOTION TO DISMISS

In their motion, The SOM and the Individual Defendants seek dismissal of many causes of action. [6] First, they argue, the University and its employees in their official capacities are not amenable to suit under 42 U.S.C. § 1983 because they are not "persons" who can be sued. Second, to the extent Plaintiff seeks to hold University employees liable in their individual capacities, Defendants argue that the allegations of her Amended Complaint fail to show constitutional violations. According to Defendants, Plaintiff's allegations allege many misdeeds but, even assuming they are true, they are not constitutional misdeeds. Third, to the extent Plaintiff has alleged a constitutional violation, there was no clearly established law putting the Individual Defendants on notice that their actions were constitutional violations. Each of these arguments will be addressed in turn.

[6]    Plaintiff has conceded that her Seventh and Eighth Causes of Action (Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing) should be dismissed on the ground that the Individual Defendants did not enter into a contract with Plaintiff; rather, the University was the contracting party. Because the University has been dismissed as a defendant, Plaintiff's Seventh and Eighth Causes of Action are dismissed in their entirety.

#### 1. Claims Against the University and the Individuals in Their Official Capacities

Plaintiff's First, Second, Third, Fourth, and Fifth Causes of Action seek to hold the University and various employees of the University sued in their official capacities, liable for various alleged constitutional violations pursuant to 42 U.S.C. § 1983. The University and its employees in their

official capacities are not "persons" who can be sued under § 1983. *Roach,* 968 F.Supp. at 1451 ("To the extent that plaintiff's § 1983 claims are asserted against the University, they are dismissed; the University is an arm of the state and is therefore not a "person" within the meaning of § 1983"); *see also Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71 (1989) ("We hold that neither a State nor its officials acting in their official capacities are 'persons' under § 1983"); *Harris v. Champion,* 51 F.3d 901, 905–06 (10th Cir.1995) ("To the extent plaintiffs sought relief against the Oklahoma Court of Criminal Appeals itself, the district court properly dismissed plaintiffs' civil rights claims. Neither the state, nor a governmental entity that is an arm of the state for Eleventh Amendment purposes, nor a state official who acts in his or her official capacity, is a 'person' within the meaning of § 1983.").

**\*9** Thus, the University and Defendants Dr. Hartsell, Dr. Stroud, Dr. Allen, Mr. Young, Dr. Betz and Dr. Bjorkman, Ms. Short, and Mr. Smith, insofar as they are sued in their official capacities, are dismissed from all claims in this lawsuit, with the exception of the Tenth Claim for Relief to the extent Plaintiff seeks prospective injunctive relief through that claim.

## 2. Claims Against the Individual Medical School Defendants in Their Individual Capacities

Next, several of the Individual Defendants are sued in their individual capacities, including Dr. Hartsell (Program Director of the Affiliated Residency in Emergency Medicine), Dr. Stroud (Associate Program Director of the Affiliated Residency in Emergency Medicine), Dr. Allen (Assistant Program Director of the Affiliated Residency in Emergency Medicine), Ms. Short (Director of the Graduate Medication Education), and Mr. Smith (general counsel for the University of Utah). [7] These Individual Defendants seek dismissal of Plaintiffs' First, Third, Fourth, Fifth, and part of the Sixth Causes of Action on the ground of qualified immunity. Specifically, they argue that Plaintiff has failed to plead a valid constitutional violation, and, furthermore, even if she had pled a constitutional violation, there is no clearly established law that would have given Defendants notice that they were violating Plaintiffs rights. Consequently, they seek dismissal of these claims against them in their individual capacities.

[7]    Mr. Smith, through separate counsel, has joined in the motion filed by the other Individual Defendants.

### a. First Cause of Action—Deprivation of Procedural and Substantive Due Process

Plaintiff claims that she had a reasonable expectation of continuing in and completing her residency program at the SOM. She argues that the summary suspension of her employment and the termination of her residency program —without a pre-termination hearing—violated her right to procedural due process of law under the United States Constitution. Plaintiff also asserts that her due process rights were further violated by Defendants' failure to provide her with a full and fair post-termination hearing. Finally, she contends that the decision of the Program Grievance Committee and the other decisions on appeal, violated her right to procedural and substantive due process and were arbitrary and capricious.

### I. Procedural Due Process

Defendants argue that Dr. Halverson's procedural due process claim fails because (1) she has no property interest in a three-year residency program, (2) she suffered no property loss because she was paid while suspended and then resumed her residency, and (3) she has failed to allege facts supporting the conclusion that the procedures provided to her were not in accord with due process. In so arguing, Defendants contend that only lesser due process procedures must be given to medical residents—not the level of due process that is required to be given to employees. Even accepting Plaintiff's allegations, however, Defendants contend that the process given was more than the process required under the Constitution. In addition, Defendants argue that even if Plaintiff has stated a due process violation, there is no clearly established law that the process she was given was deficient for a medical resident. With regard to Plaintiff's substantive due process claim, Defendants argue that such a claim fails because Plaintiff has failed to allege facts sufficient to support a claim that the decision not to renew her Agreement was "beyond the pale of reasoned academic decision making ." *See Regents of the University of Michigan v. Ewing,* 474 U.S. 214, 227 (1985).

**\*10** The Due Process Clause "provides that certain substantive rights—life, liberty, and property—cannot be deprived except pursuant to constitutionally adequate procedures." *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 541 (1985); *Board of Regents v. Roth,* 408 U.S. 564 (1972). "An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the

case." *Loudermill,* 470 U.S. at 542. The Tenth Circuit has stated that "[t]o determine whether a plaintiff was denied procedural due process, we engage in a two-step inquiry: (1) Did the individual possess a protected interest to which due process protection was applicable? (2) Was the individual afforded an appropriate level of process?" *Schulz v. City of Longmont, Colorado,* 465 F.3d 433, 443 (10th Cir.2006).

