IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Afraaz R. Irani, M.D., | ) | |
| | ) | C.A. No. 3:14-cv-3577-CMC-KDW |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **AFFIDAVIT OF** |
| Palmetto Health; University of South Carolina | ) | **DAVID E. KOON, JR., M.D.** |
| School of Medicine; David E. Koon, Jr., M.D., in | ) | [December 2015] |
| his individual capacity; and John J. Walsh, IV, | ) | |
| M.D., in his individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

David E. Koon, Jr., M.D., whose signature appears below, testifies under oath as follows:

1.      At all times relevant to this lawsuit, I have been a member of the faculty of the University of South Carolina School of Medicine ("USC-SOM") Orthopaedic Surgery Department.  In that capacity, I have served as Program Director of the Palmetto Health Orthopaedic Surgery Residency Program in which Dr. Afraaz Irani was a resident from July 1, 2010 until April 10, 2012.  I have personal knowledge and am competent to testify as to the matters stated in this affidavit.

2.      I am a custodian of records attached to this affidavit and referenced herein except as otherwise noted.  Citations referenced in this affidavit as "[USC(Irani)####]" refer to bates-labeled documents attached to this affidavit, which are documents I prepared for presentation to the grievance committee that conducted a hearing after termination of Dr. Irani's residency. Unless otherwise noted, the documents referenced in this affidavit are included in a chronological set of documents submitted with a concurrently filed affidavit of Kathryn Thomas, an attorney whose firm represents USC-SOM, Dr. Walsh, and me in this litigation.  Many of those same referenced documents may be found in my chronological submissions (attached to this affidavit) to the grievance committee that heard Dr. Irani's post-termination grievance on April 30, 2012.  All documents submitted with the Court by my attorneys that indicate my authorship, receipt, and/or signature were indeed authored, received, and/or signed by me.  My statements and representations in such documents are true and correct of my personal knowledge.  In instances when I have stated in documents that information was conveyed to me by others, or was based on information conveyed by others, such information was indeed conveyed to me by others in my capacity as Program Director.

3.      Pursuant to an Affiliation Agreement between Palmetto Health and USC-SOM, the institutions cooperate in the operations of certain residency programs, including an Orthopaedic Surgery Residency Program.  Palmetto Health is the Sponsoring Institution that

administers the residency program pursuant to guidelines of the ACGME, an accrediting organization. USC-SOM is a medical education institution affiliated with the program. Palmetto Health, as the Sponsoring Institution of the Program, pays compensation to an educational trust for our faculty's involvement in the education of residents, including my services as Program Director. Our faculty and I do not receive any pay from Palmetto Health and are not employed by Palmetto Health.

4.      The Orthopaedic Surgery Residency Program is an academic program, but residents are also technically employees of Palmetto Health. Pursuant to ACGME guidelines, Palmetto Health, as the Sponsoring Institution, is required to provide subsistence pay and benefits to residents to allow them to dedicate their full-time efforts to the pursuit of their residency education. In that regard, each resident chosen to participate in the program for the upcoming academic year enters into a one-year contract with Palmetto Health, entitled "Resident Agreement of Appointment." Kathy Stephens signs each Agreement as Palmetto Health's Vice President of Medical Education and DIO. Charles Beaman signs each Agreement as Palmetto Health's President and Chief Executive Officer. I sign as Program Director of Orthopaedics. USC-SOM solely provides academic support for the program and does not employ residents or provide them with employment benefits. Dr. Irani was never employed by USC-SOM, and never received employment benefits from USC-SOM. While the faculty may recommend academic action to Palmetto Health, USC-SOM does not hire, fire, or employ residents. The faculty and I have no authority to bind USC-SOM contractually, and no authority to employ residents.

5.      Palmetto Health, as the Sponsoring Institution, employs individuals within its organization to administer and govern its residency programs. At all relevant times, Dr. Kathy Stephens, Palmetto Health's Vice President of Medical Education, served as Palmetto Health's Designated Institutional Officer ("DIO") for the residency programs of which Palmetto Health is the Sponsoring Institution. There are other Palmetto Health representatives in Dr. Stephens's chain of command and with whom she interacts while administering the programs. DIO Stephens was the primary person with whom I would interface when it became apparent that we had residency issues that would need to be addressed with the Graduate Medical Education Committee ("GMEC"). The GMEC is an organization composed of various representatives of Palmetto Health's overall residency program, representatives of the individual residency programs within that program, and representatives of affiliated entities. As Program Director of the Orthopaedic Surgery Residency Program, I am a member of the GMEC. As Chair of the USC-SOM Orthopaedic Surgery Department, Dr. John Walsh is also a member of the GMEC. The GMEC meets approximately every other month to address various issues that are deemed to require GMEC's involvement. From time to time, issues arise with residents, and program representatives make recommendations on remediation and/or termination of residents. Only the GMEC, or GMEC's Executive Committee on a temporary basis, has the authority to approve Level II or Level III remediation, and the GMEC must vote to terminate a resident from a program.

6.      Pursuant to policies and procedures established by Palmetto Health, if our Department feels the need to address resident concerns by way of formal remediation, we must make our recommendations to the GMEC. In the rare instance when our faculty has felt the need to recommend formal remediation of a resident, I have communicated with Kathy Stephens to

2

assure that our actions and recommendations are in line with Palmetto Health's policies and with what she expects as the Program's DIO.

7.      In the fall of 2009, I was involved in selecting Dr. Afraaz Irani, among many qualified candidates, for a residency interview, and I recommended Dr. Irani to fill a first year internship (i.e., PGY1) residency position in our program for the 2010-2011 academic year. We are not required to interview everyone who applies, and we are selective in choosing whom to interview. I was impressed with Dr. Irani's application packet, which included a notable recommendation letter from the Dean of the Stanford medical school. USC-SOM faculty members Dr. John Walsh, Dr. Jeffrey Guy, and I, along with senior level resident Justin Hoover, interviewed Dr. Irani when he came to our campus to visit. I was favorably impressed with Dr. Irani, and on my interview form indicated an opinion that Dr. Irani would be an "excellent" fit within our program, my rating of Dr. Irani as a "9" on a scale of 1 to 10, and that I considered Dr. Irani to be among the "top ten" residency candidates that we interviewed for that year. [USC(Irani)0202]  Similarly, Dr. Walsh's interview form indicated an opinion that Dr. Irani would be an "excellent" fit within our program, Dr. Walsh's rating of Dr. Irani as a "10" on a scale of 1 to 10, and that Dr. Walsh considered Dr. Irani to be among the "top ten" residency candidates that we interviewed for that year. [USC(Irani)0201]  Dr. Guy's interview form indicated an opinion that Dr. Irani would be an "excellent/good" fit within our program, Dr. Guy's rating of Dr. Irani as a "9" on a scale of 1 to 10, and that Dr. Guy considered Dr. Irani to be among the "top ten/top third" of the residency candidates that we interviewed. [USC(Hoover)0199]  Dr. Hoover's  interview form indicated an opinion that Dr. Irani would be a "good" fit within our program, Dr. Hoover's rating of Dr. Irani as an "8" on a scale of 1 to 10, and that Dr. Hoover considered Dr. Irani to be among the "top third" of residency candidates that we interviewed. [USC(Irani)0200]  Dr. Irani must have been impressed with us as well, as we "matched" through the national program. As always, we were very pleased to have matched with candidates of our choosing. We had high expectations of Dr. Irani, just as we do all of our residents.

8.      The first year of Dr. Irani's residency was as an intern (PGY1). Interns are generally in the first year out of medical school and are exposed to a variety of practices (not just orthopaedics) and activities commensurate with their expected level of knowledge and abilities. Our goal is to educate, train, and motivate residents. Generally speaking, we address issues of concern with interns and residents informally as they arise. As Program Director, I would usually learn of concerns about our residents from our faculty, from senior residents, from our staff and hospital staff, and from physicians with whom residents come into contact while performing their duties. Other faculty members and I may discuss concerns directly with the residents, or we often ask senior residents to address concerns with the junior level residents on an informal basis. Usually there is not much documentation unless concerns become severe or recur after informal counseling. Our Department faculty meet approximately once a month, and during the first part of those meetings, we generally include senior residents to discuss issues relating to residents. From time to time we have asked junior residents to join us when we feel a meeting with the faculty as a group would be beneficial. Ours is a fairly small department. Our Department faculty during Dr. Irani's PGY1 year included Department Chair John Walsh, Vice Chair Frank Voss, Jeffrey Guy, and Christopher Mazoué. The senior resident (PGY5) during Dr. Irani's PGY1 year was Dr. Mary Finn. Dr. Greg Grabowski joined our faculty at the beginning of Dr. Irani's PGY2 year, and the senior residents (PGY5) that year were Dr. Justin Hoover and

Dr. Jennifer Wood.

9.    I recall a number of concerns about Dr. Irani from various sources during his PGY1 year.  It was a rough year for him.  As part of his PGY1 rotations, Dr. Irani was in a position to work under the supervision of several physicians from outside of our practice, as well as with our faculty and residents.  Palmetto Health has a New Innovations system that allows attendings, residents, and staff to submit online evaluations of residents.  Normally, we receive nothing but praise for our residents.  In the fall of his PGY1 year, Dr. Irani received mixed reviews – some praise from his attending physicians, but also some negative comments, which is very unusual for our program.  For instance, in September 2010, Dr. Harold Friedman of Plastic & Reconstructive Surgery noted in his evaluation of Dr. Irani that "after we discussed our plans for a patient he would ask me several times on different occasions what the plan was. . . . I would suggest writing things down and asking questions at the time if something is not clear." [USC(Irani)0324]  In October 2010, Dr. Mark Jones and Dr. Raymond Bynoe of the Trauma Service noted concerns in their evaluations of Dr. Irani [USC(Irani)0323-329]:

> Dr. Jones wrote: "Was not confident that Dr. Irani was completely invested in caring for our patients.  Did not give me the feeling that he was always truly aware of what was going on with the patients he was managing on the trauma floor. . . . He has not yet shown that he has the dedication it requires to have my support for caring for my family. . . . He needs to step up as a doctor and become accountable and invested in the treating of patients. . . . Dr Irani must realize he has crossed the threshold from student to physician and begin to be accountable for his actions and accountable to his patients.  He did not show me that he was interested in taking care of our patients on the trauma service at the level that we expect from our new resident physicians."

> Dr. Bynoe wrote that Dr. Irani needs "to be more aggressive in care plan," was "laid back," and needed to "be more aggressive" in gathering patient information and working with health care professionals to provide patient focused care.  Dr. Bynoe wrote that Dr. Irani "could have been more interactive on the service – I understand this is not his specialty but sometimes the pts will have general medical problems."  Dr. Bynoe wrote that Dr. Irani "needs to develop degree of enthusiasm – same somewhat lackadaisical about the service – I understand a lot of paper work but needs to put effort – maybe personality, but concern for drive."

Dr. Irani received these evaluations as they were submitted and was aware of these comments and criticisms.  I specifically counseled Dr. Irani at length in December 2010 and at other times about concerns of which we were aware, and I encouraged him to work to improve his performance as he headed into a new rotation.  In January 2011, Dr. Katherine Mastriani noted in her evaluation of Dr. Irani that he "Needs to take greater responsibility for the welfare of the patient; too often would fail to recognize need for urgency in patient care."  [USC(Irani)0331]  I wrote in my evaluation of Dr. Irani on February 2, 2011:  "I have spoken to Dr. Irani at length about his performance thus far in his internship.  He needs significant improvement in several areas and he seems to understand these issues."  [USC(Irani)0325]  Thereafter, on February 7, 2011, Dr. William Ross wrote [USC(Irani)0332]:

> Dr. Irani had a rough start at the VA hospital, where I first had occasion to work with him. He seemed to lack motivation and lacked consistency in his patient evaluations and care plans. However, I did see marked improvement by the conclusion of the rotation. His rather unique personality seems to get in the way of his interpersonal relationships, both with his peers and staff. He is highly intelligent and his core medical knowledge is excellent but he needs to temper this with a greater desire to improve his core surgical knowledge base/skill set. I think that he has incredible potential to become an excellent surgeon but needs to develop the motivation and people skills to succeed.

On February 19, 2011, the attending physician at the VA (Veterans Hospital) noted in his evaluation of Dr. Irani: "handwriting is atrocious; lacks sense of urgency; still lacks a sense of decorum – uses sarcasm and/or humor at inopportune moments in interactions with residents/staff, and (to a much smaller extent) patients." [USC(Irani)0321] On February 21, 2011, Dr. Mark Jones of the Trauma Service wrote: "Dr. Irani did improve from his first rotation on trauma to his second. . . . Overall, still needs to take responsibility for total patient care as if they are his patients. I think his improvements are promising, but he still has a lot of room for further improvement." [USC(Irani)0325] On April 3, 2011, the attending physician at the VA wrote: "Legibility of his notes is sometimes an issue – there are times even he couldn't decipher what he'd written. His quiet manner can be interpreted as being aloof or not caring." [USC(Irani)0321] Again, Dr. Irani received all of his evaluations through the New Innovations system, just as I did. As indicated in my notes, Dr. Irani and I had lengthy conversations about concerns expressed from various sources. I am also aware that other attending physicians and residents counseled Dr. Irani, as we discussed such matters among our faculty. Dr. Walsh discussed with me concerns he had about having to repeat instructions to Dr. Irani. For example, Dr. Walsh reported that he had several conversations with Dr. Irani about his inadequate H&P's (history and physical examinations of patients). We expect medical school graduates to have already learned how to do an adequate H&P. Even after counseled by Dr. Walsh, Dr. Irani would continue to prepare inadequate H&P's, leaving out different types of information each time. That was a concern I heard about Dr. Irani from other physicians as well.

10.    On August 10, 2011, Kathy Stephens emailed Dr. Walsh and me and made us aware of concerns of Palmetto Health staff regarding Dr. Irani's interactions during the care of patient "Mr. B." We shared the concerns with our faculty and senior resident for their involvement and opinion, and I forwarded the email exchange to Dr. Irani and asked for an explanation by the end of the day. Dr. Irani provided a response which to me appeared very superficial and showed a lack of concern for the patient. I followed up with Palmetto Health and obtained further information from their staff that refuted Irani's version of events.

11.    Dr. Walsh and I prepared a memorandum of record (MOR) dated August 15, 2011, that listed seven  deficiencies and recommended that Dr. Irani be placed on Level II academic remediation for the period of August 15, 2011 through December 2011. This memorandum summarized concerns to be addressed with Dr. Irani as part of an evaluation of this performance over the preceding seven-month period. On August 15, 2011, I met with Dr. Irani, with Paul Athey (practice manager) present, to discuss the concerns and recommendation.

12.    As stated in my email correspondence to Dr. Walsh and Paul Athey on August 16,

5

I informed Dr. Irani during our August 15 meeting that the faculty had serious concerns about his performance thus far in his training. I gave Dr. Irani the opportunity to share his thoughts on how his first fourteen months at Palmetto Health had gone. I informed him that we were recommending that he be placed on academic remediation and gave him a copy of the August 15, 2011 MOR. Dr. Irani stated that he did not agree with some of the points and complained that some were too vague. He initially laughed about some of them and appeared not to take them very seriously. He then proceeded to offer excuses or rationalize each point that was noted in his deficiencies and argue that he was misunderstood at times. The only item with which he agreed was item # 5 in that he should not have closed the wound with Vicryl. He accused the ER/trauma nurse of lying about the events surrounding Mr. B's care in the trauma room. Dr. Irani seemed to lack insight into his poor performance and failed to take any responsibility for his actions. I informed Dr. Irani that these were the recommendations of the department to the GMEC and that the GMEC Executive Committee would probably approve these recommendations pending full GMEC voting in early September. I encouraged him to review the GME policy on academic remediation. He was allowed to respond to each item in the MOR and ask questions. In informed him that failure to improve his performance and meet the remediation measures could result in recommendations for continued probation and/or possible termination from the training program. I invited him to provide a written response to our recommendations.

13.     I had my assistant forward the August 15 MOR to Kathy Stephens, who responded that she would take the recommendation to the GMEC Executive Committee for temporary action. Dr. Stephens requested a more specific remediation plan, and offered to send examples. Dr. Stephens, herself an Executive Committee member, consulted with Executive Committee members James Raymond and Richard Hoppman, and the three approved Level II remediation as a temporary action until next GMEC meeting. I informed Dr. Irani.

14.     On August 27, 2011, I emailed faculty members Drs. Voss, Mazoue, Guy, Grabowski, and Walsh an update that Dr. Irani was placed on Level II academic remediation with the approval of the GMEC Executive Committee pending a full vote of the GMEC at its next meeting. I shared with everyone the MOR, asked everyone for attention to Dr. Irani's clinical performance. The communication noted plans for the faculty to discuss the matter at the next faculty meeting.

15.     Pursuant to Dr. Stephens's recommendation to Dr. Irani, I met with Dr. Irani again on September 7, 2011. We had a similar discussion as before, and I encouraged him to appeal the decision if he felt he needed to. I am aware that Dr. Irani met again with Dr. Walsh on September 11, 2011. At a faculty meeting on September 12, 2011, we discussed concerns about Dr. Irani's performance and how to assist him in his remediation.

16.     On September 19, 2011, I emailed Dr. Stephens and Dr. Walsh a schedule of periodic updates for addressing academic remediation measures for Dr. Irani. The communication set forth that I met with Dr. Irani on August 15, September 7, and September 10; that Dr. Walsh had met with Dr. Irani shortly thereafter as part of the appeal/grievance process; that Drs. Grabowski and Walsh were scheduled to meet with Dr. Irani for his 6-month/7-month evaluation; and that there were plans to meet with Dr. Irani about his progress.

17.    On September 20, 2011, Dr. Grabowski and Dr. Walsh met with Dr. Irani to review his progress and the faculty's evaluation of his performance over the past seven months. Dr. Walsh later prepared a memorandum, dated September 22, that summarized that meeting. Dr. Irani signed the memorandum when Dr. Walsh and I met with him on October 3, 2011.

18.    In late October and early November, I had to ask Dr. Irani repeatedly to write a discharge order for a particular patient. When Dr. Irani finally did it, he sent me an email on November 3, 2012, that I considered insubordinate. He emailed me: "I actually never participated in the patient's care, and am not sure how I am responsible for the discharge order," but "Anyways I have gone ahead and dictated the discharge summary for your review." I was astounded, and responded, with copies to Dr. Walsh and the senior residents: "I'm amazed that, as the junior resident of the PH team, you feel somehow inconvenienced by having to dictate a discharge summary on a patient that you "never actually participated" in his care. I guess that I'm supposed to be thankful that you "have gone ahead and dictated the discharge summary" for me. Absolutely incredible...I can assure you I would have NEVER in a million years sent a response like this to my program director, especially when I was in midst of academic remediation. I would remind you that I had asked you THREE times to get this done. Instead of saying "No sweat Dr. Koon, I'll take care of it" and getting it done, I get this dribble. I really am at a loss for words. Jennifer/Justin, I'm open to any suggestions."

19.    Thereafter, Dr. Walsh reported another instance of Dr. Irani's poor judgment that affected the care of one of Dr. Walsh's patients. When the patient was released after surgery, Dr. Irani was responsible for writing the patient's prescriptions. Under Dr. Walsh's orders, the patient was to be prescribed twelve pills a day, and should have been prescribed a supply of medication to cover the time until her follow up appointment twelve to fourteen days later. Dr. Irani had written the patient a prescription for just 40 pills, so the patient was calling the clinic within a matter of days asking for a refill. Dr. Walsh addressed the concern with Dr. Irani as well as to me and others involved in monitoring Dr. Irani's progress. I was aware of concerns from other attendings and residents as well.

20.    On November 21, 2011, Dr. Jennifer Wood (senior resident) and I met with Dr. Irani to review his progress and ongoing concerns. As set forth in my November 29, 2011 memorandum of that meeting, Dr. Wood and I had a very frank discussion with Dr. Irani. Dr. Wood addressed several instances where she believed Dr. Irani was still performing below his level of training. These included failures to complete assigned tasks, for example the morning patient list. We discussed Dr. Irani's inappropriate email to me regarding the completion of a delinquent narrative summary. We discussed the fact that Dr. Walsh had to address Dr. Irani's failure to prescribe sufficient pain medication for a post-operative patient. Dr. Irani asked about the pending recommendations of the faculty on his remediation. I informed him that the decision had not been finalized, but I thought that we would transition him to Level I remediation. After a long sigh and a rolling of the eyes, Dr. Irani informed us that this decision would only continue his "overhead." When questioned about this statement, he informed us that he had been "documenting" his activities and that he would have to continue this process until he was "off of probation." He appeared to be completing a "log" in order to disprove allegations of tardiness.

21.    Thereafter, Dr. Irani failed to properly assess and manage a patient of mine with post-operative wound drainage and infection after she called twice over a three-day weekend

(November 25-27, 2011). Then Dr. Irani failed to abide by his attending surgeon's instructions during a staff clinic on November 28, 2011, and was argumentative when confronted by Dr. Wood. I was concerned that Dr. Irani continued to display behaviors that were inappropriate and unprofessional. I included these concerns in a memorandum dated November 29, 2011. I emailed the memorandum to Drs. Walsh, Wood, Hoover, and Kathy Stephens that day, stating that we would meet with Dr. Irani at our next faculty meeting on Monday, December 5, 2011. Kathy Stephens responded with a recommendation that we address these deficiencies with Dr. Irani in terms of specific examples of what is not acceptable and expectations. I prepared to do that for the December 5 meeting.

22.     The faculty met with Dr. Irani on December 5, 2011. We had heard concerns from residents that Dr. Irani was recording their conversations and had recorded a telephone conversation with Dr. Abell. At the outset of the December 5 meeting, Dr. Koon questioned Dr. Irani about that concern, and Dr. Irani sheepishly admitted that he had recorded a conversation with Dr. Abell. It was astounding to me that Dr. Irani would think it was appropriate and professional to record a conversation with an attending physician. Dr. Koon led the discussion in the December 5 meeting and addressed the ongoing concerns and the need to recommend further remediation measures. Dr. Irani was given adequate opportunity to respond, but his responses were basically to deny that he had done anything wrong and to offer excuses and shift blame to others. It was clear from his attitude that our expressions of concern to him over the course of his residency, including the course of remediation, had not gotten his attention and were not likely to lead to improvement in his performance without stepping up remediation measures. After Dr. Irani left the meeting the faculty unanimously concurred that suspension of Dr. Irani's clinical duties would be appropriate.

23.     On December 7, 2011, Palmetto Health staff brought to my attention concerns about Dr. Irani's interactions surrounding treatment of a trauma patient ("TF375"). I talked with and obtained the written accounts of hospital staff members who had interacted with Dr. Irani during the treatment of that patient. That incident was of concern in light of ongoing issues we had already addressed with Dr. Irani, including just two days earlier. That incident precipitated immediate action on the faculty's recommendations. With the GMEC Executive Committee's approval, Dr. Irani was notified that he was placed on Level III Academic Remediation and his clinical duties were suspended immediately on December 9, 2011, pending a decision by the GMEC at its next meeting.

24.     With Dr. Walsh's input, I prepared a memorandum dated December 12, 2011, and I provided a copy to Dr. Irani. The memorandum notes Dr. Irani's history of remediation and the December 5, 2011 interactions with the faculty.

25.     On December 13, 2011, the GMEC voted unanimously to approve the recommended Level III remediation and suspension of Dr. Irani for the period of December 9, 2011, through at least January 30, 2012. Pursuant to the Palmetto Health Resident Manual, Dr. Irani was removed from clinical rotations. I notified Dr. Irani of the decision by email that day. In my email, I suggested Dr. Irani refer to the Palmetto Health Resident Manual (Grievance and Due Process policy) for measures to appeal the GMEC's decision. My email notes that the faculty would review his situation at the end of January 2012 to determine appropriate action going forward.

26.     Dr. Irani thereafter met with me, and then with Dr. Walsh, as part of his grievance of the GMEC's decision.  When Dr. Irani met with me, we discussed the concerns of the faculty, and Dr. Irani was given the opportunity to present his side of things.  We discussed the purpose and process of remediation and that the goal was to have him take our concerns to heart and return from his period of suspension and address the areas of concern.  Dr. Walsh had a similar discussion with Dr. Irani which he summarized in a memorandum dated December 19, 2011.  Dr. Walsh's memorandum noted Dr. Irani provided his account of events surrounding the care of patient TF375, and that they discussed Dr. Irani's evaluations, and the purpose and process of remediation.  Dr. Walsh met with Dr. Irani on January 18, 2012, when Dr. Irani returned to South Carolina after a visit with his family in California.  Dr. Irani signed the December 19 memorandum, and Dr. Walsh reported that they had further discussion about Dr. Irani's concerns and how to address remediation going forward.

27.     Thereafter, I invited Dr. Irani to a meeting on January 31, 2012 to review a remediation plan that we had prepared.  We presented Dr. Irani with a memorandum dated January 31, 2012, signed by Dr. Walsh, Dr. Frank Voss, and me, which set forth Dr. Irani's remediation history and the faculty's recommendation that Dr. Irani be placed on Level II Academic Remediation for the period February 6 through June 15, 2012.  The memorandum states that Dr. Irani would be placed on the Total Joint service with Dr. Frank Voss, would be required to arrange and attend bi-weekly meetings with Dr. Voss to review his performance, and would be required to arrange and attend monthly meetings with me to review the progress with his remediation measures.  Attached to the memorandum is the recommended Palmetto Health Academic Remediation plan that details competencies not being met, a remediation plan for each, and evaluation tools to measure his progress.  Dr. Irani signed these documents on February 1, 2012.

28.     I am aware, from discussions with Dr. Guy, Dr. Walsh, and Dr. Irani, that Dr. Guy had spent substantial time coaching Dr. Irani, and that they had several discussions that Dr. Irani might be better suited for a non-clinical profession than for seeing patients.  I tended to agree with that assessment.  Dr. Guy had noticed that Dr. Irani seemed more drawn to technology and medical devices than to what we do as orthopaedic surgery.  Dr. Guy and Dr. Walsh both tried to introduce Dr. Irani to some colleagues who might assist Dr. Irani in effecting a career change beyond the practice of medicine.

29.     On February 14, 2012, the GMEC met and unanimously approved the recommended Level II remediation.  I promptly notified Dr. Irani.  Less than two weeks after that decision, Dr. Grabowski made me aware that he had concerns about Dr. Irani's performance with respect to one of Dr. Grabowski's spine patients.  Dr. Grabowski sent me an email about the matter on February 27, 2012.  In our discussions, Dr. Grabowski also expressed concern about a comment Dr. Irani had made during surgery, in which Dr. Irani inappropriately suggested that if they performed surgery on the wrong site they could bill for a second surgery.  I asked Dr. Grabowski and Dr. Voss to meet with Dr. Irani about those concerns, which they did.  Dr. Voss provided me an undated statement about that meeting a couple of weeks later.  I am aware that, within a day or so of their discussion with Dr. Irani, Dr. Grabowski expressed concerns that Dr. Irani had not followed through on patient instructions given to Dr. Irani during that counseling session.  The faculty had discussions about those matters and felt Dr. Irani had failed in several aspects of his remediation plan.  We were very concerned about patient safety.  We had

discussions about whether we should recommend nonrenewal of Dr. Irani's residency contract or whether patient safety issues called for recommendation of immediate termination of his residency privileges.

30.     In the meantime, another patient issue arose with my hemophiliac patient the morning of March 1, 2012.  Senior resident Dr. Jennifer Wood reported that she had instructed Dr. Irani the night before to evaluate the high risk patient at 4:00a.m.  The next morning there was no notation in the patient record that Dr. Irani had evaluated the patient during the night.  Dr. Irani failed to report for morning rounds, and Dr. Wood had to call to wake him up.  According to Dr. Wood, when she questioned him, Dr. Irani told her that he had forgotten to see the patient.  These were the sorts of issues that had been addressed with Dr. Irani on multiple occasions, and they were of great concern to me.  Dr. Irani's failure to perform the evaluation placed the patient at risk of further harm, and his failure to attend rounds increased the burdens on other residents and attending physicians.  These concerns were quite serious, particularly when Dr. Irani was already on remediation, and in my mind would justify Dr. Irani's immediate termination from the program.  I addressed my concerns with the faculty.  Dr. Walsh spoke with Dr. Irani mid-day on March 1 and got his account of the facts surrounding the care of the hemophiliac patient.  Dr. Irani admitted to Dr. Walsh that he did not see the patient at 4:00 a.m., as instructed, and that he overslept and was late for the morning rounds.  Incredibly, Dr. Irani claimed he saw the patient at around 2:30 a.m. but did not document the evaluation.  That raised additional red flags about Dr. Irani's integrity and the fact that he would fail to document an evaluation of a patient while on remediation and after all we had been through with him.  At that point, I felt we could not trust Dr. Irani and that he was unsalvageable as a resident.  Dr. Walsh and I communicated our concerns to Dr. Stephens, and she obtained approval from the GMEC Executive Committee to suspend Dr. Irani from clinical privileges effective immediately pending a recommendation of his dismissal from the program.  That evening, Dr. Hoover (chief resident) and I spoke with Dr. Irani, and he admitted that he had failed to abide by Dr. Wood's instructions, did not document appropriately, and had shown up late for rounds.  I informed Dr. Irani that the GMEC Executive Committed had approved his immediate suspension without pay pending a recommendation to the full GMEC of termination of his residency.

31.     After Dr. Irani was suspended without pay effective the evening of March 1, 2012, I discovered while reviewing the hemophiliac patient's record that Dr. Irani entered the electronic patient records system on March 3, 2012 and entered a "delayed clinical note" representing that he had evaluated the patient at 2:30 a.m. on March 1, 2012.  That was a concern for me, and I felt his "delayed clinical note" was an after-the-fact attempt to cover up  his actions.  I had similar concerns later on when we learned that Dr. Irani, after his suspension, had entered the electronic patient record system and accessed a multitude of patient records without authorization or legitimate purpose.  I considered his actions to be a violation of HIPAA, which also reflects on his professional integrity.

32.     Although Dr. Grabowski and Dr. Voss had already met with Dr. Irani about Dr. Grabowski's spine patient, and Dr. Wood, Dr. Hoover, Dr. Walsh, and I had all talked with Dr. Irani about the hemophiliac patient, I emailed a memorandum about the events on March 5, 2012, and asked Dr. Irani to provide written documentation addressing his recollection of events surrounding both patients by the end of the week.  Dr. Irani provided his written account of those events by email on March 8, 2012.  Dr. Wood gave her written account regarding the

hemophiliac patient. I found Dr. Wood's account credible, and Dr. Irani's account not credible. Dr. Grabowski opined that Dr. Irani's explanation regarding his spine patient was not consistent with his recollection and experience.

33.     At Dr. Irani's request, Dr. Walsh met with him the morning of March 14, 2012, as a step in the grievance process. Thereafter, Dr. Irani emailed me on March 30, 2012 asking for various pieces of documentation, which I then emailed to him. The documents Dr. Irani requested included memoranda (most or all of which Dr. Irani had already seen) of previous meetings, Dr. Grabowski's email communication regarding the spine patient, and Dr. Wood's email and other documents regarding the hemophiliac patient. I provided Dr. Irani all the documents he requested.

34.     Dr. Irani was originally scheduled to have a grievance hearing on April 11, 2012 regarding the action taken to suspend him from the program on March 1, 2012. We learned on or about April 3, 2012, that Dr. Irani had decided to postpone that hearing pending a decision on his termination by the GMEC on April 10, 2012. On April 10, 2012, the GMEC voted unanimously to terminate Dr. Irani from the residency program. I promptly notified Dr. Irani by email that day. In my email correspondence, I reminded Dr. Irani of his right to continue the appeals process in accordance with the Resident Grievance and Due Process Policy found in the Palmetto Health Resident Manual, and reminded him that his deadline to request a grievance hearing on his previous grievance was April 11. Dr. Irani grieved, and a grievance hearing was scheduled for April 30, 2012.

35.     I made a presentation to the grievance committee at the April 30, 2012 hearing on Dr. Irani's grievance, with assistance from Dr. Walsh. My statements at that hearing, as reflected in the verbatim transcript, were true and correct.

36.     Three days before Dr. Irani's post-termination grievance hearing, on April 27, 2012, we learned from the ACGME that Dr. Irani had filed a complaint with them contending he was denied due process and otherwise attempting to discredit the program. The program responded to Dr. Irani's allegations in communications to the ACGME. The ACGME ultimately dismissed Dr. Irani's charges as without merit. The program has at all times remained accredited by the ACGME.

37.     I do not know of any basis on which I can be found to have violated Dr. Irani's due process rights. At all times, I attempted to be fair to Dr. Irani. I met with him numerous times about various issues and concerns, and I had others meet with him. I complied with the grievance and due process policies of the program and conferred each step of way with Dr. Stephens to confirm that we were handling matters in an appropriate manner. I shared information and concerns with Dr. Irani, solicited his side of events, and listened to what he had to say.

38.     At no time in any of my communications with Dr. Irani did he convey to me any concerns along the lines set forth in his April 2012 correspondence to the ACGME. Nor was I aware that Dr. Irani had ever raised any such complaints with anyone else. I view his late-hour allegations as part of his effort to shift the focus from his performance and actions, and to place blame on the teachers for the failure of the student. I would not fault Dr. Irani for reporting

legitimate concerns related to his education and the program, but Dr. Irani's allegations to my knowledge are not legitimate or based on fact. I adamantly deny any motivation to discriminate against Dr. Irani on any basis, and deny his insinuations that I made discriminatory statements to and about him. He has taken one instance of my commenting that his newly grown beard or goatee made him look like "Achmed the Terrorist" and has attempted to blow that comment way out of proportion. Dr. Irani has referred to himself as "Aziz" and assumed the persona of the "Indian call center guy." My comment had to do with his having grown a beard, and nothing to do with his race, national origin, or religion. I was one of Dr. Irani's strongest supporters during the resident selection process and right from the start of his residency. It would not make sense for me to have been his strong supporter and then to have discriminated against him. Our program has had a diversity of residents, including Sukhbir (Sonny) Guram (of Indian descent) Carlos Kugler (Venezuelan), and Tito Arrojas (Cuban American). We have had an African American resident (Rodney Allen) and our faculty member Dr. Jeffrey Guy is also African American. My mother-in-law is 100% Lebanese, and Dr. Walsh's sister is African American. I would note that the only other resident to have been terminated from our program is Dr. Chad Lamoreaux, who is white. It is ridiculous to suggest that my actions as Program Director, or the actions of our faculty as a whole, were motivated by discrimination against Dr. Irani as opposed to being based on legitimate concerns expressed by our entire faculty, our senior residents, attending physicians outside of our practice, hospital staff, and patients.

39.    It is my hope and desire that our program and faculty are able to provide quality education and training to our residents. We would prefer to have all of our residents make it through the program, but not every resident is cut out for orthopaedic surgery or even the practice of medicine. If we could retain all of our residents for a full five-year residency, that would certainly be our preference, but we would be doing a disservice to residents, patients, and the community if we were to guarantee residents an ongoing position in the residency program regardless of their performance or aptitude. I had high hopes for Dr. Irani when he started in our program, but unfortunately he started out with a rough internship year and continued to have difficulties performing in our program, despite informal and formal remediation measures that were designed to help him succeed. It was never my intent, or anyone else's in my opinion, to punish or harm Dr. Irani, and I believe I made that clear to him in my discussions with him. I have never wished Dr. Irani any ill will, and hoped that after leaving our program he would find his true calling.

40.    In May 2012, after Dr. Irani's grievance hearing, I learned that David Rothstein had sent a letter to various individuals threatening a lawsuit on behalf of Dr. Irani, and targeting me personally. See attached Exhibit A. Mr. Rothstein had previously filed a lawsuit against Palmetto Health, the University, me, and others on behalf of a former resident, Dr. Chad Lamoreaux, in which Mr. Rothstein sued and attacked me personally. At the time of Mr. Rothstein's May 2012 letter threatening litigation on behalf of Dr. Irani, I was a defendant in yet another lawsuit filed by Mr. Rothstein, this one on behalf of Dr. John Eady, in which, yet again, Mr. Rothstein sued and attacked me personally.

