# Thomas Affidavit Exhibit S

| | |
|---|---|
| **From:** | Marsha Miller <mmiller@acgme.org> |
| **Sent:** | Friday, April 27, 2012 11:27 AM |
| **To:** | David Koon; 'katherine.stephens@palmettohealth.org' |
| **Cc:** | Pam Derstine; Pat Surdyk; Kevin Weiss; John Potts |
| **Subject:** | Complaint about the Orthopaedic Surgery Program at Palmetto Health/University of South Carolina School of Medicine |
| **Attachments:** | Palmeto Health U of South Carolina Ortho PD-DIO final LETTER.pdf |

Dear Drs. Koon and Stephens:

Afraaz Irani, MD, has submitted a complaint about lack of and unfair due process and grievance at Palmetto Health, and other allegations of noncompliance by its Orthopaedic Surgery program. Attached is my letter outlining the complaint, and I will send his supporting documentation under separate email so as not to overload everyone's mail box. Your response is due May 28, 2012, and I would appreciate acknowledgement of this email.

Sincerely,

Marsha Miller



**Marsha A. Miller, MA**
Associate Vice President, Office of Resident Services

ACGME
515 N. State Street, Suite 2000
Chicago, IL 60654
Office: 312-755-5041
mmiller@acgme.org

---------------------------------------
This e-mail transmission, in its entirety and including all attachments, is intended solely for the use of the person or entity to whom it is addressed and may contain information, including health information, that is privileged, confidential, and the disclosure of which is governed by applicable law. If you are not the intended recipient, you are hereby notified that disclosing, distributing, copying or taking any action in relation to this e-mail is STRICTLY PROHIBITED. If you have received this e-mail in error, please notify the sender immediately and destroy the related message.

USC(Irani)0511



April 27, 2012

**Accreditation Council for**
**Graduate Medical Education**

515 N. State Street
Suite 2000
Chicago, IL 60654

Phone  312.755.5000
Fax  312.755.7498
www.acgme.org

David E. Koon Jr, MD
Program Director
Palmetto Health/University of South Carolina School of Medicine
Palmetto Health Richland
Two Medical Park, Suite 404
Columbia, SC  29203

Katherine G. Stephens, PhD, MBA
Vice President, Medical Education and Research
Palmetto Health
P.O. Box 2266
Columbia, SC  29202-2266

Re: Program #2604532263 and #8004500419

Dear Drs. Koon and Stephens:

The ACGME has received a complaint from Afraaz Irani, MD, who will go
unnamed alleging that the Orthopaedic Surgery program at Palmetto
Health/University of South Carolina School of Medicine is in violation of
ACGME requirements.

Before ACGME responds to the complainant, it is important to know the
perspective of the program and institution.  Accordingly, please respond to the
allegations set forth below and include any documentation that would
demonstrate compliance with the requirements.

<u>Institutional Requirements</u>

*II.D.4.e) Grievance procedures and due process: The Sponsoring Institution
must provide residents with fair, reasonable, and readily available written
institutional policies and procedures for grievance and due process. These
policies and procedures must minimize conflict of interest by adjudicating
parties in addressing:*

*II.D.4.e).(1) Academic or other disciplinary actions taken against residents
that could result in dismissal, non-renewal of a resident's agreement, non-
promotion of a resident to the next level of training, or other actions that
could significantly threaten a resident's intended career development; and,*

*II.D.4.e).(2) Adjudication of resident complaints and grievances related
to the work environment or issues related to the program or faculty.*

USC(Irani)0512

Page 2

<u>Program Requirements for Resident Education in Orthopaedic Surgery</u>

*II.A.4.h) ensure compliance with grievance and due process procedures as set forth in the Institutional Requirements and implemented by the sponsoring institution;*

Dr. Irani alleges that he has been the subject of racial harassment, and singled out for disciplinary actions for minor infractions. He alleges that the program director has gone out of his way to discredit him in front of other faculty members, alleging improper care and inadequate medical knowledge despite clear evidence to the contrary. Dr. Irani alleges that the program director submitted false documents to the GMEC in order to demonstrate a pattern of unsatisfactory behavior. He alleges that he was placed on probation only six-weeks into his PGY-2 year based on several unsubstantiated allegations. Dr. Irani alleges that requests for clarification of these allegations have been denied.

Dr. Irani alleges that he was denied a fair hearing or due process. Dr. Irani alleges that multiple times he requested documentation of the allegations regarding poor patient care, but the program director and DIO refused to turn over the documents.

Dr. Irani alleges that program's culture does not allow one to complain or protest when violations or breach of trust are observed. He reports that after last year's ACGME resident survey revealed some resident dissatisfaction it became a witch hunt by the attendings to see who had written disparaging comments about the program.

Dr. Irani alleges that he was denied the chance to engage in the regularly assigned rotation at the Veterans Hospital in January, and this prevented him from receiving the same education as the other residents. He alleges, too, that it denied him the opportunity to get an unbiased evaluation of his performance by the Orthopaedic staff at the Veterans Hospital.

<u>Institutional Requirements</u>

*II.A.2. Resident selection*
*II.A.2.a) The Sponsoring Institution must ensure that its ACGME accredited programs select from among eligible applicants on the basis of residency program-related criteria such as their preparedness, ability, aptitude, academic credentials, communication skills, and personal qualities such as motivation and integrity. ACGME-accredited programs must not discriminate with regard to sex, race, age, religion, color, national origin, disability, or any other applicable legally protected status.*

USC(Irani)0513

Page 3

Dr. Irani alleges that the program has an unusually high attrition rate, and the program director is in the process of dismissing a third resident over the span of a four-year period.

Program Requirements for Resident Education in Orthopaedic Surgery

*VI.D. Supervision of Residents*
*VI.D.1. In the clinical learning environment, each patient must have an identifiable, appropriately-credentialed and privileged attending physician (or licensed independent practitioner as approved by each Review Committee) who is ultimately responsible for that patient's care.*

*VI.D.2. The program must demonstrate that the appropriate level of supervision is in place for all residents who care for patients. Supervision may be exercised through a variety of methods. Some activities require the physical presence of the supervising faculty member. For many aspects of patient care, the supervising physician may be a more advanced resident or fellow. Other portions of care provided by the resident can be adequately supervised by the immediate availability of the supervising faculty member or resident physician, either in the institution, or by means of telephonic and/or electronic modalities. In some circumstances, supervision may include post-hoc review of resident-delivered care with feedback as to the appropriateness of that care.*

*VI.D.3. Levels of Supervision*
*To ensure oversight of resident supervision and graded authority and responsibility, the program must use the following classification of supervision:*

*VI.D.3.a) Direct Supervision – the supervising physician is physically present with the resident and patient.*

*VI.D.3.b) Indirect Supervision:*

*VI.D.3.b).(1) with direct supervision immediately available – the supervising physician is physically within the hospital or other site of patient care, and is immediately available to provide Direct Supervision.*

*VI.D.3.b).(2) with direct supervision available – the supervising physician is not physically present within the hospital or other site of patient care, but is immediately available by means of telephonic and/or electronic modalities, and is available to provide Direct Supervision.*
Page 4

Page 4

*VI.D.3.c) Oversight – the supervising physician is available to provide review of procedures/encounters with feedback provided after care is delivered.*

Dr. Irani alleges that there are many examples regarding lack of supervision, but the weekly Monday afternoon clinic is the best example. He reports that this clinic handles usually 40 underinsured patients, and 7-8 of these patients are covered by Medicare/Medicaid. He alleges that the attending regularly shows up 1-2 hours after clinic starts, leaves early, and usually sees 1-2 patients per the entire clinic. He alleges that the attending is not routinely present and available for the patient's examination even though the attending will record in the chart that he saw the patient. Instead, the attending was in the operating room and falsely documented in the chart that he was present and available to the resident at the time of the examination. Dr. Irani notes that the documentation he provided to the ACGME is an example of patients being seen, treated, and discharged from clinic without resident supervision. He alleges only Dr. Voss regularly attends the clinic on time and sees the Medicare patients.

*II.A.4.j) implement policies and procedures consistent with the institutional and program requirements for resident duty hours and the working environment, including moonlighting, and, to that end, must:*

*II.A.4.j).(1) distribute these policies and procedures to the residents and faculty;*

*II.A.4.j).(2) monitor resident duty hours, according to sponsoring institutional policies, with a frequency sufficient to ensure compliance with ACGME requirements;*

*II.A.4.j).(3) adjust schedules as necessary to mitigate excessive service demands and/or fatigue; and,*

*VI.A.4.b) not be compromised by excessive reliance on residents to fulfill non-physician service obligations.*

*VI.G. Resident Duty Hours*
*VI.G.1. Maximum Hours of Work per Week*
*Duty hours must be limited to 80 hours per week, averaged over a four-week period, inclusive of all in-house call activities and all moonlighting.*

*VI.G.4.b) Duty periods of PGY-2 residents and above may be scheduled to a maximum of 24 hours of continuous duty in the hospital. Programs must*

USC(Irani)0515

Page 5

*encourage residents to use alertness management strategies in the context of patient care responsibilities. Strategic napping, especially after 16 hours of continuous duty and between the hours of 10:00 p.m. and 8:00 a.m., is strongly suggested.*

*VI.G.4.b).(1) It is essential for patient safety and resident education that effective transitions in care occur. Residents may be allowed to remain on-site in order to accomplish these tasks; however, this period of time must be no longer than an additional four hours.*

*VI.G.4.b).(2) Residents must not be assigned additional clinical responsibilities after 24 hours of continuous in-house duty.*

*VI.G.4.b).(3) In unusual circumstances, residents, on their own initiative, may remain beyond their scheduled period of duty to continue to provide care to a single patient. Justifications for such extensions of duty are limited to reasons of required continuity for a severely ill or unstable patient, academic importance of the events transpiring, or humanistic attention to the needs of a patient or family.*

*VI.G.4.b).(3).(a) Under those circumstances, the resident must:*
*VI.G.4.b).(3).(a).(i) appropriately hand over the care of all other patients to the team responsible for their continuing care; and,*

*VI.G.4.b).(3).(a).(ii) document the reasons for remaining to care for the patient in question and submit that documentation in every circumstance to the program director.*

*VI.G.4.b).(3).(b) The program director must review each submission of additional service, and track both individual resident and program-wide episodes of additional duty.*

*VI.G.5.b) Intermediate-level residents should have 10 hours free of duty, and must have eight hours between scheduled duty periods. They must have at least 14 hours free of duty after 24 hours of in-house duty. PGY-2 and PGY-3 residents are considered to be at the intermediate level.*

Dr. Irani provides 5.5 months of duty hour data from July to the second week of December 2011. He interprets the data to mean that for 41 days a post call resident was in the operating room. He alleges that the data show that there were 18/41 incidents or 44% violation rate of resident work hours where the post-call residents were in the operating room the next day. Allegedly, the rate of violations was similar for all junior residents ranging from 33% to 50% violation rate for each junior resident. Dr. Irani alleges that that these

USC(Irani)0516

Page 6

violations are not endemic to any particular resident, but the culture of the program. He reports that residents are repeatedly instructed to obey duty hours, but there is no method or support for compliance.

Dr. Irani alleges that contrary to policy residents are being used to solve the service needs of the institutions and not the educational needs of the residents.

Dr. Irani has given me permission to share with you the documents that he submitted to substantiate his complaint, and they are attached.

Please provide a response to the above allegations by May 28, 2012. Please send only one scanned copy of the response to the email address below (a paper copy is acceptable, but one electronic copy is encouraged).
The response must be reviewed and signed by the Designated Institutional Official.

Sincerely,

*Marsha A. Miller*

Marsha A. Miller, MA
Associate Vice President
Office of Resident Services
312-755-5041
mmiller@acgme.org

cc:     John R. Potts, III, MD, Senior Vice President, Surgical Accreditation
        Pamela Derstine, PhD, Executive Director, RC for Orthopaedic
        Surgery
        Kevin B. Weiss, MD, MPH, Senior Vice President, Institutional
        Accreditation
        Patricia Surdyk, PhD, Executive Director, Institutional Review
        Committee

USC(Irani)0517

**From:** Marsha Miller <mmiller@acgme.org>
**Sent:** Friday, April 27, 2012 12:12 PM
**To:** David Koon; katherine.stephens@palmettohealth.org
**Subject:** RE: Dr. Afraaz Irani'sComplaint attachments
**Attachments:** Palmeto Health U of South Carolina Ortho attachment 1.pdf; Palmeto Health U of South Carolina Ortho attachment 2.pdf

Sorry. Here they are.

---

**From:** David Koon [mailto:David.Koon@uscmed.sc.edu]
**Sent:** Friday, April 27, 2012 11:09 AM
**To:** Marsha Miller; katherine.stephens@palmettohealth.org
**Subject:** RE: Dr. Afraaz Irani'sComplaint attachments

No attachments on my email...

David Koon

---

**From:** Marsha Miller [mmiller@acgme.org]
**Sent:** Friday, April 27, 2012 11:30 AM
**To:** David Koon; katherine.stephens@palmettohealth.org
**Subject:** Dr. Afraaz Irani'sComplaint attachments

Dear Dr. Koon and Stephens,

Attached are the documents that Dr. Afraaz Irani submitted to substantiate his complaint alleging that the institution and Orthopaedic Surgery program are non-complaint with ACGME requirements. Please acknowledge receipt of this email.

Sincerely,

Marsha Miller

---



**Marsha A. Miller, MA**
Associate Vice President, Office of Resident Services

ACGME
515 N. State Street, Suite 2000
Chicago, IL 60654
Office: 312-755-5041
mmiller@acgme.org

---

-----------------------------------------

USC(Irani)0518

This e-mail transmission, in its entirety and including all attachments, is intended solely for the use of the person or entity to whom it is addressed and may contain information, including health information, that is privileged, confidential, and the disclosure of which is governed by applicable law. If you are not the intended recipient, you are hereby notified that disclosing, distributing, copying or taking any action in relation to this e-mail is STRICTLY PROHIBITED. If you have received this e-mail in error, please notify the sender immediately and destroy the related message.


----------------------------------------
This e-mail transmission, in its entirety and including all attachments, is intended solely for the use of the person or entity to whom it is addressed and may contain information, including health information, that is privileged, confidential, and the disclosure of which is governed by applicable law. If you are not the intended recipient, you are hereby notified that disclosing, distributing, copying or taking any action in relation to this e-mail is STRICTLY PROHIBITED. If you have received this e-mail in error, please notify the sender immediately and destroy the related message.

USC(Irani)0519

To whom it may concern:

I am a PGY-2 resident at the Palmetto Health Richland Orthopaedic Surgery Program in Columbia, South Carolina.

I am writing to you as I have become extremely concerned about the unethical behavior and harassment I have been subjected to from both my program director and the chairman of my department.

I have attempted to bring my concerns before the appropriate local committees, but have been disappointed by their unwillingness to listen to my grievances. I believe that I have been denied due process.

At this point, I feel that I have nowhere else to turn. I was encouraged to contact you by a physician who is sympathetic to my plight.

I have been the subject of racially based harassment by my program director and have been singled out for disciplinary actions for minor infractions.

This pattern of behavior has been evident throughout my PGY-2 year, when my program director -- who has repeatedly referred to me as "Achmed the terrorist" and makes constant insinuations about my cultural background – repeatedly submitted documents to the GMEC which are patently false, in order to attempt to demonstrate a pattern of unsatisfactory behavior on my part. He placed me on probation only six weeks into my PGY-2 residency, based on several unsubstantiated allegations. Requests for clarification of these allegations have been denied, and I have been unable to get any independent verification of his allegations.

My program director has gone out of his way to attempt to discredit me in front of other faculty members, alleging improper care despite clear evidence to the contrary (including from other faculty and residents).

He has further alleged deficiencies in my knowledge base, despite evidence to the contrary. In fact, my OITE score easily outpaced that of my fellow co-resident.

Needless to say, such constant harassment makes it nearly impossible for me to focus on my education and patient care.

My program director has continued to present false statements to the GMEC. For example, in one case he alleged improper care of a trauma patient. I was not involved in the patient's initial resuscitation, but was called to assist after the patient had been in the ED for over three hours. Many of the allegations did not involve me at all. My program director refused to ask for my side of the story, in complete violation of, and with complete disregard for, the hospital's policy. He turned over these factually incorrect complaints to the GMEC for my suspension. I was denied a fair hearing or due process.

USC(Irani)0520

More egregious were the multiple times I asked for documentation of the allegations of poor care, and they (and the DIO) refused to turn over these documents.

I have each time protested to the DIO, but to no avail. In fact, even my request for a hearing before the grievance council was denied.

Additionally, I was denied the chance to engage in our regularly assigned rotation at the VA beginning in January, and this prevented me from being educated on a rotation that all other residents are assigned. It also denied me the opportunity to get an unbiased evaluation of my performance by the Orthopaedic staff at the VA.

It is noteworthy that the program has an unusually high attrition rate: they are trying now to get rid of a third resident over the span of about four years, a fact they seem to be proud of (my program director emphasized this to me only six weeks into my residency).

In fact, a careful evaluation of the present practices will show that residents are being used to solve service needs of the institutions, not the educational needs of the residents – contrary to resident education policies.

The actions of my department recently culminated with them moving to have me terminated from the residency program at the upcoming April 10th GMEC meeting. I am very disappointed and concerned, since their behavior has been unethical, deceitful, and illegal.

I am not confident in the checks and balances at a hospital where the department chairman and program director can regularly violate hospital policy, and where my chairman assures me of the outcome of a GMEC committee meeting before any proceedings have even occurred.

I implore you to help me in this situation. Please help me get due process, and investigate this pattern of targeted resident behavior. I have worked hard and sacrificed much to become an orthopedic surgeon, and I feel that those entrusted with my education have reneged on their commitment.

Sincerely,

Afraaz Irani, M.D.

**Marsha Miller**

| | |
|---|---|
| **From:** | Afraaz Irani <afraaz.irani@hotmail.com> |
| **Sent:** | Friday, April 13, 2012 1:47 PM |
| **To:** | Marsha Miller; Amy Dunlap |
| **Cc:** | Pam Derstine; Susan Mansker |
| **Subject:** | RE: Palmetto Health Richland Orthopaedic Surgery |

Ms. Miller,

Thank you for getting back to me so promptly. Whatever you need to properly carry out your work (including sharing documents) is fine with me.

Thank you so much for your help.
Afraaz

From: mmiller@acgme.org
To: afraaz.irani@hotmail.com; adunlap@acgme.org
CC: pderstine@acgme.org; smansker@acgme.org
Date: Fri, 13 Apr 2012 12:32:47 -0500
Subject: RE: Palmetto Health Richland Orthopaedic Surgery

Dear Dr. Irani,

My mistake. Amy pointed out that you have already signed the letter. May I send the documents that you attached to the program/institution?

Marsha Miller

**From:** Afraaz Irani [mailto:afraaz.irani@hotmail.com]
**Sent:** Friday, April 13, 2012 12:24 PM
**To:** Marsha Miller; Amy Dunlap
**Cc:** Pam Derstine; Susan Mansker
**Subject:** RE: Palmetto Health Richland Orthopaedic Surgery

To Whom It May Concern:

I recently submitted a formal complaint regarding ACGME violations at my home program (Palmetto Health Orthopaedic Surgery in Columbia, SC).

I wanted to provide supporting documentation regarding duty hours violations, and lack of resident supervision.

*Duty Hours Violations:* I looked at 5.5 months worth of data from July to the second week of December 2011. The only method to reliably evaluate duty hours compliance is by checking operative room documentation since here one's presence or absence is readily documented.

Accordingly, over this 5 ½ month period, there were 41 days when a post call resident's service was in the operating room (i.e. if there was a resident violation there would be a record).

Using this limited data set available, there were 18/41 incidents or a startling *44% violation rate of resident work hours* where the post-call resident was in the operating room the next day. Moreover, the rate of violations was similar across all junior residents ranging form 33% to 50% violation rate for each junior resident. Clearly these violations are not

USC(Irani)0522

endemic to a particular resident, but more the culture of the program, where we are repeatedly instructed "to obey duty hours," but there is no method or support for this stated goal.

This limited data, while demonstrating an alarmingly high rate of duty hours violations – may actually underestimate the actual rate of violations

*Lack of Resident Supervision:* There are many examples of this. The simplest example of this is our weekly Monday afternoon clinic. This clinic is usually made up of about 40 underinsured patients. Usually about 7-8 of these patients have Medicare/Medicaid. The attending regularly shows up 1-2 hours after clinic starts, leaves early, and usually sees about 1-2 patients per the entire clinic. The patients are not seen by the attending in violation of Medicare/Medicaid law. Furthermore, this behaviour violates the hospital's stated guidelines that all clinics must have an attending present. Only *one* of our attendings (Dr. Voss) regularly shows up to clinic on time and sees medicare patients.

The attending will routinely write that he was present and available for the exam, when this is not true. In fact the enclosed document is one such example where patients were seen, treated, and discharged from clinic without resident supervision -- the attending was in the operating room at that time, and falsely documented in the chart that he was present and available to the resident at the time of the exam.

The culture at this program is to fall in line and not complain or protest even when violations, or breach of trust are observed. After last year's resident survey revealed some resident dissatisfaction, the residents commented on how it became a witch hunt by the attendings to see who had written disparaging comments about the program.

Those that don't fall inline (like myself), it seems, are profiled and unfairly targeted.

These documents give only a small glimpse at the alarming lack of adherence to, and disregard for, ACGME and resident guidelines.

This behaviour demonstrates clear violations of resident supervision policies of the RRC.

I know of similar failures of supervision of resident incidents at the VA. The chief or the Orthopaedic service at the VA has agreed to provide such documentation if requested.

Thank you,

Afraaz Irani M.D.

---

From: afraaz.irani@hotmail.com
To: mmiller@acgme.org; adunlap@acgme.org
CC: pderstine@acgme.org; smansker@acgme.org
Subject: Palmetto Health Richland Orthopaedic Surgery
Date: Mon, 9 Apr 2012 14:54:14 -0400

Hello,

Attached please find my signed formal complaint regarding the practices of the Palmetto Health Orthopaedics Department.

I will be providing further documentation as necessary.

Thank you,
Afraaz Irani
650-353-8523

---

USC(Irani)0523

| From: | Marsha Miller <mmiller@acgme.org> |
|---|---|
| Sent: | Friday, May 04, 2012 4:47 PM |
| To: | katherine.stephens@palmettohealth.org; David Koon |
| Subject: | Afraaz Irani's Complaint about the Orthopaedic Surgery Program and the Institution |
| Attachments: | Palmetto Health U of South Carolina Ortho attachment 1 revised.pdf; Palmetto Health U of South Carolina Ortho attachment 2 revised.pdf |

Dear Drs. Koon and Stephens,

Dr. Irani has submitted a revised, more complete document to support his complaint. It is attached for your consideration as you prepare your response to the allegations in my letter of April 27, 2012.

