IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Afraaz R. Irani, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | C/A No. 3:14-cv-03577-CMC-KDW |
| | ) | |
| Palmetto Health; University of South Carolina | ) | |
| School of Medicine; David E. Koon, Jr., M.D., | ) | |
| etc.; John J. Walsh, IV, M.D., etc. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANT PALMETTO HEALTH'S
MOTION FOR SUMMARY JUDGMENT**

COMES NOW, Defendant Palmetto Health, by and through its counsel, and files this Memorandum in Support of its Motion for Summary Judgment. For the reasons stated below, Defendant's Motion for Summary Judgment should be granted, and Plaintiff's Amended Complaint should be dismissed with prejudice.

**<u>INTRODUCTION</u>**

Plaintiff Afraaz Irani, M.D., was a medical resident in Palmetto Health's Orthopaedic Residency program in Columbia, South Columbia, from July 1, 2010, until his discharge on April 10, 2012. Dr. Irani filed his Summons and Complaint in the Court of Common Pleas in Richland County, South Carolina on June 13, 2014, *civil action number 2014-cp-40-03850*, and served it on Palmetto Health on August 8, 2014. Palmetto Health then removed the case to federal court on September 8, 2014 (Dkt. No. 1), and answered the Complaint on September 15, 2014. (Dkt. No. 5). On April 6, 2015, Dr. Irani filed an Amended Complaint by leave of Court adding additional causes of action as to defendants other than Palmetto Health. (Dkt. No. 49.) Palmetto Health answered the Amended Complaint on April 15, 2015. (Dkt. No. 58.) All

parties have engaged in substantial discovery and have resolved all discovery disputes. The matter is now ripe for summary judgment.

## STATEMENT OF FACTS

### I.    Palmetto Health's Program Background

Palmetto Health, in affiliation with the University of South Carolina School of Medicine (USC-SOM), offers twelve residency programs (eleven medical and one dental) at its two teaching hospitals, Palmetto Health Richland and Palmetto Health Baptist. (*See* http://residency.palmettohealth/body-residency-fellowship.cfm?id=15; Exhibit A, Taylor Dep. Ex. 5.) [1] Orthopaedic surgery is one of the residency programs offered. The program has an affiliation agreement with the University of South Carolina School of Medicine, and is governed by the rules of the American College of Graduate Medical Education (ACGME), which certifies that programs are in compliance with the ACGME standards and requirements. (Stephens Dep. 15-16; 29-32.) The orthopaedic surgery program of Palmetto Health is and was at all times relevant to this lawsuit, in compliance with the standards of the ACGME. (*See* Koon Dep. 272-274.)

Palmetto Health's orthopaedic residency program is authorized by the ACGME to have ten residents, two residents in each program year for a period of five years. (Koon Dep. 30-31.) Each applicant for the residency program goes through an interview process and then a "match" process, matching medical school graduates and residency programs. (P. Dep. 22-23.) The

---

[1]    References to depositions of Jeffrey A. Guy, M.D., R. Caughman Taylor, M.D., Katherine Stephens, M.D., David E. Koon, M.D., Harrison Goodno, M.D., John J. Walsh, IV, M.D., and Richard E. Grant, M.D., in this action are denoted by the last name of the deponent followed by "Dep." and the appropriate page(s) number(s), with referenced to Exhibits denoted by the last name of the deponent followed by "Dep. Ex.". References to Plaintiff's Deposition are denoted as "P. Dep." followed by the appropriate page(s) number(s), with references to Exhibits as "P. Dep. Ex." followed by the appropriate Exhibit number(s). All supporting depositions are attached to the related Motion for Summary Judgment at Exhibits A through H.

residency programs for orthopaedic surgery are, in general, highly competitive.  (Koon Dep. 30-31.)  It is a much written about and unfortunate fact that orthopaedic programs nation-wide tend not to be diverse.  This is true as to both race and gender.  (Grant Dep. 55.)  Palmetto Health does not stand out in this sense.

## II.    Dr. Irani's Residency at Palmetto Health

Dr. Irani, a 2010 graduate of Stanford Medical School, is of Indian/Zoroastrian heritage.  (Amended Complaint ¶¶ 15, 32.)  He applied for the orthopaedic residency program at Palmetto Health and was selected for an interview.  He was interviewed by faculty members including Program Director, Dr. David Koon, and Department Chair, Dr. John Walsh.  (Walsh Dep. 5; Koon Dep. Ex. 1; P. Dep. 13.)  Both viewed him as an excellent candidate.  (P. Dep. Ex. 1; Exhibit I, *Orthopaedic Application Interview Reviews*.)  Dr. Irani matched with the Palmetto Health program and accepted their offer for a slot in its orthopaedic residency program.  Dr. Harrison Goodno[2] was the other candidate who matched and accepted a slot in the program at the same time.  (Goodno Dep. 21.)  Dr. Irani is a native Californian and admits that the South Carolina culture was an adjustment for him.  (P. Dep. 69-70.)  At all times that Dr. Irani was at Palmetto Health he was employed through the residency program and was there for the purpose of medical training and education.  Resident physicians do not have hospital privileges.

An orthopaedic resident will receive a separate one-year Resident Agreement of Appointment ("Resident Agreement") for each year that he/she is in the program.  The agreement is signed by the CEO of Palmetto Health and is expressly between Palmetto Health and the resident.  USC-SOM is an independent and separate entity and not a party to the contract.  Members of the faculty are generally full-time employees of the University of South Carolina.

---

[2] Caucasian, religion unknown.

Both Dr. Koon and Dr. Walsh are employees of the University of South Carolina and were not parties to either of the Resident Agreements received by Dr. Irani. (Stephens Dep. 100; Taylor Dep. 53.) Dr. Irani initially received a Resident Agreement for his PGY1 year 2010-2011, and upon successfully completing his intern year, was offered his PGY2 Resident Agreement for 2011-2012. (P. Dep. Ex. 3 and 4.) Dr. Irani's 2011-2012 Resident Agreement ran through June 30, 2012. (*Id.*) The Resident Agreement clearly anticipates circumstances in which the contract might end prior to the expiration date and no resident is bound to continue in his/her contract beyond the prescribed period.[3] Termination of the contract is grieveable within the Palmetto Health Resident Grievance system and Due Process Policy. (P. Dep. Ex. 56.)

As a resident, Dr. Irani was also required to follow the policies and procedures of Palmetto Health. (Exhibit J, *Resident Manual Acknowledgment*.) Dr. Irani signed a disclaimer meeting the South Carolina requirements that acknowledged that the policies and procedures did not create a contract. Dr. Irani's only contracts with Palmetto Health were his Resident Agreements each with a term of one-year. (Exhibit K, *Disclaimer*.)

A review of Dr. Irani's PGY1 performance appraisals demonstrate that there were some concerns during this first year, primarily revolving around his commitment and communication issues.[4] (Exhibit L, *New Innovations RMS Evaluation*.) It is significant that the concerns raised

---

[3] The Resident Agreement provides for immediate "for cause" termination of a resident for, among other things, failure by the resident to demonstrate, meet, or maintain satisfactory levels of academic, professional, and/or clinical performance required by the programs as determined by evaluations. (P. Dep. Ex. 4.)

[4] Dr. Mark Jones commented, "Dr. Irani must realize he has crossed the threshold from student to physician and begin to be accountable for his actions and accountable to his patients. He did not show me that he was interested in taking care of our patients on the trauma service at the level that we expect from our new resident physicians." (Exhibit L.) Dr. Raymond Bynoe, also on trauma, commented that Dr. Irani "needs to develop a degree of enthusiasm – same somewhat lackadaisical about the service – I understand a lot of paper work but need to put

were by physicians/faculty members in areas other than orthopaedics.  At no time during his first

year did Dr. Irani raise a complaint about the program or any of the faculty.  There is no mention

or record of any inappropriate comments made to him concerning his race, national origin, or

religion.  He did not at any time allege that Palmetto Health breached his first Resident

Agreement, nor did he file any complaints with the ACGME.

Dr. Irani was offered a Resident Agreement for his second (PGY2) year that ran from

July 1, 2011 through June 30, 2012.[5]  (Koon Dep. Ex. 4.)  He entered his PGY2 year seemingly

satisfied with the program.  Unfortunately, problems resurfaced early in his second year and are

consistent with the comments from his PGY1 year indicating that he lacked motivation and had

communication issues.[6]  It was approximately six weeks into his second year that Dr. Irani

_____

effort – maybe personality – but concern for drive." (*Id.*)  Pediatric surgeon, Dr. Katherine Sarah
Mastriani commented, "Needs to take greater responsibility for the welfare of the patient, too
often would fail to recognize need for urgency in patient care.  Pleasant."  His evaluation from
Dr. William Aaron Ross of Surgical Associates was consistent with these concerns: "Dr. Irani
had a rough start at the VA hospital, where I first had occasion to work with him.  He seemed to
lack motivation and lacked consistency in his patient evaluation and care plans.  However, I did
see marked improvement by the conclusion of the rotation. His rather unique personality seems
to get in the way of his interpersonal relationships, both with peers and staff. He is highly
intelligent and his core medical knowledge is excellent his [sic] needs to temper this with a
greater desire to improve his core surgical knowledge base/skills set.  I think that he has
incredible potential to become an excellent surgeon but needs to develop the motivation and
people skills to succeed." (*Id.*)

[5]  Although Dr. Irani may assert that he had every expectation of remaining in the
program the entire 5 years or until graduation, he had no such contract written or otherwise and it
is clear that continuation in the program is conditioned on satisfactory performance.  (Koon Dep.
Ex. 27.)

[6]  On his "360" Evaluation for his PGY2 rotations on Ortho: Joints and Ortho: Sports
Med one of the questions asked is "Would you want this resident to treat a member of your
family?"  The sole response was "no."  (Exhibit M, *New Innovations RMS Evaluations (PGY2)*.)
Dr. Voss and Dr. Mazoue from the Orthopaedic Surgery department commented following his
multiple rotations with them.  They note multiple times his intelligence and the fact that he is
"bright."  However, the concerns raised are consistent with those above from disciplines other
than orthopaedics.  Dr. Voss commented, "Afraaz is very bright."  His OR performance was

5

experienced performance problems and was eventually dismissed from the orthopaedic residency program.

### III.    Dr. Irani's Performance Problems and the Remediation Process

#### A.    First Remediation

Palmetto Health has an Academic Remediation Policy to address resident performance issues and hopefully help the residents to succeed.  (Stephens Dep. Ex. 5; Stephens Dep. 75.)  It is not necessarily a progress policy and remediation can begin at any level.  (Stephens Dep. 73.) Dr. Irani continued to have some of the issues that had shown up in his PGY1 as he began his PGY2 year.  As a form of Level I remediation, Dr. Koon indicates that he would consider counseling sessions to be a Level I remediation.  (Koon Dep. 83.)  The attendings who gave Dr. Irani sub-par evaluations during his PGY1 year met with him; a couple of senior residents in general surgery met with him; all three chief residents met with him his PGY1 year; and Dr. Koon talked with him regarding his sub-par performance.  (Koon Dep. 83-88.)  There were very high expectations for the residents.  (Koon Dep. 89.)

