# Exhibit B

1         In The United States District Court

2        For the District of South Carolina

3            Columbia Division

4       C.A. No. 3:14-cv-03577-CMC-KDW

5

6  AFRAAZ R. IRANI, MD,         )
                         )

7             Plaintiff,   )
                         )

8      vs.                  )
                         )

9  PALMETTO HEALTH; UNIVERSITY OF  )
  SOUTH CAROLINA SCHOOL OF MEDICINE; )

10  DAVID E. KOON, JR., MD, ETC.,   )
   JOHN J. WALSH, IV, MD, ETC.,    )
                         )

11           Defendants.    )
                         )

12  _____

13            D E P O S I T I O N

14  WITNESS:        AFRAAZ IRANI, MD

15  DATE:           June 30, 2015

16  TIME:           9:00 a.m. - 7:05 p.m.

17  LOCATION:       Ogletree Deakins
                  1320 Main Street

18               Columbia, South Carolina

19  TAKEN BY:       Attorneys for the Defendants

20

21  REPORTED BY:     KATHRYN J. LINDLER

22  _____

23            COMPUSCRIPTS, INC.
        Client Focused. Deadline Driven.

24  CHARLESTON COLUMBIA HILTON HEAD GREENVILLE MYRTLE BEACH

25            1-888-988-0086

Afraaz Irani 6/30/2015

13

1    things.

2        A.    Right.

3        Q.    You filed a common application that you used for

4    Palmetto Health, correct?

5        A.    Correct.  You're specifically mentioning the

6    Electronic Residency Application System?

7        Q.    Hm-hmm.  Correct.

8        A.    I did apply through that, correct.

9        Q.    Did you use any other form of application for the

10   residency program here in Columbia?

11       A.    I don't know if Palmetto Health required a

12   supplemental application.  I don't believe at the time they

13   did.  I know several programs did.  Maybe Dr. Koon could

14   answer that question better.

15       Q.    He's finished.  He doesn't have to answer anymore

16   questions.

17       A.    He doesn't have to answer.  I know.

18       Q.    Did you interview here?

19       A.    I did.

20       Q.    With whom did you interview?

21       A.    Dr. Hoover, Dr. Voss and Dr. Koon.

22       Q.    Dr. Hoover at the time was a chief resident or

23   about to become a chief resident?

24       A.    No, he was PGY3 I believe.

25       Q.    The residency program for orthopedics is a

Afraaz Irani 6/30/2015

1    know which of them are in the top five.  Beyond that, I'm

2    sorry.

3        Q.   Who were your other top ones?

4        A.   I can list other schools that I ranked.  I don't

5    know the order after that.

6        Q.   Tell me who else you ranked.

7        A.   So University of North Carolina Chapel Hill I

8    ranked.  Stanford I ranked.  Palmetto Health I ranked.

9    University of Iowa I ranked.  Cleveland Clinic.

10       Q.   How many are you allowed to rank?

11       A.   As many as you want.  You can rank a hundred if

12   you want.

13       Q.   You said UCLA, Oregon, UNC Chapel Hill, Iowa,

14   Palmetto Health, Cleveland Clinic and I missed one that you

15   said in there.

16       A.   You have the University of Iowa?

17                       (Off the record.)

18       Q.   Dr. Irani, we were talking about programs that

19   you ranked when you were first trying to match for an

20   orthopedic program.  Out of all of these, where did

21   Palmetto Health rank for you?  Let me say it like this.

22   Where did you rank Palmetto Health?

23       A.   I believe it was sort of the middle-ish.

24       Q.   Do you recall how many programs you ranked?

25       A.   How many do I have there?

Afraaz Irani 6/30/2015

23

1      Q.    I got six.

2      A.    There might've been a couple more.  I don't

3    recall.  So.

4      Q.    Did you rank Palmetto Health in your top five?

5      A.    I don't recall.  It's possible it might not have

6    been.  But it's possible it could have been.

7      Q.    But you don't recall?

8      A.    I mean I just -- you're asking for -- what I'm

9    basing this on is sort of gestalt of where the program --

10   I'm not actually remembering hitting that submit button on

11   the rank list.  In fact, my brother did it actually.  He

12   should know better now, I'm kidding, but.  And I involved

13   him in decisions and I think it was kind of the middle-ish.

14   Again I think my top couple or so might not have been it.

15   But beyond that I'm having a hard time giving you more

16   concrete answers.

17     Q.    Have you ever stated that Palmetto Health told

18   the California Medical Board that you're incompetent?

19     A.    Have I ever stated that Palmetto Health told the

20   California Medical Board I'm incompetent.  In any sort of

21   communication at all is your question?  I.e. are we talking

22   about in court or writing e-mails or just talking with

23   friends or anything like that?

24     Q.    Yes.

25     A.    I think the California Medical Board at least

Afraaz Irani 6/30/2015

49

1    just sounds really foreign in California. It's -- I know

2    here it's common, but if -- I remember I had a kid tell me

3    yes, sir, and I was like, you know, just like -- it was

4    really foreign to me. And I know here it's a sign of

5    respect and it's being polite and here it was taught you

6    say yes, sir/no, sir and I think that that's what was

7    expected. In fact Dr. Koon at the December 5 meeting said

8    it specifically, you know, Irani, instead of saying yes,

9    sir/no, sir, I'll take care of it, sir, I get this dribble.

10   That was his exact quote in the December 5 meeting. So it

11   was enforced by him as well. So to get back to your

12   question, Mary Finn told me it was a yes, sir/no, sir

13   military program. Duffy told me that. Whiteside's common

14   phrase was welcome to it. Whenever you complained about

15   anything, don't open your mouth, this is how it is, welcome

16   to it. That was a common phrase that was admitted.

17   Everything was make it work. Make it work was a common

18   phrase from Dr. Hoover, from Dr. Whiteside, because this is

19   that program and how it was. Upper guys don't want to hear

20   about it, you make it work. And that is all in step with

21   the military program. Dr. Voss himself actually said this

22   as well. When I came back on his rotation, he said

23   Dr. Walsh and Dr. Koon are more militaristic and they're

24   more yes, sir/no, sir. It's a military program, that's how

25   it's run. I don't know if that's an exhaustive list, but

Afraaz Irani 6/30/2015

54

1      A.    I think residency programs should engender

2   teamwork.

3      Q.    Does this residency program try to engender

4   teamwork?

5      A.    I think teamwork is necessary given the stress of

6   the program.   You can't do it without teamwork.

7      Q.    Does this residency program try to engender

8   teamwork?  Were you expected to be part of a team?

9      A.    I was expected to be part of a team, yes.   I

10  think it was --

11     Q.    You've answered my question, thank you.

12     A.    Okay.

13     Q.    Tell me about the time that Dr. Koon called you

14  Achmed the dead terrorist.

15     A.    He didn't.

16     Q.    He did not?  Do you know who Achmed the dead

17  terrorist is?

18     A.    So that was not what he called me.  So let me

19  take a step back.  You want to know about that time.  Let

20  me explain to you what this means to me.

21     Q.    No.  I'm asking you that question.  If there are

22  things that --

23     A.    He did not say the word dead.

24     Q.    Achmed the terrorist?

25     A.    Yes, ma'am.

Afraaz Irani 6/30/2015

55

1    Q.    Tell me about that.

2    A.    Well, it happened more than once.

3    Q.    Tell me each time that it happened.

4    A.    I don't remember each individual time, but I can

5    give you at least a couple illustrative examples.

6    Q.    And I want to know who was present each time.

7    A.    Okay.

8    Q.    I don't want illustrative times.  I want to know

9    the times.

10    A.    Ma'am, you're asking me about something that

11    happened on a recurring basis.  I don't think I'm going to

12    go home and catalog each time that somebody says something

13    to you.  I'm not going to go home and catalog each time

14    Dave calls me on the phone.  I am going to remember, I am

15    going to remember things that are very vivid to me and

16    things that I think are very insulting to my background and

17    history of my people and this was -- this was -- this is

18    not something to take lightly.  I will say what I remember,

19    but I'm just saying for the record that I cannot remember

20    every single episode.  Now to get back to your question.

21    Q.    How many times did he call you this?

22    A.    Probably a handful of times.  I'll give you a

23    couple of examples.  The first one --

24    Q.    I don't want a couple of examples.  You're saying

25    he called you this probably five times, correct?

www.compuscripts.com

Afraaz Irani 6/30/2015

57

1    the residency program that wasn't the first day I showed up

2    with facial hair.  Dr. Koon is alleging that's the first

3    time Franny seeing and I'm not going to argue with that if

4    that's the case, but your question was was that the first

5    day and I would say no.

6         Q.   Do you recall Franny commenting on your facial

7    hair?

8         A.   She might have.

9         Q.   Do you know whether or not Dr. Koon commented at

10   that point?

11        A.   It probably was about the same time I believe.

12   It probably was, because he was saying, you know, he was

13   commenting -- he was attributing my appearance to that and

14   I think he incorrectly assumed some of the facial hair is

15   consistent with somebody who is at the height of human

16   depravity which I think is awful.

17        Q.   You're saying -- you're assuming that Dr. Koon

18   was attributing someone with facial hair to someone at the

19   height of depravity, is that what you just said?

20        A.   If you're -- your question is implicitly saying

21   that did he make that comment because I had facial hair,

22   okay, and I'm saying it could be and if he is, then he's

23   assuming facial hair and my appearance is attributable to

24   something that I hope we can all agree is not something

25   that should be tolerated.  Does that clarify?

Afraaz Irani 6/30/2015

58

1    Q.    Did he laugh?

2    A.    Did who laugh?

3    Q.    Did Dr. Koon laugh?

4    A.    I'm sure he did.

5    Q.    Did you tell him you didn't think it was funny?

6    A.    I cannot confront Dr. Koon.

7    Q.    You couldn't say that offended me?

8    A.    I can't even tell Dr. Koon to please look at the

9    chart and verify if your allegation is true.  You think I'm

10   going to confront him with something about as inflammatory

11   as I think that comment is racially insensitive when I

12   can't even say Dr. Koon please look at the chart to verify

13   the facts.

14   Q.    If it bothered you that much, you couldn't say

15   that?

16   A.    Ma'am, I don't think you understand how bad the

17   situation was.

18   Q.    When was this?

19   A.    This was my PGY2 year.

20   Q.    When in it?  You went from --

21   A.    This was towards the latter half.  I don't recall

22   when.

23   Q.    Was it after the beginning of the year of 2012?

24   A.    This specific incident?

25   Q.    Yes.

Afraaz Irani 6/30/2015

1    he wanted me to address.

2        Q.    That's two instances.  What's number three?

3        A.    Ma'am, I can't remember exactly the specifics.

4    There were a handful of them.  Those are two I can remember

5    specifically.

6        Q.    Where was number three?

7        A.    I don't have specifics.  I think they were in the

8    hospital somewhere.

9        Q.    Who was present with number three?

10       A.    I can't give you more specific details.  I really

11   would be reaching there.  I don't want to say anything on

12   the record that might be misleading or possibly false.

13       Q.    Why do you believe it was said five times if you

14   can't remember anything about it?

15       A.    I didn't say five times.  I said a handful.

16       Q.    Okay.

17       A.    I wish I could be more specific with you.

18       Q.    Well, I wish you could too, because --

19       A.    I wish I could too.  I'm sorry.

20       Q.    -- you know, it's pretty important.

21       A.    Listen, my job is to sit here and be as honest as

22   I can with you and that's what I'm doing with you today.

23   I'm sorry.  That's all I can do for you and I hope you can

24   understand that.

25       Q.    Okay, but this is something that you found wholly

Afraaz Irani 6/30/2015

68

1    Q.   When was this?

2    A.   I believe it was -- it was either that same one

3 or a different one.  I don't know.

4    Q.   I have no idea what you're talking about.  That

5 same one what?

6    A.   I'm sorry, the same -- because prison clinic --

7 the previous instance was at prison clinic with Franny.  So

8 it was either that same meeting with the comment with

9 Franny there or it was a different meeting.  Prison clinic

10 is usually held about once a week.  So this is not an every

11 day occurrence.  So it's going to be one of those prison

12 clinic days which are Monday or Wednesday I believe, or

13 Tuesday.

14    Q.   There are cultural differences in South Carolina

15 and California, aren't there?

16    A.   Sure.

17    Q.   Did you run into some problems with those?

18    A.   There's sort of a southern gentile way of

19 approaching patients and I think problem is a harsher, but,

20 yes, I had some ways to adjust in terms of how do I

21 approach patients, how do I communicate with patients and

22 that was conveyed to me by Dr. Bynoe and Dr. Mark Jones

23 about sort of the southern gentile.

24        MS. THOMAS:  Again, Dr. Irani, can you speak up

25 please.

Afraaz Irani 6/30/2015

69

1        A.    I'm sorry, ma'am.  I'll try.

2             MR. ROTHSTEIN:  Do you want to take a break, get

3    some water or something?

4        A.    I think I'm okay.  But there are differences in

5    terms of like I said yes, sir/no, sir is -- I know it

6    sounds weird here, but I mean if you say that in

7    California, people will just look at you like you're crazy.

8    And how to approach patients, you know, where are you all

9    from, how are you all doing.  Anderson, Aiken, Florence,

10   all those sort of stuff was all sort of new vernacular to

11   me, but a lot of people, at least I got the impression from

12   talking to them, it's important to ask about these sort of

13   backgrounds beyond that.  So in that way in terms of

14   communicating with patients I think the communication with

15   patients was based on California versus South Carolina

16   cultural differences if you want to call it that, but I

17   would refer more of that towards just more of the gentile

18   in the mindset of different regions.

