# Exhibit C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

Afraaz R. Irani, M.D.,          )
                                )    C/A No. 3:14-cv-03577-CMC-KDW
        Plaintiff,              )
                                )
vs.                             )
                                )
Palmetto Health;                )
University of South             )
Carolina School of             )
Medicine; David E. Koon,       )
Jr., M.D., in his              )
individual capacity; and       )
John J. Walsh, IV, M.D.,       )
in his individual              )
capacity,                       )
                                )
        Defendants.            )
_____)

DEPOSITION OF

KATHERINE STEPHENS, PhD, MBA, FACHE

*******************

Friday, August 14, 2015
9:06 a.m. - 2:56 p.m.


        The deposition of KATHERINE G. STEPHENS, PhD, MBA,

FACHE, taken on behalf of the Plaintiff at the law offices

of Ogletree, Deakins, Nash, Smoak & Stewart, P.C., 1320 Main

Street, Suite 600, Columbia, South Carolina, on the 14th day

of August, 2015, before Lyn A. Hudson, Court Reporter and

Notary Public in and for the State of South Carolina,

pursuant to Notice of Deposition and/or agreement of

counsel.

```
 1        School of Medicine.
 2   A:   And that's the name of them.
 3   Q:   Okay.
 4   A:   The way that they're phrased the ACGME allows phrasing
 5        to include a medical school affiliate and the name.
 6   Q:   And I know you're not, I assume you've not had any
 7        legal training.  You are not a lawyer?
 8   A:   I am not.
 9   Q:   Okay.  And I'm not asking for a legal definition of the
10        partnership.  But in your common understanding of the
11        term partnership, would you describe the relationship
12        between Palmetto Health and USC School of Medicine in
13        connection with the Graduate Medical Education Program
14        as a partnership?
15   A:   It's an affiliation that we have.  And we do contract
16        for services back and forth.
17   Q:   Okay.
18   A:   It's required to be, we are required to have an
19        affiliation with the medical school.  And we do.  And
20        we have for, since the, I guess the start of the
21        medical school.
22   Q:   Okay.  So you would prefer to use the term affiliation
23        rather than partnership?
24   A:   I don't know the difference in the two in terms of what
25        you're getting at from a legal point of view.  Partner
```

```
1         is a very general term that's used in many ways.  So if
2         you're looking at what's required for the accreditation
3         affiliation is what's required.
4   Q:    Okay.
5   A:    We partner in many ways with many people.
6   Q:    And would you, you would agree with me that there is
7         common leadership between the USC and Palmetto Health
8         in terms of running the Graduate Medical Education
9         Program?
10  A:    In most of those.  Yes.
11  Q:    Okay.  In fact, I think your recent appointment as an
12        associate dean is an example of that; right?
13  A:    I think that's also to look at trying to strengthen the
14        relationship.
15  Q:    Okay.  And I think recently within the last day or two
16        are you aware that the Graduate Medical Education or
17        the Palmetto Health web site for Graduate Medical
18        Education has changed?
19  A:    I haven't seen it.
20  Q:    Okay.
21  A:    I know there are changes under way.  But I haven't seen
22        it.
23  Q:    Have you been to, have you ever been to the Palmetto
24        Health Graduate Medical Education portions of the web
25        site?
```

Allen Court Reporting

```
 1         program directors are reviewed there.  There is also a

 2         review of accreditation actions taken, approval of

 3         plans for addressing citations.  There are many things

 4         that are required by the ACGME for the meeting.  And we

 5         also use that time for other things as well.

 6         Information sharing that is useful to that body with

 7         reports that are made by the Palmetto Health and

 8         typically by the CMO and CAO, the dean of the medical

 9         school and also from the VA, we have a VA

10         representative that makes reports typically to us.  The

11         residents council does a report each time and we look

12         at resident research.

13    Q:   All right.

14    A:   That's patient safety and quality.  Yeah.  That's in

15         there as well.  Every meeting.

16    Q:   Now you said the Accreditation Council --

17    A:   Uh-huh (affirmative response).

18    Q:   -- requires certain things that the GMEC do.

19    A:   Uh-huh (affirmative response).  Yeah.

20    Q:   You're talking about the ACGME requires certain things;

21         right?

22    A:   Yes.

23    Q:   How does the ACGME require Palmetto Health do

24         something?

25    A:   How do they require it?
```

Allen Court Reporting

```
 1   Q:    Yes.
 2   A:    There is a set of accreditation requirements for
 3         sponsoring institutions.  And when there is an
 4         accreditation site visit for the institution, the site
 5         visitors will review a set of minutes for the, for an
 6         entire twelve-month period to look at them and see if
 7         things have been documented that were required by the
 8         ACGME.
 9   Q:    Okay.  Now, to be an accredited institution through the
10         ACGME, there are certain standards that you as a
11         sponsoring institution have to meet; isn't that right?
12   A:    That's correct.
13   Q:    Okay.  And the ACGME publishes certain requirements
14         that are overall requirements that every residency
15         program in general has to meet to be accredited; right?
16   A:    The common program requirements?
17   Q:    Yes.
18   A:    There are common program requirements.  Yes.
19   Q:    And there are also program requirements that are
20         specific to each specialty; right?
21   A:    That's correct.
22   Q:    And the ACGME mandates that if you want to be an
23         accredited residency program in a certain specialty you
24         also have to meet the specific program requirements;
25         right?
```

| | | |
|---|---|---|
| 1 | A: | Correct. |
| 2 | Q: | And that's a part of being an accredited institution is |
| 3 | | you commit to meeting those accreditation requirements; |
| 4 | | right? |
| 5 | A: | Yes. |
| 6 | Q: | Is accreditation an important criteria or an important |
| 7 | | achievement to have to be a functioning Graduate |
| 8 | | Medical Education Program? |
| 9 | A: | It's a necessity. |
| 10 | Q: | Well, what would it mean if Palmetto Health were not |
| 11 | | accredited? |
| 12 | A: | If the sponsoring institution were not accredited? |
| 13 | Q: | Right. |
| 14 | A: | Then the residency programs would not be accredited. |
| 15 | Q: | Okay. |
| 16 | A: | They would lose accreditation. |
| 17 | Q: | And what if the residency programs, what impact would |
| 18 | | it have on the residents if the residency programs lost |
| 19 | | their accreditation? |
| 20 | A: | The institution, sponsoring institution would have to |
| 21 | | find places for those residents to complete their |
| 22 | | education. |
| 23 | Q: | If, for example, the Orthopedic Surgery Department lost |
| 24 | | its accreditation at Palmetto Health USC School of |
| 25 | | Medicine, could those residents who were in the program |

Allen Court Reporting

```
1        become board-eligible orthopedic surgeons without

2        graduating from another program?

3   A:   Well, they couldn't continue in a program that's not

4        there.  They would have to be transferred to a program

5        that was accredited to complete their training.

6   Q:   Okay.  So if the USC Palmetto Health program lost its

7        accreditation, the residents couldn't continue their

8        training sort of at an unaccredited institution?

9   A:   The sponsoring institution is obligated to work with

10        other accredited programs to find spots.

11   Q:   Okay.  But as a practical matter if, let's say tomorrow

12        the ACGME came in and said we're pulling the USC School

13        of Medicine's accreditation program for the Orthopedic

14        Surgery Department, the people that are currently in

15        that program, they couldn't just say, well, we're going

16        to continue our training and become board-certified

17        orthopedic surgeons regardless of what the ACGME says;

18        right?

19   A:   What you're describing is something that's not, that

20        can't happen.  So it's hard to answer that question.

21   Q:   And why can't that happen?

22   A:   Because if there should be a decision by the residency

23        review committee for Orthopedics that program would be,

24        the accreditation would be withdrawn.  The

25        accreditation would not be withdrawn until the end of
```

Allen Court Reporting

| | | |
|---|---|---|
| 1 | | a progressive policy? |
| 2 | A: | I'm glad you asked that because Palmetto Health's |
| 3 | | policy did change.  And we have changed this particular |
| 4 | | one since that time. |
| 5 | Q: | Okay.  How has it changed? |
| 6 | A: | It is defined specifically that it is not sequential in |
| 7 | | nature.  This one allows for, Palmetto Health policy |
| 8 | | itself had appeared more sequential in nature.  And it |
| 9 | | allows for going to any level in that ours defined what |
| 10 | | would be at what level.  In here it's not necessarily a |
| 11 | | sequential one. |
| 12 | Q: | Okay.  I'm a little confused. |
| 13 | A: | Uh-huh (affirmative response). |
| 14 | Q: | So the new policy clarifies that it's not necessarily |
| 15 | | progressive or sequential? |
| 16 | A: | No.  It is actually changed to make sure that it is |
| 17 | | always aligned with the Palmetto Health policy as best |
| 18 | | possible while also still conforming to what the |
| 19 | | Accreditation Council for GME requires.  But yeah, this |
| 20 | | one when you look at it and what it defines at |
| 21 | | different levels, you can start at level one.  You |
| 22 | | could start at level three.  You could start at level |
| 23 | | two. |
| 24 | Q: | Okay. |
| 25 | A: | Depends on what the issue is. |

Allen Court Reporting

1      believe that that is inaccurate?

2  A:   I don't have any reason to --

3          MS. THOMAS:  Object to the form.

4  A:   -- one way or the other.

5          MS. THOMAS:  I object to the form of that

6      question.

