# Exhibit D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

Afraaz R. Irani, M.D.,            )
                                  )    C/A No. 3:14-cv-03577-CMC-KDW
      Plaintiff,                  )
                                  )
vs.                               )
                                  )
Palmetto Health;                  )
University of South               )
Carolina School of               )
Medicine; David E. Koon,          )
Jr., M.D., in his                 )
individual capacity; and          )
John J. Walsh, IV, M.D.,          )
in his individual                 )
capacity,                         )
                                  )
      Defendants.                 )
_____   )

VIDEO DEPOSITION OF

DAVID E. KOON, JR., M.D.

******************

Monday, June 29, 2015
9:08 a.m. - 5:52 p.m.

        The video deposition of DAVID E. KOON, JR., M.D.,

taken on behalf of the Plaintiff at the law offices of

Ogletree, Deakins, Nash, Smoak & Stewart, P.C., 1320 Main

Street, Suite 600, Columbia, South Carolina, on the 29th day

of June, 2015, before Lyn A. Hudson, Court Reporter and

Notary Public in and for the State of South Carolina,

pursuant to Notice of Deposition and/or agreement of

counsel.

```
 1   Q:   Do you know of any, any -- I think you may have
 2        testified to this earlier.  Do you know of any
 3        orthopedic surgery residency program around the country
 4        that has preliminary residents?
 5   A:   I testified to the fact that I did not believe there
 6        were any, or I did not know of any orthopedic programs
 7        that were a pyramid program.  I don't know if there are
 8        orthopedic programs that have preliminary spots.
 9   Q:   Has USC ever had any preliminary spots to your
10        knowledge or at least since you've been there?
11   A:   No.
12   Q:   Would you agree that orthopedic surgery is generally
13        one of the most competitive residencies to get into on
14        the front end?
15   A:   It's very competitive.
16   Q:   Okay.  But once you're in in a categorical position
17        there's not competition among your peers to stay in the
18        program.  Do you agree with that?
19   A:   Not in our program.
20   Q:   Okay.  And so your program is designed when you hire a
21        resident, there are two residents in each class
22        traditionally, there have been two residents per class;
23        right?
24   A:   Correct.
25   Q:   Okay.  And the understanding when you hire a resident
```

Allen Court Reporting

| | | |
|---|---|---|
| 1 | | to that class is that that person will complete a |
| 2 | | five-year residency program as long as their job |
| 3 | | performance is up to par.  Is that a fair assessment? |
| 4 | A: | Yes. |
| 5 | Q: | Do you know what the attrition rate in orthopedic |
| 6 | | surgery programs is like nationwide? |
| 7 | A: | That data is not published. |
| 8 | Q: | Okay.  Have you ever looked at whether orthopedic |
| 9 | | surgery programs have openings sort of all cycle where |
| 10 | | people either leave or have accidents or die or for, do |
| 11 | | you know if there are a number of resident openings in |
| 12 | | orthopedic surgery around the country per year? |
| 13 | A: | Was that a question? |
| 14 | Q: | Yeah.  Do you know if there are a number of openings |
| 15 | | for orthopedic residency programs? |
| 16 | A: | Yes. |
| 17 | Q: | Okay.  Do you know how that number of openings compares |
| 18 | | to other specialties or subspecialties? |
| 19 | A: | I do not. |
| 20 | Q: | Now, when residents start at the Palmetto Health USC |
| 21 | | Orthopedic Surgery Residency Program, they're sort of |
| 22 | | given an expected graduation date; is that right?  Say |
| 23 | | like in this Exhibit 1, we see class of 2015, class |
| 24 | | of 2016, those types of things.  Do you recall seeing |
| 25 | | residents in the orthopedic surgery program identified |

```
 1        admitted.  Dr. Wood told Afraaz to check the patient
 2        around two o'clock to, it would have been about two
 3        hours after his admission, and throughout the night.
 4        And when Dr. Wood asked Afraaz if he had done it the
 5        next morning the answer was no.
 6   Q:   Okay.
 7   A:   That was my, even though I didn't come in and see the
 8        patient at midnight, that was my patient.
 9   Q:   Okay.
10   A:   I was on call and responsible for the patient's care.
11   Q:   All right.  Any other patients that looking over your
12        notes you can identify as patients that you provided
13        care for?
14   A:   The only other patient that I can remember was the
15        patient that called both Afraaz and Harrison over the
16        weekend.  I don't know that that's documented on any of
17        these notes.  But it was a patient of mine who I
18        believe was having issues with her total knee.  If I
19        remember correctly it was wound drainage.  Very similar
20        to the patient at the VA.  And the patient was not
21        instructed to come in for an evaluation.
22   Q:   Okay.
23   A:   But I don't believe I have that documented on these.
24   Q:   The first write-up of Dr. Irani occurred in August of
25        2011; right?  About six weeks into his PGY 2 year?  Is
```

1    that accurate?

2  (Plaintiff's Exhibit Number 13 was marked for identification

3  purposes.)

4  A:    I believe that is the first time we had to initiate a

5        memorandum of record.

6  Q:    All right.

7  A:    Documented the 15th of August.

8  Q:    And Exhibit 13 is a copy of that memorandum; right?

9  A:    I believe so.

10  Q:    Okay.  Was Dr. Irani ever placed on level one

11        remediation prior to this meeting?

12  A:    I don't know that officially he was placed on level one

13        remediation.  Level one remediation is, it's a

14        progressive remediation process.  And I would consider

15        counseling sessions by chief residents, counseling

16        sessions by attendings and counseling sessions by the

17        program director somewhat equivalent even though it's

18        not officially designated as level one remediation.

19  Q:    Okay.  Prior to this meeting that you had with Dr.

20        Irani on August 15th 2011, what is your understanding

21        of what counseling sessions he had received?

22  A:    I think there are numerous.  I believe that his

23        attendings who gave him sub-standard evaluations during

24        his internship met with him.  I know a couple of the

25        senior residents in general surgery met with him.  I

```
 1        know for a fact that all three chief residents met with
 2        him as an intern.  And I walked down the hall with him
 3        in December and talked to him about his sub-standard
 4        performance thus far in his internship.  So even though
 5        he wasn't officially on level one remediation, I think
 6        all those are kind of the spirit of the level one
 7        remediation step.
 8    Q:  And what is your understanding of what a level one
 9        remediation means under the Palmetto Health Graduate
10        Medical Education Committee Guidelines?
11    A:  I would have to refer to the residency manual --
12    Q:  Okay.
13    A:  -- to be specific on that answer.
14    Q:  I don't have that document.  But is that a formal
15        probation?
16    A:  Palmetto Health doesn't use the term probation.
17    Q:  Okay.  Your understanding that level, there is a formal
18        academic remediation process that's referred to as
19        level one?
20    A:  Yes.  And that's generally an intradepartmental or
21        interdepartmental process.  It doesn't have to be
22        reported to the GMEC.  It doesn't have to be approved
23        by the GMEC.  I think it's one of those that is, it's
24        prolonged or if there's lack of progress, I think it
25        probably should be presented to the GMEC.  But it
```

1    doesn't necessarily have to be approved by the

2    executive session of the GMEC.

3  Q:  Okay.

4  A:  Just level two does.

5  Q:  Are any of the counseling sessions with Dr. Irani

6    documented?

7  A:  I believe there was, I don't remember off the top of my

8    head whether or not my discussion with him was.  I know

9    that on his evaluation that you've already submitted

10    that there was a note that I spoke with him about that.

11    And that was probably my referencing the December

12    conversation that I had.

13  Q:  Okay.

14  A:  Walking down the hallway on 5 Medical Park.  It was

15    December and cold.

16  Q:  Okay.  Now, don't the senior residents and the

17    attendings routinely meet with residents following a

18    rotation to sort of provide them some constructive

19    feedback or counseling on how they did or how they

20    performed in the rotation of what they could do better?

21  A:  So your question is do they meet with them at the end

22    of the rotation to discuss their performance?

23  Q:  Right.

24  A:  Yes.

25  Q:  I mean, do you view that differently than a level one

Allen Court Reporting

1      remediation under the Palmetto Health guidelines?

2  A:   Yes.  That's, those are two different things.

3  Q:   Okay.  How do the, I mean, when Dr. Irani met with the

4      senior residents and the attendings in these so-called

5      counseling sessions, how can Dr. Irani distinguish

6      those from the routine going over the evaluation or

7      were they the same thing?

