# Exhibit ZZZ

**AnneMarie Hyer**

| | |
|---|---|
| **From:** | Marsha Miller [mmiller@acgme.org] |
| **Sent:** | Friday, April 27, 2012 11:27 AM |
| **To:** | 'david.koon@uscmed.sc.edu'; Katherine Stephens |
| **Cc:** | Pam Derstine; Pat Surdyk; Kevin Weiss; John Potts |
| **Subject:** | Complaint about the Orthopaedic Surgery Program at Palmetto Health/University of South Carolina School of Medicine |
| **Attachments:** | Palmetto Health U of South Carolina Ortho PD-DIO final LETTER.pdf |

Dear Drs. Koon and Stephens:

Afraaz Irani, MD, has submitted a complaint about lack of and unfair due process and grievance at Palmetto Health, and other allegations of noncompliance by its Orthopaedic Surgery program. Attached is my letter outlining the complaint, and I will send his supporting documentation under separate email so as not to overload everyone's mail box. Your response is due May 28, 2012, and I would appreciate acknowledgement of this email.

Sincerely,

Marsha Miller

**Marsha A. Miller, MA**
Associate Vice President, Office of Resident Services



ACGME
515 N. State Street, Suite 2000
Chicago, IL 60654
Office: 312-755-5041
mmiller@acgme.org

1

Palmetto Health - 001362



April 27, 2012

**Accreditation Council for**
**Graduate Medical Education**

515 N. State Street
Suite 2000
Chicago, IL 60654

Phone 312.755.5000
Fax 312.755.7498
www.acgme.org

A C G M E

David E. Koon Jr, MD
Program Director
Palmetto Health/University of South Carolina School of Medicine
Palmetto Health Richland
Two Medical Park, Suite 404
Columbia, SC  29203

Katherine G. Stephens, PhD, MBA
Vice President, Medical Education and Research
Palmetto Health
P.O. Box 2266
Columbia, SC  29202-2266

Re: Program #2604532263 and #8004500419

Dear Drs. Koon and Stephens:

The ACGME has received a complaint from Afraaz Irani, MD, who will go unnamed alleging that the Orthopaedic Surgery program at Palmetto Health/University of South Carolina School of Medicine is in violation of ACGME requirements.

Before ACGME responds to the complainant, it is important to know the perspective of the program and institution. Accordingly, please respond to the allegations set forth below and include any documentation that would demonstrate compliance with the requirements.

<u>Institutional Requirements</u>

*II.D.4.e) Grievance procedures and due process: The Sponsoring Institution must provide residents with fair, reasonable, and readily available written institutional policies and procedures for grievance and due process. These policies and procedures must minimize conflict of interest by adjudicating parties in addressing:*

*II.D.4.e).(1) Academic or other disciplinary actions taken against residents that could result in dismissal, non-renewal of a resident's agreement, non-promotion of a resident to the next level of training, or other actions that could significantly threaten a resident's intended career development; and,*

*II.D.4.e).(2) Adjudication of resident complaints and grievances related to the work environment or issues related to the program or faculty.*

Palmetto Health - 001363

Page 2

Program Requirements for Resident Education in Orthopaedic Surgery

*II.A.4.h) ensure compliance with grievance and due process procedures as set forth in the Institutional Requirements and implemented by the sponsoring institution;*

Dr. Irani alleges that he has been the subject of racial harassment, and singled out for disciplinary actions for minor infractions. He alleges that the program director has gone out of his way to discredit him in front of other faculty members, alleging improper care and inadequate medical knowledge despite clear evidence to the contrary. Dr. Irani alleges that the program director submitted false documents to the GMEC in order to demonstrate a pattern of unsatisfactory behavior. He alleges that he was placed on probation only six-weeks into his PGY-2 year based on several unsubstantiated allegations. Dr. Irani alleges that requests for clarification of these allegations have been denied.

Dr. Irani alleges that he was denied a fair hearing or due process. Dr. Irani alleges that multiple times he requested documentation of the allegations regarding poor patient care, but the program director and DIO refused to turn over the documents.

Dr. Irani alleges that program's culture does not allow one to complain or protest when violations or breach of trust are observed. He reports that after last year's ACGME resident survey revealed some resident dissatisfaction it became a witch hunt by the attendings to see who had written disparaging comments about the program.

Dr. Irani alleges that he was denied the chance to engage in the regularly assigned rotation at the Veterans Hospital in January, and this prevented him from receiving the same education as the other residents. He alleges, too, that it denied him the opportunity to get an unbiased evaluation of his performance by the Orthopaedic staff at the Veterans Hospital.

Institutional Requirements

*II.A.2. Resident selection*
*II.A.2.a) The Sponsoring Institution must ensure that its ACGME accredited programs select from among eligible applicants on the basis of residency program-related criteria such as their preparedness, ability, aptitude, academic credentials, communication skills, and personal qualities such as motivation and integrity. ACGME-accredited programs must not discriminate with regard to sex, race, age, religion, color, national origin, disability, or any other applicable legally protected status.*

Page 3

Dr. Irani alleges that the program has an unusually high attrition rate, and the program director is in the process of dismissing a third resident over the span of a four-year period.

<u>Program Requirements for Resident Education in Orthopaedic Surgery</u>

*VI.D. Supervision of Residents*
*VI.D.1. In the clinical learning environment, each patient must have an identifiable, appropriately-credentialed and privileged attending physician (or licensed independent practitioner as approved by each Review Committee) who is ultimately responsible for that patient's care.*

*VI.D.2. The program must demonstrate that the appropriate level of supervision is in place for all residents who care for patients. Supervision may be exercised through a variety of methods. Some activities require the physical presence of the supervising faculty member. For many aspects of patient care, the supervising physician may be a more advanced resident or fellow. Other portions of care provided by the resident can be adequately supervised by the immediate availability of the supervising faculty member or resident physician, either in the institution, or by means of telephonic and/or electronic modalities. In some circumstances, supervision may include post-hoc review of resident-delivered care with feedback as to the appropriateness of that care.*

*VI.D.3. Levels of Supervision*
*To ensure oversight of resident supervision and graded authority and responsibility, the program must use the following classification of supervision:*

*VI.D.3.a) Direct Supervision – the supervising physician is physically present with the resident and patient.*

*VI.D.3.b) Indirect Supervision:*

*VI.D.3.b).(1) with direct supervision immediately available – the supervising physician is physically within the hospital or other site of patient care, and is immediately available to provide Direct Supervision.*

*VI.D.3.b).(2) with direct supervision available – the supervising physician is not physically present within the hospital or other site of patient care, but is immediately available by means of telephonic and/or electronic modalities, and is available to provide Direct Supervision.*
Page 4

Page 4

*VI.D.3.c) Oversight – the supervising physician is available to provide review of procedures/encounters with feedback provided after care is delivered.*

Dr. Irani alleges that there are many examples regarding lack of supervision, but the weekly Monday afternoon clinic is the best example. He reports that this clinic handles usually 40 underinsured patients, and 7-8 of these patients are covered by Medicare/Medicaid. He alleges that the attending regularly shows up 1-2 hours after clinic starts, leaves early, and usually sees 1-2 patients per the entire clinic. He alleges that the attending is not routinely present and available for the patient's examination even though the attending will record in the chart that he saw the patient. Instead, the attending was in the operating room and falsely documented in the chart that he was present and available to the resident at the time of the examination. Dr. Irani notes that the documentation he provided to the ACGME is an example of patients being seen, treated, and discharged from clinic without resident supervision. He alleges only Dr. Voss regularly attends the clinic on time and sees the Medicare patients.

