IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

COLUMBIA DIVISION

| | | |
|---|---|---|
| Afraaz R. Irani, M.D., | ) | C/A No. 3:14-cv-03577-CMC-KDW |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **UNSWORN DECLARATION OF** |
| | ) | **JOHN L. EADY, M.D.** |
| Palmetto Health; University of South | ) | |
| Carolina School of Medicine; David E. | ) | |
| Koon, Jr., M.D., in his individual | ) | |
| capacity; and John J. Walsh, IV, M.D., | ) | |
| in his individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

| | |
|---|---|
| STATE OF SOUTH CAROLINA | ) |
| | ) |
| COUNTY OF RICHLAND | ) |

I, John L. Eady, M.D., hereby make this Unsworn Declaration pursuant to 28 U.S.C. § 1746, under penalty of perjury.

1. My name is John L. Eady. I am older than 18 years of age and am competent to make this Unsworn Declaration.

2. I am a physician and have been duly licensed to practice medicine by the South Carolina Board of Medical Examiners continuously since July 16, 1966. My license to practice medicine is currently in good standing, and I have never been subject to any type of discipline against my medical license.

3. I am an orthopaedic surgeon and have been board-certified by the American Board

of Orthopaedic Surgery ("ABOS") since October 1, 1976. I was recertified in 2004, and my certification from the ABOS is valid through 2016. I previously served as an oral examiner for the ABOS from 1992 to 2005. I currently serve as a Communications Skills Mentor for the American Academy of Orthopaedic Surgeons, and am an invited reviewer for the Journal of Bone and Joint Surgery.

4.     I currently serve as the Chief of the Orthopaedic Service at the Dorn VA Medical Center ("VAMC") in Columbia, SC. I have held this position continuously since August 2006.

5.     Prior to coming to the Dorn VAMC, I was the Chairman of the Orthopaedic Surgery Department at the USC School of Medicine from 1998 to 2006. I also served as the Program Director for the Orthopaedic Surgery Residency Program jointly sponsored by the USC School of Medicine and Palmetto Health, from 1998 to 2006. I have been involved in graduate medical education, training doctors to become specialists in orthopaedic surgery for over 30 years.

6.     I am familiar with a physician named Afraaz R. Irani, M.D., who was previously an orthopaedic surgery resident in Columbia, SC. Dr. Irani was terminated from the program in the Spring of 2012. He was scheduled to rotate with me at the Dorn VAMC beginning in January of 2012, but he was not allowed to conduct this rotation at the VA as scheduled.

7.     Although Dr. Irani never actually completed a rotation on my service, I had the opportunity to work with him on several occasions during his Internship year, also known as the PGY-1 year, in 2010-2011. Dr. Irani had two clinical rotations in his PGY-1 year that were located at the Dorn VAMC, one on the General Surgery Service and one on the medical intensive care unit. As the Chief of Orthopaedics at the Dorn VAMC, I had the responsibility of supervising all orthopaedic residents rotating at the Dorn VA Hospital for the quality, timeliness, and thoroughness

of their work. Dr. Irani was included in that group. I also occasionally worked with him when he preformed night call for orthopaedics at the Dorn VA Hospital.

8.      Prior to July 2012, when the Palmetto Health/USC School of Medicine Orthopaedic Surgery Residency Program decided to pull all of its residents from rotations at the Dorn VAMC, I regularly evaluated and participated in the education of orthopaedic surgery residents from that program. As the Chief of the Orthopaedic Service at the Dorn VAMC, I regularly received both positive as well as uncomplimentary feed-back from the nursing and administrative staff about all of the orthopaedic surgery residents prior to July 2012. I never heard any negative feed-back or complaints about Dr. Irani from any of the nurses or other staff members during his rotations or night call duties at the Dorn VAMC or from any of his fellow residents. In comparison, I received as many as 150 failure-to-complete-encounter-documentation tasks on one of the senior residents and 85 on a junior resident during that time period. If Dr. Irani were experiencing any difficulty in completing his assigned tasks or with his educational progress milestones, I would have heard about it at the time and would have been tasked to institute corrective measures with him. The surgical ICU nurses at the Dorn VAMC never had any hesitancy to tell me if a resident was having trouble with their professional skills or personal development. Over the years, the nursing staff submitted numerous complaints about a number of orthopaedic surgery residents, but I never heard any complaint from them about Dr. Irani.

