146

1 region of the United States to teach in that region, but I
2 have given lectures here at San Francisco at the annual
3 meeting of orthopaedic surgery in communication skills.  My
4 most recent one was University of South Florida in June.
5     Q.   When was the most recent publication in a
6 peer-reviewed journal that you have submitted and been
7 accepted?
8     A.   I just published one in eMedicine last summer.
9     Q.   How long ago was that?
10    A.   I think I got the notification a week ago.
11         THE COURT REPORTER:  I just need clarification,
12 eMedicine, correct?
13         (Talking over each other.)
14         DR. FIRESTONE:  Your Honor, at this time I would
15 like to offer Dr. Eady's curriculum vitae.  It's exhibit S in
16 Binder 1.
17 BY DR. FIRESTONE:
18    Q.   Would you pull that up, Doctor?
19    A.   Yes.
20    Q.   And authenticate that that's a correct C.V. that's
21 current?
22    A.   Exhibit S.
23    Q.   Other than the journal that you got published a
24 week ago, is this a complete rendition of your curriculum
25 vitae?

147

1     A.   Yes, sir.
2          DR. FIRESTONE:  With that, I'd offer it, Your
3 Honor.
4          ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  All right.
5 I'm marking the CV as Exhibit S for identification.  Is there
6 any objection to Exhibit S?
7          MR. MERCER:  No objection.
8          ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  Exhibit S
9 will be received into evidence.
10    (Respondent's Exhibit S was marked of identification and
11    admitted into evidence.)
12 BY DR. FIRESTONE:
13    Q.   Doctor, in your participation in the program at the
14 University of South Carolina and the VA affiliated with the
15 University program, as well as a Palmetto Health Program, did
16 you become acquainted with a doctor by the name of
17 David Kuhn?
18    A.   Yes.
19    Q.   What is Dr. Kuhn's reputation there?
20         MR. MERCER:  Objection, Your Honor, relevancy.
21 Again, we're here to determine whether or not the Applicant
22 is competent.  The character of the various people involved
23 in the faculty at the University of South Carolina, while
24 possibly relevant to Dr. Irani's lawsuit in South Carolina
25 against that program, has only the vaguest and most remote

148

1 relevance to the key issue here whether Dr. Irani is
2 relevant.
3         And it seems to me that it -- and we would contend
4 that it's an undue consumption of time to spend time,
5 basically, sharing what's no more than gossip about persons
6 who are not before this tribunal, who are not the subject of
7 this case and whose character is irrelevant to it.
8         ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  Well, can
9 you narrow it down?  I mean, I don't know need to everything
10 about Dr. Kuhn.
11        DR. FIRESTONE:  I think this goes to the validity
12 and credibility of the information that Dr. Kuhn provided
13 with regards to Dr. Irani and the allegation that we are
14 making of it being prejudicial based on prejudice and bias.
15        ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  I think you
16 can still narrow the question so it's a little more relevant.
17 BY DR. FIRESTONE:
18    Q.   Dr. Eady, can you tell us whether or not you're
19 aware of whether or not Dr. Kuhn was in any way prejudiced
20 towards minorities --
21    A.   Yes, I can.
22    Q.   -- of patients or residents?
23    A.   Yes, I can.
24    Q.   And what is the basis --
25         MR. MERCER:  Same objection, Your Honor.

149

1          DR. FIRESTONE:  What's the basis for --
2          ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  Just a
3 minute.  Let me rule on the objection.
4          I'm going to overrule the objection, but I'm not
5 sure how relevant it will be at this time.  But I'll allow
6 some questions on the subject at this time.
7 BY DR. FIRESTONE:
8     Q.   What's the basis for your awareness of that issue?
9     A.   I have personal experience with Dr. Kuhn.
10    Q.   And what did you personally observe or hear or
11 experience?
12    A.   Well, perhaps I should first paint it directly at
13 Afraaz.
14         In his second year, Afraaz was supposed to come to
15 the VA Hospital in January for his orthopaedic VA rotation.
16 I hadn't gotten any notification as to the site director
17 there of whether Afraaz was coming or not and Dr. Kuhn comes
18 or came -- he does not anymore.  He came to the VA Hospital
19 once a week for seeing patients, usually, general orthopaedic
20 patients that ran a gamut.
21         I asked Dr. Kuhn if he was going to let me know
22 about what was going to happen with Afraaz.  Was he coming?
23         And Dr. Kuhn's response to me, he said, "Well, you
24 mean Ahmed the Terrorist."
25         And I immediately told him that that was

