IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

COLUMBIA DIVISION

| | | |
|---|---|---|
| Afraaz R. Irani, M.D., | ) | C/A No. 3:14-cv-03577-CMC-KDW |
| | ) | |
| Plaintiff, | ) | |
| | ) | **PLAINTIFF'S MEMORANDUM OF** |
| vs. | ) | **LAW IN OPPOSITION TO** |
| | ) | **DEFENDANTS' MOTIONS FOR** |
| Palmetto Health; University of South | ) | **SUMMARY JUDGMENT** |
| Carolina School of Medicine; David E. | ) | |
| Koon, Jr., M.D., in his individual | ) | |
| capacity; and John J. Walsh, IV, M.D., | ) | |
| in his individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## I.  Introduction

Plaintiff, Afraaz R. Irani, M.D., by and through his undersigned counsel, hereby files this

Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment.  Defendants

disregard the cardinal rule on summary judgment, that all facts and inferences in the record must be taken

in the light most favorable to the non-moving party–here, Dr. Irani.  Instead, Defendants simply ignore

substantial evidence that is favorable to Dr. Irani and attempt to portray sharply disputed facts in their own

favor, in contravention of well-established precedent. E.g., United States v. Diebold, Inc., 369 U.S. 654,

655 (1962)  As set forth in detail below, a proper evaluation of the record, viewed in the correct

perspective, reveals that genuine issues of material fact exist, which precludes summary judgment in this

case.  Accordingly, Defendants' motions for summary judgment should be denied.

Dr. Afraaz Irani is  a highly intelligent and promising young physician whose life-long career

ambition was to be an orthopaedic surgeon. He was born and raised in Northern California, the son of Indian immigrants of Zoroastrian heritage. He received his undergraduate and medical degrees from Stanford University, where he excelled by all measures. He received an outstanding Dean's letter summarizing his time at Stanford Medical School. He was drawn to orthopaedic surgery largely because it married his deep desire for patient care with his keen interest in mechanics and the technical nature of orthopaedic practice.

Dr. Irani began residency in the Palmetto Health/University of South Carolina School of Medicine orthopaedic surgery program in Columbia, South Carolina in July 2010. He was one of two residents who started the five-year program that summer, with an expected graduation date of June 2015. He successfully completed his PGY-1 year (Post Graduate Year 1, also referred to as an internship year), which involved various rotations including general surgery, trauma, and radiology, as well as three months of actual orthopaedic training. He was promoted to his PGY-2 year in July 2011, without condition, which marked the start of his true orthopaedic surgery training.

Approximately six weeks into his PGY-2 year, Dr. Irani was placed on Level II Academic Remediation, or formal probation, by the program director, Defendant David E. Koon, Jr. M.D. When Dr. Irani questioned the grounds for his probation and asked for specific examples of his alleged shortcomings so that he might improve on his deficiencies, he set off a series of unfortunate events that caused his relationship with his attending physicians to descend into an ever-deepening downward spiral. Unfortunately, Dr. Irani's experience in the orthopaedic surgery residency program was marred by hazing, bullying, and overt racial hostility, led principally by the program director, Dr. Koon, who would disparagingly refer to Dr. Irani as "Achmed the Terrorist," and make other similar, outrageous remarks

2

indicative of bigotry and prejudice. Whenever Dr. Irani tried to defend himself from the uncorroborated attacks and vague criticisms of his performance, he was unfairly branded as "lacking insight" or as exhibiting a sense of entitlement. The more Dr. Irani requested that the unsubstantiated allegations against him be verified by reviewing the actual medical records or by talking to the patients or staff members at issue, the more he was castigated by his faculty members, who were charged with his training and professional development.

The relationship between Dr. Irani and his faculty members, primarily Dr. Koon, deteriorated to the point where what should have been an environment of constructive criticism and development had devolved into a "witch hunt," as one senior resident described it. Dr. Irani was no longer afforded an opportunity to grow from learning opportunities, as young physicians-in-training are expected to do; instead his perceived missteps were magnified and ultimately seized upon as a basis to drum him out of the program. Dr. Koon's overt animosity towards Dr. Irani culminated in a seven-week suspension in December 2011, followed by a formal recommendation for his termination in early March 2012. After an unsuccessful grievance hearing, Dr. Irani's termination was finalized on June 1, 2012, when the CEO of Defendant Palmetto Health refused to overturn his termination.

Unfortunately, an abrupt, unexplained termination from a residency program places an indelible black mark on a young doctor's career. Immediately following his termination from the Palmetto Health/USC-SOM program, Dr. Irani attempted unsuccessfully to find another residency program that he could transfer into, first in orthopaedics, and then in other specialties. He eventually re-applied through the national residency match program and secured a spot in an emergency medicine residency program in Bakersfield, California, which started in July 2013. When Dr. Irani applied for his medical license in

California in connection with his new residency program, the California Medical Board contacted the Palmetto Health/USC School of Medicine program about the circumstances of his departure from the program in South Carolina. Dr. Koon placed a negative memo into Dr. Irani's file in late June 2013, over a year after his termination, knowing that the memo would be included in the information that was sent to the California Medical Board. Based entirely on the information received from the South Carolina program, including Dr. Koon's belated, negative memo, the California Medical Board denied Dr. Irani's application for a California medical license, determining that he was not competent to practice medicine.

Dr. Irani had no choice but to resign from the Bakersfield emergency medicine residency program in the fall of 2013, after a failed attempt to obtain a summary reversal of the California Medical Board's determination. Thereafter, Dr. Irani spent over $100,000 in legal fees and over two years in hearings and appeals over the California Medical Board's decision. He was finally granted a full California Medical License, without restriction, in September 2015.

Dr. Irani has been required to draw heavily on the limited resources of his retired parents to help fund the legal battle over his California medical license. With no medical license, no apparent job prospects, and a history of two premature departures from residency programs, Dr. Irani had to move back in with his parents and take odd jobs, such as repairing cell phones and driving for Uber and Lyft, to earn some money to help with his mounting legal fees. Eventually, Dr. Irani was fortunate to land a job with a well-regarded management consulting firm, which he started in July 2015, approximately two-and-a-half months before he would receive news that the California Medial Board ultimately agreed with his appeal and issued his unrestricted medical license in California. Throughout this ordeal, Dr. Irani has not given up on his goal of becoming a practicing clinician; however, in light of commitments he made to his current

employer, very real financial constraints, and the toll this process has taken on himself and his family, it would have been impracticable for him to reapply for the residency match in 2016.

## II. Statement of the Case

Dr. Irani commenced this action by filing a Verified Complaint in the Court of Common Pleas for Richland County, South Carolina, on or about June 13, 2014. The original, Verified Complaint contains twelve causes of action: (1) Title VII–Disparate Treatment and Hostile Work Environment, against Defendants Palmetto Health and USC-SOM; (2) Race Discrimination in Violation of 42 U.S.C. § 1981, against Defendant Palmetto Health; (3) Retaliation in Violation of Title VII and 42 U.S.C. § 1981, against Defendants Palmetto Health and USC-SOM; (4) Breach of Contract, against Defendants Palmetto Health and USC-SOM; (5) Breach of Contract, as Third-Party Beneficiary, against Defendants Palmetto Health and USC-SOM: (6) Wrongful Discharge in Violation of Public Policy, against Defendants Palmetto Health and USC-SOM; (7) Denial of Procedural Due Process in Violation of 42 U.S.C. § 1983, against Defendants Koon and Walsh; (8) Denial of Substantive Due Process in Violation of 42 U.S.C. § 1983, against Defendants Koon and Walsh; (9) First Amendment Retaliation in Violation of 42 U.S.C. § 1983, against Defendants Koon and Walsh; (10) Violation of Equal Protection Clause in Violation of 42 U.S.C. § 1983, against Defendants Koon and Walsh; (11) Libel Per se, against Defendant Koon; and (12) Tortious Interference with Contract, against Defendant Koon.

Defendants were served with the Summons and Verified Complaint in early August 2014. Defendants timely removed the case to federal court on September 8, 2014. Plaintiff filed an Amended Complaint on April 6, 2015, pursuant to leave of court, which added a cause of action for Tortious Interference with Contract, against Defendants Koon and Walsh. The new tortious interference cause of

5

action against Defendants Koon and Walsh was raised as an alternative to the claims for breach of contract and third-party beneficiary breach of contract, in the event that the agreed with Defendant USC-SOM's argument that there was no contractual relationship between Plaintiff and Defendant USC-SOM.

By order of June 23, 2015, the Court dismissed Plaintiff's substantive due process claim under 42 U.S.C. § 1983, and also dismissed all constitutional claims against Defendant Walsh.

Defendants have now moved for summary judgment as to all of Plaintiff's claims.

### III.  Facts

The facts of this matter are generally set forth in Plaintiff's Verified Complaint, which is treated as the equivalent of an affidavit or declaration for purposes of summary judgment, when the allegations in the complaint are based on personal knowledge. See Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991). In addition, Dr. Irani has prepared an Unsworn Declaration under penalty to perjury, pursuant to 28 U.S.C. § 1746, which is attached hereto.  Discovery in this case has produced a record that is complex and voluminous, to say the least.  This case must be analyzed by carefully examining the underlying details, rather than merely accepting at face value the broad, generalized allegations against Dr. Irani.  On summary judgment, the Court must look beyond the self-serving affidavits or declarations of the individual Defendants, which were carefully crafted by Defendants' counsel, which contain improper conclusions of law and inadmissible opinions, and which are belied by the contemporaneous record in this case.

Dr. Irani signed contracts of employment during each of his two years in the Program, which contracts expressly incorporated the Palmetto Health Resident Manual, which in turn expressly incorporated the Resident Handbook of the USC Department of Orthopaedic Surgery.  (Resident Agreement of Appointment) (attached hereto as Exhibit R); (USC Ortho. Dept. Handbook at 7) (excerpts

attached hereto as Exhibit S).  Neither the Palmetto Health Resident Manual nor the Orthopaedic

Department's Resident Handbook contains a valid disclaimer under applicable South Carolina law.  S.C.

Code Ann. § 41-1-110.  (Stephens Depo., at 61, ll. 7-24) (excerpts attached hereto as Exhibit H).  The

Orthopaedic Department's Resident Handbook expressly incorporates the standards of the Accreditation

Council for Graduate Medical Education ("ACGME"), which is the accrediting body for medical

residencies in the United States.  (USC Orth. Dept. Handbook at 7).  The ACGME's mandatory

accreditation standards contain both common program requirements, which are generally applicable to all

residency programs, as well as program-specific requirements for each medical specialty that are

promulgated by the particular specialty's Residency Review Committee ("RRC").  (Taylor Depo., at 14,

l. 9 to p. 15, l.5) (excerpts attached hereto as Exhibit I).

  Dr. Irani's PGY-1 year consisted of monthly rotations through various areas of general surgery and

medicine, plus three months of orthopaedic surgery rotations.  He received mostly satisfactory performance

evaluations from the various rotations during his PGY-1 year and was promoted to PGY-2 in July 2011,

without any limitations, conditions, or probation.  (Irani Decl, at ¶ 10) (attached hereto as Exhibit A).

Although a couple of his early evaluations from his initial rotations in his PGY-1 year contained some

suggestions for improvement, he improved steadily throughout his PGY-1 year and his evaluations generally

reflected "marked improvement."  (Copies of Plaintiff's PGY-1 performance evaluations are attached

hereto as Exhibit T).  Approximately mid-way through his PGY-1 year, as Dr. Irani was getting ready to

start his first rotation on an orthopaedic service, he ran into Dr. Koon in the parking garage.  Dr. Koon

stated that he expected to hear nothing but overly positive and effusive things about his residents from other

faculty.  Dr. Koon stated that the orthopaedics faculty considered their residents to be the best in the

hospital; he stated that the general surgery attendings "would trade three of their residents for one of ours" and that the internal medicine program is "just happy to have residents who can speak English." (Irani Decl., at ¶ 9). Dr. Koon acknowledged in his deposition that he made the disparaging and insensitive remark about foreign residents in Dr. Irani's presence and that he regrets making it. (Koon Depo., at 89, l.23 to p. 90, l.1) (excerpts attached hereto as Exhibit J). Looking back on this remark, this was Plaintiff's first indication that Defendant Koon exhibited any underlying bias or animus against towards minority or foreign residents.

The first real sign of any overt animosity from Defendant Koon towards Dr. Irani occurred during the Program's first journal club meeting in the summer of 2011, as Dr. Irani was transitioning from his PGY-1 to his PGY-2 year. Dr. Irani was assigned to review an article entitled, "How to Swim with Sharks: A Primer," which is a reprinted article originally written in the 1800s by a sponge diver about how to survive while swimming in shark-infested waters. The article advises the reader not to flail about, not to get bit, and if bit, try not to bleed or otherwise aggravate the sharks. (Exhibit U). As Dr. Irani stood to present his review of the article to the group of his peers and faculty form the department, Dr. Koon stated to him, "This article was not randomly assigned to you." (Irani Decl., at ¶ 11). The article clearly does not comport with the Department's written policy for Journal Club articles, and Dr. Walsh stated that the article was intended to be humorous, although obviously at Dr. Irani's expense. (Walsh Depo., at 14, ll. 14-22) (excerpts attached hereto as Exhibit K). A few weeks later, when Dr. Irani sent an e-mail to Dr. Koon suggesting a journal club article from the Archives of Internal Medicine, Dr. Koon responded with a sarcastic and biting e-mail, inquiring whether Dr. Irani was not satisfied with the assigned journal club articles. (Exhibit V).

8

On August 15, 2015, less than two months into his PGY-2 year, Dr. Irani was called into a very hostile and intimidating meeting by Program Director, Defendant Koon. The Orthopaedics Department practice manager was also present to serve as a witness to the meeting. Defendant Koon began the meeting by informing Dr. Irani that they had previously fired residents from the program, including a PGY-5 senior resident who was only six months away from his expected graduation date, Dr. Chad Lamoreaux. (Irani Decl, at ¶12). Dr. Koon then handed Dr. Irani a memorandum informing him that he was being placed on Level II academic remediation, which is formal probation, through December 2011. Dr. Irani had not previously been placed on Level I remediation, or formal documented counseling. Dr. Koon's memorandum of August 15, 2011 listed seven alleged deficiencies in Dr. Irani's job performance, many of which were very vague and consisted mostly of generalized comments. When Dr. Irani requested clarification or specific examples of his alleged shortcomings, Defendant Koon chastised him further and stated, "this just shows you lack insight." (Irani Decl, at ¶ 13). Dr. Irani was not given a reasonable opportunity to defend himself or explain his side of the story in connection with the seven items in Defendant Koon's memorandum. During their meeting, Defendant Koon also reminded Dr. Irani that he (Koon) would have to sign any resident's final paperwork to allow them to graduate from the program. (Irani Decl, at ¶ 12).

