# EXHIBIT A

| | | |
|---|---|---|
| STATE OF CALIFORNIA | ) | |
| | ) | UNSWORN DECLARATION OF AFRAAZ R. |
| COUNTY OF SANTA CLARA | ) | IRANI, M.D. |

I, Afraaz Irani, hereby make this Unsworn Declaration pursuant to 28 U.S.C. § 1746, under penalty of perjury.

1) My name is Afraaz Irani. I am older than eighteen years old and am otherwise competent to make this Declaration.

2) I was born and raised in Northern California. My parents are immigrants from Mumbai, India. My religion is Zoroastrianism.

3) I received my undergraduate and medical degrees from Stanford University. As an undergrad, I graduated with departmental honors, double-majoring in Biology and Computer Science. I also stayed active in the pre-medical community, where I was the president of the Stanford Premedical Association, and volunteered my weekend at the local free clinic (Arbor Free Clinic). In medical school, I received several awards including national recognition from the American Heart Association and American Medical Association. I was also an invited speaker at an international medical conference. I published extensively in orthopaedic literature and also received a patent for a medical device that worked to improve outcomes in patients with heart failure. I graduated with a very supportive and positive Dean's letter summarizing my time at Stanford.

4) I was drawn to orthopaedic surgery largely because it married my deep desire for patient care with a keen interest in mechanics and the technical nature of orthopaedic practice.

5) I began residency in the Palmetto Health/University of South Carolina School of Medicine orthopaedic surgery program in Columbia, South Carolina in July 2010. I was one of two residents who started the five-year program that summer, with an expected graduation date of June 2015.

6) Having lived my entire life in Northern California, coming to South Carolina for my residency was a bit of an adjustment for me. During one of my first rotations in my PGY-1 year, Drs. Jones and Bynoe took me aside one day and met with me for about 30 minutes to discuss my job performance. They told me that there was nothing wrong with my patient care, knowledge base, or skill set, but instead stated that I needed to work on my approach to patients in the south – and learning the "southern" way, which was very different than what I was used to. They suggested that I should try more small talk with the patients, such as asking where they were from in South Carolina, to put them more at ease before I started my medical discussions with them. I tried to incorporate the advice of Drs. Jones and Bynoe as I moved forward in this new environment. I also learned that some people may have interpreted my laid-back demeanor as evidence of a lack of caring. In medical school, some of my greatest mentors in the intensive care unit were those who under pressure could maintain a cool, collected approach to running the team, and this was something I aspired to.

7) I later returned to rotation with Drs. Bynoe and Dr. Jones about four months later. As I was rounding with Dr. Jones in the ICU one day towards the end of my rotation in December, I asked him how I was doing and for any additional feedback he could offer. He said that I was doing fine and had made the correct changes to my approach. Dr. Bynoe echoed similar

positive feedback. I considered this feedback by Drs. Bynoe and Jones to be constructive and beneficial.

8) Overall, I believe that my PGY-1 year went well. Out of the six faculty who rated me outside the department of orthopaedics, I received "excellent" the highest possible rating on half of them. The reviews of Drs. Bynoe and Drs. Jones, which did not start out as excellent, all showed substantial improvement when I rotated with them again – illustrating how I had responded to their feedback.

9) One day in December 2010, Dr. Koon bumped into me on the way to my car in December of 2010. We had a very brief impromptu conversation, where he indicated that I would be starting on the orthopaedics service soon and they have high expectations for all their residents. Dr. Koon told me that I would have to "bring my A game" when I started on the orthopaedic service. He said that our department generally gets the best residents and that "the general surgery attendings would trade three of their residents for one of ours, and that the medicine attendings are just happy to have someone who can speak English."

10) The second half of my PGY-1 year went well. I had a general orthopaedic rotation with Dr. Koon in January and two hand rotations with Dr. Walsh in the spring. My very last rotation with Dr. Aitchison, ended on a high note, with almost universally "excellent" ratings in every applicable category. I was promoted to my PGY-2 year without any conditions or problems.

11) During our first journal club meeting of the year in July 2011, while other residents were assigned to present articles relevant to the practice of orthopaedics, I was assigned to present an article entitled "Swimming with Sharks." The article is a reprinted article originally written in the 1800s by a sponge diver about how to survive while swimming in shark-infested waters. The article advises the reader not to flail about, not to get bit, and if bit, try not to bleed or otherwise aggravate the sharks. As I stood to present my review of the article to the group of his peers and faculty from the department, Dr. Koon stated to me, "This article was not randomly assigned to you." I felt like Dr. Koon was making me the butt of a joke by assigning the Shark article to me. A few weeks later, when I sent an e-mail to Dr. Koon suggesting a journal club article from the <u>Archives of Internal Medicine,</u> he responded with a sarcastic and biting e-mail, inquiring whether I was not satisfied with the assigned journal club articles.

