# EXHIBIT H

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

Afraaz R. Irani, M.D.,          )
                                )    C/A No. 3:14-cv-03577-CMC-KDW
        Plaintiff,              )
                                )
vs.                             )
                                )
Palmetto Health;                )
University of South             )
Carolina School of             )
Medicine; David E. Koon,       )
Jr., M.D., in his               )
individual capacity; and )
John J. Walsh, IV, M.D.,       )
in his individual              )
capacity,                       )
                                )
        Defendants.             )
_____)

DEPOSITION OF

KATHERINE STEPHENS, PhD, MBA, FACHE

*******************

Friday, August 14, 2015
9:06 a.m. - 2:56 p.m.


        The deposition of KATHERINE G. STEPHENS, PhD, MBA,

FACHE, taken on behalf of the Plaintiff at the law offices

of Ogletree, Deakins, Nash, Smoak & Stewart, P.C., 1320 Main

Street, Suite 600, Columbia, South Carolina, on the 14th day

of August, 2015, before Lyn A. Hudson, Court Reporter and

Notary Public in and for the State of South Carolina,

pursuant to Notice of Deposition and/or agreement of

counsel.

Page 8

```
 1        deposition in anticipation of the deposition.
 2   A:   I did scan through some of the documents in the file
 3        folder.  And I met with Kathy Helms.
 4   Q:   What documents do you recall looking through in
 5        preparation for the deposition?
 6   A:   They would include the Graduate Medical Education
 7        Committee, Executive Committee Minutes related to Dr.
 8        Irani, some e-mails primarily.
 9   Q:   Okay.  Do you believe at any time during his
10        participation in the residency program or thereafter
11        that Dr. Irani has ever lied to you in any
12        communications he has had directly with you?
13   A:   I don't have any reason to believe he's lied.
14   Q:   Okay.  And tell me what your current position is.
15   A:   I'm Vice President for Medical Education for Palmetto
16        Health.  I serve as the DIO, the Designated
17        Institutional Official for the Residency Programs for
18        Palmetto Health USC School of Medicine.  And I also
19        have an appointment as a faculty member at the School
20        of Medicine, most recently appointed as associate dean
21        for GME.
22   Q:   How long have you had that associate dean position?
23   A:   Two, three months.  It was in June.
24   Q:   Have you held any other positions at the USC School of
25        Medicine prior to June of 2015?
```

Allen Court Reporting

```
 1        functions in those areas from day one.  The title
 2        changes have occurred over a period of time.  I don't
 3        recall when research was added.
 4   Q:   And who do you report to?
 5   A:   Dr. Jim Raymond.  He's the Chief Medical and Academic
 6        Officer for Palmetto Health.
 7   Q:   And you also used the term Designated Institutional
 8        Official or DIO.  How long have you been the DIO over
 9        the residency programs?
10   A:   Probably four or five years.
11   Q:   And Dr. Raymond was the DIO prior to you?
12   A:   Correct.
13   Q:   And tell me generally what the term DIO means.
14   A:   It is a term used by the Accreditation Council for
15        Graduate Medical Education that is required for
16        institutions that sponsor residency programs to have an
17        individual designated for oversight of the residency
18        programs.
19   Q:   I mean, is it fair to say that the DIO is sort of the
20        person with the chief oversight of the residency
21        programs?  I mean, I know you report up the chain to
22        the administration and the hospital.  But are you the
23        sort of the point person at the sponsoring institution
24        for the residency programs?
25   A:   From the accreditation point of view, absolutely.
```

| | | |
|---|---|---|
| 1 | A: | In our Internal Medicine program we have one year |
| 2 | | preliminary positions.  And our General Surgery |
| 3 | | Residency we have preliminary positions that can be one |
| 4 | | or two years. |
| 5 | Q: | What about Family Medicine? |
| 6 | A: | No. |
| 7 | Q: | Are those the only two residency programs at Palmetto |
| 8 | | Health that have preliminary positions? |
| 9 | A: | They are. |
| 10 | Q: | Would you agree that the Graduate Medical Education |
| 11 | | program at Palmetto Health is a partnership between |
| 12 | | Palmetto Health and the USC School of Medicine? |
| 13 | A: | It depends on the definition of partnership.  The |
| 14 | | sponsoring institution is Palmetto Health.  And that is |
| 15 | | the entity that is recognized by the ACGME as the |
| 16 | | sponsoring institution.  But they are named Palmetto |
| 17 | | Health/University of South Carolina School of Medicine |
| 18 | | Residency Programs. |
| 19 | Q: | Okay.  And I understand the ACGME requires there to be |
| 20 | | one sponsoring institution; right? |
| 21 | A: | Correct. |
| 22 | Q: | But I've seen in numerous publications and in numerous |
| 23 | | references on web sites and things like that the |
| 24 | | Graduate Medical Education Program at, in Columbia, |
| 25 | | South Carolina is referred to as Palmetto Health/USC |

```
 1        School of Medicine.
 2   A:   And that's the name of them.
 3   Q:   Okay.
 4   A:   The way that they're phrased the ACGME allows phrasing
 5        to include a medical school affiliate and the name.
 6   Q:   And I know you're not, I assume you've not had any
 7        legal training.  You are not a lawyer?
 8   A:   I am not.
 9   Q:   Okay.  And I'm not asking for a legal definition of the
10        partnership.  But in your common understanding of the
11        term partnership, would you describe the relationship
12        between Palmetto Health and USC School of Medicine in
13        connection with the Graduate Medical Education Program
14        as a partnership?
15   A:   It's an affiliation that we have.  And we do contract
16        for services back and forth.
17   Q:   Okay.
18   A:   It's required to be, we are required to have an
19        affiliation with the medical school.  And we do.  And
20        we have for, since the, I guess the start of the
21        medical school.
22   Q:   Okay.  So you would prefer to use the term affiliation
23        rather than partnership?
24   A:   I don't know the difference in the two in terms of what
25        you're getting at from a legal point of view.  Partner
```

```
 1        is a very general term that's used in many ways.  So if
 2        you're looking at what's required for the accreditation
 3        affiliation is what's required.
 4   Q:   Okay.
 5   A:   We partner in many ways with many people.
 6   Q:   And would you, you would agree with me that there is
 7        common leadership between the USC and Palmetto Health
 8        in terms of running the Graduate Medical Education
 9        Program?
10   A:   In most of those.  Yes.
11   Q:   Okay.  In fact, I think your recent appointment as an
12        associate dean is an example of that; right?
13   A:   I think that's also to look at trying to strengthen the
14        relationship.
15   Q:   Okay.  And I think recently within the last day or two
16        are you aware that the Graduate Medical Education or
17        the Palmetto Health web site for Graduate Medical
18        Education has changed?
19   A:   I haven't seen it.
20   Q:   Okay.
21   A:   I know there are changes under way.  But I haven't seen
22        it.
23   Q:   Have you been to, have you ever been to the Palmetto
24        Health Graduate Medical Education portions of the web
25        site?
```

Allen Court Reporting

```
 1  A:  Yes.
 2  Q:  Okay.  And on that web site both the USC School of
 3      Medicine and Palmetto Health logos are prominently
 4      featured, aren't they?
 5  A:  And their links.  Yes.
 6  Q:  Okay.  And so both Palmetto Health and USC sort of hold
 7      themselves out to the public as jointly participating
 8      in the residency programs; correct?
 9  A:  There is joint participation.
10  Q:  Okay.  And there is a letter, a joint letter from I
11      think Dr. Raymond and whoever the current dean of the
12      USC School of Medicine sort of either welcoming or
13      encouraging prospective applicants to apply to the
14      programs?
15  A:  There has been.  I think that's still in place.  Yes.
16  Q:  How is the Graduate Medical Education Program Palmetto
17      Health/USC School of Medicine funded?
18  A:  It's funded primarily through Graduate Medical
19      Education payments direct and some indirect payments
20      from Medicare, CMS.  It also is funded through some
21      Palmetto Health funds outside of that that would come
22      in in terms of general revenue.  There is a little bit
23      of funding that comes from the South Carolina AHEC
24      program that supports the family medicine program.
25      Some funding comes from the VA system for resident
```

```
 1        rotations there.  Some from the Department of Mental
 2        Health for resident rotations there.  Those are the
 3        largest funders.
 4   Q:   Okay.  Is there any funding provided from the USC
 5        School of Medicine?
 6   A:   For residency?
 7   Q:   Yes.
 8   A:   No.  The funding goes, we have funding that pays for
 9        the cost of Graduate Medical Education, some of which
10        goes from Palmetto Health to the University of South
11        Carolina to pay for faculty and leadership that's
12        required for residency programs.  So the responsibility
13        for the residency programs is Palmetto Health's as a
14        sponsoring institution.
15   Q:   So there is some sharing of revenue between Palmetto
16        Health and USC School of Medicine in terms of the
17        operation of the Graduate Medical Education Program?
18            MS. HELMS:  Object to the form of the question.
19        You can go ahead.
20   A:   There are payments made to the School of Medicine, USC
21        for services that we basically contract for for the
22        residency program.  Yes.
23   BY MR. ROTHSTEIN:
24   Q:   Who pays the program directors?
25   A:   We pay for program director time to the School of
```

| | |
|---|---|
| 1 | Medicine if that program director is a School of |
| 2 | Medicine employed physician. |
| 3 | Q: And when you say we, you're talking about Palmetto |
| 4 | Health? |
| 5 | A: Yes. |
| 6 | Q: So Palmetto Health pays a portion of the salary of the |
| 7 | program directors for the Graduate Medical Education |
| 8 | Program if the program director is also a USC employee? |
| 9 | A: Yes. If that employee, if that individual -- |
| 10 | MS. THOMAS: Object to the form. |
| 11 | A: -- is employed by USC. |
| 12 | BY MR. ROTHSTEIN: |
| 13 | Q: How many of the 22 or 23 residency programs at Palmetto |
| 14 | Health/USC School of Medicine, how many of those |
| 15 | program directors are USC employees? |
| 16 | A: Probably, I can't give you an exact number without |
| 17 | going back and looking at them. But it is probably |
| 18 | easier to say who is not. |
| 19 | Q: Okay. |
| 20 | A: The Dental residency program director is an employee of |
| 21 | Palmetto Health. The Emergency Medicine program |
| 22 | director is an employee of Carolina Care which is the |
| 23 | emergency medicine physician entity that contracts with |
| 24 | Palmetto Health. And we have a fellowship, Emergency |
| 25 | Medicine Services and Simulation and Emergency Medicine |

```
 1         available to the department?
 2    A:   Well, they're in the budgets annually.  But the
 3         reimbursement for the cost is done throughout the year
 4         based on when expenditures are made.
 5    Q:   Let's talk about the leadership of the Graduate Medical
 6         Education Program.  I understand that we talked about
 7         your position as the DIO.  And I understand that there
 8         is a Graduate Medical Education Committee.
 9    A:   There is.
10    Q:   Okay.  Tell me who's, who makes up the Graduate Medical
11         Education Committee.
12    A:   There is a requirement in the accreditation,
13         requirements for who is on that committee.  There are
14         additional people who can be on it.  But in the case of
15         Palmetto Health because our, the number of programs we
16         have is not so large that we can't do it, we do include
17         all the program directors.  And we also include all the
18         chairs as members, or directors of education is another
19         term we use for those who are not employed by the
20         medical school.  So you sometimes see that.  We include
21         the officers of the residents council.  We have other
22         administrative folks on it.  The chief medical and
23         academic officer, the dean of the medical school.
24         Let's see.  Those are some of the people who are on
25         that committee.
```

1  Q:  How many officers of the residents council are there?

2  A:  There are four.

3  Q:  All right.  Dean of the medical school, I guess

4      Dr. Raymond and you?

5  A:  And the physician who's over patient safety and quality

6      is also a member.

7  Q:  How many total members of the committee would you say

8      there are?

9  A:  Okay.

10 Q:  You've got 22 or 23 program directors.

11 A:  Right.  But not that many chairs because some of those

12     fellowships fall underneath the same.  Probably around

13     40, 45, 40 or 45, something like that.

14 Q:  Okay.  And in terms of the actual student members or

15     the resident members there's a total of four?

