# EXHIBIT I

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

Afraaz R. Irani, M.D.,          )
                                )    C/A No. 3:14-cv-03577-CMC-KDW
      Plaintiff,                )
                                )
vs.                             )
                                )
Palmetto Health;                )
University of South             )
School of Medicine;             )
David E. Koon, Jr.,             )
M.D., in his individual         )
capacity; and John J.           )
Walsh, IV, M.D., in his         )
individual capacity,            )
                                )
      Defendants.               )
_____)

DEPOSITION OF

R. CAUGHMAN TAYLOR, M.D.

*******************

Wednesday, April 15, 2015
10:41 a.m. - 12:32 p.m.


        The deposition of R. CAUGHMAN TAYLOR, M.D., taken

on behalf of the Plaintiff at the offices of the South

Carolina Bar Conference Center, 2nd Floor, 1501 Park Street,

Columbia, South Carolina, on the 15th day of April, 2015,

before Lyn A. Hudson, Court Reporter and Notary Public in

and for the State of South Carolina, pursuant to Notice of

Deposition and/or agreement of counsel.

1      look back.
2  Q:  Okay.  Are you familiar with the Accreditation Council
3      for Graduate Medical Education?
4  A:  I know who they are and what their role is.  Yes, sir.
5  Q:  And I'll refer to that as the ACGME.  Have you ever
6      heard --
7  A:  Yes, sir.
8  Q:  -- it referred by that abbreviation?
9  A:  Yes, sir.
10 Q:  What is the your understanding of the purpose of the
11     ACGME?
12 A:  They are an accrediting body to oversee regulations
13     related to education.
14 Q:  Okay.  And what is your understanding of the term
15     accreditation in connection with the residency program?
16 A:  Accreditation means that they look to see if you've
17     fulfilled certain requirements.
18 Q:  Okay.  Has the USC Pediatrics Residency Program been
19     accredited since you've been involved in it?
20 A:  Yes, sir.
21 Q:  Is that an important designation or distinction for
22     residency programs to be accredited by the ACGME?
23 A:  Yes, sir.
24 Q:  Why is that important?
25 A:  Accreditation status is important in terms of

```
 1        maintaining your residency program.  And having an

 2        accredited residency is necessary for the practice of

 3        medical education.

 4   Q:   Are there unaccredited residency programs?

 5   A:   Nationally?  Here?

 6   Q:   Nationally.

 7   A:   That's, I don't know.  You get, you have different

 8        accreditation statuses.  You can be accredited,

 9        accredited with warning.  You can be put on probation.

10        If you lose accreditation, typically programs are shut

11        down for a period of time.  So I'm not sure what you're

12        asking me.

13   Q:   Okay.  Well, I guess accreditation is important for, in

14        terms of recruiting and training residents; is that

15        right?

16   A:   You can't recruit residents into a program that is

17        closed or doesn't have accreditation, I would think.

18        I'm not sure.  But I wouldn't think you could.

19   Q:   Do the residency programs that are accredited through

20        the ACGME make a commitment to abide by the standards

21        of the accrediting body?

22   A:   As best you can.  Yes.

23   Q:   Do specialty boards -- I assume, is there American

24        Academy of Pediatrics?

25   A:   American Board of Pediatrics.
```

1   A:   I don't know if I got board certified in '87 or '86.

2        But it was the year I finished my residency.   I

3        finished residency in '86.  And then you have to take

4        some tests.  And so it might have been '87.  I don't

5        know.

6   Q:   Have you ever held any type of position with the ACGME

7        on any kind of board or committee?

8   A:   No, sir.

9   Q:   Are you familiar with some of the accreditation

10       requirements of the ACGME?

11  A:   Peripherally, you know, fifty thousand feet level,

12       yeah.  I mean, I would have to look at documents of

13       what, there's institutional documents and then -- so I

14       don't, since the residency, I don't keep up with those

15       except specifically as they relate to pediatrics.

16  Q:   Okay.  Have you ever heard of the term common program

17       requirements --

18  A:   Yes, sir.

19  Q:   -- that all residency programs have to abide by --

20  A:   Yes, sir.

21  Q:   -- through the ACGME?

22  A:   Yes, sir.

23  Q:   Are you also familiar with RRCs or Residency Review

24       Committees?

25  A:   Yes, sir.

1  Q:   Does each specialty or subspecialty have an RRC that

2       that has their own program requirements for that

3       particular designation?

4  A:   Yes, sir.  They have their specific program

5       requirements.

6  Q:   Okay.  Let me mark a document as Exhibit 1.  I've only

7       got two extra copies down there for the lawyers.

8  (Plaintiff's Exhibit Number 1 was marked for identification

9  purposes.)

10 Q:   Do you recognize Exhibit 1, Dr. Caughman?  I mean,

11      Dr. Taylor?

12 A:   Yes, sir.

13 Q:   And that's an affidavit that you prepared in this case;

14      is that right?

15 A:   That was prepared for me by legal counsel.  Yes, sir.

16 Q:   Was that prepared by Mr. Stanley's office or by

17      Ms. Thomas's office?

18 A:   I do not recall or, I'm not sure.

19 Q:   Okay.  Do you know what the purpose of this affidavit

20      is or was?

