# EXHIBIT J

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

Afraaz R. Irani, M.D.,       )
                             )       C/A No. 3:14-cv-03577-CMC-KDW
        Plaintiff,           )
                             )
vs.                          )
                             )
Palmetto Health;             )
University of South          )
Carolina School of          )
Medicine; David E. Koon,     )
Jr., M.D., in his            )
individual capacity; and     )
John J. Walsh, IV, M.D.,     )
in his individual            )
capacity,                    )
                             )
        Defendants.          )
_____)

VIDEO DEPOSITION OF

DAVID E. KOON, JR., M.D.

*******************

Monday, June 29, 2015
9:08 a.m. - 5:52 p.m.


        The video deposition of DAVID E. KOON, JR., M.D.,

taken on behalf of the Plaintiff at the law offices of

Ogletree, Deakins, Nash, Smoak & Stewart, P.C., 1320 Main

Street, Suite 600, Columbia, South Carolina, on the 29th day

of June, 2015, before Lyn A. Hudson, Court Reporter and

Notary Public in and for the State of South Carolina,

pursuant to Notice of Deposition and/or agreement of

counsel.

1  Q:  Okay.  Are you familiar with the term pyramid program?

2  A:  I think so if --

3  Q:  Tell me what you understand a pyramid program to be.

4  A:  That you start with a certain number of residents in

5      the lower level.  And then as you, as they progress

6      there is some diminution of the number or some

7      reduction of the number.

8  Q:  Okay.  It's like a weeding out kind of process; right?

9  A:  That's correct.

10 Q:  So you start with like a pyramid, a wider base.  And as

11     you progress in your training the upper class gets

12     smaller and smaller by design?

13 A:  Yeah.  I don't know that there's any orthopedic program

14     that's a pyramid program.

15 Q:  Okay.  Are there residency programs in other

16     specialties that are pyramid programs?

17 A:  I don't know.

18 Q:  Okay.  Are you aware that some residency programs start

19     with a higher number of residents in their first or

20     second year than are available in successive years?

21 A:  As I said, I don't know that there are any orthopedic

22     surgery programs that are considered a pyramid program.

23 Q:  Okay.  But in terms of other specialties or

24     subspecialties, are you aware of other programs?  For

25     example, general surgery where they may have more

```
 1        residents in the first or second year than they intend
 2        to graduate?
 3   A:   I don't know of any general surgery program that's a
 4        pyramid program.
 5   Q:   Okay.  Are you familiar with the term preliminary
 6        position as it relates to a resident?
 7   A:   Yes.
 8   Q:   Okay.  What is your understanding of the term
 9        preliminary position?
10   A:   My understanding is that that's a position that's
11        granted to a resident.  And if they do a good job they
12        are accepted into the program the following year versus
13        a categorical position which they are expected to go to
14        the next year.
15   Q:   Okay.  And does the Palmetto Health USC Orthopedic
16        Surgery Program have preliminary positions?
17   A:   No.
18   Q:   Okay.  So all of the positions at Palmetto Health since
19        you've been affiliated with the Orthopedic Surgery
20        Residency Program are categorical positions?
21   A:   Yes.
22   Q:   Okay.  And you just testified that there's an
23        expectation that the resident will continue on from
24        year to year until they graduate?
25   A:   Yes.
```

| | | |
|---|---|---|
| 1 | Q: | Do you know of any, any -- I think you may have |
| 2 | | testified to this earlier.  Do you know of any |
| 3 | | orthopedic surgery residency program around the country |
| 4 | | that has preliminary residents? |
| 5 | A: | I testified to the fact that I did not believe there |
| 6 | | were any, or I did not know of any orthopedic programs |
| 7 | | that were a pyramid program.  I don't know if there are |
| 8 | | orthopedic programs that have preliminary spots. |
| 9 | Q: | Has USC ever had any preliminary spots to your |
| 10 | | knowledge or at least since you've been there? |
| 11 | A: | No. |
| 12 | Q: | Would you agree that orthopedic surgery is generally |
| 13 | | one of the most competitive residencies to get into on |
| 14 | | the front end? |
| 15 | A: | It's very competitive. |
| 16 | Q: | Okay.  But once you're in in a categorical position |
| 17 | | there's not competition among your peers to stay in the |
| 18 | | program.  Do you agree with that? |
| 19 | A: | Not in our program. |
| 20 | Q: | Okay.  And so your program is designed when you hire a |
| 21 | | resident, there are two residents in each class |
| 22 | | traditionally, there have been two residents per class; |
| 23 | | right? |
| 24 | A: | Correct. |
| 25 | Q: | Okay.  And the understanding when you hire a resident |

Allen Court Reporting

```
1         to that class is that that person will complete a

2         five-year residency program as long as their job

3         performance is up to par.  Is that a fair assessment?

4    A:   Yes.

5    Q:   Do you know what the attrition rate in orthopedic

6         surgery programs is like nationwide?

7    A:   That data is not published.

8    Q:   Okay.  Have you ever looked at whether orthopedic

9         surgery programs have openings sort of all cycle where

10        people either leave or have accidents or die or for, do

11        you know if there are a number of resident openings in

12        orthopedic surgery around the country per year?

13   A:   Was that a question?

14   Q:   Yeah.  Do you know if there are a number of openings

15        for orthopedic residency programs?

16   A:   Yes.

17   Q:   Okay.  Do you know how that number of openings compares

18        to other specialties or subspecialties?

19   A:   I do not.

20   Q:   Now, when residents start at the Palmetto Health USC

21        Orthopedic Surgery Residency Program, they're sort of

22        given an expected graduation date; is that right?  Say

23        like in this Exhibit 1, we see class of 2015, class

24        of 2016, those types of things.  Do you recall seeing

25        residents in the orthopedic surgery program identified
```

Allen Court Reporting

```
 1   A:    That's correct.

 2   Q:    Do you agree with those statements that Dr. Greene's

 3         start date in orthopedic surgery was July 1st 2013

 4         first of all?

 5   A:    Yes.

 6   Q:    And his anticipated graduation date would have been

 7         June 30th 2018?

 8   A:    If he was still with us.

 9   Q:    All right.  And you do, you agree that the program is a

10         five-year residency program?

11   A:    Yes.

12   Q:    Okay.

13   A:    Do you need these back?

14   Q:    You can just kind of lay those to the side.  We'll

15         collect them at the end of the deposition.  The court

16         reporter will take care of those.

17   (Plaintiff's Exhibit Number 3 was marked for identification

18   purposes.)

19   Q:    Show you Exhibit 3.

20             MR. ROTHSTEIN:   Sorry, Dr. Walsh.  Didn't mean to

21         throw that at you.

22   BY MR. ROTHSTEIN:

23   Q:    Have you ever seen Exhibit 3 before?

24   A:    Yes.

25   Q:    And this is a letter that you signed as well as, along
```

1    purposes.)

2    Q:    Look at Exhibit 4.  Have you seen Exhibit 4 before?

3    A:    I believe I have seen this before.

4    Q:    Okay.  And again I'll represent to you that this is a

5          printout from the orthopedic, or the USC School of

6          Medicine web site under the Orthopedic Surgery Medical

7          Education tab.  And this is the chairman's message.

8          You recognize Dr. Walsh as the chairman of the

9          department; right?

10   A:    I do.

11   Q:    And the second paragraph, third sentence, says, every

12         year -- well, first of all, it says our residency

13         program, the second sentence, our residency program has

14         produced skilled orthopedic surgeons for more than five

15         decades.  It says every year we accept two new

16         residents into the five-year program.  Has that

17         structure changed of having two residents for a

18         five-year program?  Has that changed since you've been

19         involved with the program other than on a temporary

20         basis where you may get three residents per year or

21         one?

22   A:    It has not.  The structure remains the same.

23   Q:    I'm going to show you.  I don't have multiple copies of

24         this one.  I just wanted to show you this, marked as

25         Exhibit 1.  Let me put a sticker on it.

```
 1              MR. ROTHSTEIN:  Oh.
 2              MS. HELMS:  If it's just one or two pages let me
 3         get those so everyone has them.
 4  A:    Page four?
 5  BY MR. ROTHSTEIN:
 6  Q:    Yes.
 7              VIDEOGRAPHER:  Off the record at 9:53.
 8              (Break - 9:53 a.m.-9:59 a.m.)
 9  BY MR. ROTHSTEIN:
10  Q:    Dr. Koon, before the break we were looking at Exhibit
11         5.  And I believe you testified that you recognized
12         that document as the Department of Residency, the
13         Department of Orthopedic Surgery Residency Manual?
14  A:    Yes.
15  Q:    Does this document reflect the policies and procedures
16         of the USC Department of Orthopedic Surgery Residency
17         Program?
18  A:    It needs to be updated but it generally reflects the
19         policies and procedures.
20  Q:    Okay.  Are you aware of any more current version than
21         this document?
22  A:    No.  This one's on my desk awaiting my attention.
23  Q:    Okay.
24  A:    I've been putting it off.
25  Q:    Okay.  So this document would have covered the time
```

| | | |
|---|---|---|
| 1 | | period that Dr. Irani was involved in the program? |
| 2 | A: | It should.  Yes. |
| 3 | Q: | What's the purpose of this Department Of Orthopedic |
| 4 | | Surgery Residency Manual, Exhibit 5? |
| 5 | A: | Palmetto Health has a general residency manual that is |
| 6 | | provided to the residents, to all the residents.  And |
| 7 | | this one is, makes it more specific for the Department |
| 8 | | of Orthopedic Surgery. |
| 9 | Q: | Okay.  Is this document available to the residents in |
| 10 | | the program? |
| 11 | A: | Yes. |
| 12 | Q: | Is it available to the attendings or the faculty |
| 13 | | members in the program? |
| 14 | A: | Yes. |
| 15 | Q: | If you will turn to page four of this document, under |
| 16 | | educational paragraph.  That second paragraph says |
| 17 | | residents are selected through the National Residency |
| 18 | | Matching Program.  Says all residents are selected at |
| 19 | | the PGY 1 level for a five-year training program in |
| 20 | | orthopedic surgery.  Did I read that correctly? |
| 21 | A: | Yes. |
| 22 | Q: | Okay.  Has that always been the case, those two |
| 23 | | sentences always applied since you've been affiliated |
| 24 | | with the program? |
| 25 | A: | Other than the temporary changes that you alluded to |

1  Q:  Okay.

2  A:  And then Dr. Amanda Crawford.

3  Q:  Do you know why she left?

4  A:  She decided to go into radiology.

5  Q:  She was a classmate of Dr. Greene's?

6  A:  Yes.

7  Q:  And she resigned at the same time?

8  A:  That's correct.

9  Q:  Anyone else you can think of that's resigned from the

10      program voluntarily?

11  A:  Dr. Ellis.

12  Q:  What year, do you know why Dr. Ellis resigned?

13  A:  He decided to go into psychiatry.

14  Q:  What year was that that he resigned?

15  A:  This year.  He was a PGY 3.

16  Q:  Anyone else?

17  A:  I don't think so.  Not off the top of my head.

18  Q:  Since you've been involved in the program, are you

19      aware of a graduate who wanted to go into a fellowship

20      in a subspecialty not being able to secure that

21      fellowship position in that subspecialty?

