# EXHIBIT K

                In the United States District Court
                For the District of South Carolina
                        Columbia Division
            Civil Action No.: 3:14-cv-03577-CMC-KDW

Afraaz R. Irani, M.D.,          )
                                )
            Plaintiff,           )
                                )              Deposition of
            vs.                  )      JOHN J. WALSH, IV, M.D.
                                )
                                )
Palmetto Health;                )
University of South             )
Carolina School of              )
Medicine; David E. Koon,        )
Jr., M.D.; in his               )
individual capacity; and        )
John J. Walsh, IV, M.D.,        )
in his individual               )
capacity,                       )
                                )              April 24, 2015
            Defendants.         )
                                )
_____     )


        Deposition on oral examination of John J.

Walsh, IV, M.D., reported by Jeffrey M. Thomas,

Registered Professional Reporter and Notary Public

in and for the State of South Carolina; said

deposition taken pursuant to agreement and in

accordance with the Federal Rules of Civil

Procedure, at the Offices of South Carolina Bar

Conference Center, 950 Taylor Street, Columbia,

South Carolina, on April 24, 2015, 2015, at the hour

of 8:30 a.m.

1    Q.    Do you recall what you said to Dr. Koon?

2    A.    No.

3    Q.    Did you have any involvement with Dr.

4  Irani during his PGY-1 year?

5    A.    I don't recall any specific involvement.

6    Q.    Okay.  Tell me what the PGY-1 year

7  generally consists of for an orthopedic resident.

8    A.    A series of rotating rotations.

9    Q.    Okay.  Did he -- did he train with you at

10  all during that year, during his internship year?

11    A.    No.

12    Q.    Did you observe Dr. Irani's --

13    A.    Let me qualify the answer.  I don't

14  recall.

15    Q.    Did you observe Dr. Irani's interactions

16  with other residents during his PGY-1 year?

17    A.    Which residents?

18    Q.    Any of the residents in the orthopedic

19  surgery residency program.

20    A.    I don't recall.

21    Q.    Okay.  Have you reviewed any of Dr.

22  Irani's evaluations from his internship year?

23    A.    Yes.

24    Q.    Did you see Dr. Finn's review of Dr. Irani

25  during his PGY-1 year?

1  evaluations that Dr. Jones did of any other
2  orthopedic residents since you've been at U.S.C.?
3      A.   I don't recall.
4      Q.   Is there anything else that stands out
5  about Dr. Jones' evaluation during Dr. Irani's PGY-1
6  year?
7      A.   What do you mean by "stands out"?
8      Q.   Anything that you recall other than there
9  were some critical comments?
10     A.   I believe he evaluated him twice.
11     Q.   Okay.  Was there any improvement from the
12 first to the second evaluation?
13     A.   Yes.
14     Q.   Okay.  Is it unusual to see critical
15 comments in an intern's evaluation during their
16 first year?
17     A.   By whom?
18     Q.   By Dr. Jones or any other resident or
19 about any other resident.
20     A.   What do you mean by "unusual"?
21     Q.   You don't know what the word "unusual"
22 means?
23     A.   Are you referring to comments made by
24 separate physicians or by one?
25     Q.   With regard to any attending physician

Allen Court Reporting

1    Q.    Dr. Irani's scores were not what you would
2 consider below average, were they, on the O.I.T.C.?
3    A.    I only recall one score.  And, no, I would
4 say it's average.
5    Q.    Okay.  Nothing stands out in your mind as
6 you sit here today about Dr. Irani's O.I.T.E.
7 scores?
8    A.    No.  Referring specifically to the one
9 that I recall.
10    Q.    Okay.  Any other evaluations that you can
11 recall from Dr. Irani's PGY-1 year other than
12 Dr. Jones?
13    A.    Yes.
14    Q.    Which ones -- what other ones can you
15 recall?
16    A.    Dr. Voss.
17    Q.    What is Dr. Voss' specialty?
18    A.    I believe surgery.
19    Q.    Is Dr. Voss at the V.A.?
20    A.    Yes.
21    Q.    And what can you recall about Dr. Voss'
22 evaluation of Dr. Irani?
23    A.    It was critical.
24    Q.    Any specifics about what you can recall
25 other than just characterizing it as critical?

