# EXHIBIT L

1

```
        IN THE UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF SOUTH CAROLINA
                COLUMBIA DIVISION
                   -   -   -
AFRAAZ R. IRANI,    :  C/A NO.
M.D.                :  3:14-cv-03577-CMC-
                    :  KDW
        vs.         :
                    :
PALMETTO HEALTH;    :
UNIVERSITY OF SOUTH :
CAROLINA SCHOOL OF  :
MEDICINE; DAVID E.  :
KOON, JR., M.D.,    :
etc., JOHN J. WALSH, :
IV, M.D., etc.      :
                   -   -   -
```

MONDAY, DECEMBER 7, 2015

-   -   -

ORAL DEPOSITION OF RICHARD E.

GRANT, M.D., taken pursuant to notice, was

held at the offices of Wyndham Philadelphia

Historic District, 400 Arch Street, Adams

Conference Room, Philadelphia, PA,

commencing at 10:08 a.m., before Kimberly S.

Gordon, a Registered Professional Reporter,

Certified Court Reporter and Notary Public.


-   -   -

ELITE LITIGATION SOLUTIONS, LLC
1518 Walnut Street, Suite 300
Philadelphia, Pennsylvania 19102
www.elitelsllc.com ~ (215) 563-3703

RICHARD E. GRANT, M.D.

16

1    a Christmas party to go to and then I came

2    here.  I got here a little bit earlier than I

3    thought.  And then I was heading home here

4    last night around 7:00-something, 7:15 or so.

5        Q.    And I think you just answered this,

6    but let me be sure.  Have you received any

7    additional materials since doing your expert

8    report?

9        A.    No, not that I know of.

10       Q.    So you haven't read any of the

11   depositions that have been taken in this

12   case.  Is that correct?

13       A.    Not that I know of, no.  I have not

14   read any depositions.

15       Q.    Have you talked to anyone other than

16   Mr. Rothstein and Dr. Irani?

17       A.    Only the two gentlemen in the room

18   with me today.

19       Q.    Have you ever talked to Dr. John Eady

20   about this case?

21       A.    John Eady sent me an e-mail.  We

22   didn't speak about it specifically.  He just

23   mentioned that there was another resident who

24   needed my help and that Attorney Rothstein

RICHARD E. GRANT, M.D.

27

1        Now, there's some residents who I

2    felt had developed at the rate that they

3    should.  I might keep them an extra year.

4    I've done that, and I did that.  There's some

5    residents who I felt that even after we gave

6    them every chance possible did not

7    self-correct, and we let them go.

8        I had a resident who actually

9    abandoned his post and left patient care from

10   a hospital for two days without somebody

11   being there.  I couldn't let him back in the

12   program because it would have just been

13   poisonous for the atmosphere of learning.

14       And then I had some people who just

15   underperformed in terms of the in-training

16   examinations and in terms of the care of the

17   patients, and there was no way in the world

18   they were going to be able to pass the

19   Board's because they just didn't have the

20   intellectual database to be able to do it.

21   Those individuals we had to let go.

22       But at Howard the way that things

23   were established, and I think this was

24   according to the guidelines of the ACGME, you

RICHARD E. GRANT, M.D.

28

1    cannot fire someone without due process.  And

2    due process, not only went through our

3    department but went through an extra Board

4    beyond that's heard both sides of the story,

5    and then that resident still had the ability

6    to appeal even if there was an adverse

7    decision that was made.

8         In addition to that, I had one

9    resident that even after we went through that

10   entire process, a resident who was really

11   underperforming, took me to court.  And now

12   we had information that was reviewed before a

13   judge, and the final decision was that the

14   resident didn't measure up to the other

15   people in the program and had to leave.

16        But due process for us was a very

17   serious situation.  Because we knew that if

18   you were going to have a resident that you're

19   going to fire, eventually the ACGME comes and

20   looks at your process and they're trying to

21   figure out, given the situation, what's in

22   the folder, does the folder reflect the fact

23   that there was a situation here and did we

24   have a well-balanced hearing of the events.

RICHARD E. GRANT, M.D.

1    So that would mean that the resident has a

2    chance to represent his aspects of it and the

3    attending has a chance to represent, and then

4    we have documentation.

5        And then the question is, in the long

6    run, with respect to the issues that involve

7    patient care, it wasn't an untoward event as

8    far as patient care is concerned that was

9    binding.  Because those are the things that

10   they're going to affect the faculty.

11   Q.    Does it have to be a single untoward

12   event?

13   A.    Well, usually -- what I'm saying is

14   that usually if you think about what happens

15   in residency programs, in residency programs,

16   we know that residents are on a huge learning

17   curve.

18   Q.    Sure.

19   A.    PGY-1 year they only have three years

20   of orthopedics, I mean three months.  And

21   that's not just three months of orthopedics

22   where they're actually doing a lot.  They're

23   actually observing for three months.

24        And then when they come into their

ELITE LITIGATION SOLUTIONS, LLC ~ 215.563.3703

RICHARD E. GRANT, M.D.

30

1   PGY-2-year, when they come in in July,

2   they've really only been exposed to three

3   months of clinical orthopedics.  And when

4   they come into that first year, that's the

5   fourth month of orthopedics that they've been

6   exposed to in a spectrum that's supposed to

7   last five years.

8     Q.    Sure.  But in that spectrum, there

9   are more things being measured other than

10  surgical skills, aren't there?

11    A.    You never just measure surgical

12  skills.  Because surgery is just one part of

13  the process.  And surgery at that level is

14  not really a true measurement of what's going

15  on with that individual because it really

16  takes you about four years to be a decent

17  surgeon, and then in practice, it takes you

18  another five years to be a master surgeon.

19         But be that as it may, what you're

20  evaluating when someone is coming into their

21  July PGY-2 year you're evaluating someone who

22  for the first time is really having

23  responsibility of taking care of an

24  orthopedic patient.  Because you don't give

RICHARD E. GRANT, M.D.

1   that full responsibility of PGY-1.  But PGY-2

2   that's your first time actually taking care

3   of patients.

4           But I think what you have to do, and

5   you have to think about this, is you're not

6   taking care of this patient in a vacuum.  The

7   patient really doesn't belong to you.  That

8   patient belongs to an attending.  There's no

9   such thing as a patient that comes into a

10  medical center who doesn't have a doctor.

11   Q.    And the attending is the one who

12  makes the final call on everything, whether

13  it's he or she?  And you're shaking your head

14  "yes".

15   A.    Yes.

16   Q.    So, if an attending gives a PGY-2

17  instructions with regard to the patient,

18  those should be followed, correct?

19   A.    To the best of the PGY-2's

20  understanding.  But think about where the

21  PGY-2 was in their evolution.  They're just

22  now stepping onto an orthopedic service.

23          So that's why I come back to the

24  concept of teams.  When I was in my residency

RICHARD E. GRANT, M.D.