To have a property interest, a person clearly must have more than an abstract need or desire and more than a unilateral expectation of it. *Id.* A person must, instead, have a legitimate claim of entitlement to it, and such entitlements are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law. *Id.*

Plaintiff had no legitimate claim of entitlement to more than one year in the residency program. [8] Plaintiff signed the Agreement, which set out the terms of her program. *See* "University of Utah School of Medicine Houseofficer Agreement 2005–2006" attached as Exhibit A to Plaintiff's Amended Complaint and incorporated by reference therein. The Agreement specifically states that it was limited to a term of one year. *See* Exhibit A, page 1 stating the agreement "is entered into for one year beginning June 24, 2005 and ending June 30, 2006." The Agreement reiterates and expands on this limitation on page 4:

[8]    Dr. Halverson alleges that she had a property interest in a three-year program, but such an assertion is a legal conclusion that is not presumed to be true.

7. Terms and termination:

(a) The term of this agreement is for one year unless expressly provided otherwise therein.

(b) This agreement does not establish any right or expectancy of an appointment for any subsequent residency year regardless of the number of years generally associated with a particular training program.

© Any agreements or representations to the contrary are not valid unless reduced in writing and incorporated as a specific amendment to this agreement. [9]

[9]    Further bolstering this conclusion is the language of the Housestaff Policies and Procedures Resident Evaluation Policy, attached as Exhibit B to Plaintiff's Amended

Complaint. This document states under the heading "Renewal of Houseofficer Agreements:"

Residents performing satisfactorily may have the resident agreement renewed for the subsequent year. The resident agreement is renewable annually as agreed among the resident, the program director, and the School of Medicine. Issuance of an agreement for one year does not imply the resident will complete the training program. Agreements for succeeding years of training will be issued only after specified conditions have been met.

Therefore, based on the facts alleged in the Amended Complaint, Plaintiff has not pled a procedural due process violation with regard to the Defendants' refusal to extend her residency beyond the first year because she had no property interest in a three-year residency program.

Moreover, even if a property interest existed in a three-year residency program, Plaintiff has failed to point to any clearly established law on the subject. Rather, the small amount of authority that exists on this point suggests the contrary. *See, e .g., Board of Curators of the Univ. of Mo. v. Horowitz,* 435 U.S. 78, 86–90 (1978) (finding that the due process clause does not require that a student dismissed from a state medical school for academic reasons be given a hearing); *Trotter v. Regents of the University of New Mexico,* 219 F.3d 1179, 1184 (10th Cir.2000) ("Trotter in her written briefs and at oral argument failed to identify any clearly established law supporting her claim that she held a "property" or "liberty" interest in continued enrollment at the Medical School despite her academic failures.").

**\*11** Although Plaintiff claims that the law is clearly established that Plaintiff had a property interest in a three-year residency, her cited cases do not stand for such a proposition. For example, in *Harris v. Blake,* 798 F.2d 419 (10th Cir.1986), the Tenth Circuit Court of Appeals determined that the plaintiff had a property interest in his master's degree program. But the court pointed out that "[t]he actual payment of tuition secures an individual's claim of entitlement." *Id.* at 422. In this case, Dr. Halverson was not paying tuition; rather, she was being paid a stipend for her training. [10] Similarly, in *Roach v. University of Utah,* 968 F.Supp. 1446 (D.Utah 1997), the plaintiff was also a tuition-paying graduate student. There is no Supreme Court or Tenth Circuit law clearly establishing that a medical resident has a property interest in a three-year residency program. Therefore, the Individual Defendants are entitle to

qualified immunity on Plaintiffs procedural due process claim pertaining to the non-renewal of her contract.

10      The Tenth Circuit more recently noted in *Trotter* that the plaintiff "must demonstrate that her dismissal from the Medical School deprived her of either a 'liberty' or 'property' interest created by ... state law" and that she had failed to do so. *Id.* at 1184. Even in *Trotter,* the plaintiff was a tuition-paying medical student and not a medical resident, as in the instant case.

Even if there were a property interest in a three-year residency program, Plaintiff's allegations establish that she received all the process to which she was entitled. Among courts that have assumed that a property or liberty interest existed for graduate students, "[c]ourts overwhelmingly agree that students, whether dismissed for academic or disciplinary reasons, are not entitled to as much procedural protection under the Fourteenth Amendment as employees who are terminated from their jobs." *Davis v. Mann,* 882 F.2d 967, 973 (5th Cir.1989); *see also Ezekwo v. New York City Health & Hosps. Corp.,* 940 F.2d 775 (2nd Cir.1991) (comparing a medical resident to a student and applying the due process standard given to students who had been disciplined—notice and an opportunity to be heard); *Fenje v. Feld,* 398 F.3d 620, 625 (7th Cir.), *rehearing and rehearing en banc denied,* 2005 U.S.App. LEXIS 6175 (7th Cir. April 6, 2005) (treating medical resident as a student in deciding that he was dismissed for academic reasons for lying on his application form).

For purposes of due process, it is clear that medical residents, like other medical students, are not considered to be employees and are entitled only to lesser due process procedures than employees. *See Trotter,* 219 F.3d at 1185 (medical student not entitled to a hearing when dismissed for academic reasons). In *Davis,* the Fifth Circuit Court of Appeals held that a dental resident, even though paid for work during his residency, was a student for purposes of due process and minimal due process procedures applied:

> It is well-known that the primary purpose of a residency program is not employment or a stipend, but the academic training and the academic certification for successful completion of the program.... The same factors that justified minimal procedural protections in the *Horowitz* medical school context apply with equal force

to the paid residency situation.... For the foregoing reasons, we decline to apply the full procedural protections of the Fourteenth Amendment to Davis' academic dismissal.