41.    On or about August 31, 2012, I learned, through legal counsel, of an email David Rothstein had sent to attorneys Kathy Helms and Shahin Vafai, attorneys who had represented Palmetto Health, the University, me, and others in Dr. Lamoreaux's lawsuit, and were representing Palmetto Heath, the University, me, and others in Dr. Eady's lawsuit. See attached

Exhibit B. In that email, Mr. Rothstein again threatened litigation, this time with specific reference to Dr. Irani's attempts to enter a residency program elsewhere, and stated "I am sure you will advise your clients about their potential liability for defamation, tortious interference, and retaliation if they torpedo Dr. Irani's efforts to further his medical career."

42.      I did not provide any information about Dr. Irani to any residency program. In late 2012, I received a call from someone about Dr. Irani, and I asked her to send her inquiry in writing. I did not hear further from her.

43.      I was very relieved to learn, in approximately March 2013, that Dr. Irani had been placed with a residency program. I thought that meant he would move on with his life and not file a lawsuit against us.

44.      On May 28, 2013, Dr. Irani sent me an email, attached as Exhibit C, in which he informed me that he was applying for a medical license in California, and asked me to fill out a two-page form and mail it to the Medical Board of California. I sought, obtained, and followed legal advice on the matter, and sent the Exhibit D documents to the Medical Board of California on June 4, 2013. At all times, I was trying to balance my concerns about properly performing my obligations as Program Director, being accurate in my submissions to the Medical Board of California, and avoiding a lawsuit by Dr. Irani.

45.      While I was seeking and obtaining legal advice about a response to the Medical Board of California, Dr. Irani texted me about the matter. On June 5, 2013, the day after I sent the Exhibit D documents to the Medical Board of California, I received a FedEx package from Dr. Irani reiterating his May 28, 2013, email request. I am aware that Kathy Helms thereafter emailed David Rothstein on June 5, 2013, requesting that Dr. Irani not communicate directly with me again, but rather that he communicate with Margie Bodie, Administrative Director for Resident/Student Services at Palmetto Health. Ms. Helms also informed Mr. Rothstein that the information Dr. Irani had requested be sent to the Medical Board of California had been sent.

46.      On Monday, June 17, 2013, I received a letter Dr. Irani had apparently hand-delivered to my office, in which he asked that I address some "errors" in the form I sent to the Medical Board of California on June 4, 2013. See Exhibit E. I again sought, obtained, and followed legal advice on the matter, and sent the Exhibit F documents to the Medical Board of California on June 17, 2013. At all times, I was trying to balance my concerns about properly performing my obligations as Program Director, being accurate in my submissions to the Medical Board of California, and avoiding a lawsuit by Dr. Irani.

47.      Other than the documents attached hereto as Exhibits D and F, I have not submitted any documentation or other information to the Medical Board of California. I have not submitted any documentation or other information to any other entity with whom Dr. Irani may have sought or obtained a license, residency, or employment.

[signature on next page]

I testify under penalty of perjury this 14th day of December, 2015, that the foregoing statements are true and correct.


_____
David E. Koon, Jr., M.D.

# Attachment to Affidavit of David Koon, M.D.: Material Presented to Grievance Committee on April 30, 2012

( Koon )

- BORN IN CALIF.
- STANFORD UNDERGRAD / SOM - multiple award
  (2x major)
  - " pubs
- excellent Dennis letter

- Step 1 223

Memoir mm → Full Drane ERAS file → successful interview, impressive credentials,
competitive field

PGY 1 (2010 - 2011) → need rotation schedule → only on ortho svc for 3 mos a limit
exposure

- problems on trauma svc → attending comments / case manager concerns
  highly unusual for ortho/peds interns

- concerns from several sources

- chief residents asked to handle it

★ NI evals 1-17

- concerns prevailed → Verbal counselling in December, 2010
  - issues addressed, his version obtained, advice given →
    new rotation / ortho attending → chance to shine

③⑥⑩ Oct 2010 - trauma comments. Mark Allen Jones / Raymond Bynoe

⑫ Dec - Mastriani

⑬ Jan - William Ross          pp 1-4 note # of z's

⑥ Feb - Koon


★ Again, these problems are highly unusual for orthopaedic interns.
  Usual comments → " better than all my categorical interns "
    " recruited for my svc "
    " best of the year "
      etc

  Was met by chief residents (all 3) to discuss issues & seek improvement.
    ↳ again very unusual !


★ Transition to his PGY-2 yr - persistent concerns documented
  ⑰    in NI innovations         →(Voss & Morgue)
    → read selected evaluation comments & overall rating

PG 7 - 2

Jul Zell → Mr. B → trauma patient    (appendix 1)

(20)  - ER RN ā over 24 years experience documented her experience ī Dr. Irani @
9:40 the night of her encounter. → Allison Tunley / Director of Nursing in ER

(19)    → Dr. Catalano → Dr. Stephens 10 Aug 10:02 → Dr. Koon / Walsh

(18)        forwarded immediately to Irani for explanation (same day returned ī
explanation) → his explanation was based on recall one month p the fact

(appendix 1)  → see notes on Mr. B


(22)  15 Aug 11 → Memorandum requesting level II remediation for 3.5 months to GMEC
(23)  - discussed this ī Irani / Athey 15 aug 11 → email Koon → Walsh re: meeting
(24)  - approved by GMEC Exec Comm  15 aug 11


- Irani response to Remediation: email to Kathy 22 aug
(26 - 28)    ① - "Always" - not based on attending evaluations
            - "misinterpretation" → "routine clinical practices" "reinforce what is usually
                done" - not exactly clear what this means (surgeons vs. ER docs)
        ② again "misunderstood"
            - questioned re: scaphoid fx to Dr. Ward @ SCDC
        ③ no argument
        ④ required by my supervisors / attendings
            " perceived tardiness"                    [ (not documented or brought
                                                            to my attn.
            "always complete my work" / "often stays beyond sched'd work hours"
        ⑤ should have been done anyway
        ⑥ Does not argue about substandard evaluations → acknowledge!
        ⑦ He is misunderstanding this → Walsh H/P details in clinic

(29)  * 19 Sep * email re: Schedule to meet ī various people re: Remediation
                            (over)                    Process  2

No mention of lack of / unfair due process ...

USC(Irani)0306

email 19 Sep: - documents attempt to have transparency re: scheduled meetings

(29)            - " others involved - business admin & HR experience
                        - other attendings
        - " instruction re: appeal & grievance process as alluded
                to in GME policies
        - Irani included in process & open to changes if needed (missed
                22 Aug meeting - apparently following work hour regulations)

20 Sep email → Stephens decision

(30)        - illustrates knowledge of Appeal process
        - allude to GME policy re: Appeals process
        - Dr Irani subsequently decided not to request a Grievance Comm Hearing
        - illustrates due process per the GME policies

31 - 32) ※    22 Sep → Email / Memo from Welsh - per Welsh

(33)    03 Oct → Koon Memo    (Koon / Welsh)

        → Reminder → still on academic remediation - ? best behavior
24 Nov 11 → Koon Memo    (Koon / Wood) - inclusion of chief resident is very important

(34 · 35)       → Senior resident involvement during entire process
        → "morning list" issues
        → pain mgmt per Welsh
        → "log" - appears to be mounting a defense rather than working on improvement
        → post TKA / MVA pt c̄ wound drainage → similar circumstances to VA pt.
        → Grabowski pt in staff clinic / urgent MRI / pt allowed to go home

3

05 Dec - <u>Faculty</u> <u>mtg</u> - memo dated 12 DEC 11

(36 - 37)

- faculty, chief residents, Athey, Irani
- questions / answers
- clear lack of insight; failure to take responsibility despite clear evid
- could not admit wrong-doing even when faced by attending / resident
  evidence to the contrary
  ↳ decision was made to rec level II remediation
              - unanimous!
              - (no one present thought that he would improve enough

→ 07 Dec → email for 4 eval)        to complete his residency)
   ↳ Walsh
      input *        - discussion re: length 3 mos / weeks / etc c̄ consideration of
attempt to identify                             his overall schedule for residency - boards - fellowship, etc
other factors affecting   07 DEC → Trauma Q 375      Nothe / Irani
his performance
  ↓                     → "final straw" → sped up the process. Confirmed the dept's serious
in attempt to help          concerns & necessitated immediate action.
him & us
NOT PUNITIVE !!!    → different RN's involved   Elaine Simon (who worked c̄ Irani on 8w →
                                                                        likable / "goofy" /
& for by GME              & Arlene Vance (Asst RN mgr) & later Brian Savage.   "dangerous")
office ... not
Irani              → AOD involvement ——→ on the Attending involvement → he confirmed
                          the perceptions of pt & RN staff

( appendix 2 )     → I was not involved in this patient encounter!

                        *→ notified via email 09 DEC / heard about it Thursday 08 Dec *
(38-40) Nothe      - I personally spoke c̄ all 3 RNs who corroborated the encounter
        Version           c̄ very specific details → asked to provide written accounts
41- 44) RN Version
45-46) Irani      ↳ led to 12 Dec 11 memo ( 36 -37 )
      Version
                      The faculty was acutely concerned for our patient's safety
                      & had no choice but to rec. suspension.

                      Reiterate, the case of TQ 375 was NOT a significant determining
                          factor in the suspension decision; it only sped it up!

                                                                                    4

Wed 07  email · requested Ψ eval · -? other factors
                                      - EtOH / drugs       } see by
Thursday                       - Ψ issues , etc    } GME
08 december - Irani informed of decision telephonically by Walsh
       MoR sent electronically & copy left in his box
Suspension started Friday 09 Dec

Monday  12 Dec - Irani cx'd Ψ appt · on hour prior to appt time

Tuesday  13 Dec -> GMEC votes unanimously to approve level III suspension
            - "everybody kept in loop ; timely notification ; reminded of Appeals process
            - Ψ appt cancellation
            - timeline given - faculty meet again 4- 30 Jan 12

Thursday  15 Dec - tried again to get Ψ eval  (recs of GMEC Exec Comm)

16/17 Dec -> Irani <—> Stephens emails
      - continues to lack insight => making good program ... taking on extra duties ...
      - discontinued grievance  "... not to further jeopardize my relationship
        ' my attendings."  ???
      - notes his familiarity ' grievance & due policy ... not unfair or lacking
      - again , No mention / complaints of lack of / unfair grievance or due process

WLSN * input    19 Dec 11 => Irani mtg ' Walsh  = see Walsh memo  (Chair of the dept)
      - extensive review of Irani's version of TQ 375 case  (12 days p̄ event)
      - emphasized sincere desire to restore to residency position ≡ Not punitive
      - GMEC = external review

48
49
50
(51 - 52)
53

5

04 Jan 12

Weekend → Stephen emails

(54 - 55)

- Dranis excuse "tired, didn't sleep well" vs. "very ill..."
- $120⁰⁰ fee
- ? inaccurate stmt to Dr Stephen re: 4° appt
- psychologist concerns ...

24/05 Jan   Dranis ⟷ Stephens emails

(56 · 57)

- Agreed mtg I Dr Stephen on 03 Jan 12
- "no one even solicited my side of the story" → patently false → Walsh memo
- "never made aware of accusations" → again, patently false
- "I was never involved"          "            "    "
- "same individual, both times" incorrect
- he attaches his version of the encounter to the DIO
- no mention of lack of / unfair grievance process

⑤⑧      11 Jan 12 → email notification of Dr Stephen's decision to uphold recommendations
          again, restoration is the goal !

(59 - 68)   13 Jan  - 4° testing

Walsh          ? Walsh / Dranis meeting
input ✱        24 Jan →  Dranis → Walsh email
⑥⑨                - leave of absence  vs.  suspension
                  - time off w/out delaying graduation
                  - recommendations open to modification ?
                  - no complaint of lack of / unfair grievance / due process policy to

(70)  Sat, 28 Jan  Kaur email → 31 Jan meeting c̄ Irani

(71-76)  31 Jan 12  - Memo re: reinstatement to Level II remediation
(71) - Irani "attempted to appeal grievance counsel" → did not follow policy
- faculty recommendations (not one or two people) c̄ GMEC exec comm
- PII remediation plan ⇒ input from faculty / residents / GME exec comm
- Ψ recommendations included (outside recs, even though not one
      that had been "vetted")

- Voss service → closer monitoring → frequent touch of level by
      VA site director ; increasing difficulty c̄ site director
      fulfilling requirements dictated by ACGME
- had been taken off joint rotation prematurely
~~Voss remains fair / impartial~~
→ decision c̄ faculty / resident input to place on Voss svc

* Measures called for  "immediate & sustained improvement"
(76)  Signed by Irani  01 FEB 12

06
☏ FEB → Irani back to work ⇒ "light" 1ˢᵗ week
27 FEB → inadequate TKA H/P  (G.V.) ⟨✓ date on H/P⟩ get copy        ∅ Hep C
FRIDAY, 24 FEB   Spine pt encounter (L.O.)  (Appendix 3)            ∅ MRSA
wrong site level comment (during that week)                         ∅ Ψ dx
                                                                    ∅ labs
                                                                    ∅ ECG
                                                                    (Appendix
                                                                      5)
(80)  Monday, 27 FEB    Grabowski email (L.O.)

✱  (appendix 3)  ✱

USC(Irani)0311

(81) Grabowski / Voss / Irani meeting  Tue / 28 FEB

↓

NEXT DAY !

↓

(82) WED / 29 FEB - homophilic pt admission  (JS)

( appendix 4 )

Thurs / 01 MAR : Late for rounds / overslept  (AM)

Thurs / 01 Mar → meet ē Walsh  (noon)

Thurs / 01 Mar → Kwon / Hoover / Irani phone call  ~ 6:00 pm

(78) Mon / 05 MAR → Irani sent email re: dismissal recommendation
    - requested his version of events

(83)-(84) email : Irani → Kwon  → his version of encounters

Tues / 13 Mar - Irani requests meeting → called back ~~~~~ that afternoon
(86) see email transcript → again reminded of due process / appeal process
    No mention of lack of / unfair due process or appeals process

(87) 13 Mar : Irani → Grabowski email ; reply 20 MAR

B

USC(Irani)0312

20 Mar email from Grabowski → failure to follow Irani instructions

(85) - no dispute re: instructions / failure → just an apology
- no mention of lack of / unfair GME policies


28 Mar / Stephen email to uphold departmental recs

(89) / (90) - again reminded of Appeals / Due process policy
- no reply from Irani re: Lack of / unfair Appeals / due process

(91 - 98)  Unusual request for $1 200 for books...

10 Apr / Irani notified of GMEC approval of dismissal recs

(99) - again reminded of Due Process / Appeals policy & his right to grieve
- reply 11 Apr: No mention of lack of / unfair due process / appeal ave.
    - wanted to know why his request for book $ was denied

9

USC(Irani)0313

<u>CONCLUSIONS</u> :

- Repeated & documented substandard resident performance by ~~many~~ observers

- Graduated levels of remediation { verbal → written
                                    Sr.
                                    resident & attending
                                    II & III → dismissed

were used →

- documented attempts to get all facts of each encounter

Followed GME
policy & Due
Process & Appeal

- No allegations of a lack of or unfair due process / appeals procedures

- ~~No allegations of racial harassment~~

- No allegation of him being "singled out"

In all of his
reviews, letters, proposals
calls, conversations
etc...

- No allegations of unsatisfactory ~~[struck]~~ scholarly activities / academic program

- No allegation of duty hour violations

- No allegations of the department using residents to fulfill svc. obligations

- No allegations of our treating him differently from other residents

- No allegation of inadequate resident supervision

- No evidence that he attempted to have his concerns heard by other committees

- No evidence of <u>anyone</u> w/ holding required information

io

USC(Irani)0314

(appendix 1)

\* Diane Savage - 26 yrs ED RN \*
(↳ documented pt encounter that day)

11 days into her POI - 2 yr.

Pt. RB    MR # 12689537

(SILT)

\* initial eval 11 Jul → brief H/P; all rn intact, ⊕ rad pulse
open BGFA Frx's, hand rotated 180°, moving fingers
to OR → considered inadequate documentation ∇

Σ documented encounters Σ

· no mention of wound debridement, VS, pain meds, wound measurements,
Gustillo grade, Abx, Td, splinting, inadequate xray (single
view), no post-reduction images, ER wound mgmt (irrigation)

\* 13 Jul - very brief pre-op Note ...


- how did he know about pain meds?
- inspected the wound? "saw his pain level"?
        ↳ did he remove splint / dressing
- "great interactions" how many? documented? POC?
- 3 witnesses (documented that day) to his manipulating the UE — asked to stop
- who "wanted us to do more." ? / who was "justifiably horrified" ?
- Morphine & fentanyl- still remembered & thanked you?
- (Afzaey recollection 10 Aug (one month later) → if he had read Savage recollection
  ? amount of irrigation? Why would she make this up? → no
- "the right thing to do" → Indications for 1° amputation
- his response seems to be directed @ refuting her version
- no evidence of prior problems c D. Savage (she didn't even know the correct pronunciation)


- Email response to Kathy re: coordination

USC(Irani)0315

( Appendix Z )

(AW) TQ 375 ( MR# 11684745 )

- no documentation from Irani, none! After over 1.5" of Hx/PE, c-arm imaging, Sedation/pain control, reductions, wash-outs, splinting, discussion c family, I/c ⇒ No Documentation
- Versions vary widely
- RN account was confirmed by 3 different RN's c matching, detailed accounts
- frankly concerned for our pt's safety

- Even though Nothe/Irani version paint a very bright encounter, the patient STILL ASKED TO BE TRANSFERRED TO BAPTIST! Why would she have done that if we are to believe Irani's story? If the care was thorough, compassionate, and caring, why would she want to leave?

Irani encounter { → again → No documentation from Irani in chart.
                      ("immediately")
                      Arlene says something is wrong ... then refused to provide guidance?
- RNs upset → "played everything by the book" → did he call a Sr Resident/ attending?
                → barely a PGY-2 → multiple injuries → not prepared to handle this pt ... should have called for back-up.

{ - Irani helps the RN Δ the sheets.
  - protects the pt ... "not going anywhere ..."
  - "thanks the RN for their feedback"
  - "personally escorts the family"
  - last paragraph ... read

After all of this, after all of his cleaning up the room, protecting the patient, reviewing R/B/O, thanking the RNs, they immediately documented a version almost 180° different. Why? If everything was "played by the book", why would 3 different RNs call the AOD & the attending downstairs to intervene.

12

USC(Irani)0316

(Appendix 3)

✱ A I expresses a desire to pursue a spine fellowship ✱

L0 - Spine patient

ⓒ failure to recognize severity of patient's condition

ⓒ slow response to obvious change in strength

ⓒ no / inadequate documentation in medical record re nursing PE

ⓒ failure to document initial assessment p̄ being called by RN

ⓒ delayed response to Dr. Grabowski about pt's condition

　　　- didn't verify PT findings (asked RN to verify) - when better qualified

　　　- text to Grabowski @ 1325 hrs. (2° p̄ initial call)

　　　- who told you not to write "incongruent" notes? (lack of documentation)

　　　- explanation inconsistent " ?/s vs. o/s

ⓒ entered "delayed" clinical note → ? tampering c̄ medical record

ⓒ failed to follow instructions regarding dressing care

ⓒ ⓒ failed to document reason for MRI → told to order MRI by Dr. Grabowski

　　　based on initial Irani eval. (he believed it was a profound

　　　Δ in PE → not incongruent as documented by Irani)

　　　　　　"are you sure?"

13

USC(Irani)0317

(Appendix 4)

JJ (MR# 3764587)

Written adm note  11 PM  /29 FEB  (AI)

H/P dictated @ MN  / 01 MAR  (AI)

Chief resident note  01 MAR @ 0106

SCCA note @ 0229 / 01 MAR

SCCA note @ 0353 / 01 MAR

Chief resident note @ 0605 / 01 MAR

Resident (AI)  note @ 0830 / 01 MAR  – Spoke to Dr Wise

→ failure of appropriate documentation (if it indeed occurred)

"delayed clinical note" AI / dictated 03 MAR @ 00:21

DE @ 2:30 AM  on 01 MAR  → ? tampering c̄ medical record ?

→ failure to abide by Chief residents instructions.

* Additional issues *

* Dr. overslept the morning of 01 MAR.

* Late to rounds p̄ being called by Dr Nowan.

* Inadequate H/P in Staff clinic (TKA · Koom pt)

* additional level (during Spine surgery) comment

* Gichowski staff clinic pt (MRI order – stat ... let the pt go home)

* noted in hospital Wed / 04 apr around MN → (Conclusion)

appendix 5

GV    H/P    27 FEB

∅ mention ∂) Hep C, borderline pers. D/o, GERD, thrombocytopenia,
            ⊕ MRSA

∅ mention ∂ pre op labs abnormalities

∅ new x-ray (over 2 yrs old)

∅ notice ∂) lack ∂) medical clearance

USC(Irani)0319

New Innovations RMS Evaluations

Evaluations

Orthopaedics | mwehunt | **Log Out**

# Irani, Afraaz R

7/1/2010 to 6/30/2011 Was evaluated 30 times on the following rotations: Ortho:General Ortho.; Ortho:Radiology/Anesthesia; Plastic & Reconstructive Surgery; Trauma Service (BLUE- PHR); Vasc/Thor Surgery - VA;
**Individual Report (Admin)**

1 - 5

| Questionnaire Name/Title | Category/Question | | Pgy 1 Average | Average | Minimum | Maximum | Standard Deviation |
|---|---|---|---|---|---|---|---|
| **360 Rating Form** | | | | | | | |
| 360 Rating Form | 1 | **Staff- Select Your Status:** | 4.00 | **4.00** | **4.00** | **4.00** | **0.00** |
| | 2 | Follows through on tasks he/she agreed to perform | 3.52 | **3.64** | **3.00** | **5.00** | **0.67** |
| | 3 | Respects patient's privacy and autonomy | 3.43 | **3.45** | **2.00** | **5.00** | **0.82** |
| | 4 | Takes responsibility for actions, admits mistakes and does not blame others | 3.33 | **3.45** | **2.00** | **5.00** | **0.82** |
| | 5 | Makes patient care and well-being a priority | 3.43 | **3.55** | **3.00** | **5.00** | **0.69** |
| | 6 | Provides equitable care regardless of patient culture and socioeconomic status | 3.43 | **3.55** | **3.00** | **5.00** | **0.69** |
| | 7 | Is honest in interactions with others | 3.43 | **3.55** | **3.00** | **5.00** | **0.69** |
| | 8 | Is respectful and considerate in interactions with patients | 3.38 | **3.45** | **2.00** | **5.00** | **0.82** |
| | 9 | Is willing to answer questions and provide explanations | 3.57 | **3.64** | **3.00** | **5.00** | **0.81** |
| | 10 | Is courteous to and considerate of nurses and other staff | 3.33 | **3.45** | **2.00** | **5.00** | **0.82** |
| | 11 | Discusses patient issues clearly with staff and faculty | 3.38 | **3.55** | **3.00** | **5.00** | **0.69** |
| | 12 | Listens to and considers what others have to say about relevant issues | 3.38 | **3.55** | **3.00** | **5.00** | **0.69** |
| | 13 | Maintains complete and legible medical records | 3.10 | **2.91** | **1.00** | **5.00** | **1.14** |
| | 14 | What does this resident do well? | | | | | |
| | 15 | How could this resident improve? | | | | | |
| | 16 | Would you want this resident to treat a member of your family? | No (1)  Yes (10) | | | | |

| Evaluator | Question Comments |
|---|---|
| **02/11/2011 Ortho:Shriners** | **14)** i have not worked with this resident |

USC(Irani)0320

New Innovations RMS Evaluations

| Date/Source | | | | | | |
|---|---|---|---|---|---|---|
| 02/19/2011 Ortho:VA - Orthopaedics | 14) great hands for level of training; tries to implement constructive criticism | | | | | |
| 02/26/2011 Ortho:Joints | 14) willing to help and stays late for patient care | | | | | |
| 04/03/2011 Ortho:VA - Orthopaedics | 14) Technically for his level of training he does very well. Many of his ER procedures and reductions have been excellent. Very confident in what he does. Asks good questions. | | | | | |
| 02/11/2011 Ortho:Shriners | 15) i have not worked with this resident and cannot comment on performance, since i have not worked with resident, i would not want them to treat my family | | | | | |
| 02/19/2011 Ortho:VA - Orthopaedics | 15) handwriting is atrocious; lacks sense of urgency; still lacks a sense of decorum-- uses sarcasm and/or humor at inopportune moments in interactions with residents/staff, and (to a much smaller extent) patients | | | | | |
| 04/03/2011 Ortho:VA - Orthopaedics | 15) Legibility of his notes is sometimes an issue--there are times even he couldn't decipher what he'd written. His quiet manner can be interpreted as being aloof or not caring, although I'm certain this is not the case. | | | | | |

**Faculty to Resident 2010**
Faculty to Resident Evaluation

| # | Criteria | | | | | |
|---|---|---|---|---|---|---|
| 1 | **MEDICAL KNOWLEDGE: Intellectual Ability:** Retention, comprehension, abstraction, discrimination, logical thinking. | 3.33 | 3.20 | 2.00 | 4.00 | 0.63 |
| 2 | **MEDICAL KNOWLEDGE: OR Performance:** Exhibits knowledge of anatomy, physiology, pathology of case. Understands mechanics. Dexterity, efficiency, thoroughness. Concern for patient. Maintenance of professional OR atmosphere. | 3.33 | 3.40 | 3.00 | 5.00 | 0.70 |
| 3 | **MEDICAL KNOWLEDGE: Conference Performance:** Punctuality, organization, preparation. Demonstrates knowledge of current literature and treatments. | 3.42 | 3.30 | 3.00 | 5.00 | 0.67 |
| 4 | **MEDICAL KNOWLEDGE: Decision Making:** Makes informed decisions about diagnostic-therapeutic treatment based on patient information, preferences, up-to-date scientific evidence and clinical judgment. Develop and carry out patient management plans. Demonstrate investigatory and analytic thinking approach to clinical situations. | 3.42 | 3.20 | 2.00 | 5.00 | 0.79 |
| 5 | **PARACTICE-BASED LEARNING AND IMPROVEMENT: Technological Skills:** Uses information technology to manage information, access on-line medical information; and support their own education. | 3.35 | 3.20 | 2.00 | 5.00 | 0.92 |
| 6 | **PARACTICE-BASED LEARNING AND IMPROVEMENT: ASSESSMENTS:** Investigates and evaluates patient care practices, appraises and assimilates scientific evidence, and improves their patient care practices. | 3.33 | 3.30 | 2.00 | 5.00 | 0.82 |
| 7 | **PATIENT CARE:** | 3.42 | 3.20 | 2.00 | 4.00 | 0.79 |

USC(Irani)0321

**Judgment:**

Common sense, decisiveness, ability to draw sound conclusions, willingness to admit mistakes.  Regard for patient's needs and life conditions.

**PATIENT CARE:**
**Caring:**

8    Compassionate, appropriate and effective care of patients for the treatment of health problems and the promotion of health.

| | 3.50 | 3.30 | 2.00 | 5.00 | 0.95 |

**PATIENT CARE:**
**Communication:**

9    Gather essential and accurate information about patients; work with health care professionals to provide patient focused care.

| | 3.38 | 3.20 | 2.00 | 4.00 | 0.79 |

**INTERPERSONAL AND COMMUNICATION SKILLS**
**Communications Skills: Oral**

10    Clarity of expression, articulateness, grammar.  Skills that allow for effective information exchange with patients, their families and other health professionals.

| | 3.38 | 3.20 | 2.00 | 4.00 | 0.63 |

**INTERPERSONAL AND COMMUNICATION SKILLS**
**Communications Skills: Written**

11    Must observe and document observations accurately and in good time.  Progress, operative, and discharge notes should be written completely and promptly.

| | 3.29 | 3.20 | 2.00 | 5.00 | 0.92 |

**INTERPERSONAL AND COMMUNICATION SKILLS**
**Relating to Patients:**

12    Interested, honest and understanding.  Explains clearly and to the patient's satisfaction details related to diagnosis, proposed treatment, and implications.

| | 3.57 | 3.33 | 2.00 | 5.00 | 0.87 |

**PROFESSIONALISM**
**Concern for Others:**

13    Sensitivity to and consideration of others, tactfulness. Committed to ethical principles and sensitivity to a diverse patient population ( culture, age, gender, disabilities).

| | 3.54 | 3.40 | 2.00 | 5.00 | 0.84 |

**PROFESSIONALISM**
**Reliability:**

14    Acceptance of responsibility, punctuality, availability.

| | 3.42 | 3.40 | 2.00 | 4.00 | 0.70 |

**PROFESSIONALISM**
**Integrity:**

15    Honesty, discretion, accountability to patients, society, and the profession; a commitment to excellence and on-going professional development.

| | 3.54 | 3.40 | 2.00 | 4.00 | 0.70 |

16 **PROFESSIONALISM**

| | 3.42 | 3.40 | 2.00 | 4.00 | 0.70 |

USC(Irani)0322

New Innovations RMS Evaluations

**Appearance:**

Poise, alertness, cleanliness, appropriateness of dress.

**PROFESSIONALISM**
**Ethical Principles:**

| | | | | | |
|---|---|---|---|---|---|
| 17 A commitment to provision or withholding of clinical care, confidentiality of patient information, informed consent and business practices. | 3.50 | 3.60 | 3.00 | 5.00 | 0.70 |

**PROFESSIONALISM**
**Professional Promise:**

| | | | | | |
|---|---|---|---|---|---|
| 18 Desirability of letting this person treat you or your family. | 3.13 | 2.90 | 1.00 | 4.00 | 0.99 |

**SYSTEM-BASED PRACTICE**
**Resourcefulness:**

| | | | | | |
|---|---|---|---|---|---|
| 19 Management of available resources.  Understand roles of support personnel and makes maximum use of their assistance.  Resourcefulness in obtaining information about patients. | 3.30 | 3.33 | 3.00 | 4.00 | 0.50 |

**SYSTEM-BASED PRACTICE**
**System of Health Care:**

| | | | | | |
|---|---|---|---|---|---|
| 20 Ability to demonstrate an awareness and responsiveness to the larger context and system of health care.  The ability to effectively call on system resources to provide care for optimal value.  Advocate for quality patient care and help patients deal with system complexities. | 3.29 | 3.20 | 2.00 | 5.00 | 0.79 |

21 What does this resident do well?

22 How could this resident improve?

| | | | | | |
|---|---|---|---|---|---|
| 23 **OVERALL RATING:** | 3.33 | 3.20 | 2.00 | 4.00 | 0.63 |

| Evaluator | Question Comments |
|---|---|
| Bynoe, Raymond 10/08/2010 Trauma Service (BLUE-PHR) | 6) be more aggressive in care plan laid back |
| Bynoe, Raymond 12/02/2010 Trauma Service (BLUE-PHR) | 6) did a better job this rotational month |
| Jones, Mark Allen 02/21/2011 Trauma Service (BLUE-PHR) | 6) Needs to read more, this is probably universal for all residents |

USC(Irani)0323

New Innovations RMS Evaluations

**Jones, Mark Allen**
**10/02/2010**
**Trauma**
**Service (BLUE-PHR)**

9) Was not confident that Dr. Irani was completely invested in caring for our patients. Did not give me the feeling that he was always truely aware of what was going on with the patient's he was managing on the trauma floor.

**Bynoe, Raymond**
**10/08/2010**
**Trauma**
**Service (BLUE-PHR)**

9) be more aggressive

**Bynoe, Raymond**
**12/02/2010**
**Trauma**
**Service (BLUE-PHR)**

9) tried to communicate better and did better

**Bynoe, Raymond**
**10/08/2010**
**Trauma**
**Service (BLUE-PHR)**

12) could have been more interactive on the service - i understand this is not his speciality but sometimes the pts will have general medical problems.

**Koon Jr., David E.**
**02/02/2011**
**Ortho:General Ortho.**

12) handwritten notes essentially illegible

**Jones, Mark Allen**
**10/02/2010**
**Trauma**
**Service (BLUE-PHR)**

18) He is not yet shown that he has the dedication it requires to have my support for caring for my family.

**Friedman, Harold**
**09/26/2010**
**Plastic & Reconstructive Surgery**

20) Afraaz is pleasant to work with, He is obviously bright. When asked to perform a task, I could count on him to do it. He always asks questions about decision making. He does well instructing the medical school students. His surgical skills improved while he was on the service. He had a much better comprehension of the computerized data base than I do. He is enthusiastic and wants to learn- that is half the battle for any resident.

**Friedman, Harold**
**09/26/2010**
**Plastic & Reconstructive Surgery**

21) He is a fast learner- see above comments

**Jones, Mark Allen**
**10/02/2010**
**Trauma**
**Service (BLUE-PHR)**

21) Able to data collect.

**Friedman, Harold**
**09/26/2010**
**Plastic &**

22) The only problem I had was that after we discussed our plans for a patient he would ask me several times on different occasions what the plan was. It was almost like he wanted to make sure he didn't miss anything or do the wrong thing. I would suggest writing things down and asking questions at the time if something is not clear. I think he will make a good surgeon as time goes by and he makes the transition from student to junior and senior level resident.

USC(Irani)0324

New Innovations RMS Evaluations

**Reconstructive Surgery**

**Jones, Mark Allen**
**10/02/2010**
**Trauma Service (BLUE-PHR)**

22) He needs to step up as a doctor and become accountable and invested in treating patients.

**Friedman, Harold**
**09/26/2010**
**Plastic & Reconstructive Surgery**

23) see above comments

**Brown, Jeff**
**11/03/2010**
**Vasc/Thor Surgery - VA**

23) I didn't interact with him a great deal but he was around and readily available. Seemed quite capable for his level of training and had good interpersonal skills. Think he will mature into a very capable resident.

**Koon Jr., David E.**
**02/02/2011**
**Ortho:General Ortho.**

23) I have spoken to Dr. Irani at length about his performance thus far in his internship. He needs significant improvement in several areas and he seems to understand these issues.

**Jones, Mark Allen**
**02/21/2011**
**Trauma Service (BLUE-PHR)**

23) Dr. Irani did improve from his first rotation on trauma to his second. He is now, in my opinion, at an average or satisfactory level. Overall, still needs to take responsibilty for total patient care as if they are his patients. I think his improvements are promising but he still has a lot of room for further improvement.