Sincerely,


Marsha Miller

---

**Marsha A. Miller, MA**
Associate Vice President, Office of Resident Services



ACGME
515 N. State Street, Suite 2000
Chicago, IL 60654
Office: 312-755-5041
mmiller@acgme.org

---

----------------------------------------
This e-mail transmission, in its entirety and including all attachments, is intended solely for the use of the person or entity to whom it is addressed and may contain information, including health information, that is privileged, confidential, and the disclosure of which is governed by applicable law. If you are not the intended recipient, you are hereby notified that disclosing, distributing, copying or taking any action in relation to this e-mail is STRICTLY PROHIBITED. If you have received this e-mail in error, please notify the sender immediately and destroy the related message.

USC(Irani)0584

1  To whom it may concern:
2
3  I am a PGY-2 resident at the Palmetto Health Richland/University of South Carolina School of
4  Medicine Orthopaedic Surgery Program in Columbia, South Carolina.
5
6  I am writing to you as I have become extremely concerned about the unethical behavior and
7  harassment I have been subjected to from both my program director and the chairman of my
8  department.
9
10  I have attempted to bring my concerns before the appropriate local committees, but have been
11  disappointed by their unwillingness to listen to my grievances. I believe that I have been denied
12  due process.
13
14  At this point, I feel that I have nowhere else to turn. I was encouraged to contact you by a
15  physician who is sympathetic to my plight.
16
17  I have been the subject of racially based harassment by my program director and have been
18  singled out for disciplinary actions for minor infractions.
19
20  This pattern of behavior has been evident throughout my PGY-2 year, when my program director
21  -- who has repeatedly referred to me as "Achmed the terrorist" and makes constant insinuations
22  about my cultural background – repeatedly submitted documents to the GMEC which are
23  patently false, in order to attempt to demonstrate a pattern of unsatisfactory behavior on my part.
24  He placed me on probation only six weeks into my PGY-2 residency, based on several
25  unsubstantiated allegations. Requests for clarification of these allegations have been denied, and
26  I have been unable to get any independent verification of his allegations.
27
28  My program director has gone out of his way to attempt to discredit me in front of other faculty
29  members, alleging improper care despite clear evidence to the contrary (including from other
30  faculty and residents).
31
32  He has further alleged deficiencies in my knowledge base, despite evidence to the contrary. In
33  fact, my OITE score easily outpaced that of my fellow co-resident.
34
35  Needless to say, such constant harassment makes it nearly impossible for me to focus on my
36  education and patient care.
37
38  My program director has continued to present false statements to the GMEC.  For example, in
39  one case he alleged improper care of a trauma patient. I was not involved in the patient's initial
40  resuscitation, but was called to assist after the patient had been in the ED for over three hours.
41  Many of the allegations did not involve me at all. My program director refused to ask for my side
42  of the story, in complete violation of, and with complete disregard for, the hospital's policy. He
43  turned over these factually incorrect complaints to the GMEC for my suspension.  I was denied a
44  fair hearing or due process.
45

1

USC(Irani)0585

More egregious were the multiple times I asked for documentation of the allegations of poor care, and they (and the DIO) refused to turn over these documents.

I have each time protested to the DIO, but to no avail. In fact, even my request for a hearing before the grievance council was denied.

Additionally, I was denied the chance to engage in our regularly assigned rotation at the VA beginning in January, and this prevented me from being educated on a rotation that all other residents are assigned. It also denied me the opportunity to get an unbiased evaluation of my performance by the Orthopaedic staff at the VA.

It is noteworthy that the program has an unusually high attrition rate: they are trying now to get rid of a third resident over the span of about four years, a fact they seem to be proud of (my program director emphasized this to me only six weeks into my residency).

In fact, a careful evaluation of the present practices will show that residents are being used to solve service needs of the institutions, not the educational needs of the residents – contrary to resident education policies.

The actions of my department recently culminated with them moving to have me terminated from the residency program on March 5th 2012. I am very disappointed and concerned, since their behavior has been unethical, deceitful, and illegal.

I am not confident in the checks and balances at a hospital where the department chairman and program director can regularly violate hospital policy, and where my chairman assures me of the outcome of a GMEC committee meeting before any proceedings have even occurred.

I implore you to help me in this situation. Please help me get due process, and investigate this pattern of targeted resident behavior. I have worked hard and sacrificed much to become an orthopedic surgeon, and I feel that those entrusted with my education have reneged on their commitment.

Sincerely,

Afraaz Irani, M.D.

2

USC(Irani)0586

I started my PGY-2 year with high hopes and expectations, excited that I was finally an orthopaedic resident. However, my experience soon began to take a turn for the worse.

I love orthopaedics and was eager to partake in my education; I read traditional as well as the non-traditional orthopaedic texts. I came across an interesting article which said that many doctors were not telling their patients they were obese or overweight, and those that did so had better patient outcomes. This was a recurring and very frequent problem in our uninsured population where the residents provide primary patient care (aka "staff clinic"). Indeed the new VA guidelines (VISN 10) preclude joint replacement on anyone with a BMI over 35.

Accordingly, I thought this might an interesting article to read for journal club. I talked to the chief residents, and they told me to email Dr. Koon about the article. I emailed Dr. Koon. The email I got back was short: "not sure why you are reading the Archives of Internal Medicine... let me know if you are not satisfied with the articles selected for our journal clubs." (Email can be seen in Exhibit A). The following Monday, the belittling continued. In front of me, Dr. Koon mockingly asked the chief resident "so I guess we have to run all our journal club articles by Dr. Irani now to see if they are OK?" I was not sure why I was being chastised for partaking in my education, and while I was shocked at the time (only about 3-4 weeks into my PGY-2 year), I would later gain perspective to see that this was nothing compared to what would follow.

Episodes like this continued. In front of the other residents, a few weeks later, I made a comment to my chief resident which was well received by him. Dr. Koon immediately interjected, stating that I was in no position to ever correct a senior resident, even if I was correct. Such demeaning comments continued to escalate, including confronting me over my "audacity to question my senior resident's decision making," when I asked if a fracture pattern could be treated non-operatively. The comments began to cross the line into racially based taunts, such as calling me "Achmed the terrorist," and incorrectly associating my Indian background with terrorism.

I did not appreciate this, but I quickly realized -- as I had been instructed by senior residents regarding conflicts with an attending -- that responding only made things worse.

As my chief resident told me, at this program: "Grin and bear it;" opening your mouth will only get you in trouble. "This is a military program," I was told, with military trained doctors -- they are not interested in hearing from us. My chief resident jokingly said my colleague Dr. Goodno, would die from a heart attack, and I would die "because Dr. Koon will kill you." That was an ominous premonition by my chief resident at the beginning of my PGY -2 year.

Although, I was trying to learn, it was increasingly obvious this was an environment where learning was secondary.

I was stunned and dismayed when only six weeks into my residency, Dr. Koon called me into his office to place me on Level II remediation (see exhibit for guidelines). Additionally,

3

he brought in Mr. Jarrard, a business partner, as a witness. He said he was placing me on Level II remediation and went on to boast that he had fired Dr. Chad Lamoreaux (a previous resident) a few years ago, just a few months before he was about to graduate as a PGY-5. I was confused why he brought that up in our initial meeting. The tone of the meeting remained ominous. Immediately, I was led to believe the purpose of this meeting was to set the framework for firing me. In retrospect my initial feelings were correct.

Dr. Koon handed me a letter with seven alleged deficiencies and rather than going over them, he asked me to respond to them. Many of these were completely new to me, and I went through all of them trying to reconcile what my interpretation of these events was with what was written. I asked Dr. Koon to elaborate on many of these – notably the statement that I created more work for other residents and another one stating I lacked attention to detail, as I admittedly did not understand a majority of these complaints. These were new and troubling allegations to me.

I asked Dr. Koon to help me understand my alleged deficiencies. His response was "this just shows you lack insight," and he refused to expound more. I was puzzled. How could I improve if I could not understand my deficiencies? Again, I was left to conclude that the true motive here was to set the groundwork for termination.

However, orthopaedics was all I wanted to do, and therefore I did my best to understand these deficiencies and move forward.

I took these allegations seriously, and did everything I could to try and understand and correct the alleged deficiencies. Having no guidance from my program director, I reached out to my fellow residents. One statement in the remediation letter stated I created extra work for other residents. I contacted each of my resident peers individually and spoke to them privately. They all individually denied this and went so far as to say that I often went above and beyond what was required.

What was more puzzling about this allegation was the fact that like all my fellow residents, and as I pointed out in my response letter Aug. 24th to Drs. Koon, Walsh, and Stephens, "I always complete the work that's been assigned to me, *often staying beyond recommended work hours*." It was no secret that we often violated duty hours, while I regularly went over the 80hr/week mandate. When talking to my fellow residents, the response was always "make it work." Indeed, that summed up the culture of the program, and by challenging it and bringing violations to the forefront in my letter, this did not do much to ingratiate myself with Dr. Koon and my superiors. Dr. Koon regularly insisted that we all stay within duty hours, but there was no framework for doing so.

Indeed, in February 2012, during my return from a suspension, Dr. Koon insisted that I make up call time and not violate duty hours, something that remained impossible, as given the schedule, I was averaging over 80hours/week. Had I completed my month (he terminated me at the end of the month), I would have violated duty hours again. My attempt to bring these violations to the attention of my fellow residents/program director were ignored.

4

I additionally tried to research the allegation that I needed to improve on attention to detail. Again, I received no explanation from my program director, so I tried my best to understand how I could change. I spoke with numerous people to get their input. I even began asking ancillary staff for help understanding any alleged deficiencies. The OR staff told me that Dr. Walsh complained that I lacked attention to detail when I left a book for him in the OR. He had loaned me a book the previous day and told me to make absolutely sure it got back to him. For that reason, I brought it with me the next day with a stack of papers and placed it near Dr. Walsh's usual papers he brings to the OR so he could grab it after the case. As I was also holding the on-call pager that day, I was called away during the case.

I left the book for him in the OR, hoping to return to finish the case. When I returned later, I unfortunately missed the case because of my duties in the emergency department. I asked about the book, and Dr. Walsh had not taken it. He assumed I had forgotten it, when in fact, I had brought it to the OR because that was the only place I would see Dr. Walsh and he had stressed he wanted the book back.

This was what, to the best of my ability, I surmised Dr. Koon was referring to. I tried to dissect what had gone wrong and learn on my own how I could improve. In this case, I surmised, improved communication would have prevented this misunderstanding, and I took that as a learning point. This was my best guess as how I could be a better resident since the feedback, communication, and guidance required from my program director were missing.

I went out of my way asking residents, ancillary, and support staff for help with my remediation goals. I took these allegations seriously and did everything to try and improve in the eyes of my superiors.

The full letter placing me on remediation and my rebuttal can be seen in exhibits B & C.

Dr. Koon's letter alleged other problems: First, he alleged improper care of a VA patient. I was told by the VA ER staff that a post-op total knee patient was being admitted by medicine for cellulites not near the incision site, and the attending told me this was a "heads up" and not an official consult. I communicated directly with the medicine attending (at about 12 AM). At that time I was seeing patients in Emergency Department of Richland Memorial Hospital. I offered to see the patient at the VA. The attending told there were no acute orthopaedic issues, and that the knee appeared benign, and told me to see the patient in the AM, or when I was done at Richland (the VA is about 20 minutes away from Richland Memorial Hospital – our level I trauma center). I worked on the patients at Richland. I did not have a break to either rest or go to the VA. The following AM, the patient was seen by the VA team. His wound was benign, and he was  discharged.

I was chastised for inappropriate care with regard to this patient. In retrospect, I learned that even though the medicine attending told me there was no acute issue, I should have somehow found time and left Richland to see that patient at the VA. At that time I was very

5

early in my training and importantly without any senior resident supervision or senior resident on call with me. I learned from that incident. In this case, the attending had said it was not an acute issue; my chief resident had previously instructed me that non-acute VA consults can wait until the AM if I am busy with Richland patients. Irregardless, I should have found a way to head over to the VA. However, I believe Dr. Koon mischaracterized the case by simply stating I did not "evaluate a VA total joint patient with immediate post-operative cellulites."

I readily admit that I make mistakes like all my fellow residents – however my mistakes have been readily misconstrued and vilified. Rather than creating an environment where I can talk about my mistakes and learn from them, they were only used to castigate me. It is no wonder that I became defensive from there on out, since mistakes were not opportunities for constructive feedback or guidance, but instead were used to humiliate and embarrass me.

Additionally, I was chastised for closing a wound with vicryl. While this was inappropriate care (and I'm still upset that I grabbed the wrong suture), it is important to note that I was still early in my training, without senior resident supervision, and my care plan went through the appropriate checks and balances. I reviewed my care plan with the attending and he told me to revise the closure with different sutures, which I did within a few hours of the initial treatment. It is especially noteworthy, that I am not the only resident who has made this mistake, but I was the only resident who was disciplined for this technique. As one of my fellow residents himself volunteered, "We all make mistakes, but for some reason, you get singled out."

Dr. Koon's letter also alleged that I gave inappropriate pain meds and did not show compassion for a trauma patient with a left hand degloving injury. I pointed out that I did not actually do a reduction on this patient, that it was handled by my attending (Dr. Iaquinto), so I did not cause the patient excruciating pain as was alleged. Furthermore, after I saw the patient in the trauma bay, the next time I saw him was about a couple days later on the orthopaedic floor. He shook my hand, and I asked him if he remember me. He smiled and said he remembered me from the ED when he first came in. He thanked me and personally said how happy he was with my care.

I think the ultimate judge of compassionate care should come from the patient. The patient remembered me and was pleased with his care (although he was saddened by his injury). I did however take away that I can improve on demonstrating appropriate care, I think the events were grossly overstated at best, and at worst frankly false.

Dr. Koon gave me his personal word that these events would be kept private between Dr. Koon, Dr. Walsh, and myself. Needless to say this was not true. I was very disappointed and taken aback when my chief resident began asking me if my decisions were wise given that I "was on probation." The faculty and my fellow residents somehow all came to know about my alleged "inadequacies" without me saying a word. Cleary Dr. Koon's personal promise of confidentiality was empty. It seems that the goal here was to publicly humiliate, rather than support me.

6

USC(Irani)0590

Despite these allegations not being explained or substantiated, that did not stop them from presenting these statements to the GMEC for them to base their vote on and I was placed on Level II remediation.

This experience was disenchanting, confusing, and disappointing. It was especially disappointing to be placed on probation only six weeks into residency. What made it more frustrating was I could not get any guidance, feedback or direction from my program director. It became clear that I had to become extremely defensive if I was to have a shot at surviving.

Despite all this, I re-evaluated where I was in my training and my ultimate goal of becoming an orthopaedic surgeon. I recognize I am not perfect, and like all residents I had made my share of mistakes, but I felt like I was not given much guidance, and I went out of my way to figure out how I could improve. I racked my brain to figure out why I was being treated like this. In retrospect there was a troubling pattern of behavior from my residency director that I had tried to laugh off but which would become more and more of a problem. Dr. Koon continued an escalating trend of derogatorily making terrorist comments about me, going so far as to label me "Achmed the terrorist." While I found these comments terribly insulting, terribly unprofessional, and terribly insensitive, I quickly realized, as I had been instructed by senior residents regarding conflict with an attending, that responding only made things worse.

I decided to try to extract as many learning points as possible from this experience. I decided I needed to improve on communication. I decided to accept the probation and move on. I was still excited to come to work every day and realized that the best thing I could do to achieve my goal of becoming an orthopaedic surgeon was continue to work hard and improve in the eyes of my attendings.

In follow up meetings, I verbalized my stated goal to accept what happened and move on, working on the deficiencies that my attendings perceived as impeding my goal of becoming an accomplished orthopaedic surgeon.

During my Sept 19th & Oct. 11th progress meetings, I was asked how I was doing; I stated I thought I was improving, and I was given no feedback to the contrary. Things seemed to be improving – or so I was led to believe. It was stressed that I need to improve communication and so I made attempts to over-communicate. Indeed I was asked to prepare a grand rounds presentation on effective communication, where the point was made that "you cannot over-communicate."

Additionally, I quickly learned that going through the grievance process, while having the façade of giving residents a chance to have their voice heard, was not well received by the department; my chairman told me something very similar to: "I'm not going to tell you what to do, but I'm a busy orthopaedic surgeon, you're a busy orthopaedic surgeon -- when I have to sit here and answer questions about all this, it just gets in the way when I could be doing other things." The muted, but clear message was again for me to "grin it and bear it."

7

The inequitable and humiliating treatment continued, as even other residents noticed. Perhaps most egregious was when I presented a complication at M&M (morbidity and mortality) conference on a pediatric patient with a missed diagnosis of septic shoulder, who then went on to have delayed discovery of sepsis of the contralateral shoulder, a pathologic fracture of his humerus, and a very complicated hospital course including several months in the PICU, respiratory failure, renal failure requiring CRRT, adrenal insufficiency, anemia requiring EPO shots, stage III decubitous ulcers, and osteomyelitis of both shoulders. At the conclusion of my presentation, Dr. Koon immediately spoke attempting to discredit me in front of the entire residency and faculty saying, "I don't think this is an appropriate presentation for an M&M." I was surprised, as this had been an M&M identified by my chief resident. Also I had spoken with the pediatric orthopaedic attending. Luckily, the other attendings present confirmed that this grave hospital course from a septic shoulder was indeed was a very severe M&M.

On Oct. 26th, Dr. Koon told me that there were some issues with my performance. I asked him what the issue was. He simply said to speak with Drs. Wood (my chief resident) and Mazoue (my attending). I spoke with both them individually and they said they had no complaints (Exhibit E). Indeed this was in line with my usual feedback from Dr. Koon, which consisted of vague negative comments, lacking directions for improvement and ultimately unsubstantiated. These "feedback" sessions were frustrating and taking a toll, as I began to wonder what I was doing wrong and right and at times I was afraid of being punished for doing anything, right or wrong, and often frozen in indecision.

In early November, there was a VA patient who had been transferred to Richland. The patient was lacking a dictation, and this got routed to Dr. Koon. Dr. Koon routed it to me. A few days later, he asked if the dictation was done. I informed him it had not yet shown up in my inbox, but I would take care of it as soon as it was in my inbox. That evening a VA patient showed up in my inbox for an H&P and I took care of it. Dr. Koon texted me a few days later to ask about the dictation. I told him it was done. After a few rather confusing text messages, we spoke on the phone and clarified that there was a second VA patient who had not made it to my inbox. I wrote down the name, and researched the patient.

On examination, I had actually never been involved with this patient's care. I dictated the discharge summary as asked. Worried that this miscommunication might create more issues and knowing that I needed to over-communicate, coupled with prior allegation that I was creating more work for others, I sent Dr. Koon an email telling him everything I knew about the patient, the timeline of the patient's admission, who was involved, and that I had completed the task so that there was no miscommunication.

I believed I was doing my best to improve and correct the deficiencies my attendings had perceived. However, this attempt at trying to follow my remediation plan and ensure proper communication was not appreciated by Dr. Koon. Dr. Koon responded to my attempts at improving communication as can be seen in Exhibit F by writing "Absolutely incredible...I can assure you that I would have NEVER in a million years sent a response like this to my program director, especially when I was in the midst of academic remediation."

8

He expressed surprise and indignation and called my email "dribble." Dr. Koon became so enraged that he "was unable to speak to [his] wife." He further boasted to me that that the email he sent me was actually  "significantly toned down," and the original had much stronger language. He then openly threatened  "you were lucky you were on vacation because *I would have fired you on the spot.*" Indeed he finally admitted his true intentions.

In the weeks that followed there was a marked, much more sinister turn of events. At our meeting on Nov. 21st he now recommended that I be placed on level I academic remediation when my probation was up the first week of December. I asked for clarification. He could not cite any deficiencies regarding the remediation plan. I was encouraged that I had corrected the deficiencies outlined in my remediation.  He therefore began to bring up events that happened before I was even placed on probation and that had long been resolved. Interestingly if these were true issues, I was curious why they had not been raised during my initial remediation back in August.

It seems that this had turned into more of a fishing expedition rather than an effort truly to identify faults and ways for me to improve as a resident.

This about-face showed redoubled efforts to vilify rather than educate me. Indeed the most surprising factor was that at the faculty meeting a mere 1.5 weeks later, he somehow changed his recommendation from level I to level III remediation with suspension and relieving me of my clinical duties.

Dr. Koon invited me to attend the faculty meeting the first week of December when I was scheduled to be done with my remediation. At this faculty meeting, I was shocked by the confrontational tone of the meeting. Dr. Koon questioned me in front of the entire faculty challenging me: "you think it was a wise move to take vacation during your remediation?" I had carefully scheduled my only two vacation days to coincide with the vacation days of my attending so as not to create more work for the rest of the team. Since I started my PGY-2 year I only took two days off to see my family (I have no family in SC) and my niece who had just been born. Dr. Koon insinuated that I did not take the probation seriously. I found this insinuation terribly insulting.

In fact I missed my very own brother's wedding so I could be on call over Labor Day. I knew that if I requested those days off it would cause further work for my fellow residents, and I was striving to improve on the allegation that I was perhaps creating more work for others.

That was how seriously I took this probation. I missed my brother's wedding rather than risk upsetting Dr. Koon by taking Labor Day off.

The insinuation that I did not take my remediation plan seriously and frivolously took vacation days was hurtful, untrue, and uncaring. I had personally spoken with Dr. Stephens and Dr. Koon about my vacation days. He had personally signed off on it. I had done my best to clear it with everyone. Again, I was in a situation where I am so afraid of being punished for doing anything, right or wrong, that I often don't know what to do.

9

USC(Irani)0593

Dr. Koon then went on to reference a patient that had been seen in clinic by me. My attending, Dr. Grabowski, asked me to obtain an MRI that day to evaluate the patient for possible infection (he was several months s/p ex-fix placement and removal). I was told by Charmane, our medical assistant, that an MRI could not be scheduled until the next day. I preliminarily asked for the patient to be scheduled for the next available spot while I spoke with my chief resident. My chief resident told me to call directly over to radiology to obtain same day MRIs. I did this, got the MRI scheduled and canceled the appointment for the next day, and sent the patient over to MRI. My understanding was I had carried out Dr. Grabowski's care plan as requested.

Dr. Koon was not present during the care of this patient, but relied on second hand information about this patient. I received no complaints about this patient's care plan, and indeed it was carried out exactly as my attending had wished. Rather than ask me for details about the incident, Dr. Koon invited me to the faculty meeting and attacked me in front of the entire faculty. He declared that I had come up with a plan in direct conflict with that of my attending.

He stated that I planned to get an MRI in 2-3 days, accusing me of making a decision as a PGY-2 when my attending had told me differently. He went on to provoke me by saying, "I am wondering why you thought it was in your purview to contradict your attending's recommendation." I was taken aback by this statement, frankly confused, and obviously flustered when to the best of my understanding, my care plan had never deviated from that of my attending or chief resident. Moreover, Dr. Koon was not present, was relying on second hand information, had never asked for my side of the story, and authoritatively declared that I had contradicted my attending's recommendation. Moreover, this was the first I was hearing about it if there was a problem. The allegation was that I should never have asked the nurses to preliminarily make the appointment for the next available time frame if one was not available that day. Again the line between what was right or wrong seemed to be a moving target and I became more confused and increasingly worried about being disciplined for minor infractions. The patient had received the appropriate care as my attending had outlined.