In August 2011, Dr. Irani was involved in the care of a patient in the Emergency Room. The situation involved an elderly gentleman who presented with a partially amputated arm.  (*See*

---

made difficult by the second year call requirements.  However, beyond that his improvement in the OR was somewhat slow and seemed not to be driven by concern for the patient.  Punctuality on rounds was a concern as the trauma service was very busy as was mine and he was late for am rounds a few times.  His patient care was inconsistent and included a patient who was told to take 5 Percocet tablets at once by phone and a second one who had been taking 12/day in hospital for whom he wrote a prescription for 40 tablets.  He also seemed unaware that the drain output mattered."  Dr. Voss also comment that Dr. Irani "[s]eemed interested more by the intrigue of the case than empathy for the patient" and that he "[h]ad a hard time prioritizing his responsibilities while on call. At his current level, I would not let him take care of a member of my family."  Dr. Mazoue comments that "As with all residents, Afraaz needs to continue to learn the basics e.g. anatomy.  He also needs to work on his social skills with his professional colleagues e.g. OR personnel. In addition, he needs to work on time management and efficiencies especially in the OR."  (Stephens Dep. Ex. 37; Stephens Dep. Ex. 39.)

Exhibit N, *08/10/11 Email*; P. Dep. Ex. 16.)  The nurse complained about the treatment of the patient by both Dr. Irani and Dr. Iaquinto, the attending trauma surgeon.[7]  One of the ER nurses described the situation and Dr. Irani's care saying, "He showed no compassion for what the pt [patient] was experiencing."  (Exhibit O, *Email from Dr. Catalano to A. Turnley.*)[8]

This nurse did not go to Dr. Koon with the issue but took it to the management officials who deal with physician issues and she did so in writing.  (Koon Dep. 103-104.)  In 10 years this was the first memo of this type Dr. Koon had ever received.  (Koon Dep. 117.)  After being notified of the concerns by physician management, Dr. Koon immediately asked Dr. Irani for his explanation.  (Koon Dep. 100-102; Exhibit N.)  No action had been taken at the time Dr. Irani's input was requested.[9]  Dr. Irani provided his version of events that same day.  (P. Dep. Ex. 16.)  Dr. Koon thereafter sought to determine the reason for discrepancies in the accounts of what had happened.  (Exhibit P, *Email from Dr. Koon to A. Turnley.*)  The nurse seemed more focused on the manner in which the patient was treated by Dr. Irani and Dr. Iaquinto during their care while Dr. Irani seemed to focus primarily on the fact that the amputation of the arm was medically correct.  The nurse also felt that Dr. Irani was asking her to falsify information related to the procedure by Dr. Irani.  (Exhibit P.)  After reviewing Dr. Irani's account of the events, Dr. Koon solicited additional input from the nurse and from others who were in attendance when the patient was treated.  (Koon Dep. Ex. 14; Exhibit P.)  Following this, the department

---

[7] Dr. Iaquinto is no longer employed by Palmetto Health.  (*See* Koon Dep. 207-208; 275-276.)

[8] In her statement the assistant nurse manager, Diane Savage, refers to Dr. Orlani, but it is established that it is Dr. Irani.  (Exhibit O.)

[9] The concerns with the attending were addressed by management, as he was an employed physician with hospital privileges, which is very different than a resident physician who falls under Graduate Medical Education and all of the rules applicable to residents.

recommended remediation for Dr. Irani to the Executive Committee of the Graduate Medical Education Committee ("GMEC").  (Stephens Dep. Ex. 7; Exhibit Q, *08/15/11 Email*.)  The remediation was based on this incident as well as others noted in the remediation document. (*See* Stephens Dep. Ex. 6.)

On August 15, Dr. Koon again met with Dr. Irani and discussed faculty concerns.  In his memorandum of their meeting, Dr. Koon stated "I encouraged him to review the GME policy on academic remediation.  *He was allowed to respond to each item in the MoR and ask questions.*" (Exhibit R, *08/16/11 Email*.)  The Memorandum of Record ("MoR") lists specific areas in which Dr. Irani is to improve.  (Koon Dep. Ex. 15; Exhibit S, *08/15/11 MoR*.)  That same day, Dr. Stephens was presented with suggested Level II remediation to address what was viewed as academic deficiencies of Dr. Irani.  (Stephens Dep. Ex. 7.)  Dr. Stephens requested the plan be made more specific and spell out "the outcome expected and how to measure that he has achieved the level expected."  (Stephens Dep. Ex. 7.)  The MoR reflected multiple specific concerns of the department.  (Stephens Dep. Ex. 6.)  At this point, Dr. Koon had already had several coaching sessions with Dr. Irani and had the three Chief Residents specifically work with Dr. Irani, but concerns had not yet been corrected.

On August 16, Dr. Koon sent an e-mail to Dr. Walsh forwarding the approval of Level II academic remediation the GMEC Executive Committee and recounted his meeting with Dr. Irani concerning his performance thus far in training.  (Exhibit T, *08/16/11 Email*.)  In the meeting, Dr. Irani and Dr. Walsh discussed the areas of concern leading to the academic remediation and Dr. Irani had the opportunity to voice his side of the issues.  *Id.*  On August 22, Dr. Irani wrote to Dr. Stephens and gave his detailed response to the concerns in the Remediation Plan.  (Stephens Dep. Ex. 10; Exhibit U, *08/22/11 Email*.)  Dr. Stephens responded thanking him.  She noted days

8

later that Dr. Irani stopped by her office and she then telephoned him. *Id.* His concern was not with this improvement but how the remediation could affect future career aspirations. *Id.* Dr. Stephens suggested that Dr. Irani could talk further with Dr. Koon and reminded him of the grievance process. *Id.* Dr. Stephens also told Dr. Irani "the goal of academic remediation process is to ensure that a resident physician is provided an opportunity to improve in areas of concern and to achieve competence in these areas. I am sure Dr. Koon will appreciate your positive attitude to constructive criticism with the goal of assisting you in achieving competence." (Exhibit V, *08/27/11 Email*.)

Dr. Irani raised no concerns about inappropriate treatment or harassment by any member of the faculty. Dr. Irani initiated the Palmetto Health Resident Grievance process and when doing so informed Dr. Stephens "I was able to speak with Dr. Koon . . . He encouraged me to talk to you more and/or attempt to appeal the decision if I have concerns." (Exhibit W, *09/11/11 Email*.) [10]

On September 19, Dr. Koon provided Dr. Irani with a detailed schedule for updates in the remediation process. (P. Dep. Ex. 20.) Dr. Irani had filed a grievance within the Resident Grievance procedure and on September 20, 2011, Dr. Stephens notified Dr. Irani that she had considered his grievance and was upholding the academic remediation. (Stephens Dep. Ex. 21.) She explained the intent of remediation is not punitive but the "sole purpose is to aid you in meeting academic expectations and to have you complete your training." *Id*.

Dr. Koon memorialized his meeting on September 20 with Dr. Irani and his status in a September 22 MoR in great detail. (P. Dep. Ex. 22.) Dr. Irani signed it as "reviewed and received" on October 3. In summary, Dr. Koon states:

---

[10] The nurse alleged that both the attending and Dr. Irani lacked compassion with the patient. (Exhibit O.)

"Dr. Irani has demonstrated some short comings and mistakes during his PGY-1 and PGY-2 years. I think that these are remediable in a straight forward fashion and I expect that he will grow as an orthopaedic resident and put these issues behind him. That is my full expectation and based on his response during our evaluation I think that he feels the same. We will be meeting with him on an ongoing basis over the next several months to review his progress to date and to provide his feedback with the ultimate goal of re-evaluating him and hopefully removing him from a probationary status."

(*Id.*)

On November 3, 2011, Dr. Irani and Dr. Koon exchanged terse e-mails. (Koon Dep. Ex. 16; Walsh Dep. Ex. 7.) Dr. Koon had asked Dr. Irani several times to complete a VA patient discharge note. (Koon Dep. 154.) When he finished, he sent Dr. Koon an e-mail saying basically that he did it but did not know why he had to do it. (Koon Dep. Ex. 16; Walsh Dep. Ex. 7.) Dr. Koon sent back a searing response and copied the two Chief Residents. *Id.* Dr. Koon testified that he was amazed that Dr. Irani felt inconvenienced and burdened by being asked to complete a discharge summary. (Koon Dep. 153-154.) Dr. Irani sees this e-mail as having precipitated his demise.[11]

On November 21, 2011, Dr. Koon and Dr. Wood met with Dr. Irani to go over his progress. (Walsh Dep. Ex. 7.) In this meeting Dr. Koon and Dr. Wood covered additional new instances where Dr. Irani's care of patients raised concerns (Dr. Walsh's patient's post-operative care and wound care of one of Dr. Koon's patients.) In his MoR of the meeting, Dr. Koon

---

[11]   "And I think at that point – and, you know, I mean, to be honest, Dr. Koon declared it was his personal vendetta when I sent that e-mail. He was upset and he kept on representing that he would fire me on the spot. I think at that point there was a very marked change in tone, and it became very personal, unfortunately. I think we got off foot, and oftentimes in surgery that's all it takes, unfortunately."  (Exhibit X, *Grievance Committee transcript, page 81.*)  Dr. Irani does not mention any racial or religious comments at this time.  In a communication from Dr. Irani to Dr. Stephens concerning the grievance process for his suspension, "Unfortunately, my relationship with Dr. Koon appears to have completely derailed in the past few weeks.  I believe that Dr. Koon's displeasure with me started with an e-mail exchange on November 3 involving a discharge dictation for a VA patient."  (Exhibit Y, *12/16/11 Email.*)

concludes that Dr. Irani continues to have issues and his progress will be re-evaluated at the faculty meeting on December 5, 2011. (Walsh Dep. Ex. 7.) Dr. Walsh then met with him the following day. (Exhibit Z, *11/22/11 Email*.)

Dr. Stephens corresponded with Dr. Irani and informed him they would meet on December 5, 2011. Dr. Stephens reminded Dr. Irani that the goal of the academic remediation process is to ensure that a resident physician is provided an opportunity to improve in the areas of concern. (Exhibit W.) As is required, Dr. Irani had his opportunity to review his version of events surrounding the care of the recent trauma patient and Dr. Walsh reviewed with him all of the issues relative to his academic progress. (Exhibit AA, *12/19/11 MoR*.)

### B.    Level III Remediation

Although the faculty had expected Dr. Irani to conclude his remediation plan, Dr. Irani had further difficulties in the ER that raised additional patient care issues to the faculty. On December 7, Trauma Patient 375 was brought into the ER with severe injuries resulting from a head-on collision. (Exhibit BB, *12/09/11 Email*.) Dr. Nathe, an orthopaedic Intern (PGY1), worked on the patient, and at the suggestion of Dr. Wood, called in Dr. Irani. (Exhibit CC, *K. Nathe Statement*.) Three nurses involved in the patient's care raised concerns about the manner in which Dr. Nathe and Dr. Irani handled the matter. *Id*. Dr. Jones, the attending trauma surgeon and the administrator on duty (AOD), had to be called to the area. (Koon Dep. 201.)