19       Q.    Do you recall ever stating that you had -- you

20   were having trouble adjusting to some of the culture in

21   South Carolina?

22       A.    I don't -- if the word trouble was used.  I will

23   say that I'm sure I admitted that it was a different

24   environment and some adjustments had to be made.  But again

25   this was all -- for instance, one of the -- I like working

Afraaz Irani 6/30/2015

70

1    on cars and I didn't know what a -- how do you say it, oil,

2    oil change.  I didn't understand some of the words people

3    were actually saying, because they say it differently and

4    that, of course, is an adjustment.  That would make things

5    a little bit harder, but it's not an indictment on that

6    person per se.  It's just you need to learn how to

7    communicate down here and if there's a communication issue

8    given the different regions of where you're from that can

9    make things a little bit more difficult or trouble if you

10   want to use the word, but I think that's mainly what it's

11   attributed to.

12          Q.   At some point in the remediation process you went

13   for a psychological evaluation, correct?

14          A.   Psychological evaluation, yes, ma'am.

15          Q.   The person evaluating you found no reason -- no

16   impediments to you going through the program, correct?

17          A.   I haven't read it recently, but that's what my

18   recollection is.

19          Q.   For instance, no sort of learning disabilities or

20   anything of that sort were uncovered?

21          A.   I don't remember there being any in that report,

22   no, ma'am.

23          Q.   Do you recall that individual discussing with you

24   communication issues?

25          A.   I really don't -- so I think -- so what happens

Afraaz Irani 6/30/2015

274

1    A.    I was told that the presentation would function

2    in a vastly different way than actually it played out.  So

3    I don't think I was given a fair understanding of what was

4    going to happen and I was a little disappointed in how

5    things were carried out.

6    Q.    Did you prepare a script of basically what you

7    wanted to say in the grievance meeting before the Grievance

8    Committee?

9    A.    Yeah, I believe I had an outline of what I was

10   going to read.

11   Q.    Was that document something that you actually put

12   in with your other documents --

13   A.    No.

14   Q.    -- before the Grievance Committee?

15   A.    No.

16   Q.    Was that document approximately 20 pages?

17   A.    Sounds about right.

18   Q.    Were you able to provide the full contents of

19   that document in your presentation to the Grievance

20   Committee?

21   A.    I think I was time limited so I don't -- I wasn't

22   able to provide -- I was only able to provide so much, but

23   everything I had prepared I was able to present.

24   Q.    Were you able to put in before the Grievance

25   Committee all documents that you felt like were important

## ORTHOPAEDIC APPLICANT INTERVIEW REVIEW

NAME: _____ Drani _____

JILLIANS' IMPRESSION:    EXCELLENT / (GOOD/) FAIR/ POOR

APPEARANCE: (PROFESSIONAL)
OK
SLOPPY

DEMEANOR: (APPROPRIATE)
NERVOUS
HAUGHTY/ ARROGANT
QUIET

FIT WITHIN THE PROGRAM? (EXCELLENT /)GOOD/ FAIR/ POOR

OVERALL IMPRESSION:        1  2  3  4  5  6  7  8 (9)10

RATING:    #1 APPLICANT / (TOP 10 /) TOP THIRD / MIDDLE THIRD / NO GO

SIGNATURE: _____

DEFENDANT'S
EXHIBIT
1
Irani
PENGAD 800-631-6989

USC(Irani)0202



PALMETTO HEALTH

STATE OF SOUTH CAROLINA    )
                            )        **RESIDENT AGREEMENT OF APPOINTMENT**

COUNTY OF RICHLAND     )

This agreement is entered into this **1**st day of **July, 2010** between Palmetto Health or "Hospital", a multiple teaching hospital/health system, located in Columbia, South Carolina (hereinafter "Palmetto Health") and **AFRAAZ R IRANI MD** (hereinafter "House Staff Officer" or "Resident").

### 1. APPOINTMENT

The House Staff Officer is hereby employed by Palmetto Health as a **PGY 1 Postgraduate** in the Department of Education for **Orthopaedics**. In this capacity, the House Staff Officer will participate in a graduate medical education program which includes, but is not limited to, classroom and lecture sessions, patient care responsibilities, and other activities as determined by House Staff Officer's specific graduate medical education program.

The House Staff Officer agrees to perform all duties and services in a competent, professional, and effective manner. The House Staff Officer agrees to abide by the policies, procedures, rules and regulations of the Hospital and its Department of Medical Education, as these policies, procedures, rules and regulations currently exist and may from time to time be amended. Specifically, the House Staff Officer agrees to abide by Medical Record provisions of the Palmetto Health Hospitals' Medical and Dental Staff Bylaws, Rules and Regulations, as they currently exist and may from time to time be amended.

The House Staff Officer agrees to abide by the Statement of Resident Responsibilities. (see below)

### 2. RESIDENT RESPONSIBILITIES

The goal of the residency program is to provide the House Staff Officer with an extensive experience in the art and science of medicine in order to achieve excellence in the diagnosis, care and treatment of patients. To achieve this goal, the House Staff Officer agrees to do the following:

1. Under the direction of the Program Director (or designee) and supervision by the Attending physician, assume responsibilities for the safe, effective and compassionate care of patients, consistent with the resident's level of education and experience.

2. Participate fully in the educational and scholarly activities of the residency program and, as required, assume responsibility for teaching and supervising other residents and medical students.

3. Develop and participate in a personal program of self-study and professional growth with guidance from the teaching staff.



DEFENDANT'S
EXHIBIT
3
Irani

Post Office Box 2266
Columbia, SC 29202-2266    PHONE: (803) 296-2100    palmettohealth.org

4. Participate in institutional programs, committees, councils, and activities involving the medical staff as assigned by the program director, and adhere to the established policies, procedures and practices (to include standards of behavior) of the sponsoring institution and its affiliated institutions.

5. Participate in the evaluation of the program and its faculty.

6. Develop an understanding of ethical, socioeconomic, and medical legal issues that affect the practice of medicine.

7. Participate in educational experiences required to achieve competence in patient care, medical knowledge, practice-based learning improvement, interpersonal and communication skills, professionalism, and systems-based practice.

8. Keep charts, records, and reports up-to-date and signed at all times.

9. Adhere to ACGME institutional and program requirements.

## 3. FACULTY RESPONSIBILITIES AND SUPERVISION

Faculty is responsible for and personally involved in care provided to individual patients. Faculty direct the care of the patient and provide the appropriate level of supervision based on the nature of the patient's condition, the likelihood of major changes in the management plan, the complexity of care, and the experience and judgment of the resident being supervised. (See Supervision of Resident Physician Policy)

## 4. DURATION OF APPOINTMENT

The term of this Agreement is for one (1) year beginning July 1, 2010 and ending June 30, 2011.

## 5. FINANCIAL SUPPORT

The House Staff Officer shall receive as compensation for the term of this Agreement an amount equal to $48,883.80.

## 6. CONDITIONS FOR PROMOTION/REAPPOINTMENT OF HOUSE STAFF OFFICERS

House Staff Officers are promoted/reappointed on the basis of acceptable periodic competency-based evaluations, which may be supplemented by written or oral clinical and behavioral competency examinations or other evaluation methods; by recommendation of their department's Promotion Committee; and by final approval by the Graduate Medical Education Committee. (See Promotion/Reappointment policy)

## 7. GRIEVANCE PROCEDURES AND DUE PROCESS

Any House Staff Officer who disputes any action of any party shall have the right to appeal said action through the Graduate Medical Education Committee's due process policies, as from time to time amended. Violations of the House Staff Officer agreement may also be appealed in the same manner. Each House Staff Office will receive a copy of said policies at the time training begins and also at the time any changes or amendments are made. The Residents' Grievance Procedures and Due Process policy will be used for such disputes.

## 8. PROFESSIONAL LIABILITY INSURANCE

Palmetto Health has purchased "claims made" professional liability protection from Continental Casualty Insurance Company to protect all employees including House Staff Officers. This protection was purchased through Palmetto Healthcare Liability Insurance Program (PHLIP) that is a captive insurance program. The limit of professional liability afforded is $1,200,000 per claim that involves an employed House Staff Officer. This coverage is subject to an aggregate limit of $18,000,000. All aggregate liability limits are shared among the participating members of PHLIP. There are multiple hospital and hospital system members of PHLIP. (Coverage's are subject to periodic change by the PHLIP Board of Directors.)

Palmetto Health has also purchased high excess professional liability protection through PHLIP. The high excess limit is $20,000,000 per claim, except where it is found that the acts of the insured individual were willful, reckless, or grossly negligent, in which case the high excess per claim limit is reduced to $3,000,000. The high excess policy has a $30,000,000 annual aggregate limit which is also shared by all members of PHLIP. (Coverage's are subject to periodic change as determined by the PHLIP Board of Directors.)

It is the responsibility of Palmetto Health and not individual House Staff Officers to purchase the extended reporting period (ERP) endorsement or "tail" coverage. Employed House Staff Officers are scheduled on the Palmetto Health provider list. This provider list reflects the effective date and, as applicable, the termination or graduation date of each provider. Professional liability protection is afforded to each House Staff Officer for claims that occur within the effective date of coverage and until the graduation or termination effective date. Professional liability insurance protection is provided to each House Staff Officer within the scope of the House Staff Officer's educational program duties and does not extend to any activities outside the scope of the educational program.

This professional liability insurance will only provide coverage for the House Staff Officer in the performance of duties and obligations of this Agreement. IT IS THE SOLE RESPONSIBILITY OF THE HOUSE STAFF OFFICER TO OBTAIN AND PROVIDE FOR PROFESSIONAL AND GENERAL LIABILITY INSURANCE COVERAGE FOR ALL EMPLOYMENT OR PROFESSIONAL ACTIVITES (ie, "moonlighting") ENGAGED IN BY THE HOUSE STAFF OFFICER WHICH ARE NOT AN OFFICIAL PART OF THE HOUSE STAFF OFFICER'S TRAINING PROGRAM.

## 9. BENEFITS

Palmetto Health will provide the House Staff Officer the following benefits:

a. **Health Insurance:** Coverage for the House Staff Officer and members of his/her immediate family, (i.e., spouse and children), is available and is effective on the first day of the resident's term of agreement. There is no premium cost to House Staff Officers for individual coverage; family coverage is available, but requires premium payment by the House Staff Officer. Plans also include a prescription drug benefit. Charges for services not covered under the basic plan (or for House Staff Officer failure to complete the health screening or other enrollment requirements by designated dates) are the responsibility of the House Staff Officer.

b. **Dental Insurance:** The House Staff Officer is eligible to participate in Palmetto Health's low option dental plan provided at no charge for the House Staff Officer's individual coverage. Coverage is available for members of the House Staff Officer's immediate family, (i.e., spouse and children), but requires premium payment by the House Staff Officer. The House Staff Officer may elect to participate in the Hospital's high option dental plan with the cost of the premium difference paid by the House Staff Officer.

c. **Disability Insurance:** The House Staff Officer is eligible to participate in Palmetto Health's Long Term Disability insurance plan at no premium cost to the House Staff Officer. LTD eligibility begins 180 days after start date.

d. **Life Insurance:** The House Staff Officer is eligible to participate in Palmetto Health's life insurance plan, with one time salary life insurance coverage provided at no cost to the House Staff Officer. One or two times salary in additional life insurance may be purchased by the House Staff Officer.

e. **Vacation and Holiday Leave:** The House Staff Officer may take up to 20 days (23 days for PGY 3 and above) off for vacation and holiday leave. The House Staff officer will continue to receive his/her salary as set forth above during leave. Unused leave will not be paid as a terminal benefit. Vacation and Holiday leave must be scheduled and approved in advance by the respective Director of Education, Program Director, or his/her designee. Five of these days will be scheduled by the program near calendar year end. (See Vacation and Holiday Leave Policy)

f. **Sick Leave:** Leave (to include sick, maternity, or family medical leave) may be taken according to written GMEC and Department policies. (See Sick Leave policy)

g. **Maternity Leave:** A female House Staff Officer is entitled to be absent from the training program on maternity leave for the time period determined to be necessary and appropriate by her physician. Such leave granted may require additional training time to meet program requirements. (See Leaves of Absence policy)

h. **Family Medical Leave Act:** The House Staff Officer is eligible for applicable leave under the Family and Medical Leave Act (FMLA), once the eligibility requirements are met: (1) 12 months of service with Palmetto Health and (2) 1250 productive hours worked in the preceding 12 months. The House Staff Officer can take FML for his/her own serious health condition, care for a spouse, child, or parent that has a serious health condition, caring for a newborn, adopted or formally placed foster child. Such leave granted may require additional training time to meet program requirements (See FMLA policy)

i. **Other Leaves of Absence:**  Leave for military, disability (physical or mental), professional, personal, parental, and other approved purposes may be granted by the Director of Education/Program Director. Such leave granted may require additional training time to meet program requirements. (See Leave of Absence policy)

j. **On-Call Quarters:** Palmetto Health will provide suitable on-call quarters.

k. **Uniforms:** Four (4) uniforms (lab coats) are issued to House Staff Officers during their first (1st) contract year. Hospital laundering of uniforms (lab coats) issued to a House Staff Officer will be performed at no cost to the House Staff Officer.

l. **Meals:** Meal allowances will be provided to a House Staff Officer while on duty at Palmetto Health Richland and Palmetto Health Baptist as specified in the attached policy. (See Resident Meals While on Duty policy)

## 10. DUTY HOURS

House Staff Officer duty hours and on call schedules will conform to the Accreditation Council for Graduate Medical Education (ACGME) requirements. All House Staff Officers are expected to be rested and alert during duty hours.  (See Duty Hours policy)

## 11. MOONLIGHTING AND OTHER PROFESSIONAL ACTIVITIES

Graduate medical education is a full-time educational experience. Accordingly, the House Staff Officer shall neither accept nor engage in employment or professional activities (moonlighting) outside of the training program without the prior written approval of the appropriate Departmental Director of Education/Program Director and the DIO or DIO designee. If prior approval to moonlight is obtained, IT IS THE SOLE RESPONSIBILITY OF THE HOUSE STAFF OFFICER TO OBTAIN AND PROVIDE PROFESSIONAL LIABLITY INSURANCE (MALPRACTICE) COVERAGE FOR ALL EMPLOYMENT ACTIVITES WHICH ARE NOT AN OFFICIAL PART OF THE HOUSE  STAFF OFFICER'S TRAINING PROGRAM.  (See Moonlighting and Other Professional Activities policy)

## 12. COUNSELING SERVICES

Palmetto Health provides confidential counseling services through the Employee Assistance program. Additional counseling, medical, and psychological services may be provided for House Staff Officers, when appropriate. (See Working Environment policy)

## 13. PHYSICIAN IMPAIRMENT AND SUBSTANCE ABUSE

Palmetto Health provides education on physician impairment (including substance abuse) to House Staff Officers.  Appropriate confidential counseling services are provided in a non-punitive fashion, when necessary. (See Impairment policy)

## 14. HARASSMENT

Palmetto Health provides a work environment free from sexual and other forms of harassment and will discipline any House Staff Officer guilty of committing such conduct. (See Harassment policy)

## 15. ACCOMMODATIONS FOR DISABILITIES

Palmetto Health complies with all state and federal laws concerning qualified disabilities and does not discriminate on the basis of disability. A resident with special needs/disabilities may request reasonable accommodation(s) that will enable the resident to perform the essential functions of his/her assigned duties.