7  BY MR. ROTHSTEIN:

8  Q:   Okay.  If Dr. Irani had been placed on level one

9      remediation at some point you should have been informed

10      by Dr. Koon?

11  A:   And if it did occur I probably was and just don't

12      remember.  As I said I just can't recall it.

13  Q:   And I understand that a level one remediation can be

14      done either orally or in writing; right?  In terms of

15      how it's communicated to a resident?

16  A:   I don't recall on here what it said.  Oh, it says

17      orally or in writing.  It does say that.

18  Q:   But the resident is supposed to be given an opportunity

19      within a certain defined period of time to remediate

20      whatever identified deficiency is communicated to him

21      whether oral or in writing; right?

22          MS. THOMAS:  Object to the form.

23  A:   The plan is to remediate.  That's why it's done.

24  BY MR. ROTHSTEIN:

25  Q:   How would the program director, Dr. Koon, generally

Allen Court Reporting

```
 1   Q:   Okay.  How is that different from an academic
 2        remediation?
 3   A:   It can be the same.
 4   Q:   Okay.
 5   A:   This is suspension on here.  And that is dealt with for
 6        things that would be like not being paid for being
 7        suspended or those kinds of things.  It could be the
 8        same.  It could be separate.  With the competencies
 9        required by the ACGME, and in most cases it is an
10        academic competence issue as well.
11   Q:   So Dr. Koon had the authority as a Palmetto Health
12        employee or director, program director to suspend?
13   A:   He's not a --
14            MS. THOMAS:  Object to the form of the question.
15   A:   He's not a Palmetto Health employee.  He supervises an
16        employee of Palmetto Health.
17   BY MR. ROTHSTEIN:
18   Q:   Okay.
19   A:   As the program director.
20   Q:   He had the authority in his role as a supervisor of a
21        Palmetto Health employee to suspend Dr. Irani?
22   A:   I don't know that it's, I don't know exactly how that
23        was listed on here.  But it would be, he absolutely
24        could recommend this.  But the approval of it, HR's
25        approval on here, this doesn't have signatures on it
```

## ACADEMIC REMEDIATION

STATEMENT OF POLICY: Each residency program is responsible for assessing and monitoring each resident's academic and professional progress including specific knowledge, skills, attitudes, and educational experiences required for residents to achieve competence in patient care, medical knowledge, practice-based learning and improvement, interpersonal and communication skills, professionalism, and systems-based practice, as well as adherence to departmental policies concerning resident education and the hospital's graduate medical education policies. Failure to demonstrate adequate fund of knowledge or professional decorum adequately in any of these areas may result in academic remediation or more stringent disciplinary and corrective action if deemed appropriate.

PROCEDURES:

1. Each residency program will devise written guidelines concerning resident accountability, monitoring, discipline, and dismissal, all of which are subject to approval and periodic review by the GMEC.

2. Academic Remediation will be generally uniform throughout the hospital's residency programs and will include the following categories:

    2.1 Level I Remediation: may occur for deficiencies for which some degree of academic or professional remediation is necessary. The resident will have the opportunity to remediate the deficiency within a defined period of time. The deficiency and required remediation measures may be communicated either orally or in writing and will be monitored by the Director of Education/Program Director. If the deficiency is corrected, no further action may be taken. Note that GMEC approval is not required for Level 1 remediation, but the DIO should be informed.

    2.2 Level II Remediation: may be imposed for more serious academic or professional deficiencies. The resident will have the opportunity to remediate the deficiency within a defined period of time. The deficiency and required remediation measures will be specified in writing and will be monitored. If the deficiency is corrected, no further action may be taken. The conditions of Level II Remediation may be for variable periods of time, from a minimum of three (3) months to a maximum of twelve (12) months. Moonlighting privileges will be suspended and curriculum credit may be withheld pending the outcome of the remediation measures.

    2.3 Level III Remediation: may occur for serious academic or professional deficiencies. During Level III Remediation, the resident will be removed from his/her clinical rotations and curriculum credit will be withheld. This suspension will be for a specified period of time and specific remediation measures will be required. Following successful remediation of the deficiency, the resident may be placed on Level II Remediation for a specified period of time. Prior remediation may be considered in determining appropriate actions to address further deficiencies, if any.

    2.4 Dismissal - Dismissal of a resident is a rare occurrence. (See Resident Dismissal Policy.)

    2.5 Disciplinary Action - Disciplinary action will be taken for willful or inexcusable breaches of rules or regulations. Such action shall be at Remediation Level I, II, or III, or the resident may be dismissed for incidences that warrant such action.

3. Prior to the imposition of Level II Remediation, Level III Remediation, or Dismissal, the Director of Education/Program Director must submit a recommendation to the GMEC for official action.



Palmetto Health - 000196

4. In the event it is determined that any such remedial action must be imposed prior to a scheduled GMEC meeting, then the Director of Education/Program Director must contact the DIO, who will convene the GMEC Executive committee. The Executive committee will review the circumstances and impose temporary actions, if necessary. However any such action must be reported at the next official meeting of the GMEC for final approval.

5. Whenever remedial action is approved by the GMEC, the Director of Education/Program Director must report the resident's progress at each GMEC meeting until the resident is removed from remediation status.

6. In order to remove the resident from remediation status, the Director of Education/Program Director must submit the recommendation to the GMEC for official action.

January 1, 1991
Date of Initial GMEC Approval

Signature on File
Katherine G. Stephens
Vice President, Medical Education and DIO

Signature on File
James I. Raymond, MD
CHIEF MEDICAL OFFICER

February 24, 2010
Date of Last GMEC Review

Palmetto Health - 000197

## Lin Hearne - Irani_ Afraaz Remediation

| | |
|---|---|
| **From:** | Michelle Wehunt <Michelle.Wehunt@uscmed.sc.edu> |
| **To:** | Katherine Stephens <Kathy.Stephens@PalmettoHealth.org> |
| **Date:** | 8/15/2011 1:57 PM |
| **Subject:** | Irani_ Afraaz Remediation |
| **Attachments:** | Irani_ Afraaz_(19).pdf |

Good Afternoon Kathy,

Please see attached remediation recommendations for Dr. Irani. Should you have any questions please or suggestions please let Dr. Koon know.

Thank you,

-------------------------------------
This e-mail transmission, in its entirety and including all attachments, is intended solely for the use of the person or entity to whom it is addressed and may contain information, including health information, that is privileged, confidential, and the disclosure of which is governed by applicable law. If you are not the intended recipient, you are hereby notified that disclosing, distributing, copying or taking any action in relation to this e-mail is STRICTLY PROHIBITED. If you have received this e-mail in error, please notify the sender immediately and destroy the related message.





UNIVERSITY OF SOUTH CAROLINA
SCHOOL OF MEDICINE

UNIVERSITY SPECIALTY CLINICS

15 AUG 11

Memorandum of Record

Re: Dr. Afraaz Irani (PGY-2 Orthopaedic Resident)

1. Dr. Irani demonstrated significant lack of compassion and empathy in a patient's care in the initial trauma resuscitation. Mr. B. sustained a near forearm amputation and Dr. Irani failed to provide adequate pain medication and ignored nursing requests for same during his initial evaluation. During this encounter he requested the nurse to lie about the initial irrigation / debridement of the traumatic wound.
2. He has repeatedly demonstrated poor communication skills with patients, families, peers, and attending physicians.
3. He has repeatedly demonstrated poor time management with frequent tardiness to required conferences, clinics, and the operating room.
4. He does not demonstrate effective prioritization of clinical duties. This has resulted in additional duties for other residents.
5. He has provided substandard patient care (e.g. closing wounds with Vicryl suture; not evaluating a VA total joint patient with immediate post-operative cellulitis).
6. He received substandard evaluations during his internship.
7. He has displayed a significant lack of attention to detail in his initial PGY-2 rotation.

These deficiencies have persisted despite several verbal counseling sessions from his chief resident, his attending physicians, and his program director.

The attending physicians of the Department of Orthopaedic Surgery would recommend that Dr. Afraaz Irani be place on level II academic remediation from 15 AUG 11 to 01 DEC 11.

Remediation measures would include:

1. Dr. Irani would provide improved patient care, including pain management and wound management / closure.
2. He will answer his pages appropriately and immediately.
3. He will see all orthopaedic consultations as soon as possible.
4. He will display improved communication to peers, ancillary staff, and attending surgeons.
5. He will develop a Grand Rounds presentation of Effective Communication Skills.
6. He will demonstrate improved organizational skills and prioritize clinical duties effectively.
7. He will demonstrate improved attention to detail while on clinical rotations.

David E. Koon, Jr., MD
Program Director

John J. Walsh, MD
Chair, Dept. of Orthopaedics

DEPARTMENT OF SURGERY
Two Richland Medical Park, Suite 402, Columbia, SC 29203
803-256-2657, FAX 803-933-9545

Palmetto Health - 001284



| | |
|---|---|
| **From:** | Katherine Stephens | **Sent:** Mon, 15 Aug 2011 16:53:42 GMT |
| **To:** | David Koon; Michelle Wehunt; |
| **Subject:** | Re: Irani_ Afraaz Remediation |

I will take to the GMEC Executive com. for temporary action. In the meantime, I would like to see a more specific remediation plan that spells out the outcomes expected and how to measure that he has achieved the level expected. I have some examples that we expect to recommend for use in the next version of the GME policy on remediation and will get some examples to you for consideration for this plan.