8  A:   Those are two different things.  And so if a resident

9      is having, a junior resident is having problems then

10     I'll look to the senior residents to take care of the

11     problem whatever it is.  If they're either late on

12     filling out their notes or they're violating their duty

13     hours or whatever, I usually leave it to their

14     immediate supervisors to kind of handle.  Dr. Irani's

15     is a little bit different in that I asked all three to

16     meet with him because it was, had come to that point

17     requiring all three chief residents to meet with him to

18     address some of the problems that were going on.  Those

19     types of meetings are different than end of rotation

20     evaluations which are done to review the documents that

21     you've already presented in the rotation evaluations as

22     well as get feedback on what they do well, what they

23     can improve on.  And also gives the attendings a chance

24     to say what was good about my rotation, what was bad

25     about it, what can we do to make it better.  And those

1       are kind of ongoing discussions that we have as well.

2  Q:   Okay.  The three senior residents at that time, tell me

3       their names.  Would have been in, during his PGY 1

4       year.

5  A:   I'm pretty sure that his chief residents would have

6       been Dr. Finn, Dr. Massey and Dr. Duffy.  I turned 50

7       this year.

8  Q:   All right.  And I know you indicated that Dr. Irani

9       had, initially had some sort of negative evaluations

10      from his first couple of rotations that you mentioned

11      to him during this meeting as y'all were walking down

12      the hall in December.  Did Dr. Irani's performance and

13      subsequent rotations with those same attendings or if

14      throughout the remainder of his PGY 1 year appear to

15      improve?

16  A:   I don't know that I specifically brought up certain

17      things with Afraaz.  My recollection of that

18      conversation was, Afraaz, I know you've had some kind

19      of problems your first six months.  You started in

20      orthopedics in January.  It's kind of a brand new

21      start, brand new attendings, you know.  Time to change

22      gears and shine.  And so that's my recollection of that

23      conversation.  It wasn't, you know, Dr. X said this,

24      Dr. Y said -- it wasn't that detailed.  It was just a

25      chance to start fresh with the orthopedic department.

```
 1  Q:   Do you recall telling Dr. Irani at that time that he
 2       was performing below his expectations as an orthopedic
 3       resident?  Or up to that point had been performing
 4       below the level of performance that you would have
 5       expected as an orthopedic resident?
 6  A:   That's definitely possible that I could have used that
 7       type of terminology.  I mean, our interns are some of
 8       the best.  And so we have very high expectations for
 9       our interns.  We expect them to do really well.  And a
10       lot of the other programs would like to steal our
11       residents.  I mean, I've been told that before.  So if
12       I have a resident that's kind of getting poor comments
13       initially, then that kind of raises a red flag and
14       needs to be addressed.
15  Q:   Do you recall telling Dr. Irani during that meeting
16       that the attendings in the general surgery department
17       would trade three of their residents for one of the,
18       for one orthopedic resident?
19  A:   I don't know if I used that specific terminology in my
20       discussion with him in December.  Probably not.  I
21       mean, I could have said that.  But I don't know that
22       that was necessarily part of the December conversation.
23  Q:   Okay.  And do you recall ever telling Dr. Irani that
24       the medicine attendings are just happy if they have
25       someone that can speak English?
```

Page 100

```
 1  A:   I believe I, I was copied on an e-mail from, I believe
 2       it either came from Dr. Catalano or Dr. Stephens.  I
 3       have written down on USC(Irani) document 0306.  It says
 4       Dr. Catalano, and then it's got an arrow to Dr.
 5       Stephens 10 August, that would have been 2011 at ten
 6       o'clock.  Dr. Koon, Walsh forwarded immediately to Dr.
 7       Irani for explanation.  So I believe that's the first
 8       time I was made aware of patient RB's care by Dr.
 9       Irani.
10  Q:   So that, the date of that again was August 10th 2011
11       was the first you became aware of this situation?
12  A:   I believe that's correct.
13  Q:   Do you recall when the patient was actually seen?
14  A:   According to my documentation page eleven of my
15       documentation, but it's actually USC(Irani)0315 says
16       his initial evaluation was the 11th of July.  Again
17       that would have been 2011.
18  Q:   So exactly 30 days prior to you first becoming aware of
19       it?
20  A:   I believe the first time I became aware of it was on
21       the 10th of August.
22  Q:   I'm going to show you Exhibit 14.  Is this the e-mail
23       string where you first became aware of this particular
24       patient RB?
25  A:   I believe that was forwarded to me as I previously
```

Allen Court Reporting

| | |
|---|---|
| 1 | mentioned by Dr. Stephens.  She sent it to myself and |
| 2 | Dr. Walsh the 10th of August at ten a.m.  Says John and |
| 3 | David, please review for follow-up.  Thank you, Kathy. |
| 4 | Q:    Okay.  And that's on page two of Exhibit 14; right? |
| 5 |      And immediately after that you, well, let's see, that |
| 6 |      e-mail came in at ten a.m. on August 10th.  And at 2:34 |
| 7 |      that day you -- |
| 8 | A:    2011. |
| 9 | Q:    I'm sorry.  2011.  2:34 August 10th 2011 you forwarded |
| 10 |      the e-mail string to Dr. Irani and said I'll need an |
| 11 |      explanation of this by the end of the day. |
| 12 | A:    Right.  So I don't get my e-mails on my phone.  So it |
| 13 |      would have been at the time when I was checking my |
| 14 |      e-mails -- |
| 15 | Q:    Okay. |
| 16 | A:    -- that afternoon. |
| 17 | Q:    And later that day at 6:30, about four hours later |
| 18 |      after you sent the e-mail to Dr. Irani he sent an |
| 19 |      e-mail to you setting forth his recollection of the |
| 20 |      events from 30 days prior? |
| 21 | A:    Yes. |
| 22 | Q:    Did you ever review the medical records of patient RB? |
| 23 | A:    I believe that I did review his medical records. |
| 24 | Q:    Do you recall when was the first time you reviewed that |
| 25 |      patient's chart? |

```
 1  A:   I do not.

 2  Q:   Okay.  Were you involved in patient RB's care in any

 3       way?

 4  A:   I believe Dr. Walsh was.  But I don't believe I was.

 5  Q:   Okay.  Is it your understanding of, I mean, is there

 6       any issue with HIPAA with you reviewing a patient chart

 7       that you were not providing care on?

 8  A:   In the same way that Dr. Eady reviewed all of our

 9       records at the VA and claimed supervisory role over us,

10       I think that I have a legitimate basis to review

11       patients under the care of our residents.  So I believe

12       it is not a HIPAA violation for me to review those

13       records.

14  Q:   Okay.  That's fine.  I'm not accusing you of a HIPAA

15       violation.  I'm just asking.

16  A:   Okay.

17  Q:   Okay.  After you received Dr. Irani's response, what

18       happened next after you received his response on August

19       10th at 6:23?  Or I don't know when you received that

20       e-mail.  Was the next thing the e-mail where you

21       forwarded something to Allison Turnley?

22  A:   I believe that's, I believe she either is or was the

23       nurse manager in the ER.  And I asked her to forward it

24       to Diane.  I didn't think, I probably didn't have her

25       e-mail.  Forward it to Diane to see if her recollection
```

```
 1        of the events was the same as Afraaz's.
 2   Q:   Okay.  What do you think Dr. Irani did wrong with
 3        regard to this particular patient?
 4   A:   I'll just refer to Plaintiff's Exhibit 12.  I believe
 5        this is page is 11.  It's numbered 0315 at the bottom
 6        right-hand corner.  I have an appendix one at the top
 7        which documents what I would assume would be my review
 8        of the whole case.  And so I just make a note that
 9        Irani was eleven days into his PGY 2 year when he
10        encountered Mr. B and that Diane Savage was a nurse
11        known to me who had over 26 years of emergency
12        department experience who documented her patient
13        encounter that day.  And so it appears that there was a
14        brief H/P done by Dr. Irani.  He says that SL, SILT
15        which means sensation intact to light touch.  I think
16        for an injury like this I think that's an inappropriate
17        documentation of the neuro, part of the neurovascular
18        exam.  I mean, there's several nerves in the upper
19        extremity.  And to write sensation intact to light
20        touch doesn't differentiate that at all.  So that's an
21        inadequate part of his physical examination.  And there
22        was, according to my notes there was no mention of a
23        wound debridement, no mention of vital signs, no
24        mention of pain medications, no mention of wound
25        measurements, a Gustilo grade.  There's no mention of
```

```
 1          the patient receiving antibiotics or tetanus.  There's
 2          no mention of Afraaz splinting the extremity.  There
 3          was only one x-ray taken of the upper extremity.  There
 4          was no post-reduction images.  And there was an issue
 5          about whether or not the wound management was
 6          appropriate in the trauma bay.  He also documents a
 7          very brief pre-operative note which in something like
 8          this I think is inadequate.  I mean, you have a guy
 9          whose arm was essentially almost torn off of his body.
10          And I've got a junior resident who should have the
11          longest note in the whole chart who's barely
12          documenting anything.
13  Q:      Do you know who the attending on that particular case
14          was?
15  A:      The attending I believe was Dr. Iaquinto.
16  Q:      Do you know whether Dr. Iaquinto told Dr. Irani to
17          write an abbreviated note because Dr. Irani had to get
18          to the staff clinic that afternoon?
19  A:      Say than one more time.
20  Q:      Do you know whether Dr. Iaquinto told Dr. Irani to
21          write an abbreviated note in the chart so that Dr.
22          Irani could get to the staff clinic that started at two
23          o'clock that day?
24  A:      If he did tell him to do that that would be
25          inappropriate.
```

Allen Court Reporting

1    writes this to Allison.  And it was so dramatic that

2    she took it upon herself after her shift was over

3    probably to write this down.  It was so egregious that

4    she did this.  And I hardly ever get complaints like

5    this.  Hardly ever.  And that's, I guess that was why I

6    sent it to him immediately.  Afraaz, I got to know what

7    happened.  You know, even though it's been a month I've

8    got to know what happened because this was, this was so

9    different from the normal operating procedure.  I mean,

10    I didn't have a choice but to find out what went on.

11  Q:  Do you know if Diane Savage, I think you described her

12    in the grievance hearing as a friend of yours?