*II.A.4.j) implement policies and procedures consistent with the institutional and program requirements for resident duty hours and the working environment, including moonlighting, and, to that end, must:*

*II.A.4.j).(1) distribute these policies and procedures to the residents and faculty;*

*II.A.4.j).(2) monitor resident duty hours, according to sponsoring institutional policies, with a frequency sufficient to ensure compliance with ACGME requirements;*

*II.A.4.j).(3) adjust schedules as necessary to mitigate excessive service demands and/or fatigue; and,*

*VI.A.4.b) not be compromised by excessive reliance on residents to fulfill non-physician service obligations.*

*VI.G. Resident Duty Hours*
*VI.G.1. Maximum Hours of Work per Week*
*Duty hours must be limited to 80 hours per week, averaged over a four-week period, inclusive of all in-house call activities and all moonlighting.*

*VI.G.4.b) Duty periods of PGY-2 residents and above may be scheduled to a maximum of 24 hours of continuous duty in the hospital. Programs must*

Page 5

*encourage residents to use alertness management strategies in the context of patient care responsibilities. Strategic napping, especially after 16 hours of continuous duty and between the hours of 10:00 p.m. and 8:00 a.m., is strongly suggested.*

*VI.G.4.b).(1) It is essential for patient safety and resident education that effective transitions in care occur. Residents may be allowed to remain on-site in order to accomplish these tasks; however, this period of time must be no longer than an additional four hours.*

*VI.G.4.b).(2) Residents must not be assigned additional clinical responsibilities after 24 hours of continuous in-house duty.*

*VI.G.4.b).(3) In unusual circumstances, residents, on their own initiative, may remain beyond their scheduled period of duty to continue to provide care to a single patient. Justifications for such extensions of duty are limited to reasons of required continuity for a severely ill or unstable patient, academic importance of the events transpiring, or humanistic attention to the needs of a patient or family.*

*VI.G.4.b).(3).(a) Under those circumstances, the resident must:*
*VI.G.4.b).(3).(a).(i) appropriately hand over the care of all other patients to the team responsible for their continuing care; and,*

*VI.G.4.b).(3).(a).(ii) document the reasons for remaining to care for the patient in question and submit that documentation in every circumstance to the program director.*

*VI.G.4.b).(3).(b) The program director must review each submission of additional service, and track both individual resident and program-wide episodes of additional duty.*

*VI.G.5.b) Intermediate-level residents should have 10 hours free of duty, and must have eight hours between scheduled duty periods. They must have at least 14 hours free of duty after 24 hours of in-house duty. PGY-2 and PGY-3 residents are considered to be at the intermediate level.*

Dr. Irani provides 5.5 months of duty hour data from July to the second week of December 2011. He interprets the data to mean that for 41 days a post call resident was in the operating room. He alleges that the data show that there were 18/41 incidents or 44% violation rate of resident work hours where the post-call residents were in the operating room the next day. Allegedly, the rate of violations was similar for all junior residents ranging from 33% to 50% violation rate for each junior resident. Dr. Irani alleges that that these

Page 6

violations are not endemic to any particular resident, but the culture of the program. He reports that residents are repeatedly instructed to obey duty hours, but there is no method or support for compliance.

Dr. Irani alleges that contrary to policy residents are being used to solve the service needs of the institutions and not the educational needs of the residents.

Dr. Irani has given me permission to share with you the documents that he submitted to substantiate his complaint, and they are attached.

Please provide a response to the above allegations by May 28, 2012. Please send only one scanned copy of the response to the email address below (a paper copy is acceptable, but one electronic copy is encouraged).
The response must be reviewed and signed by the Designated Institutional Official.

Sincerely,

Marsha A. Miller

Marsha A. Miller, MA
Associate Vice President
Office of Resident Services
312-755-5041
mmiller@acgme.org

cc:     John R. Potts, III, MD, Senior Vice President, Surgical Accreditation
        Pamela Derstine, PhD, Executive Director, RC for Orthopaedic
        Surgery
        Kevin B. Weiss, MD, MPH, Senior Vice President, Institutional
        Accreditation
        Patricia Surdyk, PhD, Executive Director, Institutional Review
        Committee

**Katherine Stephens**

| | |
|---|---|
| **From:** | Marsha Miller [mmiller@acgme.org] |
| **Sent:** | Friday, May 04, 2012 4:47 PM |
| **To:** | Katherine Stephens; david.koon@uscmed.sc.edu |
| **Subject:** | Afraaz Irani's Complaint about the Orthopaedic Surgery Program and the Institution |
| **Attachments:** | Palmeto Health U of South Carolina Ortho attachment 1 revised.pdf; Palmeto Health U of South Carolina Ortho attachment 2 revised.pdf |

Dear Drs. Koon and Stephens,

Dr. Irani has submitted a revised, more complete document to support his complaint. It is attached for your consideration as you prepare your response to the allegations in my letter of April 27, 2012.

Sincerely,


Marsha Miller


**Marsha A. Miller, MA**
Associate Vice President, Office of Resident Services



ACGME
515 N. State Street, Suite 2000
Chicago, IL 60654
Office: 312-755-5041
mmiller@acgme.org

1

Palmetto Health - 001369

1  To whom it may concern;
2
3  I am a PGY-2 resident at the Palmetto Health Richland/University of South Carolina School of
4  Medicine Orthopaedic Surgery Program in Columbia, South Carolina.
5
6  I am writing to you as I have become extremely concerned about the unethical behavior and
7  harassment I have been subjected to from both my program director and the chairman of my
8  department.
9
10  I have attempted to bring my concerns before the appropriate local committees, but have been
11  disappointed by their unwillingness to listen to my grievances. I believe that I have been denied
12  due process.
13
14  At this point, I feel that I have nowhere else to turn. I was encouraged to contact you by a
15  physician who is sympathetic to my plight.
16
17  I have been the subject of racially based harassment by my program director and have been
18  singled out for disciplinary actions for minor infractions.
19
20  This pattern of behavior has been evident throughout my PGY-2 year, when my program director
21  -- who has repeatedly referred to me as "Achmed the terrorist" and makes constant insinuations
22  about my cultural background – repeatedly submitted documents to the GMEC which are
23  patently false, in order to attempt to demonstrate a pattern of unsatisfactory behavior on my part.
24  He placed me on probation only six weeks into my PGY-2 residency, based on several
25  unsubstantiated allegations. Requests for clarification of these allegations have been denied, and
26  I have been unable to get any independent verification of his allegations.
27
28  My program director has gone out of his way to attempt to discredit me in front of other faculty
29  members, alleging improper care despite clear evidence to the contrary (including from other
30  faculty and residents).
31
32  He has further alleged deficiencies in my knowledge base, despite evidence to the contrary. In
33  fact, my OITE score easily outpaced that of my fellow co-resident.
34
35  Needless to say, such constant harassment makes it nearly impossible for me to focus on my
36  education and patient care.
37
38  My program director has continued to present false statements to the GMEC. For example, in
39  one case he alleged improper care of a trauma patient. I was not involved in the patient's initial
40  resuscitation, but was called to assist after the patient had been in the ED for over three hours.
41  Many of the allegations did not involve me at all. My program director refused to ask for my side
42  of the story, in complete violation of, and with complete disregard for, the hospital's policy. He
43  turned over these factually incorrect complaints to the GMEC for my suspension. I was denied a
44  fair hearing or due process.
45

1

Palmetto Health - 001370

More egregious were the multiple times I asked for documentation of the allegations of poor care, and they (and the DIO) refused to turn over these documents.

I have each time protested to the DIO, but to no avail. In fact, even my request for a hearing before the grievance council was denied.

Additionally, I was denied the chance to engage in our regularly assigned rotation at the VA beginning in January, and this prevented me from being educated on a rotation that all other residents are assigned. It also denied me the opportunity to get an unbiased evaluation of my performance by the Orthopaedic staff at the VA.