9.      I understand that in early August 2011, at the very beginning of his PGY-2 year, Dr. Irani was written up and placed on formal probation by the program director, Dr. David Koon, for alleged deficiencies in his job performance. I was informed that one patient encounter mentioned in Dr. Irani's write-up was a VA patient who returned to the Dorn VAMC approximately 10 days

after Dr. Koon had performed knee surgery on the veteran. The patient had developed cellulitis (skin and soft tissue inflammation created by a variety of causes) on his lower leg below the surgical site. The visible skin irritation or inflammation was not in the area of the knee surgery and did not involve the surgical wound. I saw the patient in the Orthopaedic Clinic at the Dorn VAMC the morning after the patient was seen by the Emergency Department staff. I understand that Dr. Irani was on call the night the patient came into the Dorn VAMC Emergency Room and that he spoke to the medicine attending about the patient. Based on his discussion with the medicine attending, Dr. Irani did not come from Palmetto Health Richland to evaluate the patient that night. Under VA guidelines at that time, if a patient needed to have a face-to-face evaluation within an hour of the requested consult, the patient had to be identified as a Level 1 consult. This particular patient was not identified as a Level 1 consult.

10.     No one from Palmetto Health or the USC School of Medicine ever contacted me about this particular patient or about Dr. Irani's actions with regard to this particular patient. If they had, I would have told them that Dr. Irani's actions were perfectly acceptable and appropriate. I saw the patient shortly after 6:30 a.m. the following morning, and the patient had no indication that acute care was needed.

11.     In late November or early December 2011, I encountered Dr. Koon at the Dorn VAMC one day as he was seeing patients at his weekly VA clinic. I had not received any paperwork about Dr. Irani's upcoming expected Orthopaedic rotation at the Dorn VAMC for the second part of his PGY-2 year, and the VA administration was becoming insistent that I tell them who the next Orthopaedic resident to rotate at the Dorn VAMC was to be. This information was needed by the VA administration for timely payroll, ID card, and credentials currency updating. Dr. Irani's class-

mate, Dr. Harrison Goodno, had recently completed his rotation at the Dorn VAMC and I understood that Dr. Irani was supposed to switch places with him in January. In response to my inquiry about the on-coming resident, Dr. Koon stated, "You mean Achmed the Terrorist?" referring to Dr. Irani. Dr. Koon then stated that Dr. Irani would not be rotating at the VA as scheduled. I immediately told Dr. Koon that his statement was inappropriate and racist in my opinion. As he was on a federal facility where that type of discriminatory behavior was prohibited, I told him that if he repeated such remarks, I would formally write him up.

12.     I have observed other incidents of inappropriate racial bias by Dr. Koon. Several years ago, when I was still the program director of the orthopaedic surgery residency program, we had the first African-American resident ever accepted to the program to my knowledge. That resident, Dr. Rodney Alan, was a graduate of Duke Medical School. During Dr. Alan's second year of residency, Dr. Koon repeatedly gave him poor verbal evaluations. For example, Dr. Koon repeatedly complained to me that Dr. Alan was frequently late for conferences and surgeries, was ill prepared, and made frequent mistakes in surgery. When I asked Dr. Koon for some specific examples, he became upset and accused me of always taking the residents' word over his and other members of the staff. I again asked Dr. Koon for examples of Dr. Alan's allegedly deficient performance. In response, Dr. Koon stated, "Well, you never take our [meaning his and the other staff members] word for it anyway, but I'm telling you that 'Little Black Sambo' [referring to Dr. Alan] should never graduate from this program." I immediately gave Dr. Koon a verbal warning for making such a racist comment. Dr. Alan went on to graduate from the program and completed a fellowship in adult knee surgery at a prestigious fellowship program in total joint replacement surgery. He is now a well-respected and board certified orthopaedic surgeon in Florence, SC.

13. I have also had to listen to several complaints about Dr. Koon from African-America nurses and patients at the Dorn VAMC who believed that Dr. Koon has discriminated against them based on their racial background.

14. During the seven years that I was the program director of the Orthopaedic Surgery Residency Program at Palmetto Health/USC School of Medicine, we had only one resident in the entire time who left the program prior to completing the 5-year program. Since 2006, when Dr. Koon took over as program director, I understand that at least eight residents have left the program prematurely. This is very unusual because orthopaedic surgery is one of the most competitive residency programs to get into and has one of the lowest attrition rates of all specialties.

**I declare under penalty of perjury that the foregoing is true and correct. Executed on January _____, 2016.**

_____
John L. Eady, M.D.