150

1  considered -- I considered that a racist remark.  It was not
2  to be repeated in the VA system, at which point Dr. Kuhn quit
3  talking to me after that.
4          ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  I'm sorry.
5  After that that he what?
6          THE WITNESS:  He quit talking to me.
7          ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  Speaking to
8  you at all?
9          THE WITNESS:  Yes, Ma'am.
10         ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  What year
11 was this that you --
12         THE WITNESS:  That was 2000 and -- was it 2013,
13 January --
14         DR. FIRESTONE:  2012.
15         THE WITNESS:  2012, sorry.
16 BY DR. FIRESTONE:
17      Q.  I'm sorry, 2011.
18      A.  2011.  Well, it was -- actually, I think it was
19 2012, I believe.
20         MR. MERCER:  Your Honor, if it helps, Dr. Irani
21 entered his PGY-2 year in July of 2011.  So if this was
22 January, it would have been 2012.
23         DR. FIRESTONE:  Yes.
24         THE WITNESS:  2012 correct.
25         ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  Thank you.

151

1          THE WITNESS:  And to just give you some
2  explanation, PGY-2 and PGY-4 residents usually rotated at the
3  VA for 6 months at a time.  Because there were only two
4  residents each year, they split it up into six months for one
5  PGY-2, then it rotated to the other PGY-2.  The same way with
6  the senior residents.
7          Now, that sometimes varied, because the residency
8  program would sometimes get a special dispensation from the
9  Residency Review Committee to add a third resident, and in
10 the areas that they had a third=year resident at that level
11 it would be four months at the time.
12 BY DR. FIRESTONE:
13      Q.  Did you hear of any other prejudicial language that
14 related to racial discrimination from Dr. Kuhn?
15         MR. MERCER:  Objection, Your Honor.  This is way
16 overbroad, and I mean, we're talking about Dr. Irani -- and
17 at least that had some, although distant, relevance.  Now,
18 we're going to talk about his attitude towards people in
19 general.
20         ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  Yes.
21 What's the relevance of that?
22         DR. FIRESTONE:  Well, the relevance is Dr. Kuhn's
23 essential reputation for being a discriminate, prejudiced,
24 biased individual in this program.
25         MR. MERCER:  Again, Your Honor, Dr. Kuhn did not

152

1  make the licensing decision in this case.  Dr. Kuhn's not
2  applying for a medical license, Dr. Irani is.  This is simply
3  not relevant.
4          ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  Well, I'm
5  going to ask you to limit it to prejudices against this --
6  you know, against your client or maybe other residents in the
7  program, but not just against, you know, discrimination
8  against people.  I don't know how that would be relevant.
9  BY DR. FIRESTONE:
10      Q.  Have you heard Dr. Kuhn's racial prejudicial
11 remarks about other residents besides Dr. Irani?
12      A.  Yes, sir.
13      Q.  What have you heard?
14      A.  When I became the chair at the School of Medicine
15 Department of Orthopaedics at USC, one of my driving
16 forces -- because I felt the duty to South Carolina, which is
17 40 percent African American -- there have been few if any
18 African Americans ever accepted at an orthopaedic residency
19 program.
20         So I -- one of the orthopaedic residents we
21 accepted was Rodney Allan, who is a graduate of Morehouse,
22 graduate of Duke University, and we selected him as a
23 resident.
24         Each time a rotation occurred, I required the
25 attending staff -- most of time because there are only two

153

1  residents -- two or three attending staff to write reviews on
2  those folks that rotated on their program.  And it included
3  strengths, weaknesses, what they could do better, what things
4  were missing.
5          And Dr. Kuhn wrote Rodney's second year; he wrote
6  that:  "Rodney never showed up for operations on time in the
7  early morning.  Rodney was ill prepared for his conferences.
8  He was ill prepared for his surgeries.  He made mistakes in
9  surgery."
10         So I call Rodney in and asked him, "What's this all
11 about?"
12         And Rodney said, "He didn't know, because he was
13 late for conferences in the morning," because I required at
14 6:30 we always met morning, five days a week for a
15 conference.
16         On Mondays, it was a post-op conference.  What we
17 did right.  What we did wrong with surgery patients.
18 Tuesdays it was basic science.  Wednesdays it was anatomy.
19 Thursdays it was review of academy articles, based on review
20 of specific entities, and Friday it was tumor day, primarily
21 because I'm a tumor specialist.  I like tumors and I like to
22 teach that and I would.
23         Rodney said, "He didn't know, but he did show up
24 late for surgery in the mornings, because he was sometimes
25 dry comforts over."  The attendings who were supposed to