Dr. Irani's initial write-up from August 15, 2011 appears to have been prompted primarily by a patient encounter that Dr. Irani was involved in on July 11, 2011, over a month earlier and just 11 days into his PGY-2 year. In this particular incident, Dr. Irani was called to the Emergency Department ("ED") to assist with an elderly patient who had suffered a traumatic injury to one of his arms that had gotten caught in a metal lathe. The patient eventually required a surgical amputation of his arm. The complaints about

9

Dr. Irani's care towards this particular patient were generated by two nurses in the ED who accused Dr. Irani and the attending physician, Dr. John Iaquinto, of lacking empathy and compassion towards the patient and handling his injured arm in a rough manner. Little or no investigation was done into this complaint, beyond receiving the nurses' e-mail accounts of what occurred. No one spoke with the attending physician involved (Dr. Iaquinto), the ER physicians, the orthopaedic techs, the patient or his family. On August 10, 2011, Dr. Irani was asked to provide his account of this case before the end of the day (almost a month after the fact), which he did promptly. (Dkt. No. 136-3, at 48-49). Dr. Irani's response was plainly not "flippant," as described by Dr. Walsh's affidavit, but rather was a considered account of a very difficult case for a new orthopaedic resident. Dr. Iaquinto has prepared a written statement about his incident indicating that Dr. Irani's care of this particular patient was appropriate and professional. (Iaquinto Aff., at 1) (attached hereto as Exhibit E).

There were only two other items in the August 15, 2011 memorandum that had to do with specific patient encounters or direct patient care. The first one involved a patient at the VA, who came into the ED at the Dorn VAMC while Dr. Irani was on call one evening at Palmetto Health Richland. The patient appeared to have cellulitis on his lower leg, which is a skin inflammation or irritation that could be caused by a variety of factors. Although the patient was recovering from a recent knee surgery, the cellulitis was not in the area of the surgical wound and did not appear to involve the surgical site. Dr. Irani was criticized for not immediately traveling to the VA to evaluate the patient in person, despite his primary call duties at the Palmetto Health Richland trauma hospital, which is 20-30 minutes across town from the VA. Dr. John Eady, the Chief of Orthopaedics at the Dorn VAMC, evaluated the patient the following morning and confirmed that there was no urgency to that patient's situation and that the patient did not have any

10

orthopaedic complications.  Dr. Eady verified that Dr. Irani's response with this patient was appropriate.  (Eady Testimony from Cal. Med. Bd. Hearing, at 167) (excerpts attached hereto as Exhibit W).  Significantly, Dr. Koon never spoke with either Dr. Eady or the medicine attending from the VA who was involved with this patient's care.  (Koon Depo., at 118, l.17 to p. 119, l.9).  Dr. Irani has provided contemporaneous text messages from the medicine attending at the VA confirming that the patient did not need to be seen by an orthopaedist on an emergent basis that night, but could wait to been seen in the orthopaedic clinic the next day.  (Exhibit X).

The other specific patient care remark in the August 15 write-up was that Dr. Irani improperly closed a patient's wound with Vicryl suture.  Dr. Irani had seen one of his co-residents use Vicryl to close a wound in a similar circumstance under the guidance of a more senior resident, so Dr. Irani thought that practice was acceptable. (Irani Decl, at ¶ 16).  When the potential complications for using Vicryl in that particular presentation were explained to Dr. Irani, he understood the potential problems and immediately replaced the sutures with a different material.  He never used Vicryl suture in a similar situation again.  (Walsh Depo., at 107, l.25 to p. 108, l. 10).  This is a prime example of a new surgical resident learning from his mistakes; it should not have been an item listed as a reason to justify Level II remediation.

The other items in the list of seven deficiencies in the August 15, 2011 memorandum were somewhat vague, such as "poor communication skills," "poor time management," ineffective prioritization of clinical duties, which "resulted in additional duties for other residents," and "a significant lack of attention to detail in his initial PGY-2 rotation."  When Dr. Irani asked Dr. Koon for clarification of these allegations and for some specific examples so that he (Irani) could improve his job performance or the impressions of others about his job performance, Dr. Koon refused but simply told him, rather tersely, "this just shows

11

you lack insight." (Irani Decl, at ¶ 17). Neither Dr. Koon nor Dr. Walsh ever elaborated about the alleged "lack of attention to detail" during Dr. Irani's Hand rotation. In fact the first time Dr. Irani heard complaints about inadequate H&Ps (history and physicals), was at the grievance committee hearing in April 2012. (Irani Decl, at ¶ 73). Dr. Irani was never informed this was an issue, and this "attention to detail" complaint was never explained to Dr. Irani despite multiple requests for clarification. (Irani Decl, at ¶ 20). Notably, Dr. Irani's evaluations from his PGY-1 year contain marks in the Average to Excellent range on the three specific questions about "[t]he overall quality of the Resident's H&P," whether "The H&P reflects a thoughtful and realistic differential diagnosis" and "the accuracy of the information in the Resident's H&P." (Exhibit Y, at PH-000021, PH-000030, PH-000036, and PH-000045). In addition, the Dean's Letter in support of Dr. Irani's residency application specifically quotes several favorable comments about Plaintiff's proficiency with H&Ps while in medical school, including that "His notes were excellent, complete, and appropriate." (Exhibit Z).

Dr. Koon's sixth comment on the August 15 memorandum is that Dr. Irani "received substandard evaluations during his internship." This allegation is demonstrably untrue and is a plain mischaracterization of Dr. Irani's PGY-1 year. Palmetto Health has produced a total of ten faculty to resident evaluations from the twelve, month-long rotations in Dr. Irani's PGY-1 year. Some rotations had more than one evaluation (multiple attending physicians), and some rotations were repeated throughout the year. Four of the rotations in the second half of his PGY-1 year had no written evaluations at all, including two orthopaedic rotations on the Hand service, which is led by Defendant Walsh. Of the ten evaluations that were provided from his PGY-1 year, Dr. Irani received three overall ratings of "Excellent," five overall ratings of "Satisfactory" (including Dr. Koon's evaluation from January 2011 for the General Orthopaedics rotation),

12

and only one overall rating of "Marginal." (Exhibit T). The sole "Marginal" overall rating was from Dr. Jones after only Dr. Irani's second month of his residency, which was on the Surgery: Trauma Service rotation in August 2010. Significantly, when Dr. Irani did a second rotation with the Trauma Service in December 2010, Dr. Jones gave him an overall rating of "Satisfactory." Dr. Jones commented, "Dr. Irani did improve from his first rotation on trauma to his second. He is now, in my opinion, at an average or satisfactory level." (Exhibit T, at PH000068). Dr. Irani not receive any overall rating of "Unsatisfactory" during his entire tenure in the Program. Defendants have repeatedly asserted that Dr. Irani had a "difficult" or "rough" PGY-1 year, including in the recent Affidavits by Defendants Koon and Walsh. That allegation is not accurate and is not supported by any contemporaneous evidence in the record. Even Dr. Koon's first cover letter to the California Medical Board stated, "Dr. Irani satisfactorily completed his internship (PGY-1) from 01 JUL 10- 30 JUN 11." (Exhibit AA).

After the meeting with Dr. Koon on August 15, 2011, Dr. Irani individually met with all of his co-residents and colleagues to find out how he caused additional work for other residents, in a sincere effort to remediate this alleged deficiency. Not a single one of his co-residents echoed Dr. Koon's accusation that Dr. Irani caused more work for others. (Irani Decl, at ¶ 18). Throughout his brief tenure in residency, whenever Dr. Irani sincerely tried to gain clarity about his shortcomings (perceived or actual), he was accused of being defensive, refusing to acknowledge his mistakes, blaming other people for his mistakes, or lacking insight. (Irani Decl, at ¶ 17).

Dr. Irani pursued an informal grievance of his Level II remediation. The first two steps required the resident to discuss the matter with his Program Director (Defendant Koon) and then with his Department Chair (Defendant Walsh), respectively. Neither changed his position about the academic

remediation. The third step of the grievance was an informal review by Defendant Palmetto Health's

Designated Institutional Official ("DIO"), Dr. Kathy Stephens, who summarily denied the grievance. There

is no evidence that Dr. Stephens did any investigation, spoke with any witnesses, or reviewed any

additional documents prior to her decision to deny the grievance. The fourth step in the grievance process

would have been a request for a formal hearing before the grievance committee. Dr. Irani discussed this

option with Defendant Walsh, who told him, "I'm not going to tell you what to do, but I'm a busy

orthopaedic surgeon, you're a busy orthopaedic surgeon -- when I have to sit here and answer questions

about all this, it just gets in the way when I could be doing other things." (Irani Decl, at ¶ 21). Dr. Irani

later informed Ms. Stephens that he decided not to appeal the matter further to the grievance committee,

because he did not want to further harm his relationship with his attendings or risk alienating his program

director and chairman. (Exhibit BB). Although Ms. Stephens testified that residents should not be

discouraged from utilizing the grievance policy, she took no action to follow up on Dr. Irani's comment

that he was being discouraged from doing so. (Stephens Depo., at 50, ll 19-24).

Dr. Irani met with Drs. Walsh and Grabowski on September 20, 2011 to review his six-month

evaluation from the latter part of his PGY-1 year. In his memorandum of September 22, 2011 summarizing

that meeting, Dr. Walsh indicated that Dr. Irani was making improvements in his performance. During their

meeting on September 20, Dr. Walsh did not mention anything about Dr. Irani's H&Ps during his previous

hand rotation on Dr. Walsh's service, which ended on August 31, 2011. In paragraph two of his

memorandum, Dr. Walsh states, "With the exceptions noted below I think that Dr. Irani's progress to date

has been reasonably satisfactory." (Exhibit CC). Dr. Walsh goes on to discuss the trauma patient with the

arm amputation, as well as items 2-5 from the August 15, 2011 memorandum; however, he does not

14

mention anything about item 7, which alleged a "significant lack of attention to detail in his initial PGY-2 rotation." Notably, Dr. Walsh did not complete any written evaluations for Dr. Irani, either for the two Hand rotations from his PGY-1 year (February and May 2011), or the two-month Hand rotation he had in July and August 2011, at the beginning of his PGY-2 year. Palmetto Health's policy is that attending physicians "[m]ust provide written evaluation of resident on Program Director approved form or format within 2 weeks of rotation completion." (Exhibit DD).

Dr. Irani's next rotation in his PGY-2 year was on Sports Medicine, one month with Dr. Jeffrey Guy followed by one month with Dr. Mazoue, in September and October respectively. Dr. Guy's contemporaneous, verbal feedback to Dr. Irani was mostly positive. (Irani Depo., at 138, ll. 17-23). On October 3, 2011, Dr. Irani met with Dr. Walsh and Dr. Koon to discuss his progress and to review Dr. Walsh's memorandum of September 22, 2011. According to Dr. Koon's memorandum of the October 3, 2011 meeting, "Dr. Irani appears to have gained some insight into his deficiencies. He received constructive advice from Dr. Guy during his September rotation and has been working hard to improve in these areas." (Exhibit EE). Presumably, if Dr. Guy thought Dr. Irani's performance in September 2011 were problematic, it would have been reflected in Dr. Koon's October 3, 2011 memorandum. Dr. Guy's actual written evaluation of this rotation from September 2011 was not completed until January 29, 2012, almost four months after Dr. Irani completed the rotation, far beyond the Department's requirement of submitting evaluations within two weeks of the end of the rotation. (Exhibit PP). Significantly, Dr. Guy's written evaluation also occurred after Dr. Irani had been harshly criticized during a faculty meeting on December 5, 2011, which is discussed below, and had been on suspension for almost two months.

Dr. Irani's second month on the Sports rotation in October was also positive, as reflected in the

timely evaluation of Dr. Mazoue dated November 6, 2011. Dr. Mazoue rated Dr. Irani as "Satisfactory" in every category, with the exception of a "Marginal" rating on "Reliability: Acceptance of responsibility, punctuality, availability." (Exhibit FF). Dr. Mazoue's overall evaluation of Dr. Irani was also "Satisfactory." (Id.).

Dr. Irani began his next rotation in Joints with Dr. Frank Voss in November 2011. On November 3, 2011, Dr. Irani sent an e-mail to Dr. Koon informing him that he (Irani) had completed the dictation of the discharge summary for a VA patient. Although Dr. Koon had previously asked Dr. Irani several times about taking care of this task, there was some confusion about which VA patient Dr. Koon was referring to, because Dr. Koon did not identify the patient by name or ID number. Dr. Irani took care of the dictation promptly when Dr. Koon made the request. Unfortunately, the VA patient Dr. Koon was referring to was still showing as uncompleted, which prompted a reminder from Dr. Koon to Dr. Irani to handle the VA patient. Dr. Irani responded that he had already completed the assignment, thinking that Dr. Koon was referring to the first VA patient that Dr. Irani had completed. Shortly thereafter, Dr. Irani realized the he and Dr. Koon were not in sync about which VA patient, since Dr. Koon was requesting Dr. Irani to do a dictation for a patient whom Dr. Irani had not actually provided any medical care. (Irani Decl, at ¶¶ 22-23). Plaintiff has produced contemporaneous text messages between him and Dr. Koon about this issue and illustrating the confusion. (Exhibit GG). As soon as Dr. Irani called and spoke with Dr. Koon to clarify the patient information, he promptly completed the dictation and sent Dr. Koon an e-mail to let him know that the task had been completed. Dr. Irani's e-mail attempted to explain the reason for the confusion by stating that he was not actually involved in the care of the patient Dr. Koon was referring to, which explained why Dr. Irani had not done what Dr. Koon had asked him to do. (Irani Decl,

16

at ¶ 23).  Dr. Koon went ballistic when he received Dr. Irani's e-mail, and Dr. Koon sent a blistering e-mail response back to Dr. Irani:

> I am well aware of the facts surrounding this patient's care and do not need you to remind me of the details.  I'm amazed that, as the junior resident of the PH team, you feel somehow inconvenienced by having to dictate a discharge summary on a patient that you "never actually participated" in his care.  I guess that I'm supposed to be thankful that you "have gone ahead and dictated the discharge summary" for me.  Absolutely incredible. . . I can assure you that I would have NEVER in a million years sent a response like this to my program director, especially when I was in the midst of academic remediation.  I would remind you that I have asked you THREE times to get this done.  Instead of saying "No sweat Dr. Koon, I'll take care of it" and getting it done, I get this dribble.

(Exhibit HH).  Dr. Koon told Dr. Irani that he was so upset by the e-mail that he (Koon) could not talk to his wife for a short while after reading it.  Dr. Koon actually told Dr. Irani that the version of the e-mail Dr. Irani received had been toned down considerably.  Dr. Koon told Dr. Irani that he (Irani) was lucky he was on vacation at the time, otherwise Dr. Koon would have fired him on the spot.  ([cite to record]).  Shortly thereafter, one of the senior residents at the time, Dr. Kenny Lindley, sent an e-mail to one of the Chief Residents, Dr. Justin Hoover, about this issue, stating "I felt that I needed to say something as I feel this is more of a witch hunt than anything."  (Exhibit II).

At a meeting on November 21, 2011, to review Dr. Irani's remediation progress, Defendant Koon stated that he would recommend Level I remediation once the probation ended on December 1, 2011.  (Irani Decl, at ¶ 25).  Shortly thereafter, on December 5, 2011, Dr. Irani was requested to appear at a faculty meeting of the Department to discuss his remediation.  He anticipated that he was going to be moved from Level II remediation to Level I remediation during the faculty meeting.  Instead, the faculty meeting was a very hostile atmosphere where he was blind-sided by a number of additional allegations against him.  Dr. Irani's detailed account of the faculty meeting is set forth in his Declaration at Paragraphs 26-37.  Dr.