12) On August 15, 2010, only six weeks into my residency, Dr. Koon called me into his office with Paul Athey, the Department's practice manager, to tell me I had been placed on Level II academic remediation. I was stunned. Dr. Koon stated that he has have fired residents from the department before, including a 5th year resident who was only six months away from graduation. He mentioned Dr. Chad Lamoreaux by name, who I had heard about from some of the older residents in the program. He also emphasized that if I were to graduate from the program, I would need his signature on my graduation papers.

13) Dr. Koon simply handed me the sheet of complaints and asked me to read the document. I was obviously perplexed since many of these complaints were new and troubling to me. I asked for clarification, and hoping for a constructive feedback session like Dr. Bynoe and Jones had done for me, the only response was "that just shows you lack insight."

14) The first item on the memo accused me of providing improper care to an elderly trauma patient in early July who had suffered a severe injury to his left arm while working on a metal lathe. I had been asked by Dr. Koon to provide a write-up about this patient a couple of days before the August 15 meeting. I recalled this particular patient very well and

thought his care had gone fine. Dr. Iaquinto had done all of the manipulations on this patient's arm. I recall sending a text message of the injury to Dr. Walsh, and he agreed that the patient's arm needed be amputated. Dr. Iaquinto said that nothing was done inappropriately, and the patient himself had personally thanked me for my care a couple of days later. When I received the e-mail from Dr. Koon asking me to describe what occurred with this patient, I responded promptly and sincerely. I presented the facts as I recalled them, and asked Dr. Koon to follow-up with witnesses to substantiate the facts as I presented them. At no time did I accuse anyone of lying.

15)     Another patient that Dr. Koon mentioned in his memo was patient at the VA, who came into the emergency department there one evening while I was on call at Palmetto Health Richland. The medicine attending told me that the patient had cellulitis on his lower leg, and that he was recovering from a knee surgery a few days earlier. The attending stated that the cellulitis was not near the knee area but that he wanted to give us a "head's up" because it was one of our patients. I asked if the patient needed to be seen that night, and the attending told me there was no acute orthopaedic issue and that he could be seen in just a few hours by the morning team. The VA is approximately 20-30 minutes away from Palmetto Health Richland, where I was taking call. I was busy handling other patients at Palmetto Richland at the time. Dr. Eady, the Chief of Orthopaedics at the VA, saw the patient the following morning and the patient was fine.

16)     Dr. Koon's memo also mentioned that I had improperly closed a wound with Vicryl suture. I had seen one of my co-residents, Dr. Goodno, use Vicryl to close a wound in a similar circumstance under the direct guidance of a more senior resident, so thought that suture material was okay to use for my application. After my attending pointed out to me the potential concerns about using Vicryl suture in that situation, I immediately removed the Vicryl sutures and changed to a different material.

17)     I was very concerned that Dr. Koon's memo had several vagaries that did not seem tied to any specific events, and gave me no context upon which to improve. I asked Dr. Koon to clarify this for me. He refused. He just told me that "I lacked insight."

18)     I took all of the allegations in the memo very seriously. Not having any direction for my program director, I spoke with each and every single resident individually privately and asked how I can improve or to help me understand the specific allegations. They all said I was doing fine, specifically mentioning I always did my share or more than my share of the work. I also spoke with nursing staff, ancillary staff, and the operating room staff to understand how I could improve. Together with them I tried to understand how I could translate these broad reaching vagaries to actionable items that could make me a better resident.

19)     Regarding the comment about "attention to detail" I worked with OR staff to brainstorm what this could be referring to. They mentioned that Dr. Walsh believed I showed a lack of attention to detail when I left one of his text books in the operating room for him to pick up after his case. He apparently believed that I had carelessly left the book in the OR, when in fact I had brought it for him and placed it next to his bag, so he could grab it on the way out of the OR. I am not sure where this miscommunication happened, but I resolved to over communicate in the future.

20)     I emailed Dr. Koon describing the incident as being pertinent to the lack of attention to detail complaint and how I would try to increase my level of communication. He did not

respond or lead me to believe that the complaint about "lack of attention to detail" was anything but what I had mentioned in my email.