16 A:  Four are members, yes.

17 Q:  So less than ten percent of the GMEC is made up of

18     student representatives, or resident representatives;

19     is that right?

20 A:  Probably.  If I've got the numbers right here.

21 Q:  And do you know how many -- well, let me ask you this.

22     The GMEC meets every other month; is that right?

23 A:  Correct.

24 Q:  And do you know how many are required to be present to

25     have a quorum?

```
1      program directors are reviewed there.  There is also a
2      review of accreditation actions taken, approval of
3      plans for addressing citations.  There are many things
4      that are required by the ACGME for the meeting.  And we
5      also use that time for other things as well.
6      Information sharing that is useful to that body with
7      reports that are made by the Palmetto Health and
8      typically by the CMO and CAO, the dean of the medical
9      school and also from the VA, we have a VA
10     representative that makes reports typically to us.  The
11     residents council does a report each time and we look
12     at resident research.
13  Q: All right.
14  A: That's patient safety and quality.  Yeah.  That's in
15     there as well.  Every meeting.
16  Q: Now you said the Accreditation Council --
17  A: Uh-huh (affirmative response).
18  Q: -- requires certain things that the GMEC do.
19  A: Uh-huh (affirmative response).  Yeah.
20  Q: You're talking about the ACGME requires certain things;
21     right?
22  A: Yes.
23  Q: How does the ACGME require Palmetto Health do
24     something?
25  A: How do they require it?
```

Allen Court Reporting

```
 1   Q:   Yes.
 2   A:   There is a set of accreditation requirements for
 3        sponsoring institutions.  And when there is an
 4        accreditation site visit for the institution, the site
 5        visitors will review a set of minutes for the, for an
 6        entire twelve-month period to look at them and see if
 7        things have been documented that were required by the
 8        ACGME.
 9   Q:   Okay.  Now, to be an accredited institution through the
10        ACGME, there are certain standards that you as a
11        sponsoring institution have to meet; isn't that right?
12   A:   That's correct.
13   Q:   Okay.  And the ACGME publishes certain requirements
14        that are overall requirements that every residency
15        program in general has to meet to be accredited; right?
16   A:   The common program requirements?
17   Q:   Yes.
18   A:   There are common program requirements.  Yes.
19   Q:   And there are also program requirements that are
20        specific to each specialty; right?
21   A:   That's correct.
22   Q:   And the ACGME mandates that if you want to be an
23        accredited residency program in a certain specialty you
24        also have to meet the specific program requirements;
25        right?
```

```
 1   A:   Correct.
 2   Q:   And that's a part of being an accredited institution is
 3        you commit to meeting those accreditation requirements;
 4        right?
 5   A:   Yes.
 6   Q:   Is accreditation an important criteria or an important
 7        achievement to have to be a functioning Graduate
 8        Medical Education Program?
 9   A:   It's a necessity.
10   Q:   Well, what would it mean if Palmetto Health were not
11        accredited?
12   A:   If the sponsoring institution were not accredited?
13   Q:   Right.
14   A:   Then the residency programs would not be accredited.
15   Q:   Okay.
16   A:   They would lose accreditation.
17   Q:   And what if the residency programs, what impact would
18        it have on the residents if the residency programs lost
19        their accreditation?
20   A:   The institution, sponsoring institution would have to
21        find places for those residents to complete their
22        education.
23   Q:   If, for example, the Orthopedic Surgery Department lost
24        its accreditation at Palmetto Health USC School of
25        Medicine, could those residents who were in the program
```

Allen Court Reporting

```
 1        right?
 2   A:   Palmetto Health would not continue having a resident in
 3        a program if we didn't have an accredited program.  So
 4        there would be nowhere for that individual to continue
 5        training.
 6   Q:   Okay.  You've made a commitment to the residents to
 7        continue the accreditation through the ACGME; isn't
 8        that right?
 9   A:   All of our programs.
10             MS. THOMAS:  Object to the form of that question.
11   A:   But the decision on accreditation is not Palmetto
12        Health's decision.  It's the ACGME's decision.
13   BY MR. ROTHSTEIN:
14   Q:   That's right.  But you as the DIO and the entire
15        Graduate Medical Education Department at Palmetto
16        Health have made a commitment to the residents to
17        comply with the ACGME's standards on accreditation;
18        isn't that right?
19             MS. HELMS:  Objection to the form.
20             MS. THOMAS:  Object to the form.
21   A:   It's the only way to have a program.  So yes.
22   Q:   Okay.
23   (Plaintiff's Exhibit Number 2 was marked for identification
24   purposes.)
25   Q:   I show you Exhibit 2.
```

```
 1              MR. ROTHSTEIN:  And Kathy, or Kathryn, Exhibit 2
 2         is a page from the Palmetto Health Residency web site
 3         under the Graduate Medical Education Program.
 4    BY MR. ROTHSTEIN:
 5    Q:   Dr. Stephens, have you seen that document before?
 6              MS. THOMAS:  Does it have a Bates number, David?
 7              MR. ROTHSTEIN:  No.  I printed it off the web site
 8         two days or three days ago.
 9              MS. THOMAS:  So you have not produced it to any of
10         us before today?
11              MR. ROTHSTEIN:  It's Palmetto Health's document.
12         I mean, it's off the web site.  It's a public document.
13              MS. THOMAS:  I'm just going to, I'm going to put
14         an objection on the record that there's been a document
15         presented that's never been in discovery.  Thank you.
16    BY MR. ROTHSTEIN:
17    Q:   Have you ever seen this document before?
18    A:   Sure.
19    Q:   Okay.  And do you recognize that as a web page from the
20         Palmetto Health, palmettohealth.org's Graduate Medical
21         Education web site?
22    A:   Yes.
23    Q:   And do you see the Palmetto Health logo on the upper
24         left-hand corner?
25    A:   I do.
```

Allen Court Reporting

```
 1  Q:  And the University of South Carolina School of Medicine
 2      logo on the right-hand corner?
 3  A:  I do.
 4  Q:  And under the graphics at the top it has a link for
 5      Palmetto Health USC School of Medicine and contact us;
 6      right?
 7  A:  I see that.
 8  Q:  And then under Graduate Medical Education it says
 9      welcome to the Palmetto Health/University of South
10      Carolina School of Medicine Graduate Medical Education
11      Programs; right?
12  A:  Correct.
13  Q:  Okay.  Then it says Palmetto Health, in partnership
14      with the University of South Carolina School of
15      Medicine and other affiliated institutions --
16  A:  Uh-huh (affirmative response).
17  Q:  -- regards medical education, graduate medical
18      education, graduate dental education and research as an
19      integral part of its commitment to provide patient care
20      to all in need.  Do you agree with that statement?
21  A:  It's what we do.
22  Q:  And at least on the web site they use the term
23      partnership between Palmetto Health and the University
24      School of Medicine; right?
25  A:  That word is in it.
```

```
 1   Q:   Okay.  And then at the end of the second or I guess
 2        third paragraph of that web page it says, we further
 3        commit to conducting these programs in compliance with
 4        the Institutional and Program requirements of the
 5        Accreditation Council for Graduate Medical Education,
 6        its Residency Review Committees and the Commission on
 7        Dental Accreditation; right?
 8   A:   Yes.
 9   Q:   Okay.  And this language or this language on this web
10        site is basically part of the recruiting material that
11        you use to attract potential residents to the Graduate
12        Medical Education Program at Palmetto Health/USC School
13        of Medicine at least copyright 2015; right?
14   A:   It can be used by anybody but certainly candidates for
15        the residency programs would see this.
16   Q:   Do you know how long this language has been used at
17        Palmetto Health?
18   A:   Not really.  But some of this is absolutely things that
19        are required that a commitment statement be made by the
20        ACGME.  And some of it is linked to the Palmetto Health
21        mission statement as well.  So in some form or fashion
22        it's been around for a while.  I don't know how long.
23   Q:   All right.  Getting back to the GMEC, I mean, we
24        discussed that the GMEC meets every other month.  If
25        something comes, occurs before a regular GMEC meeting
```

```
1   Q:   And explain to me the general procedure for when the
2        executive -- is it executive committee or executive
3        subcommittee?  What's the proper term?
4   A:   I don't know.  Subcommittee I guess.
5   Q:   Okay.
6   A:   I think it's been called, before there were
7        subcommittees that were set up for the GMEC I think it
8        was just called committee.  So it may be called one in
9        one place and something different in another.
10  Q:   Okay.  What is the general procedure for the executive
11       subcommittee to take action with regard to a resident?
12       I guess we'll focus on some sort of either discipline,
13       academic remediation, suspension or similar action.
14  A:   If there's an issue that arises that needs attention
15       before the next meeting of the GMEC, then the
16       subcommittee would be the, the executive subcommittee
17       would be convened to address it.
18  Q:   How would that be brought to the attention of the
19       executive subcommittee?
20  A:   Typically it would be something that came from the
21       program director to my attention.
22  Q:   Okay.  And what would happen after the program director
23       brought it to your attention?
24  A:   The subcommittee, the executive subcommittee would be
25       convened to review it.
```

Allen Court Reporting

```
 1  Q:    Okay.  And what is involved in reviewing that matter?
 2              MS. HELMS:  Objection to the form of the question.
 3  A:    Looking at the information that's provided and making a
 4        temporary action decision.
 5  BY MR. ROTHSTEIN:
 6  Q:    Does the resident typically have an opportunity to
 7        appear before the executive subcommittee at that stage
 8        in the process?
 9  A:    No.
10  Q:    Is the resident typically even provided notice that the
11        program director is seeking interim action by the
12        executive subcommittee?
13  A:    I don't know.
14  Q:    Since you've been a member of the -- well, first of all
15        how long have you been a member of the executive
16        subcommittee?
17  A:    I guess since I became the DIO.  There have been some
18        changes that we've made as a result of ACGME
19        institutional accreditation requirement changes.  But I
20        don't recall exactly.
21  Q:    So at least four or five years?
22  A:    Yes.
23  Q:    Okay.  I thought you were on the executive subcommittee
24        when Dr. Lamoreaux was involved or I was involved in
25        Dr. Lamoreaux's case.
```

```
 1   A:   I know I was involved in discussions with that because
 2        of the role that I played but it was not the DIO role
 3        at that time.
 4   Q:   Weren't you on the executive subcommittee at that time?
 5   A:   I don't remember exactly.
 6   Q:   Is it possible that you've been on the executive
 7        subcommittee --
 8   A:   It's possible.
 9   Q:   -- longer than you've been the DIO?  Okay.
10   A:   I know I've been involved in discussions.  But official
11        subcommittee role, I just don't recall.
12   Q:   Since you've been a member of the executive
13        subcommittee, to your knowledge has the executive
14        subcommittee ever rejected a recommendation or a
15        request by a program director with regard to the
16        academic remediation, discipline, suspension, whatever,
17        treatment of a resident?
18            MS. HELMS:  Objection to the form of the question.
19   A:   I don't recall an instance.
20   BY MR. ROTHSTEIN:
21   Q:   Okay.  Now, after the executive subcommittee acts, that
22        decision becomes essentially the status quo until the
23        GMEC has an opportunity to meet and address the issue
24        on a permanent basis; is that right?
25   A:   Right.
```

```
 1          their decision would be in effect until the next GMEC
 2          meeting which could be over two months away?
 3               MS. HELMS:  Objection to the form.
 4  A:    It could.
 5  BY MR. ROTHSTEIN:
 6  Q:    As the DIO, one of your job responsibilities, I think
 7          you testified earlier is to ensure that the ACGME
 8          accreditation requirements are complied with; correct?
 9  A:    Correct.
10  Q:    And one of the requirements of the ACGME is that
11          residents are afforded due process in connection with
12          their residency; isn't that right?
13               MS. HELMS:  Objection to the form.
14  A:    The requirement is that there is a due process policy
15          and that the institution follows its due process
16          policy.
17  BY MR. ROTHSTEIN:
18  Q:    Okay.  I mean, is it fair to say that as the DIO you
19          are the, you would be the person that, in charge of
20          ensuring that the residents receive the due process
21          rights under the policy?
22  A:    Yes.  I would oversee that.
23  Q:    Okay.  And what is your understanding of what is
24          required for a resident to receive due process under
25          the Palmetto Health USC due process policy?
```

```
1   A:   There are several steps in the process.  So following
2        those steps is what would be considered to be involved
3        in that process.
4   Q:   Okay.  What does the term due process mean to you?
5   A:   Means that there is a, that it is, the information is
6        looked at and reviewed and that there is a review of
7        it, that it's done in a way that is spelled out in the
8        policy.
9   Q:   Okay.  Do you know what the underlying purpose of
10       having a due process policy is?
11  A:   The reason for having it?
12  Q:   Yes.
13  A:   To ensure that there is a review of what is going on.
14  Q:   Okay.  What's the basic underlying rationale for having
15       a review?
16            MS. HELMS:  Objection to the form of the question.
17  A:   Just to ensure that all the information is looked at.
18  BY MR. ROTHSTEIN:
19  Q:   Doesn't it come down to a matter of fairness?
20  A:   Uh-huh (affirmative response).  Sure.
21  Q:   And as the DIO, would it be fair to say that you're,
22       you're the, ultimately the guardian of the due process
23       rights of the residents at Palmetto Health and USC?
24  A:   If you want to use that term.  To ensure that it is
25       actually being done is what my responsibility is.  Yes.
```

1  Q:    Okay.  Can you explain to me the due process that is

2        afforded to a resident -- and let's I guess at the time

3        of Dr. Irani's termination.  So we're talking about the

4        2011-2012 academic year.  Explain to me at that time

5        what the due process rights or the process was for

6        residents at Palmetto Health/USC in connection with a

7        major decision affecting their academic progression?