21 A:   I think it was to determine or state what the

22      relationship was for Dr. Irani with the School of

23      Medicine.

24 Q:   Are you aware that this document has been submitted to

25      the United States District Court in this case?

```
 1   A:   Not until you just told me.

 2   Q:   Do you see the caption of the case at the top, Afraaz

 3        R. Irani, M.D. versus Palmetto Health and others?

 4   A:   Yes, sir.

 5   Q:   And it's in the United States District Court for the

 6        District of South Carolina?

 7   A:   Yes, sir.

 8   Q:   Did you read this affidavit before you signed it?

 9   A:   Yes, sir.

10   Q:   Was it true and accurate to the best of your abilities

11        or knowledge?

12   A:   Yes, sir.

13   Q:   What did you do to confirm that the statements in this

14        affidavit are true?

15   A:   Discussed with legal counsel.

16   Q:   How did you confirm that Dr. Irani -- let me ask first.

17        Other than discussions with legal counsel, did you do

18        anything else in terms of making yourself familiar with

19        this situation or researching the situation in

20        preparing your affidavit?

21   A:   No, sir.

22   Q:   How did you confirm that Dr. Irani was not employed by

23        the University of South Carolina School of Medicine?

24   A:   Because none of the residents are.

25   Q:   What does the word employed mean to you?
```

Allen Court Reporting

```
 1   A:   That you are paid by that institution.
 2   Q:   Can you be an employee of somewhere without being paid
 3        directly by that institution?
 4             MS. THOMAS:  Object to the form.
 5   A:   I wouldn't know.
 6   BY MR. ROTHSTEIN:
 7   Q:   Are you, I assume you're not a lawyer?
 8   A:   No, sir.
 9   Q:   Have you ever had any type of legal training or
10        education?
11   A:   No, sir.
12   Q:   Okay.  Do you know what the legal definition of being
13        employed under South Carolina is?
14   A:   No, sir.
15   Q:   Do you know what the legal definition of being employed
16        for federal law is?
17   A:   No, sir.
18   Q:   All right.  So when you said that you confirmed Dr.
19        Irani was never employed by the University of South
20        Carolina School of Medicine, that meant that he was
21        never paid directly from the University of South
22        Carolina School of Medicine; is that right?
23             MS. THOMAS:  Objection.
24   BY MR. ROTHSTEIN:
25   Q:   For any work that he did?
```

```
 1        State of South Carolina while acting within the course
 2        and scope of their employment?
 3   A:   Yes, sir.
 4   Q:   Do you believe that's why you were dismissed from the
 5        case?
 6             MS. THOMAS:  Object to the form.
 7             MS. HELMS:  Object to the form.
 8   A:   No, sir.
 9   BY MR. ROTHSTEIN:
10   Q:   Okay.  Did the case continue against the University of
11        South Carolina School of Medicine after you were
12        dropped from the case?
13             MS. THOMAS:  Object to the form.
14   A:   I don't know.
15   BY MR. ROTHSTEIN:
16   Q:   Now looking at paragraph four of your affidavit, what
17        did you do to confirm that Dr. Irani never had a
18        contract with the University of South Carolina School
19        of Medicine?
20   A:   Confirmed with legal counsel.
21   Q:   Anything other than talking to the lawyers for the USC
22        School of Medicine?
23   A:   No, sir.
24   Q:   Do you know, do you know whether an employment contract
25        can be implied under South Carolina law by the issuance
```

Allen Court Reporting

```
 1        of an employee handbook or policy manual?
 2             MS. THOMAS:  Object to the form.
 3             MS. HELMS:  Object to the form.
 4  A:   No, sir.
 5  (Plaintiff's Exhibit Number 2 was marked for identification
 6  purposes.)
 7  Q:   Show you Exhibit 2.  Have you ever seen Exhibit 2
 8       before?
 9  A:   No, sir.
10  Q:   Does your department at the USC Pediatrics Department
11       have a residency manual?
12  A:   Yes, sir.
13  Q:   Does it look similar to this Exhibit 2 other than the
14       fact that this one is for the orthopaedics, Orthopaedic
15       Surgery Department?
16  A:   There's similarities.  Yes, sir.
17  Q:   You've never seen this document or a portion of this
18       document before?
19  A:   No, sir.
20  Q:   Okay.  So when you said there was no contract between
21       Dr. Irani and the University of South Carolina School
22       of Medicine, you didn't consider the possibility that
23       this document could create an employment contract, did
24       you?
25             MS. THOMAS:  Object to the form.
```

```
 1  A:   Again, I discussed it all with legal counsel.
 2  BY MR. ROTHSTEIN:
 3  Q:   My question is when you made that statement in your
 4       affidavit you didn't consider whether the residency
 5       manual or the residency handbook could create an
 6       employment contract between USC and Dr. Irani, did you?
 7            MS. THOMAS:  Object to the form.
 8  A:   I would have no reason to know that or expect that.  I
 9       would have thought that legal counsel or our GME
10       offices would advise anyone of that.
11  BY MR. ROTHSTEIN:
12  Q:   So in your affidavit when you stated that the
13       statements in there are based on your own personal
14       knowledge, that wasn't true, was it?
15  A:   No, sir.  That was true.
16  Q:   Okay.  What is your personal knowledge about whether
17       the residency manual under orthopaedic surgery could be
18       a contract of employment between Dr. Irani and USC?
19            MS. THOMAS:  Object to the form.
20  A:   As I've stated I don't know law.  But I've always been
21       told that they were employed by Palmetto Health, knew
22       the checks and benefits came from there and any salary
23       increases and everything.  So in simple terms and being
24       a personal understanding was that they were employed by
25       Palmetto Health.  And we were always told that.
```

```
 1        document before today; correct?
 2   A:   No, sir.  I have not.
 3   Q:   Okay.  And if you will look at page seven of the
 4        document.  Well, first of all, are you aware of whether
 5        this document has any kind of disclaimer in it that
 6        says it's not an employment contract?
 7             MS. THOMAS:  Object to the form.
 8   A:   As I said, I've never seen it today and you don't give
 9        me the entire document.  So how would I know?
10   BY MR. ROTHSTEIN:
11   Q:   Okay.  So when you put in your affidavit there was no
12        contract, you weren't relying on any kind of disclaimer
13        in this document for that conclusion?
14   A:   I wouldn't see how this document would have any effect
15        on that.
16   Q:   Well, if you will look at page seven, do you see the
17        bullets under general residency requirements?
18   A:   Yes, sir.
19   Q:   Does the Pediatrics Residency Manual have something
20        similar to this in it?
21   A:   I would assume so.  I haven't looked at it since I've
22        been dean for 15 months.  So, you know, when it's
23        updated I would have to pull it to look.  But I would
24        assume it would.
25   Q:   Okay.  Look, I direct you to the sixth bullet under
```