22  A:  Am I aware of a graduate from our program?

23  Q:  Yes.

24  A:  Who wanted to do a fellowship and did not get in?

25  Q:  In the area that he wanted.  Maybe not necessarily the

| | | |
|---|---|---|
| 1 | | program but the type of, like if somebody wanted to go |
| 2 | | into spine or hand or something like that. |
| 3 | A: | I don't believe so. |
| 4 | Q: | Okay.  What percentage of graduates from the USC |
| 5 | | Palmetto Health Orthopedic Surgery Residency Program go |
| 6 | | on to pursue fellowships? |
| 7 | A: | The vast majority of them do.  The only exception to |
| 8 | | that would be our armed forces graduates who basically |
| 9 | | can't go into a fellowship based on their service |
| 10 | | obligations. |
| 11 | Q: | So you've got a pretty good track record that if a |
| 12 | | particular resident wants to go into a fellowship in a |
| 13 | | certain area that they generally are able to find a |
| 14 | | position in that subspecialty? |
| 15 | A: | I believe so.  I believe so. |
| 16 | Q: | I read in The State newspaper several months ago, maybe |
| 17 | | six or eight months ago about a case, a couple of, I |
| 18 | | think it was six or seven cases or maybe eight cases |
| 19 | | involving infections from knee injections within your |
| 20 | | department.  Are you familiar with those cases? |
| 21 | A: | Peripherally.  I read the paper. |
| 22 | Q: | Okay.  Were you involved in any of those, in the care |
| 23 | | of any of those patients? |
| 24 | A: | No. |
| 25 | Q: | Were any residents involved in any of the care of those |

| | | |
|---|---|---|
| 1 | | institutions in the Resident Graduate Medical Education |
| 2 | | Program at Palmetto Health; right?  That's a general |
| 3 | | requirement for a, a general definition of a program |
| 4 | | letter of agreement? |
| 5 | A: | Right.  It just sets forth the guidelines for rotations |
| 6 | | outside of the department. |
| 7 | Q: | Okay.  And this particular one is between Palmetto |
| 8 | | Health and the University Specialty Clinics Orthopedic |
| 9 | | Surgery; correct? |
| 10 | A: | Can you ask that question one more time? |
| 11 | Q: | Yeah.  This program letter of agreement is between |
| 12 | | Palmetto Health and the University Specialty Clinics |
| 13 | | Orthopedic Surgery Department; correct? |
| 14 | A: | Yes.  Yes, it is. |
| 15 | Q: | All right.  And you see on page two under, looks like |
| 16 | | paragraph number three, evaluation? |
| 17 | A: | Yes. |
| 18 | Q: | Okay.  And it says must provide written evaluation of |
| 19 | | resident on program director approved form or format |
| 20 | | within two weeks of rotation completion.  Do you see |
| 21 | | that? |
| 22 | A: | I do see it. |
| 23 | Q: | Have you ever been aware that that provision was in the |
| 24 | | program letter of agreement? |
| 25 | A: | Not off the top of my head. |

Allen Court Reporting

1        leaves the program; is that right?

2   A:   Yes.

3   Q:   Okay.  Do you recall doing a summative evaluation on

4        Dr. Irani?

5   A:   Yes.

6   (Plaintiff's Exhibit Number 9 was marked for identification

7   purposes.)

8   Q:   I'll show you Exhibit 9.  Does Exhibit 9 appear to be

9        an accurate copy of the summative evaluation you

10       performed for Dr. Irani?

11  A:   I believe so.

12  Q:   Okay.  And that's your signature about two-thirds of

13       the way down the page?

14  A:   That is correct.

15  Q:   Can you tell me what the date, looks like '06, August

16       of 2012?

17  A:   I believe that's correct.

18  Q:   Okay.  Was there something specific that prompted you

19       to complete this document in August of 2012?

20  A:   Well, it's something that is required that I do.  I

21       don't know exactly what prompted me to do it on the 6th

22       of August 2012.

23  Q:   Okay.  Dr. Irani, Dr. Irani's termination was finalized

24       in June of 2012 when Dr., or when Mr. Beaman denied his

25       final step agreements; do you understand that?

1             MS. THOMAS:  Object to the form.

2   A:   Those dates sound about right.

3   BY MR. ROTHSTEIN:

4   Q:   Okay.  Do you know why this was completed over two

5        months after his termination was finalized?

6             MS. THOMAS:  Object to the form.

7   A:   I do not.

8   BY MR. ROTHSTEIN:

9   Q:   Okay.  Is there a time frame for when summative

10       evaluations should be completed on residents that

11       either graduate or leave the program?

12  A:   I don't remember any specific policy that dictates the

13       timeliness of the summative evaluations.

14  Q:   Okay.  And on this document under internship that would

15       have been Dr. Irani's PGY 1 year; correct?

16  A:   That's correct.

17  Q:   And the dates listed there were July 1st 2010 to June

18       30th 2011.  And you indicated that he completed twelve

19       months of that year successfully?

20  A:   That's correct.

21  Q:   Okay.  And then under residency you have listed July

22       1st 2011 to April 10th 2012.  And says did not, no for

23       completed program and months successfully completed you

24       have one month.  And what month was that that he

25       successfully completed in his PGY 2 year?

```
 1   A:   I would have to look at the schedule and the

 2        evaluations and --

 3   Q:   And you believe that was the first month before he was

 4        put on level two remediation?

 5   A:   I suspect that it was July.  But again, I would have to

 6        look to be sure.

 7   Q:   And the second set of, or part of the summative

 8        evaluation is the assessment of the six core

 9        competencies of the ACGME program; right?

10   A:   That's correct.

11   Q:   Okay.  And half of those competencies you rated Dr.

12        Irani in the good category?

13   A:   Yes.

14   Q:   And on two of them he was rated in the poor category?

15        And one of them was rated in the fair category.  Do you

16        see that?

17   A:   I do see that.

18   Q:   Do you believe those are accurate assessments of Dr.

19        Irani's performance in the program?

20   A:   I believe they're accurate as of the 6th of August of

21        2012.

22   Q:   Okay.  And for overall performance you gave Dr. Irani a

23        rating of four; right?

24   A:   Yes.

25   Q:   Okay.  Do you know why this document is not signed by
```

Allen Court Reporting

| | | |
|---|---|---|
| 1 | Q: | Okay.  So all you can remember here today is Dr. |
| 2 | | Lamoreaux's situation? |
| 3 | A: | I believe that's correct. |
| 4 | Q: | Okay.  Now you've also been a voting member of the GMEC |
| 5 | | during the time that you were on the, or you were the |
| 6 | | program director; correct? |
| 7 | A: | Yes. |
| 8 | Q: | Do you regularly attend the GMEC monthly meetings? |
| 9 | A: | Usually I'm a little bit late.  But I try to get there. |
| 10 | Q: | Okay.  Have you, to your recollection have you ever |
| 11 | | voted against another program director's recommendation |
| 12 | | about a resident in their department? |
| 13 | A: | I don't believe I've ever voted against a program |
| 14 | | director's recommendation. |
| 15 | Q: | Have you ever witnessed the GMEC turning down another |
| 16 | | program director's recommendation about a resident in |
| 17 | | their department?  Even if you didn't specifically vote |
| 18 | | to reject it, have you ever seen the majority of the |
| 19 | | GMEC vote to reject the program director's |
| 20 | | recommendation? |
| 21 | A: | I've seen things tabled until the next month.  But I've |
| 22 | | never seen a recommendation actually voted down. |
| 23 | Q: | Would it be fair to say that the practice of the GMEC |
| 24 | | is to give deference to the recommendations of the |
| 25 | | program directors in terms of what a particular program |

| | | |
|---|---|---|
| 1 | | director wants done with the residents in that |
| 2 | | particular department? |
| 3 | A: | Yes. |
| 4 | Q: | Have you ever served on a grievance committee at |
| 5 | | Palmetto Health? |
| 6 | A: | I'm not allowed to. |
| 7 | Q: | Okay.  Are you aware of any resident at Palmetto Health |
| 8 | | ever winning a grievance through the grievance |
| 9 | | committee? |
| 10 | A: | I'm not sure of the details.  But I think there was |
| 11 | | one. |
| 12 | Q: | Okay.  Which one are you aware of where a resident |
| 13 | | was -- |
| 14 | A: | I believe there was an ophthalmology resident who, who |
| 15 | | the grievance committee sided with.  But I don't know |
| 16 | | the details of that case. |
| 17 | Q: | Okay.  I understand that the Orthopedic Surgery |
| 18 | | Residency Program participates or sponsors a journal |
| 19 | | club; is that right? |
| 20 | A: | Yes. |
| 21 | Q: | Okay.  And is the journal club something that's |
| 22 | | required by the ACGME mandate? |
| 23 | A: | I don't know if it's required.  It may be strongly |
| 24 | | encouraged.  But it's something that is kind of a usual |
| 25 | | and customary practice for all residency programs, not |

1  purposes.)

2  Q:    Show you Exhibit 10.  Are you familiar with the article

3        that's photocopied as Exhibit 10?

4  A:    Yes.

5  Q:    Do you recall assigning this article to Dr. Irani to

6        review for the journal club in June of 2011?

7  A:    I did not assign the article to Dr. Irani.

8  Q:    Okay.  Do you recall Dr. Irani being assigned this

9        article during journal club in 2011?

10  A:   I probably would have found out that night.

11  Q:   Okay.  You don't recall telling Dr. Irani as he stood

12       up to make his presentation that this article was not

13       randomly assigned to you?

14  A:   I don't recall that statement.

15  Q:   Is it possible you made that statement?

16  A:   Is it possible?

17  Q:   Yeah.

18  A:   Yes.

19  Q:   Have you ever seen this article presented by a resident

20       before at journal club?

21  A:   Yes.

22  Q:   Okay.  How often would you say you've seen this article

23       presented to, or at the journal club?

24  A:   I probably presented it when I was a resident.  This is

25       something that's been around for quite some time.  So

1      Dr. Irani, do you recall forwarding that to Dr. Hoover

2      and Dr. Wood?

3   A:  It appears that I copied them on my reply to his

4      e-mail.  Yes.

5   Q:  Okay.  Did you think Dr., it looks like you're sort of

6      dismissing Dr. Irani's suggested article as not

7      relevant or not significant for orthopedics?

8          MS. HELMS:  Objection to the form of the question.

9   BY MR. ROTHSTEIN:

10  Q:  Is that right?

11  A:  Well, at this time Dr. Irani had been, he had done

12     about three and a half months of orthopedics.  I wasn't

13     really sure why he was sending me articles for journal

14     club.

15  Q:  Okay.  You didn't think it was, that it was appropriate

16     for him to be suggesting articles for journal club?

17  A:  Not out of the Archives of Internal Medicine.

18  Q:  Okay.  And why would that be inappropriate for Dr.

19     Irani as a PGY 2 year to suggest that article for

20     journal club?

21  A:  The volume of information that we expect an orthopedic

22     resident to gain over his residency is such, so

23     voluminous that I thought his reading of the Archives

24     of Internal Medicine was a waste of time.