1    A.    Page 2692, the third paragraph, Dr. Irani

2  summarizes an interaction that he had when he was at

3  the staff clinic where he was instructed to obtain

4  an M.R.I.  I had discussed this with Dr. Grabowski

5  around the time of the incident, perhaps that day or

6  the next day.

7         And Dr. Irani's story here to the

8  Grievance Committee is completely in conflict with

9  the information that Dr. Grabowski provided to me as

10  well as resident staff that I don't recall

11  specifically who discussed it with me at that time.

12  This is directly in conflict with what they

13  described to me taking place.

14    Q.    Okay.  You weren't involved in that, the

15  care of that particular patient, M.R.I. patient or

16  the patient that Dr. Grabowski asked --

17    A.    No, I was not.

18    Q.    Okay.  So Dr. Irani didn't lie to you in

19  that situation.  You are relying on what Dr. Irani

20  may have said to Dr. Grabowski or what Dr. Irani may

21  have said to another resident or staff member; is

22  that right?

23    A.    No.  He lied to me during grievance

24  hearing regarding this.  He did not lie to me at the

25  specific time of that incident.

1    Q.    So your belief that this was a lie is
2  based on what?  How do you know what he told the
3  patient if you didn't witness it?
4    A.    Because I very specifically questioned the
5  patient when I talked to her about it.
6    Q.    Okay.  And this patient was on narcotics?
7    A.    Yes.
8    Q.    Okay.  Do narcotics have an effect on
9  someone's ability to recall things accurately?
10   A.    They can.
11   Q.    Okay.  So how do you know that the patient
12 wasn't misperceiving something because of the
13 narcotics she was on?
14   A.    Because I very specifically -- I was
15 surprised by his recommendation.  And so I very
16 specifically questioned her about exactly what he
17 had said and, in fact, offered what I thought was an
18 alternate explanation that was more reasonable with
19 what he had said.
20         And she stated that she was surprised,
21 too.  And that she had specifically repeated it to
22 Dr. Irani about the amount of pain medicine that he
23 was suggesting and he told her to take it, which was
24 a massive dose.
25   Q.    Okay.  In this situation did Dr. Irani

1  actually talk to the patient or did he talk to the
2  patient's husband?
3       A.   My recollection at the time was that Dr.
4  Irani talked to the patient and that is who I spoke
5  with.  Dr. Irani later stated that he spoke with the
6  husband.
7       Q.   Did you ever speak with the husband?
8       A.   I don't recall.
9       Q.   I'm going to come back to that one.  Any
10 other instances in the Grievance Committee where you
11 believe that Dr. Irani lied?
12      A.   Page 2694, very first paragraph he
13 references the meeting that I had with him
14 discussing the care of a trauma female where we
15 discussed the specifics of what we had heard about
16 the care for this particular patient.
17           And he responded and directed -- during
18 that conversation we discussed the care of that
19 patient.  And he states in the second to the last
20 sentence, no one was interested in hearing Dr.
21 Irani's recollection of events.  In fact, I had just
22 heard about them during that meeting.
23      Q.   Okay.  And when did that meeting occur
24 between you and Dr. Irani?
25      A.   I don't recall the date.  He states in the

1    the suspension at the time he met with you and told
2    you his side of the story for the first time?
3         A.    Can you repeat that question, please?
4         Q.    Yes.  Wasn't Dr. Irani suspended --
5    already suspended at the time that you and he met as
6    referenced in this particular paragraph on Page 2 --
7    2694?
8         A.    I don't recall the exact timing of that.
9         Q.    Do you recall telling Dr. Irani that he
10   was being suspended so that an investigation could
11   be performed?
12        A.    Dr. Irani states that.
13        Q.    Do you believe that was a lie?
14        A.    I don't recall.
15        Q.    Did you tell Dr. Irani that the
16   investigation would get all sides of the story,
17   including his?
18        A.    I don't recall if I said that or not.
19        Q.    Do you know if the investigation, in fact,
20   got Dr. Irani's side of the story?  Or let me put it
21   this way.  Do you know if Dr. Irani's -- anyone
22   asked Dr. Irani for his side of the story during
23   this so-called investigation?
24        A.    Certainly.  I just told you that.  That
25   was during the time that I was meeting with Dr.