33

1    or not the PGY-2 can do what they're being

2    asked to have done?

3       A.     Yes.  But the scope of a PGY-2 is so

4    limited there's not a whole lot that they can

5    do at that level.  They're just now starting

6    orthopedics.  They're not -- they have not

7    mastered -- they have not been exposed to

8    probably anything in orthopedics.

9           Because you have a PGY-1 year which

10   is an internship year.  And the way that the

11   internship year was redesigned and what we

12   did on the ACGME, we said, "Okay, these are

13   our residents".  Because, before, they were

14   in general surgery.

15          And the reason that we took them out

16   of that is because when they were in general

17   surgery they were just sitting around doing

18   scud work.  Because the general surgeons knew

19   that they weren't going to be general

20   surgeons.  So we said, "Okay, we'll pick up

21   these residents.  They belong to us.  We'll

22   let them rotate on your service, but

23   ultimately they belong to us".  Because we

24   needed them to learn how to do general

RICHARD E. GRANT, M.D.

34

1    surgery management.

2          But then they said, "Okay, within

3    that time, we also wanted to get exposed to

4    orthopedics".  So then in three months they

5    have three months out of 12 months where they

6    actually rotate on orthopedics.  But they

7    don't know anything.  This is their first

8    exposure.  When they start their July year

9    PGY-2, they've basically only had three

10   months of exposure to orthopedics at the

11   very, very basic level.

12   Q.    And every attending knows that in

13   orthopedics, don't they?

14   A.    I would hope that they do.  But the

15   thing about is what is the backup for PGY-2.

16   You can't take a PGY-2 individual and expose

17   them to problems that are complex even for a

18   PGY-4 and expect them to know everything

19   about the management of that patient.

20   Q.    Let me ask you what you know about

21   the setup at Palmetto Health, the actual

22   setup.

23   A.    I know that you have two residents

24   per year.  And where I am right now --

RICHARD E. GRANT, M.D.

53

1    A.    My expectation is that they'll get it

2    done.

3    Q.    Do you rely on their H&P in any way

4    as the attending?

5    A.    No, I don't rely on -- they're in

6    training.  I don't rely on residents.  I

7    think that's something you should never do.

8    I think you have to rely on your assessment

9    of the patient.  It's your patient.  It's not

10   the resident's patient.

11   Q.    So what a resident does is immaterial

12   to you in caring for a patient?

13   A.    No.  No.  No, it's not immaterial.

14   It's just that I'm saying that ultimately, if

15   a patient comes into a medical center,

16   ultimately that patient is your patient.

17   Patients do not belong to residents.

18   Residents are rotating on your service.

19   They're in evolution.  They're not where you

20   are.

21        And part and parcel of the

22   educational process is letting the residents

23   do part of the situation, and then coming and

24   see what they come up with and then helping

ELITE LITIGATION SOLUTIONS, LLC ~ 215.563.3703

RICHARD E. GRANT, M.D.

54

1    them to understand the situation in depth.

2    Because the reason that you're an attending

3    and they're a resident is because you know

4    what could go wrong; you know what to think

5    about that they may not think about.  And

6    they're in the educational process.  They're

7    evolving.

8        Q.    They're supposed to evolve, correct?

9    So, if you talk to them and tell them what

10   you want or what your expectations are and

11   what they may have not done correctly in a

12   situation, do you expect the next time that

13   it be done as discussed?

14       A.    Usually.  I mean -- and you have to

15   look at each resident individually to try to

16   figure out how they learn and what they're

17   learning.  Because usually, if they've gotten

18   through the application process and gotten

19   into the residency, they've gotten there to

20   the exclusion of a lot of people, so these

21   are usually pretty bright individuals.

22   Because it's very hard to get into orthopedic

23   surgery as far as the residency is concerned.

24       Q.    There are a lot of good applicants

RICHARD E. GRANT, M.D.

61

1    be an advocate for diversity, I don't know.

2    I don't know if it has anything to do with

3    family or not.

4    Q.    Would you share with me what

5    Dr. Irani related to you as the reason he

6    believes he had problems during his residency

7    program at Palmetto Health?

8    A.    Well, I mean I think there were

9    several issues that came up in our

10   discussion.  And I think from my own

11   standpoint what surprised me, and just

12   looking at the sequence of events, I was just

13   a little bit puzzled about how everything

14   took place so suddenly.

15        Because when you finish your PGY-1

16   year, you've not really had much in the way

17   of contact with the faculty or you've not had

18   much in the way of interaction with the

19   residents other than you're sort of like --

20   you're an intern on the service for a short

21   period of time.  You don't have a high-level

22   responsibility.

23        And what surprised me and still

24   surprises me in looking over everything is

RICHARD E. GRANT, M.D.

62

1    that a lot happened in a short period of time

2    in the PGY-2 year.  Because you're just

3    coming on into the service and you get on the

4    service for July and August and all of a

5    sudden you're in really deep difficulty with

6    the faculty.

7         I've looked over the cases that have

8    been cited.  I've seen the course of events

9    for the management of each of those patients.

10   And when I looked at them and I looked at the

11   outcome, not one of those patients had any

12   untoward outcome.

13   Q.    Is that the determining factor if

14   someone is hurt or not?

15   A.    The determining factor has to do with

16   patient safety.  Because the determining

17   factor of what we do in training situations

18   is we, not only educate people, we take care

19   of patients.  And we have to be able to take

20   care of patients in the way that they have a

21   positive outcome on the opposite side.

22        What I don't understand, and in

23   looking at the cases that Dr. Irani had to

24   handle, why isn't he handling these types of

ELITE LITIGATION SOLUTIONS, LLC ~ 215.563.3703

RICHARD E. GRANT, M.D.

63

1   really complex cases at the PGY-2 level?  It

2   doesn't really make sense to me.  Because at

3   the PGY-2 level if you're coming in in July

4   or August, you have only had two months of

5   orthopedics out of a spectrum of five years.

6   And a multiple trauma case that you're

7   handling at the PGY-2 level and you're making

8   critical decisions, it doesn't make sense to

9   me.

10        It should be a situation where as a

11  PGY-2 he's on the learning curve, he gives

12  what he knows and what he assesses, and then

13  reverberates that through his chief resident.

14  And his chief resident should then talk to

15  the staff.

16  Q.    And do you know that that was not

17  happening in these cases?

18  A.    I don't see any proof of it here.  I

19  don't see that on many of these services

20  where he was working where he was actually

21  covered by a PGY-4 or 5 and that the PGY-4 or

22  5 was actually coming in to help him to

23  examine the patient and make a final decision

24  on them.

RICHARD E. GRANT, M.D.

64

1          I think that in the beginning of his

2    second year he was given responsibility

3    that's well beyond his level of

4    comprehension.