**\*12** *Id.* at 974. The *Davis* court reasoned that "[s]uccessful completion of the residency program depends upon subjective evaluations by trained faculty members into areas of expertise that courts are poorly equipped to undertake in the first instance or to review. A school is an academic institution not a courtroom or administrative hearing room, and thus it should not be weighted down with formalized procedural requirements imposed by actors estranged from the academic environment." *Id.* (internal citations and quotation omitted). The Fifth Circuit applied this reasoning to medical residents in a subsequent case. *See Shaboon v. Duncan,* 252 F.3d 722, 732 (5th Cir.2001) ("*Davis [v. Mann]* established that medical residents are not employees protected by the due process clause"). *See also Hernandez v. Overlook Hospital,* 692 A.2d 971 (N.J.1997); *Allahverdi v. Regents of the Univ. Of New Mexico,* 2006 WL 1313807 (D.N.M. April 25, 2006).

In addition, not only are students afforded less procedural due process than employees, but also, the Supreme Court has emphasized that even less stringent procedural requirements attach when a school makes an academic judgment about a student than when it takes disciplinary action. *See Harris v. Blake,* 798 F.2d 419, 423 (10th Cir.1986). In making an academic judgment, the court has held that notice, followed by a careful and deliberate determination, satisfied the requirements of due process. *Id.*

In the instant case, the decision affecting Dr. Halverson was academic rather than disciplinary. *See Shabbon v. Duncan,* 252 F.3d 722, 731 (5th Cir.2001). In *Shaboon,* court reasoned that the plaintiff medical resident's dismissal was academic if it "rested on the academic judgment of school officials that she did not have the necessary clinical ability to perform adequately as a medical doctor and was making insufficient progress toward that goal ." *Id.* (quoting *Horowitz,* 435 U.S. at 89–90) (finding that person hygiene and timeliness might be important factors in a school's determination of whether a student will make a good medical doctor). The *Shaboon* court then found that the plaintiffs refusal to acknowledge and deal with her problems furnished a sound academic basis for her dismissal. *Id.*

Similarly, in this case, the letter sent to Dr. Halverson on February 22, 2006, recounts Dr. Halverson's failure to attend

a mandatory educational conference, her failure to take the ABEM in-training examination, the difficulty other residents had had working with her, her inadequate interpersonal communication skills, her lack of professionalism, and the lack of reliability and predictable attendance. The court finds that the non-renewal of Plaintiff's residency Agreement was due to academic reasons. Moreover, as demonstrated by Exhibit D to Plaintiff's Amended Complaint (and not contradicted by Plaintiff), Plaintiff had actually sent an email resigning from the program as of June 30, 2006. She was told that Drs. Hartsell and Stroud did not accept her resignation —and they asked her to reconsider. Even after having been given a chance to rescind her resignation, Plaintiff failed to do so. Defendants, then, were under some obligation to make it clear to Plaintiff that the Agreement would not be renewed because the Resident Evaluation Policy provides that "[a]ny decision not to renew shall be made and communicated in writing to the houseofficer no later than four months prior to the end of the agreement year [June 30], when possible." Thus, the four-month deadline was just days away. Because of these extraordinary circumstances, the court finds that even under Plaintiffs alleged facts, she received notice, followed by a careful and deliberate determination.[11] Because only lesser due process procedures must be given to medical residents, Plaintiff has failed to state a constitutional due process violation.

[11]    Even if not Plaintiffs residency was not renewed based on disciplinary—rather than academic—reasons, the court finds that she still received all process to which she was entitled.

**\*13** In her First Cause of Action, Plaintiff appears to seek employee-type due process protections. Such protections simply do not apply in this case. To establish a constitutional procedural due process violation, she must show that she did not receive the protections applicable to a student and she has failed to do this. At most, assuming she had a property interest in a three-year residency, Plaintiff was entitled to "some meaningful notice and an opportunity to respond." *Davis,* 882 F.2d at 975. In fact, the Amended Complaint affirmatively demonstrates that she received more than minimal due process protections. Plaintiff alleges that she was offered the opportunity to appeal her suspension and dismissal pursuant to the University's Due Process Policy. Amended Complaint, ¶ 29 and Exhibit D (dismissal letter which stated that "If you disagree with this decision, you may file a grievance ..."). The Due Process Policy allowed review by a grievance committee of residents and faculty. Exhibit C, page 3. Plaintiff would have been allowed to

appear before the grievance committee with an advocate. *Id.* The decision of the grievance committee could be appealed further. *Id.* Ultimately, Plaintiff was reinstated into the academic program before the grievance process took place. Amended Complaint ¶ 33. Eventually, Plaintiff did appeal the decision to not renew her for a second year of residency and was given even more rights than the University's Due Process Policy provided. Amended Complaint ¶¶ 36, 39. Thus, the First Cause of Action is dismissed for failing to state a constitutional violation with regard to the due process procedures offered.

Again, even if she had stated a claim for inadequate due process for students, the Individual Defendants are entitled to qualified immunity because Plaintiff has failed to show any clearly established law that the due process available under the University's policies or the greater process she actually received was deficient. Thus, there is no clearly established law that would put a reasonable person on notice that their actions violated the constitution.

With respect to Plaintiff's claim for a procedural due process violation with respect to the interruption of her first year of residency, she has failed to state a claim. Ultimately, the suspension did not cause Plaintiff to lose any salary or benefits because she was paid during the six weeks she was suspended. The suspension did not set back her education because she would have received a full year's credit had she finished out the remainder of the year. Thus, no constitutional due process violation is stated with regard to the suspension.

Plaintiff also claims that she suffered a violation of her procedural due process rights when the University violated its own policies and procedures. This allegation fails to state a due process violation because a University's violation of its own policies or procedures is not enough to make out a constitutional claim. "[E]ven assuming that the Medical School failed to follow its own regulations, we find that this failure would not, by itself, give rise to a constitutional claim under the Fourteenth Amendment." *Trotter,* 219 F.3d at 1185; *Horowitz,* 435 U.S. at 92 n. 8 (suggesting that a university's failure to follow its own academic rules does not, in itself, give rise to a due process violation).