**Faculty to Resident Evaluation rev. July 2008**
USC SOM Department of Surgery Faculty to Resident Evaluation

( 1 - 10 )

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1 | **Attendance & Availability** Describe the Resident's availability during rounds and the OR. | 5.83 | **5.75** | **5.00** | **7.00** | **0.96** |
| 2 | **Attendance & Availability** Quantify the Resident's contributions during rounds and the OR. | 5.33 | **5.00** | **4.00** | **7.00** | **1.41** |
| 3 | **Attendance & Availability** Describe the Resident's conference participation. | 5.67 | **5.50** | **5.00** | **7.00** | **1.00** |
| 4 | **Attendance & Availability** Willingness to go the extra mile. | 5.33 | **5.00** | **3.00** | **7.00** | **1.63** |
| 5 | **Attendance & Availability** Describe the Resident's punctuality. | 6.17 | **6.00** | **5.00** | **7.00** | **0.82** |
| 6 | **Chart Audits/Medical Record Review** The overall quality of the Resident's H&P is: | 5.67 | **5.50** | **4.00** | **7.00** | **1.29** |
| 7 | **Chart Audits/Medical Record Review** The H&P reflects a thoughtful and realistic differential diagnosis. | 5.67 | **5.50** | **4.00** | **7.00** | **1.29** |
| 8 | **Chart Audits/Medical Record Review** | 5.67 | **5.50** | **4.00** | **7.00** | **1.29** |

USC(Irani)0325

New Innovations RMS Evaluations

Score the accuracy of the information in the Resident's H&P.

| | | | | | | |
|---|---|---|---|---|---|---|
| 9 | **Clinical Judgement**<br>How well does this Resident make diagnostic decisions? | 5.50 | 5.25 | 4.00 | 7.00 | 1.26 |
| 10 | **Clinical Judgement**<br>How well does this Resident integrate medical facts and clinical data? | 5.67 | 5.50 | 4.00 | 7.00 | 1.29 |
| 11 | **Clinical Judgement**<br>How well does this Resident weigh alternatives? | 5.50 | 5.25 | 4.00 | 7.00 | 1.26 |
| 12 | **Clinical Judgement**<br>How well does this Resident understand limitations of knowledge? | 5.67 | 5.50 | 4.00 | 7.00 | 1.29 |
| 13 | **Clinical Judgement**<br>How well does this Resident weigh risk-benefit for the patient? | 5.67 | 5.50 | 4.00 | 7.00 | 1.29 |
| 14 | **Clinical Judgement**<br>Please rate this Resident's overall clinical judgment. | 5.67 | 5.50 | 4.00 | 7.00 | 1.29 |
| 15 | **Clinical Skills**<br>Demonstrates appropriate dexterity. | 5.80 | 5.67 | 5.00 | 7.00 | 1.15 |
| 16 | **Clinical Skills**<br>Knows relevant anatomy. | 5.67 | 5.50 | 5.00 | 7.00 | 1.00 |
| 17 | **Clinical Skills**<br>Handles tissue appropriately. | 6.25 | 6.50 | 6.00 | 7.00 | 0.71 |
| 18 | **Clinical Skills**<br>Anticipates contingencies. | 5.67 | 5.50 | 5.00 | 7.00 | 1.00 |
| 19 | **Clinical Skills**<br>Rate this Resident on appropriate pre-operative planning. | 6.00 | 6.00 | 5.00 | 7.00 | 1.41 |
| 20 | **Clinical Skills**<br>Demonstrates improvement. | 5.67 | 5.50 | 4.00 | 7.00 | 1.29 |
| 21 | **Technical Skills**<br>Describe the resident's ability to develop operative plans | 5.80 | 5.67 | 5.00 | 7.00 | 1.15 |
| 22 | **Technical Skills**<br>How would you rate the resident's psychomotor skills? | 6.00 | 6.00 | 5.00 | 7.00 | 1.00 |
| 23 | **Technical Skills**<br>How well does the resident anticipate problems? | 5.50 | 5.25 | 4.00 | 7.00 | 1.26 |
| 24 | **System-Based Practices**<br>Appropriate utilization of laboratory, radiology, and consultants. | 5.50 | 5.25 | 4.00 | 7.00 | 1.26 |
| 25 | **Humanistic Qualities**<br>How well does this Resident demonstrate integrity in patient care? | 5.67 | 5.50 | 4.00 | 7.00 | 1.29 |
| 26 | **Humanistic Qualities**<br>How well does this Resident demonstrate compassion in patient care? | 5.67 | 5.50 | 4.00 | 7.00 | 1.29 |
| 27 | **Humanistic Qualities**<br>How well does this Resident respect the patient's need for information and autonomy? | 5.83 | 5.75 | 5.00 | 7.00 | 0.96 |
| 28 | **Humanistic Qualities** | 5.83 | 5.75 | 5.00 | 7.00 | 0.96 |

USC(Irani)0326

New Innovations RMS Evaluations

How well does this Resident attain credibility and rapport with the patient and their family?

**Interpersonal and Communication Skills**
29 Creates and sustains an ethically sound relationship with patients.    5.83    **5.75**    **5.00**    **7.00**    **0.96**

**Interpersonal and Communication Skills**
30 Elicit and provide informaiton using multiple skills, including effective listening, nonverbal, explanatory, questioning, and writing skills    5.50    **5.25**    **4.00**    **7.00**    **1.26**

**Interpersonal and Communication Skills**
31 Elicits and provides information using multiple skills, including effective listening, nonverbal, explanatory, questioning, and writing skills.    5.50    **5.25**    **4.00**    **7.00**    **1.26**

**Interpersonal and Communication Skills**
32 Counseling Skills: Explains rationale for test and treatment, obtains patient's consent, educates/counsels regarding management.    5.50    **5.25**    **4.00**    **7.00**    **1.26**

**Interpersonal and Communication Skills**
33 Works effectively with others as a member or leader of a health care team or other professional group.    5.83    **5.75**    **4.00**    **7.00**    **1.50**

**Medical Care**
34 Develops and implements patient management plans.    5.50    **5.25**    **4.00**    **7.00**    **1.26**

**Medical Care**
35 Provides patient-focused care by integrating knowledge and assistance from other disciplines.    5.50    **5.25**    **4.00**    **7.00**    **1.26**

**Medical Knowledge**
36 How is the Resident's core medical knowledge?    5.67    **5.50**    **4.00**    **7.00**    **1.29**

**Medical Knowledge**
37 How well does this Resident apply medical knowledge to patient problems?    5.80    **5.50**    **4.00**    **7.00**    **1.29**

**Medical Knowledge**
38 Demonstrates an investigative and analytical approach to clinical situations.    5.67    **5.50**    **4.00**    **7.00**    **1.29**

**Medical Knowledge**
39 Knows and applies the basic and clinically supportive sciences appropriate to surgery.    5.80    **5.67**    **4.00**    **7.00**    **1.53**

**Practice-Based Learning and Improvement**
40 Applies knowledge of study designs and statistical methods to the appraisal of clinical studies and other information on diagnostic and therapeutic effectiveness.    5.50    **5.25**    **4.00**    **7.00**    **1.26**

**Practice-Based Learning and Improvement**
41 Uses information technology to manage information, access on-line medical information; and support their own education.    5.50    **5.25**    **4.00**    **7.00**    **1.26**

**Practice-Based Learning and Improvement**
42 Investigates and evaluates patient care practices, appraises and assimilates scientific evidence, and improves their patient care practices.    5.50    **5.25**    **4.00**    **7.00**    **1.26**

**Practice-Based Learning and Improvement**
43 Analyzes practice experience and performs practice-based improvement activities using a systematic methodology.    5.50    **5.25**    **4.00**    **7.00**    **1.26**

USC(Irani)0327

New Innovations RMS Evaluations

| # | Question | | | | | |
|---|---|---|---|---|---|---|
| 44 | **Professionalism** How well does this Resident demonstrate altruism? | 5.50 | 5.25 | 4.00 | 7.00 | 1.26 |
| 45 | **Professionalism** How well does this Resident demonstrate duty and service? | 5.67 | 5.50 | 4.00 | 7.00 | 1.29 |
| 46 | **Professionalism** How well does this Resident accept responsibility? | 5.67 | 5.50 | 4.00 | 7.00 | 1.29 |
| 47 | **Professionalism** How well does this Resident perform self-assessments? | 5.50 | 5.25 | 4.00 | 7.00 | 1.26 |
| 48 | **Professionalism** How well does this resident perform peer reviews of clinical performance? | 6.00 | 6.00 | 5.00 | 7.00 | 1.00 |
| 49 | **Responsibility** How well does this Resident take responsibility for their education? | 5.67 | 5.50 | 4.00 | 7.00 | 1.29 |
| 50 | **System-Based Practices** Demonstrates awareness of and responsiveness to the system of health care. | 5.50 | 5.25 | 4.00 | 7.00 | 1.26 |
| 51 | **System-Based Practices** Understands the different types of medical practice and delivery systems, and alternative methods of controlling health care costs and allocating resources. | 5.50 | 5.25 | 4.00 | 7.00 | 1.26 |
| 52 | **System-Based Practices** Advocates for quality patient care and assists patients in dealing with system complexities. | 5.67 | 5.50 | 4.00 | 7.00 | 1.29 |
| 53 | **System-Based Practices** Able to partner with health care managers and providers to assess, coordinate, and improve health care and understand how these activities can affect outcomes. | 5.67 | 5.50 | 4.00 | 7.00 | 1.29 |
| 54 | **Teaching Skills** Functions as a role model. | 5.33 | 5.00 | 3.00 | 7.00 | 1.63 |
| 55 | **Teaching Skills** Demonstrates committment to facilitating the education of subordinates. | 5.67 | 5.50 | 4.00 | 7.00 | 1.29 |
| 56 | **Teaching Skills** Willingness to share information with others. | 6.00 | 6.00 | 5.00 | 7.00 | 1.15 |
| 57 | **Teaching Skills** Fosters an environment of mutual respect. | 6.00 | 6.00 | 4.00 | 7.00 | 1.41 |
| 58 | **Teaching Skills** Provides appropriate feedback. | 5.33 | 5.00 | 3.00 | 7.00 | 1.63 |
| 59 | **Teaching Skills** Includes students in clinical activities. | 5.80 | 5.67 | 5.00 | 7.00 | 1.15 |
| 60 | **Teaching Skills** How would you rate this Resident's overall teaching abilities? | 5.80 | 5.67 | 5.00 | 7.00 | 1.15 |
| 61 | **Total Overall Summary** Resident's overall clinical competence in rotation. | 5.67 | 5.50 | 4.00 | 7.00 | 1.29 |
| 62 | **Total Overall Summary** Overall Clinical Competence: (as demonstrated in this focused exercise) Judgement, synthesis, caring, analysis, effectiveness, efficiency. | 5.67 | 5.50 | 4.00 | 7.00 | 1.29 |

USC(Irani)0328

New Innovations RMS Evaluations

**Total Overall Summary**

63  The resident has completed all rotation objectives and is   Yes (4)
deemed to be competent in these areas

| Evaluator | General Comments |
|---|---|
| **Brown, Jeff**<br>08/18/2010<br>**Vasc/Thor**<br>**Surgery -**<br>**VA** | **Quiet; pleasant. Worked effectively as a team member.** |
| **Fann,**<br>**Stephen A**<br>10/01/2010<br>**Trauma**<br>**Service**<br>**(BLUE- PHR)** | **Nice job on trauma floor enthusiastic resident** |
| **Jones, Mark**<br>**Allen**<br>10/02/2010<br>**Trauma**<br>**Service**<br>**(BLUE- PHR)** | **Dr. Irani must realize he has crossed the threshold from student to physician and begin to be accountable for his actions and accountable to his patients. He did not show me that he was interested in taking care of our patients on the trauma service at the level that we expect from our new resident physicians.** |
| **Bynoe,**<br>**Raymond**<br>10/08/2010<br>**Trauma**<br>**Service**<br>**(BLUE- PHR)** | **needs to develop degree of enthusiasm - same somewhat lackadaisical about the service - i understand alot of paper work but needs to put effort - maybe personality - but concern for drive** |

Peer- to- Peer
2009
03/31/2010
USC SOM
Department of
Orthopaedic
Surgery
Peer to Peer
Evaluation

| | | | | | | |
|---|---|---|---|---|---|---|
| 1 | **Attendance & Availability**<br>How is this Resident at making themselves available? | 6.90 | **6.50** | **6.00** | **7.00** | **0.58** |
| 2 | **Attendance & Availability**<br>How is this Resident at being accessible while on-call? | 6.80 | **6.50** | **6.00** | **7.00** | **0.58** |
| 3 | **Clinical Judgement**<br>How well does this Resident integrate medical facts and clinical data? | 6.30 | **5.75** | **5.00** | **7.00** | **0.96** |
| 4 | **Clinical Judgement**<br>How well does this Resident understand the limitations of knowledge? | 6.30 | **5.50** | **5.00** | **7.00** | **1.00** |
| 5 | **Clinical Judgement**<br>How well does this Resident weigh risk-benefit for the patient? | 6.20 | **5.50** | **5.00** | **7.00** | **1.00** |
| 6 | **Clinical Judgement**<br>How well does this Resident demonstrate clinical judgement? | 6.20 | **5.50** | **5.00** | **7.00** | **1.00** |
| 7 | **Competence**<br>Rate this resident's competence as a doctor. | 6.20 | **5.50** | **5.00** | **7.00** | **1.00** |
| 8 | **Enthusiasm & Responsiveness**<br>How well does this resident respond to questions? | 6.40 | **5.50** | **5.00** | **7.00** | **1.00** |

USC(Irani)0329

New Innovations RMS Evaluations

| # | Question | | | | | |
|---|----------|------|------|------|------|------|
| 9 | **Enthusiasm & Responsiveness**<br>How is this Resident at responding to patients? | 6.50 | **5.75** | **5.00** | **7.00** | **0.96** |
| 10 | **Enthusiasm & Responsiveness**<br>How is this Resident at exhibiting enthusiasm while teaching? | 6.00 | **5.33** | **4.00** | **7.00** | **1.53** |
| 11 | **Humanistic Qualities**<br>How well does this Resident demonstrate respect in patient care? | 6.70 | **6.25** | **5.00** | **7.00** | **0.96** |
| 12 | **Humanistic Qualities**<br>How well does this Resident demonstrate compassion in patient care? | 6.50 | **5.75** | **5.00** | **7.00** | **0.96** |
| 13 | **Humanistic Qualities**<br>How well does this Resident listen to the patient? | 6.40 | **5.75** | **5.00** | **7.00** | **0.96** |
| 14 | **Humanistic Qualities**<br>How well does this Resident earn the patient's trust? | 6.40 | **5.75** | **5.00** | **7.00** | **0.96** |
| 15 | **Humanistic Qualities**<br>How well does this Resident attain credibility and rapport with the patient and their family? | 6.30 | **5.50** | **5.00** | **7.00** | **1.00** |
| 16 | **Interpersonal and Communication Skills**<br>Communicates effectively with team members. | 6.50 | **5.75** | **5.00** | **7.00** | **0.96** |
| 17 | **Interpersonal and Communication Skills**<br>Demonstrates respect for the opinions of others. | 6.50 | **6.00** | **5.00** | **7.00** | **0.82** |
| 18 | **Interpersonal and Communication Skills**<br>Resolves differences of opinion fairly. | 6.50 | **6.00** | **5.00** | **7.00** | **0.82** |
| 19 | **Interpersonal and Communication Skills**<br>Communicates effectively with other health care providers. | 6.50 | **6.00** | **5.00** | **7.00** | **0.82** |
| 20 | **Medical Care**<br>How well does this Resident apply appropriate comprehensive care of high quality? | 6.30 | **5.25** | **4.00** | **7.00** | **1.26** |
| 21 | **Medical Care**<br>How well does this Resident provide appropriate and efficient utilization in the coordination of care by consultants and non-physician providers? | 6.40 | **5.75** | **5.00** | **7.00** | **0.96** |
| 22 | **Medical Knowledge**<br>How effective is the resident in applying medical knowledge to the clinical arena? | 6.10 | **5.50** | **5.00** | **7.00** | **1.00** |
| 23 | **Medical Knowledge**<br>How is the Resident's general medical knowledge? | 6.50 | **6.50** | **5.00** | **8.00** | **1.29** |
| 24 | **Medical Knowledge**<br>How is the Resident's core surgical knowledge? | 6.20 | **6.00** | **5.00** | **7.00** | **0.82** |
| 25 | **Moral & Ethical Behavior**<br>How well does this Resident provide consistent medical therapy, irrespective of patient's race, creed, socioeconomic status, etc.? | 6.80 | **6.50** | **5.00** | **9.00** | **1.91** |
| 26 | **Moral & Ethical Behavior**<br>How well does this Resident demonstrate moral and ethical behavior? | 6.90 | **6.50** | **5.00** | **9.00** | **1.91** |
| 27 | **Patient Care**<br>Gathers essential and accurate information about patients. | 6.10 | **5.50** | **5.00** | **7.00** | **1.00** |

USC(Irani)0330

New Innovations RMS Evaluations

| | | | | | | |
|---|---|---|---|---|---|---|
| 28 | **Patient Care**<br>Makes informed diagnostic and therapeutic decisions. | 6.20 | **5.50** | **5.00** | **7.00** | **1.00** |
| 29 | **Patient Care**<br>Develops and implements patient management plans. | 6.20 | **5.75** | **5.00** | **7.00** | **0.96** |
| 30 | **Patient Care**<br>Performs competently essential medical procedures. | 6.33 | **5.75** | **5.00** | **7.00** | **0.96** |
| 31 | **Personality**<br>The resident's attitude encourages a spirit of cooperation. | 6.00 | **5.25** | **4.00** | **7.00** | **1.26** |
| 32 | **Personality**<br>How effective is the resident in fostering a spirit of enthusiasm for patient care and learning? | 6.10 | **5.25** | **4.00** | **7.00** | **1.26** |
| 33 | **Procedures & Practical Experience**<br>Evaluate the resident's level of comfort when performing procedures. | 6.33 | **5.75** | **5.00** | **7.00** | **0.96** |
| 34 | **Procedures & Practical Experience**<br>Evaluate the resident's ability to anticipate problems. | 6.00 | **5.25** | **4.00** | **7.00** | **1.26** |
| 35 | **Procedures & Practical Experience**<br>Describe the resident's understanding of the relevant anatomy and physiology of the procedures performed. | 6.50 | **(6.33)** | **5.00** | **7.00** | **1.15** |
| 36 | **Procedures & Practical Experience**<br>Evaluate the resident's response to constructive criticism. | 6.33 | **5.50** | **4.00** | **7.00** | **1.29** |
| 37 | **Professionalism**<br>How well does this Resident demonstrate duty and service? | 6.44 | **5.25** | **4.00** | **7.00** | **1.26** |
| 38 | **Teaching Skills**<br>How would you rate this Resident's overall teaching abilities? | 6.10 | **5.50** | **5.00** | **7.00** | **1.00** |
| 39 | **Teaching Skills**<br>Rate the resident's priority for teaching and learning. | 6.10 | **5.25** | **2.00** | **7.00** | **2.36** |
| 40 | **Teaching Skills**<br>Evaluate the resident's willingness to share information. | 6.30 | **5.25** | **4.00** | **7.00** | **1.26** |
| 41 | **Teaching Skills**<br>How would you rate the residents interest in teaching? Unsatisfactory = Disinterested in teaching, unable to use appropriiate modes for venue.<br>Superior = Takes interest in teaching and actively teaches facts, cognitive processes & behaviors. Demonstrates ability to use effective teaching techniques, models teaching behavior. | 6.00 | **5.00** | **4.00** | **6.00** | **1.00** |

| Evaluator | General Comments |
|---|---|
| **Mastriani, Katherine Sarah**<br>**01/17/2011**<br>**Pediatric Surgery** | **Needs to take greater responsibility for the welfare of the patient; too often would fail to recognize need for urgency in patient care. Pleasant.** |
| **Reeves, Jeremy Mark**<br>**01/30/2011**<br>**Private-** | **Has been a bid help on the service. Willing to go the extra mile.** |

USC(Irani)0331

New Innovations RMS Evaluations

**Surgical Associates**

Ross, William Aaron *
02/07/2011
Pediatric Surgery

Dr. Irani had a rough start at the VA hospital, where I first had occasion to work with him. He seemed to lack motivation and lacked consistency in his patient evaluations and care plans. However, I did see marked improvement by the conclusion of the rotation. His rather unique personality seems to get in the way of his interpersonal relationships, both with peers and staff. He is highly intelligent and his core medical knowledge is excellent but his needs to temper this with a greater desire to improve his core surgical knowledge base/skill set. I think that he has incredible potential to become an excellent surgeon but needs to develop the motivation and people skills to succeed.

Export to Excel

Notes:

⊕ A blank Standard Deviation indicates that there is either no deviation (only one score) or that this statistic does not apply to the question

New Innovations, Inc. ©1995-2012

USC(Irani)0332

New Innovations RMS Evaluations

Page 1 of 4

Evaluations
# Irani, Afraaz R   *PGY - 2*

Orthopaedics | mwehunt | **Log Out**

7/1/2011 to 6/30/2012 Was evaluated 3 times on the following rotations: Ortho:Joints; Ortho:SportsMed;
**Individual Report (Admin)**

| Questionnaire Name/Title | | Category/Question | Pgy 2 Average | Average | Minimum | Maximum | Standard Deviation |
|---|---|---|---|---|---|---|---|
| **360 Rating Form** 360 Rating Form | 1 | **Staff- Select Your Status:** | 3.00 | **3.00** | **3.00** | **3.00** | |
| | 2 | Follows through on tasks he/she agreed to perform | 3.00 | **3.00** | **3.00** | **3.00** | |
| | 3 | Respects patient's privacy and autonomy | 3.00 | **3.00** | **3.00** | **3.00** | |
| | 4 | Takes responsibility for actions, admits mistakes and does not blame others | 2.00 | **2.00** | **2.00** | **2.00** | |
| | 5 | Makes patient care and well-being a priority | 2.00 | **2.00** | **2.00** | **2.00** | |
| | 6 | Provides equitable care regardless of patient culture and socioeconomic status | 3.00 | **3.00** | **3.00** | **3.00** | |
| | 7 | Is honest in interactions with others | 3.00 | **3.00** | **3.00** | **3.00** | |
| | 8 | Is respectful and considerate in interactions with patients | 3.00 | **3.00** | **3.00** | **3.00** | |
| | 9 | Is willing to answer questions and provide explanations | 2.00 | **2.00** | **2.00** | **2.00** | |
| | 10 | Is courteous to and considerate of nurses and other staff | 3.00 | **3.00** | **3.00** | **3.00** | |
| | 11 | Discusses patient issues clearly with staff and faculty | 3.00 | **3.00** | **3.00** | **3.00** | |
| | 12 | Listens to and considers what others have to say about relevant issues | 2.00 | **2.00** | **2.00** | **2.00** | |
| | 13 | Maintains complete and legible medical records | 3.00 | **3.00** | **3.00** | **3.00** | |
| | 14 | What does this resident do well? | | | | | |
| | 15 | How could this resident improve? | | | | | |
| | 16 | Would you want this resident to treat a member of your family? | No (1) | | | | |
| **Faculty to Resident 2010** Faculty to Resident Evaluation | | **MEDICAL KNOWLEDGE:** **Intellectual Ability:** | | | | | |
| | 1 | Retention, comprehension, abstraction, discrimination, logical thinking. | 3.20 | **3.00** | **3.00** | **3.00** | **0.00** |

https://www.new-innov.com/EvaluationReports/EVALRPT_ReportsHost.aspx?Control=EVALRPT_Rep...    1/24/2012

USC(Irani)0333

New Innovations RMS Evaluations

**MEDICAL KNOWLEDGE:**
**OR Performance:**

2  Exhibits knowledge of anatomy, physiology, pathology of case. Understands mechanics.  Dexterity, efficiency, thoroughness.  Concern for patient. Maintenance of professional OR atmosphere.

| | | | | |
|---|---|---|---|---|
| 2.80 | 2.50 | 2.00 | 3.00 | 0.71 |

**MEDICAL KNOWLEDGE:**
**Conference Performance:**

3  Punctuality, organization, preparation.  Demonstrates knowledge of current literature and treatments.

| | | | | |
|---|---|---|---|---|
| 3.40 | 3.00 | 3.00 | 3.00 | 0.00 |

**MEDICAL KNOWLEDGE:**
**Decision Making:**

4  Makes informed decisions about diagnostic-therapeutic treatment based on patient information, preferences, up-to-date scientific evidence and clinical judgment.  Develop and carry out patient management plans.  Demonstrate investigatory and analytic thinking approach to clinical situations.

| | | | | |
|---|---|---|---|---|
| 3.00 | 3.00 | 3.00 | 3.00 | 0.00 |

**PARACTICE-BASED LEARNING AND IMPROVEMENT:**
**Technological  Skills:**

5  Uses information technology to manage information, access on-line medical information; and support their own education.

| | | | | |
|---|---|---|---|---|
| 3.40 | 3.00 | 3.00 | 3.00 | 0.00 |

**PARACTICE-BASED LEARNING AND IMPROVEMENT:**
**ASSESSMENTS:**

6  Investigates and evaluates patient care practices, appraises and assimilates scientific evidence, and improves their patient care practices.

| | | | | |
|---|---|---|---|---|
| 3.00 | 2.50 | 2.00 | 3.00 | 0.71 |

**PATIENT CARE:**
**Judgment:**

7  Common sense, decisiveness, ability to draw sound conclusions, willingness to admit mistakes.  Regard for patient's needs and life conditions.

| | | | | |
|---|---|---|---|---|
| 3.20 | 2.50 | 2.00 | 3.00 | 0.71 |

**PATIENT CARE:**
**Caring:**

8  Compassionate, appropriate and effective care of patients for the treatment of health problems and the promotion of health.

| | | | | |
|---|---|---|---|---|
| 3.20 | 2.50 | 2.00 | 3.00 | 0.71 |

**PATIENT CARE:**
**Communication:**

9  Gather essential and accurate information about patients; work with health care professionals to provide patient focused care.

| | | | | |
|---|---|---|---|---|
| 3.20 | 3.00 | 3.00 | 3.00 | 0.00 |

**INTERPERSONAL AND COMMUNICATION SKILLS**
**Communications Skills: Oral**

10  Clarity of expression, articulateness, grammar.  Skills that allow for effective information exchange with patients, their families and other health professionals.

| | | | | |
|---|---|---|---|---|
| 3.20 | 3.00 | 3.00 | 3.00 | 0.00 |

**INTERPERSONAL AND COMMUNICATION SKILLS**
11  **Communications Skills: Written**

| | | | | |
|---|---|---|---|---|
| 3.40 | 3.00 | 3.00 | 3.00 | 0.00 |

USC(Irani)0334

New Innovations RMS Evaluations                                                    Page 3 of 4

Must observe and document observations accurately and in good time. Progress, operative, and discharge notes should be written completely and promptly.

**INTERPERSONAL AND COMMUNICATION SKILLS**
**Relating to Patients:**

| | | | | | |
|---|---|---|---|---|---|
| 12 Interested, honest and understanding. Explains clearly and to the patient's satisfaction details related to diagnosis, proposed treatment, and implications. | 3.20 | 3.00 | 3.00 | 3.00 | 0.00 |

**PROFESSIONALISM**
**Concern for Others:**

| | | | | | |
|---|---|---|---|---|---|
| 13 Sensitivity to and consideration of others, tactfulness. Committed to ethical principles and sensitivity to a diverse patient population ( culture, age, gender, disabilities). | 3.40 | 3.00 | 3.00 | 3.00 | 0.00 |

**PROFESSIONALISM**
**Reliability:**

| | | | | | |
|---|---|---|---|---|---|
| 14 Acceptance of responsibility, punctuality, availability. | 3.00 | 2.00 | 2.00 | 2.00 | 0.00 |

**PROFESSIONALISM**
**Integrity:**

| | | | | | |
|---|---|---|---|---|---|
| 15 Honesty, discretion, accountability to patients, society, and the profession; a commitment to excellence and on-going professional development. | 3.40 | 3.00 | 3.00 | 3.00 | 0.00 |

**PROFESSIONALISM**
**Appearance:**

| | | | | | |
|---|---|---|---|---|---|
| 16 Poise, alertness, cleanliness, appropriateness of dress. | 3.40 | 3.00 | 3.00 | 3.00 | 0.00 |

**PROFESSIONALISM**
**Ethical Principles:**

| | | | | | |
|---|---|---|---|---|---|
| 17 A commitment to provision or withholding of clinical care, confidentiality of patient information, informed consent and business practices. | 3.40 | 3.00 | 3.00 | 3.00 | 0.00 |

**PROFESSIONALISM**
**Professional Promise:**

| | | | | | |
|---|---|---|---|---|---|
| 18 Desirability of letting this person treat you or your family. | 2.80 | 2.50 | 2.00 | 3.00 | 0.71 |

**SYSTEM-BASED PRACTICE**
**Resourcefulness:**

| | | | | | |
|---|---|---|---|---|---|
| 19 Management of available resources. Understand roles of support personnel and makes maximum use of their assistance. Resourcefulness in obtaining information about patients. | 3.20 | 3.00 | 3.00 | 3.00 | 0.00 |

**SYSTEM-BASED PRACTICE**
**System of Health Care:**

| | | | | | |
|---|---|---|---|---|---|
| 20 Ability to demonstrate an awareness and responsiveness to the larger context and system of health care. The ability to effectively call on system resources to provide care for optimal value. Advocate for quality patient care and help patients deal with system complexities. | 3.20 | 3.00 | 3.00 | 3.00 | 0.00 |

21 What does this resident do well?

USC(Irani)0335

New Innovations RMS Evaluations

22  How could this resident improve?

23  OVERALL RATING:                 3.00    2.50    2.00    3.00    0.71

| Evaluator | Question Comments |
|---|---|
| Voss, Frank R.<br>12/28/2011<br>Ortho:Joints | 6) Afraaz is very bright. His OR performance was made difficult by the second year call requirements. However, beyond that his improvement in the OR was somewhat slow and seemed not to be driven by concern for the patient. Punctuality on rounds was a concern as the trauma service was very busy as was mine and he was late for am rounds a few times. His patient care was inconsistent and included a patient who was told to take 5 Percocet tablets at once by phone and a second one who had been taking 12/day in hospital for whom he wrote a prescription for 40 tablets. He also seemed unaware that the drain output mattered. |
| Voss, Frank R.<br>12/28/2011<br>Ortho:Joints | 9) Please see above comments. Also, he never was willing to admit that he made an error. Compassion for the patient needs to improve. His level of communication with me was appropriate. |
| Voss, Frank R.<br>12/28/2011<br>Ortho:Joints | 12) Seemed interested more by the intrigue of the case than empathy for the patient. |
| Voss, Frank R.<br>12/28/2011<br>Ortho:Joints | 18) See previous comments about punctuality for morning rounds. Had a hard time prioritizing his responsibilities while on call. At his current level, I would not let him take care of a member of my family. |
| Voss, Frank R.<br>12/28/2011<br>Ortho:Joints | 20) Afraaz was able to function well with regard to the utilization of resources. |
| Mazoue',<br>Christopher<br>11/06/2011<br>Ortho:SportsMed | 21) Afraaz is intelligent and inquisitive. |
| Voss, Frank R.<br>12/28/2011<br>Ortho:Joints | 21) He is very bright. He learns easily. He is intrigued by the breadth of orthopaedics. He communicatios well with peers. |
| Mazoue',<br>Christopher<br>11/06/2011<br>Ortho:SportsMed | 22) As with all residents, Afraaz need to continue to learn the basics e.g. anatomy. He also needs to work on his social skills with his professional colleagues e.g. OR personnel. In addition, he needs to work on time management and efficiencies especially in the OR. |
| Voss, Frank R.<br>12/28/2011<br>Ortho:Joints | 22) Better prioritization of work priorities. Review what we learned in the last few cases to improve in the OR the next time. Improve empathy for the patient. |
| Voss, Frank R.<br>12/28/2011<br>Ortho:Joints | 23) This recommendation covers the approximately 6 week period that Afraaz was on my service. His clinical suspension of priveleges precluded completion of our rotation. |

Export to Excel

Notes:

◎ A blank Standard Deviation indicates that there is either no deviation (only one score) or that this statistic does not apply to the question

New Innovations, Inc. ©1995-2012

USC(Irani)0336



**Re: patient encounter**
Diane Savage [Diane.Savage@PalmettoHealth.org]

Sent: Friday, August 12, 2011 8:17 PM
To:    Allison Turnley [Allison.Turnley@PalmettoHealth.org]; David Koon
Cc:    wcgrsq911@mindspring.com

All,
    I read Dr. Irani's response and wish he had displayed the compassion and care he described.   Upon his arrival to the trauma room he did not inquire about the pt's vital signs nor pain meds, so I am unsure how this could have been a concern for with holding additional doses.  Mr. ████ had received the first dose of pain meds about 45 minutes before Dr. Irani arrived.   Dr. Irani waited on the additional dose of pain meds after I stopped him from manipulating the pts injury so the meds could be administered.    Dr. Irani was reluctant to wait on the meds and kind of smirked at me when I asked him a second time to allow us to give the meds.   Dr. Irani's response was something along the lines that it would only be painful briefly.  I did ask him to speak with the family, after he had evaluated the injury and about a half hour had passed, not to give details, but to alleviate the anxiety they were experiencing....it was about an hour before he did speak with the family.   This appeared to be a very close family and they were very anxious.     From my recollection of the time in the trauma bay, Dr. Irani only spoke briefly with the pt and when he did, it lacked compassion.   I have worked in the ED for 26 years and this was a "horrific" injury as Dr. Irani described below, but I have seen worse...I did not believe his arm would be salvagable---my angst was at the lack of sensitivity displayed by Drs. Irani and Iaquinta.

Sincerely,
Diane Savage

>>> David Koon <David.Koon@uscmed.sc.edu> 08/11/11 7:10 AM >>>
Allison -

Please forward this to Diane. I would like to know if his explanation below matches their memory of Mr. B's care. Also, if there were others in attendance (Mandy, Dr. Robinson) I would like to have their version as well.

Thanks

David Koon

From: Afraaz Irani [afraaz.irani@gmail.com]
Sent: Wednesday, August 10, 2011 6:23 PM
To: David Koon
Cc: John Walsh
Subject: Re: FW: Fwd:

Drs. Koon and Walsh.

I remeber this pleasant gentleman very well.

My first steps with all such traumatic wounds are the same. The patient had already been given fentanyl before my arrival. Therefore my first step is to inspect wound, and see his pain level before approving a possible overdose of narcotics to an 80+ year old male. Accordingly I inspected the wound first. He had some pain, then I waited for the additional dose of additional pain meds. All the manipulation was done by Iaquinto as was outlined in the prior email

I did introduce myself to the patient. My back was to the nurses, so not sure if they heard me. It is it true that I can mumble and so that cannot be clear. Indeed the nurse here does not know the correct pronunciation of my name so I can work on better enunciation when introduction myself

I spoke with Iaquinto in the trauma bay. I called and he told me to stay at bedside he is coming down directly. The admission plan, everything was unknown, and I was instructed to say at bedside, accordingly I did not feel it appropriate to talk to the family until he had arrived as I was instructed.

Often in the setting of a traumatic injury, when the orthpaedist arrived, he/she is expected to immediately talk to family. In that situation I am less likely to jump the gun and speak to family, since it is important to wait a few extra minutes to get details correct, since this could potentially be a major surgery/life altering event.

Re: patient encounter - Outlook Web Access Light                    https://uscmed.sc.edu/owa/?ae=PreFormAction&t=IPM.Note&a=Next...

It was a regrettable decision, but one that had to be done. Many of the staff were justifiably horrified at this, and wanted us to do more. However this was medically the correct decision. Indeed he had a heart attack during the procedure, and passed away a few days later. It is clear he could have not withstood a salvage procedure to his arm.

The patient was very thankful throughout and when I saw him on the floor we had great interactions. He remebered me from the trauma bay and shook my hand and thanked me again (although truth be told he was a real gentleman). I really did enjoy my time with him. It is a shame that he is no longer with us.

I remember we talked about how he was still able to do what he loved (metal/wood working) in his 80s. He was thankful that he was still there, and we talked about his family and how his children work with him in the shop. I do remeber Mr ████ and wish he was still with us.

Hope that clarifies things.

Thanks,
Afraaz

On Wed, Aug 10, 2011 at 2:34 PM, David Koon
<David.Koon@uscmed.sc.edu<mailto:David.Koon@uscmed.sc.edu>> wrote:
Afraaz -

I'll need an explanation by the end of the day.

DK

_____
From: Katherine Stephens [Kathy.Stephens@PalmettoHealth.org]
Sent: Wednesday, August 10, 2011 10:00 AM
To: David Koon; John Walsh
Subject: Re: Fwd: Pt. ████████

John & David,

Pls. review for follow up.

Thank you,
Kathy

Katherine G. Stephens, MBA, FACHE
Vice President, Medical Education and Research
ACGME Designated Institutional Official
Palmetto Health
Fifteen Medical Park, Suite 202
Five Richland Medical Park Drive
Columbia, SC 29203

803-434-6861<tel:803-434-6861> or 803-434-4476<tel:803-434-4476>

katherine.stephens@palmettohealth.org<mailto:katherine.stephens@palmettohealth.org>

>>> Allison Turnley 8/9/2011 2:14 PM >>>
Please see concern below. I do not have an email address for Dr. Walsh.

Thanks -
Allison

Allison Turnley, RN BSN MSM
Director of Nursing
Emergency Services
Palmetto Health Richland
Office - 434-2945
Cell - 622-3376
Allison.Turnley@palmettohealth.org<mailto:Allison.Turnley@palmettohealth.org>
<mailto:Allison.Turnley@palmettohealth.org<mailto:Allison.Turnley@palmettohealth.org>>

>>> Edward Catalano 7/19/2011 2:46 PM >>>

Re: patient encounter - Outlook Web Access Light                 https://uscmed.sc.edu/owa/?ae=PreFormAction&t=IPM.Note&a=Next...