If the goal of residency is to educate and support residents, I believe I should have been afforded the common courtesy to explain what happened, since Dr. Koon was relying on second-hand information and did not have first-hand knowledge of the events. Instead he asked me to respond to an inflammatory, incorrect accusation in an obviously confrontational manner. This was a calculated effort to bring the new attending (Dr. Grabowski) into line by belittling me in front of the faculty and attempting to demonstrate how I had "mismanaged" one of his patients. Indeed by that point, Dr. Koon had already successfully turned popular opinion against me and now had the backing of all the attendings. As multiple attendings admitted, all they know about me is what they hear from Dr. Koon.

It was clear I had no ground to stand on. As Dr. Koon had verbalized, his goal was to fire me, and fair hearings and proper representation of the facts would not get in the way. As one of

10

my co-resident wrote in a confidential email, *"I feel this is more of a witch hunt than anything."*

Dr. Koon made two more points in front of the rest of the faculty. The first alleged inappropriate pain management regarding a post-op patient. This was a patient POD #0 status post an AC joint reconstruction with Drs. Mazoue and Walsh. I had seen her in clinic and in the OR. She was of average build and relatively young (49). She had been sent home with a prescription for oxycodone 5mg 1-3 q4 hours. Dr. Mazoue routinely gives Percocet (oxycodone) 20mg q4 hours for his narcotic naïve patients. I received a call after midnight saying she was having some pain. I asked the patient if there were any sensory or motor deficits. I assessed the level of consciousness. The patient was appropriately alert and oriented. She did not have any parasthesias or neurovascular compromise. I therefore OK'd the patient to take an extra oxycodone to get to our usual post-op dose for these patients.

I received a repeat call ~1 hour later. She was still in some pain. She had no neurovascular changes or worrisome post surgical changes. Importantly, this patient was on oxycodone pre-operatively; and we routinely give more than 20mg q4 hours to narcotic sensitized patients who are older than the patient in question. Additionally, I had been explicitly directed to treat pain appropriately as part of my remediation plan (Exhibit B). I therefore OK'd another 5mg (which again is well in line with what many of our non narcotic naïve patients receive) and said as long as she is asymptomatic from side effects of narcotics (including being alert and oriented and Neurovascularly intact) she was OK to continue to dose as we had been doing (25mg spread over four hours). Additionally Dr. Walsh had told me previously that he uses Oxycodone instead of Percocet so additional doses could be given (as in this case) without the acetaminophen toxicity.

I immediately informed the morning team just a few hours later, so they could follow-up with the patient. I learned later that my care plan was misinterpreted by the patient as 25mg every four hours instead of over four hours. Granted this conversation happened in the early morning, so the miscommunication could have happened at either end. Accordingly I realized this was an opportunity for improvement. In this case, a middle-of-the-night call is often ripe for miscommunication, and on future middle-of-the-night calls I made my plan more clear to the patient by having the patient repeat the plan back to me. The patient was followed up with in the morning, was a little drowsy, but had no adverse surgical outcomes.

Dr. Koon continued to cite this as substandard care, again bringing it up at a meeting with myself and faculty and residents in February. I was still puzzled how this had been construed as an inappropriate dose of narcotics. I asked what I should have done differently. Dr. Koon asked Dr. Hoover (the chief resident) what he would have done. Dr. Hoover replied that would have asked the patient if she was having any weakness, parasthesias or mental status changes, and if no changes were present, he would have OK'd more narcotics. I was stunned. I was stunned why the exact same treatment plan stated by my colleague became inappropriate management, fit for suspension, when carried out by me.

11

USC(Irani)0595

Dr. Koon additionally asked why I failed to evaluate a post-op total knee. This was a patient who called November 26th 2011 and said that a scab had come off her knee and she had some drainage. I told her with these exact words: "I cannot tell you anything about your wound without taking a look at it" and encouraged her to come into the ED. This is documented in Exhibit G.

I again told her that *I could not tell her anything about her wound without taking a look at it and encouraged her to come into the ED for evaluation*. She did not show.

The patient called twice the next day when a different resident was on call. I conferred with the resident on call that day, *he too had told her to come in for evaluation*, but she failed to show.

Despite two residents who both told her to come in, the patient did not follow these instructions. Dr. Koon lambasted me in front of the other faculty, simply saying a patient called three times and I told her not to come in, which was frankly untrue. At the conclusion of this I insisted that there be a way to document our phone calls, since no such system was in place, and since it was clear Dr. Koon placed no value on the veracity of any of my statements. In addition, it was increasingly clear to me that I needed additional safeguards to protect myself.

Dr. Koon also insisted that I get a psychiatric evaluation to "help structure my remediation process." I asked numerous times what the purpose of this exam was. Was this a fitness for duty exam? I had severe misgivings about this since I know that such exams can be *used to justify termination*, something that I was fairly certain at this point Dr. Koon was working toward. I never got a clear answer, and got significant pushback even though under the Americans with Disabilities Act, I believed I had the right to know the reason why this exam was ordered. Again, no one wished to communicate with me, or explain to me what the purpose of such actions were, and I became more and more worried about the motives behind these actions.

Lastly, Dr. Koon, made the allegation in front of the orthopaedic department staff that my poor behavior is a pattern. He stated that he heard similar complaints about unprofessionalism and poor patient skills about me from the trauma case managers. I was puzzled because I had received positive feedback from them. However, I wanted to understand how I could become a better resident. I approached them again and spoke with both of them privately (Peggy Fields and Debra Floyd). They frankly denied such claims, said they were very pleased with my performance, and emphatically stated they enjoyed working with me.

Indeed it was clear that Dr. Koon was intent on slandering my name in front of my peers and my attending, irreparably harming my name and reputation.

The faculty meeting concluded. Later that week a multi trauma came in at 11AM. She was seen and evaluated by our orthopaedics intern. The intern called the chief (Dr. Wood) saying it was a particularly sticky situation. Dr. Wood directed her to call me, a second year

12

resident on probation, to supervise the intern in a volatile environment. I received a page at ~2/2:30 PM to see the patient. I immediately informed my attending and went to the ED to help.

I arrived to a situation in frank disarray. The patient was roughly 3.5 hours after her initial trauma. She had been moved out of the trauma bay and still had open displaced fractures that were untreated several hours after her presentation.

The patient and nursing staff were understandably upset. Before I had even seen the patient, the nurse (Arlene) clearly and again understandably upset, said to me we had to talk about how this was all handled. I asked her what happened, what I could do, and what needed to be addressed. She simply said we will talk about it at the end.

Having gone through such an experience with some of the *same* nurses before (nurses with whom not only myself but Dr. Goodno had had issues with), I toed the line, did the best with what I had, and went out of my way to please all parties involved including introducing myself to the patient, describing all injuries, assessing pain, giving systemic and local anesthesia, talking to the family, showing the family the injury films on the PACS station, and helping nursing and ancillary staff in any way possible including cleaning up and changing wet sheets. (full details of patient encounter can be seen in Exhibit I).

Two days later, I received a phone call from my chairman, Dr. Walsh, at about noon, who said that there was an incident involving the trauma female I took care of, and he informed me that I was being suspended so an investigation could be performed. Dr. Walsh assured me that the purpose of the suspension would be to get all sides of the story "including yours."

This turned out to be false. I was shocked, saddened, and stunned at the events that transpired next. No one talked to me. No one attempted to contact me. No one was even interested in hearing my recollection of the events. To add insult to injury, I received a phone call from our program coordinator Michelle Wehunt stating that there was a letter for me. This letter was a copy of the letter from Dr. Koon to the GMEC recommending me for level III remediation that had already submitted and been approved. I was floored. No one had contacted me about what had happened with the trauma female, despite Dr. Walsh's personal assurance to me, and my program director didn't even have the decency to call me and inform me of his decision or thought process, but rather had the secretary give me a call to pick up a memo that he had already turned over to the GMEC. This was the ultimate slap in the face and lacked common human decency and courtesy.

It was now abundantly clear to me that Dr. Koon and those entrusted with my education had made no attempt to ascertain, and were not interested in ascertaining, the veracity of the statements that were presented to the GMEC. Most glaring were the frank misrepresentations presented to the GMEC -- statements that I later argued to no avail in the grievance process, and pointed out *constituted frank libel* -- Notably:

13

• *Neglect of informed consent:* This allegation is false on many different levels. First no resident in the program gets consent for such emergent procedures. Furthermore, this discussion with nursing staff was broached to the orthopaedic intern well before my arrival. Simple fact checking, following standard procedure, or having the common courtesy to talk to me would have avoided such deceitful and libelous comments presented to the GMEC.

• Similarly, other statements about improper pain management are untrue as I gave both local and systemic anesthetic prior to any manipulation, and I assessed the patient's pain level during the procedure. I took the additional step of talking to the neurosurgery attending who informed me that conscious sedation was not an option.

• Moreover, as presented above, allegations of inappropriate narcotic dosages and failure to evaluate post-op pain care were gross overstatements of the truth and actions that were either substantiated by, or performed in the same manner as, my non-minority colleagues. Similarly, as described above, the statement that I failed to abide by direct attending instruction is also a perversion of the facts.

Broad statements such as "has been delinquent in assigned tasks," were similarly never defined, substantiated, or explained.

The fact that neither my program director nor chairman talked to me to ask what happened is even more shocking when one looks at the efforts undertaken to try and malign me. Dr. Koon attempted to have witnesses state I had told the patient she would never walk again. (he asked Toni the cast tech about this). I am only left to surmise that he had received an inaccurate report that I had said that – something that made no medical sense, and was absolutely false. The cast tech denied this was ever uttered. (Indeed telling a young active lady with an ankle fracture that she would never walk again makes no medical sense). Despite the fact that there appeared to be inaccuracies in some of the allegations against me, Dr. Koon did not interview me or all the witnesses involved. What is surprising is the extra effort he went through to call other people (other cast techs who were not involved in the case) to try and solicit complaints about me. They all replied very positively, but these positive comments did not factor into my evaluation.

It was clearly not a lack of effort or time that could explain Dr. Koon's failing to talk to me, but rather a deliberate and malevolent attempt to slander my name and further his goal to terminate me.

What was more surprising was that my superior *violated Palmetto Health's own guidelines,* (page 61 of the resident handbook Exhibit R) which cites disruptive behavior as "inappropriate conduct that reflects in a negative way on the Hospital or University." The handbook then clearly states under procedure (also seen in Exhibit R) that "The program director or designee ... interviews the complainant and any witnesses within one business day of receiving the complaint. The resident is given the opportunity to respond in writing." Additional provisions are made to allow the program director up to ten days for this action to take place. Most stunning, and what I find very unusual was all the statements of

14

Palmetto Health's stated and written objectives as listed above for procedure were violated:
-All witnesses were not interviewed (despite my providing names of witnesses)
-I was never given a chance to respond in writing.

The fact that no one bothered to ask for my side of the story was not only horribly unethical and hurtful, but it also lacked common courtesy and respect that I would think everyone, let alone physicians, should practice.

By this point, Dr. Koon had successfully turned all popular opinion against me. I was still honestly confused about this situation and wanted to understand how I could improve. Just as I had in the past made progress on my remediation goals by doing investigations myself, I attempted to do the same thing here. I asked what the complaints were and who made the complaints so I could speak with them, and I requested a copy of all the records associated with that patient's care, so I could understand what exactly was alleged and how I might improve. Despite repeated verbal and written requests to understand and get a copy of the complaints against me so I could improve, my requests were denied (Exhibit K).

I went through the grievance process, and only after I complained did Dr. Walsh hear my side of the story; however, he continued to express grave reservations about the veracity of my statements after what he had heard from Dr. Koon. I stressed to Kathy Stephens (the DIO) that Palmetto Health guidelines were being violated, and these statements constituted slander. I suggested perhaps there were some communication issues and that we -- physicians, staff, and nurses -- should all meet to understand what happened and resolve this issue in person. Nothing was done and this request was denied.

It was clear at this point that there was no interest from anyone to get my side of the story. I spoke with Dr. Walsh again and said I was concerned these actions would delay my graduation making fellowships difficult, if not impossible, to obtain, and secondly that I would have to report the suspension on future job applications. I told him if those issues could be mitigated, I would be happy to drop all further appeals (I was considering appealing to a grievance council) and make a good faith effort to move forward despite the fact that I had serious reservations about my treatment up to this point.

I waited to hear back from Dr. Walsh, attempting to determine if I should request a grievance council. I sent two follow-up emails to Dr. Walsh (exhibit M), but when I did not hear back before 10 business days (1/26/12)I submitted  a request with HR to initiate a grievance council meeting within ten days of the DIO's decision, as outlined  under "Grievance and Due Process" of the resident handbook step 1.5 (Exhibit Q). Since Martin Luther King Jr. Day was a national holiday with banks, offices, the post office, and most importantly the orthopaedic clinic closed, it was logical not to count MLK as a "business day." I spoke with Gwen Hill (Vice President of HR at 803-296-5221) and told her the situation. I was told they would communicate with Kathy Stephens for guidance.

I was shocked when they refused to grant me a grievance council review, saying that eleven business days had elapsed because Martin Luther King Jr day *is not a holiday*. I pointed out

15

that to my understanding MLK is a national holiday – furthermore a business day is to my knowledge *not* defined in the resident handbook – a fact that Kathy Stephens herself later conceded. Moreover, should there be any confusion about the deadline the resident handbook makes explicit provisions to "extend any deadlines," due to extenuating circumstances. I was denied due process despite the fact that I made a good faith effort to follow the guidelines laid out in the resident handbook and filed my request within 10 business days as outlined in the resident handbook.

It appear that the primary motive here was not to act in the resident's best interest but rather to play "gotcha" with my career– a career that I have worked my entire life for, and something that I would hope would garner more respect and understanding from those charged with graduate medical education.

To add insult to injury, I received an email shortly thereafter requesting me to come in and write a check to refund a paycheck that was "accidently" paid to me during my suspension.

At this time, I expressed serious reservations about the fairness of treatment from Dr. Koon and sought council elsewhere. I spoke with Dr. Guy. I appreciated his feedback and found I made much more progress speaking with him. He gave me good feedback and tips on how to be a better resident. I spoke with him and asked him if he would oversee my remediation plan so that I could get some guidance since I felt I was not making much progress with Dr. Koon; he stated he would be willing to do so.

I therefore proposed that Dr. Guy oversee my remediation and progress as I had reservations about how I was being treated and felt that I could get more constructive feedback to help me become a better physician with Dr. Guy overseeing my remediation process (exhibit N). This was request was summarily denied by Dr. Koon.

Despite the failure of due process, and violation of Palmetto Health guidelines, and the presentation of false statements to GMEC, Dr. Koon successfully had me suspended from early December to the end of January. This was embarrassing, humiliating, and demeaning, and was done in violation of professional and Palmetto Health guidelines.

I was reinstated at the beginning of February. This time Dr. Koon handed me a letter placing me on Level II remediation, with a greatly expanded list of deficiencies. I was a little taken aback by the new laundry list of "competencies not being met." I had not been on service since my previous evaluation placing me on Level III remediation, yet somehow the list of my alleged deficiencies had exploded. Notably things that I had been told were never issues were now listed as "competencies not being met" including: "make informed decisions about diagnostic and therapeutic interventions based on patient information and preferences, up-to-date scientific evidence, and clinical judgment." This theme was again alluded to when Dr. Koon listed another deficiency as: "Medical Knowledge: (IV.A.5.b) Residents must demonstrate knowledge of established and evolving biomedical, clinical, epidemiological and social behavioral sciences, as well as the application of this knowledge to patient care." I had never been told that my knowledge base was lacking. In fact, Drs. Walsh, Mazoue, and Guy had all explicitly told me that my knowledge base was fine to

16

USC(Irani)0600

better than average. My in-training exam results substantiated this and easily outpaced that of my white colleague. This was alarming to me, and it was apparent that Dr. Koon's goal was to list as many competencies as possible as "deficient" so that should if I make any kind of misstep he could much more easily fire me. The goal here, it seemed, was not to provide a framework for remediation, but rather to continue to play "gotcha" with my career. Once again here was something that I had been told I was doing well in, and again I was in a situation in which it seemed I was being punished for doing anything, right or wrong.

Furthermore, Dr. Koon continued to attempt to discredit me in front of both my peers and attendings. He flung the resident handbook across the table and asked me read aloud the grievance process from the resident handbook, in front of my fellow residents and attendings, and then proudly declared that I had not followed the guidelines either time. He said that I had skipped step 1.1 in the grievance process which states, "A resident who has a dispute or grievance must discuss this with his/her Program Director who will make every effort to resolve the matter within five (5) business days." I was taken aback, but I tried to deflect this saying I wanted to move forward. He persisted, showing increasingly desperate attempts to belittle me in front of my peers. I did not attempt to confront him. All I said was I had spoken with him, and I apologized if he had wished to speak again. He went on to state that in fact it was me who was violating Palmetto Health guidelines! I did not respond and tried to "grin and bear it."

The surprising thing is that Dr. Koon decided to try and turn the tables on me and claim that I had violated guidelines, whereas as can be clearly seen in Exhibits D and L, not only did I follow all the guidelines, but an email *penned by Dr. Koon himself* clearly shows I was following the protocol of the grievance process. At this point Dr. Koon's personal, racially charged vendetta against me was clear as he continued to slander me in front of my colleagues and attendings.

It is also interesting to note that in an email dated 3/13/12, Dr. Koon wrote that Dr. Irani "would like to initiate the Grievance process and I would consider his discussion with me as the first step, *even though it was not initiated within the five (5) business days as required* (Resident Manual, Grievance and Due Process policy, 1.1)." Glancing at the resident Manual, Grievance and Due Process policy, 1.1 clearly makes no such provision (Exhibit Q). In fact it states that a program director has five days to respond to a complaint brought by a resident. Clearly this demonstrated Dr. Koon's unfamiliarity with the process and was likely an attempt (with several other people cc'ed on the email) to again try and make me look like I was a substandard resident.

Despite these worries I spoke with my chief resident who encouraged me to just try and accept the plan and move on (which was also one of the things explicitly listed in my remediation plan interestingly enough). Furthermore, I knew from my prior experience that there was little I'd gain by trying to challenge things, besides creating more animosity between myself and my superiors.

17

USC(Irani)0601

1    Lastly I noticed that Drs. Koon and Walsh had changed my schedule. I was scheduled to be
2    rotating at the VA and Baptist Hospital. However, these rotations were removed, and I was
3    assigned to the Richland service again on services with attendings I had just rotated with.
4    My education was further compromised as I did not have the opportunity to have someone
5    else supervise me or serve in a mentorship role.
6
7    While this upset me, I once more did my best to honestly and faithfully heed the advice of
8    my chief resident, even though all previous precedents had illustrated that I would not get
9    a fair hearing in any future actions.
10
11   I redoubled my efforts to do well and was genuinely happy to be back. I started back on Dr.
12   Voss's service. I took the initiative and decided to adapt and created a resident's step-by-
13   step guide, including figures and diagrams of how Dr. Voss performs his total knee
14   arthroplasty. I reviewed this guide with my chief resident and Dr. Voss. The goal of this
15   guide was to provide step-by-step instructions for future residents to understand how Dr.
16   Voss performs his surgeries. I believed I could help out my fellow residents by doing this as
17   Dr. Koon had wanted me to do.
18
19   On the evening of March 1st Dr. Koon called and told me that I was again suspended for my
20   treatment regarding two patients and that he was recommending my termination. Please
21   see exhibit for full details surrounding these patients. A hemophiliac patient was admitted
22   at approximately midnight for observation for possible compartment syndrome. I did an
23   interval physical examination at about 2:30 for compartment syndrome. The exam was
24   unchanged, and as I was seeing another patient, and because my exam was unchanged from
25   before, I decided to treat the current patient in an expeditious and caring manner; I then
26   put in a note within 48 hours of seeing the patient on the patient who was admitted for
27   observation.
28
29   Dr. Koon also mentioned an issue with a spine patient with neurological changes, I saw her
30   as soon as the nurse told me that she saw neurological changes (please see exhibit P for full
31   details). I did not write a note in the chart, because when I called my attending, he told me
32   that my physical exam and findings were inaccurate and incorrect. Accordingly, I
33   consciously did not and could not document my findings, as I had been directly instructed
34   by attending that my exam was inaccurate. Per previous instruction from my attendings, I
35   could not document an inaccurate exam in the chart. It is also noteworthy that this was the
36   *very first* spine patient I had ever managed as a resident, and there was no senior resident
37   on the spine service with me.
38
39   When confronted about these patients, I attempted to follow the remediation plan, which
40   directed me to "admit and apologize for mistakes and be willing to endorse personal flaws."
41   Therefore when confronted about these patients, I immediately apologized and said I
42   would do better next time. I did not make any excuses and I listened to what was said.
43   While I admit that I have made mistakes, both patients were evaluated in a timely manner. I
44   learned from these experiences that I still need to work on improving my efficiency.
45

18

USC(Irani)0602

Again I believe these are all examples of resident education. While, I believe there is always room for improvement, mistakes, feedback, and resident supervision are all integral parts of resident development.

I of course went through the grievance process again. When I spoke with Dr. Walsh he stated the futility of the process and openly declared, "There is no way the GMEC committee will go against us. *No way.*" Needless to say my interaction with my department has not been one that I believe puts residents first.

It has been very hard for me to focus on learning and my education with the stress of this unmerited treatment. Throughout this entire process, I have been illegally targeted. I have been vilified for actions that my colleagues have not been penalized for. Standard hospital policy has been ignored, and my  name and reputation have been subject to libel and slander by Drs. Koon and Walsh in front of the GMEC committee and hospital staff. They misrepresented me to the Graduate Medical Education Council. I believe the GMEC's decisions were based on false information and malicious misrepresentation.

Lastly and perhaps most importantly, I have had more stress placed upon me when dealing with patient care, by having to undergo the derogatory, inappropriate, and insensitive racial taunting by those who were entrusted with my education. While on remediation, Dr. Koon regularly taunted me, calling me "Achmed the Terrorist." While I tried to laugh it off, these comments were deeply hurtful and insensitive given the past history of religious persecution of those of my faith and culture and recent terrorist attacks in Mumbai, India where my family resides, and the impact these cowardly attacks had on my immediate family.

This pattern of singling me out, open slander and libel when presenting my case, and racist behavior is incongruous with someone entrusted in the role of an educator.

Moreover, at least five of the deficiencies cited here were either performed or verified by my white colleagues without retribution including treatment of trauma patient TF375, dosing of narcotics, medical knowledge, evaluation of post-op knee patient, and wound closure with vicryl.

I have felt constantly intimidated by Dr. Koon either calling me a terrorist or by threatening me with discipline for some minor infraction but for which he gave a pass to other residents who had done the same or similar things. I was frankly in a situation in where often I was so afraid of being punished for doing anything, right or wrong, that it was not clear what I could do to avoid punishment.

I believe I am friendly person, but cultural differences and insensitive behavior have made it hard to focus on becoming a better physician. I admit I may appear and act different than my colleagues. I am new to the South. I was born and raised in California. I completed my undergraduate and medical school training at Stanford University on the West Coast, in an environment quite different from my current setting. I don't think it is the responsibility of others to understand my background, but I think they should at least be accepting.