Information as to the situation was gathered and the faculty met with Dr. Irani and addressed his status. (Koon Dep. 201-203.) With regard to Trauma Patient 375, the faculty believed that he displayed a lack of empathy and compassion, a lack of appropriate pain management, a neglect of appropriate informed consent, had poor interpersonal communication, and a lack of appropriate teamwork with ancillary staff. (Exhibit DD, *12/11/11 MoR*.) The

faculty recommended that Dr. Irani be placed on an unpaid leave of absence to run from December 9, 2011 through January 30, 3012. *Id*. Dr. Koon as the Program Director could not terminate any resident but with the faculty could make recommendations to the GMEC. (Koon Dep. 152.) On December 13, Dr. Koon communicated with Dr. Irani and informed him that he was being placed on Level III remediation and referred him to the Resident Manual for information concerning the grievance process. (Exhibit EE, *12/13/11 Email*.) He also informed Dr. Irani that the faculty would meet on January 30, 2012, to determine an appropriate action. *Id*.

As with his concerns and grievance before, Dr. Irani again contacted Dr. Stephens and told her that he was suspended and under a Level III remediation. (Exhibit Y.) Dr. Stephens and Dr. Irani then corresponded concerning the appropriate grievance procedure. *Id.*

At Dr. Irani's request, Dr. Walsh met with him on December 19, 2011, to discuss both his academic progress and the grievance process. (Exhibit FF, *12/19/11 MoR*.) Dr. Walsh offered that Dr. Irani could communicate with him at any time concerning any point regarding their conversation. *Id*.

During the process of reviewing the grievance, Dr. Stephens reviewed the e-mails associated with the concerns. She questioned whether the matter had been addressed with Dr. Nathe and it appeared that a verbal counseling was in order. (Exhibit GG, *01/03/12 Email*.) Dr. Koon did counsel Dr. Nathe as was appropriate, as she had no other discipline of record. (Exhibit HH, *01/04/12 Email*.)

Dr. Irani met with Dr. Stephens on January 3, 2012, as part of the grievance process. He questioned the "sudden change" in Dr. Koon's position as to his prior remediation, argued that he was being libeled and slandered, and suggested that Palmetto Health had not followed its own

process.  (Exhibit II, *K. Stephens Notes regarding Grievance Process Meeting*.)  He did not mention discrimination in any form or a hostile environment.  He did not mention being harassed or called inappropriate names.  *Id.*  The following day, Dr. Irani e-mailed Dr. Stephens and reiterated his points and attached further documentation.  (Exhibit JJ, *Dr. Irani Statement of Account*.)

On January 11, 2012, Dr. Stephens notified Dr. Irani that after carefully reviewing the documents and having discussions with others, she was upholding his December 9, 2011, academic remediation.  (Exhibit KK, *01/11/12 Letter from Dr. Stephens to Dr. Irani*.)  She emphasized that "[a]n action like this is never simple, and I want to make it clear that our intent in initiating academic remediation is to aid you in meeting academic expectations and to have you complete your training."  *Id.*

Dr. Koon wrote a memo to the file detailing the various issues with Dr. Irani's performance.  (Exhibit LL, *01/26/12 Remediation List*.)  In a January e-mail from Dr. Irani to Dr. Koon, Dr. Irani thanked Dr. Koon for his feedback and for his belief that the remediation process was not meant to be a punitive process.  (Exhibit MM, *01/24/12 Email*.)  He further expressed his concern that the suspension would hurt him in the job market and requested to call it a leave of absence instead to avoid any long term effects.  *Id.*  On January 27, 2012, Dr. Koon sent a Remediation MoR to the faculty for their review and editing.  (Exhibit NN, *01/27/12 Final Remediation*.)  Dr. Stephens reviewed the MoR and made suggestions as to necessary changes. (Exhibit OO, *01/27/12 Remediation Draft*.)  The next day Dr. Koon e-mailed Dr. Irani that they would meet on January 31, 2012.  (Exhibit PP, *01/28/12 Email*.)  During this same time period, Dr. Walsh followed up with a communication to clarify some of Dr. Irani's misstatements about his meeting with Dr. Irani.  (Exhibit QQ, *01/24/12 Email*.)  Dr. Irani expressed his appreciation.

In no way did he indicate that he had been mistreated, harassed, discriminated against, or subject to harassment or inappropriate comments. The MoR and Remediation Plan was signed by Dr. Koon on January 31 and by Dr. Irani on February 1, 2012. (*See* Exhibit RR, *Remediation Plan*.) Following this, Dr. Guy discussed the fact with Dr. Irani that he might be better suited in a field outside of clinical medicine. (P. Dep. Ex. 46; Guy Dep. Ex. 8-10.)

In the February 14, 2012, GMEC meeting, Dr. Koon, in executive session, went over the remediation history of Dr. Irani and recommended that Dr. Irani be moved from Level III to Level II beginning February 6, 2012, and lasting through June 15, 2012. The motion was made and carried. The GMEC was to receive and update in April. (Exhibit SS, *GMEC Minutes.*)

### C.     Termination

On February 27, 2012, Dr. Irani again ran into trouble. Dr. Grabowski contacted Dr. Koon and voiced concerns about how Dr. Irani handled the patient care of one of his spine patients. (Exhibit TT, *02/27/12 Email*.) A nurse made Dr. Irani aware of neurological changes and a deficit with a female post-operative patient at 11:30 a.m. Dr. Irani did not see the patient for approximately one hour and followed up with Dr. Grabowski after approximately one more hour. When Dr. Grabowski saw the patient, there were no notes reflecting Dr. Irani's examination. *Id.* Dr. Grabowski expressed concern over the timing of Dr. Irani's evaluation as well as his lack of documentation surrounding significant post-operative complications. *Id.*

Following this incident, Dr. Koon approached Dr. Stephens and indicated the department had already decided not to offer Dr. Irani a contract for the next year but wanted to know if his behavior rose to the level of "just cause" for dismissal. (Exhibit UU, *02/29/12 Email*.) Dr. Grabowski and Dr. Voss then met with Dr. Irani concerning this recent incident. (Exhibit VV, *Dr. Voss Note to File*.) Dr. Grabowski reviewed all of the issues with Dr. Irani. (*Id.*) Dr. Voss

stated that there was a failure to recognize the amount of care required for an orthopaedic spine patient and questioned whether Dr. Irani could meet the standards expected of him. (Exhibit VV.)

Almost immediately another issue arose. Dr. Irani evaluated a hemophiliac patient with leg pain they thought might be compartment syndrome. (Exhibit WW, *03/01/12 Email*.) The Chief Resident, Dr. Wood, instructed Dr. Irani to evaluate the patient at 4 a.m. (Exhibit XX, *03/09/12 Email*.) Dr. Irani did see the patient, but not at 4 a.m., and he failed to document his actions. *Id.* Furthermore, when Dr. Wood directly asked Dr. Irani about the patient, Dr. Irani did not inform her that he had seen the patient at a different hour. When asked, Dr. Irani only responded that he forgot. *Id.* Dr. Irani did not document any evaluation. *Id.*

When Dr. Koon contacted Dr. Stephens concerning these issues, she told him to meet with Dr. Irani to obtain his side of the story. (Exhibit YY, *03/01/12 Email*.) Thereafter, Dr. Walsh met with Dr. Irani concerning the spine patient and Dr. Koon and Dr. Wood met with him concerning Dr. Wood's patient. (Exhibit YY.) Dr. Koon informed Dr. Irani that the department's recommendation to the GMEC would be for dismissal and that would be presented on April 10, 2012. (*Id.*) Later that day, Dr. Stephens took the recommendation to the Executive Committee of the GMEC based on articulated patient care issues. (Exhibit ZZ, *03/01/12 Email from Dr. Stephens regarding Dr. Irani Update*.)

Dr. Irani was placed on suspension without pay as of March 1, 2012. (Exhibit AAA, *03/01/12 Email to M. Bodie regarding Dr. Irani Status*.) Dr. Koon also asked Dr. Irani to provide his recollection of the events as he perceived them. (Exhibit BBB, *03/05/12 Email*.) On March 8, Dr. Irani provided a memorandum beginning, "Dr. Koon, Thank you for giving me the opportunity to respond to the events surrounding the two patients in question and going on to

address the specific incidents." (Exhibit CCC, *03/08/12 Email*.) With regard to the patient he was to evaluate for Dr. Wood, Dr. Irani basically just acknowledged that he saw the patient. *Id.* He did not address the fact that he did not document his evaluation and when asked if he had done the evaluation, he indicated that he had forgotten. *Id.* With regard to the spine patient and Dr. Irani failing to document his evaluation, Dr. Irani states that Dr. Grabowski told him his findings were incongruent and he had been told not to document incongruent findings. *Id.*

At this point, Dr. Irani contacted Dr. Walsh and asked to meet with him. Dr. Walsh agreed. (Exhibit DDD, *03/13/12 Email*.) He also wrote Dr. Wood and Dr. Grabowski and asked for their feedback. (Exhibit EEE, *03/13/12 Email*.)

For a third time, Dr. Irani filed a grievance under the Resident Grievance Policy. (Exhibit FFF, *03/15/12 Email*.) After meeting with Dr. Koon and then Dr. Walsh, Dr. Irani approached Dr. Stephens about meeting with her. (Exhibit GGG, *03/16/12 Email*.) Dr. Grabowski met with Dr. Irani again, with Dr. Voss present, and Dr. Grabowski also talked to him about the patient's dressing changes and the need for him to do the dressing change. Dr. Voss stated that Dr. Irani admitted short coming in his assessment and compulsiveness but failed to have insight about the true concerns. (Exhibit HHH, *Dr. Voss Note to File*.)

On March 28, 2012, Dr. Stephens informed Dr. Irani that she had considered his grievance and his next step was to appeal. (Exhibit III, *03/28/12 Letter*.) Dr. Irani decided to hold off on setting the date for his grievance before the full committee until after the GMEC had taken actions as the Executive Committee had only taken temporary action at this point. (Exhibit JJJ, *04/02/12 Email*.) During this time, Dr. Irani requested copies of a number of documents from Dr. Koon and Dr. Koon provided them. (Exhibit KKK, USC 0777-0909.)

The GMEC met on April 10, 2012, and approved the recommendation of the faulty to dismiss Dr. Irani from the Palmetto Health Orthopaedics Surgery program.  (Exhibits LLL, *GMEC Meeting Minutes*.)   Twenty-one program directors, department chairs, and resident representatives were present for the meeting.  (Exhibit LLL.)  Following the meeting, Dr. Koon notified Dr. Irani of the outcome and stated "Per the dismissal of Residents policy found in the PH Resident Manual, you are dismissed from the residency program effective immediately." (emphasis added).  (Exhibit MMM, *04/10/12 Email*.)[12]  The next day Dr. Irani asked Human Resources to move forward with his grievance (Exhibit OOO, *04/11/12 Email*) and he also turned everything [badges, access cards, etc.] in to a member of the GME department.  (Exhibit PPP, *04/11/12 Email regarding Book Money*.)  On March 28, 2012, Dr. Stephens upheld his termination.  (Stephens Dep. 140-142; Stephens Dep. Ex. 32.)