## 16. DRUG FREE WORKPLACE

The illegal manufacture, illegal distribution, illegal dispensation, illegal possession, or illegal use of narcotics, drugs, or other controlled substances is strictly prohibited by Palmetto Health. (See Substance Abuse policy)

## 17. OSHA AND CDC RECOMMENDATIONS

The House Staff Officer is required to comply with Occupational Safety and Health Act (OSHA) and Center for Disease Control (CDC) standards, which assumes that every direct contact with a patients' blood and other body substances is infectious and requires the use of protective equipment to prevent parenteral, mucous membrane and non-contact skin exposures to the healthcare provider. Palmetto Health agrees to provide, and make readily available, personal protective equipment to include gloves, face protection (masks and goggles), and cover gowns.

## 18. TERMINATION

It is the intent of the House Staff Officer and Palmetto Health that this Agreement shall be for a period of one (1) year, provided, however, the House Staff Officer has the option to terminate this Agreement, with or without cause, by giving the appropriate Departmental Director of Education/Program Director at least thirty (30) days prior written notice of intent to terminate. Palmetto Health has the option to immediately terminate this Agreement "for cause". Termination for cause includes, but is not limited to the following:

1.1. Incapacitating illness, which in the judgment of the resident's Director of Education/Program Director precludes the resident from participation in the graduate medical education programs and in-patient care activities.

1.2 Failure by the resident to abide by policies of Palmetto Health's teaching hospitals and participating sites, GMEC policies, departmental policies, and resident-related provisions of the Medical and Dental Staff Bylaws/Rules and Regulations of the teaching hospitals.

1.3 Failure by the resident to demonstrate, meet, or maintain satisfactory levels of academic, professional, and/or clinical performance required by the residency programs as determined by evaluations.

1.4 Failure by the House Staff Officer to comply with licensure, registration, or certification requirements and/or failure by the House Staff Officer to maintain authorization for employment in the United States.

1.5 Actions which directly violate any of the terms of the resident agreement of appointment.

1.6 Willful or inexcusable breaches of Palmetto Health rules or regulations. (See Disciplinary Action policy)

1.7 Unprofessional conduct or behavior by the House Staff Officer which in the opinion of the appropriate Departmental Director of Education and Palmetto Health, interferes with the performance of the activities provided for under this Agreement and/or which are determined by the appropriate Departmental Director of Education and the Hospital to be unsatisfactory for members of Palmetto Health's House Staff.

## 19 GOVERNING LAW

This Agreement shall be governed by the laws of the State of South Carolina.

IN WITNESS WHEREOF THIS AGREEMENT is made effective this _____7th_____ day of _____APRIL_____, in the County of Richland, State of South Carolina.

DESIGNATED INSTITUTIONAL OFFICIAL

Katherine G. Stephens, MBA, FACHE
Vice President for Medical Education & DIO

David Koon, MD
Program Director
Orthopaedics

PALMETTO HEALTH

Charles D. Beaman, Jr.
President and Chief Executive Officer

AFRAAZ R IRANI  MD
House Staff Officer

Revised 3/02/2010



**PALMETTO HEALTH**

STATE OF SOUTH CAROLINA   )
                             )       **RESIDENT AGREEMENT OF APPOINTMENT**

COUNTY OF RICHLAND        )

This agreement is entered into this **1**st day of **July, 2011** between Palmetto Health or "Hospital", a multiple teaching hospital/health system, located in Columbia, South Carolina (hereinafter "Palmetto Health") and **AFRAAZ R IRANI, MD** (hereinafter "Resident").

**1. APPOINTMENT**

The Resident is hereby employed by Palmetto Health as a PGY **2 Postgraduate** in the Department of Education for **Orthopaedics.** In this capacity, the Resident will participate in a graduate medical education program which includes, but is not limited to, classroom and lecture sessions, patient care responsibilities, and other activities as determined by Resident's specific graduate medical education program.

The Resident agrees to perform all duties and services in a competent, professional, and effective manner. The Resident agrees to abide by the policies, procedures, rules and regulations of the Hospital and its Department of Medical Education, as these policies, procedures, rules and regulations currently exist and may from time to time be amended. Specifically, the Resident agrees to abide by Medical Record provisions of the Palmetto Health Hospitals' Medical and Dental Staff Bylaws, Rules and Regulations, as they currently exist and may from time to time be amended.

The Resident agrees to abide by the Statement of Resident Responsibilities. (see below)

**2. RESIDENT RESPONSIBILITIES**

The goal of the residency program is to provide the Resident with an extensive experience in the art and science of medicine in order to achieve excellence in the diagnosis, care and treatment of patients. To achieve this goal, the Resident agrees to do the following:

1. Under the direction of the Program Director (or designee) and supervision by the Attending physician, assume responsibilities for the safe, effective and compassionate care of patients, consistent with the resident's level of education and experience.

2. Participate fully in the educational and scholarly activities of the residency program and, as required, assume responsibility for teaching and supervising other residents and medical students.

3. Develop and participate in a personal program of self-study and professional growth with guidance from the teaching staff.

DEFENDANT'S
EXHIBIT
4
Irani

4. Participate in institutional programs, committees, councils, and activities involving the medical staff as assigned by the program director, and adhere to the established policies, procedures and practices (to include standards of behavior) of the sponsoring institution and its affiliated institutions.

5. Participate in the evaluation of the program and its faculty.

6. Develop an understanding of ethical, socioeconomic, and medical legal issues that affect the practice of medicine.

7. Participate in educational experiences required to achieve competence in patient care, medical knowledge, practice-based learning improvement, interpersonal and communication skills, professionalism, and systems-based practice.

8. Keep charts, records, and reports up-to-date and signed at all times.

9. Adhere to ACGME institutional and program requirements.

## 3. FACULTY RESPONSIBILITIES AND SUPERVISION

Faculty are responsible for and personally involved in care provided to individual patients. Faculty direct the care of the patient and provide the appropriate level of supervision based on the nature of the patient's condition, the likelihood of major changes in the management plan, the complexity of care, and the experience and judgment of the resident being supervised. (See Supervision of Resident Physician Policy).

## 4. DURATION OF APPOINTMENT

The term of this Agreement is for one (1) year beginning **July 1, 2011** and ending **June 30, 2012.**

## 5. FINANCIAL SUPPORT

The Resident shall receive as compensation for the term of this Agreement an amount equal to **$52,064.06.**

## 6. CONDITIONS FOR PROMOTION/REAPPOINTMENT OF RESIDENTS

Residents are promoted/reappointed on the basis of acceptable periodic competency-based evaluations, which may be supplemented by written or oral clinical and behavioral competency examinations or other evaluation methods; by recommendation of their department's Promotion Committee; and by final approval by the Graduate Medical Education Committee. (See Promotion/Reappointment policy).

## 7. GRIEVANCE PROCEDURES AND DUE PROCESS

Any Resident who disputes any action of any party shall have the right to appeal said action through the Graduate Medical Education Committee's due process policies, as from time to time amended. Violations of the Resident agreement may also be appealed in the same manner. Each Resident will receive a copy of said policies at the time training begins and also at the time any changes or amendments are made. The Residents' Grievance Procedures and Due Process policy will be used for such disputes.

## 8. PROFESSIONAL LIABILITY INSURANCE

Palmetto Health has purchased "claims made" professional liability protection from Continental Casualty Insurance Company to protect all employees including Residents. This protection was purchased through Palmetto Healthcare Liability Insurance Program (PHLIP) that is a captive insurance program. The limit of professional liability afforded is $1,200,000 per claim that involves an employed Resident. This coverage is subject to an aggregate limit of $18,000,000. All aggregate liability limits are shared among the participating members of PHLIP. There are multiple hospital and hospital system members of PHLIP. (Coverage's are subject to periodic change by the PHLIP Board of Directors.)

Palmetto Health has also purchased high excess professional liability protection through PHLIP. The high excess limit is $20,000,000 per claim, except where it is found that the acts of the insured individual were willful, reckless, or grossly negligent, in which case the high excess per claim limit is reduced to $3,000,000. The high excess policy has a $30,000,000 annual aggregate limit which is also shared by all members of PHLIP. (Coverage's are subject to periodic change as determined by the PHLIP Board of Directors.)

It is the responsibility of Palmetto Health and not individual Residents to purchase the extended reporting period (ERP) endorsement or "tail" coverage. Employed Residents are scheduled on the Palmetto Health provider list. This provider list reflects the effective date and, as applicable, the termination or graduation date of each provider. Professional liability protection is afforded to each Resident for claims that occur within the effective date of coverage and until the graduation or termination effective date. Professional liability insurance protection is provided to each Resident within the scope of the Resident's educational program duties and does not extend to any activities outside the scope of the educational program.

This professional liability insurance will only provide coverage for the Resident in the performance of duties and obligations of this Agreement. IT IS THE SOLE RESPONSIBILITY OF THE RESIDENT TO OBTAIN AND PROVIDE FOR PROFESSIONAL AND GENERAL LIABILITY INSURANCE COVERAGE FOR ALL EMPLOYMENT OR PROFESSIONAL ACTIVITES (i.e., "moonlighting") ENGAGED IN BY THE RESIDENT WHICH ARE NOT AN OFFICIAL PART OF THE RESIDENT'S TRAINING PROGRAM.

## 9. BENEFITS

Palmetto Health will provide the Resident the following benefits:

a. **Health Insurance:** Coverage for the Resident and members of his/her immediate family, (i.e., spouse and children), is available and is effective on the first day of the resident's term of agreement. There is no premium cost to Residents for individual coverage; family coverage is available, but requires premium payment by the Resident. Plans also include a prescription drug benefit. Charges for services not covered under the basic plan (or for Resident failure to complete the health screening or other enrollment requirements by designated dates) are the responsibility of the Resident.

b. **Dental Insurance:** The Resident is eligible to participate in Palmetto Health's low option dental plan provided at no charge for the Resident's individual coverage. Coverage is available for members of the Resident's immediate family, (i.e., spouse and children), but requires premium payment by the Resident. The Resident may elect to participate in the Hospital's high option dental plan with the cost of the premium difference paid by the Resident.

c. **Disability Insurance:** The Resident is eligible to participate in Palmetto Health's Long Term Disability insurance plan at no premium cost to the Resident. LTD eligibility begins 91 days after start date.

d. **Life Insurance:** The Resident is eligible to participate in Palmetto Health's life insurance plan, with one time salary life insurance coverage provided at no cost to the Resident. One or two times salary in additional life insurance may be purchased by the Resident. Life insurance eligibility begins 91 days after start date.

e. **Vacation and Holiday Leave:** The Resident may take up to 20 days (23 days for PGY 3 and above) off for vacation and holiday leave. The Resident will continue to receive his/her salary as set forth above during leave. Unused leave will not be paid as a terminal benefit. Vacation and holiday leave must be scheduled and approved in advance by the respective Director of Education, Program Director, or his/her designee. Five of these days will be scheduled by the program near calendar year end. (See Vacation and Holiday Leave Policy)

f. **Sick Leave:** Leave (to include sick, maternity, or family medical leave) may be taken according to written GMEC and Department policies. (See Sick/Medical Leave & LTD policy)

g. **Maternity Leave:** A female Resident is entitled to be absent from the training program on maternity leave for the time period determined to be necessary and appropriate by her physician. Such leave granted may require additional training time to meet program requirements. (See Maternity Leave policy, Sick/Medical Leave & LTD policy, and Leaves of Absence policy)

h. **Family Medical Leave Act:** The Resident is eligible for applicable leave under the Family and Medical Leave Act (FMLA), once the eligibility requirements are met: (1) 12 months of service with Palmetto Health and (2) 1250 productive hours worked in the preceding 12 months. The Resident can take FML for his/her own serious health condition, care for a spouse, child, or parent that has a serious health condition, caring for a newborn, adopted or formally placed foster child. Such leave granted may require additional training time to meet program requirements. (See FMLA policy)

i.   **Other Leaves of Absence:** Leave for military, disability (physical or mental), professional, personal, parental, and other approved purposes may be granted by the Director of Education/Program Director. Such leave granted may require additional training time to meet program requirements. (See Leave of Absence policies)

j.   **On-Call Quarters:** Palmetto Health will provide suitable on-call quarters.