Thanks,
Kathy

Katherine G. Stephens, MBA, FACHE
Vice President, Medical Education and Research
ACGME Designated Institutional Official
Palmetto Health
Fifteen Medical Park, Suite 202
Five Richland Medical Park Drive
Columbia, SC 29203

803-434-6861 or 803-434-4476

katherine.stephens@palmettohealth.org

>>> Michelle Wehunt <Michelle.Wehunt@uscmed.sc.edu> 8/15/2011 1:57 PM >>>
Good Afternoon Kathy,

Please see attached remediation recommendations for Dr. Irani. Should you have any questions please or suggestions please let Dr. Koon know.

Thank you,

---------------------------------------
This e-mail transmission, in its entirety and including all attachments, is intended solely for the use of the person or entity to whom it is addressed and may contain information, including health information, that is privileged, confidential, and the disclosure of which is governed by applicable law. If you are not the intended recipient, you are hereby notified that disclosing, distributing, copying or taking any action in relation to this e-mail is STRICTLY PROHIBITED. If you have received this e-mail in error, please notify the sender immediately and destroy the related message.

PLAINTIFF'S
EXHIBIT 7
Stephens
8/14/15    LH
PENGAD 800-631-6989

# Katherine Stephens - Re: Department of Orthopaedics.

**From:** Katherine Stephens
**To:** Irani, Afraaz
**Date:** Friday, August 26, 2011 10:26 AM
**Subject:** Re: Department of Orthopaedics.
**CC:** Koon, David

*8/29/11 Dr. Irani stopped by office today while I was out. Returned his call. He was concerned about how his intent was received & how remediation could affect future career aspirations. I advised him to discuss his concerns with Dr. Koon and if not satisfied with response to follow grievance process*

Dr. Irani,

Thank you for your email and the commitment you expressed to improving in the areas identified. The goal of the academic remediation process is to ensure that a resident physician is provided an opportunity to improve in areas of concern and to achieve competence in these areas. I am certain that Dr. Koon will appreciate your positive attitude to constructive criticism with the goal of assisting you in achieving competence.

*KS*

Katherine G. Stephens, MBA, FACHE
Vice President, Medical Education and Research
ACGME Designated Institutional Official
Palmetto Health
Fifteen Medical Park, Suite 202
Five Richland Medical Park Drive
Iumbia, SC 29203

*Arani's cell # 650-353-8523*

803-434-6861 or 803-434-4476

katherine.stephens@palmettohealth.org


PLAINTIFF'S EXHIBIT 10
Stephens
8/11/15 UT

>>> Afraaz Irani <afraaz.irani@gmail.com> 8/22/2011 10:01 PM >>>
Ms. Stephens,

I was recently informed by Dr. Koon, that he would be taking steps to suggest I be placed on academic remediation.

I was very surprised and disappointed to hear this given the positive comments from my peers.

I was handed a sheet with specific complaints against me and told to send you an email to explain the following issues. Please allow me to explain myself regarding the seven points outlined in Dr. Koon's letter:

*1. Dr. Irani demonstrated significant lack of compassion and empathy in a patient's care in the initial trauma resuscitation. Mr B sustained a near forearm amputation and Dr. Irani failed to provide adequate pain medication and ignored nursing requests for same during his initial evaluation. During this encounter he request the nurse to lie about the initial irrigation / debridement of the traumatic wound.*

I always demonstrate the highest level of compassion and empathy in a patient's care. There are many individuals involved in the resuscitation. My job as the orthopaedic resident is to manage the orthopaedic injury in conjunction with the attending. I was consulted on Mr. B after the ER physicians had evaluated the patient and I was at the patient's bedside within 10 minutes. the time of my evaluation the patient had already received pain medication. Given the severity of the trauma in this 82 year gentleman, the severity of the pain would not have been controlled to a level that the nurse in question was attempting to achieve by a safe level of pain medications.

As part of my initial assessment, I unwrapped the initial dressing and given the severity of what was discovered, I immediately

consulted my attending for immediate patient care and plan for OR.

Regarding the accusation about lying about patient care; this is a misinterpretation of the nurse about my comments regarding ...gation. My comments to her were meant to say that usually we irrigate with two liters and I was surprised that an ER physician would irrigate with only one liter. So my statement that it was two liters was under the assumption that routine clinical practices were being followed. I did not irrigate as we already had a plan to go to the OR. My comments to nurse are meant to reinforce what is usually done. However I was not personally involved, nor did I document any irrigation in my note as I did not perform any irrigation, nor was I present during any irrigation.

*2. He has repeatedly demonstrated poor communication with patients, families, peers, and attending physicians.*

I appreciate the fact that these issues have been brought to my attention but as the incident with the nurse above illustrates, I may have been misunderstood. Therefore I will increase my efforts to ensure I am being properly understood, including repeating what I have requested when appropriate. I appreciate the opportunity to spend time focusing on improving my communications skills with the grand rounds presentation which will be prepared in the time provided, as that is important to patient care, regardless of the care giver.

As part of my effort to improve communication, I will notify the appropriate attendings or peers regarding patients who I have been contacted about on call, so that incidents such as the VA patient (below), who I was told by the ER attending that I do not need to see, do not recur. This will also reduce interruption in patient care. This would be along the same lines as patient care/sign outs and hand-offs and understanding what has been accomplished and what remains to be done with patient care.

*3. He has repeatedly demonstrated poor time management with frequent tardiness to required conferences, clinics, and the operating room.*

*4. He does not demonstrate effective prioritization of clinical duties. This has resulted in additional duties for other residents.*

...ny of these items are likely related to times when I have been required by my supervisors and/or attending to remain in one location when I am expected in another location. I frequently contact the location where I am expected to be and notify the nurses so that they may appropriately coordinate patient care. In the future, I will instead speak directly with the physician who is expecting me so that there is no confusion regarding perceived tardiness.

Regarding the additional duties for other residents. I always complete my work that's been assigned to me, often staying beyond recommended work hours, as I do not think it appropriate to burden fellow residents. No resident has brought to this my attention and when I requested that they do so, each of them stated there was no issue. If there are specific instances, I would be happy to help out whoever the resident who was burdened with my duties.

*5. He has provided substandard care (e.g. closing wound with Vicryl suture; not evaluating a VA total joint patient with post-operative cellulitis).*

Whenever I have been notified of errors. In the future I will proactively make my supervisors/attendings aware of a plan of care, and modify as guidance is provided to insure patients never receive substandard care.

*6. He received substandard evaluation during his internship.*

Once these evaluations were made known to me, I made significant improvements based on suggestions that were provided to me. Whenever my superiors raised issues I make every effort to address them and more recent evaluations reflect that. For example in my initial evaluation with trauma, I had the opportunity to discuss my performance with Dr. Bynoe. He offered good constructive suggestions for improvement, which I was glad to receive. I implemented them on my subsequent rotation, and my evaluation seems to reflect that.

*7. He has displayed a significant lack of attention to detail in his initial PGY-2 rotation.*

This might be related to perceived forgetfulness in the OR. Although I think that this too may be related to lack of communication. I am not just leaving things lying around. I am leaving them for specific individuals. I did not however mention that to the individual involved and that gets back to my need for improved communication.

Palmetto Health - 001583

I really appreciate your help and understanding in this matter. I take these allegations seriously as there are cases where an ion like this precludes one from a fellowship, and results in significant difficulty obtaining a job.

I hope you will consider my statements above, and if there are any questions, I would be more than happy to provide third party references to substantiate the above statements, and/or speak with you in person or over the phone.

Thank you for your kind understanding.
Afraaz
650-353-8523

Palmetto Health - 001584



PALMETTO HEALTH

January 11, 2012                    DELIVERED VIA EMAIL

Afraaz Irani, MD
Department of Orthopaedics
2 Medical Park, Suite 404
Columbia, South Carolina 29203

Dear Dr. Irani:

After carefully reviewing the information available to me, and after further discussions with several others, I have decided to uphold the decision concerning your December 9, 2011 academic remediation. An action like this is never simple, and I want to make it clear that our intent in initiating academic remediation is to aid you in meeting academic expectations and to have you complete your training.

If you decide to continue with the grievance process, please refer to the steps outlined in your Resident Manual.

Sincerely yours,

Katherine G. Stephens, PhD, MBA, FACHE
Vice President for Medical Education and Research

KGS/amh

cc: John Walsh, MD, Department of Orthopaedics
    David Koon, MD, Department of Orthopaedics
    James Raymond, MD, Chief Medical Officer

PLAINTIFF'S
EXHIBIT 21
Stephens
8/14/15 CH

Print                                                                                     Close

# Grievance Decision

From:  **Katherine Stephens** (Kathy.Stephens@PalmettoHealth.org)
Sent:  Wed 3/28/12 11:30 AM
To:    afraaz.irani@gmail.com
Cc:    James Raymond (James.Raymond@PalmettoHealth.org); David Koon
       (David.Koon@uscmed.sc.edu); John Walsh (John.Walsh@uscmed.sc.edu)
       1 attachment
       AfraazIraniLtrMar282012.pdf (13.8 KB)

Dr. Irani,

My letter of decision regarding the grievance of your academic remediation is attached.