13  A:  I don't know her personally outside of work.

14  A:  Okay.  Do you know if she's had other incidents where

15    she's complained about residents or attendings in their

16    treatment of patients in the --

17  A:  I know that Afraaz has stated that.  But I don't know

18    that for a fact.  I've been there for ten years and

19    this is the first memo I got from her, I believe.

20  Q:  In the original write-up that she wrote on the day of

21    the incident, on page four it says that when

22    Dr. Iaquinto entered the room, he didn't introduce

23    himself to the patient and roughly removed the dressing

24    and splint.  Patient grimaced and moaned out in pain.

25    Before myself or Mandy to ask about pain meds,

```
 1       well; right?
 2  (Plaintiff's Exhibit Number 32 was marked for identification
 3  purposes.)
 4  Q:    Show you Exhibit 32.  And this is Irani 30 and Irani
 5        14.
 6            MS. THOMAS:  I'm sorry.  What numbers were those,
 7        David?
 8            MR. ROTHSTEIN:  Irani 30 and Irani 14.
 9            MS. THOMAS:  Could you describe for me what those
10        are?
11            MR. ROTHSTEIN:  Irani 30 is an e-mail from Kathy
12        Stephens to Dr. Irani on March 28th 2012 attaching
13        Irani 14 which is the letter announcing the grievance
14        decision denying his level or step three grievance.
15  BY MR. ROTHSTEIN:
16  Q:    Do you recognize Exhibit 32 --
17  A:    Yes.
18  Q:    -- as I've just described it?
19  A:    Yes.
20  Q:    Okay.  And that's your signature on the second page of
21        Exhibit 32?
22  A:    It is.
23  Q:    And tell me what you did to carefully consider the
24        information available to you in deciding Dr. Irani's
25        grievance?
```

Allen Court Reporting

Page 141

| | | |
|---|---|---|
| 1 | A: | I reviewed the information I had, the documentation, |
| 2 | | went back through that again. |
| 3 | Q: | Did you review any medical records? |
| 4 | A: | No. |
| 5 | Q: | Did you speak with any patients? |
| 6 | A: | No. |
| 7 | Q: | Did you speak with any family members of any patients? |
| 8 | A: | No. |
| 9 | Q: | Did you speak with any nurses? |
| 10 | A: | At this point I don't remember that I did. |
| 11 | Q: | Okay.  And your understanding there were two, at this |
| 12 | | point there were two patient encounters that were |
| 13 | | immediately at issue with regard to Dr. Irani.  One was |
| 14 | | a spine patient of Dr. Grabowski's; is that right? |
| 15 | A: | There were a host of things that we looked at here. |
| 16 | Q: | Okay.  But the -- |
| 17 | A: | Certainly there were patient issues that had come up, |
| 18 | | those we just talked about. |
| 19 | Q: | Okay.  And then there was a hemophiliac patient of |
| 20 | | Dr. Koon's, I believe? |
| 21 | A: | I think there was one in these documents. |
| 22 | Q: | Okay.  Did you speak with Dr. Wood at all? |
| 23 | A: | I don't know that I did.  I don't remember. |
| 24 | Q: | Okay.  Have you ever spoken with Dr. Wood about Dr. |
| 25 | | Irani? |

```
 1  A:   I don't remember.

 2  Q:   Was Dr. Wood the senior resident at that time?

 3  A:   She was at some point.   I assume it was this period of

 4       time.

 5  Q:   And this letter the second page of Exhibit 32 instead

 6       of just saying you have ten business, or referring him

 7       to the policy you actually give him the ten business

 8       days and then you give him the deadline which is April

 9       11th 2012; right?

10  A:   Yes.  Because of the confusion he had from the previous

11       one.

12  Q:   Okay.

13  A:   So I made it very clear in this one.

14  Q:   And Dr. Irani timely requested a hearing before the

15       grievance committee this time; right?

16  A:   There was a grievance committee.

17  Q:   Okay.  And I understand that the grievance committee

18       was presided over by a Palmetto Health HR employee at

19       the time?

20  A:   That's the process.  It's always HR.

21  Q:   And in this particular hearing were you present for the

22       grievance hearing?

23  A:   I think I was.

24  Q:   And who was sort of the presiding officer so to speak

25       of the grievance hearing.
```

| | |
|---|---|
| 1 | under this.  It's not Dave Koon sitting in front of the |
| 2 | faculty telling them what to do.  I mean, it's here are |
| 3 | the facts, here's what's going on.  What do you guys |
| 4 | think the recommendation would be.  And that's a |
| 5 | conversation that's had amongst the faculty.  It's not |
| 6 | me printing up a memo saying, all right, we need to |
| 7 | approve this so I can send it to the GMEC.  It just |
| 8 | doesn't happen like that.  That's not my leadership |
| 9 | style.  And it's not, it wouldn't be accepted in our |
| 10 | faculty.  I mean, we have at that time seven or eight |
| 11 | orthopedic surgeons there in the room. |
| 12 Q: | Okay.  What made you upset about Dr. Irani's e-mail at |
| 13 | the bottom of this string that's Exhibit 16? |
| 14 A: | Well, I said that I was aware of the patient's care and |
| 15 | I really didn't need him to remind me of the details. |
| 16 | I said, I'm amazed that as the junior resident of the |
| 17 | Palmetto Health team you feel somehow inconvenienced by |
| 18 | having to dictate a discharge summary on a patient that |
| 19 | you never actually participated in his care.  So my |
| 20 | feeling was that Afraaz, you know, did it because I |
| 21 | asked him to but somehow felt inconvenienced and |
| 22 | burdened that I had asked him to do that. |
| 23 Q: | Was there some agreement or misunderstanding about what |
| 24 | VA patient you had originally asked Dr. -- |
| 25 A: | In Afraaz's mind, yes.  In my mind, no.  There was only |

```
 1        one VA patient that needed a discharge summary that I
 2        asked him three times to do.
 3   Q:   Okay.  And whose patient was that?
 4   A:   I don't remember whose patient exactly it was.  I just
 5        remember asking him to do it.
 6   Q:   Okay.  Why did that responsibility fall to Dr. Irani?
 7        Was it just because you told him to do it?
 8   A:   It could have been the fact that Irani entered the
 9        order in the computer on the order sheet.  I don't
10        know.  It could have been the fact that he was sitting
11        at the desk with nothing to do and one of the other
12        residents said, hey, can you dictate this discharge
13        summary on somebody.  I mean, they function as a team.
14        And different people do different things in the process
15        of getting the patient out the door.  And so I don't
16        know how it fell to him to do but I know that it fell
17        to him to do and he didn't do it.
18   Q:   Okay.  Do you remember Afraaz indicating that there was
19        some confusion on his part about which VA patient
20        showed up on his list of things to do in terms of
21        discharge summaries?
22   A:   I remember that coming up in, I don't know if it was
23        actually the grievance committee but it came up later.
24        I don't remember that specifically happening that day
25        or during that time period when the discharge summary
```

Page 176

```
 1  purposes.)
 2  Q:   Okay.  Exhibit 43 is Palmetto Health 1315 through 1318.
 3  A:   Uh-huh (affirmative response).
 4  Q:   Do you recognize this document?
 5  A:   Yes.  This was a response to a complaint letter that
 6       was sent to the ACGME's office that handles these.
 7  Q:   Who was involved in creating this response?
 8  A:   There was, I know Dr. Koon and I both were involved in
 9       this.  I don't remember.  I would have to look through
10       it and see who else was consulted in this.
11  Q:   You see on the first page where it says Dr. Irani
12       himself frequently issued joking self-deprecating
13       stereotypical comments about being the IT guy?
14  A:   Yes.
15  Q:   Okay.  Do you know where that information came from?
16  A:   I think that came from Dr. Koon.
17  Q:   Were you involved in responding to the California
18       Medical Board's request for information about Dr.
19       Irani?
20  A:   I know I forwarded on some information to people who
21       could respond.
22  Q:   Okay.
23  (Plaintiff's Exhibit Number 44 was marked for identification
24  purposes.)
25  Q:   I'm going to show you Exhibit 44.
```