It is noteworthy that the program has an unusually high attrition rate: they are trying now to get rid of a third resident over the span of about four years, a fact they seem to be proud of (my program director emphasized this to me only six weeks into my residency).

In fact, a careful evaluation of the present practices will show that residents are being used to solve service needs of the institutions, not the educational needs of the residents – contrary to resident education policies.

The actions of my department recently culminated with them moving to have me terminated from the residency program on March 5th 2012. I am very disappointed and concerned, since their behavior has been unethical, deceitful, and illegal.

I am not confident in the checks and balances at a hospital where the department chairman and program director can regularly violate hospital policy, and where my chairman assures me of the outcome of a GMEC committee meeting before any proceedings have even occurred.

I implore you to help me in this situation. Please help me get due process, and investigate this pattern of targeted resident behavior. I have worked hard and sacrificed much to become an orthopedic surgeon, and I feel that those entrusted with my education have reneged on their commitment.

Sincerely,

Affraaz Irani, M.D.

2

I started my PGY-2 year with high hopes and expectations, excited that I was finally an orthopaedic resident. However, my experience soon began to take a turn for the worse.

I love orthopaedics and was eager to partake in my education; I read traditional as well as the non-traditional orthopaedic texts. I came across an interesting article which said that many doctors were not telling their patients they were obese or overweight, and those that did so had better patient outcomes. This was a recurring and very frequent problem in our uninsured population where the residents provide primary patient care (aka "staff clinic"). Indeed the new VA guidelines (VISN 10) preclude joint replacement on anyone with a BMI over 35.

Accordingly, I thought this might an interesting article to read for journal club. I talked to the chief residents, and they told me to email Dr. Koon about the article. I emailed Dr. Koon. The email I got back was short: "not sure why you are reading the Archives of Internal Medicine... let me know if you are not satisfied with the articles selected for our journal clubs." (Email can be seen in Exhibit A). The following Monday, the belittling continued. In front of me, Dr. Koon mockingly asked the chief resident "so I guess we have to run all our journal club articles by Dr. Irani now to see if they are OK?" I was not sure why I was being chastised for partaking in my education, and while I was shocked at the time (only about 3-4 weeks into my PGY-2 year), I would later gain perspective to see that this was nothing compared to what would follow.

Episodes like this continued. In front of the other residents, a few weeks later, I made a comment to my chief resident which was well received by him. Dr. Koon immediately interjected, stating that I was in no position to ever correct a senior resident, even if I was correct. Such demeaning comments continued to escalate, including confronting me over my "audacity to question my senior resident's decision making," when I asked if a fracture pattern could be treated non-operatively. The comments began to cross the line into racially based taunts, such as calling me "Achmed the terrorist," and incorrectly associating my Indian background with terrorism.

I did not appreciate this, but I quickly realized -- as I had been instructed by senior residents regarding conflicts with an attending -- that responding only made things worse.

As my chief resident told me, at this program: "Grin and bear it;" opening your mouth will only get you in trouble. "This is a military program," I was told, with military trained doctors -- they are not interested in hearing from us. My chief resident jokingly said my colleague Dr. Goodno, would die from a heart attack, and I would die "because Dr. Koon will kill you." That was an ominous premonition by my chief resident at the beginning of my PGY -2 year.

Although, I was trying to learn, it was increasingly obvious this was an environment where learning was secondary.

I was stunned and dismayed when only six weeks into my residency, Dr. Koon called me into his office to place me on Level II remediation (see exhibit for guidelines). Additionally,

3

Palmetto Health - 001372

he brought in Mr. Jarrard, a business partner, as a witness. He said he was placing me on Level II remediation and went on to boast that he had fired Dr. Chad Lamoreaux (a previous resident) a few years ago, just a few months before he was about to graduate as a PGY-5. I was confused why he brought that up in our initial meeting. The tone of the meeting remained ominous. Immediately, I was led to believe the purpose of this meeting was to set the framework for firing me. In retrospect my initial feelings were correct.

Dr. Koon handed me a letter with seven alleged deficiencies and rather than going over them, he asked me to respond to them. Many of these were completely new to me, and I went through all of them trying to reconcile what my interpretation of these events was with what was written. I asked Dr. Koon to elaborate on many of these – notably the statement that I created more work for other residents and another one stating I lacked attention to detail, as I admittedly did not understand a majority of these complaints. These were new and troubling allegations to me.

I asked Dr. Koon to help me understand my alleged deficiencies. His response was "this just shows you lack insight," and he refused to expound more. I was puzzled. How could I improve if I could not understand my deficiencies? Again, I was left to conclude that the true motive here was to set the groundwork for termination.

However, orthopaedics was all I wanted to do, and therefore I did my best to understand these deficiencies and move forward.

I took these allegations seriously, and did everything I could to try and understand and correct the alleged deficiencies. Having no guidance from my program director, I reached out to my fellow residents. One statement in the remediation letter stated I created extra work for other residents. I contacted each of my resident peers individually and spoke to them privately. They all individually denied this and went so far as to say that I often went above and beyond what was required.

What was more puzzling about this allegation was the fact that like all my fellow residents, and as I pointed out in my response letter Aug. 24th to Drs. Koon, Walsh, and Stephens, "I always complete the work that's been assigned to me, *often staying beyond recommended work hours.*" It was no secret that we often violated duty hours, while I regularly went over the 80hr/week mandate. When talking to my fellow residents, the response was always "make it work." Indeed, that summed up the culture of the program, and by challenging it and bringing violations to the forefront in my letter, this did not do much to ingratiate myself with Dr. Koon and my superiors. Dr. Koon regularly insisted that we all stay within duty hours, but there was no framework for doing so.

Indeed, in February 2012, during my return from a suspension, Dr. Koon insisted that I make up call time and not violate duty hours, something that remained impossible, as given the schedule, I was averaging over 80hours/week. Had I completed my month (he terminated me at the end of the month), I would have violated duty hours again. My attempt to bring these violations to the attention of my fellow residents/program director were ignored.

4

I additionally tried to research the allegation that I needed to improve on attention to detail. Again, I received no explanation from my program director, so I tried my best to understand how I could change. I spoke with numerous people to get their input. I even began asking ancillary staff for help understanding any alleged deficiencies. The OR staff told me that Dr. Walsh complained that I lacked attention to detail when I left a book for him in the OR. He had loaned me a book the previous day and told me to make absolutely sure it got back to him. For that reason, I brought it with me the next day with a stack of papers and placed it near Dr. Walsh's usual papers he brings to the OR so he could grab it after the case. As I was also holding the on-call pager that day, I was called away during the case.

I left the book for him in the OR, hoping to return to finish the case. When I returned later, I unfortunately missed the case because of my duties in the emergency department. I asked about the book, and Dr. Walsh had not taken it. He assumed I had forgotten it, when in fact, I had brought it to the OR because that was the only place I would see Dr. Walsh and he had stressed he wanted the book back.

This was what, to the best of my ability, I surmised Dr. Koon was referring to. I tried to dissect what had gone wrong and learn on my own how I could improve. In this case, I surmised, improved communication would have prevented this misunderstanding, and I took that as a learning point. This was my best guess as how I could be a better resident since the feedback, communication, and guidance required from my program director were missing.

I went out of my way asking residents, ancillary, and support staff for help with my remediation goals. I took these allegations seriously and did everything to try and improve in the eyes of my superiors.

The full letter placing me on remediation and my rebuttal can be seen in exhibits B & C.