17

Koon repeatedly stated that Dr. Irani failed to accept ownership in the face of "overwhelming evidence"; yet, no such evidence was provided during the meeting, and Dr. Koon refused to allow Dr. Irani to present objective evidence to refute the allegations. Claiming that Dr. Irani was not owning up to clear mistakes and misrepresenting facts, Dr. Koon made it clear that Dr. Irani's statements should not be trusted by the faculty. At that point, other faculty members chimed in that Dr. Irani needed to accept responsibility for his mistakes and to stop trying to justify his actions or make excuses for his conduct. The faculty berated Dr. Irani for over an hour, according to Dr. Koon's memorandum of December 12, 2011 summarizing the faculty meeting. (Exhibit JJ).

During the faculty meeting, Dr. Koon raised several additional patient care episodes that completely mischaracterized events without allowing Dr. Irani the chance to explain himself. Specifically, Dr. Koon accused Dr. Irani of prescribing "inappropriate doses of narcotics," failing "to evaluate post-operative patients with wound care issues," and failing "to abide by direct attending instructions during the care of clinic patients." (Exhibit JJ). Dr. Irani's became increasingly frustrated and disheartened because he believed (and still believes) that the allegations made against him were based on misinformation or mistaken inferences, assumptions, and uncorroborated speculation, without any effort to review the medical records or to interview the relevant, material witnesses. The more Dr. Irani attempted to dispute or disagree with the allegations against him and requested a review of the patients' medical records, the more Dr. Koon accused him of lacking insight and questioned his integrity. None of the faculty members intervened to request further investigation or to consider that Dr. Irani's account of events might be correct. The inquisition of Dr. Irani during the faculty meeting quickly turned all faculty opinion against him, and shortly after Dr. Irani was dismissed from the meeting, the faculty apparently voted unanimously to suspend him

18

from the program. No further information about the allegations was obtained, and Dr. Irani was not

afforded any further opportunity to rebut the allegations against him after the faculty meeting was adjourned.

The specific patient issues raised during the faculty meeting were portrayed in an incomplete and

misleading manner. The first item–prescribing inappropriate doses of narcotics–involved a patient who was

having continued pain the night after being discharged from the hospital following surgery. Dr. Walsh

testified in his deposition that this was a patient who had a difficult shoulder procedure performed by Dr.

Walsh and Dr. Mazoue. (Walsh Depo., at 145, l. 16 to p. 146, l. 12). Dr. Walsh stated that he spoke with

the patient the following morning to question whether Dr. Irani had prescribed too much medication the

night before while Dr. Irani was on call. According to Dr. Walsh, the patient stated that Dr. Irani told her

to take five tablets of Oxycodone at once. (Walsh Depo., at 155, ll.8-13). Dr. Irani's recollection of this

patient is that her husband called at approximately 3:00 a.m. to report that his wife was having unremitting

pain. Dr. Irani states that he asked some questions about the wife's condition and okayed an additional

five milligrams of Oxycodone. After his call shift, Dr. Irani asked the on-coming resident to follow up with

the patient to make sure she was doing okay and that there was no misunderstanding with the patient's

husband about the dosage. (Irani Decl., at ¶ 37) Dr. Walsh acknowledged that there is no specified

maximum dosage for Oxycodone. (Walsh Depo., at 155, ll. 5-7). Dr. Walsh did not recall ever speaking

with the husband, but his recollection is that he only spoke with the patient herself. (Walsh Depo., at 33,

l. 25 to p. 34, l. 8). Dr. Walsh conceded that the patient was on narcotics at the time and that narcotics

can have an effect on a person's ability to recall things accurately. (Walsh Depo., at 33, ll. 6-10). Dr.

Walsh did not ask the patient to report to the hospital, nor did the patient need any other inventions. It is

clear the patient did not have any complications, was appropriately treated for her pain, and Dr. Irani's

19

attention to detail and patient care allowed for appropriate patient followup.

There appears to be some confusion on Defendants' side with regard to this patient, because Dr. Voss testified in his deposition that he thought this particular patient was actually his patient and that the medication involved was Percocet, not Oxycodone. Dr. Voss's written evaluation of Plaintiff dated December 28, 2011 states, "His patient care was inconsistent and included a patient who was told to take 5 Percocet tablets at once by phone." (Exhibit KK). Dr. Voss does not recall how he heard about this incident, what procedure the patient had, or what the patient's name was. (Voss Depo., at 49, l.22 to p. 50, l.6). Dr. Voss conceded in his deposition that this patient might not even be one of his. (Voss Depo., at 50, ll. 7-9). Dr. Voss appears to have conflated what he heard about this patient from the faculty meeting on December 5, 2011, when he was completing Dr. Irani's evaluation about three weeks later at the end of December.

Similarly, there appears to be confusion about another medication issue with a patient that not raised in the faculty meeting, but was mentioned for the first time Dr. Voss's evaluation of Plaintiff from December 28, 2011. In the evaluation, Dr. Voss wrote, in relevant part, "His patient care was inconsistent and included a patient who was told to take 5 Percocet tablets at once by phone and a second one who had been taking 12/day in hospital for whom he wrote a prescription for 40 tablets." (Exhibit KK). Dr. Walsh, in his recent Affidavit testifies that this particular patient was actually his (Walsh's) and that he reported this to Dr. Koon as "a concern with Dr. Irani's judgment that affected the care of one of my patients." Dr. Walsh goes on to describe the situation where, "Under my orders, the patient was to be prescribed twelve pills a day, and should have been prescribed a supply of medication to cover the time until her follow up appointment twelve to fourteen days later. Dr. Irani had written the patient a prescription

20

for just 40 pills, so the patient was calling the clinic within a matter of days asking for a refill." (Walsh Aff.,

at 5, ¶ 17). Dr. Koon's Affidavit has the same story at Paragraph 19, also attributing that to a patient of

Dr. Walsh's. (Koon Aff., at 7, ¶ 19). Oddly enough, Dr. Walsh unequivocally testified in is deposition that

this particular patient was one of Dr. Voss's patients and that Dr. Walsh was made aware of this incident

"from reviewing the documentation." (Walsh Depo., at 146, l. 24 to p. 147, l. 15). Dr. Voss testified in

his deposition that the patient in question was his patient, (Voss Depo., at 55, ll. 10-22); however, Dr.

Voss also concede that it is possible that another resident actually wrote the inadequate prescription. (Voss

Depo., at 57, ll. 9-13).

This is reminiscent of a bad installment of the "telephone game" you played at camp as a kid, where

a secret message is passed around a circle from person to person and at the end of the chain, the original

message as been so distorted as to be unrecognizable. Not only does this allegation illustrate Dr. Irani's

frustration with the series of unsubstantiated accusations, it also calls into question the validity of

Defendants' recent affidavits, which are signed under penalty of perjury.

During discovery in this case, Plaintiff's counsel requested that Defendants Palmetto Health and

USC-SOM "Produce the medical records for any patient to whom Plaintiff is alleged to have administered

inappropriate or deficient medical treatment." Plaintiff's First Set of Interrogatories and Requests for

Production to Defendant Palmetto Health, Request No. 28. Later, Plaintiff narrowed the request to seven

or eight specific patient encounters based on information obtained from discovery responses and deposition

testimony:

> Produce the complete medical chart, including inpatient, outpatient, or clinical
> records, nursing notes or records, progress notes, dictation summaries, histories and
> physicals, radiology reports, and discharge summaries/orders, for the following patients

(redacted to protect the confidentiality of PHI as required by HIPAA), for which Plaintiff was involved in their care:

    a.    R.B. (date of service 7/11/2011)–patient had traumatic injury to arm from metal lathe;

    b.    G.E. (date of service 11/28/2011)–patient had external fixator, operated on by Dr. Walsh, seen in clinic by Dr. Grabowski, MRI ordered for suspected infection;

    c.    Patient of Dr. Walsh's/Dr. Mazoue's in Nov. 2011 for whom Plaintiff allegedly prescribed an excessive dosage of Oxycodone;

    d.    Patient of Dr. Voss's for whom Plaintiff allegedly prescribed an excessive dosage of Percocet;

    e.    Patient of Dr. Voss's for whom Plaintiff allegedly prescribed an insufficient amount of pain medication following discharge;

    f.    Female Trauma patient 375 (date of service 12/5/2011);

    g.    L.O. (approx. dates of service 2/21/2012 to 2/28/2012), spine fusion patient of Dr. Grabowski's who had temporary compression of spinal nerves due to duratomy;

    h.    Hemophiliac patient (approx. date of service 3/1/2012) for whom Plaintiff allegedly failed to perform an evaluation for possible compartment syndrome.

Plaintiff's Second Set of Interrogatories and Requests for Production to Defendant Palmetto Health, Request No. 37. After the court compelled responses to these requests, Defendant Palmetto Health produced records only for five of the patients identified above–(a), (b), (f), (g), and (h). Defendants did not produce any patient records for the two or three patients for whom Dr. Irani allegedly provided improper pain management. Even after Dr. Walsh clearly testified that he recalled the patient's name and could pull the patient's chart if requested, (Walsh Depo., at 150, l. 22 to p. 151, l. 2), that information has never been produced in discovery in this case. Defendants' failure or refusal to produce documents that are exclusively within their possession, custody, or control allows the court to draw a negative inference that such evidence would have been detrimental to Defendants' case and supportive of Plaintiff's claims. See generally Vodusek v. Bayliner Marine Corp., 71 F.3d 148, 156 (4th Cir. 1995) ("As a general

proposition, the trial court has broad discretion to permit a jury to draw adverse inferences from a party's failure to present evidence, the loss of evidence, or the destruction of evidence. While a finding of bad faith suffices to permit such an inference, it is not always necessary.").

During the faculty meeting, Dr. Koon also stated that Dr. Irani failed to evaluate a post-patient who had a potential infection of her surgical wound. Dr. Koon blamed Dr. Irani for the patient not coming to the emergency department over Thanksgiving weekend to have her wound evaluated. The patient supposedly called in three times over the weekend, but did not actually come to the hospital until the following Monday. Dr. Irani tried to explain that when he was on call over the weekend, the patient had called and indicated that her bandage had fallen off and that there was some minimal drainage from her incision. Dr. Irani informed the patient that she needed to come to the emergency department to have her wound evaluated, because he could not properly assess her over the phone. The patient also called Dr. Irani's co-resident, Dr. Goodno, twice the following day when Dr. Goodno was on call, and he told her the same thing, that she needed to come into the emergency department for an evaluation. (Irani Decl., at ¶¶ 35-36). Dr. Koon would not accept Dr. Irani's explanation, but continued to badger him about owning up to his mistakes. Significantly, Dr. Goodno was not counseled or disciplined in connection with this patient. (Koon Depo., at 166, ll. 12-18). Additionally, the patient showed the following Monday to the ED, which likely confirms Dr. Irani's and Dr. Goodno's accounts that she was told to show up at the ED, but just delayed her visit.

Another patient encounter raised during the faculty meeting involved an allegation that Dr. Irani failed to abide by the instructions of attending physician Dr. Grabowksi during an outpatient clinic on November 28, 2011. Specifically, Dr. Koon accused Dr. Irani of failing to obtain a "stat" (i.e., immediate)

MRI on a patient who had a potential infection in an external fixator attached to his forearm. Dr. Koon asserted that Dr. Irani substituted his judgment for the instructions of Dr. Grabowski and allowed the patient to go home and obtain the MRI only on an elective basis. Dr. Irani tried to provide his rebuttal to the allegations, again to no avail. According to Dr. Irani, when he tried to have one of the staff members schedule this patient's MRI, she returned and informed Dr. Irani that the earliest MRI appointment in the radiology department was not until two days later. Dr. Irani told the nurse to hold the spot on the schedule, while he figured out how to get it done quicker. Dr. Irani then explained the situation to his Chief Resident, Dr. Wood, and asked her how to schedule an MRI on an expedited basis. Dr. Wood told Dr. Irani that if he calls and speaks directly with the radiologist, they can override the schedulers and get a stat MRI. Dr. Irani did so and was able to schedule the patient's MRI that same afternoon. The patient received the MRI as requested. (Irani Decl., at ¶ 32). During the faculty meeting, Dr. Koon refused Dr. Irani's request to pull the patient's chart to verify the date of the MRI or to speak with the nurse, who could have corroborated Dr. Irani's account of the events.

During discovery in this case, Plaintiff also requested copies of the MRI patient's file. Incredibly, Defendant Palmetto Health originally produced only the nurse's initial order scheduling the MRI for December 2, 2011, which order was never effectuated. Only after Plaintiff's counsel requested the court's intervention during a status conference in the case did Palmetto Health finally produce the actual MRI report, which confirms that the MRI was actually performed on November 28, 2011, at 7:17 p.m., just like Dr. Irani had tried to explain. (Exhibit LL) ["CONFIDENTIAL"]. The nurse involved in this incident, Charmain Reed, also corroborated Dr. Irani's account in an Affidavit she signed in connection with Dr. Irani's California Medical Board case. (C. Reed Affidavit) (attached hereto as Exhibit C).

24

Dr. Koon testified that at the end of the faculty meeting on December 5, 2011, after Dr. Irani had been excused from the meeting, the orthopaedic surgery faculty voted unanimously to place Dr. Irani on suspension, or Level III remediation. (Koon Depo., at 191, ll. 17-21).

On December 7, 2011, two days after the faculty meeting, Dr. Irani was involved in another patient encounter where Dr. Koon alleges that Dr. Irani provided inadequate or improper patient care.  The allegations apparently stemmed from complaints from two or three nurses in the emergency department who brought the matter to Dr. Koon's attention shortly after the incident.  This particular case involved a young woman who was involved in a head-on automobile collision and suffered significant traumatic injuries, including multiple open fractures.  (Irani Decl., at ¶ 40).  This patient has been referred to as "Trauma Female 375."  The patient was seen initially by Dr. Kristin Nathe, who was an orthopaedic intern, or PGY-1 resident, at the time.  Dr. Nathe was called to the emergency department at approximately 11:30 a.m. about this particular patient and about another critical patient with an open fracture (Trauma Female 374).  Dr. Jones, the orthopaedic traumatologist, told Dr. Nathe to see the patients and order x-rays.  Dr. Nathe quickly realized that the patients' injuries were too complicated for her level of training as a PGY-1 resident.  She attempted to call one of the senior residents, Dr. Whiteside, at about 12:30 or 1:00 p.m., but Dr. Whiteside told her that he was at Baptist Hospital and suggested she call Dr. Hoover.  When she did not receive a response from Dr. Hoover, she went up to the Premier Orthopaedic Clinic, which is in Palmetto Health, and spoke with Dr. Jones, about the patient's injuries and her x-rays.  Dr. Jones was in clinic at the time with Chief Resident, Dr. Wood.  When Dr. Wood overheard the conversation between Dr. Nathe and Dr. Jones, she (Wood) suggested that Dr. Nathe  page Dr. Irani, which she did at approximately 2:00 p.m.  Dr. Irani arrived in the emergency department at approximately 2:30 p.m., over

25

three hours after the patient's arrival at the hospital. Dr. Irani reduced the patient's fractures and splinted them with the help of Dr. Nathe. (Exhibit MM). Plaintiff's expert witness, Dr. Richard Grant, testified that Dr. Irani acted appropriately in his treatment of Trauma Female 375, because the critical issue was reducing the fractures as quickly as possible. (Grant Depo., at 167, l.13 to p. 169, l.1) (excerpts attached hereto as Exhibit L). After the patient's fractures were reduced and splinted, she was taken into the operating room, where Dr. Jones surgically repaired her fractures.