21) Additionally, I quickly learned that going through the grievance process, was not well received by the department. When I met with Dr. Walsh to discuss pursuing a formal grievance over my Level II remediation, he stated, "I'm not going to tell you what to do, but I'm a busy orthopaedic surgeon, you're a busy orthopaedic surgeon -- when I have to sit here and answer questions about all this, it just gets in the way when I could be doing other things." The clear message was for me to "grin it and bear it."

22) In early November 2010, there was a VA patient who had been transferred to Richland hospital. The patient was lacking a dictation, and this got routed to Dr. Koon. Dr. Koon asked me to "dictate the VA patient." We agreed I would take care of it as soon as he forwarded me the patient, because he did not tell me the name of the patient. That evening a VA patient showed up in my inbox to dictate and I took care of it. Dr. Koon texted me a few days later to ask about the dictation. I told him it was done. After a few rather confusing text messages, we spoke on the phone and clarified that there was a second VA patient who had not made it to my inbox. I wrote down the name, and researched the patient.

23) Upon further review, I realized that I had actually never been involved with this patient's care. Nevertheless, I dictated the discharge summary the same day. I sent Dr. Koon an email telling him everything I knew about the patient, the timeline of the patient's admission, who was involved, and that I had completed the task so that there was no miscommunication. Again, as I had learned from my previous experience with the attention to detail case involving Dr. Walsh's textbook, my goal was to over communicate -- my only reason for sending this email was to fulfill the mantra that "you cannot over-communicate."

24) Stunningly, this attempt to follow my remediation plan and ensure proper communication was not appreciated by Dr. Koon. Sent me a very hostile email: "Absolutely incredible...I can assure you that I would have NEVER in a million years sent a response like this to my program director, especially when I was in the midst of academic remediation." He expressed surprise and indignation and called my email "dribble." Dr. Koon became so enraged that he told me he "was unable to speak to [his] wife." He further boasted to me that that the email he sent me was actually "significantly toned down," and the original had much stronger language. He then openly threatened, "You were lucky you were on vacation because I would have fired you on the spot."

25) I met with Dr. Koon on November 21, 2011, and he told me that he was going to recommend that I be placed on Level I academic remediation when my probation was up first week of December. I asked for clarification. He could not cite any deficiencies regarding the remediation plan. I was encouraged that I had corrected the deficiencies outlined in my remediation. He then began to cite events that had happened during the end of my PGY-1 year/beginning of my PGY-2 year, before I was even placed on probation initially, and that had long been resolved.

26) I attended the faculty meeting on December 5, 2011, expecting to receive the word that my Level II remediation was over and that I was being moved to Level I. Instead, Dr. Koon started the meeting by asking me, "Is this conversation being recorded?" I told him no, but then he still insisted that I place my phone on the table, with no purpose but to further humiliate me. He then launching into a nearly five minute diatribe castigating me in front of the entire faculty stating that I had been placed on level II remediation because of "several deficiencies." He then stated that I had "had issues with substandard patient care,

substandard evaluations, poor time management, poor prioritization, lack of attention to detail" He stated that even though I "was given ample opportunity to air any complaints" I "continued to lack any insight into [my] problems." I was not given any chance to respond to these accusations as he projected as fact what became an insurmountable impression for me to overcome with the other orthopaedic faculty.

27)    Dr. Koon asked very pointed questions in an intimidating manner, whose only purpose seemed to be to further discredit me. Then he asked me, "You still think it was a wise move to take vacation during your remediation?" Again, I was shocked because he himself had told me earlier that there was no problem in my taking two vacation days to see my newborn niece. I had carefully scheduled my only two vacation days to coincide with the vacation days of my attending so as not to create more work for the rest of the team. Since I started my PGY-2 year I only took two days off to see my family (I have no family in SC) and my niece who had just been born. Moreover, these two days off were approved by Kathy Stephens, Dr. Wood, and signed off on by Dr. Koon himself. Dr. Koon insinuated that I did not take the probation seriously and had somehow taken vacation at an inopportune time. He did not mention that he himself had signed off on my vacation request. The accusation that I did not take the remediation seriously was disheartening. In fact, I missed my very own brother's wedding so I could be on call over Labor Day. I knew that if I requested those days off it would cause further work for my fellow residents, and I was striving to improve on the allegation that I was perhaps creating more work for others.