8              MS. HELMS:  Objection to the form of the question.

9  BY MR. ROTHSTEIN:

10 Q:    And we're talking about things like academic

11       remediation, probation, suspension, non-promotion or

12       termination.

13 A:    The first thing is to review this with the program

14       director.  If the resident is not satisfied with that

15       decision or discussion, then the resident would review

16       it with the chair or director of education depending on

17       that situation.  If the resident is not satisfied then,

18       then the next step would be to come to the, I think the

19       next step is the DIO.  And if not satisfied with, I was

20       trying to remember, I don't recall off the top of my

21       head the order for the grievance, a grievance committee

22       would then come into play.  And then the grievance

23       committee would meet.  If the resident's not satisfied

24       with the decision of the grievance committee, then it

25       would come to the, I think that's when it comes to the

```
 1        DIO.  And the DIO would review it.  And then if the
 2        resident is not satisfied with that, it would go to the
 3        CEO to review.  And that would the final decision.
 4   Q:   Okay.
 5   A:   Roughly how it works.
 6   Q:   So the entire due process system at Palmetto Health and
 7        USC occurs after the decision has already been made
 8        with regard to that resident?  Is that a fair --
 9   A:   It's set up for any decision that's related to those
10        things that you talked about earlier.  So after a
11        decision is made that's when you would actually do
12        that.
13   Q:   Okay.  Let me ask you this.  In your entire 17 or so
14        years in the Palmetto Health system, can you recall an
15        incident where the CEO of Palmetto Health has ever
16        overturned a decision of the grievance committee?
17   A:   I don't know that, I'm trying to remember.  I don't
18        recall that that has happened.  I don't think there's
19        always been action by the CEO.
20   Q:   Okay.  And the CEO is the final sort of safeguard in
21        the due process process; right?
22   A:   During the time period you're talking about.  Yes.
23   Q:   Okay.  And at least to your memory the CEO has never
24        changed a decision after the grievance committee level?
25             MS. HELMS:  Objection to the form of the question.
```

Allen Court Reporting

```
 1   A:   I don't recall that happening.
 2   BY MR. ROTHSTEIN:
 3   Q:   Okay.  Can you recall in your entire history at
 4        Palmetto Health the grievance committee ever changing a
 5        decision of a resident that had appealed through the, a
 6        decision that had come to the grievance committee?
 7   A:   Yes.
 8   Q:   How many times has that occurred?
 9   A:   I don't recall.
10   Q:   Okay.  Has it occurred more than once?
11   A:   I don't know.  I don't recall.
12   Q:   Okay.  I'm aware of one incident that that's occurred
13        in 17 years that would have covered your history.  Are
14        you aware of more than one incident?
15            MS. HELMS:  Objection to the form of the question.
16   A:   I don't recall.  I do recall one incident.  I don't
17        recall whether there were others off the top of my
18        head.
19   BY MR. ROTHSTEIN:
20   Q:   Okay.  And the incident that I know about occurred
21        after Dr. Irani filed the lawsuit in this, the lawsuit
22        that we're here about today; right?
23   A:   The one that I recall?
24   Q:   Yes.
25   A:   Would have occurred after his, after this period of
```

Allen Court Reporting

Page 49

```
1       time you're discussing.
2   Q:  Okay.  So can you recall --
3   A:  You know, I do think there was one other one.  In fact,
4       I'm, yes, I do recall a second one but I don't recall
5       exactly the period when it was.
6   Q:  Can you tell me anything about that case?
7   A:  I think it was prior to this time period that you're
8       talking about.
9   Q:  Can you tell me anything about that particular case?
10  A:  My recollection on that is it was not a termination
11      grievance but rather something else that was being
12      grieved.
13  Q:  Do you recall what department it was in?
14  A:  No.  I can't remember.
15  Q:  Do you recall what decade it would have been in?
16  A:  It would have been over the last decade.
17  Q:  So sometime in the 2010 time frame?  I mean, after
18      2010?
19  A:  I don't recall, David.
20  Q:  Okay.  Can you recall a time -- I think you testified
21      earlier that you can't recall ever rejecting a program
22      director's request at the executive subcommittee level.
23      Can you recall a time where the full GMEC committee
24      rejected what the subcommittee had done?  Do you
25      understand my question?
```

Allen Court Reporting

```
1   A:   I do but --

2   Q:   So the subcommittee acted on something on an interim

3        basis.  Can you recall a time where the GMEC rejected

4        that action?

5   A:   I do recall the GMEC itself asking for further review

6        for also other types of things as opposed to what was

7        recommended.

8   Q:   Should a resident at Palmetto Health ever be

9        discouraged from pursuing a grievance?

10            MS. HELMS:  Objection to the form of the question.

11  A:   I'm not sure I understand what you're asking.

12  BY MR. ROTHSTEIN:

13  Q:   Do you believe it would be appropriate for an attending

14       physician to discourage a resident from using the

15       grievance process?

16  A:   It is there for use for all residents.  So I don't know

17       why, I don't have any knowledge of anybody recommending

18       a resident not use any policy.

19  Q:   Okay.  But my question is do you think it would be

20       inappropriate for an attending to try to discourage a

21       resident --

22  A:   Sure.

23  Q:   -- from using the grievance process?

24  A:   Yes.

25  Q:   If it was ever brought to your attention, or has it
```

```
 1   Q:   Okay.  Well, let's say in the 17 years you've been with

 2        the program have there been on average less than one a

 3        year?

 4   A:   I don't recall that there was more than that.

 5   Q:   Okay.  How many grievance hearings are you aware of

 6        involving residents either for an academic remediation,

 7        suspension or termination have occurred at Palmetto

 8        Health or USC School of Medicine within the past ten

 9        years?

10   A:   It's not a common occurrence.  One or two a year at the

11        most.

12   Q:   The next thing I want to do, this is a little

13        cumbersome.  I have a stack of documents that were

14        produced in discovery.  I don't know the best way to do

15        it.  But the starting Bates number is Palmetto Health

16        000585.  And I've just got a series of documents that I

17        don't know where they end.  And I'm going to hand you

18        this stack of documents.  The ones I've got go through

19        Palmetto Health 001046.  And that, it looks like a

20        logical break in a group of documents.  And I want to

21        hand you this packet; okay?

22   A:   Okay.

23   Q:   I know it's kind of a pretty hefty, over a thousand

24        pages, or about a thousand pages of documents.  But do

25        you see the first page of that document, it has a, sort
```

1    of looks like a title page.  And it says Resident --

2    I'm sorry.  You have to take off my sticky note.

3    Resident Physician Manual?

4  A:  Uh-huh (affirmative response).

5  Q:  Department of Medical Education, 2011-2012, Palmetto

6    Health.  Do you see that?

7  A:  I do.

8  Q:  Does that appear to be the resident manual that was

9    issued to Dr. Irani's resident class for the academic

10   year in which he was terminated?

11 A:  When was he terminated?

12 Q:  He was terminated in the spring of 2012.

13 A:  Then this does appear to be that.

14 Q:  Okay.  And can you tell me in that stack of documents

15   what is actually included in the, quote, resident

16   manual?

17 A:  Well, you've given me lots of pages.

18 Q:  Yeah.

19 A:  So that's impossible to tell without taking time to go

20   through the whole thing to see what's in here or not.

21 Q:  Well, it may be helpful if you look at page 591,

22   there's a, looks like a table of contents.

23 A:  Right.

24 Q:  And I don't know if that can sort of help narrow it

25   down.  But I'm trying to get an idea of exactly what

```
 1         constitutes the Palmetto Health Resident Physician
 2         Manual.
 3    A:   Okay.  The manual this time had different sections.
 4         And the first section was administrative and general
 5         information.  The second section is typically the GME
 6         policies.  And let's see.  That would include policies
 7         like you're talking about with the due process policy.
 8         Then there's typically a section that has other
 9         Palmetto Health patient policies that residents would
10         commonly need to be familiar with.  And I think there's
11         a section also on Palmetto Health employee policies
12         that the residents would also need to be familiar with.
13         I think it's those four sections.
14    Q:   Okay.
15    A:   To the best of my recollection if that's what you've
16         got in here.
17    Q:   Just flipping through, does that appear to include, I
18         mean, I'm not going to hold you to that's got
19         everything in it.
20    A:   Thank you.
21    Q:   But does that appear, I mean, the documents that I've
22         handed to you, does that appear to be the Resident
23         Physician Manual?
24              MS. HELMS:  Object to the form.
25    A:   I don't know.  Let's see.  Okay.  Here's Section B.
```

1  BY MR. ROTHSTEIN:

2  Q:  And when you say here, tell me what pages you're

3      talking about when you say Section B.

4  A:  I saw one that definitely looked like Section B.  Let's

5      see here.  These things have changed from time to time

6      to be organized differently.  Okay.  On page 635,

7      that's section B.  And those would be the GME and

8      Residency, or Resident Policies.  All right.  And then

9      on 814 it's the start of Section C which is the

10     patient-related policies residents need to be familiar

11     with.  So so far it's looking like a manual would have

12     looked.  And it looks like some of the other employee

13     things were probably included in the Section B but I'm

14     not sure.

15  Q:  Okay.

16  A:  They were somewhere in here.  Like I say it does get

17     reorganized at times to make it easier to work with.

18  Q:  Okay.

19  A:  But that's what it looks like.

20  Q:  If you will flip back to the, you said it looks like --

21  A:  It appears to be.

22  Q:  -- it includes the handbook and maybe some additional

23     HR policies.  Is that a fair statement?

24  A:  This one looks like some of those HR policies that may

25     be separate in other years are included in here in the

1     other sections.

2  Q:  Okay.  And what would, now the Resident Physician

3     Manual is that something that is made available to the

4     residents every year?

5  A:  Yes.

6  Q:  And how is that sort of either transmitted or

7     communicated to the residents?

8  A:  It's information that's shared along with the agreement

9     of appointment and also at orientation.

10 Q:  Okay.

11 A:  And I don't recall when, I don't think we give hard

12    copies any more.  I think it's electronic access.  But

13    I don't recall when that happened.  We did have hard

14    copies handed out for a long time.  But I think we

15    changed that.

16 Q:  Okay.  What would you consider to be the first page of

17    the resident manual?

18 A:  This one.

19 Q:  And when you say this one read the --

20 A:  585.

21 Q:  585?

22 A:  It's the resident manual that includes a lot of

23    information.