1    General Residency Requirements.  And do you see that

2    one of the general residency requirements is adhere to

3    established practices, procedures and policies of the

4    University of South Carolina School of Medicine and

5    Palmetto Health?

6  A:  Yes, sir.  I see that.

7  Q:  Okay.  If the resident is only an employee of Palmetto

8    Health and not USC, why are they required to adhere to

9    the policies, practices and procedures of the

10    University of South Carolina School of Medicine?

11        MS. THOMAS:  Object to the form.

12 A:  This is an educational program.  We have affiliation

13    agreements with many institutions as Palmetto Health

14    and as USC.  And when you put a learner in that

15    affiliated institution you have to follow the policies

16    of both institutions.

17 BY MR. ROTHSTEIN:

18 Q:  Fair enough.  So the University of South Carolina

19    School of Medicine exercises control over what

20    residents can or cannot do as part of their residency;

21    isn't that right?

22        MS. THOMAS:  Object to the form.

23 A:  I would say they do not exercise control as a body.

24    There are certain policies that are not applicable to

25    residents because they are not employees of the

```
 1        university.
 2   BY MR. ROTHSTEIN:
 3   Q:   Okay.  And your basis that they're not employees is
 4        just something you've heard from legal counsel; right?
 5             MS. THOMAS:  Object to the form.
 6             MS. HELMS:  Object to the form.
 7   A:   I think I've answered that before.
 8   BY MR. ROTHSTEIN:
 9   Q:   Okay.  Also I'm going to ask you to look at the eighth
10        bullet point under General Residency Requirements.  You
11        see it says, adhere to the high standards of medical
12        and academic ethics commensurate with the medical
13        profession and a representative of the University of
14        South Carolina School of Medicine.  Do you see that?
15   A:   Yes, sir.
16   Q:   Okay.  So that implies that residents are
17        representatives of the University of South Carolina
18        School of Medicine; right?
19   A:   I wouldn't know what that statement implies because I
20        didn't write it.  But again when it's an affiliated
21        institution, you represent the medical profession when
22        you are a doctor or you are a resident or you're a
23        medical student.  And you represent those institutions
24        that you may be affiliated with just like you represent
25        the law profession.
```

```
 1  Q:   Okay.  The next section of page seven of Exhibit 2

 2       states, ACGME Program Requirements; correct?

 3  A:   Under program --

 4            MS. THOMAS:  Object to the form.

 5  BY MR. ROTHSTEIN:

 6  Q:   Program Requirements (ACGME).  Do you see that?

 7  A:   Yes, sir.

 8  Q:   Okay.  So this document appears to be incorporating the

 9       program requirements for Residency Education in

10       Orthopaedic Surgery as published by the Accreditation

11       Counsel for Graduate Medical Education; correct?

12            MS. THOMAS:  Object to the form.

13  A:   As you've stated, to be an accredited program you have

14       to follow the ACGME common requirements and you have to

15       follow the RRC's specific requirements.  So a document

16       such as this is to state those policies and

17       expectations of a residency training program.

18  BY MR. ROTHSTEIN:

19  Q:   When you say you have to follow those requirements,

20       what compels you to follow those requirements?

21  A:   Because those things are things necessary for

22       accreditation.

23  Q:   Okay.  And when you become an accredited institution,

24       you are agreeing to follow those requirements; right?

25  A:   To the best of your ability.
```

Allen Court Reporting

```
 1        education to give you one example.
 2   BY MR. ROTHSTEIN:
 3   Q:   Okay.  What about due process?  Do you know whether the
 4        ACGME mandates due process for residents?
 5   A:   Do not know specifically.  No, sir.
 6   Q:   Okay.  What about academic remediation?  Are there any
 7        policies in the ACGME about academic remediation that
 8        would benefit a resident?
 9             MS. THOMAS:  Object to the form.
10   A:   I don't have that in front of me.  I've not reviewed
11        it.  And so I can't comment specifically.  I'm sorry.
12   BY MR. ROTHSTEIN:
13   Q:   Okay.  So when you did your affidavit, you didn't
14        review those ACGME requirements prior to signing the
15        affidavit either, did you?
16   A:   No, sir.
17   Q:   Now is there a contract between the USC School of
18        Medicine and Palmetto Health that would benefit Dr.
19        Irani?
20             MS. THOMAS:  Object to the form.
21   A:   I would not know of any contract that is between the
22        two of them that would have any bearing on this.
23   BY MR. ROTHSTEIN:
24   Q:   Okay.  You'll need to keep that one with the sticker on
25        it here.
```

```
 1  (Plaintiff's Exhibit Number 3 was marked for identification
 2  purposes.)
 3  A:   Okay.  I didn't know that.  I marked on one.  Sorry.  I
 4       circled the one you told me to talk about.
 5  Q:   Okay.  Do you remember which page you circled?
 6  A:   Yes, sir.  When you were asking me to look, I circled
 7       right there.
 8  Q:   Okay.  So on page seven of Exhibit 2 you circled one of
 9       the bullet points?
10  A:   Yes, sir.
11  Q:   Okay.
12  A:   When you asked me to look at it.
13  Q:   Okay.  We'll just make that part of the record.  That's
14       fine.  Now, I'm going to direct your attention to
15       Exhibit 3.  Have you ever seen this document before?
16  A:   Yes, sir.
17  Q:   Okay.  When was the last time you saw this document?
18  A:   Within the last month.
19  Q:   Okay.  Did you review this document before you prepared
20       your affidavit?
21  A:   No, sir.
22  Q:   What was the occasion for you to review this document?
23  A:   I've been asked to work on a new affiliation agreement
24       between the university and Palmetto Health.
25  Q:   Was that while you were still the interim dean?
```