25  Q:  Okay.  But the shark article was not a waste of time;

|    |    |                                                              |
|----|----|--------------------------------------------------------------|
| 1  |    | no mention of pre-operative lab abnormalities, no new        |
| 2  |    | x-rays.  The x-rays for the patient were over two years      |
| 3  |    | old and.  And no notice of lack of medical clearance.        |
| 4  |    | So the patient was inadequately evaluated for his            |
| 5  |    | surgery which put him as risk.                               |
| 6  | Q: | Okay.  And that was February 27th of what year?  Is          |
| 7  |    | that 2012?  Is that right?                                    |
| 8  | A: | I believe that is 2012.  Yeah.                               |
| 9  | Q: | Okay.  Did you ever document this in a written               |
| 10 |    | memorandum to Dr. Irani, you know, sort of a write-up        |
| 11 |    | or deficiency in writing other than your handwritten         |
| 12 |    | notes?                                                        |
| 13 | A: | Can you repeat that?                                          |
| 14 | Q: | Yeah.  Did you ever create a written memorandum to Dr.       |
| 15 |    | Irani about this particular patient from February of        |
| 16 |    | 2012 and the inadequate history and physical?               |
| 17 | A: | Well, the inadequate history and physical had been           |
| 18 |    | previously documented by Dr. Walsh.  So this was a          |
| 19 |    | repeat of the same issue that Dr. Walsh had counseled        |
| 20 |    | him on.  This was so close to his dismissal that I           |
| 21 |    | probably did not write a separate memorandum for this        |
| 22 |    | patient.                                                      |
| 23 | Q: | Did you ever confront Dr. Irani about this particular        |
| 24 |    | patient and give him a chance to explain what had            |
| 25 |    | happened?                                                     |

Allen Court Reporting

```
 1   A:   I had multiple discussions with Dr. Irani where he was
 2        given opportunities to explain things.  I don't
 3        remember discussing this particular patient with Dr.
 4        Irani.
 5   Q:   Is it possible that the first time you raised this
 6        particular patient to Dr. Irani was during the
 7        grievance committee hearing?
 8   A:   It's also possible that I talked to him before the
 9        grievance committee about it.
10   Q:   But you have no written memorandum or written
11        documentation that suggests that you met with him about
12        that particular patient; is that right?
13   A:   Off the top of my head I don't know that this
14        particular patient was included in any of the
15        memorandums that I wrote.
16   Q:   Okay.  All right.  What other patients can you recall
17        where Dr. Irani allegedly provided sub-standard care
18        that were your patients?
19             MS. THOMAS:  Object to the form.
20   A:   I believe on page 307 of the same document it says, the
21        second line from the bottom of the page, it says 29
22        November Koon memo, and the second line from the bottom
23        says post TKA/MUA, patient with wound drainage, similar
24        circumstances to the VA.  I don't know if that was my
25        patient or not.  I have a feeling it was but I'm not
```

```
 1        admitted.  Dr. Wood told Afraaz to check the patient
 2        around two o'clock to, it would have been about two
 3        hours after his admission, and throughout the night.
 4        And when Dr. Wood asked Afraaz if he had done it the
 5        next morning the answer was no.
 6   Q:   Okay.
 7   A:   That was my, even though I didn't come in and see the
 8        patient at midnight, that was my patient.
 9   Q:   Okay.
10   A:   I was on call and responsible for the patient's care.
11   Q:   All right.  Any other patients that looking over your
12        notes you can identify as patients that you provided
13        care for?
14   A:   The only other patient that I can remember was the
15        patient that called both Afraaz and Harrison over the
16        weekend.  I don't know that that's documented on any of
17        these notes.  But it was a patient of mine who I
18        believe was having issues with her total knee.  If I
19        remember correctly it was wound drainage.  Very similar
20        to the patient at the VA.  And the patient was not
21        instructed to come in for an evaluation.
22   Q:   Okay.
23   A:   But I don't believe I have that documented on these.
24   Q:   The first write-up of Dr. Irani occurred in August of
25        2011; right?  About six weeks into his PGY 2 year?  Is
```

1    that accurate?

2    (Plaintiff's Exhibit Number 13 was marked for identification

3    purposes.)

4    A:   I believe that is the first time we had to initiate a

5         memorandum of record.

6    Q:   All right.

7    A:   Documented the 15th of August.

8    Q:   And Exhibit 13 is a copy of that memorandum; right?

9    A:   I believe so.

10   Q:   Okay.  Was Dr. Irani ever placed on level one

11        remediation prior to this meeting?

12   A:   I don't know that officially he was placed on level one

13        remediation.  Level one remediation is, it's a

14        progressive remediation process.  And I would consider

15        counseling sessions by chief residents, counseling

16        sessions by attendings and counseling sessions by the

17        program director somewhat equivalent even though it's

18        not officially designated as level one remediation.

19   Q:   Okay.  Prior to this meeting that you had with Dr.

20        Irani on August 15th 2011, what is your understanding

21        of what counseling sessions he had received?

22   A:   I think there are numerous.  I believe that his

23        attendings who gave him sub-standard evaluations during

24        his internship met with him.  I know a couple of the

25        senior residents in general surgery met with him.  I

1  Q:  Do you recall telling Dr. Irani at that time that he

2      was performing below his expectations as an orthopedic

3      resident?  Or up to that point had been performing

4      below the level of performance that you would have

5      expected as an orthopedic resident?

6  A:  That's definitely possible that I could have used that

7      type of terminology.  I mean, our interns are some of

8      the best.  And so we have very high expectations for

9      our interns.  We expect them to do really well.  And a

10     lot of the other programs would like to steal our

11     residents.  I mean, I've been told that before.  So if

12     I have a resident that's kind of getting poor comments

13     initially, then that kind of raises a red flag and

14     needs to be addressed.

15 Q:  Do you recall telling Dr. Irani during that meeting

16     that the attendings in the general surgery department

17     would trade three of their residents for one of the,

18     for one orthopedic resident?

19 A:  I don't know if I used that specific terminology in my

20     discussion with him in December.  Probably not.  I

21     mean, I could have said that.  But I don't know that

22     that was necessarily part of the December conversation.

23 Q:  Okay.  And do you recall ever telling Dr. Irani that

24     the medicine attendings are just happy if they have

25     someone that can speak English?

| | | |
|---|---|---|
| 1 | A: | Yes.  And I regret saying that. |
| 2 | Q: | All right.  Now, tell me about the meeting that you had |
| 3 | | with Dr. Irani in August of 2011 that's reflected in |
| 4 | | Exhibit 13 right in front of you.  Where, or do you |
| 5 | | recall who was at that meeting, first of all? |
| 6 | A: | I believe it was Afraaz, myself and Paul Athey. |
| 7 | Q: | Okay.  Why was Mr. Athey in the meeting? |
| 8 | A: | Paul was our business administrator who has extensive, |
| 9 | | who would have had extensive knowledge of HR-type |
| 10 | | items.  And any time I'm going to discuss things of a |
| 11 | | sensitive nature with sub-standard evaluations, I would |
| 12 | | like to have somebody else there.  Paul was probably |
| 13 | | just sitting in his office and I pulled him into mine. |
| 14 | Q: | Okay.  Was Dr. Walsh included in the meeting? |
| 15 | A: | I don't believe Dr. Walsh was personally at the |
| 16 | | meeting.  But he knew the meeting was going to happen. |
| 17 | Q: | Okay.  Do you recall mentioning Dr. Lamoreaux by name |
| 18 | | during the meeting? |
| 19 | A: | I don't remember mentioning Dr. Lamoreaux by name. |
| 20 | Q: | Okay.  Do you recall telling Dr. Irani that you had |
| 21 | | terminated residents from the program before or |
| 22 | | recommended residents be terminated from the program |
| 23 | | before? |
| 24 | A: | Which is it? |
| 25 | Q: | Either one of those.  Do you either recall him, telling |

1    are not.  So you can leave them in longer.  The Vicryl

2    suture will start degrading fairly rapidly and won't

3    hold the tissue in place.  If for some reason this

4    patient doesn't heal his wound normally, that Vicryl

5    suture is going to dissolve and the wound is going to

6    open again.  There is going to be a problem.

7  Q:  How was it brought to your attention that Dr. Irani had

8     attempted or had closed a wound with Vicryl suture?

9  A:  I don't know --

10 Q:  Okay.

11 A:  -- off the top of my head.

12 Q:  Do you know if any other residents in the orthopedic

13    surgery program have closed wounds improperly with

14    Vicryl suture on something else --

15 A:  I don't know of any other doctor who's ever closed a

16    wound with Vicryl suture.

17 Q:  Okay.  Do you know if, what attending it was that

18    brought it to Dr. Irani's attention that you shouldn't

19    close a wound with a Vicryl suture?

20 A:  No.

21 Q:  Do you know if Dr. Irani after being instructed it was

22    improper to use Vicryl suture ever used it again?

23 A:  I hope he didn't.  I don't know for a fact he did but I

24    would assume he didn't.

25 Q:  Okay.  So at least with item number five on Exhibit 13,

```
 1         once the impropriety of using a Vicryl suture was
 2         brought to Dr. Irani's attention and he was instructed
 3         that that was improper he never did it again?
 4   A:    I hope not.
 5   Q:    Okay.  So at least with that item he remediated his
 6         deficiency?
 7   A:    Yes.
 8   Q:    Okay.  And that's part of the resident process; right?
 9         Learning by your mistakes?  You don't expect a PGY 1 or
10         PGY 2 year resident to be perfect or know everything
11         about orthopedics?
12   A:    I don't expect them to be perfect.  But if they have a
13         question there are levels of supervision that are
14         available to him at all times that they could avail
15         themselves of.  He could have called one of the senior,
16         he could have called one of the junior residents and
17         asked them, hey, what should I close this wound with
18         and here are your options.
19   Q:    Do you recall what Dr. Irani's response to this
20         particular item on the Vicryl suture was when you said,
21         you know, this is sub-standard patient care?
22   A:    I don't remember his exact response to that.  I think
23         this was the only one that he agreed with out of the
24         seven.
25   Q:    Okay.  Now, let's look at the -- I'm sorry, we're about
```