1     Q.    Do you know what the word or the phrase
2   "business day" means?
3     A.    No.
4     Q.    Do you know whether Martin Luther King --
5   the Martin Luther King holiday is a business day?
6              MS. HELMS:   Object to the form of the
7   question.
8              MS. THOMAS:   Object to the form.
9              THE WITNESS:   It depends on the
10  employer.
11  BY MR. ROTHSTEIN:
12    Q.    Okay.   Is your department closed on Martin
13  Luther King holiday?
14    A.    It varies.
15    Q.    It varies?   What do you mean by that?
16    A.    There are sometimes that we work and
17  sometimes that we don't.
18    Q.    Is the clinic open?
19    A.    There are patients that are seen, yes.
20    Q.    What about in 2012 was Martin Luther King
21  holiday a business day for the Orthopedic Surgery
22  Department at U.S.C. in 2012?
23    A.    I don't recall.
24    Q.    Do you know whether your clinic saw
25  patients on Martin Luther King holiday in 2012?

```
1        A.    I don't recall.
2        Q.    Is Memorial Day a business day?
3        A.    I believe it depends on the employer.
4        Q.    With regard to the U.S.C. Orthopedics
5   Department?
6        A.    It depends on the chairman.
7        Q.    Okay.  Well, you've been the chairman for
8   quite some time, haven't you?
9        A.    Yes.
10       Q.    Okay.  Since you've been the chairman has
11  Memorial Day been a business day?
12       A.    No, that has been a holiday.
13       Q.    Okay.  What about since you've been the
14  chairman has Martin Luther King holiday been a
15  business day?
16       A.    I think we have worked all Martin Luther
17  King days except for this past year.
18       Q.    So 2015 was the first day -- first year
19  you believe that your department has taken off for
20  Martin Luther King holiday is 2015?
21       A.    I'm not certain.
22       Q.    Do you know if the State of South Carolina
23  recognizes Martin Luther King as a State holiday?
24       A.    No.
25       Q.    Okay.  Do you know whether mail is
```

1  particular form.

2      Q.   Okay.  As the chair of the department are

3  you aware of whether residents are assigned specific

4  attendings to serve as an adviser to them.

5      A.   As I mentioned a moment ago, no, we do not

6  routinely assign advisers to particular residents.

7      Q.   Do you know who have put that on the form?

8      A.   No.

9      Q.   But this is the form or the document,

10 Exhibit 1 from Dr. Voss' deposition, that you went

11 over with Dr. Grabowski and Dr. Irani during the

12 meeting on September 20th; is that correct?

13              MS. THOMAS:  Object to the form.

14 BY MR. ROTHSTEIN:

15     Q.   When you say, we reviewed his progress to

16 date over the last six months --

17              MS. THOMAS:  If you are going to ask

18 the witness about this document, I don't believe

19 he's seen that.  And I think I would have a right to

20 talk to him about that if you are going to ask him

21 about it Exhibit 1 to Dr. Voss' deposition.

22              MR. ROTHSTEIN:  I'm fine if you want

23 to take a break and --

24              MS. THOMAS:  It's not a break.

25              MR. ROTHSTEIN:  If you want to confer

1    Q.   Okay.  What was -- what is your

2  understanding of what Grabowski observed of Dr.

3  Irani's job performance as a resident?

4    A.   On a day-to-day basis he would have

5  evaluated him during conference which would be

6  multiple times a week.  And whenever he was on call

7  with Dr. Grabowski he would have evaluated him then

8  if they were on call together.

9    Q.   Okay.  If they were on call together would

10 there also be a senior resident on call at the same

11 time?