5    Q.    Do you know that he was given

6    responsibilities different than any other

7    PGY-2 --

8    A.    I don't know what the other people

9    do.  I'm talking about --

10                THE COURT REPORTER:  Doctor?

11                MR. ROTHSTEIN:  Yes, let her

12          finish talking before you start to

13          answer.

14                THE WITNESS:  I know.  I just

15          feel very passionate about this.

16                I don't know what the other

17          residents were inclined to do.  But I

18          do know this:  A PGY-2 is not the

19          person to make a final decision about

20          a multiple trauma patient.  A PGY-2

21          is not the person who should be

22          picking up the phone and talking to

23          the chairman or the faculty member

24          about what's going on.  That should

RICHARD E. GRANT, M.D.

65

1          be resonated through someone who has

2          much more experience than he does.

3   BY MS. HELMS:

4     Q.    And what I'm asking you is -- I

5   understand you're critical of the way you

6   perceive that it was done.  What I'm asking

7   you is:  Do you know that what was asked of

8   Dr. Irani is different than what was asked of

9   any other PGY-2 in the orthopedic residency?

10    A.    I don't know all of your PGY-2s.  But

11  if I see your structure that a multiple

12  trauma patient at the PGY-2 year is evaluated

13  and that individual is now supposed to

14  recommend a treatment plan at the PGY-2

15  level, I think that that's wrong.

16    Q.    Let me ask this:  Do you know

17  anything about any resident in the Palmetto

18  Health program other than Dr. Irani?

19    A.    I've not interviewed them all.

20    Q.    Have you interviewed any?

21    A.    No.

22    Q.    Do you know anything about what has

23  been requested of other PGY-2s in the

24  orthopedic residency program?

RICHARD E. GRANT, M.D.

67

1  passionate about it, but I'm not really

2  getting into the same points that you're

3  making.  We'll go through that later if you

4  wish.

5      A.    Okay.

6      Q.    But that's not where I am right now.

7              MR. ROTHSTEIN:  I think he

8          should have the opportunity to

9          explain that answer he was giving

10         you.  I think you cut him off.

11             MS. HELMS:  It would be great

12         if he would answer my questions.

13 BY MS. HELMS:

14     Q.    Go ahead.  You can add it now.

15 Because you'll add it later anyway.

16     A.    I'm just saying that talking to

17 family is one thing.  Making a decision as to

18 what should be done clinically is another

19 thing.

20     Q.    Sure, and I understand that.  And

21 what I was focusing in on is the basic

22 compassion element that you talked about

23 about talking to a family of someone who is

24 badly injured.

RICHARD E. GRANT, M.D.

68

1     A.     Communication and education and

2   communication with patients is also something

3   that, not only the American Academy of

4   Orthopedic Surgery is trying to improve, but

5   it's something that the ACGME is also

6   interested in.  And that is an evolving

7   process also.

8     Q.     Sure.

9     A.     Because the communication at the

10  PGY-2 level may not be as sophisticated as

11  the communication at a PGY-4 or 5.

12          I mean, when I was a junior resident,

13  I had plenty of senior residents who would

14  come in and talk to the family and be much

15  more effective than I was.  Because I'm in

16  the learning process.

17    Q.     Absolutely.  But, again, you've used

18  the term "evolution".  And when there are

19  problems there and those problems are

20  addressed, one would expect improvement,

21  correct?

22    A.     I think that you would expect

23  improvement, but it takes a little while to

24  measure improvement.  If you're saying that

RICHARD E. GRANT, M.D.

69

1   everybody should be improved and perfect

2   within three months of their second year of

3   residency, which is really their first year

4   of orthopedics, I'm not really sure that

5   that's reasonable.

6       Q.    Has anyone said that?  Has anyone

7   said that there should be perfection?

8       A.    No, I didn't say perfection.  You

9   said improvement.  I said improvement is one

10  thing.  Measuring improvement is something

11  that continues for five years.

12      Q.    How do you define a program's

13  attrition?

14      A.    Attrition has to do with people who

15  have either dropped off and fired or left the

16  program.

17      Q.    Does it matter to you if they go into

18  other specialties?

19      A.    No, it doesn't.  I think attrition is

20  attrition.

21      Q.    Do you know when you looked at

22  Palmetto Health's attrition rate which of the

23  residents who left left to go to other

24  specialties?

RICHARD E. GRANT, M.D.

1    A.    That's my understanding.  It's like

2    60 percent attrition rate for your program.

3    Q.    No.  Do you know how many of those

4    actually left or were terminated from the

5    program?

6    A.    No, I don't.

7    Q.    Do you know how many of those shifted

8    into other specialties?

9    A.    I don't know an exact number.

10    Q.    What would it tell you if a program

11    selected residents who repeatedly went into

12    different specialties?

13    A.    It's a problem.

14    Q.    Can it be a problem in the selection

15    process?

16    A.    Usually not.

17    Q.    Usually not?  You don't think it's a

18    problem with identifying people who are

19    correctly suited for orthopedic surgery?

20    A.    No, I don't.  I'm sure most program

21    directors would say the same.  Because

22    usually the people that get into orthopedics,

23    that's been their lifetime ambition.  Once

24    they get in, they usually don't leave.

RICHARD E. GRANT, M.D.

94

1    for residents.

2    Q.    Have you seen residents make unfound

3    accusations about faculty members when they

4    were in that position?

5    A.    Not that I've witnessed personally,

6    no.  I've not experienced that.

7    Q.    Did you review Dr. Irani's

8    performance appraisals from his PGY-1 year?

9    A.    Yes, I think I did.  And they were

10   good.  And I think the first rotation was a

11   little bit rough, but the rest of them were

12   good.

13   Q.    Were there concerns raised in that

14   PGY-1 year?

15   A.    Nothing specific that stood out in

16   terms of a PGY-1 year, which is really just

17   an internship year.

18   Q.    So, as a faculty member, you just

19   overlook concerns in the PGY-1 year?

20   A.    I wouldn't have any major concerns.

21   I've had residents that have come to me in

22   the PGY-1 year that's had some difficulty;

23   I've had to pull them aside and talk to them.

24           Usually I think in the PGY-1 year

RICHARD E. GRANT, M.D.

98

1    Q.    Did he indicate that any faculty

2    member discriminated against him?

3    A.    No.  I did get an indication about

4    Achmed the Terrorist and some talk in that

5    direction that's just trying to make him into

6    something other.  That's a sensitive issue

7    for me because I've dealt with that for four

8    years as an orthopedic resident.  There were

9    always some sort of racial comments or racial

10   jokes around.  I mean I'm not sure it's the

11   best environment, but it's just life.

12   Q.    Did Dr. Irani tell you any context in

13   which that comment was made?

14   A.    I don't know.  I don't really care

15   about the context.