### ii. **Substantive Due Process Claim**

**\*14** In addition to a procedural due process claim, Plaintiff has alleged a substantive due process violation in her First Cause of Action.[12] While procedural due process "ensures

that a state will not deprive a person of life, liberty or property unless fair procedures are used in making that decision; substantive due process, on the other hand, guarantees that the state will not deprive a person of those rights for an arbitrary reason regardless of how fair the procedures are that are used in making the decision." *Archuleta v. Colorado Dep't of Insts., Div of Youth Servs.,* 936 F.2d 483, 490 (10th Cir.1991). Substantive due process claims "are not based on state law but are founded upon 'deeply rooted notions of fundamental personal interests derived from the Constitution.' " *Hennigh v. City of Shawnee,* 155 F.3d 1249 (10th Cir.1998) (quoting *Mangels v. Pena,* 789 F.2d 836, 838 (10th Cir.1986)).

12    Plaintiff's allegation that the decision and appeals decisions were arbitrary and capricious is merely a legal conclusion, which the court need not accept as true.

Assuming, *arguendo,* that Plaintiff had a fundamental property interest in her residency. Plaintiff has failed to allege facts sufficient to support a substantive due process violation. Even if Plaintiff's version of the facts is accepted as true, she has done nothing to allege that the February 22, 2006 letter contains false statements. Consequently, the alleged facts in the Amended Complaint are that ultimately Plaintiff was not continued in the Emergency Medicine residency program because the program was dissatisfied with her. Plaintiff makes no showing that this decision was "beyond the pale of reasoned academic decision making." *See Hennessy v. City of Melrose,* 194 F.3d 237, 252 (1st Cir.1999); *see Regents of the University of Michigan v. Ewing,* 474 U.S. 214, 227 (1985); *Whiting v. University of Southern Mississippi,* 451 F.3d 339 (5th Cir.2006).

Finally, even if she had alleged facts amounting to a substantive due process violation, she has failed to set forth any clearly established law. The Individual Defendants, therefore, are protected by qualified immunity regarding Plaintiff's substantive due process claim.

### b. Third Cause of Action—Deprivation of Equal Rights and Due Process–Corrective Action Plan
Plaintiffs Third Cause of Action alleges that she was deprived of equal rights and procedural due process with regard to the reinstatement under a corrective action plan. This claim pertains to the Defendants' agreement to reinstate Plaintiff effective April 1, 2006 and to allow her to finish her first year of residency and transfer to a different residency program under a Corrective Action Plan. Plaintiff claims that implicit with this commitment was an obligation of good faith and fair

dealing without any further deprivations of due process. Yet, according to Plaintiff, Defendants' intentional and purposeful refusal to honor in good faith their commitment to reinstate her for the balance of her first year and allow her to transfer, violated her right to equal protection of the law and due process of law, depriving her of her property and liberty interests, and that their actions were arbitrary and capricious.

### I. Equal Rights
**\*15** The equal rights portion of this Cause of Action is dismissed because Plaintiff has failed to state such a claim. There are no allegations in the Amended Complaint regarding how she was treated differently from others who were similarly situated. *See Hennigh,* 155 F.3d at 1257. In addition, she has failed to link the alleged deprivations to the person who allegedly caused the deprivation. Finally, Plaintiff has failed to show any clearly established law on this point, thus entitling the Individual Defendants to qualified immunity.

### ii. Due Process—Corrective Action Plan
In her Third Cause of Action, Plaintiff also makes a number of allegations about the Defendants' breach of a duty of good faith and fair dealing, their failure to allow her to transfer, and their causing her severe emotional distress. These allegations fail to state a due process violation regarding her Corrective Action Plan for reasons discussed above—she has not clearly established that she had a property interest in her residency program, and even if she did, Plaintiff was entitled to only very minimal procedural due process. Further, Plaintiff received all the process to which she was entitled. Because Plaintiff has failed to allege a constitutional violation and has also failed to set forth any clearly established law on this point, the Individual Defendants are entitled to qualified immunity.

### c. Fourth Cause of Action—Conspiracy to Deprive Federal Constitutional Rights
Plaintiff's Fourth Cause of Action, alleges that Dr. Hartsell, Dr. Stroud, Dr. Allen, Mr. Smith, and Ms. Short intentionally and purposefully engaged in a conspiracy prohibited under Section 1983. She claims that on or about February 10, 2006 and continuing thereafter, the conspirator defendants attempted to force Plaintiffs resignation from the residency program solely to prevent her from having access to due process and/or the grievance policies provided by the University. In addition, she claims that they intentionally

delayed her access to Human Resources available to her and engaged in a ruse designed to make the Plaintiff believe that Dr. Allen was a mediator who would reconcile the Plaintiff back into her residency program. Finally, she claims that these defendants conspired to prevent her from being successful under the Corrective Action Plan and from transferring to another residency program.

This Cause of Action fails to state a claim because no constitutional violation is pled. Plaintiff alleges that the Individual Defendants conspired to attempt to force the Plaintiffs resignation from the residency program to prevent her from having access to due process and/or the grievance policies provided by the University. Amended Complaint, ¶ 86. The alleged conspiracy was unsuccessful because ultimately Plaintiff alleges she did not resign due to this pressure, she was terminated and was offered hearings and access to the grievance policies provided by the University. Amended Complaint, ¶¶ 25, 29, Exhibit D. Because there was no actual deprivation of rights, this fails to state a claim for relief. *Dixon v. City of Lawton, Okla.,* 898 F.2d 1443, 1449 (10th Cir.1990) (to recover under a § 1983 conspiracy claim, a plaintiff must prove (1) a conspiracy and (2) an actual deprivation of rights).

**\*16** Plaintiff further alleges that the Individual Defendants delayed Plaintiff's access to Human Resources available to her at the University and engaged in a ruse designed to make the plaintiff believe that Dr. Allen was a mediator who would reconcile plaintiff back into her residency program. Amended Complaint, ¶ 87. These allegations fail to state a claim because they do not allege a constitutional violation. While the alleged actions, if true, might not have been nice, they did not violate some constitutional right. Plaintiff further alleges that the individual defendants conspired to prevent the plaintiff from being successful under the Corrective Action Plan and from transferring to another residency program. Amended Complaint, ¶ 88. Again, this fails to allege a constitutional violation. Without a constitutional violation, there can be no conspiracy to deprive Plaintiff of her rights.