Allison, This note should be forwarded to: Dr. Gretta Harper ( VP responsible for employed MDs), Dr. Walsh ( Chair of the USC Dept. of Ortho), Kathy Stephens ( VP for education ) and Cheryl Coble. Thanks, EWC

Edward W. Catalano M.D.
VP Medical Affairs
Palmetto Health Richland Hospital
5 Richland Medical Park Drive
Columbia, SC 29203
Phone: 803 434 2819<tel:803%20434%202819> Fax: 434 6668
e-mail: edward.catalano@palmettohealth.com<mailto:edward.catalano@palmettohealth.org>

>>> Allison Turnley 7/14/2011 5:32 PM >>>
Dr. Catalano -

Please see below for information regarding a concern about an orthopedic resident and attending. Diane refers to the resident as Dr. Orlani, however she pointed him out to me and he is actually Dr. Irani.

As a side note, I was in the trauma room before the orthopedic resident arrived, and I saw the injury to this man's arm. It was an impressive injury. And the patient is an elderly man, I believe in his 70s or 80s.

Please let Diane or me know if you need additional information.

Allison

Allison Turnley, RN BSN MSM
Director of Nursing
Emergency Services
Palmetto Health Richland
Office - 434-2945
Cell - 622-3376
Allison.Turnley@palmettohealth.org<mailto:Allison.Turnley@palmettohealth.org>
<mailto:Allison.Turnley@palmettohealth.org<mailto:Allison.Turnley@palmettohealth.org>>

>>> Diane Savage 7/11/2011 9:39 PM >>>
Mr. ████ came to the ED with a traumatic partial amputation of his left forearm. His left arm was angulated, hand rotated approximately 180 degrees, muscle, bone, tendons, arteries, etc exposed. Dr. Orlani (?) from ortho was the consulting resident. He enter the trauma room and barely acknowledged the pt, did not introduce himself and proceeded to manipulate the fractured arm. Myself and Mandy, along with the ED resident asked him to wait before he moved the pt's arm so we could administer pain meds. I had to ask him twice to stop so I could give the meds. I had the meds in my hand. He showed no compassion for what the pt was experiencing. I asked Dr. Orlani to speak with the patients family and he was reluctant, but finally did speak with them. Dr. Spencer Robinson irrigated the wound with 1L of NS. When Dr. Orlani asked if the wound had been irrigated-I stated it had been irrigated with 1L. He stated "2" and I stated "no, 1L". He smiled and stated "2L" and I repeated "1". He remarked "we will say it was 2". I stated "no, it was 1. During the entire encounter I felt Dr. Orlani was not concerned for the pt, but more for himself and the work he had ahead of him. When Dr. Iaquinta entered the room, he too did not introduce himself to the pt and roughly removed the dressing and splint. The pt grimaced and moaned out in pain. Before myself or Mandy to ask about pain meds, Dr. Iaquinta grabbed the pts partially amputated extremity and twisted it to the anatomically correct position. The pt yelled out and came about a foot off of the stretcher. We had the means to make this pt comfortable and we instead inflicted undue pain and duress. Dr. Iaquinta very bluntly stated to the pt "we are going to have to cut off your arm".....a total lack of compassion or explanation. I have had many similar encounters with both of these physicians and have also heard other nurses and residents state the same. Please feel free to contact me for any needed information. Thanks, Diane
---------------------------------------------------------------------------
PALMETTO HEALTH CONFIDENTIALITY NOTICE

This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited by law. If you have received this communication in error, please notify me immediately.

---------------------------------------

This e-mail transmission, in its entirety and including all attachments, is intended solely for the use of the person or entity to whom it is addressed and may contain information, including health information, that is privileged, confidential, and the disclosure of which is governed by applicable law. If you are not the intended recipient, you are hereby notified that disclosing, distributing, copying or taking any action in relation to this e-mail is STRICTLY PROHIBITED. If you have received this e-mail in error, please notify the sender immediately and destroy the related message.

4/25/2012 8:50 AM
                                                                                                                            USC(Irani)0339

Re: patient encounter - Outlook Web Access Light          https://uscmed.sc.edu/owa/?ae=PreFormAction&t=IPM.Note&a=Next...

----------------------------------------
This e-mail transmission, in its entirety and including all attachments, is intended solely for the use of the
person or entity to whom it is addressed and may contain information, including health information, that is
privileged, confidential, and the disclosure of which is governed by applicable law. If you are not the
intended recipient, you are hereby notified that disclosing, distributing, copying or taking any action in
relation to this e-mail is STRICTLY PROHIBITED. If you have received this e-mail in error, please notify the
sender immediately and destroy the related message.
--------------------------------------------------------------------------------
PALMETTO HEALTH CONFIDENTIALITY NOTICE
This message is intended only for the use of the individual or entity to which
it is addressed and may contain information that is privileged, confidential and
exempt from disclosure under applicable law.  If the reader of this message is
not the intended recipient, you are hereby notified that any dissemination,
distribution, or copying of this communication is strictly prohibited by law.
If you have received this communication in error, please notify me immediately.

Connected to Microsoft Exchange



UNIVERSITY OF SOUTH CAROLINA
SCHOOL OF MEDICINE

UNIVERSITY SPECIALTY CLINICS

15 AUG 11

Memorandum of Record

Re: Dr. Afraaz Irani (PGY-2 Orthopaedic Resident)

1. Dr. Irani demonstrated significant lack of compassion and empathy in a patient's care in the initial trauma resuscitation. Mr. B. sustained a near forearm amputation and Dr. Irani failed to provide adequate pain medication and ignored nursing requests for same during his initial evaluation. During this encounter he requested the nurse to lie about the initial irrigation / debridement of the traumatic wound.
2. He has repeatedly demonstrated poor communication skills with patients, families, peers, and attending physicians.
3. He has repeatedly demonstrated poor time management with frequent tardiness to required conferences, clinics, and the operating room.
4. He does not demonstrate effective prioritization of clinical duties. This has resulted in additional duties for other residents.
5. He has provided substandard patient care (e.g. closing wounds with Vicryl suture; not evaluating a VA total joint patient with immediate post-operative cellulitis).
6. He received substandard evaluations during his internship.
7. He has displayed a significant lack of attention to detail in his initial PGY-2 rotation.

These deficiencies have persisted despite several verbal counseling sessions from his chief resident, his attending physicians, and his program director.

The attending physicians of the Department of Orthopaedic Surgery would recommend that Dr. Afraaz Irani be place on level II academic remediation from 15 AUG 11 to 01 DEC 11.

Remediation measures would include:
1. Dr. Irani would provide improved patient care, including pain management and wound management / closure.
2. He will answer his pages appropriately and immediately.
3. He will see all orthopaedic consultations as soon as possible.
4. He will display improved communication to peers, ancillary staff, and attending surgeons.
5. He will develop a Grand Rounds presentation of Effective Communication Skills.
6. He will demonstrate improved organizational skills and prioritize clinical duties effectively.
7. He will demonstrate improved attention to detail while on clinical rotations.

David E. Koon, Jr., MD
Program Director

John J. Walsh, MD
Chair, Dept. of Orthopaedics

DEPARTMENT OF SURGERY
Two Richland Medical Park, Suite 402, Columbia, SC 29203
803-256-2657, FAX 803-933-9545

USC(Irani)0341

Re: Secure: Fwd: Irani_ Afraaz Remediation - Outlook Web Access Light     https://uscmed.sc.edu/owa/?ae=PreFormAction&t=IPM.Note&a=Next...



Office Outlook Web Access | Type here to search | This Folder | Address Book | Options | Log Off

**Mail**

**Calendar**

**Contacts**

Deleted Items
Drafts
Inbox
Junk E-Mail
Sent Items

Click to view all folders ⊗

AOA trip
Goodno
Irani
Kanwisher
Lamoreaux
Lindley
Massey
Residency
Riis
Sent Items

Manage Folders...

Reply | Reply to All | Forward | Move | Delete | Junk | Close

## Re: Secure: Fwd: Irani_ Afraaz Remediation
John Walsh

**Sent:** Tuesday, August 16, 2011 7:03 PM
**To:** David Koon

Facts are very clear.

Sent from my Verizon Wireless Phone

----- Reply message -----
From: "David Koon" <David.Koon@uscmed.sc.edu>
Date: Tue, Aug 16, 2011 5:09 pm
Subject: Secure: Fwd: Irani_ Afraaz Remediation
To: "John Walsh" <John.Walsh@uscmed.sc.edu>, "Paul Athey" <Paul.Athey@uscmed.sc.edu>

John -

Please see the approval of Dr.s Hoppman and Raymond and Kathy Stephens re: Dr. Irani's level II academic remediation.

Paul Athey and I met with Dr. Irani yesterday afternoon.  I informed him that the faculty had serious concerns regarding his performance thus far in his training.  I gave him the opportunity to share his thoughts on how his first 14 months here at PH had gone.  I informed him that we were recommending that he be placed on academic remediation and let him read the MoR dated 15 AUG 11 re: his remediation.

He stated that he did not agree with some of the points and complained that some were too vague.  He initially laughed about some of them and appeared not to take them very seriously.  He then proceeded to offer excuses or rationalize each point that was noted in his deficiencies and argue that he was misunderstood at times.  The only item with which he agreed with was item # 5 - in that he should not have closed the wound with Vicryl.  He accused the ER/trauma nurse of lying about the events surrounding Mr. B's care in the trauma room.

Dr. Irani seemed to lack insight into his poor performance and failed to take any responsibility for his actions.

I informed Dr. Irani that these were the recommendations of the department to the GMEC and that the GMEC Executive Comm would probably approve these recommendations pending full GMEC voting in early September. I encouraged him to review the GME policy on academic remediation.  He was allowed to respond to each item in the MoR and ask questions. I informed him that failure to improve his performance and meet the remediation measures could result in recommendations for continued probation and/or possible termination from the training program.  I provided him a copy of the MoR dated 15 AUG 11 for his review and informed him that he could respond in writing to our recommendations.

Our meeting was concluded at 1330 hrs.

David Koon

_____
From: James Raymond [james.raymond@palmettohealth.com]
Sent: Monday, August 15, 2011 7:29 PM
To: Richard Hoppmann
Cc: Katherine Stephens; David Koon
Subject: Re: Secure: Fwd: Irani_ Afraaz Remediation

Kathy,
I approve also.
Jim

Sent from my iPad

On Aug 15, 2011, at 6:44 PM, "Richard Hoppmann" <Richard.Hoppmann@uscmed.sc.edu> wrote:

> I approve Level II remediation to begin immediately – be  sure to follow due process.
> Richard Hoppmann
>
> From: Katherine Stephens [mailto:Kathy.Stephens@PalmettoHealth.org]

USC(Irani)0342

Secure: Fwd: Irani_ Afraaz Remediation - Outlook Web Access Light    https://uscmed.sc.edu/owa/?ae=PreFormAction&t=IPM.Note&a=Next...

> Sent: Monday, August 15, 2011 4:57 PM
> To: James Raymond; Richard Hoppmann
> Cc: David Koon
> Subject: Secure: Fwd: Irani_ Afraaz Remediation
>
> Jim & Dick,
>
> I will forward to you as a separate email the action that precipitated this request. I ask that the three of
us as the GMEC executive committee, approve Level II remediation as a temporary action until the next
GMEC mtg. I am also working with David to put the remediation plan into outcomes language with specific
measures.
>
> Please let me know your approval/disapproval and any questions.
>
> Thank you,
>
> Kathy
>
> Katherine G. Stephens, MBA, FACHE
> Vice President, Medical Education and Research
> ACGME Designated Institutional Official
> Palmetto Health
> Fifteen Medical Park, Suite 202
> Five Richland Medical Park Drive
> Columbia, SC  29203
>
> 803-434-6861 or 803-434-4476
>
> katherine.stephens@palmettohealth.org
>
>
> > > > Michelle Wehunt <Michelle.Wehunt@uscmed.sc.edu> 8/15/2011 1:57 PM > > >
> Good Afternoon Kathy,
>
> Please see attached remediation recommendations for Dr. Irani.  Should you have any questions please
or suggestions please let Dr. Koon know.
>
> Thank you,
>
>
>
> --------------------------------------
> This e-mail transmission, in its entirety and including all attachments, is intended solely for the use of
the person or entity to whom it is addressed and may contain information, including health information,
that is privileged, confidential, and the disclosure of which is governed by applicable law. If you are not the
intended recipient, you are hereby notified that disclosing, distributing, copying or taking any action in
relation to this e-mail is STRICTLY PROHIBITED. If you have received this e-mail in error, please notify the
sender immediately and destroy the related message.
--------------------------------------------------------------------
> PALMETTO HEALTH CONFIDENTIALITY NOTICE
> This message is intended only for the use of the individual or entity to which it is addressed and may
contain information that is privileged, confidential and exempt from disclosure under applicable law.  If the
reader of this message is not the intended recipient, you are hereby notified that any dissemination,
distribution, or copying of this communication is strictly prohibited by law.  If you have received this
communication in error, please notify me immediately.
>
> --------------------------------------
> This e-mail transmission, in its entirety and including all attachments, is intended solely for the use of
the person or entity to whom it is addressed and may contain information, including health information,
that is privileged, confidential, and the disclosure of which is governed by applicable law.  If you are not the
intended recipient, you are hereby notified that disclosing, distributing, copying or taking any action in
relation to this e-mail is STRICTLY PROHIBITED.  If you have received this e-mail in error, please notify the
sender immediately and destroy the related message.
> <winmail.dat>
--------------------------------------------------------------------
PALMETTO HEALTH CONFIDENTIALITY NOTICE
This message is intended only for the use of the individual or entity to which it is addressed and may
contain information that is privileged, confidential and exempt from disclosure under applicable law.  If the
reader of this message is not the intended recipient, you are hereby notified that any dissemination,
distribution, or copying of this communication is strictly prohibited by law.  If you have received this

3

USC(Irani)0343

Re: Secure: Fwd: Irani_ Afraaz Remediation - Outlook Web Access Light    https://uscmed.sc.edu/owa/?ae=PreFormAction&t=IPM.Note&a=Next...

communication in error, please notify me immediately.

Connected to Microsoft Exchange

USC(Irani)0344

Re: Department of Orthopaedics. - Outlook Web Access Light          https://uscmed.sc.edu/owa/?ae=PreFormAction&t=IPM.Note&a=Prev...



Dr. Irani,

Thank you for your email and the commitment you expressed to improving in the areas identified. The goal of the academic remediation process is to ensure that a resident physician is provided an opportunity to improve in areas of concern and to achieve competence in these areas. I am certain that Dr. Koon will appreciate your positive attitude to constructive criticism with the goal of assisting you in achieving competence.

Katherine G. Stephens, MBA, FACHE
Vice President, Medical Education and Research
ACGME Designated Institutional Official
Palmetto Health
Fifteen Medical Park, Suite 202
Five Richland Medical Park Drive
Columbia, SC 29203

803-434-6861 or 803-434-4476

katherine.stephens@palmettohealth.org

>>> Afraaz Irani <afraaz.irani@gmail.com> 8/22/2011 10:01 PM >>>
Ms. Stephens,

I was recently informed by Dr. Koon, that he would be taking steps to suggest I be placed on academic remediation.

I was very surprised and disappointed to hear this given the positive comments from my peers.

I was handed a sheet with specific complaints against me and told to send you an email to explain the following issues. Please allow me to explain myself regarding the seven points outlined in Dr. Koon's letter:

*1. Dr. Irani demonstrated significant lack of compassion and empathy in a patient's care in the initial trauma resuscitation. Mr B sustained a near forearm amputation and Dr. Irani failed to provide adequate pain medication and ignored nursing requests for same during his initial evaluation. During this encounter he request the nurse to lie about the initial irrigation / debridement of the traumatic wound.*

I always demonstrate the highest level of compassion and empathy in a patient's care. There are many individuals involved in the resuscitation. My job as the orthopaedic resident is to manage the orthopaedic injury in conjunction with the attending. I was consulted on Mr. B after the ER physicians had evaluated the patient and I was at the patient's bedside within 10 minutes. At the time of my evaluation the patient had already received pain medication. Given the severity of the trauma in this 82 year old gentleman, the severity of the pain would not have been controlled to a level that the nurse in question was attempting to achieve by a safe level of pain medications.

As part of my initial assessment, I unwrapped the initial dressing and given the severity of what was discovered, I immediately consulted my attending for immediate patient care and plan for OR.

Regarding the accusation about lying about patient care; this is a misinterpretation of the nurse about my comments regarding irrigation. My comments to her were meant to say that usually we irrigate with two liters and I was surprised that an ER physician would irrigate with only one liter. So my statement that it was two liters was under the assumption that routine clinical practices were being followed. I did not irrigate as we already had a plan to go to the OR. My comments to nurse were meant to reinforce what is usually done. However I was not personally involved, nor did I document any irrigation in my note as I did not perform any irrigation, nor was I present during any irrigation.

*2. He has repeatedly demonstrated poor communication with patients, families, peers, and attending physicians.*

I appreciate the fact that these issues have been brought to my attention but as the incident with the nurse above illustrates, I may have been misunderstood. Therefore I will increase my efforts to ensure I am being properly understood, including repeating what I have requested when appropriate. I appreciate the opportunity to spend time focusing on improving my communications skills with the grand rounds presentation which will be prepared in the time provided, as that is important to patient care, regardless of the care giver.

As part of my effort to improve communication, I will notify the appropriate attendings or peers regarding patients who I have been contacted about on call, so that incidents such as the VA patient (below), who I was told by the ER attending that I do not need to see, do not recur. This will also reduce interruption in patient care. This would be along the same lines as patient care/sign outs and hand-offs and understanding what has been accomplished and what remains to be done with patient care.

*3. He has repeatedly demonstrated poor time management with frequent tardiness to required conferences, clinics, and the operating room.*

*4. He does not demonstrate effective prioritization of clinical duties. This has resulted in additional duties for other residents.*

Many of these items are likely related to times when I have been required by my supervisors and/or attending to remain in one location when I am expected in another location. I frequently contact the location where I am expected to be and notify the nurses so that they may appropriately coordinate patient care. In the future, I will instead speak directly with the physician who is expecting me so that there is no confusion regarding perceived tardiness.

Regarding the additional duties for other residents. I always complete my work that's been assigned to me, often staying beyond recommended work hours, as I do not think it appropriate to burden fellow residents. No resident has brought to this my attention and when I requested that they do so, each of them stated there was no issue. If there are specific instances, I would be happy to help out whoever the resident who was burdened with my duties.

*5. He has provided substandard care (e.g. closing wound with Vicryl suture; not evaluating a VA total joint patient with post-operative cellulitis).*

Whenever I have been notified of errors. In the future I will proactively make my supervisors/attendings aware of a plan of care, and modify as guidance is provided to insure patients never receive substandard care.

*6. He received substandard evaluation during his internship.*

Once these evaluations were made known to me, I made significant improvements based on suggestions that were provided to me. Whenever my superiors raised issues I make every effort to address them and more recent evaluations reflect that. For example in my initial evaluation with trauma, I had the opportunity to discuss my performance with Dr. Bynoe. He offered good constructive suggestions for improvement, which I was glad to receive. I implemented them on my subsequent rotation, and my evaluation seems to reflect that.

*7. He has displayed a significant lack of attention to detail in his initial PGY-2 rotation.*

This might be related to perceived forgetfulness in the OR. Although I think that this too may be related to lack of communication. I am not just leaving things lying around. I am leaving them for specific individuals. I did not however mention that to the individual involved and that gets back to my need for improved communication.

I really appreciate your help and understanding in this matter. I take these allegations seriously as there are cases where an action like this precludes one from a fellowship, and results in significant difficulty obtaining a job.

I hope you will consider my statements above, and if there are any questions, I would be more than happy to provide third party references to substantiate the above statements, and/or speak with you in person or over the phone.

Thank you for your kind understanding.
Afraaz
650-353-8523
--------------------------------------------------------------------------------
PALMETTO HEALTH CONFIDENTIALITY NOTICE
This message is intended only for the use of the individual or entity to which
it is addressed and may contain information that is privileged, confidential

Re: Department of Orthopaedics. - Outlook Web Access Light      https://uscmed.sc.edu/owa/?ae=PreFormAction&t=IPM.Note&a=Prev...

and exempt from disclosure under applicable law.  If the reader of this message
is not the intended recipient, you are hereby notified that any dissemination,
distribution, or copying of this communication is strictly prohibited by law.
If you have received this communication in error, please notify me immediately.

Connected to Microsoft Exchange

4/25/2012 8:57 AM
USC(Irani)0347

Michelle Wehunt

| | |
|---|---|
| From: | David Koon |
| Sent: | Monday, September 19, 2011 11:05 AM |
| To: | Afraaz.irani@gmail.com; Michelle Wehunt; John Walsh; katherine.stephens@palmettohealth.org |
| Subject: | Remediation Updates |

All -

Just to keep everyone on the same page - we will be having periodic updates re: the academic remediation measures for Dr. Irani.

15 AUG 11 - Koon / Athey / Irani - initial meeting

07 SEP 11 - Koon / Irani - meeting re: the appeal / grievance process

10 SEP 12 - Walsh / Irani - meeting re: the appeal / grievance process

19 SEP 11 - Walsh / Grabowski / Irani - scheduled 6 month evaluation (missed 22 AUG 11 due to post-call status)

03 OCT 11 (7:45 am) - progress report re: remediation measures

07 NOV 11 (7:45 am) - progress report re: remediation measures

05 DEC 11 (7:45am) - meeting with faculty re: Level II Academic Remediation status (15 AUG - 01 DEC 11)

Thanks

DKoon

1

USC(Irani)0348



September 20, 2011                    <u>HAND DELIVERED</u>

Afraaz Irani, MD
Department of Orthopaedics
2 Medical Park, Suite 404
Columbia, South Carolina 29203

Dear Dr. Irani:

After carefully reviewing the information available to me, and after further discussions with several others, I have decided to uphold the decision concerning academic remediation. An action like this is never simple, and I want to make it clear that our intent is not punitive. The sole purpose is to aid you in meeting academic expectations and to have you complete your training.

If you decide to continue with the grievance process, please refer to the steps outlined in your Resident Manual. As you work toward meeting remediation expectation, I have every confidence that you will meet this challenge.

Sincerely yours,

Katherine G. Stephens, MBA, FACHE
Vice President for Medical Education and Research

KGS/amh

cc: John Walsh, MD, Department of Orthopaedics
    David Koon, MD, Department of Orthopaedics
    James Raymond, MD, Chief Medical Officer

USC(Irani)0349



UNIVERSITY OF SOUTH CAROLINA
SCHOOL OF MEDICINE

UNIVERSITY SPECIALTY CLINICS®

**SEPTEMBER 22, 2011**               **RE:  DR. AFRAAZ IRANI**
                                     **(PGY-2 ORTHOPAEDIC RESIDENT)**

**MEMO FOR RECORD**

This memo for record summarizes a meeting that Dr. Grabowski and I had with Dr. Irani on 20th of September 2011.  We reviewed his progress to date over the last six months of his orthopaedic residency.  At the time of his previous evaluation and scheduling it had to be postponed and so the evaluation on the 20th will serve for his evaluation of the preceding seven months.  During the course of our discussion we reviewed Dr. Irani's progress overall and that specifically addressed the issues noted on the memorandum for record dated 15 August 2011.

With regards to Dr. Irani's surgical skills they are on par with his peers at this very early stage in his residency.  Dr. Irani has rotated with me and I found his technical skills to be appropriate relative to wound closure and fracture fixation.  He did not have the opportunity to do much with me in the area of arthroscopy.  I have heard from Dr. Guy that his skills in arthroscopy are quite elementary and will require substantial growth and improvement during the course of his residency.  My direct observations of his interactions with patients have been favorable.  He appears to demonstrate appropriate relationships with the patients and their families while under my direct supervision.  Dr. Irani demonstrates an excellent degree of interest and commitment to his own education. He carries around a small notebook while we are seeing patients in the office and if he encounters something which he is unfamiliar with he will note that for a later review.  I consider this to be an excellent teaching tool.  With the exceptions noted below I think that Dr. Irani's progress to date has been reasonably satisfactory.

Dr. Irani has had struggles and problems during his early phase in his orthopaedic residency.  Some of these issues reflect his performance while he was a first year resident but on an orthopaedic rotation. Some of these are reflected by his behavior when he is rotating in other specialties.  Some of these are noted during the first two months that he has been full-time here in the orthopaedic department.  I communicated these with him during the course of our discussion.  During this portion of the interview I specifically referenced the numbered topics present on the 15 August memo.  With respect to point number one I am aware of the circumstances surrounding this patient's care on a firsthand basis.  I had been consulted for the management of his arm injury.  I am also aware of the issues surrounding the attending physician's treatment of this patient while he was in the trauma bay.  I had spoken to Dr. Irani on a separate occasion about his behavior and his communication with the nurses.  His central assertion is that he had a favorable relationship with the patient following his initial resuscitation.  I informed him that the patient had received some sedation which also involves a certain degree of amnesia.  Whether or not the patient responded to him appropriately after he was resuscitated did not in any way support proper treatment prior to that point.  I also

CONTINUED

*DEPARTMENT OF ORTHOPAEDIC SURGERY*
**Two Medical Park, Suite 404, Columbia, SC 29203**
**803-434-6812, FAX 803-434-7306**

USC(Irani)0350



UNIVERSITY OF SOUTH CAROLINA
SCHOOL OF MEDICINE

UNIVERSITY SPECIALTY CLINICS®

SEPTEMBER 22, 2011
RE: DR. AFRAAZ IRANI (PGY-2 ORTHOPAEDIC RESIDENT)
PAGE 2

addressed the fact that his communication with the nursing staff and that his behavior was unacceptable. With respect to points number 2, 3 and 4 regarding communication, prioritization and tardiness, he acknowledged that these have been issues in the past and he indicated his desire to improve them. With regards to point number 5, he acknowledged that his decision making was incorrect regarding the total joint patient at the VA Medical Center that Dr. Koon references in his memo. He recognizes his errors involving the patient were threefold: 1) He failed to recognize the urgency of an infection in a patient who had had a total joint replacement. 2) He did not go to evaluate the patient personally. 3) He relied on a physician with less expertise to communicate the level of urgency which unfortunately proved to be incorrect. He acknowledged that his behavior was substandard in this area.

Dr. Irani was clear and forthright in his response to my evaluation. He indicated that he understood that he had made mistakes, had shortcomings, and needed to improve his performance. There still appears to be a small gap in his level of insight. He seems to feel that some of the issues here have to do with an incorrect perception by others and not incorrect performance by him. He did, however, indicate that he wanted to work in such a fashion that he would not leave any room for misperception on the part of others.

Dr. Grabowski provided some feedback about prioritization of duties in the emergency room.

In summary, Dr. Irani has demonstrated some shortcomings and mistakes during his PGY-1 and PGY-2 years. I think that these are remediable in a straight forward fashion and I expect that he will grow as an orthopaedic resident and put these issues behind him. That is my full expectation and based on his response during our evaluation I think that he feels the same. We will be meeting with him on an ongoing basis over the next several months to review his progress to date and provide him feedback with the ultimate goal of re-evaluating him and hopefully removing him from a probationary status.

David E. Koon, Jr., M.D.
Program Director

John J. Walsh, IV, M.D.
Chair Department of Orthopaedics

JJW.09.22.11.cct.ORTHO

*Received + Reviewed   10/3/11*
*— (Irani).*

**DEPARTMENT OF ORTHOPAEDIC SURGERY**
Two Medical Park, Suite 404, Columbia, SC 29203
803-434-6812, FAX 803-434-7570

USC(Irani)0351



UNIVERSITY OF SOUTH CAROLINA
SCHOOL OF MEDICINE
UNIVERSITY SPECIALTY CLINICS

03 OCT 11

Memorandum of Record

Re: Dr. Afraaz Irani (PGY-2 Orthopaedic Resident)

Dr.s John Walsh and David Koon met with Dr. Afraaz Irani on Monday, 03 OCT 11 to review the progress of his Level II Academic Remediation.

Dr. Walsh reviewed his 6 month evaluation. We then solicited his opinion on the progress of his remediation measures. We reviewed each remediation measure and provided feedback.

Dr. Irani appears to have gained some insight into his deficiencies. He has received constructive advice from Dr. Guy during his September rotation and has been working hard to improve in these areas.

Dr. Irani proceeded thru the Grievance Process as outlined in the PH Resident Manual. His appeal was denied by Kathy Stephens.

We will meet with Dr. Irani again on Monday, 07 November to review his progress.

David E. Koon, Jr., MD
Program Director

John J. Walsh, MD
Chair, Dept. of Orthopaedics

DEPARTMENT OF SURGERY
Two Richland Medical Park, Suite 402, Columbia, SC 29203
803-256-2657, FAX 803-933-9545

USC(Irani)0352



UNIVERSITY OF SOUTH CAROLINA
SCHOOL OF MEDICINE

UNIVERSITY SPECIALTY CLINICS

29 NOV 11

Memorandum of Record

Re: Dr. Afraaz Irani (PGY-2 Orthopaedic Resident)

Dr.s David Koon and Jennifer Wood (orthopaedic chief resident) met with Dr. Irani on Monday, 21 NOV 11 to discuss his remediation process. We had a very frank discussion with Dr. Irani regarding his remediation measures. Dr. Irani stated that he believed he was doing well and improving in all areas.

Dr. Wood had several instances where she believed Dr. Irani was still performing below his level of training. These included failures to complete assigned tasks (eg. morning patient list).

I informed Dr. Irani that his email to me regarding the completion of a delinquent narrative summary was inappropriate. (see below) His failure to timely complete assigned tasks, as well as his sense of entitlement, was unprofessional and inappropriate.

Dr. Irani has been verbally counseled regarding inappropriate patient care during a pain management problem with one of Dr. Walsh's post-operative patients.

Dr. Irani asked about the pending recommendations of the faculty re: his remediation. I informed him that the final decision had not been finalized, but I thought that we would transition him to level I remediation. After a long sigh and a rolling of the eyes, Dr. Irani informed us that this decision would only continue his "overhead." When questioned about this statement, he informed us that he had been "documenting" his activities and that he would have to continue this process until he was "off of probation." He appeared to be completing a "log" in order to disprove allegations of tardiness.

Dr. Irani failed to properly assess and manage a patient of Dr. Koon's with post-operative wound drainage and infection after she called twice over a three day weekend (25-27 NOV 11).

Dr. Irani failed to abide by his attending surgeon's instructions during Staff clinic (28 NOV 11) and was argumentative when confronted by his chief resident.

Dr. Irani continues to display behaviors which are inappropriate and unprofessional. His progress will be re-evaluated at our next faculty meeting on Monday, 05 DEC 11. We have asked for his presence at this meeting.

David E. Koon, Jr., MD
Program Director

*DEPARTMENT OF SURGERY*
Two Richland Medical Park, Suite 402, Columbia, SC 29203
803-256-2657, FAX 803-933-9545

USC(Irani)0353



UNIVERSITY OF SOUTH CAROLINA
SCHOOL OF MEDICINE

UNIVERSITY SPECIALTY CLINICS

RE: VA patient
David Koon
Sent: Thursday, November 03, 2011 9:39 PM
To: Afraaz Irani [afraaz.irani@gmail.com]; jhoov14@yahoo.com; Jennifer, Wood [jhwood23@gmail.com]; John Walsh

Dr. Irani -

I am well aware of the facts surrounding this patient's care and do not need you to remind me of the details.

I'm amazed that, as the junior resident of the PH team, you feel somehow inconvenienced by having to dictate a discharge summary on a patient that you "never actually participated" in his care. I guess that I'm supposed to be thankful that you "have gone ahead and dictated the discharge summary" for me. Absolutely incredible...I can assure you that I would have NEVER in a million years sent a response like this to my program director, especially when I was in the midst of academic remediation. I would remind you that I had asked you THREE times to get this done. Instead of saying "No sweat Dr. Koon, I'll take care of it" and getting it done, I get this dribble.

I really am at a loss for words. Jennifer / Justin - I'm open to any suggestions.

DK

---

From: Afraaz Irani [afraaz.irani@gmail.com]
Sent: Thursday, November 03, 2011 6:24 PM
To: David Koon
Subject: VA patient

Hey Dr. Koon,

Just to follow up regarding the VA patient. That patient was transferred from the VA. Hoover did the H&P. The patient was seen by Drs. Wood and Walker. I actually never participated in the patient's care, and am not sure how I am responsible for the discharge order. The only thing I can think of is that Dr. Wood asked me to put in the discharge order. Anyways I have gone ahead and dictated the discharge summary for your review.

Thanks,
Afraaz

*DEPARTMENT OF SURGERY*
Two Richland Medical Park, Suite 402, Columbia, SC 29203
803-256-2657, FAX 803-933-9545

USC(Irani)0354



UNIVERSITY OF SOUTH CAROLINA
SCHOOL OF MEDICINE

UNIVERSITY SPECIALTY CLINICS

12 DEC 11

Memorandum of Record

Re: Dr. Afraaz Irani (PGY-2 Orthopaedic Resident)

Dr. Afraaz Irani was placed on Level II Academic Remediation from 15 AUG – 01 DEC 11.

The faculty of the orthopaedic department met with Dr. Irani on Monday, 05 DEC 11.
In attendance were Dr.s Walsh, Koon, Voss, Guy, Grabowski, McGown, McBryde, Hoover, and
Wood, as well as Paul Athey, MBA. We met with Dr. Irani for over one hour.

We asked Dr. Irani many questions, ranging from his desire to be in an orthopaedic training
program to patient care issues. Dr. Irani admitted to secretly recording phone calls with an
attending surgeon (Dr. Abell). He repeatedly refused to give direct answers to several questions
and failed to take responsibility for his actions in several patient care examples. Despite
attending direction and encouragement to take ownership of his actions, he steadfastly refused to
admit any wrongdoing, even when faced with overwhelming evidence to the contrary. He
appeared to consistently lack insight into these issues.

Dr. Irani could not admit agreement to any of the initial remediation issues which led to his
placement on Level II academic remediation.

Dr. Irani has displayed evidence of ongoing inadequate patient care. He has prescribed
inappropriate doses of narcotics, failed to evaluate post-operative patients with wound care
issues, and failed to abide by direct attending instructions during the care of clinic patients.

Dr. Irani has continued to display a lack of teamwork within the residency framework. He has
repeatedly shown up late for morning rounds, been ineffective in preparing the morning "list",
and has been delinquent in assigned tasks.

Dr. Irani displayed inappropriate patient care in the case of Trauma,F375. He displayed a lack of
empathy and compassion, a lack of appropriate pain management, a neglect of appropriate
informed consent, poor interpersonal communication, and a lack of appropriate teamwork with
ancillary staff.

Dr. Irani has had multiple verbal and written counseling sessions regarding these deficiencies.

It is the recommendation of the faculty of the orthopaedic department that Dr. Irani be placed on
immediate suspension from patient care (Level III Academic Remediation). This would involve
a leave of absence beginning 09 DEC 11 thru (at least) 30 JAN 12. He would be restricted from
any resident duties. He is required to attend psychological evaluation with Dr. Parnell on

*DEPARTMENT OF SURGERY*
**Two Richland Medical Park, Suite 402, Columbia, SC 29203**
**803-256-2657, FAX 803-933-9545**

USC(Irani)0355



UNIVERSITY OF SOUTH CAROLINA
SCHOOL OF MEDICINE

UNIVERSITY SPECIALTY CLINICS

Monday, 12 DEC and any follow-up appointments she deems necessary. He would be required to attend any psychological counseling sessions recommended by her evaluation. Curriculum credit will be withheld during this leave of absence.

The faculty will meet on/about 30 JAN 12 to evaluate his progress and determine the appropriate next step in Dr. Irani's academic remediation.

A copy of this memorandum will be provided to Dr. Irani. He is reminded of his option to appeal this action per the Grievance and Due Process policy in the Resident Manual.

David E. Koon, Jr., MD
Program Director

John J. Walsh, MD
Chair, Dept. of Orthopaedics

USC(Irani)0356

*e mail from Dr Nathe*
*Sunday 11 Dec @ 6:43 pm*

This is my understanding and knowledge of what happened on 12/7/11:

11:30 am phone call on my cell from Catherine Loflin (general surgery) about two consults in the ED with open fractures. Was on my way in from prison clinic and stopped by the OR to pick up the call pager and change. Told Dr. Jones that there were two consults and he told me to see the patients, order XR, and come back when the XR were uploaded.

11:45 saw the critical patient (TF 374) in the trauma bay and CT 2. That patient was transferred straight to STICU. Ordered the proper x-rays.