19

USC(Irani)0603

I readily admit that I have made mistakes like all young physicians, and want to change in a way to make me a better doctor. Indeed each time I was placed on remediation, subsequent evaluations largely validated that I addressed or improved upon my remediation goals previously set forth. I want to do better and indeed I strived hard to do so, talking to others and soliciting feedback where this was missing from my program director. But in order to improve I need a clear definition of my mistakes and how I may improve.

I am shocked by the callous nature and actions of my department. Decisions like this have derailed my entire career and should be at least subject to due process. My name has been slandered and is extremely difficult, if not irreparable to fix. My name is my profession as a doctor, and it has been unjustly tarnished. What job prospects do I have in the area now?

At the initial meeting six weeks into my residency, Dr. Koon boasted about firing a previous resident (Dr. Lamoreaux) just before he was about to graduate. (The resident sued the program and the individuals involved and got his job back). Dr. Koon boasted that he always gets the best residents. He boasted that the general surgery program would trade three of their residents for one of his, whereas the medicine program is just happy to land a resident who speaks English. He went on to say that he fired Dr. Lamoreaux because he lied, and if anyone ever lies they are out of the program.

I think Dr. Koon should be held to his own standards. He has not been forthcoming with me, and as can be seen on my accompanying complaint he has lied about resident supervision in patients' charts and misrepresented me to the GMEC. Such reckless, slanderous and racist behavior should not be tolerated from anyone, let alone those entrusted with educating the next generation of physicians.

I respectfully ask that the RRC review the practices, failure of due process, and the motives and behavior of the program director and chairman at the USC/Palmetto Health Richland Orthopaedic Surgery Residency Program.

Respectfully,

*Afraaz Irani*

Afraaz Irani M.D.

20

USC(Irani)0604

21

USC(Irani)0605

Exhibit A:
Emails Regarding Suggestion of Journal Club Articles
July 13th 2011

USC(Irani)0606

Date: Wed, 13 Jul 2011 21:17:27 -0400
Subject: interesting article
From: Afraaz Irani <afraaz.irani@gmail.com>
To: "david.koon" <david.koon@uscmed.sc.edu>

Hey Dr. Koon,

If you are looking for a kinda fun/interesting article for journal club, this is an article from the
Archives of Internal Medicine, that states that majority of overweight patients are not told they
are overweight by their doctor, and essentially the role of they physician, in telling patients they
are overweight/obese. Just thought I'd pass it along.
http://www.ncbi.nlm.nih.gov/pubmed/21357807

Thanks,
Afraaz

From: David Koon <David.Koon@uscmed.sc.edu>
To: Afraaz Irani <afraaz.irani@gmail.com>, "jhoov14@yahoo.com"
        <jhoov14@yahoo.com>, "Jennifer, Wood <jhwood23@gmail.com>
Date: Thu, 14 Jul 2011 20:21:07 -0400
Subject: RE: interesting article

not sure why you are reading the Arch of Int Med...

let me know if you are not satisfied with the articles selected for our journal clubs.

dk

23

USC(Irani)0607

Exhibit B:
Letter informing me I was placed on Level II remediation
Aug. 15 2011

USC(Irani)0608



UNIVERSITY OF SOUTH CAROLINA
SCHOOL OF MEDICINE

UNIVERSITY SPECIALTY CLINICS

15 AUG 11

Memorandum of Record

Re: Dr. Afraaz Irani (PGY-2 Orthopaedic Resident)

1. Dr. Irani demonstrated significant lack of compassion and empathy in a patient's care in the initial trauma resuscitation. Mr. B. sustained a near forearm amputation and Dr. Irani failed to provide adequate pain medication and ignored nursing requests for same during his initial evaluation. During this encounter he requested the nurse to lie about the initial irrigation / debridement of the traumatic wound.
2. He has repeatedly demonstrated poor communication skills with patients, families, peers, and attending physicians.
3. He has repeatedly demonstrated poor time management with frequent tardiness to required conferences, clinics, and the operating room.
4. He does not demonstrate effective prioritization of clinical duties. This has resulted in additional duties for other residents.
5. He has provided substandard patient care (e.g. closing wounds with Vicryl suture; not evaluating a VA total joint patient with immediate post-operative cellulitis).
6. He received substandard evaluations during his internship.
7. He has displayed a significant lack of attention to detail in his initial PGY-2 rotation.

These deficiencies have persisted despite several verbal counseling sessions from his chief resident, his attending physicians, and his program director.

The attending physicians of the Department of Orthopaedic Surgery would recommend that Dr. Afraaz Irani be place on level II academic remediation from 15 AUG 11 to 01 DEC 11.

Remediation measures would include:
1. Dr. Irani would provide improved patient care, including pain management and wound management / closure.
2. He will answer his pages appropriately and immediately.
3. He will see all orthopaedic consultations as soon as possible.
4. He will display improved communication to peers, ancillary staff, and attending surgeons.
5. He will develop a Grand Rounds presentation of Effective Communication Skills.
6. He will demonstrate improved organizational skills and prioritize clinical duties effectively.
7. He will demonstrate improved attention to detail while on clinical rotations.

David E. Koon, Jr., MD
Program Director

John J. Walsh, MD
Chair, Dept. of Orthopaedics

**DEPARTMENT OF SURGERY**
**Two Richland Medical Park, Suite 402, Columbia, SC 29203**
**803-256-2657, FAX 803-933-9545**

25

USC(Irani)0609

Exhibit C:
Rebuttal to Level II remediation
Aug. 22 2011

26

USC(Irani)0610

*I was asked to respond to allegations of improper care regarding improper care regarding patient Mr. B. Below is my email dated 8/10/11*

Date: Wed, 10 Aug 2011 18:23:39 -0400
Subject: Re: FW: Fwd: Pt. Roy Butler
From: Afraaz Irani <afraaz.irani@gmail.com>
To: David Koon <David.Koon@uscmed.sc.edu>
Cc: John.Walsh@uscmed.sc.edu

Drs. Koon and Walsh.

I remember this pleasant gentleman very well.

My first steps with all such traumatic wounds are the same. The patient had already been given fentanyl before my arrival. Therefore my first step is to inspect wound, and see his pain level before approving a possible overdose of narcotics to an 80+ year old male. Accordingly I inspected the wound first. He had some pain, then I waited for the additional dose of additional pain meds. All the manipulation was done by Iaquinto as was outlined in the prior email

I did introduce myself to the patient. My back was to the nurses, so not sure if they heard me. It is is true that I can mumble and so that cannot be clear. Indeed the nurse here does not know the correct pronunciation of my name so I can work on better enunciation when introduction myself

I spoke with Iaquinto in the trauma bay. I called and he told me to stay at bedside he is coming down directly. The admission plan, everything was unknown, and I was instructed to say at bedside, accordingly I did not feel it appropriate to talk to the family until he had arrived as I was instructed.

Often in the setting of a traumatic injury, when the orthopaedist arrived, he/she is expected to immediately talk to family. In that situation I am less likely to jump the gun and speak to family, since it is important to wait a few extra minutes to get details correct, since this could potentially be a major surgery/life altering event.

It was a regrettable decision, but one that had to be done. Many of the staff were justifiably horrified at this, and wanted us to do more. However this was medically the correct decision. Indeed he had a heart attack during the procedure, and passed away a few days later. It is clear he could have not withstood a salvage procedure to his arm.

The patient was very thankful throughout and when I saw him on the floor we had great interactions. He remebered me from the trauma bay and shook my hand and thanked me again (although truth be told he was a real gentleman). I really did enjoy my time with him. It is a shame that he is no longer with us.

I remember we talked about how he was still able to do what he loved (metal/wood working) in his 80s. He was thankful that he was still there, and we talked about his family and how his children work with him in the shop. I do remeber Mr Butler, and wish he was still with us.

Hope that clarifies things.

Thanks,
Afraaz

27

USC(Irani)0611

*Email to Dr. Stephens, about the remediation plan*

Date: Mon, 22 Aug 2011 22:01:48 -0400
Subject: Department of Orthopaedics.
From: Afraaz Irani <afraaz.irani@gmail.com>
To: Kathy.Stephens@PalmettoHealth.org

Ms. Stephens,

I was recently informed by Dr. Koon, that he would be taking steps to suggest I be placed on academic remediation.

I was very surprised and disappointed to hear this given the positive comments from my peers.

I was handed a sheet with specific complaints against me and told to send you an email to explain the following issues. Please allow me to explain myself regarding the seven points outlined in Dr. Koon's letter:

*1. Dr. Irani demonstrated significant lack of compassion and empathy in a patient's care in the initial trauma resuscitation. Mr B sustained a near forearm amputation and Dr. Irani failed to provide adequate pain medication and ignored nursing requests for same during his initial evaluation. During this encounter he request the nurse to lie about the initial irrigation / debridement of the traumatic wound.*
I always demonstrate the highest level of compassion and empathy in a patient's care. There are many individuals involved in the resuscitation. My job as the orthopaedic resident is to manage the orthopaedic injury in conjunction with the attending. I was consulted on Mr. B after the ER physicians had evaluated the patient and I was at the patient's bedside within 10 minutes. At the time of my evaluation the patient had already received pain medication. Given the severity of the trauma in this 82 year old gentleman, the severity of the pain would not have been controlled to a level that the nurse in question was attempting to achieve by a safe level of pain medications.
As part of my initial assessment, I unwrapped the initial dressing and given the severity of what was discovered, I immediately consulted my attending for immediate patient care and plan for OR.
Regarding the accusation about lying about patient care; this is a misinterpretation of the nurse about my comments regarding irrigation. My comments to her were meant to say that usually we irrigate with two liters and I was surprised that an ER physician would irrigate with only one liter. So my statement that it was two liters was under the assumption that routine clinical practices were being followed. I did not irrigate as we already had a plan to go to the OR. My comments to nurse are meant to reinforce what is usually done. However I was not personally involved, nor did I document any irrigation in my note as I did not perform any irrigation, nor was I present during any irrigation.

*2. He has repeatedly demonstrated poor communication with patients, families, peers, and attending physicians.*

28

USC(Irani)0612

I appreciate the fact that these issues have been brought to my attention but as the incident with the nurse above illustrates, I may have been misunderstood. Therefore I will increase my efforts to ensure I am being properly understood, including repeating what I have requested when appropriate. I appreciate the opportunity to spend time focusing on improving my communications skills with the grand rounds presentation which will be prepared in the time provided, as that is important to patient care, regardless of the care giver.

As part of my effort to improve communication, I will notify the appropriate attendings or peers regarding patients who I have been contacted about on call, so that incidents such as the VA patient (below), who I was told by the ER attending that I do not need to see, do not recur. This will also reduce interruption in patient care. This would be along the same lines as patient care/sign outs and hand-offs and understanding what has been accomplished and what remains to be done with patient care.

*3. He has repeatedly demonstrated poor time management with frequent tardiness to required conferences, clinics, and the operating room.*
*4. He does not demonstrate effective prioritization of clinical duties. This has resulted in additional duties for other residents.*

Many of these items are likely related to times when I have been required by my supervisors and/or attending to remain in one location when I am expected in another location. I frequently contact the location where I am expected to be and notify the nurses so that they may appropriately coordinate patient care. In the future, I will instead speak directly with the physician who is expecting me so that there is no confusion regarding perceived tardiness.

Regarding the additional duties for other residents. I always complete my work that's been assigned to me, often staying beyond recommended work hours, as I do not think it appropriate to burden fellow residents. No resident has brought to this my attention and when I requested that they do so, each of them stated there was no issue. If there are specific instances, I would be happy to help out whoever the resident who was burdened with my duties.

*5. He has provided substandard care (e.g. closing wound with Vicryl suture; not evaluating a VA total joint patient with post-operative cellulitis).*

Whenever I have been notified of errors. In the future I will proactively make my supervisors/attendings aware of a plan of care, and modify as guidance is provided to insure patients never receive substandard care.

*6. He received substandard evaluation during his internship.*

Once these evaluations were made known to me, I made significant improvements based on suggestions that were provided to me. Whenever my superiors raised issues I make every effort to address them and more recent evaluations reflect that. For example in my initial evaluation with trauma, I had the opportunity to discuss my performance with Dr. Bynoe. He offered good constructive suggestions for improvement, which I was glad to receive. I implemented them on my subsequent rotation, and my evaluation seems to reflect that.

*7. He has displayed a significant lack of attention to detail in his initial PGY-2 rotation.*

This might be related to perceived forgetfulness in the OR. Although I think that this too may be related to lack of communication. I am not just leaving things lying around. I am leaving them for specific individuals. I did not however mention that to the individual involved and that gets back to my need for improved communication.

29

USC(Irani)0613

I really appreciate your help and understanding in this matter. I take these allegations seriously as there are cases where an action like this precludes one from a fellowship, and results in significant difficulty obtaining a job.

I hope you will consider my statements above, and if there are any questions, I would be more than happy to provide third party references to substantiate the above statements, and/or speak with you in person or over the phone.

Thank you for your kind understanding.
Afraaz
650-353-8523

30

USC(Irani)0614

Exhibit D:
Documentation of Grievance Process
Aug./Sept. 2011

USC(Irani)0615

*The allegation was made by Dr. Koon on January 31ˢᵗ 2012 that I did not follow the grievance process as outlined in the Resident Handbook under Grievance and Due Process (Exhibit)*
*Note: I have italicized portions of the email to document the timeline/course of actions:*

*This first email documents my conversation with Dr. Koon and his recommendation to continue on with the grievance process pursuant to step 1.1:*

Date: Wed, 7 Sep 2011 22:19:22 -0400
Subject: Re: Department of Orthopaedics.
From: Afraaz Irani <afraaz.irani@gmail.com>
To: Katherine Stephens <Kathy.Stephens@palmettohealth.org>

Ms. Stephens,

Thank you for the phone call last week. *As we talked about, I was able to speak with Dr. Koon this morning. He encouraged me to talk to you more and/or attempt to appeal the decision if I had concerns.*

I was hoping you could help me with the next step. He mentioned an upcoming meeting where my academic remediation will be voted on. I had a few questions that I was hoping you could help me with. When is this meeting, who is involved with this, and how can I be represented? Additionally, I have had other staff willing to support my response to the perceived deficiencies. How do I make sure those letters are delivered to the appropriate faculty?Please advise me as the next step. If you have time I would be happy to meet. If a grievance council, is the next step, then please let me know how that can be accomplished in a timely manner that would allow me to represent myself before a vote on the academic remediation process takes place. Would it make more sense to meet with the grievance council before a decision is made?

Again, for me this action came as a dramatic shock. I have taken the comments to heart, and as has been the case in the past, I have already implemented the changes outlined in my previous email to you.

Please let me know, as I take this feedback and this process very seriously.

Respectfully,
Afraaz
650-353-8523

32

USC(Irani)0616

*Email from Kathy Stephens 9/8/12 Confirming satisfactory completion of step 1.1 of the Grievance Process:*

Date: Thu, 08 Sep 2011 09:59:45 -0400
From: "Katherine Stephens" <Kathy.Stephens@PalmettoHealth.org>
To: "Afraaz Irani" <afraaz.irani@gmail.com>
Subject: Re: Department of Orthopaedics.

Dr. Irani,

Please review the Grievance and Due Process policy in the Residents manual.  It is available online.  Here is a direct link:
http://residency.palmettohealth.org/documents/Graduate%20Medical%20Education/Resident%20Manual%202011-2012.pdf
There are also policies on Academic Remediation and the Graduate Medical Education Committee in the manual, which should provide answers to some of your questions.

*It appears that you have already initiated 1.1 of the Grievance and Due Process policy and need to move to 1.2 (i.e., meet with Dr. Walsh).  If you are not satisfied with his response, you should then contact my office to schedule a meeting with me.  Anne Marie Hyer (434-4416) can schedule the meeting, if needed.*

33

USC(Irani)0617

*Email from Dr. Koon himself confirming satisfactorily performing steps of the grievance process (1.1 and 1.2) Please also note that meeting scheduled for 07 Nov 11 below actually happened 21 Nov 11:*

From: David Koon <David.Koon@uscmed.sc.edu>
To: "Afraaz.irani@gmail.com" <Afraaz.irani@gmail.com>, Michelle Wehunt
     <Michelle.Wehunt@uscmed.sc.edu>, John Walsh <John.Walsh@uscmed.sc.edu>,
     "katherine.stephens@palmettohealth.org"
     <katherine.stephens@palmettohealth.org>
Date: Mon, 19 Sep 2011 11:05:19 -0400
Subject: Remediation Updates

All -

Just to keep everyone on the same page - we will be having periodic updates re: the academic remediation measures for Dr. Irani.

15 AUG 11 - Koon / Athey / Irani -  initial meeting

*07 SEP 11 - Koon / Irani - meeting re: the appeal / grievance process*

*10 SEP 12 - Walsh / Irani - meeting re: the appeal / grievance process*

19 SEP 11 - Walsh / Grabowski / Irani - scheduled 6 month evaluation (missed 22 AUG 11 due to post-call status)

03 OCT 11 (7:45 am) - progress report re: remediation measures

07 NOV 11 (7:45 am) - progress report re: remediation measures

05 DEC 11 (7:45am) - meeting with faculty re: Level II Academic Remediation status (15 AUG - 01 DEC 11)

Thanks

DKoon

34

USC(Irani)0618

Exhibit E:
Email to Dr. Stephens documenting Progress on Remediation
Nov. 7th 2011

USC(Irani)0619

*Dr. Koon stated that there "were some complaints about me," but refused to expound, and I was unable to validate them through the channels provided me:*

Date: Mon, 7 Nov 2011 04:38:53 -0500
Subject: update on progress
From: Afraaz Irani <afraaz.irani@gmail.com>
To: Katherine Stephens <kathy.stephens@palmettohealth.org>

Ms. Stephens,

Thank you for all your help over the past couple months.

I appreciate the opportunity to speak with you and your feedback.

I just wanted to update you on my recent meetings with Drs. Koon and Walsh. At our previous review on October 3rd, they mentioned things were progressing well, curriculum credit would not being withheld, and I am on track to complete the process by Dec 1st.

Thereafter, Dr Koon mentioned on 10/26 that he had heard some increased complaints about me. *When I asked for more details, he deferred saying simply to talk to Drs. Mazoue and Wood.*

*I individually spoke with Dr. Mazoue on 10/27 who said I was doing fine on his service.* When asked how I could improve, he suggested to try and work more quickly which I have attempted to do since. Otherwise he said I was doing fine and did not have any other suggestions.

*I individually spoke with Dr. Wood on 10/28 who said she did not have any issues to raise or complaints to address.*

Since this process has begun, it appears that everything is on track. At our last review on October 3rd, it was mentioned that should I wish to continue the grievance process it would strain my relationship with the chairman and program director. Accordingly, since everything is going according to schedule, and I was jeapordizing my relationship with my attendings, I suspended the grievance process based on their urging.

I appreciate feedback during my training process, and my goal is to obviously become a better resident. At this point, like most of my colleagues, I am working on becoming more efficient and knowledgeable.

Thank you for your continued support,
Afraaz

36

USC(Irani)0620

Exhibit F:
Email from Dr. Koon about VA patient dictation
Nov. 3rd 2011

USC(Irani)0621

From: David Koon <David.Koon@uscmed.sc.edu>
To: Afraaz Irani <afraaz.irani@gmail.com>, "jhoov14@yahoo.com"
        <jhoov14@yahoo.com>, "Jennifer, Wood" <jhwood23@gmail.com>, John Walsh
        <John.Walsh@uscmed.sc.edu>
Date: Thu, 3 Nov 2011 21:39:20 -0400
Subject: RE: VA patient

Dr. Irani -

I am well aware of the facts surrounding this patient's care and do not need you to remind me of the details.

I'm amazed that, as the junior resident of the PH team, you feel somehow inconvenienced by having to dictate a discharge summary on a patient that you "never actually participated" in his care. I guess that I'm supposed to be=
 thankful that you "have gone ahead and dictated the discharge summary" for me. Absolutely incredible...I can assure you that I would have NEVER in a million years sent a response like this to my program director, especially when I was in the midst of academic remediation. I would remind you that I had asked you THREE times to get this done. Instead of saying "No sweat Dr. Koon, I'll take care of it" and getting it done, I get this dribble.

I really am at a loss for words. Jennifer / Justin - I'm open to any suggestions.

DK

38

USC(Irani)0622

Exhibit G:
Documentation of Phone Call with Dr. Koon Post-Op Patient
Nov. 26th 2011

USC(Irani)0623

*Documentation of phone call 11-26-11. Events transcribed within three days of phone call:*

Patient called in stating she was having drainage from her knee. She was six week s/p total knee. Told her that I am concerned and would like her to come into ED. She said she had a couple scabs, and one fell off and now it is draining. Denies systemic symptoms. She pressed me asking what I thought it was. I told her if were a superficial scab that just came off it is probably OK, but if it is anything else, it could be an infection of the hardware, but I stressed that "I cannot tell you anything about your knee without taking a look at it." She the said she was in clinic this past week. She then she said that she was told that the scab would come off and drain. I told her I could not tell her anything about her wound and I would need to see it. She seemed satisfied and I didn't hear from her again.

Apparently she called twice again the next day and was told the same thing (not by me) and still did not present to the ER.

40

USC(Irani)0624

Exhibit H:
Level III remediation
December 12th 2011

41

USC(Irani)0625

UNIVERSITY OF SOUTH CAROLINA
SCHOOL OF MEDICINE

UNIVERSITY SPECIALTY CLINICS

12 DEC 11

Memorandum of Record

Re: Dr. Afraaz Irani (PGY-2 Orthopaedic Resident)

Dr. Afraaz Irani was placed on Level II Academic Remediation from 15 AUG – 01 DEC 11.

The faculty of the orthopaedic department met with Dr. Irani on Monday, 05 DEC 11. In attendance were Dr.s Walsh, Koon, Voss, Guy, Grabowski, McGown, McBryde, Hoover, and Wood, as well as Paul Athey, MBA. We met with Dr. Irani for over one hour.

We asked Dr. Irani many questions, ranging from his desire to be in an orthopaedic training program to patient care issues. Dr. Irani admitted to secretly recording phone calls with an attending surgeon (Dr. Abell). He repeatedly refused to give direct answers to several questions and failed to take responsibility for his actions in several patient care examples. Despite attending direction and encouragement to take ownership of his actions, he steadfastly refused to admit any wrongdoing, even when faced with overwhelming evidence to the contrary. He appeared to consistently lack insight into these issues.

Dr. Irani could not admit agreement to any of the initial remediation issues which led to his placement on Level II academic remediation.

Dr. Irani has displayed evidence of ongoing inadequate patient care. He has prescribed inappropriate doses of narcotics, failed to evaluate post-operative patients with wound care issues, and failed to abide by direct attending instructions during the care of clinic patients.

Dr. Irani has continued to display a lack of teamwork within the residency framework. He has repeatedly shown up late for morning rounds, been ineffective in preparing the morning "list", and has been delinquent in assigned tasks.