During the course of his active residency Dr. Irani never complained that he was being asked to work in excess of the allowable duty hours as sanctioned by the ACGME.  Neither did he complain that his or other residents' supervision was inconsistent with the requirements of the ACGME.  He simply stated that residents were told to "make it work."  (P. Dep. 49.)  It was only upon his termination and communication with Dr. Eady (who was ousted as Chair of the Department and has been engaged in multiple litigation matters against the department and Dr. Walsh and Dr. Koon) that Dr. Irani filed a complaint with the ACGME.  (Stephens Dep. 176; Stephens Dep. Ex. 43.)   His complaints were dismissed by the ACGME.  (Exhibit QQQ, *08/02/12 ACGME Letter*.)  The program was found not to have violated the ACGME duty hours rules and supervision requirements of the ACGME.  *Id.*  These are the ACGME requirements

---

[12]     Although Dr. Koon sent an e-mail containing the information concerning his termination, Dr. Irani also acknowledges that he missed a telephone call from Dr. Koon. (Exhibit NNN, *04/11/12 Email regarding GMEC Action*.)

which Dr. Irani now bases several of his causes of action.  (Am. Compl. ¶¶ 62-65; 70-75.)  During the course of this litigation and before, the ACGME did site visits of the Palmetto Health program (beyond the Complaint by Dr. Irani and response by Palmetto Health in 2012) and determined the orthopaedic residency program to be in compliance with its accreditation being renewed.

    With each academic remediation and his termination, Dr. Irani was advised that he could use the grievance process and he did so a total of three occasions.  In one instance he fell short of the full grievance committee because the Human Resources Business Partner determined that his request was untimely.  Dr. Irani worked with his attorney and Dr. Eady in preparing for the grievance of his termination before the full grievance committee.  (Exhibit RRR, *Emails with Dr. Eady*.)  Together they worked on an approach to file a complaint with the ACGME concerning duty hours and supervision that would give Dr. Irani "leverage" in his attempts to be reinstated into the program.  (P. Dep. Ex. 51-54 )  Neither as a result of Dr. Irani's review or an additional 2015 on-site review did the program lose its accreditation.  Contrary to the result Dr. Irani suggests, the ACGME found the program to be in satisfactory compliance with its standards.  (*See* Exhibit QQQ.)

    Dr. Irani's plan to affect the grievance committee failed.  After he appealed Dr. Stephens' decision, Dr. Irani was granted a hearing before a grievance committee consisting of three physicians in other specialties who are program directors and department chairs and two residents.  Dr. Irani was assigned a Business Partner from Palmetto Health Human Resources to assist him.  (Exhibit SSS, *04/11/12 Emails with Lin Hearne*.)  He worked with his attorney and Dr. Eady to prepare.  (P. Dep. Ex. 1.)  The grievance committee heard both sides.  Dr. Irani does not dispute that he was allowed to get before the committee all that he prepared.  (P. Dep. 274.)

After hearing all sides, the grievance committee adjourned but asked for several additional pieces of information.  In response, statements were provided from Drs. Koon and Walsh.  (Stephens Dep. Exhibit 34-36; P. Dep. Ex. 27; Guy Dep. Ex. 5; and Exhibit TTT, *Voss Dep. Ex. 6*.)  Thereafter, the committee reconvened and voted to uphold Dr. Irani's termination.  (P. Dep. Ex. 43.)  Consistent with the Grievance and Due Process Policy, Mr. Beaman, Chief Executive Officer of Palmetto Health, reviewed the matter and decided that the termination was proper.  Accordingly, he upheld the decision of the Grievance Committee.  (P. Dep. Ex. 44.)

During the time in which Dr. Irani was struggling in the program, both Dr. Walsh and Dr. Guy informed him that he might be better suited to another vocation and that each would assist him in making industry contacts.  (P. Dep. Ex. 46, 47.)  Dr. Irani had a background in device design and research and both Dr. Walsh and Dr. Guy could see him being successful in this type of environment.  Following his departure, Dr. Irani initially chose not to pursue any alternative career and instead applied only to other residency programs.  He was accepted to an emergency medical program at Kern Medical Center in California and began in the program.  He was required to obtain his California medical license.  Dr. Irani dropped off information for Dr. Koon, as Program Director, to complete.  (Koon Dep. 277.)  In responding, Dr. Koon said that his goal was not to be sued and he hoped Dr. Irani would move on.  (Koon Dep. 241.)  At this point, Palmetto Health responded as the California Board of Medicine indicated was necessary to provide a complete response.

Palmetto Health and Dr. Koon worked together to provide the information requested by the California Medical Board but did so cautiously as Dr. Irani, through his counsel, had made it clear he would sue if he felt that his new residency was impeded.  (Exhibit UUU, *Emails with David Rothstein*.)  After providing an initial response, the California Medical Board made it clear

the measured response was insufficient and more was required. *Id.* Dr. Irani has testified that the only thing required was that the residency program complete two forms but the requirements are spelled out in the communication from the Medical Board. *Id.* The only evidence is that neither Palmetto Health nor anyone associated with the Orthopaedic Surgery Residency program had communication with the California Medical Board that was not sought by Dr. Irani.

**Additional Facts**

Dr. Irani alleges that he was pulled into a faculty meeting that was hostile. He has no evidence that this does not occur when other residents have performance issues and, in fact, his co-resident was also called before the faculty at the end of his PGY2 year. (Goodno Dep. 65. ) Dr. Goodno testified that he had to answer difficult questions and discuss his deficiencies. *Id.* Dr. Goodno, just like Dr. Irani, was asked if orthopaedic surgery was really where he belonged. (Goodno Dep. 66, 68.) Dr. Goodno also testifies that the orthopaedic program is a tough program and that it was hard on everyone. (Goodno Dep. 46, 56.) There is no evidence that Dr. Goodno is anything other than Caucasian or of his national origin or religion.

Dr. Irani also mentions Dr. Lamoreaux, a resident who was previously removed from the program. There is no evidence that Dr. Lamoreaux is anything other than Caucasian and his ethnic background and religion are unknown. The same is true of the other five residents who left the program for a variety of reasons. All are believed to be Caucasian and their national origins and religions are unknown. A resident of Indian decent, Dr. Sonny Guram, M.D., successfully completed the Orthopaedic Surgery Residency program. (Exhibit VVV, *Dr. Guram profile*.)

Finally, Dr. Irani had rotations with Dr. Guy, an African American member of the orthopaedics faculty, and would go talk to him for guidance from time to time. Dr. Irani raised

the possibility with Dr. Koon for Dr. Guy seeing him through the remediation process.  (Guy Dep. 51.)  Although Dr. Guy did not do so, he testified that he was just trying to get him [Irani] to continue forward. (Guy Dep. 52.)  Dr. Guy is also one of the faculty members who discussed with Dr. Irani the possibility of going into a field other than clinical medicine and made industry contacts for him to explore the opportunities.  (Guy Dep. 56-58; Guy Dep. Exhibits 2, 8, 9, and 10.)  Dr. Guy admits that Dr. Irani told him that orthopaedics was all he ever wanted to do, but "not that convincingly."  (Guy Dep. 56, 57.)  Dr. Guy agreed with Dr. Irani's suspension (Guy Dep. 47) and as is reflected in his written response at the request of the grievance committee, believes that Dr. Irani was amazingly bright, one who is destined to do great things.  (Guy Dep. Ex. 11.)  However, he did "not believe that orthopaedic surgery and/or any other clinical subspecialty is the way he [Dr. Irani] is going to do this." Moreover, "[h]e does not demonstrate the level of passion or desire one would expect from even a first year resident. I believe this may be a major contributor to Dr. Irani's difficulties."  Dr. Irani never indicated that Dr. Guy was anything other than supportive of him.

## STANDARD

The Supreme Court has emphasized the importance of the summary judgment procedure under Rule 56:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.  The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "[T]he burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

In order to establish a genuine issue of material fact exists, Dr. Irani must show there is evidence upon which a finder of fact can reasonably hold in her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). While all facts and reasonable inferences therefrom must be construed in the light most favorable to the non-moving party, that party only creates a "genuine" issue of fact when he produces evidence that would create a reasonable probability, and not a mere possibility, of a jury finding in his favor. *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 512 (4th Cir. 1993). Under this standard, the existence of a mere scintilla of evidence in support of Plaintiff's position is insufficient to withstand summary judgment. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude summary judgment. *Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985) (abrogated on other grounds). The facts here, even when taken in the light most favorable to Dr. Irani, do not establish any genuine issue of material fact for trial. Accordingly, Palmetto Health is entitled to summary judgment.

## ARGUMENT AND AUTHORITIES

### I.    Dr. Irani Fails to State a Wrongful Termination in Violation of Public Policy Claim

Dr. Irani's wrongful discharge in violation of public policy claim must be dismissed because his termination was not prohibited by any clear mandate of public policy established by statute or the courts. Where the retaliatory discharge of an at-will employee constitutes a violation of a clear mandate of public policy, a cause of action in tort for wrongful discharge exists. *Ludwick v. This Minute of Carolina, Inc.*, 287 S.C. 219, 225, 337 S.E. 2d 213 (1985). The Supreme Court of South Carolina extended this "public policy exception" to at-will

employees under notice provisions in *Stiles v. American General Life Ins. Co.*, 335 S.C. 222, 226, 516 S.E.2d 449 (1999).  Dr. Irani was not an at-will employee under a notice provision; therefore, he cannot seek protection under South Carolina's public policy exception to the at-will employment doctrine.

It is uncontested Dr. Irani entered into a Resident Agreement of Appointment with Palmetto Health for a one-year term.  (Am. Compl. ¶ 53.)  This contract afforded Dr. Irani remedies in the event of its breach, as Dr. Irani's breach of contract claim evidences. (*See* Am. Compl. ¶¶ 53-60.)  The contract further contained a mandatory "for cause" termination provision applicable only to Palmetto Health.  (P. Dep. Ex. 4.)  Dr. Irani was not under a notice provision. Consequently, Dr. Irani was not an at-will employee and cannot avail himself of South Carolina's public policy exception to the at-will employment doctrine.

*Assuming arguendo* that Dr. Irani was an at-will employee, his claim does not fit within the recognized bounds of wrongful termination in violation of public policy.  *Cervantes v. Wells Fargo Bank, N.A.*, No. 0:12-CV-02966-CMC, 2013 WL 120697, at *3 (D.S.C. Jan. 9, 2013) *reconsideration denied*, No. 0:12-CV-02966-CMC, 2013 WL 1186730 (D.S.C. Mar. 20, 2013). Dr. Irani does not allege that Palmetto Health required him to violate any law or that Palmetto Health's termination was a violation of criminal law.  *See Id.*  Instead, Dr. Irani claims his actions in objecting to the duty hour violations of the Program and in complaining about inadequate resident supervision are protected activities under the clear mandates of the State of South Carolina's public policy, yet he provides no statutory or case law support for these contentions.  (Am. Compl. ¶ 74.)  Because Dr. Irani was under a contract for a definite term, his termination had to be "for cause," and his termination was not a violation of criminal law, Dr.

Irani does not have a claim for wrongful discharge in violation of public policy.  Accordingly, summary judgment should be granted in favor of Palmetto Health as to this claim.

## II.     Dr. Irani's Breach of Contract Claim Fails Because He Cannot Show Palmetto Health Breached the Residency Agreement.