k.   **Uniforms:** Four (4) uniforms (lab coats) are issued to Residents during their first (1st) contract year. Hospital laundering of uniforms (lab coats) issued to a Resident will be performed at no cost to the Resident.

l.   **Meals:** Meal allowances will be provided to a Resident while on duty at Palmetto Health Richland and Palmetto Health Baptist as specified in the attached policy. (See Resident Meals While on Duty policy)

## 10. DUTY HOURS

Resident duty hours and on call schedules will conform to the Accreditation Council for Graduate Medical Education (ACGME) requirements. All Residents are expected to be rested and alert during duty hours. (See Duty Hours policy)

## 11. MOONLIGHTING AND OTHER PROFESSIONAL ACTIVITIES

Graduate medical education is a full-time educational experience. Accordingly, the Resident shall neither accept nor engage in employment or professional activities (moonlighting) outside of the training program without the prior written approval of the appropriate Departmental Director of Education/Program Director and the DIO or DIO designee. If prior approval to moonlight is obtained, IT IS THE SOLE RESPONSIBILITY OF THE RESIDENT TO OBTAIN AND PROVIDE PROFESSIONAL LIABLITY INSURANCE (MALPRACTICE) COVERAGE FOR ALL EMPLOYMENT ACTIVITES WHICH ARE NOT AN OFFICIAL PART OF THE RESIDENT'S TRAINING PROGRAM. (See Moonlighting and Other Professional Activities policy)

## 12. COUNSELING SERVICES

Palmetto Health provides confidential counseling services through the Employee Assistance program (E-Care). Additional counseling, medical, and psychological services may be provided for Residents, when appropriate. (See Impairment and Working Environment policy)

## 13. PHYSICIAN IMPAIRMENT AND SUBSTANCE ABUSE

Palmetto Health provides education on physician impairment (including substance abuse) to Residents. Appropriate confidential counseling services are provided in a non-punitive fashion, when necessary. (See Impairment policy)

## 14. HARASSMENT

Palmetto Health provides a work environment free from sexual and other forms of harassment and will discipline any Resident guilty of committing such conduct. (See Harassment policy)

## 15. ACCOMMODATIONS FOR DISABILITIES

Palmetto Health complies with all state and federal laws concerning qualified disabilities and does not discriminate on the basis of disability. A resident with special needs/disabilities may request reasonable accommodation(s) that will enable the resident to perform the essential functions of his/her assigned duties.

## 16. DRUG FREE WORKPLACE

The illegal manufacture, illegal distribution, illegal dispensation, illegal possession, or illegal use of narcotics, drugs, or other controlled substances is strictly prohibited by Palmetto Health. (See Substance Abuse policy)

## 17. OSHA AND CDC RECOMMENDATIONS

The Resident is required to comply with Occupational Safety and Health Act (OSHA) and Center for Disease Control (CDC) standards, which assumes that every direct contact with a patient's blood and other body substances is infectious and requires the use of protective equipment to prevent parenteral, mucous membrane and non-contact skin exposures to the healthcare provider. Palmetto Health agrees to provide, and make readily available, personal protective equipment to include gloves, face protection (masks and goggles), and cover gowns.

## 18. TERMINATION

It is the intent of the Resident and Palmetto Health that this Agreement shall be for a period of one (1) year, provided, however, the Resident has the option to terminate this Agreement, with or without cause, by giving the appropriate Departmental Director of Education/Program Director at least thirty (30) days prior written notice of intent to terminate. Palmetto Health has the option to immediately terminate this Agreement "for cause". Termination for cause includes, but is not limited to the following:

1.1. Incapacitating illness, which in the judgment of the resident's Director of Education/Program Director precludes the resident from participation in the graduate medical education program and patient care activities.

1.2  Failure by the resident to abide by policies of Palmetto Health's teaching hospitals and participating sites, GMEC policies, departmental policies, and resident-related provisions of the Medical and Dental Staff Bylaws/Rules and Regulations of the teaching hospitals.

1.3  Failure by the resident to demonstrate, meet, or maintain satisfactory levels of academic, professional, and/or clinical performance required by the residency programs as determined by evaluations.

1.4  Failure by the Resident to comply with licensure, registration, or certification requirements and/or failure by the Resident to maintain authorization for employment in the United States.

1.5  Actions which directly violate any of the terms of the resident agreement of appointment.

1.6  Willful or inexcusable breaches of Palmetto Health rules or regulations.  (See Disciplinary Action policy)

1.7  Unprofessional conduct or behavior by the Resident which in the opinion of the appropriate Departmental Director of Education and Palmetto Health, interferes with the performance of the activities provided for under this Agreement and/or which are determined by the appropriate Departmental Director of Education and the Hospital to be unsatisfactory for members of Palmetto Health's House Staff.

## 19. GOVERNING LAW

This Agreement shall be governed by the laws of the State of South Carolina.

IN WITNESS WHEREOF THIS AGREEMENT is made effective this _____11th_____ day of ___April, 2011_____, in the County of Richland, State of South Carolina.

DIRECTOR OF MEDICAL EDUCATON

_____
Katherine G. Stephens, MBA, FACHE
Vice President for Medical Education & DIO

PALMETTO HEALTH

_____
Charles D. Beaman, Jr.
Chief Executive Officer

_____
David Koon, MD
Program Director
Orthopaedic Surgery

_____
AFRAAZ R IRANI, MD
Resident

Revised 1/21/2011

ACGME Program Requirements for Graduate Medical Education
in Orthopaedic Surgery

*Common Program Requirements are in BOLD*

*Effective: July 1, 2007*

Introduction

A.    Definition and Scope of the Specialty

Orthopaedic surgery is the medical specialty that includes the study and prevention of musculoskeletal diseases, disorders, and injuries and their treatment by medical, surgical, and physical methods.

B.    Duration and Scope of Education

1.    Orthopaedic residencies will be accredited to offer five years of graduate medical education. The orthopaedic residency director is responsible for the design, implementation, and oversight of a PGY-1 year that will prepare residents for specialty education in orthopaedic surgery. This year must include resident participation in clinical and didactic activities that will give them the opportunity to:

a)    develop the knowledge, attitudes, and skills needed to formulate principles and assess, plan, and initiate treatment of adult and pediatric patients with surgical and/or medical problems;

b)    be involved in the care of patients with surgical and medical emergencies, multiple organ system trauma, soft tissue wounds, nervous system injuries and diseases, peripheral vascular injuries and diseases, and rheumatologic and other medical diseases;

c)    gain experience in the care of critically ill surgical and medical patients;

d)    participate in the pre-, intra- and post-operative care of surgical patients; and,

e)    develop an understanding of surgical anesthesia, including anesthetic risks and the management of intra-operative anesthetic complications.

2.    In order to meet these goals, the PGY-1 year must include:

Orthopaedic Surgery 1



DEFENDANT'S EXHIBIT
5
Irani
PENGAD 800-631-6989

8

USC(Irani)0008

a) a minimum of six months of structured education in surgery, to include multi-system trauma, plastic surgery/burn care, intensive care, and vascular surgery;

b) a minimum of one month of structured education in at least three of the following: emergency medicine, medical/cardiac intensive care, internal medicine, neurology, neurological surgery, pediatric surgery or pediatrics, rheumatology, anesthesiology, musculoskeletal imaging, and rehabilitation; and,

c) a maximum of three months of orthopaedic surgery.

3. The program director is also responsible for the design, implementation and oversight of PGY-2 through PGY-5 years that:

a) must include at least three years of rotations on orthopaedic services, and

b) may include rotations on related services such as plastic surgery, physical medicine and rehabilitation, rheumatology, or neurological surgery.

I. Institutions

A. Sponsoring Institution

One sponsoring institution must assume ultimate responsibility for the program, as described in the Institutional Requirements, and this responsibility extends to resident assignments at all participating sites.

The sponsoring institution and the program must ensure that the program director has sufficient protected time and financial support for his or her educational and administrative responsibilities to the program.

1. One primary site must provide most of the residents' basic science and research education.

a) Residents' clinical education at the primary site should include extensive experience in patient care. Preoperative evaluation and postoperative follow-up, as well as evaluation and treatment of patients not requiring surgery, must be included.

Orthopaedic Surgery 2

9

USC(Irani)0009

ACGME Program Requirements for Graduate Medical Education
in Orthopaedic Surgery

*Common Program Requirements are in BOLD*

*Effective: July 1, 2007*

Introduction

A.    Definition and Scope of the Specialty

Orthopaedic surgery is the medical specialty that includes the study and prevention of musculoskeletal diseases, disorders, and injuries and their treatment by medical, surgical, and physical methods.

B.    Duration and Scope of Education

1.    Orthopaedic residencies will be accredited to offer five years of graduate medical education. The orthopaedic residency director is responsible for the design, implementation, and oversight of a PGY-1 year that will prepare residents for specialty education in orthopaedic surgery. This year must include resident participation in clinical and didactic activities that will give them the opportunity to:

a)    develop the knowledge, attitudes, and skills needed to formulate principles and assess, plan, and initiate treatment of adult and pediatric patients with surgical and/or medical problems;

b)    be involved in the care of patients with surgical and medical emergencies, multiple organ system trauma, soft tissue wounds, nervous system injuries and diseases, peripheral vascular injuries and diseases, and rheumatologic and other medical diseases;

c)    gain experience in the care of critically ill surgical and medical patients;

d)    participate in the pre-, intra- and post-operative care of surgical patients; and,

e)    develop an understanding of surgical anesthesia, including anesthetic risks and the management of intra-operative anesthetic complications.

2.    In order to meet these goals, the PGY-1 year must include:

Orthopaedic Surgery 1



DEFENDANT'S EXHIBIT 5 Irani PENGAD 800-631-6989

8

USC(Irani)0008

     a)    a minimum of six months of structured education in surgery, to include multi-system trauma, plastic surgery/burn care, intensive care, and vascular surgery;

     b)    a minimum of one month of structured education in at least three of the following: emergency medicine, medical/cardiac intensive care, internal medicine, neurology, neurological surgery, pediatric surgery or pediatrics, rheumatology, anesthesiology, musculoskeletal imaging, and rehabilitation; and,

     c)    a maximum of three months of orthopaedic surgery.

3.    The program director is also responsible for the design, implementation and oversight of PGY-2 through PGY-5 years that:

     a)    must include at least three years of rotations on orthopaedic services, and

     b)    may include rotations on related services such as plastic surgery, physical medicine and rehabilitation, rheumatology, or neurological surgery.

I.    **Institutions**

   A.    **Sponsoring Institution**

   One sponsoring institution must assume ultimate responsibility for the program, as described in the Institutional Requirements, and this responsibility extends to resident assignments at all participating sites.

   The sponsoring institution and the program must ensure that the program director has sufficient protected time and financial support for his or her educational and administrative responsibilities to the program.

     1.    One primary site must provide most of the residents' basic science and research education.

        a)    Residents' clinical education at the primary site should include extensive experience in patient care. Preoperative evaluation and postoperative follow-up, as well as evaluation and treatment of patients not requiring surgery, must be included.

Orthopaedic Surgery 2

USC(Irani)0009

DEFENDANT'S
EXHIBIT
6
Irani

> Subject: Palmetto Health Richland Orthopaedic Surgery
> Date: Mon, 9 Apr 2012 14:54:14 -0400
>
>
>
>
>
>
> Hello,
> Attached please find my signed formal complaint regarding the practices of
> the Palmetto Health Orthopaedics Department.
> I will be providing further documentation as necessary.
> Thank you,Afraaz Irani650-353-8523
>
>
> From: mmiller@acgme.org
> To: afraaz.irani@hotmail.com; adunlap@acgme.org; pderstine@acgme.org;
> smansker@acgme.org
> Date: Fri, 30 Mar 2012 10:25:17 -0500
> Subject: RE: Palmetto Health Richland Orthopaedic Surgery
>
>
>
> Dear Dr. Irani, I am sorry for your plight, but the ACGME does not
> adjudicate disputes between program directors and residents and you must
> avail yourself of all the resources available within the institution. The
> ACGME cannot get involved in the institution's due process proceedings. The
> ACGME's role is to make sure that they have policies and procedures for due
> process. Please know that the ACGME cannot help you personally and all that
> it can do is affect the program's accreditation for violating ACGME
> requirements. After the hearing, if you have evidence that it was unfair,
> you can file a formal complaint at that time as you won't know whether the
> hearing was unfair until you've had it. Please remember that unfair is not
> that you do not like the outcome. Unfair is that they did not follow their
> own policies and procedures. In regard to the harassment, we can address
> that at the same time as the due process issue. You may want to obtain
> legal counsel for your hearing if it is allowed. Most often the institution
> allows an attorney to be present to advise the resident, but not to speak
> because it is not a court of law. And for the discrimination issue, you may
> want to contact the Equal Employment Opportunity Commission and file a
> complaint with them. The ACGME does not address discrimination except
> within the context of harassment. If you file a formal complaint after the
> hearing, it must be in writing and signed. Email is fine, but we will need
> your signature on the email. Remember the complaint is not going to help
> you, but will help the residents that are there and those that follow if
> your allegations are true. I am sorry that this is not the answer you were
> hoping for, but the ACGME has educational oversight and not administrative
> oversight. Sincerely, Marsha MillerAssociate Vice PresidentOffice of
> Resident Services

August 2, 2012

A
A C G M E

Accreditation Council for
Graduate Medical Education

515 N. State Street
Suite 2000
Chicago, IL 60654

Phone 312.755.5000
Fax 312.755.7498
www.acgme.org

David E. Koon Jr, MD
Program Director
Palmetto Health/University of South Carolina School of Medicine
Palmetto Health Richland
Two Medical Park, Suite 404
Columbia, SC 29203

Katherine G. Stephens, PhD, MBA
Vice President, Medical Education and Research
Palmetto Health
P O Box 2266
Columbia, SC 29202-2266

Re:  Program #2604532263

Dear Drs. Koon and Stephens:

The Review Committee for Orthopaedic Surgery has reviewed Afraaz Irani's
complaint alleging the Orthopaedic Surgery Program at Palmetto
Health/University of South Carolina School of Medicine is noncompliant with
ACGME requirements. The review committees also reviewed your May 25,
2012, response with supporting documentation.  The review committee judged
there was no validity to the complaint and will not pursue any further action
related to the complaint.