Katherine G. Stephens, PhD, MBA, FACHE
Vice President, Medical Education and Research
ACGME Designated Institutional Official
Palmetto Health
'ifteen Medical Park, Suite 202
r'ive Richland Medical Park Drive
Columbia, SC 29203

803-434-6861 or 803-434-4476

katherine.stephens@palmettohealth.org

--------------------------------------------------------------------------
PALMETTO HEALTH CONFIDENTIALITY NOTICE
This message is intended only for the use of the individual or entity to which it is addressed and may contain
information that is privileged, confidential and exempt from disclosure under applicable law. If the reader
of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or
copying of this communication is strictly prohibited by law. If you have received this communication in
error, please notify me immediately.





March 28, 2012                          DELIVERED VIA EMAIL


Afraaz Irani, MD
Department of Orthopaedics
2 Medical Park, Suite 404
Columbia, South Carolina 29203

Dear Dr. Irani:

After carefully considering the information available to me, I have decided to uphold the decision concerning your March 1, 2012 academic remediation.

If you decide to continue with the grievance process, your next step is to appeal through Palmetto Health's Human Resources department. Note that the grievance process requires an appeal to occur within ten business days, which is April 11, 2012. Please refer to the Grievance and Due Process policy in your Resident Manual for more information if you choose to appeal further.

Sincerely yours,

Katherine G. Stephens, PhD, MBA, FACHE
Vice President for Medical Education and Research

KGS/amh

cc: John Walsh, MD, Department of Orthopaedics
    David Koon, MD, Department of Orthopaedics
    James Raymond, MD, Chief Medical Officer



UNIVERSITY OF SOUTH CAROLINA
SCHOOL OF MEDICINE

UNIVERSITY SPECIALTY CLINICS®

02 MAY 12

Dear Grievance Committee:

Dr. Walsh and I appreciate the request from the Grievance Committee for additional information regarding the remediation process of Dr. Irani. Below is the requested information and we have explained the rationale underlying each item.

Drs. Voss and Guy have provided summative statements regarding Dr Irani. We have also included the most recent New Innovations evaluations of Dr. Irani's PGY-2 year by these two physicians. We would encourage you to review the Dr. Guy and Dr. Irani email thread from 02 FEB to 05 FEB 12 where Dr. Irani has solicited industry positions within one of our implant manufacturers and sought advice "into careers outside of medicine."

In an effort to be clear, understandable, specific, and thorough, the Executive Committee of the GME, the orthopaedic faculty, and both chief residents (Drs. Hoover and Wood) formulated the Remediation Measures which went into effect 06 FEB 12. Many of these measures addressed prior difficulties that Dr. Irani had in performing at the level expected of every resident at his level of training. For example, under "Patient Care" we listed that he would:
   *Follow patient care plan set out by attending and/or senior resident. If the plan needs to be altered in any way, inform attending and/or senior resident immediately of changes to patient care plan.*
Dr. Irani failed to follow his clinic attending's instructions regarding obtaining an MRI of a patient's extremity the same day, instead allowing the patient to leave the clinic and obtain the MRI at a later date. Not one month into the remediation process, Dr. Irani repeated this pattern of behavior by failing to evaluate a patient admitted for possible compartment syndrome on 01 MAR 12. Dr. Irani was instructed by Dr. Wood to evaluate the patient at 4:00 that morning and he failed to perform this evaluation and admitted as much the following morning. At the time he was first questioned about it (approximately 6 am), he stated that he did not evaluate the patient, and when asked why, he stated "I forgot". Only during a subsequent conversation with Dr Walsh several hours later did he make the statement that he had seen the patient at 2:30 am, yet never documented it. This failure put the patient's limb at risk. This encounter was documented by Dr. Wood shortly after the incident. Dr. Irani again failed to follow his attending's instructions regarding wound care of a post-operative spine surgery patient. Dr. Grabowski's email dated 20 MAR 12 states:
   *Due to concerns of creation of a dural-cutaneous fistula in the event of an ongoing leak, I specifically spoke with Dr. Irani regarding the need for him to personally perform dressing changes on this patient on a daily basis and noting any qound* (sic) *drainage. Despite these clear instructions, Dr. Irani failed to perform this duty.*

*DEPARTMENT OF ORTHOPAEDIC SURGERY*
**Two Medical Park, Suite 404, Columbia, SC 29203**
**803-434-6812, FAX 803-434-7306**



PLAINTIFF'S
EXHIBIT 354
Stephens
8/14/15   CH
PENGAD 800-631-6989

USC(Irani)0953



UNIVERSITY OF SOUTH CAROLINA
SCHOOL OF MEDICINE

UNIVERSITY SPECIALTY CLINICS®

This occurred almost immediately after Drs.Grabowski and Voss had met with him on 28 FEB 12 regarding his care of the same patient. This has been documented in the email dated 27 FEB 12 by Dr. Grabowski which ends by stating:

> *My concern over this is the timing of Dr. Irani's evaluation given the severe nature of the issue surrounding this patient as well as his lack of documentation surrounding a significant post-operative complication.*

Dr Irani failed this competency by failing to perform an adequate history and physical examination of a pre-operative total joint arthroplasty patient. On 27 FEB 12, again not one month into his remediation process, he failed to note that the patient had significant past history issues including MRSA infection, chronic thrombocytopenia, psychiatric issues, Hepatitis C, lack of medical clearance, and the only imaging studies present were greater than two years old. All of these findings are considered extremely important in our pre-operative patients and certainly affect pre-operative planning. All residents at any level of training would be expected to adequately document these issues in a properly done history and physical. Dr. Irani had been counseled by Dr. Walsh during his Hand rotation regarding deficiencies in his H/Ps and yet his continuing inadequate documentation persisted. He has been informed of inadequacies involving documentation of patient care and has repeatedly failed to adequately document patient encounters involving post-operative strength deficits (see Dr. Grabowski memo dated 27 FEB 12) and compartment syndrome assessment (see Dr. Wood memo regarding hemophiliac patient).

Dr. Irani has also demonstrated deficiencies in the competency of Systems Based Practice. We included:

> *Respond to constructive criticism in an appropriate and professional way. Admit and apologize for mistakes and be willing to endorse personal flaws. Take immediate action to correct deficiencies.*

His pattern of evasiveness and refusal to admit responsibility for his actions is consistent with the results of his psychological testing (see page 6 of the testing results). Throughout his tenure here at Palmetto Health, Dr Irani has repeatedly failed to accept responsibility for his actions. His explanations and answers are frequently evasive and he attempts to rationalize his behaviors, even in the face of clear and convincing evidence to the contrary. Despite recently stating "I'm sorry," he does not demonstrate remorse for his mistakes and attempts to explain his shortcomings as other's misperception or his "miscommunication." This has been noted in the memorandum dated 12 DEC 12:

> *He repeatedly refused to give direct answers to several questions and failed to take responsibility for his actions in several patient care examples. Despite attending direction and encouragement to take ownership of his actions, he steadfastly refused to admit any wrongdoing, even when faced with overwhelming evidence to the contrary. He appeared to consistently lack insight into these issues.*

When confronted with the clear mishandling of the post-operative patient with new-onset lower extremity weakness and his lack of following instructions for the hemophiliac patient, he attempted to explain away his mistakes by later changing his version of the

*DEPARTMENT OF ORTHOPAEDIC SURGERY*
Two Medical Park, Suite 404, Columbia, SC 29203
803-434-6812, FAX 803-434-7306

USC(Irani)0954



UNIVERSITY OF SOUTH CAROLINA
SCHOOL OF MEDICINE

UNIVERSITY SPECIALTY CLINICS®

events and entering a "delayed clinical note" in the electronic medical record over 48 hours later to "document" his findings.

Dr. Irani has failed in the competency of Interpersonal and Communication Skills. We included:

> *IV.A.5.d).(1) communicate effectively with patients, families, and the public, as appropriate, across a broad range of socioeconomic and cultural backgrounds; IV.A.5.d).(2) communicate effectively with physicians, other health professionals, and health related agencies; IV.A.5.d).(3) work effectively as a member or leader of a health care team or other professional group.*

His communication skills with the attending did improve after counseling by Dr. Guy. However, he has been unable to work effectively within the health care team. His frequent tardiness to clinics, the operating room, conferences, and rounds during the first one half of his PGY-2 year persisted despite the usual verbal counseling by the attending and senior residents. Therefore this item was added to his remediation measures. He was to be early to rounds each morning, round on each of his assigned patients, and have the list ready for the team. Not even one month into his remediation this pattern of behavior recurred. Dr. Hoover even had to call into the call room and wake him up on 01 MAR 12. This added additional work for other members of the orthopaedic team. Being on time for assigned duties is expected of each resident and was not considered a burdensome requirement of Dr. Irani.

Lastly, Dr. Irani has failed in the competency of Professionalism. He signed the document (memo dated 31 JAN 12) under the paragraph which required "immediate and sustained improvement." He was asked to make a commitment to excellence and ongoing professional development. During his third week of remediation Dr. Irani was quizzed on the relevant spinal anatomy during an operative case with Dr. Grabowski. Dr. Irani was informed that knowing the pertinent anatomical landmarks and confirming these with intra-operative radiographs would keep the surgeon from performing a procedure in the wrong location, the so-called "wrong site surgery." This is a major cause of malpractice litigation within the spine surgeon's realm. Dr. Irani then joked, "What's wrong with that? You just fuse the extra level (the "wrong site") and charge extra." Needless to say Dr. Grabowski found no humor in the comment and was very concerned that Dr. Irani had even broached the subject in this unprofessional manner. This episode in the midst of academic remediation only deepened the faculty's concern that Dr. Irani lacks enough insight into his shortcomings to commit to excellence and ongoing professional development.