Allen Court Reporting

```
 1   Q:   Did you ever speak with Dr. Jones about this situation?

 2   A:   Yes.

 3   Q:   Did you ever get a written statement from Dr. Jones

 4        about this situation?

 5   A:   No.

 6   Q:   And what is your understanding of when Dr. Jones

 7        arrived on the scene?

 8   A:   I think things had, from my understanding things had

 9        deteriorated to the point where the nurses, there were

10        three nurses involved including the assistant nurse

11        manager who got the AOD involved who then got the

12        orthopedic attending involved and because of there was

13        communication, patient care issues with this patient.

14        And so the nurses felt it appropriate to get the AOD

15        involved who also was assisting in getting the

16        orthopedic attending involved.

17   Q:   Did you ever speak with Dr. Irani about his care with

18        regard to patient trauma female 375?

19   A:   Yes.

20   Q:   You personally?

21   A:   Yes.

22   Q:   When did you first speak with Dr. Irani about his care

23        with this patient?

24   A:   I don't know when the first time I asked him but I

25        asked him to provide his side of the story.
```

```
 1        What, I mean, according to Nathe she got the call at
 2        11:30.  When does that hour and a half start?
 3   A:   I'm not sure.  I mean, I don't know if I looked on the
 4        records.  And, you know, sometimes the nurses will say,
 5        you know, Dr. X arrived at this time, Dr. Y, I mean,
 6        sometimes they're that detailed.  And I don't know if I
 7        got that hour and a half from something to that effect
 8        or not.
 9   Q:   Okay.  This seems like a pretty chaotic scene.  I mean,
10        you know --
11   A:   Shouldn't be chaotic but it certainly sounds like it.
12        Yes.
13   Q:   Okay.  And you have a PGY 1 resident Nathe and a PGY 2
14        resident Irani managing the care of this patient?
15   A:   Correct.
16   Q:   All right.  Keep, all right, after, it says no
17        documentation?
18   A:   Correct.
19   Q:   Okay.
20   A:   Then it says versions vary widely.
21   Q:   Okay.
22   A:   Then it says nursing account was confirmed by three
23        different nurses with matching detailed accounts.  And
24        what I meant by that was when I went to see the nurses,
25        I asked them what happened with this patient
```

Allen Court Reporting

1    individually, separate from each other.  And they all

2    told me exactly the same story.  And that was what I

3    found remarkable.  And that's why I put it here is that

4    we weren't sitting in a room and one person gave the

5    story and the other two were nodding their heads.  I

6    went to one nurse at a time on an individual basis and

7    they all told me exactly the same story.

8  Q:  Okay.  Which three nurses were those?

9  A:  The nurses, if you flip back to 08.  It says Elaine

10    Simon who actually worked with Afraaz up on the ward,

11    Arlene Vance who was the assistant nurse manager and

12    then later on Diane Savage.

13  Q:  Okay.  Was Diane Savage, when it says later on what

14    does that mean?

15  A:  I don't know what the, I can't remember exactly what

16    happened.  I don't know if Elaine and Arlene asked

17    Diane to help or whether she is shift change and she

18    came on to help or came back from lunch.  Somehow she

19    kind of got involved in the patient's care afterwards.

20    And then subsequently the AOD and Dr. Jones.

21  Q:  Okay.  All right.  Then what is the next, faculty

22    concerned for?

23  A:  Right.  Based on what we saw here the faculty was

24    concerned for the patient's safety.

25  Q:  Right.  What's next?

1    A:    Can I see the transcript?  I don't remember making that

2          exact statement.

3              MR. ROTHSTEIN:  I don't think we need to mark this

4          one.

5              MS. THOMAS:  Thank you.

6    BY MR. ROTHSTEIN:

7    Q:    Ask you to look at page 37, line 15 and 16.

8    A:    Yes.

9    Q:    And you're talking about February 24th.  It says that

10         morning Dr. Irani did not document any type of

11         neurological testing or strength testing.

12   A:    Yes.  I see that.

13   Q:    What was that, that statement based on?

14   A:    It probably would have been based on Dr. Grabowski's

15         description of his care of that patient.

16   (Plaintiff's Exhibit Number 22 was marked for identification

17   purposes.)

18   Q:    Okay.  I'm going to show you Exhibit 22 and ask you to

19         compare it to Exhibit 21.  And if you look at page two

20         of Exhibit 22 that looks like the original e-mail from

21         Dr. Grabowski to you about the spine patient; right?

22   A:    I believe that's correct.

23   Q:    And if you will compare page two of Exhibit 22 to

24         Exhibit 21, it appears to be verbatim except for the

25         last sentence of Dr. Grabowski's e-mail.  Do you see

```
 1        And so my thought was if I could provide that
 2        information to the California Board, then they could
 3        make a determination about whether or not they wanted
 4        to grant him a medical license.
 5   Q:   Okay.  So your intent in communicating with the
 6        California Board was to let them know that you believed
 7        Dr. Irani was competent to be licensed as a physician?
 8   A:   My intent was not to get sued.
 9             MS. THOMAS:  Object to the form.
10             MS. HELMS:  Object to the form.
11   A:   Because you had made it clear by that time that I was
12        going to get sued.  And so the California Board asked
13        me for an evaluation of Dr. Irani.  I mean, I consulted
14        legal counsel and did what I was instructed to do or
15        advised to do.
16   BY MR. ROTHSTEIN:
17   Q:   Okay.  So you never intended to communicate to the
18        California Medical Board that Dr. Irani was incompetent
19        to practice medicine in California?
20   A:   That's not my determination to make.  My determination
21        to make is how he performed while he was here in South
22        Carolina.  And then it stops.
23   Q:   Okay.  So the answer to my question is that you did not
24        intend to tell California that Dr. Irani was
25        incompetent to practice medicine in California?
```

Page 272

```
 1   A:    We actually had a focus site visit last month.

 2   Q:    Is that a routine part of the accreditation process?

 3   A:    So there is a, what's called a next accreditation

 4         system which is different from what was in place when

 5         Irani was there.  When Irani was there, there were, you

 6         got accredited for a certain number of years.  And then

 7         every certain number of years you would get a site

 8         visit and you would have to make this program

 9         information form, send it off to the RRC for them to

10         review and then you would have two site visitors come

11         on a fairly scheduled basis.  It's kind of like a JCAHO

12         inspection for the hospital except it's a little bit

13         more regular.  Now we have transitioned to submitting

14         documentation on a fairly regular basis to what's

15         called an ADS system which is a sub of web site of the

16         ACGME system.  And so you can get a focused site visit

17         basically for a number of different reasons.  We

18         actually requested a temporary increase in our

19         complement.  And so we were granted two residents a

20         year.  And we kind of went over that in a lot of detail

21         earlier.  Two residents per year for five years.  With

22         our transition and turnover that we had, we requested

23         an increase to fill some of the positions of the

24         residents who had left the program.  That basically

25         triggered a focus site visit from the ACGME and the
```

```
1        RRC.  And so when we requested a temporary increase,
2        they said we're going to approve it because we were
3        trying to request the increase prior to the match.  And
4        so to be able to go, if we're only allotted ten slots
5        we can't have eleven residents.  And so if we want
6        eleven residents or twelve residents, we have to
7        request a temporary increase.  If we don't have any PGY
8        5s but we've got three 3s and three 2s, we can fill our
9        complemented ten.  But they're all cycled.  And so we
10       knew that next year as Nathe is promoted to 5 and even
11       further, as we have three residents going through
12       instead of two we were going to be above.  So we
13       requested a temporary increase in our complement, which
14       is a pretty customary thing.  They granted that
15       increase but they said due to the nature of your
16       turnover, and they actually used the phrase that Irani
17       used, an unusually high attrition rate, we're going to
18       perform a focus site visit.  And so that site visit was
19       either in the latter part of April or early, I believe
20       it was in the latter part of April.  So we had ACGME,
21       RRC representatives, orthopedic-specific RRC members
22       come and perform a focus site visit of our program.
23  Q:   Has there been any response to that focus site visit?
24  A:   Yes.
25  Q:   Okay.  Did they issue some sort of report?
```