Dr. Koon's letter alleged other problems: First, he alleged improper care of a VA patient. I was told by the VA ER staff that a post-op total knee patient was being admitted by medicine for cellulites not near the incision site, and the attending told me this was a "heads up" and not an official consult. I communicated directly with the medicine attending (at about 12 AM). At that time I was seeing patients in Emergency Department of Richland Memorial Hospital. I offered to see the patient at the VA. The attending told there were no acute orthopaedic issues, and that the knee appeared benign, and told me to see the patient in the AM, or when I was done at Richland (the VA is about 20 minutes away from Richland Memorial Hospital – our level I trauma center). I worked on the patients at Richland. I did not have a break to either rest or go to the VA. The following AM, the patient was seen by the VA team. His wound was benign, and he was  discharged.

I was chastised for inappropriate care with regard to this patient. In retrospect, I learned that even though the medicine attending told me there was no acute issue, I should have somehow found time and left Richland to see that patient at the VA. At that time I was very

5

early in my training and importantly without any senior resident supervision or senior resident on call with me. I learned from that incident. In this case, the attending had said it was not an acute issue; my chief resident had previously instructed me that non-acute VA consults can wait until the AM if I am busy with Richland patients. Irregardless, I should have found a way to head over to the VA. However, I believe Dr. Koon mischaracterized the case by simply stating I did not "evaluate a VA total joint patient with immediate post-operative cellulites."

I readily admit that I make mistakes like all my fellow residents – however my mistakes have been readily misconstrued and vilified. Rather than creating an environment where I can talk about my mistakes and learn from them, they were only used to castigate me. It is no wonder that I became defensive from there on out, since mistakes were not opportunities for constructive feedback or guidance, but instead were used to humiliate and embarrass me.

Additionally, I was chastised for closing a wound with vicryl. While this was inappropriate care (and I'm still upset that I grabbed the wrong suture), it is important to note that I was still early in my training, without senior resident supervision, and my care plan went through the appropriate checks and balances. I reviewed my care plan with the attending and he told me to revise the closure with different sutures, which I did within a few hours of the initial treatment. It is especially noteworthy, that I am not the only resident who has made this mistake, but I was the only resident who was disciplined for this technique. As one of my fellow residents himself volunteered, "We all make mistakes, but for some reason, you get singled out."

Dr. Koon's letter also alleged that I gave inappropriate pain meds and did not show compassion for a trauma patient with a left hand degloving injury. I pointed out that I did not actually do a reduction on this patient, that it was handled by my attending (Dr. Iaquinto), so I did not cause the patient excruciating pain as was alleged. Furthermore, after I saw the patient in the trauma bay, the next time I saw him was about a couple days later on the orthopaedic floor. He shook my hand, and I asked him if he remember me. He smiled and said he remembered me from the ED when he first came in. He thanked me and personally said how happy he was with my care.

I think the ultimate judge of compassionate care should come from the patient. The patient remembered me and was pleased with his care (although he was saddened by his injury). I did however take away that I can improve on demonstrating appropriate care, I think the events were grossly overstated at best, and at worst frankly false.

Dr. Koon gave me his personal word that these events would be kept private between Dr. Koon, Dr. Walsh, and myself. Needless to say this was not true. I was very disappointed and taken aback when my chief resident began asking me if my decisions were wise given that I "was on probation." The faculty and my fellow residents somehow all came to know about my alleged "inadequacies" without me saying a word. Cleary Dr. Koon's personal promise of confidentiality was empty. It seems that the goal here was to publicly humiliate, rather than support me.

6

Palmetto Health - 001375

Despite these allegations not being explained or substantiated, that did not stop them from presenting these statements to the GMEC for them to base their vote on and I was placed on Level II remediation.

This experience was disenchanting, confusing, and disappointing. It was especially disappointing to be placed on probation only six weeks into residency. What made it more frustrating was I could not get any guidance, feedback or direction from my program director. It became clear that I had to become extremely defensive if I was to have a shot at surviving.

Despite all this, I re-evaluated where I was in my training and my ultimate goal of becoming an orthopaedic surgeon. I recognize I am not perfect, and like all residents I had made my share of mistakes, but I felt like I was not given much guidance, and I went out of my way to figure out how I could improve. I racked my brain to figure out why I was being treated like this. In retrospect there was a troubling pattern of behavior from my residency director that I had tried to laugh off but which would become more and more of a problem. Dr. Koon continued an escalating trend of derogatorily making terrorist comments about me, going so far as to label me "Achmed the terrorist." While I found these comments terribly insulting, terribly unprofessional, and terribly insensitive, I quickly realized, as I had been instructed by senior residents regarding conflict with an attending, that responding only made things worse.

I decided to try to extract as many learning points as possible from this experience. I decided I needed to improve on communication. I decided to accept the probation and move on. I was still excited to come to work every day and realized that the best thing I could do to achieve my goal of becoming an orthopaedic surgeon was continue to work hard and improve in the eyes of my attendings.

In follow up meetings, I verbalized my stated goal to accept what happened and move on, working on the deficiencies that my attendings perceived as impeding my goal of becoming an accomplished orthopaedic surgeon.

During my Sept 19th and Oct. 11th progress meetings, I was asked how I was doing; I stated I thought I was improving, and I was given no feedback to the contrary. Things seemed to be improving -- or so I was led to believe. It was stressed that I need to improve communication and so I made attempts to over-communicate. Indeed I was asked to prepare a grand rounds presentation on effective communication, where the point was made that "you cannot over-communicate."

Additionally, I quickly learned that going through the grievance process, while having the façade of giving residents a chance to have their voice heard, was not well received by the department; my chairman told me something very similar to: "I'm not going to tell you what to do, but I'm a busy orthopaedic surgeon, you're a busy orthopaedic surgeon -- when I have to sit here and answer questions about all this, it just gets in the way when I could be doing other things." The muted, but clear message was again for me to "grin it and bear it."

7

Palmetto Health - 001376

The inequitable and humiliating treatment continued, as even other residents noticed. Perhaps most egregious was when I presented a complication at M&M (morbidity and mortality) conference on a pediatric patient with a missed diagnosis of septic shoulder, who then went on to have delayed discovery of sepsis of the contralateral shoulder, a pathologic fracture of his humerus, and a very complicated hospital course including several months in the PICU, respiratory failure, renal failure requiring CRRT, adrenal insufficiency, anemia requiring EPO shots, stage III decubitous ulcers, and osteomyelitis of both shoulders. At the conclusion of my presentation, Dr. Koon immediately spoke attempting to discredit me in front of the entire residency and faculty saying, "I don't think this is an appropriate presentation for an M&M." I was surprised, as this had been an M&M identified by my chief resident. Also I had spoken with the pediatric orthopaedic attending. Luckily, the other attendings present confirmed that this grave hospital course from a septic shoulder was indeed was a very severe M&M.

On Oct. 26th, Dr. Koon told me that there were some issues with my performance. I asked him what the issue was. He simply said to speak with Drs. Wood (my chief resident) and Mazoue (my attending). I spoke with both them individually and they said they had no complaints (Exhibit E). Indeed this was in line with my usual feedback from Dr. Koon, which consisted of vague negative comments, lacking directions for improvement and ultimately unsubstantiated. These "feedback" sessions were frustrating and taking a toll, as I began to wonder what I was doing wrong and right and at times I was afraid of being punished for doing anything, right or wrong, and often frozen in indecision.

In early November, there was a VA patient who had been transferred to Richland. The patient was lacking a dictation, and this got routed to Dr. Koon. Dr. Koon routed it to me. A few days later, he asked if the dictation was done. I informed him it had not yet shown up in my inbox, but I would take care of it as soon as it was in my inbox. That evening a VA patient showed up in my inbox for an H&P and I took care of it. Dr. Koon texted me a few days later to ask about the dictation. I told him it was done. After a few rather confusing text messages, we spoke on the phone and clarified that there was a second VA patient who had not made it to my inbox. I wrote down the name, and researched the patient.