On December 9, 2011, Dr. Irani was informed that he was being suspended from the residency program. Dr. Walsh told him that the purpose of the suspension was so they could perform an investigation and get all sides of the story about Trauma Female 375, including Dr. Irani's. (Irani Decl., at ¶ 45); (Walsh Depo., at 208, ll. 8-12). The Disciplinary Action Report for Dr. Irani's suspension on December 9, 2011 states, "Dr. Irani displayed inappropriate patient care in the case of Trauma, F375. He displayed a lack of empathy and compassion, poor interpersonal communication, and a lack of appropriate teamwork with ancillary staff. These actions led to the patient requesting to be transferred to another hospital." (Exhibit NN). Dr. Koon testified that he was the one who conducted the investigation into Trauma Female 375. (Koon Depo., at 204, l. 19 to p. 205, l. 1). Dr. Koon did not obtain a written statement from Dr. Nathe until December 11, 2011, and spoke with the nurses who initially made the complaint. Dr. Koon states that he spoke with Dr. Jones about matter, but did not get a written statement from Dr. Jones. (Koon Depo., at 201, ll. 1-5). Contrary to the statement in Dr. Koon's recent Affidavit (Koon Aff., at 9, ¶ 26). Dr. Koon did not speak with Dr. Irani to get his side of the story, nor did Dr. Koon speak with the cast tech, Toni Pettiford-Smith. (Irani Decl., at ¶¶ 46-47). Ms. Pettiford-Smith signed an Affidavit for Dr. Irani that was submitted to the California Medical Board. (Exhibit D). Ms. Smith's account of this incident was

26

very complimentary of Dr. Irani's performance with regard to this particular patient and directly contradicts an allegation that Dr. Irani acted inappropriately. Ms. Smith confirmed that the patient has been requested a transfer to another hospital long before Dr. Irani was paged to the ED to help out. (Id. ¶¶ 20-21).

Neither Dr. Nathe nor Dr. Wood was disciplined or placed on any type of academic remediation based on the Trauma Female 375 case. (Koon Depo., at 196, ll. 5-11; p. 210, l. 23 to p. 211, l.9); (Walsh Depo., at 198, ll. 9-13).

Dr. Irani's suspension was formally presented to the Graduate Medical Education Committee ("GMEC") on December 12, 2011, which approved the recommendation that Dr. Irani be suspended from the program through January 20, 2012. Notably, Dr. Irani was not allowed to appear before the GMEC or to submit any information to the GMEC. (Irani Decl., at ¶ 47). Dr. Koon made a brief presentation about Dr. Irani in executive session at the end of the GMEC meeting.

On December 18, 2011, Dr. Irani met with Dr. Guy to express concerns about the way that his (Irani's) suspension was being handled. Specifically, Dr. Irani expressed concern that no one had spoken with him to about his involvement in the Trauma Female 375 case. The next day, Monday, December 19, 2011, Dr. Walsh agreed to meet with Dr. Irani at the behest of Dr. Guy. During that meeting, Dr. Irani provided his account of the Trauma Female 375 situation to Dr. Walsh to begin the grievance process..

On January 3, 2012, Dr. Irani met with Kathy Stephens to discuss his suspension. Ms. Stephens considered that Dr. Irani's meeting with Dr. Walsh on December 19 satisfied step 2 of the grievance process, and that step 1 occurred during Dr. Irani's discussion with Dr. Koon during the faculty meeting. Ms. Stephens treated her meeting with Dr. Irani as the third step in the grievance process over his suspension. Also during the meeting with Ms. Stephens, Dr. Irani complained that Dr. Koon and

repeatedly referred to him as "Achmed the Terrorist" and made several other inappropriate racial comments about Dr. Irani's middle eastern heritage. (Irani Decl., at ¶ 53).

On January 11, 2012, Dr. Irani received notice that Ms. Stephens had denied his step 3 grievance. Although Ms. Stephens's letter denying the grievance indicates that she "carefully review[ed]" the matter and had further discussions with "several others," she could only recall talking with Dr. Irani and Dr. Koon, and she has no contemporaneous notes of speaking with anyone else about the issues. (Stephens Depo., at 104, l.8 to p. 105, l.5).

Under the Palmetto Health Residency Manual, a resident has 10 business days from the denial of his step 3 grievance to request a formal grievance hearing. Dr. Irani determined based on his review of the calendar, that the request for the grievance hearing would be due on January 26, 2012, because he did not count Martin Luther King's Birthday as a "business day." On January 13, 2012, Dr. Irani e-mailed Dr. Stephens and requested that she send him "a copy of all the original documents/complaints/ allegations against [him] regarding Trauma F375." Ms. Stephens responded on January 16, 2012 telling him that he should be focusing on meeting the terms of his remediation plan instead of gathering documents for his appeal. (Exhibit PP). Dr. Irani met with Dr. Walsh on January 18, 2012 to discuss his situation further. Dr. Irani asked Dr. Walsh if it would be possible for his suspension to be treated as a leave of absence so it would not have to be reported on any licensure applications. Dr. Irani also asked Dr. Walsh if it would be possible for him to make up the time missed during the suspension, so as not to delay his graduation because he intended to pursue a fellowship. Dr. Walsh assured Dr. Irani that he would talk with Ms. Stephens about this, as it was something that would have to be cleared with Ms. Stephens. Dr. Walsh promised to get back in touch with Dr. Irani shortly. Dr. Irani was hesitant to pursue a formal grievance

committee hearing and do further harm to his relationship with his attendings if they were willing to re-characterize the suspension and allow him to make up the missed time. Dr. Walsh did not respond to Dr. Irani's attempts to follow up with him. On January 26, 2012, when Dr. Irani had not heard back from Dr. Walsh, he filed his request for a grievance hearing. Dr. Irani's request for a grievance hearing was rejected, because his request was not filed within 10 business days, according to Defendant Palmetto Health's Human Resources Department. Ms. Stephens would not make an exception to the 10-day deadline, despite language in the handbook that allows flexibility in the grievance deadlines under extenuating circumstances. (Irani Decl., at ¶¶ 59-60). Ms. Stephens even admitted to Dr. Irani that a "business day" was not formally defined in the Resident Manual, but she still refused to accept the request for a grievance committee hearing. (Stephens Depo., at 121, ll., 14-17; at 127, l. 25 to p. 128, l. 17).

Dr. Irani met with Dr. Koon and some other faculty on or about January 30, 2012, to discuss his return to the program and to review his new remediation plan. The list of deficiencies identified on the new remediation plan had grown substantially from his previous write-ups and now including alleged deficiencies in almost all core competencies. Dr. Irani requested that Dr. Guy be assigned to take over responsibility for mentoring him and monitoring his remediation plan, which Dr. Koon rejected out of hand because Dr. Guy was "more favorable" towards Dr. Irani. It was clear to Dr. Irani that Dr. Koon wanted to make sure that Dr. Irani did not have any positive reviews or chance of finishing the program. Dr. Irani returned to the program on or about February 6, 2012, when he was placed back on Dr. Voss's service. Dr. Irani was supposed to move off-site to the VA and to Baptist Hospital for the second half of his PGY-2 year, but he was not given an opportunity to be trained and evaluated by attending physicians from outside the USC Orthopaedics Department, who had not been present at the December faculty meeting. (Irani Decl.,

29

at ¶ 63).

On Monday, February 27, 2012, at 1:49 p.m., Dr. Grabowski sent an e-mail to Dr. Koon complaining about Dr. Irani's care of the spine patient.  Dr. Irani's detailed account of this patient is set forth in his Declaration at Paragraphs 65 to 67. On Wednesday, February 29, 2012, Dr. Grabowski and Dr. Voss met with Dr. Irani to discuss the spine patient for the first time. (Grabowski Depo., at 138, ll. 11-13).  Dr. Voss's memorandum is vague about the actual date of the meeting, because it is dated "Tuesday approximately two weeks ago." (Exhibit QQ).  Dr. Grabowski's e-mails about the meeting indicate that it occurred on the morning of Wednesday, February 29, 2012.  (Grabowski Depo., at 147, ll. 23-25). Dr. Voss's memorandum about the meeting describes Dr. Irani's response to the nurse's phone call about the patient's foot drop as "somewhat flippant." (Exhibit QQ).  Dr. Grabowski does not agree with this characterization of Dr. Irani's response to the nurse.  (Grabowski Depo., at 139, ll. 13-18).  Dr. Grabowski never spoke with the nurse about the phone call with Dr. Irani; in fact, Dr. Grabowski never even determined the identity of the nurse. (Grabowski Depo., at 126, ll. 15-21). Dr. Voss also admitted that he never spoke to the nurse or any of the staff involved.  (Voss Depo., at 87, ll. 18-20).   Dr. Grabowski acknowledged in his deposition that the spine patient's complication was ultimately caused by a cut in the patient's dura that was not recognized during the surgery.  (Grabowski Depo., at 159, l.21 to p. 160, l.2).  Furthermore, Dr. Grabowski's own notes document that he delayed seeing the patient for an hour, until approximately 2:00 p.m.  (Grabowski Depo., at 128, ll. 18-22).

Later in the morning on February 29, 2012, Dr. Koon notified Kathy Stephens that the department had decided not to renew Dr. Irani's resident contract.  (Exhibit RR).

In the evening of February 29 and into the morning of March 1, 2012, Dr. Irani was involved in

the final patient encounter in question, which involved a hemophiliac patient who was suspected of having compartment syndrome in his leg. Dr. Irani was instructed to check the patient at 4:00 a.m. on March 1 to make sure that the pressure in the patient's leg had not increased. Dr. Irani checked the patient at 2:30 a.m. and the pressures were fine, but that he neglected to put a note in the patient's chart to that effect because the patient was being transferred and the patient's paper chart was not yet available. In addition, Dr. Irani had other patients who required his immediate attention. (Irani Decl., at ¶ 68). When the senior resident arrived in the morning and did not see a note in the chart about Dr. Irani's evaluation of patient, she asked him whether he had seen the patient at 4:00 a.m. as he was instructed. Dr. Irani told the senior resident that he did not see the patient at 4:00 a.m. and apologized. Dr. Irani eventually added a delayed clinical note to the patient's chart on or about March 3, 2012 documenting the evaluation at 2:30 a.m., instead of at 4:00 a.m. The patient did not have compartment syndrome and did not have any other complications because of Dr. Irani's care. (Irani Decl., at ¶ 68).

On March 5, 2012, Dr. Irani was notified that he was being placed on Level III academic remediation and again suspended from the program, pending official action on the faculty's recommendation that he be terminated from the program. On or about April 15, 2012, Dr. Irani was informed that the GMEC had accepted the recommendation to terminate him from the program. (Complaint, ¶¶ 22-23).

Dr. Irani appealed his termination through Palmetto Health's resident grievance policies, which upheld the termination at every level. (Complaint, ¶¶ 24-29). Defendant Walsh attempted to convince Dr. Irani to drop his grievance and resign from the program "with dignity." Dr. Walsh stated that the GMEC and the grievance committee would never rule against the Department and that Dr. Irani should consider

pursuing an alternate career in technology instead of clinical medicine. (Irani Decl., at ¶ 71).

Dr. Irani's grievance hearing was held on April 30, 2012. At the conclusion of the hearing, the grievance committee could not reach a decision. Thereafter, the committee requested additional information from Drs. Koon and Walsh. On May 7, 2012, Dr. Koon submitted a packet of new information to the grievance committee, which included an additional memorandum from Drs. Koon and Walsh regarding Dr. Irani's alleged deficiencies (Exhibit FFF), a final summative statement from Dr. Voss (Exhibit TT), and a final summative statement from Dr. Guy. (Exhibit YY). Dr. Irani was not provided a copy of the information or given an opportunity to respond to the new information. (Irani Decl., at ¶ 74). On May 7, 2012, the grievance committee upheld the GMEC's termination decision to terminate Dr. Irani from the program. Dr. Irani appealed the grievance committee's decision to the CEO of Defendant Palmetto Health, the last step in the grievance process. On June 1, 2012, the CEO issued a letter confirming that Plaintiff's termination was final.

Dr. Irani is of Indian/Zoroastrian heritage. He is of dark skin complexion and dark hair, and his name is obviously of Middle Eastern or Persian descent. On several occasions during Dr. Irani's employment in the residency program, Defendant Koon, the Program Director, referred to him as "Achmed the Terrorist." Defendant Koon also jokingly suggested that he (Irani) might "blow the place up" if he became upset or agitated. Defendant Koon's remarks were outrageous and were clearly based on Defendant Koon's mistaken perception of Dr. Irani's ethnicity or religion. Dr. Irani has alleged that Defendant Koon's comments directed towards him and about him created a hostile work environment based on his race, national origin, or religion. Defendant Koon's outrageous and insensitive comments were particularly hurtful to Dr. Irani, because his Zoroastrian ancestors have historically been victims of religious

32

persecution and terrorism in the middle eastern regions of ancient Persia near what is now Iran. (Complaint, ¶¶ 32-33). Plaintiff's Complaint also alleges that Defendant Koon engaged in disparate treatment towards him by repeatedly singling him out in group discussions and by magnifying every misstep that he made, while similar mistakes and behaviors by his colleagues in the Program were overlooked or minimized. (Complaint, ¶ 34).

Plaintiff has alleged that his treatment during his residency program, including his termination, amounts to unlawful discrimination under the statutes and Constitution of the United States. (Complaint, ¶¶ 35-36, and 40-41).

During his participation in the program, Dr. Irani also complained about being required to work in excess of the maximum duty-hour restrictions imposed by the ACGME, the accrediting body for medical residencies including those conducted by Defendants Palmetto Health and USC School of Medicine. Dr. Irani also complained about inadequate supervision of residents within the program. He has alleged that his disciplinary actions and ultimately his termination were taken because of his complaining on significant issues of public concern impacting patient safety and resident well-being.

After Dr. Irani's termination from the Program, he eventually found employment in another residency program in a different specialty. He began the emergency medicine residency training program at Kern Medical Center in Bakersfield, CA, starting in June 2013. In connection with his medical training in California, Dr. Irani applied for his medical license there in 2013. The California Medical Board contacted Defendant Koon during the application process, and Defendant Koon provided information about Dr. Irani that caused his medical license in California to be denied. Dr. Koon dictated a memorandum to Dr. Irani's residency file on June 26, 2013, over a year after Plaintiff's termination from

the program, knowing that the memorandum would be included in the information provided to the California

Medical Board.  The June 26, 2013 memorandum states that Dr. Irani had "persistent patient care issues"

and that he failed in the competencies of patient care, interpersonal skills and communications, and

professionalism. (Exhibit EEE).  Significantly, the Summative Evaluation that Dr. Koon completed for Dr.