28)    Dr. Koon then continued to ask me a series of questions that served no apparent purpose but to demean me. He said, "I need to hear from you if you want to do orthopaedics." He then asked why I called the chief resident to ask what time the faculty meeting was. Notably Dr. Koon had never told me what time the faculty meeting was and so I had called the chief resident to double check the time. Dr. Koon incorrectly insisted he had told me the time, and that I had somehow made a grave mistake by asking someone what time the meeting was: "That means that you don't care, or I don't know what it means. I think 99.9% of residents would be scared to death and pretty much know what time they had to show up." I did not confront him or remind him that he never told me what time faculty meeting was. It was clear that I was in a no-win situation.

29)    He then asked me why I went "outside the department" to talk to Kathy Stephens. He stated "I was curious why you are meeting with her when I didn't know anything about it." I was shocked. Kathy Stephens was supposed to be an alleged neutral third party, but Dr. Koon openly declared that I could not speak to her without his approval. He was now openly saying that my "going outside the department" to undertake the grievance process was seen as an affront to him.

30)    He then asked me if I have an attorney.

31)    Next he launched into a series of criticisms: "You provided substandard care when closing wound with Vicryl suture"; "you did not go see VA total patient with post-operative cellulitis"; "you had pain management issues"; "you had an inappropriate wound evaluation on one of my patients"; "over the phone you decided that post-operative cellulitis was a medicine patient and not need to be seen"; "a patient of mine called three times and with a draining wound and you decide she does not need to be seen." Many of these statements were patently false, but rather than ask me to clarify or give me the opportunity to point out how his statements are inaccurate, he asked simply, "Are we going to keep having these issues?"

32) Then Dr. Koon further blindsided me, raising a complaint that I had never heard about before this meeting: Dr. Koon stated that Dr. Grabowski had some recommendations on a patient I saw in staff clinic and I didn't abide by those recommendations. I had honestly no idea what he was talking about. Dr. Koon then went on to reference a patient that had been seen in clinic by me a few days prior. My attending Dr. Grabowski, asked me to obtain an MRI that day to evaluate the patient for possible infection following removal of an external fixator device from his forearm. I was told by Charmain, our medical assistant, that the earliest possible appointment she was able to secure was later that week. I told her to hold it in the interim while I speak with my chief resident about how to get the request expedited. My chief resident told me to call directly over to radiology to obtain same-day MRIs. I followed her suggestion, got the MRI scheduled, canceled the appointment for later in the week, and sent the patient over to MRI. I carried out Dr. Grabowski's care plan for that patient exactly as requested.

33) I received no complaints about this patient's care plan prior to this meeting, and indeed it was carried out exactly as my attending had wished. Rather than ask me for details about the incident in private, Dr. Koon sprang this on me in front of the entire faculty. He had already said in front of the entire faculty that I do not admit fault and "shift blame." He baited me with patently false statement, saying "I am wondering why you thought it was in your purview as a PGY-2 resident to contradict your attending's recommendation." I was taken aback by this statement, frankly confused, and obviously flustered when this was demonstrably false. A simple fact check of the chart would have shown the truth. When I tried to point out that this was entirely false, and he chastised in front of the department saying "this is exactly what I'm talking about," and saying that I "lack insight" and refuse to accept fault.

34) If the goal of the residency is to educate and support residents, I believe I should have been afforded the common courtesy to explain what happened. Instead Dr. Koon asked me to respond to inflammatory, incorrect accusations in an obviously confrontational manner.

35) Dr. Koon made two more points in front of the rest of the faculty. Dr. Koon asked why I failed to evaluate a post-op total knee. This was a patient who called on November 26, 2011 and said a scab had come off her knee and she had some drainage. I told her, "I cannot tell you anything about your wound without taking a look at it" and encouraged her to come into the ED.

36) The patient called back twice the next day when a different resident (Dr. Goodno) was on call. I conferred with Dr. Goodno that day – he too had told her to come in for evaluation, but she failed to show. Despite two residents who both told her to come in, the patient did not follow these instructions. Dr. Koon lambasted me in front of the other faculty, simply saying a patient called three times and I told her not to come in, which was frankly untrue.

37) Dr. Koon next alleged that I gave inappropriate narcotic pain meds to a non-narcotic naïve patient who had undergone a complex upper extremity surgery with Drs. Walsh and Mazoue. She had pain in the night and I allowed her to take additional pain meds. I asked the morning team to follow-up with her. She was a little drowsy because she had been up all night because of pain, as well as the somewhat sedative effect of narcotics. Indeed she was determined not to be in any harm by Dr. Walsh himself, and was not instructed to come in for evaluation or present to the ER. Instead, Dr. Koon mischaracterized this saying I had provided her "Inappropriate narcotics."