24 Q:  Okay.  Do residents actually sign an acknowledgement

25    form for receipt of the Resident Physician Manual?

| 1 | A: | I think that is part of the process. |
|---|---|---|
| 2 | Q: | Okay.  Are the residents at that time 2012, 2011, 2012 |
| 3 | | were they considered W-2 employees of Palmetto Health? |
| 4 | A: | You mean did they get paid by Palmetto Health and get a |
| 5 | | W-2? |
| 6 | Q: | Yes. |
| 7 | A: | Yes. |
| 8 | Q: | Okay.  And if you could turn to page 587.  If you will |
| 9 | | look at the Bates number.  I think it's a couple of |
| 10 | | pages in. |
| 11 | A: | Uh-huh (affirmative response). |
| 12 | Q: | That looks like sort of an introductory page describing |
| 13 | | the resident manual. |
| 14 | A: | I see. |
| 15 | Q: | And do you see there's a quote there, it says in the |
| 16 | | second paragraph, it says some departments may have |
| 17 | | supplemental policy manuals providing additional |
| 18 | | guidance.  Your specific department will provide these |
| 19 | | for you. |
| 20 | A: | I see that. |
| 21 | Q: | Have you ever seen the specific departmental policy or |
| 22 | | manual for the Orthopedic Surgery Department? |
| 23 | A: | I see manuals for certain departments but I don't |
| 24 | | recall specifically which ones. |
| 25 | Q: | So with regard, you've never, you can't recall sitting |

Allen Court Reporting

| | | |
|---|---|---|
| 1 | | here today whether you've ever seen the Orthopedic |
| 2 | | Surgery Residency Program Handbook? |
| 3 | A: | I think they have one.  I know they have policies that |
| 4 | | are reviewed by the GMEC as are policies from all of |
| 5 | | the departments.  The specific form of a policy manual |
| 6 | | for Orthopedics I can't say. |
| 7 | Q: | Okay.  On that page, 587, do you see a disclaimer in |
| 8 | | underlined capital letters on that page anywhere? |
| 9 | A: | A disclaimer? |
| 10 | Q: | Disclaimer. |
| 11 | A: | In underlined capital letters? |
| 12 | Q: | Yes. |
| 13 | A: | No.  I see a disclaimer but I don't see anything in |
| 14 | | underlined capital letters. |
| 15 | Q: | Okay.  Where is the disclaimer? |
| 16 | A: | At the bottom of it underneath the line. |
| 17 | Q: | Okay.  And that's in the footnote? |
| 18 | A: | Yeah. |
| 19 | Q: | Is the type in that footnote a smaller font than the |
| 20 | | rest of the type? |
| 21 | A: | It is a little smaller.  Yes. |
| 22 | Q: | You don't have any trouble discerning that there are no |
| 23 | | underlined or capital letters in the disclaimer? |
| 24 | A: | I don't see any. |
| 25 | Q: | Okay.  If you will turn to page 602, that page is |

```
 1        entitled Institutional Commitment to Graduate Medical
 2        Education.
 3   A:   Yes.
 4   Q:   And that appears to be verbatim of what we looked at on
 5        the web site that was Exhibit 2; right?
 6   A:   It does look similar, yes.
 7   Q:   Okay.  And you see the last sentence there, it says, we
 8        further commit conducting these programs in compliance
 9        with the institutional and program requirements of the
10        Accreditation Counsel for Graduate Medical Education,
11        its residency review committees and the Commission on
12        Dental Accreditation; right?
13   A:   Yes.
14   Q:   And then your signature is at the bottom there along
15        with the Chairman of the Board of Directors, Jerome
16        Odom, Ph.D., the CEO, Charles Beaman and Dr. Jim
17        Raymond; right?
18   A:   Correct.
19   Q:   Let me get that back from you to clear up a little
20        space.  And if you need to take a break, let me know.
21             MS. HELMS:  That sounds good to me actually.
22             MR. ROTHSTEIN:  Okay.  All right.  Let's take a
23        brief break.
24                  (Break - 10:32 a.m.-10:39 a.m.)
25   BY MR. ROTHSTEIN:
```

```
 1   A:    Probably.

 2               MS. HELMS:  Objection.

 3   A:    I don't have a calendar.

 4   BY MR. ROTHSTEIN:

 5   Q:    Okay.  And it does not appear that Dr. Irani was

 6         allowed, or he was not present at the GMEC meeting?

 7   A:    No.

 8   Q:    Was he allowed or was he notified that the GMEC meeting

 9         was occurring?

10               MS. HELMS:  Objection to the form.

11   A:    I don't know.

12   BY MR. ROTHSTEIN:

13   Q:    Okay.  Do you know if he was invited to the GMEC

14         meeting?

15   A:    He would not have been.

16   Q:    Was he allowed to submit any information to the GMEC?

17   A:    The policy doesn't include that.

18   Q:    Okay.  So he was not allowed to submit any letter or

19         evidence to the GMEC before they made their decision?

20   A:    There was nothing that was submitted from, he was not

21         there at the meeting.

22   Q:    Okay.  Was anyone present at the GMEC meeting to

23         advocate Dr. Irani's side of the story?

24   A:    To advocate?

25   Q:    Yes.  For Dr. Irani's side of the story.
```

1  A:    The program director brought forward the information.

2        Dr. Irani was not there.

3  Q:    Okay.  And so the program director at this October 11th

4        2011 GMEC meeting in the executive session presented

5        his recommendation for putting Dr. Irani on level two

6        remediation, sort of made his case for why Dr. Irani

7        should be placed on level two remediation.  And there

8        was a, I guess a Roberts Rules of Order kind of, a

9        motion was made and someone seconded and there was a

10       vote.  Is that how it occurred?

11             MS. HELMS:  Objection to the form.

12  A:   Yes.

13  BY MR. ROTHSTEIN:

14  Q:   Was there any discussion about the recommendation?

15  A:   I don't recall the discussion, what it was and how long

16       it was and what questions were asked.

17  Q:   Are these three items that were on the executive

18       session agenda for the resident issues, are those

19       typically routine things that are handled fairly

20       quickly?

21  A:   It depends on the issue.

22  Q:   Do you recall any debate about Dr. Irani at that

23       meeting?

24  A:   I don't remember.

25  Q:   Okay.  And I guess usually debate has two sides of the

```
 1          story.  There's the pro and the con; right?
 2   A:     Uh-huh (affirmative response).
 3   Q:     And in Dr. Irani's situation, Dr. Koon was advocating
 4          his position, the pro for the level two remediation;
 5          right?
 6               MS. HELMS:  Objection to the form.
 7   A:     I don't remember the discussion at all and how much
 8          discussion there was, what questions were asked or who
 9          asked them.  But the function is for the program
10          director to provide the information related to
11          residents who need to have some improvement in any of
12          their competency areas.  And that's what happened here.
13   BY MR. ROTHSTEIN:
14   Q:     Okay.  And my point is that there's no one to offer the
15          resident's rebuttal or response at the GMEC meeting.
16   A:     But that's not the function of this part of the
17          process.
18   Q:     Okay.  And that's fair enough.  But the way the process
19          is set up, the decision to, the official decision of
20          the GMEC to make or to take action against a resident
21          is based entirely on one side of the story; isn't that
22          right?
23               MS. HELMS:  Objection to form.
24   A:     That is not the way it's put together.
25   BY MR. ROTHSTEIN:
```

1   Q:   Okay.  Why is that statement not accurate?

2   A:   You said it's taken based entirely on the program

3        director and not the resident.  There are, there is

4        information, there are things that happened before the

5        program director would bring this forward to the GMEC.

6        And in this case you saw there had been verbal

7        counseling, other things that had occurred before it

8        got to the level of coming to the GMEC.  So the

9        resident did have the opportunity to address those

10       things before it got to the GMEC.

11  Q:   Well --

12  A:   Maybe that's not what you were asking me.

13  Q:   No.  My question is the person who's conveying

14       information to the GMEC to make the official decision

15       is Dr. Koon, the program director?

16  A:   Who has the responsibility for this.  Yes.

17  Q:   Okay.  And he, for lack of a better word, he's the

18       filter of that.  I mean, he's the sole source of what

19       information is conveyed to the GMEC during that

20       executive session meeting?

21       MS. HELMS:  Objection to the form.

22  A:   He's the one who presents it.  Yes.

23  BY MR. ROTHSTEIN:

24  Q:   Okay.  And so it's entirely within Dr. Koon's

25       discretion as to what information gets presented to the

```
 1        GMEC in support of that recommendation?
 2   A:   He's the one who makes the presentation.
 3   Q:   So there's no one to make the counter-point or the
 4        counter-arguments or rebuttal for Dr. Irani's position
 5        at that meeting; right?
 6   A:   That's not the function of this part of the process.
 7   Q:   And that's fine.  So the answer to my question would be
 8        yes, there's no one at the GMEC meeting to --
 9   A:   That's correct.
10   Q:   -- to provide Dr. Irani's side of the story?
11             MS. HELMS:  Objection to the form of the question.
12   BY MR. ROTHSTEIN:
13   Q:   Okay.  So his voice gets heard later in the process in
14        the grievance system?
15             MS. HELMS:  Objection to the form of the question.
16   A:   His voice gets heard earlier in the process.  And if
17        improvement doesn't occur such that he is removed from
18        the remediation plan, then it could occur later on in
19        due process policy as you stated.
20   BY MR. ROTHSTEIN:
21   Q:   Okay.  But his voice, in terms of the GMEC hearing, the
22        GMEC never hears his voice other than what Dr. Koon or
23        what of Dr. Irani's voice Dr. Koon lets the GMEC hear?
24             MS. HELMS:  Objection to the form of the question.
25   A:   No.  It's not set up for that to occur.
```

3:14-cv-03577-CMC     Date Filed 01/26/16     Entry Number 149-1     Page 43 of 87

```
1   Q:   And this is the GMEC meeting in which Dr. Irani's
2        termination was officially approved by the GMEC; right?
3   A:   That's correct.
4   Q:   Now, the part of the resident manual that we looked at
5        before includes a sample standard resident contract.
6        Are you familiar with that?
7   A:   The agreement of appointment.  Yes.
8   Q:   And that agreement of appointment is the same across
9        all of the residency programs at Palmetto Health; isn't
10       that right?
11  A:   The only difference is the PGY has graduate year, which
12       program and the compensation level based on that
13       post-graduate year.
14  Q:   Okay.  But those are blanks that are filled in --
15  A:   The rest of it is standard.
16  Q:   But the rest of it is standard?
17  A:   Yes.
18  Q:   And you mentioned earlier there were some preliminary
19       positions as opposed to the categorical positions.  But
20       those preliminary positions would use the same standard
21       residency agreement of appointment?
22  A:   Yes.
23  (Plaintiff's Exhibit Number 5 was marked for identification
24  purposes.)
25  Q:   Show you Exhibit 5.  Exhibit 5 has Palmetto Health
```

Allen Court Reporting

```
 1  Q:  To your knowledge had Dr. Irani ever been placed on
 2      level one remediation during his tenure in the Palmetto
 3      Health USC Orthopedic Surgery Residency Program?
 4  A:  Well, let's look at the notes and see because I know
 5      there were some different levels discussed.  All right.
 6      That was level two.  I don't see anything in these
 7      minutes related to level one.  And you will note level
 8      one does not require GMEC approval.
 9  Q:  Okay.
10  A:  So I just, I don't recall.
11  Q:  And I know it doesn't require GMEC approval.  But it
12      does require that you be informed as the DIO --
13  A:  Uh-huh (affirmative response).
14  Q:  -- that level one remediation is being taken?
15  A:  Correct.
16  Q:  Do you recall ever being informed that Dr. Irani was
17      being placed on level one remediation?
18  A:  I don't recall the specifics of what level.  I know
19      there was counseling.  I know there were different
20      remediation levels.  But it's been five years.  And I
21      do not recall specifically.
22  Q:  And I've looked through the records that Palmetto
23      Health and USC have provided to me several different
24      times.  And I have not seen any record of level one
25      remediation for Dr. Irani.  Do you have any reason to
```