1   A:   No, sir.  It was after I became associate dean.

2   Q:   So sometime after February of this year you saw this

3        document?

4   A:   Yes, sir.

5   Q:   Okay.  I'm going to direct you to paragraph 3.2 on page

6        three.  And I'm going to direct you to the second

7        sentence.  And I'm going to read it and I want you to

8        read it along with me.  Palmetto Health and the School

9        of Medicine will share the responsibility for ensuring

10       an appropriate learning environment and that clinical

11       instruction occurs in an atmosphere of mutual respect

12       and collegiality between faculty, residents, medical

13       students and staff.  Do you see that?

14  A:   Yes, sir.

15  Q:   Do you believe that that responsibility that's jointly

16       shared between Palmetto Health and the School of

17       Medicine benefits residents like Dr. Irani?

18            MS. THOMAS:  Object to the form.

19  A:   Affiliation agreements describe what is expected to

20       meet requirements and to provide appropriate areas for

21       instruction and environments for instruction.

22  BY MR. ROTHSTEIN:

23  Q:   Okay.  Do you believe this document is a contract

24       between --

25  A:   No, sir.

```
 1   Q:   You do not?

 2   A:   No, sir.

 3   Q:   Why do you believe this is not a contract?

 4   A:   It states what two institutions are going to do to

 5        provide education.

 6   Q:   Okay.  How is that not a contract?

 7   A:   I'm not a lawyer.  But that's not a contract.

 8   Q:   Okay.  Well, you've got a promise by both institutions

 9        to do something; correct?

10   A:   Are you asking a contract between the two institutions?

11   Q:   Between the two institutions.

12   A:   Oh.  Again I'm not a lawyer.  To me it's an affiliation

13        agreement.  I'm not trying to be deceitful.  I just

14        don't know the terms you're trying to use or what, it's

15        an affiliation agreement of what one institution is

16        going to do to provide for the medical students.

17   Q:   Okay.  But it's got two parties to it.  At least two

18        parties are agreeing to do something; right?

19   A:   Yes, sir.

20   Q:   And it's signed, it's in writing that lays out what the

21        responsibilities are; correct?

22   A:   Yes, sir.

23   Q:   And do you know whether this document is actually

24        signed by anybody?

25   A:   I don't know.  It doesn't have it on here.
```

Allen Court Reporting

1    Q:    Okay.

2    A:    No signatures in this document you gave me.

3    Q:    Let me direct you to page ten.  I think you're looking

4          at the exhibit.

5    A:    Oh, I'm sorry.

6    Q:    The appendix.

7    A:    Okay.  Yes, sir.

8    Q:    Signed by Palmetto Health.  It looks like three

9          representatives of Palmetto Health; right?

10   A:    Yes, sir.

11   Q:    Jim Raymond who is the senior VP for Quality, Medical

12         Education and Research and the Chief Academic Officer

13         of Palmetto Health; right?

14   A:    Yes, sir.

15   Q:    Signed by Charles B. Beaman Jr., the President and CEO

16         of Palmetto Health; right?

17   A:    Yes, sir.

18   Q:    And it's signed by the Chair of the Board of Directors

19         of Palmetto Health; right?

20   A:    Yes, sir.

21   Q:    Do you believe those three individuals have the ability

22         or authority to bind Palmetto Health to a contract or

23         an agreement?