| | |
|---|---|
| 1 | either incomplete or inaccurate.  He mentions that, I |
| 2 | don't know if he removed this, the wound.  There's no |
| 3 | mention of splinting, of a dressing.  Sometimes the |
| 4 | emergency department physicians will clean up the wound |
| 5 | a little bit and put it in a splint and put a dressing |
| 6 | on.  There's no mention of him doing that.  He also |
| 7 | mentions in his subsequent comments about this patient |
| 8 | that he sees his pain level.  I don't really understand |
| 9 | how he could do that. |
| 10 | Q:  Do you know how long this patient had been in the ER |
| 11 | before Dr. Irani was paged to come to the scene? |
| 12 | A:  I do not. |
| 13 | Q:  Okay.  Is this a pretty advanced case for someone that |
| 14 | had just finished their internship year to handle? |
| 15 | A:  I think it was a complicated injury to be sure.  Is it |
| 16 | too complicated for a junior resident to manage the |
| 17 | initial management of the wound?  No. |
| 18 | Q:  Okay.  Now, once Dr. -- |
| 19 | A:  Well, can I finish answering your question before that? |
| 20 | Q:  Yeah.  I'm sorry.  Yeah. |
| 21 | A:  You asked what else did he do wrong.  He also mentions |
| 22 | in his review of the patient that it was the right |
| 23 | thing to do.  And he was referring to an amputation of |
| 24 | the patient's extremity.  Based on his initial write-up |
| 25 | of the patient where his nerves were intact, his radial |

```
 1        pulse was fine, there was really, that calls into
 2        question whether or not there really were indications
 3        for a primary amputation of this patient.  I didn't see
 4        the patient.  I didn't see the wound.  Dr. Iaquinto and
 5        he did.  But based on his documentation he was moving
 6        his fingers.  He had a good pulse and his nerves were
 7        intact.  So all of those things vote against doing a
 8        primary amputation.
 9   Q:   Do you know who made the decision to amputate that
10        patient's arm?
11   A:   Afraaz said it was the right thing to do.  But Afraaz
12        wouldn't have been the one who makes that decision.
13        That decision is ultimately up to the patient.
14   Q:   Right.  Do you know who recommended the amputation to
15        that patient?
16   A:   I don't know.
17   Q:   Do you know if Dr. Walsh agreed with the decision to
18        amputate that patient's arm?
19   A:   I don't know.
20   Q:   Okay.  But that's not a decision that a new PGY 2
21        resident could make to recommend that the patient --
22   A:   Afraaz thought he could.  Afraaz said it was the right
23        thing to do.  And that was less than a month after it
24        actually happened.
25   Q:   Okay.  But he didn't tell the patient I think you need
```

```
 1          to have your -- I mean, that wasn't the final
 2          recommendation from Afraaz to the patient --
 3    A:    I don't know.
 4    Q:    Okay.  Do you know who actually performed the
 5          amputation?
 6    A:    I do not.
 7    Q:    Did you talk to Dr. Iaquinto in connection with the
 8          complaint about Dr. Irani?
 9    A:    I don't remember whether I talked to John or not about
10          it.
11    Q:    All right.  What else did Dr. Irani do wrong?  And
12          again, I mean, just to be clear, your comment about or
13          the quote, the right thing to do, means that decision
14          or that determination is not consistent with the
15          documented notes of the chart; is that right?
16    A:    That's what I'm saying.  I mean, there may have been
17          ample reasons to perform a primary amputation on this
18          extremity.  What I'm saying is based on Afraaz's
19          documentation that I can see, that calls into question
20          that determination.  It may be, I mean, Afraaz may be a
21          hundred percent right.  Maybe there were a lot of
22          reasons to amputate the guy's arm.  But based on what
23          he wrote, there weren't.  And that's what, you know,
24          that's what I did as far as reviewing the chart.
25    Q:    Okay.  What else did he do wrong?
```

```
 1        called on this patient or not.
 2   Q:   You didn't speak with anyone from the trauma team about
 3        this particular patient when you were reviewing the
 4        circumstances?
 5   A:   I don't believe so.
 6   Q:   Okay.  So let's assume Dr. Irani's called to this, to
 7        the scene.  And I guess the way he is aware of the
 8        issue is he's carrying some sort of pager or some sort
 9        of device to let him know there's a consult for
10        orthopedics --
11   A:   Yes.
12   Q:   -- required in the emergency department?
13   A:   Sure.
14   Q:   So when he gets there because it's an upper extremity
15        orthopedic, I mean, that's sort of I guess his
16        bailiwick; right?
17   A:   (Nods head affirmatively.)
18   Q:   What happens, what happens next?  I mean, this is
19        something that's kind of over his head or something he
20        needs to get additional help on, what's the proper
21        protocol for Dr. Irani to do that?
22   A:   He would have called one of the other residents or a
23        resident more senior to him to come, hey, I've got
24        Mr. B down here with an injury.  I'm going to need some
25        help.
```

```
 1        Dr. Iaquinto grabbed the patient's partially amputated
 2        extremity and twisted it to the anatomically correct
 3        position.  So that indicates that Dr. Iaquinto did the
 4        manipulation of the patient's arm rather than Dr.
 5        Irani; isn't that right?
 6            MS. HELMS:  Objection to the form.
 7   A:   No.  That's not right.  That just says that
 8        Dr. Iaquinto apparently did it too.
 9   BY MR. ROTHSTEIN:
10   Q:   Okay.
11   A:   I mean, this is the same recollection, this is the same
12        story.  And I don't know why, if she meant for Iaquinto
13        only then she would have said Dr. Iaquinto without the
14        other mention of Afraaz before.
15   Q:   Do you know if Dr. Iaquinto's board-certified?
16   A:   I don't know that for a fact.  No.
17   Q:   Okay.  Who else did you speak with about this incident
18        besides Diane Savage and Dr. Irani?
19            MS. THOMAS:  Object to the form.
20   BY MR. ROTHSTEIN:
21   Q:   Or communicate with?  E-mail?
22   A:   Sure.
23   Q:   Written statement, whatever?
24   A:   Well, the only e-mail that Diane sent back, Allison
25        Turnley is copied, some person at mindspring.com is
```

| | |
|---|---|
| 1 | copied. And I would assume I spoke with Dr. Walsh |
| 2 | about the patient because I believe he was involved in |
| 3 | the care. And I don't remember anybody else directly |
| 4 | that I spoke to about this patient other than Afraaz. |
| 5 | Q: Okay. In your e-mail to Allison you state, if there |
| 6 | are others in attendance such as Mandy or Dr. Robinson |
| 7 | I would like to have their version as well. Did you |
| 8 | ever get versions from Mandy or Dr. Robinson? |
| 9 | A: I do not believe I did. |
| 10 | Q: Do you know if anyone received statements from -- do |
| 11 | you know who Mandy is, first of all? |
| 12 | A: I do not know who Mandy is specifically, whether she's |
| 13 | a nurse or a tech or what. |
| 14 | Q: Okay. Do you know who Dr. Robinson is? |
| 15 | A: I believe he was the emergency department resident at |
| 16 | that time. |
| 17 | Q: And you didn't get any kind of statement from |
| 18 | Dr. Iaquinto? |
| 19 | A: Other than what I've seen produced in Dr. Afraaz's, I |
| 20 | mean, Dr. Irani's documents. |
| 21 | Q: Okay. And in those documents Dr. Iaquinto expresses |
| 22 | that he thought Dr. Irani handled himself appropriately |
| 23 | in the care of that patient; right? |
| 24 | A: I would need to see that letter. |
| 25 | Q: You don't recall? I don't have it in front of me |

1      the New Innovations system?

2  A:  Yes.  I have had an opportunity to print those off.

3  Q:  Okay.  Who has access to print off the evaluations of

4      particular residents?

5  A:  I probably do.  I don't know if I would know how to,

6      the mechanism to do that.  I would, that would be

7      something I ask our program coordinator to do.

8  Q:  Okay.  Do you know if all of Dr. Irani's evaluations

9      have been provided in this case?

10  A:  I believe they have.  Yes.

11  Q:  Okay.  Do you know if all of Dr. Irani's evaluations

12      were provided to the California Medical Board?

13  A:  I don't know the answer to that question.

14  Q:  All right.  In the second paragraph of Exhibit 15 Dr.

15      Walsh writes, with the exceptions noted below I think

16      Dr. Irani's progress to date has been reasonably

17      satisfactory.  Do you see that?

18  A:  What paragraph is that in?

19  Q:  Paragraph two on the first page of Exhibit 15, the last

20      sentence.

21  A:  Yes.  I do see that.

22  Q:  Okay.  And correct me if I'm wrong, but I didn't see

23      anything in this memo that discusses concerns that Dr.

24      Walsh had with the histories and physicals that Dr.

25      Irani did.  Do you see any reference to the histories

1    complete that list in its entirety.

2  Q:  Okay.  Do you remember medical students ever taking

3    over the responsibility from Dr. Irani for preparing

4    the morning list because Dr. Irani had done a bad job

5    at it?

6  A:  No.

7  Q:  Okay.  Do you ever remember it the other way around,

8    where the medical students had not done an adequate job

9    of preparing the morning lists and Dr. Irani had to

10    sort of resume that task?

11  A:  I've seen Dr. Irani's statement to that fact.

12  Q:  Do you not, do you disagree with that statement?

13  A:  Based on what I know about the medical students who

14    were on service at that time, I would disagree with it.

15  Q:  Okay.  How do you think it's inaccurate?

16  A:  Well, I know, I know one of the medical students who

17    was on there and we tried to recruit her to stay in

18    Columbia.  And if she was told to do something she

19    would have done it --

20  Q:  Okay.

21  A:  -- without question.

22  Q:  What's that medical student's name?

23  A:  Her name is Renee.  And it's G-E-N-O-V-A I believe is

24    how you spell her last name.

25  Q:  Do you know when she graduated?

Allen Court Reporting

1  A:  That's what he told me it was.

2  Q:  Okay.  He was concerned that he was going to continue,

3      have to continue to keep up that log during the level

4      one remediation period or the probation period; right?

5  A:  Nobody in the faculty asked him to complete a log.  So

6      from what is written here it appears that he had issues

7      with my allegation of tardiness.  And so he was

8      completing a log of when he showed up on time.  If you

9      show up on time you don't have to complete a log.  You

10     just show up on time.

11 Q:  Okay.

12 A:  So I wasn't running around, you know, with a stopwatch

13     checking if he got to clinic on time.

14 Q:  Okay.  After you brought it up to him in August at

15     least through this meeting had you noticed any problems

16     with his attendance or punctuality?

17 A:  I don't specifically recall whether or not he was late

18     or on time to cases or conferences.

19 Q:  Did you tell him that he didn't need to complete a log,

20     that if it became a problem you would let him know?

21 A:  I don't remember the exact conversation that I had or

22     whether or not I told him that.

23 Q:  Okay.  Is that pretty much the end of your discussions

24     with Dr. Wood on the 21st?  The memo is dated, you

25     know, eight days after your actual meeting; correct?

Allen Court Reporting

```
 1   A:   I believe those were his six-month evaluations which we
 2        do have the residents sign.  And I don't believe this
 3        was reflective of that.  This was just a memorandum for
 4        record.
 5   Q:   So I mean as a memorandum of record, wouldn't you have
 6        given Dr. Irani a copy of that document or provided a
 7        copy of that document to him?
 8   A:   I don't remember whether I gave him a copy of this
 9        document or not.
10   Q:   Okay.  That third to last paragraph that we looked at
11        that you just mentioned about the failure to properly
12        assess and manage a patient with post-operative wound
13        drainage, tell me what happened with regard to that
14        patient.
15   A:   I don't remember the exact details.  But from my
16        recollection today it was a patient who had wound
17        drainage after an infection and that she had called
18        twice over a long weekend and that Dr. Irani and
19        Dr. Harrison, I believe he was on call part of that
20        time, failed to have the patient come in and be
21        evaluated.
22   Q:   Okay.  Do you know what Dr. Irani told the patient when
23        she called in when Dr. Irani was on call?
24   A:   I have seen his recollection of events that he has
25        written subsequent to that.  I don't remember some of
```

1        the details regarding that conversation that I had

2        approximately on the 28th of November.

3   Q:   Okay.  Did Dr. Irani indicate to the patient that she

4        would need to come in to the hospital to be evaluated

5        before he could advise her as to whether the wound

6        drainage was a sign of an infection?