12   A.   It depends on the rotation schedule at

13 that point, but usually, yes.

14   Q.   Okay.  Looking at this -- at this

15 Exhibit 3 document, can you -- I mean, does this

16 fairly and accurately summarize the meeting that you

17 had with Dr. Irani about his job performance both on

18 your service and through the first six or seven

19 months of his or the -- I'm sorry.  The last six or

20 seven months of his PGY-1 year?

21   A.   Yes.

22   Q.   And on Paragraph 2 you stated that Dr.

23 Irani's surgical skills are on par with his peers.

24 Is that accurate?

25   A.   Sure.  Eight weeks into his residency,

1   yes.

2       Q.    Okay.  And that you operated with or Dr.

3   Irani was in the operating room with you on --

4   throughout the two months of the rotation on hand?

5       A.    Yes.

6       Q.    Did you have an occasion to observe his

7   ability to suture patients or close wounds and fix

8   fractures?

9       A.    Yes.

10      Q.    And those technical skills appeared to be

11  on par for Dr. Irani?

12      A.    Yes.

13      Q.    Now, with regard to arthroscopy, describe

14  to me what arthroscopy is.

15      A.    It's looking inside a joint or a potential

16  space using a lighted arthroscope.

17      Q.    And that is a little camera on the end of

18  a -- what is the -- describe that for me.

19      A.    It's a hand-held device that has a camera

20  on one end and has a tubular portion that goes into

21  the joint that has a lens.  It's probably -- it has

22  a lens and a light source.  I'm not sure what --

23  there is lens at one end of it.  And I'm not sure if

24  there is a second lens at the tip of it.

25      Q.    Do junior residents typically do a lot in

1  an arthroscopy procedure?

2      A.   It depends on the attendant.

3      Q.   When they rotate on your service do you

4  let the junior residents do much with the

5  arthroscope?

6      A.   It depends on the particular operation

7  that I'm doing.

8      Q.   Okay.  But here at least you said you

9  hadn't had an opportunity to observe Dr. Irani do

10  much with regard to arthroscopy, correct?

11      A.   Yes.

12      Q.   And it says you've heard from Dr. Guy that

13  his skills -- his -- I assume meaning Dr. Irani's in

14  arthroscopy are quite elementary?

15      A.   Yes.

16      Q.   That wouldn't be Dr. Guy's skills in

17  arthroscopy are elementary?

18      A.   Correct.

19      Q.   Okay.  So when he says, "I have heard from

20  Dr. Guy that his skills," you are talking about

21  "his" means Dr. Irani's?

22      A.   Yes.

23      Q.   Did Dr. Irani rotate to Dr. Guy's service

24  after finishing with you?

25      A.   Yes.

1    Q.   Okay.  So at this point he had been with
2  Dr. Guy less than three weeks?
3    A.   Yes.
4    Q.   Okay.  Is that really too early for
5  Dr. Guy to tell much about his -- Dr. Irani's skills
6  with arthroscopy?
7    A.   No.
8    Q.   Do you know what Dr. Guy observed about
9  Dr. Irani's arthroscopy skills during that 20-day
10  period?
11    A.   I don't recall.
12    Q.   Okay.  Next sentence says that your
13  observations of Dr. Irani's interactions with
14  patients have been favorable, right?
15    A.   Yes.
16    Q.   And the next sentence says he's
17  demonstrated appropriate relationship --
18  relationships with patients and their families,
19  right?
20    A.   Under my direct supervision.
21    Q.   Did you believe he showed empathy and
22  compassion towards the patients and the families?
23    A.   While I was watching him, yes.
24    Q.   Okay.  Are you aware of any issues during
25  this timeframe with Dr. Irani's interactions with