16   Q.    I understand that.

17   A.    What's context got to do with it?

18   Q.    I'm just asking.

19   A.    I don't know.  He told me the

20   circumstances.  Just the fact that anything

21   like that was said to me, I don't care what

22   the context is.  I'm not really sure that

23   anybody can rationalize that comment.  It has

24   nothing to do with education.

RICHARD E. GRANT, M.D.

1    an orthopedic education.

2    Q.    I understand that you're saying there

3    is no excuse, no context for the Achmed the

4    Terrorist comment.

5    A.    And the same thing goes for women who

6    are exposed to the same type of comments from

7    male residents.  I usually tell them,

8    "There's no place for that in my residency

9    program".

10    Q.    I understand that.  Now, what I'm

11    asking you -- and without knowing the time, I

12    don't think you could know if it was in

13    response to or it initiated things.

14         But did Dr. Irani indicate to you

15    that he would take on this persona as an

16    Indian IT person and use the heavy Indian

17    accent and that sort of thing around people

18    in the program?

19    A.    I don't know.  I don't care.  I never

20    had that conversation with him.

21    Q.    He didn't tell you that?

22    A.    He didn't tell me that.  But if he

23    did do that, why did he feel compelled to do

24    that?  What's the atmosphere in which he felt

ELITE LITIGATION SOLUTIONS, LLC ~ 215.563.3703

RICHARD E. GRANT, M.D.

101

1    compelled to do that?

2       Q.    Do you know if Dr. Irani had a very

3    joking personality?  I'm just asking that

4    simple question.

5       A.    I'm sure that I don't know everything

6    there is to know about Dr. Irani's

7    personality, but sometimes humor is used to

8    diffuse an uncomfortable atmosphere.

9       Q.    Sometimes it is and sometimes it's

10   not, correct?

11      A.    Yes, but --

12      Q.    Do you know how --

13      A.    But I do know, I do know that walk.

14      Q.    I understand that.  Do you know the

15   specific circumstances in this case?

16      A.    No.  I've not been in residency with

17   him.  I know similar situations because I've

18   been there.

19      Q.    Do you know if Dr. Irani expressed

20   great discomfort with the southern culture?

21      A.    I have no idea about that.

22      Q.    Do you know if he expressed great

23   discomfort with having to use "yes, sir" and

24   "yes, ma'am"?

RICHARD E. GRANT, M.D.

107

1    report three months after it was due.  So I

2    just got to the point where I dictated my own

3    operative report.

4            I'm interested in the original thing

5    though.  He's responding to something sent.

6    He's responding on November 3, 2011 --

7    Q.    To Dr. Irani's e-mail at the bottom.

8    That's what Dr. Koon's response is to.

9    A.    All Dr. Irani is doing is asking a

10   question.  I don't think he was -- he's

11   asking a question like, "I'm dictating this

12   because"?  Why is he dictating it?  Usually,

13   if you're dictating something as a resident,

14   you had some part in the process.  You took

15   care of the patient.  You're on the team.

16           So I think he's asking a reasonable

17   question.  But why does this question

18   generate all this?

19   Q.    If he had been told repeatedly to do

20   this dictation and had not done it and then

21   came back and said, "Well, okay, I did it,

22   but I don't know why I'm having to do it", --

23   A.    Okay.

24   Q.    -- that's not a problem to you at

RICHARD E. GRANT, M.D.

108

```
1    all?  There's not a better way to address

2    that?

3       A.      There may be a problem, but I'm

4    trying to figure out what is the problem.

5    You think the problem is with him bringing up

6    the question or the problem is he never

7    should have even brought up the question; is

8    that what you're saying?  It sounds like

9    you're characterizing it.

10            Because the impression I'm getting

11   from the response was, you know, "You should

12   never ask me a question like this".  But what

13   is a residency process other than asking

14   questions?  You could bring him to the side

15   and sit him down and say, "This is a teaching

16   moment.  This is why you should have done

17   this".

18            It doesn't have to come with all this

19   sarcasm, "NEVER in a million years sent a

20   response like this to my program director".

21   Well, we don't know what he did in his

22   residency program because we weren't there.

23   I don't know.

24      Q.      What if --
```

RICHARD E. GRANT, M.D.

1    Q.    Do you ever sizzle in your responses

2    to residents?

3    A.    I hope not.  I hope not.

4    Q.    Never?

5    A.    I hope not.  I hope not.  And I try

6    my best to go to a resident and say, "Listen,

7    thanks for what you've done".

8    Q.    Just earlier you said if residents

9    have problems repeatedly that ultimately they

10    have to deal with you.

11    A.    They have to deal with me and a

12    committee of people.  I cannot just deal with

13    a resident alone.  There was a time in the

14    '60s and '70s where the Program Director

15    could come to you and say, "You're fired".

16    Q.    And that's not true anymore, is it?

17    A.    No, those days are long gone.  Even

18    if I'm upset with a resident, it has to

19    modulate with a committee.

20    Q.    Correct.

21    A.    And then you get other people to

22    weigh in their opinions.

23    Q.    Correct.

24    A.    But what I'm saying is they have to

RICHARD E. GRANT, M.D.

113

1  deal with me is that I have to then bring the

2  full weight of that to bear on them and I

3  have to get them involved in the process.  My

4  end goal is not to say, "You're dismissed".

5  My end goal is, "How can we save you".

6    Q.    And repeated attempts to remediate a

7  resident would indicate a program trying to

8  save someone, wouldn't it?

9    A.    Hold on now.  Let's go back to

10  something.  We got a PGY-1 year.

11                  -  -  -

12    (Dr. Irani has exited the room.)

13                  -  -  -

14        MS. HELMS:  Note for the record

15        that Dr. Irani is leaving the room.

16        MR. ROTHSTEIN:  He has to grab

17        a phone call at 12:00.

18        THE WITNESS:  Okay.  What I've

19        said here, and I'm going to go back

20        to my original point, the residents

21        that I usually fire, okay, I cannot

22        remember firing them within their

23        second year or the beginning of their

24        second year.  Usually I did

RICHARD E. GRANT, M.D.

114

1    everything that I possibly could, and

2    usually I would at least get them

3    through that third year.  And if by

4    that third year it looks as though

5    we're not making process, then I

6    would move towards removing them.

7         To me, it's a little unusual to

8    focus in on a guy just coming into

9    July/August and then you lay the

10   hammer on him and start to move him

11   out of the program.  That's unusual.

12        Usually, in my process, or at

13   least as I remember it correctly, and

14   probably the people who were on

15   faculty with me would remember also,

16   we usually went through at least a

17   year of working with someone and

18   tried to save them with whatever

19   remediation process we could have.

20        When I say that they had to

21   deal with me is that that means

22   they're now going to have to go

23   through this process, that we're

24   going to keep really close track on

RICHARD E. GRANT, M.D.

1           them, and we're going to be meeting

2           with them on a monthly basis.

3  BY MS. HELMS:

4     Q.    So, when someone is in remediation,

5  they're watched more closely than other --

6     A.    Yes, and they meet with us every

7  month.