### d. Fifth Cause of Action—Deprivation of Liberty Interest (in maintaining her good name and reputation)

In her Fifth Cause of Action, Plaintiff claims that the Individual Defendants intentionally or recklessly deprived her of her liberty interest in maintaining her good name and reputation by, among other things, suspending and termination her residency; being required by the SOM's own

policies to report Plaintiff to the Division of Occupation Licensing and other entities as a result of the suspension and termination, thereby jeopardizing her status as a professional medical provider; causing on or about September 6, 2006 to be published a false and stigmatizing statement to the ACGME that Plaintiff was dishonest; and that on or about April 26, 2006, Dr. Allen caused to be published a false and stigmatizing statement to physicians and others at the LDS Hospital that there was justification for both the corrective action plan and non-renewal of the Plaintiff's residency and implying that the circumstances surrounding Plaintiff's residency were "depressing and sad."

Defendants argue that Plaintiff has failed to allege the elements of a deprivation of a liberty interest and there is no clearly established law that there is even a liberty interest in a medical residency. The court finds agrees with Defendants that Plaintiff has failed to demonstrate that there is clearly established law that a liberty interest exists in a medical residency, and thus the Defendants are entitled to qualified immunity.

Further, the allegations in Plaintiff's Amended Complaint fail to plead a violation of a liberty interest by any defendant. To establish a violation of a liberty interest, four elements need to be shown—(1) that the defendant made a statement impugning the plaintiff's good name, reputation, honor, or integrity; (2) that the statements were false; (3) that the defendant made the statements in the course of termination proceedings or that the statements foreclosed other employment opportunities; and (4) that the statements were published. *Workman v. Jordan,* 32 F.3d 475, 481 (10th Cir.1994).

**\*17** With regard to Drs. Hartsell and Stroud and Ms. Short, no allegations are made that they did any of these things. Plaintiff makes general allegations about the "Defendants" but does not link any Individual Defendant to any of the above elements. If Plaintiff were to tie her general allegations more specifically to the individual defendants, her general allegations would still fail to state a claim. The suspension and termination of Plaintiff's residency by itself fails to state a claim. *See Lancaster v. Indep. Sch. Dist. No. 5,* 149 F.3d 1228, 1235 (10th Cir.1998); *Dickeson v. Quarberg,* 844 F.2d 1435, 1440 (10th Cir.1988). Also, reporting the suspension and nonrenewal of Plaintiff to the Division of Occupational Licensing and other entities does not state a violation of a liberty interest Such a report would only be actionable if it were false, but Plaintiff acknowledges she was suspended and

that her residency was not renewed. *See Workman,* 32 F.3d at 481.

Defendants' causing to be published a false and stigmatizing statement to the ACGME that Plaintiff was dishonest might state a claim but Plaintiff does not allege who published that statement or that it occurred in the course of termination proceedings. If Plaintiff is capable of making these specific allegations, she may amend her complaint to so state. [13]

[13]    Unless discovery on this issue has already occurred, however, such an amendment will postpone the dispositive motion deadline and the trial in this matter.

Plaintiffs allegation that Dr. Allen caused to be published a statement "that there was justification for both the corrective action plan and non-renewal of the Plaintiffs residency and implying that the circumstances surrounding the Plaintiff's residency was depressing and sad," fails to state a violation of a liberty interest because the alleged statements do not impugn Plaintiffs good name, reputation, honor, or integrity.

Statements must rise to a certain level before they can be considered stigmatizing enough to violate an employee's liberty interest. Statements charging an employee with improper job performance, neglect of duties, insubordination, negligence, or dereliction in performance of her job duties are not stigmatizing and do not show a violation of a liberty interest. Statements that an employee is under investigation when such statements are true is not stigmatizing and do not show a violation of a liberty interest. It is likewise not enough that Plaintiff's termination alone makes her less attractive to future employers. Statements that do rise to the level of a liberty interest violation generally involve charges of dishonesty or immorality. Such charges directly attack the character and integrity of the plaintiff and attach to her like a "badge of infamy," making it difficult for a plaintiff to explain or justify them to future employers. [14]

[14]    See *Garcia v. Albuquerque,* 232 F.3d 760, 772 (10th Cir.2000) (stigmatizing allegations involve dishonesty or immorality); *Primus v. City of Oklahoma City,* 958 F.2d 1506, 1510 (10th Cir.1992) (the mere statement that there is an investigation does not violate a liberty interest when there actually is an ongoing investigation); *Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir.1988) (neglect of duties and insubordination, even when considered false, do not call into question a person's good name, reputation, honor, or integrity, only charges of dishonesty or immorality qualify); *Sullivan v. Stark,*

808 F.2d 737, 739–740 (10th Cir.1987) (statements charging an employee with negligence or dereliction in job performance not a liberty interest violation); *Asbill v. Housing Authority of the Choctaw Nation of Oklahoma,* 726 F.2d 1499, 1503 (10th Cir.1984) (charge of disputing authority of a new agency director held not to stigmatize discharged employee).

The statements allegedly made by Dr. Allen are not false, there was justification for the corrective action plan and nonrenewal, and the circumstances surrounding Plaintiff's residency were depressing and sad. Plaintiff may disagree with whether the justification was sufficient or even accurate but the statement made—that there was justification—is completely true. In addition, the statement never rises to the level of accusations of dishonesty or immorality. Dr. Allen did not say that the corrective action plan was imposed or the contract was not renewed for stigmatizing reasons, he merely said reasons existed. With regard to the second statement, "implications" are not actionable but even if they were, that the circumstances were depressing and sad is not false and is not stigmatizing.

**\*18** Thus, Plaintiff has failed to state a constitutional violation or point to any clearly established law, thus entitling the Individual Defendants to qualified immunity on this claim.