12:15 went to evaluate TF375, but patient was in CT3. Patient started in trauma bay 1 and was transferred to CT3. General surgery wanted to get bilateral lower extremity CTAs and the CT scanner was having problems, taking longer than normal. Followed the patient back into trauma bay 1 where x-rays were taken that I ordered while in CT. After x-rays, the patient was moved to ED room 254. When the patient was taken back to the trauma bay after CT is when I introduced myself to the patient.

12:30-1ish checked on results of CTs and x-rays and performed an H&P on TF375. Also went up to STICU to perform a more extensive survey of TF374. TF374 was hypotensive and her x-rays were deferred until later. Paged Whiteside. He called back and said since he was at Baptist that I should page Hoover. Paged Hoover once, no return call. Waited approximately 5 minutes then decided to talk to Dr. Jones.

1:15-1:30 when to priemer ortho clinic to discuss x-ray reads and injuries with Dr. Jones. Wood was in the clinic and overheard the injuries. She instructed me to page Irani to help with the consults. Dr. Jones gave a list of things to start with (wash out, reductions, and splinting for both patients) and check back when x-rays of TF374 were completed. Stated that depending on general surgery consent he would like to take TF375 to the OR that night. No discussion as to what would be fixed or done in the OR.

1:45ish headed back down to the ED. At that time, general surgery asked that the patient's family be removed from the ED room and placed in the consultation area. General surgery and a patient liaison asked me to speak to the patient's family to update them on the injuries and current plan. I spent approximately 10 minutes with the family, answered all questions to their satisfaction. After talking with the family, I discussed the injuries with the patient and immediate actions that would need to be taken including splinting the right ankle and left arm.

2pm Paged Irani. Called the ortho tech (Toni) and grabbed the C-arm to be used for reductions. At this point the patient's nurse, Elaine, asked me to consent the patient for the reductions. I responded that I had never consented a patient for reductions when not involving sedation. She told me it was protocol so I said I would. She went to get the forms. I never heard back about the consent paperwork. Irani introduced himself to the patient and described what needed to be done in the ED, reduce and splint her right ankle and reduce and splint her left arm.

USC(Irani)0357

The small room was set up with the c-arm at the end of the bed. In order to pass to the other side of the bed, the c-arm needed to be moved and replaced. The ortho tech was working with a small area nearest to the door, trying to help. The small room caused the ortho cart to possibly be in the way of entry of the room at times. We started by placing 4 chuck pads under the right leg with a trail into the trash can to try to minimize a mess. 10cc of 1% lidocaine was injected into the right ankle joint for pain control. The patient was also given 75mg of Fentanyl, she had received at least 150mg in the trauma bay. General surgery had instructed me not to use sedation. Irani then used 2L sterile NS to wash out the 3 cm lac over the medial malleoli after the lidocaine had time to take effect and the fentanyl was given. After the washout, the lac continued to slowly drip with a little on the floor after the trashcan had been moved. Fluoro was used to plan the reduction. Adaptec was placed over the wound with 4x4s then soft roll to keep it in place. Bulky jones was used for padding and then a short leg trilam splint was applied under fluoro. The reduction was hard to maintain. The reduction was checked after the splint dried under fluoro. I attempted the reduction and molded the splint. The sheets on the right side of the patient's bed were soaked with water even after attempts to prevent this from the washout. At some point during my molding, infusion tubing disconnected and I pointed out to the nurse, Elaine, that the patient's transfusion was leaking all over the patient and the bed. The c-arm was moved so the nurse could get to the line. During the right leg, the only comments that I can remember that could be construed badly were: Irani said "this reduction is difficult. That's as good as its gonna get, splint it there. It will be stabilized in the OR."

Next, Irani told the patient that we needed to fix the arm. He asked if she was doing ok and she said yes. As I cleaned up the right side of the room and remnants from splinting, Irani placed the patient in finger traps with no weight applied as directed by Dr. Jones to help in the left forearm and elbow reductions.

At one point, Elaine, was blocked in the back of the room by the C-arm, however, it was not asked to be moved so she could exit. No one had to crawl on the floor under the c-arm to pass. It was moved at least twice for nurses and myself to pass by.

Next, Irani placed chucks under the left arm trailing into the trash can. He used 2L NC to wash out the lateral lacerations to the elbow. We then padded the left arm and measured the long arm posterior slab. I attempted reduction of the elbow and checked it with fluoro. 2-3 attempts continued to show the elbow with subluxation of the radial head. The posterior slab was applied and I held the elbow in reduction while it hardened. Then the sugar tong splint was applied after that. I continued to hold the reduction and mold the sugar tong. At some point I said, "the elbow keeps popping back out, I am trying to hold it in with my mold."

After the left long arm splint hardened, the patient fell asleep for a few minutes while we were cleaning up the room. In regards to pain control, Irani and myself advised the patient before we started with the ankle reduction to tell us if she was having any pain and we would stop and get more pain medication. The patient never told us she was having pain, never cried out, never jerked limbs to pull away

USC(Irani)0358

from painful stimuli. The patient did cry when given her diagnoses and was concerned that she would not be able to run again.

The ortho tech, Toni, and I then placed the patient in bilateral knee immobilizers per Dr. Jones. The Hare traction on the left side had to be removed and the immobilizer had to be placed over her trilam splint on the right. Afterwards, we both helped the nurses roll the patient to change the bed sheets. The wet sheets were delayed being changed because the nursing staff had come in to tell us that they would prefer to only change it once and she was heading to the ICU. At that point, she had a bed but it was still occupied in the ICU. A few minutes later another nurse came in and said that she had a bed and was moving up to the ICU immediately. A few minutes after that, another nurse came to say she was going straight to the OR and we (Irani and myself) needed to consent her for surgery. At that point, Dr. Jones had not discussed surgery with us or what procedures he would like the patient consented for. Meanwhile, the patient was asking to see her family.

After finishing the reductions and splinting, Irani went to talk to the family and escorted them into the patient's room. Irani and myself were then asked to step into the trauma bay with a nurse manager (Arlene) and Elaine. My understanding of the concerns that they expressed were: 1. that things seemed unorganized and that the patient did not seem to know what was going on 2. that the patient wanted to see her family 3. needing consent for the reductions. The nurse manager stated that the reductions and splinting was not something that should have been done in the ED. The nursing staff did not stop Irani or myself at any point to suggest that the patient may need more explanation as to what was happening during the reductions. The nurses asked what pain medication was given, however, did not seem to give concern that the patient did not have adequate pain control.

The process of splinting took 1 hour and 15 minutes to 2 hours to complete. Honestly, I never checked the clock because I continued on to the next patient in the STICU.

I was focused while holding my reductions and molding. I can sometimes be unaware of what else is going on during those times. I may have missed conversations or actions by others during that time.

In my opinion, I felt that I worked as quickly and efficiently as possible to accommodate all of the patient's injuries at my level of education while keeping the patient informed of what was going on. I realize that there may have been a lack of communication between nursing staff and myself. I would appreciate the opportunity to work with them on correcting the communication barriers. I was unaware that Dr. Jones was called down to the ED and that there was any concern over comments made around the patient. In the future, I would love to be directly notified of any concerns so that I can attempt to understand, and correct my actions.

USC(Irani)0359

Fwd: trauma female 375
Arlene Vance [Arlene.Vance@PalmettoHealth.org]
Sent:Friday, December 09, 2011 11:47 AM
To:  dkoon@sc.rr.com
Cc:  brianandelaine@gmail.com; Allison Turnley [Allison.Turnley@PalmettoHealth.org]; Arlene Vance
     [Arlene.Vance@PalmettoHealth.org]; Diane Savage [Diane.Savage@PalmettoHealth.org]
Dr Koon,

Attached is Elaine's detailed account of treatment for ███████████. As you and I discussed yesterday,
I requested Dr Irani accompany me to update patient's family following the reduction as well as talk again
to Ms ███████with family present given her valid concerns about surgery and care received.  We then
contacted the AOD, Mike Rawl, who paged Dr T Jones.  Dr Jones immediately came to the ED and talked
with Ms █████and her family.  He thoroughly explained all injuries, plan for care, and answered all
questions.  Following this, Ms █████was taken to the OR.

Reiterating Elaine's account, it was as if Drs Irani and Nathe were twisting and turning the limbs of a toy
doll instead of a human being.  Through this entire ordeal the patient was awake, oriented and fully
aware about what was going on, as well as tearful.  There were no visible or verbal compassionate efforts
by either to provide comfort or lessen her fears.

If you need any further information or clarification, please do not hesitate to email or call.  Arlene Vance,
RN

**Arlene Vance, RN, BSN**
**Assistant Nurse Manager**
**Palmetto Health Richland**
**Emergency Department**
434-2220


>>> Elaine Simon <brianandelaines@gmail.com> 12/9/2011 1:35 AM >>>
To whom it may concern:

I am writing this letter because I had the privilege to provide care to the patient brave ███████████,
Trauma Female 375 on Wednesday December 7, 2011. Unfortunately during her stay in the ED the
treatment provided was less than adequate and not up to Palmetto Health Richland's Policies or Standards
of Care. Ms. ███████was involved in a head on collision with prolonged entrapment, was flown in by
Lifenet and sustained injuries which included: bilateral femur fractures, open right ankle fracture and
open left humerus fracture with dislocation of the left elbow.

My care started in the Trauma Bay with the patient to the CT scanner, back to the trauma bay for
additional x-rays, to my assigned room in the ED and ended in the block room in preparation of surgery. I
felt that overall the treatment of the patient in the Trauma bay was adequate. We were able to stabilize the
patient's blood pressure there with fluid boluses and control her pain as best we could with fentanyl. The
CT scans took longer than normal apparently there was an issue with the contrast dye but still the
patient's vital signs and pain was controlled. The patient was transported to trauma 1 for x-rays. At this
time I met with the patient's family and asked them if they had been updated by anyone. The mother and
father of the patient said, "no one had come and told them anything". It was at that time I explained the
injuries that I knew to the family and reassured them that she had stable vital signs and at that time and
we were controlling the patient's pain. I also told them there was a chance she might have to go to surgery
that same day due to the nature of the injuries but that the physicians would talk to them more about that.

I asked Dr Loflin to update the family and she said she couldn't till all the films were back. I asked Dr. Loflin were I could bed board the patient for and she answered with, "I can't give you an answer till all the films are back".

The problems really began happening when the orthopedic resident arrived for the consult and met the patient in the trauma bay. While we were trying to get a Foley catheter in the patient, (she desperately had to urinate). Dr. Nathe began examining the patient's right ankle by removing the splint and ace wrap in the trauma bay before even introducing herself to the patient. Blood was heavily flowing out of the patients open ankle. Bleeding had been controlled prior to removing the splint and ace wrap. Once the x-rays were completed the split was put back on and ace wrap re-applied and the patient was transferred to room 254. Shortly after the patient arrived to the ED room I became aware due that the patient's hemoglobin had dropped from 10 to 7. An order for 4 units of PRBC was obtained from Dr. Loflin and I sent a tech down to retrieve 2 units at a time. I overheard Dr. Nathe on the phone trying to get in touch with some other ortho. resident to help her with "the wash out and reduction". Apparently she got in touch with Dr. Irani. Dr Nathe asked me to gather several supplies and for the reduction of the right ankle and left elbow. I told her at that time we needed to get a consent signed. She responded "What? We are not doing a conscious sedation only a reduction". I told her that I understood that but that we still needed to obtain consent for a procedure. Dr. Nathe stated, "well I have never had to do that". I filled out the consent for with the procedures she said we were doing and left it at the patient's bedside. I gathered all the supplies and as I was coming around the corner to the room and heard Dr. Loflin tell Dr. Nathe, "just do what she says".

The patient requested that her mom be there in the room with her. I asked Dr. Nathe and she agreed it would be fine. When Dr. Irani arrived he said in front of the patient (after Dr. Nathe said it was okay) that her mom could not come back. This was all discussed at the patient's bedside.

Again I inquired about obtaining consent. Dr. Irani said, "Oh no we don't need consent for this". My consent form remained unsigned at the bedside. Dr Irani introduced himself and said to the patient, "You know you have a broken ankle right; you know your arm is broken too, right?" Ms. ████ answered "yes". At this time the blood arrived and I could not get into the room to hang it. I said, "Hey can I get around so I can hang the blood". It was like I was invisible to Dr. Nathe and Dr. Irani. They had the C-arm blocking the end of the bed and doorway and had turned the patients bed so there was no way around to the pumps etc. Finally the Ortho Tech Toni pushed the C-arm so I could duck underneath it to get around. At this time the right ankle splint was removed and blood began gushing out of patient's ankle all over the C-arm and onto floor. Dr Irani asked me, "Can you get me chucks pads please". I responded, "I will as soon as I get this blood started". At this time the patients systolic was hovering in the 90's and she was obviously in need of pain meds. I continued to give patient the prn doses of fentanyl to control her pain during this procedure. Her blood pressure was too low to tolerate the Morphine PCA and Loflin told me to hold off. I was bolusing the PRBC's with at warmer. At this time I was basically trapped in and was able to witness the cruel treatment of this patient. Dr. Irani and Dr. Nathe began working on the ankle washing out the open bleeding fracture with NS and soaking the patient and all her linens in the process. The patient was shivering. As Dr. Nathe was working on the ankle Dr. Irani unwrapped with left humerus to begin working on it. He said, "Oh this is open?" Dr. Nathe said, "No one told me". Really you are the ortho. resident who has examined the patient and you aren't clear on her injuries. I was in complete shock that they were talking about the patient as if she couldn't hear them. She was totally awake, totally alert with tears in her eyes. Dr. Irani asked me if I would assist him with placing the patient's hand in the finger trap. I did so, but did not understand why Nathe or the tech did not. Post right ankle reduction (while looking at the fracture with the c-arm), Dr. Nathe said, "Uh look at this, that's not good". Dr. Irani said, "Can you turn it to the left a little". He said, "Well it's not going to get fixed down here". They were talking again like the patient was not there. I managed to transfuse 3 units of the PRBC's during this time and the patients BP was in the 120's. Once ortho. left the room I got extra staff

to help turn the patient to get her off the saline and blood soaked linens.

At this time I could tell the patient was worried and I asked her what was wrong. Ms. ███████told me, "I have always gone to Palmetto Baptist before and it just seems like everything here is disorganized, and I am worried about the people taking care of me". She said, "Not you two" speaking to Marie B. PCT and myself. She said, "The doctors, I am just worried I won't be able to walk again". I did the best I could to reassure the patient and make sure she was as comfortable as I could make her. I told her she was in good hands and I was sorry that it had felt disorganized. Although in my heart I couldn't blame or contest anything that she was saying. Directly following the reduction in the ER Vicki RN from the OR called saying they were ready for the patient to come to the block room and wait for surgery.

I couldn't believe it, an hour plus had gone by of pain and extensive bleeding for this patient in an ER room and the fractures were not even fixed and now the OR was ready to take the patient to surgery where all this should have been done in the first place. There the patient could have been unaware of the pain, not felt cold, not felt fear. She would have been comfortable. This is what I would have wanted for my family and friends. This is what our standards should be and what this facility is capable of. Don't physicians take an oath to first do no harm? Well what were they doing? I don't know but in my 5 years at PHR ER I have never felt so uneasy, so upset or like I had to help save the patient from what was going on.

Early on I had gotten the Charge RN, Arlene Vance and Diane Savage involved in what was happening. They were very supportive to me and made the appropriate phone calls. Before the patient went to the OR, Dr. Jones came down and explained the surgery and the injuries to the patient. The patient verbalized her understanding. The AOD, Mike was present as well. Before the patient left for surgery the surgery checklist was obtained, consent signed and 4th unit of PRBC's were hung.

My hope is that we can learn from this. Learn to work together for the patient. The Nurses are there to advocate for the patient and make sure things are done according to policy. Let's not forget we are caring for a person not just fixing bones. We need to look at the whole picture. Let's not forget about the family and the patients requests. I hope this never comes close to happening again.

Elaine Simon, RN

--------------------------------------------------------------------------------
PALMETTO HEALTH CONFIDENTIALITY NOTICE
This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited by law. If you have received this communication in error, please notify me immediately.

USC(Irani)0362

**From:** "Marie Brady" <Marie.Brady@PalmettoHealth.org>
**Subject: Trauma F110375**
**Date:** December 7, 2011 6:18:29 PM EST
**To:** "Diane Savage" <Diane.Savage@PalmettoHealth.org>

I was just writing this E-mail to let you know that I was working in pod 5 when the pt. came in, I actually helped Elaine Simons, RN take care of the pt. from the trauma bay 2 and continued through her stay in pod 5... We both, Elaine and I were in the room and she was getting her ready to go to the OR and she became very nervous and looked like she wanted to say something but not sure how she could say it..... Elaine asked her what she was thinking about and she stated that she was very uncomfortable with the Ortho Residents that were just in her room.... She said that she has only gone to Baptist and that this was very unorganized and she was scared.. We tried to assure her that it was going to be ok but you could tell that she still felt very uncomfortable.... Elaine then left the room to speak with Diane about the way the pt. felt and I stayed with her for a little bit to see if I could calm her nerves a little by talking to her and she stated that she felt like she was just thrown around and it was very scary and she was very uncomfortable with the surgery doctors.... I then stated that I would let her nurse know and my charge Nurse at the time was Diane know and Im sure we would be  addressing the situation and she smiled and said thank you so much for everything you have done for me today. The Doctors names were: Dr. Irani and Dr. Natche... Elaine, Diane, and Arlene were at her bedside talking with her... The next thing I know is that  Dr. Jones the Attending was in the room and spoke with the family and the pt. and she felt better. When I went back in there Elaine, Diane and Arlene were with her and Diane was holding her hand and stated to her that she was in good hands.... She stated to me that she wanted to say thank you and that just talking was a big help... and to thank Elaine, Diane,  Arlene and myself for understanding and making her feel better...

Marie Brady

USC(Irani)0363

Events for 12/7/11:

**Patient arrives as trauma 911 at 11AM.**

**Called down at about 2PM by Dr. Loflin (PGY-2 trauma resident), who told me Dr Nathe (Ortho intern) needed help (Dr. Nathe said Dr. Wood  told her to call me for help with patient).**

Arrive in POD 5.

Arlene (nurse) walks out of POD 5 room. Dr. Nathe in room.  I have not yet seen the patient, Nathe, or anyone else. Arlene immediately turns to me and states we need to talk about how all this was handled. I asked her what was wrong, and what I needed to do. Arlene refused to provide any guidance and only said we would talk about it at the end, and ended the conversation by walking away.

I realized that the nurses were upset, and therefore played everything by the book. I met with Nathe and reviewed all films. Together we assessed all injuries and determined a game plan. She brought the c-arm and we saw the patient again together. I introduced myself to the patient, described her injuries, and what we would be doing for her in the ER. I spoke with Dr Toussaint from neurosurgery and Dr. Loflin from Trauma. I was informed sedation was not an option in this patient. I told the patient we were going to splint and reduce her right ankle. I asked the nurse for fentanyl. Fentanyl was given. Her right lower extremity was unwrapped. An intrarticular block (local lidocaine) performed. After appropriate local and systemic anesthesia given, we irrigated her wound with 2L sterile normal saline because it was an open wound, and start reduction under fluoro.  (nursing charting also documents administration of pain meds and reduction of right lower extremity as described above).

Diane Savage (another assistant nurse manager) around this time, stepped in for a few seconds, but stepped back out again as we were using fluoro and there was radiation exposure. I did not see her again during rest of procedure.

Attention was then turned to left upper extremity. The room was small and I had difficulty making it around bed, but we all had to work efficiently with what we had. I again explained the injuries to the patient, and asked if she was OK, and if her pain was under control. She stated she was alright. We explained we would irrigate the arm and perform a reduction. We began reduction. During this time, Dr Nathe took some final fluoro pics of RLE in splint. I said that is a hard reduction, that's as good as we are going to get it down here, and we will have to take care of it upstairs in the OR.  After reductions performed, again explained to patient exactly what had been done.

The sheets were wet, so I helped the nurses change the wet sheets.

The patient stated she wanted to see her parents. I told patient I was going to talk to her family and that I would make sure she was not going anywhere until she saw her parents. I

USC(Irani)0364

stepped out. I spoke with nurse (Arlene), who again said we need to talk about how situation was handled after things were finished. Again I asked what we could do. Again all that was said was that we would talk about it later. I wrote the consent and spoke with family (mother and father) in consultation room with Arlene.  I made sure all questions were answered satisfactorily.

Nursing staff wanted to meet. Arlene, Elaine, Dr Nathe and myself met. Elaine states that the patient was scared and confused. When addressing informed consent, the nurse stated consent was needed not because it was indicated, but because the nurses have to "cover our assess." (Of note: this all happened before I had arrived -- I was not involved in the informed consent discussion at all). Arlene seems to take issue with our care stating that two washouts and reductions were "pretty complicated for an ER."

I thanked the nurses for their feedback. I go back to room to check on the patient. She seems to be doing fine. I step out to bring family back. I bring the family back to the ER. The patient is getting an EKG. I use that time to show the family all the xrays of their daughter's injuries on the xray viewing stations in the ER and again explain what we would be doing. I escort the family personally back to the patient's bedside.

I spoke with family and patient frankly about injuries (I was most concerned about Right ankle  in terms of some long term pain) Never at any point did I tell patient or parents there is a chance she would not walk again. I spoke with the patient about each injury in detail and possible long term ramifications. Answered all questions for both the family and patient. Explained the severity of the injuries frankly and honestly, and what we were going to do in the OR. Explained the risks/benefits/alternatives of all her injuries. All questions were satisfactorily answered. I asked the nurses if they needed anything else. They said they did not. The OR was calling for the patient.

At this time Nathe and I left with the c-arm as there was another patient upstairs with an open ankle that needed an urgent reduction.

USC(Irani)0365

Untitled Message - Outlook Web Access Light                    https://uscmed.sc.edu/owa/?ae=PreFormAction&t=IPM.Note&a=Next...

Office Outlook Web Access    | Type here to search | This Folder | 🔍 | 📖 Address Book | Options | @ | Log Off

| Mail | ✉ Reply | ✉ Reply to All | ↪ Forward | 📁 Move | ✕ Delete | 🚫 Junk | Close |

**Mail**

**Calendar**

**Contacts**
.........

Deleted Items
Drafts
Inbox
Junk E-Mail
Sent Items

Click to view all folders ⮟

AOA trip
Goodno
Irani
Kanwisher
Lamoreaux
Lindley
Massey
Residency
Riis
Sent Items

Manage Folders...

**David Koon**

**Sent:** Wednesday, December 07, 2011 5:55 PM
**To:**    Afraaz.irani@gmail.com; John Walsh; David Koon; Kathy.Stephens@PalmettoHealth.org; Jennifer, Wood [jhwood23@gmail.com]

Dr. Irani -

In an effort to better structure your academic remediation, you are required to attend
an evaluation by Dr. Michele Parnell on
Monday, 12 DEC at 4:30.

Her office contact information is:

Michele Marinkovic Parnell, PHD
1620 Lady Street Suite B
Columbia, SC 29201
Phone:
(803) 451-7600
Fax Number: (803) 451-7604

Her office has requested that you bring copies of any documentation that you have
regarding your remediation thus far.

David Koon

Connected to Microsoft Exchange

1 of 1

meeting with Dr. Parnell - Outlook Web Access Light                    https://uscmed.sc.edu/owa/?ae=PreFormAction&t=IPM.Note&a=Next...

Office Outlook Web Access | Type here to search | This Folder | Address Book | Options | Log Off

| Mail | Reply | Reply to All | Forward | Move | Delete | Junk | Close |

**Calendar**

**Contacts**

........

Deleted Items
Drafts
Inbox
Junk E-Mail
Sent Items

Click to view all folders ⌄

AOA trip
Goodno
Irani
Kanwisher
Lamoreaux
Lindley
Massey
Residency
Riis
Sent Items

Manage Folders...

# meeting with Dr. Parnell
Afraaz Irani [afraaz.irani@gmail.com]

**Sent:** Monday, December 12, 2011 3:31 PM

**To:**    David Koon; Katherine Stephens [Kathy.Stephens@palmettohealth.org]

Hello,

I just contacted Dr. Parnell's office. Since the events of last Friday, I'm not feeling so great today, and did not get sleep last night.

I contacted her office, and let her know that obviously I wasn't feeling well enough today to do the testing. We will reschedule soon.

Thank you for setting this up for me, and we will try and reschedule.

Thank you,
Afraaz

Connected to Microsoft Exchange

4/25/2012 9:05 AM
USC(Irani)0367

GMEC Meeting 13 DEC 11 - Outlook Web Access Light          https://uscmed.sc.edu/owa/?ae=PreFormAction&t=IPM.Note&a=Next...



**GMEC Meeting 13 DEC 11**
David Koon

**Sent:** Tuesday, December 13, 2011 7:03 PM
**To:** Afraaz.irani@gmail.com; John Walsh; Kathy.Stephens@PalmettoHealth.org; Jennifer, Wood [jhwood23@gmail.com]; Michelle Wehunt

Dr. Irani -

I wanted to inform you that the PH GMEC considered the recommendation of the Dept of Orthopaedic Surgery (Memorandum of Record dated 12 DEC 11) and affirmed their recommendation.

You have been placed on Level III Academic Remediation from 09 DEC 11 thru 30 JAN 12. Per the 2011-2012 PH Resident Manual, you are removed from clinical rotations and curriculum credit will be withheld.

It is unfortunate that you cancelled your initial evaluation with Dr. Michele Parnell. It is recommended that you pursue this evaluation as soon as possible.

It is suggested that you refer to the 2011-2012 PH Resident Manual for your option of appealing this decision by the GMEC (Grievance and Due Process policy).

The faculty of the Dept of Orthopaedic Surgery will meet on/about 30 JAN 12 to determine the next appropriate action.

Questions may be directed to myself or Dr. Stephens.

David Koon

4/25/2012 9:06 AM
USC(Irani)0368

Evaluation - Outlook Web Access Light                    https://uscmed.sc.edu/owa/?ae=PreFormAction&t=IPM.Note&a=Next...



Microsoft
Office Outlook Web Access     | Type here to search |   | This Folder |   | Address Book   Options   ⊘   Log Off

**Mail**

Reply | Reply to All | Forward | Move | Delete | Junk | Close

**Calendar**

**Contacts**

**Evaluation**
David Koon

Deleted Items
Drafts
Inbox
Junk E-Mail
Sent Items

Sent: Thursday, December 15, 2011 10:46 AM

**To:** John Walsh; katherine.stephens@palmettohealth.org; Afraaz.irani@gmail.com; Jennifer, Wood [jhwood23@gmail.com]

Click to view all folders ⤳

AOA trip
Goodno
Irani
Kanwisher
Lamoreaux
Lindley
Massey
Residency
Riis
Sent Items

Dr. Irani-

Per the recommendations of the Executive Committee of the GMEC, you are required to have a psychological evaluation. This evaluation is to be completed by 15 JAN 2012. This evaluation can be completed by any of the providers listed below:

Dr. Michele Parnell
451-7600

Dr. Mark Sloan
788-1440

Dr. Monica Wright
238-5239

Failure to complete this evaluation by 15 JAN 2012 will result in termination from the residency program.

Questions can be directed to myself or the GME office.

David Koon

Manage Folders...

Connected to Microsoft Exchange

USC(Irani)0369

Fwd: Residency - Outlook Web Access Light       https://uscmed.sc.edu/owa/?ae=PreFormAction&t=IPM.Note&a=Next...



**Fwd: Residency**

John Walsh

**Sent:** Saturday, December 17, 2011 12:02 PM
**To:** David Koon

Sent from my Verizon Wireless Phone

----- Forwarded message -----
From: "Katherine Stephens" <Kathy.Stephens@PalmettoHealth.org>
Date: Fri, Dec 16, 2011 10:38 am
Subject: Residency
To: "Afraaz Irani" <afraaz.irani@gmail.com>
Cc: "John Walsh" <John.Walsh@uscmed.sc.edu>

Dr. Irani,

Please refer to the PH Resident Manual Grievance and Due Process policy. Step 1.2 directs you to meet with your Director of Education as your next step. In Orthopaedics, that is Dr. Walsh. If the response from Dr. Walsh is unsatisfactory to you, your next step would be to meet with me.

Once you have met with Dr. Walsh, if you wish to continue the process, please contact me again.

Katherine G. Stephens, PhD, MBA, FACHE
Vice President, Medical Education and Research
ACGME Designated Institutional Official
Palmetto Health
Fifteen Medical Park, Suite 202
Five Richland Medical Park Drive
Columbia, SC 29203

803-434-6861 or 803-434-4476

katherine.stephens@palmettohealth.org

>>> Afraaz Irani <afraaz.irani@gmail.com> 12/16/2011 8:40 AM >>>

Ms. Stephens,

On December 12, 2011, I was informed that the faculty of the orthopaedic department have recommended that I be suspended and placed on Level III academic remediation at least until the end of January 2012.

As you might imagine, this was a tremendous disappointment for me as I take my commitment to my job very seriously. This action would have a devastating effect on my residency and would likely preclude me from pursuing my career goal of obtaining a fellowship after residency. Since my previous probation instituted by Dr. Koon from August 15 to December 1, I have done everything I know to do to comply with the academic remediation plan. I felt like I was making very good progress, seeking and accepting constructive criticism, and consciously taking on extra duties to support my fellow residents. As you know, I had to discontinue the grievance process over my probation so as not to further jeopardize my relationship with my attendings.

Unfortunately, my relationship with Dr. Koon appears to have become completely derailed in the past few weeks. I believe that Dr. Koon's displeasure with me started with an e-mail exchange on November 3 involving a discharge dictation for a VA patient. Dr. Koon requested that I do the discharge dictation, although I never participated in the patient's treatment or care. I was not trying to shirk my duties; my cover letter to Dr. Koon merely explained my confusion about how I was assigned to the dictation. I believe that Dr. Koon misinterpreted my cover e-mail because he really unloaded on me in his e-mail response.

I strongly disagree with the latest allegations against me as set forth in Dr. Koon's memorandum of December 12, 2011. Please accept this letter as my request for a grievance of my suspension and the proposed disciplinary action pursuant to the Grievance and Due Process provisions in the Resident Handbook. Please also accept this letter as a request for a meeting with you, as the DIO, to discuss the

1 of 2

USC(Irani)0370

https://uscmed.sc.edu/owa/?ae=PreFormAction&t=IPM.Note&a=Next...

grievance.

To allow me to have a better understanding of the circumstances surrounding my proposed suspension, please provide to me copies of all documents on which the proposed Level III remediation is based, including a copy of the complaint against me arising out of Trauma case F375. Although I fully understand that I am only a PGY-2 resident with much to learn, I am confident that my care of this trauma patient was appropriate, empathetic, and compassionate.

With regard to the required psychological evaluation by Dr. Parnell, as I e-mailed you before, I had to cancel the appointment on Monday afternoon, December 12, because I was feeling very ill that day. When I called Dr. Parnell's office the following day to reschedule my appointment, she informed me that her next available appointment is not until January. I am also uncertain about the nature of my upcoming visit with Dr. Parnell. Can you please provide further explanation to me about what Dr. Parnell will be evaluating and why such an evaluation was ordered by Dr. Koon? I mean no disrespect, but I am very uncomfortable with this situation and would prefer to see a provider of my own choice.

Thank you,

Afraaz

----------------------------------------------------------------------------
PALMETTO HEALTH CONFIDENTIALITY NOTICE
This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law.  If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited by law.  If you have received this communication in error, please notify me immediately.

Connected to Microsoft Exchange



UNIVERSITY OF SOUTH CAROLINA
SCHOOL OF MEDICINE

UNIVERSITY SPECIALTY CLINICS℠

DECEMBER 19, 2011                    RE:  AFRAAZ IRANI

<u>MEMORANDUM FOR RECORD:</u>

This memo is to document a conversation between Dr. Irani and Dr. Walsh on Monday, December 19, 2011. Dr. Irani and I discussed his academic progress to date. Dr. Irani had the opportunity to review his version of the events surrounding the care of a recent female trauma patient. I reviewed with him issues in general relative to his academic progress.

We specifically went through an evaluation form present on the new innovations website and discussed issues related to communication, professionalism, punctuality, and insight. I urged him to use the time period of his suspension for self-reflection in a "time-out" for him to reevaluate his performance here. I discussed with him the process of academic remediation and that the goal is restoration of him to the program here. I specifically stated it is not punitive in nature.

We also discussed the nature of the graduate medical education committee review process and the value of the external scrutiny that that provides for his academic situation here within the department. Afraaz is headed home for vacation, and I offered him the opportunity to communicate with me at any point regarding the nature of our conversation.

John J. Walsh, IV, M.D.
JJW.12.19.11.tlh.ORTHO

RECEIVED: _____          DATE: ___1/18/12___
                    Afraaz Irani

DEPARTMENT OF ORTHOPAEDIC SURGERY
Two Medical Park, Suite 404, Columbia, SC 29203
803-434-6812, FAX 803-434-7306

USC(Irani)0372

Irani - Outlook Web Access Light       https://uscmed.sc.edu/owa/?ae=PreFormAction&t=IPM.Note&a=Prev...

| Office Outlook Web Access | Type here to search | This Folder | 🔍 | 📖 Address Book | Options | ⚙ | Log Off |

📧 Mail      📨 Reply   📨 Reply to All   📨 Forward    ✉ Move   ✕ Delete   🚫 Junk   Close

📅 Calendar

👥 Contacts

· · · · · · · · ·

🗑 Deleted Items

📝 Drafts

📥 Inbox

🚫 Junk E-Mail

📤 Sent Items

Click to view all folders ⌄

📁 AOA trip
📁 Goodno
📁 Irani
📁 Kanwisher
📁 Lamoreaux
📁 Lindley
📁 Massey
📁 Residency
📁 Riis
📁 Sent Items

📁 Manage Folders...

## Irani
### Michelle Wehunt

**Sent:** Wednesday, January 04, 2012 4:26 PM
**Cc:** David Koon

Good Morning Kathy,

Follow-up from our telephone conversation ... I spoke with Kim at Dr. Michele Parnell's office she stated that Dr. Irani is unable to reschedule his appointment at this time due to office policy . Dr. Irani canceled his initial appointment that was to take place on December 12th, at 4:30. Dr. Irani telephoned there office on December 12th, at 3:30pm to cancel the appointment stating he was tired, didn't sleep well. Due to his cancelation he is being charged a $120.00 fee that must be paid before he can reschedule his appointment. Dr. Irani has attempted to reschedule his appointment however, Kim stated that he is very adamant the he should not be responsible for the $120.00 fee that it should be Palmetto Health's/ USC Orthopaedic because he didn't make the initial appointment and didn't know why he needed the appointment.

In your meeting with Dr. Irani yesterday (1-3-12) he stated he has an appointment scheduled at Dr. Parnell's office on the 11th of January. I have left a message with Kim to verify this information (as of yesterday bill is still unpaid). She will be in after 1:00 today.

Secondly, I spoke with Dr. Irani this morning regarding the payroll issue. I explained to him that as of December 9, 2011 he was put on a leave without pay status (LWP) and that he should not have received a pay check for pay period ending 12/24/11. Payroll asked if he could write us a check back for the net amount. He is very reluctant to give us a check stating that "what difference does it make", he is in the middle of a grievance and if he wins the hearing we would have to reimburse him for his LWP status. He asked when did we need it and I told him as soon as possible... he asked "what does that mean" ...I said meaning as soon as possible- sometime today. He ended the conversation with he would need to check his bank statement and get back with me later. I'm not sure if that means today, tomorrow etc...

I'll let you know when I hear from Dr. Parnell's office and when I hear back from him

*Michelle C. Wehunt*
*Residency Coordinator Orthopaedic Surgery*
*M-III, M-IV Student Rotation Coordinator*
*HIPAA Privacy Contact*
*USC School of Medicine*
*Two Medical Park, Ste. 404*
*Columbia, SC 29203*
*Office: 803-434-6879*
*Fax: 803-434-7306*

📶 Connected to Microsoft Exchange

Irani - Outlook Web Access Light                    https://uscmed.sc.edu/owa/?ae=PreFormAction&t=IPM.Note&a=Prev...

Office Outlook Web Access | Type here to search | This Folder | 🔍 | 📖 Address Book | Options | @ | Log Off

**Mail**
**Calendar**
**Contacts**
.........
Deleted Items
Drafts
Inbox
Junk E-Mail
Sent Items

Click to view all folders ≽

AOA trip
Goodno
Irani
Kanwisher
Lamoreaux
Lindley
Massey
Residency
Riis
Sent Items

Manage Folders...