Dr. Irani displayed inappropriate patient care in the case of Trauma,F375. He displayed a lack of empathy and compassion, a lack of appropriate pain management, a neglect of appropriate informed consent, poor interpersonal communication, and a lack of appropriate teamwork with ancillary staff.

Dr. Irani has had multiple verbal and written counseling sessions regarding these deficiencies.

It is the recommendation of the faculty of the orthopaedic department that Dr. Irani be placed on immediate suspension from patient care (Level III Academic Remediation). This would involve a leave of absence beginning 09 DEC 11 thru (at least) 30 JAN 12. He would be restricted from any resident duties. He is required to attend psychological evaluation with Dr. Parnell on

DEPARTMENT OF SURGERY
Two Richland Medical Park, Suite 402, Columbia, SC 29203
803-256-2687, FAX 803-933-9545

42

USC(Irani)0626



UNIVERSITY OF SOUTH CAROLINA
SCHOOL OF MEDICINE

UNIVERSITY SPECIALTY CLINICS

Monday, 12 DEC and any follow-up appointments she deems necessary. He would be required to attend any psychological counseling sessions recommended by her evaluation. Curriculum credit will be withheld during this leave of absence.

The faculty will meet on/about 30 JAN 12 to evaluate his progress and determine the appropriate next step in Dr. Irani's academic remediation.

A copy of this memorandum will be provided to Dr. Irani. He is reminded of his option to appeal this action per the Grievance and Due Process policy in the Resident Manual.

David E. Koon, Jr., MD
Program Director

John J. Walsh, MD
Chair, Dept. of Orthopaedics

DEPARTMENT OF SURGERY
Two Richland Medical Park, Suite 402, Columbia, SC 29203
803-256-2657, FAX 803-933-9545

43

USC(Irani)0627

Exhibit I:
Documentation of events surrounding Trauma F110175
December 7th 2011

USC(Irani)0628

*Events documented within three days of incident:*

**Patient arrives as trauma 911 at 11AM.**

**Called down at about 2PM by Dr. Loflin (PGY-2 trauma resident), who told me Dr Nathe (Ortho intern) needed help (Dr. Nathe said Dr. Wood  told her to call me for help with patient).**

Arrive in POD 5.

Arlene (nurse) walks out of POD 5 room. Dr. Nathe in room.  I have not yet seen the patient, Nathe, or anyone else. Arlene immediately turns to me and states we need to talk about how all this was handled. I asked her what was wrong, and what I needed to do. Arlene refused to provide any guidance and only said we would talk about it at the end, and ended the conversation by walking away.

I realized that the nurses were upset, and therefore played everything by the book. I met with Nathe and reviewed all films. Together we assessed all injuries and determined a game plan. She brought the c-arm and we saw the patient again together. I introduced myself to the patient, described her injuries, and what we would be doing for her in the ER. I spoke with Dr Toussaint from neurosurgery and Dr. Loflin from Trauma. I was informed sedation was not an option in this patient. I told the patient we were going to splint and reduce her right ankle. I asked the nurse for fentanyl. Fentanyl was given. Her right lower extremity was unwrapped. An intrarticular block (local lidocaine) performed. After appropriate local and systemic anesthesia given, we irrigated her wound with 2L sterile normal saline because it was an open wound, and start reduction under fluoro.  (nursing charting also documents administration of pain meds and reduction of right lower extremity as described above).

Diane Savage (another assistant nurse manager) around this time, stepped in for a few seconds, but stepped back out again as we were using fluoro and there was radiation exposure. I did not see her again during rest of procedure.

Attention was then turned to left upper extremity. The room was small and I had difficulty making it around bed, but we all had to work efficiently with what we had. I again explained the injuries to the patient, and asked if she was OK, and if her pain was under control. She stated she was alright. We explained we would irrigate the arm and perform a reduction. We began reduction. During this time, Dr Nathe took some final fluoro pics of RLE in splint. I said that is a hard reduction, that's as good as we are going to get it down here, and we will have to take care of it upstairs in the OR.  After reductions performed, again explained to patient exactly what had been done.

The sheets were wet, so I helped the nurses change the wet sheets.

The patient stated she wanted to see her parents. I told patient I was going to talk to her family and that I would make sure she was not going anywhere until she saw her parents. I stepped out. I spoke with nurse (Arlene), who again said we need to talk about how situation was handled

45

after things were finished. Again I asked what we could do. Again all that was said was that we would talk about it later. I wrote the consent and spoke with family (mother and father) in consultation room with Arlene. I made sure all questions were answered satisfactorily.

Nursing staff wanted to meet. Arlene, Elaine, Dr Nathe and myself met. Elaine states that the patient was scared and confused. When addressing informed consent, the nurse stated consent was needed not because it was indicated, but because the nurses have to "cover our assess." (Of note: this all happened before I had arrived -- I was not involved in the informed consent discussion at all). Arlene seems to take issue with our care stating that two washouts and reductions were "pretty complicated for an ER." Of note the nurses did not look at me or address me when giving feedback.

I thanked the nurses for their feedback. I go back to room to check on the patient. She seems to be doing fine. I step out to bring family back. I bring the family back to the ER. The patient is getting an EKG. I use that time to show the family all the xrays of their daughter's injuries on the xray viewing stations in the ER and again explain what we would be doing. I escort the family personally back to the patient's bedside.

I spoke with family and patient frankly about injuries (I was most concerned about Right ankle in terms of some long term pain) Never at any point did I tell patient or parents there is a chance she would not walk again. I spoke with the patient about each injury in detail and possible long term ramifications. Answered all questions for both the family and patient. Explained the severity of the injuries frankly and honestly, and what we were going to do in the OR. Explained the risks/benefits/alternatives of all her injuries. All questions were satisfactorily answered. I asked the nurses if they needed anything else. They said they did not. The OR was calling for the patient.

At this time Nathe and I left with the c-arm as there was another patient upstairs with an open ankle that needed an urgent reduction.

46

USC(Irani)0630

Exhibit J:
Supplemental Documentation for
Rebuttal to Level II remediation
December 12th 2011

USC(Irani)0631

*On Nov. 21ˢᵗ Dr. Koon stated he would recommend me for level I remediation based on activities in July that predated my being placed on probation. 1 ½ weeks later on Dec. 5ᵗʰ he recommended Level III remediation. The following four events are the only events that happened in the interim justify this change in recommendation:*

1) *In paragraph 5 there is a statement that I failed to evaluate post-operative patient with wound care issues.* This patient called me on Saturday, I told her to come to the ED. She called the other resident twice on Sunday and was told to come in. She did not follow these instructions. The patient did not present. Both the other resident and I corroborated this is what we told the patient. Short of going to the patient's house, we had no other options. We both instructed the patient to come in for evaluation.

2) *Repeatedly shown up late for morning rounds.* During the entire remediation process, I showed up late twice. It was in the same week (unfortunately the last week). This was due to known bug in the Android operating system where the alarm did not go off. This has happened to other residents outside the department who have the same operating system and is corroborated with multiple posts online.
 (e.g.: http://www.droidxforums.com/forum/droid-x-general-discussion/2027-alarm-clocks-not-working.html, http://www.droidforums.net/forum/droid-general-discussions/34414-alarm-clock-not-working.html, http://www.droidforums.net/forum/droid-x-tech-support/62007-alarm-clock-not-working.html, http://androidforums.com/motorola-droid/22323-alarm-clock-not-working.html) . Again this only happened twice.

3) *Failure to abide by direct attending instruction during the care of clinical patients.* I was asked to get an MRI that day on a  patient in clinic. I told the nurse. She said we were not able to get it until the next day. I "accepted" this before going back and talking with the chief resident who told me to call over to radiology.  Since I had never done this before, I was not familiar with the process. At my chief resident's direction, I called radiology and got the scan ordered that evening. Patient care was never compromised or in danger of being compromised.

4) Inappropriate care regarding TF375. As I detailed in my previous email, I absolutely toed the line in treating this patient. They have still not revealed all the documentation to me. It is interesting to note that my entire time here, only one nurse/pair of nurses have ever had issues with my patient care.

48

USC(Irani)0632

Date: Wed, 4 Jan 2012 12:56:14 -0500
Subject: Suspension
From: Afraaz Irani <afraaz.irani@gmail.com>
To: Katherine Stephens <Kathy.Stephens@palmettohealth.org>

Ms. Stephens,

Thank you for meeting with me yesterday. Just to reiterate the points of our conversation. The scheduled reviews of my performance have been for the most part positive until taking a sharp and sudden recent turn. On Nov. 21ˢᵗ Dr. Koon stated to me that he would recommend level I remediation. Between that time and the time of his letter, he changed his mind to level III remediation with suspension. Looking at the complaints in the most recent letter, I attempted to ascertain what caused this change. Dr. Koon's letter identified four issues in the interim that according to his letter formed the basis for his recommendation.

As I discussed with you, I provided my justification of the three more minor points. I would like to focus on the perceived major issue. I was told that the suspension was in response to the handling of TF 375 and the purpose of the suspension was to perform an investigation to get all sides of the story including mine. Unfortunately, this did not happen; no one ever solicited to my side of the story.

Needless to say I am extremely disappointed with how this has been handled. Not only was my opinion never solicited, but I was never made aware of the accusations to defend myself. Furthermore, contradictions were identified during the investigation and the investigator was unable to verify statements that were inaccurately attributed to me.

Moreover, I find it more concerning that the written and stated Palmetto Health guidelines were not followed. Judgment was based on hearsay, and I was never involved. More than violating guidelines, I was not even afforded the basic human courtesy of communication or asked what happened.

I fully stand by my care of this patient. You are welcome to interview the other witnesses involved with this case (Kristin Nathe the ortho intern, Toni the cast tech, and Dr. Loflin the trauma resident). I hold myself to a high standard. It is interesting that I have only had two complaints against me from ancillary staff: same individuals both times.

I welcome you to talk to any other staff, be it in the ER, the orthopaedics floor where I spend majority of my time, the ICU, the operating room, or my fellow residents. Please talk to these people. I'm confident they will validate that my care has been professional and appropriate. At your request I will be more than happy to provide additional references.

I would like to defend myself against these accusations which have severely and perhaps irreparably damaged my reputation throughout the hospital, so that I may take the necessary steps to defend my name against slander.

Let's as a team determine what really happened during this incident. If there is room for

49

improvement I am always to happen listen, but I believe this case has not been handled appropriately or fairly.

I have attached my writeup of the events regarding this patient, which I typed up the day after the incident. Again, my opinion was never solicited.

To add insult to injury I received a phone call this morning saying they had mistakenly paid me, and I need me to come in and write a check for the amount of my last paycheck.

Thank you.
Afraaz

50

USC(Irani)0634

*More detailed rebuttal to suspension letter with line by line breakdown:*

*We met with Dr. Irani for over one hour*
Small point, but nonetheless, it was closer to 40 minutes.

*Dr. Irani admitted to secretly recording phone calls with an attending Surgeon (Dr. Abell)*
Two times prior Dr. Abell (locums attending who sometimes covers weekends) had provided contradictory statements to what we had discussed. On this third rather contentious issue, where I was given two contradictory instructions by Dr. Guy and Dr. Abell, I had no choice but to protect myself. He had previously called me a "dumbass," and I was about tell him I was not comfortable doing something by myself that he wanted me to do. I told him five times, I was uncomfortable reblocking and re reducing a young girl, because I had been directed previously by Dr. Guy about the dangers inducing carpal tunnel syndrome in these patients. I expressed my concerns about performing a reduction on a patient with local anesthetic, and requested that we use conscious sedation where the patient is not aware of her surroundings (propofol). The emergency department agreed to this plan. Dr. Abell steadfastly told me not to do this. 45 minutes later, he proceeded to confront m on my management. He insisted that I could have done it using conscious sedation despite his statements 45 minutes prior to the contrary. I had expressed these concerns previously to my department, but to no avail.

*Dr. Irani could not admit agreement to any of the initial remediation issues which led to his placement on Level II academic remediation.*
The statement is false. Dr, Koon has said multiple times (multiple witnesses) that I disagreed with 6 out of the seven statements. Now that statement has changed despite documentation to the contrary.
In any case, when I was placed on remediation initially the points Koon raised were new to me and came as a shock and a surprise.  In order to understand the complaints, I presented how I perceived them, and asked if he could clarify some of the statements. In return he simply said "that just shows you lack insight." Accordingly, there was never a discussion about what I should do differently, or where exactly some of these generic complaints came from. Indeed some statements, such as "resulted in additional duties for other residents" was never substantiated. I spoke with each resident individually who had no complaints about me creating extra work on their behalf. There was no attempt to clarify, hear another side of the story, or give constructive criticism. This obviously made following his standards and guidelines somewhat more difficult.

*He prescribed inappropriate doses of narcotics, failed to evaluate post-operative patient with wound care issues and failed to abide by direct attending instructions during the care of clinic patients"*
Please see text for further documentation. Briefly:
Regarding the narcotics allegation, this was a patient whom I had seen in clinic, and in the operating room, and had a fairly sizeable surgery. That night her husband called a few times for pain. At each call, I let her take 5mg more of oxycodone. At some point he reached 25mg/4hours. I told him she may take up to 25mg over four hours (as we had been doing when he called me each time – essentially telling him to continue the current regimen). This was interpreted by the patient as 25mg every four hours instead of over four hours. Additionally I

51

immediately informed the team the next AM, and Dr. Walsh was able to call and speak with the patient.

Regarding the patient with wound care issues. She called me once on Saturday. I told her to come to the ED. She did not. She called twice on Sunday when a different resident was on. He told her the same thing She did not present. The other resident and I both spoke with each other and we both told the patient to come in. It is unfortunate that she was not able to find means to present to the ED.

Regarding failing to follow instructions of attending. I was in the middle of trying to obtain a stat MRI. I was initially told by the clinic staff that the MRI could not be done until the next day. The attending wanted it done that evening. I talked to Dr. Wood in the hallway who told me to call Radiology. I did so. At no point was I ready to, or preparing to, send the patient without obtaining the MRI as directed by my attending, unless it was impossible to obtain, at which point the plan would have been discussed with my attending. The patient was not discharged with improper instructions and I was in the middle of my workup. I think this was an unfortunate misunderstanding, but something that never did compromise patient care, or never did go against the attending's plan.

*Continued to display lack of teamwork within the residency framework. He has repeatedly shown up late for morning rounds, been ineffective in preparing the morning "list", and has been delinquent in assigned tasks.*

In the past several months I have shown up to morning rounds late twice. These were both in the same week, and due to a known bug with the Droid operating system and the alarm. The same problem happened to Dr. Zack Broch from trauma surgery, who has corroborated this known bug (please reference earlier in Exhibit G for online documentation of this bug).

Regarding the list, I was actually *put back on* the task of making the list, because the med students were ineffective at doing it. Moreover if this was a concern, I feel it should have been addressed earlier during my previous meetings, as this was over the summer, and is only now being raised.

Additionally, regarding being late to conference in the AM, of the 6 times I have been late over the past several months (including times of 6:31 being recorded as "late"), only once was I the last person to arrive. Accordingly, I believe I am actually the person who is statistically least likely to show up late to conference. Additionally Dr. Koon about a month ago, said you don't need to write down times, I will let you know if you are showing up late. He did not let me know I was showing up late. (witnessed).

*Dr Irani displayed inappropriate patient care in case of Trauma,F375. He displayed a lack of empathy and compassion."* I have still not heard the official writeup of the complaints. Please see full documentation in accompanying exhibit for all details.

This whole episode was witnessed by our cast tech Toni. In addition the trauma resident Catherine Loflin can attest to the fact the nurses were upset before my arrival and none of this was of my doing. Yet somehow I got singled out. Additionally I spent time with the family explaining to them, I am confident they may speak with the family and determine my "empathy and compassion."

*Dr. Irani had multiple verbal and written counseling sessions regarding these deficiencies*

52

Again as demonstrated above, they were not "counseling," as I was not able to elicit any constructive feedback. Moreover, all my reviews said things were progressing well up until about a couple weeks or so ago, when Koon got that email and decided to change gears.

Lastly, regarding duty hours, it is also worth noting that in my original email response to the initial letter of remediation under the bullet point *"resulted in additional duties for other residents,"* I wrote "Regarding the additional duties for other residents. I always complete my work that's been assigned to me, *often staying beyond recommended work hours*, as I do not think it appropriate to burden fellow residents."

53

Exhibit K:
Multiple Requests Asking for Documentation
Of Improper Behaviour alleged by nurses regarding Trauma
F110175
December/January 2011/2012

USC(Irani)0638

*Email 12/16/11. Please note in the second to last paragraph where I request documentation.*

Date: Fri, 16 Dec 2011 14:30:55 -0500
Subject: Re: Residency
From: Afraaz Irani <afraaz.irani@gmail.com>
To: Katherine Stephens <Kathy.Stephens@palmettohealth.org>


Ms. Stephens,

On December 12, 2011, I was informed that the faculty of the orthopaedic department have recommended that I be suspended and placed on Level III academic remediation at least until the end of January 2012.

As you might imagine, this was a tremendous disappointment for me as I take my commitment to my job very seriously. This action would have a devastating effect on my residency and would likely preclude me from pursuing my career goal of obtaining a fellowship after residency. Since my previous probation instituted by Dr. Koon from August 15 to December 1, I have done everything I know to do to comply with the academic remediation plan. I felt like I was making very good progress, seeking and accepting constructive criticism, and consciously taking on extra duties to support my fellow residents. As you know, I had to discontinued the grievance process over my probation so as not to further jeopardize my relationship with my attendings.

Unfortunately, my relationship with Dr. Koon appears to have become completely derailed in the past few weeks. I believe that Dr. Koon's displeasure with me started with an e-mail exchange on November 3 involving a discharge dictation for a VA patient. Dr. Koon requested that I do the discharge dictation, although I never participated in the patient's treatment or care. I was not trying to shirk my duties; my cover letter to Dr. Koon merely explained my confusion about how I was assigned to the dictation. I believe that Dr. Koon misinterpreted my cover e-mail because he really unloaded on me in his e-mail response.

I strongly disagree with the latest allegations against me as set forth in Dr. Koon's memorandum of December 12, 2011. Please accept this letter as my request for a grievance of my suspension and the proposed disciplinary action pursuant to the Grievance and Due Process provisions in the Resident Handbook. Please also accept this letter as a request for a meeting with you, as the DIO, to discuss the grievance.

*To allow me to have a better understanding of the circumstances surrounding my proposed suspension, please provide to me copies of all documents on which the proposed Level III remediation is based, including a copy of the complaint against me arising out of Trauma case F375.* Although I fully understand that I am only a PGY-2 resident with much to learn, I am confident that my care of this trauma patient was appropriate, empathetic, and compassionate.

With regard to the required psychological evaluation by Dr. Parnell, as I e-mailed you before, I had to cancel the appointment on Monday afternoon, December 12, because I was feeling very ill

55

that day. When I called Dr. Parnell's office the following day to reschedule my appointment, she informed me that her next available appointment is not until January. I am also uncertain about the nature of my upcoming visit with Dr. Parnell. Can you please provide further explanation to me about what Dr. Parnell will be evaluating and why such an evaluation was ordered by Dr. Koon? I mean no disrespect, but I am very uncomfortable with this situation and would prefer to see a provider of my own choice.

Thank you,

Afraaz

56

USC(Irani)0640

*Repeat Request 1/13/12 for documentation from Dr. Stephens:*

Date: Fri, 13 Jan 2012 19:43:39 -0500
Subject: Re: Grievance Decision
From: Afraaz Irani <afraaz.irani@gmail.com>
To: Katherine Stephens <Kathy.Stephens@palmettohealth.org>

Ms. Stephens,

Thank you for your prompt reply.

I need a copy of all the original documents/complaints/
allegations against me regarding Trauma F375.

I had requested these records previously; please let me know how I may get a copy so that I may
understand the complaints against me and I can move forward.

Thank you,
Afraaz

57

USC(Irani)0641

*Email 1/16/12 effectively denying my request for documents surrounding accusations of improper care:*

Date: Mon, 16 Jan 2012 10:02:04 -0500
From: "Katherine Stephens" <Kathy.Stephens@PalmettoHealth.org>
To: "Afraaz Irani" <afraaz.irani@gmail.com>
Subject: Re: Grievance Decision

Dr. Irani,

You have already seen the issues specific to the trauma patient situation and should already know what they are, including poor interpersonal communication to the point that Palmetto Health's vision - "to be remembered by each patient as providing the care and compassion we want for our families and ourselves" - was not met in this case.

Rather than focusing on gathering documents, your focus should be on meeting the terms of your remediation plan. As you know, Dr. Koon will discuss with you next steps in your remediation at the end of this month.

Dr. Stephens


Katherine G. Stephens, PhD, MBA, FACHE
Vice President, Medical Education and Research
ACGME Designated Institutional Official
Palmetto Health
Fifteen Medical Park, Suite 202
Five Richland Medical Park Drive
Columbia, SC 29203

803-434-6861 or 803-434-4476

katherine.stephens@palmettohealth.org

58

USC(Irani)0642

Exhibit L:
Documentation of Adhering to Guidelines of the Grievance
Process
December/January 2011/2012

59

USC(Irani)0643

*Dr. Koon alleged Jan 31st 2012 that I failed to follow the grievance policy guidelines. Below is documentation of the process:*

*Having met with both Drs. Koon and Walsh at the faculty meeting I requested clarification from Dr. Stephens if I should redo steps 1.1 and 1.2:*

Date: Fri, 16 Dec 2011 14:30:55 -0500
Subject: Re: Residency
From: Afraaz Irani <afraaz.irani@gmail.com>
To: Katherine Stephens <Kathy.Stephens@palmettohealth.org>

Ms. Stephens,

Thank you for your response. Since both Dr. Walsh and Koon were at the faculty meeting and spoke with me I was not sure if you would like me to speak to Dr. Walsh again. I would be happy to do so if you feel that it is the most appropriate next step.

Please let me know what you think the next best step is, and I will act accordingly.

Thank you again for your help.
Afraaz

60

USC(Irani)0644

*Email response from Dr. Stephens confirming that I had completed step 1.1 and the next step was to carry out step 1.2 (meeting with Dr. Walsh):*

From: "Katherine Stephens" Kathy.Stephens@PalmettoHealth.org
To: "Afraaz Irani" <afraaz.irani@gmail.com>
Cc: "John Walsh" <john.walsh@uscmed.sc.edu>
Subject: Re: Residency

Dr. Irani,

Please refer to the PH Resident Manual Grievance and Due Process policy. Step 1.2 directs you to meet with your Director of Education as your next step. In Orthopaedics, that is Dr. Walsh. If the response from Dr. Walsh is unsatisfactory to you, your next step would be to meet with me.

Once you have met with Dr. Walsh, if you wish to continue the process, please contact me again.