To prevail on a breach of contract claim, the Dr. Irani bears the burden of establishing the existence and terms of the contract, the Defendant's breach of one or more of the contractual terms, and damages resulting from the breach.  *Taylor v. Cummins Atlantic, Inc.,* 852 F. Supp. 1279, 1286 (D.S.C. 1994), citing *Fuller v. Eastern Fire & Cas. Ins. Co.,* 240 S.C. 75, 124 S.E.2d 602, 610 (1962).  Under South Carolina law, there is a presumption that employees are at-will, and therefore a Plaintiff in an employment context must also present sufficient factual allegations to establish the existence of an employment contract beyond the at-will relationship.  *Ferguson v. Waffle House, Inc.*, 18 F. Supp. 3d 705, 731 (D.S.C. 2014), citing *Perrine v. G4 Secure Solutions (USA), Inc.,* No. 11–1210, 2011 WL 3563110, at * 2 (D.S.C. Aug. 9, 2011).

It is undisputed that Dr. Irani had a one-year employment contract and that he signed a valid disclaimer as to the Palmetto Health Policies and Procedures. [13]  That contract was Dr. Irani's July 1, 2011, Resident Agreement of Appointment ("Resident Agreement"), which was for a one-year term.  (P. Dep. Ex. 4.)  His Resident Agreement provided that Dr. Irani could terminate his orthopaedic residency with or without cause by giving thirty days' prior written notice.  Palmetto Health, in contrast, could only terminate the residency agreement "for cause" as defined by the Resident Agreement.  The basis for that cause has been set forth in the facts above, and under Section 1.3 of the Resident Agreement, Palmetto Health has cause to terminate Dr. Irani.

---

[13]     Dr. Irani may attempt to assert that one or more of the Resident Manuals created a contract. They did not, but even if they did, there is no breach that can be shown.

> 1.3    Failure by the resident to demonstrate, meet, or maintain satisfactory levels academic, professional, and/or clinical performance required by the residency programs as determined by evaluations.

(P. Dep. Ex. 4.)  As laid out above, the faculty and GMEC all had a good faith belief that Dr. Irani was failing to demonstrate, meet, or maintain satisfactory levels of performance.  This is supported by both his formal evaluation and by the specific case evaluations of the faculty. There is no evidence that the physicians who raised concerns did not have a good faith and reasonable belief that Dr. Irani's continued actions created concern with patient safety and created a doubt that he could ever be successful in the program.

The appropriate test on the issue of breach is as follows: "If the fact finder finds a contract to terminate only for cause, he must determine whether the employer had a reasonable good faith belief that sufficient cause existed for termination." *Conner v. City of Forest Acres*, 348 S.C. 454, 464, 560 S.E.2d 606, 611 (2002), quoting *Prescott v. Farmers Telephone Co-op., Inc.,* 328 S.C. 379, 393, 491 S.E.2d 698, 705 (Ct. App. 1997), *rev'd on other grounds,* 335 S.C. 330, 516 S.E.2d 923 (1999).   The focus is not whether the employee actually committed misconduct; instead, the focus must be on whether the employer reasonably determined it had cause to terminate.  *Conner*, 348 S.C. at 465, 560 S.E.2d at 611.  Although Dr. Irani disagrees that the issues were serious or that he was not making progress, there is no evidence that the faculty as a whole did not believe that the performance issues of Dr. Irani were deserving of remediation and ultimately required his termination.

In *Conner*, plaintiff worked for the City of Forest Acres ("the City") as a police dispatcher from July 1984 to October 1993.  *Id.* at 457*, 560 S.E. 2d at 607.  Beginning in November 1992, plaintiff received numerous reprimands for such things as violating the dress code, tardiness, performing poor work, leaving work without permission, and using abusive

language.  *Id.*  After being placed on probation and receiving two additional reprimands, the City terminated plaintiff.  *See id.*  Plaintiff filed a grievance and the grievance committee voted 2-1 to reinstate her; however, the City Council rejected the grievance committee's decision and voted to uphold plaintiff's termination.  *See id.*, 560 S.E. 2d at 607-08.

Plaintiff argued there was no just cause for her termination.  *Id.* at 465, 560 S.E. 2d at 611.  Because the grievance committee and City Council reached opposite conclusions as to whether cause existed for plaintiff's firing, the Court determined that reasonable minds could differ as to whether just cause existed to support plaintiff's termination.  *Id.*  Thus, the ultimate question remained as to whether the City had a reasonable, good-faith belief that sufficient cause existed for termination, and summary judgment was inappropriate.  *Id.* 560 S.E. 2d at 612.

Unlike the plaintiff in *Conner*, Dr. Irani cannot show "reasonable minds could differ" as to whether his termination was for cause.[14]  *See id.*  Dr. Irani was taken through multiple remediation steps, from faculty and residents counseling him, to two suspensions, and then termination.  Each occurred at the recommendation of the faculty, each was reviewed by the GMEC, and his termination being reviewed by a grievance committee and finally the CEO of Palmetto Health.  All but the initial informal remediation involved reviews of his actions.  Dr. Irani grieved his suspensions internally with the first two ending at the review of the DIO, Dr. Stephens, and the third going through a grievance committee and to the CEO for the final review.

---

[14]  Dr. Irani may use the expert opinion of Dr. Grant who found that Dr. Irani was meeting the standard of case and there was no untoward outcome for any of the patients. However, there is no evidence that this addresses the concerns of the faculty members, nurses, and other attending physicians.  A review of the specific remediation documents makes it clear that the concerns were focused on patient concerns resulting from incomplete or poorly done patient histories and notes, failing to follow through on instructions, failing to have a sense of urgency that again, had the possibility of resulting in a bad patient result.  Dr. Irani was in training.  He was failing to handle basis matters as was appropriate and on which he had been repeatedly counseled.

During the course of the multiple remediation efforts, Dr. Irani made some progress but ultimately would lapse back into the same issues.  Each series of events was investigated.  When it appeared that the remediations were simply not being successful, the faculty decided that it would not renew his contract for a third year.  However, in the meantime he again had serious issues with deficient patient notes for a hemophiliac patient with multiple dangerous complicating factors and with a post-spinal surgery patient with whom there were multiple issues with regard to Dr. Irani's care.  On March 5, 2012, Palmetto Health again placed Dr. Irani on Level III remediation and suspended him from its program.  Based on the foregoing events, Palmetto Health recommended to the GMEC that Dr. Irani be terminated from its orthopaedic residency program.  The GMEC accepted the recommendation and Dr. Irani received notice that he was terminated "effective immediately" on April 10, 2012.

Dr. Irani then initiated his third and final grievance proceedings according to the Resident Grievance and Due Process policy.  Dr. Irani appealed the determination of the grievance committee to the CEO, Mr. Beaman.  Mr. Beaman upheld the findings of the grievance committee and notified Dr. Irani of this on June 1, 2012.

Unlike in *Conner* where the termination decision was overturned, Dr. Irani's discharge in the present litigation consistently has been upheld as "for cause."  348 S.C. at 547, 560 S.E. 2d at 607-08.  There has never been a question that Palmetto Health had a reasonable, good faith belief that sufficient cause for Dr. Irani's discharged existed.  While Palmetto Health cannot be shown to have violated the Residency Agreement with Dr. Irani because he was legitimately terminated "for cause" neither can the residency program be shown to have to have violated any of the contractual terms.  Consequently, summary judgment should be granted in favor of Palmetto Health as to Dr. Irani's breach of contract claim.

III.   **Dr. Irani's Claim of Breach of Contract as an Intended Third-Party Beneficiary of the Accreditation Agreement Fails Because He Cannot Prove an Enforceable Contract Existed, and That He Has Standing to Sue Under any Alleged Contract**

Palmetto Health denies the existence of an enforceable contract between it and the ACGME based on its accreditation.  Because the ACGME Program Requirements for Graduate Medical Education in Orthopaedic Surgery (hereinafter "accreditation agreement") spans for a period in excess of one year and there is no signed writing, any alleged contract is unenforceable under the Statute of Frauds.  S.C. Code Ann. § 32-3-10 (2012).  According to the South Carolina Code, an agreement is required to be in writing and signed if it is "not to be performed within the space of one year from the making thereof."  *Id.*  The accreditation agreement expressly states that "orthopaedic residencies will be accredited to offer five years of graduate medical education."  (P. Dep. Ex. 5).  The accreditation agreement contains no signature of either party and consequently violates the statute.  *See id.*

By way of analogy, the ACGME's accreditation requirements are comparable to regulations.  A corporation that complies with OSHA regulations in order to stay in business, for example, is not deemed to have a contract with the federal government.  Palmetto Health complies with the ACGME's regulations in order to maintain accreditation and produce qualified doctors, and its doing so does not amount to a contract.  Moreover, as discussed above, any alleged contract is violative of the Statute of Frauds and thus unenforceable.

Even assuming for the sake of argument the accreditation agreement does constitute a contract, the only thing that the ACGME can do under the agreement is "affect the programs accreditation."  (P. Dep. Ex. 6.)  Dr. Irani has no claim as a third party beneficiary because Palmetto Health never breached the contract.  *See Vance v. Tennessee Valley Auth.*, 738 F.2d 1418, 1421 (4th Cir. 1984); *see also Equity Capital Associates v. Sec. Mortgage Corp.*, 981 F.2d

1250 (4th Cir. 1992) (no third party beneficiary because no intent to benefit Plaintiff and alternatively, no breach of contract).

In *Vance*, the Plaintiffs were a class of heirs of deceased persons buried in twenty private and public cemeteries, located on a 44,400-acre tract of land in Swain County, North Carolina. *Id*. at 1419.  The tract of land was acquired by the United States in the 1940s on behalf of the Tennessee Valley Authority ("TVA") to erect a dam, watershed, and reservoir.  *Id.*  Before acquiring the land, TVA approached the residents with the choice of either leaving the grave sites intact or having the remains reinterred at an alternative site at TVA's expense.  *Id*. at 1420.  Plaintiffs and their relatives chose to leave the remains in their original location, claiming that they relied upon certain promises by TVA that the Department of the Interior ("Interior") would construct a road to provide access into the area.  *Id.*

In 1943, TVA entered into a written contract with the Interior, Swain County, and the State of North Carolina, which provided that TVA would acquire from the private owners the entire 44,400 acres, and transfer the acquired lands to the Interior's National Park Service.  *Id.* The contract further stated that the Interior agreed to construct two roads to provide access to the cemeteries in question.  *Id.*  However, the obligation to build the roads was contingent on the appropriation of funds by Congress.  *Id.*  The National Park Service began constructing the roads but encountered difficulties and determined it was no longer environmentally or economically feasible to continue.  *Id.*  As a result, congressional funding ceased and the roads never were completed.  *Id.*  In 1983, Plaintiffs brought suit against the State of North Carolina, Swain County, TVA, the Secretary of the Interior, and the Interior to compel completion of the roads under a third-party beneficiary theory.  *Id.*  The district court dismissed the action, holding that the Plaintiffs were only incidental beneficiaries of the 1943 agreement, and as such, had no

enforceable rights and no standing to sue under the agreement.  *Id.* at 1421.  On appeal, the Fourth Circuit concluded that whether or not the Plaintiffs had standing to sue as beneficiaries was immaterial because it found that any agreement to construct a road was never breached.  *Id.* at 1422.  The roads' construction was always contingent on federal funding; because funding stopped, the parties to the contract had no further obligations.  *See id.*  Consequently, the Plaintiffs had no claim as possible beneficiaries because there was no breach.  *Id.*