The ACGME will close its file on the complaint, and the complainant will be
notified of the review committees' decision.

Sincerely,

Marsha a. Miller

Marsha A. Miller, MA
Associate Vice President
Office of Resident Services
312-755-5041
mmiller@acgme.org

cc:     Pamela Derstine, PhD, Executive Director, RC for Orthopaedic
        Surgery
        Patricia Surdyk, PhD, Executive Director, Institutional Review
        Committee



DEFENDANT'S
EXHIBIT
8
Irani

USC(Irani)0689

Appendix 3:
Rebuttal to Level II remediation
Aug. 22 2011



DEFENDANT'S
EXHIBIT
16
Irani

PENGAD 800-631-6989

*I was asked to respond to allegations of improper care regarding regarding Mr. B:*

Re: FW: Fwd: Pt. Roy Butler - afraaz.irani@gmail.com - Gmail

https://mail.google.com/mail/u/0/?search=&redirect=...

Apple  iCloud  Facebook  Twitter  Wikipedia  Yahoo  News  Popular

## Google

**I remember this pleasant gentleman very well** 

Gmail ▾    ←   ⊠   🛈   🗑    Move to Inbox    🏷 ▾    More ▾                3

COMPOSE

Norwich U. - Civil Engineering Masters - Earn your Master's online on your schedule

**Inbox (4,135)**
Starred
Important
Sent Mail
Drafts (33)
Personal
Travel
More ▾

Re: FW: Fwd: Pt. R    B

**Afraaz Irani** <afraaz.irani@gmail.com>                              8/10/11
to David, John.Walsh

Drs. Koon and Walsh.

I remeber this pleasant gentleman very well.

My first steps with all such traumatic wounds are the same. The patient had
already been given fentanyl before my arrival. Therefore my first step is to inspect
wound, and see his pain level before approving a possible overdose of narcotics
to an 80+ year old male. Accordingly I inspected the wound first. He had some
pain, then I waited for the additional dose of additional pain meds. All the
manipulation was done by Iaquinto as was outlined in the prior email

I did introduce myself to the patient. My back was to the nurses, so not sure if
they heard me. It is is true that I can mumble and so that cannot be clear. Indeed
the nurse here does not know the correct pronunciation of my name so I can work
on better enunciation when introduction myself

I spoke with Iaquinto in the trauma bay. I called and he told me to stay at bedside
he is coming down directly. The admission plan, everything was unknown, and I
was instructed to say at bedside, accordingly I did not feel it appropriate to talk to
the family until he had arrived as I was instructed.

Often in the setting of a traumatic injury, when the orthpaedist arrived,  he/she is
expected to immediately  talk to family. In that situation I am less likely to jump the
gun and speak to family, since it is important to wait a few extra minutes to get
details correct, since this could potentially be a major surgery/life altering event.

It was a  regrettable decision, but one that had to be done. Many of the staff were
justifiably horrified at this, and  wanted us to do more. However this was medically
the correct decision. Indeed he had a heart attack during the procedure, and
passed away a few days later. It is clear he could have not withstood a salvage
procedure to his arm.

The patient was very thankful throughout and when I saw him on the floor we had
great interactions. He remebered me from the trauma bay and shook my hand
and thanked me again (although truth be told he was a real gentleman). I really
did enjoy my time with him. It is a shame that he is no longer with us.

I remember we talked about how he was still able to do what he loved
(metal/wood working) in his 80s. He was thankful that he was still there, and we
talked about his family and how his children work with him in the shop. I do
remeber Mr B      , and wish he was still with us.

Hope that clarifies things.

Thanks,
Afraaz

Irani000516

*Email from Dr. Koon himself confirming satisfactorily performing steps of the grievance process (1.1 and 1.2) Please also note that meeting scheduled for 07 Nov 11 below actually happened 21 Nov 11:*



Remediation Updates    Inbox  x

David Koon <David.Koon@uscmed.sc.edu>    9/19/11

to me, Michelle, John, katherine.step.

All -

Just to keep everyone on the same page - we will be having periodic updates re: the academic remediation measures for Dr. Irani.

15 AUG 11 - Koon / Athey / Irani - initial meeting

07 SEP 11 - Koon / Irani - meeting re: the appeal / grievance process

10 SEP 12 - Walsh / Irani - meeting re: the appeal / grievance process

19 SEP 11 - Walsh / Grabowski / Irani - scheduled 6 month evaluation (missed 22 AUG 11 due to post-call status)

03 OCT 11 (7:45 am) - progress report re: remediation measures

07 NOV 11 (7:45 am) - progress report re: remediation measures

05 DEC 11 (7:45am) - meeting with faculty re: Level II Academic Remediation status (15 AUG - 01 DEC 11)

Thanks

DKoon

This e-mail transmission, in its entirety and including all attachments, is intended solely for the use of the person or entity to whom it is addressed and may contain information, including health information, that is privileged, confidential, and the disclosure of which is governed by applicable law. If you are not the intended recipient, you are hereby notified that disclosing, distributing, copying or taking any action in relation to this e-mail is STRICTLY PROHIBITED. If you have received this e-mail in error, please notify the sender immediately and destroy the related message.



DEFENDANT'S
EXHIBIT
20
Irani

Irani000523


DEFENDANT'S
EXHIBIT
22
Irani



UNIVERSITY OF SOUTH CAROLINA
SCHOOL OF MEDICINE

UNIVERSITY SPECIALTY CLINICS®

**SEPTEMBER 22, 2011**              RE: DR. AFRAAZ IRANI
                                    (PGY-2 ORTHOPAEDIC RESIDENT)

MEMO FOR RECORD

This memo for record summarizes a meeting that Dr. Grabowski and I had with Dr. Irani on 20th of September 2011. We reviewed his progress to date over the last six months of his orthopaedic residency. At the time of his previous evaluation and scheduling it had to be postponed and so the evaluation on the 20th will serve for his evaluation of the preceding seven months. During the course of our discussion we reviewed Dr. Irani's progress overall and that specifically addressed the issues noted on the memorandum for record dated 15 August 2011.

With regards to Dr. Irani's surgical skills they are on par with his peers at this very early stage in his residency. Dr. Irani has rotated with me and I found his technical skills to be appropriate relative to wound closure and fracture fixation. He did not have the opportunity to do much with me in the area of arthroscopy. I have heard from Dr. Guy that his skills in arthroscopy are quite elementary and will require substantial growth and improvement during the course of his residency. My direct observations of his interactions with patients have been favorable. He appears to demonstrate appropriate relationships with the patients and their families while under my direct supervision. Dr. Irani demonstrates an excellent degree of interest and commitment to his own education. He carries around a small notebook while we are seeing patients in the office and if he encounters something which he is unfamiliar with he will note that for a later review. I consider this to be an excellent teaching tool. With the exceptions noted below I think that Dr. Irani's progress to date has been reasonably satisfactory.

Dr. Irani has had struggles and problems during his early phase in his orthopaedic residency. Some of these issues reflect his performance while he was a first year resident but on an orthopaedic rotation. Some of these are reflected by his behavior when he is rotating in other specialties. Some of these are noted during the first two months that he has been full-time here in the orthopaedic department. I communicated these with him during the course of our discussion. During this portion of the interview I specifically referenced the numbered topics present on the 15 August memo. With respect to point number one I am aware of the circumstances surrounding this patient's care on a firsthand basis. I had been consulted for the management of his arm injury. I am also aware of the issues surrounding the attending physician's treatment of this patient while he was in the trauma bay. I had spoken to Dr. Irani on a separate occasion about his behavior and his communication with the nurses. His central assertion is that he had a favorable relationship with the patient following his initial resuscitation. I informed him that the patient had received some sedation which also involves a certain degree of amnesia. Whether or not the patient responded to him appropriately after he was resuscitated did not in any way support proper treatment prior to that point. I also

CONTINUED

*DEPARTMENT OF ORTHOPAEDIC SURGERY*
*Two Medical Park, Suite 404, Columbia, SC 29203*
*803-434-6812, FAX 803-434-7306*

Irani000093



Appendix 9:
Documentation of events surrounding Trauma F110175
December 7th 2011

Irani000533

*Events documented within three days of incident:*

**Patient arrives as trauma 911 at 11AM.**

**Called down at about 2PM by Dr. Loflin (PGY-2 trauma resident), who told me Dr Nathe (Ortho intern) needed help (Dr. Nathe said Dr. Wood told her to call me for help with patient).**

Arrive in POD 5.

Arlene (nurse) walks out of POD 5 room. Dr. Nathe in room.  I have not yet seen the patient, Nathe, or anyone else. Arlene immediately turns to me and states we need to talk about how all this was handled. I asked her what was wrong, and what I needed to do. Arlene refused to provide any guidance and only said we would talk about it at the end, and ended the conversation by walking away.

I realized that the nurses were upset, and therefore played everything by the book. I met with Nathe and reviewed all films. Together we assessed all injuries and determined a game plan. She brought the c-arm and we saw the patient again together. I introduced myself to the patient, described her injuries, and what we would be doing for her in the ER. I spoke with Dr Toussaint from neurosurgery and Dr. Loflin from Trauma. I was informed sedation was not an option in this patient. I told the patient we were going to splint and reduce her right ankle. I asked the nurse for fentanyl. Fentanyl was given. Her right lower extremity was unwrapped. An intrarticular block (local lidocaine) performed. After appropriate local and systemic anesthesia given, we irrigated her wound with 2L sterile normal saline because it was an open wound, and start reduction under fluoro. (nursing charting also documents administration of pain meds and reduction of right lower extremity as described above).

Diane Savage (another assistant nurse manager) around this time, stepped in for a few seconds, but stepped back out again as we were using fluoro and there was radiation exposure. I did not see her again during rest of procedure.

Attention was then turned to left upper extremity. The room was small and I had difficulty making it around bed, but we all had to work efficiently with what we had. I again explained the injuries to the patient, and asked if she was OK, and if her pain was under control. She stated she was alright. We explained we would irrigate the arm and perform a reduction. We began reduction. During this time, Dr Nathe took some final fluoro pics of RLE in splint. I said that is a hard reduction, that's as good as we are going to get it down here, and we will have to take care of it upstairs in the OR.  After reductions performed, again explained to patient exactly what had been done.

The sheets were wet, so I helped the nurses change the wet sheets.

The patient stated she wanted to see her parents. I told patient I was going to talk to her family and that I would make sure she was not going anywhere until she saw her parents. I stepped out. I spoke with nurse (Arlene), who again said we need to talk about how situation was handled after things were finished. Again I asked what we could do. Again all that was said was that we

Irani000534

would talk about it later. I wrote the consent and spoke with family (mother and father) in consultation room with Arlene. I made sure all questions were answered satisfactorily.

Nursing staff wanted to meet. Arlene, Elaine, Dr Nathe and myself met. Elaine states that the patient was scared and confused. When addressing informed consent, the nurse stated consent was needed not because it was indicated, but because the nurses have to "cover our assess." (Of note: this all happened before I had arrived -- I was not involved in the informed consent discussion at all). Arlene seems to take issue with our care stating that two washouts and reductions were "pretty complicated for an ER." Of note the nurses did not look at me or address me when giving feedback.

I thanked the nurses for their feedback. I go back to room to check on the patient. She seems to be doing fine. I step out to bring family back. I bring the family back to the ER. The patient is getting an EKG. I use that time to show the family all the xrays of their daughter's injuries on the xray viewing stations in the ER and again explain what we would be doing. I escort the family personally back to the patient's bedside.

I spoke with family and patient frankly about injuries (I was most concerned about Right ankle in terms of some long term pain) Never at any point did I tell patient or parents there is a chance she would not walk again. I spoke with the patient about each injury in detail and possible long term ramifications. Answered all questions for both the family and patient. Explained the severity of the injuries frankly and honestly, and what we were going to do in the OR. Explained the risks/benefits/alternatives of all her injuries. All questions were satisfactorily answered. I asked the nurses if they needed anything else. They said they did not. The OR was calling for the patient.

At this time Nathe and I left with the c-arm as there was another patient upstairs with an open ankle that needed an urgent reduction.

Irani000535



**PALMETTO HEALTH**

To:    Dr. Afraaz Irani
       Kathy Stephens
       Dr. David Koon
       Dr. John Walsh
       Dr. James Raymond
       Charles Beaman

From: Gwen Hill, Interim Vice President of Human Resources

Date: May 7, 2012

Re: Dr. Afraaz Irani Grievance

The grievance committee listened to testimony from Dr. Koon, Dr. Walsh and Dr. Irani on April 30th, 2012.

After all testimony was given and questions were presented and answered, Dr. Koon, Dr. Walsh and Dr. Irani were dismissed and the committee started its deliberations.