In summary, the faculty of the department of orthopaedic surgery had indications very early in Dr. Irani's training of problematic behavior. We attempted multiple avenues of corrective actions including verbal and written counseling by residents and attendings. We sought mentorship and psychological testing. We provided Dr. Irani multiple opportunities for remediation and responded to his requests for measures that were clear, understandable, and specific. We included the psychological recommendation for

*DEPARTMENT OF ORTHOPAEDIC SURGERY*
Two Medical Park, Suite 404, Columbia, SC 29203
803-434-6812, FAX 803-434-7306

USC(Irani)0955



UNIVERSITY OF SOUTH CAROLINA
SCHOOL OF MEDICINE

UNIVERSITY SPECIALTY CLINICS®

counseling and provided him a venue for this in a confidential, non-threatening manner. We reminded him repeatedly that these measures were restorative in nature and not punitive. We provided him and he took advantage of access to the program director, the department chair, and the institutional DIO. We reminded him of, and he utilized, the GME policies regarding the appeals and due process which was afforded to him. Dr. Irani was not expected to behave or perform in any fashion that was not expected of all residents. Given the cumulative nature of these deficiencies, the potential harm to our orthopaedic patients, and the lack of any sustained improvement, the faculty had no other choice but to recommend to the GMEC that Dr. Irani be terminated from the program.

It was also clear that Dr Irani's answers to the committee during the grievance hearing confirm the patterns we have seen of evasiveness, deception, lack of responsibility for his behavior, and lack of insight into the gravity of the mistakes he has made.

We will be happy to provide additional information / documentation as necessary.

David E. Koon, Jr., MD
Program Director
PH / USC SOM Orthopaedic Residency Program

John J. Walsh
Chair, Department of Orthopaedic Surgery

USC(Irani)0956

Summative Statement

Dr. Frank Voss

I have been asked to summarize my impressions of Dr. Afraaz Irani:

"The secret of caring for the patient is caring for the patient" This oft quoted saying of Sir William Osler captures Dr. Irani's problem. In the interactions with patients, he often was very friendly. But as the care became onerous or difficult, Dr. Irani fell far short of what was expected of him as a physician. The heavy narcotic user was discharged with enough pain medication to last 1-2 days. The relatively narcotic naïve patient was encouraged to take 5 Percocet at once. The concern about compartment syndrome did not lead him to ask the nurse to get him from the call room to recheck the patient or sleep fitfully. The concern for the patient did not lead him to premedicate the trauma patient before he manipulated the arm.

I can only conclude he did not really care for the patient. Although these shortcomings impact on patient care, they really fall under the category of professionalism. Similarly to what we have been taught in the Orthopedic Educators Course, these shortcomings have not been remediable. This is the major reason for termination.

5/3/12

PLAINTIFF'S
EXHIBIT 35
Stephens
8/14/15 CH
FERNGAD 800-631-6989

Palmetto Health - 001590



UNIVERSITY OF SOUTH CAROLINA
SCHOOL OF MEDICINE

UNIVERSITY SPECIALTY CLINICS®

May 2, 2012

RE:  DR. AFRAAZ IRANI, PGY-2 RESIDENT, ORTHOPAEDIC SURGERY
     PALMETTO HEALTH ORTHOPAEDIC RESIDENCY PROGRAM

Dear Grievance committee:

I have been asked to write you today with regard to my relationship to Dr. Afraaz Irani.
As you know, Dr. Irani has been our PGY-2 resident this past year and is currently under
evaluation for clinical performance over the past year.  I have had a chance to have a
number of interactions with Dr. Irani over the last several months and have been asked to
write a letter with regard to my interaction with him.  I have had several talks with Dr.
Irani during the course of his rotation through the sports medicine department as well as
individual talks in my office and on several occasions at dinner.

First of all I would like to say that I am quite a fan of Dr. Irani in several respects.  I think
that Afraaz is genuinely a very nice young man.  I think that from a social standpoint, he
is very well liked by his peers.  I do think that he has a good heart and in general tries to
do the right thing. However, Dr. Irani has been involved in a number of incidents that I
am sure you are well aware of.

Several months ago Dr. Irani joined our sports medicine service.  I took it upon myself to
spend some extra time with him to see if we could get Afraaz back on track and get him
to a point that he could continue his future training in orthopaedics.  Again, I have spent
time not only in the operating room and clinic setting with Dr. Irani but he also has
traveled to the training room with me. Outside the rotation settings, Dr Irani and I have
spent several late Sunday evenings in the office discussing his progress and future. I
believe Afraaz and I had very open and candid conversations during his time on our
rotation and therefore feel I have a good understanding of Dr. Irani's situation.

While our conversations have dealt with many issues, I think one of the central issues has
been the concept of being a good physician or more specifically a good orthopaedic
surgeon.  It is my experience that there are 3 areas that are critical to the success of being
a good orthopaedic surgeon.  The first is I believe every physician needs to have an
academic ability to be able to keep and maintain the standards of an individual
subspecialty.  Second is to be able to be technically competent and be able to maintain
the skills necessary to perform and complete surgery in an appropriate manner.  Third is
the ability to be a good clinician and be able to interact with patients and to have a desire
and willingness as well as compassion to take care of patients.

With regard to Dr. Irani, I think Afraaz is an amazingly bright young gentleman and
probably one of the brighter gentlemen whom we have had come through our doors.  I
believe he reads and academically does well at the PGY2 relative to his peers.



PLAINTIFF'S
EXHIBIT 36
Stephens
8/18/15  LH

*DEPARTMENT OF ORTHOPAEDIC SURGERY*
**Two Medical Park, Suite 404, Columbia, SC 29203**
**803-434-6812, FAX 803-434-7306**

Palmetto Health - 001591



UNIVERSITY OF SOUTH CAROLINA
SCHOOL OF MEDICINE

UNIVERSITY SPECIALTY CLINICS®

MAY 2, 2012
RE: DR. AFRAAZ IRANI, PGY-2 RESIDENT
PAGE 2

Regarding Dr. Irani's surgical skills, I believe them to be average and/or slightly below average. However, at a PGY-2 level it could be too early to actually assess the potential for his surgical skills.

From my perspective, I believe that the issues surrounding Dr. Irani really involve the category of being a good clinician. I often counsel the residents about the differences between being "book smart" and "being street smart", the ability to anticipate and to actually "worry." I believe these are essential tools for a resident and/or a physician to be able to empathize with their patients, to be able to counsel their patients, as well as to be able to decide when "extra" is necessary when caring for their patients. In addition, I believe one of the critical steps is communication. Whether at a resident or a practicing physician level, it is critical to learn the ability to communicate and to ask for help when necessary. I believe to be the most critical out of the three components to being a good doctor.

I have had several very open and honest conversations with Dr. Irani regarding this topic. I have been quite blunt with him in our interactions while discussing some of the situations he has been involved in. Again, on review of Dr. Irani, I do believe that he is an unbelievably intelligent person and, as I have told him, probably destined for amazing things in this world. I, however, have expressed to him my doubts that clinical medicine is where he is going to do this. I believe Dr. Irani's expertise lies in an area of technology. He is clearly driven by the inner workings of mechanics and device technology. We have had long talks with him about this topic, and I believe that one of his mentors at Stanford was a spine physician who had a significant portion of their practice involved in this type of area. To quote one of his e-mails, "Dr. Irani has spent time in medical school working with a startup on validation studies for a prototype device and afterwards developed a new device and founded a company that is currently doing animal studies." It is in this area that I see his passion. I'm reminded of a story one day in the operating room with Dr. Irani. I often ask the junior residents to spend an early case unscrubbed and assist the circulator in the room in order to better learn the systems that we are using during an operation. I was amazed watching Dr. Irani dissect the arthroscopy tower over the next half hour. He was clearly taken by how the tower worked. It is this "desire and passion" that I have not witnessed in Dr. Irani's clinical work. I have probed and discussed on many occasions whether or not clinical medicine really drives him or if this is simply a means to an end?

CONTINUED

Palmetto Health - 001592



UNIVERSITY OF SOUTH CAROLINA
SCHOOL OF MEDICINE

UNIVERSITY SPECIALTY CLINICS®

MAY 2, 2012
RE: DR. AFRAAZ IRANI, PGY-2 RESIDENT
PAGE 3

In summary, it is certainly difficult to condense my entire experience with Dr. Irani in a short letter. However, I have quite a bit of experience with several friends and other colleagues who have had to make several decisions with alterations in their career path.

Again, I think Afraaz is an amazingly intelligent person who is destined for great things. I have told him this on several occasions, and I truly believe this. I believe that he has the intelligence and desire to unlock the keys of a problem one day that others have not been able. However, as I have also expressed to him on a number of occasions, I do not believe that orthopaedic surgery and/or any other clinical subspecialty is the way he is going to do this. I do not get any sincere passion or desire for him to return to an orthopaedic residency and to pursue any type of clinical career. As with many people facing an alteration in career path, it can very frustrating. We have talked about options of taking a year off and exploring those types of opportunities, and I have also placed him in contact with several orthopaedic companies involved in new and innovative device development. I believe he has contacted several of those companies regarding those opportunities.