Page 274

| | | |
|---|---|---|
| 1 | A: | Continued accreditation. |
| 2 | Q: | Okay.  And I assume there's some paperwork or documents |
| 3 | | that you're required to submit in connection with the |
| 4 | | focus site visit? |
| 5 | A: | No.  And that's kind of what I was explaining earlier. |
| 6 | | So all that stuff is done on a regular basis through |
| 7 | | the ADS.  And so now we have these things called |
| 8 | | milestones which are kind of like the New Innovation |
| 9 | | evaluations.  We are, what's the term I'm looking for, |
| 10 | | prompted by the ACGME and ADS web site, hey, it's time |
| 11 | | to fill out your milestones.  You have until June the |
| 12 | | 26th to get those done.  And so we actually just did |
| 13 | | those.  And we do those twice a year.  And those are |
| 14 | | available to the ACGME.  They're also available to |
| 15 | | faculty and to the residents themselves.  So it's kind |
| 16 | | of like a New Innovations evaluation on steroids.  Just |
| 17 | | increases my work, unfortunately. |
| 18 | Q: | Give me one second, Doctor. |
| 19 | A: | Sure. |
| 20 | Q: | I may be about finished.  Have you ever been involved |
| 21 | | in any service to the ACGME?  Ever served on any |
| 22 | | positions within the ACGME or the RRC? |
| 23 | A: | No. |
| 24 | Q: | Do you keep track of the board certification rate of |
| 25 | | your graduates? |

```
1   A:   We're required to.

2   Q:   Okay.

3   A:   And that's one of the things that's included in the ADS

4        documentation is our board pass rate for part one and

5        two.

6   Q:   How have your residents or graduates fared within the

7        last ten years?

8   A:   Since I've been here since 2002 I believe we've had one

9        resident fail part one and subsequently pass it the

10       next time.  And we've had one resident fail part two.

11       And he is on schedule to take that exam again.

12  Q:   So when I asked you about Dr. Lamoreaux earlier, he's

13       not one of the ones that failed part one or part two,

14       is he?

15  A:   He did not fail part one or part two.

16  Q:   Okay.  I don't have any further questions.  Thank you.

17       I don't know if the defense lawyers might have some

18       questions for you.  I don't know.

19  EXAMINATION BY MS. HELMS:

20  Q:   I've got one or two, Dr. Koon.  Does the board

21       certification test for truthfulness?

22  A:   There are two exams for board certification.  Part one

23       is the written exam which is an academic question and

24       answer type thing.  Part two potentially could test for

25       truthfulness because it's an oral examination about
```

Page 276

```
 1        your cases that you perform during the board collection
 2        process.  And so in a roundabout way that could test
 3        it.
 4   Q:   Would someone going in to, for the boards know that
 5        that was being examined, that that was part of what's
 6        being examined?
 7   A:   Yes.
 8   Q:   Okay.  Do you know whether or not Dr. Iaquinto is still
 9        at Palmetto Health?
10   A:   He is not with Palmetto Health.
11   Q:   All right.  I think you testified to two things that
12        went to the, or one thing that you sent to, or two
13        things to the California Board; right?  One was the
14        final summative evaluation; is that correct?  Is that
15        the first thing that was sent?
16   A:   No.  I believe what I sent to the California Board were
17        the two memorandums for record that are in the exhibits
18        that we looked at.  There is one very brief one stating
19        that Dr. Irani completed his internship.  If you have
20        any other questions, I'll need a waiver.  And then
21        there was a second one that was a little bit longer
22        than that.  Those serve as cover letters to the
23        questionnaire that I filled out by them.  The third one
24        I prepared that went to the GMEC office.  And I believe
25        that, I don't know if that was included in that 129
```

Allen Court Reporting

```
 1        pages but that was included in that third request from
 2        them.
 3   Q:   Okay.  And that was issued because the first two,
 4        because the first response was considered incomplete?
 5   A:   Yes.
 6   Q:   By California?
 7   A:   Yes.
 8   Q:   Okay.  Did Dr. Irani ever contact you about contacting
 9        the California Board?
10   A:   I believe he e-mailed me, say hey, Dr. Koon, I know
11        you're busy.  The California Board needs this thing
12        filled out.
13   Q:   Did he ever visit your office?
14   A:   There was a letter left on my desk one morning when I
15        came in.  But subsequently found out that he had
16        dropped it off with the front desk folks who put it on
17        my desk.
18   Q:   Did you ever have any input from Dr. Irani that
19        anything that you were sending was inappropriate or
20        improper?
21   A:   I believe, I would have to look at that e-mail.  There
22        was an e-mail from him that said, if I remember
23        correctly, there was a mistake or errors or something
24        that I needed to fix.  And so that was when I forwarded
25        that kind of stuff to legal counsel, got advice and did
```



PALMETTO HEALTH

UNIVERSITY OF
SOUTH CAROLINA
School of Medicine

Palmetto Health     University of South Carolina School of Medicine     Contact Us

Residency Programs > Surgery > Surgery Residents

About GME

Why Choose Palmetto Health

GME Applicants

Resident Manual/Sample Contract

Visiting Medical Students

Safety & Quality

Informatics

Research

PH/USC Simulation Center

GME In The News

Residents' Corner

Physician Opportunities

FICA Refunds

---

Residency Programs

Fellowship Programs

Contact Us

Conference/Clinic Schedule

Curriculum

How to Apply

Program Overview

Resident Data

Surgery Faculty

Surgery Residents

## Surgery Residents          Print This Page 🖨

**Class of 2015**



**Peter Felice, MD**
Loyola University Chicago Stritch School of Medicine



**Catherine Loflin, MD**
Brody School of Medicine at East Carolina University



**Amy Vocl, DO**
Arizona College of Osteopathic Medicine of Midwestern University



**Katherine Warner, DO**
Kansas City University of Medicine and Bioscience College of Osteopathic Medicine

**Class of 2016**



**Henrik Berdel, MD**
Charite-Universitatsmedizin Berlin



**Dustin Huynh, MD**
University of Hawaii John A Burns School of Medicine

**Class of 2017**







PLAINTIFF'S EXHIBIT 1
Koon
6/29/15 LH
PENGAD 800-631-6989

**Ashkan Afshari, MD**
Saint George's University

**Paul DiEgidio, MD**
Ross University

**Mead Ferris, MD**
Saint George's University





**Steven Hermiz, MD**
Ross University

**Alicia Snider, MD**
University of South Carolina School
of Medicine

**Class of 2018**







**Tabitha Burton, MD**
University of Louisville School of
Medicine

**Richard McCarroll, MD**
Saint George's University

**Tristan Thomas, MD**
Temple University School of
Medicine

**Class of 2019**







**Tamara Floyd, MD**

**Ashley Jones, DO**
Preliminary

**Ashlee Justice, MD**
Preliminary





**Maryann Mbaka, MD**

**Allison Quinn, MD**
Preliminary

Copyright © 2015 Palmetto Health. All Rights Reserved.



For Medical Professionals

SCHOOL OF MEDICINE HOME | GIVING | MEDICAL EDUCATION | CONTACT US

SEARCH

PHYSICIAN SEARCH | APPOINTMENTS | MEDICAL SERVICES | PATIENT GUIDE | ABOUT US

SOM Home > Orthopaedic Surgery Medical Education > Orthopaedic Surgery Patient Care > Chair's Message



ABOUT US

BILLING & INSURANCE

CHAIR'S MESSAGE

CONTACT US

OUR PHYSICIANS

PATIENT FORMS

RESIDENCY PROGRAM

SPORTS MEDICINE

VIDEOS





## Chair's Message

At the University of South Carolina School of Medicine Department of Orthopaedic Surgery, we take pride in a long history of service. With commitment and compassion we serve the community and the state of South Carolina through our three-fold mission of education, research and patient care.

Instruction is provided to medical students through lectures, rounds, conferences and seminars. Our residency program has produced skilled orthopaedic surgeons for more than five decades. Every year, we accept two new residents into the five-year program, which is structured to provide extensive training in the many facets of orthopaedic surgery. We are proud of the quality of orthopaedic surgeons whom we have prepared for practice.

Through University Specialty Clinics, we provide comprehensive patient care services, including hand surgery, sports medicine, joint replacement surgery, arthritis care, general orthopaedics, foot and ankle surgery, spine care and management of fractures. Our extremity MRI technology is providing patients new comforts while delivering superior imaging to physicians diagnosing soft-tissue injuries. We also serve the specialized health care needs of athletes and individuals with an active lifestyle through the USC Sports Medicine Center. A collaborative effort between the Department of Orthopaedic Surgery and the Department of Family and Preventive Medicine, the center provides comprehensive care including advanced surgical knee and shoulder reconstruction and primary health care specific to women and child athletes.

Our commitment to orthopaedic education helps us provide the best quality of care to our patients and the community at large.

John J Walsh IV, M.D.
Professor and Chairman
Department of Orthopaedic Surgery

 **The Official Team Physicians for the USC Gamecocks**

© University of South Carolina Board of Trustees. University of South Carolina School of Medicine physicians are also medical staff of Palmetto Health Richland and the Dorn VA Medical Hospital. Privacy Policy.