On examination, I had actually never been involved with this patient's care. I dictated the discharge summary as asked. Worried that this miscommunication might create more issues and knowing that I needed to over-communicate, coupled with prior allegation that I was creating more work for others, I sent Dr. Koon an email telling him everything I knew about the patient, the timeline of the patient's admission, who was involved, and that I had completed the task so that there was no miscommunication.

I believed I was doing my best to improve and correct the deficiencies my attendings had perceived. However, this attempt at trying to follow my remediation plan and ensure proper communication was not appreciated by Dr. Koon. Dr. Koon responded to my attempts at improving communication as can be seen in Exhibit F by writing "Absolutely incredible...I can assure you that I would have NEVER in a million years sent a response like this to my program director, especially when I was in the midst of academic remediation."

8

He expressed surprise and indignation and called my email "dribble." Dr. Koon became so enraged that he "was unable to speak to [his] wife." He further boasted to me that that the email he sent me was actually "significantly toned down," and the original had much stronger language. He then openly threatened "you were lucky you were on vacation because *I would have fired you on the spot.*" Indeed he finally admitted his true intentions.

In the weeks that followed there was a marked, much more sinister turn of events. At our meeting on Nov. 21st he now recommended that I be placed on level I academic remediation when my probation was up the first week of December. I asked for clarification. He could not cite any deficiencies regarding the remediation plan. I was encouraged that I had corrected the deficiencies outlined in my remediation. He therefore began to bring up events that happened before I was even placed on probation and that had long been resolved. Interestingly if these were true issues, I was curious why they had not been raised during my initial remediation back in August.

It seems that this had turned into more of a fishing expedition rather than an effort truly to identify faults and ways for me to improve as a resident.

This about-face showed redoubled efforts to vilify rather than educate me. Indeed the most surprising factor was that at the faculty meeting a mere 1.5 weeks later, he somehow changed his recommendation from level I to level III remediation with suspension and relieving me of my clinical duties.

Dr. Koon invited me to attend the faculty meeting the first week of December when I was scheduled to be done with my remediation. At this faculty meeting, I was shocked by the confrontational tone of the meeting. Dr. Koon questioned me in front of the entire faculty challenging me: "you think it was a wise move to take vacation during your remediation?" I had carefully scheduled my only two vacation days to coincide with the vacation days of my attending so as not to create more work for the rest of the team. Since I started my PGY-2 year I only took two days off to see my family (I have no family in SC) and my niece who had just been born. Dr. Koon insinuated that I did not take the probation seriously. I found this insinuation terribly insulting.

In fact I missed my very own brother's wedding so I could be on call over Labor Day. I knew that if I requested those days off it would cause further work for my fellow residents, and I was striving to improve on the allegation that I was perhaps creating more work for others.

That was how seriously I took this probation. I missed my brother's wedding rather than risk upsetting Dr. Koon by taking Labor Day off.

The insinuation that I did not take my remediation plan seriously and frivolously took vacation days was hurtful, untrue, and uncaring. I had personally spoken with Dr. Stephens and Dr. Koon about my vacation days. He had personally signed off on it. I had done my best to clear it with everyone. Again, I was in a situation where I am so afraid of being punished for doing anything, right or wrong, that I often don't know what to do.

9

Palmetto Health - 001378

Dr. Koon then went on to reference a patient that had been seen in clinic by me. My attending, Dr. Grabowski, asked me to obtain an MRI that day to evaluate the patient for possible infection (he was several months s/p ex-fix placement and removal). I was told by Charmane, our medical assistant, that an MRI could not be scheduled until the next day. I preliminarily asked for the patient to be scheduled for the next available spot while I spoke with my chief resident. My chief resident told me to call directly over to radiology to obtain same day MRIs. I did this, got the MRI scheduled and canceled the appointment for the next day, and sent the patient over to MRI. My understanding was I had carried out Dr. Grabowski's care plan as requested.

Dr. Koon was not present during the care of this patient, but relied on second hand information about this patient. I received no complaints about this patient's care plan, and indeed it was carried out exactly as my attending had wished. Rather than ask me for details about the incident, Dr. Koon invited me to the faculty meeting and attacked me in front of the entire faculty. He declared that I had come up with a plan in direct conflict with that of my attending.

He stated that I planned to get an MRI in 2-3 days, accusing me of making a decision as a PGY-2 when my attending had told me differently. He went on to provoke me by saying, "I am wondering why you thought it was in your purview to contradict your attending's recommendation." I was taken aback by this statement, frankly confused, and obviously flustered when to the best of my understanding, my care plan had never deviated from that of my attending or chief resident. Moreover, Dr. Koon was not present, was relying on second hand information, had never asked for my side of the story, and authoritatively declared that I had contradicted my attending's recommendation. Moreover, this was the first I was hearing about it if there was a problem. The allegation was that I should never have asked the nurses to preliminarily make the appointment for the next available time frame if one was not available that day. Again the line between what was right or wrong seemed to be a moving target and I became more confused and increasingly worried about being disciplined for minor infractions. The patient had received the appropriate care as my attending had outlined.

If the goal of residency is to educate and support residents, I believe I should have been afforded the common courtesy to explain what happened, since Dr. Koon was relying on second-hand information and did not have first-hand knowledge of the events. Instead he asked me to respond to an inflammatory, incorrect accusation in an obviously confrontational manner. This was a calculated effort to bring the new attending (Dr. Grabowski) into line by belittling me in front of the faculty and attempting to demonstrate how I had "mismanaged" one of his patients. Indeed by that point, Dr. Koon had already successfully turned popular opinion against me and now had the backing of all the attendings. As multiple attendings admitted, all they know about me is what they hear from Dr. Koon.

It was clear I had no ground to stand on. As Dr. Koon had verbalized, his goal was to fire me, and fair hearings and proper representation of the facts would not get in the way. As one of

10

my co-resident wrote in a confidential email, *"I feel this is more of a witch hunt than anything."*

Dr. Koon made two more points in front of the rest of the faculty. The first alleged inappropriate pain management regarding a post-op patient. This was a patient POD #0 status post an AC joint reconstruction with Drs. Mazoue and Walsh. I had seen her in clinic and in the OR. She was of average build and relatively young (49). She had been sent home with a prescription for oxycodone 5mg 1-3 q4 hours. Dr. Mazoue routinely gives Percocet (oxycodone) 20mg q4 hours for his narcotic naïve patients. I received a call after midnight saying she was having some pain. I asked the patient if there were any sensory or motor deficits. I assessed the level of consciousness. The patient was appropriately alert and oriented. She did not have any parasthesias or neurovascular compromise. I therefore OK'd the patient to take an extra oxycodone to get to our usual post-op dose for these patients.

I received a repeat call ~1 hour later. She was still in some pain. She had no neurovascular changes or worrisome post surgical changes. Importantly, this patient was on oxycodone pre-operatively; and we routinely give more than 20mg q4 hours to narcotic sensitized patients who are older than the patient in question. Additionally, I had been explicitly directed to treat pain appropriately as part of my remediation plan (Exhibit B). I therefore OK'd another 5mg (which again is well in line with what many of our non narcotic naïve patients receive) and said as long as she is asymptomatic from side effects of narcotics (including being alert and oriented and Neurovascularly intact) she was OK to continue to dose as we had been doing (25mg spread over four hours). Additionally Dr. Walsh had told me previously that he uses Oxycodone instead of Percocet so additional doses could be given (as in this case) without the acetaminophen toxicity.