Irani in August 2012, ten months earlier,  indicated that Dr. Irani performance in the "Professionalism"

category was "Good."  (Exhibit DDD).  Only after Dr. Irani filed his EEOC charge against Defendants in

March 2013 did Dr. Koon indicate that Dr. Irani failed in professionalism, as reflected in the June 26, 2013

memorandum.

## IV.  Discussion

### A.  Breach of Contract

#### 1.  Joint Employment Between Defendants Palmetto Health and USC-SOM

The record in this case demonstrates that Defendants Palmetto Health and USC-SOM were joint

employers of Plaintiff in the residency program at issue, even though Defendant Palmetto Health was

designated as the official "sponsor" of the residency program and even though Plaintiff's paychecks and

employment benefit were provided by Defendant Palmetto Health.  Both institutional Defendants have

undertaken contractual obligations  to comply with the accreditation mandates and standards of the

Accreditation Council for Graduate Medical Education ("ACGME"): Defendant Palmetto Health through

its Resident Manual and Defendant USC-SOM, through its Department of Orthopaedic Surgery's Resident

Manual.  Furthermore, as discussed in detail in Section B below, Defendant USC-SOM has contractual

obligations to Plaintiff as a third-party beneficiary of two additional  contracts: (1) the Affiliation Agreement

for Medical Education, Research and Other Related Activities between Defendants Palmetto Health and

34

USC-SOM; and (2) the Program Letter of Agreement ("PLA") between Defendant Palmetto Health and the University Specialty Clinics–Orthopedic Surgery.

As a preliminary matter, Plaintiff's counsel is astonished that Defendant USC-SOM would continue to rely (almost exclusively, no less) on the Affidavit of Dr. Caughman Taylor, former interim dean of Defendant USC-SOM, especially in light of the standard for a motion for summary judgment. Plaintiff's counsel's deposition of Dr. Taylor rendered the Taylor Affidavit completely worthless. During his deposition, Dr. Taylor frankly admitted that his Affidavit was nothing more than a string of unsubstantiated, proffered legal conclusions, not a statement of factual material based on personal knowledge or direct observation. See Taylor Depo., at 16 ("Q: What did you to do confirm that the statements in this affidavit are true? A. Discussed with legal counsel. Q. . . . Other than discussions with legal counsel, did you do anything else in terms of making yourself familiar with this situation or researching the situation in preparing your affidavit? A. No, sir."); id. at 21 ("Q. Now looking at paragraph four of your affidavit, what did you do to confirm that Dr. Irani never had a contract with the University of South Carolina School of Medicine? A. Confirmed with legal counsel. Q. Anything other than talking to the lawyers from the USC School of Medicine? A. No, sir."); id. at 22-23 ("Q. . . . So when you said there was no contract between Dr. Irani and the University of South Carolina School of Medicine, you didn't consider the possibility that this document [i.e., the USC Orthopaedic Surgery Department Resident Manual] could create an employment contract, did you? A. Again, I discussed it all with legal counsel. Q. My question is when you made the statement in your affidavit you didn't consider whether the residency manual or residency handbook could create an employment contract between USC and Dr. Irani, did you? A. I would have no reason to know that or expect that."). Dr. Taylor's conclusory statements that Plaintiff was not an employee of Defendant

35

USC-SOM are based on a clear misapprehension of the underlying facts and the governing law upon which such determination must be based.

The USC Department of Orthopaedic Surgery issued its own, separate Residency Manual, as Defendant Palmetto Health's Resident Manual expressly authorizes. This document does not contain any disclaimer that would comply with S.C. Code Ann. § 41-1-110, so as to avoid contractual liability on a handbook. The Orthopaedic Surgery Department Handbook provides, in relevant part under "General Residency Requirements" that the Residency Program will "Adhere to established practices, procedures, and policies of the University of South Carolina School of Medicine and Palmetto Health."   (USC Ortho Handbook, Exhibit S, at 7) (emphasis added). Both the Palmetto Health Resident Manual and the USC Ortho Handbook cross-reference each other, thereby creating contractual obligations by both institutional Defendants to comply with each other's policies and procedures. The USC Ortho Department Handbook also expressly incorporates the requirements of the ACGME and specifically the ACGME's orthopaedic surgery Residency Review Committee requirements for Defendants' residency program in orthopaedic surgery. (USC Ortho Handbook, at 7). The Orthopaedic Department handbook actually re-prints the ACGME Program Requirement for Graduate Medical Education in Orthopaedic Surgery. (Id. at 8-30). Accordingly, the ACGME's requirements are contractual in nature and may be enforced against both Defendants Palmetto Health and USC-SOM through Plaintiff's cause of action for breach of contract.

## 2. Scope of Plaintiff's Breach of Contract Allegations

Plaintiff's claim for breach of contract is much broader than as characterized by Defendant Palmetto Health and involves far more than the question of whether Defendant Palmetto Health had a reasonable belief that it had cause to terminate Plaintiff's employment. Plaintiff's employment as a resident is governed

36

by more than just the Resident Agreement of Appointment, but also includes provisions of the Resident

Physician Manual as well as the USC Department of Orthopaedic Surgery Resident Manual.

Kathy Stephens testified that the applicable Resident Manual in effect at the time of Plaintiff's

termination is reproduced at Bates labels "Palmetto Health - 000585" through "Palmetto Health - 001046,"

which includes Sections A, B, and C of the manual. (Stephens Depo., at 56, l.23 to p. 59, l. 20).  The

Resident Manual clearly does not contain a disclaimer that complies with S.C. Code Ann. § 41-1-110 of

the South Carolina Code, because there is no operable language "in underlined capital letters on the first

page of the document and signed by the employee."  S.C. Code Ann. § 41-1-110.  The disclaimer in

footnote one on the introductory page of the Resident Manual (Bates label page "Palmetto Health -

000587") is not conspicuous as a matter of law.  Id.  Accordingly, if the Resident Manual includes

enforceable promises, stated in mandatory language, such promises can be enforced in contract.  See, e.g.,

Anthony v. Atlantic Group, 900 F. Supp. 2d 455 (D.S.C. 2012).

Among other provisions, the Resident Handbook includes an "Institutional Commitment to

Graduate Medical Education," which is signed by senior officials of Defendant Palmetto Health, and which

contains the following, promissory or mandatory language:

> We therefore commit ourselves to providing graduate medical education programs that
> enable physicians in training to develop competence in patient care, medical knowledge,
> practice-based learning and improvement, interpersonal and communication skills,
> professionalism, and systems-based practice and to participate in a wide range of scholarly
> activities under the guidance and supervision of the faculty and staff.  We further commit
> to conducting these programs in compliance with the Institutional, Common, and Program
> requirements of the Accreditation Council for Graduate Medical Education, [and] its
> Residency Review Committees.

 (Exhibit UU, at A-10) ("Palmetto Health - 000602).

The Resident Manual also contains numerous Graduate Medical Education/Resident Policies on subjects such as academic remediation, agreement of appointment, dismissal of residents, evaluation of residents, grievance and due process, harassment, promotion/reappointment, and working environment. (Excerpts of Resident Manual are attached hereto as Exhibit UU). In addition, the Resident Manual specifically incorporates by reference department-specific, supplemental policy manuals, such as the USC Department of Orthopaedic Surgery Residency Manual. (Exhibit UU, at "Palmetto Health - 000587).

Among the ACGME's requirements is a commitment to provide an educational environment conducive to resident education, to provide timely feedback and evaluations to residents, to provide bona fide academic remediation to residents, and to provide due process to residents. The record evidence demonstrates that the Orthopaedic Surgery Residency Program breached its contractual obligations to Plaintiff in each of these areas.

The environment within the USC Orthopaedic Surgery Department was hostile and intimidating, involving bully and hazing rather than nurturing and supporting. From Dr. Koon's ominous assignment of the "Swimming with Sharks" article to the "feeding frenzy" that occurred during the December 5, 2011 faculty meeting where Dr. Irani was pilloried, it was clear that Dr. Irani was in Dr. Koon's cross-hairs at a very early stage in his residency training. Dr. Koon's outrageous racial slurs and sarcastic, cutting e-mails to Dr. Irani demonstrate that the Program breached its contractual obligations to ensure and appropriate learning environment for Dr. Irani.

Second, there was no bona fide effort at academic remediation to enable Dr. Irani to successfully complete the program. There was never any effort to verify or validate reported problems with Dr. Irani's performance, and the department's leadership refused to consider Dr. Irani's side of the story or

explanation of the events in question.  As soon as Dr. Irani got on Dr. Koon's bad side, the department began to look for missteps by Dr. Irani as grounds for his dismissal rather than as teachable moments to help his development as a physician.

The program's failure to ensure that Dr. Irani received due process is discussed in detail in Section C below.  In short, the Department's deliberate distortions of the facts and demonstrable misrepresentations to the GMEC and to the grievance committee violated the contractual promise of due process.  Furthermore, the ex parte submission of documents to the grievance committee by Defendants Koon and Walsh after the hearing had closed, with no notice to Plaintiff or an opportunity to refute such evidence was a clear violation of due process and fundamental fairness.

### B.  Third-Party Beneficiary of Contract

Plaintiff has also asserted a claim for third-party beneficiary of contract against both Defendants Palmetto Health and USC-SOM.  The theory of this cause of action is that Plaintiff, as a resident, was an intended third-party beneficiary of one or more agreements between Palmetto Health and the USC-SOM to abide by the ACGME accreditation guidelines.  Defendants assert that Plaintiff's third-party beneficiary claim must fail because there is actual written, signed contract between the ACGME and Defendant Palmetto Health.  Defendant Palmetto Health asserts that Plaintiff's third-party breach of contract claim would, therefore, be barred by the South Carolina Statue of Frauds because the accreditation is anticipated to last beyond one year.

During discovery in this matter, Plaintiff had identified two specific contracts that govern the conduct of the residency programs, which are enforceable on his third-party beneficiary claim : (1) the Affiliation Agreement for Medical Education, Research and Other Related Activities between Palmetto Health and

USC-SOM (hereinafter "Affiliation Agreement"), and (2) the Program Letter of Agreement Between

Palmetto Health and the University Specialty Clinics, Department of Orthopaedic Surgery (hereinafter

"PLA"). Both of these contracts provide a valid foundation for Plaintiff's third-party beneficiary claims.

First, the Affiliation Agreement dated January 1, 2009, is signed by three senior executives or

directors of each entity. On behalf of Palmetto Health, the Affiliation Agreement is signed by the Senior

Vice President for Quality, Medical Education and Research and Chief Academic Office of Palmetto

Health, the President and CEO of Palmetto Health, and the Chairman of the Board of Directors of Palmetto

Health. On behalf of USC, the Affiliation Agreement is signed by the Vice President for Medical Affairs

and Dean of the USC School of Medicine, the President of USC, and the Chairman of the USC Board

of Trustees. (Affiliation Agreement, at 10) (copy attached hereto as Exhibit AA). The Affiliation

agreement provides, in relevant part as follows:

> Palmetto Health and the University's School of Medicine will actively collaborate to ensure
> that Palmetto Health's graduate medical education programs operate in an effective manner
> and in compliance with regulatory and accreditation standards. Palmetto Health and the
> School of Medicine will share the responsibility for ensuring an appropriate learning
> environment and that residency education occurs in an atmosphere of mutual respect and
> collegiality between faculty, residents, medical students, and staff.

Affiliation Agreement, at 6, ¶ 6.6 (emphasis added). Clearly, this document requires both Palmetto Health

and the USC-SOM to abide by the accreditation standards of the ACGME.

Second, the PLA between Palmetto Health and the Orthopaedic Surgery Department, dated April

28, 2011, is signed by representatives of both Palmetto Health and the USC-SOM Department of

Orthopaedic Surgery. On behalf of Palmetto Heath, the PLA is signed by Katherine Stephens, the

Designated Institutional Official, Vice President of Medical Education for Palmetto Health and Defendant

Koon, the Program Director for Orthopaedic Surgery. On behalf of the USC-SOM Orthopaedic Surgery Department, the PLA is signed by Paul Athey, the Administrative Director and Authorized Representative of the Department, and Defendant Walsh, the Chair of the Orthopaedic Surgery Department. (PLA, at 2) (copy attached hereto as Exhibit DD). The PLA provides, in relevant part, "The purpose of this Letter of Agreement is to set forth the general terms and specific conditions under which University Specialty Clinics–Orthopedic Surgery has agreed to participate in the education and supervision of residents in the Palmetto Health Graduate Medical Education Program(s)." (PLA, at 1). The PLA also provides, "Further, the educational experiences of the resident while on rotation at our site will be provided in a manner consistent with applicable Accreditation Council for Graduate Medical Education (ACGME) Residency Review Committee (RRC) requirements, and other federal, state, and local laws, rules, and regulations." (PLA, at 2) (emphasis added). The plain language of the PLA obligates the USC-SOM to abide by ACGME accreditation standards.

Under South Carolina law, "if a contract is made for the benefit of a third person, that person may enforce the contract if the contracting parties intended to create a direct, rather than an incidental or consequential, benefit to such third person." Johnson v. Sam English Grading, Inc., 772 S.E.2d 544, 552 (S.C. Ct. App. 2015); see also Helms Realty, Inc. v. Gibson-Wall Co., 611 S.E.2d 485, 488 (S.C. 2005) ("A third-party beneficiary is a party that the contracting parties intend to directly benefit."). Here, Plaintiff as a resident in one of the residency programs at Palmetto Health/USC-SOM is a direct beneficiary of both the Affiliation Agreement and the PLA. The Affiliation Agreement specifically contains a definition of the term "Resident," which plainly includes Plaintiff. (Affiliation Agreement, at 2, ¶ 1.14). Similarly, the PLA specifically lists Plaintiff's name in Appendix A as one of the residents scheduled to rotation through the

Department's Sports Medicine Service.  (PLA, at 3).  As such, Plaintiff is allowed to bring an action as a third-party beneficiary of these two contracts, to enforce the obligations of the parties to those contracts.

Plaintiff's expert witness, Dr. Richard E. Grant, is a board-certified orthopaedic surgeon with over 30 years' experienced in educating orthopaedic surgery residents.  He has been involved in the highest levels of orthopaedic surgery and resident education: he served as a director of the American Board of Orthopaedic Surgery ("ABOS") for eleven years, from 1996 to 2006; he served as president of the ABOS from 2002-03; and he was a member of the ACGME's RRC for Orthopaedic Surgery from 2001 to 2007. Dr. Grant's expert report in this case indicates that Dr. Irani's care of the patients in question was appropriate and consistent with his level of training as a PGY-2 resident.  Dr. Grant also indicates that Dr. Irani's experience within the Palmetto Health/USC School of Medicine Orthopaedic Surgery Residency Program was not consistent with the ACGME's requirements for creating and maintaining a conducive learning environment for residents.  (Expert Report of Dr. Richard Grant attached hereto as Exhibit WW).