38) Interestingly, at the faculty meeting on January 30, 2012, I asked for clarification of what I had done wrong with regard to this patient. Dr. Koon asked Dr. Hoover (the chief resident) what he would have done in that situation. Dr. Hoover replied that would have asked the patient if she was having any weakness, parasthesias or mental status changes, and if no changes were present, he would have OK'd more narcotics. I was stunned. Dr. Hoover said exactly what I had done that Dr. Koon complained about in the December 5 faculty meeting.

39) Lastly, Dr. Koon, made the allegation in front of the orthopaedic department staff that my poor behavior is a pattern. He stated he heard similar complaints about unprofessionalism and poor patient skills about me from the trauma case managers. I was puzzled because I had received positive feedback from them. However, I wanted to understand how I could become a better resident. I approached them again and spoke with both of them privately (Peggy Fields and Debra Floyd). They frankly denied such claims, and said they were very pleased with my performance, and emphatically stated they enjoyed working with me, and signed affidavits stating as much.

40) Two days after the faculty meeting, a multi trauma came in at around 11AM. The patient was seen and evaluated by our orthopaedics intern (Dr. Nathe). The intern called the chief resident (Dr. Wood) saying it was a particularly sticky situation. Dr. Wood directed her to call me, a second year resident on probation, to supervise the intern in a volatile environment. I received a page at approximately 2:00 or 2:30 PM to see the patient. I immediately informed my attending and went to the ED to help.

41) I arrived to a situation in frank disarray. The patient was roughly 3.5 hours after her initial trauma. She had been moved out of the trauma bay, into a very small room, and still had open displaced fractures that were still untreated several hours after her presentation.

42) The patient and nursing staff were understandably upset. Before I had even seen the patient, the nurse (Arlene) clearly and again understandably upset, said to me we had to talk about how this was all handled. I asked her what happened, what I could do, and what needed to be addressed. She simply said we will talk about it at the end.

43) Having gone through a similar experience with some of the same nurses before, I toed the line and did the best I knew how with what I had. I went out of my way to please all parties involved including introducing myself to the patient, describing all injuries, assessing pain, giving systemic and local anesthesia, talking to the family, showing the family the injury films on the PACS station, and helping nursing and ancillary staff in any way possible including cleaning up and changing wet sheets.

44) Immediately afterwards, Dr. Nathe and I met with the nurses. Notably, I was standing, and Dr. Nathe was sitting on a stool. During the whole conversation, the nurses never addressed me but spoke toward Dr. Nathe. What was concerning to me was that they took issue with the actual medical care that Dr. Nathe and I had carried out, as directed by the attending in charge, Dr. Jones. Diane Savage said: "I mean you did two wash outs and two reductions in an ER room. That's pretty complex for an ER room." They stated that that we should have waited and done that procedure in the OR, in direct contravention to the orders of Dr. Jones. When the issue of informed consent was raised, Dr. Nathe pointed out that for Emergency cases we do not do a written informed consent, stating she "had never done a written consent" for a patient in the ER before.

45) Two days later, I received a phone call from my chairman, Dr. Walsh, at about noon, who said that there was an incident involving the trauma female I took care of, and he

informed that I was being suspended so an investigation can be performed. Dr. Walsh assured me that the purpose of the suspension would be to get all sides of the story "including yours."

46) I was shocked, saddened, and stunned at the events that transpired next. No one talked to me. No one attempted to contact me. No one was even interested in hearing my recollection of the events. To add insult to injury, I received a phone call from our program director Michelle Wehunt stating that there was a letter for me in my box. This letter was a copy of the letter to the GMEC recommending me for Level III remediation (suspension) that had already submitted and been approved. I was floored.

47) No one had contacted me about what had happened with the trauma female as I had personally been promised by my chairman. My program director didn't even have the decency to call me and inform me of his decision or thought process, but rather had the secretary give me a call to pick up a memo that he had already turned over to the GMEC.

48) Furthermore, the relevant witnesses were not interviewed (despite my providing names of witnesses), and I was never given a chance to respond in writing in an appropriate manner.

49) I spoke with Dr. Guy on December 18th 2011. I told him that no one had spoken with me about the alleged incidents regarding trauma female 375 even though Dr. Walsh had promised the purpose of the suspension was to perform an investigation. I also asked him for a summary of how I was doing. He said that he looks at three metrics in evaluating residents – academics, surgical skills, and interaction with peers and patients. He said in terms of academics, he put me on the high end of the spectrum. He agreed it was too soon to assess surgical skill but put me in the average to maybe average minus category. He said that he believed where I was falling down was in the third category. When I pushed him to further explain, he agreed that his comment was based on what he had heard about me from mainly from Dr. Koon during the faculty meeting. I expressed that I do not believe that the characterization of my having poor interactions with patients was true, and he agreed that may be the case, and he hadn't seen anything to substantiate that, but was concerned based on what he had heard about me from Dr. Koon. At the conclusion of our meeting, Dr. Guy agreed to facilitate a meeting with Dr. Walsh, which happened the next day.