1      Dr. Koon placing or recommending that Dr. Irani be
2      placed on level two remediation?
3  A:  I recall seeing this Memorandum of Record.  I don't
4      recall exactly the e-mails and dates that I received
5      it.
6  Q:  Okay.  But looking at this document Exhibit 6, does
7      that refresh your memory about when you would have
8      received the document?
9  A:  Well, obviously this e-mail came from the program
10      coordinator to me with the information.
11  Q:  Okay.
12  (Plaintiff's Exhibit Number 7 was marked for identification
13  purposes.)
14  Q:  Show you Exhibit 7.
15  A:  Okay.
16  Q:  Exhibit 7 is Bates number Palmetto Health 1944.
17  A:  Uh-huh (affirmative response).
18  Q:  And this looks to be your response later that evening
19      about almost five o'clock that day.  You're responding
20      to David Koon and Michelle Wehunt.  It says I will take
21      to GMEC executive committee for temporary action.   In
22      meantime I would like to see a more specific
23      remediation plan that spells out the outcomes expected
24      and how to measure that he has achieved the level
25      expected.  I have some examples that we expect to

| | |
|---|---|
| 1 | recommend for use in the next version of the GMEC |
| 2 | policy, or the GME policy on remediation and will get |
| 3 | some examples to you for consideration for this plan. |
| 4 | A: Uh-huh (affirmative response). |
| 5 | Q: Okay.  Did Dr. Koon ever follow up on your |
| 6 | recommendation to create a more specific remediation |
| 7 | plan? |
| 8 | A: I know there was a more specific remediation plan done, |
| 9 | whether it was exactly after this was done or what. |
| 10 | But using the template and format that I was |
| 11 | referencing here, that was done at some point. |
| 12 | Specifically when, I can't recall. |
| 13 | Q: Okay.  After you received Exhibit 6, did you have |
| 14 | discussion with Dr. Koon or did you do anything in |
| 15 | terms of reviewing this matter other than reviewing the |
| 16 | Memorandum of Record before you wrote Exhibit 7? |
| 17 | A: Before I did this e-mail? |
| 18 | Q: Yes. |
| 19 | A: I don't think so.  I don't recall. |
| 20 | Q: Okay.  And what was your, and when you said, I will |
| 21 | take to GMEC Executive Committee for temporary action, |
| 22 | what was your intent at that time with regard to the |
| 23 | executive committee? |
| 24 | A: For this, this was for his remediation plan to put him |
| 25 | on remediation level two for temporary action before |

```
 1        the next GMEC meeting.
 2   Q:   So based on Dr. Koon's e-mail you were going to
 3        recommend that the executive committee approve the
 4        recommendation and put Dr. Irani on level two
 5        remediation?
 6   A:   Take action on it, yes.
 7   Q:   Yes.
 8   A:   Review it and take action.
 9   Q:   Okay.
10   A:   Temporary action.
11   Q:   Okay.  And did that in fact happen?
12   A:   I think it did.
13   Q:   Okay.
14   A:   I don't have any reason to believe it didn't.
15   Q:   Do you know --
16   A:   Exactly the date, I can't recall when it would have
17        occurred.
18   Q:   Do you know what specific event prompted Exhibit 6, the
19        level two remediation?
20   A:   I don't recall specifically what event.  There were
21        several things noted in here as areas for improvement.
22   Q:   Did you ever talk to anybody other than Dr. Koon about
23        this matter?
24   A:   I know there were conversations, follow-up information.
25        But I don't recall who and how many of them and when
```

```
 1        they occurred.
 2   Q:   Okay.
 3   (Plaintiff's Exhibit Number 8 was marked for identification
 4   purposes.)
 5   BY MR. ROTHSTEIN:
 6   Q:   Show you Exhibit 8.   Exhibit 8 is Bates number 1945 --
 7   A:   Uh-huh (affirmative response).
 8   Q:   -- and 1946.   Okay.   This is your e-mail three minutes
 9        or so after Exhibit 7 forwarding Dr. Koon's
10        recommendations to Jim Raymond and Dean Hoppmann --
11   A:   Uh-huh (affirmative response).
12   Q:   -- as the other two members of the executive committee
13        of the GMEC?
14   A:   Uh-huh (affirmative response).   I do see that.
15   Q:   And you're asking or requesting that the three of you
16        all as the executive committee approve the action as
17        requested by Dr. Koon the program director with regard
18        to Dr. Irani; right?
19   A:   And I asked for approval or disapproval and any
20        questions.   Yes.
21   (Plaintiff's Exhibit Number 9 was marked for identification
22   purposes.)
23   Q:   Show you Exhibit 9.
24        MS. THOMAS:   David, can you tell me those Bates
25        numbers?
```

| | |
|---|---|
| 1 | Q: All right. What else? Other than meeting with him and |
| 2 | talking with him, what did you do to process his |
| 3 | grievance? |
| 4 | A: It has been four years. I don't remember the details |
| 5 | of exactly what happened except that we followed the |
| 6 | grievance process. I did meet with him. I did talk |
| 7 | with other people. I did look at documents that were |
| 8 | provided. |
| 9 | Q: Okay. You don't recall who you spoke with? |
| 10 | A: No. |
| 11 | Q: Do you recall speaking with any of his co-residents? |
| 12 | A: I don't recall. |
| 13 | Q: Do you recall speaking with Dr. Iaquinto? |
| 14 | A: Dr. who? |
| 15 | Q: Iaquinto. |
| 16 | A: I don't recall that I did speak with him. |
| 17 | Q: Have you seen Dr. Iaquinto's statement that he never |
| 18 | spoke with you about the patient encounter that was |
| 19 | referenced? |
| 20 | A: I don't recall. |
| 21 | Q: Okay. Would you dispute Dr. Iaquinto's statement that |
| 22 | he never spoke with you about this particular patient? |
| 23 | A: I don't have a reason to because I don't remember |
| 24 | meeting with him myself. |
| 25 | Q: Okay. Do you recall what documents you reviewed? |

```
 1  A:   I don't.

 2  Q:   Did you speak with any patients?

 3  A:   I did not speak with a patient.

 4  Q:   Did you speak with any family members of any patients?

 5  A:   I don't.  No, I did not.

 6  Q:   Did you speak with any nurses?

 7  A:   I may have.

 8            MS. HELMS:  Objection to the form.

 9  A:   I don't recall.

10  BY MR. ROTHSTEIN:

11  Q:   Did you keep any records of any discussions you had in

12       the grievance process?  Notes or memos?

13  A:   Any copies of anything that I had you would already

14       have a copy of.

15  Q:   Okay.

16  A:   I don't recall specifically what notes or documents I

17       kept or made.

18  Q:   Was that your, I mean, when you're involved in the

19       grievance process as the DIO is it your standard

20       practice to keep notes or records of things that you do

21       or, you know, people you interview or contact as part

22       of the grievance process?

23  A:   That would be the expectation.

24  Q:   Okay.  Has that always been your practice as the DIO?

25  A:   To the best of my ability.
```

1    Q:    Do you recall ever reviewing any of Dr. Irani's

2          evaluations?

3    A:    I look at evaluations of the program annually.  I also

4          look at some resident evaluations.  Maybe -- I don't

5          remember.  I just don't remember.  I don't typically

6          look at the level of detail as a routine unless there's

7          an issue that needs to be addressed.

8    Q:    Do you recall ever speaking with Dr. Eady about Dr.

9          Irani?

10   A:    I don't recall that I did.  No.  He was not still, at

11         this point he was not with the residency program.  So

12         no, I don't think I would have.

13   Q:    Do you recall receiving any letters of support for Dr.

14         Irani around that time from any staff members?

15   A:    I don't recall.  But it sounds vaguely familiar.

16   (Plaintiff's Exhibit Number 11 was marked for identification

17   purposes.)

18   Q:    Show you Exhibit 11.

19   A:    Okay.

20             MS. THOMAS:  Can you identify that, David?

21             MR. ROTHSTEIN:  Bates number Palmetto Health 1973.

22   BY MR. ROTHSTEIN:

23   Q:    Dr. Stephens, have you ever seen that document before?

24   A:    It looks familiar now that I'm reviewing it.

25   Q:    Did you ever speak with Meagan Blizzard?

1  A:   I don't think so.

2  Q:   Did you ever follow up on this e-mail from Meagan

3       Blizzard?

4  A:   I don't think so.  Do you see my response to her?

5  Q:   Well, other than the e-mail response that says thank

6       you for sharing information, did you take her up on

7       her, when she says many nurses agree with me when they

8       say Dr. Irani is great to work with?

9  A:   Uh-huh (affirmative response).

10 Q:   Did you ever follow up with the other nurses who had

11      worked with Dr. Irani?

12 A:   I did not follow up with Meagan Blizzard or whoever

13      else she had on here.

14 Q:   Do you agree that Meagan Blizzard's e-mail account of

15      Dr. Irani's compassion and care for patients is

16      different than the report from the emergency department

17      nurses?

18           MS. HELMS:  Objection to the form.

19 A:   It definitely is different.

20 BY MR. ROTHSTEIN:

21 Q:   Okay.

22 A:   That is the question.

23 Q:   Did you see any need to follow up further to see why

24      there was a discrepancy between Dr., I mean, Nurse

25      Blizzard's account of his behavior or his compassion

```
 1        there is no action requested in this.  It's an update.
 2        So what was the question?
 3   Q:   I just asked if you recalled reviewing this e-mail from
 4        Dr. Irani.
 5   A:   There were so many different e-mails.  It doesn't look
 6        familiar or unfamiliar.
 7   Q:   Okay.  You see in the second to last paragraph on
 8        Exhibit 12 Dr. Irani's, at least it appears to be
 9        indicating that since the process has begun it appears
10        that everything is now back on track.  At our last
11        review on October 3rd it was mentioned that should I
12        wish to continue the grievance process it would strain
13        my relationship with the chairman and program director.
14        Accordingly, since everything is going according to
15        schedule and I was jeopardizing my relationship with my
16        attendings, I suspended the grievance process based on
17        their urging.
18   A:   Interesting.
19   Q:   Do you recall being notified by Dr. Irani that he had
20        been urged by his attendings or by Dr. Koon and
21        Dr. Walsh to suspend the grievance process?
22   A:   I don't recall that.
23   Q:   While Dr. Irani was on, or during the period of his
24        level two remediation, do you recall him meeting with
25        you to request two days of vacation?
```

```
 1         you were not working at that time.
 2  A:    It's not the norm.
 3  Q:    Okay.  So the next morning you come in.  And it looks
 4         like you responded to Dr. Koon's e-mail about 9:38 in
 5         the morning stating, David -- that's your, Exhibit 13
 6         is your response to Dr. Koon's e-mail; is that right?
 7  A:    Appears to be.
 8              MS. THOMAS:  Object to the form.
 9  BY MR. ROTHSTEIN:
10  Q:    Would you have done anything between when you received
11         Dr. Koon's e-mail and the response --
12  A:    Would I have done anything?
13  Q:    -- in terms of any independent investigation?
14  A:    No.
15  Q:    I mean, did you you follow up on the Memorandum of
16         Record in any way?
17  A:    No.
18  Q:    So Exhibit 13, your response you state, David, when you
19         meet with Dr. Irani next week be sure to approach these
20         deficiencies in terms of specific examples of what is
21         not acceptable and expectations.  From what you've told
22         me and my own unscientific assessment it appears that
23         lack of humility and maturity are underlying issues
24         with him.  Let me know if you need further assistance
25         in terms of outside evaluation, et cetera.  So I mean,
```

```
 1        it's fair to say that your sort of impression of Dr.
 2        Irani at that time was that he lacks humility and
 3        maturity?
 4   A:   Yeah.  That's what I said.
 5   Q:   Okay.  And what is that based on?
 6   A:   The information with communication with him, with
 7        communication with others about what had occurred and
 8        the discussion about lack of insight.
 9   Q:   And the only people you can remember having discussions
10        about Dr. Irani with is Dr. Koon?
11             MS. HELMS:   Objection to the form.
12   BY MR. ROTHSTEIN:
13   Q:   I mean, who else can you recall having discussions
14        about Dr. Irani?  Or who else can you recall having
15        discussions with about Dr. Irani at that time besides
16        Dr. Koon?
17   A:   There were discussions that included the GMEC,
18        Dr. Walsh, Dr. Koon.  I don't recall exactly who.  I
19        think probably Diane Savage who was in the ED or
20        Allison Tourney.  I don't recall.  It's been too long
21        ago.  And I don't recall who I may have talked to about
22        all of these different things that came up.
23   Q:   Okay.  So the names you can recall at this point are
24        possibly Walsh, Koon, Savage and Tourney?
25   A:   Possibly.
```

1    Did you meet with any other people?

2  A:  I don't know if I had other meetings or not or just

3      conversations.