24   A:    Yes, sir.

25   Q:    And then if you will look to the right University of

```
 1        South Carolina representatives have also signed this
 2        document; correct?
 3   A:   Yes, sir.
 4   Q:   All right.  The first one is Dean, is it DiPette?
 5   A:   DiPette.
 6   Q:   DiPette?
 7   A:   DiPette.  Yes, sir.
 8   Q:   And at the time he was the dean, he was the Vice
 9        President for Medical Affairs and Dean of the
10        University of South Carolina School of Medicine?
11   A:   I assume if he signed it he was.
12   Q:   Okay.  And it's signed by President Pastides of the
13        University of South Carolina?
14   A:   Yes, sir.
15   Q:   And it was signed by the Chair of the Board of Trustees
16        for the University of South Carolina; right?
17   A:   Yes, sir.
18   Q:   Do you believe those three gentlemen had the ability to
19        contract or bind South Carolina to an agreement?
20             MS. THOMAS:  Object to the form.
21   A:   I would assume so.  Yes, sir.
22   BY MR. ROTHSTEIN:
23   Q:   Okay.  And would you agree that all residents are
24        beneficiaries of this agreement between Palmetto Health
25        and USC School of Medicine?
```

```
 1              MS. THOMAS:  Object to the form.
 2   A:   The affiliation document, I haven't reviewed it in
 3        detail, haven't reviewed it since I was asked to do
 4        things.  But affiliation document, that describes the
 5        educational relationship and the things that will be
 6        provided for the educational environment.  And in that
 7        sense, you always are looking to provide an environment
 8        that's beneficial for learning.
 9   BY MR. ROTHSTEIN:
10   Q:   Okay.  But my question is, would that inure to the
11        benefit of the residents?
12              MS. THOMAS:  Object to the form.
13   A:   Because there's an affiliation agreement?
14   BY MR. ROTHSTEIN:
15   Q:   And the promises and obligations in the agreement
16        itself.
17   A:   Well, I would have to go back --
18              MS. THOMAS:  Object to the form.
19   A:   I would have to go back and read the entire document.
20   BY MR. ROTHSTEIN:
21   Q:   All right.  Well, let me just direct you to page three,
22        the paragraph 3.2 that I was talking about.  Just
23        looking at that one promise, Palmetto Health and the
24        USC School, or the School of Medicine will share the
25        responsibility for ensuring an appropriate learning
```

Allen Court Reporting

1    environment and that clinical instruction occurs in an

2    atmosphere of mutual respect and collegiality between

3    the faculty, residents, medical students and staff;

4    right?

5  A:  (Nods head affirmatively.)

6  Q:  Does that sentence benefit the residents?

7         MS. THOMAS:  Object to the form.

8  A:  An appropriate learning environment and an atmosphere

9    of mutual respect and collegiality always benefits

10   everybody.

11  BY MR. ROTHSTEIN:

12  Q:  And the responsibility for ensuring those two things

13    falls jointly on Palmetto Health and the USC School of

14    Medicine; isn't that right?

15         MS. THOMAS:  Object to the form.

16  A:  Says they will share it.

17  (Plaintiff's Exhibit Number 4 was marked for identification

18  purposes.)

19  BY MR. ROTHSTEIN:

20  Q:  Have you ever seen Exhibit 4 before?

21  A:  No, sir.

22         MS. THOMAS:  If you are going to ask him questions

23    about it, we need to step out and talk about it.

24         MR. ROTHSTEIN:  That's fine.

25              (Off the Record)

```
 1  BY MR. ROTHSTEIN:
 2  Q:  All right, Dr. Taylor.  Have you had a chance to look
 3      at Exhibit 4?
 4  A:  Yes, sir.
 5  Q:  Okay.  Have you ever seen that document before today?
 6  A:  No, sir.
 7  Q:  Okay.  Are you familiar with the program letters of
 8      agreement between Palmetto Health and various practices
 9      or clinics?
10  A:  I know they exist.  Yes, sir.
11  Q:  Do they exist in connection with the pediatrics
12      residency program?
13  A:  I'm not sure.  But I would think so.
14  Q:  Okay.  And I'm going to turn your attention to the
15      second page of Exhibit 4.  Do you believe this to be a
16      contract?
17  A:  This is a letter of agreement of what an entity will
18      provide educationally.
19  Q:  Do you believe it involves promises on both sides, by
20      both parties to this agreement?
21          MS. THOMAS:  Object to the form.
22  A:  It says what both are agreeing to provide.  Yes, sir.
23  BY MR. ROTHSTEIN:
24  Q:  And it's signed by authorized representatives of both
25      parties?  Looks like Kathy Stephens from Palmetto
```

```
 1        Health?
 2   A:   Uh-huh (affirmative response).
 3   Q:   Vice President --
 4   A:   She's the DIO.  Yes, sir.
 5   Q:   Okay.  Does she have the authority to bind Palmetto
 6        Health?
 7             MS. THOMAS:  Object to the form.
 8   BY MR. ROTHSTEIN:
 9   Q:   Or do you believe she has the authority to bind
10        Palmetto Health?
11             MS. HELMS:  Object to the form.
12   A:   I don't know who has the authority to bind Palmetto
13        Health ultimately.  But I would assume that as DIO she
14        can do educational agreements.
15   BY MR. ROTHSTEIN:
16   Q:   And it's accepted by Paul Athey, MBA, Administrative
17        Director.  Do you know who he is?
18   A:   I knew who he was.  Yes, sir.
19   Q:   Who was his position?
20   A:   As it states, administrative director.
21   Q:   Do you know if he's still employed by the university?
22             MS. THOMAS:  Object to the form.
23   A:   I do not believe he is.
24   BY MR. ROTHSTEIN:
25   Q:   Do you know anything about the circumstances of him
```

```
 1      leaving?
 2 A:   Nothing.  No, sir.
 3 Q:   It also appears to be signed by a John Walsh, MD.  Do
 4      you know Dr. Walsh?
 5 A:   Yes, sir.
 6 Q:   Dr. Walsh is the Chair of the Orthopedic Surgery
 7      Department of USC?
 8 A:   Yes, sir.
 9 Q:   Would he have authority to bind the USC Orthopaedic
10      Surgery Department to this agreement?
11          MS. THOMAS:  Object to the form.
12 A:   Nobody has ultimate authority to bind USC to any
13      agreement except the dean.  And in certain contracts
14      you can't, the dean can't and it has to go to the board
15      of trustees.  So it depends on what type of agreements
16      and contracts that you may be referring to.
17 BY MR. ROTHSTEIN:
18 Q:   Okay.  What about this particular agreement, this
19      program letter of agreement?  Do you believe Dr. Walsh
20      has the authority as the chair of the department to
21      bind the department?
22          MS. THOMAS:  Object to the form.
23 A:   I would assume so since it's signed.
24 BY MR. ROTHSTEIN:
25 Q:   Okay.
```

```
1   A:    And accepted.

2   Q:    Okay.

3   A:    But not sure.

4         MS. THOMAS:  Okay.  I'm going to point out this

5         contract is not with the department.  The contract very

6         clearly says who the parties are.  And John Walsh is

7         not signing as a representative of the School of

8         Medicine.

9         MR. ROTHSTEIN:  You can't make a speaking

10        objection.  The rules are pretty clear on that.  If you

11        want to make that argument to the Court about who has

12        the --

13        MS. THOMAS:  Yeah.  But you're deliberately

14        misrepresenting --

15        MR. ROTHSTEIN:  Well, you can ask him that.

16        MS. THOMAS:  -- the laws of --

17        MR. ROTHSTEIN:  You can ask him those questions on

18        redirect.  You can't coach your witness during my

19        questioning; okay?

20  BY MR. ROTHSTEIN:

21  Q:    Let me ask you to turn to page, the first page of the

22        agreement.  Are you familiar with, see the first

23        paragraph or first sentence there, the purpose of this

24        Letter of Agreement is to set forth the general terms

25        and specific conditions under which University
```