7   A:   Yeah.  That's not my recollection of the events.

8        Otherwise I, I mean, if he would have told the patient

9        that and the patient didn't do it, then I can't really

10       fault Irani for that.  I don't think I would have

11       included that in there if that's what had happened.

12  Q:   Okay.  What about Dr. Goodno?  Did he get written up

13       for, I think you mentioned that the patient also called

14       Dr. Goodno later that weekend?

15  A:   I think I spoke with both of them.

16  Q:   Did Dr. Goodno ever get written up for that?

17  A:   I don't think I ever wrote a memorandum of record about

18       Dr. Goodno on this patient.

19  Q:   Okay.  Who got the first call from the patient?  Was it

20       Dr. -- do you know the order of the calls?  Did the

21       patient call Dr. Irani first and Goodno second or do

22       you know?

23  A:   I don't remember.

24  Q:   How did the patient, or how did it come to your

25       attention that this patient spoke to Dr. Irani and

1       Dr. Goodno over the weekend and didn't come in?

2   A:  Can you repeat that?

3   Q:  Yeah.  How did it come to your attention that the

4       patient had called over the weekend on two occasions

5       and did not come in to the hospital?

6   A:  I don't remember whether the patient called back on

7       Monday and I got the message or whether one of these

8       guys told me Monday that somebody had called.  I don't

9       remember.

10  Q:  Okay.  Did you eventually see the patient?

11  A:  I don't, I don't remember exactly which patient it was.

12      I'm sure I did.

13  Q:  That three-day weekend, that would have been I guess

14      Thanksgiving weekend; is that right?

15  A:  I assume so.

16  Q:  Yeah.  Is it common for patients to delay coming in

17      over the weekend or to come to the emergency room on

18      the Monday?

19  A:  Is it common for patients to do what?

20  Q:  For patients to delay coming in to the hospital over

21      the weekend and come in to the emergency room on a

22      Monday?

23  A:  No.  That's not common.

24  Q:  So you don't know what Dr. Irani or Dr. Goodno said to

25      this particular patient when she called in over the

```
 1        weekend on two occasions?
 2   A:   Dr. Irani didn't record the conversation and play it
 3        back to me.  So I don't really know exactly what was
 4        said --
 5   Q:   Okay.
 6   A:   -- in their conversation.
 7   Q:   Okay.  But you do know what Dr. Irani informed you
 8        about what he said; right?
 9   A:   (Nods head affirmatively.)
10   Q:   And he said that he told the patient that, you know, I
11        would need to actually see you at the hospital or you
12        would need to come in --
13   A:   Yeah.
14   Q:   -- to the hospital to be evaluated?
15   A:   That's not my understanding of what he told her.
16   Q:   Okay.  What is your understanding of what he told her?
17   A:   That the patient called twice and was having problems
18        and was not told to come for an evaluation.
19   Q:   He just said, I'm sorry, I can't do anything for you?
20   A:   I don't know what he said to her.
21   Q:   Okay.  Well, if you don't know what he said how can you
22        dispute what Dr. Irani's recollection of what he said
23        --
24   A:   Well, based on this memorandum I can confidently assume
25        that the patient either called me or called my nurse
```

| | | |
|---|---|---|
| 1 | | come in?  You think you'd have to go out and pick the |
| 2 | | patient up? |
| 3 | A: | Well, for example, we had a patient that canceled |
| 4 | | surgery on Thursday because he couldn't get a ride to |
| 5 | | the hospital.  And I made a mention the nurse that if I |
| 6 | | would have known he was having problems I would have |
| 7 | | stopped by and picked him up.  And I would have.  And |
| 8 | | so if the patient calls twice over a three-day weekend |
| 9 | | and is having drainage from a post-operative wound, |
| 10 | | then somehow that patient needs to come in and be seen. |
| 11 | | And if all else fails call an ambulance.  People call |
| 12 | | an ambulance for all kinds of reasons.  And post-op |
| 13 | | wound drainage is a great reason to come in to the |
| 14 | | hospital. |
| 15 | Q: | Okay.  Do you know what Dr. Goodno said to this patient |
| 16 | | when she called in the second or first time that she |
| 17 | | called? |
| 18 | A: | No. |
| 19 | Q: | Do you know if Dr. Goodno's statement was consistent |
| 20 | | with Dr. Irani's statement with regard to what this |
| 21 | | patient -- |
| 22 | A: | I don't remember the exact conversation I had with |
| 23 | | Harrison about this patient. |
| 24 | Q: | All right.  The next item on Exhibit 17 says Dr. Irani |
| 25 | | failed to abide by his attending surgeon's instructions |

|    |     |                                                              |
|----|-----|--------------------------------------------------------------|
| 1  |     | during staff clinic 28 November 11 and was                   |
| 2  |     | argumentative when confronted by his chief resident.         |
| 3  |     | What does that entry refer to?                               |
| 4  | A:  | There was a patient in our 1801 staff clinic who needed      |
| 5  |     | an MRI of an extremity.  The attending surgeon               |
| 6  |     | instructed, gave instructions that the patient was to        |
| 7  |     | get the MRI immediately.  And Dr. Irani let the patient      |
| 8  |     | leave the clinic without getting that MRI ordered and        |
| 9  |     | taken care of as instructed by his attending surgeon.        |
| 10 | Q:  | Who told you -- I mean, you weren't involved in this         |
| 11 |     | incident, were you?                                          |
| 12 | A:  | I was not the attending surgeon in staff clinic.             |
| 13 | Q:  | How did you become aware of this issue?                      |
| 14 | A:  | I believe I became aware of that that afternoon.             |
| 15 | Q:  | Okay.  The afternoon of November 28th 2011?                  |
| 16 | A:  | Right.  That was a Monday.                                    |
| 17 | Q:  | How did you become, or how were you made aware of that?      |
| 18 | A:  | I don't know if we had a faculty meeting that night or       |
| 19 |     | what the reason was.  But somehow I found out about it       |
| 20 |     | that afternoon.                                               |
| 21 | Q:  | Okay.  Who told you about it?                                 |
| 22 | A:  | I don't remember whether it was Dr. Wood or Dr.             |
| 23 |     | Grabowski.                                                    |
| 24 | Q:  | But whoever it was told you that Dr. Irani let the           |
| 25 |     | patient go home without getting an MRI?                      |

1    A:    I don't know the exact conversation.  But I think it
2          was more along the lines of Dr. Irani didn't abide by
3          the attending instructions regarding the patient's care
4          and let the patient go home.
5    Q:    Okay.  And what's your understanding of what the
6          instructions were from Dr. Grabowski?
7    A:    To get the MRI immediately.
8    Q:    Okay.  And when somebody says get an MRI immediately,
9          what does that mean to you?
10   A:    Well, I believe the instructions were to get it that
11         day.
12   Q:    Okay.  Do you know if that patient received the MRI
13         that day?
14   A:    I don't know exactly when the patient received the MRI.
15         But the order was not entered as a today order.  And it
16         was not initially ordered by Dr. Irani as a today MRI.
17   Q:    Okay.  Prior to you writing this memo on November 29th
18         did you ask Dr. Irani for his side or his version of
19         the events?
20   A:    I don't remember.
21   Q:    Did you attend Dr. Irani's Grand Rounds presentation on
22         the importance of communication on November 30th 2011?
23   A:    I believe I did.
24   Q:    Okay.  What was your assessment of his presentation?
25   A:    I don't remember anything out of the ordinary bad or

| | | |
|---|---|---|
| 1 | | good about my assessment of his presentation. |
| 2 | Q: | Okay. And the remediation plan, or the November 15th |
| 3 | | meeting, do you have that? I've misplaced it. Do you |
| 4 | | have that? Or you've got it in front of you. Exhibit |
| 5 | | 13. |
| 6 | A: | Uh-huh (affirmative response). |
| 7 | Q: | That was one of the items on the remediation plan was |
| 8 | | that he do a Grand Rounds presentation on |
| 9 | | communication; right? |
| 10 | A: | That's correct. |
| 11 | Q: | Do you believe that his presentation on November 30th |
| 12 | | 2011 satisfied that part of the remediation plan? |
| 13 | A: | I don't remember if it was specifically on that date. |
| 14 | | But I believe I do remember him doing it and did a fine |
| 15 | | job. |
| 16 | Q: | Okay. Do you recall any discussions with any of the |
| 17 | | residents about Dr. Irani's presentation on |
| 18 | | communications? |
| 19 | A: | No. I don't remember any specific conversations about |
| 20 | | that. |
| 21 | Q: | Did anyone ever indicate to you that they were offended |
| 22 | | by Dr. Irani's Grand Rounds presentation on |
| 23 | | communication? |
| 24 | A: | No. |
| 25 | Q: | All right. Your memorandum of record on November 29th |

```
 1  A:    Yes.
 2  Q:    Okay.  Do you recall how the meeting began on December
 3        5th?
 4  A:    No.
 5            MS. THOMAS:  David, I hate to, I know you're going
 6        into a long line of questioning.  Can we take a quick
 7        restroom break?
 8            MR. ROTHSTEIN:  Sure.
 9            VIDEOGRAPHER:  This is the end of tape number
10        four.  We're off the record at 2:36.
11                (Break - 2:36 p.m.-2:44 p.m.)
12            VIDEOGRAPHER:  This is tape number five in the
13        deposition of Dr. David Koon.  We're on the record at
14        2:44.
15  BY MR. ROTHSTEIN:
16  Q:    Before we go on to Exhibit 18, back on the patient that
17        Dr. Irani and Dr. Hoover spoke of over the weekend, I'm
18        sorry, Goodno.  Dr. Irani and Dr. Goodno spoke over the
19        long Thanksgiving weekend, would that patient have been
20        on some sort of pain medicines after surgery?
21  A:    I don't know how far out she was from surgery.  So I
22        don't know.
23  Q:    Would narcotics interfere, pain medicines interfere
24        with the patient's ability to either understand things
25        or recollect things?
```

1  A:  Depends on the patient and the dose of narcotics.

2  Q:  Okay.  But it's possible that narcotics could have

3      interfered with her ability to understand things or

4      remember what she was told; right?

5  A:  Is it possible?  Yes.

6  Q:  Okay.  All right.  Back to the meeting, faculty meeting

7      on December 5th 2011.  I think we established at least

8      your recollection of it was that it was, that you had

9      met with Dr. Irani for over an hour.  What time were

10     the staff meetings usually held?

11 A:  Our faculty meetings usually start at 5:30.

12 Q:  Do you recall whether the meeting on December 5th

13     started at the normal time, 5:30?

14 A:  I don't know exactly what time it started.

15 Q:  How did you inform Dr. Irani that he was expected to be

16     at the faculty meeting on December the 5th?

17 A:  Well, according to Exhibit 17 it says, we have asked

18     for his presence at this meeting.  So evidently he knew

19     about it sometime between the 21st of November and the

20     29th.

21 Q:  Okay.  Do you recall how that was communicated to him,

22     the invitation to come to the meeting?

23 A:  I do not.

24 Q:  What was your demeanor like toward Dr. Irani in this

25     meeting?