1  patients when he was not under your direct
2  supervision?
3      A.   Yes.
4                (Ms. Stephens left the room.)
5  BY MR. ROTHSTEIN:
6      Q.   Okay.  Tell me about what you are aware of
7  with regard to Dr. Irani's interactions with
8  patients at that time when he was not under your
9  direct supervision.
10     A.   Well, it would have been the preceding six
11  months where there were multiple comments about not
12  caring, lack of empathy, inappropriate attention to
13  detail.  So that would have incorporated the time
14  period prior to him starting with me.  And then
15  during my rotations he had the interaction with my
16  particular patient about the narcotics.
17     Q.   Okay.  We'll get to that in a minute, but
18  at the time he came to you, you didn't notice any
19  problems with his patient interactions or his
20  empathy and compassion towards patients?
21     A.   What do you mean he came to me?
22     Q.   In your rotation.  When he came from the
23  PGY-1 year into your rotation.
24     A.   During the time period that I was
25  observing him I did not see that.

1      Q.    Okay.  So if there were issues that other
2  attendings had raised about his PGY-1 year and his
3  empathy, compassion, interactions with patients, he
4  had improved those by the time he got to your
5  rotation; is that right?
6      A.    No.  I can only comment about how he
7  behaved when I was directly observing him.
8      Q.    Okay.  And your observations were good
9  about Dr. Irani?
10     A.    Yes.
11     Q.    At least with regard to his interactions
12  with patients and families, right?
13     A.    While I was observing him, yes.
14     Q.    You also noted that Dr. Irani demonstrated
15  an excellent degree of interest and commitment to
16  his own education.  Was that accurate?
17     A.    Yes.
18     Q.    Okay.  And I think you commented about Dr.
19  Irani's taking initiative to bring a notebook around
20  with him to use as a tool to record things that he
21  wanted to review for later purposes, right?
22     A.    Yes.
23     Q.    And did you believe that to be -- I mean,
24  that was obviously worth noting.  So you believed
25  that to be a good part of Dr. Irani's education was

1  Dr. Iaquinto with this patient?

2      A.   I don't recall.

3      Q.   Do you agree with Dr. Iaquinto's treatment

4  of this patient?

5      A.   I believe the patient received an

6  amputation.  To the best of my recollection that was

7  the appropriate decision.

8      Q.   And when Dr. Iaquinto asked for your

9  consultation did you concur on his diagnosis or

10 evaluation of the patient?

11     A.   Yes.

12     Q.   Did you observe Dr. Iaquinto do anything

13 improper during the surgery or in the trauma bay

14 that you believe you layed eyes on this patient?

15     A.   I don't recall.

16     Q.   Did you personally observe anything

17 inappropriate -- you personally observe anything

18 inappropriate about the way that Dr. Irani cared for

19 this particular patient?

20     A.   I don't recall if I observed that or not.

21     Q.   How did this incident come to your

22 attention in terms of why it ended up on the

23 August 15th, 2011, memorandum of record?

24     A.   Can you repeat the beginning of that

25 question, again, please?

1  communication directly with the nurses about this
2  incident?
3      A.   I had a number of conversations about it.
4  I don't recall which particular nurse that I had a
5  verbal conversation about it.
6      Q.   Do you recall when that occurred -- when
7  those discussions with the nurses occurred.
8      A.   No.
9      Q.   Would it have been prior to August 15th,
10 2011?
11     A.   I don't recall if it would have been
12 before or after that date.
13     Q.   Did you speak with Dr. Iaquinto about Dr.
14 Irani's behavior and communications during this
15 incident?
16     A.   I don't recall speaking with him about Dr.
17 Irani's behavior.
18     Q.   Are you aware that Dr. Iaquinto has done
19 an affidavit saying that Dr. Irani's behavior and
20 conduct during this incident was appropriate?
21     A.   I'm aware of that affidavit.
22     Q.   Okay.  Do you have reason to think that
23 Dr. Iaquinto is lying on that affidavit?
24     A.   Yes.
25     Q.   And what is your reason to believe that

1  Dr. Iaquinto would lie on an affidavit?

2      A.    Because there is substantial evidence to

3  the contrary that Dr. Irani behaved in a manner

4  consistent with what Dr. Iaquinto states in his

5  affidavit.

6      Q.    Would it be fair to say that Dr. Iaquinto

7  has a different perception of what happened during

8  the events than Diane Savage and the other nurse

9  had?