8     Q.    And you talk with them about

9  expectations, correct?

10    A.    Not just me.  The whole education

11 committee says, "Listen, this is what you

12 should be doing.  This last report that we

13 had on you was unsatisfactory.  You need to

14 sit down with that attending and see how you

15 would do better.  These are the books that

16 you should be reading.  Bring your books.  I

17 want to see that you've been reading your

18 books.  I want to look at them.  I want you

19 to tell me what's in this chapter".  So I

20 mean it was a very close process where we

21 weren't interested in losing residents.

22 We're interested in trying to keep them.

23          But it was very rare -- I don't

24 remember, and maybe my recollection is not

ELITE LITIGATION SOLUTIONS, LLC ~ 215.563.3703

RICHARD E. GRANT, M.D.

122

1    figure out how to work with each one of them.

2      Q.    What amount of time now do you spend

3    on education as opposed to your pure clinical

4    practice?

5      A.    I'm involved in education every day.

6    I have residents with me on a daily basis.

7    If I'm not in clinic, I'm going to

8    conference.  If I'm not in conference, I'm

9    going to some sort of educational conference.

10   So I've been involved with education all my

11   life.

12     Q.    Do you expect your residents to be on

13   time for clinic?

14     A.    To the extent possible.  Most of what

15   I do is hip and knee replacements.  And with

16   four residents, what happens is they rotate

17   through different rotations.  Sometimes

18   they'll be in clinic with me, but most of the

19   time they have their own clinic supervised by

20   our non-orthopedic surgeons or they'll have

21   clinic with one of the hand surgeons.

22     Q.    If a resident is not tied up in

23   another clinic or another matter with a

24   doctor and doesn't have the duty hours

RICHARD E. GRANT, M.D.

123

1   issued, do you expect that resident to be on

2   time for things with you?

3       A.    Yes, I do, unless there's some

4   extenuating circumstance that has to do with

5   patient care.  Yes, that happens quite

6   frequently.  Especially when there's only two

7   people in the residency program per year,

8   they are stretched in a lot of different

9   directions, especially if you're at a Level 1

10  trauma center.  Einstein is a Level 1 trauma

11  center.

12      Q.    So certainly patient care issues, if

13  you're tied up with a patient, that's a valid

14  reason to be late for something?

15      A.    Yes.

16      Q.    What about oversleeping?

17      A.    I've had residents oversleep.  I mean

18  I've done that myself.  When I was in my

19  fellowship, I overslept one time.  For some

20  reason, the attending was upset me.  And I

21  said, you know, "How many times have I

22  overslept?  It's one time.  The alarm didn't

23  go off".  He understood what I was talking

24  about because I'm usually on time or earlier.

RICHARD E. GRANT, M.D.

133

1   aware of an incident.

2       Q.    What about Dr. Koon?

3       A.    I'm trying to remember who made the

4   reference of Achmed the Terrorist.  Is that

5   Dr. Koon?

6       Q.    That's Dr. Koon.

7       A.    I think that's problematic.

8       Q.    I understand it's problematic.  But

9   do you have any basis or any reason to

10  believe that the actions taken were based on

11  discrimination?

12      A.    I don't know.  I just think that that

13  was an unnecessary statement.

14      Q.    Do you have any reason to believe

15  that the actions that Dr. Koon took with

16  Dr. Irani are discriminatory?

17      A.    I was not there to experience what he

18  did with him.  All I know is that those type

19  of comments are not healthful or healthy in

20  terms of the graduate medical education

21  learning environment.

22          He can call him whatever he wants to

23  call him, but when you use that kind of

24  terminology, it can be interpreted a lot of

RICHARD E. GRANT, M.D.

134

1    ways.  And I don't think it helps anybody's

2    education, and it certainly doesn't help

3    Dr. Irani's education.  And those type of

4    comments in my background and my experience

5    didn't help my education either.

6        Q.    But you graduated, didn't you?

7        A.    Yes, I did.

8        Q.    And you've been very successful,

9    haven't you?

10       A.    I have been very successful.

11       Q.    Do you know of anything done by

12   Dr. Mazoue that you considered to be

13   discriminatory with regard to Dr. Irani?

14       A.    No.

15       Q.    Do you consider academic remediation

16   to be constructive or punitive?

17       A.    Well, it depends on how you use it.

18   The process that I described I thought was

19   helpful.  Our process of remediation was very

20   careful supervision of the resident going

21   back to see what they were doing, suggested

22   things that they could read, making sure that

23   they got them read, that they increased their

24   database, and that they were in compliance

RICHARD E. GRANT, M.D.

1    see anything in the record about him calling

2    the chief resident.  But there are plenty of

3    patients who are on Oxycodone, and different

4    patients can tolerate different levels of

5    Oxycodone.

6        Q.    If the attending had a concern about

7    the level that was prescribed, do you have

8    any information that would indicate that the

9    attending was wrong in that concern?

10       A.    No.  But I mean it's a teaching

11   moment.  I mean there are plenty of times

12   that residents write prescriptions and the

13   prescription is not exactly what you would

14   have written.  You pull them aside and say,

15   "This is what you should have done".  That's

16   the purpose of the residency.

17       Q.    Do you know if there was a separate

18   incident with Dr. Irani regarding writing

19   prescriptions?

20       A.    A separate instance as far as what is

21   concerned?

22       Q.    Him writing a prescription that the

23   attending found problematic.

24       A.    I'm not aware of that.  What was the

RICHARD E. GRANT, M.D.

167

1    A.    Then it's with Dr. Irani, unless he

2  can make arrangements to get one of his

3  residents to help him out, which hopefully

4  they were helping each other out.

5    Q.    Do you know whether Dr. Irani and his

6  co-resident Dr. Goodnell (ph) worked well

7  together as a team?

8    A.    I have no idea.

9    Q.    Do you think it's reasonable that an

10  attending would expect a resident to see

11  something through if it was assigned to them?

12    A.    Certainly it's reasonable.

13    Q.    And in your review of Trauma Patient

14  TF-375, you indicate that you believe that

15  orthopedic care was administered in a careful

16  and thoughtful manner.  On what do you base

17  that opinion?

18    A.    Based on the information that I had

19  in front of me.

20    Q.    Is that the patient record?

21    A.    The patient record and the

22  information that I had available.  This is

23  the patient that had the elbow fracture and

24  the motor vehicle accident, the bilateral

RICHARD E. GRANT, M.D.

168

1    open ankle fractures?  Yes.  Yes, I think

2    that was handled in an appropriate manner.

3    Q.    And how do you conclude that it was a

4    thoughtful manner?

5    A.    I mean the patient had fracture

6    dislocations to the ankle.  The first thing

7    you do, overriding principle there is

8    immediate reduction to be able to restore

9    circulation and splinting and then definitive

10   care, and then doing the best possible to

11   take care of the open elbow fracture and then

12   take the patient to the operating room for

13   treatment.