*e. Sixth Cause of Action—State Due Process and Free Speech Violations*

Plaintiff argues that Defendants' Due Process Policy failed to comply with the Utah Constitution and due process of law. Defendants have moved to dismiss the due process component of this claim (and not the free speech component) for the same reasons that they are entitled to qualified immunity under federal law. Utah offers a qualified immunity defense to state constitutional claims. *See Spackman v. Board of Education of the Box Elder County School District,* 16 P.3d 533 (Utah 2000).

Under Utah's qualified immunity defense, a plaintiff must establish that he or she suffered a flagrant violation of his or her constitutional rights. "In essence, this means that a defendant must have violated 'clearly established' constitutional rights 'of which a reasonable person would have known.' " *Id.* ¶ 23 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). To be considered clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Id.* The requirement that

*Halverson v. University of Utah School of Medicine, Not Reported in F.Supp.2d (2007)*

the unconstitutional conduct be flagrant ensures that a government employee is allowed the ordinary human frailties of forgetfulness, distractability, or misjudgment without rendering him or herself liable for a constitutional violation. *Id.*

For the same reasons that the Individual Defendants are entitled to qualified immunity with regard to plaintiffs federal due process claims, they are entitled to qualified immunity with regard to the state due process claims. In short, there is no clearly established law that a medical resident was to be given more due process than Plaintiff was given.

## C. Defendant Scott Smith's Motion to Dismiss the Claims Against Him in His Individual Capacity

Scott Smith is the attorney from the University's Office of General Counsel who advised the University as to this situation involving Plaintiff. Mr. Smith has joined in the above motion of the other Individual Defendants, and thus, the rulings discussed above also pertain to Mr. Smith.

Mr. Smith, however, also seeks dismissal of Plaintiff's First Amendment claims embodied the Second and Sixth Causes of Action because Plaintiff's allegations fail to tie Mr. Smith to those alleged deprivations. Additionally, he seeks dismissal of Plaintiff's Ninth Cause of Action for intentional infliction of emotional distress because the alleged conduct was not extreme or outrageous.

Plaintiff alleges, in her Second and Sixth Causes of Action, that her First Amendment rights were violated. Specifically, Plaintiff avers that the Individual Defendants, including Mr. Smith, terminated her residency in retaliation for Plaintiff having reported numerous concerns about the residency program. Amended Complaint, ¶ 64. However, Plaintiff cannot establish that Mr. Smith caused Plaintiff's residency to be terminated because Mr. Smith had no authority over the terms or duration of Plaintiff's residency.

**\*19** Mr. Smith, as an attorney at the University's Office of General Counsel, provides "legal advice to the institution's administration ." Amended Complaint ¶ 16. Plaintiff alleges that Mr. Smith also had "final policy making authority with respect to Plaintiffs education and employment." *Id.* This is a conclusory allegation, however, made without supporting facts and need not be accepted as true. *See, e.g., Erikson v. Pawnee County Bd. of County Comm.,* 263 F.3d 1151, 1154–55 (10th Cir.2001). Moreover, this conclusory allegation is belied by the attachments to the Amended

Complaint. The February 22, 2006 letter informing Plaintiff of the decision not to renew her residency contract, was signed by Dr. Stephen Hartsell and Dr. Susan Stroud, the directors of the emergency medicine residency program. Amended Complaint, Exhibit D. Additionally, Plaintiff's one-year contract was signed by Dr. Hartsell and the director of graduate medical education, Ms. Judi Short. Amended Complaint, Exhibit A. These attachments establish that the program directors, not Mr. Smith, were the final decision makers with regard to Plaintiffs residency. Thus, Plaintiff has failed to allege facts tying Mr. Smith to the deprivation of her First Amendment rights, and thus her First Amendment claims (embodied in her Second and Sixth Causes of Action) against Mr. Smith are dismissed.

To the extent Plaintiff claims that Mr. Smith was a co-conspirator in the alleged violation of her free speech rights, she has not alleged "specific facts showing an agreement and concerted action amongst the defendants." *Tonkovich v. Kan. Bd. of Regents,* 159 F.3d 504, 533 (10th Cir.1998); *Durre v. Dempsey,* 869 F.2d 543, 545 (10th Cir.1989) (affirming dismissal of conspiracy claim on a motion to dismiss, finding that."[c]onclusory allegations of conspiracy are insufficient to state a valid [section] 1983 claim."); *Cardoso v. Calbone* 490 F .3d 1194, 1199 (10th Cir.2007). Accordingly, Plaintiff's conclusory allegations of a conspiracy are insufficient to state a § 1983 claim.

Plaintiff has also alleged a claim for intentional infliction of emotional distress claim, the Ninth Cause of Action, against Mr. Smith. The court finds, however, that Mr. Smith's alleged conduct was not extreme, outrageous, and intolerable to the level of offending the generally accepted standards of morality. Under Utah taw, a plaintiff must prove four elements to establish an intentional infliction of emotional distress claim: (1) the defendant's conduct complained of was outrageous and intolerable in that it offended generally accepted standards of decency and morality; (2) the defendant intended to cause, or acted in reckless disregard of the likelihood of causing, emotional distress; (3) the plaintiff suffered severe emotional distress; and (4) the defendant's conduct proximately caused the emotional distress. *Prince v. Bear River Mut. Ins. Co.,* 56 P.3d 524, 535–36 (Utah 2002) (quotations and citation omitted).