📩 Reply | 📩 Reply to All | ➡ Forward | Move | ✕ Delete | Junk | Close

# Irani
Michelle Wehunt

**Sent:** Wednesday, January 04, 2012 4:26 PM
**To:** Katherine Stephens [Kathy.Stephens@PalmettoHealth.org]
**Cc:** David Koon

Kathy,

I spoke with Kim at Dr. Parnell's office to inquire if Dr. Irani has an appointment scheduled for January 11, 2012(as he stated to you  yesterday when you met with him) and she stated that Dr. Irani *does not* have an appointment scheduled with their office *(on any date)*.  He did however, call this morning (1-4-12) about him needing to schedule one.  She is expressing concerns about him lying about the appointment.  The initial evaluation is about an hour long and if GME and the Program really want her to conduct the evaluation then she will (but only if you want her to) and if he will not pay the prior cancelation fee we would need to and be responsible for future payments.

Per Kim - Dr. Parnell stated that thus far in her professional opinion she doesn't' feel he is being or trying to be compliant with the program.  After the initial evaluation future testing session(s) can be any where from 3-4 hours in length and she is expressing  concerns that he may not be compliant with keeping appointments and not sure that he will take the process seriously and is concerned about blocking that length of time out of her schedule.  If he sets up and keeps the initial evaluation she may be able to access his willingness for future appointments.

*Michelle C. Wehunt*
*Residency Coordinator Orthopaedic Surgery*
*M-III, M-IV Student Rotation Coordinator*
*HIPAA Privacy Contact*
*USC School of Medicine*
*Two Medical Park, Ste. 404*
*Columbia, SC 29203*
*Office:  803-434-6879*
*Fax:  803-434-7306*

Connected to Microsoft Exchange

4/25/2012 9:10 AM
USC(Irani)0374

Re: Suspension - Outlook Web Access Light                    https://uscmed.sc.edu/owa/?ae=Item&t=IPM.Note&atttyp=embdd&id...



**Re: Suspension**
Katherine Stephens [Kathy.Stephens@PalmettoHealth.org]

Sent: Thursday, January 05, 2012 10:37 AM
To: Afraaz Irani [afraaz.irani@gmail.com]

Dr. Irani,

Thank you for providing the information below. As called for in the grievance policy, I am currently investigating these issues and will respond to you within 8 business days.

On another note, I want to remind you that a psychological evaluation by January 15, 2012 is a requirement of your remediation plan. At our meeting on January 3rd, you indicated a tentative date of January 11th. Subsequent to our meeting, Michelle Wehunt contacted me you believe that Palmetto that a $120 late cancellation fee be paid before you could reschedule and that you believe that Palmetto Health should pay the cancellation fee. Because you made the decision to cancel the previously scheduled appointment, any late cancellation fees are your responsibility - not Palmetto Health's. Note that this late cancellation fee issue does not change the January 15th deadline for a psychological evaluation, and you were provided other options for an evaluation. Also note that having begun the grievance process does not change the January 15th deadline, which is fast approaching.

As stated above, I will respond to your grievance within the 10 business day period required by the grievance policy.

Katherine G. Stephens, PhD, MBA, FACHE
Vice President, Medical Education and Research
ACGME Designated Institutional Official
Palmetto Health
Fifteen Medical Park, Suite 202
Five Richland Medical Park Drive
Columbia, SC 29203

803-434-6861 or 803-434-4476

katherine.stephens@palmettohealth.org

>>> Afraaz Irani <afraaz.irani@gmail.com> 1/4/2012 12:56 PM >>>
Ms. Stephens,
Thank you for meeting with me yesterday. Just to reiterate the points of our conversation. The scheduled reviews of my performance have been for the most part positive until taking a sharp and sudden recent turn. On Nov. 21st Dr. Koon stated to me that he would recommend level I remediation. Between that time and the time of his letter, he changed his mind to level III remediation with suspension. Looking at the complaints in the most recent letter, I attempted to ascertain what caused this change. Dr. Koon's letter identified four issues in the interim that according to his letter formed the basis for his recommendation.
As I discussed with you, I provided my justification of the three more minor points. I would like to focus on the perceived major issue. I was told that the suspension was in response to the handling of TF 375 and the purpose of the suspension was to perform an investigation to get all sides of the story including mine. Unfortunately, this did not happen; no one ever solicited to my side of the story.
Needless to say I am extremely disappointed with how this has been handled. Not only was my opinion never solicited, but I was never made aware of the accusations to defend myself. Furthermore, contradictions were identified during the investigation and the investigator was unable to verify statements that were inaccurately attributed to me.
Moreover, I find it more concerning that the written and stated Palmetto Health guidelines were not followed. Judgment was based on hearsay, and I was never involved. More than violating guidelines, I was not even afforded the basic human courtesy of communication or asked what happened.
I fully stand by my care of this patient. You are welcome to interview the other witnesses involved with this case (Kristin Nathe the ortho intern, Toni the cast tech, and Dr. Loflin the trauma resident). I hold myself to a high standard. It is interesting that I have only had two complaints against me from ancillary staff: same individuals both times.

I welcome you to talk to any other staff, be it in the ER, the orthopaedics floor where I spend majority of my time, the ICU, the operating room, or my fellow residents. Please talk to these people. I'm confident they will validate that my care has been professional and appropriate. At your request I will be more than happy to provide additional references.

I would like to defend myself against these accusations which have severely and perhaps irreparably damaged my reputation throughout the hospital, so that I may take the necessary steps to defend my name against slander.

Let's as a team determine what really happened during this incident. If there is room for improvement I am always to happen listen, but I believe this case has not been handled appropriately or fairly.

I have attached my writeup of the events regarding this patient, which I typed up the day after the incident. Again, my opinion was never solicited.

To add insult to injury I received a phone call this morning saying they had mistakenly paid me, and I need me to come in and write a check for the amount of my last paycheck.

Thank you.

Afraaz

⌗ Connected to Microsoft Exchange

USC(Irani)0376



January 11, 2012                    <u>DELIVERED VIA EMAIL</u>

Afraaz Irani, MD
Department of Orthopaedics
2 Medical Park, Suite 404
Columbia, South Carolina 29203

Dear Dr. Irani:

After carefully reviewing the information available to me, and after further discussions with several others, I have decided to uphold the decision concerning your December 9, 2011 academic remediation. An action like this is never simple, and I want to make it clear that our intent in initiating academic remediation is to aid you in meeting academic expectations and to have you complete your training.

If you decide to continue with the grievance process, please refer to the steps outlined in your Resident Manual.

Sincerely yours,

Katherine G. Stephens, PhD, MBA, FACHE
Vice President for Medical Education and Research

KGS/amh

cc: John Walsh, MD, Department of Orthopaedics
    David Koon, MD, Department of Orthopaedics
    James Raymond, MD, Chief Medical Officer

Comprehensive Psychological Services, LLC
Marc Harari, Ph.D.
1816 Bull Street
Columbia, SC 29201
Telephone (803) 422-0017
Facsimile (803) 799-5596

### Fax Form

DATE:_____ JANUARY 20, 2012 _____

TO:_____ DR. KATHERINE STEPHENS _____

FAX NUMBER:_ 803-434-4419 _____

FROM:_____ Marc Harari, Ph.D. _____

# OF PAGES INCLUDING COVER_ 11 _____

ADDITIONAL INFORMATION:_ BILLING STATEMENT _

_3 EVALUATION FOR AFERAZ IRANI._

## Confidentiality Notice

This transmission is intended only for the use of the individual or entity to which it is addressed and may contain information which is privileged and/or confidential. If the reader of this message is not the intended recipient, you are hereby notified that any disclosure, distribution, or copying of this information is strictly prohibited. If you received this information in error, please notify the sender immediately by all the number listed above.

# PSYCHOLOGICAL EVALUATION

Marc Harari, Ph.D.
1816 Bull Street
Columbia, SC 29201
(803) 422-0017

Date of Testing: 1/13/12
Date of Report: 1/20/12

Client: Afraaz Irani

DOB —

## REASON FOR REFERRAL

Dr. Afraaz Irani was referred for a general psychological evaluation by Dr. Katherine Stephens. The purpose of this evaluation is to assess his mental health and personality functioning in order to design an appropriate remediation plan. All residents must demonstrate competence to the Accreditation Council for Graduate Medical Education (ACGME) prior to graduation. Dr. Irani is currently a second year orthopedic resident at Palmetto Health.





USC(Irani)0380



**BACKGROUND**



USC(Irani)0381



USC(Irani)0382



USC(Irani)0383



Jan 20 2012 12:47 HP Fax

USC(Irani)0384



USC(Irani)0385



Jan 20 2012 12:47 HP Fax

USC(Irani)0386



Marc Harari, Ph.D.          1/20/12
Licensed Counseling Psychologist (875)

USC(Irani)0387

FW: follwup - Outlook Web Access Light                    https://uscmed.sc.edu/owa/?ae=PreFormAction&t=IPM.Note&a=Next...

**Office Outlook** Web Access | Type here to search | This Folder | Address Book | Options | Log Off

Mail | Reply | Reply to All | Forward | Move | Delete | Junk | Close

Calendar

Contacts

..........

Deleted Items
Drafts
Inbox
Junk E-Mail
Sent Items

Click to view all folders ⌄

AOA trip
Goodno
Irani
Kanwisher
Lamoreaux
Lindley
Massey
Residency
Riis
Sent Items

Manage Folders...

## FW: follwup
### John Walsh

**Sent:** Tuesday, January 24, 2012 8:48 AM
**To:**  David Koon

Call me about this

**From:** Afraaz Irani [mailto:afraaz.irani@gmail.com]
**Sent:** Tuesday, January 24, 2012 2:21 AM
**To:** John Walsh
**Subject:** follwup

Dr. Walsh,

Thank you for meeting with me last week. I have learned from the feedback, and have had time to reflect on my performance.

I was encouraged to hear that I can make up the time off without delaying my graduation.

I was also glad to hear that you do not believe this is a punitive process. I am concerned about the suspension and how that may be viewed in an increasingly competitive job market; I am hopeful that calling this time off a leave of absence may achieve the same goals, without harmful long-term effects.

My understanding of the grievance process was that the recommendations/actions are now reviewable and open to modification; I hope this option can be explored.

I look forward to incorporating the feedback of the department, working toward becoming a better resident, and rejoining my fellow residents to finish my training.

Thank you,

Afraaz

Connected to Microsoft Exchange

1 of 1

Remediation Plan - Outlook Web Access Light  https://uscmed.sc.edu/owa/?ae=PreFormAction&t=IPM.Note&a=Next...

Microsoft
Office Outlook Web Access | Type here to search | This Folder | Address Book | Options | | Log Off

**Mail** | Reply | Reply to All | Forward | Move | Delete | Junk | Close

**Calendar**

**Contacts**

Deleted Items
Drafts
Inbox
Junk E-Mail
Sent Items

Click to view all folders

AOA trip
Goodno
Irani
Kanwisher
Lamoreaux
Lindley
Massey
Residency
Riis
Sent Items

Manage Folders...

## Remediation Plan
David Koon
You replied on 1/28/2012 10:01 AM.

**Sent:** Saturday, January 28, 2012 9:37 AM
**To:**    John Walsh; Frank R Voss; Kathy.Stephens@PalmettoHealth.org; jhoov14@yahoo.com; Jennifer, Wood [jhwood23@gmail.com]; Afraaz.Irani@gmail.com

Dr. Irani -

We will meet with you on Tuesday, 31 JAN 12 in the orthopaedic conference room at 5:30 pm to review the next step in your academic remediation.

Please acknowledge receipt of this message.  If you have any questions before then, please contact me or Kathy Stephens.

Thanks

DK

Connected to Microsoft Exchange

4/25/2012 9:24 AM
USC(Irani)0389



UNIVERSITY OF SOUTH CAROLINA
SCHOOL OF MEDICINE
UNIVERSITY SPECIALTY CLINICS

31 JAN 12

Memorandum of Record                          Re: Dr. Afraaz Irani (PGY-2 Orthopaedic Resident)

Dr. Afraaz Irani was placed on Level II Academic Remediation from 15 AUG 11 to 01 DEC 11.

Dr. Irani was placed on Level III Academic Remediation from 09 DEC 11 to 31 JAN 12.

Dr. Irani proceeded thru the Grievance Process in both instances through the DIO appeal level, and his appeal was denied both times. Dr. Irani did not appeal beyond the DIO level. (*attempted appeal to grievance council*).

It is the recommendation of the faculty of the orthopaedic department that Dr. Irani be placed on Level II Academic Remediation beginning 06 FEB 12 thru 15 JUN 12.

It is our recommendation that the Palmetto Health Academic Remediation plan be instituted. (see attached)

Dr. Irani is also required to attend individual outpatient counseling thru the Palmetto Health E-CARE with Dr. Janice McMeekin or other E-CARE counselor on the schedule recommended by E-CARE. He is responsible for arranging and attending these sessions. The first appointment must occur by 15 FEB 12. He is responsible for providing electronic verification of these sessions within 48 hours to the Program Director.

Dr. Irani will be placed on the Total Joint service with Dr. Frank Voss beginning Monday, 06 FEB 12. He is required to arrange and attend bi-weekly meetings with Dr. Voss to review his performance. He will also arrange and attend monthly meetings with his Program Director to review the progress with his remediation measures.

Dr. Irani will be required to make up all missed call days within the remediation period. He will adhere to all duty hour restrictions per the ACGME guidelines.

Dr. Irani will no longer secretly record any conversation or phone calls.

These recommendations will be reviewed with Dr. Irani on 31 JAN 12 and will be forwarded to the GMEC Executive Committee for review / temporary approval on 01 FEB 12. Review / approval by the GMEC will be on 14 FEB12.


Dr. John Walsh                    Dr. David Koon              Dr. Frank Voss
Chair, Dept of Orthopaedic Surgery    Program Director          Vice-Chair, Dept of
                                                               Orthopaedic Surgery


*DEPARTMENT OF SURGERY*
Two Richland Medical Park, Suite 402, Columbia, SC 29203
803-256-2657, FAX 803-933-9545

USC(Irani)0390



UNIVERSITY OF SOUTH CAROLINA
SCHOOL OF MEDICINE
UNIVERSITY SPECIALTY CLINICS

# Palmetto Health Academic Remediation

**Personal Data**

| Resident: Afraaz Irani, MD | Dates of Action: 2/6/12 – 6/15/12 |
|---|---|
| Program: Orthopaedic Surgery | Program Year level: 2 |
| Academic Remediation Action Proposed: | |

☐ Level I    ☒ Level II    ☐ Level III    ☐ Termination

| *History* | *Date* |
|---|---|
| Remediation, Level II | 8/15/11 – 12/1/11 |
| Remediation, Level III | 12/9/11 – 1/31/12 |

| *Procedures* | *Date* |
|---|---|
| Resident informed of recommendation | 1/31/12 |
| Projected GMEC Exec. Com. action | 2/1/12 |
| Projected date of GMEC action | 2/14/12 |
| Projected date of progress reports to GMEC | 4/10/12, 6/12/12 |

**Assessment of factors impacting Dr. Irani's performance:**

- Attitude of the resident
- Commitment to lifelong learning and self improvement
- Intellectual honesty with patients, colleagues, and self
- Professional ethical standards

USC(Irani)0391



UNIVERSITY OF SOUTH CAROLINA
SCHOOL OF MEDICINE

UNIVERSITY SPECIALTY CLINICS

# Remediation Plan

| Resident: Afraaz Irani, MD |
|---|

## Timeline

| |
|---|
| Dates of Action:  2/6/12 – 6/15/12 |
| GMEC Executive Committee Temporary Action date:  2/1/12 |
| Projected GMEC Action date:  2/14/12 |
| GMEC Progress report(s) on:  4/10/12, 6/12/12 |

## Remediation plan for each competency not being met

| Competencies not being met | Remediation Plan | Evaluation Tools |
|---|---|---|
| Patient Care:<br>IV.A.5.a).(6).(a) communicate effectively and demonstrate caring and respectful behaviors when interacting with patients and their families;<br>IV.A.5.a).(6).(c) make informed decisions about diagnostic and therapeutic interventions based on patient information and preferences, up-to-date scientific evidence, and clinical judgment;<br>IV.A.5.a).(6).(d) develop and carry out patient management plans | Display empathy and compassion in all patient encounters.<br>Discuss injuries with patients and families in laymen terms.<br>Follow patient care plan set out by attending and/or senior resident.  If plan needs to be altered in any way, inform attending and/or senior resident immediately of changes to patient care plan.<br>Read and prepare appropriately for clinics and operative cases.<br>Discuss all cases preoperatively with attending.<br>Discuss every consult/patient/phone call taken while on call with chief resident. Check out immediately if urgent; check out the next morning if not urgent.<br>Orthopaedic consults:  See patient. Evaluate patient. Order appropriate imaging and/or other studies as indicated. Provide timely and appropriate management to patients, including pain management. Obtain consents when necessary, mark patient when necessary, prepare patient for OR when necessary. Devise appropriate plan of action for care. | Direct observation and feedback from faculty, attending(s), nurses, peers, and patients<br><br>Review of patient outcomes |

DEPARTMENT OF SURGERY
Two Richland Medical Park, Suite 402, Columbia, SC 29203
803-256-2657, FAX 803-933-9545

USC(Irani)0392



UNIVERSITY OF SOUTH CAROLINA
SCHOOL OF MEDICINE

UNIVERSITY SPECIALTY CLINICS

| | Then call senior resident or attending. | |
|---|---|---|
| Medical Knowledge:<br>IV.A.5.b) Residents must demonstrate knowledge of established and evolving biomedical, clinical, epidemiological and social behavioral sciences, as well as the application of this knowledge to patient care. | Read all assigned articles/chapters for conference. Be prepared to have interactive discussion/answer questions based on the assigned reading.<br>When on call over weekend, be prepared and present patients at fracture conference. Be prepared to discuss fracture classification, treatment options, outcomes, etc. | Direct observation and feedback from faculty, attending(s), and peers |
| Systems Based Practice:<br>IV.A.5.c).(1) identify strengths, deficiencies, and limits in one's knowledge and expertise | Respond to constructive criticism in an appropriate and professional way. Admit and apologize for mistakes and be willing to endorse personal flaws. Take immediate action to correct deficiencies. | Direct observation by program director and faculty |
| Interpersonal and Communication Skills:<br>IV.A.5.d).(1) communicate effectively with patients, families, and the public, as appropriate, across a broad range of socioeconomic and cultural backgrounds;<br>IV.A.5.d).(2) communicate effectively with physicians, other health professionals, and health related agencies;<br>IV.A.5.d).(3) work effectively as a member or leader of a health care team or other professional group | Morning list ready by specified time daily set by chief resident. List includes up to date labs, vitals, patient plans, antibiotics, UOP, drain output, etc.<br>All assigned patients appropriately rounded on before morning conference.<br>Present to conference room by 6:25am every morning.<br>Report to OR and/or clinic immediately after conference is concluded.<br>Be on time to all assigned outpatient clinics.<br>Check out every day at the end of the day with chief resident regarding inpatients.<br>Communicate clearly and effectively with attending, ancillary staff, peers and families.<br>Respond appropriately to text messages and emails in a timely fashion.<br>Perform postoperative checks on all patients operated on, or needing postoperative checks at end of day.<br>Perform discharge or transfer summaries in a timely fashion, including patients as instructed by chief resident and/or attending, regardless of your involvement in the patient's care.<br>Perform other duties as assigned by | Direct observation and feedback from faculty, attending(s), nurses, peers, and patients |

*DEPARTMENT OF SURGERY*
Two Richland Medical Park, Suite 402, Columbia, SC 29203
803-256-2657, FAX 803-933-9545

USC(Irani)0393



UNIVERSITY OF SOUTH CAROLINA
SCHOOL OF MEDICINE

UNIVERSITY SPECIALTY CLINICS

|  |  |  |
|---|---|---|
|  | attending / senior resident with a good attitude.<br>  If holding call pager during day, keep attending informed on whereabouts when seeing consults/attending to call issues.<br>  Return phone calls, pages in timely fashion.<br>  Work effectively and efficiently within the patient care team, including nurses and ancillary staff. |  |
| Professionalism:<br>IV.A.5.e).(6) commitment to excellence and ongoing professional development | Commit to immediate and sustained improvement in all areas listed above. | Direct observation by attending(s) and faculty |
| Practice Based Learning and Improvement: |  |  |

**Additional remediation requirements**

| Standards of Behavior | Dr. Irani to review and adhere to Palmetto Health's Standards of Behavior – available at http://residency.palmettohealth.org/documents/Graduate%20Medical%20Education/Resident%20Manual%202011-2012.pdf |
|---|---|
| Counseling support | Dr. Irani to arrange counseling sessions through PH's E-Care program; to attend sessions on schedule recommended by E-Care counselor; to provide recommended schedule of sessions to Program Director; and to provide electronic verification of attendance at each session to Program Director within 48 hours of each session. |

**Feedback on remediation progress**

| Attending feedback | Formative feedback provided by attending(s) twice per month. Dr. Irani to arrange times with attending(s). |
|---|---|
| Program Director feedback | Monthly feedback sessions with Program Director. Dr. Irani to arrange times with program Director. |

**Program Director signature and date:**

_____  DKoon _____ 31 Jan 12

*DEPARTMENT OF SURGERY*
Two Richland Medical Park, Suite 402, Columbia, SC 29203
803-256-2657, FAX 803-933-9545

USC(Irani)0394



UNIVERSITY OF SOUTH CAROLINA
SCHOOL OF MEDICINE

UNIVERSITY SPECIALTY CLINICS

***Resident verification:*** I have reviewed and discussed the contents of this form with my program director and understand that immediate and sustained improvement is required.  Failure to correct the deficiencies noted above may result in further action up to, and including, dismissal from the residency program. I know where to get a copy of the Palmetto Health Grievance and Due Process Policy from the Palmetto Health web site at http://residency.palmettohealth.org/documents/Graduate%20Medical%20Education/Resident%20Manual%202011-2012.pdf

Resident signature and date:

_____  2/1/12_____

USC(Irani)0395

[SOMspam] mtg - Outlook Web Access Light                https://uscmed.sc.edu/owa/?ae=PreFormAction&t=IPM.Note&a=Next...

Microsoft
Office Outlook Web Access | Type here to search | This Folder | Address Book | Options | Log Off

| Mail | Reply | Reply to All | Forward | Move | Delete | Junk | Close |

**[SOMspam] mtg**

Calendar

Contacts

Afraaz Irani [afraaz.irani@gmail.com]

........

This message was sent with Low importance.

Deleted Items

**Sent:** Tuesday, February 28, 2012 9:46 PM

Drafts

Inbox

**To:**   David Koon

Junk E-Mail

Sent Items

Hey Dr. Koon,

I'm approaching one month back on service. I was wondering when you might have some time to meet up to review progress/get feedback.

Click to view all folders  ⌄

Thanks,
Afraaz

AOA trip
Goodno
Irani
Kanwisher
Lamoreaux
Lindley
Massey
Residency
Riis
Sent Items

Manage Folders...

Connected to Microsoft Exchange

1 of 1

RE: Irani Update - Outlook Web Access Light    https://uscmed.sc.edu/owa/?ae=PreFormAction&t=IPM.Note&a=Next...



Office Outlook Web Access   | Type here to search | This Folder | 🔍 | 📖 Address Book | ⚙ Options | ❓ | Log Off

| Mail |
| Calendar |
| Contacts |

✉ Reply | ✉ Reply to All | ➡ Forward | ➡ Move | ✖ Delete | 🚫 Junk | Close

## RE: Irani Update
David Koon

You forwarded this message on 3/1/2012 7:20 PM.

**Sent:** Thursday, March 01, 2012 6:52 PM
**To:** Katherine Stephens [Kathy.Stephens@PalmettoHealth.org]; AnneMarie Hyer [AnneMarie.Hyer@PalmettoHealth.org]; John Walsh
**Cc:** James Raymond

Deleted Items
Drafts
Inbox
Junk E-Mail
Sent Items

Click to view all folders »

AOA trip
Goodno
Irani
Kanwisher
Lamoreaux
Lindley
Massey
Residency
Riis
Sent Items

Manage Folders...

All –

Dr. Walsh spoke with Dr. Irani this afternoon and confirmed the facts surrounding the care of the hemophiliac patient last night.

Dr. Hoover (chief resident) and I spoke with Dr. Irani tonight. I questioned him about the events lasts night and this morning. He had no excuse for his actions and admitted that he had failed to abide by Dr. Wood's instructions, did not document appropriately, and that he had shown up late for rounds.

I informed Dr. Irani that the department's recommendation to the GMEC would be that he be dismissed from the program. In discussion with Dr. Stephens and the Exec Comm of the GMEC, he would be suspended (without pay per HR) from clinical duties immediately. Our recommendation will be brought forth to the full GMEC for their consideration on 10 APR 12.

I informed Dr. Irani that he has the opportunity to appeal this decision thru the Grievance and Due Process Policy.

David Koon

From: Katherine Stephens [Kathy.Stephens@PalmettoHealth.org]
Sent: Thursday, March 01, 2012 11:23 AM
To: AnneMarie Hyer; David Koon; John Walsh
Cc: James Raymond
Subject: Re: Irani Update

David,

Pls proceed with meeting with Irani to get his side of story. Will arrive in Orlando around 1:30. Call me to discuss next steps after that. We cannot continue current path and termination may be next step.

(Jim, I have contracted H.R. and Labor atty already. Will be in touch later today shouls GMEC Exec Com action be needed.)

Kathy
-----Original Message-----
From: David Koon <David.Koon@uscmed.sc.edu>
To: Katherine Stephens <Kathy.Stephens@PalmettoHealth.org>
To: AnneMarie Hyer <AnneMarie.Hyer@PalmettoHealth.org>
To: John Walsh <John.Walsh@uscmed.sc.edu>

Sent: 3/1/2012 8:36:27 AM
Subject: Irani Update

Kathy / John –

Dr. Wood approached me this morning about another patient care issue that occurred last night while we were on trauma call. A hemophiliac patient came in to be evaluated for leg pain which we thought could be a compartment syndrome (a limb threatening problem). Dr. Irani evaluated the patient and Dr. Wood came in around midnight to see the patient with him. They called me shortly thereafter to give me an update. Dr. Wood instructed Dr. Irani to evaluate the patient at 4:00 this morning to make sure that his conditioned had not worsened. During rounds this morning, he admitted to Dr. Wood that he had "forgotten" to perform this evaluation. Failure to perform this evaluation placed the patient at risk for further harm. Also, Dr. Irani failed to report early for morning rounds (one of the remediation measures) and Dr. Hoover called into the call room and actually woke him up.

Despite the department's and the GMEC's actions to provide him with a reasonable remediation plan, I think that his actions over the past few days speak for themselves and he is putting our orthopaedic patients at risk. I would recommend that we immediately suspend him from clinical duties. I would recommend that we meet with him this afternoon to hear his side of the story. If a reasonable explanation is not presented by him, I would think that we have "just cause" to begin the dismissal process.

RE: Irani Update - Outlook Web Access Light                     https://uscmed.sc.edu/owa/?ae=PreFormAction&t=IPM.Note&a=Next...

I'll be at the VA all day in  clinic and will await your recommendations.

DK

From: David Koon
Sent: Wednesday, February 29, 2012 7:34 PM
To: Kathy.Stephens@PalmettoHealth.org; John Walsh
Subject: FW:  Dr Irani patient encounter

Kathy –

Below is the email that I received from Dr. Grabowski for your review.  Dr. Grabowski
(with Dr. Voss)  has discussed these issues with Dr. Irani.  He instructed Dr. Irani to
see the patient each morning and evaluate her wound and change her dressing.  Dr. Irani
failed to do this either today or yesterday and did not have a good answer as to why
this was left undone.

The department has struggled with what the next step should be and we request guidance
from the Executive Comm of the GMEC.  We think that Dr. Irani has failed certain
aspects of his remediation plan (patient care, interpersonal skills and communication,
and professionalism) and we are concerned with patient safety.  We have recommended in
a previous email that we intend not to renew his contract, but we would request
guidance as to whether or not this behavior rises to the level of "just cause" for
dismissal.

Thanks for your consideration in this matter.

David


David,

I just wanted to tell you about an experience that I had with Dr. Irani last week.  He
had helped me with my cases last Tuesday and as a result was following them on the
floor.  On Friday morning, his note on LO, one of my patients who had undergone a
lumbar laminectomy and fusion, failed to include a neurological exam.  I discussed this
with Dr. Irani when I saw him in clinic that morning at approximately 10:00.

Subsequently, regarding the same patient, Dr. Irani was called by the nursing staff at
11:30 to be made aware of an acute neurological change and deficit.  Dr. Irani alerted
me of this in clinic at approximately 12:30, at which point in time, I instructed him
to see and evaluate the patient and then report back to me.  He did so, but called back
saying that "the patient is in the bathroom and therefore I cannot examine her at this
time."  I instructed him to evaluate her as quickly as possible, then report back to me
immediately.

He contacted me at approximately 1:30, saying that the patient had a profound
neurological deficit.  I instructed him to order a stat MRI of the lumbar spine, and
call me with the results.  I then saw and evaluated the patient myself at 2:00,
corroborating Dr. Irani's exam.  At that time, however, there was no documentation from
Dr. Irani regarding the patient's condition.  Upon completion of the MRI at 4:30, I
left a detailed note describing the event in the patient's chart, and noted that Dr.
Irani at that point still had not documented his findings within the patient's record.
The patient was taken to the OR emergently for evacuation of a compressive fluid
collection leading to paralysis.  The patient was in the OR by 6:00 pm.

My concern over this is the timing of Dr. Irani's evaluation given the severe nature of
the issue surrounding this patient as well as his lack of documentation surrounding a
significant post-operative complication.

I have not yet discussed these issues with Dr. Irani and wanted to alert you of them
prior to speaking with him.

Thank you,
Greg

----------------------------------------
This e-mail transmission, in its entirety and including all attachments, is intended
solely for the use of the person or entity to whom it is addressed and may contain
information, including health information, that is privileged, confidential, and the
disclosure of which is governed by applicable law.  If you are not the intended
recipient, you are hereby notified that disclosing, distributing, copying or taking any
action in relation to this e-mail is STRICTLY PROHIBITED.  If you have received this
e-mail in error, please notify the sender immediately and destroy the related message.

-------------------------------------------------------------------------
PALMETTO HEALTH CONFIDENTIALITY NOTICE
This message is intended only for the use of the individual or entity to which it is
addressed and may contain information that is privileged, confidential and exempt from
disclosure under applicable law.  If the reader of this message is not the intended
recipient, you are hereby notified that any dissemination, distribution, or copying of

RE: Irani Update - Outlook Web Access Light                    https://uscmed.sc.edu/owa/?ae=PreFormAction&t=IPM.Note&a=Next...

this communication is strictly prohibited by law.  If you have received this
communication in error, please notify me immediately.

 Connected to Microsoft Exchange

USC(Irani)0399

Level III remediation - Outlook Web Access Light                    https://uscmed.sc.edu/owa/?ae=PreFormAction&t=IPM.Note&a=Next...

Office Outlook Web Access | Type here to search | This Folder | 🔍 | Address Book | Options | ⓘ | Log Off

| Mail | Calendar | Contacts |

📧 Reply  📧 Reply to All  📧 Forward  | ➡ Move  ✖ Delete  | 🚫 Junk  Close

Deleted Items
Drafts
Inbox
Junk E-Mail
Sent Items

Click to view all folders ✵

AOA trip
Goodno
Irani
Kanwisher
Lamoreaux
Lindley
Massey
Residency
Riis
Sent Items

Manage Folders...

## Level III remediation
### David Koon

**Sent:** Monday, March 05, 2012 2:40 PM
**To:** Afraaz.irani@gmail.com; John Walsh; Kathy.Stephens@PalmettoHealth.org
**Attachments:** 📄 Irani_MoR_7-dismissal.docx (125 KB) [Open as Web Page]

Afraaz -

Please review the attached memorandum.

I would like to have your recollection of events surrounding both patients by the end of the week.

Feel free to contact any of the faculty or Dr. Stephens if you have questions.

DK

⬡ Connected to Microsoft Exchange

1 of 1



UNIVERSITY OF SOUTH CAROLINA
SCHOOL OF MEDICINE

UNIVERSITY SPECIALTY CLINICS

05 MAR 12

Memorandum of Record                    Re: Dr. Afraaz Irani (PGY-2 Orthopaedic Resident)

Dr. Afraaz Irani was placed on Level II Academic Remediation from 15 AUG 11 to 01 DEC 11.

Dr. Irani was placed on Level III Academic Remediation from 09 DEC 11 to 31 JAN 12.

Dr. Irani was placed on Level II Academic Remediation beginning 06 FEB 12.

During his first month on this Level II Remediation, Dr. Irani was involved in two patient encounters that the faculty deemed below acceptable standards.

The first encounter involved a spine patient of Dr. Grabowski's.  His email to me is included below for your review.  Dr.s Grabowski and Voss met with Dr. Irani and discussed the situation with him on Tuesday, 28 FEB 12.

The following day Dr. Irani admitted a hemophiliac patient to the hospital.  His senior resident (Dr. Wood) evaluated the patient and instructed Dr. Irani to re-evaluate the patient at 4:00 that morning.  He failed to perform this examination and failed to appropriately document an evaluation earlier that morning.  Upon questioning by Dr. Wood during morning rounds, he admitted to not performing this evaluation as instructed.  This failure placed the patient's limb at risk.  Dr. Hoover and I discussed this situation with Dr. Irani on Thursday, 01 MAR 12.  He stated that he failed to follow Dr. Wood's instructions.

I have asked Dr. Irani to provide written documentation regarding the care of these two patients.

Dr. Irani has failed to demonstrate immediate and sustained improvement as required by his remediation measures.  He has failed in the competencies of patient care, interpersonal skills and communication, and professionalism and the faculty is acutely concerned with our patient's safety.

It is the recommendation of the orthopaedic faculty to place Dr. Irani immediately on Level III academic remedation (effective 01 MAR 12) and suspend him from clinical duties.  We will investigate these encounters thoroughly.  If no reasonable explanation can be identified for his actions, the faculty will recommend to the GMEC on 10 APR 12 that Dr. Irani be dismissed from the program.

Dr. John Walsh                     Dr. David Koon              Dr. Frank Voss
Chair, Dept of Orthopaedic Surgery   Program Director           Vice-Chair, Dept of
                                                                Orthopaedic Surgery

*DEPARTMENT OF SURGERY*
**Two Richland Medical Park, Suite 402, Columbia, SC 29203**
**803-256-2657, FAX 803-933-9545**

USC(Irani)0401



UNIVERSITY OF SOUTH CAROLINA
SCHOOL OF MEDICINE

UNIVERSITY SPECIALTY CLINICS

Dr. Grabowski to Dr. Koon (Monday, 27 FEB 12)

"I just wanted to tell you about an experience that I had with Dr. Irani last week.  He had helped me with my cases last Tuesday and as a result was following them on the floor.  On Friday morning, his note on LO, one of my patients who had undergone a lumbar laminectomy and fusion, failed to include a neurological exam.  I discussed this with Dr. Irani when I saw him in clinic that morning at approximately 10:00.

Subsequently, regarding the same patient, Dr. Irani was called by the nursing staff at 11:30 to be made aware of an acute neurological change and deficit.  Dr. Irani alerted me of this in clinic at approximately 12:30, at which point in time, I instructed him to see and evaluate the patient and then report back to me.  He did so, but called back saying that "the patient is in the bathroom and therefore I cannot examine her at this time."  I instructed him to evaluate her as quickly as possible, then report back to me immediately.

He contacted me at approximately 1:30, saying that the patient had a profound neurological deficit.  I instructed him to order a stat MRI of the lumbar spine, and call me with the results.  I then saw and evaluated the patient myself at 2:00, corroborating Dr. Irani's exam.  At that time, however, there was no documentation from Dr. Irani regarding the patient's condition.  Upon completion of the MRI at 4:30, I left a detailed note describing the event in the patient's chart, and noted that Dr. Irani at that point still had not documented his findings within the patient's record.  The patient was taken to the OR emergently for evacuation of a compressive fluid collection leading to paralysis.  The patient was in the OR by 6:00 pm.