Katherine G. Stephens, PhD, MBA, FACHE
Vice President, Medical Education and Research
ACGME Designated Institutional Official
Palmetto Health
Fifteen Medical Park, Suite 202
Five Richland Medical Park Drive
Columbia, SC  29203

803-434-6861 or 803-434-4476

katherine.stephens@palmettohealth.org

61

USC(Irani)0645

*Email again 12/19/11 confirming proper adherence to the grievance process:*

Date: Mon, 19 Dec 2011 11:02:13 -0500
From: "Katherine Stephens" <Kathy.Stephens@PalmettoHealth.org>
To: "Afraaz Irani" <afraaz.irani@gmail.com>
Cc: "John Walsh" <john.walsh@uscmed.sc.edu>
Subject: Re: Residency


Dr. Irani,

I see that you have contacted Dr. Walsh about meeting with him.  That is the next step.



Katherine G. Stephens, PhD, MBA, FACHE
Vice President, Medical Education and Research
ACGME Designated Institutional Official
Palmetto Health
Fifteen Medical Park, Suite 202
Five Richland Medical Park Drive
Columbia, SC  29203

803-434-6861 or 803-434-4476

katherine.stephens@palmettohealth.org

62

USC(Irani)0646

Exhibit M:
Conversation with Dr. Walsh about effect of suspension on graduation
January 2012

63

USC(Irani)0647

*The below document summarized my hope that my meeting with Dr. Walsh would yield some answers about my concerns about having to report the suspensions on future job applications, and my concern about graduating late because of this.*

*This document was sent to my colleague. Name has been removed to protect third parties:*

Date: Wed, 18 Jan 2012 14:26:29 -0500
Subject: update
From: Afraaz Irani <afraaz.irani@gmail.com>
To: [censored]

[censored],

Quick update. I spoke with Dr. Guy last night. I explained to him where I thought the errors were. He in turn said he would speak with Dr. Walsh. I got a call this AM from Dr. Walsh, who said he could meet with me this AM. I talked to him, told him my two biggest concerns were about making up the academic credit and having to report the suspension. He said, that he thinks they can work out the academic credit such that I graduate on time (although it might involve vacations etc... -- although I haven't used any vacation this year anyway...) and I told him my second issue was the suspension. He said he would talk to Kathy within the next day or two and see about that (he doesn't know if that can be changed to "leave of absence" or something -- he was less hopeful about getting that changed.) But in any case that's the most positive development I got so far -- so  I guess I'll see what will happen with that and keep you posted?...

Thanks,
Afraaz

64

*Follow-up email to Dr. Walsh after I had not heard back after our meeting 1/18. I was waiting for a response, based upon which I was to determine if I needed to continue my grievance by requesting a grievance council:*

Date: Tue, 24 Jan 2012 02:20:58 -0500
Subject: follwup
From: Afraaz Irani <afraaz.irani@gmail.com>
To: John Walsh <John.Walsh@uscmed.sc.edu>

Dr. Walsh,

Thank you for meeting with me last week. I have learned from the feedback, and have had time to reflect on my performance.

I was encouraged to hear that I can make up the time off without delaying my graduation.

I was also glad to hear that you do not believe this is a punitive process. I am concerned about the suspension and how that may be viewed in an increasingly competitive job market; I am hopeful that calling this time off a leave of absence may achieve the same goals, without harmful long-term effects.

My understanding of the grievance process was that the recommendations/actions are now reviewable and open to modification; I hope this option can be explored.
I look forward to incorporating the feedback of the department, working toward becoming a better resident, and rejoining my fellow residents to finish my training.

Thank you,
Afraaz

65

USC(Irani)0649

*I had not heard back from Dr. Walsh, with the deadline for the grievance council fast approaching I sent another email to Dr. Walsh:*

Date: Thu, 26 Jan 2012 22:03:04 -0500
Subject: Re: follwup
From: Afraaz Irani <afraaz.irani@gmail.com>
To: John Walsh <John.Walsh@uscmed.sc.edu>

Again 1/26:
Dr. Walsh,

I appreciate all your help with the remediation process.

Last time we spoke you had talked about having my time off recorded as a leave of absence so as not to have any punitive long term effects.

I was just hoping for a little guidance about how that works --  do I need to go through the grievance council, or can that be worked out at this stage after your meeting with Kathy Stephens?

Thanks again for your understanding and input.

Afraaz

66

USC(Irani)0650

*Response from Dr. Walsh, which came only after the grievance deadline passed. It is interesting to noted that he was well aware of when the grievance deadline passed. Note: I did actually file for a grievance council within 10 business days. A movement that was denied.*

From: John Walsh <John.Walsh@uscmed.sc.edu>
To: Afraaz Irani <afraaz.irani@gmail.com>
Date: Sun, 29 Jan 2012 22:04:50 -0500
Subject: RE: follwup

Afraaz- I made it clear when we spoke that I did not have the authority to change the wording of your suspension, and that I doubted that it could happen at all. The deadline for the grievance committee passed last week. My comments re: punitive were intended to convey that this is a process of academic remediation, and not some form of punishment. Further progress in your residency is up to you and your willingness to demonstrate growth in the areas you are aware are concerns in your performance.

We can discuss this further on Tuesday.


John J Walsh IV
Professor and Chairman
University of South Carolina
School of Medicine
Department of Orthopaedics

67

USC(Irani)0651

Exhibit N:
Email Requesting different oversight for the remediation process
January 30 2012

USC(Irani)0652

*I had sever misgivings about the treatment I was receiving from Dr. Koon. I sent an email expressing my reservations and my request to have someone else be my mentor for this process.*

Date: Mon, 30 Jan 2012 12:16:26 -0500
Subject:
From: Afraaz Irani <afraaz.irani@gmail.com>
To: John Walsh <John.Walsh@uscmed.sc.edu>

Dr. Walsh,

Last time we met, one of the things you asked me to think about, was how I would like to be better "heard." I know during the remediation process, I have expressed wanting more clarification on some of the points raised.

As you know I have recently been speaking with Dr. Guy. I feel more open to talk, and have appreciated the feedback, communication, and guidance that he has provided me with the remediation, and benefit greatly with this method of feedback.

I spoke with him about it and wanted to run it by you – in order to be better "heard," at least moving forward, I would greatly appreciate if it could be arranged such that Dr. Guy would handle the remediation process. I think this would allow me to better understand issues as they arise and discuss them in a setting where I can explore and understand the issue -- and ultimately better work toward becoming a better resident based on goals set forth by the faculty.

Please let me know what you think.

Thank you,
Afraaz

69

USC(Irani)0653

Exhibit O:
Level II Remediation
January 31st 2012

USC(Irani)0654

*Please Note: The document below incorrectly states that I did not appeal beyond the DIO level. On the official document that I signed, I corrected this erratum and wrote I did file an appeal for the grievance council.*



**UNIVERSITY OF SOUTH CAROLINA**
**SCHOOL OF MEDICINE**

**UNIVERSITY SPECIALTY CLINICS**

31 JAN 12

Memorandum of Record                    Re: Dr. Afraaz Irani (PGY-2 Orthopaedic Resident)

Dr. Afraaz Irani was placed on Level II Academic Remediation from 15 AUG 11 to 01 DEC 11.

Dr. Irani was placed on Level III Academic Remediation from 09 DEC 11 to 31 JAN 12.

Dr. Irani proceeded thru the Grievance Process in both instances through the DIO appeal level, and his appeal was denied both times.  Dr. Irani did not appeal beyond the DIO level.

It is the recommendation of the faculty of the orthopaedic department that Dr. Irani be placed on Level II Academic Remediation beginning 06 FEB 12 thru 15 JUN 12.

It is our recommendation that the Palmetto Health Academic Remediation plan be instituted. (see attached)

Dr. Irani is also required to attend individual outpatient counseling thru the Palmetto Health E-CARE with Dr. Janice McMeekin or other E-CARE counselor on the schedule recommended by E-CARE.  He is responsible for arranging and attending these sessions.  The first appointment must occur by 15 FEB 12. He is responsible for providing electronic verification of these sessions within 48 hours to the Program Director.

Dr. Irani will be placed on the Total Joint service with Dr. Frank Voss beginning Monday, 06 FEB 12. He is required to arrange and attend bi-weekly meetings with Dr. Voss to review his performance.  He will also arrange and attend monthly meetings with his Program Director to review the progress with his remediation measures.

Dr. Irani will be required to make up all missed call days within the remediation period.  He will adhere to all duty hour restrictions per the ACGME guidelines.

Dr. Irani will no longer secretly record any conversation or phone calls.

These recommendations will be reviewed with Dr. Irani on 31 JAN 12 and will be forwarded to the GMEC Executive Committee for review / temporary approval on 01 FEB 12. Review / approval by the GMEC will be on 14 FEB12.

Dr. John Walsh                    Dr. David Koon                    Dr. Frank Voss
Chair, Dept of Orthopaedic Surgery    Program Director              Vice-Chair, Dept of
                                                                     Orthopaedic Surgery

**DEPARTMENT OF SURGERY**
**Two Richland Medical Park, Suite 402, Columbia, SC 29203**
**803-256-2657, FAX 803-933-9545**

71

USC(Irani)0655



**UNIVERSITY OF SOUTH CAROLINA**
SCHOOL OF MEDICINE

**UNIVERSITY SPECIALTY CLINICS**

# Palmetto Health Academic Remediation

### Personal Data

| | |
|---|---|
| Resident: Afraaz Irani, MD | Dates of Action: 2/6/12 – 6/15/12 |
| Program: Orthopaedic Surgery | Program Year level: 2 |

Academic Remediation Action Proposed:

☐ Level I   ☒ Level II   ☐ Level III   ☐ Termination

### History / Date

| History | Date |
|---|---|
| Remediation, Level II | 8/15/11 – 12/1/11 |
| Remediation, Level III | 12/9/11 – 1/31/12 |

### Procedures / Date

| Procedures | Date |
|---|---|
| Resident informed of recommendation | 1/31/12 |
| Projected GMEC Exec. Com. action | 2/1/12 |
| Projected date of GMEC action | 2/14/12 |
| Projected date of progress reports to GMEC | 4/10/12, 6/12/12 |

**Assessment of factors impacting Dr. Irani's performance:**

- Attitude of the resident
- Commitment to lifelong learning and self improvement
- Intellectual honesty with patients, colleagues, and self
- Professional ethical standards

*DEPARTMENT OF SURGERY*
Two Richland Medical Park, Suite 403, Columbia, SC 29203
803-256-2657, FAX 803-933-9545

72

USC(Irani)0656



UNIVERSITY OF SOUTH CAROLINA
SCHOOL OF MEDICINE

UNIVERSITY SPECIALTY CLINICS

# Remediation Plan

**Resident:** *Afraaz Irani, MD*

## Timeline

| | |
|---|---|
| Dates of Action:  2/6/12 – 6/15/12 | |
| GMEC Executive Committee Temporary Action date: 2/1/12 | |
| Projected GMEC Action date: 2/14/12 | |
| GMEC Progress report(s) on:  4/10/12, 6/12/12 | |

## Remediation plan for each competency not being met

| Competencies not being met | Remediation Plan | Evaluation Tools |
|---|---|---|
| Patient Care:<br>IV.A.5.a).(6).(a) communicate effectively and demonstrate caring and respectful behaviors when interacting with patients and their families;<br>IV.A.5.a).(6).(c) make informed decisions about diagnostic and therapeutic interventions based on patient information and preferences, up-to-date scientific evidence, and clinical judgment;<br>IV.A.5.a).(6).(d) develop and carry out patient management plans | Display empathy and compassion in all patient encounters.<br>   Discuss injuries with patients and families in laymen terms.<br>   Follow patient care plan set out by attending and/or senior resident.  If plan needs to be altered in any way, inform attending and/or senior resident immediately of changes to patient care plan.<br>   Read and prepare appropriately for clinics and operative cases.<br>   Discuss all cases preoperatively with attending.<br>   Discuss every consult/patient/phone call taken while on call with chief resident. Check out immediately if urgent; check out the next morning if not urgent.<br>   Orthopaedic consults:  See patient. Evaluate patient. Order appropriate imaging and/or other studies as indicated. Provide timely and appropriate management to patients, including pain management. Obtain consents when necessary, mark patient when necessary, prepare patient for OR when necessary. Devise appropriate plan of action for care. | Direct observation and feedback from faculty, attending(s), nurses, peers, and patients<br><br>Review of patient outcomes |

*DEPARTMENT OF SURGERY*
Two Richland Medical Park, Suite 402, Columbia, SC 29203
803-256-2657, FAX 803-933-9545

73

USC(Irani)0657



UNIVERSITY OF SOUTH CAROLINA
SCHOOL OF MEDICINE

UNIVERSITY SPECIALTY CLINICS

| | Then call senior resident or attending. | |
|---|---|---|
| **Medical Knowledge:**<br>IV.A.5.b) Residents must demonstrate knowledge of established and evolving biomedical, clinical, epidemiological and social behavioral sciences, as well as the application of this knowledge to patient care. | Read all assigned articles/chapters for conference. Be prepared to have interactive discussion/answer questions based on the assigned reading.<br>When on call over weekend, be prepared and present patients at fracture conference. Be prepared to discuss fracture classification, treatment options, outcomes, etc. | Direct observation and feedback from faculty, attending(s), and peers |
| **Systems Based Practice:**<br>IV.A.5.c).(1) identify strengths, deficiencies, and limits in one's knowledge and expertise | Respond to constructive criticism in an appropriate and professional way. Admit and apologize for mistakes and be willing to endorse personal flaws. Take immediate action to correct deficiencies. | Direct observation by program director and faculty |
| **Interpersonal and Communication Skills:**<br>IV.A.5.d).(1) communicate effectively with patients, families, and the public, as appropriate, across a broad range of socioeconomic and cultural backgrounds;<br>IV.A.5.d).(2) communicate effectively with physicians, other health professionals, and health related agencies;<br>IV.A.5.d).(3) work effectively as a member or leader of a health care team or other professional group | Morning list ready by specified time daily set by chief resident. List includes up to date labs, vitals, patient plans, antibiotics, UOP, drain output, etc.<br>All assigned patients appropriately rounded on before morning conference.<br>Present to conference room by 6:25am every morning.<br>Report to OR and/or clinic immediately after conference is concluded.<br>Be on time to all assigned outpatient clinics.<br>Check out every day at the end of the day with chief resident regarding inpatients.<br>Communicate clearly and effectively with attending, ancillary staff, peers and families.<br>Respond appropriately to text messages and emails in a timely fashion.<br>Perform postoperative checks on all patients operated on, or needing postoperative checks at end of day.<br>Perform discharge or transfer summaries in a timely fashion, including patients as instructed by chief resident and/or attending, regardless of your involvement in the patient's care.<br>Perform other duties as assigned by | Direct observation and feedback from faculty, attending(s), nurses, peers, and patients |

*DEPARTMENT OF SURGERY*
Two Richland Medical Park, Suite 402, Columbia, SC 29203
803-256-2657, FAX 803-933-9545

74

USC(Irani)0658



UNIVERSITY OF SOUTH CAROLINA
SCHOOL OF MEDICINE

UNIVERSITY SPECIALTY CLINICS

|  |  |  |
|---|---|---|
|  | attending / senior resident with a good attitude.<br><br>If holding call pager during day, keep attending informed on whereabouts when seeing consults/attending to call issues.<br><br>Return phone calls, pages in timely fashion.<br><br>Work effectively and efficiently within the patient care team, including nurses and ancillary staff. |  |
| Professionalism:<br>IV.A.5.e).(6) commitment to excellence and ongoing professional development | Commit to immediate and sustained improvement in all areas listed above. | Direct observation by attending(s) and faculty |
| Practice Based Learning and Improvement: |  |  |

**Additional remediation requirements**

| Standards of Behavior | Dr. Irani to review and adhere to Palmetto Health's Standards of Behavior – available at http://residency.palmettohealth.org/documents/Graduate%20Medical%20Education/Resident%20Manual%202011-2012.pdf |
|---|---|
| Counseling support | Dr. Irani to arrange counseling sessions through PH's E-Care program; to attend sessions on schedule recommended by E-Care counselor; to provide recommended schedule of sessions to Program Director; and to provide electronic verification of attendance at each session to Program Director within 48 hours of each session. |

**Feedback on remediation progress**

| Attending feedback | Formative feedback provided by attending(s) twice per month. Dr. Irani to arrange times with attending(s). |
|---|---|
| Program Director feedback | Monthly feedback sessions with Program Director. Dr. Irani to arrange times with program Director. |

**Program Director signature and date:**

_____

*DEPARTMENT OF SURGERY*
*Two Richland Medical Park, Suite 402, Columbia, SC 29203*
*803-256-2687, FAX 803-933-9545*

75

USC(Irani)0659



UNIVERSITY OF SOUTH CAROLINA
SCHOOL OF MEDICINE

UNIVERSITY SPECIALTY CLINICS

*Resident verification:* I have reviewed and discussed the contents of this form with my program director and understand that immediate and sustained improvement is required. Failure to correct the deficiencies noted above may result in further action up to, and including, dismissal from the residency program. I know where to get a copy of the Palmetto Health Grievance and Due Process Policy from the Palmetto Health web site at http://residency.palmettohealth.org/documents/Graduate%20Medical%20Education/Resident%20Manual%202011-2012.pdf

**Resident signature and date:**

_____

*DEPARTMENT OF SURGERY*
Two Richland Medical Park, Suite 402, Columbia, SC 29203
803-256-2657, FAX 803-933-9545

76

USC(Irani)0660

Exhibit P:
Writeup Regarding Care of Post-op Spinal Patient and
Haemophiliac Patient
March 1st 2012

USC(Irani)0661

*Regarding the haemophiliac patient with LLE swelling:*

The patient presented with swelling of his LLE. He had last been examined at about midnight and would be examined again at 6AM. I was asked to perform a serial exam on the patient at "about four o clock." I saw the patient for follow-up check at about halfway between the two projected exam points for possible eval for compartment syndrome (at about 2:30AM on 3/1/12). The patient was in no acute distress, but he did have a slight grimace on his face when I walked in (he was moving his left lower extremity at that time). I asked him if he was about the same, worse or better. He stated that he "felt the same." His LLE was elevated on 3 pillows. Compartments felt similar in pressure to before. Patient was able to wiggle his toes. Some pain on passive ROM of left ankle -- again unchanged from before. Mild numbness on the dorsum of foot -- similar to slightly improving from exam a few hours ago. Strong DP pulse. Foot was warm and well perfused.

78

USC(Irani)0662

*Regarding L.O. (the spinal patient):*

I was called sometime after 11:30AM on 2/24/12 by the nurse stating that the patient was having difficulty moving RLE with PT today. I knew the patient was having more pain of the RLE with activity, and asked the nurse to verify if there was a neuro deficit, or if this was compensation for pain (nurse had not assessed the patient, only saying what PT had said). I received repeat page from the nurse 20-30 minutes later saying the patient was unable to dorsiflex her foot. At that point I left clinic and went across the street to see the patient. She was in the restroom. I waited for several minutes, for her to finish. She remained on the toilet. I notified Dr. Grabowski that she was on the toilet and what happened. Several repeat attempts were made to see patient.

As soon as patient was done on the toilet, I personally assisted her from the bathroom to her bed. She was noted to have some difficulty dorsiflexing right foot while ambulating. She was dragging her right foot. I helped her to the bed. My exam revealed 2/5 R knee extension strength. She was unable to flex her knee, ankle dorsiflex or plantar flex, but was able to wiggle her toes on the right. She maintained a good DP pulse. I completed my exam, and she became tearful and emotional, and I spent some time at bedside consoling and discussing my findings with her and attempting to let her know that we would do whatever needed to be done – I told her I would discuss all my findings with Dr. Grabowski and he would be by soon to see her.

I notified Dr. Grabowski of these findings. I notified him that the patient had difficulty walking and almost no motor function in the right quad/hamstring/gastroc/soleus muscle group. Dr. Grabowski informed me that my exam was incongruent with my observation of the patient walking, and that there was likely an error in my exam. Accordingly I did not write a note at that point; I had previously been directed to not write notes in the chart with findings that may be incongruent (this came up with regards to leg length discrepancy in a prior patient). Accordingly I did not write a note as I was led to believe that my physical exam findings were inaccurate, and I did not want to put something potentially damaging on the chart, until I could fully discuss this with my attending.

The patient was subsequently examined by Dr. Grabowski and he told me via phone to order a stat MRI. I placed the order for the MRI and called radiology and told them to expedite the scan as this was for a possible stat OR case. They informed me there were two patients currently in the scan or scanner area (one was a PICU patient). I told them to do whatever they could do to expedite this scan as there was potential permanent neurological damage at risk here. I stayed in touch with radiology. The scan was again slightly delayed when the patient was unable to be transferred over to the scanner from the stretcher because she required a push of IV morphine which I gave a verbal for the nurse to give. Subsequently, the scan was completed and as soon as the scan was done I communicated to Dr. Grabowski that the scan was completed, and what the findings were. The patient was then scheduled for an emergent decompression in the OR. There was obviously very real gravity to this case, and I did not ask any additional questions of the attending or say anything in addition to the information I was required to communicate. I scrubbed in on the case until Dr. Hoover scrubbed in and told me to break scrub.

79

USC(Irani)0663

Exhibit Q:
Selection from 2011-2012 Resident Handbook
Grievance and Due Process

USC(Irani)0664

## GRIEVANCE AND DUE PROCESS

STATEMENT OF POLICY: Residents are provided a process for resolving academic and job-related complaints, to include grievances related to actions which could result in dismissal, non-renewal of a resident's agreement of appointment, non-promotion to the next level of training, or other actions that could significantly threaten a resident's intended career development, as well as complaints and grievances related to the work environment or issues related to the program or faculty.

PROCEDURES:

1.  Grievance Steps:

    1.1  A resident who has a dispute or grievance must discuss this with his/her Program Director who will make every effort to resolve the matter within five (5) business days.

    1.2  If the response is unsatisfactory to the resident, the resident must discuss the complaint or grievance with his/her Director of Education, who will make every effort to resolve the matter within five (5) business days. (If the Program Director is also the Director of Education, this step is skipped).

    1.3  If the response is unsatisfactory to the resident, the resident must immediately request a meeting with the DIO, which will be arranged by the Director of Education or his/her designee no more than ten (10) business days from the date of the request.

    1.4  The above individuals investigate and review the resident's grievance and respond with a decision in writing by the DIO to the resident within ten (10) business days from the date the meeting was held. .

    1.5  If the response is unsatisfactory to the resident, the resident may appeal through Palmetto Health Human Resources to a Dispute Resolution Committee by contacting  Human Resources within ten (10) business days from the decision of the DIO.

    1.6  If requested, Human Resources will assist the resident in preparing his/her grievance.  No attorneys will be present during any of the proceedings.

2.  Grievance Committee:

    2.1  The Grievance Committee proceeding will be held within fifteen (15) business days of receipt of the request by Human Resources, unless circumstances do not allow and the resident is fully informed of the circumstances. In no instance should a grievance hearing be held more than twenty (20) business days after a written request.

    2.2  Human Resources will select members of the Grievance Committee, which will be composed of two residents and three faculty members, all of whom will be selected from a program(s) other than the one from which the grievance is originating.  The Senior Vice President for Human Resources will chair the committee but will not vote on the outcome.