Similar to the class of plaintiffs in *Vance*, Dr. Irani has no claim as a third party beneficiary because the accreditation agreement between Palmetto Health and the ACGME was never breached.  At all times during Dr. Irani's enrollment and at present, Palmetto Health has been an accredited residency program with the ACGME.  Dr. Irani cites various "particulars" in which Palmetto Health allegedly breached the accreditation agreement.  However, Dr. Irani brought these exact particulars to the attention of the ACGME when he formally filed a complaint alleging that the Orthopaedic Surgery program at Palmetto Health/University of South Carolina School of Medicine was in violation of ACGME requirements.  The ACGME notified Palmetto Health of Dr. Irani's complaint on April 27, 2012, and requested a response with documentation pertaining to each of his allegations.  (Exhibit ZZZ, *Letter from ACGME to Palmetto Health*.)  Palmetto Health submitted a response on May 5, 2012, addressing Dr. Irani's claims of Palmetto Health's inadequate supervision, failure to follow duty hour requirements, and failure to provide procedures for grievance and due process, among other things.  The ACGME conducted a thorough review of the complaint and Palmetto Health's response.  The review committee concluded there was *no validity* to the complaint and no further action was to be pursued regarding the complaint.  (Exhibit QQQ.)  In other words, Palmetto Health did not breach the accreditation agreement according to the ACGME.  *See id.*

In addition, the ACGME has conducted t on-site visits at Palmetto Health to assess its compliance with the ACGME's requirements. The only evidence is that the orthopaedic residency program has consistently maintained its accreditation. Even when the ACGME found issues requiring corrections or adjustments, the program was directed to make adjustments and report on their progress. At no time has the Orthopaedic Surgery Residency program been without ACGME accreditation.

However, Dr. Irani' status as an alleged third party beneficiary is irrelevant. He is not entitled to recovery under any alleged contract as a potential beneficiary because the accreditation agreement was never breached. Indeed, the accreditation agreement still remains in effect. Consequently, Dr. Irani's claim fails and summary judgment must be granted in favor of Palmetto Health.

## IV.     The Academic Decision Being Challenged by Dr. Irani is Not Covered by Title VII or Section 1981

Dr. Irani's academic shortcomings are not subject to challenge under Title VII of the Civil Rights Act of 1961. The events and decision that Dr. Irani challenges in this case relate only to the educational problems Dr. Irani was experiencing in the residency program, not his activities as an employee. Dr. Irani functioned in a dual capacity as a resident, one being an employee of Palmetto Health and the other being a student in the Palmetto Health/USC-SOM Residency Program.

Dr. Irani's dismissal was due to his academic failures. See *Mohammed v. Mathog*, 635 F. Supp. 748, 751 (E.D. Mich. 1986) ("[a]s a resident, plaintiff was undeniably a student, subject to the academic requirements of the . . . program"). Accordingly, the Court does not have jurisdiction over this matter under Title VII.

In a case based on very similar facts, the Minnesota Court of Appeals reached a similar conclusion.  *Ross v. University of Minn.*, 439 N.W.2d 28 (Minn. Ct. App. 1989).  In *Ross*, a resident was dismissed from the University of Minnesota's psychiatric residency program.  *Id*. The resident later filed suit claiming, inter alia, breach of contract as well as denial of substantive and procedural due process rights.  *Id*.  As a threshold matter, the court had to determine whether the resident should be considered an employee or a student.  *Ross*, 439 N.W. 2d at 32.  There were no Minnesota cases addressing this particular issue; therefore, the court had to review case law from other jurisdictions and specialized courts.  After doing so, the court found that there was no clear rule regarding the treatment of residents.  *Id*.[15]  As such, the court stated that "whether a resident is considered an employee or a student depends on the context in which the question (and cause of action) arises."  The court then found the resident to be a student, not an employee, of the University.  *Id*. at 33.  The court's finding was based on the fact that the gravamen of the resident's complaint "arose in the academic arena and must therefore be considered an academic problem concerning a student."  *Id*.  As such, the University's dismissal was viewed as a pass or fail decision based on the student's ability to meet curriculum standards. *Id*.  In consideration of the academic context of the decision, the court deferred to the University's expertise in the academic area and affirmed the grant of summary judgment in favor of the University.  *Id*. at 35.  The court stated that "to hold otherwise would be to threaten the

---

[15]   The court found that in a taxation context, residents are considered employees to the extent that their salaries/stipends are taxable income.  See, e.g., *Hembree v. United States*, 464 F.2d 1262, 1265 (4th Cir. 1972).  In collective bargaining cases, the court found that some cases held residents were not employees while other cases held that residents were employees within the meaning of state and federal collective bargaining statutes.  In *re Cedars-Sinai Med. Ctr.*, 91 L.R.R.M. (BNA) 1398, 223 N.L.R.B. 251 (1976); *see also*, *Regents of Univ. of California v. Public Employment Relations Bd.*, 715 P.2d 590, 599-603 (Cal. 1986).

autonomy of academic instructions to determine standards for the passing and failing of students." *Id*. at 33.

Likewise, in *Gupta v. New Britain Gen. Hosp.*, 687 A.2d 111 (1996), Connecticut Supreme Court focused on the context in which the cause of action arose in addressing the claims of a discharged resident.  The resident in that case brought a breach of contract action against the defendant hospital.  In affirming a summary judgment in favor of the hospital, the court acknowledged the hybrid relationship of residents (i.e., containing both employment and educational features), but characterized the decision to dismiss that particular resident as an academic decision.  *Gupta*, 687 A.2d at 117.  The court stated that "[a] residency committee's decision to dismiss a resident physician for poor performance in the clinic mirrors a professor's decision to fail a medical school student for poor performance in the class room."  *Id*.  The court thus declined to "second guess" the academic decision of the hospital.

In this case, the decision to terminate Dr. Irani's residency was based solely on his poor academic performance.  The circumstances surrounding Dr. Irani's termination arose entirely out of his status as a resident participating in a graduate educational program designed to teach him the skills necessary to become a fully-licensed physician specializing in orthopaedics.  Therefore, Dr. Irani's dismissal is indistinguishable from any other institutional decision to pass or fail a student for failure to meet academic requirements.  Courts have consistently held that assessing a student's academic performance must be left to the sound judgment of the individual academic institution.  *See University of Pennsylvania v. EEOC*, 493 U.S. 182, 110 S. Ct. 577, 587 (1990); *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 255, 106 S. Ct. 507 (1985).  The process of rendering an academic decision frequently involves a subjective assessment of a student's ability to meet curriculum standards.  Those evaluations should be conducted in an academic, rather

than a legal, environment because such decisions do not lend themselves to the traditional fact-finding process of civil litigation.  *See Hubbard v. John Tyler Cmty. Coll.*, 455 F. Supp. 753 (E.D. Va. 1978); *Jane v. Bowman Gray Sch. Med. - N.C. Baptist Hosp.*, 211 F. Supp. 2d 678 (M.D.N.C. July 2, 2002).   Dr. Irani's claim, therefore, should be dismissed because the performance issues are academic and not employment-related issues.  Thus, Title VII does not apply.

## V.    Dr. Irani's Title VII Claims Fail Because They Were Untimely

Dr. Irani's Title VII claims are barred because he failed to file his administrative charge within the statutory, three hundred day limitation period.  Section § 706(e) of the Civil Rights Act of 1964, *as amended* (codified at 42 U.S.C. § 2000e-5(e)(1)) currently provides that:

> A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred … except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred, or within thirty days after receiving notice that the State or local agency has terminated the proceedings under the State or local law, whichever is earlier[.]

Simplified, a plaintiff has three hundred (300) days to file an administrative charge following a discriminatory act, and a failure to do so bars that plaintiff from pursing a Title VII lawsuit in this Court with respect to any alleged discriminatory act which falls outside of this three hundred (300) day period. *United Black Firefighters of Norfolk v. Hirst,* 604 F.2d 844, 847 (4th Cir. 1979); *Mickel v. South Carolina State Employment Serv.,* 377 F.2d 239, 242 (4th Cir.1967); *see National RR Passenger Corp. v. Morgan,* 536 U.S. 101, 110 (2002).

The method of computing the filing period is well-settled and does not involve a question of fact for the jury.  In situations where an employee receives notification of an adverse

employment action, the general rule is that the filing period begins when the alleged discriminatory decision is made and communicated to the employee. This rule was announced by the United States Supreme Court in *Delaware State College v. Ricks*, 449 U.S. 250, 250, 101 S. Ct. 498 (1980), in the context of a tenure denial; however, its application is one of general applicability. *See Chardon v. Fernandez*, 454 U.S. 6, 8 (1981). In the context of discharges, the *Ricks/Chardon* rule mandates that the filing period generally begins on the date when an employee is notified of a pending discharge, not on his last day of work or after optional grievance proceedings. *See Hutson v. Wells Dairy, Inc.*, 578 F.3d 823, 107 FEP 50 (8th Cir. 2009) (the 300-day filing period began running on the date when the plaintiff was notified by her supervisor that she had been terminated); *Shockley v. Vermont State Colleges*, 793 F.2d 478, 45 FEP 923 (2d Cir. 1986) (the 300 days began to run on the date he received notice that he would be terminated, not when the termination actually took effect).

Ricks was a university professor who had been denied tenure and given a one-year terminal employment contract. *Ricks*, 449 U.S. at 252. After Ricks' employment ended a year later, he brought a claim alleging discrimination in the tenure decision. *Id.* at 254. The Supreme Court held that the claim was untimely because the limitations period had commenced on the date that Ricks was notified that he had been denied tenure. *Id.* at 259. The Court refused to treat the end of his grievance process challenging the tenure decision as the date the filing period started. *See id.* at 261.

Dr. Koon notified Dr. Irani of his release from the residency program by e-mail on April 10, 2012. (Koon Dep. Ex. 6.) Dr. Koon's e-mail contained no ambiguity; it stated Dr. Irani was dismissed "**effective immediately**." (Exhibit WWW, *Change of Status form*.) His Palmetto Health Change of Status also shows that he was terminated as of April 10, 2012. *Id.* Although

Dr. Irani grieved his termination, the purpose of his grievance was to *overturn his termination and reinstate him into the residency program.* Dr. Irani was not suspended pending the outcome of the grievance.  He was terminated from the residency program as of April 10, 2012. Dr. Irani did not file his Charge with the Equal Employment Opportunity Commission until May 23, 2013.  He filed his Charge more than 300 days after he received notice of his immediate termination.  Consequently, the EEOC dismissed his Charge as untimely.

Dr. Irani may argue that the operative date for computing the filing period is June 1, 2012, the date on which he received the final denial of his grievance.  (P. Dep., Ex. 44.) However, as discussed above, the pendency of a grievance, or some other method of collateral review of an employment decision, does not toll the running of the limitations period. *Ricks*, 449 U.S. 250, 261.  The mere possibility that an employer could change its mind and rectify the alleged wrong at another time does not mean that the termination decision is not final.