At approximate 5:15pm the committee asked the moderator for additional documents from Dr. Walsh and Dr. Koon and for additional time to review the documents that were presented from Dr. Irani, Dr. Walsh and Dr. Koon.

The committee reconvened on Monday, May 7th at 11:30am. After further deliberation, the committee voted by secret ballot and the decision for termination was upheld.

DEFENDANT'S
EXHIBIT
43
Irani
PENGAD 800-631-6989

Post Office Box 2266
Columbia, SC 29202-2266    PHONE:  (803) 296-2100    palmettohealth.org

USC(Irani)0917



# PALMETTO HEALTH

Charles D. Beaman, Jr.
*Chief Executive Officer*

June 1, 2012                                    **Sent Via Email and Certified Mail**

Afraaz R. Irani, M.D.
3900 Bentley Drive, Apt. 1911
Columbia, South Carolina 29210

Dear Dr. Irani:

After reviewing all the information at my disposal, I have determined that your termination was proper and I uphold the decision of the Grievance Committee. This decision is final.

If you wish further follow-up or desire additional information on this matter, please contact Lin Hearne in Human Resources at 296-7883.

Sincerely,

Charles D. Beaman, Jr.
Chief Executive Officer

CDBJr/db

c:    James Raymond, M.D.
      Kathy Stephens, Ph.D.
      Lin Hearne, HR Business Partner

DEFENDANT'S
EXHIBIT
44



From: **Jeffrey Guy** jagdr@aol.com
Subject: Re: Dr. Guy / USC resident question
Date: February 5, 2012 at 11:50 AM
To: Afraaz Irani  afraaz.irani@gmail.com

Very Nice...

spoke with two people for you.

Michael Mcbrayer   DJO  DonJoy Orthopedics.  Very knowledgeable... send him similar email as below. He will contact you.
Mention my name.

**Michael McBrayer**
Senior Vice President Global Business and Professional Relations

**DJO Global, Inc.**
1430 Decision Street, Vista, CA 92081

D  760.734.3573
F  760.597.8412
C  760-533-7701

michael.mcbrayer@djoglobal.com
DJOglobal.com



Phillip Bowman:  Regional guy for Arthrex.   May have a interesting offer for you while you explore the company for device
positions.  call him 803-960-0201

Philip Bowman
South Carolina Distributor for:

Arthrex

Peerless Surgical, Inc.
717 Lady Street
Suite H
Columbia, SC 29201
803-732-4661-o
803-781-4456-f

On Feb 3, 2012, at 11:26 AM, Afraaz Irani wrote:

Dr. Hanypsiak,

I am PGY-2 orthopaedic surgery resident at the USC program here in Columbia.

I have spent some time working with Dr. Guy, and he noticed that I am drawn toward the technology/device portion of
orthopaedics (including pouring over the arthroscopy towers). Indeed this was definitely a large part of my draw toward
orthopaedics.

USC(Irani)0924

In medical school I worked with a startup on validation studies for a prototype device (the company was later bought by medtronic), and after that I developed a new device and founded a company that is currently doing animal studies.

Given this background, Dr. Guy has encouraged me to explore what options there are beyond medicine for MDs -- specifically the use of MDs in industry -- product development or other options, or even options specific to arthrex.

We don't know if it is doable yet, but we have also toyed with the idea of my taking a year of absence to explore this side of medicine.

If you have a few minutes, I would really appreciate your insight into careers outside of medicine.

Thank you for your time,
Afraaz
650-353-8523

On Thu, Feb 2, 2012 at 10:23 PM, Jeffrey Guy <jagdr@aol.com> wrote:
Bryan.Hanypsiak@Arthrex.com

Bryan T. Hanypsiak, MD

Director of Medical Education


Telephone: (239) 207-6762
1370 Creekside Blvd.
Toll-Free: (800) 933-7001
Naples, FL 34108
Fax: 239-552-2317
E-Mail:Bryan.Hanypsiak@Arthrex.com



Jeffrey Guy MD.
Assistant Professor
Dept.Orthopedics & Sports Medicine
USC School of Medicine
Team Physician, Medical Director
USC Gamecocks


<image001.jpg>


Jeffrey Guy MD.
Assistant Professor
Dept.Orthopedics & Sports Medicine
USC School of Medicine
Team Physician, Medical Director
USC Gamecocks



USC(Irani)0925

From: Jeffrey Guy <jagdr@aol.com>
Subject: Re: Dr. Guy / USC resident question
Date: March 5, 2012 7:45:33 PM EST
To: Bryan Hanypsiak <Bryan.Hanypsiak@Arthrex.com>

_1 Attachment, 3 KB

Hey Bryan.... Thanks for keeping up with him. Anything in the development division or devices that would apply to his situation? Thanks for your help  Jeff

On Mar 5, 2012, at 8:40 AM, Bryan Hanypsiak wrote:

fyi

Bryan T. Hanypsiak, MD

Director of Medical Education


Telephone: (239) 207-6762
1370 Creekside Blvd.
Toll-Free: (800) 933-7001
Naples, FL 34108
Fax: 239-552-2317
E-Mail:Bryan.Hanypsiak@Arthrex.com

-----Original Message-----
From: Afraaz Irani [mailto:afraaz.irani@gmail.com]
Sent: Sunday, March 04, 2012 6:22 PM
To: Bryan Hanypsiak
Subject: Re: Dr. Guy / USC resident question

Dr. Hanypsiak,

Thank you so much for the phone call the other day. I know you have a very busy schedule.  I really appreciate your help and insight. I also appreciate your offer to show me around the Arthrex facility as time permits.  Hopefully we will have time to meet at some point.

Thanks again for your help and time.

Afraaz

On Thu, Feb 16, 2012 at 10:08 AM, Bryan Hanypsiak <Bryan.Hanypsiak@arthrex.com> wrote:

Spoke to Dr. Guy at academy. Can I call u next week?
Bryan

Sent from my iPhone

On Feb 3, 2012, at 9:26 AM, "Afraaz Irani" <afraaz.irani@gmail.com> wrote:


Dr. Hanypsiak,

USC(Irani)0926

I am PGY-2 orthopaedic surgery resident at the USC program here in Columbia.

I have spent some time working with Dr. Guy, and he noticed that I am drawn toward the technology/device portion of orthopaedics (including pouring over the arthroscopy towers). Indeed this was definitely a large part of my draw toward orthopaedics.

In medical school I worked with a startup on validation studies for a prototype device (the company was later bought by medtronic), and after that I developed a new device and founded a company that is currently doing animal studies.

Given this background, Dr. Guy has encouraged me to explore what options there are beyond medicine for MDs -- specifically the use of MDs in industry -- product development or other options, or even options specific to arthrex.

We don't know if it is doable yet, but we have also toyed with the idea of my taking a year of absence to explore this side of medicine.

If you have a few minutes, I would really appreciate your insight into careers outside of medicine.

Thank you for your time,
Afraaz
650-353-8523

On Thu, Feb 2, 2012 at 10:23 PM, Jeffrey Guy <jagdr@aol.com> wrote:


Bryan.Hanypsiak@Arthrex.com

Bryan T. Hanypsiak, MD

Director of Medical Education


Telephone: (239) 207-6762 <tel:%28239%29%20207-6762>
1370 Creekside Blvd.
Toll-Free: (800) 933-7001 <tel:%28800%29%20933-7001>
Naples, FL 34108
Fax: 239-552-2317
E-Mail:Bryan.Hanypsiak@Arthrex.com



Jeffrey Guy MD.
Assistant Professor
Dept.Orthopedics & Sports Medicine
USC School of Medicine
Team Physician, Medical Director
USC Gamecocks

This e-mail and any files transmitted with it are the property of Arthrex, Inc. and/or its affiliates, are confidential, and are intended solely for the use of the individual or entity to whom this e-mail is addressed. If you are not one of the named recipient(s) or otherwise have reason to believe that you have received this message in error, please notify the sender at 239-643-5553 and delete this message immediately from your computer. Any other use, retention, dissemination forwarding, printing or copying of this e-mail is strictly prohibited. Please note that any views or opinions presented in this email are solely those of the author and do not necessarily represent those of the company. Finally, while Arthrex uses virus protection, the recipient should check this email and any attachments for the presence of viruses. The company accepts no liability for any damage caused by any virus transmitted by this email.

This e-mail and any files transmitted with it are the property of Arthrex, Inc. and/or its affiliates, are confidential, and are intended solely for the use of the individual or entity to whom this e-mail is addressed. If you are not one of the named recipient(s) or otherwise have reason to believe that you have received this message in error, please notify the sender at 239-643-5553 and delete this message immediately from your computer. Any other use, retention, dissemination forwarding, printing or copying of this e-mail is strictly prohibited. Please note that any views or opinions presented in this email are solely those of the author and do not necessarily represent those of the company. Finally, while Arthrex uses virus protection, the recipient should check this email and any attachments for the presence of viruses. The company accepts no liability for any damage caused by any virus transmitted by this email.

Jeffrey Guy MD.
Assistant Professor
Dept.Orthopedics & Sports Medicine
USC School of Medicine
Team Physician, Medical Director
USC Gamecocks





UNIVERSITY OF SOUTH CAROLINA
SCHOOL OF MEDICINE

UNIVERSITY SPECIALTY CLINICS®



May 2, 2012

RE:    DR. AFRAAZ IRANI, PGY-2 RESIDENT, ORTHOPAEDIC SURGERY
       PALMETTO HEALTH ORTHOPAEDIC RESIDENCY PROGRAM

Dear Grievance committee:

I have been asked to write you today with regard to my relationship to Dr. Afraaz Irani. As you know, Dr. Irani has been our PGY-2 resident this past year and is currently under evaluation for clinical performance over the past year. I have had a chance to have a number of interactions with Dr. Irani over the last several months and have been asked to write a letter with regard to my interaction with him. I have had several talks with Dr. Irani during the course of his rotation through the sports medicine department as well as individual talks in my office and on several occasions at dinner.

First of all I would like to say that I am quite a fan of Dr. Irani in several respects. I think that Afraaz is genuinely a very nice young man. I think that from a social standpoint, he is very well liked by his peers. I do think that he has a good heart and in general tries to do the right thing. However, Dr. Irani has been involved in a number of incidents that I am sure you are well aware of.

Several months ago Dr. Irani joined our sports medicine service. I took it upon myself to spend some extra time with him to see if we could get Afraaz back on track and get him to a point that he could continue his future training in orthopaedics. Again, I have spent time not only in the operating room and clinic setting with Dr. Irani but he also has traveled to the training room with me. Outside the rotation settings, Dr Irani and I have spent several late Sunday evenings in the office discussing his progress and future. I believe Afraaz and I had very open and candid conversations during his time on our rotation and therefore feel I have a good understanding of Dr. Irani's situation.

While our conversations have dealt with many issues, I think one of the central issues has been the concept of being a good physician or more specifically a good orthopaedic surgeon. It is my experience that there are 3 areas that are critical to the success of being a good orthopaedic surgeon. The first is I believe every physician needs to have an academic ability to be able to keep and maintain the standards of an individual subspecialty. Second is to be able to be technically competent and be able to maintain the skills necessary to perform and complete surgery in an appropriate manner. Third is the ability to be a good clinician and be able to interact with patients and to have a desire and willingness as well as compassion to take care of patients.

With regard to Dr. Irani, I think Afraaz is an amazingly bright young gentleman and probably one of the brighter gentlemen whom we have had come through our doors. I believe he reads and academically does well at the PGY2 relative to his peers.

*DEPARTMENT OF ORTHOPAEDIC SURGERY*
**Two Medical Park, Suite 404, Columbia, SC 29203**
**803-434-6812, FAX 803-434-7306**

USC(Irani)0929



UNIVERSITY OF SOUTH CAROLINA
SCHOOL OF MEDICINE

UNIVERSITY SPECIALTY CLINICS®

MAY 2, 2012
RE: DR. AFRAAZ IRANI, PGY-2 RESIDENT
PAGE 2

Regarding Dr. Irani's surgical skills, I believe them to be average and/or slightly below average. However, at a PGY-2 level it could be too early to actually assess the potential for his surgical skills.

From my perspective, I believe that the issues surrounding Dr. Irani really involve the category of being a good clinician. I often counsel the residents about the differences between being "book smart" and "being street smart", the ability to anticipate and to actually "worry." I believe these are essential tools for a resident and/or a physician to be able to empathize with their patients, to be able to counsel their patients, as well as to be able to decide when "extra" is necessary when caring for their patients. In addition, I believe one of the critical steps is communication. Whether at a resident or a practicing physician level, it is critical to learn the ability to communicate and to ask for help when necessary. I believe to be the most critical out of the three components to being a good doctor.

I have had several very open and honest conversations with Dr. Irani regarding this topic. I have been quite blunt with him in our interactions while discussing some of the situations he has been involved in. Again, on review of Dr. Irani, I do believe that he is an unbelievably intelligent person and, as I have told him, probably destined for amazing things in this world. I, however, have expressed to him my doubts that clinical medicine is where he is going to do this. I believe Dr. Irani's expertise lies in an area of technology. He is clearly driven by the inner workings of mechanics and device technology. We have had long talks with him about this topic, and I believe that one of his mentors at Stanford was a spine physician who had a significant portion of their practice involved in this type of area. To quote one of his e-mails, "Dr. Irani has spent time in medical school working with a startup on validation studies for a prototype device and afterwards developed a new device and founded a company that is currently doing animal studies." It is in this area that I see his passion. I'm reminded of a story one day in the operating room with Dr. Irani. I often ask the junior residents to spend an early case unscrubbed and assist the circulator in the room in order to better learn the systems that we are using during an operation. I was amazed watching Dr. Irani dissect the arthroscopy tower over the next half hour. He was clearly taken by how the tower worked. It is this "desire and passion" that I have not witnessed in Dr. Irani's clinical work. I have probed and discussed on many occasions whether or not clinical medicine really drives him or if this is simply a means to an end?