Lastly, I would like to reiterate that I think that we are dealing with a very talented person whose talents clearly involve areas other than clinical medicine. I do not believe that Afraaz will excel in any manner in clinical medicine and do not believe that he belongs in an orthopaedic residency program. He does not demonstrate the level of passion or desire one would expect from even a first year resident. I believe that this may be a major contributor to Dr. Irani's difficulties. I believe it is a lack of desire and passion that translates into tardiness and ultimately poor patient care. Again, I have mentioned this to him on several occasions and have not gotten much push-back from him, even when posing him the question. I truly believe that if given the option of a job in industry or development as opposed to clinical medicine and/or patient care, that Afraaz would take the former. I look forward to continuing a friendship with Afraaz and being of assistance in his growth in another manner. Again, I do not believe this will be in clinical medicine.

Sincerely,




Jeffrey A. Guy, M.D.
Chief of Sports Medicine, University of South Carolina

JAG/tlh




*DEPARTMENT OF ORTHOPAEDIC SURGERY*
**Two Medical Park, Suite 404, Columbia, SC 29203**
**803-434-6812, FAX 803-434-7306**

Palmetto Health - 001593

Faculty to Resident Evaluation



**Afraaz R Irani, MD**
Pgy 2
Palmetto Health
Orthopaedics
**Ortho:Joints**
11/1/2011 to 11/30/2011

Frank R. Voss, MD
Attending
USC SOM (2MP)

**MEDICAL KNOWLEDGE:**

**Intellectual Ability:**

Retention, comprehension, abstraction, discrimination, logical thinking.

| Unsatisfactory | Marginal | Satisfactory | Excellent | N/A |
|---|---|---|---|---|

**OR Performance:**

Exhibits knowledge of anatomy, physiology, pathology of case.  Understands mechanics.  Dexterity, efficiency, thoroughness. Concern for patient, Maintenance of professional OR atmosphere.

| Unsatisfactory | Marginal | Satisfactory | Excellent | N/A |
|---|---|---|---|---|

**Conference Performance:**

Punctuality, organization, preparation.  Demonstrates knowledge of current literature and treatments.

| Unsatisfactory | Marginal | Satisfactory | Excellent | N/A |
|---|---|---|---|---|

**Decision Making:**

Makes informed decisions about diagnostic-therapeutic treatment based on patient information, preferences, up-to-date scientific evidence and clinical judgment.  Develop and carry out patient management plans.  Demonstrate investigatory and analytic thinking approach to clinical situations.

| Unsatisfactory | Marginal | Satisfactory | Excellent | N/A |
|---|---|---|---|---|

**PARACTICE-BASED LEARNING AND IMPROVEMENT:**

**Technological Skills:**

Uses information technology to manage information, access on-line medical information; and support their own education.

| Unsatisfactory | Marginal | Satisfactory | Excellent | N/A |
|---|---|---|---|---|

**ASSESSMENTS:**

Investigates and evaluates patient care practices, appraises and assimilates scientific evidence, and improves their patient care practices.

| Unsatisfactory | Marginal | Satisfactory | Excellent | N/A |
|---|---|---|---|---|

*Afraaz is very bright. His OR performance was made difficult by the second year call requirements. However, beyond that his improvement in the OR was somewhat slow and seemed not to be driven by concern for the patient. Punctuality on rounds was a concern as the trauma service was very busy as was mine and he was late for am rounds a few times. His patient care was inconsistent and included a patient who was told to take 5 Percocet tablets at once by phone and a second one who had been taking 12/day in hospital for whom he wrote a prescription for 40 tablets. He also seemed unaware that the drain output mattered.*

**PATIENT CARE:**

**PLAINTIFF'S EXHIBIT** 37
Stephens
8/4/15  CH

Palmetto Health - 000081

**Judgment:**

Common sense, decisiveness, ability to draw sound conclusions, willingness to admit mistakes.  Regard for patient's needs and life conditions.

| Unsatisfactory | Marginal | Satisfactory | Excellent | N/A |
|---|---|---|---|---|
| ○ | ◉ | ○ | ○ | ○ |

**Caring:**

Compassionate, appropriate and effective care of patients for the treatment of health problems and the promotion of health.

| Unsatisfactory | Marginal | Satisfactory | Excellent | N/A |
|---|---|---|---|---|
| ○ | ◉ | ○ | ○ | ○ |

**Communication:**

Gather essential and accurate information about patients; work with health care professionals to provide patient focused care.

| Unsatisfactory | Marginal | Satisfactory | Excellent | N/A |
|---|---|---|---|---|
| ○ | ○ | ◉ | ○ | ○ |

*Please see above comments. Also, he never was willing to admit that he made an error. Compassion for the patient needs to improve. His level of communication with me was appropriate.*

## INTERPERSONAL AND COMMUNICATION SKILLS

**Communications Skills: Oral**

Clarity of expression, articulateness, grammar.  Skills that allow for effective information exchange with patients, their families and other health professionals.

| Unsatisfactory | Marginal | Satisfactory | Excellent | N/A |
|---|---|---|---|---|
| ○ | ○ | ◉ | ○ | ○ |

**Communications Skills: Written**

Must observe and document observations accurately and in good time.  Progress, operative, and discharge notes should be written completely and promptly.

| Unsatisfactory | Marginal | Satisfactory | Excellent | N/A |
|---|---|---|---|---|
| ○ | ○ | ◉ | ○ | ○ |

**Relating to Patients:**

Interested, honest and understanding.  Explains clearly and to the patient's satisfaction details related to diagnosis, proposed treatment, and implications.

| Unsatisfactory | Marginal | Satisfactory | Excellent | N/A |
|---|---|---|---|---|
| ○ | ○ | ◉ | ○ | ○ |

*Seemed interested more by the intrigue of the case than empathy for the patient.*

## PROFESSIONALISM

**Concern for Others:**

Sensitivity to and consideration of others, tactfulness.  Committed to ethical principles and sensitivity to a diverse patient population ( culture, age, gender, disabilities).

| Unsatisfactory | Marginal | Satisfactory | Excellent | N/A |
|---|---|---|---|---|
| ○ | ○ | ◉ | ○ | ○ |

**Reliability:**

Acceptance of responsibility, punctuality, availability.

| Unsatisfactory | Marginal | Satisfactory | Excellent | N/A |
|---|---|---|---|---|
| ○ | ◉ | ○ | ○ | ○ |

Palmetto Health - 000082

**Integrity:**

Honesty, discretion, accountability to patients, society, and the profession; a commitment to excellence and on-going professional development.

| Unsatisfactory | Marginal | Satisfactory | Excellent | N/A |
|---|---|---|---|---|
| ⌒ | ⌒ | ⊙ | ⌒ | ⌒ |

**Appearance:**

Poise, alertness, cleanliness, appropriateness of dress.

| Unsatisfactory | Marginal | Satisfactory | Excellent | N/A |
|---|---|---|---|---|
| ⌒ | ⌒ | ⊙ | ⌒ | ⌒ |

**Ethical Principles:**

A commitment to provision or withholding of clinical care, confidentiality of patient information, informed consent and business practices.

| Unsatisfactory | Marginal | Satisfactory | Excellent | N/A |
|---|---|---|---|---|
| ⌒ | ⌒ | ⊙ | ⌒ | ⌒ |

**Professional Promise:**

Desirability of letting this person treat you or your family.

| Unsatisfactory | Marginal | Satisfactory | Excellent | N/A |
|---|---|---|---|---|
| ⌒ | ⊙ | ⌒ | ⌒ | ⌒ |

*See previous comments about punctuality for morning rounds. Had a hard time prioritizing his responsibilities while on call. At his current level, I would not let him take care of a member of my family.*

**SYSTEM-BASED PRACTICE**

**Resourcefulness:**

Management of available resources. Understand roles of support personnel and makes maximum use of their assistance. Resourcefulness in obtaining information about patients.

| Unsatisfactory | Marginal | Satisfactory | Excellent | N/A |
|---|---|---|---|---|
| ⌒ | ⌒ | ⊙ | ⌒ | ⌒ |

**System of Health Care:**

Ability to demonstrate an awareness and responsiveness to the larger context and system of health care. The ability to effectively call on system resources to provide care for optimal value. Advocate for quality patient care and help patients deal with system complexities.

| Unsatisfactory | Marginal | Satisfactory | Excellent | N/A |
|---|---|---|---|---|
| ⌒ | ⌒ | ⊙ | ⌒ | ⌒ |

*Afraaz was able to function well with regard to the utilization of resources.*

What does this resident do well?

*He is very bright. He learns easily. He is intrigued by the breadth of orthopaedics. He communicates well with peers.*

How could this resident improve?

*Better prioritization of work priorities. Review what we learned in the last few cases to improve in the OR the next time. Improve empathy for the patient.*

**OVERALL RATING:**

| Unsatisfactory | Marginal | Satisfactory | Excellent | N/A |
|---|---|---|---|---|
| ⌒ | ⊙ | ⌒ | ⌒ | ⌒ |

*This recommendation covers the approximately 6 week period that Afraaz was on my service. His clinical suspension of privileges precluded completion of our rotation.*

Frank Voss (Evaluator) signed and submitted this document on 12/28/2011 8:16:05 AM

Palmetto Health - 000083

**David Koon Jr.** (Subject's Program Director) signed this document on 12/29/2011 5:37:48 PM ☑

Evaluation Submitted on 12/28/2011 8:16:05 AM EST.