PLAINTIFF'S EXHIBIT 4
Koon 6/29/15 LH



UNIVERSITY OF SOUTH CAROLINA SCHOOL OF MEDICINE

**From:**       Diane Savage <Diane.Savage@PalmettoHealth.org>
**Sent:**       12 August, 2011 8:18 PM
**To:**       Allison Turnley; David Koon
**Cc:**       wcgrsq911@mindspring.com
**Subject:**       Re: patient encounter

All,

   I read Dr. Irani's response and wish he had displayed the compassion and care he described.   Upon his arrival to the trauma room he did not inquire about the pt's vital signs nor pain meds, so I am unsure how this could have been a concern for with holding additional doses. ▮▮▮▮▮ had received the first dose of pain meds about 45 minutes before Dr. Irani arrived.  Dr. Irani waited on the additional dose of pain meds after I stopped him from manipulating the pts injury so the meds could be administered.   Dr. Irani was reluctant to wait on the meds and kind of smirked at me when I asked him a second time to allow us to give the meds.  Dr. Irani's response was something along the lines that it would only be painful briefly.   I did ask him to speak with the family, after he had evaluated the injury and about a half hour had passed, not to give details, but to alleviate the anxiety they were experiencing….it was about an hour before he did speak with the family.  This appeared to be a very close family and they were very anxious.     From my recollection of the time in the trauma bay, Dr. Irani only spoke briefly with the pt and when he did, it lacked compassion.  I have worked in the ED for 26 years and this was a "horrific" injury as Dr. Irani described below, but I have seen worse...I did not believe his arm would be salvagable---my angst was at the lack of sensitivity displayed by Drs. Irani and Iaquinta.

Sincerely,
  Diane Savage

>>> David Koon <David.Koon@uscmed.sc.edu> 08/11/11 7:10 AM >>>
Allison -

Please forward this to Diane. I would like to know if his explanation below matches their memory of Mr. B's care. Also, if there were others in attendance (Mandy, Dr. Robinson) I would like to have their version as well.

Thanks

David Koon

————————————————
From: Afraaz Irani [afraaz.irani@gmail.com]
Sent: Wednesday, August 10, 2011 6:23 PM
To: David Koon
Cc: John Walsh
Subject: Re: FW: Fwd:

Drs. Koon and Walsh.

I remeber this pleasant gentleman very well.

My first steps with all such traumatic wounds are the same. The patient had already been given fentanyl before my arrival. Therefore my first step is to inspect wound, and see his pain level before approving a possible overdose of narcotics to an 80+ year old male. Accordingly I inspected the wound first. He had some pain, then I waited for the additional dose of additional pain meds. All the manipulation was done by Iaquinto as was outlined in the prior email

I did introduce myself to the patient. My back was to the nurses, so not sure if they heard me. It is is true that I can mumble and so that cannot be clear. Indeed the nurse here does not know the correct pronunciation of my name so I can work on better enunciation when introduction myself

I spoke with Iaquinto in the trauma bay. I called and he told me to stay at bedside he is coming down directly. The

1



PLAINTIFF'S
EXHIBIT 14
Koon
4/29/15  CH
PENGAD 800-631-6989

USC(Irani)0910

admission plan, everything was unknown, and I was instructed to say at bedside, accordingly I did not feel it appropriate to talk to the family until he had arrived as I was instructed.

Often in the setting of a traumatic injury, when the orthpaedist arrived, he/she is expected to immediately talk to family. In that situation I am less likely to jump the gun and speak to family, since it is important to wait a few extra minutes to get details correct, since this could potentially be a major surgery/life altering event.

It was a regrettable decision, but one that had to be done. Many of the staff were justifiably horrified at this, and wanted us to do more. However this was medically the correct decision. Indeed he had a heart attack during the procedure, and passed away a few days later. It is clear he could have not withstood a salvage procedure to his arm.

The patient was very thankful throughout and when I saw him on the floor we had great interactions. He remebered me from the trauma bay and shook my hand and thanked me again (although truth be told he was a real gentleman). I really did enjoy my time with him. It is a shame that he is no longer with us.

I remember we talked about how he was still able to do what he loved (metal/wood working) in his 80s. He was thankful that he was still there, and we talked about his family and how his children work with him in the shop. I do remeber Mr ████████ and wish he was still with us.

Hope that clarifies things.

Thanks,
Afraaz


On Wed, Aug 10, 2011 at 2:34 PM, David Koon <David.Koon@uscmed.sc.edu<mailto:David.Koon@uscmed.sc.edu>> wrote:
Afraaz -

I'll need an explanation by the end of the day.

DK

_____
From: Katherine Stephens [Kathy.Stephens@PalmettoHealth.org]
Sent: Wednesday, August 10, 2011 10:00 AM
To: David Koon; John Walsh
Subject: Re: Fwd: Pt. ███████████

John & David,

Pls. review for follow up.

Thank you,
Kathy

Katherine G. Stephens, MBA, FACHE
Vice President, Medical Education and Research
ACGME Designated Institutional Official
Palmetto Health
Fifteen Medical Park, Suite 202
Five Richland Medical Park Drive
Columbia, SC 29203

803-434-6861<tel:803-434-6861> or 803-434-4476<tel:803-434-4476>

katherine.stephens@palmettohealth.org<mailto:katherine.stephens@palmettohealth.org>

2

USC(Irani)0911

>>> Allison Turnley 8/9/2011 2:14 PM >>>
Please see concern below. I do not have an email address for Dr. Walsh.

Thanks -
Allison

Allison Turnley, RN BSN MSM
Director of Nursing
Emergency Services
Palmetto Health Richland
Office - 434-2945
Cell - 622-3376
Allison.Turnley@palmettohealth.org<mailto:Allison.Turnley@palmettohealth.org><mailto:Allison.Turnley@palmettohealth
.org<mailto:Allison.Turnley@palmettohealth.org>>

>>> Edward Catalano 7/19/2011 2:46 PM >>>
Allison, This note should be forwarded to: Dr. Gretta Harper ( VP responsible for employed MDs), Dr. Walsh ( Chair of the
USC Dept. of Ortho), Kathy Stephens ( VP for education ) and Cheryl Coble. Thanks, EWC

Edward W. Catalano M.D.
VP Medical Affairs
Palmetto Health Richland Hospital
5 Richland Medical Park Drive
Columbia, SC 29203
Phone: 803 434 2819<tel:803%20434%202819> Fax: 434 6668
e-mail: edward.catalano@palmettohealth.org<mailto:edward.catalano@palmettohealth.org>

>>> Allison Turnley 7/14/2011 5:32 PM >>>
Dr. Catalano -

Please see below for information regarding a concern about an orthopedic resident and attending. Diane refers to the
resident as Dr. Oriani, however she pointed him out to me and he is actually Dr. Irani.

As a side note, I was in the trauma room before the orthopedic resident arrived, and I saw the injury to this man's arm. It
was an impressive injury. And the patient is an elderly man, I believe in his 70s or 80s.

Please let Diane or me know if you need additional information.

Allison

Allison Turnley, RN BSN MSM
Director of Nursing
Emergency Services
Palmetto Health Richland
Office - 434-2945
Cell - 622-3376
Allison.Turnley@palmettohealth.org<mailto:Allison.Turnley@palmettohealth.org><mailto:Allison.Turnley@palmettohealth
.org<mailto:Allison.Turnley@palmettohealth.org>>

>>> Diane Savage 7/11/2011 9:39 PM >>>
███████ came to the ED with a traumatic partial amputation of his left forearm. His left arm was angulated, hand
rotated approximately 180 degrees, muscle, bone, tendons, arteries, etc exposed. Dr. Oriani (?) from ortho was the
consulting resident. He enter the trauma room and barely acknowledged the pt, did not introduce himself and proceeded
to manipulate the fractured arm. Myself and Mandy, along with the ED resident asked him to wait before he moved the
pt's arm so we could administer pain meds. I had to ask him twice to stop so I could give the meds. I had the meds in my
hand. He showed no compassion for what the pt was experiencing. I asked Dr. Oriani to speak with the patients family

3

USC(Irani)0912

and he was reluctant, but finally did speak with them. Dr. Spencer Robinson irrigated the wound with 1L of NS. When Dr. Orlani asked if the wound had been irrigated-I stated it had been irrigated with 1L. He stated "2" and I stated "no, 1L". He smiled and stated "2L" and I repeated "1". He remarked "we will say it was 2". I stated "no, it was 1. During the entire encounter I felt Dr. Orlani was not concerned for the pt, but more for himself and the work he had ahead of him. When Dr. Iaquinta entered the room, he too did not introduce himself to the pt and roughly removed the dressing and splint. The pt grimaced and moaned out in pain. Before myself or Mandy to ask about pain meds, Dr. Iaquinta grabbed the pts partially amputated extremity and twisted it to the anatomically correct position. The pt yelled out and came about a foot off of the stretcher. We had the means to make this pt comfortable and we instead inflicted undue pain and duress. Dr. Iaquinta very bluntly stated to the pt "we are going to have to cut off your arm".....a total lack of compassion or explanation. I have had many similar encounters with both of these physicians and have also heard other nurses and residents state the same. Please feel free to contact me for any needed information. Thanks, Diane

------------------------------------------------------------------------

PALMETTO HEALTH CONFIDENTIALITY NOTICE
This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited by law. If you have received this communication in error, please notify me immediately.