I immediately informed the morning team just a few hours later, so they could follow-up with the patient. I learned later that my care plan was misinterpreted by the patient as 25mg every four hours instead of over four hours. Granted this conversation happened in the early morning, so the miscommunication could have happened at either end. Accordingly I realized this was an opportunity for improvement. In this case, a middle-of-the-night call is often ripe for miscommunication, and on future middle-of-the-night calls I made my plan more clear to the patient by having the patient repeat the plan back to me. The patient was followed up with in the morning, was a little drowsy, but had no adverse surgical outcomes.

Dr. Koon continued to cite this as substandard care, again bringing it up at a meeting with myself and faculty and residents in February. I was still puzzled how this had been construed as an inappropriate dose of narcotics. I asked what I should have done differently. Dr. Koon asked Dr. Hoover (the chief resident) what he would have done. Dr. Hoover replied that would have asked the patient if she was having any weakness, parasthesias or mental status changes, and if no changes were present, he would have OK'd more narcotics. I was stunned. I was stunned why the exact same treatment plan stated by my colleague became inappropriate management, fit for suspension, when carried out by me.

11

Dr. Koon additionally asked why I failed to evaluate a post-op total knee. This was a patient who called November 26th 2011 and said that a scab had come off her knee and she had some drainage. I told her with these exact words: "I cannot tell you anything about your wound without taking a look at it" and encouraged her to come into the ED. This is documented in Exhibit G.

I again told her that *I could not tell her anything about her wound without taking a look at it and encouraged her to come into the ED for evaluation.* She did not show.

The patient called twice the next day when a different resident was on call. I conferred with the resident on call that day, *he too had told her to come in for evaluation,* but she failed to show.

Despite two residents who both told her to come in, the patient did not follow these instructions. Dr. Koon lambasted me in front of the other faculty, simply saying a patient called three times and I told her not to come in, which was frankly untrue. At the conclusion of this I insisted that there be a way to document our phone calls, since no such system was in place, and since it was clear Dr. Koon placed no value on the veracity of any of my statements. In addition, it was increasingly clear to me that I needed additional safeguards to protect myself.

Dr. Koon also insisted that I get a psychiatric evaluation to "help structure my remediation process." I asked numerous times what the purpose of this exam was. Was this a fitness for duty exam? I had severe misgivings about this since I know that such exams can be *used to justify termination,* something that I was fairly certain at this point Dr. Koon was working toward. I never got a clear answer, and got significant pushback even though under the Americans with Disabilities Act, I believed I had the right to know the reason why this exam was ordered. Again, no one wished to communicate with me, or explain to me what the purpose of such actions were, and I became more and more worried about the motives behind these actions.

Lastly, Dr. Koon, made the allegation in front of the orthopaedic department staff that my poor behavior is a pattern. He stated that he heard similar complaints about unprofessionalism and poor patient skills about me from the trauma case managers. I was puzzled because I had received positive feedback from them. However, I wanted to understand how I could become a better resident. I approached them again and spoke with both of them privately (Peggy Fields and Debra Floyd). They frankly denied such claims, said they were very pleased with my performance, and emphatically stated they enjoyed working with me.

Indeed it was clear that Dr. Koon was intent on slandering my name in front of my peers and my attending, irreparably harming my name and reputation.

The faculty meeting concluded. Later that week a multi trauma came in at 11AM. She was seen and evaluated by our orthopaedics intern. The intern called the chief (Dr. Wood) saying it was a particularly sticky situation. Dr. Wood directed her to call me, a second year

12

1  resident on probation, to supervise the intern in a volatile environment. I received a page at
2  ~2/2:30 PM to see the patient. I immediately informed my attending and went to the ED to
3  help.
4
5  I arrived to a situation in frank disarray. The patient was roughly 3.5 hours after her initial
6  trauma. She had been moved out of the trauma bay and still had open displaced fractures
7  that were untreated several hours after her presentation.
8
9  The patient and nursing staff were understandably upset. Before I had even seen the
10  patient, the nurse (Arlene) clearly and again understandably upset, said to me we had to
11  talk about how this was all handled. I asked her what happened, what I could do, and what
12  needed to be addressed. She simply said we will talk about it at the end.
13
14  Having gone through such an experience with some of the *same* nurses before (nurses with
15  whom not only myself but Dr. Goodno had had issues with), I toed the line, did the best
16  with what I had, and went out of my way to please all parties involved including
17  introducing myself to the patient, describing all injuries, assessing pain, giving systemic
18  and local anesthesia, talking to the family, showing the family the injury films on the PACS
19  station, and helping nursing and ancillary staff in any way possible including cleaning up
20  and changing wet sheets. (full details of patient encounter can be seen in Exhibit I).
21
22  Two days later, I received a phone call from my chairman, Dr. Walsh, at about noon, who
23  said that there was an incident involving the trauma female I took care of, and he informed
24  me that I was being suspended so an investigation could be performed. Dr. Walsh assured
25  me that the purpose of the suspension would be to get all sides of the story "including
26  yours."
27
28  This turned out to be false. I was shocked, saddened, and stunned at the events that
29  transpired next. No one talked to me. No one attempted to contact me. No one was even
30  interested in hearing my recollection of the events.  To add insult to injury, I received a
31  phone call from our program coordinator Michelle Wehunt stating that there was a letter
32  for me. This letter was a copy of the letter from Dr. Koon to the GMEC recommending me
33  for level III remediation that had already submitted and been approved. I was floored.
34  No one had contacted me about what had happened with the trauma female, despite Dr.
35  Walsh's personal assurance to me,  and my program director didn't even have the decency
36  to call me and inform me of his decision or thought process, but rather had the secretary
37  give me a call to pick up a memo that he had already turned over to the GMEC. This was the
38  ultimate slap in the face and lacked common human decency and courtesy.
39
40  It was now abundantly clear to me that Dr. Koon and those entrusted with my education
41  had made no attempt to ascertain, and were not interested in ascertaining, the veracity of
42  the statements that were presented to the GMEC. Most glaring were the frank
43  misrepresentations presented to the GMEC -- statements that I later argued to no avail in
44  the grievance process, and pointed out *constituted frank libel* -- Notably:

13

•*Neglect of informed consent:* This allegation is false on many different levels. First no resident in the program gets consent for such emergent procedures. Furthermore, this discussion with nursing staff was broached to the orthopaedic intern well before my arrival. Simple fact checking, following standard procedure, or having the common courtesy to talk to me would have avoided such deceitful and libelous comments presented to the GMEC.

•Similarly, other statements about improper pain management are untrue as I gave both local and systemic anesthetic prior to any manipulation, and I assessed the patient's pain level during the procedure. I took the additional step of talking to the neurosurgery attending who informed me that conscious sedation was not an option.

•Moreover, as presented above, allegations of inappropriate narcotic dosages and failure to evaluate post-op pain care were gross overstatements of the truth and actions that were either substantiated by, or performed in the same manner as, my non-minority colleagues. Similarly, as described above, the statement that I failed to abide by direct attending instruction is also a perversion of the facts.

Broad statements such as "has been delinquent in assigned tasks," were similarly never defined, substantiated, or explained.

The fact that neither my program director nor chairman talked to me to ask what happened is even more shocking when one looks at the efforts undertaken to try and malign me. Dr. Koon attempted to have witnesses state I had told the patient she would never walk again. (he asked Toni the cast tech about this). I am only left to surmise that he had received an inaccurate report that I had said that – something that made no medical sense, and was absolutely false. The cast tech denied this was ever uttered. (Indeed telling a young active lady with an ankle fracture that she would never walk again makes no medical sense). Despite the fact that there appeared to be inaccuracies in some of the allegations against me, Dr. Koon did not interview me or all the witnesses involved. What is surprising is the extra effort he went through to call other people (other cast techs who were not involved in the case) to try and solicit complaints about me. They all replied very positively, but these positive comments did not factor into my evaluation.