### C.  Due Process

Plaintiff's claims for violation of Due Process are based on two separate sources: (1) contractual promises of due process made to Plaintiff both as a direct party to the contracts and as a third-party beneficiary of the contracts as described above; and (2) constitutional guarantees of due process, as asserted in plaintiff's claims against Defendant Koon under 42 U.S.C. § 1983.  Plaintiff's allegations under both theories are based on the same underlying facts–that Plaintiff was terminated from the residency program without being afforded a fair and reasonable opportunity to be heard.  The analysis of the due process issues here does not require the court to delve too deeply into the intellectually demanding question of whether the residency program is primarily an academic endeavor or a matter of public employment; nor

42

does it require the court to define carefully the specific quantum of process that is actually due, such as the length of the hearing, use of evidentiary rules, or the right to counsel. Instead, the process employed here to remove Plaintiff from the Orthopaedic Surgery Residency Program was tainted by deliberate, patent misrepresentations about Dr. Irani to the grievance committee. The most egregious violation of Plaintiff's due process was the ex parte submission of evidence by Defendants Koon and Walsh after the hearing was closed and after the grievance committee had reached an impasse in its deliberations, without providing a copy of such information to Plaintiff and without allowing him any opportunity to contest it.

### 1. Contractual Due Process Claim

Due process in the residency programs requires more than simply having a written grievance policy and checking the box as each level of the grievance is completed. Due process must involve some measure of fundamental fairness before any potentially career-impacting or career-ending measures are taken against a resident. The Palmetto Health DIO, Ms. Stephens, testified that she is ultimately the guardian of the due process rights of residents in the Palmetto Health/USC-SOM programs. (Stephens Depo., at 45, ll. 21-25). Ms. Stephens acknowledged that the fundamental, underlying purpose of due process is a matter of fairness. (Stephens Depo., at 45, ll. 14-20).

A brief overview of the formal decision-making process for resident issues and the grievance process is helpful to provide context for the court's due process analysis. Official decisions affecting residents are made by the GMEC, upon recommendation of the program director for the relevant program. The GMEC meets every other month and handles resident matters in executive session at the end of each regular meeting. There is no provision for a resident to appear before the GMEC or to submit information to the GMEC either during or before the meetings. (Stephens Depo., at 64, ll. 13-17). The GMEC is

43

primarily made up of department chairs and program directors of the various residency departments, plus four members of the resident council and several senior administrators in the graduate medical education program at Palmetto Health and  the dean of the USC-SOM.  Of the more than forty members of the GMEC, only 4 are resident peers.  (Stephens Depo., at 24, l.4 to p. 25, l.20).  Decisions of the GMEC are generally a "rubber stamp" of the program director's recommendation.  Former Dean, Dr. Taylor, testified that in his fourteen or fifteen years of serving on the GMEC, he cannot recall the GMEC ever rejecting a program director's recommendation to terminate a resident.  (Taylor Depo., at 62, l. 24 to p . 63, l.1 ).  Dr. Taylor also cannot recall a single incident where a resident was allowed to address the GMEC in executive session.  (Taylor Depo., at 68, ll. 7-9).  Similarly, Dr. Koon testified that he has never witnessed the GMEC reject a program director's recommendation, and that the GMEC's practice is to give considerable deference to the program directors.  (Koon Depo., at 64, l. 10 to p. 65, l.3).

Where action must be taken against a resident before the next regularly scheduled meeting of the GMEC, the executive subcommittee of the GMEC can provide an interim decision.  Palmetto Health's policies do not allow the resident to be heard by the executive subcommittee of the GMEC.  (Stephens Depo., at 40, l. 10 to p. 41, l. 9).  The executive subcommittee similarly appears to be essentially a rubber stamp for the program director's request, because no independent investigation is done by the executive subcommittee.  Ms. Stephens cannot recall a single instance where the executive subcommittee has rejected a program director's request for remediation or discipline of a resident.  (Stephens Depo., at 42, ll. 12-19).

Once an official action is taken against a resident, either by way of GMEC action as an interim measure by the executive subcommittee, the resident is allowed to pursue a grievance.  Step 1 of the grievance is to ask the program director to reconsider the decision.  Step 2 of the grievance is to ask the

department chair to override the program director's decision. Step 3 of the grievance is to ask the DIO

(Ms. Stephens), to reverse the program director's decision. Step 4 of the grievance is a formal hearing

before the grievance committee. And Step 5 is a final appeal to the CEO of Palmetto Health. (Exhibit UU,

at "Palmetto Health - 000718-000719). Ms. Stephens testified that she is not aware of any instance, in

her entire 17-year tenure with Palmetto Health, where the CEO has ever overturned a decision of the

grievance committee. (Stephens Depo., at 47, l.13 to p. 48, l. 1). She also testified that she can only

recall one incident where the grievance committee overturned a decision to terminate a resident from his

or her residency program; however, and that case occurred after Plaintiff's lawsuit in this case was filed.

(Stephens Depo., at 43, l.3 to p. 44, l.1). Dr. Taylor similarly testified that he was only aware of one

incident where the GMEC's decision about a resident was overturned in the grievance process, which

involved the same resident referenced by Ms. Stephens. (Taylor Depo., ast 63, ll. 16-22).

    The grievance process at Palmetto Health is entirely a post hoc system, where the resident faces

an uphill battle (to say the least) to change the status quo of the GMEC's decision. Because residents are

not allowed to appear before the GMEC or to submit information to the GMEC about the resident's

particular issues, the grievance committee hearing is the resident's only opportunity to have a purportedly

neutral, independent review of a decision affecting his or her residency. The Palmetto Health grievance

policy does not allow residents to be represented by counsel during the grievance committee hearing, nor

does it allow residents to be assisted by a resident peer. The only assistance provided to the resident is

an employee assigned from the Palmetto Health human resources department, who would have an obvious

conflict of interest. (Stephens Depo., at 143, l.10 to 145, l. 18). In Dr. Irani's case, the assistant provided

Dr. Irani substantial misinformation about how the grievance proceedings would be conducted. (Irani

Decl., at ¶ 73).  There is also no guidance in the grievance policy about who bears the burden of proof, about what the standard of proof is, or even about whether the decision of the grievance committee has to be unanimous, simple majority, or otherwise.  (Stephens Depo., at 148, l. 21 to p. 149, l.4).

All three of Dr. Irani's experiences with the Palmetto Health grievance process during his PGY-2 year were problematic.  First, with regard to the Level II remediation on August 15, 2011, Dr. Irani was discouraged to pursue the matter to the fourth step of a grievance committee hearing.  Dr. Walsh told him, "I'm not going to tell you what to do, but I'm a busy orthopaedic surgeon, you're a busy orthopaedic surgeon -- when I have to sit here and answer questions about all this, it just gets in the way when I could be doing other things."  (Irani Decl., at ¶ 21).

Next, Dr. Stephens appears to have pre-judged Dr. Irani in November 2011, by telling Dr. Koon that the underlying problem with Dr. Irani "Sounds like a lack of humility and maturity to me." (Exhibit XX).

In January 2012, when Dr. Irani requested Ms. Stephens to provide documents underlying his suspension, particularly with the allegations surrounding the Trauma Female 375 patient encounter, Dr. Stephens told him that he needed to focus on completing his remediation measures rather than requesting documents that might help his appeal.  (Irani Decl., at ¶ 53).  Later that month, when Dr. Irani attempted to request an appeal to the grievance hearing, Ms. Stephens determined that his appeal was untimely, because it was not filed on or before the 10th business day following her Step 3 decision.  Dr. Irani had not counted the Martin Luther King, Jr. Holiday as a "business day," because his reasonable understanding of the term "business day" did not include days that are recognized as state and federal holidays.  Significantly, the USC Orthopaedic Clinic was closed on the Marin Luther King, Jr. Holiday, which is a

statutory holiday under South Carolina law for governmental offices. See S.C. Code Ann. § 53-5-10.
Ms. Stephens acknowledged that the Resident Manual does not define the term "business day" and that
the grievance policy allows the deadlines to be extended for extenuating circumstances; however, Ms.
Stephens refused to accept Dr. Irani's appeal to the grievance committee, which would have been timely
but for the MLK day issue. (Stephens Depo., at 126, l. 16 to p. 128, l.17).

In the third grievance of his PGY-2 year, Dr. Irani timely appealed his termination to the grievance
committee. Dr. Walsh attempted to persuade him to drop the appeal of his suspension and his termination
recommendation, stating that he should "leave with dignity," because there was no way the GMEC and the
grievance committee would rule against the Department. (Irani Decl., at ¶ 71).

During the grievance committee hearing, Defendants Koon and Walsh made allegations about Dr.
Irani that were demonstrably false, which shows either a deliberate attempt to harm Dr. Irani or a reckless
disregard for the truth of the matters stated. The most egregious and obvious examples include the
following:

(1)    With regard to the trauma patient who suffered the lathe injury, Dr. Koon suggested that
Dr. Irani's assessment of the patient may have led to an amputation that was not even indicated. Dr. Koon
stated, "I'm not sure that there's – there were indications for a primary amputation in this patient." Dr.
Koon also stated, "I wasn't sure that it was indeed the right thing to do." (Grievance Hearing Transcript,
at 14, ll. 1-5) (excerpts attached hereto as Exhibit M). The truth is that Dr. Koon was not involved at all
in the care of this patient. Moreover, Dr. Walsh testified in his deposition that he was peripherally involved
in the care of that patient and that he concurred with Dr. Iaquinto's decision that amputation was necessary.
(Walsh Depo., at 80, ll. 3-11)

(2)      With regard to Dr. Grabowski's MRI patient, Dr. Koon testified at the grievance hearing that "Dr. Grabowski said the patient needs a stat MRI.  Dr. Irani discussed this with the head nurse and decided to let the patient go home and obtain the MRI on an elective basis."  (Grievance Hearing Transcript, at 26, ll. 13-16).  As discovery in this case revealed, the patient obtained the MRI the afternoon it was ordered, just like Dr. Grabowski had requested.  (Exhibit LL) [CONFIDENTIAL].  There was absolutely no basis for Dr. Koon to testify that Dr. Irani decided to let the patient go home and obtain the MRI on an elective basis.

(3)      Perhaps the most egregious misstatements occurred with regard to Dr. Grabowski's spine patient from February 2012.  Dr. Walsh testified, "the initial responses that the nurse told us when she called and said, 'The patient has a foot drop' is that [Dr. Irani] said, 'Aww, she has a foot drop.'" (Grievance Hearing Transcript, at 42, ll. 18-20).  The audio portion of Dr. Walsh's testimony is particularly interesting because Dr. Walsh actually used a mock, sarcastic voice in describing Dr. Irani's allegedly flippant response to the nurse.  In truth, Dr. Grabowski and Dr. Voss were the only faculty members who investigated Dr. Irani's involvement with the spine patient, and neither one of them overheard Dr. Irani's side of the phone conversation, nor did they ever speak to the nurse in question.  Dr. Grabowski did not even know the name of the  nurse who spoke with Dr. Irani about the patient's foot drop. During his deposition in this matter, Dr. Grabowski specifically disagreed with Dr. Voss's use of the term "flippant" to describe Dr. Irani's response to the nurse.  Dr. Voss also testified that he never spoke with the nurse in question.

(4)      Also with regard to the spine patient, Dr. Koon testified, "That morning, Dr. Irani did not document any type of neurological testing or strength testing." (Grievance Hearing Transcript, at 37, ll. 16-

48

17). Later in the hearing, Dr. Koon similarly cross-examined Dr. Irani by stating, "Actually, your note did not include any measure of neurosensory testing or strength testing, is that correct?" . . . Your note of the morning of the – the morning the patient went into surgery." (Grievance Hearing Transcript, at 99, ll. 5-10). Even a cursory review of the patient records in this case would have revealed that Dr. Irani did, in fact, document a neurological exam of this patient at 10:00 a.m. that morning. Although Dr. Grabowski asserted that the notes of Dr. Irani's neurological exam may have indicated an incomplete or inadequate exam, Dr. Irani did in fact document that he performed such and exam on the patient. This was Dr. Irani's first spine patient he had ever handled, and he had not yet done a spine rotation that early in his PGY-2 year.

The most glaring violation of due process occurred after the grievance committee reached an impasse in their deliberations the day of the hearing. The information from the hearing itself was not sufficient to enable the grievance committee to reach a decision on Dr. Irani's termination. Thereafter, the committee requested that Drs. Koon and Walsh provide additional information. In response, Dr. Koon submitted an additional memorandum summarizing Dr. Irani's alleged deficiencies, plus two "summative statements: from Drs. Voss and Guy. (Exhibits FFF, TT, YYY). Ms. Stephens acknowledged that there is no specific provision in the grievance policy allowing for ex parte submissions of evidence after the grievance hearing is closed. (Stephens Depo., at 161, ll. 7-25).

Drs. Koon and Walsh's late submission was a four-page document dated May 2, 2012, in which they repeated some of the misstatements identified above and also added still new allegations that had never been raised to Dr. Irani. (Exhibit FFF). Dr. Voss's summative statement attempts to summarize four patient encounters of Dr. Irani's during his PGY-2 year. (Exhibit TT). Only one of those patients was actually Dr. Voss's patient ("[t]he heavy narcotic user who was discharged with enough pain medication

49

to last 1-2 days"). In his deposition in this case, Dr. Voss conceded that Dr. Irani may not have even been the resident who wrote the prescription in question. (Voss Depo., at 57, ll. 9-13). Dr. Voss had absolutely no involvement with the other patients on his summative statement, but relied solely on hearsay information he had obviously heard about Dr. Irani during the faculty meeting on December 5, 2011. Dr. Voss's statement that, "I can only conclude he did not really care for the patient" (Exhibit TT) is nothing more than an unsubstantiated and unjustified opinion. For Dr. Voss to state that Dr. Irani had shortcomings in professionalism that "have not been remediable" is outrageous, especially since Dr. Voss rated Plaintiff's performance as "Satisfactory" in the category of Professionalism, Concern for Others, on his most recent New Innovations evaluation form on December 28, 2011. (Exhibit KK). Similarly, Dr. Guy's submission to the grievance committee had no basis in fact. Dr. Guy was actually fairly complimentary about Dr. Irani: "With regard to Dr. Irani, I think Afraaz is an amazingly bright young gentleman and probably one of the brighter whom we have had come through our doors. I believe he reads and academically does well at the PGY2 [level] relative to his peers. Regarding Dr. Irani's surgical skills, I believe them to be average and/or slightly below average. However, as a PGY-2 level it could be too early to actually assess the potential for his surgical skills." (Exhibit YY). Dr. Guy goes on to state that he believes Dr. Irani would be better suited for a career other than clinical medicine. Dr. Guy's letter was expressing his personal opinions rather than providing factual material.

The hallmark of due process is notice and an opportunity to be heard. Dr. Irani was never provided a copy of the ex parte information submitted to the grievance committee, nor was Dr. Irani ever afforded an opportunity to respond to the new information. Obviously, this information was material because it enabled the grievance committee to reach a decision shortly after the new information was

50

provided. Dr. Irani was clearly denied due process when the grievance committee reached out to Drs. Koon and Walsh and received information from them without providing notice to Dr. Irani and an opportunity to counter such new information.