50) I met with Dr. Walsh the following day, December 19, 2011. Dr. Walsh began the meeting by saying that I could not record the conversation. I told Walsh with regard to the trauma patient, I did everything I could in my power to diffuse a tense situation. I told him I carried out the care plan as was ordered by my attending, and made great effort to respond to all concerns of nursing staff and/or family. I asked him to talk to witnesses, including the family themselves, to corroborate my story.

51) When I had finished my explanation, Dr. Walsh still refused to believe me, saying "it doesn't make sense to me." He said that even if I had done everything right, I still should have picked up the phone and called someone. I pointed out that both chief residents, and the attending, Dr. Jones were aware of the situation and in fact Dr. Wood insisted that I take care of the situation and refused to come the ER and assist in the patient's care; I informed him that we had attempted to get help, but no help was offered.

52) Rather than considering this, or agreeing to follow up with the family and/or witnesses he insisted that "I lack insight." He then just started general criticisms of me saying my work was not very, good and presentations are "lazy," and there is point "where there is a lack of trust." I was stunned how he could say these again refusing to provide details

beyond these vagaries, and refusing to honor my simple request to fact check his what he had heard about me.

53) Disappointed, I met with Kathy Stephens on January 3, 2012, and told her I wished to continue the grievance process. I again informed her that my side of the story was never solicited. I told her that I was concerned about that Dr. Koon was not an unbiased evaluator of me and treated me differently, and notably called racially charged names like "Achmed the Terrorist." I implored her to perform a careful review of the facts surrounding Trauma Female 375. I gave her a list of witnesses to talk to. I asked for the actual complaints about me since no one had provided any more context regarding Trauma Female 375. I repeated multiple times that I need to understand the accusations against me and to please turn over any documentation. She refused to turn over these documents or any of the accusations against my care, insisting I should focus on moving forward instead.

54) After Ms. Stephens denied my request to overturn the suspension, I spoke with Dr. Walsh again on January 18, 2012, and stated that I was concerned these actions would delay my graduation making fellowships difficult, if not impossible, to obtain, and secondly that I would have to report the suspension on future job applications. I told him if those issues could be mitigated, I would be happy to drop all further appeals and make a good faith effort to move forward despite the fact that I had serious reservations about my treatment up to this point.

55) I again reiterated at this meeting that I had asked to see the documented complaints about what I had been accused of regarding Trauma Female 375, and had still not seen anything. In response, Dr. Walsh chided me for wanting to see the complaints. He said that, "even if you had done everything correctly, and even if there was a videotape of it" showing that I did everything correct – "you would still be suspended." He then went on to repeat that my recollection makes "no sense to [him]." He again faulted me for not calling an attending, even though I expressed that both the attending and chief resident were already aware and did not come down but told us to carry out the care plan. I expressed to Dr. Walsh that I have been told repeatedly that I lack insight, but no one will answer questions or listen to my side of the story to understand any problems, if there are any.

56) Dr. Walsh then stated it sounds like "You wanted to have your side heard. What is going to help you feel like you had a chance to explain yourself?" He also asked me if I wanted to do something besides Orthopaedics. I told him I always listen to what my attendings say but "Orthopaedics is what I want to do."

57) Dr. Walsh then told me to think about how I want to be able to "tell [my] side of the story." And he explicitly said "It doesn't have to involve Dr. Koon."

58) I told him I would get back to him on that and reminded him at the closing of the meeting if there was "anyway to re-word the suspension so I don't have to report it." Dr. Walsh at this point said he would be "happy to talk" with Kathy Stephens "tomorrow." I told him I had two issues. He wrote both of them down and repeated them back to me, "so graduating on time and reporting suspension." I told him those are the two things I would like him to look into and if those questions can be taken care of then I would forego the grievance process, and I would also get back to him about how I wish to be "heard."

59) I waited to hear back from Dr. Walsh before attempting to determine whether I should request a grievance council. I sent two follow-up emails to Dr. Walsh. On the 10th business day (1/26/12), I still had not heard back from him, so I submitted a request with HR to initiate a grievance council meeting within ten days of the DIO's decision, as outlined under

"Grievance and Due Process" of the resident handbook step 1.5. I did not count Martin Luther King Day as a work day in calculating the due date for my grievance request. I spoke with Gwen Hill (Vice President of HR) and told her the situation. I was told they would communicate with Kathy Stephens for guidance.