4  Q:  Okay.  Did you ever talk to Dr. Nathe?

5  A:  I don't recall.

6  Q:  Do you recall Dr. Koon, I mean, I'm sorry, Dr. Irani

7      complaining that no one had ever asked for his side of

8      the story with regard to trauma patient 375?

9  A:  I think I remember seeing that in one of the documents.

10  Q:  Do you recall Dr. Irani stating that Palmetto Health

11      didn't follow its own policy regarding the

12      investigation of trauma patient 375?

13  A:  I don't remember that.

14  Q:  Do you recall Dr. Irani stating that he felt like he

15      was being singled out?

16  A:  That does sound vaguely familiar.

17  Q:  Do you ever recall Dr. Irani complaining to you that he

18      felt like he was being treated differently because of

19      his cultural background?

20  A:  Cultural background?

21  Q:  Yes.

22  A:  I don't remember.

23  Q:  Okay.  Do you ever recall Dr. Irani complaining that

24      Dr. Koon would call him names?

25  A:  Oh, yes.  I do recall that.

1  Q:   Okay.  Tell me the context that you can recall that

2       coming up.

3  A:   Something about when he returned from being gone for a

4       week or two, I don't recall if it was vacation,

5       education or what the reason was, but he was gone and

6       came back into the program with facial hair.  And

7       Dr. Koon said, you look like Achmed the Terrorist.  And

8       Dr. Irani indicated later at some point that he took

9       offense to that and felt that it was offensive to

10      compare him to that as though he was being compared as

11      a terrorist.  I also asked Dr. Koon about it.  And his

12      intent he said was that it was the humorous character

13      that -- what's the name of that comedian who has that

14      puppet?  I don't remember his name.  You probably know

15      what I'm talking about.  But he looked like him.

16 Q:   Okay.

17 A:   So that's probably what he was referring to.

18 Q:   Do you think that was an appropriate comment for

19      Dr. Koon to make?

20 A:   I don't know that it was appropriate.  I wouldn't have

21      made it necessarily.  I don't know the context and what

22      else was said in that, at that point.

23 Q:   Do you think that comment that Dr. Koon said Dr. Irani

24      looked like Achmed the Terrorist was consistent with

25      the Palmetto Health anti-harassment policy?

```
1   A:   I don't know.  I don't know.  I know Dr. Irani from
2        what he said later did not like those comments.
3   Q:   Okay.  And you discussed with Dr. Koon at some point
4        the fact that Dr. Irani had complained to you about it?
5   A:   I don't recall who he complained to.  But I did ask the
6        question about it because I think there was something
7        about multiple issues.  And that was the only thing
8        that Dr. Koon recalled.
9   Q:   Okay.  Do you recall when that occurred that you had
10       this conversation with Dr. Koon?
11  A:   I don't know.
12  Q:   Was it in the January 5th meeting?
13  A:   I don't think, it was not in a meeting.
14  Q:   Was it before Dr. Irani was terminated?
15  A:   I don't know when it was.  It was a hallway
16       conversation after another meeting when I asked him
17       about it.  But I don't remember what meeting it was or
18       exactly when it was.
19  Q:   I'm going to show you a couple of pages.  Again, this
20       is from that stack of documents we looked at --
21  A:   Uh-huh (affirmative response).
22  Q:   -- starting at Palmetto Health 585.
23  A:   Uh-huh (affirmative response).
24  Q:   And if you will be kind enough to read the two pages on
25       the bottom for me in the record so Kathryn Thomas can
```

```
1   A:   I don't recall whether he told me that or I saw it in
2        documents later.
3   Q:   Did you ever do anything to follow up with anybody
4        about those comments who might have overheard them or
5        the context in which they were spoken?
6   A:   No.  I asked Dr. Koon about it and what was said in
7        that meeting.  I don't remember what else I did or who
8        else I may have talked to.
9   Q:   I mean, can you think of a situation that would be
10       appropriate to say that someone looked like Achmed the
11       Terrorist?
12  A:   I don't recall the context but humor is quite often
13       used in places.  And I don't know if that was the
14       intent or how it was being used.  I was not there when
15       it was stated so I don't know the context.  This is a
16       well-known comic who, or a character that's out there.
17  Q:   Do you think it's appropriate for attendings to bully
18       residents or haze residents?
19  A:   No.  No.
20  Q:   Do you know whether Dr. Koon has ever used an air horn?
21  A:   Used a what?
22  Q:   An air horn or blown an air horn toward a resident
23       during conference?
24  A:   No.
25  Q:   Do you think that would be appropriate?
```

```
 1              MS. THOMAS:  I'm sorry.  I didn't understand a
 2         word you were saying, David.
 3              MR. ROTHSTEIN:  I said, have you ever heard that
 4         Dr. Koon has blown an air horn at a resident.
 5              MS. THOMAS:  Okay.
 6  A:    And my answer is no, I have not heard that.
 7  BY MR. ROTHSTEIN:
 8  Q:    And do you believe that that would be appropriate
 9         behavior for a program director to do toward a
10         resident?
11  A:    No.
12  Q:    Have you ever reviewed Dr. Goodno's deposition
13         transcript?
14  A:    I don't recall.  But if it's in those documents I may
15         have seen it.  But I just don't remember.  There were
16         so many things.
17  Q:    Were you present for Dr. Goodno's deposition?  I'm
18         trying to remember.
19  A:    I don't think I was but I don't remember.  I don't
20         think so.  I don't remember.  No.  Almost certain I was
21         not there for his.
22  (Plaintiff's Exhibit Number 19 was marked for identification
23  purposes.)
24  Q:    After you met with Dr. Irani, I'm going to hand you
25         Exhibit 19, he sent you an e-mail on January 4th 2012.
```

```
 1            MS. THOMAS:  I'm sorry, David.  Are you referring
 2        to an Exhibit 19?
 3            MR. ROTHSTEIN:  I just handed her Exhibit 19, it's
 4        Bates numbers 2069 and 2070.
 5   BY MR. ROTHSTEIN:
 6   Q:   Do you see the e-mail string that begins, Thanks,
 7        Ms. Stephens, thank you for meeting with me yesterday?
 8   A:   I do.
 9   Q:   Dr. Irani sent you an e-mail on January 24th at 12:56
10        p.m.  And again Dr., at this point Dr. Irani is saying
11        he doesn't feel like his side of the story has been
12        heard and he doesn't believe that the Palmetto Health
13        guidelines have been followed in this investigation.
14        And then he says that you're welcomed to interview the
15        other witnesses involved in the case, parentheses,
16        Kristin Nathe, the ortho tech or the ortho intern,
17        Toni, the cast tech and Dr. Loflin, the trauma
18        resident.  Did you ever interview Kristin Nathe?
19            MS. HELMS:  Objection to the form of the question.
20   A:   I don't know.  I don't recall.
21   BY MR. ROTHSTEIN:
22   Q:   Did you ever interview Toni, the cast tech?
23   A:   I don't recall.
24   Q:   Did you ever interview Dr. Loflin?
25   A:   I don't recall.
```

| | | |
|---|---|---|
| 1 | | been reviewing the e-mails concerning the care of the |
| 2 | | trauma patient by him on 12/7/11.  In doing so a |
| 3 | | question occurred.  How have you addressed his care |
| 4 | | with Dr. Nathe?  It appears that verbal counseling is |
| 5 | | in order, to include a review of the standards of |
| 6 | | behavior.  Thanks, Kathy.  How did you determine that |
| 7 | | verbal counseling of Dr. Nathe was in order? |
| 8 | A: | Reviewing the documentation that was written up by the, |
| 9 | | I believe it was one of the nurses in the ED. |
| 10 | Q: | Okay.  Do you know whether Dr. Koon ever counseled |
| 11 | | Dr. Nathe? |
| 12 | A: | That would not have come to me.  I don't know when he |
| 13 | | did. |
| 14 | Q: | Okay.  His response at the time when he, on Exhibit 20 |
| 15 | | it says I have spoken to her to gather information but |
| 16 | | I have not counseled her yet.  It is on my to do list. |
| 17 | | Do you know if Dr. Nathe was ever put on academic |
| 18 | | remediation? |
| 19 | A: | I don't recall that she was.  No. |
| 20 | Q: | If she was put on academic remediation you would have |
| 21 | | received notice of it under the academic remediation |
| 22 | | policy; right? |
| 23 | A: | I would. |
| 24 | Q: | You just don't recall seeing -- |
| 25 | A: | I don't remember. |

Allen Court Reporting

1  A:    It's time for another break.

2  Q:    Yeah.

3               (Break - 12:10 p.m.-1:06 p.m.)

4  BY MR. ROTHSTEIN:

5  Q:    We were talking about before the lunch break the

6        January 11th 2012 decision that you made denying the

7        level three grievance.  And I'm going to mark Exhibit

8        22.  And this is Bates number 2161 and 2162 Palmetto

9        Health.

10 (Plaintiff's Exhibit Number 22 was marked for identification

11 purposes.)

12 Q:    So after you e-mailed the decision to Dr. Irani, he

13       responded and said, thank you for your prompt reply.  I

14       need a copy of all of the original documents,

15       complaints, allegations against me regarding trauma

16       female 375.  I have requested these records previously.

17       Please let me know how I may get a copy so that I may

18       understand the complaints against me and can move

19       forward.  Thank you, Afraaz.  Do you recall receiving

20       that e-mail from Dr. Irani?

21 A:    Yes.

22 Q:    And your response was, is I guess the top of Exhibit

23       22; right?

24 A:    Yes.

25 Q:    And you told him basically that he's already seen the

```
 1        issues.  You reminded him of what the vision of
 2        Palmetto Health is and that rather than focusing on
 3        gathering documents he should be focusing on meeting
 4        the terms of his remediation plan; right?
 5   A:   Yes.
 6   Q:   Do you know if Dr. Irani was ever provided the
 7        documentation regarding trauma female 375 that he had
 8        requested?
 9   A:   I know there was information that he had previously,
10        some information that you have copies of.  I don't know
11        what else, what other information he may have gotten.
12   Q:   Are you aware that Dr. Irani after your decision was
13        announced was having some discussions with Dr. Koon,
14        or, I'm sorry, Dr. Walsh about possibly resolving his
15        issues outside of the grievance process?
16             MS. HELMS:  Objection to the form of the question.
17   A:   I don't recall what you're talking about.
18   BY MR. ROTHSTEIN:
19   Q:   Okay.  Did Dr. Walsh ever meet with you after you
20        announced your decision on Dr. Irani's grievance to
21        discuss the possibility of allowing Dr. Irani to make
22        up the days of the suspension?
23   A:   I don't recall.
24   Q:   Do you ever recall having a discussion with Dr. Walsh
25        about Dr. Irani at that time frame at all?
```

1      first step 1.1; right?

2  A:  Yes.

3  Q:  And then 1.2 would be discussion between the resident

4      and the department director and the director of

5      education?

6  A:  Yes.

7  Q:  And the third step is your step, that's the DIO level;

8      correct?

9  A:  Yes.

10 Q:  And if the resident is still unhappy with the decision,

11     they have ten business days from the decision of the

12     DIO to request a hearing before the grievance

13     committee; right?

14 A:  Yes.

15 Q:  Okay.  Where is the term business day defined in the

16     policy?

17 A:  I don't think it is defined in this policy.

18 Q:  Okay.  What is your understanding of what the term

19     business day means?

20 A:  It means a day that the office, administrative offices

21     are open for business.  It would not include recognized

22     holidays.

23 Q:  Do you know if the term business day is the same

24     between Palmetto Health and USC?

25 A:  I think that it's probably defined the same but the

1      actual holidays are different.

2  Q:  Okay.

3  A:  USC is a state agency.  And they have many more

4      holidays than Palmetto Health does.

5  Q:  In your letter to Dr. Irani announcing your decision,

6      your last paragraph says, if you decide to continue

7      with the grievance process please refer to the steps

8      outlined in the resident manual; right?