Allen Court Reporting

```
 1        Specialty Clinics/Oorthopaedic Surgery has agreed to
 2        participate in the education and supervision of
 3        residents in the Palmetto Health Graduate Medical
 4        Education Program.  The components of our relationship
 5        are as follows.  Do you see that?
 6   A:   Yes, sir.
 7   Q:   So it looks like the two parties to this agreement are
 8        the University Specialty Clinics/Orthopedic Surgery and
 9        Palmetto Health; right?  Do you agree with that?
10   A:   As stated in this paragraph.  Yes, sir.
11   Q:   And the University Specialty Clinics is part of the
12        University of South Carolina School of Medicine, isn't
13        it?
14            MS. THOMAS:  Object to the form.
15   A:   It is.  But I would think down there, if you look at
16        the bullet point number four which begins with Palmetto
17        Health will be solely responsible for payment of
18        salary, fringe benefits and professional liability, it
19        clearly states who's responsible for the resident's
20        compensation and support and employment.  And it
21        additionally states that it's the, an arrangement or
22        affiliation agreement throughout the document
23        clarifying clearly that you are agreeing to participate
24        in the Palmetto Health Graduate Medical Education
25        Program.  And the other document further in the
```

```
 1        document that you are referring to it states clearly
 2        that despite having to follow the policies as I alluded
 3        to before of any place where the resident trains,
 4        ultimately you have to follow the sponsoring goals and
 5        objectives of the sponsoring institution which is
 6        Palmetto Health.  So when residents or students train
 7        anywhere, it doesn't change who they're employed by or
 8        who assumes ultimate responsibility.  And clearly in
 9        this PLA as all PLAs are, the residents are under the
10        auspices of the graduate program of Palmetto Health as
11        this document that you've asked me to look at states.
12  BY MR. ROTHSTEIN:
13  Q:   That's fair enough.  But I think my question -- I don't
14       remember what the question was.  But I don't think you
15       answered the question.  Let me ask you another one.  Do
16       you see it on page two, the second bullet point -- I'm
17       sorry.  The first bullet point on page two.
18  A:   Supervision?
19  Q:   No.
20  A:   I'm sorry.
21  Q:   I'm talking about the little asterisk looking bullet
22       point.
23  A:   Yes, sir.  Further it is agreed?
24  Q:   Yes.  Do you see the last sentence of that bullet says,
25       further, the educational experiences of the resident
```

```
 1        while on rotation at your site will be provided in a
 2        manner consistent with applicable Accreditation Council
 3        for Graduate Medical Education Residency Review
 4        Committee requirements and other federal, state and
 5        local laws, rules and regulations?  Do you see that?
 6   A:   I must be on the wrong page.  I'm sorry.
 7   Q:   Page two.
 8   A:   Yeah.  Yes, sir.
 9   Q:   Do you see the first bullet, the last sentence of that
10        bullet?
11   A:   Okay.
12   Q:   States --
13   A:   I'm sorry.
14   Q:   -- the educational experiences of the resident --
15   A:   Uh-huh (affirmative response).
16   Q:   -- while on rotation at your site will be provided in a
17        manner consistent with the applicable ACGME RRC
18        requirements; right?
19   A:   Yes, sir.
20   Q:   Okay.  That sentence uses the term will be provided.
21        Do you see the phrase will be provided?  What does that
22        mean to you?
23   A:   That I'm going to provide educational experiences on
24        that rotation.
25   Q:   Okay.  It doesn't say may be provided; right?  It's not
```

```
 1        an optional sentence, it's a mandatory sentence.  Would
 2        you agree with that?
 3             MS. THOMAS:  Object to the form.
 4   A:   Oh, gosh.  I feel like this is Bill Clinton.  Will be,
 5        may be, should be.  It says that we, that they're
 6        asking that this resident be, or all residents who come
 7        through here be provided educational experiences in
 8        this setting.
 9   BY MR. ROTHSTEIN:
10   Q:   Okay.  And that requirement falls on both Palmetto
11        Health and the other party to this PLA; right?  Which
12        would be University Specialty Clinics Orthopaedic
13        Surgery Department; right?
14   A:   This is an educational agreement to provide that
15        training.  Yes, sir.
16   Q:   Okay.  And then after the second bullet about halfway
17        down the page it says, your agreement to participate in
18        the Palmetto Health Graduate Medical Education Program
19        or programs is greatly appreciated; right?  And then
20        the next sentence says, the PH/USC Department of
21        Orthopaedic Surgery pledges its full support to the
22        clinic site to help in education of the residents
23        within your office.  Did I read that correctly?
24   A:   Yes, sir.
25   Q:   Okay.  And that talks about both Palmetto Health and
```

```
 1        USC Department of Orthopaedic Surgery pledging; right?
 2   A:   Yes, sir.
 3   Q:   Okay.  Do you believe that this Program Letter of
 4        Agreement benefits residents in the Orthopaedic Surgery
 5        Residency Program at Palmetto Health and USC School of
 6        Medicine?
 7             MS. THOMAS:  Object to the form.
 8             MS. HELMS:  Object to the form.
 9   A:   We seek training sites to benefit our learners, whether
10        they are students or residents, for education.
11   BY MR. ROTHSTEIN:
12   Q:   So that was, that would be a yes to my question; right?
13        You believe that this PLA benefits the residents in the
14        Orthopaedic Surgery Residency Program?
15             MS. THOMAS:  Object to the form.
16   A:   Yes, sir.
17   BY MR. ROTHSTEIN:
18   Q:   And that would include Dr. Irani; correct?
19             MS. THOMAS:  Object to the form.
20   BY MR. ROTHSTEIN:
21   Q:   If you will look over to the third page his name is
22        specifically listed as an appendix to this document;
23        right?
24             MS. THOMAS:  Object to the form.
25   A:   The purpose of an agreement is to provide equal
```

```
 1        education and benefit to all residents who are in a
 2        program for education.
 3   BY MR. ROTHSTEIN:
 4   Q:   And that would include Dr. Irani; correct?
 5             MS. THOMAS:  Object to the form.
 6   A:   He's a resident so he would benefit from that
 7        educational affiliation.
 8   BY MR. ROTHSTEIN:
 9   Q:   Now you testified a little while ago that, you said it
10        was the Palmetto Health Residency Program; correct?
11   A:   Yes, sir.
12   Q:   Let me ask you to look at page two, I mean, Exhibit 2.
13   A:   Page two, Exhibit 2?
14   Q:   I'm sorry.  Exhibit 2, page four.
15   A:   Exhibit 2, page four.
16   Q:   Do you see the introduction at the top of the page?
17   A:   Uh-huh (affirmative response).  Yes, sir.
18   Q:   Okay.  This document -- and by the way, when you hand
19        out your documents to residents do you make them
20        available to the residents?  I mean, when the resident
21        starts, do you make the residency manual available to
22        the resident?
23   A:   Yes, sir.
24   Q:   So you would assume that Exhibit 2 would have been
25        distributed or at least made available to the residents
```