1       bringing up or sort of berating Afraaz about going to
2       Dr. Stephens about the academic remediation?
3            MS. HELMS:  Objection to the form of the question.
4  A:   I don't remember berating Dr. Irani during that
5       meeting.
6  BY MR. ROTHSTEIN:
7  Q:   Do you recall berating him about anything during that
8       meeting?
9  A:   I don't think I berated him about anything during that
10      meeting.
11 Q:   Okay.  What was Dr. Irani's demeanor like during the
12      meeting?
13 A:   Well, it states that he steadfastly refused to admit
14      any wrongdoing even when faced with overwhelming
15      evidence to the contrary.  He appeared to consistently
16      lack insight into these issues.
17 Q:   Do you recall discussion about Dr., among the faculty
18      members that Dr. Irani needed to acknowledge his
19      mistakes and accept responsibility for his mistakes?
20 A:   I think that would have been a normal response.
21 Q:   Do you recall discussing with Dr. Irani the fact that
22      he had taken two days of vacation during the
23      remediation period?
24 A:   Yes.
25 Q:   Okay.  Did you believe that that was inappropriate for

```
 1        him to take two days of vacation during the remediation
 2        period?
 3   A:   I don't know that I would use the term inappropriate.
 4        I think it lacks a little bit of wisdom.  If you're in
 5        the midst of an academic remediation, I would think
 6        that you would be early, stay late and do whatever it
 7        takes.
 8   Q:   Okay.  Do you know if Dr. Irani had scheduled his
 9        vacation during the time that his attending service was
10        out of town on his rotation?
11   A:   I don't know that specifically.  No.
12   Q:   Okay.  Do you know whether Dr., or did Dr. Irani
13        indicate that he was visiting his newborn niece during
14        that two-day period?
15   A:   I don't remember that, him saying that to me.
16   Q:   Okay.  Do you know whether Dr. Irani missed his own
17        brother's wedding in September of 2011 during his PGY 2
18        year?
19   A:   I have seen that in some of Afraaz's records.
20   Q:   Okay.  Do you have any reason to believe that to be
21        untrue?
22   A:   No.
23   Q:   Did Dr. Irani follow the procedures for requesting to
24        take two days of vacation during his academic
25        remediation?
```

| | | |
|---|---|---|
| 1 | Q: | Okay. Do you recall Dr. Irani, or asking Dr. Irani if |
| 2 | | he wanted to continue to do orthopedics in Columbia? |
| 3 | A: | Yes. |
| 4 | Q: | What do you recall Dr. Irani's response being? |
| 5 | A: | Yes. |
| 6 | Q: | Okay. Do you recall asking Dr. Irani if he had an |
| 7 | | attorney? |
| 8 | A: | Yes. |
| 9 | Q: | What was the purpose of you asking Dr. Irani if he had |
| 10 | | an attorney? |
| 11 | A: | To find out whether he had an attorney. |
| 12 | Q: | Okay. Why would that matter? |
| 13 | A: | Because it was my impression that there are a number of |
| 14 | | things that were going wrong and that instead of taking |
| 15 | | responsibility, changing his behavior, he was |
| 16 | | retreating into a defensive mode where he rationalized |
| 17 | | every single mistake that he had. He said that, you |
| 18 | | know, it was other people's misunderstanding of his |
| 19 | | intentions and instead of owning up to his own failures |
| 20 | | and fixing them he just persisted in evasive answers |
| 21 | | and didn't take any responsibility for the mistakes he |
| 22 | | had made. So I thought those were inappropriate |
| 23 | | responses. |
| 24 | Q: | What was Dr. Irani's response when you asked him if he |
| 25 | | had an attorney? |

```
 1   Q:   Okay.  Did Dr. Wood say anything about the MRI patient
 2        of Dr. Grabowski's?
 3   A:   I believe that was part of the discussion.  That's part
 4        of what I referred to that says steadfastly refused to
 5        admit any wrongdoing even when faced with overwhelming
 6        evidence to the contrary.  My recollection is that he
 7        was told to do one thing, he didn't do it, then he
 8        argued with Jennifer about it and eventually got it
 9        done.  But there was some discussion between he and
10        Jennifer about the appropriate management of that
11        patient.
12   Q:   Okay.  When you say he eventually got it done, when did
13        he get it done?
14   A:   I believe that when we found out that he had let the
15        patient leave the clinic without the MRI being obtained
16        that day, I don't know whether the patient was still in
17        the waiting room or not.  But somehow we got it
18        corrected before the patient actually left.
19   Q:   Okay.  So the patient may have left the actual clinic
20        but was still in the, is it the Palmetto Richland area?
21        Is that, I mean, --
22   A:   It's a Palmetto Health-owned building.
23   Q:   Okay.  And to get the MRI the patient would have had to
24        leave the clinic to get the MRI; right?
25   A:   The MRI was scheduled four days later when the patient,
```

```
 1        when Dr. Irani was finished with the patient.
 2  Q:   But your understanding is that that patient received
 3        the MRI that day that Dr. Grabowski ordered it?
 4  A:   I'm not sure when, I'm not sure if Dr. Irani fixed the
 5        problem or if Jennifer fixed the problem or if Dr.
 6        Grabowski fixed the problem.  Somehow the patient got
 7        the MRI.  I don't know if it was that afternoon or the
 8        next day.  But the patient did get the MRI pretty
 9        quickly.
10  Q:   Do you recall Dr. Irani trying to explain what had
11        happened with regard to the scheduling of the MRI
12        patient?
13  A:   Yes.
14  Q:   Okay.  Do you recall Dr. Irani saying that he initially
15        called the radiology and they told him the earliest
16        they could make an appointment was two or three days
17        down the road?
18  A:   It was actually four days down the road.
19  Q:   Four days down?
20  A:   That's not, that was when it was scheduled.  That's not
21        what Dr. Irani said.
22  Q:   Okay.  Now, did Dr. Irani say that he sort of held the
23        slot for that patient and then called Dr. Wood to see
24        what he needed to do to get the patient seen?
25  A:   No.
```

1      Nathe to you attaching her write-up of the events of

2      December 7th 2011 with regard to this particular

3      patient; right?

4  A:   Yes.

5  Q:   Was Kristen Nathe ever placed on academic remediation

6      in connection with her treatment of this particular

7      patient?

8  A:   No.

9  Q:   Okay.  Was she ever disciplined in connection with her

10     treatment of this particular patient?

11  A:  She was counseled.

12  Q:  Okay.  Who performed her counseling about this?

13  A:  I did.

14  Q:  And when did you perform counseling of Kristen Nathe in

15     connection with this patient?

16  A:  It was on or about the 11th of December.  And I believe

17     there's an e-mail from Kathy Stephens, from me to Kathy

18     Stephens acknowledging that fact.

19  Q:  Okay.  How did you first find out about an issue with

20     trauma patient 375?

21  A:  I don't know the exact way that I found out about this

22     patient.

23  Q:  Do you know when you were informed that there was a

24     problem with the way Dr. Irani had managed this

25     patient's care?

1  Q:  Okay.  Did you, have you ever looked at the patient

2      records for trauma patient 375?

3  A:  I believe I have seen the patient's records.  Yes.  I

4      make a note in Exhibit 12, page 12, USC(Irani) document

5      0316 says no documentation from Irani, none.

6  Q:  Okay.

7  A:  Says after 1.5 hours of history and physical, CR

8      imaging, sedation, pain control, reductions, wash out,

9      splinting, discussion with family, informed consent, no

10     documentation.  So evidently I did look at the chart.

11 Q:  Okay.  Now, what does, what does informed consent mean

12     in connection with an emergent patient like this that

13     has open, multiple open fractures?

14 A:  It would involve a discussion with the patient

15     regarding the risks, benefits and options of what needs

16     to be done to manage the traumatic injuries.

17 Q:  Okay.  Is any written signed consent form required on

18     an emergent patient like that?

19 A:  In general if you're going to do a procedure on a

20     patient, you need a consent of some form.

21 Q:  Okay.  Can that consent be oral, a verbal consent?

22 A:  If it's witnessed by the, by the appropriate folks,

23     yes.

24 Q:  Okay.  Is a written signed consent form required in

25     trauma patients in your experience?

| | |
|---|---|
| 1 | What, I mean, according to Nathe she got the call at |
| 2 | 11:30.  When does that hour and a half start? |
| 3 | A: I'm not sure.  I mean, I don't know if I looked on the |
| 4 | records.  And, you know, sometimes the nurses will say, |
| 5 | you know, Dr. X arrived at this time, Dr. Y, I mean, |
| 6 | sometimes they're that detailed.  And I don't know if I |
| 7 | got that hour and a half from something to that effect |
| 8 | or not. |
| 9 | Q: Okay.  This seems like a pretty chaotic scene.  I mean, |
| 10 | you know -- |
| 11 | A: Shouldn't be chaotic but it certainly sounds like it. |
| 12 | Yes. |
| 13 | Q: Okay.  And you have a PGY 1 resident Nathe and a PGY 2 |
| 14 | resident Irani managing the care of this patient? |
| 15 | A: Correct. |
| 16 | Q: All right.  Keep, all right, after, it says no |
| 17 | documentation? |
| 18 | A: Correct. |
| 19 | Q: Okay. |
| 20 | A: Then it says versions vary widely. |
| 21 | Q: Okay. |
| 22 | A: Then it says nursing account was confirmed by three |
| 23 | different nurses with matching detailed accounts.  And |
| 24 | what I meant by that was when I went to see the nurses, |
| 25 | I asked them what happened with this patient |

Allen Court Reporting

| | | |
|---|---|---|
| 1 | | Dr. Jones actually come to the scene? |
| 2 | A: | I think it was after the nurses and the AOD called him. |
| 3 | Q: | Okay.  When Dr. Irani first arrived on the scene, the |
| 4 | | patient was already pretty upset, wasn't she?  She had |
| 5 | | been there probably over two hours? |
| 6 | A: | I don't know. |
| 7 | Q: | Okay.  Do you recall Arlene immediately saying to Dr. |
| 8 | | Irani, something's wrong when he got to the scene? |
| 9 | A: | That's what Irani says.  So Irani encounter, Arlene |
| 10 | | says something's wrong.  Then refused to provide |
| 11 | | guidance.  So again it says RN's upset.  According to |
| 12 | | Irani he played everything by the book.  And I had a |
| 13 | | question, did he call the senior resident on our team. |
| 14 | | I said he's barely a PGY 2 and is a patient with |
| 15 | | multiple injuries and in my estimation was not prepared |
| 16 | | to handle this patient.  And he should have called for |
| 17 | | backup. |
| 18 | Q: | Okay.  But didn't Dr. Wood know about the injuries |
| 19 | | before Dr. Irani? |
| 20 | A: | Yes. |
| 21 | Q: | According to -- |
| 22 | A: | According to Nathe's statement.  Yes. |
| 23 | Q: | And Dr. Wood's the one that suggested that Nathe call |
| 24 | | Irani instead of Dr. Wood going down and handling the |
| 25 | | situation herself? |

Allen Court Reporting

1  A:  That's correct.

2  Q:  Did Dr. Wood get written up for --

3  A:  No.

4  Q:  -- her pushing this off onto Dr. Irani?

5  A:  No.  Because I didn't know, I didn't have that timeline

6      until later.