10     A.    Certainly.

11     Q.    But you don't know which of those

12 perceptions is accurate, do you, because you weren't

13 there, right?

14     A.    I was not there.

15     Q.    Have residents ever had any -- other

16 residents ever had any problems Diane Savage?

17     A.    I don't know.

18     Q.    Okay.  Do you know Diane Savage?

19     A.    No.

20     Q.    Do you recall Dr. Koon referring to Diane

21 Savage as his friend during the grievance hearing?

22     A.    I recall the word "friend."  I don't

23 recall who he was referring to when he stated that.

24     Q.    Do you know what Diane Savage's position

25 is?

1      A.    Right.
2      Q.    Do you know whether it was -- the Vicryl
3  suture issue occurred while Dr. Irani was on your
4  service?
5      A.    I do not believe it was when he was on my
6  service, at least not with one of my patients.  He
7  could have been on call during that time interval
8  there, but I don't believe it was with one of my
9  patients.
10     Q.    Okay.  Where would Dr. Irani get Vicryl
11 suture, the material, the actual material itself?
12     A.    It's usually present in an operating room,
13 an emergency room, or any procedure room where
14 people are doing surgery.
15     Q.    Do you know if Dr. Irani had observed
16 other residents using Vicryl suture in the same
17 situation he was using it?
18     A.    I don't know if he did or not.
19     Q.    Do you know if any other resident was ever
20 written up for using Vicryl suture inappropriately?
21     A.    I'm not aware of any other circumstances
22 where another resident used Vicryl suture
23 inappropriately.  They certainly never used it on
24 one of my patients.
25     Q.    But after this -- I think I may have asked

1  this, but after this memo you are not aware of Dr.
2  Irani using Vicryl suture inappropriately once he
3  was told about the issue with the bacteria and
4  the braided suture?
5       A.   Correct.
6       Q.   So do you believe he addressed that or
7  once he was educated about that he took it to heart
8  and understood it and applied it?
9       A.   All I can say is to the best of my
10  knowledge he didn't use it after that point.
11      Q.   Okay.  All right.  The next patient issue
12  on that Paragraph 5 says, not evaluating a V.A.
13  total joint patient with immediate post-operative
14  cellulitis, right?
15      A.   Yes.
16      Q.   Do you know anything about that particular
17  patient encounter?
18      A.   Yes.
19      Q.   What do you know about that patient
20  encounter?
21      A.   He was contacted regarding a patient that
22  was in the immediate post-operative period after a
23  total joint --
24      Q.   What is the immediate post-operative
25  period?

1  physician is contacting somebody with subspecialty
2  expertise or who is being -- is on call with
3  somebody who has subspecialty expertise.  So at that
4  point it would have been Afraaz's responsibility if
5  he was unable to go over there to indicate to
6  somebody else that it needed to be evaluated.
7       Q.    Okay.  Do you know what the emergency
8  medical physician in this case did with the patient
9  after communicating with Dr. Irani?
10      A.    I believe the patient was admitted.
11      Q.    The next item, substandard evaluations
12  during his internship.  Did Dr. Irani get
13  unsatisfactory in any of his evaluations that you
14  reviewed?
15      A.    He had a number of below average
16  evaluations during his internship and a number of
17  comments about his behavior.
18      Q.    Was Dr. Irani promoted from PGY-1 to PGY-2
19  without conditions?
20      A.    Yes.
21      Q.    Okay.  Do you believe Dr. Irani
22  satisfactorily completed his PGY-1 year?
23      A.    He was given credit for his PGY-1 year.
24      Q.    My question was do you believe Dr. Irani
25  satisfactorily completed his PGY-1 year?