14          And as I understand, the patient had

15   a fairly decent outcome.  There was some

16   delay I understand in terms of the patient

17   getting treatment.  Supposedly the patient

18   had been in the trauma bay for about three

19   hours.  And then when Dr. Irani came, it

20   sounds as though things were done to expedite

21   the care of the patient.  And then I think

22   that case was turned over to your

23   traumatologist, who I believe is not a

24   faculty member but is the traumatologist in

RICHARD E. GRANT, M.D.

169

1    charge of that case.

2        Q.    Do you know whether or not the

3    traumatologist had to be called to talk to

4    the family?

5        A.    I don't know.  But I think the

6    traumatologist ended up having to take the

7    patient to the operating room and that the

8    outcome for the patient was -- there was no

9    compromise in the outcome to the patient.

10       Q.    Do you know whether or not the

11   concern was with the, I'll say, and I don't

12   know if I'm saying this right or not, the

13   surgical or the procedure aspect that

14   Dr. Irani used in that situation?

15       A.    There's only one very straightforward

16   procedure for an open fracture dislocation,

17   and that's reduction as soon as possible.

18   Because if you let the extremity maintain

19   itself in that area, then the

20   microcirculation is cut off and it

21   compromises the prognosis of the situation.

22           So there's only some very

23   straightforward things to do with an open

24   fracture dislocation is to reduce it, splint

RICHARD E. GRANT, M.D.

170

1    it, reduce the ankle, splint them, reduce the

2    elbow, splint it, get them to the operating

3    room.  That's all there is to do.

4        Q.    Are there other aspects to care

5    beyond that?  Assuming you do those things

6    correctly, are there other aspects to caring

7    for a patient?

8        A.    Well, there's always other aspects

9    taking care of a patient.  I mean there's a

10   360 approach to the patient.  But the first

11   thing you have to do is take care of the

12   priorities.  The priority is to reduce the

13   fracture and splint it.

14          Because, otherwise, you can do all

15   these other things.  If you haven't done

16   that, you've done nothing.  I mean that

17   cancels out everything.

18       Q.    So, if you do that right, it doesn't

19   matter what else you do?

20       A.    No, everything matters.  I'm not

21   saying that everything doesn't, that

22   everything else doesn't matter.

23          The most critical thing to an outcome

24   and prognosis of the patient is you've got a

RICHARD E. GRANT, M.D.

171

1    fracture dislocation that's open.  First of

2    all, you're going to have to do something

3    about that.  The first thing that you're

4    going to have to do is reduce it.  You're

5    going to have to reduce those ankle fractures

6    so that the circulation can be preserved so

7    the person doesn't lose the leg or lose the

8    foot and ankle.  The next thing you need to

9    do is for the elbow.  Once you get those

10   things done, and that's your priority issues,

11   then everything else would follow from that

12   point on.  But if you don't get those things

13   done, then the outcome for the patient is

14   going to be an adverse outcome.

15          So, in terms of prioritizing what you

16   do in a trauma bay, that's what you would

17   have to do.  And then you're asking someone

18   who is a PGY-2 to take on multiple trauma at

19   a Level 1 trauma center without a chief

20   resident being there, but I think under the

21   circumstances he did a good job.

22   Q.    Do you know how he handled other

23   aspects of the matter?  Do you know if they

24   were legitimate concerns about whether or not

RICHARD E. GRANT, M.D.

177

1    Q.    Did you review the documents from the

2    nurses in that case?

3    A.    I don't know that I reviewed the

4    documents from the nurses in that case, but I

5    remember that that patient ended up with an

6    amputation from the lathe injury, a form of

7    amputation which was conducted by the

8    traumatologist.

9    Q.    Do you know if that traumatologist

10   remained employed by Palmetto Health?

11   A.    I have no idea about your employment

12   processes.

13   Q.    I'm talking about that patient in

14   particular.

15   A.    I have no idea.  I would have no way

16   of knowing that.

17   Q.    But you don't recall the nurses'

18   accounts, a document with the nurses'

19   accounts of what happened?

20   A.    Well, I don't know what the nurses

21   had to say, but what surprises me and

22   surprises me to this day is that here's a

23   patient with a lathe injury where his arm is

24   rotated 180 degrees and then the person who

RICHARD E. GRANT, M.D.

178

1    is assigned to evaluate him is a PGY-2.

2    Where is the chief resident?

3        Q.    Well, that's not my question.

4        A.    Well, that's my question.  And I

5    don't know that I saw anything about the

6    nurses other than saying that the nurses

7    weren't happy.  I mean what's that have to do

8    with anything?  What's that have to do with

9    patient care?  I mean I'm not really sure

10   that that's relevant.

11       Q.    You don't think it's relevant if the

12   nurses felt like that Dr. Irani did not

13   correctly handle the patient?

14       A.    Are the nurses orthopedic surgeons?

15   Are the nurses orthopedic attendings?  Have

16   the nurses had experience in handling these

17   patients?  Are the nurses the one that ended

18   up going the amputation?  Are the nurses the

19   one who made the final decision on this?

20       Q.    Are the nurses people who have had

21   years of experience --

22       A.    No.  No.  But they're not orthopedic

23   surgeons.  You can have years of experience

24   as a nurse, but you didn't do an orthopedic

RICHARD E. GRANT, M.D.

179

1    residency program.

2        Q.    Dr. Grant, are there different ways

3    to approach and be successful in orthopedics?

4    Can you handle a patient and do so in a

5    manner that's cruel?

6        A.    I'm sure that you can do anything

7    that's humanly conceivable.  But where was

8    there documentation of cruelty?  I'm not

9    picking that up.  I didn't see cruelty.

10            I saw a junior resident come in at

11   the PGY-2 level evaluating somebody in a

12   multiple trauma institution who has an

13   180-degree rotation of an arm that's

14   basically about torn up.  The patient ends up

15   with an amputation.  Where is the chief

16   resident?

17            So the nurses are upset.  Sure, I

18   would be upset.  But probably because there's

19   nobody at the appropriate level in there

20   evaluating this patient and making a decision

21   as to what should be done.  A PGY-2 doing a

22   multi-trauma patient with a mangled limb?

23       Q.    Do you know if any other PGY-2

24   orthopedic resident ever had to do that

RICHARD E. GRANT, M.D.

184

1   Dr. Irani acted correctly with regard to

2   that?

3       A.    Well, I would like to have seen some

4   information documented in the chart.  But I

5   mean, if the outcome was good and he did the

6   measurements, then fine.

7       Q.    So it doesn't matter that he didn't

8   timely chart it?

9       A.    It does matter, but as I said, that's

10  a learning opportunity for a PGY-2 resident.

11  Not everything is going to be perfect.

12      Q.    What if he had repeatedly been asked

13  to timely document things?