**\*20** The Utah Supreme Court has held that a court may decide whether a claim for intentional infliction of emotional distress is sufficient as a matter of law. *Bennett v. Jones, Waldo, Holbrook & McDonough,* 70 P.3d 17, 33 (Utah 2003)

(affirming trial court's dismissal of plaintiff's fourth amended complaint where plaintiff failed to plead facts indicating defendants' conduct was sufficiently extreme, outrageous, and intolerable as a matter of law); *see also Coroles v. Sabey,* 79 P.3d 974, 983 n. 18 (Utah Ct .App.2003). A plaintiff must establish conduct that "evokes outrage or revulsion; it must be more than unreasonable, unkind, or unfair." *Prince,* 56 P.3d at 536 (quotations and citation omitted). "Additionally, conduct is not outrageous simply because it is tortious, injurious, or malicious, or because it would give rise to punitive damages, or because it is illegal." *Id.* (quotations and citation omitted). Here, Plaintiff alleges that Mr. Smith (1) delayed the production of a letter of certification, and (2) failed to safeguard her procedural rights in a hearing where she was represented by her own counsel. This alleged conduct cannot support a claim for intentional infliction of emotional distress. At most, the conduct that Plaintiff has alleged is merely "unreasonable, unkind, or unfair." *Prince,* 56 P.3d at 536 (quotations and citation omitted). Accordingly, Plaintiffs Ninth Cause of Action against Mr. Smith is dismissed. [15] In addition, because all claims against Mr. Smith have been dismissed, the pending discovery motions are denied as moot.

[15]    The other Individual Defendants did not move to dismiss this claim, and thus, Plaintiffs claim for intentional infliction of emotional distress remains against them.

### IV. CONCLUSION

Accordingly, IT IS HEREBY ORDERED that:

1. The Defendant University of Utah Medical School's Motion to Dismiss [docket # 71] is GRANTED, and all claims against the University of Utah Medical School are DISMISSED without prejudice, except, as noted below, the § 1983 claims against the University are DISMISSED with prejudice;

2. The Medical School and Individual Defendants' Motion to Dismiss [docket # 51] is GRANTED in part and DENIED in part. The § 1983 claims against the Medical School are DISMISSED with prejudice. In addition, the Individual Defendants, insofar as they are sued in their official capacities, are dismissed from this action, with the exception of the Tenth Claim for Relief, to the extent it seeks prospective injunctive relief. Plaintiffs First, Third, Fourth, Fifth and Sixth Causes of Action (due process portion) are DISMISSED with prejudice, with the exception of a small portion of Plaintiff's Fifth Cause of Action, noted above, which is dismissed without prejudice;

3. Defendant Scott Smith's Motion to Dismiss [docket # 54] is GRANTED, and the claims against Mr. Smith are DISMISSED with prejudice;

4. Plaintiff's pending Motion to Compel Discovery and for Sanctions [docket # 98] is DENIED AS MOOT, and Defendant's Motion for Protective Order [docket # 94] is also MOOT;

5. Plaintiff may pursue her Second Cause of Action (First Amendment), the portion of her Sixth Cause of Action pertaining to Free Speech under the Utah Constitution, her Ninth Cause of Action (Intentional Infliction of Emotional Distress) against the Individual Defendants except for Mr. Smith, and her Tenth Cause of Action to the extent it seeks prospective injunctive relief;

**\*21** 6. The Order dated August 30, 2007, imposing a stay in this case, is VACATED and the stay is now LIFTED.

---

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 4585873
Only the Westlaw citation is currently available.
United States District Court,
D. South Carolina,
Charleston Division.

Jo A. LEWIS, Plaintiff,
v.
EXCEL MECHANICAL, LLC,
and Roger W. Lewis, Defendants.

Civil Action No. 2:13–cv–
281–PMD.    |    Aug. 28, 2013.

**Attorneys and Law Firms**

Bert Glenn Utsey, III, Peters Murdaugh Parker Eltzroth and
Detrick, Walterboro, SC, Lee D. Cope, Peters Murdaugh
Parker Eltzroth and Detrick, Hampton, SC, for Plaintiff.

Lee E. Dixon, Richard D. Addison, Hedrick Gardner
Kincheloe and Garofalo, Columbia, SC, for Defendants.

### ORDER

PATRICK MICHAEL DUFFY, District Judge.

**\*1** This matter is before the Court upon Plaintiff's Motion
for Judgment on the Pleadings ("Motion") pursuant to Rule
12(c) of the Federal Rules of Civil Procedure. Defendants
filed a Response in Opposition, and Plaintiff filed a Reply.
After considering the arguments of the parties, the pleadings
submitted, and the record in this case, the Court denies
Plaintiff's Motion.

### BACKGROUND/PROCEDURAL HISTORY

Plaintiff Jo. A Lewis ("Mrs.Lewis") filed this action against
her husband, Roger W. Lewis ("Mr.Lewis"), and Excel, a
South Carolina limited liability company, of which Mr. Lewis
is the single member. On or about September 4, 2011, Mr.
Lewis was operating a watercraft (hereinafter, the "Boat")
in the Charleston harbor, and his wife, along with two other
passengers, were onboard. Mr. Lewis drove the Boat onto
a sandbar where he intended to ground the Boat, but in
the process, he caused a collision that trapped Mrs. Lewis's
lower leg between the Boat and the sandbar. According to

Plaintiff, Mr. Lewis was entertaining the other two passengers
as business prospects of Excel, and therefore, Mr. Lewis was
engaged in the conduct of Excel's business. Additionally,
Plaintiff contends that the injuries she sustained were caused
directly and proximately by Mr. Lewis's negligence and that
Excel is vicariously liable for Mr. Lewis's negligence. Mrs.
Lewis seeks actual and punitive damages.

Defendants filed their Answer on April 1, 2013, and admit
therein that Mr. Lewis was negligent; that he was acting
within the course and scope of his employment at the time of
the collision; and that Defendant Excel is vicariously liable
for Mr. Lewis's negligence. Defs.' Answer ¶¶ 7, 14, 15,
ECF No. 7. Defendants also assert an affirmative defense of
comparative negligence by Plaintiff.

On July 23, 2013, Plaintiff filed the instant Motion seeking
a judgment on the pleadings on the issues of Mr. Lewis's
negligence and Excel's vicarious liability for that negligence.
Defendants filed their Response in Opposition on August 8,
2013, and after being granted an extension of time to file,
Plaintiff filed a Reply on August 23, 2013.