My concern over this is the timing of Dr. Irani's evaluation given the severe nature of the issue surrounding this patient as well as his lack of documentation surrounding a significant post-operative complication."

*DEPARTMENT OF SURGERY*
**Two Richland Medical Park, Suite 402, Columbia, SC 29203**
**803-256-2657, FAX 803-933-9545**

USC(Irani)0402



UNIVERSITY OF SOUTH CAROLINA
SCHOOL OF MEDICINE
UNIVERSITY SPECIALTY CLINICS®

Meeting with Dr. Greg Grabowski and Dr. Afraaz Irani

Date: Tuesday approximately two weeks ago.

Re: Review of the circumstances under which Dr. Irani was delayed in evaluation of a patient with new onset weakness after a recent spine surgery while still hospitalized.

We carefully reviewed the circumstances under which Dr. Irani was called by the nurse where she informed him that the patient had a new foot drop in the morning. Dr. Irani's initial response was somewhat flippant to the nurse and told her that he would come by a little bit later. About 1-1/2 hours later, he came by, noted some of the weakness, and then contacted Dr. Grabowski. The further evaluation revealed fluid collection near the area of the surgery that proved to be a CSF leak. A repeat surgery fortunately stopped the CSF leak and the patient gradually improved but the patient was watched extremely cautiously over the weekend after the decompression surgery and there was reliance on physicians to do very sensitive neurologic testing at regular intervals. When Dr. Irani contacted Dr. Grabowski and told him that the muscle strength had faded to 4+/5+ there was immediate anxiety on the part of Dr. Grabowski that the patient's problem was recurring. Dr. Grabowski reviewed all of these issues with Dr. Irani and wondered whether Dr. Irani had any insight into why these situations might cause anxiety for Dr. Grabowski. Ultimately, Dr. Irani did admit shortcoming in terms of the his assessment and compulsiveness about thorough patient examination but I think he failed to have any true insight into the level of concern that we would expect that he would demonstrate in the care of a patient who was at risk for becoming paralyzed. It seemed that Dr. Irani's description of the events was consistent but there failed to be recognition or demonstration of true care for the patient's condition in this situation. The discussion session was largely conducted by Dr. Grabowski with response by Dr. Irani. My sentiment and that of Dr. Grabowski was that there was a failure of recognition of the amount of care required for an orthopedic spine patient. There were still concerns about the level whether Dr. Irani could meet with the standards expected of him.

Frank R. Voss, M.D.
FRV:tlg

Cc: David Koon, M.D.

**DEPARTMENT OF ORTHOPAEDIC SURGERY**
**Two Medical Park, Suite 404, Columbia, SC 29203**
**803-434-6812, FAX 803-434-7306**

USC(Irani)0403

To Whom it may concern:

The following are my recollection of events in reference to the 19 y/o hemophiliac that Orthopaedics was consulted on to rule out compartment syndrome:

I was called by Dr. Irani regarding the patient. He relayed the patient's history to me and his physical exam findings. I asked him to measure the patient's compartments so that we could have an objective number of his compartment pressures. He called me back to inform me of the patient's compartment pressures. I informed him that I thought we at least needed to admit him overnight for observation and came to evaluate the patient.

The patient was very comfortable in the ER at that time. Although his leg was swollen and I had concern for development of compartment syndrome, I did not feel he had compartment syndrome at that time. Dr Koon was the attending on call that night. I called Dr. Koon on the phone and spoke with him regarding the patient. It was agreed upon that we would admit the patient to observe him and ensure his exam did not worsen and he did not develop compartment syndrome.

I finished writing my consult note. I spoke with Dr. Irani at approximately 1:15 a.m. and informed him the patient needed to be admitted, and I would like the patient checked in a few hours, and I then further clarified to give a more specific time frame of 4a.m. I left the ER where the patient was at approximately 1:15a.m. I informed Dr. Irani of my physical exam findings and also told him that if patient had worsening of symptoms that I wanted to be contacted immediately.

At around 6am that morning I went to 8 west to check again on the patient. The patient was still comfortable and had continued to improve. I sat down at the 8 west nurses' station and opened the chart to write my note. I saw that Dr. Irani's original consult note was in the chart, my consult from earlier that morning was in the chart, a consult note from another service regarding the patient's hemophilia was in the chart, and no other notes. Since I did not see a second note from Dr. Irani in the chart, I assumed he had not reevaluated him. At that time, Dr. Irani was sitting across from me at the nurses' station on 8 west and I asked him if he had seen the patient at 4am as I had asked him to. He stated, no. I asked why not. He went on the state that he was sorry, and that he had forgotten. I informed him that this type of thing was not to ever happen again. He once again stated he was sorry. I then wrote my progress note on the patient and left the floor.

Later that morning, I spoke with Dr. Koon regarding the interaction that I had with Dr. Irani. My concern was that the patient was not reevaluated by Dr. Irani, and that this could have had serious implications if the patient had developed compartment syndrome.

I am aware that Dr. Irani was questioned about this patient encounter, and he has stated that he reevaluated the patient at 2:30a.m that morning. Dr. Irani did not indicate to me that he reevaluated the patient when I spoke to him regarding the issue. At approximately 6 a.m. when I reevaluated the patient, there was no documentation in the chart by Dr. Irani regarding a reevaluation of the patient.

Sincerely,

Jennifer Wood

USC(Irani)0404

Sent:Thursday, March 08, 2012 11:17 PM
To:  David Koon

Dr. Koon,

Thank you for giving me the opportunity to respond to the events surrounding the two patients in question. Below is the description of events surrounding the patients:

Regarding the haemophiliac patient with LLE swelling:

The patient presented with swelling of his LLE. He had last been examined at about midnight and would be examined again at 6AM. I was asked to perform a serial exam on the patient at "about four o clock." I saw the patient for follow-up check at about halfway between the two projected exam points for possible eval for compartment syndrome (at about 2:30AM on 3/1/12). The patient was in no acute distress, but he did have a slight grimace on his face when I walked in (he was moving his left lower extremity at that time). I asked him if he was about the same, worse or better. He stated that he "felt the same." His LLE was elevated on 3 pillows. Compartments felt similar in pressure to before. Patient was able to wiggle his toes. Some pain on passive ROM of left ankle -- again unchanged from before. Mild numbness on the dorsum of foot -- similar to slightly improving from exam a few hours ago. Strong DP pulse. Foot was warm and well perfused.

Regarding L.O. (the spinal patient):

I was called sometime after 11:30AM on 2/24/12 by the nurse stating that the patient was having difficulty moving RLE with PT today. I knew the patient was having more pain of the RLE with activity, and asked the nurse to verify if there was a neuro deficit, or if this was compensation for pain (nurse had not assessed the patient, only saying what PT had said). I received repeat page from the nurse 20-30 minutes later saying the patient was unable to dorsiflex her foot. At that point I left clinic and went across the street to see the patient. She was in the restroom. I waited for several minutes, for her to finish. She remained on the toilet. I notified Dr. Grabowski that she was on the toilet and what happened. Several repeat attempts were made to see patient.

As soon as patient was done on the toilet, I personally assisted her from the bathroom to her bed. She was noted to have some difficulty dorsiflexing right foot while ambulating. She was dragging her right foot. I helped her to the bed. My exam revealed 2/5 R knee extension strength. She was unable to flex her knee, ankle dorsiflex or plantar flex, but was able to wiggle her toes on the right. She maintained a good DP pulse. I completed my exam, and she became tearful and emotional, and I spent some time at bedside consoling and discussing my findings with her and attempting to let her know that we would do whatever needed to be done – I told her I would discuss all my findings with Dr. Grabowski and he would be by soon to see her.

I notified Dr. Grabowski of these findings. I notified him that the patient had difficulty walking and almost no motor function in the right quad/hamstring/gastroc/soleus muscle group. Dr. Grabowski informed me that my exam was incongruent with my observation of the patient walking, and that there was likely an error in my exam. Accordingly I did not write a note at that point; I had previously been directed to not write notes in the chart with findings that may be incongruent (this came up with regards to leg length discrepancy in a prior patient). Accordingly I did not write a note as I was led to believe that my physical exam findings were inaccurate, and I did not want to put something potentially damaging on the chart, until I could fully discuss this with my attending.

USC(Irani)0405

The patient was subsequently examined by Dr. Grabowski and he told me via phone to order a stat MRI. I placed the order for the MRI and called radiology and told them to expedite the scan as this was for a possible stat OR case. They informed me there were two patients currently in the scan or scanner area (one was a PICU patient). I told them to do whatever they could do to expedite this scan as there was potential permanent neurological damage at risk here. I stayed in touch with radiology. The scan was again slightly delayed when the patient was unable to be transferred over to the scanner from the stretcher because she required a push of IV morphine which I gave a verbal for the nurse to give. Subsequently, the scan was completed and as soon as the scan was done I communicated to Dr. Grabowski that the scan was completed, and what the findings were. The patient was then scheduled for an emergent decompression in the OR. There was obviously very real gravity to this case, and I did not ask any additional questions of the attending or say anything in addition to the information I was required to communicate. I scrubbed in on the case until Dr. Hoover scrubbed in and told me to break scrub.


Thanks,

Afraaz

USC(Irani)0406

Sent:Tuesday, March 20, 2012 10:55 AM
To:  David Koon
Cc:  Frank R Voss

David,


I just wanted to update you from my last email.


On Wednesday, February 29th, I met with Dr. Irani to discuss the concerns that I had regarding the care of patient LO.  In addition to the concerns I outlined in my prior email, I additionally discussed with him the topic of dressing changes in this patient once her drains had been pulled. Due to concerns of creation of a dural-cutaneous fistula in the event of an ongoing leak, I specifically spoke with Dr. Irani regarding the need for him to personally perform dressing changes on this patient on a daily basis and noting any qound drainage.  Despite these clear instructions, Dr. Irani failed to perform this duty.


Dr. Voss was present for our meeting, which went well.  At the time of the meeting, Dr. Irani did not dispute any of the patient care concerns discussed with him and simply apologized for his errors.


Please let me know if you need any more information regarding this meeting.


Thank you,

Greg

USC(Irani)0407

RE: Level III remediation - Outlook Web Access Light          https://uscmed.sc.edu/owa/?ae=PreFormAction&t=IPM.Note&a=Next...



Office Outlook Web Access | Type here to search | This Folder | Address Book | Options | Log Off

Mail
Calendar
Contacts
........
Deleted Items
Drafts
Inbox
Junk E-Mail
Sent Items

Click to view all folders ⬇

AOA trip
Goodno
Irani
Kanwisher
Lamoreaux
Lindley
Massey
Residency
Riis
Sent Items

Manage Folders...

Reply | Reply to All | Forward | Move | Delete | Junk | Close

## RE: Level III remediation
David Koon

**Sent:** Tuesday, March 13, 2012 2:39 PM.
**To:** Afraaz Irani [afraaz.irani@hotmail.com]; Kathy.Stephens@PalmettoHealth.org; John Walsh; Margie Bodie [Margie.Bodie@PalmettoHealth.org]; Laura Rasmussen

I spoke with Afraaz this afternoon and gave him an update re: our inquiry into the two patient encounters. He has provided me with a MoR which I have forwarded to Dr.s Wood, Grabowski, and Stephens for their review.

I informed him that I had received a MoR from Dr. Wood re: the hemophiliac patient and I'm awaiting one from Dr. Grabowski re: the spine patient.

At this point, the department has not changed it's recommendation to the GMEC.

He would like to initiate the Grievance process and I would consider his discussion with me as the first step, even though it was not initiated within the five (5) business days as required (Resident Manual, Grievance and Due Process policy, 1.1).

His next step would be to meet with Dr. Walsh within the next five (5) business days and I have cc'd him (and Laura Rasmussen) on this message.

DK

From: Afraaz Irani [afraaz.irani@hotmail.com]
Sent: Tuesday, March 13, 2012 1:43 PM
To: David Koon
Subject: RE: Level III remediation

Dr. Koon,

I would like to meet to discuss the memorandum and the actions proposed. Let me know when you have some time.

Thanks,
Afraaz

> From: David.Koon@uscmed.sc.edu
> To: Afraaz.irani@gmail.com; John.Walsh@uscmed.sc.edu;
Kathy.Stephens@PalmettoHealth.org
> Date: Mon, 5 Mar 2012 14:40:12 -0500
> Subject: Level III remediation
>
> Afraaz -
>
> Please review the attached memorandum.
>
> I would like to have your recollection of events surrounding both patients by the end of the week.
>
> Feel free to contact any of the faculty or Dr. Stephens if you have questions.
>
> DK
>
> ----------------------------------------
>
> This e-mail transmission, in its entirety and including all attachments, is intended solely for the use of the person or entity to whom it is addressed and may contain information, including health information, that is privileged, confidential, and the disclosure of which is governed by applicable law. If you are not the intended recipient, you are hereby notified that disclosing, distributing, copying or taking any action in relation to this e-mail is STRICTLY PROHIBITED. If you have received this e-mail in error, please notify the sender immediately and destroy the related message.

Connected to Microsoft Exchange

4/25/2012 9:34 AM
USC(Irani)0408

RE: feedback - Outlook Web Access Light                    https://uscmed.sc.edu/owa/?ae=PreFormAction&t=IPM.Note&a=Prev...



**RE: feedback**
Greg Grabowski

You forwarded this message on 3/20/2012 11:11 AM.

**Sent:** Tuesday, March 20, 2012 11:06 AM
**To:**   Afraaz Irani [afraaz.irani@hotmail.com]
**Cc:**   David Koon

Afraaz,

I apologize for the slow reply.  Our patient is doing well at her follow-up visit; thank you for asking.

With regards to feedback, I must admit to being somewhat confused by your request.  From my standpoint, we met on the morning of 2/29 to discuss the situation and at that time I outlined to you all of my reasons for concern surrounding the care provided for this patient.  Truthfully, I have nothing more to add; as far as I am concerned, the issue is closed.

Best,
Greg Grabowski

**From:** Afraaz Irani [mailto:afraaz.irani@hotmail.com]
**Sent:** Tuesday, March 13, 2012 10:25 PM
**To:** Greg Grabowski
**Cc:** David Koon
**Subject:** feedback

Hey Dr. Grabowski,

Hope all is well.

Dr. Koon asked me to writeup the events surrounding our patient L.O. from a few weeks ago.

I asked him today for some feedback and he asked that I contact you directly so I can better understand the situation.

I know you're busy, but if you could provide me with your thoughts that would be very much appreciated.

Thanks,
Afraaz
650-353-8523

PS How is Ms. O doing? Did her RLE pain ever resolve?

Connected to Microsoft Exchange

l of 1

Meeting with Dr. Irani - Outlook Web Access Light                https://uscmed.sc.edu/owa/?ae=PreFormAction&t=IPM.Note&a=Prev...

Office Outlook Web Access | Type here to search | This Folder | Address Book | Options | Log Off

**Mail**
**Calendar**
**Contacts**
.........
Deleted Items
Drafts
Inbox
Junk E-Mail
Sent Items

Click to view all folders ⌄

AOA trip
Goodno
Irani
Kanwisher
Lamoreaux
Lindley
Massey
Residency
Riis
Sent Items

Manage Folders...

Reply | Reply to All | Forward | Move | Delete | Junk | Close

## Meeting with Dr. Irani
Greg Grabowski

You forwarded this message on 3/20/2012 11:11 AM.

**Sent:** Tuesday, March 20, 2012 10:55 AM
**To:**   David Koon
**Cc:**   Frank R Voss

David,

I just wanted to update you from my last email.

On Wednesday, February 29th, I met with Dr. Irani to discuss the concerns that I had regarding the care of patient LO. In addition to the concerns I outlined in my prior email, I additionally discussed with him the topic of dressing changes in this patient once her drains had been pulled. Due to concerns of creation of a dural-cutaneous fistula in the event of an ongoing leak, I specifically spoke with Dr. Irani regarding the need for him to personally perform dressing changes on this patient on a daily basis and noting any qound drainage. Despite these clear instructions, Dr. Irani failed to perform this duty.

Dr. Voss was present for our meeting, which went well. At the time of the meeting, Dr. Irani did not dispute any of the patient care concerns discussed with him and simply apologized for his errors.

Please let me know if you need any more information regarding this meeting.

Thank you,
Greg

Connected to Microsoft Exchange

4/25/2012 9:37 AM
USC(Irani)0410

Grievance Decision - Outlook Web Access Light                    https://uscmed.sc.edu/owa/?ae=PreFormAction&t=IPM.Note&a=Next...





March 28, 2012                    <u>DELIVERED VIA EMAIL</u>

Afraaz Irani, MD
Department of Orthopaedics
2 Medical Park, Suite 404
Columbia, South Carolina 29203

Dear Dr. Irani:

After carefully considering the information available to me, I have decided to uphold the decision concerning your March 1, 2012 academic remediation.

If you decide to continue with the grievance process, your next step is to appeal through Palmetto Health's Human Resources department. Note that the grievance process requires an appeal to occur within ten business days, which is April 11, 2012. Please refer to the Grievance and Due Process policy in your Resident Manual for more information if you choose to appeal further.

Sincerely yours,

Katherine G. Stephens, PhD, MBA, FACHE
Vice President for Medical Education and Research

KGS/amh

cc: John Walsh, MD, Department of Orthopaedics
    David Koon, MD, Department of Orthopaedics
    James Raymond, MD, Chief Medical Officer

USC(Irani)0412

Re: FW: book money - Outlook Web Access Light          https://uscmed.sc.edu/owa/?ae=PreFormAction&t=IPM.Note&a=Next...

---

Office Outlook Web Access | Type here to search | This Folder | 🔍 | 📖 Address Book | 📋 Options | ◎ | Log Off

| Mail | ↩ Reply | ↩ Reply to All | ↪ Forward | ⇗ Move | ✕ Delete | 🚫 Junk | Close |

**Re: FW: book money**

Calendar

Contacts

..........

Deleted Items

Drafts

Inbox (1)

Junk E-Mail

Sent Items

Click to view all folders ≫

AOA trip

Goodno

Irani

Kanwisher

Lamoreaux

Lindley

Massey

Residency

Riis

Sent Items

Manage Folders...

**Katherine Stephens [Kathy.Stephens@PalmettoHealth.org]**

Sent: Thursday, April 12, 2012 3:37 PM
To:   Afraaz Irani [afraaz.irani@hotmail.com]
Cc:   David Koon

Dr. Irani,

While our practice has been to reimburse residents for educational materials purchased, this is not an entitlement but rather a benefit that residents can choose to access or not. My understanding from your email is that you have not purchased the materials and were seeking clarification before doing so. Had you purchased materials while in good standing prior to your suspension, reimbursement would have been approved. Because you have not purchased these items, were under suspension at the time of request, and have been dismissed from the program, you are no longer eligible for this benefit.

Palmetto Health's human resources practices would also not allow for similar requests by any employee who was suspended. For example, had you, or any employee, asked to attend and be reimbursed for an educational conference during suspension, that request would also have been denied.

I hope this information clarifies the issue for you.

Katherine G. Stephens, PhD, MBA, FACHE
Vice President, Medical Education and Research
ACGME Designated Institutional Official
Palmetto Health
Fifteen Medical Park, Suite 202
Five Richland Medical Park Drive
Columbia, SC 29203

803-434-6861 or 803-434-4476

katherine.stephens@palmettohealth.org

>>> Afraaz Irani <afraaz.irani@hotmail.com> 4/11/2012 10:09 AM >>>
Ms. Stephens,

I just got off the phone with Dr. Koon. He said to contact you for clarification about getting my books requested with my book money. Could you please provide some clarification pursuant to my email below?

Thank you,
Afraaz

From: Afraaz Irani [mailto:afraaz.irani@hotmail.com]
Sent: Thursday, April 05, 2012 9:23 AM
To: Carrie Jarrard
Cc: David Koon; John Walsh; Tonya Holmes; kathy.stephens@palmettohealth.org; margie.bodie@palmettohealth.org
Subject: book money

Mr. Jarrard,

Thank you for your reply. I am a little puzzled, and hoping you can provide a little guidance as to why my request for using my educational funds was denied.

I am currently employed by Palmetto Health Richland. On page 48 of the resident manual it describes the benefits due to an employed resident, listing "education materials [including] allowances for journals,

USC(Irani)0413

Re: FW: book money - Outlook Web Access Light                 https://uscmed.sc.edu/owa/?ae=PreFormAction&t=IPM.Note&a=Next...

books and/or software" as one the benefits due to a resident. This same portion of the handbook makes allowances for several other benefits including, but not limited to health and dental insurance. I went ahead and checked, and it appears none of my other benefits have been similarly rescinded. Under the guidelines in the handbook, it seems I am therefore entitled to the education materials that were allocated for me at the beginning of this year.

Moreover, it would seem rather odd that I, as an employed physician, may still exercise all the other benefits enumerated in the resident handbook, with the striking exception of this one item? I tried to search the resident handbook for such a provision, but was unable to find such a provision.

I have some time now and I would like to study. My livelihood and income have been stripped from me, and I would think during difficult times like these, some understanding and due process would be in order.

From reading the resident handbook, it appears that I should be entitled to the allocated education funds. If I am mistaken, please accept my sincere apologies and point me in the direction of the proper documentation so I may educate myself as to the policies. Otherwise, I have listed the books below that I would like to purchase during this time.


Thank you,

Afraaz Irani


Books:

Surgical Anatomy and Techniques to the Spine + Image bank CD-ROM

  ISBN-13: 9781416003137

                                                      ($274)


Tachdjian's Pediaric Orthopaedics, 4th Edition 3-Volume Set with DVD

  ISBN-13: 9781416022213

                                                      ($580)


Handbook of Fractures: 4th Edition

  ISBN-13: 9781605477602

                                                      ($72)


Total is $926.

After 20% discount: $740.80

Total after 7% sales tax: $792.66

USC(Irani)0414

Re: FW: book money - Outlook Web Access Light                    https://uscmed.sc.edu/owa/?ae=PreFormAction&t=IPM.Note&a=Next...

From: Carrie.Jarrard@uscmed.sc.edu
To: afraaz.irani@hotmail.com
CC: David.Koon@uscmed.sc.edu; John.Walsh@uscmed.sc.edu; Tonya.Holmes@uscmed.sc.edu
Date: Mon, 2 Apr 2012 08:25:30 -0400
Subject: RE: paycheck

Dr. Irani,


I apologize for any confusion, but I have been informed that at this time, you are suspended from use of educational funds.  If reinstated, you will again have access to these funds.  Sorry for the inconvenience and please let me know if you have any additional questions.


Carrie E. Jarrard, MBA

Business and Operations Manager

USC Dept. of Orthopaedic Surgery and Sports Medicine

(803) 434-7720 (office)

(864) 680-6718 (cell)

(803) 434-7306 (fax)


**From:** Afraaz Irani [mailto:afraaz.irani@hotmail.com]
**Sent:** Friday, March 30, 2012 1:22 PM
**To:** Carrie Jarrard
**Subject:** RE: paycheck


Hey Me. Jarrard,


Who is in charge of book money/book ordering? I spoke with the USC bookstore, since it's through the ortho department we get a 20% discount, they just need to be emailed  (weber4@mailbox.sc.edu) the titles.


I know we have $800 in book money. I wanted to purchase the following three books with my book money:


Surgical Anatomy and Techniques to the Spine + Image bank CD-ROM

 ISBN-13: 9781416003137

                                                                ($274)


Tachdjian's Pediaric Orthopaedics, 4th Edition 3-Volume Set with DVD

 ISBN-13: 9781416022213

                                                                ($580)

USC(Irani)0415

Re: FW: book money - Outlook Web Access Light                    https://uscmed.sc.edu/owa/?ae=PreFormAction&t=IPM.Note&a=Next...

Handbook of Fractures: 4th Edition
ISBN-13: 9781605477602

($72)

Total is $926.

After 20% discount: $740.80

Total after 7% sales tax: $792.66

Thank you for your help.

-Afraaz

----------------------------------------
This e-mail transmission, in its entirety and including all attachments, is intended solely for the use of the person or entity to whom it is addressed and may contain information, including health information, that is privileged, confidential, and the disclosure of which is governed by applicable law. If you are not the intended recipient, you are hereby notified that disclosing, distributing, copying or taking any action in relation to this e-mail is STRICTLY PROHIBITED. If you have received this e-mail in error, please notify the sender immediately and destroy the related message.

------------------------------------------------------------------------------
PALMETTO HEALTH CONFIDENTIALITY NOTICE
This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law.  If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited by law.  If you have received this communication in error, please notify me immediately.

Connected to Microsoft Exchange

4/25/2012 11:04 AM
USC(Irani)0416

RE: book money - Outlook Web Access Light          https://uscmed.sc.edu/owa/?ae=PreFormAction&t=IPM.Note&a=Next...



Office Outlook Web Access    | Type here to search | This Folder | 🔍  📖 Address Book | ⚙ Options | ◎ | Log Off

**Mail**                       ↩ Reply  ↩ Reply to All  ↪ Forward  ✗ Move  ✗ Delete  Junk  Close

**Calendar**

**Contacts**                   **RE: book money**
...........                    **Katherine Stephens [Kathy.Stephens@PalmettoHealth.org]**

Deleted Items                  **Sent:** Tuesday, April 10, 2012 1:33 PM
Drafts                         **To:**   Carrie Jarrard
Inbox (1)                      **Cc:**   Margie Bodie [Margie.Bodie@PalmettoHealth.org]; David Koon; John Walsh; Tonya Holmes
Junk E-Mail
Sent Items                     All,

Click to view all folders ⌄    In response to this request by Dr. Irani, I am neither approving nor disapproving his request. Decision will
                               be made after action by GMEC today. If suspension is rescinded, approval is appropriate. If not,
                               disapproval is appropriate.
AOA trip
Goodno                         Dr. Koon will need to contact him after today's GMEC action to let him know what is decided. Accordingly,
Irani                          the above information can be relayed to him at that point, or you can relay it earlier - whichever works
Kanwisher                      best for you.
Lamoreaux
Lindley                        Regards,
Massey
Residency                      Katherine G. Stephens, PhD, MBA, FACHE
Riis                           Vice President, Medical Education and Research
Sent Items                     ACGME Designated Institutional Official
                               Palmetto Health
Manage Folders...              Fifteen Medical Park, Suite 202
                               Five Richland Medical Park Drive
                               Columbia, SC 29203

                               803-434-6861 or 803-434-4476

                               katherine.stephens@palmettohealth.org

                               >>> Carrie Jarrard <Carrie.Jarrard@uscmed.sc.edu> 4/5/2012 9:53 AM >>>
                               I'm replying to you about the below email that we all received. I'm requesting your help in how to best
                               deal with this situation. I suppose I became his point of contact while acting as interim Residency
                               Coordinator. However, this not my area of expertise, nor do I really know much about his situation. I do
                               not mind acting in this capacity if need be, but I do ask for some assistance in how to respond to his
                               questions. I recognize this is a sticky situation and would like to handle it in the best way possible.

                               Thanks for your help.

                               Carrie E. Jarrard, MBA
                               Business and Operations Manager
                               USC Dept. of Orthopaedic Surgery and Sports Medicine
                               (803) 434-7720 (office)
                               (864) 680-6718 (cell)
                               (803) 434-7306 (fax)

                               **From:** Afraaz Irani [mailto:afraaz.irani@hotmail.com]
                               **Sent:** Thursday, April 05, 2012 9:23 AM
                               **To:** Carrie Jarrard
                               **Cc:** David Koon; John Walsh; Tonya Holmes; kathy.stephens@palmettohealth.org;
                               margie.bodie@palmettohealth.org
                               **Subject:** book money

                               Mr. Jarrard,

                               Thank you for your reply. I am a little puzzled, and hoping you can provide a little guidance as to
                               why my request for using my educational funds was denied.

                               I am currently employed by Palmetto Health Richland. On page 48 of the resident manual it
                               describes the benefits due to an employed resident, listing "education materials [including]
                               allowances for journals, books and/or software" as one the benefits due to a resident. This same
                               portion of the handbook makes allowances for several other benefits including, but not limited to

health and dental insurance. I went ahead and checked, and it appears none of my other benefits have been similarly rescinded. Under the guidelines in the handbook, it seems I am therefore entitled to the education materials that were allocated for me at the beginning of this year.

Moreover, it would seem rather odd that I, as an employed physician, may still exercise all the other benefits enumerated in the resident handbook, with the striking exception of this one item? I tried to search the resident handbook for such a provision, but was unable to find such a provision.

I have some time now and I would like to study. My livelihood and income have been stripped from me, and I would think during difficult times like these, some understanding and due process would be in order.

From reading the resident handbook, it appears that I should be entitled to the allocated education funds. If I am mistaken, please accept my sincere apologies and point me in the direction of the proper documentation so I may educate myself as to the policies. Otherwise, I have listed the books below that I would like to purchase during this time.

Thank you,
Afraaz Irani

Books:
Surgical Anatomy and Techniques to the Spine + Image bank CD-ROM
    ISBN-13: 9781416003137
                                                        ($274)

Tachdjian's Pediaric Orthopaedics, 4th Edition 3-Volume Set with DVD
    ISBN-13: 9781416022213
                                                        ($580)

Handbook of Fractures: 4th Edition
    ISBN-13: 9781605477602
                                                        ($72)


Total is $926.
After 20% discount: $740.80
Total after 7% sales tax: $792.66

---

From: Carrie.Jarrard@uscmed.sc.edu
To: afraaz.irani@hotmail.com
CC: David.Koon@uscmed.sc.edu; John.Walsh@uscmed.sc.edu; Tonya.Holmes@uscmed.sc.edu
Date: Mon, 2 Apr 2012 08:25:30 -0400
Subject: RE: paycheck

Dr. Irani,


I apologize for any confusion, but I have been informed that at this time, you are suspended from use of educational funds. If reinstated, you will again have access to these funds. Sorry for the inconvenience and please let me know if you have any additional questions.


Carrie E. Jarrard, MBA

Business and Operations Manager

USC(Irani)0418

: book money - Outlook Web Access Light                    https://uscmed.sc.edu/owa/?ae=PreFormAction&t=IPM.Note&a=Next...

USC Dept. of Orthopaedic Surgery and Sports Medicine

(803) 434-7720 (office)

(864) 680-6718 (cell)

(803) 434-7306 (fax)

**From:** Afraaz Irani [mailto:afraaz.irani@hotmail.com]
**Sent:** Friday, March 30, 2012 1:22 PM
**To:** Carrie Jarrard
**Subject:** RE: paycheck

Hey Me. Jarrard,

Who is in charge of book money/book ordering? I spoke with the USC bookstore, since it's through the ortho department we get a 20% discount, they just need to be emailed (weber4@mailbox.sc.edu) the titles.

I know we have $800 in book money. I wanted to purchase the following three books with my book money:

Surgical Anatomy and Techniques to the Spine + Image bank CD-ROM
  ISBN-13: 9781416003137
                                        ($274)

Tachdjian's Pediaric Orthopaedics, 4th Edition 3-Volume Set with DVD
  ISBN-13: 9781416022213
                                        ($580)

Handbook of Fractures: 4th Edition
  ISBN-13: 9781605477602
                                        ($72)

Total is $926.

After 20% discount: $740.80

Total after 7% sales tax: $792.66

Thank you for your help.

book money - Outlook Web Access Light                    https://uscmed.sc.edu/owa/?ae=PreFormAction&t=IPM.Note&a=Next...

-Afraaz

-----------------------------------------

This e-mail transmission, in its entirety and including all attachments, is intended solely for the use of the person or entity to whom it is addressed and may contain information, including health information, that is privileged, confidential, and the disclosure of which is governed by applicable law. If you are not the intended recipient, you are hereby notified that disclosing, distributing, copying or taking any action in relation to this e-mail is STRICTLY PROHIBITED. If you have received this e-mail in error, please notify the sender immediately and destroy the related message.

------------------------------------------------------------------------

PALMETTO HEALTH CONFIDENTIALITY NOTICE

This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law.  If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited by law.  If you have received this communication in error, please notify me immediately.

Connected to Microsoft Exchange

4/25/2012 11:03 AM
USC(Irani)0420

RE: 10 APR 12 GMEC action - Outlook Web Access Light          https://uscmed.sc.edu/owa/?ae=PreFormAction&t=IPM.Note&a=Next...

Office Outlook Web Access | Type here to search | This Folder | Address Book | Options | Log Off

**Mail**
**Calendar**
**Contacts**
.........
Deleted Items
Drafts
**Inbox** (1)
Junk E-Mail
Sent Items

Click to view all folders ⥥

AOA trip
Goodno
Irani
Kanwisher
Lamoreaux
Lindley
Massey
Residency
Riis
Sent Items

Manage Folders...

Reply | Reply to All | Forward | Move | Delete | Junk | Close

## RE: 10 APR 12 GMEC action

Afraaz Irani [afraaz.irani@hotmail.com]

**Sent:** Wednesday, April 11, 2012 9:40 AM
**To:**  David Koon
**Cc:**   Kathy Stephens [kathy.stephens@palmettohealth.org]

Dr. Koon,

Thanks for the update. I have contacted Lin Hearne. I got your voicemail and tried to call you back this AM.

I have not received an explanation about why the use of the book money was denied. Was there an explanation of these guidelines that you could direct me toward that I may review?

Thank you,
Afraaz

> From: David.Koon@uscmed.sc.edu
> To: Afraaz.irani@gmail.com; John.Walsh@uscmed.sc.edu; Frank.Voss@uscmed.sc.edu; Christopher.Mazoue@uscmed.sc.edu;
> Greg.Grabowski@uscmed.sc.edu; mcbrydea@aol.com; jhoov14@yahoo.com; jhwood23@gmail.com;
> Kathy.Stephens@PalmettoHealth.org; Margie.Bodie@PalmettoHealth.org; jagdr@aol.com; Lin.Hearne@PalmettoHealth.org;
> Tonya.Holmes@uscmed.sc.edu
> Date: Tue, 10 Apr 2012 17:54:18 -0400
> Subject: 10 APR 12 GMEC action
>
> Dr. Irani -
>
> The Palmetto Health Graduate Medical Education Committee met this afternoon and approved the recommendations of the
> faculty regarding your dismissal from the PH Orthopaedic Residency program. Per the Dismissal of Residents policy found in the
> PH Resident Manual, you are dismissed from the residency program effective immediately.
>
> Lin Hearne in the Palmetto Health Human Resources department will contact you soon for you to return to her all Palmetto
> Health and Department of Orthopaedic Surgery property, including but not limited to pagers, keys, badges, etc. She can also
> address any H.R. benefit questions that you may have.
>
> Per Dr. Stephens recommendations, your request for monies to acquire books is disapproved.
>
> You are reminded of your right to continue the appeals process in accordance with the Resident Grievance and Due Process
> Policy found in the PH Resident Manual.
> You are again reminded that your deadline to file a grievance to committee is close of business tomorrow (April 11th).
>
> Questions should be directed to Dr. Stephens in the GME office.
>
> David Koon
>
> --------------------------------------
>
> This e-mail transmission, in its entirety and including all attachments, is intended solely for the use of the person or entity to
> whom it is addressed and may contain information, including health information, that is privileged, confidential, and the disclosure
> of which is governed by applicable law. If you are not the intended recipient, you are hereby notified that disclosing, distributing,
> copying or taking any action in relation to this e-mail is STRICTLY PROHIBITED. If you have received this e-mail in error, please
> notify the sender immediately and destroy the related message.

Connected to Microsoft Exchange

4/25/2012 11:05 AM

USC(Irani)0421

Koon Affidavit Exhibit A



# ROTHSTEIN LAW FIRM, PA

*Certified Specialist in Employment and Labor Law*

David E. Rothstein
derothstein@mindspring.com
*Also licensed in North Carolina*

514 Pettigru Street
Greenville, SC 29601
Telephone: 864.232.5870
Facsimile: 864.241.1386

May 3, 2012

**VIA E-MAIL (katherine.stephens@palmettohealth.org)**
**AND U.S. MAIL**
Katherine G. Stephens, Ph.D., MBA, FACHE
Vice President, Medical Education and Research
ACGME Designated Institutional Official
Palmetto Health
Fifteen Medical Park, Suite 202
Five Richland Medical Park Drive
Columbia, SC 29203

Re:    Afraaz Irani, M.D.