    2.3  In addition to the above, the Director of Education and/or the Program Director of the aggrieved resident, the DIO, the resident filing the grievance, the Human Resources employee assisting the resident in filing the grievance, if requested, and a secretary for the purpose of taking minutes will be in attendance. The CMO may also be in attendance.

    2.4  Witnesses, other employees, written materials, or other information beneficial to either party may be requested and considered by the Committee.  All hearings will be held in executive session and

Page 84

81

USC(Irani)0665

will be conducted under Palmetto Health rules for resolving disputes. The tape recording and minutes of the proceedings will be subjected to the control and disposition of the Senior Vice President for Human Resources.

2.5   All parties, except the Committee and the secretary, will be dismissed after the hearing is completed and before deliberations begin. The Committee deliberations will not be taped. Voting will be by secret ballot. The decision of the Committee is communicated to the resident immediately following the hearing through the Senior Vice President for Human Resources. A synopsis of the committee's findings is distributed in writing within five (5) business days of the hearing to the resident, Director of Education, Program Director, CMO, Senior Vice President for Human Resources or his/her designee, and the CEO.

2.6   If the resident or the DIO is not satisfied with the decision of the Grievance Committee, within ten (10) business days of receiving the committee's written synopsis, either may request in writing through Human Resources that the dispute be submitted to the Chief Executive Officer. The Chief Executive Officer will respond within ten (10) business days in writing providing copies to the employee, Human Resources, DIO, and CMO. The decision of the Chief Executive Officer will be final.

3.   Grievance Timelines:

3.1.   The decision to extend any deadlines will be made by an appropriate representative of Human Resources and will be made based on the extenuating circumstances.

3.2.   Approvals for a delay will be documented and communicated by e-mail or letter.


June 30, 1989
Date of Initial GMEC Approval

Signature on File
Katherine G. Stephens
Vice President, Medical Education and DIO

Signature on File
James I. Raymond, MD
CHIEF MEDICAL OFFICER

February 8, 2011
Date of Last GMEC Review

82

USC(Irani)0666

Exhibit R:
Selection from 2011-2012 Resident Handbook
Disruptive Behaviour

83

USC(Irani)0667

## DISRUPTIVE BEHAVIOR

STATEMENT OF POLICY: To create and maintain an environment free from intimidating, disruptive, threatening or violent behavior. To establish a policy regarding disruptive resident behavior that ensures residents conduct themselves in a professional, cooperative manner while providing services as members of the patient care team. To encourage the prompt identification and resolution of alleged disruptive behavior by all involved or affected persons through information, collaborative efforts at counseling and rehabilitation.  To coincide with the existing Palmetto Health Medical Staff Disruptive Conduct policy in MEC Bylaws.

Definition: Disruptive behavior includes verbal or physical attacks, and inappropriate comments. Disruptive behavior is any conduct of behavior included but not limited to:

- Use of language that is profane, vulgar, sexually suggestive or explicit
- Degrading racial, ethnic, or religious slurring in any professional setting related to the care of patients
- Unwanted touching, sexually-oriented or degrading jokes or comments
- Obscene gestures or throwing objects
- Oral or written threats to a person or property, whether in person or o via email or other means of communication
- Making inappropriate comments about each other or patients that jeopardize or interfere with quality patient care or ability for others to provide quality patient care
- Unethical (in written and verbal communications?)
- Physical or verbal abuse of others involved with providing patient care and/or educational instruction
- Inappropriate conduct that reflects in a negative way on the Hospital or University
- Some behaviors which may be disruptive are UNLAWFUL as well (discrimination, sexual harassment, retaliation)

1. It is the expectation that residents behave in a professional, courteous, and cooperative manner.
   Residents are expected to:

- Address dissatisfaction through appropriate channels provided
- Accept and incorporate feedback in a thoughtful and non-defensive manner
- Cooperate and communicate with all Hospital and University staff with respect and displaying regard for their dignity
- Be truthful in all written and verbal communications

2. Disruptive behavior by residents, or refusal to cooperate with procedures described in this policy, may result in disciplinary action.  This will enable the necessary actions to ensure a safe working environment or to prevent unlawful conduct.  Individuals who violate this policy may be subject to disciplinary action according to the level of severity.  Residents identified as demonstrating disruptive behavior may be subject to:

- Written warning / letter of counseling
- Probation
- Suspension
- Termination

3. Classification of severity:

**Page 61**

84

USC(Irani)0668

Level 1: Physical violence or other physical abuse including sexual harassment involving physical contact.

Level 2: Verbal abuse such as unwarranted yelling, swearing, or cursing; threatening,     humiliating, sexual or otherwise inappropriate comments directed at a person or physical     violence or abuse directed in anger at an inanimate object.

Level 3: Verbal abuse that is directed at-large, but has been reasonably perceived and witnessed to be disruptive behavior as defined above.

4. The training programs and clinical services shall promote continued awareness of these issues in the following ways:

- Sponsoring educational programs on disruptive behavior for residents and faculty
- Dissemination of this policy to educate current residents and faculty of its adoption
- Requiring that E-Care be accessed to assist a resident who exhibits disruptive behavior to obtain education, behavior modification and treatment to prevent further violations.

February 24, 2010
Date of Initial GMEC Approval

Signature on File
Katherine G. Stephens
Vice President, Medical Education and DIO

Signature on File
James I. Raymond, MD
CHIEF MEDICAL OFFICER

February 8, 2011
Date of Last GMEC Review

85

USC(Irani)0669

## DISRUPTIVE RESIDENT BEHAVIOR PROCEDURE

PROCEDURE: Complaints about a resident regarding alleged disruptive behavior must be written, signed and directed to the resident's Program Director (see attached Confidential report of Incident of Disruptive behavior form).

Level 1: The Program Director or designee, with the advice of GME/legal counsel:
Interviews the complainant and any witnesses within one business day of receiving the complaint. The resident is given the opportunity to respond in writing. The Director of Education/Program Director may:

1. determine that no action is warranted
2. issue a warning
3. require a written apology to the complainant
4. refer resident to E-Care
5. initiate disciplinary action pursuant to GME Resident policies/procedures

Level 2: The Program Director or designee:
Interviews the complainant and any witnesses within 5 business days of receiving complaint and interviews the resident within 5 business days. He/she provides an opportunity for the resident to respond in writing. The Director of Education/Program Director may:

1. determine that no action is warranted
2. issue a warning
3. require a written apology to the complainant
4. refer resident to E-Care
5. initiate disciplinary action pursuant to GME Resident policies/procedures

Level 3: The Program Director or designee:
Interviews the complainant and any witnesses within 10 business days of receiving the complaint. The resident is provided the opportunity to respond in writing. The Director of Education/Program Director may:

1. determine that no action is warranted
2. issue a warning
3. require a written apology to the complainant
4. refer resident to E-Care
5. initiate disciplinary action pursuant to GME Resident policies/procedures

86

USC(Irani)0670

| | |
|---|---|
| **From:** | Katherine Stephens <Katherine.Stephens@palmettohealth.org> |
| **Sent:** | Monday, May 28, 2012 2:12 PM |
| **To:** | Marsha Miller |
| **Subject:** | Response to ACGME Complaint Letter Dated April 27, 2012 |
| **Attachments:** | ACGMEComplaintResponseLetterwithAttachments_052512.pdf |

Ms. Miller:

Please find attached a letter from Palmetto Health along with other documentation in response to the ACGME's complaint letter dated April 27, 2012.

Katherine G. Stephens, PhD, MBA, FACHE
Vice President, Medical Education & Research
ACGME Designated Institutional Official
Palmetto Health
3555 Harden Street Extension
15 Medical Park, Suite 202
Columbia, SC 29203

katherine.stephens@palmettohealth.org
Office: 803-434-6861
Fax: 803-434-4419

-----------------------------------------------------------------------------
PALMETTO HEALTH CONFIDENTIALITY NOTICE
This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited by law. If you have received this communication in error, please notify me immediately.


---------------------------------------
This e-mail transmission, in its entirety and including all attachments, is intended solely for the use of the person or entity to whom it is addressed and may contain information, including health information, that is privileged, confidential, and the disclosure of which is governed by applicable law. If you are not the intended recipient, you are hereby notified that disclosing, distributing, copying or taking any action in relation to this e-mail is STRICTLY PROHIBITED. If you have received this e-mail in error, please notify the sender immediately and destroy the related message.

USC(Irani)0671



**PALMETTO HEALTH**

May 25, 2012

Marsha A. Miller, MA
Associate Vice President
Office of Resident Services
Accreditation Council for Graduate Medical Education
515 N. State Street
Suite 2000
Chicago, Illinois 60654

Re: Program #2604532263 and #8004500419

Dear Ms. Miller:

As requested in your letter of April 27, 2012, this letter responds to the complaint filed by Afraaz Irani, MD, alleging that the Orthopaedic Surgery program at Palmetto Health/University of South Carolina School of Medicine is in violation of ACGME requirements.

As a prelude to our response, it is important to note that the goal of graduate medical education at our institution is to provide an education that prepares each of our residents to enter practice as competent physicians who will provide the level of care and compassion that we would want for our families and ourselves. Like all of our residents, this was the goal for Dr. Irani. It was unfortunate that our GMEC found it necessary to dismiss Dr. Irani from the Orthopaedics residency after he failed to successfully complete remediation efforts. This action was not taken lightly, however, and occurred only after Dr. Irani was provided multiple opportunities for improvement through counseling and remediation efforts.

Our responses to each of Dr. Irani's allegations follow:

**Grievance procedures and due process:**

Harassment of any sort, including racial harassment, is not practiced or allowed in the program, and there has been no racial harassment of Dr. Irani or any other resident. Over the past twelve years the program has educated two Indian residents, an African American, and four women. Dr. Irani himself frequently issued joking, self-deprecating, stereotypical comments about his being the "I.T. guy" and assumed the voice pattern / intonation of "Indian call center" to other residents, but there has been no racial harassment by the program director or others. Dr. Irani was also not treated differently than any other resident. Dr. Irani was not "singled out" nor held to a different standard.

The Program Director did not submit false documentation or give misleading statements to the GMEC. Dr. Irani was not present in any of the GMEC meetings, nor did he have access to any minutes of the meetings, including executive sessions involving resident remediation. Each item listed on the August 15th memo was confirmed prior to initiation of initial Level II remediation. Clarification of initial remediation items were reviewed with him verbally multiple times. Emails from RN staff regarding patient encounters were not given to Dr. Irani, but their content was reviewed with him on multiple occasions.

Post Office Box 2266
Columbia, SC 29202-2266     PHONE   (803) 296-2100     palmettohealth.org

USC(Irani)0672

Like all resident policies, the Palmetto Health Resident Grievance and Due Process policy is reviewed, revised, and approved annually by the GMEC of Palmetto Health (Attachment 1). A written copy of the approved policies is provided to each resident each year as an attachment to the resident agreement of appointment, which references several of the policies. Dr. Irani acknowledged receipt of the policies for both academic years 2010-2011 and 2011-2012 (Attachment 2). Residents are also informed that policies are available online (latest version available at http://residency.palmettohealth.org/documents/Graduate%20Medical%20Education/Resident%20Manual %202011-2012.pdf ).

The Resident Grievance and Due Process policy was written to be fair, reasonable, and is readily available to all residents. Dr. Irani was reminded multiple times of this policy via verbal and electronic means: 8/15/11 verbal reminder, 9/8/11 Stephens email, 9/20/11 Stephens memo, 12/12/11 memo, 12/13/11 email, 12/16/11 email, 1/5/12 email, 1/11/12 Stephens memo, 1/31/12 memo, 3/1/12 email, 3/13/12 Stephens memo, 3/28/12 Stephens memo, 4/10/12 memo. With one exception, prior to his letter to the ACGME, Dr. Irani did not complain of unfair due process or grievance. In fact, Dr. Irani utilized the policy on several occasions. He also expressed familiarity with the policy and, in fact, reminded us of specifics of the policy (page 17 of additional Irani documentation). Dr. Irani employed the grievance and due process policy, proceeding through Step 1.4 (i.e., appeal to the DIO) in both of his first two instances of academic remediation.

The one complaint that Dr. Irani did state was in regards to appealing beyond Step 1.4 to Step 1.5 (i.e., to a Palmetto Health Dispute Resolution committee) in the second instance of academic remediation. The policy states that appeal to Step 1.5 must be made within 10 business days from the decision by the DIO. Dr. Irani contacted the Palmetto Health Human Resources department with his request to appeal at the end of the 11th business day after the DIO's decision. He complained that his appeal was actually made within 10 business days because the Martin Luther King holiday occurred during the period. Palmetto Health, like most hospitals, does not recognize many holidays observed by other types of businesses. Palmetto Health only officially recognizes 5 holidays: New Year's Day, Fourth of July, Labor Day, Thanksgiving Day, and Christmas Day (Attachment 3, Section 5.1). Dr. Irani had already been a resident at Palmetto Health through the same period the previous year and knew that Martin Luther King holiday was not recognized as a holiday by the hospital, but rather as a business day. Accordingly, his request to appeal to Step 1.5 was denied.

There was also no "witch hunt" by the attending physicians "to see who had written disparaging comments about the program" during the latest ACGME resident survey. In fact, no attending in the department, other than Dr. Koon, has seen the results of the latest survey. This would have been reviewed at the next annual residency retreat (previously scheduled for April 2012).

Dr. Irani was placed back on the Total Joint service at Palmetto Health Richland after first his suspension. The decision to change resident rotations at the VA site was not made to deny Dr. Irani "the same education as other residents" or to deny him an opportunity to have an unbiased evaluation by the attending staff at the VA. Several factors determined this decision: 1) He was removed prematurely from that service when suspended, therefore he was placed back on the Total Joint service to complete the rotation; 2) there was increasing difficulty in communication with the site director at the VA site; 3) the VA site director had had a portion of his hospital surgical privileges suspended; 4) the VA had persistent sterilization processing equipment issues that resulted in a significant drop in surgical case volume and complexity, making the rotation subpar; and 5) the patient volume was sufficiently covered by only one resident. Due to these and other issues, the VA had already been notified of the program's decision to discontinue the VA rotation for the PGY 2-5 residents effective 7/1/12. This decision was made to ensure that all rotations provide quality educational experiences and not to deny Dr. Irani any opportunities.

USC(Irani)0673

**Resident Selection:**

The program does not have an unusually high attrition rate. Dr. Irani calls himself the third resident dismissed over a four-year period. In fact, Dr. Irani is the first resident during this period who will not complete the program due to dismissal. Dr. Irani is including Dr. Chad Lamoreaux and Dr. Jeff McDaniel in his count of three. Dr. Lamoreaux was involved in academic remediation related to professionalism and was considered for dismissal, but he ultimately graduated from the program. Dr. McDaniel withdrew from the program five years ago during his PGY-2 year due to his personal decision to pursue a non-surgical residency in Family Medicine at our institution. After completion of his Family Medicine program, he also completed a Sports Medicine fellowship at our institution, which included time in our Orthopaedics department.

**Supervision of Residents:**

Residents are supervised by attending at all times in all settings. Supervision includes both Direct and Indirect supervision per the guidelines of the ACGME and the Palmetto Health Resident Supervision policy (Attachment 4). Appropriate levels of supervision are provided to the residents for each patient encounter, including within the Monday afternoon clinic which provides care to uninsured patients. Interns, junior residents, senior residents, and attending physicians may all be involved in the care of an individual patient. Graduated levels of responsibility are granted to the residents as they demonstrate competence in caring for orthopaedic patients. Depending on the complexity of the patient's condition, the senior resident may serve as the supervising physician for a more junior resident. Each resident clinic is supervised by an attending physician. This physician provides Direct and Indirect supervision per the guidelines. If the attending physician is not physically present in the clinic, he is available to provide Indirect supervision immediately through telephonic and/or electronic modalities and is also available to provide Direct supervision, as needed. Dr. Irani's documentation provides only part of the patient encounter information. His documentation only provides information regarding when the resident note was electronically signed, when the note was co-signed by the attending physician, and the fact that the attending physician was involved in an operative case that same afternoon. Nowhere in the documentation is found when the patient actually left the clinic, whether or not the patient was kept in the clinic until the attending was physically present in the clinic, what time the patient's care was reviewed with the attending, or if the resident reviewed the care of the patient with a more senior resident prior to the patient's departure.

**Resident Duty Hours:**

The orthopaedic residency program at Palmetto Health abides by the duty hour requirements as set forth by the ACGME. The policy is reviewed regularly by the attending staff and residents. As Dr. Irani acknowledges, the program instructs all residents to "obey the duty hour" requirements. The institution utilizes the New Innovations system to monitor resident compliance with the requirements. Chief residents and individual attendings also monitor resident duty hours and compliance. If a violation is recorded in the New Innovations system, the GME office notifies the resident and asks for comments on the violation. This is then forwarded to the program director for review. If a violation did indeed occur, the program director reviews the duty hour requirements with the resident and makes efforts to ensure future compliance. In addition, at each meeting, the GMEC is provided with a report of duty hour violations, resolution of violations, and any follow up needed.

The department receives two to three violation reports each month which are handled on an individual basis. Dr. Irani appears to have violated HIPAA guidelines and searched dozens of patient records in search of supposed duty hour violations by the residents. The information provided to the ACGME does not support his contention. His documentation only informs the reader that the post-call resident was in the operating room the following day. Given the fact that our residents can take home call, these

USC(Irani)0674

instances provide no evidence of duty hour violations. Per the ACGME guidelines, if the resident had no in-hospital duty the night before, he/she would be allowed to work the next day. Our residents are very familiar with the duty hour requirements and make every effort to maximize their educational opportunities while also abiding by these requirements. The instances provided by Dr. Irani appear to illustrate these efforts. While his documentation appears to show non-compliance with duty hours requirements, it is misleading because it only includes part of the picture.

The focus of our residency is on providing a quality education to our residents – not on meeting service needs. Our previous RRC site visits, OITE scores, Board pass rates, fellowship acceptance, and other indicators provide evidence that we do an excellent job in educating our residents. Many of our physicians regularly function without resident participation. Patient care service is a component of all residency education programs, but our residents are not being used to solve service needs. Our attending surgeons have busy, thriving clinical practices, but over 50% of our sports clinics and operative cases are conducted without resident involvement.

We appreciate this opportunity to respond to the allegations made by Dr. Irani and believe that the information we have provided shows that Palmetto Health and its Orthopaedic Surgery program are in compliance with both ACGME institutional requirements and residency program requirements. As our response demonstrates, Dr. Irani's documentation often omits information that is not favorable to his position. Accordingly, if you need any additional information to assist you in preparing your response to Dr. Irani, we would be happy to provide it.

Sincerely,

Katherine G. Stephens, PhD, MBA, FACHE
Vice President, Medical Education and Research
Designated Institutional Official
(803) 434-6861
katherine.stephens@palmettohealth.org

David E. Koon, MD
Program Director
Orthopaedic Surgery Residency Program
(803) 434-8284
david.koon@uscmed.sc.edu

cc:    John R. Potts, III, MD, Senior Vice President, Surgical Accreditation
       Pamela Derstine, PhD, Executive Director, RC for Orthopaedic Surgery
       Kevin B. Weiss, MD, MPH, Senior Vice President, Institutional Accreditation
       Patricia Surdyk, PhD, Executive Director, Institutional Review Committee

USC(Irani)0675

**Attachment 1**

## GRIEVANCE AND DUE PROCESS

STATEMENT OF POLICY: Residents are provided a process for resolving academic and job-related complaints, to include grievances related to actions which could result in dismissal, non-renewal of a resident's agreement of appointment, non-promotion to the next level of training, or other actions that could significantly threaten a resident's intended career development, as well as complaints and grievances related to the work environment or issues related to the program or faculty.

PROCEDURES:

1.    Grievance Steps:

  1.1    A resident who has a dispute or grievance must discuss this with his/her Program Director who will make every effort to resolve the matter within five (5) business days.

  1.2    If the response is unsatisfactory to the resident, the resident must discuss the complaint or grievance with his/her Director of Education, who will make every effort to resolve the matter within five (5) business days. (If the Program Director is also the Director of Education, this step is skipped).

  1.3    If the response is unsatisfactory to the resident, the resident must immediately request a meeting with the DIO, which will be arranged by the Director of Education or his/her designee no more than ten (10) business days from the date of the request.

  1.4    The above individuals investigate and review the resident's grievance and respond with a decision in writing by the DIO to the resident within ten (10) business days from the date the meeting was held. .

  1.5    If the response is unsatisfactory to the resident, the resident may appeal through Palmetto Health Human Resources to a Dispute Resolution Committee by contacting   Human Resources within ten (10) business days from the decision of the DIO.

  1.6    If requested, Human Resources will assist the resident in preparing his/her grievance.  No attorneys will be present during any of the proceedings.

2.    Grievance Committee:

  2.1    The Grievance Committee proceeding will be held within fifteen (15) business days of receipt of the request by Human Resources, unless circumstances do not allow and the resident is fully informed of the circumstances. In no instance should a grievance hearing be held more than twenty (20) business days after a written request.

  2.2    Human Resources will select members of the Grievance Committee, which will be composed of two residents and three faculty members, all of whom will be selected from a program(s) other than the one from which the grievance is originating.  The Senior Vice President for Human Resources will chair the committee but will not vote on the outcome.

  2.3    In addition to the above, the Director of Education and/or the Program Director of the aggrieved resident, the DIO, the resident filing the grievance, the Human Resources employee assisting the resident in filing the grievance, if requested, and a secretary for the purpose of taking minutes will be in attendance.  The CMO may also be in attendance.

  2.4    Witnesses, other employees, written materials, or other information beneficial to either party may be requested and considered by the Committee.  All hearings will be held in executive session and

USC(Irani)0676

will be conducted under Palmetto Health rules for resolving disputes.  The tape recording and minutes of the proceedings will be subjected to the control and disposition of the Senior Vice President for Human Resources.

2.5   All parties, except the Committee and the secretary, will be dismissed after the hearing is completed and before deliberations begin.  The Committee deliberations will not be taped. Voting will be by secret ballot.  The decision of the Committee is communicated to the resident immediately following the hearing through the Senior Vice President for Human Resources.  A synopsis of the committee's findings is distributed in writing within five (5) business days of the hearing to the resident, Director of Education, Program Director,  CMO, Senior Vice President for Human Resources or his/her designee, and the CEO.

2.6   If the resident or the DIO is not satisfied with the decision of the Grievance Committee, <u>within ten (10)</u> business days of receiving the committee's written synopsis, either may request in writing through Human Resources that the dispute be submitted to the Chief Executive Officer.  The Chief Executive Officer will respond within ten (10) business days in writing providing copies to the employee, Human Resources, DIO, and CMO.  The decision of the Chief Executive Officer will be final.

3.  Grievance Timelines:

3.1.  The decision to extend any deadlines will be made by an appropriate representative of Human Resources and will be made based on the extenuating circumstances.