Based on Plaintiff's administrative charge filing date of May 23, 2013, any separate and distinct discrimination claims occurring prior to July 27, 2012, are not be actionable and should be dismissed

## VI.    Dr. Irani's Title VII and Section 1981 Discrimination Claims

Plaintiff alleges his termination from the residency program was an act of discrimination on the basis of his race, national origin, and religion.  He has no direct evidence of discrimination on any basis, so his claim must be analyzed through the burden shifting scheme established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S. Ct. 1817 (1973), *aff'd* 528 F.2d 1102 (8th Cir. 1976) and *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089 (1981).  Section 1981 claims race and national origin claims are analyzed in the same manner as claims brought pursuant to Title VII. *Montgomery v. American Airlines, Inc.,* 626 F.3d 382, 389

36

(7th Cir. 2010). Under *McDonnell Douglas*, Plaintiff must first establish a *prima facie* case of unlawful discrimination. *Burdine*, 450 U.S. at 252-253. If Plaintiff establishes a *prima facie* case, the burden of production shifts to Defendant Palmetto Health to articulate legitimate, nondiscriminatory reasons for Plaintiff's termination from the residency program. *Gillins v. Berkley Elec. Co-op., Inc.,* 148 F.3d 413, 415-416 (4th Cir. 1998). Once Palmetto Health sets forth a legitimate, non-discriminatory reasons for Plaintiff's termination, the burden shifts back to Plaintiff to show that such reasons are pretextual or unworthy of credence. *Amirmokri v. Baltimore Gas & Elec. Co.,* 60 F.3d 1126, 1129-1130 (4th Cir. 1995); *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 n.2 (4th Cir. 1989); *citing Burdine,* 450 U.S. at 253 (the ultimate burden of persuasion remains on plaintiff to establish discrimination or a discriminatory motive).

## A. Dr. Irani Cannot Establish a *Prima Facie* Case

To establish a *prima facie* case, Dr. Irani must establish that: (1) he is a member of a protected group; (2) he was qualified for his position and his performance was satisfactory; (3) despite his qualifications and performance he was terminated; and (4) individuals outside his protected class were treated more favorably than he was treated. *See Alvarado v. Board of Trs. of Montgomery Community College,* 928 F.2d 118, 122 (4th Cir. 1991).

Dr. Irani cannot establish a *prima facie* case because he was not qualified for his position as the result of his unsatisfactory performance. Additionally, he cannot demonstrate that individuals outside of his protected class were treated more favorably than he was treated. Dr. Irani's evaluations provide specific performance issues that were required to be addressed although he did receive some satisfactory ratings. Beyond his evaluations, individual faculty members (beyond Dr. Koon) and a Chief Resident found his performance unacceptable in multiple specific instances. Dr. Irani received counseling and faculty attempted to correct his

deficiencies and return him to a satisfactory level through the academic remediation process. Each time Dr. Irani would appear to progress and reach a level of satisfactory performance, however, he would lapse and performance issues would resurface.

Dr. Irani may argue that there were no adverse patient outcomes and therefore the criticism and concerns were unjust. He may present expert testimony from Dr. Grant that says the same. While there was no untoward outcome to a patient, a review of the concerns raised with Dr. Irani make clear that it was not the final outcome that was in issue. Dr. Irani was a resident physician, not an attending physician. Accordingly, it is his role to learn and the faculty's role to teach him. The issue is not merely the final outcome, but how the resident arrives at that point. Undoubtedly Dr. Irani is intelligent, but as a PGY2 resident, following the orders of attendings and senior residents is essential. Dr. Irani believes that he was performing in a satisfactory manner and disagrees with the various bases for his academic remediation and termination. However, it is well established that the employer's perception regarding an employee's performance is the relevant focus. An employee's own statement and assessments of his job performance are insufficient to establish a *prima facie* case. *See Evans v. Technologies Applications & Serv. Co.,* 80 F.3d 954, 960-961 (4th Cir. 1996), *quoting Smith v. Flax,* 618 F.2d 1062, 1067 (4th Cir. 1980); *Smith v. University of N. Carolina,* 632 F.2d 316, 345-46 (4th Cir. 1980) (an employer's business decision should be given deference, especially when the decision is made within the complex world of academia).

In an attempt to save his claim, Dr. Irani may offer the opinion of Dr. Grant. Just as with Dr. Irani's opinion, nothing that Dr. Grant offers establishes that Dr. Irani was performing at a satisfactory level or overcomes the issues that were the basis of his multiple remediations. Again, the employer's perception remains the relevant focus. *Evans* at 960-961. Moreover, Dr.

Grant's conclusions are unworthy of consideration because he was not present at any of the incidents in question and never worked with or witnessed any of Dr. Irani's work. (Grant Dep. 14-17.) Dr. Grant's "second guessing" of the faculty and physicians who were present and actually observed Dr. Irani during his residency does not establish that Dr. Irani's performance was satisfactory. The discovery process has revealed that Dr. Irani has no evidence that can outweigh the opinions of those faculty members who actually worked with Dr. Irani and assessed his performance and the deficiencies therein.

Plaintiff claims generically that other residents were treated more favorably than he but he does not identify specifics. Plaintiff can point to no resident who had a series of deficiencies such as those he demonstrated in his performance. Plaintiff can point to no resident who was on academic remediation and continued to make the errors that he made.

There was one other resident at Dr. Irani's level, Dr. Goodno. Dr. Goodno testified that he too was called in to meet with the faculty and questioned whether he really wanted to be in the Orthopaedic Surgery program. He too felt that the meeting was intimidating. There is no evidence that Dr. Goodno is anything other than Caucasian, and his ethnic origin and religion are unknown. Similarly, Dr. Irani has repeatedly noted that he believes the program has a high turnover rate. However, of the six individuals who have left the Orthopaedic Surgery program other than Plaintiff, all have been Caucasian and Dr. Irani has not identified the religion of any of them.

**B.     Defendant Palmetto Health's Legitimate, Nondiscriminatory Reasons for Plaintiff's Termination**

If the Court finds that Dr. Irani has established a *prima facie* case, the burden shifts to Palmetto Health to articulate legitimate, nondiscriminatory reasons for his termination. *See*

*Gillins,* 143 F.3d at 416; *see also EEOC v. Western Elec. Co., Inc.,* 713 F.2d 1011, 1014 (4th Cir. 1983). Palmetto Health can satisfy this burden.

As set forth in detail in the Statement of Facts and throughout this Memorandum, Palmetto Health had legitimate, nondiscriminatory reasons for Dr. Irani's termination from its residency program.    Issues with Dr. Irani's performance were noted in his PGY1 year by physicians/faculty and he was coached as to these issues.  Shortly into his PGY2 year, Dr. Irani's issues worsened and the faculty required academic remediation.  The concerns were limited to no sole member of the faculty.  The members of the GMEC, which included program directors, Chairs, and residents, all agreed that remediation was appropriate, suspension was appropriate, and ultimately, termination was appropriate.

Dr. Irani's numerous performance issues as outlined are a legitimate, nondiscriminatory reason for his termination from the residency program. No evaluations, recommendations, or decisions regarding Dr. Irani were based on any discriminatory motive.

The faculty that interviewed and "hired" Dr. Irani into the Orthopaedic Surgery Residency program included Dr. Koon and Dr. Walsh.  The faculty offered Dr. Irani a contract (Resident Agreement) for 2011-2102, his second year.  That same faculty recommended to the GMEC that each of Dr. Irani's remediation steps take place and that he be terminated.  Both Drs. Koon and Walsh, as well as other faculty members, met Dr. Irani in person in the interview stage and prior to offering him one of the two available slots in the residency program.  (*See* Exhibit I.) When an individual is hired and fired by the same individual and the termination occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the action taken by the employer.  *Proud v. Stone,* 945 F.2d 796, 797 (4th Cir.1996)(age discrimination); *Evans,* 80 F.3d 954, 959.

### C.      Plaintiff Cannot Establish Pretext

Because Palmetto Health has articulated legitimate, nondiscriminatory reasons for Dr. Irani's termination, the burden shifts back to Dr. Irani to show that Palmetto Health's stated reasons are "pretextual" for unlawful discrimination.   To establish pretext, Dr. Irani must produce evidence that his termination was actually based on his race, national origin, or religion. *Burdine,* 450 U.S. 248; *Cerberonics, Inc.,* 871 F. 2d at 455-56; *Fuentes v. Perskie,* 32 F.3d 759, 767 (3rd Cir. 1994).  Dr. Irani has no evidence of pretext and, thus, Palmetto Health is entitled to summary judgment.  *See Mease v. Champion Int'l Corp.,* 76 Fair Empl. Prac. Cas (BNA) 1727, 1731 (W.D.N.C. Feb. 11, 1998); *Blahut v. W.W. Grainger Inc.,* 65 Fair Empl. Prac. Cas. (BNA) 1858 (D. Md. Oct. 4, 1993), *aff'd,* 36 F.3d 1091 (4th Cir. 1994).

In *Sreeram v. Louisiana State Univ. Med. Ctr. Shreveport*, 188 F.3d 314, 319 (5th Cir. 1999), the plaintiff, a fourth-year medical student, alleged she was discharged because of her sex and national origin in violation of Title VII.  *Id.* At 316, 319.  Affirming the district court's opinion, the Fifth Circuit Court of Appeals noted that the plaintiff failed to establish that she was qualified to remain in the defendant's program because she could not refute the numerous bad reviews given by faculty members <u>and</u> she offered no evidence of a discriminatory motive.  *Id.* at 319 (emphasis added).

As in *Sreeram*, Dr. Irani cannot refute the issues with his performance.  Dr. Irani's opinion that he should not have been terminated and that other residents may have received more favorable treatment is not evidence of pretext and discrimination. *Evans*, 80 F.3d at 960 (a plaintiff's unsubstantiated allegations and bald assertions concerning her own qualifications and the shortcomings of her co-workers fail to disprove [an employer's] explanation or show discrimination); *see also Cerberonics, Inc.,* 871 F.2d at 456*; Douglas v. PHH Fleetamerica*

*Corp.,* 832 F. Supp. 1002, 1010 (D. Md. 1993). As previously stated, there is nothing in Dr. Grant's report or testimony that can establish pretext and he cannot refute the numerous accounts of Dr. Irani's performance issues.

Dr. Irani has also failed to establish a discriminatory motive behind his termination and cannot show that his race, national origin and/or religion was a motivating factor in his termination. *Sreeram,* 188 F.3d at 316, 319.

Dr. Irani will attempt to show pretext by establishing that there was a hostile work environment. A hostile environment exists "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys. Inc.,* 510 U.S. 17, 21, 114 S. Ct. 367, 126 L.Ed. 295 (1993)(internal quotation marks omitted). To prevail on a Title VII claim that a workplace is racially hostile, "a plaintiff must show that there is (1) unwelcome conduct; (2) that is based on the Plaintiff's … race; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputed to the employer." *Okoli v. City of Baltimore,* 648 F.3d 216, 220 (4th Cir. 2011)(alteration and internal quotation marks omitted). The same test applies to a hostile work environment claim asserted under Section 1981. *See Spriggs v. Diamond Auto Glass,* 242 F.3d 179, 184 (4th Cir. 2001). Whether the environment is objectively hostile or abusive is judged from the perspective of a reasonable person in the plaintiff's position. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81, 118 S. Ct. 998, 140 L.Ed.2d 201 (1998). That determination is made "by looking at all of the circumstances," which "may include the frequency of the discriminatory conduct; its severity; whether it is

physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 23,114 S. Ct. 367.