CONTINUED

*DEPARTMENT OF ORTHOPAEDIC SURGERY*
**Two Medical Park, Suite 404, Columbia, SC 29203**
**803-434-6812, FAX 803-434-7306**

USC(Irani)0930



UNIVERSITY OF SOUTH CAROLINA
SCHOOL OF MEDICINE

UNIVERSITY SPECIALTY CLINICS®

MAY 2, 2012
RE: DR. AFRAAZ IRANI, PGY-2 RESIDENT
PAGE 3

In summary, it is certainly difficult to condense my entire experience with Dr. Irani in a short letter. However, I have quite a bit of experience with several friends and other colleagues who have had to make several decisions with alterations in their career path.

Again, I think Afraaz is an amazingly intelligent person who is destined for great things. I have told him this on several occasions, and I truly believe this. I believe that he has the intelligence and desire to unlock the keys of a problem one day that others have not been able. However, as I have also expressed to him on a number of occasions, I do not believe that orthopaedic surgery and/or any other clinical subspecialty is the way he is going to do this. I do not get any sincere passion or desire for him to return to an orthopaedic residency and to pursue any type of clinical career. As with many people facing an alteration in career path, it can very frustrating. We have talked about options of taking a year off and exploring those types of opportunities, and I have also placed him in contact with several orthopaedic companies involved in new and innovative device development. I believe he has contacted several of those companies regarding those opportunities.

Lastly, I would like to reiterate that I think that we are dealing with a very talented person whose talents clearly involve areas other than clinical medicine. I do not believe that Afraaz will excel in any manner in clinical medicine and do not believe that he belongs in an orthopaedic residency program. He does not demonstrate the level of passion or desire one would expect from even a first year resident. I believe that this may be a major contributor to Dr. Irani's difficulties. I believe it is a lack of desire and passion that translates into tardiness and ultimately poor patient care. Again, I have mentioned this to him on several occasions and have not gotten much push-back from him, even when posing him the question. I truly believe that if given the option of a job in industry or development as opposed to clinical medicine and/or patient care, that Afraaz would take the former. I look forward to continuing a friendship with Afraaz and being of assistance in his growth in another manner. Again, I do not believe this will be in clinical medicine.

Sincerely,


Jeffrey A. Guy, M.D.
Chief of Sports Medicine, University of South Carolina

JAG/tlh

19146439.1

USC(Irani)0931

DEFENDANT'S
EXHIBIT
5-1
Irani

**From:**          Afraaz Irani <afraaz.irani@hotmail.com>
**Sent:**          Wednesday, March 28, 2012 8:19 PM
**To:**            John Eady
**Cc:**            David Rothstein
**Subject:**       RE: next steps.

Dr. Eady,

Thank you for your reply.  I apologize for the miscommunication. I appreciate your help and kind understanding.

My assumption was that I would turn over my complaint to the RRC to help discredit Drs. W,K etc. in parallel with fighting this at the Palmetto Health level. Or should I approach the RRC with complaints about the program only after I am reinstated? When and what order do you foresee the RRC's involvement?

If I get reinstated, then at that point will I be in technically "good standing" where I can attempt to enlist their help with getting an alternate position?    My apologies -- I believe I was attempting to do everything simultaneously, instead of the appropriate order.

Again your help and support mean a lot to me during this difficult time.

Thank you,
Afraaz

---

Date: Wed, 28 Mar 2012 04:14:46 -0700
From: jl_eady_98@yahoo.com
Subject: Re: next steps.
To: afraaz.irani@hotmail.com
CC: DERothstein@mindspring.com

Afraaz,
     I was not as clear as needed in my advice, it appears. The RRC will not allow you to transfer to another Orthopaedic residency program if you are not a resident in good standing in your present program. Mr. Rothstein will need to help you with the legal aspects of your situation as I am only a want to be lawyer. However, the reality is that you are in a life or death situation, and only by completely discrediting Drs. W,K, etc will you prevail in Orthopaedics. If you are not a resident in good standing the RRC won't get involved. If you decide to pursue legal redress (which is the only one with a chance of success in my opinion) I will help all I can in support of your goal. I have some helpful data about Dr. K's lack of supervision of residents, staff and patient mistreatment at the VA that may help. Mr. Rothstein will have to advise you if that would be helpful and admissable in court proceedings. As I said to you in our meeting, I will do whatever is ethical, possible and legally admissable to expose the perfidy of the involved individuals. JLE

From: Afraaz Irani <afraaz.irani@hotmail.com>
To: John Eady <jl_eady_98@yahoo.com>
Cc: David Rothstein <derothstein@mindspring.com>
Sent: Tuesday, March 27, 2012 6:54 PM
Subject: next steps.

Dr. Eady,

Irani003934

1

Thank you for all your help during this difficult time. If you have a chance to look over the document I attached on my email to Mr. Rothstein that would be great since you might have more insight into how physicians and the GMEC would react to that letter. I recognize you are very busy, so any time would be much appreciated.

My plan is to work with Mr. Rothstein, to develop a cover letter/finalize the document hopefully with your input and move forward.

We had talked about the next step being exploring other programs and the possibility of the RRC letting me add on a spot to an existing program. My goal is to submit the letter to the RRC and request an add on resident spot. In the mean time I am thinking about starting conversations with other programs.

I was wondering what your thoughts were about reaching out to those I know from medical school. Namely talking to the program director at Stanford (Dr. Ivan Cheng). They applied for expansion to six residents a couple years back, but got approved for five. I had talked to him before – at that time all he could tell me was there were no openings. I am also considering speaking with Dr. Stuart Goodman from Stanford whom I did research with as well and wrote me a letter of recommendation.

Also I noticed that Dr. Lawrence Marsh from the University of Iowa sits on the orthopaedic board for the RRC (http://www.acgme.org/acWebsite/RRC_260/260_comMemb.asp). I know Dr. Chuck Clark from the Univ. of Iowa and he also wrote me a letter of recommendation. I was considering contacting him about the RRC as well as about possibly transferring to their program?

I also have a letter of recommendation from Dr. Eric Johnson at UCLA who heads the division orthopaedic trauma as well as Dr. Ryan Goodwin, the program director at the Cleveland Clinic.

I was wondering if you know anything about these programs or the individuals above, and what your thoughts are about beginning to contact them, and any advice for that.

I know you had also mentioned contacting MUSC. If you wouldn't mind seeing what the options there are, I would be tremendously grateful, as that seems like a great place to train. (I have attached my resume).

Please let me know your thoughts, and thank you so much for your time. I can meet up anytime if that is more convenient for you as well.

Thank you,
Afraaz

Irani003935

**From:**       Afraaz Irani <afraaz.irani@hotmail.com>
**Sent:**       Friday, March 30, 2012 12:52 PM
**To:**         John Eady; David Rothstein
**Subject:**    FW: Palmetto Health Richland Orthopaedic Surgery

Hello,

I spoke with  Susan Mansker (312) 755-5028  (Associate Executive Director of the RRC for Orthopaedic Surgery) who referred me over to Marsha Miller (who is in charge of resident complaints). Ms. Miller essentially said that the RRC role is to affect accreditation (her complete response is below). She said I may file a formal complaint, in which case they will begin an investigation and move it in front of the RRC.

I am assuming I am correct in assuming our strategy here is to file a formal complaint soon so that the investigation can begin, and the fact that an investigation is being performed will help put pressure on GMEC, grievance council, etc?

I also spoke with Lin Hearn (lin.hearne@palmettohealth.org 803-296-7883) who is the business associate who is assigned to me. She offered to meet next week to go over how the grievance council works and help copy or prepare any documents.

She said that the earliest the grievance council can meet is April 11th (the day after GMEC meeting was conveniently the "only" day that Drs. Walsh and Koon could meet). Alternatively she said I could initiate the request for a grievance council April 11th, and delay the grievance council until much later, but right now I see no reason to do that, so we are scheduled for April 11th grievance council at this point.

I am going to request the remaining documents that Dr. Koon has not turned over namely: all the memorandums regarding review of my performance during the probation period, the nursing complaints about TF 375 that were never turned over to me, and the memorandum from Dr. Wood regarding the haemophiliac patient.

Right now the next step would be to prepare the writeup formally and submit a formal complaint is the plan. Please let me know your thoughts.

Thank you again for all your help.

Afraaz

---

From: mmiller@acgme.org
To: afraaz.irani@hotmail.com; adunlap@acgme.org; pderstine@acgme.org; smansker@acgme.org
Date: Fri, 30 Mar 2012 10:25:17 -0500
Subject: RE: Palmetto Health Richland Orthopaedic Surgery

Dear Dr. Irani,

DEFENDANT'S EXHIBIT
52
Irani

Irani003936

I am sorry for your plight, but the ACGME does not adjudicate disputes between program directors and residents and you must avail yourself of all the resources available within the institution. The ACGME cannot get involved in the institution's due process proceedings. The ACGME's role is to make sure that they have policies and procedures for due process. Please know that the ACGME cannot help you personally and all that it can do is affect the program's accreditation for violating ACGME requirements.

After the hearing, if you have evidence that it was unfair, you can file a formal complaint at that time as you won't know whether the hearing was unfair until you've had it. Please remember that unfair is **not** that you do not like the outcome. Unfair is that they did not follow their own policies and procedures. In regard to the harassment, we can address that at the same time as the due process issue. You may want to obtain legal counsel for your hearing if it is allowed. Most often the institution allows an attorney to be present to advise the resident, but not to speak because it is not a court of law. And for the discrimination issue, you may want to contact the Equal Employment Opportunity Commission and file a complaint with them. The ACGME does not address discrimination except within the context of harassment.

If you file a formal complaint after the hearing, it must be in writing and signed. Email is fine, but we will need your signature on the email. Remember the complaint is not going to help you, but will help the residents that are there and those that follow if your allegations are true.

I am sorry that this is not the answer you were hoping for, but the ACGME has educational oversight and not administrative oversight.

Sincerely,

Marsha Miller

Associate Vice President

Office of Resident Services

---

**From:** Afraaz Irani [mailto:afraaz.irani@hotmail.com]
**Sent:** Friday, March 30, 2012 9:59 AM
**To:** Marsha Miller; Amy Dunlap; Pam Derstine; Susan Mansker
**Subject:** Palmetto Health Richland Orthopaedic Surgery

To whom it may concern:

Irani003937

I am a PGY-2 resident at the Palmetto Health Richland Orthopedic Surgery Program in Columbia, South Carolina.

I am writing to you as I have become extremely concerned about the unethical behavior and harassment I have been subjected to from my program director and chairman of my department.

I have attempted to bring my concerns before the appropriate local committees, but have been disappointed by their unwillingness to listen to my grievances; I have been denied due process.

At this point, I feel that I have nowhere else to turn. I was encouraged to contact you by a physician who is sympathetic to my plight.

I have been the subject of racially-based harassment by my program director, and have been singled out for disciplinary actions for minor infractions.

This pattern of behavior has been evident throughout my PGY-2 year, when my program director -- who constantly refers to me as "Achmed the terrorist," and makes constant insinuations about my cultural background – has repeatedly submitted documents to the GMEC which are patently false, in order to attempt to demonstrate a pattern of unsatisfactory behavior on my part. He placed me on probation only six weeks into my PGY-2 residency, based on several unsubstantiated allegations. He has ignored multiple requests for clarification of these allegations, and I have been unable to get any independent verification of his allegations.

My program director has gone out of his way to attempt to discredit me in front of other faculty members, alleging improper care despite clear evidence to the contrary (including from other faculty and residents).

He has further alleged deficiencies in my knowledge base, despite evidence to the contrary. In fact, my OITE score easily outpaced that of my fellow co-resident.

Needless to say, such constant harassment makes it nearly impossible for me to focus on my education and patient care.

My program director has continued to present false statements to the GMEC. For example: in one case he alleged improper care in the case of a trauma patient. I was not involved in the patient's initial resuscitation, and many of the allegations did not involve me. He refused to ask for my side of the story, in complete violation of,

3

Irani003938

and with complete disregard for, the hospital's policy. He turned over these factually incorrect complaints to the GMEC for my suspension.  I was denied a fair hearing or due process.

More egregious were the multiple times I asked for documentation of the allegations of poor care, and they (and the DIO) refused to turn over these documents.

I have each time I protested to the DIO, but to no avail. In fact, even my request for a hearing before the grievance council was denied.

It is noteworthy that the program has an unusually high attrition rate; they are trying now to get rid of a third resident over the span of about four years, a fact they seem to be proud of (my program director emphasized this to me only six weeks into my residency).

The actions of my department recently culminated with them moving to have me terminated from the residency program at the upcoming April 10th GMEC meeting. I am very disappointed and concerned, since their behavior has been unethical, deceitful, and illegal.

I am not confident in the checks and balances at a hospital where the chairman and program director can regularly violate hospital policy, and where my chairman assures me of the outcome of a GMEC committee meeting before any proceedings.

I implore you to help me in this situation. Please help me get due process, and investigate this pattern of targeted resident behavior. I have worked hard, and sacrificed much to become an orthopedic surgeon, and I feel that those entrusted with my education have reneged on their commitment.

Sincerely,

Afraaz Irani, M.D.