Palmetto Health - 000084

Faculty to Resident Evaluation



Afraaz R Irani, MD
Pgy 2
Palmetto Health
Orthopaedics
Ortho:SportsMed
9/1/2011 to 10/31/2011

Christopher Mazoue', MD
Attending
USC SOM (2MP)

MEDICAL KNOWLEDGE:

Intellectual Ability:

Retention, comprehension, abstraction, discrimination, logical thinking.

| Unsatisfactory | Marginal | Satisfactory | Excellent | N/A |
|---|---|---|---|---|
| ○ | ○ | ⊙ | ○ | ○ |

OR Performance:

Exhibits knowledge of anatomy, physiology, pathology of case. Understands mechanics. Dexterity, efficiency, thoroughness. Concern for patient. Maintenance of professional OR atmosphere.

| Unsatisfactory | Marginal | Satisfactory | Excellent | N/A |
|---|---|---|---|---|
| ○ | ○ | ⊙ | ○ | ○ |

Conference Performance:

Punctuality, organization, preparation. Demonstrates knowledge of current literature and treatments.

| Unsatisfactory | Marginal | Satisfactory | Excellent | N/A |
|---|---|---|---|---|
| ○ | ○ | ⊙ | ○ | ○ |

Decision Making:

Makes informed decisions about diagnostic-therapeutic treatment based on patient information, preferences, up-to-date scientific evidence and clinical judgment. Develop and carry out patient management plans. Demonstrate investigatory and analytic thinking approach to clinical situations.

| Unsatisfactory | Marginal | Satisfactory | Excellent | N/A |
|---|---|---|---|---|
| ○ | ○ | ⊙ | ○ | ○ |

PARACTICE-BASED LEARNING AND IMPROVEMENT:

Technological Skills:

Uses information technology to manage information, access on-line medical information; and support their own education.

| Unsatisfactory | Marginal | Satisfactory | Excellent | N/A |
|---|---|---|---|---|
| ○ | ○ | ⊙ | ○ | ○ |

ASSESSMENTS:

Investigates and evaluates patient care practices, appraises and assimilates scientific evidence, and improves their patient care practices.

| Unsatisfactory | Marginal | Satisfactory | Excellent | N/A |
|---|---|---|---|---|
| ○ | ○ | ⊙ | ○ | ○ |

PATIENT CARE:

Judgment:

Common sense, decisiveness, ability to draw sound conclusions, willingness to admit mistakes. Regard for patient's needs and life conditions.

| Unsatisfactory | Marginal | Satisfactory | Excellent | N/A |
|---|---|---|---|---|
| ○ | ○ | ⊙ | ○ | ○ |

PLAINTIFF'S
EXHIBIT 39
Stephan
8/11/15  LA
PENGAD 800-631-6989

(6 of 12)

Palmetto Health - 000078

**Caring:**

Compassionate, appropriate and effective care of patients for the treatment of health problems and the promotion of health.

| Unsatisfactory | Marginal | Satisfactory | Excellent | N/A |
|---|---|---|---|---|
| ○ | ○ | ◉ | ○ | ○ |

**Communication:**

Gather essential and accurate information about patients; work with health care professionals to provide patient focused care.

| Unsatisfactory | Marginal | Satisfactory | Excellent | N/A |
|---|---|---|---|---|
| ○ | ○ | ◉ | ○ | ○ |

**INTERPERSONAL AND COMMUNICATION SKILLS**

**Communications Skills: Oral**

Clarity of expression, articulateness, grammar.  Skills that allow for effective information exchange with patients, their families and other health professionals.

| Unsatisfactory | Marginal | Satisfactory | Excellent | N/A |
|---|---|---|---|---|
| ○ | ○ | ◉ | ○ | ○ |

**Communications Skills: Written**

Must observe and document observations accurately and in good time.  Progress, operative, and discharge notes should be written completely and promptly.

| Unsatisfactory | Marginal | Satisfactory | Excellent | N/A |
|---|---|---|---|---|
| ○ | ○ | ◉ | ○ | ○ |

**Relating to Patients:**

Interested, honest and understanding.  Explains clearly and to the patient's satisfaction details related to diagnosis, proposed treatment, and implications.

| Unsatisfactory | Marginal | Satisfactory | Excellent | N/A |
|---|---|---|---|---|
| ○ | ○ | ◉ | ○ | ○ |

**PROFESSIONALISM**

**Concern for Others:**

Sensitivity to and consideration of others, tactfulness.  Committed to ethical principles and sensitivity to a diverse patient population ( culture, age, gender, disabilities).

| Unsatisfactory | Marginal | Satisfactory | Excellent | N/A |
|---|---|---|---|---|
| ○ | ○ | ◉ | ○ | ○ |

**Reliability:**

Acceptance of responsibility, punctuality, availability.

| Unsatisfactory | Marginal | Satisfactory | Excellent | N/A |
|---|---|---|---|---|
| ○ | ◉ | ○ | ○ | ○ |

**Integrity:**

Honesty, discretion, accountability to patients, society, and the profession; a commitment to excellence and on-going professional development.

| Unsatisfactory | Marginal | Satisfactory | Excellent | N/A |
|---|---|---|---|---|
| ○ | ○ | ◉ | ○ | ○ |

**Appearance:**

Poise, alertness, cleanliness, appropriateness of dress.

| Unsatisfactory | Marginal | Satisfactory | Excellent | N/A |
|---|---|---|---|---|
| ○ | ○ | ◉ | ○ | ○ |

Palmetto Health - 000079

Ethical Principles:

A commitment to provision or withholding of clinical care, confidentiality of patient information, informed consent and business practices.

| Unsatisfactory | Marginal | Satisfactory | Excellent | N/A |
| --- | --- | --- | --- | --- |

Professional Promise:

Desirability of letting this person treat you or your family.

| Unsatisfactory | Marginal | Satisfactory | Excellent | N/A |
| --- | --- | --- | --- | --- |

SYSTEM-BASED PRACTICE

Resourcefulness:

Management of available resources. Understand roles of support personnel and makes maximum use of their assistance. Resourcefulness in obtaining information about patients.

| Unsatisfactory | Marginal | Satisfactory | Excellent | N/A |
| --- | --- | --- | --- | --- |

System of Health Care:

Ability to demonstrate an awareness and responsiveness to the larger context and system of health care. The ability to effectively call on system resources to provide care for optimal value. Advocate for quality patient care and help patients deal with system complexities.

| Unsatisfactory | Marginal | Satisfactory | Excellent | N/A |
| --- | --- | --- | --- | --- |

What does this resident do well?

  *Afraaz is intelligent and inquisitive.*

How could this resident improve?

  *As with all residents, Afraaz need to continue to learn the basics e.g. anatomy. He also needs to work on his social skills with his professional colleagues e.g. OR personnel. In addition, he needs to work on time management and efficiencies especially in the OR.*

OVERALL RATING:

| Unsatisfactory | Marginal | Satisfactory | Excellent | N/A |
| --- | --- | --- | --- | --- |

**Christopher Mazoue'** (Evaluator) signed and submitted this document on 11/6/2011 1:35:29 PM

**David Koon Jr.** (Subject's Program Director) signed this document on 11/7/2011 5:58:54 PM

Evaluation Submitted on 11/6/2011 1:35:29 PM EST.

Palmetto Health - 000080



**PALMETTO HEALTH**

May 25, 2012

Marsha A. Miller, MA
Associate Vice President
Office of Resident Services
Accreditation Council for Graduate Medical Education
515 N. State Street
Suite 2000
Chicago, Illinois 60654

Re: Program #2604532263 and #8004500419

Dear Ms. Miller:

As requested in your letter of April 27, 2012, this letter responds to the complaint filed by Afraaz Irani, MD, alleging that the Orthopaedic Surgery program at Palmetto Health/University of South Carolina School of Medicine is in violation of ACGME requirements.

As a prelude to our response, it is important to note that the goal of graduate medical education at our institution is to provide an education that prepares each of our residents to enter practice as competent physicians who will provide the level of care and compassion that we would want for our families and ourselves. Like all of our residents, this was the goal for Dr. Irani. It was unfortunate that our GMEC found it necessary to dismiss Dr. Irani from the Orthopaedics residency after he failed to successfully complete remediation efforts. This action was not taken lightly, however, and occurred only after Dr. Irani was provided multiple opportunities for improvement through counseling and remediation efforts.

Our responses to each of Dr. Irani's allegations follow:

Grievance procedures and due process:

Harassment of any sort, including racial harassment, is not practiced or allowed in the program, and there has been no racial harassment of Dr. Irani or any other resident. Over the past twelve years the program has educated two Indian residents, an African American, and four women. Dr. Irani himself frequently issued joking, self-deprecating, stereotypical comments about his being the "I.T. guy" and assumed the voice pattern / intonation of "Indian call center" to other residents, but there has been no racial harassment by the program director or others. Dr. Irani was also not treated differently than any other resident. Dr. Irani was not "singled out" nor held to a different standard.

The Program Director did not submit false documentation or give misleading statements to the GMEC. Dr. Irani was not present in any of the GMEC meetings, nor did he have access to any minutes of the meetings, including executive sessions involving resident remediation. Each item listed on the August 15th memo was confirmed prior to initiation of initial Level II remediation. Clarification of initial remediation items were reviewed with him verbally multiple times. Emails from RN staff regarding patient encounters were not given to Dr. Irani, but their content was reviewed with him on multiple occasions.