----------------------------------------

This e-mail transmission, in its entirety and including all attachments, is intended solely for the use of the person or entity to whom it is addressed and may contain information, including health information, that is privileged, confidential, and the disclosure of which is governed by applicable law. If you are not the intended recipient, you are hereby notified that disclosing, distributing, copying or taking any action in relation to this e-mail is STRICTLY PROHIBITED. If you have received this e-mail in error, please notify the sender immediately and destroy the related message.

----------------------------------------

This e-mail transmission, in its entirety and including all attachments, is intended solely for the use of the person or entity to whom it is addressed and may contain information, including health information, that is privileged, confidential, and the disclosure of which is governed by applicable law. If you are not the intended recipient, you are hereby notified that disclosing, distributing, copying or taking any action in relation to this e-mail is STRICTLY PROHIBITED. If you have received this e-mail in error, please notify the sender immediately and destroy the related message.

------------------------------------------------------------------------

PALMETTO HEALTH CONFIDENTIALITY NOTICE
This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited by law. If you have received this communication in error, please notify me immediately.

----------------------------------------

This e-mail transmission, in its entirety and including all attachments, is intended solely for the use of the person or entity to whom it is addressed and may contain information, including health information, that is privileged, confidential, and the disclosure of which is governed by applicable law. If you are not the intended recipient, you are hereby notified that disclosing, distributing, copying or taking any action in relation to this e-mail is STRICTLY PROHIBITED. If you have received this e-mail in error, please notify the sender immediately and destroy the related message.

USC(Irani)0913



UNIVERSITY OF SOUTH CAROLINA
SCHOOL OF MEDICINE

UNIVERSITY SPECIALTY CLINICS®

**SEPTEMBER 22, 2011**

**RE: DR. AFRAAZ IRANI**
**(PGY-2 ORTHOPAEDIC RESIDENT)**

**MEMO FOR RECORD**

This memo for record summarizes a meeting that Dr. Grabowski and I had with Dr. Irani on 20th of September 2011. We reviewed his progress to date over the last six months of his orthopaedic residency. At the time of his previous evaluation and scheduling it had to be postponed and so the evaluation on the 20th will serve for his evaluation of the preceding seven months. During the course of our discussion we reviewed Dr. Irani's progress overall and that specifically addressed the issues noted on the memorandum for record dated 15 August 2011.

With regards to Dr. Irani's surgical skills they are on par with his peers at this very early stage in his residency. Dr. Irani has rotated with me and I found his technical skills to be appropriate relative to wound closure and fracture fixation. He did not have the opportunity to do much with me in the area of arthroscopy. I have heard from Dr. Guy that his skills in arthroscopy are quite elementary and will require substantial growth and improvement during the course of his residency. My direct observations of his interactions with patients have been favorable. He appears to demonstrate appropriate relationships with the patients and their families while under my direct supervision. Dr. Irani demonstrates an excellent degree of interest and commitment to his own education. He carries around a small notebook while we are seeing patients in the office and if he encounters something which he is unfamiliar with he will note that for a later review. I consider this to be an excellent teaching tool. With the exceptions noted below I think that Dr. Irani's progress to date has been reasonably satisfactory.

Dr. Irani has had struggles and problems during his early phase in his orthopaedic residency. Some of these issues reflect his performance while he was a first year resident but on an orthopaedic rotation. Some of these are reflected by his behavior when he is rotating in other specialties. Some of these are noted during the first two months that he has been full-time here in the orthopaedic department. I communicated these with him during the course of our discussion. During this portion of the interview I specifically referenced the numbered topics present on the 15 August memo. With respect to point number one I am aware of the circumstances surrounding this patient's care on a firsthand basis. I had been consulted for the management of his arm injury. I am also aware of the issues surrounding the attending physician's treatment of this patient while he was in the trauma bay. I had spoken to Dr. Irani on a separate occasion about his behavior and his communication with the nurses. His central assertion is that he had a favorable relationship with the patient following his initial resuscitation. I informed him that the patient had received some sedation which also involves a certain degree of amnesia. Whether or not the patient responded to him appropriately after he was resuscitated did not in any way support proper treatment prior to that point. I also

CONTINUED

*DEPARTMENT OF ORTHOPAEDIC SURGERY*
Two Medical Park, Suite 404, Columbia, SC 29203
803-434-6812, FAX 803-434-7306

PLAINTIFF'S
EXHIBIT    15
*KCM*
6/29/15  LH



UNIVERSITY OF SOUTH CAROLINA
SCHOOL OF MEDICINE

UNIVERSITY SPECIALTY CLINICS®

SEPTEMBER 22, 2011
RE: DR. AFRAAZ IRANI (PGY-2 ORTHOPAEDIC RESIDENT)
PAGE 2

addressed the fact that his communication with the nursing staff and that his behavior was unacceptable. With respect to points number 2, 3 and 4 regarding communication, prioritization and tardiness, he acknowledged that these have been issues in the past and he indicated his desire to improve them. With regards to point number 5, he acknowledged that his decision making was incorrect regarding the total joint patient at the VA Medical Center that Dr. Koon references in his memo. He recognizes his errors involving the patient were threefold: 1) He failed to recognize the urgency of an infection in a patient who had had a total joint replacement. 2) He did not go to evaluate the patient personally. 3) He relied on a physician with less expertise to communicate the level of urgency which unfortunately proved to be incorrect. He acknowledged that his behavior was substandard in this area.

Dr. Irani was clear and forthright in his response to my evaluation. He indicated that he understood that he had made mistakes, had shortcomings, and needed to improve his performance. There still appears to be a small gap in his level of insight. He seems to feel that some of the issues here have to do with an incorrect perception by others and not incorrect performance by him. He did, however, indicate that he wanted to work in such a fashion that he would not leave any room for misperception on the part of others.

Dr. Grabowski provided some feedback about prioritization of duties in the emergency room.

In summary, Dr. Irani has demonstrated some shortcomings and mistakes during his PGY-1 and PGY-2 years. I think that these are remediable in a straight forward fashion and I expect that he will grow as an orthopaedic resident and put these issues behind him. That is my full expectation and based on his response during our evaluation I think that he feels the same. We will be meeting with him on an ongoing basis over the next several months to review his progress to date and provide him feedback with the ultimate goal of re-evaluating him and hopefully removing him from a probationary status.


David E. Koon, Jr., M.D.
Program Director

John J. Walsh, IV., M.D.
Chair Department of Orthopaedics

JJW.09.22.11.cct.ORTHO

Received + Reviewed  10/3/11
— (Irani).

DEPARTMENT OF ORTHOPAEDIC SURGERY
Two Medical Park, Suite 404, Columbia, SC 29203
803-434-6812, FAX 803-434-7306

Palmetto Health - 001528



UNIVERSITY OF SOUTH CAROLINA
SCHOOL OF MEDICINE
UNIVERSITY SPECIALTY CLINICS

RE: VA patient
David Koon
Sent: Thursday, November 03, 2011 9:39 PM
To: Afraaz Irani [afraaz.irani@gmail.com]; jhoov14@yahoo.com; Jennifer, Wood [jhwood23@gmail.com]; John Walsh

Dr. Irani -

I am well aware of the facts surrounding this patient's care and do not need you to remind me of the details.

I'm amazed that, as the junior resident of the PH team, you feel somehow inconvenienced by having to dictate a discharge summary on a patient that you "never actually participated" in his care. I guess that I'm supposed to be thankful that you "have gone ahead and dictated the discharge summary" for me. Absolutely incredible...I can assure you that I would have NEVER in a million years sent a response like this to my program director, especially when I was in the midst of academic remediation. I would remind you that I had asked you THREE times to get this done. Instead of saying "No sweat Dr. Koon, I'll take care of it" and getting it done, I get this dribble.

I really am at a loss for words. Jennifer / Justin - I'm open to any suggestions.

DK

From: Afraaz Irani [afraaz.irani@gmail.com]
Sent: Thursday, November 03, 2011 6:24 PM
To: David Koon
Subject: VA patient

Hey Dr. Koon,

Just to follow up regarding the VA patient. That patient was transferred from the VA. Hoover did the H&P. The patient was seen by Drs. Wood and Walker. I actually never participated in the patient's care, and am not sure how I am responsible for the discharge order. The only thing I can think of is that Dr. Wood asked me to put in the discharge order. Anyways I have gone ahead and dictated the discharge summary for your review.