It was clearly not a lack of effort or time that could explain Dr. Koon's failing to talk to me, but rather a deliberate and malevolent attempt to slander my name and further his goal to terminate me.

What was more surprising was that my superior *violated Palmetto Health's own guidelines,* (page 61 of the resident handbook Exhibit R) which cites disruptive behavior as "inappropriate conduct that reflects in a negative way on the Hospital or University." The handbook then clearly states under procedure (also seen in Exhibit R) that "The program director or designee ... interviews the complainant and any witnesses within one business day of receiving the complaint. The resident is given the opportunity to respond in writing." Additional provisions are made to allow the program director up to ten days for this action to take place. Most stunning, and what I find very unusual was all the statements of

14

1   Palmetto Health's stated and written objectives as listed above for procedure were
2   violated:
3   -All witnesses were not interviewed (despite my providing names of witnesses)
4   -I was never given a chance to respond in writing.
5
6   The fact that no one bothered to ask for my side of the story was not only horribly unethical
7   and hurtful, but it also lacked common courtesy and respect that I would think everyone,
8   let alone physicians, should practice.
9
10  By this point, Dr. Koon had successfully turned all popular opinion against me. I was still
11  honestly confused about this situation and wanted to understand how I could improve. Just
12  as I had in the past made progress on my remediation goals by doing investigations myself,
13  I attempted to do the same thing here. I asked what the complaints were and who made the
14  complaints so I could speak with them, and I requested a copy of all the records associated
15  with that patient's care, so I could understand what exactly was alleged and how I might
16  improve. Despite repeated verbal and written requests to understand and get a copy of the
17  complaints against me so I could improve, my requests were denied (Exhibit K).
18
19  I went through the grievance process, and only after I complained did Dr. Walsh hear my
20  side of the story; however, he continued to express grave reservations about the veracity of
21  my statements after what he had heard from Dr. Koon. I stressed to Kathy Stephens (the
22  DIO) that Palmetto Health guidelines were being violated, and these statements constituted
23  slander. I suggested perhaps there were some communication issues and that we --
24  physicians, staff, and nurses -- should all meet to understand what happened and resolve
25  this issue in person. Nothing was done and this request was denied.
26
27  It was clear at this point that there was no interest from anyone to get my side of the story.
28  I spoke with Dr. Walsh again and said I was concerned these actions would delay my
29  graduation making fellowships difficult, if not impossible, to obtain, and secondly that I
30  would have to report the suspension on future job applications. I told him if those issues
31  could be mitigated, I would be happy to drop all further appeals (I was considering
32  appealing to a grievance council) and make a good faith effort to move forward despite the
33  fact that I had serious reservations about my treatment up to this point.
34
35  I waited to hear back from Dr. Walsh, attempting to determine if I should request a
36  grievance council. I sent two follow-up emails to Dr. Walsh (exhibit M), but when I did not
37  hear back before 10 business days (1/26/12)I submitted a request with HR to initiate a
38  grievance council meeting within ten days of the DIO's decision, as outlined under
39  "Grievance and Due Process" of the resident handbook step 1.5 (Exhibit Q). Since Martin
40  Luther King Jr. Day was a national holiday with banks, offices, the post office, and most
41  importantly the orthopaedic clinic closed, it was logical not to count MLK as a "business
42  day." I spoke with Gwen Hill (Vice President of HR at 803-296-5221) and told her the
43  situation. I was told they would communicate with Kathy Stephens for guidance.
44
45  I was shocked when they refused to grant me a grievance council review, saying that eleven
46  business days had elapsed because Martin Luther King Jr day *is not a holiday.* I pointed out

15

Palmetto Health - 001384

that to my understanding MLK is a national holiday – furthermore a business day is to my knowledge *not* defined in the resident handbook – a fact that Kathy Stephens herself later conceded. Moreover, should there be any confusion about the deadline the resident handbook makes explicit provisions to "extend any deadlines," due to extenuating circumstances. I was denied due process despite the fact that I made a good faith effort to follow the guidelines laid out in the resident handbook and filed my request within 10 business days as outlined in the resident handbook.

It appear that the primary motive here was not to act in the resident's best interest but rather to play "gotcha" with my career– a career that I have worked my entire life for, and something that I would hope would garner more respect and understanding from those charged with graduate medical education.

To add insult to injury, I received an email shortly thereafter requesting me to come in and write a check to refund a paycheck that was "accidently" paid to me during my suspension.

At this time, I expressed serious reservations about the fairness of treatment from Dr. Koon and sought council elsewhere. I spoke with Dr. Guy. I appreciated his feedback and found I made much more progress speaking with him. He gave me good feedback and tips on how to be a better resident. I spoke with him and asked him if he would oversee my remediation plan so that I could get some guidance since I felt I was not making much progress with Dr. Koon; he stated he would be willing to do so.

I therefore proposed that Dr. Guy oversee my remediation and progress as I had reservations about how I was being treated and felt that I could get more constructive feedback to help me become a better physician with Dr. Guy overseeing my remediation process (exhibit N). This was request was summarily denied by Dr. Koon.

Despite the failure of due process, and violation of Palmetto Health guidelines, and the presentation of false statements to GMEC, Dr. Koon successfully had me suspended from early December to the end of January. This was embarrassing, humiliating, and demeaning, and was done in violation of professional and Palmetto Health guidelines.

I was reinstated at the beginning of February. This time Dr. Koon handed me a letter placing me on Level II remediation, with a greatly expanded list of deficiencies. I was a little taken aback by the new laundry list of "competencies not being met." I had not been on service since my previous evaluation placing me on Level III remediation, yet somehow the list of my alleged deficiencies had exploded. Notably things that I had been told were never issues were now listed as "competencies not being met" including: "make informed decisions about diagnostic and therapeutic interventions based on patient information and preferences, up-to-date scientific evidence, and clinical judgment." This theme was again alluded to when Dr. Koon listed another deficiency as: "Medical Knowledge: (IV.A.5.b) Residents must demonstrate knowledge of established and evolving biomedical, clinical, epidemiological and social behavioral sciences, as well as the application of this knowledge to patient care." I had never been told that my knowledge base was lacking. In fact, Drs. Walsh, Mazoue, and Guy had all explicitly told me that my knowledge base was fine to

16

better than average. My in-training exam results substantiated this and easily outpaced that of my white colleague. This was alarming to me, and it was apparent that Dr. Koon's goal was to list as many competencies as possible as "deficient" so that should if I make any kind of misstep he could much more easily fire me. The goal here, it seemed, was not to provide a framework for remediation, but rather to continue to play "gotcha" with my career. Once again here was something that I had been told I was doing well in, and again I was in a situation in which it seemed I was being punished for doing anything, right or wrong.

Furthermore, Dr. Koon continued to attempt to discredit me in front of both my peers and attendings. He flung the resident handbook across the table and asked me read aloud the grievance process from the resident handbook, in front of my fellow residents and attendings, and then proudly declared that I had not followed the guidelines either time. He said that I had skipped step 1.1 in the grievance process which states, "A resident who has a dispute or grievance must discuss this with his/her Program Director who will make every effort to resolve the matter within five (5) business days." I was taken aback, but I tried to deflect this saying I wanted to move forward. He persisted, showing increasingly desperate attempts to belittle me in front of my peers. I did not attempt to confront him. All I said was I had spoken with him, and I apologized if he had wished to speak again. He went on to state that in fact it was me who was violating Palmetto Health guidelines! I did not respond and tried to "grin and bear it."