## 2. Constitutional Due Process Claim–42 U.S.C. § 1981

In addition to the contractual due process claims against Defendants Palmetto Health and USC-SOM, Plaintiff has also asserted that Defendant Koon deprived him of his right to due process, acting under color of law, in violation of 42 U.S.C. § 1983. As program director, Dr. Koon had a duty under the ACGME requirements to ensure that residents in his program received due process. Furthermore, most of the adverse action taken against Dr. Irani appears to have been pushed primarily, if not exclusively, by Dr. Koon.

The first step in a constitutional due process claim is identifying a cognizable liberty or property interest at issue. Here, Plaintiff has a property interest in his expectancy to continue his residency for the entire 5 years and to graduate from the program. In addition, he has a liberty interest in his good name, integrity, and professional reputation.

There is no dispute that orthopaedic surgery residency program is a five-year program. (Koon Depo., at 27, ll. 22-25). Some residency programs in other specialties may be pyramid programs, where the programs start with a larger number of residents than are expected to graduated, and there is competition among the residents to move on to successive years in the program. Other specialties may also have "preliminary" positions, where residents have no specific expectation to move on beyond the one-year of their contract, but may be "weeded out" in future years. Orthopaedic surgery programs are neither pyramid programs, nor do they have preliminary positions. Once a resident is accepted into the program,

there is a clear expectation that they will continue in the program for all five years, unless cause exists to remove them from the program. (Koon Depo., at 30, l.25 to p. 31, l.4). The USC Orthopaedic Surgery Department Resident Manual states that "all residents are selected at the PGY 1 level for a five-year training program in orthopaedic surgery." (Exhibit S, at 4). Clearly, Plaintiff's property interest in the continuation of his residency extended throughout the entire 5-year program, not just the single year identified in each successive Resident Agreement of Appointment with Palmetto Health.

Other courts around the country have recognized a property interest in continuation of a medical residency, particularly where the resident's participation in the residency program is governed by a contract. See Stretten v. Wadsworth Veterans Hosp., 537 F.2d 361, 367 (9th Cir. 1976) ("Dr. Stretten's claim to his residency is a property interest deserving of appropriate due process before it is removed."); Adler v. Cnty. of Nassau, 113 F. Supp. 2d 423, 431 (E.D.N.Y. 2000) (resident possessed constitutionally protected property right not to be terminated without due process hearing in accordance with terms of the contract); Ezekwo v. New York City Health & Hospitals Corp., 940 F.2d 775, 783 (2d Cir. 1991) (position of Chief Resident constituted a constitutionally protected property right); Barsoumian v. University at Buffalo, No. 06-CV-831S, 2012 WL 930331, at *7 (W.D.N.Y. Mar. 19, 2012) ("Defendants do not dispute that Plaintiff had a constitutionally protected property right not to be terminated from the residency program without procedural due process.") (unpublished decision attached hereto).

Courts have also recognized a liberty interest in one's good name, reputation, honor, or integrity. See, e.g., Board of Regents v. Roth, 408 U.S. 564, 572 (1972); Wisconsin v. Constantineau, 400 U.S. 433, 437 (1971); Paul v. Davis, 424 U.S. 693, 701 (1976).

Once a liberty or property interest is identified, the inquiry turns to whether the plaintiff was

afforded the necessary due process before being deprived of that interest. As set forth in detail above, the deliberate or reckless nature of the allegations made against Dr. Irani during the grievance hearing, plus the ex parte submissions of additional information after the hearing deprived Dr. Irani of due process in this case.

The Fourth Circuit appears not to have addressed the question of whether a medical residency is primarily "academic" or "employment." See Ezekwo v. New York City Health & Hospitals Corp., 940 F.2d 775, 785 (2d Cir. 1991) ("While a medical residency program is largely an academic undertaking, it also is an employment relationship."). Even if the court were to find that Plaintiff's termination was an "academic dismissal," he could still establish a constitutional due process violation here. In Board of Curators of Univ. of Mo. v. Horowitz, 435 U.S. 78 (1978), the Court recognized that procedural due process in the academic dismissal context is satisfied only if the following conditions are met: (1) the Defendants fully informed Plaintiff of their dissatisfaction with his progress, (2) Defendants notified Plaintiff of the dangerous consequences that such deficiencies posed to his continued enrollment, and (3) the ultimate decision to dismiss the student was "careful and deliberate." Id. 435 U.S. at 85.

The record in this case, especially viewed in the light most favorable to Plaintiff, is sufficient to establish a constitutional due process violation even under the academic dismissal standard. Defendants simply cannot show that the ultimate decision to terminate Plaintiff from the residency program was "careful and deliberate."

With respect to Defendant Koon's qualified immunity argument, Plaintiff incorporates his previous brief on this issue in opposition to the USC Defendants' Motion for Judgment on the Pleadings. The court has already ruled that Defendant Koon is not entitled to qualified immunity in this case on Plaintiff's

53

procedural due process claim.

### D.  Racial or Religious Discrimination

Plaintiff contends that he was subjected to unlawful discrimination based on his race or religion during his participation in the residency program.  This basic claim encompasses four different causes of action: (1) breach of contract against Defendants Palmetto Health and USC-SOM, (2) Title VII of the Civil Right Act of 1964, against Defendants Palmetto Health and USC-SOM, (3) violation of 42 U.S.C. § 1981 against Defendant Palmetto Health for unlawfully using race in the making and enforcing of contracts, and (4) violation of the Equal Protection Clause acting under color of law in violation of 42 U.S.C. § 1983, against Defendant Koon individually.  Plaintiff asserts both a disparate treatment claim based on his race, as well as a hostile work environment claim.  The facts and the basic, legal principles underlying on the various claim is almost identical.

### 1.  Title VII

### a.  Timeliness of Plaintiff's Administrative Charge

Defendants argue that Plaintiff's Title VII claim is precluded because he did not file a timely charge of discrimination.  According to Defendants, the charge was not filed until May 23, 2013, beyond the 300-day deadline under Title VII.  Plaintiff submits that his charge was actually filed on March 26, 2013, when the EEOC received his Intake Questionnaire, which Plaintiff signed on March 10, 2013 and checked Box 2 indicating his intent to file a charge of discrimination.  (Exhibit ZZ).  Under the United States Supreme Court's decision in Federal Express Corp. v. Holowecki, 552 U.S. 389 (2008), an intake questionnaire can constitute a charge of discrimination.  The later-filed Form 5 document that was actually verified by Plaintiff relates back to the filing date of the intake questionnaire.  The March 26, 2013 date is 298 days

from June 1, 2012, the date that Plaintiff was notified by the CEO of Defendant Palmetto Health, that his termination from the program was finalized. Accordingly, Plaintiff submits that the EEOC charge was timely.

### b.  Joint Employment

Defendant USC-SOM argues that it cannot be held liable for Plaintiff's discrimination claims because it was not actually Plaintiff's "employer" for purposes of Title VII, since Plaintiff's pay and benefits came entirely from Defendant Palmetto Health. Defendant USC-SOM's argument disregards the recent Fourth Circuit case of Butler v. Drive Auto. Indus. of Am., Inc., 793 F.3d 404 (4th Cir. 2015). The Butler case established a nine-factor test to determine when an individual can have a "joint employment" relationship with more than one "employer":

> (1) authority to hire and fire the individual; (2) day-to-day supervision of the individual, including employee discipline; (3) whether the putative employer furnishes the equipment used and the place of work; (4) possession of and responsibility over the individual's employment records, including payroll, insurance, and taxes; (5) the length of time during which the individual has worked for the putative employer; (6) whether the putative employer provides the individual with formal or informal training; (7) whether the individual's duties are akin to a regular employee's duties; (8) whether the individual is assigned solely to the putative employer; and (9) whether the individual and putative employer intended to enter into an employment relationship.

Id. at 414. Plaintiff's Intake Questionnaire identifies his "Employer" as "Palmetto Health/University of South Carolina Department of Orthopaedics."  (Exhibit ZZ).

The record in this case amply supports a finding that Defendants USC-SOM and Palmetto Health were "joint employers" of Plaintiff's for purposes of this lawsuit. Defendants Palmetto Health and USC-SOM clearly hold themselves out as being jointly run by both entities, even though Palmetto Health is technically designated as the "sponsoring institution." (Taylor Depo., at 48, l.7 to p. 49, l. 8). The web-site

55

for the residency program prominently features the logos of both Palmetto Health and USC-SOM, and there are welcome messages from both the Palmetto Health Chief Medical Officer and the Dean of the Medical School. (Exhibit AAA). The web-page for the USC-SOM Orthopaedics Department states, "The University of South Carolina School of Medicine, in conjunction with Palmetto Health, is proud to offer two fully accredited five-year orthopaedic residency program positions in Columbia, South Carolina." (Id.). The Orthopaedic Surgery Department faculty members are listed in the Palmetto Health Residency Program web-site. (Id.). As noted previously, the Affiliation Agreement specifically provides that both entities "will share the responsibility for ensuring an appropriate learning environment and that clinical instruction occurs in an atmosphere of mutual respect and collegiality between faculty, residents, medical students, and staff." (Exhibit BBB) (emphasis added).

### 2.  Discrimination Claims

### a.  Hostile Work Environment

The issue of whether or not Plaintiff's discrimination claims under Title VII were timely filed is somewhat academic because Defendants Palmetto Health and USC-SOM could still be held liable for unlawful discrimination, either under 42 U.S.C. § 1981 or under contractual obligations that govern the residency programs, even if the Title VII claims were dismissed as untimely. First, Plaintiff has asserted a claim for hostile work environment based on Defendant Koon's references to him as "Achmed the Terrorist." A hostile work environment is unlawful under both Title VII and Section 1981 where "workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."

56

Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993). To prevail on a hostile work environment case based on race, religion, or national origin, a plaintiff must show four basic elements: (1) unwelcome conduct; (2) based on the plaintiff's race, religion, or national origin; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer. Okoli v. City of Baltimore, 648 F.3d 216, 220 (4th Cir.2011). The same test applies to a hostile work environment claim whether it is asserted under Title VII or 42 U.S.C. § 1981. Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 277 (4th Cir. 2015).

In the recent case of Boyer-Liberto, the Fourth Circuit held that a single episode of a racial epithet in the workplace can give rise to a hostile work environment claim. 786 F.3d at 280. The epithet used here by Defendant Koon is clearly as offensive as the use of the term "porch monkey" or the "n-word" to refer to African-American employees. The Boyer-Liberto court also found that the alleged harasser's status can be a significant factor in evaluating whether the conduct was sufficiently severe to give rise to a hostile-work environment claim. Id. at 278 ("In measuring the severity of harassing conduct, the status of the harasser may be a significant factor–e.g., 'a supervisor's use of [a racial epithet] impacts the work environment far more severely than use by co-equals.'").

Defendant Koon's admitted use of the slur, "Achmed the Terrorist" was sufficiently severe and pervasive to give rise to a factual question about whether Plaintiff was subjected to a hostile work environment. Defendants' attempts to down-play Defendant Koon's comment as a joke or to provide other mitigating circumstances cannot be the basis of their summary judgment motion on this issue. Similarly, Defendants' assertions that Plaintiff would jokingly refer to himself as "Aziz" or speak with a mock Indian accent in performing a humorous impression as Dell Tech Support Employee does not excuse

Defendant Koon's conduct, nor does it eliminate the hostile nature of the work environment. Plaintiff's self-effacing comments or poking innocent fun at himself simply does not give Defendants grounds for summary judgment on this claim.

Plaintiff's evidence of Defendant Koon's unprofessional and improper comments is not limited to the single incident acknowledged by Defendant Koon in his deposition. Plaintiff testified that this was not a one-time occurrence, but that Defendant Koon used that epithet on several occasions and also stated that Plaintiff might "blow the place up." (Irani Decl., at ¶ 53). Defendant Koon's improper comments about Plaintiff or directed towards Plaintiff were confirmed by other witnesses. (See Eady Testimony from Cal. Med. Board, at 149, ll. 12-23); (Affidavit of Tonya Hamby) (attached hereto as Exhibit B).

Plaintiff submits that the same standards for hostile work environment should apply to Plaintiff's breach of contract claims regarding Defendants Palmetto Health's and USC-SOM's obligations to provide a safe and conducive atmosphere for resident education, as found in the various handbooks, resident manuals, ACGME guidelines, and other similar documents discussed previously.

### b. Disparate Treatment

Plaintiff has also asserted a claim for discrimination based on disparate treatment. Plaintiff has alleged that he was subjected to different treatment than his non-minority co-residents, because of his race, religion, or national origin. As Defendants acknowledge, the basic methodology for proving race discrimination under either Title VII or Section 1981 is through the circumstantial evidence framework articulated in the landmark case of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) and its progeny. To establish a prima facie case of disparate treatment, a plaintiff generally must show the following four elements: (1) that he is a member of a protected class; (2) that he suffered adverse

58

employment action; (3) that he was meeting his employer's legitimate expectations; and (4) that similarly situated employees outside his class received more favorable treatment. Holland v. Washington Homes, Inc., 487 F.3d 208, 214 (4th Cir. 2007).

Defendants first attack Plaintiff's disparate treatment claim by asserting that he cannot establish a prima facie case because his job performance as a resident was allegedly unsatisfactory. The evidence in the record, properly viewed in the light most favorable to Plaintiff, supports Plaintiff's allegations that he was meeting his employer's legitimate expectations at the various times that he suffered adverse employment action. The Affidavits of Defendants Koon and Walsh present an unfair portrayal of Plaintiff's actual job performance, because they distort the evidence in the record and cherry-pick negative comments out of Plaintiff's performance evaluations out of context. Defendants Koon's and Walsh's almost identical, conclusory statements that Dr. Irani's PGY-1 year was a "rough year" are simply not supported by the record evidence in this case.

Dr. Irani received a total of ten faculty to resident evaluations from the twelve, month-long rotations during his PGY-1 year. Some rotations had more than one evaluation (different attending physicians), and some rotations were repeated throughout the year. Four of the rotations in the second half of his PGY-1 year had no written evaluations at all, including two orthopaedic rotations on the Hand service, which is led by Defendant Walsh. Of the ten evaluations that were provided from his PGY-1 year, Dr. Irani received three overall ratings of "Excellent," five overall ratings of "Satisfactory" (including Dr. Koon's evaluation from January 2011 for the General Orthopaedics rotation), and only one overall rating of "Marginal." " (Copies of Plaintiff's PGY-1 performance evaluations are attached hereto as Exhibit T). The sole "Marginal" overall rating was from Dr. Jones in Dr. Irani's second rotation, which was on the Surgery:

59

Trauma Service rotation in August 2010.  Significantly, Dr. Irani did a second rotation with the Trauma Service in December 2010, and Dr. Jones gave him an overall rating of "Satisfactory."  Dr. Jones commented, "Dr. Irani did improve from his first rotation on trauma to his second.  He is now, in my opinion, at an average or satisfactory level." (Exhibit T, at 24).  Dr. Irani did not receive any overall rating of "Unsatisfactory" during his entire tenure in the Program.  Even Dr. Koon's initial cover letter to the California Medical Board stated, "Dr. Irani satisfactorily completed his internship (PGY-1) from 01 JUL 10- 20 JUN 11."  (Exhibit AA).