60)     I was shocked when they refused to grant me a grievance council hearing saying that eleven business days had elapsed because Martin Luther King Jr day is not a holiday for Palmetto Health. I pointed out that to my understanding MLK is a national holiday – furthermore a business day is to my knowledge not defined in the resident handbook – a fact that Kathy Stephens herself later conceded. Moreover, the resident handbook makes explicit provisions to "extend any deadlines," due to extenuating circumstances. I had made a good faith effort to follow the guidelines laid out in the resident handbook.

61)     I attempted to seek council elsewhere. Since Dr. Walsh had encouraged me to explore how I wished to be "heard," I spoke with Dr. Guy. I appreciated his feedback and found I made much more progress speaking with him. I asked him if he would oversee my remediation plan so that I could get some guidance since I felt I was not making much progress with Dr. Koon; he stated he would be willing.

62)     Dr. Koon confronted me angrily about this at the January 30th faculty meeting saying I just wanted "someone who provide a more favorable opinion about [me]." During the meeting, Dr. Koon also confronted me by flinging the resident handbook across the table and asking me read aloud the grievance process from the resident handbook, in front of my fellow residents and attendings. After I finished reading, he then proudly declared that I had not followed the guidelines. He said that I had skipped step 1.1 in the grievance process which stated "A resident who has a dispute or grievance must discuss this with his/her Program Director who will make every effort to resolve the matter within five (5) business days."

63)     I noticed that Drs. Koon and Walsh had changed my rotation schedule for my return to the program. I was scheduled to be rotating at the VA and Baptist hospital with attendings who had not been present during the December 5th faculty meeting. However, these rotations were removed, and I was assigned to the Richland service again on services with attendings I had just rotated with. My education was further compromised as I did not have the opportunity to have someone else supervise me or serve in a mentorship role.

64)     Upon my return, I redoubled my efforts to do well, and was genuinely happy to be back. I started back on Dr. Voss's service. I worked to help my fellow residents by creating a step-by-step guide with figures to explain how Dr. Voss does surgery. As was directed by my remediation plan, I met with Dr. Voss after two weeks on the service. He said I was doing well, and he just suggested that I keep on doing what I was doing.

65)     On Wednesday, February 29, 2012, I was called into a meeting with Dr. Grabowski and Dr. Voss to discuss an issue involving a spine patient of Dr. Grabowski's who had a complication following a spinal decompression and fusion procedure the week before. I was assisting Dr. Grabowski with this patient because my attending, Dr. Voss, was out of town for a few days, and I had expressed an interest in going into a spine fellowship. The patient (L.O.) was in the hospital recovering from surgery which had occurred on February 21, 2012. On Friday, February 24, 2012, at approximately 11:30 a.m., I received a call from the nurse who informed me that the patient was having difficulty walking during physical therapy that morning. I immediately asked the nurse whether the patient was having neurological changes, or if she was just having routine pain following her surgery. The nurse informed

me that she had not actually seen the patient yet, but was relaying what she was told from physical therapy. I told the nurse that if there are neurological changes, that is very important, and I needed to know right away. The nurse said she would check on the patient and call me back. When the nurse called me back to report that there were, in fact, signs of neurological changes, I immediately spoke with Dr. Grabowski in the clinic. Dr. Grabowski told me to see the patient and perform a neurological exam myself.

66)     When I got to the patient's room, she was in the bathroom for a very long time. I had given her an enema earlier that morning because she having trouble moving her bowels following the surgery, which is a common side effect of anesthesia. I called Dr. Grabowski and told him that the patient was in the bathroom. He told me to "see her when you can." I waited at the patient's bedside until she finished in the restroom, then personally helped her from the toilet to bed. I noticed that one of her feet was dragging. I then performed an exam on her and confirmed that she had a profound neurological deficit. I immediately called Dr. Grabowski with the results, and he told me that my findings were inaccurate and did not make sense. At my insistence, Dr. Grabowski came down to evaluate the patient himself, about an hour later. Dr. Grabowski's exam confirmed my findings.