9  A:  It does.

10 Q:  So that's referring Dr. Irani to essentially Exhibit 23

11     or whatever policy would be in effect at that time;

12     right?

13 A:  Correct.

14 Q:  And nowhere in that policy does it define the term

15     business day?

16 A:  Business day is the day the business, the office is

17     open for business.  But it is not defined here.

18 Q:  The grievance policy also has a provision in it on the

19     second page of Exhibit 23 that allows the deadline to

20     be extended by a human resources representative for

21     extenuating circumstances; right?

22 A:  It does allow for that.

23 Q:  Okay.  So the deadlines are not absolute rigid

24     deadlines.  In fairness or for other circumstances they

25     can be extended?

1        MS. HELMS:  Objection to the form.

2  A:   An extension can be granted and requested before a

3       deadline.

4  BY MR. ROTHSTEIN:

5  Q:   Is Memorial Day a business day under the policy?

6  A:   Is Memorial Day a business day?

7  Q:   Memorial Day.

8  A:   For Palmetto Health?

9  Q:   Yes.

10 A:   Palmetto Health recognizes New Year's Day, Independence

11      Day, Labor Day, Thanksgiving Day and Christmas Day are

12      the five recognized holidays.

13 Q:   Okay.  But I'm not talking about recognized holidays.

14      I'm talking about under the grievance policy would

15      Memorial Day be considered a business day?

16 A:   Yes.

17 (Plaintiff's Exhibit Number 24 was marked for identification

18 purposes.)

19 Q:   Show you exhibit, is that 24?

20      MS. THOMAS:  David, can you identify that

21      document?

22      MR. ROTHSTEIN:  Bates numbers Palmetto Health 1252

23      and 1253.

24 BY MR. ROTHSTEIN:

25 Q:   Do you know who Delphine Bigony is?

Allen Court Reporting

```
 1   A:   Yes.

 2   Q:   Who is Delphine Bigony?

 3   A:   She is the executive assistant to the CEO.

 4   Q:   And who is Lin Hearne?

 5   A:   She is an HR executive.

 6   Q:   They're both employees of Palmetto Health?

 7   A:   They are.

 8   Q:   Have you ever seen this document before?

 9   A:   I don't think I have.

10   Q:   Okay.  I'm going to give you a second to look at it.

11   A:   Uh-huh (affirmative response).

12   Q:   And if you will, I'll direct your attention sort of to

13        the bottom of the first page.

14   A:   Uh-huh (affirmative response).

15   Q:   And it looks like some discussion about the final step

16        in the process of Dr. Irani's grievance, you know, when

17        Mr. Beaman has to make his decision; right?  And do you

18        see at the bottom it says if he has ten working days to

19        respond then that would be June the 1st instead of June

20        the 4th, please clarify.  And that would be an e-mail

21        from Delphine Bigony to Joni Glasscock?

22   A:   Who is he?

23   Q:   He being I think Chuck Beaman the CEO?

24   A:   I don't know what was meant by that.

25   Q:   Well, do you see the second page?
```

```
 1  A:   Uh-huh (affirmative response).
 2  Q:   This 1253?  It looks like some sort of time line that's
 3       proposed for when, it's a memo for when --
 4  A:   Yes.
 5  Q:   -- Mr. Beaman needs to respond.
 6  A:   I do see that.
 7  Q:   And do you see paragraph five under what you need to
 8       do?
 9  A:   I do see that.
10  Q:   It says by policy guidelines a letter should be sent no
11       later than June the 4th 2012?
12  A:   Uh-huh (affirmative response).  Okay.
13  Q:   And this looks like some sort of e-mail traffic
14       relating somehow to that --
15  A:   It does appear to be.
16  Q:   -- memo.  All right.  So Lin Hearne wrote back to
17       Delphine, and said, you're right, it's June the 1st,
18       I'm sorry about that.  Thank you for following up.  And
19       then Delphine wrote back to Lin and said, Lin, I think
20       you were right.  If we don't count Memorial Day as one
21       of the business days then it would be Monday, June the
22       4th.  Once Mr. Beaman makes a decision what procedures
23       should we follow.  So there's some discussion or some
24       confusion between Lin Hearne and Delphine about whether
25       Memorial Day counts as a business day under the
```

Allen Court Reporting

```
 1       grievance policy; right?
 2  A:   That appears to be the case in here.
 3  Q:   Okay.
 4  A:   I have not seen this before.
 5  Q:   So would you agree with me that there's some ambiguity
 6       even among the Palmetto Health employees about what the
 7       term business day means?
 8            MS. HELMS:  Objection to the form of the question.
 9  A:   You can see what's in here as well as I.
10  BY MR. ROTHSTEIN:
11  Q:   Okay.
12  A:   I cannot say what they were thinking.
13  Q:   Do you know whether the State of South Carolina has a
14       statute about what constitutes a business day?
15  A:   No.
16  (Plaintiff's Exhibit Number 25 was marked for identification
17  purposes.)
18  Q:   Show you Exhibit 25.
19            MS. HELMS:   David, she hasn't ever seen this so
20       we get to discuss it.
21            MR. ROTHSTEIN:  That's fine.
22            MS. THOMAS:  Can you tell me what that document
23       is?
24            MR. ROTHSTEIN:  It's a copy of a statute.
25       Sections, it's section 53-5-10 of the South Carolina --
```

```
 1              MS. THOMAS:  55-3-10?
 2              MR. ROTHSTEIN:  53-5-10 of the South Carolina
 3         Code.
 4                        (Off the Record)
 5    BY MR. ROTHSTEIN:
 6    Q:   Okay.  Have you ever seen or were you aware of Section
 7         53-5-10 of the South Carolina Code of Laws?
 8    A:   No.  It does not apply to Palmetto Health.  So I
 9         haven't seen this before.
10    Q:   Okay.  Do you believe that section applies to the
11         University of South Carolina School of Medicine?
12    A:   It appears to.
13              MS. THOMAS:  Object to the form.
14    A:   It says public colleges and universities.
15    BY MR. ROTHSTEIN:
16    Q:   Okay.  Now you understand that when Dr. Irani attempted
17         to pursue a requested grievance hearing in January of
18         2012, that after receiving your denial of his grievance
19         he attempted to file a request for further
20         consideration of the grievance to the grievance
21         committee?
22    A:   Yes.
23    Q:   Okay.  And that grievance was denied because they said,
24         well, you filed it on the 11th business day, not the
25         10th business day?
```

1  A:  Correct.

2  Q:  And Dr. Irani said, wait a minute, I wasn't counting

3      the Dr. Martin Luther King holiday as a business day

4      because that's a public holiday; right?

5  A:  He's a Palmetto Health employed resident, not a public

6      employed resident.

7  Q:  I understand that y'all didn't agree with his argument.

8      But that's what his argument was, that he didn't count

9      that as a business day?

10 A:  That's what he said.

11 Q:  And the grievance policy says, uses the term business

12     day?

13 A:  You have ten business days to grieve.

14 Q:  Right.  If the term business day did not include Martin

15     Luther King holiday, his grievance would have been

16     timely; right?

17 A:  It did include.  Martin Luther King holiday was not a

18     paid holiday with Palmetto Health.

19 Q:  I understand.  But if the term business day did not

20     include Martin Luther King, his grievance would have

21     been timely, his request for grievance would have

22     occurred on the 10th day?

23 A:  Had that been the case then the math would have been

24     ten.

25 Q:  Okay.  So the Palmetto Health Human Resources

1        Department could have given him some leniency in how
2        they interpreted the policy and said, okay, even though
3        you're on the 11th, there was some ambiguity in how the
4        policy is written or how you interpreted it so we're
5        going to accept your grievance as timely even though it
6        was a day late?
7             MS. HELMS:  Objection to the form.
8    A:   I have no idea.  That wasn't part of the process.
9    BY MR. ROTHSTEIN:
10   Q:   Who made the decision to deny his grievance?
11   A:   I did.
12   Q:   Are you part of the Palmetto Health Human Resources
13        Department?
14   A:   I am not.
15   Q:   Okay.
16   A:   This was not a human resource policy.  It was a
17        Graduate Medical Education policy.
18   Q:   All right.  What was your next involvement with Dr.
19        Irani's situation?
20   A:   I don't remember.
21   Q:   Do you recall meeting with the orthopedic faculty and
22        Dr. Irani to discuss the remediation plan for his level
23        two academic remediation after he came back from his
24        suspension?
25   A:   I don't remember that I did meet with the faculty.  I

Allen Court Reporting

```
 1        well; right?
 2   (Plaintiff's Exhibit Number 32 was marked for identification
 3   purposes.)
 4   Q:    Show you Exhibit 32.  And this is Irani 30 and Irani
 5         14.
 6              MS. THOMAS:  I'm sorry.  What numbers were those,
 7         David?
 8              MR. ROTHSTEIN:  Irani 30 and Irani 14.
 9              MS. THOMAS:  Could you describe for me what those
10         are?
11              MR. ROTHSTEIN:  Irani 30 is an e-mail from Kathy
12         Stephens to Dr. Irani on March 28th 2012 attaching
13         Irani 14 which is the letter announcing the grievance
14         decision denying his level or step three grievance.
15   BY MR. ROTHSTEIN:
16   Q:    Do you recognize Exhibit 32 --
17   A:    Yes.
18   Q:    -- as I've just described it?
19   A:    Yes.
20   Q:    Okay.  And that's your signature on the second page of
21         Exhibit 32?
22   A:    It is.
23   Q:    And tell me what you did to carefully consider the
24         information available to you in deciding Dr. Irani's
25         grievance?
```

| | | |
|---|---|---|
| 1 | A: | I reviewed the information I had, the documentation, |
| 2 | | went back through that again. |
| 3 | Q: | Did you review any medical records? |
| 4 | A: | No. |
| 5 | Q: | Did you speak with any patients? |
| 6 | A: | No. |
| 7 | Q: | Did you speak with any family members of any patients? |
| 8 | A: | No. |
| 9 | Q: | Did you speak with any nurses? |
| 10 | A: | At this point I don't remember that I did. |
| 11 | Q: | Okay.  And your understanding there were two, at this |
| 12 | | point there were two patient encounters that were |
| 13 | | immediately at issue with regard to Dr. Irani.  One was |
| 14 | | a spine patient of Dr. Grabowski's; is that right? |
| 15 | A: | There were a host of things that we looked at here. |
| 16 | Q: | Okay.  But the -- |
| 17 | A: | Certainly there were patient issues that had come up, |
| 18 | | those we just talked about. |
| 19 | Q: | Okay.  And then there was a hemophiliac patient of |
| 20 | | Dr. Koon's, I believe? |
| 21 | A: | I think there was one in these documents. |
| 22 | Q: | Okay.  Did you speak with Dr. Wood at all? |
| 23 | A: | I don't know that I did.  I don't remember. |
| 24 | Q: | Okay.  Have you ever spoken with Dr. Wood about Dr. |
| 25 | | Irani? |

```
1    A:   I don't recall who the HR VP, the person was, if it
2         was, it may have been Rob Brinkerhoff or it may have
3         been -- I don't know who it was at that time.
4    Q:   I think it may have been Gwen Hill.  Does that sound
5         right?
6    A:   It may have been.
7    Q:   Okay.
8    A:   Because she was serving in that role as a senior HR
9         person for a while.
10   Q:   And I understand that pursuant to the grievance and due
11        process policy that's Exhibit 23, residents are not
12        allowed to have attorneys represent them during the
13        grievance proceedings at any level?
14   A:   It's a grievance process, not a legal event.
15   Q:   Okay.  Is there are any provision in the grievance
16        process for residents to compel witnesses to the
17        hearing?
18   A:   Let me see what it says here.  It does allow under 2.4
19        for that.
20   Q:   Okay.  It says it may be requested.  Is there anything
21        that allows like a subpoena to compel people to attend
22        the hearing if they're not willing to --
23   A:   It is not a legal issue.  Subpoenas are not addressed
24        at all in here.
25   Q:   Does the grievance policy say anything about protecting
```

| | | |
|---|---|---|
| 1 | | witnesses from retaliation? |
| 2 | A: | I don't think there's even any discussion about that |
| 3 | | possibility in here. |
| 4 | Q: | Now, I understand that Dr. Irani was assigned someone |
| 5 | | from the HR department to serve as an assistant to him |
| 6 | | during the grievance proceedings? |
| 7 | A: | That's what the policy calls for. |
| 8 | Q: | Okay.  And do you recall Lin Hearne being assigned to |
| 9 | | serve as Dr. Irani's assistant? |
| 10 | A: | She could very well have been. |
| 11 | Q: | Okay.  Do you know -- |
| 12 | A: | I don't recall specifically who it was. |
| 13 | Q: | Do you know what the role of that person is in terms of |
| 14 | | what they, what they do for the resident who's filing |
| 15 | | the grievance? |
| 16 | A: | Under 2.3 it describes that. |
| 17 | Q: | So the role of the HR employee is to assist the |
| 18 | | resident in filing the grievance? |
| 19 | A: | That's what it says. |
| 20 | Q: | Okay.  And the way the system is set up that person is |
| 21 | | a, by design is a current employee of Palmetto Health; |
| 22 | | right? |
| 23 | A: | That's an HR person employed by Palmetto Health. |
| 24 | Q: | Okay.  That person's allegiance and interests are with |
| 25 | | Palmetto Health as their employer; right? |

1          MS. HELMS:  Objection to the form of the question.

2   A:   The person is employed by Palmetto Health.

3   BY MR. ROTHSTEIN:

4   Q:   Okay.  Do you believe there's an inherent conflict of

5        interest in having someone from Palmetto Health assist

6        someone whose interests might be adverse to Palmetto

7        Health?

8          MS. HELMS:  Objection to the form.

9   A:   I don't see how my opinion matters.  It's a Palmetto

10       Health policy.

11  BY MR. ROTHSTEIN:

12  Q:   Okay.  I mean, do you believe, I'm just asking do you

13       believe that's a conflict of interest?