1          of the Orthopaedic Surgery Residency Program at USC?

2              MS. HELMS:  Objection to the form.

3    A:   I would assume that you would distribute policies and

4         procedures to residents, yes, sir, at the beginning of

5         their training.

6    BY MR. ROTHSTEIN:

7    Q:   So on page four under Introduction, it says the

8         University Surgery -- it says the Orthopaedic Surgery

9         Residency Training Program at the University of South

10        Carolina School of Medicine is dedicated to the

11        education of its residents and places primary emphasis

12        on their training as general orthopaedic surgeons.  Do

13        you see that?

14   A:   Yes, sir.

15   Q:   It doesn't say anything about Palmetto Health, does it?

16   A:   Not in that sentence.  No, sir.

17   Q:   Okay.  And the residency programs are really a joint

18        venture between Palmetto Health and the University of

19        South Carolina School of Medicine, aren't they?

20              MS. THOMAS:  Object to the form.

21   A:   Officially as the affiliation agreement stated, I

22        quickly saw that statement, they're called jointly the

23        programs Palmetto Health and USC.  But the sponsoring

24        institution and the ultimate responsible organization

25        is Palmetto Health as the sponsoring institution.

Allen Court Reporting

```
 1  BY MR. ROTHSTEIN:

 2  Q:   Okay.  And I certainly understand that.  But you hold

 3       out to the world, and specifically the residents, that

 4       this is a joint program between Palmetto Health and

 5       USC; right?

 6            MS. THOMAS:  Object to the form.

 7  A:   Yes, sir.  It's an affiliation of joint training.  Yes,

 8       sir.

 9  (Plaintiff's Exhibit Number 5 was marked for identification

10  purposes.)

11  BY MR. ROTHSTEIN:

12  Q:   Have you ever seen Exhibit 5 before?

13  A:   I've seen parts of it.  Yes, sir.  Parts of some of the

14       document.

15  Q:   Okay.  And I'll represent to you that these are web

16       pages from the residency.palmettohealth.org web site.

17       Do you see that at the top?

18  A:   Uh-huh (affirmative response).

19  Q:   Have you ever been on the web site before?

20  A:   Oh, yeah.

21  Q:   Okay.  Do you remember seeing the --

22                      (Off the Record)

23  BY MR. ROTHSTEIN:

24  Q:   Do you see both logos for Palmetto Health and the USC

25       School of Medicine on this document at the very top of
```