7  Q:  Okay.  After you got the timeline did you mention

8      anything to, or did you --

9  A:  I don't remember saying anything to Dr. Wood about it.

10  Q:  Okay.  But your comments there that Irani was barely a

11     PGY 2 and he and Nathe were kind of over their heads, I

12     mean, that's, that's consistent with Dr. Irani's

13     version of events, isn't it?

14         MS. HELMS:  Objection to the form of the question.

15  A:  Again, I haven't, I don't have Dr. Irani's memorandum

16     in front of me.  From my estimation this is a senior

17     level resident patient and they should have called

18     Dr. Wood to come down here and help.  Yes.

19  BY MR. ROTHSTEIN:

20  Q:  All right.  What's next?

21  A:  Then it says according to Irani's version he helps the

22     nurse change the sheets.  He protects the patient.

23     Tells the patient in quotes, you're not going anywhere.

24     He thanks the nurses for their feedback.  He personally

25     escorts the family.  And then it says read the last

Allen Court Reporting

```
 1   Q:   Okay.  Do you recall sliding the resident manual across
 2        the table to Dr. Irani and telling him to read the
 3        grievance guidelines out loud during that meeting?
 4   A:   I don't ever remember doing that.  I remember, I mean,
 5        I've read that that Afraaz said I did that but I don't
 6        ever remember doing it.
 7   Q:   Okay.  At that point Dr. Irani had missed the time for
 8        requesting a further review of his suspension, the
 9        grievance hearing?
10   A:   I think at every step in the remediation process based
11        on my experience with the Lamoreaux issue I told him
12        that there was a policy regarding grievance and you're,
13        here's the policy, here's where to look it up.  In
14        fact, in one of the memos I actually gave him the web
15        site.  Here it is again.  He actually corrected me on a
16        couple of things on the grievance process itself.  So
17        he knew where it was.
18   Q:   Were you aware of the issue about whether Dr. Irani had
19        filed his request on the 10th or the 11th business day
20        after Kathy Stephen's denial of his grievance?
21   A:   That came to my understanding afterwards that they
22        didn't consider MLK Day a holiday and Afraaz did.
23   Q:   Okay.  Is your department closed on Martin Luther King
24        holiday?
25   A:   Well, we're a state department.  And so we go by state
```

| | |
|---|---|
| 1 | holidays.  And state holidays is, yes. |
| 2 | Q: Okay. |
| 3 | A: That doesn't mean we're not working.  It just means |
| 4 | that the office is closed. |
| 5 | Q: Okay.  Is that included in that resident manual, the |
| 6 | holidays?  The department manual? |
| 7 | A: Yes. |
| 8 | Q: Okay. |
| 9 | A: And I think Kathy Stephens alluded to that in one of |
| 10 | her e-mails that's actually in there. |
| 11 | Q: And I'm not talking about the Palmetto Health Resident |
| 12 | Manual.  I'm talking about your Orthopedic Surgery |
| 13 | Residency Manual. |
| 14 | A: I doubt if that's specific because we don't update it |
| 15 | every year. |
| 16 | Q: Okay. |
| 17 | A: And the Palmetto Health is updated every year to |
| 18 | reflect those changes. |
| 19 | Q: And you recall some discussion about Dr. Irani being a |
| 20 | day late in getting his grievance or request for a |
| 21 | grievance hearing submitted to Dr. Stephens? |
| 22 | A: I think she stated that in her e-mail that was, either |
| 23 | e-mailed to me or e-mailed to Irani that I was copied |
| 24 | on. |
| 25 | Q: Okay.  Now, after Dr. Irani's return in at the very end |

|    |     |                                                              |
|----|-----|--------------------------------------------------------------|
| 1  |     | from Dr. Grabowski to you on Monday, February 27th           |
| 2  |     | 2012; right?  About this particular spine patient?           |
| 3  | A:  | Yes.                                                         |
| 4  | Q:  | Have you reviewed or were you involved in this               |
| 5  |     | patient's care at all?                                       |
| 6  | A:  | No.                                                          |
| 7  | Q:  | Have you reviewed this patient's medical records?            |
| 8  | A:  | I don't believe I reviewed her, his or her records.         |
| 9  | Q:  | Okay.  You've never reviewed the records of this             |
| 10 |     | particular patient?                                          |
| 11 | A:  | I don't believe so.                                          |
| 12 | Q:  | Okay.  Now I note in your appendix to Exhibit 12, this       |
| 13 |     | patient's on appendix three.  And you refer to that          |
| 14 |     | appendix three in, on page seven, I guess?                   |
| 15 | A:  | Yes.                                                         |
| 16 | Q:  | Okay.  I don't see a medical records number associated       |
| 17 |     | with or noted on this particular patient.                    |
| 18 | A:  | Neither do I.                                                |
| 19 | Q:  | Would that indicate to you that you didn't pull the          |
| 20 |     | records on the spine patient?                                |
| 21 | A:  | No.  It just indicates I didn't write it down.               |
| 22 | Q:  | Okay.  Now, when you told the grievance council in Dr.       |
| 23 |     | Irani's case that Dr. Irani did not perform a                |
| 24 |     | neurological exam at all on this patient, what was that      |
| 25 |     | based on?                                                    |

```
1        right?

2   A:   Yes.

3   Q:   Okay.  And the non-renewal would have been effective at

4        the end, at the expiration of the contract; correct?

5   A:   Yes.

6   Q:   Okay.

7   A:   But there is a time period that we have to notify the

8        resident that we're not going to renew their contract.

9        And so I probably initiated that based on that time

10       line.  I believe the time line is four months.  And so

11       it's one of those things that's time-sensitive that I

12       have to do.

13  Q:   Okay.  When did you notify Dr. Irani that you were not

14       going to renew his contract?

15  A:   I don't think I ever did.

16  Q:   Okay.  That was sort of preempted by the recommendation

17       that he be terminated?

18  A:   Yes.

19  Q:   Okay.  Have you ever referred to Dr. Afraaz Irani at

20       Achmed the Terrorist?

21  A:   Have I ever called him Achmed the Terrorist?

22  Q:   Yes.

23  A:   No.

24  Q:   Have you ever used the name Achmed the Terrorist in his

25       presence?
```

```
 1  A:  Yes.

 2  Q:  Okay.  Tell me the context in which you used the phrase

 3      Achmed the Terrorist in Dr. Irani's presence.

 4  A:  So there is one time Afraaz showed up a little late to

 5      prison clinic.  We were in the clinic room which is

 6      very small.  And one of the nurses, he came to the

 7      clinic and his appearance was very different.  He had a

 8      full kind of half beard or a goatee.  And he looked

 9      radically, well, not radically different.  He looked

10      much different than he had the last time we saw him or

11      the last time Fran had seen him.  And so Fran went all

12      googly-eyed over him and told him how great he looked

13      and, you know, she liked it and all this kind of stuff.

14      And I turned to Fran, and I said, don't tell him that.

15      He looks like Achmed the Terrorist.  And he laughed,

16      she laughed.  It was just kind of a joking thing that

17      has now turned into this huge issue.

18  Q:  Okay.  When did that occur?

19  A:  I don't know.  It was either a Monday or Wednesday

20      morning in the prison clinic.

21  Q:  Was it during his PGY 1 year or his PGY 2 year?

22  A:  I believe, I don't know.  It was either after he got

23      back from vacation.  There was some reason why she

24      hadn't, or she and I had not seen him like that.

25  Q:  Okay.  Have you ever said in the presence of Dr. Irani,
```

1          the medical licensing board of the states.
2   Q:    Okay.  As a practicing licensed physician, if you
3          believe that a physician was unfit to practice medicine
4          you have an ethical duty to report that person to the,
5          say in South Carolina you would have a duty to report
6          that person to the South Carolina Medical Board; right?
7              MS. THOMAS:  Object to the form.
8   A:    I would have to look and see what the specific
9          regulations about that are.
10  BY MR. ROTHSTEIN:
11  Q:    Okay.  In your affidavit -- well, first of all, have
12         you ever reported Dr. Irani to any medical board?
13  A:    No.
14  Q:    Okay.  On page three of your affidavit you state at
15         paragraph 13 that you were very relieved to learn in
16         approximately March of 2013 that Dr. Irani had been
17         placed with a residency program; do you see that?
18  A:    Yes.
19  Q:    And you said, I thought it might, it meant that he
20         would move on with his life and not file a lawsuit
21         against us; right?
22  A:    Yes.
23  Q:    At the time you submitted this affidavit, did you have
24         concerns about Dr. Irani's competency to practice
25         medicine in his new residency program?

1          And so my thought was if I could provide that
2          information to the California Board, then they could
3          make a determination about whether or not they wanted
4          to grant him a medical license.
5    Q:   Okay.  So your intent in communicating with the
6          California Board was to let them know that you believed
7          Dr. Irani was competent to be licensed as a physician?
8    A:   My intent was not to get sued.
9              MS. THOMAS:  Object to the form.
10             MS. HELMS:  Object to the form.
11   A:   Because you had made it clear by that time that I was
12         going to get sued.  And so the California Board asked
13         me for an evaluation of Dr. Irani.  I mean, I consulted
14         legal counsel and did what I was instructed to do or
15         advised to do.
16   BY MR. ROTHSTEIN:
17   Q:   Okay.  So you never intended to communicate to the
18         California Medical Board that Dr. Irani was incompetent
19         to practice medicine in California?
20   A:   That's not my determination to make.  My determination
21         to make is how he performed while he was here in South
22         Carolina.  And then it stops.
23   Q:   Okay.  So the answer to my question is that you did not
24         intend to tell California that Dr. Irani was
25         incompetent to practice medicine in California?

```
 1            MS. THOMAS:  Object to the form.
 2   A:   I had no intentions of telling California that Dr.
 3        Irani was incompetent to practice medicine in
 4        California.
 5   BY MR. ROTHSTEIN:
 6   Q:   Okay.
 7   A:   That's correct.
 8   Q:   Thank you.  Are you aware that California has made a
 9        determination that Dr. Irani, the California Medical
10        Board has made a preliminary determination that Dr.
11        Irani is incompetent to practice medicine in
12        California?
13            MS. THOMAS:  Object to the form.
14            MS. HELMS:  Object to the form.
15   A:   I subsequently read the proceedings from California.  I
16        didn't know the outcome until I met with my legal
17        counsel.
18   BY MR. ROTHSTEIN:
19   Q:   Okay.  Are you aware that the California Medical Board
20        initially denied Dr. Irani his license to practice
21        medicine in California?
22            MS. HELMS:  Object to the form.
23            MS. THOMAS:  Object to the form.
24   A:   I subsequently found out that that's what the
25        determination was.
```

1  BY MR. ROTHSTEIN:

2  Q:   I think you're confusing the --

3            MS. THOMAS:   Let the witness finish his answer.

4            MR. ROTHSTEIN:   Yeah.

5  BY MR. ROTHSTEIN:

6  Q:   The procedures.  My question was when they made the

7       initial determination to deny his license, not talking

8       about the hearing that Mr. Mercer was involved in.  I'm

9       talking about the thing that led to the hearing that

10      Mr. Mercer was involved in.  There was an application

11      submitted by Dr. Irani and a request for records from

12      Palmetto Health; right?

13 A:   And the waiver.

14 Q:   And the waiver that allowed I guess Palmetto Health to

15      turn those records over on a, from a privacy matter?