1    A.    He completed it in a satisfactory fashion
2  to be allowed to have credit.
3    Q.    Okay.  Item Number 7, he has displayed a
4  significant lack of attention to detail in his
5  initial PGY-2 rotation.  That would be your
6  rotation, right?
7    A.    Yes.
8    Q.    Okay.  How did Dr. Irani display a
9  significant lack of attention to detail in his
10 rotation with you?
11   A.    That would refer to his inadequate history
12 and physical examinations and documentation.
13   Q.    Anything else?
14   A.    That is what I can think of at the present
15 time.
16   Q.    Okay.  How many times did you confer with
17 Dr. Irani about what you believed to be
18 inadequate H&P, histories and physicals, and
19 documentation on your rotation?
20   A.    More than once.  I don't recall how many.
21   Q.    Now, I understand that this was a -- what
22 they call a Level 2 remediation; is that right?
23   A.    Yes.
24   Q.    What is Level 2 remediation or what is
25 your understanding of Level 2 remediation?

1  that are coming on duty after a night call?  Is
2  there some sort of interchange between, you know,
3  what happened the night before?
4      A.    So you are referring to a resident who is
5  going home after call?
6      Q.    Right.  Yeah.  Is there usually some sort
7  of meeting or sort of handing off the continuum of
8  care?
9      A.    They have to meet to be able to pass off
10 the pager and so forth.
11     Q.    Okay.  Do you recall when during the day
12 you spoke with this particular woman -- this
13 patient?
14     A.    No.
15     Q.    Do you know the patient's name?
16             MS. THOMAS:  Whoa.  Let's talk about
17 this.
18             MR. ROTHSTEIN:  I'm just asking --
19 I'm not asking her name.  I'm asking, do you know
20 the patient's name?
21 BY MR. ROTHSTEIN:
22     Q.    Sitting here today, do you remember that
23 patient's name?
24     A.    Yes.
25     Q.    So you could pull that patient's chart if

1  I asked for it, right?

2      A.   Yes.

3      Q.   Okay.  And in terms of complying with

4  HIPAA, you know how to redact out protected health

5  information?

6              MS. THOMAS:  That is an inappropriate

7  question to ask this witness.  And you know you deal

8  with that through us.

9  BY MR. ROTHSTEIN:

10     Q.   What medication was that patient on?

11     A.   She was on oral narcotic.  I believe it

12 was Oxycodone.

13     Q.   You sure it wasn't Percocet?

14     A.   My normal thing that I prescribe is

15 Oxycodone.

16     Q.   What is Oxycodone?

17     A.   An oral narcotic.

18     Q.   How is that different from Oxycontin?

19     A.   Oxycontin is a long-acting oral narcotic.

20 Oxycodone is something that has a shorter onset and

21 a shorter duration of action.

22     Q.   When you discharge someone from the

23 hospital do you typically put them on Oxycontin or

24 Oxycodone?

25     A.   Oxycodone.

1    A.    Yes.

2    Q.    Okay.  And that phenomenon, that sort of

3  tolerance, also applies to Oxycodone?

4    A.    Yes.

5    Q.    What is the maximum dosage for Oxycodone?

6    A.    There is not a specified maximum dosage

7  for Oxycodone.

8    Q.    What did Dr. Irani -- specifically what

9  did Dr. Irani instruct this patient or her husband

10  that you believe to be inappropriate care?

11    A.    What the patient communicated to me was

12  that he had instructed her to take five pills, five

13  milligrams each, every three hours.

14    Q.    Five pills of five milligrams each every

15  three hours.  And why is that inappropriate?

16    A.    Because ultimately that works out to about

17  200 milligrams of Oxycodone a day.  And for a

18  patient who is -- I would describe her as sort of

19  somewhere in the neighborhood of 130 to 150 pounds,

20  that is an enormous dose of narcotic.

21    Q.    Did you send this patient home with

22  discharge instructions about narcotics?

23    A.    There are instructions that go on the

24  prescription.

25    Q.    Okay.  Do you recall what those

1    A.    I was only peripherally involved with

2  this.  So my understanding is he was told to do

3  something.  He didn't do it.  And when he was

4  challenged about it, rather than taking care of it

5  he was argumentative.

6    Q.    Do you know what Dr. Grabowski asked him

7  to do?