14      A.    Then that would have been a subject

15  of discussion.  We would have had to talk

16  about these things and see if we could

17  correct his actions and improve his actions.

18      Q.    And what if that's already been a

19  subject of discussion?

20      A.    You have to decide, as I said, you

21  know, talking about from my own experience,

22  when you decide that you want to proceed

23  forward to reinvest or when you want to pull

24  away from the reinvestment process.

RICHARD E. GRANT, M.D.

186

1    essentially it's your name on the patient?

2    A.    It's my patient.

3    Q.    It's your patient?

4    A.    Yes.  Because when we go to court,

5    it's my patient.

6    Q.    Are you very particular about the way

7    things are done for your patients?

8    A.    Of course.

9    Q.    Do you make that known to residents?

10   A.    Of course I do.

11   Q.    With the spine patient, again, I

12   believe you've indicated there was no bad

13   outcome for the patient.  Is that correct?

14   A.    The patient had a dural leak.  I

15   think it's Dr. Grabowski's first set of

16   patients.  He's in his collection period as

17   far as the Boards are concerned.  He just

18   finished his fellowship.  The patient ended

19   up postoperatively having some trouble with

20   the right lower extremity, lower sensory.

21        Dr. Irani came and evaluated the

22   patient.  After speaking to the nurse, the

23   patient is on the toilet.  He had to get off

24   the toilet and so forth.  Then he noted that

RICHARD E. GRANT, M.D.

187

1    there was an issue with the right lower

2    extremity and the diagnosis was made.

3         The patient got the proper studies.

4    He was taken back to take care of the leak.

5    Didn't have permanent deficit.  These things

6    happen with spinal surgery.  Because I used

7    to be a spinal surgeon.

8    Q.    Do you know how long it took

9    Dr. Irani to go and even try to see the

10   patient after the nurse alerted him that

11   there was a problem?

12   A.    I don't know.  I think it was maybe

13   about an hour.  He said he was in clinic.  He

14   got there as soon as he possibly good.  And

15   then he informed Dr. Grabowski of his

16   findings.  I guess Dr. Grabowski didn't agree

17   with his findings and felt that the physical

18   examination didn't make any sense to him.

19   Then Dr. Grabowski came and saw the patient

20   and decided the patient needed to go to the

21   operating room.

22   Q.    Could a resident ask to leave clinic

23   to go check on a patient if it was of enough

24   concern?

RICHARD E. GRANT, M.D.

1   concern whenever you have a patient who has a

2   neurological deficit, and you want to try to

3   figure out how to correct it right away.

4        Q.    And you really don't want to wait

5   until lunch comes around to do that, do you?

6        A.    I don't know if you want to talk

7   about lunch.  I don't know what lunch has to

8   do with it.  But I'm just saying that it's

9   something you want to try to diagnosis as

10  soon as you possibly can and then correct it.

11  In this instance, it was corrected by taking

12  care of the dural leak.

13       Q.    Are you aware that Dr. Grabowski had

14  concerns about Dr. Irani's incomplete notes

15  of the matter?

16       A.    Yes, I'm aware of that.

17       Q.    And does that cause you any concern?

18       A.    No.  It's just that residents need to

19  be reminded they need to document everything.

20  That's all.

21       Q.    How many times does someone get to be

22  reminded?

23       A.    As many times as it takes.  That's

24  what residencies are.  That's why we're

RICHARD E. GRANT, M.D.

191

1    educators.  As many times as it takes, until

2    you figure you get to the point and everybody

3    agrees that you don't want to invest anymore.

4    But you do as much as you can as long as you

5    can.  It's a learning process.

6    Q.    And is it up to each faculty to

7    determine where that point is?

8    A.    It's up to the faculty as a group to

9    make a decision.  I mean, if you look at most

10   things that happen at ACGME, they happen as a

11   group decision, as a group discussion, at

12   least that's the way I understand orthopedic

13   education.

14   Q.    And that's the way it's set up,

15   intended to be, correct?

16   A.    There's not usually unilateral

17   decisions anymore.

18   Q.    And there's no evidence that you have

19   it was a unilateral decision in this case, is

20   there?

21   A.    I never said it was a unilateral --

22   Q.    No, I'm just asking.

23   A.    I don't have any dispute of that.

24   Q.    I read your report and came away

RICHARD E. GRANT, M.D.

220

```
 1   that statement in terms of what environment

 2   that created in the program?

 3      A.    I think if you're an attending making

 4   the comment and that's your supervisor I

 5   think that can be a little bit more

 6   devastating for you.  Because it makes you

 7   wonder about, if you're saying that in

 8   public, what do they say about you behind the

 9   scenes.

10      Q.    Do you think it would ever be

11   appropriate for an attending physician to

12   refer to an African American resident as

13   Little Black Sambo?

14      A.    No, period.  No, it's not

15   appropriate.

16      Q.    Do you think it would ever be

17   appropriate for an attending physician to say

18   that other departments are just happy to have

19   residents who can speak English?

20      A.    No, I don't think that's appropriate

21   at all.

22      Q.    Do you think humiliation of residents

23   is an appropriate teaching technique in

24   orthopedic surgery?
```

RICHARD E. GRANT, M.D.

221

1    A.    Never.

2    Q.    Do you think intimidation of

3   residents is an appropriate teaching

4   technique in orthopedic surgery?

5    A.    No, I don't think that it enhances

6   education at all.

7    Q.    Do you think orthopedic surgery

8   residents need to be broken down or put in

9   their place?

10   A.    Not that I've ever conceived of.

11   Q.    Do you think making residents cry is

12  an appropriate teaching technique?

13   A.    No, I don't think making residents

14  cry in any circumstance is -- unless there's

15  something happened that's tragic in their

16  family.  No, I don't believe in that.

17   Q.    Have you ever attended something

18  called the Orthopedic Educators Course?

19   A.    No, I did not.  But I have had plenty

20  of people that went through the Orthopedic

21  Educators Course.  But I did not go.  I have

22  not attended.

23   Q.    As part of your career, have you ever

24  heard anyone say that professionalism cannot

RICHARD E. GRANT, M.D.

228

1    individual three months of orthopedics as an

2    introduction".  So I think that's the way it

3    was structured at that time.  So nine months

4    usually was general surgery rotations, very

5    specific rotation, and then three months of

6    orthopedics at the PGY-1 level.

7        Q.    Let's assume for a second you have

8    three months of exposure to orthopedics in

9    your internship year.

10       A.    Yes.

11       Q.    And then with Dr. Irani, he was

12   terminated in March of his PGY-2 year.

13       A.    Uh-huh.

14       Q.    And prior to that, he had been

15   suspended for approximately six to eight

16   weeks in December and January.

17            So, if you take out two months, we're

18   talking about less than nine months of

19   orthopedics experience.  Is that right?