### STANDARD OF REVIEW

Parties are permitted to make a motion for judgment on the
pleadings under Rule 12(c) of the Federal Rules of Civil
Procedure "[a]fter the pleadings are closed—but early enough
not to delay trial...." Fed.R.Civ.P. 12(c). A motion to dismiss
under Rule 12(c) is designed to "dispos[e] of cases in which
there is no substantive dispute that warrants the litigants and
the court proceeding further...." 5C Charles A. Wright and
Arthur R. Miller, *Federal Practice and Procedure* § 1368 (3d
ed.2010).

Under a Rule 12(c) motion, "only the pleadings are
considered...." *A.S. Abell Co. v. Baltimore Typographical
Union,* 338 F.2d 190, 193 (4th Cir.1964). The court may,
however, consider the documents and exhibits attached to
and incorporated into the pleadings themselves. *See Eagle
Nation, Inc. v. Market Force, Inc.,* 180 F.Supp.2d 752, 754
(E.D.N.C.2001); *N. Ind. Gun & Outdoor Shows, Inc. v. City
of South Bend,* 163 F.3d 449, 452–53 (7th Cir.1998).

**\*2** A district court, in reviewing a Rule 12(c) motion,
"appl[ies] the same standard ... as for motions made pursuant
to Rule 12(b)(6)." *Burbach Broad. Co. v. Elkins Radio Corp.,*
278 F.3d 401, 405–06 (4th Cir.2002). "To survive a Rule

12(b)(6) motion, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A motion for judgment on the pleadings should be granted only if "the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law." *Park Univ. Enters. v. Am. Cas. Co.,* 442 F.3d 1239, 1244 (10th Cir.2006) (quoting *United States v. Any & All Radio Station Transmission Equip.,* 207 F.3d 458, 462 (8th Cir.2000)). When a court reviews a motion for judgment on the pleadings, it should "construe the facts and reasonable inferences ... in the light most favorable to the [nonmoving party]." *Ibarra v. United States,* 120 F.3d 472, 474 (4th Cir.1997). Thus, "[t]he court must accept all well pleaded factual allegations in the non-moving party's pleadings as true and reject all contravening assertions in the moving party's pleadings as false." *John S. Clark Co., Inc. v. United Nat'l Ins. Co.,* 304 F.Supp.2d 758, 763 (M.D.N.C.2004) (citing 5A Charles A. Wright and Arthur R. Miller, *Federal Practice and Procedure* § 1368 at 520 (2d ed.1990)).

Courts follow "a fairly restrictive standard" in ruling on Rule 12(c) motions, as "hasty or imprudent use of this summary procedure by the courts violates the policy in favor of ensuring to each litigant a full and fair hearing on the merits of his or her claim or defense." 5C Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1368 (3d ed.2011). Ultimately, "a defendant may not prevail on a motion for judgment on the pleadings if there are pleadings that, if proved, would permit recovery for the plaintiff." *BET Plant Servs., Inc. v. W.D. Robinson Elec. Co. .,* 941 F.Supp. 54, 55 (D.S.C.1996).

### DISCUSSION

Plaintiff argues that she is entitled to a judgment on the pleadings because Defendants' Answer: (1) "clearly and unequivocally admits [Mr.] Lewis acted negligently and caused the accident and Plaintiff's injuries," and (2) "admits unequivocally that Excel is vicariously liable for [Mr.] Lewis'[s] negligent conduct in injuring Plaintiff inasmuch as [Mr.] Lewis was acting as Excel's agent at the time of the subject accident." Pl.'s Mot. J. on Pleadings 2, ECF No. 37. Defendants do not dispute that they have made these admissions. Instead, Defendants contend that because other

factual issues remain to be determined by the Court, Plaintiff's Motion is not appropriate and must be denied. The Court agrees.

Further factual issues remain to be resolved in this case. For instance, the Court must still determine to what extent Mr. Lewis was, admittedly, negligent, and whether his actions or inactions in operating the Boat were also grossly negligent, careless, reckless, willful, wanton and unlawful, as alleged by Plaintiff. *See* Compl. ¶ 14, ECF No. 1. Defendants have also asserted the affirmative defense of comparative negligence in their Answer. Therefore, the Court will be required to make findings of fact with respect to Plaintiff's negligence, if any.

**\*3** Defendants state that judgment on the issue of negligence is not appropriate because Plaintiff alleges that the "[c]ollision was due to and caused directly and proximately by ... Lewis'[s] negligence;" [1] but, in their Answer, Defendants only admit "that the collision was due to and caused directly by Lewis'[s] negligence." [2] Thus, Defendants contend that the Court must make a determination as to whether that negligence was the proximate cause of Plaintiff's injuries. Plaintiff argues that the omission of the words "and proximately" is merely a scrivener's error. At this stage, however, the Court must construe the facts in the light most favorable to Defendants and assume this omission was not in error, but intentional as Defendants' claim.

[1]   Compl. ¶ 14, ECF. No. 1

[2]   Defs.' Answer ¶ 14, ECF No. 7

It is evident that the pleadings do not resolve all of the factual issues in this case. The Court finds that a bench trial on the merits would be more appropriate than an attempt at resolution of certain issues of the case on a Rule 12(c) motion. *See Roberts v. Robert v. Rohrman, Inc.,* 909 F.Supp. 545, 552 (N.D.Ill.1995) ("If the pleadings do not resolve all of the factual disputes, a trial is more appropriate than a judgment on the pleadings.") (citing Wright & Miller, 5A *Federal Practice and Procedure* § 1367 at 509–10 (2d ed.1990)).

### CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Plaintiff's Motion for Judgment on the Pleadings pursuant to Rule 12(c) is **DENIED.**

**Lewis v. Excel Mechanical, LLC, Slip Copy (2013)**

---

**AND IT IS SO ORDERED.**

---

**End of Document**                                              © 2015 Thomson Reuters. No claim to original U.S. Government Works.

---