Dear Dr. Stephens:

Dr. Afraaz Irani has hired my law firm to represent him in connection with his employment with, and recent termination from, the Orthopaedic Surgery Residency Program at Palmetto Health/USC School of Medicine. I understand that on Monday, April 30, 2012, Dr. Irani participated in a grievance committee hearing through the GMEC regarding his termination. Please take immediate steps to ensure that all recordings of the grievance hearing are preserved, along with any notes of the committee members or participants in the hearing. I anticipate that Dr. Irani's situation may end up in litigation, and the recording of the grievance hearing and any contemporaneous notes would likely contain crucial evidence regarding his case.

Dr. Irani has related to me numerous problems that he has had, primarily with Dr. David E. Koon, Jr., during his relatively brief stint as a PGY-2 orthopaedic surgery resident. Approximately six weeks into his first true year of orthopaedic training, Dr. Irani was called into a very hostile and intimidating meeting by Dr. Koon, with the practice manager as a witness, where Dr. Koon told him that they have previously fired residents from the program, including a fifth-year resident approximately six months from his expected graduation, specifically referring to Dr. Chad Lamoreaux, my former client. I am shocked that Dr. Koon would invoke Dr. Lamoreaux's name during a remediation meeting with a new resident, as Dr. Lamoreaux's case has undoubtedly become a part of the folklore among the residents at Palmetto Health, especially in the orthopaedic surgery program. Dr. Koon's reference to Dr. Lamoreaux's unfortunate situation immediately caused Dr. Irani to assume (and understandably so) that he was being targeted for termination as well, not for constructive remediation.

USC(Irani)0472

Dr. Stephens
May 3, 2012
Page 2

Dr. Koon's treatment of Dr. Irani has been, frankly, astounding and appears to be characterized by a pattern of humiliation and ridicule, rather than education and compassion. Dr. Koon repeatedly referred to Dr. Irani in front of others as "Achmed the Terrorist" and jokingly suggested that he might "blow the place up," in an offensive reference to Dr. Irani's mistakenly perceived middle eastern ethnicity. This outrageous behavior was particularly hurtful to Dr. Irani, because he is actually of Indian/Zoroastrian heritage, whose ancestors have historically been victims of religious persecution. Dr. Koon also repeatedly singled Dr. Irani out in group discussions and magnified every misstep that Dr. Irani made, while similar mistakes and behaviors by his colleagues have been overlooked or minimized.

Dr. Irani's career dream of becoming a respected orthopaedic surgeon is in serious jeopardy because of a clearly dysfunctional relationship with Dr. Koon, which has now unfairly tarnished his reputation among his colleagues and other attendings. Although Dr. Irani will be the first one to admit that he has made some honest mistakes during his residency, he is still very early in his medical training, where residents should be encouraged to learn from their expected mistakes rather than be forced to live in constant fear of approbation from their supposed mentors and educators.

I am writing in a good-faith effort to negotiate an amicable separation of Dr. Irani's relationship with the Palmetto Health/USC School of Medicine Orthopaedic Surgery Residency Program. Dr. Irani seeks to be restored to good standing with the program for the sole purpose of allowing him to transfer to another, mutually agreed upon residency program as a PGY-2 resident, where he can attempt to salvage his career goals. Dr. Irani remains hopeful that he can get his career back on track and make a fresh start with another program, without becoming embroiled in what would certainly be a costly, distracting, and damaging lawsuit.

Please contact me or have the hospital's employment counsel to call me about this matter as soon as possible. I am hopeful that an early mediation session might be beneficial to all parties involved. I look forward to hearing from you soon.

Sincerely yours,

David E. Rothstein

cc:    Charles Beaman, CEO Palmetto Health
       John Singerling, President, Palmetto Health Richland
       Richard A. Hoppmann, M.D., Dean, USC School of Medicine
       Kathy Dudley Helms, Esq.
       Shahin Vafai, Esq., Esq.

# Koon Affidavit Exhibit B

From: David Rothstein [mailto:derothstein@mindspring.com]
Sent: Friday, August 31, 2012 10:34 AM
To: kathy.helms@ogletreedeakins.com
Cc: Shahin Vafai
Subject: Afraaz Irani, M.D.

Dear Kathy and Shahin.  Dr. Irani has applied for an opening for a PGY-2 position in an
ophthalmology residency program, which I believe is in Boston.  I understand that this
prospective program will likely contact Dr. Koon or others from the Palmetto Health/USC
School of Medicine Orthopaedic Surgery program to get a reference for him or otherwise to
discuss his employment there.  I hope that your clients will recognize the benefit of
providing a response that will not hurt Dr. Irani's chances of getting that position.  I do
not yet know if Dr. Irani intends to pursue legal claims against PH/USC-SOM or any of the
individual doctors relating to his separation from the program; however he is attempting to
mitigate his damages and to salvage his career as a clinical physician.  I am sure that you
understand how difficult it is to move into a second residency program without having to
start all over again from scratch at the PGY-1 level.  I am sure you will advise your clients
about their potential liability for defamation, tortious interference, and retaliation if
they torpedo Dr. Irani's efforts to further his medical career.  If you have any questions or
would like to discuss this matter further, please do not hesitate to call me.  Dave.

David E. Rothstein
Certified Specialist in Employment and Labor Law (S.C.) (Also licensed in N.C.) Rothstein Law
Firm, PA
514 Pettigru Street
Greenville, SC  29601
(864) 232-5870
(864) 241-1386 (fax)
derothstein@mindspring.com<mailto:derothstein@mindspring.com>
www.rothsteinlawfirm.com<http://www.rothsteinlawfirm.com>

USC(Irani)0474

Koon Affidavit Exhibit C

From: Afraaz Irani [afraaz.irani@hotmail.com]
Sent: Tuesday, May 28, 2013 5:30 PM
To: David Koon
Subject: California Medical License

Dr. Koon,

I am applying for a medical license in California. The medical board asks that my program director fill out the attached two page form.

I know you are very busy and appreciate your help in advance.

The form has to be mailed directly from you to the California Medical Board (address at the bottom of the form).

Thank you,
Afraaz
Personal Information

<application_forms_I3a-I3b.pdf>

1

USC(Irani)0475

STATE AND CONSUMER SERVICES AGENCY- *Department of Consumer Affairs*                    EDMUND G. BROWN JR., *Governor*



**MEDICAL BOARD OF CALIFORNIA**
Licensing Program



## CERTIFICATE OF COMPLETION OF ACGME/RCPSC POSTGRADUATE TRAINING

To be completed by the facility for every medical school graduate completing postgraduate training in the United States or Canada.

Check one:  ☒ **U.S. or Canadian Medical School Graduate**          ☐ **International Medical School Graduate**

| Type or Print Legibly | APPLICANT INFORMATION | | MBC Use Only |
|---|---|---|---|
| NAME:     Last | First | Middle | |
| *I RANI* | *AFRAAZ* | *RUSTOM* | |
| **Date of Birth** (mm/dd/yyyy) | **U.S. Social Security Number** | **Medical School of Graduation** | Personal Data ☐ |
| Personal Information | Personal Information | *STANFORD UNIVERSITY SCHOOL OF MEDICINE* | |

| PROGRAM DIRECTOR TO COMPLETE ACGME OR RCPSC TRAINING INFORMATION | | |
|---|---|---|
| **ATTENTION PROGRAM DIRECTOR: Do not sign and date this form prior to the last day of any postgraduate training year which will be used by the applicant to qualify for licensure.** Completion of this form will certify that the applicant referenced above has satisfactorily completed a period of accredited postgraduate training at this facility and that the applicant has acquired the skill and qualifications necessary to safely assume the unrestricted practice of medicine in this state. *The completed form must be mailed directly from the program to the Board.* | | Training Information |

| | | |
|---|---|---|
| **Facility Name** | | ☐ |
| **Facility Address** | | ☐ |
| **Specialty** | ACGME 10-digit Program # <br> http://www.acgme.org/adspublic    _ _ _ _ _ _ _ _ _ _ | ☐    ☐ |
| **Dates of Training** (mm/dd/yyyy) | Start Date: <br> _ _ / _ _ / _ _ _ _ | End Date (or anticipated completion date): <br> _ _ / _ _ / _ _ _ _    ☐    ☐ |

| UNUSUAL CIRCUMSTANCES | | |
|---|---|---|
| 1. Did the applicant receive partial or no credit for any postgraduate training year? | ☐ Yes ☐ No | ☐ |
| 2. Did the applicant ever take a leave of absence or break from his/her training? | ☐ Yes ☐ No | ☐ |
| 3. Was the applicant ever terminated, dismissed or expelled? | ☐ Yes ☐ No | ☐ |
| 4. Did the applicant ever resign? | ☐ Yes ☐ No | ☐ |
| 5. Was the applicant ever placed on probation? | ☐ Yes ☐ No | ☐ |
| 6. Was the applicant ever disciplined or placed under investigation? | ☐ Yes ☐ No | ☐ |
| 7. Were any incident reports regarding this applicant ever filed by instructors? | ☐ Yes ☐ No | ☐ |
| 8. Were any limitations or special requirements placed upon the applicant for clinical performance, professionalism, medical knowledge, discipline, or for any other reason? | ☐ Yes ☐ No | ☐ |
| 9. Did the program decline to renew or offer the applicant postgraduate training program contract for a following year? | ☐ Yes ☐ No | ☐ |

*Program Director:* **Please provide a signed and dated letter of explanation for any "yes" response to questions # 1-9. The explanation must be provided on program letterhead and mailed directly to the Board with the Form L3A-L3B.**                    **L3A**

07A-100 (Rev. 10/2012)

2005 Evergreen Street, Suite 1200, Sacramento, CA  95815-3831 (916) 263-2382 (800) 633-2322 FAX: (916) 263-2487 www.mbc.ca.gov

USC(Irani)0476

| | MBC Use Only |
|---|---|

### GENERAL MEDICINE TRAINING REQUIREMENT

To qualify for licensure in California, applicants who are graduates of an international medical school must complete at least four months of postgraduate training in GENERAL MEDICINE as part of the requirement. Applicants who are graduates of a U.S. or Canadian medical school, who have not completed postgraduate training required for licensure by July 1, 1990, must also complete four months of training in GENERAL MEDICINE prior to licensure. The GENERAL MEDICINE requirement may be satisfied by actual clinical practice where the applicant had direct patient care responsibilities for at least four months in any particular specialty or sub-specialty area.

General Medicine

10. Did the applicant named on the L3A form complete a minimum of four months as part of this postgraduate training program accredited by the ACGME or the RCPSC?   ☐ Yes ☐ No

☐

### PROGRAM DIRECTOR OFFICIAL CERTIFICATION

**NOTE:** The completed Form L3A-L3B must be mailed directly from the program to the Board to be acceptable.

The program director signing this form is formally certifying and documenting under penalty of perjury that the applicant received instruction appropriate for the particular postgraduate level and that he/she satisfactorily completed periods of training in accordance with the accepted standards and the criteria defined as equating to satisfactory performance. The program director is attesting to the fact that the applicant has acquired the skill and qualifications necessary to safely assume the unrestricted practice of medicine in this state.

*I hereby declare under penalty of perjury under the laws of the State of California that all of the information contained on these forms is true and correct. I further certify that the training program is accredited by the ACGME or the RCPSC to offer the type and level of training completed by the applicant named on the Form L3A, and the applicant was trained in an ACGME or RCPSC slotted program position.*

Program Director's Signature & Date

PRINTED NAME OF PROGRAM DIRECTOR          Email Address

☐

SIGNATURE OF PROGRAM DIRECTOR          DATE          Phone Number
(Signature Stamp is Not Acceptable)

**ATTENTION PROGRAM DIRECTOR:** THE PERSON WHO SIGNS THIS FORM MAY NOT BE RELATED TO THE APPLICANT BY BLOOD, MARRIAGE, OR ADOPTION. Only the Program Director may sign this form. If that signature authority is being delegated to another person, evidence of that delegation must be attached to this form (may be a photocopy). Such delegation must be on official letterhead and must be dated within the last 12 months.

**NOTE:** If a hospital seal is not available, the program director shall also sign in the section below in the presence of a notary public.

Program Director's Signature

☐

SIGNATURE OF PROGRAM DIRECTOR: _____
(Please sign full name in presence of notary)

State of _____

County of _____

Subscribed and sworn to (or affirmed) before me on this _____ day of _____, 20_____,

by, _____ proved to me on the basis of satisfactory evidence
(Print program director's name)

to be the person who appeared before me.

| HOSPITAL or NOTARY SEAL |
|---|

Notary Signature & Seal

☐

Hospital Seal

☐

_____
SIGNATURE OF NOTARY PUBLIC

**L3B**

*NOTE: The completed form must be mailed directly from the program to the Board to be acceptable.*

USC(Irani)0477

Koon Affidavit Exhibit D



UNIVERSITY OF SOUTH CAROLINA
SCHOOL OF MEDICINE

UNIVERSITY SPECIALTY CLINICS®

04 JUN 13

Re: Dr Afraaz Irani

To Whom It May Concern:

Dr. Irani satisfactorily completed training from 01 July 2010 through 14 August 2011.

We will be happy to respond to any further requests if accompanied by a release from Dr. Irani.

David Koon, Jr., MD
Program Director
Palmetto Health / USC SoM Orthopaedic Residency Program

*DEPARTMENT OF ORTHOPAEDIC SURGERY*
**Two Medical Park, Suite 404, Columbia, SC 29203**
**803-434-6812, FAX 803-434-7306**

USC(Irani)0478

STATE AND CONSUMER SERVICES AGENCY- *Department of Consumer Affairs*                    EDMUND G. BROWN JR., *Governor*




# MEDICAL BOARD OF CALIFORNIA
## Licensing Program

## CERTIFICATE OF COMPLETION OF ACGME/RCPSC POSTGRADUATE TRAINING
To be completed by the facility for every medical school graduate completing postgraduate training in the United States or Canada.

Check one: ☑ U.S. or Canadian Medical School Graduate          ☐ International Medical School Graduate

| APPLICANT INFORMATION | | | MBC Use Only |
|---|---|---|---|
| **Type or Print Legibly** | | | |
| NAME:   Last *IRANI* | First *AFRAAZ* | Middle *R* | Personal Data ☐ |

| Date of Birth (mm/dd/yyyy) | U.S. Social Security Number | Medical School of Graduation |
|---|---|---|
| *Personal Information* | *Personal Information* | *STANFORD UNIVERSITY* |

### PROGRAM DIRECTOR TO COMPLETE ACGME OR RCPSC TRAINING INFORMATION

ATTENTION PROGRAM DIRECTOR:  <u>Do not sign and date this form prior to the last day of any postgraduate training year which will be used by the applicant to qualify for licensure.</u>  Completion of this form will certify that the applicant referenced above has satisfactorily completed a period of accredited postgraduate training at this facility and that the applicant has acquired the skill and qualifications necessary to safely assume the unrestricted practice of medicine in this state. *The completed form must be mailed directly from the program to the Board.*

| | | | | Training Information |
|---|---|---|---|---|
| Facility Name | PALMETTO HEALTH / UNIV OF SOUTH CAROLINA SCHOOL OF MEDICINE | | | ☐ |
| Facility Address | Z MED PARK STE 404 , COLUMBIA SC 29203 | | | ☐ |
| Specialty | ORTHOPAEDICS | ACGME 10-digit Program # http://www.acgme.org/adspublic | 2 6 0 4 5 3 2 2 6 3 | ☐ ☐ |
| Dates of Training (mm/dd/yyyy) | Start Date: 0 7 / 0 1 / 2 0 1 0 | End Date (or anticipated completion date): 0 4 / 1 0 / 2 0 1 2 | | ☐ ☐ |

### UNUSUAL CIRCUMSTANCES

| | | |
|---|---|---|
| 1. Did the applicant receive partial or no credit for any postgraduate training year? | ☑ Yes ☐ No | ☐ |
| 2. Did the applicant ever take a leave of absence or break from his/her training? | ☑ Yes ☐ No | ☐ |
| 3. Was the applicant ever terminated, dismissed or expelled? | ☑ Yes ☐ No | ☐ |
| 4. Did the applicant ever resign? | ☐ Yes ☑ No | ☐ |
| 5. Was the applicant ever placed on probation? N/A : *Program does not use "probation"* | ☐ Yes ☐ No | ☐ |
| 6. Was the applicant ever disciplined or placed under investigation? | ☑ Yes ☐ No | ☐ |
| 7. Were any incident reports regarding this applicant ever filed by instructors? | ☐ Yes ☑ No | ☐ |
| 8. Were any limitations or special requirements placed upon the applicant for clinical performance, professionalism, medical knowledge, discipline, or for any other reason? | ☑ Yes ☐ No | ☐ |
| 9. Did the program decline to renew or offer the applicant postgraduate training program contract for a following year?   N/A | ☐ Yes ☐ No | ☐ |

*Program Director*: Please provide a signed and dated letter of explanation for any "yes" response to questions # 1-9.  The explanation must be provided on program letterhead and mailed directly to the Board with the Form L3A-L3B.

**L3A**

07A-100 (Rev. 10/2012)

2005 Evergreen Street, Suite 1200, Sacramento, CA  95815-3831 (916) 263-2382 (800) 633-2322 FAX: (916) 263-2487 www.mbc.ca.gov

| GENERAL MEDICINE TRAINING REQUIREMENT | MBC Use Only |
|---|---|

To qualify for licensure in California, applicants who are graduates of an international medical school must complete **at least four months** of postgraduate training in GENERAL MEDICINE as part of the requirement. Applicants who are graduates of a U.S. or Canadian medical school, who have not completed postgraduate training required for licensure by July 1, 1990, must also complete **four months** of training in GENERAL MEDICINE prior to licensure. The GENERAL MEDICINE requirement may be satisfied by actual clinical practice where the applicant had direct patient care responsibilities for at least four months in any particular specialty or sub-specialty area.

| | |
|---|---|
| 10.  Did the applicant named on the L3A form complete a minimum of four months of general medicine as part of this postgraduate training program accredited by the ACGME or the RCPSC? | ☑Yes ☐ No |

General Medicine ☐

| PROGRAM DIRECTOR OFFICIAL CERTIFICATION | |
|---|---|

NOTE:  The completed Form L3A-L3B must be mailed directly from the program to the Board to be acceptable.

The program director signing this form is formally certifying and documenting under penalty of perjury that the applicant received instruction appropriate for the particular postgraduate level and that he/she satisfactorily completed periods of training in accordance with the accepted standards and the criteria defined as equating to satisfactory performance.  The program director is attesting to the fact that the applicant has acquired the skill and qualifications necessary to safely assume the unrestricted practice of medicine in this state.

*I hereby declare under penalty of perjury under the laws of the State of California that all of the information contained on these forms is true and correct.  I further certify that the training program is accredited by the ACGME or the RCPSC to offer the type and level of training completed by the applicant named on the Form L3A, and the applicant was trained in an ACGME or RCPSC slotted program position.*

DAVID  KOON, JR, MD

david.koon @ uscmed.sc.edu

PRINTED NAME OF PROGRAM DIRECTOR          Email Address

Program Director's Signature & Date ☐

03 Jun 13

(803) 434-6879

SIGNATURE OF PROGRAM DIRECTOR          DATE          Phone Number
(Signature Stamp Is Not Acceptable)

**ATTENTION PROGRAM DIRECTOR**: THE PERSON WHO SIGNS THIS FORM MAY NOT BE RELATED TO THE APPLICANT BY BLOOD, MARRIAGE, OR ADOPTION.  Only the Program Director may sign this form.  If that signature authority is being delegated to another person, evidence of that delegation must be attached to this form (may be a photocopy).  Such delegation must be on official letterhead and be dated within the last 12 months.

NOTE:  If a hospital seal is not available, the program director shall also sign in the section below in the presence of a notary public.

Program Director's Signature ☐

SIGNATURE OF PROGRAM DIRECTOR: _____ David C Koon Jr MD
(Please sign full name in presence of notary)

State of  South Carolina

County of  Richland

Subscribed and sworn to (or affirmed) before me on this  3rd  day of  June , 20 13 .

by,  David Koon Jr, MD  proved to me on the basis of satisfactory evidence
(Print program director's name)

to be the person who appeared before me.

Notary Signature & Seal ☐

HOSPITAL or NOTARY SEAL   10/26/14

Hospital Seal ☐

Kathryn Norris Young
SIGNATURE OF NOTARY PUBLIC

L3B

*NOTE:  The completed form must be mailed directly from the program to the Board to be acceptable.*

USC(Irani)0480

# Koon Affidavit Exhibit E

Afraaz Irani

Personal Information

Santa Clara, CA 95050

David E Koon, Jr, MD
Palmetto Health USC
Ste 404
Two Medical Park
Columbia, SC  29203

Dr. Koon,

I received an email from the California Medical Board advising me that forms L3A/B that you filled out previously had a few errors (please see next page).

I know you are busy, and I apologize that you have to fill the form out again. If you could look into the matter and mail it in, I would appreciate it.

Thank you for your time,
Afraaz

Personal Information

From: Maria.Acosta@mbc.ca.gov

To: afraaz.irani@hotmail.com
Subject: RE: Afraaz Irani, M.D.
Date: Tue, 11 Jun 2013 17:08:36 +0000

Hello:

I received the L3A/B document from Palmetto Health. It turns out they did not complete all the questions on the L3A form. They will need to complete both pages of the document pages L3A/B in its entirety to be accepted.

1.    They did not answer question #5, & 9. Which if they do not applied must still be answered in the negative if it did not affect you.
2.    Also the questions that they did answer positive were not explained on a letter on letterhead signed and dated by the current program director.
3.    The ACGME code which was entered is incorrect.
4.    The Board will need a new L3A/B completed in its entirety.

If the Board does not receive the above information as requested it will delay me from submitting your file a.s.a.p to QA for final review. Please make sure to stress to the program that all questions must be answered. We must have a letter (on letterhead) of explanation for any and all positive answers to the questions, signed and dated by the current program director.

Thank you,

*Maria H. Acosta*
*Management Service Technician*
*Medical Board of California*
*2005 Evergreen Street, Ste 1200*
*Sacramento, CA  95815*
*(916)263-2448   FAX (916)263-2944*

STATE AND CONSUMER SERVICES AGENCY- *Department of Consumer Affairs*                    EDMUND G. BROWN JR., *Governor*



## MEDICAL BOARD OF CALIFORNIA
### Licensing Program



## CERTIFICATE OF COMPLETION OF ACGME/RCPSC POSTGRADUATE TRAINING

To be completed by the facility for every medical school graduate completing postgraduate training in the United States or Canada.

Check one: ☒ U.S. or Canadian Medical School Graduate        ☐ International Medical School Graduate

| Type or Print Legibly: APPLICANT INFORMATION | | | MBC Use Only |
|---|---|---|---|
| NAME: Last | First | Middle | Personal Data ☐ |
| I R A N I | A F R A A Z | R U S T O M | |
| Date of Birth (mm/dd/yyyy) | U.S. Social Security Number | Medical School of Graduation | |
| Personal Information | Personal Information | STANFORD UNIVERSITY School Of Medicine | |

**PROGRAM DIRECTOR TO COMPLETE ACGME OR RCPSC TRAINING INFORMATION**

**ATTENTION PROGRAM DIRECTOR:** <u>Do not sign and date this form prior to the last day of any postgraduate training year which will be used by the applicant to qualify for licensure.</u> Completion of this form will certify that the applicant referenced above has satisfactorily completed a period of accredited postgraduate training at this facility and that the applicant has acquired the skill and qualifications necessary to safely assume the unrestricted practice of medicine in this state. *The completed form must be mailed directly from the program to the Board.*

| | | | Training Information |
|---|---|---|---|
| **Facility Name** | | | ☐ |
| **Facility Address** | | | ☐ |
| **Specialty** | | ACGME 10-digit Program # http://www.acgme.org/adspublic ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ | ☐  ☐ |
| **Dates of Training** (mm/dd/yyyy) | Start Date: ___ / ___ / ___ ___ ___ ___ | End Date (or anticipated completion date): ___ / ___ / ___ ___ ___ ___ | ☐  ☐ |

**UNUSUAL CIRCUMSTANCES**

| | | |
|---|---|---|
| 1. Did the applicant receive partial or no credit for any postgraduate training year? | ☐ Yes ☐ No | ☐ |
| 2. Did the applicant ever take a leave of absence or break from his/her training? | ☐ Yes ☐ No | ☐ |
| 3. Was the applicant ever terminated, dismissed or expelled? | ☐ Yes ☐ No | ☐ |
| 4. Did the applicant ever resign? | ☐ Yes ☐ No | ☐ |
| 5. Was the applicant ever placed on probation? | ☐ Yes ☐ No | ☐ |
| 6. Was the applicant ever disciplined or placed under investigation? | ☐ Yes ☐ No | ☐ |
| 7. Were any incident reports regarding this applicant ever filed by instructors? | ☐ Yes ☐ No | ☐ |
| 8. Were any limitations or special requirements placed upon the applicant for clinical performance, professionalism, medical knowledge, discipline, or for any other reason? | ☐ Yes ☐ No | ☐ |
| 9. Did the program decline to renew or offer the applicant postgraduate training program contract for a following year? | ☐ Yes ☐ No | ☐ |

*Program Director:* Please provide a signed and dated letter of explanation for any "yes" response to questions # 1-9. The explanation must be provided on program letterhead and mailed directly to the Board with the Form L3A-L3B.    **L3A**

07A-100 (Rev. 10/2012)
2005 Evergreen Street, Suite 1200, Sacramento, CA 95815-3831 (916) 263-2382 (800) 633-2322 FAX: (916) 263-2487 www.mbc.ca.gov

USC(Irani)0483

| | MBC Use Only |
|---|---|

## GENERAL MEDICINE TRAINING REQUIREMENT

To qualify for licensure in California, applicants who are graduates of an international medical school must complete at least four months of postgraduate training in GENERAL MEDICINE as part of the requirement. Applicants who are graduates of a U.S. or Canadian medical school, who have not completed four months of training in GENERAL MEDICINE prior to licensure. The GENERAL MEDICINE requirement may be satisfied by actual clinical practice where the applicant had direct patient care responsibilities for at least four months in any particular specialty or sub-specialty area.

General Medicine

| | |
|---|---|
| 10. Did the applicant named on the L3A form complete a minimum of four months of general medicine as part of this postgraduate training program accredited by the ACGME or the RCPSC? | ❑ Yes ❑ No |

❑

## PROGRAM DIRECTOR OFFICIAL CERTIFICATION

**NOTE:** The completed Form L3A-L3B must be mailed directly from the program to the Board to be acceptable.

The program director signing this form is formally certifying and documenting under penalty of perjury that the applicant received instruction appropriate for the particular postgraduate level and that he/she satisfactorily completed periods of training in accordance with the accepted standards and the criteria defined as equating to satisfactory performance. The program director is attesting to the fact that the applicant has acquired the skill and qualifications necessary to safely assume the unrestricted practice of medicine in this state.

*I hereby declare under penalty of perjury under the laws of the State of California that all of the information contained on these forms is true and correct. I further certify that the training program is accredited by the ACGME or the RCPSC for the type and level of training completed by the applicant named on the Form L3A, and the applicant was trained in an ACGME or RCPSC slotted program position.*

Program Director's Signature & Date

❑

| PRINTED NAME OF PROGRAM DIRECTOR | Email Address |
|---|---|

| SIGNATURE OF PROGRAM DIRECTOR          DATE | Phone Number |
|---|---|
| (Signature Stamp is Not Acceptable) | |

**ATTENTION PROGRAM DIRECTOR:** THE PERSON WHO SIGNS THIS FORM <u>MAY NOT</u> BE RELATED TO THE APPLICANT BY BLOOD, MARRIAGE, OR ADOPTION. Only the Program Director may sign this form. If that signature authority is being delegated to another person, evidence of that delegation must be attached to this form (may be a photocopy). Such delegation must be on official letterhead and must be dated within the last 12 months.

**NOTE:** If a hospital seal is not available, the program director shall also sign in the section below in the presence of a notary public.

Program Director's Signature

❑

SIGNATURE OF PROGRAM DIRECTOR: _____
(Please sign full name in presence of notary)

State of _____

County of _____

Subscribed and sworn to (or affirmed) before me on this _____ day of _____, 20_____,

by, _____ proved to me on the basis of satisfactory evidence
(Print program director's name)

to be the person who appeared before me.

Notary Signature & Seal

❑

| | HOSPITAL or NOTARY SEAL |
|---|---|

Hospital Seal

❑

_____
SIGNATURE OF NOTARY PUBLIC

**L3B**

**NOTE:** *The completed form must be mailed directly from the program to the Board to be acceptable.*

USC(Irani)0484

# Koon Affidavit Exhibit F



UNIVERSITY OF SOUTH CAROLINA
SCHOOL OF MEDICINE

UNIVERSITY SPECIALTY CLINICS®

17 JUN 13

Re: Dr. Afraaz Irani

To Whom It May Concern:

Dr. Irani satisfactorily completed his internship (PGY-1) from 01 JUL 10 – 30 JUN 11.

Dr. Irani underwent GMEC–directed academic remediation during his PGY2 year. He failed to complete the GMEC-directed remediation measures and was terminated from his position on 10 APR 11 (questions 3,6,8). He was not offered a renewal of his contract for the following year (question 9). Dr. Irani satisfactorily completed one month of his PGY-2 training from 01 JUL 11 – 10 APR 11 (question 1). During his PGY-2 year he was placed on Palmetto Health Level III academic remediation which included a leave of absence from his clinical duties (question 2).

David Koon, Jr., MD
Program Director
PH/USC SoM Orthopaedic Surgery Residency Program

*DEPARTMENT OF ORTHOPAEDIC SURGERY*
**Two Medical Park, Suite 404, Columbia, SC 29203**
**803-434-6812, FAX 803-434-7306**

STATE AND CONSUMER SERVICES AGENCY- *Department of Consumer Affairs*                    EDMUND G. BROWN JR., *Governor*




# MEDICAL BOARD OF CALIFORNIA
### Licensing Program

## CERTIFICATE OF COMPLETION OF ACGME/RCPSC POSTGRADUATE TRAINING

To be completed by the facility for every medical school graduate completing postgraduate training in the United States or Canada.

Check one: ☑ U.S. or Canadian Medical School Graduate        ☐ International Medical School Graduate

| Type or Print Legibly | APPLICANT INFORMATION | | MBC Use Only |
|---|---|---|---|
| NAME: Last *IRANI* | First *AFRAAZ* | Middle *RUSTOM* | Personal Data ☐ |
| Date of Birth (mm/dd/yyyy) Personal Information | U.S. Social Security Number Personal Information | Medical School of Graduation *STANDFORD UNIVERSITY* | |

**PROGRAM DIRECTOR TO COMPLETE ACGME OR RCPSC TRAINING INFORMATION**

ATTENTION PROGRAM DIRECTOR: Do not sign and date this form prior to the last day of any postgraduate training year which will be used by the applicant to qualify for licensure. Completion of this form will certify that the applicant referenced above has satisfactorily completed a period of accredited postgraduate training at this facility and that the applicant has acquired the skill and qualifications necessary to safely assume the unrestricted practice of medicine in this state. *The completed form must be mailed directly from the program to the Board.* | Training Information

| | | | | MBC |
|---|---|---|---|---|
| Facility Name | *PALMETTO HEALTH / USC School of Medicine* | | | ☐ |
| Facility Address | *2 MED PARK STE 404 COLUMBIA SC 29203* | | | ☐ |
| Specialty | *ORTHOPAEDICS* | ACGME 10-digit Program # http://www.acgme.org/adspublic *2 6 0 4 5 3 1 1 6 3* | | ☐ ☐ |
| Dates of Training (mm/dd/yyyy) | Start Date: *0 7 / 0 1 / 2 0 1 0* | End Date (or anticipated completion date): *0 4 / 1 0 / 2 0 1 2* | | ☐ ☐ |

**UNUSUAL CIRCUMSTANCES**

| | | MBC |
|---|---|---|
| 1. Did the applicant receive partial or no credit for any postgraduate training year? | ☑ Yes ☐ No | ☐ |
| 2. Did the applicant ever take a leave of absence or break from his/her training? | ☑ Yes ☐ No | ☐ |
| 3. Was the applicant ever terminated, dismissed or expelled? | ☑ Yes ☐ No | ☐ |
| 4. Did the applicant ever resign? | ☐ Yes ☑ No | ☐ |
| 5. Was the applicant ever placed on probation? | ☐ Yes ☑ No | ☐ |
| 6. Was the applicant ever disciplined or placed under investigation? | ☑ Yes ☐ No | ☐ |
| 7. Were any incident reports regarding this applicant ever filed by instructors? | ☐ Yes ☑ No | ☐ |
| 8. Were any limitations or special requirements placed upon the applicant for clinical performance, professionalism, medical knowledge, discipline, or for any other reason? | ☑ Yes ☐ No | ☐ |
| 9. Did the program decline to renew or offer the applicant postgraduate training program contract for a following year? | ☑ Yes ☐ No | ☐ |

*Program Director:* Please provide a signed and dated letter of explanation for any "yes" response to questions # 1-9. The explanation must be provided on program letterhead and mailed directly to the Board with the Form L3A-L3B.    **L3A**

07A-100 (Rev. 10/2012)

2005 Evergreen Street, Suite 1200, Sacramento, CA 95815-3831 (916) 263-2382 (800) 633-2322 FAX: (916) 263-2487 www.mbc.ca.gov

USC(Irani)0486

## GENERAL MEDICINE TRAINING REQUIREMENT

MBC Use Only

To qualify for licensure in California, applicants who are graduates of an international medical school must complete at **least four months** of postgraduate training in GENERAL MEDICINE as part of the requirement. Applicants who are graduates of a U.S. or Canadian medical school, who have not completed postgraduate training required for licensure by July 1, 1990, must also complete **four months** of training in GENERAL MEDICINE prior to licensure. The GENERAL MEDICINE clinical requirement may be satisfied by actual clinical practice where the applicant had direct patient care responsibilities for at least four months in any particular specialty or sub-specialty area.

General Medicine

10. Did the applicant named on the L3A form complete a minimum of four months of general medicine as part of this postgraduate training program accredited by the ACGME or the RCPSC?     ☑ Yes ☐ No

☐

## PROGRAM DIRECTOR OFFICIAL CERTIFICATION

**NOTE:** The completed Form L3A-L3B must be mailed directly from the program to the Board to be acceptable.

The program director signing this form is formally certifying and documenting under penalty of perjury that the applicant received instruction appropriate for the particular postgraduate level and that he/she satisfactorily completed periods of training in accordance with the accepted standards and the criteria defined as equating to satisfactory performance. The program director is attesting to the fact that the applicant has acquired the skill and qualifications necessary to safely assume the unrestricted practice of medicine in this state.

*I hereby declare under penalty of perjury under the laws of the State of California that all of the information contained on these forms is true and correct. I further certify that the training program is accredited by the ACGME or the RCPSC to offer the type and level of training completed by the applicant named on the Form L3A, and the applicant was trained in an ACGME or RCPSC slotted program position.*

DAVID Koon, MD
PRINTED NAME OF PROGRAM DIRECTOR

david.Koon@uscmed.sc.edu
Email Address

Program Director's Signature & Date

Koon MD          17 June 13
SIGNATURE OF PROGRAM DIRECTOR          DATE
(Signature Stamp Is Not Acceptable)

(803) 434-6879
Phone Number

☐

**ATTENTION PROGRAM DIRECTOR:** THE PERSON WHO SIGNS THIS FORM <u>MAY NOT</u> BE RELATED TO THE APPLICANT BY BLOOD, MARRIAGE, OR ADOPTION. Only the Program Director may sign this form. If that signature authority is being delegated to another person, evidence of that delegation must be attached to this form (may be a photocopy). Such delegation must be on official letterhead and must be dated within the last 12 months.

**NOTE:** If a hospital seal is not available, the program director shall also sign in the section below in the presence of a notary public.

Program Director's Signature

SIGNATURE OF PROGRAM DIRECTOR: _____

☐

(Please sign full name in presence of notary)

State of _____

County of _____

Subscribed and sworn to (or affirmed) before me on this _____ day of _____, 20_____,

by, _____ proved to me on the basis of satisfactory evidence

(Print program director's name)

Notary Signature & Seal

☐

to be the person who appeared before me.

HOSPITAL or NOTARY SEAL

Hospital Seal

☐

☐

_____
SIGNATURE OF NOTARY PUBLIC

**L3B**

*NOTE: The completed form must be mailed directly from the program to the Board to be acceptable.*

USC(Irani)0487