3.2.  Approvals for a delay will be documented and communicated by e-mail or letter.


June 30, 1989
Date of Initial GMEC Approval


Signature on File
Katherine G. Stephens
Vice President, Medical Education and DIO


Signature on File
James I. Raymond, MD
CHIEF MEDICAL OFFICER


February 8, 2011
Date of Last GMEC Review

USC(Irani)0677

New Innovations RMS Evaluations                                    **Attachment 2**

## Resident Manual Acknowledgement

**Resident Manual**                                                Evaluator

**Afraaz R Irani**
Pgy 1
Palmetto Health
Orthopaedics

5/19/2011 to 5/31/2011

*As your Sponsoring Institution, Palmetto Health is responsible for ensuring that our residents are informed of and adhere to established educational and clinical practices, policies and procedures in all sites to which residents are assigned. In doing so, we ask that you access and review our PH GME resident manual online. The manual will open up in a new window on your browser. When you complete the review of the manual, please close the window and continue with the questionnaire.*

*Please answer the following questions upon acknowledgement of accessing your Graduate Medical Education Resident Manual online for the upcoming academic year. Thank you.*

To access your PH GME resident manual at anytime, please login to New Innovations and click on the resident manual on your Welcome Screen. OR log onto http://residency.palmettohealth.org/residencymanual to access the PH GME residency manual from our PH GME website.

I attest that I have been given instructions on how to access the Palmetto Health Graduate Medical Education resident manual at anytime online in New Innovations or our PH GME website.

| True | False |
|------|-------|
| ⊘ | ○ |

I hereby confirm that I have reviewed the Palmetto Health Graduate Medical Education resident manual online.

| Yes | No |
|-----|-----|
| ⊘ | ○ |

As a Housestaff Officer (Resident/Fellow), I agree to abide by these policies along with other policies and procedures provided by Palmetto Health, the Residency Training Programs, and Affiliate Hospitals.

| True | False |
|------|-------|
| ⊘ | ○ |

**Afraaz Irani** (Evaluator) signed and submitted this document on 8/24/2011 9:47:05 PM ☑

Evaluation Submitted on 8/24/2011 9:47:05 PM EST.

New Innovations, Inc. © 1998-2012.

USC(Irani)0678

New Innovations RMS Evaluations

## Resident Manual Acknowledgement

**Resident Manual**

Evaluator

**Afraaz R Irani**
Incoming Resident
Palmetto Health
Orthopaedics

4/1/2010 to 4/30/2010

As your Sponsoring Institution, Palmetto Health is responsible for ensuring that our residents are informed of and adhere to established educational and clinical practices, policies and procedures in all sites to which residents are assigned. In doing so, we ask that you access and review our PH GME resident manual online. The manual will open up in a new window on your browser. When you complete the review of the manual, please close the window and continue with the questionnaire.

Please answer the following questions upon acknowledgement of accessing your Graduate Medical Education Resident Manual online for the upcoming academic year. Thank you.

To access your PH GME resident manual at anytime, please login to New Innovations and click on the resident manual on your Welcome Screen. OR log onto http://residency.palmettohealth.org/residencymanual to access the PH GME residency manual from our PH GME website.

I attest that I have been given instructions on how to access the Palmetto Health Graduate Medical Education resident manual at anytime online in New Innovations or our PH GME website.

**True    False**
  ⊘        ○

I hereby confirm that I have reviewed the Palmetto Health Graduate Medical Education resident manual online.

**Yes    No**
  ⊘      ○

As a Housestaff Officer (Resident/Fellow), I agree to abide by these policies along with other policies and procedures provided by Palmetto Health, the Residency Training Programs, and Affiliate Hospitals.

**True    False**
  ⊘        ○

**Afraaz Irani** (Evaluator) signed and submitted this document on 4/7/2010 9:59:10 PM ☑

Evaluation Submitted on 4/7/2010 9:59:10 PM EST.

New Innovations, Inc. V.1405 2012

https://www.new-innov.com/...ACw3j2DYYW/As9opOgKx9sIPSreplacedPSt4ry2ejH82UhjpYGiC4/dASY7SGoWb/FYj8NB2sJMi/H/[5/24/2012 3:50:05 PM]

USC(Irani)0679

**Attachment 3**

NOTHING CONTAINED IN THIS POLICY OR IN ANY OTHER POLICY CREATES A CONTRACT RIGHT. CONSISTENT WITH SOUTH CAROLINA LAW, ALL EMPLOYEES ARE EMPLOYED "AT WILL," WHICH MEANS THAT THE EMPLOYEE HAS THE RIGHT TO TERMINATE HIS OR HER EMPLOYMENT AT ANY TIME, WITH OR WITHOUT NOTICE OR CAUSE, AND THAT PALMETTO HEALTH RETAINS THE SAME RIGHT. EXCEPTIONS TO THE POLICY THAT ALL EMPLOYEES ARE EMPLOYED "AT WILL" MAY BE MADE ONLY BY WRITTEN AGREEMENT SIGNED BY THE CEO OF PALMETTO HEALTH.



**PALMETTO HEALTH**

**Paid Time Off**

Human Resources
Policy No. 157

Effective: November 1, 2004
Revised: February 4, 2009

**Policy Statement**

Paid-Time Off (PTO) is provided so that employees have personal time for vacation, holidays, short-term illness/injury and other situations such as family illness, death, funerals, etc. PTO applies only to absences from regularly scheduled work as approved by the employee's supervisor or department head. **PTO use is mandatory**.

**GUIDELINES:**

1. **Program:**
   1.1. A PTO hour equals one hour of compensation at the employee's budgeted hourly rate.
   1.2. PTO balances carry over from year to year not to exceed 480 hours.
   1.3. PTO balances will be forfeited if an employee separates employment for improper notice, misconduct or having less than one year of service.
   1.4. PTO may not be cashed in at the end of the year. Special exceptions may be considered throughout the year, see "PTO Cash-in" paragraph 6 for additional information.
   1.5. Newly eligible employees may use PTO after 90 days of benefit eligible status except when a holiday falls in the first 90 days. If a holiday occurs during the first ninety days of becoming benefit eligible, accrued PTO, up to the employee's budgeted hours, may be used for that holiday.

2. **Accrual:**
   2.1. PTO hours for exempt and non-exempt employees accrue each pay period equal to a predetermined number of hours defined by class code and length of service with Palmetto Health.
   2.2. PTO must be accrued before it can be used.
   2.3. The amount of PTO accrued during the last pay period of an employee's termination notice period is paid out in their final check.
   2.4. PTO accrues for up to 90 days during an approved leave of absence.

USC(Irani)0680

Human Resources
Policy No. 157

Effective: November 1, 2004
Revised: February 4, 2009

| PALMETTO HEALTH PTO ACCRUAL | | | | | | |
|---|---|---|---|---|---|---|
| | FULL-TIME | | PART-TIME 56-64 SCHEDULED HRS PER PAY | | PART-TIME 40-48 SCHEDULED HRS PER PAY | |
| YEARS OF SERVICE | DAYS EARN PER YR | HOURS EARN PER PAY | DAYS EARN PER YR | HOURS EARN PER PAY | DAYS EARN PER YR | HOURS EARN PER PAY |
| 0-2 years | 21 | 6.46 | 17 | 5.23 | 13 | 4.00 |
| 2yrs & 1 day -5 years | 23 | 7.08 | 18 | 5.54 | 14 | 4.31 |
| 5yrs & 1 day-10 years | 25 | 7.69 | 20 | 6.15 | 15 | 4.62 |
| 10 yrs & 1 day-15 years | 27 | 8.31 | 22 | 6.77 | 16 | 4.92 |
| 15 yrs & 1 day-20 years | 30 | 9.23 | 24 | 7.38 | 18 | 5.54 |
| 20 yrs & 1 day-25 years | 31 | 9.54 | 25 | 7.69 | 19 | 5.85 |
| Over 25 yrs & 1 day | 32 | 9.85 | 26 | 8.00 | 19 | 5.85 |
| LEASED PTO ACCRUAL | | | | | | |
| 0-2 years | 18 | 5.54 | 14 | 4.31 | 13 | 4.00 |
| 2yrs & 1 day -5 years | 20 | 6.15 | 16 | 4.92 | 14 | 4.31 |
| 5yrs & 1 day-10 years | 22 | 6.77 | 18 | 5.54 | 15 | 4.62 |
| 10 yrs & 1 day-15 years | 24 | 7.38 | 19 | 5.85 | 16 | 4.92 |
| 15 yrs & 1 day-20 years | 27 | 8.31 | 22 | 6.77 | 18 | 5.54 |
| 20 yrs & 1 day-25 years | 28 | 8.62 | 22 | 6.77 | 19 | 5.85 |
| Over 25 yrs & 1 day | 29 | 8.92 | 23 | 7.08 | 19 | 5.85 |

3. **Requesting PTO:**
   3.1. Requests to use PTO for less than three days should be made at least 24 hours in advance.
   3.2. Requests to use more than three days of PTO for vacation should be made at least two weeks in advance, or prior to establishing the next staffing schedule, whichever is sooner.
   3.3. Requests to use PTO for absences, other than vacation time, lasting more than three consecutive days should be made at least 30 days in advance, or as soon as possible where a longer notice is impractical due to extenuating circumstances.
   3.4. Requests to use PTO must be made to the employee's manager or director. Giving a false reason for PTO use could lead to disciplinary action up to and including termination.
   3.5. Requests to use PTO to cover an unexcused, or unapproved, absence may be denied by the manager even if the employee has PTO time available.
   3.6. Approval of PTO requests will be made by the manager, who will consider the impact the PTO request will have on departmental operations, the amount of PTO previously used by the employee, etc.

USC(Irani)0681

Human Resources                              Effective: November 1, 2004
Policy No. 157                               Revised: February 4, 2009

3.7. In some instances, a previously approved PTO request may be rescinded based on unforeseen and extenuating circumstances.
3.8. Requests for time off without pay (where a PTO bank has been exhausted) can be approved at the manager's discretion based on factors mentioned above.
3.9. Requests for time off without pay (where PTO is still available) will not be approved.

4. **Using PTO:**
   4.1. Palmetto Health employees must use PTO for vacation, holidays, unexpected absences (unless denied by the manager), family illness, religious observances, preventive health and dental care, personal business, bereavement or funerals, etc. Time off without pay, when PTO time is available, will not be approved.
   4.2. Sick banks must be depleted for employee illness or injury before using PTO.
   4.3. Leased employees must use PTO for vacation, holidays, religious observances, personal business, bereavement and funerals, etc. For illnesses, Sick Pay Bank must be depleted before PTO is used.
   4.4. Non-exempt employees must take a minimum of one hour PTO. After the first hour, employees may take PTO in 15-minute increments.
   4.5. Exempt, salaried, employees use PTO in whole day increments.(See Exempt Pay Policy #97)
   4.6. PTO must be used to supplement Short-term Disability benefits up to a maximum of 50% of base pay, such that the employee does not receive more than 100% of their regularly scheduled pay.
   4.7. PTO usage during an employee's resignation notice period is allowed, at the Manager's discretion.
   4.8. PTO usage must be posted on payroll timesheet for exempt employees.
   4.9. PTO usage is not mandatory when time off is due to low census.
   4.10.     PTO is paid up to the biweekly scheduled FTE value.
   4.11.     PTO does not count toward overtime.

5. **Holidays:**
   5.1. The PTO program recognizes the following holidays: New Year's Day, Fourth of July, Labor Day (no holiday premium pay rate for Labor Day), Thanksgiving Day and Christmas Day.
   5.2. Department directors will decide if the department will or will not officially close on a holiday; if the department closes, employees must take the day off and use PTO. Manager's permission in advance is required to work on a holiday when the department is officially closed; in this case holiday premium pay will not be paid.

USC(Irani)0682

Human Resources
Policy No. 157

Effective: November 1, 2004
Revised: February 4, 2009

## 6. **PTO Cash-in:**

### 6.1. **Hardship**

6.1.1.  PTO may be cashed in at 80% value only for hardship reasons (1) certain medical expenses; (2) costs relating to the purchase of a principal residence; (3) tuition and related educational fees and expenses; (4) payments necessary to prevent eviction from, or foreclosure on, a principal residence; (5) burial or funeral expenses; and (6) certain expenses for the repair of damage to the employee's principal residence.

6.1.2.  The employee's department manager and vice president must approve PTO cash-in for a hardship.

### 6.2. **Voluntary Cash In**

6.2.1.  PTO may be cashed in twice per year as determined by senior management. Each employee with an available PTO balance in excess of 80 hours may cash in up to 40 hours during each cash in period. For these purposes, PTO will be paid out at 80% of value.

### 6.3. **Donation**

6.3.1.  Employees may donate PTO hours to a fellow employee for hardship reasons such as house fire, family medical emergency, maternity, death in the family, and other issues that will cause the employee to be out of work and unable to cover these absences with PTO. Examples of situations that are not eligible for PTO donation are elective surgery, post secondary education, vacation, etc.

6.3.2.  Requests to donate PTO are to be approved by the recipient's department director and vice president.

6.3.3.  Payroll will move PTO hours from the donor's PTO balance to the recipient's PTO balance.

## 7. **Change of Status:**

7.1. Leased employees may cash-out PTO or roll their PTO balance over to Palmetto Health when retiring from S. C. State Retirement plan and subsequently becoming reemployed with Palmetto Health.

7.2. When transferring to class code 18, Weekend Option, PTO is cashed-out to a remaining balance of 80 hours.

7.3. When changing to a benefit ineligible status, PTO is cashed out.

## 8. **Director and Above PTO:**

8.1. There is no PTO accrual for directors and above. Time off is approved by their supervisor.

8.2. When someone is promoted to a director or above status, their PTO is **NOT** cashed out, the hour balance is frozen.

USC(Irani)0683

Human Resources                                    Effective: November 1, 2004
Policy No. 157                                     Revised: February 4, 2009

**9.** **Separation from service**
   9.1. Upon separation from Palmetto Health, PTO may be cashed out at 100%.  When an employee is separating from service in good standing, PTO accrued during the last pay period of an employee's termination notice period is paid out in their final check.
   9.2. Employees who resign with proper notice and one year of service will receive pay for their PTO balance provided all required scheduled hours have been worked.
   9.3. Employees who do not **provide** a proper notice, are employed less than one year, or are terminated (involuntarily separated) forfeit their right to any unpaid PTO accrual balance.
   9.4. Refer to Human Resources Policy 185 Separation from Employment.


APPROVED:   _____
                        Gwen Hill, Interim Vice President
                        Human Resources

APPROVED:   _____
                        Charles D. Beaman, Jr., CEO
                        Palmetto Health

DATE:           _____

USC(Irani)0684

**Attachment 4**

**SUPERVISION OF PALMETTO HEALTH RESIDENT PHYSICIANS**

**STATEMENT OF POLICY:**  .  In accordance with accreditation, regulatory, and other requirements, all residents will be actively supervised by independently-licensed attending physicians and/or senior level residents, as appropriate.

1.1    Within the scope of the residency training program, all residents will function under the supervision of appropriately credentialed attending physicians.  Every residency program must ensure that adequate supervision is provided for residents at all times.  A responsible attending must be immediately available to the resident in person or by telephone and able to be present within a reasonable period of time, if needed.  Each program will publish and make available in a prominent location, call schedules indicating the responsible attending(s) to be contacted.

1.2    Each residency program will be structured to encourage and permit residents to assume increasing levels of responsibility commensurate with their individual progress in the six general competencies, including experience, skill, knowledge, and judgment.  Program Directors will review each resident's performance and supervise progression from one year of training to the next based on Accreditation Council for Graduate Medical Education guidelines and program curriculum.  As the residents advance, they may be given increasing responsibilities to conduct clinical activities with limited supervision, to act as teaching assistants for less experienced residents, and/or to supervise less experienced residents, as appropriate.

1.3     Resident job descriptions (by year of training) and competency checklists are available on the intranet to accurately reflect the resident's progression.   Competency checklists are updated by the training programs at least annually. (PGY 1 resident competencies are updated at least twice per year).  These competencies reflect the patient care services that may be performed by the resident and the level of supervision required.

1.4    Throughout all clinic hours, there will be an attending physician present and immediately available to the resident.

**ROLES AND RESPONSIBILITIES:**

1.1.    The **Graduate Medical Education Committee (GMEC)** is responsible for establishing and monitoring policies and procedures with respect to the institution's residency programs.

1.2.    Each **Program Director** is responsible for the quality of overall residency education and for ensuring that the program is in compliance with the policies of the respective accrediting and certifying bodies.  The Program Director defines the levels of responsibility for each year of training by preparing a description of types of clinical activities residents may perform and those for which residents may act in a teaching capacity. The Program Director monitors resident progress and ensures that problems, issues, and opportunities to improve education are addressed.

1.3    The **attending physician** is responsible for, and is personally involved in, the care provided to individual patients.   When a resident is involved, the attending physician continues to maintain personal involvement in the care of the patient.  The attending physician will direct the care of the patient and provide the appropriate level of supervision based on the nature of the patient's condition, the likelihood of major changes in the management plan, the complexity of care, and the experience and judgment of the resident being supervised.   Documentation of involvement includes at a minimum attending physician:

USC(Irani)0685

1. progress notes written at least daily on critically ill patients and those where there is difficulty in diagnosis or management of the clinical problem, and at least every two (2) days on all other patients;

2. countersignature on history and physical exams (to include current complaints, assessment of findings, and treatment plans);

3. countersignature on operative reports; and

4. countersignature on the discharge summaries.

1.4    **Residents** must be aware of their limitations and not attempt to provide clinical services or do procedures for which they are not trained.  They must know the graduated level of responsibility described for their level of training and not practice outside of that scope of service.  Failure to function within graduated levels of responsibility, respond appropriately to directions by the attending physician, or to communicate significant patient care issues to the responsible attending physician may result in remediation actions and the removal of the resident from patient care activities.

## GRADUATED LEVELS OF RESPONSIBILITY:

1.1    As part of their training program, residents will be given progressive responsibility for the care of the patient.  The determination of a resident's ability to provide care to patients without a supervisor being physically present, to act in a teaching capacity, and/or to supervise less experienced residents will be based on documented evaluation of the resident's level of achievement in the six general competency areas, including clinical experience, judgment, knowledge, and technical skill.  Ultimately, it is the decision of the attending physician as to which activities the resident will be allowed to perform within the context of the assigned levels of responsibility.  The overriding consideration must be the safe and effective care of the patient.

1.2    To ensure oversight of resident supervision and graded authority and responsibility, programs must use the following classification of supervision, which must be based on documented evidence (e.g., evaluations by attending physicians and program directors, procedure logs, and other clinical practice information reflecting a resident's knowledge, skill, experience, and judgment):

- Direct Supervision – the supervising physician is physically present with the resident and patient (Level 1).

- Indirect Supervision with direct supervision immediately available – the supervising physician is physically within the hospital or other site of patient care, and is immediately available to provide Direct Supervision (Level 2).

- Indirect Supervision with direct supervision available – the supervising physician is not physically present within the hospital or other site of patient care, but is immediately available by means of telephonic and/or electronic modalities, and is available to provide Direct Supervision (Level 3).

- Oversight – the supervising physician is available to provide review of procedures/encounters with feedback provided after care is delivered (Level 4).

1.3    The assignment of graduated levels of responsibility will be made available to other staff who have a need to know through the residency competency database on the Palmetto Health intranet.  Updates are made at least annually.

## HOSPITAL MONITORING OF SUPERVISION:

1.1    The DIO is responsible for ensuring that the institution fulfills all responsibilities identified within this section.

USC(Irani)0686

1.2    Along with the DIO, each Program Director is responsible for monitoring resident supervision, identifying problems, and devising plans of action for their remedy.

1.3    At a minimum, the monitoring process includes:

    a.    A review of compliance with inpatient and outpatient documentation requirements, as part of medical record reviews;

    b.    A review of all incidents and risk events with complications to ensure that the appropriate level of supervision occurred;

    c.    A review of all accrediting and certifying bodies' concerns and follow-up actions;

    d.    A review of resident evaluations of their faculty and rotations;

    e.    An analysis of events where violations of graduated levels of responsibility may have occurred;

    f.    A review of all tort claims involving residents, to determine if there was an appropriate level of supervision.

1.4    Reviews pertaining to monitoring of resident supervision are communicated, at a minimum, on a yearly basis, to the MEC and Board of Palmetto Health.

February 5, 2002
Date of Initial GMEC Approval

Signature on File
Katherine G. Stephens, PhD, MBA, FACHE
Vice President, Medical Education & Research and DIO

Signature on File
James I. Raymond, MD
CHIEF MEDICAL OFFICER

February 14, 2012
Date of Last GMEC Review

USC(Irani)0687

**From:**                Marsha Miller <mmiller@acgme.org>
**Sent:**                Thursday, August 02, 2012 2:09 PM
**To:**                  David Koon; katherine.stephens@palmettohealth.org
**Cc:**                  Pam Derstine; Pat Surdyk
**Subject:**           Review Committee for Orthopaedic Surgery's Decision on Afraaz Iran's complaint
**Attachments:**    Palmetto Health U SC Ortho PD-DIO Dismissal.pdf

Dear Drs. Koon and Stephens:

Here is my letter about the Review Committee for Orthopaedic Surgery's dismissal decision on the complaint submitted by Afraaz Irani.

Sincerely,

Marsha Miller

---

**Marsha A. Miller, MA**
Associate Vice President, Office of Resident Services



                              ACGME
                 515 N. State Street, Suite 2000
                    Chicago, IL 60654
                  Office: 312-755-5041
                   mmiller@acgme.org

---

--------------------------------------

This e-mail transmission, in its entirety and including all attachments, is intended solely for the use of the person or entity to whom it is addressed and may contain information, including health information, that is privileged, confidential, and the disclosure of which is governed by applicable law. If you are not the intended recipient, you are hereby notified that disclosing, distributing, copying or taking any action in relation to this e-mail is STRICTLY PROHIBITED. If you have received this e-mail in error, please notify the sender immediately and destroy the related message.

USC(Irani)0688

August 2, 2012

**Accreditation Council for**
**Graduate Medical Education**

515 N. State Street
Suite 2000
Chicago, IL 60654

Phone  312.755.5000
Fax  312.755.7498
www.acgme.org

David E. Koon Jr, MD
Program Director
Palmetto Health/University of South Carolina School of Medicine
Palmetto Health Richland
Two Medical Park, Suite 404
Columbia, SC  29203

Katherine G. Stephens, PhD, MBA
Vice President, Medical Education and Research
Palmetto Health
P O Box 2266
Columbia, SC  29202-2266

Re:  Program #2604532263

Dear Drs. Koon and Stephens:

The Review Committee for Orthopaedic Surgery has reviewed Afraaz Irani's
complaint alleging the  Orthopaedic Surgery Program at Palmetto
Health/University of South Carolina School of Medicine is noncompliant with
ACGME requirements. The review committees also reviewed your May 25,
2012, response with supporting documentation.  The review committee judged
there was no validity to the complaint and will not pursue any further action
related to the complaint.

The ACGME will close its file on the complaint, and the complainant will be
notified of the review committees' decision.

Sincerely,

Marsha a. miller

Marsha A. Miller, MA
Associate Vice President
Office of Resident Services
312-755-5041
mmiller@acgme.org

cc:    Pamela Derstine, PhD, Executive Director, RC for Orthopaedic
        Surgery
        Patricia Surdyk, PhD, Executive Director, Institutional Review
        Committee