In *Boyer-Liberto v. Fountainbleau Corp,* 786 F.3d 264, 270 (4th Cir. 2015), the Fourth Circuit determined that a single incident could establish a hostile environment. However, the court clearly continues to look at the totality of the circumstances to determine the severity of the comment and whether it can be considered sufficiently severe and pervasive to create a hostile environment.[16] The present case is distinguishable from the facts of *Boyer-Liberto*. In that case, the employee in a supervisory role came so close to Liberto that Liberto could feel his breath on her face. He then confronted Liberto later the same day and threatened her. He was shouting at her in an aggressive manner and was visibly angry. He looked directly at her and called her a "porch monkey." While racial slurs are never appropriate in any environment, Dr. Koon's comments simply do not amount to a hostile work environment. Dr. Irani testified that Dr. Koon could have been laughing when he made the remark, and in his pleading Dr. Irani states that Dr. Koon jokingly made the comment about bombing.[17] (P. Dep. 57-58; Koon Dep. 236.) Dr. Irani makes multiple claims with regard to Dr. Koon having called him "Acmed the Terrorist,"[18] ranging from alleging that it was frequent in his grievance materials to claiming it only occurred four or five times in his deposition testimony. (P. Dep. 55, 64.) But Dr. Irani can identify on two instances. (P. Dep. 54-57.) Either in the same or in a separate instance, it is unclear, Dr. Koon made a comment about Dr. Irani blowing things up. Although these comments were

---

[17] Although we must accept Plaint's account for purposes of this Motion, Dr. Koon testified that he would never make a comment about someone coming in and blowing up the place as he was an active duty Army officer during 9/11. (Koon dep. 230.)

[18] Although Plaintiff says that Dr. Koon used the name "Achmed the Terrorist" there is a comic routine by Jeff Dunham with "Achmed the Dead Terrorist."
*See e.g.*, https://en.wikipedia.org/wiki/Jeff_Dunham#Achmed_the_Dead_Terrorist.

perhaps unwise and a poor attempt at humor, there is no evidence whatsoever that they reveal a racial/national origin/religious animus that lead to Dr. Irani's termination.  The incident was a playful jab regarding the change in Dr. Irani's appearance. Dr. Irani himself was known for joking, sometimes inappropriately, and for his impersonation of an Indian tech support representative.  Dr. Irani cannot recount even when the events occurred other than the latter half of his PGY2 year.  (P. Dep. 58.)  Not once did he contact Palmetto Health Human Resources to report Dr. Koon's references to him as a terrorist, jokingly or otherwise. He also did not report it to Dr. Walsh, and more importantly, he did not claim that it put him under stress that impacted his ability to learn and perform until his termination grievance hearing.  Even assuming a*rguendo* the facts as stated by Dr. Irani, this situation does not rise to the level of severity to constitute a hostile work environment.[19]   Dr. Koon's comments neither created a hostile environment nor are they evidence of any form of disparate impact resulting in termination.

Although a comment unrelated to a termination decision may contribute to a circumstantial case for pretext, it will usually not be sufficient absent some additional evidence supporting a finding of pretext.  *Scott v. Suncoast Beverage Sales, Ltd.,* 295 F.3d 1223 (11th Cir. 2002).

Plaintiff does not allege any inappropriate comments by any other member of the faculty, within the Graduate Medical Education administration, by any member of the GMEC, or by Mr. Beaman.  Although he may argue that Dr. Koon improperly influenced the decision by "poisoning the well," there is absolutely no evidence of this.  In fact, there is no evidence whatsoever that Dr. Koon had any input as to the comments made in Dr. Irani's PGY1 year

---

[19]  In fact, Plaintiff also makes reference to cultural differences as being significant and from his testimony it appears that he is referring to the difference in California and South Carolina with an example being the expectation that he say "Yes, Sir" and "No, Sir."  (P. Dep. 68.)

evaluations or that Dr. Koon prompted the concerns with Dr. Irani's performance that were brought forward by other faculty members in Dr. Irani's PGY2 year.  There is no evidence that Dr. Koon altered any faculty members' vote with regard to the issues of remediation or that he took to the GMEC more than the faculty recommended. In fact, rather pointing to any name calling incident,  Dr. Irani stated in his grievance  hearing that  a November 11, 2011 e-mail exchange with Dr. Koon over a VA patient discharge note that where there was a very marked change in the tone and that it became personal.  (Grievance Transcript at page 81.)   Plaintiff's offense taken and concerns with specifics now in issue seem to have come into play when he hired counsel and began to be advised by Dr. Eady.[20]

Even assuming the facts as Dr. Irani presents them, there is no evidence that his race, national origin or religion was the motiving factor for any of the remediation efforts by the faculty or when he failed to sufficiently remediate, his termination.  Dr. Irani testified that the comments were made in the latter part of his second year and by this time the remediation efforts were well underway.  The decision to discharge Dr. Irani followed two additional incidents after his remediation level was about to be stepped down and were the "tipping point" for the faculty. There is nothing to tie the comments made by Dr. Koon to his termination.

It is interesting to note that when Dr. Irani references alleged problems he sees with the program and points to the turnover rate of residents in the program, he fails to mention that none of those who left are minorities.  He also does not mention that another minority of similar decent, Dr. Sukhbir (Sonny) Guram, successfully completed the program and has gone on to be an orthopaedic spine surgeon.  (Exhibit VVV.)  Not until Dr. Irani was well down the road with his performance problems did he even raise issues with regard to his national origin or treatment.

---

[20] *See* Exhibit RRR where Dr. Eady advises him on making certain arguments to increase the likelihood of success in his grievance.

His response was generally that he did not agree with the facts as stated. Additionally, Dr. Irani chose not to make a complaint to Human Resources or ask their assistance for any issues of harassment or discrimination as he should have done under their policy. (Exhibit XXX, *Sexual Harassment Policy*.) Dr. Irani had entered the grievance process on three occasions and was familiar with the Human Resources department. The only connection between Dr. Koon's comments and Dr. Irani's termination is the one Dr. Irani makes for his own purposes. Finally. Dr. Irani saw Dr. Guy, also a minority, as a source of support in the department but yet he overlooks the fact that Dr. Guy encouraged him to leave clinical medicine and tried to assist him in doing so. Dr. Irani cannot show that the legitimate, nondiscriminatory reasons given for his remediations or termination are pretextual and, therefore, his Section 1981 claim should be dismissed. Should his Title VII claim survive the timeliness issue, then it should be dismissed as well.

> **D.      Plaintiff Was Not Subject to Either Title VII or Section 1981 Retaliation**

Just as Dr. Irani's Title VII claim is untimely, so too is his Title VII retaliation claim. Consequently, this claim should be dismissed.

Both Title VII and Section 1981 contain provisions that prohibit retaliation and are analyzed in the same way. In order to establish a *prima facie* case for retaliation, Dr. Irani must show: (1) engagement in a protected activity; (2) an adverse employment action; and (3) a causal link between the protected activity and the employment action. *See Ziskie v. Mineta,* 547 F.3d 220, 229 (4th Cir. 2008); *Holland v. Washington Homes, Inc.,* 487 F.3d 208, 218 (4th Cir. 2007).

As in the analysis above, if the plaintiff establishes a *prima facie* case, the burden shifts to the employer to prove a legitimate, nondiscriminatory reason for the adverse employment action. It is then the plaintiff's burden to establish that the reasons were pretext for the true

46

reasons for the action. *Heiko v. Colombo Sav. Bank, F.S.B.,* 434 F.3d 249, 258 (4th Cir. 2006). This final pretext inquiry "merges with the ultimate burden of persuading the court that the plaintiff has been the victim of intentional discrimination, which at all times remains with the plaintiff." *Merritt v. Old Dominion Freight Line, Inc.*, 601 F3d 289, 294 (4th Cir. 2010)(internal quotation marks and alteration omitted).   The plaintiff must prove that her participation in a protected activity was the but-for cause of her termination.   *Univ. of Texas Sw. Med Ctr. V. Nassar,* 133 S.Ct. 2517, 2528 (2013). He must also prove "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.* 133 S. Ct. at 2533.  *See also Foster v. University of Maryland-Eastern Shore*, 787 F.3d 243, 252 (4th Cir. 2015)("[T]he *McDonnell Douglas* framework has long demanded proof at the pretext stage that retaliation was but-for cause of a challenged adverse employment action.")

Dr. Irani complains of retaliation for filing his grievances, for filing his administrative Charge, and for complaining about protected activity.  Dr. Irani cannot demonstrate a *prima facie* case because he cannot show that there is a causal link between the protected activity (that that was protected) and his academic remediation or termination. The fact that Dr. Irani was placed on academic remediation is not considered an adverse employment action. *See Jensen-Graf v. Chesapeake Employers' Ins. Co.,* 616 F. App'x. 596, 598 (4th Cir. 2015).   An adverse employment action is an action "that constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id*. quoting *Hoyle v. Freightliner, LLC,* 650 F. 3d. 321, 337 (4th Cir. 2011).  "[A] poor performance evaluation is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment." *Jensen-Graf*, 616 F. App'x. at 598, quoting *James v.*

*Booz-Allen & Hamilton, Inc.,* 368 F.3d 371, 377 (4th Cir. 2004) (internal quotation marks omitted). Similarly, any report made to the California Medical Board, at Dr. Irani's request, following his employment would also not be considered an adverse employment action.

Accordingly, the Court should only look to whether Plaintiff can demonstrate a causal link between some protected activity and his termination. Palmetto Health publishes its Residency Grievance Policy in the Resident Manual. (Exhibit YYY, *Resident Grievance Policy*.) In each of the instances where Dr. Irani took concerns about remediation measure to his Program Director, the Chairman of the department, or the DIO, he was reminded of the grievance procedure and he utilized it. Dr. Irani may testify that he believed his supervisors did not favor his use of the grievance process, yet the only evidence remains that he failed to voice his concerns to Human Resources and his performance issues were addressed when they occurred. There is no evidence tying his performance reviews or termination to his use of the grievance procedure. The legitimate, non-discriminatory reasons for his termination have been stated above and just as argued above, Dr. Irani cannot show, much less prove, that the reasons given for his performance issues are pretext.

## CONCLUSION

For the reasons set forth above, Palmetto Health respectfully moves this Court to grant its Motion for Summary Judgment and dismiss all claims by Dr. Irani with prejudice.

**[SIGNATURE PAGE TO FOLLOW]**

Dated this the 14th day of December 2015.

Respectfully submitted,

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.

By:  s/Katherine Dudley Helms
Katherine Dudley Helms (Fed ID No. 1811)

**Attorneys for Defendant Palmetto Health**

1320 Main Street, Suite 600
Columbia, SC  29201
803.252.1300 (telephone)
803.254.6517 (facsimile)
kathy.helms@ogletreedeakins.com