Irani003939

DEFENDANT'S
EXHIBIT
53
Irani
PENGAD 800-631-6989

**From:** Afraaz Irani <afraaz.irani@hotmail.com>
**Sent:** Sunday, April 01, 2012 1:11 PM
**To:** John Eady
**Cc:** David Rothstein
**Subject:** RE: Additional item

Dr. Eady,

Thank you again for those very helpful comments. The write-up at the time of my last draft focused on K, but the violators spread beyond that.

I didn't know if we would be diluting the focus so I didn't bring out other facets. However, you raise a point that is very relevant to something not fully brought out before and perhaps needs to be regarding Wood: After I dictated a discharge summary on that VA patient I had never seen, I clarified who the patient was and everyone that was involved in this veteran's care to Dr. Koon. This was the incident where Dr. Koon got so upset he would have fired me on the spot. At our subsequent meeting (Nov 21st), Dr. Wood was with him to review my performance.

This was the meeting that represented a sharp change in tone. At this meeting, Dr. Koon started citing inadequacies in preparing the AM list from back in *June 2011*.

It was clear that complaint could only have been furnished by Dr. Wood, as she was chief resident at that time, and was the only one who had a problem with the list.

Moreover, at that meeting, Dr. Wood also stated how upset she was about my email to Dr. Koon regarding the discharge summary she had not completed – that I was assigned to do instead. (I have included Kenny's email below since it summarizes the chain of events).

The feedback Dr. Wood gave me at that meeting was that I was "starting to sound like Lamoreaux."

At the follow-up staff meeting on December 5th, Dr. Koon alleged I delivered improper care to the patient who Grabowski wanted to get an MRI. The only person I talked to about that patient was Dr. Wood; it is clear that this incident supplied to Dr. Koon by her. I really think she tried hard to create something that wasn't there. After that incident, it was very apparent that she was feeding Dr. Koon complaints about my performance, since the incidents involved only involved her and me.

Again, like you pointed out, I haven't been perfect, but I know for a fact that Dr. Wood has been actively looking to find and report errors on my part since mid-November, when she took affront at my email making apparent that she had reneged on her assignment (the other residents know this too).

Your comment regarding lacking resident oversight as dictated by Medicare, the VA and the RRC is especially relevant. Medicare regulations, are violated every week at our Monday staff clinic. About 20% of those patients have Medicare. The attending (who 80% of the time is Dr. Koon) shows up about an hour late and leaves early (Dr. Walsh usually shows up about 2 hours after clinic begins). Medicare rules require that an attending see patients, but none of these patients are seen by the attending. Dr. Voss is the only one who insists on seeing all Medicare patients. I actually went through the records of 8 staff clinics and have a list of about ~60 patients that should have been seen by an attending, but were not. It sounds like bringing this to the forefront would be useful.

Irani003940

Additionally, I was wondering if you have been in touch with the RRC, as I could then refer to you in cases where I am unable to provide direct evidence (e.g. lack of resident oversight).

Lastly, I have been considering moving the date of the grievance council hearing back (from April 11th), as that would give me time to file a complaint with the RRC, and would give the RRC time to investigate (they are given one month to investigate). I think the grievance council would be more willing to listen to my side of the story if they knew the program was being investigated by the RRC. What are your thoughts on that?

Thank you. Again I cannot express how much your help really means to me.

Afraaz


----------

Letter from Kenny to Justin in its entirety:

Justin,

I don't know how much you've heard about the latest flap between Dr. Koon and Afraaz regarding the VA patient. Afraaz calls me occasionally with details regarding the drama. I know that Herzog also gets these calls. We're fine to talk with him since we know him as well as anyone due to us having worked with him on call last year. I have enough to worry about between trying to get organized at the VA, OITE prep, fellowship applications, getting hounded by Jennifer Miley for research garbage that I don't care about, and my family that I am not looking to get sucked into something that doesn't directly involve me. However, I felt that I needed to say something as I feel this is more of a witch hunt than anything.

The patient in question was a patient that I think you transferred over to Richland from the VA (Edison Fairey?). You wrote the Richland H&P, Wood (who was on spine at the time when nothing was really going on with spine, and certainly minimal to no inpatients) saw him and wrote notes on 2 days, and Walker wrote the note the day he was discharged (he was on Hand). Afraaz was busy at that time with the Sports service.

Apparently Koon told Afraaz to do the discharge summary after it had been left undone for a while. It had been initially sent to Wood who, from the looks of it on PowerChart, refused it and sent it to Walker since he wrote the note the last day. Walker told me that Wood told him that everything was done and all he needed was a note for the date of discharge and a discharge order. Somehow, Afraaz had the discharge order put in under his name. He never saw the patient. After the D/C summary had been refused, it ended up in Koon's hands, who for some reason assigned it to Afraaz.

We can argue about whether or not Afraaz should have just sucked it up and done it, but the fact of the matter is that this isn't the first time that Jennifer has dumped something for which she should have been responsible on someone else to do. It actually happened again this past Monday morning when she made Goodno, who was post-call and trying to get over to the VA, call a consult to HIM on a Koon patient when she was on Koon's service. She also got after Walker for not showing up to rounds this week (he had no inpatients and there are a total of 5 residents on service at Richland) when a patient assigned to Koon didn't get seen.

I realized long ago that Jennifer doesn't care about anyone but herself. Whatever. But when it starts impacting people who are already in trouble I have more of a problem with it. In my opinion, if Jennifer had done what she should have, none of this would have been an issue. Again, I am an impartial observer in all of this but thought that you needed to hear a different side of the story.

Kenny

Irani003941

Date: Sat, 31 Mar 2012 07:16:38 -0700
From: jl_eady_98@yahoo.com
Subject: Additional Item
To: afraaz.irani@hotmail.com
CC: DERothstein@mindspring.com

Afraaz,

   I recommend you also send a letter to the RRC stating specifically that you were denied the chance to engage in your regualarly assigned rotation at the VA beginning in Jan, and this a. prevented you from being educated on a rotation that all other residents are assigned, and b. the opportunity to get an unbiased evaluation of your performance by the Orthopaedic staff at the VA, who have no ties with the university staff. Mr. Rothstein will need to advise you about adding a comment that this was the only way a former resident was able to show the performance bias K W etc have about residents of different ethnic, racial or religious groups they discriminate against, and which does affect the resident's educational content. If Mr. Rothstein agrees, you may want to discuss with Chad Lamereaux the details of his issues about K,W etc, since there are legal restraints we all must honor in this matter.  In your letter to the RRC, I would also emphasize that a careful evaluation of the present practices of the Dept of Ortho at PH/USC will show residents are being used to solve service needs of these institutions, not the educational ones of the residents, and that their acts do not connform to their policies. This last fact is a duty of the RRC to address, and will stir its inertia. Lastly, I can help you with negating any statement Dr. Wood, the senior resident, may make about your performance as I have documentation of her failure to perform her duty in the completion of patient records in over 250 incidences within a 5 month period, and which I had to personally address.  No punitive actions were taken against her in this matter. I also have facts that will show K did not supervise any activities of residents at the VA for the entire time a patient he did a total knee on was in the hospital, and the veteran's kneet got infected that had to be debrided by me within a month after the primary operation ( I was out of town the entire time the veteran was hospitalized for his primary surgery, so K can't say someone else was responsible for this duty).  If Mr. Rothstein agrees, you should add you can show K, etc don't supervise residents as required by RRC and federal medicare as well as VA rules.

   Maybe this will be helpful. JLE

Irani003942

**From:**        Afraaz Irani <afraaz.irani@hotmail.com>
**Sent:**        Monday, April 02, 2012 3:47 PM
**To:**        John Eady
**Cc:**        David Rothstein
**Subject:**        RE: Additional item



DEFENDANT'S EXHIBIT
5-4
Irani

Dr. Eady,

Thank you for your response. I went ahead and delayed the grievance council, so that the RRC can start rustling some feathers before the meeting. You raise a good point about resident supervision. I was curious. Are inpatients required to be seen by an attending every day they are in the hospital? It is not uncommon for post-op patients to have surgery and then not ever checked on by an attending (or maybe checked once) during the hospital stay, and otherwise only seen by resident every day. Is that legal? Is that OK by RRC guidelines? This is something I was wondering, but had no idea what proper care is.

It sounds like we need to add some stuff to the document, beefing up and bringing more to the forefront the improper resident supervision and examples of that.

Thank you,
Afraaz

---

Date: Sun, 1 Apr 2012 12:45:48 -0700
From: jl_eady_98@yahoo.com
Subject: Re: Additional item
To: afraaz.irani@hotmail.com
CC: DERothstein@mindspring.com

Afraaz,
    I will happily share what I have concerning lack of resident oversight by KVW with the RRC if they request it. You need to also keep your stuff handy. I have recently contacted the RRC about the rumored elimination of the Orthopaedic resident rotation at the VA but was told a resident or residents had to raise this issue before they would investigate. Therefore, your raising it will affect their inertia. You must clear the following with Mr. Rothstein but one way of showing K/W have little basis on which to judge you is with proof that they don't do their duty of resident supervision and are depending on second hand (Wood) data instead of first hand observations. I don't know if the GMEC will delay the hearing but getting it delayed would seem to me to be a help for you. However, you must get Mr. Rothstein's advice about this as I really don't know.  JLE
**From:** Afraaz Irani <afraaz.irani@hotmail.com>
**To:** John Eady <jl_eady_98@yahoo.com>
**Cc:** David Rothstein <derothstein@mindspring.com>
**Sent:** Sunday, April 1, 2012 1:11 PM
**Subject:** RE: Additional item

Dr. Eady,

Thank you again for those very helpful comments. The write-up at the time of my last draft focused on K, but the violators spread beyond that.

Irani003943

**From:**          Afraaz Irani <afraaz.irani@hotmail.com>
**Sent:**          Sunday, April 08, 2012 10:16 AM
**To:**          John Eady; David Rothstein
**Subject:**       final edits.
**Attachments:**   Cover Letter.doc

Hi,

I will be submitting the formal signed complaint tomorrow, as well as calling the RRC. If you don't mind looking it over and giving any final thoughts. I will let them know that the full document will follow shortly.

Dr. Eady, there is a line in there that states that "I was encouraged to contact you by a physician who is sympathetic to my plight." Your name is not used, but I hope you are OK with that?

Please let me know if you have any final comments, or feedback and then we will submit the full writeup with all the supporting documents soon.

Thanks again for all your help and support,
Afraaz



DEFENDANT'S EXHIBIT
5-6
Irani
PENGAD 800-631-6989

Irani003952

To whom it may concern:

I am a PGY-2 resident at the Palmetto Health Richland Orthopedic Surgery Program in Columbia, South Carolina.

I am writing to you as I have become extremely concerned about the unethical behavior and harassment I have been subjected to from my program director and chairman of my department.

I have attempted to bring my concerns before the appropriate local committees, but have been disappointed by their unwillingness to listen to my grievances; I have been denied due process.

At this point, I feel that I have nowhere else to turn. I was encouraged to contact you by a physician who is sympathetic to my plight.

I have been the subject of racially-based harassment by my program director, and have been singled out for disciplinary actions for minor infractions.

This pattern of behavior has been evident throughout my PGY-2 year, when my program director -- who constantly refers to me as "Achmed the terrorist," and makes constant insinuations about my cultural background – has repeatedly submitted documents to the GMEC which are patently false, in order to attempt to demonstrate a pattern of unsatisfactory behavior on my part. He placed me on probation only six weeks into my PGY-2 residency, based on several unsubstantiated allegations. Requests for clarification of these allegations have been denied, and I have been unable to get any independent verification of his allegations.

My program director has gone out of his way to attempt to discredit me in front of other faculty members, alleging improper care despite clear evidence to the contrary (including from other faculty and residents).

He has further alleged deficiencies in my knowledge base, despite evidence to the contrary. In fact, my OITE score easily outpaced that of my fellow co-resident.

Needless to say, such constant harassment makes it nearly impossible for me to focus on my education and patient care.

My program director has continued to present false statements to the GMEC. For example: in one case he alleged improper care in the case of a trauma patient. I was not involved in the patient's initial resuscitation, and many of the allegations did not involve me. He refused to ask for my side of the story, in complete violation of, and with complete disregard for, the hospital's policy. He turned over these factually incorrect complaints to the GMEC for my suspension. I was denied a fair hearing or due process.

Irani003953

More egregious were the multiple times I asked for documentation of the allegations of poor care, and they (and the DIO) refused to turn over these documents.

I have each time protested to the DIO, but to no avail. In fact, even my request for a hearing before the grievance council was denied.

Additionally, I was denied the chance to engage in our regularly assigned rotation at the VA beginning in January, and this prevented me from being educated on a rotation that all other residents are assigned. It also denied me the opportunity to get an unbiased evaluation of my performance by the Orthopedic staff at the VA.

It is noteworthy that the program has an unusually high attrition rate; they are trying now to get rid of a third resident over the span of about four years, a fact they seem to be proud of (my program director emphasized this to me only six weeks into my residency).

In fact, a careful evaluation of the present practices will show residents are being used to solve service needs of the institutions, not the educational needs of the residents – not conforming to resident education policies.

The actions of my department recently culminated with them moving to have me terminated from the residency program at the upcoming April 10th GMEC meeting. I am very disappointed and concerned, since their behavior has been unethical, deceitful, and illegal.

I am not confident in the checks and balances at a hospital where the chairman and program director can regularly violate hospital policy, and where my chairman assures me of the outcome of a GMEC committee meeting before any proceedings.

I implore you to help me in this situation. Please help me get due process, and investigate this pattern of targeted resident behavior. I have worked hard, and sacrificed much to become an orthopedic surgeon, and I feel that those entrusted with my education have reneged on their commitment.


Sincerely,


Afraaz Irani, M.D.