Post Office Box 2266
Columbia, SC 29202-2266        PHONE  (803) 296-2100        palmettohealth.org

PLAINTIFF'S
EXHIBIT 43
Stephens
6/19/15   LA
PENGAD 800-631-6989

Like all resident policies, the Palmetto Health Resident Grievance and Due Process policy is reviewed, revised, and approved annually by the GMEC of Palmetto Health (Attachment 1). A written copy of the approved policies is provided to each resident each year as an attachment to the resident agreement of appointment, which references several of the policies. Dr. Irani acknowledged receipt of the policies for both academic years 2010-2011 and 2011-2012 (Attachment 2). Residents are also informed that policies are available online (latest version available at http://residency.palmettohealth.org/documents/Graduate%20Medical%20Education/Resident%20Manual%202011-2012.pdf ).

The Resident Grievance and Due Process policy was written to be fair, reasonable, and is readily available to all residents. Dr. Irani was reminded multiple times of this policy via verbal and electronic means: 8/15/11 verbal reminder, 9/8/11 Stephens email, 9/20/11 Stephens memo, 12/12/11 memo, 12/13/11 email, 12/16/11 email, 1/5/12 email, 1/11/12 Stephens memo, 1/31/12 memo, 3/1/12 email, 3/13/12 email, 3/28/12 Stephens memo, 4/10/12 memo. With one exception, prior to his letter to the ACGME, Dr. Irani did not complain of unfair due process or grievance. In fact, Dr. Irani utilized the policy on several occasions. He also expressed familiarity with the policy and, in fact, reminded us of specifics of the policy (page 17 of additional Irani documentation). Dr. Irani employed the grievance and due process policy, proceeding through Step 1.4 (i.e., appeal to the DIO) in both of his first two instances of academic remediation.

The one complaint that Dr. Irani did state was in regards to appealing beyond Step 1.4 to Step 1.5 (i.e., to a Palmetto Health Dispute Resolution committee) in the second instance of academic remediation. The policy states that appeal to Step 1.5 must be made within 10 business days from the decision by the DIO. Dr. Irani contacted the Palmetto Health Human Resources department with his request to appeal at the end of the 11th business day after the DIO's decision. He complained that his appeal was actually made within 10 business days because the Martin Luther King holiday occurred during the period. Palmetto Health, like most hospitals, does not recognize many holidays observed by other types of businesses. Palmetto Health only officially recognizes 5 holidays: New Year's Day, Fourth of July, Labor Day, Thanksgiving Day, and Christmas Day (Attachment 3, Section 5.1). Dr. Irani had already been a resident at Palmetto Health through the same period the previous year and knew that Martin Luther King holiday was not recognized as a holiday by the hospital, but rather as a business day. Accordingly, his request to appeal to Step 1.5 was denied.

There was also no "witch hunt" by the attending physicians "to see who had written disparaging comments about the program" during the latest ACGME resident survey. In fact, no attending in the department, other than Dr. Koon, has seen the results of the latest survey. This would have been reviewed at the next annual residency retreat (previously scheduled for April 2012).

Dr. Irani was placed back on the Total Joint service at Palmetto Health Richland after first his suspension. The decision to change resident rotations at the VA site was not made to deny Dr. Irani "the same education as other residents" or to deny him an opportunity to have an unbiased evaluation by the attending staff at the VA. Several factors determined this decision: 1) He was removed prematurely from that service when suspended, therefore he was placed back on the Total Joint service to complete the rotation; 2) there was increasing difficulty in communication with the site director at the VA site; 3) the VA site director had had a portion of his hospital surgical privileges suspended; 4) the VA had persistent sterilization processing equipment issues that resulted in a significant drop in surgical case volume and complexity, making the rotation subpar; and 5) the patient volume was sufficiently covered by only one resident. Due to these and other issues, the VA had already been notified of the program's decision to discontinue the VA rotation for the PGY 2-5 residents effective 7/1/12. This decision was made to ensure that all rotations provide quality educational experiences and not to deny Dr. Irani any opportunities.

Palmetto Health - 001316

## Resident Selection:

The program does not have an unusually high attrition rate. Dr. Irani calls himself the third resident dismissed over a four-year period. In fact, Dr. Irani is the first resident during this period who will not complete the program due to dismissal. Dr. Irani is including Dr. Chad Lamoreaux and Dr. Jeff McDaniel in his count of three. Dr. Lamoreaux was involved in academic remediation related to professionalism and was considered for dismissal, but he ultimately graduated from the program. Dr. McDaniel withdrew from the program five years ago during his PGY-2 year due to his personal decision to pursue a non-surgical residency in Family Medicine at our institution. After completion of his Family Medicine program, he also completed a Sports Medicine fellowship at our institution, which included time in our Orthopaedics department.

## Supervision of Residents:

Residents are supervised by attending at all times in all settings. Supervision includes both Direct and Indirect supervision per the guidelines of the ACGME and the Palmetto Health Resident Supervision policy (Attachment 4). Appropriate levels of supervision are provided to the residents for each patient encounter, including within the Monday afternoon clinic which provides care to uninsured patients. Interns, junior residents, senior residents, and attending physicians may all be involved in the care of an individual patient. Graduated levels of responsibility are granted to the residents as they demonstrate competence in caring for orthopaedic patients. Depending on the complexity of the patient's condition, the senior resident may serve as the supervising physician for a more junior resident. Each resident clinic is supervised by an attending physician. This physician provides Direct and Indirect supervision per the guidelines. If the attending physician is not physically present in the clinic, he is available to provide Indirect supervision immediately through telephonic and/or electronic modalities and is also available to provide Direct supervision, as needed. Dr. Irani's documentation provides only part of the patient encounter information. His documentation only provides information regarding when the resident note was electronically signed, when the note was co-signed by the attending physician, and the fact that the attending physician was involved in an operative case that same afternoon. Nowhere in the documentation is found when the patient actually left the clinic, whether or not the patient was kept in the clinic until the attending was physically present in the clinic, what time the patient's care was reviewed with the attending, or if the resident reviewed the care of the patient with a more senior resident prior to the patient's departure.

## Resident Duty Hours:

The orthopaedic residency program at Palmetto Health abides by the duty hour requirements as set forth by the ACGME. The policy is reviewed regularly by the attending staff and residents. As Dr. Irani acknowledges, the program instructs all residents to "obey the duty hour" requirements. The institution utilizes the New Innovations system to monitor resident compliance with the requirements. Chief residents and individual attendings also monitor resident duty hours and compliance. If a violation is recorded in the New Innovations system, the GME office notifies the resident and asks for comments on the violation. This is then forwarded to the program director for review. If a violation did indeed occur, the program director reviews the duty hour requirements with the resident and makes efforts to ensure future compliance. In addition, at each meeting, the GMEC is provided with a report of duty hour violations, resolution of violations, and any follow up needed.

The department receives two to three violation reports each month which are handled on an individual basis. Dr. Irani appears to have violated HIPAA guidelines and searched dozens of patient records in search of supposed duty hour violations by the residents. The information he provided to the ACGME does not support his contention. His documentation only informs the reader that the post-call resident was in the operating room the following day. Given the fact that our residents can take home call, these

Palmetto Health - 001317

instances provide no evidence of duty hour violations. Per the ACGME guidelines, if the resident had no in-hospital duty the night before, he/she would be allowed to work the next day. Our residents are very familiar with the duty hour requirements and make every effort to maximize their educational opportunities while also abiding by these requirements. The instances provided by Dr. Irani appear to illustrate these efforts. While his documentation appears to show non-compliance with duty hours requirements, it is misleading because it only includes part of the picture.

The focus of our residency is on providing a quality education to our residents – not on meeting service needs. Our previous RRC site visits, OITE scores, Board pass rates, fellowship acceptance, and other indicators provide evidence that we do an excellent job in educating our residents. Many of our physicians regularly function without resident participation. Patient care service is a component of all residency education programs, but our residents are not being used to solve service needs. Our attending surgeons have busy, thriving clinical practices, but over 50% of our sports clinics and operative cases are conducted without resident involvement.

We appreciate this opportunity to respond to the allegations made by Dr. Irani and believe that the information we have provided shows that Palmetto Health and its Orthopaedic Surgery program are in compliance with both ACGME Institutional requirements and residency program requirements. As our response demonstrates, Dr. Irani's documentation often omits information that is not favorable to his position. Accordingly, if you need any additional information to assist you in preparing your response to Dr. Irani, we would be happy to provide it.

Sincerely,

Katherine G. Stephens, PhD, MBA, FACHE
Vice President, Medical Education and Research
Designated Institutional Official
(803) 434-6861
katherine.stephens@palmettohealth.org

David E. Koon, MD
Program Director
Orthopaedic Surgery Residency Program
(803) 434-8284
david.koon@uscmed.sc.edu

cc:    John R. Potts, III, MD, Senior Vice President, Surgical Accreditation
       Pamela Derstine, PhD, Executive Director, RC for Orthopaedic Surgery
       Kevin B. Weiss, MD, MPH, Senior Vice President, Institutional Accreditation
       Patricia Surdyk, PhD, Executive Director, Institutional Review Committee