Thanks,
Afraaz

DEPARTMENT OF SURGERY
Two Richland Medical Park, Suite 402, Columbia, SC 29203
803-256-2657, FAX 803-933-9545



PLAINTIFF'S
EXHIBIT 16
Koon
6/29/15 LH

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

Afraaz R. Irani, M.D.,                                    )
                                                         )     C.A. No. 3:14-cv-3577-CMC-KDW
              Plaintiff,                                 )
                                                         )
       v.                                                )
                                                         )     AFFIDAVIT OF
Palmetto Health; University of South Carolina            )     DAVID E. KOON, JR., M.D.
School of Medicine; David E. Koon, Jr., M.D., in         )
his individual capacity; and John J. Walsh, IV,          )
M.D., in his individual capacity,                        )
                                                         )
              Defendants.                                )
_____                  )

David E. Koon, Jr., M.D., whose signature appears below, testifies under oath as follows:

1.     At all times relevant to this lawsuit, I have served as the Program Director of the

Orthopaedic Surgery Residency Program jointly operated by Palmetto Health and the University

of South Carolina School of Medicine.  I have personal knowledge and am competent to testify

as to the matters stated in this affidavit.

2.     Dr. Alfraaz Irani was a resident in the Orthopaedic Surgery Residency Program

from July 1, 2010 until April 10, 2012.  He completed his PGY-1 year.

3.     Dr. Irani was placed on Level II Academic Remediation from August 15, 2011,

through December 1, 2011.  Dr. Irani appealed to Dr. Katherine Stephens, who upheld his

Academic Remediation, and Dr. Irani did not take his grievance to the next step.

4.     Dr. Irani was placed on Level III Academic Remediation from December 9, 2011,

until January 31, 2012.  After Dr. Stephens upheld Dr. Irani's January 2012 Academic

Remediation, Dr. Irani did not timely request a grievance hearing.

5.     In February 2012, Dr. Irani was again placed on Level II Academic Remediation.



PLAINTIFF'S
EXHIBIT 26
Koon
6/29/15  LH
PENGAD 800-631-6989

USC(Irani)0468

6.      In March 2012, Dr. Irani was again placed on Level III Academic Remediation and was suspended from the Residency Program pending official action on the recommendation that he be terminated from the Residency Program.

7.      On April 10, 2012, the Graduate Medical Education Committee (GMEC) voted to terminate Dr. Irani from the Residency Program.

8.      After the April 10, 2012 termination decision, Dr. Irani pursued a grievance. Dr. Katherine Stephens upheld the GMEC's decision, and the resident grievance committee heard Dr. Irani's grievance on April 30, 2012. The grievance committee upheld the termination decision.

9.      By letter dated June 1, 2012, Charles Beamon, CEO of Palmetto Health, notified Dr. Irani that he found the termination to be proper and that he upheld the decision of the grievance committee.

10.      In May 2012, I learned that David Rothstein had sent a letter to various individuals threatening a lawsuit on behalf of Dr. Irani, and targeting me personally. See attached Exhibit A. Mr. Rothstein had previously filed a lawsuit against Palmetto Health, the University, me, and others on behalf of a former resident, Dr. Chad Lamoreaux, in which Mr. Rothstein sued and attacked me personally. At the time of Mr. Rothstein's May 2012 letter threatening litigation on behalf of Dr. Irani, I was a defendant in yet another lawsuit filed by Mr. Rothstein, this one on behalf of Dr. John Eady, in which, yet again, Mr. Rothstein sued and attacked me personally.

11.      On or about August 31, 2012, I learned, through legal counsel, of an email David Rothstein had sent to attorneys Kathy Helms and Shahin Vafai, attorneys who had represented Palmetto Health, the University, me, and others in Dr. Lamoreaux's lawsuit, and were representing Palmetto Heath, the University, me, and others in Dr. Eady's lawsuit. See attached

2

Exhibit B. In that email, Mr. Rothstein again threatened litigation, this time with specific reference to Dr. Irani's attempts to enter a residency program elsewhere, and stated "I am sure you will advise your clients about their potential liability for defamation, tortious interference, and retaliation if they torpedo Dr. Irani's efforts to further his medical career."

12.    I did not provide any information about Dr. Irani to any residency program. In late 2012, I received a call from someone about Dr. Irani, and I asked her to send her inquiry in writing. I did not hear further from her.

13.    I was very relieved to learn, in approximately March 2013, that Dr. Irani had been placed with a residency program. I thought that meant he would move on with his life and not file a lawsuit against us.

14.    On May 28, 2013, Dr. Irani sent me an email, attached as Exhibit C, in which he informed me that he was applying for a medical license in California, and asked me to fill out a two-page form and mail it to the Medical Board of California. I sought, obtained, and followed legal advice on the matter, and sent the Exhibit D documents to the Medical Board of California on June 4, 2013. At all times, I was trying to balance my concerns about properly performing my obligations as Program Director, being accurate in my submissions to the Medical Board of California, and avoiding a lawsuit by Dr. Irani.

15.    While I was seeking and obtaining legal advice about a response to the Medical Board of California, Dr. Irani texted me about the matter. On June 5, 2013, the day after I sent the Exhibit D documents to the Medical Board of California, I received a FedEx package from Dr. Irani reiterating his May 28, 2013, email request. I am aware that Kathy Helms thereafter emailed David Rothstein on June 5, 2013, requesting that Dr. Irani not communicate directly with me again, but rather that he communicate with Margie Bodie, Administrative Director for Resident/Student Services at Palmetto Health. Ms. Helms also informed Mr. Rothstein that the

3

USC(Irani)0470

information Dr. Irani had requested be sent to the Medical Board of California had been sent.

16.    On Monday, June 17, 2013, I received a letter Dr. Irani had apparently hand-delivered to my office, in which he asked that I address some "errors" in the form I sent to the Medical Board of California on June 4, 2013.  See Exhibit E.  I again sought, obtained, and followed legal advice on the matter, and sent the Exhibit F documents to the Medical Board of California on June 17, 2013.  At all times, I was trying to balance my concerns about properly performing my obligations as Program Director, being accurate in my submissions to the Medical Board of California, and avoiding a lawsuit by Dr. Irani.

17.    Other than the documents attached hereto as Exhibits D and F, I have not submitted any documentation or other information to the Medical Board of California.  I have not submitted any documentation or other information to any other entity with whom Dr. Irani may have sought or obtained a license, residency, or employment.

I testify under penalty of perjury this _6th_ day of January, 2015, that the foregoing statements are true and correct.

_____
David E. Koon, Jr., M.D.

4

USC(Irani)0471



UNIVERSITY OF SOUTH CAROLINA
SCHOOL OF MEDICINE

UNIVERSITY SPECIALTY CLINICS



RECEIVED
MEDICAL BOARD OF
CALIFORNIA

2013 JUL -1  AM 10: 32

LICENSING
PROGRAM

26 JUN 13

Memorandum of Record

Re: Dr. Afraaz Irani

Dr. Afraaz Irani joined the orthopaedic residency on 01 JUL 10. He completed his internship (PGY1) on 30 JUN 11 and was promoted to PGY2 effective 01 JUL 11.

Dr. Afraaz Irani was placed on Level II Academic Remediation from 15 AUG 11 to 01 DEC 11 for patient care, organizational, and communication issues.

Dr. Irani was placed on Level III Academic Remediation from 09 DEC 11 to 31 JAN 12 for persistent patient care issues and for failing to complete his remediation measures.

After his Level III remediation was completed, the department recommended that Dr. Irani be placed on Level II Academic Remediation beginning 06 FEB 12.

During his first month on this Level II Remediation, Dr. Irani was involved in two patient encounters that the faculty deemed below acceptable standards. Dr. Irani had failed to demonstrate immediate and sustained improvement as required by his remediation measures. He had failed in the competencies of patient care, interpersonal skills and communication, and professionalism.

It was the recommendation of the orthopaedic faculty to place Dr. Irani immediately on Level III academic remediation (effective 01 MAR 12) and suspend him from clinical duties. We investigated these encounters thoroughly. No reasonable explanation could be identified for his actions, and the faculty recommended to the Graduate Medical Education Committee (GMEC) on 10 APR 12 that Dr. Irani be dismissed from the program. This decision was confirmed by the GMEC, the DIO, the Grievance Committee, and the Palmetto Health Chief Executive Officer during the appeals process.

Dr. David Koon
Program Director
PH/USC SoM Orthopaedic Residency Program

*DEPARTMENT OF ORTHOPAEDIC SURGERY*
*Two Medical Park, Suite 404, Columbia, SC 29203*
*803-434-6812, FAX 803-434-7306*



PLAINTIFF'S
EXHIBIT 27

6/29/15 LH

Palmetto Health - 000002