The surprising thing is that Dr. Koon decided to try and turn the tables on me and claim that I had violated guidelines, whereas as can be clearly seen in Exhibits D and L, not only did I follow all the guidelines, but an email *penned by Dr. Koon himself* clearly shows I was following the protocol of the grievance process. At this point Dr. Koon's personal, racially charged vendetta against me was clear as he continued to slander me in front of my colleagues and attendings.

It is also interesting to note that in an email dated 3/13/12, Dr. Koon wrote that Dr. Irani "would like to initiate the Grievance process and I would consider his discussion with me as the first step, *even though it was not initiated within the five (5) business days as required* (Resident Manual, Grievance and Due Process policy, 1.1)." Glancing at the resident Manual, Grievance and Due Process policy, 1.1 clearly makes no such provision (Exhibit Q). In fact it states that a program director has five days to respond to a complaint brought by a resident. Clearly this demonstrated Dr. Koon's unfamiliarity with the process and was likely an attempt (with several other people cc'ed on the email) to again try and make me look like I was a substandard resident.

Despite these worries I spoke with my chief resident who encouraged me to just try and accept the plan and move on (which was also one of the things explicitly listed in my remediation plan interestingly enough). Furthermore, I knew from my prior experience that there was little I'd gain by trying to challenge things, besides creating more animosity between myself and my superiors.

17

Palmetto Health - 001386

Lastly I noticed that Drs. Koon and Walsh had changed my schedule. I was scheduled to be rotating at the VA and Baptist Hospital. However, these rotations were removed, and I was assigned to the Richland service again on services with attendings I had just rotated with. My education was further compromised as I did not have the opportunity to have someone else supervise me or serve in a mentorship role.

While this upset me, I once more did my best to honestly and faithfully heed the advice of my chief resident, even though all previous precedents had illustrated that I would not get a fair hearing in any future actions.

I redoubled my efforts to do well and was genuinely happy to be back. I started back on Dr. Voss's service. I took the initiative and decided to adapt and created a resident's step-by-step guide, including figures and diagrams of how Dr. Voss performs his total knee arthroplasty. I reviewed this guide with my chief resident and Dr. Voss. The goal of this guide was to provide step-by-step instructions for future residents to understand how Dr. Voss performs his surgeries. I believed I could help out my fellow residents by doing this as Dr. Koon had wanted me to do.

On the evening of March 1st Dr. Koon called and told me that I was again suspended for my treatment regarding two patients and that he was recommending my termination. Please see exhibit for full details surrounding these patients. A hemophiliac patient was admitted at approximately midnight for observation for possible compartment syndrome. I did an interval physical examination at about 2:30 for compartment syndrome. The exam was unchanged, and as I was seeing another patient, and because my exam was unchanged from before, I decided to treat the current patient in an expeditious and caring manner; I then put in a note within 48 hours of seeing the patient on the patient who was admitted for observation.

Dr. Koon also mentioned an issue with a spine patient with neurological changes, I saw her as soon as the nurse told me that she saw neurological changes (please see exhibit P for full details). I did not write a note in the chart, because when I called my attending, he told me that my physical exam and findings were inaccurate and incorrect. Accordingly, I consciously did not and could not document my findings, as I had been directly instructed by attending that my exam was inaccurate. Per previous instruction from my attendings, I could not document an inaccurate exam in the chart. It is also noteworthy that this was the *very first* spine patient I had ever managed as a resident, and there was no senior resident on the spine service with me.

When confronted about these patients, I attempted to follow the remediation plan, which directed me to "admit and apologize for mistakes and be willing to endorse personal flaws." Therefore when confronted about these patients, I immediately apologized and said I would do better next time. I did not make any excuses and I listened to what was said. While I admit that I have made mistakes, both patients were evaluated in a timely manner. I learned from these experiences that I still need to work on improving my efficiency.

18

Palmetto Health - 001387

Again I believe these are all examples of resident education. While, I believe there is always room for improvement, mistakes, feedback, and resident supervision are all integral parts of resident development.

I of course went through the grievance process again. When I spoke with Dr. Walsh he stated the futility of the process and openly declared, "There is no way the GMEC committee will go against us. *No way.*" Needless to say my interaction with my department has not been one that I believe puts residents first.

It has been very hard for me to focus on learning and my education with the stress of this unmerited treatment. Throughout this entire process, I have been illegally targeted. I have been vilified for actions that my colleagues have not been penalized for. Standard hospital policy has been ignored, and my name and reputation have been subject to libel and slander by Drs. Koon and Walsh in front of the GMEC committee and hospital staff. They misrepresented me to the Graduate Medical Education Council. I believe the GMEC's decisions were based on false information and malicious misrepresentation.

Lastly and perhaps most importantly, I have had more stress placed upon me when dealing with patient care, by having to undergo the derogatory, inappropriate, and insensitive racial taunting by those who were entrusted with my education. While on remediation, Dr. Koon regularly taunted me, calling me "Achmed the Terrorist." While I tried to laugh it off, these comments were deeply hurtful and insensitive given the past history of religious persecution of those of my faith and culture and recent terrorist attacks in Mumbai, India where my family resides, and the impact these cowardly attacks had on my immediate family.

This pattern of singling me out, open slander and libel when presenting my case, and racist behavior is incongruous with someone entrusted in the role of an educator.

Moreover, at least five of the deficiencies cited here were either performed or verified by my white colleagues without retribution including treatment of trauma patient TF375, dosing of narcotics, medical knowledge, evaluation of post-op knee patient, and wound closure with vicryl.

I have felt constantly intimidated by Dr. Koon either calling me a terrorist or by threatening me with discipline for some minor infraction but for which he gave a pass to other residents who had done the same or similar things. I was frankly in a situation in where often I was so afraid of being punished for doing anything, right or wrong, that it was not clear what I could do to avoid punishment.

I believe I am friendly person, but cultural differences and insensitive behavior have made it hard to focus on becoming a better physician. I admit I may appear and act different than my colleagues. I am new to the South. I was born and raised in California. I completed my undergraduate and medical school training at Stanford University on the West Coast, in an environment quite different from my current setting. I don't think it is the responsibility of others to understand my background, but I think they should at least be accepting.

19

Palmetto Health - 001388

I readily admit that I have made mistakes like all young physicians, and want to change in a way to make me a better doctor. Indeed each time I was placed on remediation, subsequent evaluations largely validated that I addressed or improved upon my remediation goals previously set forth. I want to do better and indeed I strived hard to do so, talking to others and soliciting feedback where this was missing from my program director. But in order to improve I need a clear definition of my mistakes and how I may improve.

I am shocked by the callous nature and actions of my department. Decisions like this have derailed my entire career and should be at least subject to due process. My name has been slandered and is extremely difficult, if not irreparable to fix. My name is my profession as a doctor, and it has been unjustly tarnished. What job prospects do I have in the area now?

At the initial meeting six weeks into my residency, Dr. Koon boasted about firing a previous resident (Dr. Lamoreaux) just before he was about to graduate. (The resident sued the program and the individuals involved and got his job back). Dr. Koon boasted that he always gets the best residents. He boasted that the general surgery program would trade three of their residents for one of his, whereas the medicine program is just happy to land a resident who speaks English. He went on to say that he fired Dr. Lamoreaux because he lied, and if anyone ever lies they are out of the program.

I think Dr. Koon should be held to his own standards. He has not been forthcoming with me, and as can be seen on my accompanying complaint he has lied about resident supervision in patients' charts and misrepresented me to the GMEC. Such reckless, slanderous and racist behavior should not be tolerated from anyone, let alone those entrusted with educating the next generation of physicians.

I respectfully ask that the RRC review the practices, failure of due process, and the motives and behavior of the program director and chairman at the USC/Palmetto Health Richland Orthopaedic Surgery Residency Program.

Respectfully,

*Afraaz Irani*

Afraaz Irani M.D.

20

Palmetto Health - 001389