Defendant Koon misquotes several evaluations and takes selected comments entirely out of context to paint an unfairly negative picture of Dr. Irani's performance.  For example, in Paragraph 9 of his Affidavit, Defendant Koon quotes from an evaluation of Dr. Friedman from September 2010.  Dr. Friedman actually gave Dr. Irani an overall evaluation of "Excellent" on that particular evaluation. Defendant Koon also misquotes the evaluation from page USC(Irani)321.  The actual quotation is "His quiet manner can be interpreted as being aloof or not caring, although I am certain that this is not the case." Dr. Koon completely omitted out the emphasized phrase from the evaluation, causing a misrepresentation of the actual evaluation.  The senior resident evaluation of Plaintiff by Dr. Mark Ross has been frequently cited by Defendants Koon and as evidence of Dr. Irani's alleged poor performance during his PGY-1 year. Dr. Ross has submitted a Declaration in this case very complimentary of Plaintiff's performance during his PGY-1 year and indicating that the written comments from his evaluation have been distorted and taken out of context.  (W. Ross Decl.) (attached hereto as Exhibit G).

Similarly, Dr. Walsh now states in his Affidavit, "I recall a number of concerns about Dr. Irani from various sources during his PGY1 year, and I had personal interactions with him as well." (Walsh Aff., at

4). In his deposition in this case, however, Defendant Walsh testified that he "didn't recall any specific involvement" with Dr. Irani during his PGY-1 year." (Walsh Depo., at 7, ll. 3-5). Dr. Walsh also confirmed that Dr. Irani completed his PGY-1 year "in a satisfactory fashion." (Walsh Depo., at 117, l. 18 to p. 118, l.2).

Plaintiff has also strongly disputed the allegations about his patient care in the seven or eight specific patient encounters underlying his various academic remediations, suspension, and termination. Unfortunately, the uncorroborated and unverified allegations against Dr. Irani snowballed, especially those presented during the December 5, 2011 faculty meeting. Prior to that date, the only evaluation he received during his PGY-2 year was from Dr. Mazoue's sports rotation in October 2011, which was "Satisfactory." Although Plaintiff received "Marginal" evaluations from Dr. Guy and Dr. Voss, both of those evaluations are suspect because they were substantially late and because they were completed after Dr. Irani's unjustified dressing-down in the faculty meeting. Both Dr. Guy and Dr. Voss had provided largely positive feedback to Dr. Irani in person during the actual rotations in the fall of 2011. (Irani Decl., at ¶¶ 49, 60).

The record evidence supports a finding that Dr. Irani was performing his job adequately as a PGY-2 resident. This is not based on Dr. Irani's own self-evaluation of his performance. It is based on contemporaneous, objective medical records and statements from attending physicians, nurses, and staff members who directly observed Dr. Irani's patient care. In addition, Dr. Grant's expert opinion verifies that Dr. Irani was performing at an expected level for a PGY-2 resident. (Grant Report) (attached hereto as Exhibit WW).

The final element in the prima facie case is showing that non-minority residents were treated better than Dr. Irani under similar circumstances. Dr. Irani was the only minority resident at the time of his

adverse employment actions. He was also the only one who was placed on formal academic remediation during his tenure. Plaintiff has identified a number of incidents where his co-residents were not disciplined or counseled for similar conduct as that used to place Plaintiff academic remediation and ultimately to terminate him from the Program. Dr. Goodno was not counseled for using Vicryl suture on a patient. Dr. Goodno was also not counseled about the patient with the suspected knee infection who called in while he and Dr. Irani were on call on successive days over Thanksgiving weekend in 2011. Dr. Kristen Nathe was not placed on academic remediation for her involvement in Trauma Female 375. Chief Resident Jennifer Wood was also not counseled for suggesting that Dr. Nathe (then a PGY-1 resident) page Dr. Irani (then a PGY-2 resident) to handle Trauma Female 375, which was a very complicated trauma obviously beyond either junior resident's abilities or experience. During the January 30, 2012 meeting to discuss Dr. Irani's return from suspension, Dr. Hoover stated that he would have handled the narcotic issue the same way ad Dr. Irani had for the patient whose husband called in the middle of the night requesting a higher dosage of Oxycodone. (Irani Decl., at ¶ 75). And finally, Dr. Walker was not disciplined for performing or documenting an inadequate neurological evaluation on the spine patient shortly before Plaintiff's final suspension. (Grabowski Depo., at 152, ll. 5-18).

In summary, the evidence of record supports Plaintiff's prima facie case of disparate treatment.

The issue of whether Defendants' proferred non-discriminatory reason for Plaintiff's treatment is legitimate or pre-textual is somewhat repetitive of the prima facie case issue discussed above about Plaintiff's job performance.

### 2. Equal Protection Claims–42 U.S.C. § 1983

The record also supports a claim against Defendant Koon in his individual capacity for violation

of the Equal Protection Claus of the Fourteenth Amendment for his intentional discrimination against Plaintiff. The analysis above regarding Defendant Koon's racial animus, as reflected in his admitted slurs towards Plaintiff or in Plaintiff's presence creates material questions of fact on these issues that should be decided at trial, rather than on summary judgment. Defendant Koon is also not entitled to qualified immunity on the Equal Protection claim, for the reasons previous articulated by the court in denying Defendant Koon's motion for judgment on the pleadings on this issue. See, e.g., Wygant v. Jackson Bd. of Educ., 476 U.S. 267, 273 (1986) ("Decisions by faculties and administrators of public schools based on race or ethnic origin are reviewable under the Fourteenth Amendment.").

### E.  Unlawful Retaliation

Plaintiff has alleged a claim of unlawful retaliation by Defendants Palmetto Health and USC-SOM under Title VII, 42 U.S.C. § 1981, and as part of his breach of contract claim. The analysis of this claim on summary judgment is similar to that raised above in connection with Plaintiff's race discrimination claims.

Retaliation under Section 1981 for complaints of racial discrimination is treated the same as under Title VII. Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 281 (4th Cir. 2015). To establish a prima facie case of unlawful retaliation, a plaintiff must prove three elements: (1) that he engaged in protected activity; (2) that the employer took adverse employment action against him; and (3) that a causal link exists between the two events. Id.

Here, the evidence shows that Plaintiff complained to Ms. Stephens about Defendant Koon's referring to him as "Achmed the Terrorist" in January 2012. (Irani Decl., at ¶ 53). Dr. Stephens testified that she recalls Plaintiff complaining about Defendant Koon's comments, but she cannot recall the exact timing of the complaint. (Stephens Depo., at 150, ll. 23-25). Dr. Irani's testimony is that he believes the

63

complaints to Ms. Stephens occurred in January 2012, which would have been contemporaneous with Step

3 of his grievance regarding his suspension from December 2012. (Irani Depo., at 66, l. 9 to p. 63, l. 3).

Shortly thereafter, Dr. Stephens denied his grievance, refused to provide him documents he requested

about the investigation of Trauma Female 375, and denied his request for a grievance hearing, stating that

he filed it a day late because MLK holiday was considered a business day. The relatively short time span

between Plaintiff's complaint to Ms. Stephens and her actions in refusing his grievance hearing request is

sufficient evidence of causation to survive summary judgment on this claim.

### F.  First Amendment Retaliation–42 U.S.C. § 1981

Plaintiff has also asserted a claim against Defendant Koon in his individual capacity for unlawful

retaliation against Plaintiff for speaking out on a matter of public concern by complaining to the ACGME

about excessive working hours and inadequate resident supervision.  Plaintiff's complaints to the ACGME

occurred in April 2012, just prior to the GMEC's meeting to consider Defendant Koon's recommendation

to terminate Plaintiff from the residency program.  Plaintiff's complaint to the ACGME was not merely a

"personal grievance" as asserted by Defendants, but was a matter of public concern because the problems

were widespread throughout the residency program  and the issues directly implicate patient safety, as well

as the health and well-being of other residents.

"[W]hether a public employee's speech touches on a matter of public concern rests on whether

the public or the community is likely to be truly concerned with or interested in the particular expression,

or whether it is more properly viewed as essentially a private matter between employer and employee."

Campbell v. Galloway, 483 F.3d 258, 270 (4th Cir. 2007) (internal quotations omitted). The Campbell

court found that a female police officer's internal complaints were protected speech, because they included

complaints about public safety and complaints about inappropriate conduct directed towards other female officers and female members of the public.   Id. at 269-70.

Here, Plaintiff's protected speech as alleged in this case is plainly more than a "personal employment grievance" because it directly implicates the public in terms of patient care and resident well-being.  The record in this case is also sufficient to show causation.  Defendants Koon and Walsh were clearly irate about Plaintiff's complaint to the ACGME, because they cross examined him extensively about it during his grievance committee hearing at the end of April.  A permissible inference is that Defendants Koon and Walsh's overt hostility towards Plaintiff during the grievance hearing and their manipulation and distortion of the evidence during the grievance hearing, as discussed in detail above, was causally related to Plaintiff's complaint to the ACGME.

Defendant Koon is not entitled to qualified immunity on this issue because of the well-developed body of case law applying the First Amendment in the employment context, including to speech contained in employment grievances. See Ridpath v. Board of Governors of Marshall University, 447 F.3d 292 (4th Cir. 2006) (rejecting qualified immunity defense where Plaintiff alleged First Amendment retaliation claims after he was terminated from his position in defendant's athletic department after speaking out about a matter of public concern).

## G.  Libel

Plaintiff's claim for libel is based on false information that Defendant Koon provided to the California Medical Board after Plaintiff applied for medical licensure in that state in mid-2013 as he entered an emergency medicine residency program in Bakersfield, California.  Libel is written defamation.  In Holtzcheiter v. Thomson Newspapers, Inc., 506 S.E.2d 497 (S.C. 1998), the South Carolina Supreme

Court stated, "Libel is actionable per se if it involves 'written or printed words which tend to degrade a person, that is, to reduce his character or reputation in the estimation of his friends or acquaintances, or the public, or to disgrace him, or to render him odious, contemptible, or ridiculous.'" Id. at 510 (quoting Lesesne v. Willingham, 83 F.Supp. 918, 921 (E.D.S.C.1949)).

The evidence in this case reveals that Defendant Koon dictated a Memorandum dated June 26, 2013, to Dr. Irani's residency file knowing that the document would be sent to the California Medical Board in connection with Dr. Irani's license application there. (Koon Depo., at 246, ll. 9-19). The Memorandum at issue is materially different than the Final Summative Evaluation that Defendant Koon prepared about Dr. Irani in August 2012, where Dr. Irani was rated as "Good" in the category of "Professionalism." (Exhibit DDD). In the Memorandum to the California Medical Board, Dr. Koon wrote that Dr. Irani "failed in the competencies of patient care, interpersonal skills and communication, and professionalism." (Exhibit EEE). The only thing that transpired between Dr. Koon's final summative evaluation and the June 26, 2013 Memorandum was that Dr. Irani had filed a EEOC Charge against the program by that time. Plaintiff asserts that the June 26, 2013 Memorandum contains other false, defamatory statements such as that Dr. Irani had "persistent patient care issues"; that the patient encounters were "investigated . . . thoroughly"; and that "[n]o reasonable explanation could be identified for his actions." (Id.). The Memorandum appears to be a gratuitous effort to harm Dr. Irani's reputation with the California Medical Board, for no reasonable purpose.

Defendant Koon's contention that the letter was written on the advice of counsel is not a defense to libel. Also, Dr. Irani's signing a waiver to allow the California Medical Board to obtain his residency file from South Carolina does not preclude a libel claim here. Dr. Irani's waiver was nothing more than a

privacy waiver under FERPA; it did not release and Defendant from liability for providing false information.

Defendant Koon's motion for summary judgment on this issue should be denied.

## H.  Tortious Interference with Contract

Plaintiff has alleged two tortious interference with contract claims in his Amended Complaint.  The first one is against both Defendants Koon and Walsh relating to Plaintiff's contracts with the Palmetto Heath residency program.  This claim was added as an alternative theory to Plaintiff's direct breach of contract claims, because of Defendant USC-SOM's argument that there was no privity of contract between USC-SOM and Plaintiff.  The discovery in this case solidified Defendant USC-SOM's contractual obligations to Plaintiff, either directly through the USC Orthopaedics Department Resident Manual, or as a third-party beneficiary, as discussed in detail above.  Plaintiff's tortious interference with contract claim appears to be somewhat superfluous at this point.

Plaintiff's second cause of action for tortious interference was against Dr. Koon alone, for allegedly interfering with Plaintiff's employment contract with the emergency medicine residency program that Plaintiff started in June 2013.  Although Plaintiff's counsel had a good-faith, reasonable basis to believe that the facts supported such allegations at the time the original Complaint in this case was filed, discovery in this case has not produced sufficient evidence to continue prosecution of this cause of action.  Accordingly, Plaintiff hereby withdraws the claim against Defendant Koon for tortious interference with contract.

## I.  Wrongful Discharge in Violation of Public Policy

Plaintiff concedes that the recent case of Cunningham v. Anderson County, 778 S.E.2d 884 (S.C. 2015), appears to preclude his claim for wrongful discharge in violation of public policy.  The Cunningham case held that a plaintiff who has an employment contract (other than one terminable at will) cannot plead

a claim for wrongful termination in violation of public policy as recognized by the case of <u>Ludwick v. This Minute of Carolina, Inc.</u>, 337 S.E.2d 213 (S.C. 1985). This doctrine has been somewhat dynamic in recent years. Although Plaintiff's counsel had a good-faith basis for raising the claim in the initial complaint, he has determined that this cause of action is no longer viable. Accordingly, Plaintiff also hereby withdraws his cause of action for wrongful discharge in violation of public policy.

## V.  Conclusion

Plaintiff fully understands that this case involves a substantial number of complex issues, both legal and factual. Unfortunately, Defendants' strategy throughout Plaintiff's residency has appeared to be designed to overwhelm him with unsubstantiated allegations, following the philosophy that where there is smoke there must be fire. Even in the newly filed Affidavits from Dr. Koon and Dr. Walsh, new information is presented that Plaintiff was never provided an opportunity to respond to. Plaintiff has endeavored to address each of these unwarranted attacks on his abilities and character. As voluminous as this record is, the facts still must be construed in the light most favorable to Plaintiff, as the non-moving party.

For all of the foregoing reasons, Defendants' Motions for Summary Judgment should be denied.

Respectfully submitted,

 s/ David E. Rothstein
David E. Rothstein, Fed. ID No. 6695
ROTHSTEIN LAW FIRM, PA
1312 Augusta Street
Greenville, South Carolina  29605
Office: (864) 232-5870
Facsimile: (864) 241-1386
E-mail: drothstein@rothsteinlawfirm.com

Attorney for Plaintiff, Afraaz R. Irani, M.D.

68

January 25, 2016

Greenville, South Carolina.