67)     I did not put a note in the patient's medical chart about my abnormal findings from my neurological exam because I had recently been told by Dr. Voss not to prematurely document potential complications that might be evidence of a malpractice claim, especially as a PGY-2 resident with a complicated case. I also spoke with Drs. Hoover and Lindley after that, who were in the call room, to see what I should do. They told me to just let Dr. Grabowski handle the patient and documentation since Dr. Grabowski was new to the practice. Dr. Grabowski sent the patient off for an urgent MRI. He ended up taking the patient back to the operating room that evening to perform a surgery to relieve an accumulation of spinal fluid that was pressing on one of her nerves causing temporary paralysis.

68)     On the evening of March 1, 2012, Dr. Koon called and told me that I was again suspended for my treatment regarding two patients and he was recommending my termination. The first patient he mentioned was a hemophiliac patient who was admitted at approximately midnight for observation for possible compartment syndrome. I did an interval physical examination at about 2:30 for compartment syndrome. The exam was unchanged, and as I was seeing another patient, and my exam was unchanged from before, I decided to treat the patient in the ER an expeditious and caring manner.

69)     Additionally Dr. Koon stated that the following morning, I was late for rounds and the senior resident had to call the call room and wake me up. This is untrue. Often times when we are on call we may be a few minutes late to rounds because of duties from overnight. However, I had made arrangements so that all my patients would be seen and there was no interruption in service. Patient care was never compromised, and the chief resident did not have to call into the call room to wake me up.

70)     Dr. Koon also mentioned the issue with Dr. Grabowski's spine patient.

71)     I initiated the grievance process yet again. When I spoke with Dr. Walsh on 3/14/12 he stated the futility of the process and openly declared, "There is no way the GMEC committee will go against us. *No way.*" Dr. Walsh tried to pressure me into leaving the program "with dignity."

72)     I met with Kathy Stephens on 3/21/12 to go over the next step of my grievance. I told her that I felt like the facts were not correct. I described what I would like her to investigate, to review the chart, and to speak with witnesses. She asked me how Dr. Voss believed I was

doing, and I informed her that Dr. Voss at his two week evaluation said I was performing well. At the end of our meeting, she went to her calendar and counted off 10 business days because she admitted that it was not clear last time what ten business days were and also admitted that a business day was not defined in the resident handbook.

73)  After Ms. Stephens failed to overturn the decision, I requested a grievance council hearing. I was told by Lin Hearne that the structure of the meeting would be Dr. Koon would give his presentation, then I would give my presentation, then the council would ask clarifying questions. Instead, after I finished my presentation, Drs. Walsh and Koon spent about 20 to 30 minutes directly ask me accusatory questions in an aggressive "cross-examination," rather than fielding questions from the committee as I had been told. What was even more surprising was that, during the hearing, many allegations against me were being raised for the very first time. During the grievance committee hearing, Dr. Koon now stated that the "lack of attention to detail" complaint from the August 15th memo referred to allegedly inadequate history and physicals from my rotation on Dr. Walsh's service in July and August. I had never heard this complaint from Dr. Walsh before. Furthermore now he accused me of lying to Kathy Stevens which was also false. He also raised a new complaint that I had made an "inappropriate" joke in the operating room, something again that I had never been confronted about and was hearing for the first time at the grievance council. My hope was that the grievance council would review charts, and objective evidence to determine which side was correct, as I had been lead to believe.

74)  I was however informed by Lin Hearne that after grievance hearing adjourned, the grievance committee was unable to reach a decision, and they were gathering additional facts about the cases at issue. I was hopeful that the committee would review the relevant records or interview witnesses. Instead, new information was submitted to the committee by Drs. Koon and Walsh. I was never provided with a copy of the information they submitted to the grievance committee after the hearing had closed until my lawyer sent them to me as part of the discovery in this case.

75)  I believe that I was unfairly singled out throughout my residency at Palmetto Health/USC School of Medicine I believe the facts have been misrepresented. Moreover, at least five of the deficiencies cited here were either performed or verified by my white colleagues without retribution including treatment of trauma patient TF375 (Drs. Nathe and Wood), dosing of narcotics (Dr. Hoover), medical knowledge (Dr. Goodno), evaluation of post-op knee patient (Dr. Goodno), and wound closure with Vicryl suture (Dr. Goodno).

76)  During most of my PGY-2 year, I felt constantly intimidated by Dr. Koon either calling me a terrorist or by threatening me with discipline for some minor infraction but for which he gave a pass to other residents who had done the same of similar things. This was not an environment to learn as the defense has portrayed, and it was not one that was fair and equitable and allowed me a chance to become an orthopaedic surgeon.

I declare under penalty of perjury that the foregoing is true and correct. Executed on January 25th, 2016.

_____
Afraaz R. Irani, M.D.