14  A:   No.

15  Q:   Do you think it's a --

16  A:   Not necessarily.

17  Q:   -- potential conflict of interest?

18  A:   Yes.

19  Q:   Okay.  Have residents ever complained about not being

20       provided with an independent advocate or assistant to

21       help them in the grievance process?

22  A:   Residents complained about an advocate to help with the

23       process?

24  Q:   Right.

25  A:   They complained that the policy, I have heard

1     proceedings at the grievance council or what Dr. Irani

2     could expect at the proceedings in the grievance

3     council?

4 A:  I wasn't there when Ms. Hearne spoke with Dr. Irani.

5 Q:  Okay.  Would you expect Ms. Hearne to inform Dr. Irani

6     about what the proceedings would involve?

7 A:  Yes.

8 Q:  Were you there when the grievance committee -- let me

9     ask you this.  Did Dr. Irani have any input as to who

10    would be on the grievance committee?

11 A:  No.

12 Q:  Do you know how many people were on the grievance

13    committee?

14 A:  It followed the policy.  Two residents and three

15    faculty members from programs outside of orthopedics.

16 Q:  Okay.

17 A:  I don't recall who they were.

18 Q:  So the majority of the persons on the committee were

19    attendings or --

20 A:  Two residents and three faculty members.

21 Q:  Right.  Does the decision of the grievance committee

22    have to be unanimous?

23 A:  What does it say?  Since I am not there when they were

24    discussing this I don't recall.  Let's see.  It says

25    secret ballot.  It doesn't say.  You would have to ask

Allen Court Reporting

```
 1        someone in HR about that.
 2   Q:   Okay.  What is your understanding about --
 3   A:   I don't have an, I don't have any, whether it's the
 4        majority or all in favor.  I don't know what this was.
 5   Q:   Do you know how the grievance committee is selected?
 6   A:   There are different names that the HR will look at.
 7        They will look at previous committees, try not to use
 8        the same people over and over again.  Try to look at
 9        being as broad as possible across the different areas.
10   Q:   What's the purpose of the rule of not having someone in
11        the same department?
12   A:   So that things can be looked at in as, as unbiased a
13        way as possible.
14   Q:   Okay.
15   A:   These are, I mean, it's a small department.  And many
16        of our residencies are, so that there's not an
17        appearance of there being bias.
18   Q:   Are any of the committee members members of the actual
19        GMEC?
20   A:   They may have been.  I just don't recall who was on
21        this committee.  You probably have those names.  And I
22        can tell you if they're on the GMEC.
23   Q:   Does the policy provide that a member of the GMEC who
24        voted for the original discipline would be recused from
25        serving on the grievance committee?
```

```
 1   A:   It doesn't speak to that at all.
 2   Q:   Do you believe that would be an important part of
 3        fairness, of ensuring fairness in the process if
 4        somebody's already heard the decision at the GMEC level
 5        that they not sit on the grievance because they may
 6        have pre-judged the case?
 7   A:   Could or could not.
 8   Q:   Have you ever served on jury duty before?
 9   A:   I have gone but never sat on the jury.
10   Q:   But you've been at least through the qualification
11        process?
12   A:   Yes.
13   Q:   Do you recall one of the first questions the judge asks
14        people is have you ever heard anything about this case
15        --
16   A:   Yes.
17   Q:   -- or formed, or do you have a preconceived idea about
18        what the case is about?
19   A:   And you're talking about a jury trial.
20   Q:   Right.
21   A:   This is not a jury trial.
22   Q:   I understand.  But what do you believe the reason for
23        that to be?
24             MS. HELMS:  Objection to the form of the question.
25   A:   However the law is set up so there can be, what is the
```

```
 1          term, fair process, impartial, whatever.  I can't
 2          remember all the terms they use.  They never select me
 3          for jury duty.
 4   BY MR. ROTHSTEIN:
 5   Q:    Do you know if Dr. Irani was told that he would not be
 6          cross examined by Dr. Koon and Dr. Walsh during the
 7          hearing?
 8   A:    I don't know what he was told by Ms. Hearne.
 9   Q:    Do you understand that the grievance committee was
10          unable to reach a decision at the end of their original
11          deliberation period?
12   A:    I don't remember the specifics of the process.
13   Q:    Do you recall --
14   A:    I remember the outcome.
15   (Plaintiff's Exhibit Number 33 was marked for identification
16   purposes.)
17   Q:    Do you recall participating in the hearing as -- or
18          tell me how you participated in the hearing I guess
19          would be the better --
20   A:    Merely an observer.
21   Q:    Okay.  What about in terms of the preparation leading
22          up to the hearing?  Tell me what your involvement would
23          have been.
24   A:    I would have met with the program director typically
25          ahead of time to discuss the information that the
```

| | | |
|---|---|---|
| 1 | | grievance committee? |
| 2 | A: | That's what it says.  Uh-huh (affirmative response). |
| 3 | Q: | Okay.  Do you know if Dr. Irani was informed that the |
| 4 | | grievance committee had requested additional |
| 5 | | information? |
| 6 | A: | I don't know because I am not involved at all, in these |
| 7 | | matters once they are taken up by the grievance |
| 8 | | committee. |
| 9 | Q: | Okay.  Do you know whether Dr. Irani was given a copy |
| 10 | | of the information that was provided to the grievance |
| 11 | | committee? |
| 12 | A: | I do not know. |
| 13 | Q: | Do you know if Dr. Irani was given an opportunity to |
| 14 | | respond to any of the information that was provided to |
| 15 | | the grievance committee? |
| 16 | A: | I do not know. |
| 17 | Q: | Do you know what was provided to the grievance |
| 18 | | committee? |
| 19 | A: | Well, it says in here in this e-mail what was included. |
| 20 | | But I was not, I'm not on the grievance committee, |
| 21 | | didn't receive the information. |
| 22 | Q: | Have you ever reviewed that information, the -- well, |
| 23 | | let's look at them in order first.  The memorandum from |
| 24 | | Dr. Walsh and Dr. Koon regarding deficiencies and |
| 25 | | incompetencies. |

1  purposes.)

2  Q:  Show you Exhibit 36.  Would it surprise you that Dr.

3      Irani never saw these until the discovery in this

4      lawsuit?

5  A:  I don't know.  Like I said, I haven't seen them either.

6      They appear to be a final summative statement which is

7      not a resident evaluation.  So I don't know, that is

8      not a normal term we use.  So I don't know what they,

9      why they were exhibited or generated.

10 Q:  Is there a provision in the grievance policy Exhibit 23

11     that we looked at that provides for ex parte submission

12     of evidence after the hearing?

13 A:  I don't know.  But as you have said this is, they asked

14     for more information.  Did the committee ask for this

15     information?  I don't know.

16 Q:  Do you think it would be fair for the committee to

17     receive information from only one side of the case

18     after the hearing is over?

19 A:  That's up to the committee to request the information.

20 Q:  Okay.  But your role is to ensure due process for the

21     resident; right?

22 A:  And that the committee is meeting and dealing with the

23     issue.

24 Q:  But I'm asking you, do you think it would be fair for

25     the committee to base its decision on information

1          obtained after the hearing that the resident is not

2          given an opportunity to see or respond to?

3               MS. HELMS:  Objection to the form.

4    A:   The committee can request whatever information it

5          wishes.

6    BY MR. ROTHSTEIN:

7    Q:   Okay.  So there's no oversight by the, I mean, the

8          committee can do whatever it wants?

9               MS. HELMS:  Objection.

10   A:   The committee has the final word on this.  The

11         committee can request whatever information it wants.

12         It could request information from the resident that no

13         one else would see.  Obviously this committee felt it

14         needed something more that they asked for.  I don't

15         know.  I was not in the deliberations.  It's not part

16         of my role.  And I don't know what the deliberations

17         were and why they asked for additional information.

18   BY MR. ROTHSTEIN:

19   Q:   Where in the grievance due policy does it say the

20         committee can ask for whatever it wants?

21   A:   I don't think it does.  It also, I don't think it also

22         speaks to there not being a decision made at that

23         meeting and asking for additional information.  So

24         obviously the HR senior person decided to do that.  I

25         don't know.

```
 1              MS. THOMAS:  Okay.
 2   BY MR. ROTHSTEIN:
 3   Q:  See Exhibit 39?
 4   A:  I see it.
 5   Q:  Have you ever seen this one before?
 6   A:  It's the same kind of tool as the others.
 7   Q:  And this one's done by Dr. Mazoue; right?
 8   A:  That's what it says.
 9   Q:  Covers the same period of time as Exhibit 38.
10              MS. THOMAS:  David, can you give me those Bates
11          numbers?
12              MR. ROTHSTEIN:  Yeah.  Palmetto Health 78 through
13          80.
14              MS. THOMAS:  Thank you.
15   BY MR. ROTHSTEIN:
16   Q:  It covers ortho sports medicine from September 1st 2011
17          through October 31st 2011.  Do you see that?
18   A:  I do.
19   Q:  So Dr. Mazoue is evaluating Dr. Irani for the same
20          period of time on the same service that Dr. Guy
21          evaluated him for Exhibit 38; correct?
22   A:  I see this.
23   Q:  Okay.
24   A:  At the same time.  I don't know that they would
25          necessarily have always had the same patients same time
```

Allen Court Reporting

1    together.

2  Q:  Okay.  And Dr. Guy's, I mean, I'm sorry, Dr. Mazoue's

3      evaluation was done within a week of the end of the --

4  A:  That's what it says.

5  Q:  I mean, end of the rotation; correct?

6  A:  That's what it says.

7  Q:  And Dr. Mazoue's evaluation was satisfactory on the

8      overall rating; correct?

9  A:  Looks like he put satisfactory on everything except one

10     testimony and only one comment.

11 Q:  Do you know why this, or do you know first of all if

12     this document was submitted to the grievance committee?

13 A:  I don't know.

14 Q:  It's not listed as one of the things that Dr. Koon

15     submitted after the hearing though, is it?

16 A:  This list that's on Dr. Koon's e-mail says most recent

17     faculty to resident evaluations from Guy and Voss.

18     That's what it says.  But I didn't get what the

19     committee got.  I don't know why the committee asked

20     for what it asked for.

21 (Plaintiff's Exhibit Number 40 was marked for identification

22 purposes.)

23 Q:  Show you Exhibit 40.  Have you ever seen Exhibit 40?

24          MS. THOMAS:  David?

25          MR. ROTHSTEIN:  Exhibit 40 is Bates Number

Allen Court Reporting