Allen Court Reporting

| 1 | A: | Yes, sir. |
| 2 | Q: | -- a -- |
| 3 | A: | GMEC. |
| 4 | Q: | -- member of the GMEC? |
| 5 | A: | Yes, sir. |
| 6 | Q: | Do you recall the GMEC rejecting a program director's |
| 7 |  | recommendations since you've been the chair of the |
| 8 |  | department? |
| 9 | A: | I just don't remember the specifics.  But I would, I |
| 10 |  | don't know. |
| 11 | Q: | Okay.  Can you give me a ballpark of how many times |
| 12 |  | you've seen the GMEC reject a program director's |
| 13 |  | recommendation? |
| 14 | A: | No, sir. |
| 15 | Q: | Was it more than five? |
| 16 | A: | As I said I just don't recall.  We have four or five |
| 17 |  | residents at different levels of different things at |
| 18 |  | different times.  And they're presented, you listen, |
| 19 |  | there's discussion.  And whether we end up rejecting |
| 20 |  | what the program director did or recommended, I don't |
| 21 |  | recall.  We focus on trying to do what's best for the |
| 22 |  | resident and what's best for the program and best for |
| 23 |  | the patients. |
| 24 | Q: | Have you ever seen the GMEC reject a program director's |
| 25 |  | recommendation of terminating a resident? |

Allen Court Reporting

```
 1   A:   Gosh.  I do not recall.

 2   Q:   Have you ever had to fire a resident from one of your

 3        programs?

 4   A:   Yes, sir.

 5   Q:   How many times has that occurred?

 6   A:   One time.

 7   Q:   Do you remember what decade that was?

 8   A:   Yes, sir.  Nineties.

 9   Q:   1990s?  Did the GMEC agree with your recommendation?

10   A:   Yes, sir.

11   Q:   Did that resident file a grievance?

12   A:   No, sir.

13   Q:   During your tenure on the GMEC have you ever served on

14        the grievance committee?

15   A:   No, sir.

16   Q:   Are you aware of any resident successfully completing

17        the grievance process at Palmetto Health?

18   A:   What do you mean by successfully completing?

19   Q:   Having the decision of the GMEC overturned?

20   A:   Yes, sir.

21   Q:   How many times has that happened?

22   A:   I'm aware of one.

23   Q:   Which one was that?

24            MS. HELMS:  We're not going into this.

25   BY MR. ROTHSTEIN:
```

Allen Court Reporting

1        Dr. Koon's recommendation?

2   A:   No, sir.

3   Q:   Do you know how long Dr. Koon's presentation to the

4        executive, in the executive session of the GMEC lasted?

5   A:   No, sir.

6   Q:   Did Dr. Koon present any documents in support of his

7        recommendation?

8   A:   I do not recall.

9   Q:   Did any of the GMEC committee members or GMEC members

10       have any questions for Dr. Koon?

11  A:   I do not recall.

12  Q:   Do you recall asking any questions of Dr. Koon?

13  A:   I do not recall.

14  Q:   How was this resident issue, I guess, passed upon by

15       the GMEC at that time?

16  A:   How was it passed upon?

17  Q:   Yeah.  Did they just have a motion, a second and a

18       voice vote?  Is that typically how in terms of adopting

19       or rejecting one of these recommendations?

20  A:   There's usually information provided by the program

21       director.  There may or may not be questions.  And then

22       there's usually a recommendation put forth that is

23       discussed and then a motion and vote.  Yeah.

24  Q:   In your experience on the GMEC, are residents typically

25       allowed to present their side of the story to the GMEC

```
 1        before the GMEC takes action?

 2   A:   No, sir.

 3   Q:   So Dr. Irani was not given an opportunity to present

 4        his side of the story to the GMEC before the GMEC acted

 5        on Dr. Koon's recommendation; right?

 6   A:   Not that I recall.

 7   Q:   Do you recall a resident ever being allowed to address

 8        the GMEC in executive session?

 9   A:   I do not believe so.

10   Q:   Is there any advocate for the resident present during

11        the executive session of the GMEC?

12   A:   I think we all try to be resident advocates because the

13        last thing you want to do is to have a resident leave

14        the program.

15   Q:   Do you recall anyone specifically acting as Dr. Irani's

16        advocate on October 11th 2011 during the GMEC meeting?

17   A:   As I stated I do not recall specifics about Dr. Irani's

18        presentations at GMEC or any specifics regarding his

19        situation.

20   (Plaintiff's Exhibit Number 7 was marked for identification

21   purposes.)

22   Q:   Show you Exhibit 7 which appears to be the next GMEC

23        meeting, December of 2011, December 13th 2011.  Do you

24        see that?

25   A:   Yes, sir.
```

Allen Court Reporting

```
 1        the GMEC taking official action?
 2   A:   Do I recall if those processes involve resident input?
 3   Q:   Right.
 4   A:   My understanding and thought would be that the program
 5        director discusses any remediation plans or
 6        recommendations that will be taken with the resident to
 7        gain understanding and input.
 8   Q:   Okay.  But the program director doesn't make the
 9        ultimate decision about whether to suspend or terminate
10        a resident; right?
11   A:   That is correct.
12   Q:   Okay.  And that actually has to be officially taken
13        through the GMEC?
14   A:   Yes, sir.
15   Q:   Okay.  And does the resident have any direct input to
16        the GMEC prior to that decision being made under your
17        understanding of the due process?
18             MS. THOMAS:  Object to the form.
19   A:   I don't recall that that is part of the process.
20   BY MR. ROTHSTEIN:
21   Q:   All right.
22   A:   Can I interrupt for two seconds?
23   Q:   Yeah.
24             (Off the Record Discussion)
25   BY MR. ROTHSTEIN:
```

Allen Court Reporting