16 A:   And according to Mr. Mercer they could have made the

17      determination without reviewing any of the records from

18      Palmetto Health.

19 Q:   Okay.

20 A:   Based on his initial application.

21 Q:   Have you ever communicated to California that you

22      didn't believe Dr. Irani should have been denied his

23      California medical license?

24 A:   The only communication that I've had with the

25      California Medical Licensing Board are the two exhibits

1    that you have just showed me in that document.

2         MR. ROTHSTEIN:  How much time do we have left?

3    Fifteen minutes?  On the tape or on the deposition?

4         VIDEOGRAPHER:  Do you want to go off for one

5    second?  Actually about another hour it looks like if

6    it's seven hours.

7         MR. ROTHSTEIN:  Okay.

8  (Plaintiff's Exhibit Number 27 was marked for identification

9  purposes.)

10  BY MR. ROTHSTEIN:

11  Q:   I show you Exhibit 27.  Do you recognize Exhibit 27?

12  A:   Yes.

13  Q:   Okay.  And that appears to be a memorandum of record

14       that you dictated or it's dated June 26, 2013; right?

15  A:   Yes.

16  Q:   And it's signed by you David Koon, Program Director;

17       correct?

18  A:   Yes.

19  Q:   What was the purpose of this memorandum?

20  A:   To summarize Dr. Irani's time here in South Carolina as

21       far as his remediations.

22  Q:   Okay.  Didn't his summative evaluation from August of

23       2012 do the same thing?

24  A:   No.

25  Q:   Okay.  Why did you feel a need to summarize Dr. Irani's

```
 1        involvement in the USC Palmetto Health Residency
 2        Program, Orthopedic Surgery Residency Program on June
 3        26, 2013?
 4   A:   Because the California Board determined that what we
 5        had submitted before was inadequate and they asked for
 6        additional information.  So at the advice of legal
 7        counsel I prepared this and sent this to the GME
 8        office.
 9   Q:   Okay.  And so when you prepared this document you knew
10        or understood that it was going to be submitted to the
11        California Medical Board?
12   A:   I thought it was going to be included in the
13        information that the GMEC might send to the California
14        Medical Board.  Yes.
15   Q:   Okay.  So although you didn't address this document to
16        the California Medical Board, you wrote the document
17        with the expectation that it would be submitted to the
18        California Medical Board?
19   A:   At the advice of legal counsel, yes.
20   Q:   Okay.  And in Exhibit 27 you indicated that Dr. Irani
21        during his residency failed in the competencies of
22        patient care, interpersonal skills, communication and
23        professionalism; right?
24   A:   Where are you reading that?
25   Q:   I'm sorry.  Yeah.  The fifth paragraph, second to last
```

1          the first page and throughout the whole document in the

2          left-hand margin there's a number of pages that are

3          circled, or numbers with circles around them?

4    A:    Yes.

5    Q:    Do you know what those numbers reference?

6    A:    Those may reference the grievance committee binder but

7          I'm not positive.

8    Q:    Do you remember during the grievance committee the, at

9          the end of the hearing the committee was unable to

10         reach a decision in the case?

11   A:    I do remember that.

12              MS. HELMS:  Objection to the form of the question.

13   BY MR. ROTHSTEIN:

14   Q:    Okay.  Do you recall they requested additional

15         information to be submitted to the committee after the

16         hearing?

17   A:    Yes.

18   Q:    Do you recall requesting that Dr. Voss and Dr. Guy

19         provide you statements or summaries about their

20         experience with Dr. Irani?

21              MS. HELMS:  Objection to the form of the question.

22   A:    Yes.

23   (Plaintiff's Exhibit Number 29 was marked for identification

24   purposes.)

25   BY MR. ROTHSTEIN:

1      lecture or discussion about ones that are remediable

2      and ones that are not remediable.

3  Q:  Did you understand what Dr. Voss was referring to when

4      he said similarly to what we've been taught in the

5      Orthopedic Educators Course these shortcomings have not

6      been remediable?

7  A:  I understood what he said.  Yes.

8  (Plaintiff's Exhibit Number 30 was marked for identification

9  purposes.)

10  Q:  Show you Exhibit 30.  Do you recognize Exhibit 30?

11  A:  Yes.

12  Q:  Do you recognize Exhibit 30 as the memorandum Dr. Guy

13      provided to the grievance committee?

14  A:  Yes.

15  Q:  Did you review this document before Dr. Guy submitted

16      it?

17  A:  I don't know if these items were submitted directly to

18      the committee which is what I think happened.  Or

19      whether they gave them to me and then I delivered them.

20      I believe it was the former.  They submitted them

21      directly to the grievance committee and Dr. Guy may

22      have provided me a copy of it.

23  (Plaintiff's Exhibit Number 31 was marked for identification

24  purposes.)

25  Q:  Show you Exhibit 31.  Do you recognize Exhibit 31?

```
1   A:   Yes.

2   Q:   And this document is unsigned.  But does this appear to

3        be a copy of the exhibit you submitted to the grievance

4        committee following the hearing?

5   A:   I believe that's correct.

6   Q:   Okay.  And did you and Dr. Walsh prepare this document?

7   A:   I believe we both had input into the preparation of

8        this document.

9   Q:   Okay.

10            MR. ROTHSTEIN:  We're about at the end of the

11       tape.

12            VIDEOGRAPHER:  This is the end of tape number six

13       in the deposition of Dr. Koon.  We're off the record at

14       4:58.

15                 (Break - 4:58 p.m.-5:12 p.m.)

16            VIDEOGRAPHER:  This is tape number seven in the

17       deposition of Dr. David Koon.  We're on the record at

18       5:12.

19  (Plaintiff's Exhibit Number 32 was marked for identification

20  purposes.)

21  BY MR. ROTHSTEIN:

22  Q:   Dr. Koon, I'm going to hand you Exhibit 32 and ask if

23       you have ever seen Exhibit 32 before.

24  A:   Yes.  My signature is on the back of that exhibit dated

25       11/7/2011.
```

| | |
|---|---|
| 1 | Q: Okay. And this appears to be the faculty resident |
| 2 | evaluation about Dr. Irani from Christopher Mazoue, |
| 3 | attending, regarding the sports medicine residency |
| 4 | rotation from September 1st 2011 to October 31st 2011; |
| 5 | right? |
| 6 | A: Yes. |
| 7 | Q: And who are the attendings that generally cover these |
| 8 | sports medicine rotation? |
| 9 | A: At that time it would have been Dr. Mazoue, Dr. Guy and |
| 10 | maybe Dr. McBride. I don't know if he was with us at |
| 11 | that time or not. |
| 12 | Q: Okay. And Dr. Mazoue, his evaluation was dated |
| 13 | November 6th 2011 on the last page. And you reviewed |
| 14 | it and signed it on November 7th 2011; correct? |
| 15 | A: That's correct. |
| 16 | Q: Okay. And if the rotation ended the end of October, |
| 17 | he's within that two-week time period of submitting the |
| 18 | evaluation; right? |
| 19 | A: Yes. Dr. Mazoue is usually fairly prompt about getting |
| 20 | his back in. |
| 21 | Q: Okay. And Dr. Mazoue's evaluation of Dr. Irani was |
| 22 | satisfactory in every category except for acceptance of |
| 23 | responsibility, punctuality, availability he rated Dr. |
| 24 | Irani as marginal; is that right? |
| 25 | A: Yes. |

```
1   Q:   Okay.  And that was during the period of Dr. Irani's
2        level two remediation; right?
3   A:   Yes.
4   (Plaintiff's Exhibit Number 33 was marked for identification
5   purposes.)
6   Q:   I'm going to show you Exhibit 33.  Have you ever seen
7        Exhibit 33 before?
8   A:   Yes.  My signature is again at the back of that
9        document dated 31 January 2012.
10  Q:   Okay.  And this is, appears to be an evaluation of Dr.
11       Irani again for the sports medicine rotation from
12       September 1st to October 31st 2011, same period of time
13       that Dr. Mazoue evaluated Dr. Irani?
14  A:   Yes.  And the way the sports medicine rotation is set
15       up, half of their time is spent with Dr. Mazoue and
16       half of their time is spent with Dr. Guy.  So both of
17       them would have been involved in his evaluation
18       process.
19  Q:   Okay.  And in contrast to Dr. Mazoue's evaluation which
20       was done within a week of the end of the rotation,
21       Dr. Guy's evaluation was not done until the end of
22       January 2012; is that right?
23  A:   Dr. Guy is one of the ones who will not fill it out on
24       time no matter what I do.
25  Q:   Okay.  Would you believe or would you think that
```

1      Afraaz scored fifty percentile on his OITE, you know,

2      good job or study harder next year or something to that

3      effect.

4  BY MR. ROTHSTEIN:

5  Q:  When is the OITE administered?

6  A:  It's the second Saturday of November.

7  Q:  Okay.  So Dr. Irani would have two OITEs in his tenure

8      at USC?

9  A:  He would have taken the OITE twice.

10 Q:  Do you know how he performed on the OITE?

11 A:  His, I'm almost positive his second year was fifty

12     percentile.  I don't know what his -- one of his scores

13     was fifty percentile.  I don't know what the other one

14     was off the top of my head.

15 Q:  Okay.  How did he compare to his classmate?  I guess

16     that would have been Dr. Goodno.

17 A:  Fifty percentile.  So he's right at the national

18     average nationally and that's for American graduates.

19     I don't think Harrison did as well his, that same year.

20     But I don't remember off the top of my head what

21     Harrison's score was.

22 Q:  Do you --

23 A:  The OITE is a marker of progress.  It's not used to

24     promote or demote the resident.  We're not, we're

25     really encouraged not to use it like that.  It's a

Allen Court Reporting

| | |
|---|---|
| 1 | it again. |
| 2 | Q: Did he ever indicate any of the information you were |
| 3 | sending was not truthful? |
| 4 | A: I don't believe he did in his e-mails. |
| 5 | Q: Did he offer to write the response for you? |
| 6 | A: I don't believe he did. |
| 7 | Q: Was Dr. Irani one of the top applicants you've ever |
| 8 | received in the time that you've been the program |
| 9 | director? |
| 10 | A: I would not say that he is one of the top applicants |
| 11 | that we've had. |
| 12 | Q: Okay? Where did he fall? Approximately where did he |
| 13 | fall? |
| 14 | A: Probably in the middle. |
| 15 | Q: Okay. That's all I have. |
| 16 | EXAMINATION BY MS. THOMAS: |
| 17 | Q: I do have a few. Dr. Koon, everything you've stated in |
| 18 | this affidavit that you signed on January 6, 2015 and |
| 19 | which we've filed with the court is true, isn't it? |
| 20 | A: I believe it to be truthful. |
| 21 | Q: Okay. And other than the two documents that you've |
| 22 | indicated in this affidavit that you sent to the |
| 23 | California Medical Board, you have not sent anything |
| 24 | else to the California Medical Board, have you? |
| 25 | A: That's correct. |

Allen Court Reporting