8    A.    Obtain an M.R.I.

9    Q.    Do you know if Dr. Irani obtained the

10 M.R.I.?

11   A.    I do not know that.

12   Q.    Do you have an understanding that Dr.

13 Irani either disregarded or ignored the instruction

14 to get an M.R.I.?

15   A.    At this point in time this was my

16 understanding that, yes, that is correct.  I have

17 seen documentation subsequent to that where Dr.

18 Irani is telling his story and he states that he did

19 get the M.R.I.  I'm unsure if he's telling the truth

20 or if office staff ended up getting the M.R.I.

21 independent of him actually doing it.

22   Q.    Okay.  Did you do anything to confirm

23 whether Dr. Irani's story was truthful or not?

24   A.    During that faculty meeting we discussed

25 that particular case.  And it appeared from his

1  responses that he was not telling the truth.

2     Q.    How did it appear from Dr. Irani's

3  responses that he was not telling the truth?

4     A.    I mean, throughout the faculty meeting

5  when confronted or -- that is the wrong word.  When

6  we discussed any particular example of things that

7  he was doing wrong, he was evasive, argumentative,

8  refused to recognize that something was a problem.

9  There wasn't anything that he was really willing to

10 say, "Geez, I made a mistake.  That won't happen

11 again."

12          And that exact same type of behavior was

13 true throughout the discussion about this particular

14 patient.  And I don't remember the exact wording of

15 what he said, but there was no question in my mind

16 that he was not telling the truth at that point

17 about his side of the story.

18    Q.    Did Dr. Irani indicate that he had not

19 previously been made aware of the allegations with

20 regard to Dr. Grabowski and Dr. Wood and this M.R.I.

21 patient prior to the faculty meeting?

22    A.    Can you phrase that again?

23    Q.    Yes.  I mean, was this faculty -- did Dr.

24 Irani indicate that the faculty meeting was the

25 first time he had heard that Grabowski and Wood

1    Q.    Have you ever spoken to Dr. Thomas Jones
2  about Dr. Irani's care of Trauma Patient 375?
3    A.    No.
4    Q.    Do you know if any other residents were
5  involved in the care of Trauma Patient 375?
6    A.    Dr. Nathe.
7    Q.    Nathe?
8    A.    N-a-t-h-e.
9    Q.    Do you know if Dr. Nathe was placed on
10 remediation in connection with her care of Trauma
11 Patient 375?
12   A.    The case was discussed with her.  I don't
13 believe she was placed on remediation.
14   Q.    Okay.  When this issue was brought up
15 during the December 5th, 2011, faculty meeting what
16 was Dr. Irani's response?
17   A.    I don't remember specifically what he said
18 about that particular patient.  His tenor in general
19 was to -- it was to be argumentative and deny any
20 type of problem with his behavior.
21   Q.    You specifically recall this patient being
22 discussed at the faculty meeting?
23   A.    No, I don't.
24        MS. THOMAS:  David, you can ask the
25 same questions over and over and over again, but I'm

1    BY MR. ROTHSTEIN:

2        Q.    Do you recall how Dr. Irani was informed

3    of his suspension following the faculty meeting?

4        A.    No.

5        Q.    Was any type of vote taken during the

6    faculty meeting about Dr. Irani?

7        A.    I think it would have been a general

8    discussion at the consensus.  I don't think that

9    there was -- I don't recall there being a show of

10   hands or any other type of formal vote.

11       Q.    What was the consensus of the faculty at

12   the conclusion of the faculty meeting about Dr.

13   Irani?

14       A.    It's stated right there in the last

15   paragraph.  It's the recommendation of the faculty

16   that Dr. Irani be placed on immediate suspension.

17       Q.    And when did that recommendation occur?

18       A.    Well, the leave of absence would have

19   begun 9 December according to this memo.  I don't

20   know.  The memo was typed up three days later.  I

21   don't know when the recommendation would have been

22   made to the GMEC or thereafter.  So I'm not certain

23   of those particular exact steps in the timing.

24       Q.    Okay.  How would that recommendation have

25   been communicated to the executive committee of the