20       A.    So you have the three months of the

21   PGY-1 level --

22       Q.    Right.

23       A.    -- and then you have about six

24   months, give or take a few weeks, at the

ELITE LITIGATION SOLUTIONS, LLC ~ 215.563.3703

RICHARD E. GRANT, M.D.

1   PGY-2 level.

2       Q.      Is that enough time to formulate an

3   opinion about whether or not a resident is

4   cut out to be an orthopedic surgeon in terms

5   of their clinical skills or clinical

6   practice?

7       A.      Well, I'm just giving you my

8   perspective.  From my perspective, it seems

9   like it's a little bit early.

10          Because, first of all, during that

11  PG-1 level, you're talking about an

12  individual who just finished medical school.

13  And at the PG-1 level, they've just finished

14  medical school and they're just kind of

15  getting their feet wet.  They're an intern

16  and they're an acting intern for three months

17  of that year, and then they come to you and

18  that's when they really start to get a little

19  bit of responsibility in terms of taking care

20  of orthopedic patients.

21          From my perspective, what we did with

22  those individuals at the PG-2 level is to

23  pair them very closely with someone who was a

24  PG-2 and a PG-5 so that that individual is

RICHARD E. GRANT, M.D.

230

1    assigned to a team where there was more of a

2    team approach and that individual did what

3    they were confident to do under the

4    supervision of the PG-3 or PG-4 and then the

5    PG-5 resident.

6         But I do think it's a little bit

7    early to make a decision on someone if

8    they're just in their first half of that PG-2

9    year.

10   Q.    How would you describe an orthopedic

11   surgery resident's PGY-2 year in terms of

12   what the learning curve looks like?

13   A.    I think you're at the bottom of the

14   learning curve.  Because you're certainly not

15   serving as a competent orthopedic surgeon

16   when you're in the PG-2 level.

17        I think you're at the very beginning

18   of the learning curve.  Because what's going

19   to happen is that each year you're going to

20   be introduced to more trauma; you're going to

21   be introduced to more clinical care; you're

22   going to be introduced to different

23   disciplines.  Because as you rotate to the

24   hand service, the spine service, the oncology

RICHARD E. GRANT, M.D.

231

1    service, you rotate through foot and ankle

2    service, sports medicine service, there's a

3    lot that you need to learn.

4           So there's very little that you've

5    been exposed to by the time you get to that

6    PG-2 year.  And by the time you finish the

7    PG-2 year, you still have a great deal more

8    to be exposed to because you're going to have

9    to go all the way through the PG-5 level.

10   And at each level, you'll get different

11   levels of responsibility in terms of the

12   operating room.  Because it's very little

13   that you're capable of doing at the PGY-2

14   level in terms of the operating room.

15   Q.    Now, I'm going to represent to you --

16   we talked a little bit or Ms. Helms talked to

17   you about the patient who had a near

18   amputation of his arm with a metal lathe.  Do

19   you recall that patient?

20   A.    Yes, I do.

21   Q.    And I'll represent to you that that

22   patient presented to the emergency department

23   somewhere in the July 10th or July 11th time

24   frame --

RICHARD E. GRANT, M.D.

232

1    A.    Okay.

2    Q.    -- of Dr. Irani's PGY-2 year.

3          Do you understand when residents

4    typically turn over or move up from one

5    graduation year to the next or

6    post-graduation year to the next?

7    A.    Sure.  Usually what happens is that

8    the academic year begins in July, and then

9    runs through from July to July is really the

10   academic year.

11   Q.    If we assumed July 1 was the

12   promotion period for Dr. Irani from PGY-1 to

13   PGY-2 and this particular patient was seen on

14   the 10th or 11th of July, he would have been

15   a true orthopedic trainee for about ten days.

16   Is that right?

17   A.    Ten days, yes.  Depending on what he

18   was doing, that was his tenth day of

19   experience as an orthopedic resident.

20   Q.    Would you expect someone at that

21   level of training in their orthopedic surgery

22   residency to be able to handle a case

23   involving a traumatic near amputation of a

24   patient's arm that involved exposed nerves,

RICHARD E. GRANT, M.D.

1    tendons, bone, muscle, without the assistance

2    of a senior resident or an attending?

3    A.    No.    I think that that's well beyond

4    the level of comprehension of someone who is

5    ten days into their orthopedic residency.

6    Q.    You also talked about Trauma Patient

7    Female 375 involved in a head-on collision

8    with.

9    A.    Yes.

10    Q.    I think there were three open

11    fractures.    And that occurred in I think it

12    was the first or second week of December of

13    2011.

14    A.    Yes.

15    Q.    So that would have been approximately

16    five months into Dr. Irani's PGY-2 year.    If

17    his PGY-2 year started the beginning of July,

18    we're talking about the beginning of

19    December.    That would have been about

20    five-month --

21    A.    That's correct.    And then he was

22    suspended for two months, November and

23    December.

24    Q.    Would you expect a PGY-2 orthopedic

RICHARD E. GRANT, M.D.

234

1    resident who had about five months into his

2    PGY-2 year to be able to handle a trauma case

3    involving three or more fractures without

4    receiving assistance from a senior resident

5    or an attending?

6        A.    I think that when you say "handle" I

7    think he could have come in and seen what the

8    situation is and looked at the diagnosis.

9    But in terms of coming up with a care plan

10   and a definitive care plan as to what should

11   have been done next, I think that would have

12   been very difficult at that level unless

13   there was a team approach that involved

14   something like a PGY-3/4 and then a chief

15   resident working in tandem together.  That

16   would have been my preference.

17          But it's a little bit overwhelming

18   when you have two fracture dislocations and

19   an elbow injury in a motor vehicle accident

20   to, at that level, figure out everything that

21   should be done and everything that should be

22   thought about.  So I think the best that you

23   can do is to reverberate those situations and

24   say to your more senior resident, "Hey, you

RICHARD E. GRANT, M.D.

235

1  know, this is the situation.  Can you come

2  down and help me".

3      Q.    Now, Ms. Helms mentioned during her

4  examination of Dr. Jeffrey Guy -- and I think

5  you indicated that you had met him a couple

6  of times at various meetings.  Is that right?

7      A.    Yes.

8      Q.    Do you know if Dr. Irani requested

9  that Dr. Guy sort of take over as his mentor

10  in the program?

11      A.    I think so, yes.

12      Q.    Do you think that would be

13  appropriate to have an experienced doctor of

14  diverse background to shepherd or sort of

15  mentor Dr. Irani, who is also of minority

16  background?

17      A.    I don't see that there's anything

18  inappropriate about it.  I think that's fine.

19  I don't have any issues with it.

20      Q.    And Ms. Helms asked if you knew

21  whether or not Dr. Guy was supportive of

22  Dr. Irani's termination.

23      A.    I think that he eventually concurred

24  with the group opinion.  That was my