# EXHIBIT M

1   AFRAAZ R. IRANI,
     vs.
2   PALMETTO HEALTH-RICHLAND

3

4

5

6
                  COMMITTEE MEETING IN RE
7
                TERMINATION OF DR. IRANI
8

9

10

11
   Due to the quality of the recorded media, portions were unable
12  to be transcribed.  The transcript may also include
    misinterpreted words.  The transcriber was not present at the
13  time of the recording; therefore, this transcript should not be
    considered verbatim.

14

15  AUDIO RECORDING WAS TRANSCRIBED BY:
    Sherri L. Jolley
16  Midwest Litigation Services

17  711 North Eleventh Street

18  St. Louis, Missouri 63101

19  (314) 644-2191

20

21

22

23

24

25

2

1            T R A N S C R I P T I O N

2            MS. HILL:  (unintelligible) your time.  I've already

3    briefed the committee this afternoon on their responsibilities,

4    so I'm going to go ahead and get started.  As I introduce

5    people, if you will -- I don't -- have it written down, but

6    probably not in order.  So if you'll just raise your hand as I

7    introduce you.

8            I am Gwen Hill.  I'm the interim vice president here

9    at Palmetto Health, in human resources.  My role today is the

10   moderator of this committee.  I will not be a decision maker or

11   a voting member of this committee.

12           All right.  We're here to consider the matter of Dr.

13   Irani's termination (unintelligible) Dr. Irani is sitting here

14   on the left.

15           I will introduce everyone.  Assisting Dr. Irani is

16   Lynn Hearn (ph), human resource business partner.  Representing

17   management today is Dr. Walsh and Dr. Koon.  The HR business

18   partner assisting management is Donna Brown.  Today's committee

19   members are Mohan Sridaran, resident general psychiatry; Zach

20   Brock, resident, surgery; Allie Giddings, faculty OB/GYN;

21   Davinder Lally, faculty, internal medicine; and Eric Brown,

22   faculty, emergency medicine.

23           Dr. Irani, the grievance committee members

24   understand the seriousness and the confidential nature of these

25   proceedings.  All in the room have been asked to sign a form

3

1   indicating they acknowledge the information we hear today is

2   considered as confidential as any information used by Palmetto

3   Health, just as you've been asked, along with your

4   (unintelligible) sign that.

5            My role, again, is the moderator.  I'll keep us on

6   task and on time.  You're free to share information relevant to

7   today's proceedings.  However, if you circle back and repeat, I

8   may ask you to move forward.

9            We will first hear from management.  They will have

10  up to one hour to state their case.  After they finish I'll ask

11  the committee if they have questions.  After the committee has

12  finished its questions, I will ask you, Dr. Irani, if you have

13  questions.  Please direct your questions to me during this time.

14

15           After you finish with questions, you will have up to

16  an hour to state your case.  Likewise, after you finish, the

17  committee will have an opportunity for questions, and management

18  will then have an opportunity for questions.  Make sure you

19  direct your questions to me, as well.

20           Then management will have five minutes to give a

21  concluding statement, followed by your five-minute concluding

22  statement.  After the concluding statement, I'll ask the

23  committee if they're ready to vote.  If they are not ready, they

24  will ask additional questions.  At that point, both management

25  and the employee will be excused.  We will let both sides know

4

1   the results of the vote by the end of today.

2           Does anyone have any questions about the process

3   we'll follow?

4           None?  All right.  We'll get started then.

5           DR. WALSH:  I want to introduce myself for those of

6   you who don't know me.  I'm John Walsh.  I'm the chair of

7   orthopedics.  David Koon is our program director.  Everybody who

8   you are going to hear about as faculty members for orthopedics

9   was present during the entirety of Dr. Irani's residency, with

10  the exception of Dr. Grabowski, who started last August.

11          And the way that we're going to do this is Dave is

12  going to present the details of the case, and then I'll kind of

13  flesh things out and -- as they -- as they develop.  These are

14  copies of e-mails and supporting documentation for Afraaz's

15  termination.

16          DR. KOON:  I'm Dave Koon.  I've been program

17  director for the department of orthopedics since 2006.  I came

18  on staff in 2002.  I'm a graduate of the University of South

19  Carolina School of Medicine.  I finished in 1992.  I served ten

20  years in the United States Army, got out in 2002, came to work

21  here at the University.

22          What I'd like to do today is start and kind of

23  describe the events that have occurred over the past couple of

24  years.  And the bottom right-hand side of your pages are

25  numbered, and I'll refer to those numbers as we go through the

5

1    discussion.

2          Dr. Irani was a very impressive orthopedic applicant

3    to our program several years ago.  He was born in California,

4    and he actually double majored at Stanford and attended Stanford

5    School of Medicine.  He had multiple awards and publications and

6    research documentation.  He had an excellent dean's letter.

7          He scored a respectable 223 on Step 1, and had a very

8    impressive interview with us two years ago.  We were really

9    happy to have Dr. Irani join us.  And I believe he was in the

10   top 12 of our applicant ranking, so he was highly sought after

11   when he came here.

12         He started his internship in 2010, in July.  He had

13   the same rotation schedule as our other interns.  In orthopedics

14   they're allowed to have three orthopedic rotations, and the

15   first few months were off-service.  So we had fairly limited

16   exposure to Dr. Irani to start off with.

17         I began hearing some concerns from the other

18   services, some general attending comments in the hallway, and

19   specifically came to light when the trauma case managers came to

20   me one day and said, you know, "Dr. Koon, we usually don't have

21   problems with your residents, but here are some issues we're

22   having," and they were issues with time management and not

23   attend -- completing assigned tasks and things like that.  And I

24   said, "Fine.  I'll take care of it."

25         Please note that this is highly unusual for

6

1    orthopedic interns.  Usually our interns do very well.  You

2    know, we have attendings say, you know, "I want your intern in

3    my program, and we're going to try to recruit them away from

4    you," and things like that.  And so having complaints against

5    one of our interns was unusual.  And so I asked the chief

6    residents to handle it, which is what I usually do; you know,

7    "You guys talk to Afraaz, see what the deal is and, you know,

8    take care of it."  And that was the last I heard of that.

9              The concerns continued, and in December of 2002,

10   while we were walking down the third floor hallway and

11   downstairs, I ran into Afraaz as I was walking across the street

12   to the office, and I talked to him a little bit about it, got

13   his side of the story, and told him that, you know, it was kind

14   of a rough way to start your internship, but he was getting

15   ready to go on an orthopedic service.

16             I said, you know, "You've got a brand-new chance to

17   shine, new attendings, orthopedic attendings.  You know, here's

18   your chance to not necessarily start over but open -- or turn

19   the page and get a better start on things."

20             His -- if you look at our New Innovations

21   evaluations -- those are at Pages 1 through 17 -- there are

22   several things that I would like you to take a look at.  On Page

23   -- first of all, if you look at the first several pages you'll

24   see that on a scale of one to five, Afraaz was starting to get

25   some twos on some of his evaluations.  Now, we recognize that

7

1  there are different attendings who have different ways of

2  evaluating people, but, again, it was unusual for us to start

3  receiving this type of evaluation from our interns.

4         If you turn to Page 5, you'll notice additional

5  comments.  On the top was a comment by Dr. Jones, "I was not

6  confident that Dr. Irani was completely invested in caring for

7  our patients.  He did not give me the feeling that he was always

8  truly aware of what was going on with our -- with the patients

9  he was managing on the trauma floor."  And that was similar to

10  one of the other attending comments that I had in the hallway.

11         Dr. Bynoe writes down in the -- Line 12, "Could've

12  been more interactive on the service."  I noted in 12 -- Line 12

13  that his handwritten notes were essentially illegible, which is

14  something that he and several other residents have, and so I was

15  just going to give him a hard time and -- we actually had one

16  resident that we made stop -- start typing notes because no one

17  could read his notes, and it was, you know, not very helpful for

18  other people on the service, so -- but anyway, that was the

19  comment that I had written.

20         Dr. Jones again says, "He has not shown that he has

21  the desire he requires to support -- my support for caring for

22  my family."  Those are very, very unusual comments for us to

23  receive about an intern on our service.

24         They continue onto Page 6, "He needs to step up to

25  being a doctor and become accountable and invested in treating

8

1  patients."  And then Dr. Jones says, "Overall, still needs to

2  take responsibility for total patient care if they are his

3  patients."

4           And then I note in the middle of the page at Line

5  23, "I've spoken to Dr. Irani at length about his performance

6  thus far in his internship, and he needs significant improvement

7  in several areas.  And he seems to understand these issues."  So

8  this is something that I had spoken with Dr. Irani on several

9  occasions, and I've made a note of that.

10          If you turn to Page 12, another evaluator,

11  Dr. Mostriani (ph) notes, "Needs to take greater responsibility

12  for the welfare of the patient.  Too often would fail to

13  recognize the need for urgency in patient care."

14          If you turn the page to 13, Dr. Ross, who was his

15  chief resident at the VA, says, "Dr. Irani had a rough start at

16  the VA where I first had occasion to work with him.  He seems to

17  lack motivation and lack consistency in his patient evaluations

18  and care plans.  However, I did see marked improvement by the

19  conclusion of the rotation.

20          His unique personality seems to get in the way of

21  interpersonal relationships, both with peers and staff.  He is

22  highly intelligent and his core medical knowledge is excellent,

23  but he needs to temper this with a greater desire to improve his

24  core surgical knowledge base and skill set.  I think that he has

25  the incredible potential to become an excellent surgeon, but he

9

1    needs to develop motivation and people skills to succeed."

2            So, again, I note that these were highly unusual for

3    our orthopedic interns, and he actually was --        Dr.

4    Irani was met by all three chief residents in 2010 to discuss

5    these issues and seek improvement, which was highly unusual.

6    It's not unusual for the chief residents to be asked to take

7    care of problems with the junior residents, but it was very

8    unusual for us to ask all three residents to do that for Afraaz.

9

10           He did transition to PGY 2 year in July of 2011, but

11   the concerns persisted.  And if you note on Page 17, these are

12   several of the comments that he had during his PGY 2 year.  And

13   the only reason I'm kind of jumping ahead a little bit, because

14   I'm not going to -- I'm not going to go back to the New

15   Innovations evaluations again, so I just thought it would be

16   worthwhile to look at some of these comments.

17           Dr. Voss notes that, "Somewhat slow and seemed to

18   not be driven by concern for the patient.  Punctuality on rounds

19   was a concern.  The trauma service is very busy, and he was late

20   for rounds several times.  His patient care was inconsistent."

21   And so we have another evaluator who's noting some of the same

22   things that he had problems with as an intern.

23           Dr. Mazoue, one of our sports attendings, notes

24   that, "He also needs to work on his social skills with his

25   professional colleagues -- for example, OR personnel.  In

Irani, M.D., Afraaz R. v.                    Termination of Dr. Irani, Committee Meeing
Palmetto Health-Richland                                              April 30, 2015

10

1    addition, he needs to work on time management and efficiencies,

2    especially in the OR."  And then Dr. Voss, on the

3    second-to-the-last notation, "Needs to improve empathy for the

4    patient."  So all these concerns that we had near the initial

5    year and a half of Dr. Irani's training.

6              In July of 2011, Dr. Irani was involved in the care

7    of Mr. B, who was a trauma patient.

8              DR. WALSH:  Brand-new PGY 2.

9              DR. KOON:  Right, he's a brand-new PGY 2 resident.

10   And his initial -- Dr. Irani's initial eval with his patient was

11   11 July, so 11 days into his PGY 2 year.  I heard of this

12   through a friend of mine who is a nurse in the emergency room.

13   Diane Savage is her name, and you'll see her name listed on

14   several of the e-mails.  Diane has over 26 years of emergency

15   department nursing experience.  Diane had an encounter with Dr.

16   Irani and Dr. Iaquinto, and that day documented her experience

17   and what happened in the ED.

18             Dr. Irani evaluated Mr. B at the request of the

19   trauma service.  In his notations, he did a very brief history

20   and physical examination where he noted that the sensation was

21   intact to light touch; and then when evaluating his nerves, that

22   he had a radial pulse.  He noted that the patient had an open

23   both-bone forearm fracture, that his hand was rotated 180

24   degrees, and that he was moving his fingers.

25             I would consider this fairly inadequate

11

1 documentation for a patient in the trauma room.  There's no

2 mention of wound debridement, vital signs, pain medications,

3 wound measurements, grade of open fracture, antibiotics given,

4 tetanus, splinting, and there were inadequate radiographs

5 obtained by the orthopedic resident that day, because there was

6 only one single view.  There are no post-reduction images, and

7 there was only wound management basically by the ER.

8          The only other documentation we have from      Dr.

9 Irani regarding Mr. B was a very brief preoperative note that he

10 wrote the day before he was to go to surgery.

11          In short, the patient had an injury with, I believe,

12 a metal lathe, and Dr. Walsh was actually involved in his care

13 at a later time.  That night, Diane Savage documented her

14 experience, and that was on Page 20.  And I'll ask your

15 forgiveness.  The ER threads are in chronological order,

16 backwards.  And so the first -- the first note will be on the

17 20th, and then we're going to go back to 19 and 18.

18          So Dr. -- Diane had concerns about Dr. Irani's wound

19 manipulation, compassion that he did not show to the family.

20 Diane says that she asked him to stop manipulating the extremity

21 so she could get pain medicines, and Dr. Irani basically

22 refused.  And this was noted by Dr. Spencer Robinson as well.

23          There was some discussion about how much irrigation

24 was used in the initial wound management by the ER physician,

25 and Dr. Irani says -- stated that -- Diane says Dr. Irani

12

1  stated that, "You used two, right?"  She said, "No.  We used

2  one."  And then there was a little bit of back and forth where

3  Diane was under the impression that Dr. Irani wanted her to

4  state that there was two liters instead of one being used.  And

5  then Dr. Iaquinto comes down and manipulates the extremity as

6  well.

7          This -- her view of the events was sent to Alice

8  internally, the director of nursing; Dr. Cadalano (ph); and then

9  to Dr. Stevens.  Dr. Stevens forwarded the note to me at 10

10  August, and I immediately forwarded that to Dr. Irani, which is

11  on Page 19, for his explanation.  Dr. Irani sent me his

12  explanation that night, and that is on Page 18.

13          Also, his recollection of events was forwarded to

14  Diane for her review, just to say, "Is this consistent with what

15  happened?"  Please note that Dr. Irani's version of the events

16  was almost one month after the fact.

17          Several questions come to mind when I was reading

18  Dr. Irani's evaluation.  First, he notes that he made a note

19  about the pain medications, but it's unclear whether he asked

20  Diane about the pain medications or not.  Her recollection was

21  that he did not ask about the pain medications.

22          So his -- he wanted to inspect the wound, see his

23  pain level before approving a possible overdose of narcotics in

24  an 80-year-old male.  But Diane notes that he never asked about

25  the pain medications.  I'm not sure exactly what Dr. Irani means

13

1  by "see his pain level when inspecting the wound."  And it's

2  unsure whether he removed the splint or not.

3          Dr. Irani also says that -- on Page 19, second

4  paragraph, he says, "The patient was very thankful throughout,

5  and when I saw him on the floor we've had great interactions."

6  But there's only one documented visit, and that was two days

7  later, which included a brief op note.  So I'm not sure how many

8  interactions he had, were any documented, and there's no

9  documentation of a postoperative check that day.

10         Again, Diane notes that there were three witnesses

11 that documented the encounter that she recollected that night of

12 surgery.  Dr. Irani also says that, "It was a regrettable

13 decision but one that had to be done.  Many of the staff were

14 justifiably horrified at this and wanted us to do more."

15         I'm not sure who he's speaking of, "wanted us to do

16 more," and who was justifiably horrified.  Diane Savage notes in

17 her review that the wound was impressive but not the worst she's

18 ever seen.

19         Dr. Irani later accused Diane of lying about the

20 irrigation amount.  And when I asked him why she would make this

21 up, he really had no answer.  For her to have an encounter,

22 document it that night, and make something like that up would be

23 highly unusual in my knowledge of her.

24         He also states that it's -- he stated that it was

25 the right thing to do.  And when I reviewed his physical exam,

14

1   I'm not sure that there's -- there were indications for a

2   primary amputation in this patient.  Again, Dr. Irani noted that

3   the nerves were intact, he had a good radial pulse, and could

4   move his fingers, so I wasn't sure that it was indeed the right

5   thing to do.

6           His version of the events that day seems to be

7   directed at her version rather than documenting the patient

8   care.  And so we had concerns that day, and given those concerns

9   led us as a faculty to develop the memoranda for record which is

10  dated 15 August, which is Page 22.

11          And I'll just briefly review this.  "Dr. Irani

12  demonstrated a significant lack of compassion and empathy in the

13  patient's care on the initial trauma resuscitation.  Mr. B

14  sustained a near forearm amputation.  Dr. Irani failed to

15  provide adequate pain medications and ignored nursing requests

16  for same during his initial evaluation.  In this encounter, he

17  requested the nurse to lie about his initial

18  irrigation/debridement of the wound."

19          Number 2, "He had repeatedly demonstrated poor

20  communication skills with patient's family, peers, and

21  attending."  And this was a concern that the faculty had not

22  only with his initial internship but also with us during the

23  first month that he was on our service.

24          "He has repeatedly demonstrated poor time management

25  with frequent tardiness to required conferences, clinics, and

Irani, M.D., Afraaz R. v.                                    Termination of Dr. Irani, Committee Meeing
Palmetto Health-Richland                                                              April 30, 2015

15

1   the operating room."  And that's noted on several of the

2   comments that we've already looked at on the New Innovations.

3              "He does not demonstrate effective prioritization of

4   clinical duties, which has resulted in other duties for

5   residents."  That was something that two of the junior residents

6   stated that they had extra work to do because he wasn't either

7   efficient in the emergency room or efficient on call with his

8   on-call duties, so I felt that was something that needed to be

9   included in his remediation.

10             Number 5, "He has provided substandard care."  One

11  of the substandard cares was he closed a wound while

12  Dr. Abel (ph) was on call with a Vicryl suture, and that's

13  something that he never saw one us do, and I don't know if he

14  ever read it in a book, but that was something Dr. Abel, who is

15  one of our locum tenums doctors called me and said, "Are you --

16  you know, basically, what's the deal?"  And I said, "I don't

17  know what you're talking about."  He said, "Well, one of your

18  residents closed a wound with Vicryl."  And so when --

19             DR. WALSH:  Externally.

20             DR. KOON:  Externally.  And that was just something

21  that, you know, we would not consider appropriate.

22             He also was involved in a patient of mine when I was

23  on call one night.  He got a call from the emergency room at the

24  VA about a patient who was in the early postoperative period

25  after a total knee arthroplasty.  The patient had developed

16

1   cellulitis on his leg.  And after a telephone discussion with

2   this physician, Dr. Irani made the decision that he didn't need

3   to see the patient; that Medicine needed to see them, to admit

4   the patient, even though the patient was I believe around ten

5   days after a total joint.

6           Number 6, "He received substandard evaluations

7   during his internship," which we've already gone through.

8           And Number 7, "He displayed a significant lack of

9   attention to detail in his initial PGY 2 rotation," which was

10  actually with Dr. Walsh.

11          Given the fact that we had verbal counseling with

12  residents, verbal counseling with faculty, and the degree of the

13  things that we were seeing this early in his internship, we as a

14  faculty discussed it and recommended to the executive committee

15  of the GMEC that these -- this remediation plan be implemented.

16

17          After their approval, we recommended three and a

18  half months of remediation of this document.  This was discussed

19  with Dr. Irani and Paul Lathey (ph), who is our business manager

20  at the office, on the 15th of August, which is Page 23.

21          So the middle of the page is just my notes to Dr.

22  Walsh stating that I discussed it with him, that it had been

23  approved by Dr. Raymond and Dr. Stevens, and that it would be

24  implemented pending full vote in the GMEC at the next meeting.

25          Initially, when Dr. Irani was presented with the

17

1    facts in the memorandum, he did not agree with some of the

2    points and complained that some were too vague.  He initially

3    laughed about some of them and appeared not to take them very

4    seriously.  He then proceeded to offer excuses or rationalize

5    each point that was noted in his deficiencies and argued that he

6    was misunderstood.

7           The only item that he -- in which he agreed to was

8    Item Number 5, that he had not -- should not have closed the

9    wound with Vicryl.  And that's when he accused Diane of lying

10   about the events surrounding Mr. B's care.

11          So I informed him that these were the

12   recommendations of the department, that it was -- that the

13   executive committee would probably approve it pending full vote.

14    I encouraged him to review the policy on academic remediation.

15   He was allowed to respond to each item in the memorandum and ask

16   questions.

17          And I informed him at that time that failure to meet

18   the remediation measures could result in remediation or

19   continued probation or possible termination from the program.  I

20   gave him a copy of the memo and informed him that he could

21   respond in writing to our recommendations.

22          23 -- at Page 23 is that -- this was discussed with

23   Irani and approved.

24          Page 24 is the approval by the GMEC executive

25   committee on the 15th of August.

18

1    Pages 26 through 28 are Irani's response in an

2  e-mail -- a response to the remediation measures in an e-mail to

3  Kathy on -- Dr. Stevens -- I'm sorry -- on the 22nd of August.

4    Several things that surprised me about

5  Dr. Irani's response is that if you see in the fourth paragraph

6  from the bottom it says, "I always demonstrate the highest level

7  of compassion and empathy in patient's care."  And these

8  basically were not based on other attendings' evaluations.

9    Throughout his response, he says that he was

10  misinterpreted and that others just -- there was a perception

11  that was in error.  He says in the second paragraph from the top

12  -- from the bottom, "Regarding the accusation about my lying

13  about patient care, this is a misinterpretation."  And that's

14  one thing that we see again and again, that it's somebody else's

15  perception or it's a misinterpretation of what he said or what

16  he meant.

17    He states that he did everything right regarding Mr.

18  B's care and that he had already been given pain medicine even

19  though he didn't ask.  And, initially, during my evaluation with

20  him on this topic, he accused Diane of having frequent

21  encounters which were not the best in the emergency room with

22  the orthopedic attendings, and that was one way he tried to

23  explain away that.

24    Regarding Number 2, that he demonstrates poor

25  communication, and the top of Page 27, that he says that he

Irani, M.D., Afraaz R. v.                          Termination of Dr. Irani, Committee Meeing
Palmetto Health-Richland                                                    April 30, 2015

19

1   appreciates the fact -- and, again, in the second line, he may

2   have been misunderstood, and so he's going to make efforts to

3   improve communication.

4           Regarding 3, he doesn't really say anything about an

5   excuse of why he's continually late for conferences and the

6   operating room and frequent tardiness to clinics.

7           In Item 4, he says that he's again misunderstood and

8   that there's perceived tardiness by the attendings.  He says, "I

9   always complete my work and I often stay beyond the recommended

10  work hours so as not to burden other residents."  All of our

11  residents know that the duty hours is non-negotiable and that

12  you have to abide by them, so never has any faculty or other

13  resident asked him to stay beyond the recommended duty hours.

14          Number 5, he did provide substandard care, and

15  actually admits to that, "Whenever I've been notified of my

16  errors, I proactively make improvements."

17          Number 6, he does not disagree with the substandard

18  evaluations that he has.  He actually agrees with them and made

19  significant improvements based on the suggestions that were

20  provided to me.

21          And Number 7, he's a little bit -- he misunderstood

22  what we meant about the attention to detail.  That attention to

23  detail was regarding Dr. Walsh and the history and physical

24  examinations in the clinic.

25          I don't know if you wanted to say anything about

Irani, M.D., Afraaz R. v.                                   Termination of Dr. Irani, Committee Meeing
Palmetto Health-Richland                                                                April 30, 2015

20

1    that or not.

2            DR. WALSH:  Just briefly.  When I see a patient in

3    the office who's going to need surgery, either I or the resident

4    will fill out a history and physical at that point.  And Afraaz

5    had rotated with me for -- well, for a number of weeks at that

6    point, and I had noted -- generally speaking, at the end of the

7    day, the residents go on up (unintelligible) my dictations and I

8    go through and proof everything, and I noticed that there was

9    repeated mistakes on the H&Ps, so I brought it to his attention.

10     It was a day that we had had several patients who needed

11    surgery.

12            I sat down, was correcting the first one.  Afraaz

13    was still there at that point.  Countless mistakes were brought

14    to his attention.  He corrected them.  I turned to the second

15    one, exact same thing -- more mistakes.  And so I said, you

16    know, "Why don't you, right now -- while I'm still dictating,

17    why don't you go through these things, fix the things that you

18    can see are in error, and take care of it."  So he did that.

19            For the most part, he was able to identify things

20    that he had either omitted or incorrectly documented.  The real

21    issue was subsequent to that when he was doing H&Ps beyond that.

22     He either would omit the same things he was before, he would

23    omit other things, he would make the same mistakes, including

24    grossly inadequate documentation -- an extremity exam or -- kind

25    of what the whole point of the H&P is in orthopedics.

21

1          And I asked him, I said, you know, "Afraaz, this --

2     you know, if you've had the things identified to you and you fix

3     them, and now you continue to make mistakes, but they're always

4     different.  It's like every H&P there's something you're leaving

5     or forgetting or, sorry I didn't take care of that or whatever.

6     It just seems completely casual, like you don't care.  And there

7     isn't something that's a -- something I can identify, oh, you're

8     not understanding this; let's fix it and take care of it.  It

9     just is this scattershot kind of thing that is constantly

10    changing, and basically the -- what it communicates is I don't

11    really care."

12          DR. KOON:  If you look on Page 29, this was an

13    e-mail from me to several people just to give an outline of what

14    we were going to do during his remediation process.  So I wanted

15    to have complete transparency.  I wanted it to be on a schedule.

16     And I wanted other people involved so it would not appear to be

17    a program director versus resident issue.  I wanted multiple

18    people involved, and this included chief residents as well.
      Paul Lathey was included because he's our business administrator
19    who has HR experience.

20          Dr. Irani was included in the process, and we

21    actually had to change one of his meetings because he was

22    post-call.  So this was not something that was set in stone.  If

23    something needed to be changed, we'd be more than happy to

24    change it.

25          Page 30 is Dr. Stevens' e-mail noting her decision.

22

1   She illustrates knowledge of the appeals process.  She alludes

2   to the GME policy on appeals process.  And Dr. Irani

3   subsequently decided not to request a grievance hearing on this

4   remediation measures -- these remediation measures.  So there's

5   no accusation of lack of or unfair due process or appeals

6   policies.

7          Page 31 is an e-mail -- Page 31 and 32 is a

8   memorandum from Dr. Walsh regarding a meeting that he and Dr.

9   Grabowski had with Afraaz.

10          DR. WALSH:  Well, it's a relatively detailed memo,

11  and I think the thing at this point -- you know, he began in

12  July of 2011 where he's full-time in orthopedics.  This is three

13  months later.  And what I'm attempting to summarize in this memo

14  has to do with his performance as an intern on other services,

15  his performance as an intern when he was rotating in

16  orthopedics, and the time period there between July 1st, 2011

17  and the latter part of September.

18          And it's the same thing that I described a moment

19  ago about his performance in H&Ps.  It's a checkered behavior

20  that is related to -- it's related to his behavior, it's related

21  to follow-through, it's related to his willingness to accept

22  responsibility, to perhaps initially accept responsibility

23  verbally, and it made zero difference whatsoever in terms of his

24  future behavior after that.  So there's some specifics that I

25  tried to address relative to surgical skill and so forth.  Most

23

1    of these things are -- Dave has already covered.

2          If you look at the bottom of the first page, I'm

3    aware of that particular patient with the complex forearm injury

4    because of my role in his care and subsequent care there.  And

5    when I talked to Afraaz about that, one of the things that he

6    repeatedly mentioned was that, "Well, I knew him after this

7    all over with, and he was an inpatient and we had a great

8    relationship and things were okay."

9          And I explained to him that's a patient who has had

10   major trauma, has had different forms of sedative medications;

11   then they had general anesthesia.  More often than not they're

12   amnestic for everything prior to that point.

13         So the fact that the patient had a good relationship

14   with him later didn't in any way support the fact that he had

15   done the right thing prior to that, and that the real direct

16   observation or information that we had about his care for that

17   patient beforehand was related to the patient -- or to the

18   hospital staff members who were present and not to patient's

19   recollection several days later.

20         DR. KOON:  Page 33 is a memorandum of record that I

21   wrote just basically stating that we again met with Afraaz.  We

22   reviewed his six-month evaluation.  We solicited his opinion and

23   feedback and progress, and we reviewed each remediation measure

24   and provided feedback.  And that was Dr. Walsh and I met with

25   him.

24

1       And I know that he appeared to gain some insight

2   into his deficiencies.  He was on Dr. Guy's service and was

3   enjoying that.  And Dr. Guy had been working with him on

4   communicating effectively.  And Dr. Guy is definitely our best

5   communicator.

6       And that he -- he does note that -- I did note that

7   he had appealed through the grievance process as outlined in the

8   resident manual and that his appeal was subsequently denied by

9   Dr. Stevens.  And then I said we'll meet with him again.

10      Pages 34 and 35 are the second memorandum that I

11  wrote after Dr. Jennifer Wood, who is a chief resident, and I

12  met with Afraaz in the prison clinic.  Dr. Irani continued to

13  have problems completing assigned tasks.  He was just having

14  problems on the ward.

15      And Dr. Wood had actually asked him to do things

16  that he had not done, and one of those was as simple as the

17  morning list -- print off the morning list each day, get some

18  vital signs, get current labs.  And after repeated instances of

19  Dr. Wood telling Irani to do it, it basically wasn't done so she

20  started having the medical students do it instead.  And that was

21  something that she addressed with him that morning.

22      Page 35 is -- the bottom one is an e-mail that he

23  sent to me one Thursday night about a patient that he had

24  dictated a transfer summary, and sent me a message stating that

25  he had never participated in the patient's care; Dr. Hoover did

Irani, M.D., Afraaz R. v.                        Termination of Dr. Irani, Committee Meeing
Palmetto Health-Richland                                                 April 30, 2015

25

1   the H&P; and the patient transferred from the VA, and the only

2   thing I can think of is Dr. Wood asked me to put in the

3   discharge order.  And so he did the discharge summary

4   afterwards.

5           And I sent him a very terse response back stating

6   that, as a junior resident of a health team, his sense of

7   entitlement was somewhat astounding, that he would write an

8   attending, in the midst of academic remediation, that note,

9   after I'd asked him to do that same thing three separate times.

10  And so part of that was included in that memorandum as well.

11          He had been verbally counseled regarding

12  inappropriate patient care during a pain management problem with

13  one of Dr. Walsh's postoperative patients during this time,

14  where he had instructed the patient to take an inordinate dose

15  of narcotics in the postoperative period.

16          When we discussed this with him, he asked me about

17  the -- what my thoughts were about his remediation, and I said,

18  "Well, I think you'll probably go from Level 2 to Level 1," and

19  this seemed to irritate Dr. Irani.  He kind of sat back and

20  rolled his eyes and let a big sigh and said, "All that's going

21  to do is increase my overhead."

22          And I had no idea what he was talking about, so I

23  said, "Afraaz, what are you talking about?"  And he went on to

24  describe his keeping of a log, documenting when he answered

25  pages and when he got to clinic and when he got to the OR so as

26

1  to disprove any allegations of tardiness.

2          During that same time frame, on the 25th and 27th, I

3  had a postoperative patient who had manipulation and had wound

4  drainage after that manipulation.  The patient called Dr. Irani

5  twice over the weekend, and not once did Dr. Irani tell the

6  patient to come in, be seen, and be evaluated.  And this was

7  less than four months after his -- a similar problem at the VA

8  with another one of the postoperative patients.

9          On the 28th of November, Dr. Irani failed to abide

10 by the attending surgeon's directions in a staff clinic, and

11 became argumentative when confronted by the chief resident.

12 Basically, this was an instance of a gentleman with a foot

13 problem in the staff clinic.  Dr. Grabowski said the patient

14 needs a stat MRI.  Dr. Irani discussed this with the head nurse

15 and decided to let the patient go home and obtain the MRI on an

16 elective basis.

17         When confronted with this by the chief resident he

18 became argumentative and very defensive.  And this was brought

19 up in a subsequent faculty meeting, and even when confronted

20 with Dr. Grabowski and Dr. Wood sitting in the room saying,

21 "This is how it went," he refused to acknowledge a mistake or

22 take responsibility for his actions.

23         And so, all of this together, I thought that we

24 needed to meet with him as a faculty on the 5th and discuss all

25 of these instances.

27

1          Page 36 is documentation -- or the memo of our

2     meeting with him.  We met with Dr. Irani for over an hour and

3     included the vast majority of the orthopedic faculty.  It

4     included chief residents Hoover and Wood and Paul Lathey.  We

5     asked him several difficult questions, including, you know, "Do

6     you really want to be in an orthopedic program?  If you do, do

7     you really want to be here?"  Because we were getting the

8     feeling that he just didn't want to be here and he wasn't happy.

9

10          Then the issue came up of him recording phone calls.

11     Several of the residents had come to me with concerns that

12     there were weird sounds when they were talking to Irani, and it

13     was almost as if he was calling, knowing the plan but wanting it

14     confirmed by someone more senior to him.  And so I basically

15     asked him if he was recording phone calls, and he admitted to

16     secretly recording Dr. Abel, one of our trauma -- orthopedic

17     trauma locums.  And I asked him not to tape-record that faculty

18     meeting.

19          We again reviewed his remediation measures, and he

20     could not admit agreement to any of the initial remediation

21     measures.  He continued to complain -- to provide evidence of

22     ongoing patient care and continued to display lack of effective

23     teamwork within the residency framework.

24          After this faculty meeting, the department voted

25     unanimously to place Dr. Irani back on Level 3 -- well, to place

28

 1   him onto Level 3 remediation.  There was a long discussion

 2   regarding timeframe for that.  There were initial -- there were

 3   discussions for three months and six months and four weeks, and

 4   basically what we came to was we wanted to place him on Level 3

 5   but not affect his graduation date.

 6          So we were looking to the future.  We were looking

 7   to fellowships and things like that.  So instead of doing a

 8   three-month, we had agreed to a four-week suspension to allow

 9   him to have a time-out, to go home to California for a little

10   while and to, you know, start fresh when he came back.

11          The -- that was on the 5th.  On the 7th he was

12   involved with a patient, trauma female 375.  Trauma female 375

13   was a patient who had multiple orthopedic injuries, multiple

14   severe injuries, and was cared for by different nurses than what

15   were involved with the initial care of the trauma patient, Mr.

16   B.  That was on the 7th.

17          I heard about it on the 8th in staff clinic.  And

18   that afternoon I went to the ER to speak with Arlene Vance,

19   Elaine Simon, and Diane Savage.  I got the same story of the

20   patient encounter from all three nurses -- very detailed

21   accounts that were in agreement in all areas.

22          DR. WALSH:  And speaking with them separately.

23          DR. KOON:  And speaking with them separately.  Yes.

24

25          One of the nurses said, you know, "Dr. Koon, I like

29

1   Afraaz.  He's kind of a goofy guy.  He's kind of Irani."  "But,"

2   she said, "he's dangerous with patients."  And then she went on

3   to describe what happened.

4               The accounts vary.  Pages 38 through 40 are

5    Dr. Nathy's (ph) version of the accounts.  Pages 41 through 44

6   are the nurses' accounts of the encounter.  And Page 45 and 46

7   is Dr. Irani's encounter.

8               My understanding of what happened -- and the

9   accounts varied from Dr. Irani's, "We did everything perfectly.

10  The patient was well taken care of.  Everything was as it should

11  be," to the nurses, where not enough pain medications,

12  inconsiderate with the patient being awake and talking about the

13  patient in front of her, about her injuries, inadequate pain

14  medication, not getting out of the way so blood could be hung in

15  a hemodynamically unstable patient.

16              It was very, very disturbing what I heard that night

17  from the three nurses.  But they were -- okay.  They were all in

18  agreement, and therefore that is included on his trauma -- on

19  the encounter, and our decision to speed up the remediation

20  process.  The faculty was acutely aware of -- acutely concerned

21  for our patient's safety and had no choice but to recommend

22  suspension while we further investigated the trauma female

23  incident.

24              Let me reiterate, the trauma female incident was not

25  a significant determining factor in his Level 3 remediation.  It

30

1   was just the one that sped it up.  We had basically made a

2   decision to do it.  And based on his care of that patient, we

3   decided to recommend suspension.

4          DR. WALSH:  Let me just add something here.  You

5   know, Dave's been here since 2002.  I've been here since 1999.

6   We've had residents who rotate through the ED and on other

7   services the entire time.  Periodically, people have different

8   personalities, perhaps there's a dispute or that sort of thing

9   with how a patient was taken care of and so forth.

10          And we try and interpret these things in context.

11  And not every one of them was -- when we look into it do we

12  necessarily concur with, and so we're not really -- we're not

13  taking every single account at face value and not trying to look

14  at the greater context.

15          But in both of these cases you have something where

16  there is internally consistent accounts from the people who are

17  present.  You have something that disputes that and doesn't

18  entirely hold water from Dr. Irani.  And you have something that

19  involves the quality of a patient's care.

20          And, really, the thing that showed up a number of

21  times on his evaluations is this lack of empathy.  And so in

22  both cases here you have somebody who's been badly injured and

23  the descriptions that we have of the behavior is that it was

24  very casual and it didn't really seem to be compassionate for

25  somebody who was badly injured.

31

```
 1          MS. HILL:  Okay, Dr. Koon, Dr. Walsh.  Just a

 2   time check in.  You have 20 minutes remaining.

 3          DR. KOON:  Okay.  Page 47, that is a request for a

 4   psychological evaluation of Dr. Irani.  We weren't sure as a

 5   faculty what was going on, and I asked the residents, you know,

 6   "Is there a drug problem?  Is there an alcohol problem?  Is

 7   there something going on at home that we need to know about?"

 8   And I asked them to check with Dr. Irani to see.  Having heard

 9   the answer was no, the GMEC executive committee recommended a

10   psychological evaluation for Dr. Irani to help assist the --

11   assist us in formulating his remediation measures.

12          Page 48 is Dr. Irani cancelled the appointment less

13   than an hour before it was scheduled, having known about it for

14   a week, because he was not feeling so great today and did not

15   get sleep.  So despite our efforts to get help for --

16          (File 2015 1 30 10 14 18(A) cut off)

17          (Beginning of File 2015 4 30 10 174 18(B))

18          DR. KOON:  Dr. Irani states that he discontinued

19   the grievance not to further jeopardize my relationship with my

20   attendings.  Again, I would note there was no attending pressure

21   for him to discontinue any grievance.  In fact, it's the exact

22   opposite.  We made him aware of it every time we turned around,

23   that the appeals process is there for him.

24          And, again, one of the things that has been brought

25   up numerous times is that this process was not punitive in
```

32

1   nature.  These remediation measures were to get him back on

2   track to finish his residency.  And those -- that has been

3   alluded to several different times in his -- in this

4   documentation.

5            Dr. Irani, in those notes on Pages 51 and 52, notes

6   that -- his familiarity with the grievance and due process

7   policy.  And, again, there's no mention of unfair or lack of due

8   process.

9            Page 53 is Irani meeting with Dr. Walsh, and that's

10  a Dr. Walsh memo where there's an extensive review of Irani's

11  version of trauma female 375 -- her care.  This was 12 days

12  after the event, and he had the opportunity to give his side of

13  the story to Dr. Walsh, the chair of the department.  We again

14  emphasized that remediation is to restore to your residency

15  position, not as punitive, and that the GMEC functioned as our

16  external review.

17           DR. WALSH:  Let me just add one thing about the tail

18  end of that discussion with Afraaz.  You know, we've had any

19  number of times where we have discussed things with him, where

20  it's been formally, informally, one-on-one, a couple of people,

21  in the hospital, outside the hospital, and so forth.

22           This particular time that he and I spoke, after -- I

23  gave him the opportunity to go back through the entire -- his

24  version of the issues with trauma female 375 and talked to him

25  about accepting responsibility, having some insight, getting

33

1   used to the fact that he had to pay attention to what others

2   said, and one of the phrases that Afraaz would commonly use is

3   he would say, "I realize it doesn't really matter what I think.

4   It matters what you guys think."

5          And the time I -- the first time I heard that I

6   thought, well, okay, you know, he's beginning to understand that

7   he needs to pay attention to the perceptions of others.

8          And then, as time passed, what I realized is, what

9   he was basically saying was, it doesn't matter if I think you're

10  right or wrong, I just have to respond to what you're saying.

11  And the follow-up implication from that is, I think you're

12  wrong, but all I have to do is kind of live with that.

13         And at the very end of this meeting that we had --

14  which I thought was very collegial; there wasn't anything

15  combative about it whatsoever -- I said, "By the way, why did

16  you cancel your psychological evaluation right before it was

17  supposed to be done?"  And he said, "Well, I was tired and I was

18  a little concerned, wasn't sure how it was going to be used."

19  And I said, "Well, did you call anybody?"  And he said, "Well, I

20  sent an e-mail to Kathy Stevens."

21         Well, I just -- I wasn't hunting for it.  I just was

22  aware that he had sent that actually after the fact.  So I said,

23  "So you sent an e-mail to her when?"  And he said, "Well,

24  Wednesday," or whenever it was, which was after he had cancelled

25  the meeting.  So in my conversation with him he is responding in

34

1   such a way as basically to try and trick me, and to say, yes, I

2   sent an e-mail to Dr. Stevens explaining why I wasn't going to

3   do it, when, in fact, he had sent it afterwards.

4          So I said, "Afraaz, you just did it.  We sat here

5   for an hour.  We talked about things and -- about how you need

6   to accept responsibility and so forth, and you just tried to

7   trick me by telling me you had contacted Kathy Stevens prior to

8   cancelling this appointment as opposed to saying, well, I didn't

9   contact anybody, but I notified Dr. Stevens later."

10          So, again, it's an evasive way of responding to

11   someone immediately in the context of a conversation about

12   accepting responsibility and so forth.  It was like he couldn't

13   let it go to try and get out of something that he had done that

14   was incorrect.

15          DR. KOON:  Pages 54 and 55 are documentation that

16   Dr. Irani made a misstatement to Dr. Stevens.  He told her that

17   he had scheduled an appointment with the -- for the

18   psychological evaluation when, in fact, he had not.

19          Pages 56 and 57 are e-mail -- is an e-mail thread

20   from -- to and from Dr. Irani and Dr. Stevens where Afraaz met

21   with Dr. Stevens on the 3rd of January.  He makes misstatements

22   such as, "No one ever solicited my side of the story," which is

23   patently false.  Dr. Walsh did it less than two weeks after the

24   fact.  He said "never made aware of accusations against me,"

25   which, again, was patently false.  Dr. Walsh provided those to

35

1   him.  He said, "I was never involved," again, which is patently

2   false.  He was involved from the very beginning.

3            He also says that the same individual both times

4   wrote complaints against him.  Well, it was not the same

5   individual both times.  It was three different nurses -- or two

6   different nurses and Diane Savage.

7            He then attaches his version of the encounter and

8   forwards that to Dr. Stevens.  Again, there's no mention of lack

9   of or unfair grievance process.

10           Page 58 is an e-mail notification to Dr. -- to

11  Afraaz with regards to the decision to uphold the

12  recommendations.  And, again, she states at the bottom of that,

13  "This is to aid you in completing your training."  So again this

14  is not a punitive thing; this is our attempt to get him back on

15  track.

16           Pages 59 through 68 are his psychological

17  evaluations which were later included in his remediation

18  measures.

19           On the 24th of January, Dr. Irani e-mails

20   Dr. Walsh about the meeting that they had on the 24th, and

21  there were some -- there's some disagreements about what exactly

22  that meeting involved.  And Dr. Irani takes Dr. Walsh out of

23  context about the -- the recommendations that we sent to the

24  GMEC are modifiable, and he notes that and that he is

25  appreciative -- he looks forward to incorporating the feedback

36

1    of the department and becoming a better resident.

2              Page 70 is an e-mail from myself that we were going

3    to meet with him on the 31st to go to the next step.

4              Pages 71 through 76 are a reinstatement of Level 2,

5    so he's on -- he's been suspended over the holidays.  He's back

6    with us.  And we met with him to review the new remediation

7    plan.  So he's going from a Level 3 to a Level 2.  I reviewed

8    his academic remediations there at the beginning.  He handwrites

9    in there on Page 71 that he attempted to appeal to the grievance

10   council.  He attempted to appeal after the time that was

11   allotted for that, so he basically wasn't following the policy,

12   so they did not grant him a grievance committee hearing at that

13   time.

14             Again, these were faculty recommendations, not just

15   one or two people.  They were all approved by the GMEC executive

16   committee.  And the remediation plan was a very detailed plan

17   that was a combination of faculty and resident input.  And if

18   you read that remediation plan, they're basic things that our

19   interns and residents should know to do and should do them.

20             There wasn't -- there was no attempt to make these

21   remediation measures so hard that he would never be able to

22   complete them.  These were very reasonable things like making

23   the lists, reading and preparing appropriately for clinic cases,

24   making the morning list ready.  I mean, these are very, very

25   black-and-white things that he should do.

37

1        We placed him on Dr. Voss' service because he was on

2   Dr. Voss' service to begin with.  He was on Dr. Voss' service to

3   begin with, so we placed him back on the -- Dr. Voss' service.

4   We had had problems getting our VA attending to complete timely

5   evaluations, and we've had difficulty with him completing his

6   requirements as set forth by the ACGME, so we thought it best to

7   keep Afraaz on-site and under Dr. Voss' tutelage.

8        He signed Page 76 which called for immediate and

9   sustained improvement.

10       On the 6th of February, Dr. Irani came back to work

11  as a PGY 2.  It was a very light week because most of us were

12  gone to the academy.

13       On the 24th of February, Dr. Irani was involved in

14  the care of a spine patient.  And briefly, the patient was

15  post-op day two or three from a very large decompression and

16  fusion.  That morning Dr. Irani did not document any type of

17  neurologic testing or strength testing.  Dr. Grabowski went and

18  did it.

19       Later that morning Dr. Irani got notified that the

20  patient had a foot drop, by the nurse.  And the physical

21  therapist had noticed that.  So instead of being concerned, Dr.

22  Irani asked the nurse to verify that foot drop in an immediately

23  post-op patient.  So -- right.

24       Dr. Irani then went up to see the patient,

25  basically, appeared to lack concern for the gravity of the

Irani, M.D., Afraaz R. v.                          Termination of Dr. Irani, Committee Meeing
Palmetto Health-Richland                                              April 30, 2015

38

1   situation.  Still did not document his assessment.  Called Dr.

2   Grabowski, who went and evaluated the patient that way, ordered

3   the MRI, and the patient was in the operating room that night to

4   -- for a mass that was causing paralysis.

5           That Monday, Dr. Irani was with me in the staff

6   clinic.  He did a history and physical on a patient that had --

7   that was to have a total joint.  He not only -- it was a very

8   inadequate H&P.  He didn't note that the patient had hepatitis

9   C, which is very important from a surgical standpoint.  He

10  didn't note that the patient had an MRSA-positive history.  He

11  didn't note that the patient had chronic thrombocytopenia.  He

12  didn't note that the patient had psychiatric disorders.  He

13  noted no abnormal labs and no EKG.

14          Dr. Grabowski let me know about this in an e-mail,

15  which is on Page 80.  Dr. Grabowski and Voss met with Dr. Irani

16  that Tuesday.  And the very next day Dr. Irani was on call.  He

17  was asked to admit a patient with hemophilia who had a large

18  swollen and tender calf.  There was a concern that the patient

19  had compartment syndrome.

20          Dr. Irani provided compartment measurements about

21  midnight.  Dr. Wood said -- told -- the chief resident said, "I

22  want you to check the patient at four o'clock.  If there's any

23  difference I want you to call me, and then this patient may need

24  surgery for a limb-threatening condition."

25          That -- the next day, Dr. Irani overslept, had to

39

1   actually be called by our chief resident to come to rounds.

2   When asked what the evaluation was like at four o'clock,

3   Dr. Irani looked at Dr. Walsh and said, "I forgot.  I'm sorry."

4

5              DR. WALSH:  Dr. Wood.

6              DR. KOON:  Dr. Wood.  He said, "I forgot.  I'm

7   sorry."  He didn't do exactly what the chief resident told him

8   to do, and had no excuse.  He didn't say, "I checked the patient

9   at 2:30."  He didn't say that, "I checked the patient at 4:30."

10  He said, "I forgot.  I didn't do it."  There's no documentation

11  in the record that he ever checked the patient.

12             With these last two events, the department had no

13  recourse but to recommend dismissal from the program.

14  Dr. Irani was informed of this.  And there are e-mail notes

15  starting in 83, 84, and 86, documenting -- that mention

16    Dr. Grabowski's e-mail, solidifying the fact that not only

17  after he forgot to document all that, Dr. Grabowski told him,

18  "Well, the drain got pulled out early.  You really need to

19  monitor the dressings."  And Dr. Irani couldn't even do that,

20  and had no excuse for that.

21             We notified Dr. Irani of these findings.  We

22  forwarded the departmental recommendations to the GMEC executive

23  committee, who forwarded it.  And these got approved on the 10th

24  of April.

25             In the midst of his suspension without pay, there

40

1   was a very unusual request for Dr. -- from Dr. Irani for $800 of

2   book money, in the middle of being suspended without pay.  So

3   our conclusions were that there had been repeated and documented

4   substandard resident performances by many observers. There's

5   been graduated levels of remediation measures used in

6   accordance with the GMEC policy.  There were both verbal and

7   written, senior resident and attending interventions.  And the

8   -- it progressed from Level 2 to Level 3 twice.

9            There are documented attempts to get all the facts

10  on each encounter.  There are no allegations of a lack of unfair

11  due process appeals procedures.  In fact, we followed the GMEC

12  policies to the tee.  There's no allegations of Dr. Irani ever

13  being singled out in any of his calls, letters, conversations,

14  or e-mails.  There's no allegations of unsatisfactory academic

15  progress by -- from us to Dr. Irani.

16           Dr. Irani has never alleged inappropriate duty hour

17  violations; the department using residents to fulfill service

18  obligations.  There's no allegations of us ever treating him

19  differently from any other residents.  There's no allegations of

20  inadequate resident supervision.  There's no evidence that he

21  attempted to have his concerns by other committees -- and

22  there's no evidence of anyone withholding information from Dr.

23  Irani.

24           DR. WALSH:  So, I guess, in conclusion, you know,

25  Dave began this talking about when we interviewed Afraaz.  You

41

1  know, here's somebody who's a smart guy, he's likeable, he has a

2  record of success when he was in medical school.  I interviewed

3  Afraaz.  I can remember the day that we were making the rank

4  list that I was supportive of ranking him highly.

5          He starts here as an intern.  We kind of hear some

6  rumblings from other services and people that we trust, and

7  there -- we don't necessarily trust everybody when we hear about

8  it from other services.  In fact, there's one particular

9  attending that our residents used to rotate with years ago that

10 we stopped that rotation because his evaluations were actually

11 often incorrect, and it kind of was a waste of time.

12         But anyway, we're hearing the rumblings all the way

13 along, and eventually he comes around to do his full-time

14 orthopedic residency and, you know, there's this stack of paper.

15  And keep in mind that nine-tenths of that is from July of last

16 year through January.  And so, you've got a very short period of

17 time where he's making repeated, major mistakes.

18         The same theme is coming up over and over again

19 about lack of empathy, lack of insight, lack of attention to

20 detail, despite verbal and written counseling, informal talks,

21 formal talks.  Dr. Guy took him out to dinner one night at

22 Harper's and tried to have sort of the "big brother, throw my

23 arms around your shoulders" type of talk.  And nothing seems to

24 change at all.

25         So, you know, in the context of a situation where we

42

1  have feedback from nurses, from very experienced nurse managers

2  who have seen many of our residents go by over the years,

3  attendings from other services, orthopedic attendings, our

4  residents, residents from other services, nursing staff that are

5  in different parts of the hospital who -- one of whom knows

6  Afraaz sort of on a slightly more social level, at least in

7  context of professional interaction, but then also was party to

8  one of these things that happened down in the emergency room,

9  you know, we've got that backdrop.

10          Then we've got a situation where now we're talking

11 about big patient care issues, the gentleman with the complex

12 forearm injury, the female patient who had the ankle and the --

13 I forget what --

14          DR. KOON:  Multiple --

15          DR. WALSH:  -- multiple fractures.  You've got Dr.

16 Grabowski's patient who has a -- who basically has an acutely

17 developing paralysis.  It's happening right in front of

18 everybody.  And the initial response that the nurse told us when

19 she called and said, "The patient has a foot drop" is that he

20 said, "Aww, she has a foot drop?" in a setting where somebody --

21 I mean, this lady could've been paralyzed for the rest of her

22 life.

23          That happens on a Friday.  He's counseled on Tuesday

24 morning, going over the details with Dr. Grabowski, who is the

25 attending, and Dr. Voss.  And the following day there's a

43

1   patient who has a limb-threatening condition and he doesn't show

2   up, doesn't take care of the patient; that morning says, "Aww,

3   shucks, I forgot."

4           When I talked to him about it the following morning,

5   he says, "Well, actually, I did go by at 2:30, but I didn't

6   document it."  I have no way of proving whether that's right or

7   wrong, but, once again, it smacks of evasive, defensive

8   behavior.  And I really can't tell if it's -- if it's the truth

9   or not.

10          And at this point, there's just been a tremendous

11  erosion of trust of all of the faculty in his ability to provide

12  any type of reasonable care in that he's provided substandard

13  or, frankly, horrible care for a patient of mine, Dr. Koon's,

14  Dr. Voss', Dr. Grabowski's that are something considerably worse

15  than a resident who was told to check the potassium and forgot

16  and then made something up -- I mean, way, way worse situation.

17

18          Here's somebody who's only eight months into his

19  residency.  This isn't something where we feel like there's a

20  salvageable problem.  We've done every single thing we could

21  because we wanted to make the most and restore him to the

22  residency.

23          And, I mean, there's been other residents along the

24  way who have had to, you know, kind of have the talk or -- with

25  one attending, or perhaps in front of everybody.  They've made

44

1    measures to correct things, and graduated as very highly

2    successful residents.  And here we just feel like we're getting

3    absolutely nowhere.  So that's what led us to the point of

4    reluctantly but without apology terminating him.

5               MS. HILL:  That concludes.  Committee members, did

6    you have questions now for Dr. Walsh or Dr. Koon?

7               UNIDENTIFIED FEMALE:  Has he ever received a failing

8    grade?  I mean, (unintelligible) end of each rotation there's a

9    different (unintelligible) pass or fail. (unintelligible)?

10              DR. KOON:  Our evaluations are 1 through 5 --

11              UNIDENTIFIED FEMALE:  Okay.

12              DR. KOON:  -- and he really wasn't on our teams long

13   enough without being on probation for us to ever really do that.

14    So, no.

15              UNIDENTIFIED FEMALE:  Is there an evaluation from

16   Dr. Voss' recent three months with Dr. Irani?

17              DR. KOON:  Yes, ma'am.

18              UNIDENTIFIED FEMALE:  Oh, is it in here?  I'm sorry.

19    I saw the letter that he wrote.  I didn't know if there was an

20   actual evaluation from the three months that he did with him.

21              DR. KOON:  If you look -- okay.  So you're asking

22   when he came back on the 6th --

23              UNIDENTIFIED FEMALE:  Yes.

24              DR. KOON:  -- was there an evaluation before he went

25   back on Level 3?

45

 1              UNIDENTIFIED FEMALE:  Right.

 2              DR. KOON:  No, because Dr. Voss was gone the first

 3    week.  And so he was basically only on service for those two

 4    weeks.

 5              UNIDENTIFIED FEMALE:  Okay.

 6              UNIDENTIFIED MALE:  It's a little hard to process all

 7    this at once, but could you --

 8              DR. KOON:  A little hard to get it in an hour, too,

 9    huh?

10              UNIDENTIFIED MALE:  Yeah.

11              DR. KOON:  I'm sorry.

12              UNIDENTIFIED MALE:  Can you just give us an assessment

13    of whether that psychological evaluation made a difference and what

14    conclusions you drew from that, if any?  How did that contribute

15    to the process?

16              DR. KOON:  There was --

17              DR. WALSH:  I didn't think that it showed anything

18    that was new that we haven't presented to you right now.  I

19    didn't see anything that there -- that I would consider a

20    mitigating factor or something that would explain things at all.

21     It just was basically more of the same.

22              DR. KOON:  It did note that he was somewhat hesitant

23    on his answers and that the final conclusion should be taken in

24    that context, that he was a little bit defensive, which is kind

25    of a normal thing.  But he did say on Page 67 that they

46

1   recommended individual counseling.  And this is worked into the

2   remediation measures that we formulated after that.

3              And what we would have him do is go to E-Care,

4   because you get four as an employee free.  And so that was what

5   we took from that.  We didn't -- there was no DSM-R IV or V,

6   whatever it's up to now -- there are no diagnoses that had to be

7   acted upon.

8              MS. HILL:  Do you need additional time to review

9   or ask questions?  All right.

10             Dr. Irani, do you have questions for Dr. Koon or Dr.

11  Walsh at this time?

12             DR. IRANI:  No, not right now.  No, ma'am.

13             MS. HILL:  Okay.  If you're ready to proceed --

14             DR. IRANI:  Sure.

15             MS. HILL:  -- you have up to an hour to present.

16             DR. IRANI:  I think we have some packets to

17  distribute.  I'll go -- can I get started, Lynn?  Is that fine?

18             LYNN:  Yes.

19             DR. IRANI:  Okay.  All right.  Good afternoon.

20  First, I want to thank everyone for being here on my behalf.

21  Drs. Koon and Dr. Walsh, I've had the privilege of working with

22  both of you personally.  I know how busy both of your schedules

23  are, so I do appreciate you being here.  I know the rest of you

24  are all very busy, as well.  I know several of you had to make

25  sacrifices to be here on my behalf, and I do appreciate that.

Irani, M.D., Afraaz R. v.                         Termination of Dr. Irani, Committee Meeing
Palmetto Health-Richland                                                    April 30, 2015

47

```
 1            I would like to start off by saying that I am
 2   encouraged by the panel here today, that I am encouraged my
 3   grievance will be heard by a neutral third party.
 4            I sit before you extremely concerned by the
 5   unethical behavior and the harassment I've been subject to at
 6   the hands of my program director and the chairman of my
 7   department.
 8            I'd like to take a step back and start at the
 9   beginning.  I arrived from the West Coast at Palmetto
10   Health-Richland in 2010, excited to start my orthopedic surgery
11   residency.  What attracted me to this program was it was a small
12   program and the plethora of opportunities to operate one-on-one
13   with an attending physician.  I felt this was an opportunity at
14   hands-on training that you do not get in many other places.
15            However, my excitement was quickly suppressed.  Six
16   weeks into my residency, Dr. Koon called me into his office and
17   told me that he was placing me on Level 2 remediation.  He said
18   he was placing me on Level 2 remediation.  And in that same
19   meeting he went on to boast about firing Dr. Chad Lamoreaux, a
20   previous resident a few years ago, a few months before he was
21   about to graduate as a PGY 5 resident.  I was confused why he
22   brought up this incident only six weeks into my residency.
23            Dr. Koon then handed me a letter with several
24   deficiencies.  And rather than going over them, he asked me to
25   respond to them.  Many of these were completely new to me and I
```

48

1    was admittedly confused.  I went through them.  I tried to

2    reconcile what my interpretation of these events were with what

3    was written.  I asked Dr. Koon to elaborate on many of these, as

4    I admittedly did not understand the majority of these

5    complaints.

6            These were troubling allegations to me.  I asked Dr.

7    Koon for help.  His response, "This just shows you lack

8    insight," period.  I was puzzled.  How could I improve if I

9    could not understand my own deficiencies?  I was left to

10   conclude that the true motive at this early stage was to set the

11   groundwork for termination.

12           Attempts at further clarification were simply met

13   with the response, "Look, we get the best residents.  The

14   surgery program would be happy to trade three of theirs for one

15   of mine.  The medicine program here is happy to get somebody

16   that speaks English.  We get the best residents."

17           It was clear I could not get any more clarification

18   at this meeting, but I took these allegations seriously.  I did

19   everything I could to understand how I could improve.  I wanted

20   to do whatever I could to correct these alleged deficiencies.

21   Having no guidance from my program director, I reached out to my

22   fellow residents.

23           One statement in the remediation letter said I

24   created more work for my resident peers.  I spoke to each of

25   them individually and privately.  They all individually and

49

1   privately denied this, and went so far as to say that I went

2   above and beyond what was required of me.

3          In fact, there was no secret we often violated duty

4   hours, myself regularly going over the 80 hours a week mandate.

5   From talking to my program director, my fellow residents, the

6   response was always, "Make it work."  Indeed, the program is

7   currently under investigation by the ACGME for, amongst other

8   things, work hour violations and lack of resident supervision.

9          The letter also alleged I did not appropriately

10  treat pain in a trauma patient.  I pointed out that on this

11  particular patient I was not the primary team, nor did I do a

12  reduction.  This was all done by my attending.  So I did not

13  cause the patient the excruciating pain alleged.

14         In fact, I saw the patient a couple of days later on

15  the floor.  He shook my hand.  I asked him if he remembered me,

16  and he volunteered that he remembered me from the emergency

17  department.  He thanked me personally and said how happy he was

18  with my care.  I think the ultimate judge of compassion and care

19  should come from the patient.  This patient remembered me and

20  was pleased with the care, albeit he was very disappointed with

21  his injury.

22         I did, however, take away that I should work on

23  improving how I present myself in front of my peers.  However, I

24  think these events as presented to the GMEC were grossly

25  overstated at best, and at worst frankly false.

50

1          Lastly, Dr. Koon at this meeting gave me his

2    personal word that these events would be kept private between

3    Drs. Koon, Dr. Walsh, and myself.  Needless to say, this was not

4    true.  I was very disappointed when my chief resident began

5    asking me if my decisions were okay given that I was on

6    probation.  The faculty and my fellow residents somehow all came

7    to know about my inadequacies without me saying a single word.

8    Clearly, Dr. Koon's personal promise was empty.  It seems the

9    goal here was to publicly humiliate me rather than support me.

10          Despite these allegations not being explained or

11   substantiated, that did not stop them from presenting these

12   statements to the GMEC, for them to base their decision on

13   voting if I was to be placed on Level 2 remediation.  This

14   experience was disenchanting, confusing, and disappointing.  It

15   was especially disappointing to be placed on probation six weeks

16   into my residency.  What made it more frustrating was I could

17   not get any guidance, feedback, or direction from my program

18   director.

19          It became clear that I had to become extremely

20   defensive if I had a shot at surviving.  Despite all this, I

21   reevaluated where I was in my training and my ultimate goal of

22   becoming an orthopedic surgeon.  I recognize I am not perfect,

23   and, like all residents, I have had my share of mistakes.  But I

24   felt that I was not given much guidance.  And I went out of my

25   way to figure out how I could improve.  I racked my brain to

51

1   figure out why I was being treated like this.

2              In retrospect, there was a troubling pattern of

3   behavior from my residency director that I tried to laugh

4   off that would become more and more of a problem.  Dr. Koon

5   continued to escalate in trying to derogatory -- making

6   comments, saying I was a terrorist, going so far as to label me

7   Achmed the Terrorist.

8              While I found his comments terribly insulting,

9   terribly unprofessional, and terribly insensitive, I quickly

10  realized as I had been instructed by my senior residents

11  regarding conflict with an attending, that responsing (sic) --

12  that responding only makes things worse; in this program, grin

13  and bear it.

14             I decided to try and extract as many learning points

15  as possible from this experience.  I decided I needed to improve

16  on my communication.  I decided to accept the probation and move

17  on.  I was excited to come to work every day, and realized the

18  best thing I could do towards reaching my goal of becoming an

19  orthopedic surgeon was continuing to work hard and improve in

20  the eyes of my attending.

21             On October 26th Dr. Koon told me there was some

22  issues with my performance.  I asked him what the issue was.

23  He simply said, "Speak with Drs. Wood and Dr. Mazoue."  I spoke

24  with them individually, and they said they had no complaints.

25  Indeed, this was in line with my usual feedback from Dr. Koon,

Irani, M.D., Afraaz R. v.                    Termination of Dr. Irani, Committee Meeing
Palmetto Health-Richland                                          April 30, 2015

52

1    consisting of vague, negative comments, lacking direct

2    directions for improvement, and ultimately unsubstantiated.

3    These feedback sessions were becoming frustrating and taking a

4    toll, as I began to wonder what I was doing wrong and right, at

5    the same time afraid of being punished for doing anything right

6    or wrong, and often frozen in indecision.

7              In early November there was a VA patient that was

8    transferred to Richland.  The patient was lacking a dictation.

9    This got routed to Dr. Koon.  Dr. Koon routed it to me.  A few

10   days later, he asked if the dictation was done.  I informed him

11   that it had not shown up yet, but as soon as it shows up in my

12   inbox I would take care of it.

13             That evening a dictation showed up in my inbox for a

14   VA patient for an H&P.  I took care of it.  Dr. Koon texted me a

15   few days later asking about this.  I told him I took care of it.

16    After a few rather confusing text messages, we got on the phone

17   to figure out there was actually a second VA patient.  I took

18   down the name and investigated the patient.

19             On examination, I actually -- I'd actually never

20   been involved in this patient's care.  I dictated the discharge

21   summary, as asked.

22             Worried that this miscommunication might create more

23   issues and knowing that Dr. Koon had repeatedly emphasized my

24   need to over-communicate, coupled with prior allegations that I

25   was creating more work for others, I sent him an e-mail telling

53

1   him everything I knew about the patient -- who was involved, the

2   time of the patient's admission, and that I had completed the

3   task as assigned so there was no miscommunication this time.

4          I believe I was doing my best to improve and correct

5   the deficiencies my attendings had perceived.  However, this

6   attempt at trying to follow my remediation plan and ensure

7   proper communication was not taken well by Dr. Koon.  Dr. Koon

8   responded to my attempts at improving communication, as can be

9   seen in Exhibit F of your binder, by writing, "Absolutely

10  incredible.  I can assure you I would never in a million years

11  send a response like this to my program director, especially

12  when I am in the midst of active remediation."  He expressed

13  surprise and indignation, and called my e-mail "drivel."

14         Dr. Koon became so enraged he was "unable to speak

15  to his wife."  He further boasted to me that the e-mail he sent

16  me was actually "significantly toned down" and the original had

17  much stronger language.  He then openly threatened, "You were

18  lucky you were on vacation because I would have fired you on the

19  spot."  Indeed, he finally admitted his true intentions to me.

20         In the weeks that followed, there was a much more

21  sinister turn of events.  At our meeting on November 21st, he

22  now recommended that I be placed on Level 1 active remediation,

23  when my probation was up on the first week of December.  I asked

24  for clarification.  He could not cite any deficiencies regarding

25  the remediation plan.  I was encouraged to hear that I corrected

54

1    the deficiencies outlined in my remediation.

2            He therefore began to cite events that had happened

3    before I was placed on remediation, from back in June and July,

4    issues that had long been resolved.  Interestingly, if these

5    were true issues, I was curious why they were now being brought

6    up now, and not in my initial feedback, back in August.  It

7    seems things had turned into a fishing expedition rather than

8    truly identifying faults and ways for me to improve as a

9    resident.

10           His about-face showed re-doubled efforts to vilify

11   rather than educate me.  Indeed, the most surprising factor was

12   a mere one and a half weeks later after that meeting, he somehow

13   changed his recommendation from Level 1 to Level 3 remediation,

14   with suspension of clinical duties.

15           Dr. Koon invited me to attend the faculty meeting

16   when I was scheduled to be done with my remediation.  At this

17   meeting, I was shocked by the confrontational tone of this

18   meeting.  Dr. Koon questioned me in front of the entire faculty,

19   challenging me, "Do you think it was a wise move to take

20   vacation during your remediation?"

21           I had carefully scheduled my only two vacation days

22   to coincide with the vacation days of my attending, so as not to

23   create more work for the rest of my team.  Since I had started

24   my PGY 2 year, I only took two days off to see my family.  I

25   have no family in South Carolina.  And I went to visit my family

Irani, M.D., Afraaz R. v.                          Termination of Dr. Irani, Committee Meeing
Palmetto Health-Richland                                                    April 30, 2015

55

1   and my newborn niece.

2           Dr. Koon insinuated that I did not take the

3   probation seriously.  I found this insinuation terribly

4   insulting.  In fact, I missed my very own brother's wedding so I

5   could be on call over Labor Day.  I knew that if I requested

6   those days off it would cause further work for my fellow

7   residents, and I was striving to improve on the allegations that

8   I was perhaps creating more work for other residents.  That was

9   how seriously I took my probation.  I missed my brother's

10  wedding rather than risk upsetting Dr. Koon by taking Labor Day

11  off.

12          The insinuation that I did not take my remediation

13  plan seriously and frivolously took vacation days off was

14  hurtful, uncouth, and uncaring.

15          I had personally spoken with Dr. Stevens and Dr.

16  Koon about my two vacation days.  He had personally signed off

17  on it.  I had done my best to clear it with everyone.  Again, I

18  was in a situation where I am so afraid of being punished for

19  doing anything, right or wrong, that I often don't know what to

20  do.

21          Dr. Koon went on to reference a patient that had

22  been in clinic and seen by me.  My attending, Dr. Grabowski had

23  asked for an MRI to evaluate the patient for possible infection.

24  He was status post several months an ex-fix removal of his right

25  upper extremity.

56

1      I was told by ancillary staff that one could not be

2   scheduled that day, and the next available spot was the next

3   day.  I preliminarily asked them to schedule the MRI for that

4   day, and went back to the room and talked to my chief resident.

5

6      My chief resident instructed me to call radiology

7   personally, which I did.  I got the MRI scheduled that day.  At

8   that point, I returned to the patient's room and I sent him

9   across the street to get his MRI taken.  To my understanding the

10  care plan was carried out exactly as my attending Dr. Grabowski

11  had requested.

12      Dr. Koon was not present during the care of that

13  patient, and relied on secondhand information about this

14  patient.  I had no complaints about the patient's care, and

15  indeed it was carried out exactly as my attending wanted.

16      Rather than asking me for details about the

17  incident, Dr. Koon invited me to the faculty meeting and incited

18  me in front of the entire faculty.  He declared that I came up

19  with the plan in direct conflict with that of my attending.  He

20  stated I planned to get an MRI in two to three days, and stated

21  that was a decision I made as a PGY 2 when my attending had told

22  me differently.  He went on to provoke me by saying, "I am

23  wondering why you thought it was in your purview to contradict

24  your attending's recommendation."

25      I was taken aback by the statement, frankly



57

1  confused, obviously flustered, when to the best of my

2  understanding my care plan had not deviated from that of my

3  attending.

4         Moreover, Dr. Koon was not present.  He relied on

5  secondhand information, and never asked for my side of the

6  story, and authoritatively declared that I had contradicted my

7  attending's recommendation.  Moreover, this was the first I was

8  hearing about it.  If there was a problem, I should've been

9  asked beforehand.

10        The allegation here was that if there wasn't an MRI

11 scheduled until the next day, I should not even have bothered to

12 schedule that.  Again, the line between what is right or wrong

13 seemed to be a moving target, and I became more confused and

14 increasingly worried about the discipline for minor infractions.

15  The patient had received the appropriate care that my attending

16 had outlined.

17        If the goal is to educate and support residents, I

18 believe I should've been afforded the common courtesy to explain

19 what happened, since Dr. Koon was relying on secondhand

20 information and did not have firsthand knowledge of the events.

21 Instead, he asked me to respond to an inflammatory, incorrect

22 accusation in an obviously confrontational manner.

23        It was clear I had no ground to stand on, as Dr.

24 Koon had verbalized.  His goal was to fire me, and fair hearing

25 and proper representation of the facts would not get in his way.

Irani, M.D., Afraaz R. v.                    Termination of Dr. Irani, Committee Meeing
Palmetto Health-Richland                                        April 30, 2015

58

1    Indeed, as one of my co-residents wrote in an unsolicited,

2    confidential e-mail, "I feel this is more of a witch-hunt than

3    anything."

4            It was clear that my superiors were not interested

5    in my education.  They were, rather, working towards Dr. Koon's

6    openly declared goal of firing me.

7            Dr. Koon made two more points in front of the rest

8    of the faculty, attempting to degrade me.  He alleged improper

9    dosing of narcotics.  This was a non-narcotic naïve patient who

10   was post-op day zero, status post shoulder surgery.  She had no

11   weakness, paresthesias, or mental status changes.  I okayed 5

12   milligrams of oxycodone, more than Dr. Mazoue gives his

13   narcotic-naïve post-op shoulder patients.  Dr. Koon repeatedly

14   cited this as substandard care, again, bringing it up in front

15   of myself and the faculty in February.

16           I asked what I should've done differently.  Dr. Koon

17   asked Dr. Hoover, our chief resident, what he would've done.

18   Dr. Hoover replied that he would ask the patient if he had any

19   weakness, paresthesias, or mental status changes, and if the

20   patient didn't, he would have okayed more narcotics.  I was

21   stunned.  The same treatment plan said by my colleague became

22   inappropriate management when spoken by me.  Again, I felt

23   constantly intimidated by my attending, calling me a terrorist

24   and threatened with discipline for minor infractions but for

25   which he gave a pass to other residents who had done the same

59

1   thing.

2       Again, I found myself in a situation in which I'm

3   being afraid of being punished for doing anything right or wrong,

4   and I'm unclear what to do.

5       Dr. Koon additionally asked why I failed to evaluate

6   a post-op total knee patient.  This was a patient who had called

7   the previous Saturday.  She told me a scab had fallen off her

8   knee and there was some drainage.  I told her with these exact

9   words, "Ma'am, I cannot tell you anything about your wound

10   without taking a look at it."  And I encouraged her to come to

11   the ED.

12       She called twice again the next day with a different

13   resident.  That resident told her the same thing.  I conferred

14   with that resident.  We both told her to come in.  She was told

15   once by me, twice by the resident the next day.  She did not

16   show up at the emergency department.

17       Despite two residents who both told her to come in,

18   the patient did not follow these instructions.  Dr. Koon

19   lambasted me in front of the other residents and faculty simply

20   saying a patient called three times and I had told her not to

21   come in, which is frankly untrue.

22       At the conclusion of this, I insisted that there be

23   a way to document our phone calls, since no such system was in

24   place and since it was clear Dr. Koon placed no value on the

25   veracity of any statements, and it was increasingly clear I

60

1   needed additional safeguards to protect myself.

2              Lastly, Dr. Koon, in front of the orthopedic

3   department staff, made the allegation that my poor behavior was

4   a pattern.  He stated he heard similar complaints about

5   unprofessionalism and poor patient skills about me from the

6   trauma case managers.  I was puzzled because I had received

7   positive feedback from them.  However, I wanted to understand

8   how I could become a better resident.

9              I approached them again.  I spoke to them

10  individually and privately and asked what they thought.  They

11  frankly denied such claims.  They said they were pleased with my

12  performance, and emphatically stated they enjoyed working with

13  me.  Again, I was confused, in a situation in which I was so

14  afraid of being punished for doing anything, right or wrong.

15             Indeed, it was clear that Dr. Koon was more intent

16  on slandering my name in front of my peers and my attendings,

17  irreparably harming my name and my reputation.  The faculty

18  meeting concluded.

19             Later that week a multi-trauma came in at 11:00 a.m.

20   She was seen and evaluated by our orthopedic intern.  The

21  intern called the chief resident, Dr. Wood, saying that it was a

22  particularly sticky situation and she needed help.

23             Dr. Wood directed her to call me, a second-year

24  resident on probation, to supervise the orthopedic intern in a

25  sticky situation in the emergency department.  I received a page

Irani, M.D., Afraaz R. v.                          Termination of Dr. Irani, Committee Meeing
Palmetto Health-Richland                                                       April 30, 2015

61

1  at about 2:00, 2:30 p.m.  I immediately informed my attending,

2  then went to the ED to help out.

3           I arrived to a situation of frank disarray.  The

4  patient was now three and a half hours her initial -- after her

5  initial trauma.  She had been moved out of the trauma bay and

6  still had open, displaced, and non-treated fractures.  The

7  patient and nursing staff were understandably upset.

8           Before I had even seen the patient, the nurse

9  clearly and, again, understandably upset, said, "We need to talk

10 about how all this was handled."  I asked her what happened,

11 what I could do, and what needed to be addressed.  She simply

12 said, "We will talk about it at the end."

13          Having gone through this experience with these

14 nurses before, I toed the line.  I did my best, went out of my

15 way to please all parties involved.  I introduced myself to the

16 patient.  I described all injuries to the patient.  I assessed

17 her pain.  I talked to neurosurgery who told me they could not

18 do conscious sedation.  I then went and gave local and systemic

19 anesthesia before performing any reductions.

20          I talked to the family personally.  I brought the

21 family back personally to the emergency department, where I

22 showed them all the injury films on the PACS station.  And then

23 I helped the nursing and ancillary staff, including cleaning up

24 and helping them change all the wet sheets on the bed.

25          That Friday I received a phone call from my

62

1   chairman, Dr. Walsh, who said there was an incident involving a

2   trauma female that I took care of and I am being suspended so

3   that an investigation can be performed.  Dr. Walsh assured me

4   the purpose of the suspension was to get all sides of the story

5   "including yours."  This turned out to be false.  I was shocked,

6   saddened, stunned at the events that transpired next.  No one

7   talked to me.  No one attempted to contact me.  No one was even

8   interested in hearing my recollection of the events.

9           To add insult to injury, I received a phone from our

10  program director, Michelle Wehunt, saying that there was a

11  letter for me.  The letter was a copy of the GMEC recommendation

12  for Level 3 remediation.  It had already been submitted and

13  already been approved by GMEC.  I was floored.

14          No one contacted me about what happened with trauma

15  female, as I had personally been promised by my chairman.  And

16  my program director who performed the investigation didn't even

17  have the decency to call me and inform me of his decision or

18  thought process, but rather had his secretary give me a call to

19  pick up a memo that he had already turned over to the GMEC.

20          This was the ultimate slap in the face and lacked

21  common human decency and courtesy.  It was now abundantly clear

22  that Dr. Koon and those entrusted with my education had made no

23  attempt to and were not interested in ascertaining the veracity

24  of statements that were presented to the GMEC.  Most glaring

25  were the frank falsehoods presented to GMEC, statements that

63

1  constituted frank libel, notably neglect of informed consent.

2  This allegation is false on many different levels.

3         First, no resident, no resident -- none of our

4  residents in our program get consents for emergent procedures.

5  Furthermore, this discussion with nursing staff was broached to

6  the orthopedic intern before my arrival, three and a half hours

7  after -- three and a half hours after the initial trauma.  Simple

8  fact-checking, following standard procedure, or having the

9  professional courtesy to call and talk would have avoided such

10  deceitful and libelous comments presented to the GMEC.

11         Similarily (sic), other statements about improper

12  pain management are untrue as I gave both local and systemic

13  anesthesia prior to manipulation.  I assessed the patient's

14  level.  I went to the additional step of talking to Dr. Toussant

15  from neurosurgery, who told me conscious sedation was not an

16  option.

17         Moreover, as presented above, allegations of

18  inappropriate narcotic dosage and failure to evaluate a post-op

19  knee were gross overstatements of the truth, and actions that

20  were either substantiated or performed in the same manner by my

21  colleagues.  Similarily, as described above the statements that

22  I failed to abide by direct attending instruction is a perversion

23  of the facts.

24         What was surprising was that my superiors had

25  violated Palmetto Health's own written and stated guidelines.

64

1   In the resident handbook, Page 61, which can be seen at Exhibit

2   R, it cites disruptive behavior as inappropriate conduct that

3   reflects in a negative way on a hospital or university.  It then

4   clearly states under "procedure," also under Exhibit R, the

5   program director or designee interviews the complainant and any

6   witnesses within one business day of receiving the complaint.  A

7   resident is given the opportunity to respond in writing (audio

8   cuts off; end of File CD 2)

9          DR. IRANI:  Most stunning, and what I find very

10  unusual, were all three of Palmetto Health's own guidelines were

11  violated.  I was never interviewed.  All witnesses were not

12  interviewed, despite my providing names.  I was never given the

13  chance to respond, period.

14          The fact that no one bothered to ask for my side of

15  the story was not only horribly unethical, hurtful, but lacked

16  common courtesy and respect that I would think everyone, let

17  alone physicians, should practice.

18          By this point Dr. Koon had successfully turned all

19  popular opinion against me.  I was still honestly confused about

20  the situation and wanted to understand how I could improve.

21  Just as I in the past made progress on my remediation goals by

22  doing investigation myself, I attempted to do the same thing

23  here.  I asked what the complaints were, who made the complaint

24  so I could speak to them, and for a copy of all records

25  associated with the patient's care so I could understand what

65

1    exactly was alleged and how I may improve.

2              Despite repeated verbal and written requests as can

3    be seen in Exhibit K, to understand and get a copy of the

4    complaints against me so I can improve, my request was denied.

5    I initiated a request with HR to initiate a grievance council

6    meeting regarding my suspension within ten business days of the

7    DIO's decision as outlined under grievance and due process in

8    the resident handbook, which can be seen in Exhibit Q under 1.5.

9

10             Since Martin Luther King Day was a national holiday,

11   the banks, offices, post office, and most importantly the

12   orthopedic surgery clinic closed, it was logical not to count

13   MLK as a business day.

14             I was shocked when they refused to grant me a

15   grievance council, saying that 11 business days had elapsed and

16   that MLK Day is not a holiday.  I pointed out that to my

17   understanding MLK is a national holiday; furthermore, there's a

18   discrepancy -- a business day is not, to my knowledge, defined

19   in the resident handbook, a fact that Kathy Stevens herself

20   later conceded.

21             Moreover, should there be any confusion about the

22   deadline, the resident handbook makes explicit provisions to

23   extend any deadlines due to extenuating circumstances.  I was

24   denied due process despite the fact that I made a good-faith

25   effort to follow the guidelines laid out in the resident

66

1  handbook and filed my request within ten business days as

2  outlined in the resident handbook.

3          It appeared the primary motive here was not to act

4  in the resident's best interest, but rather play "gotcha" with

5  our careers, a career I've worked my entire life for, and

6  something I would hope would garner more respect and

7  understanding from those charged with graduate medical

8  education.

9          To add insult to injury, I received an e-mail

10  shortly thereafter requesting me to come in and write a check

11  for a paycheck that was accidentally paid to me during my

12  suspension.  At this time, I expressed serious reservations

13  about my treatment and the fairness I was receiving from my

14  program director, and I sought counsel elsewhere.

15          I spoke with Dr. Guy.  I appreciated his feedback,

16  found I made much more progress speaking with him.  I asked him

17  if he could oversee my remediation plan so I could get more

18  guidance, since I felt I was not making much progress with Dr.

19  Koon.  He stated he would be willing.

20          As seen in Exhibit N, I proposed Dr. Guy oversee my

21  remediation and progress, as I had reservations about how I was

22  being treated and felt I could get much more constructive

23  feedback to help me become a better physician with Dr. Guy

24  overseeing my remediation plan.  This request was summarily

25  denied by Dr. Koon.

67

1          Despite the failure of due process, violation of

2     Palmetto Health guidelines, and the presentation of false

3     statements to GMEC, Dr. Koon successfully had me suspended from

4     early December to the end of January.  This was embarrassing,

5     humiliating, demeaning, and was done in violation of

6     professional and Palmetto Health guidelines.

7          I was reinstated in the beginning of February.  At

8     this time Dr. Koon handed me a letter placing me on Level 2

9     remediation.  What was interesting was a now greatly expanded

10    list of deficiencies.  I was taken aback by now the laundry list

11    of competencies not being met under Exhibit O.  I had not been

12    on service since my previous evaluation placing me on Level 3

13    remediation, yet somehow my list of uncompetencies had somehow

14    exploded.

15         Notably, things that I had been told were never

16    issues were now listed as competencies not being met, including

17    complaints about my knowledge base.  I had never been told my

18    knowledge base was lacking.  In fact, Drs. Walsh, Mazoue, and

19    Guy had all explicitly told me my knowledge base was fine,

20    better than average.  Excuse me.  My in-training results

21    substantiated this and easily outpaced that of my PGY 2

22    colleague.  This was alarming to me, and it was apparent

23     Dr. Koon's goal was to list as many competencies as deficient

24    so should I make any misstep he can more easily fire me.

25         The goal here, it seemed, was not to provide a

68

1  framework for remediation, but rather, again, continuing to play

2  "gotcha" with my career.  Once again, here was something I had

3  been told I was doing well in, and again I was in a situation in

4  which I was being punished for doing anything, right or wrong.

5           Lastly, I noticed that Dr. Koon and Walsh had

6  changed my schedule.  I was scheduled to be rotating at the VA

7  and Baptist Hospital.  However, these rotations that all the

8  other residents partake in were removed and I was assigned to

9  the Richland service, again on service with the same attendings

10  I had just rotated with.  My education was further compromised

11  as I did not have the opportunity to have someone else supervise

12  me or serve in a mentorship role.

13           However, I redoubled my efforts and was genuinely

14  happy to be back.  In February, after I finished the two-month

15  suspension, I was willing to work to correct any legitimate

16  deficiencies, and again earnestly strived to show that I was

17  serious about the comments that I had received and my education.

18

19           I started back on Dr. Voss' service.  I wished to

20  show I was indeed a team player, and took the initiative and

21  decided to adapt and create a resident step-by-step guide with

22  step-by-step directions, pictures and figures about how     Dr.

23  Voss performs his total knee arthroplasty.  I thought this would

24  be an invaluable tool to residents coming after me.  I worked

25  hard to correct these perceived deficiencies in my performance.

69

1

2          On the evening of March 1st, Dr. Koon called and

3    told me that I was again suspended, and he was recommending me

4    for termination regarding my care of two patients.  A

5    hemophiliac patient was admitted at approximately midnight for

6    observation for possible compartment syndrome.

7          I did an interval examination at about 2:30 for

8    compartment syndrome.  The examination was unchanged.  And as I

9    was seeing another patient, my exam was unchanged from before, I

10   decided to treat the current patient in an expeditious and

11   caring manner.  I put in a note on the patient within 48 hours

12   of seeing the patient.

13         Dr. Koon also mentioned the issue with a spine

14   patient with neurologic changes.  I saw her as soon as the nurse

15   told me that she saw neurologic changes.  I examined the patient

16   as soon as she was available, and called my attending as soon as

17   my exam was done.

18         My attending, over the phone, told me my physical

19   exams and findings were inaccurate and incorrect.  Accordingly,

20   I could not document my findings as I had been directed by my

21   attending that my exam was inaccurate.  I had been directed

22   previously by my attendings to not document inaccurate findings

23   in the patient's chart.

24         It is also noteworthy that this was my very first

25   spine patient as a resident, and there was no senior on the

70

1   resident service with me.

2           When confronted about these patients, I followed the

3   remediation plan which directed me to "admit and apologize for

4   mistakes and be willing to endorse personal flaws."  Therefore,

5   when confronted about these patients, I immediately apologized.

6   I said that I would do better next time.  I did not make any

7   excuses and listened to what was said.

8           While I admit that I have made mistakes, both

9   patients were evaluated.  It is also noteworthy that I had just

10  returned from a two-month hiatus and was unsupervised on

11  service.  I learned from these experiences that I still need to

12  work on improving my efficiency.

13          Again, I believe these are all examples of resident

14  education.  While I believe there is always room for

15  improvement, mistakes, feedback, and resident supervision are

16  all integral parts of resident development.  It has been hard

17  for me to focus on learning and my education with the stress of

18  this unmerited treatment.

19          Through the entire process, I've been illegally

20  targeted.  I have been vilified for activities that my

21  colleagues have not been penalized for.  Standard hospital

22  policy has been ignored.  And my name and reputation have been

23  subject to libel and slander by Drs. Koon and Walsh in front of

24  the GMEC committee and the hospital staff.

25          They misrepresented me to the Graduate Medical

71

1   Education Council.  I believe that GMEC's decisions were based

2   on false information and malicious misrepresentations.

3            Lastly, and perhaps most importantly, I have had

4   more stress placed upon me when dealing with patient care by

5   having to undergo derogatory, inappropriate, and insensitive

6   racial taunting by those entrusted with my education.

7            While on remediation, Dr. Koon regularly taunted me,

8   calling me Achmed the Terrorist.  While I tried to laugh it off,

9   these comments are deeply harmful and insensitive, given the

10  past history of religious persecution of those of my people and

11  the recent terrorist attacks in Mumbai, India, where my family

12  resides, and the impact these cowardly attacks have on my

13  immediate family.

14           The pattern of singling me out and open slander and

15  libel in presenting my case and racist behavior is incongruous

16  with someone entrusted in the role of an educator.  Moreover, at

17  least five of these deficiencies cited here were either

18  performed or verified by my resident colleagues without

19  retribution, including treatment of trauma female 375, dosing of

20  narcotics, medical knowledge, evaluation of post-op knee, and

21  wound closure.

22           I felt constantly intimidated by Dr. Koon, either

23  calling me a terrorist or threatening me with discipline for

24  some minor infraction, but for which he gave a pass to other

25  residents who had done similar things.

72

1          I was frankly in a situation where often I was

2    afraid of being punished for doing anything, right or wrong,

3    that it was not clear what I could do to avoid punishment.

4          I believe I'm a friendly person, but cultural

5    differences and insensitive behavior have made it hard to focus

6    on becoming a better physician.

7          I admit, I may appear differently.  I might act

8    differently.  I'm new to the south.  I was born and raised in

9    California.  I completed my undergraduate and medical school

10   education at Stanford University on the West Coast, in an

11   environment quite different from my current setting.  I don't

12   think it's the responsibility of others to understand my

13   background, but I think they should at least be accepting.

14         I readily admit that I have made mistakes, like all

15   young physicians, and want to change in a way that will make me

16   a better doctor.  Indeed, each time I was placed on remediation,

17   subsequent evaluations largely validated that I addressed or

18   improved upon my remediation goals set forth.

19         I want to do better, and indeed I've strived hard to

20   do so, talking to others and soliciting feedback where this was

21   missing from my program director.  But in order to improve, I

22   need a clear definition of mistakes and how I may improve.

23         I'm shocked by the callous nature and actions of my

24   department.  Decisions like this have derailed my entire career,

25   and should at least be subject to due process.  My name has been

73

1   slandered, and it's extremely difficult, if not irreparable, to

2   fix.  My name is my profession as a physician, and it has been

3   unjustly tarnished.  What job prospects do I now have in this

4   area?

5           In summary, I have attempted to bring my concerns

6   before the appropriate local committees, but I've been

7   disappointed by their unwillingness to listen to my grievances,

8   and believe I have been denied due process.

9           Additionally, I have been subject to racially based

10  harassment by my program director, and I've been singled out for

11  disciplinary actions for minor infractions.  This pattern of

12  behavior has been evident throughout my PGY 2 year and my

13  program director who repeatedly calls me Achmed the Terrorist,

14  and makes constant insinuations about my cultural background,

15  repeatedly submitted documents to GMEC that are patently false

16  in order to attempt to demonstrate a pattern of unsatisfactory

17  behavior on my part.

18          He placed me on probation only six weeks into my PGY

19  2 residency based on several unsubstantiated allegations.

20  Requests for clarification of those allegations were denied, and

21  I have been unable to get any independent verification of these

22  allegations.

23          My program director has gone out of his way to

24  attempt to discredit me in front of other faculty members,

25  alleging improper care despite clear evidence to the contrary,

74

1   including from other faculty and residents.  He has further

2   alleged deficiencies in my knowledge base, despite evidence to

3   the contrary.  My training scores outpace that of my fellow

4   resident.  Needless to say, such constant harassment makes it

5   nearly impossible for me to focus on my education and my patient

6   care.

7              My program director is continuing to present false

8   statements to GMEC.  For example, in one case, he alleged

9   improper care of a trauma patient.  I was not involved in that

10  patient's initial resuscitation, but was called to assist after

11  the patient had been in the ED for over three hours.

12             Many of these allegations did not involve me at all.

13   My program director refused to ask for my side of the story, in

14  complete violation of and in complete disregard for the

15  hospital's policy.  He turned over factually incorrect

16  complaints to the GMEC for my suspension.  I was denied fair

17  hearing and due process.  Most egregious were the multiple times

18  I asked for documentation of the allegations of poor care, and

19  they and Kathy Stevens refused to turn over these documents.

20             I have, each time, protested to Kathy Stevens, but

21  to no avail.  In fact, my previous request for a grievance

22  council was denied.

23             Additionally, I was denied the chance to engage in

24  regularly assigned rotations at the VA beginning in January, and

25  this prevented me from being educated on a rotation that all

75

1   other residents are assigned to.  It also denied me the

2   opportunity to get an unbiased evaluation of my performance by

3   the orthopedic staff at the VA.

4           It is noteworthy that this program has an attrition

5   rate well above the national average, taking only two residents

6   a year, the smallest in the nation, and now potentially losing a

7   third resident in the past four to five years, a fact they seem

8   proud of, and my program director emphasized only six weeks into

9   his residency -- my residency.

10          The actions of my department recently culminated

11  with them moving for my termination.  I am very disappointed and

12  concerned, since their behavior has been unethical, deceitful,

13  and illegal.  I am not confident in the checks and balances of

14  the hospital when the department chairman and program director

15  can regularly violate hospital policy and when my chairman

16  assures me of the outcome of a GMEC meeting before any

17  proceedings have ever occurred.

18          Importantly, it is noteworthy that this program is

19  currently being investigated by the ACGME for work hour

20  violations and lack of resident supervision.  I implore you to

21  help me in this situation.  Please help me get due process and

22  investigate this pattern of targeted unfair behavior.  I have

23  worked hard and sacrificed much to become an orthopedic surgeon,

24  and I feel that those entrusted with my education have reneged

25  on their commitment.

76

1          Thank you.

2          MS. HILL:  Committee members, do you have

3    questions for Dr. Irani?

4          UNIDENTIFIED FEMALE:  Dr. Irani, how would you

5    address the contention that you've been repeatedly counseled and

6    you've failed to make any change in your behavior?

7          DR. IRANI:  Well, I think the one point that came up

8    with the evaluation of my intern year -- and you saw the

9    selection of them -- those were all in the first half.  And Dr.

10   Jones and Dr. Bynoe, I think, were correct.  I was new to the

11   area.  And I met with them.  They gave me very good feedback.

12   They said, "This is, you know, how you present yourself.  This

13   is how you come across."

14         And their subsequent evaluations showed marked

15   improvement, and I was able to make progress.  I think that

16   conversation was one of the best I've had in terms of feedback.

17   And I've never gotten that -- once I started orthopedic surgery,

18   all I got was it shows you lack insight, and I wasn't given any

19   guidance about how to do that.  And so I did have some issues

20   initially, but the -- and the reviews all showed improvement

21   towards the end of my intern year.

22         UNIDENTIFIED FEMALE:  Do you have any doubt about

23   your choice of orthopedics (indiscernible) profession?

24         DR. IRANI:  No.

25         UNIDENTIFIED FEMALE 2:  I have a question.

77

1              DR. IRANI:  Sure.

2              UNIDENTIFIED FEMALE 2:  This memorandum that was

3    dated August 15th --

4              DR. IRANI:  Is that in --

5              UNIDENTIFIED FEMALE 2:  It's in -- you both actually

6    have a copy of it.

7              DR. IRANI:  Okay.  Okay.

8              UNIDENTIFIED FEMALE 2:  But you said a couple of

9    times that you felt like you weren't given any specific mentions

10   of where your deficiencies were or what you could do to improve

11   them, but this outlines pretty well, in my opinion, you know,

12   what they felt were your deficiencies and the measures that you

13   should go to try and improve those things.  Did you not feel

14   like that that was adequate, or how would --

15             DR. IRANI:  So are you talking about the initial

16   letter -- August 15, '11?

17             UNIDENTIFIED FEMALE 2:  Yeah.

18             DR. IRANI:  So --

19             UNIDENTIFIED FEMALE 2:  What would you have added to

20   that to make it more clear?  What did you feel like needed to be

21   added to it?

22             DR. IRANI:  Sure.  So, you know, first of all, if

23   you look at stuff like, "He has repeatedly demonstrated poor

24   time management, frequent tardiness, required conference,

25   clinics," I was not aware of that.  I asked for specific

78

1  examples.  I was not provided any, but I decided I would work on

2  it.

3              Poor communication skills with patients, family,

4  peers, and attending physicians, again, this was the first time

5  I'd heard about it, so I said, "Where is this coming from?  I

6  haven't had anybody tell me this before.  Could you please tell

7  me what I'm doing wrong?  How am I going to improve?"  Again,

8  "It just shows you lack insight."

9              Effective prioritization of clinical duties, these

10  are all very broad statements.  Actually, some of this, what I'm

11  hearing today, I'm hearing for the first time.  I was not

12  provided any clarification.  I asked them -- I went to each of

13  them and I asked.  I was not provided any -- how I'm not

14  performing well in my clinical duties.

15              Additional duties for other residents, I took this

16  one most seriously, and I asked what he was -- what I was doing,

17  how was I creating -- what had I done wrong.  I got no examples

18  from Dr. Koon.  And that's when I spoke to each resident

19  individually and privately, and a lot of them said I go above

20  and beyond.

21              So, you know, those are the examples.  You know,

22  substandard evaluation, we talked about that.  I think I showed

23  improvement throughout the way.

24              And lack of attention to detail, so that was never

25  laid out, where that came from.  I got no feedback.  I went and

79

1    talked to the OR staff to try and get some feedback, and that's

2    how I was able to determine anything at that time.

3              So I think the broad statements, it's the first time

4    I'm hearing about them.  They're not explained to me where they

5    came from.  There are no examples given.  And maybe -- you know,

6    maybe I do lack insight, but if that's the case, I think I need

7    to be shown how I can improve, and that effort was not there.

8              UNIDENTIFIED FEMALE 3:  Can I clarify something?

9              DR. IRANI:  Sure.

10             UNIDENTIFIED FEMALE 3:  One of the patient anecdotes

11   -- and we've gotten into some pretty detailed discussions here

12   -- I think it's the hemophiliac where there was a question about

13   compartment syndrome.

14             DR. IRANI:  Yeah.

15             UNIDENTIFIED FEMALE 3:  You wrote that you went back

16   and wrote a note within 48 hours.

17             DR. IRANI:  Right.

18             UNIDENTIFIED FEMALE 3:  Do you think that was a

19   reasonable time period?

20             DR. IRANI:  I think -- I evaluated the patient, but,

21   as I said, I think I -- I should've put it in right there.  I

22   should've stopped with the patient and moved on to it.

23             UNIDENTIFIED FEMALE 3:  Have you admitted that to

24   anybody?

25             DR. IRANI:  Yeah.  The very first time I met I think

80

1  I said, "Here's where I went wrong."  In my initial meeting, I

2  think, you know, Dr. Koon said I admitted I made mistakes.  And

3  this time I just said, "Yeah, I should've just written --

4  stopped what I was doing right there, but I thought I'd bounce

5  back and do it again."  But that was probably not the best move.

6   But I think the -- I did evaluate the patient and I put the

7  note in afterwards.

8           UNIDENTIFIED FEMALE 3:  You do understand the

9  importance of that note?

10          DR. IRANI:  Right.  Yeah.

11          UNIDENTIFIED FEMALE 3:  So they would argue that

12  they've tried to point this sort of thing out to you and nothing

13  really changes.  How would you respond to that line of -- or

14  that sort of accusation?

15          DR. IRANI:  The accusation with response to the

16  hemophiliac patient?

17          UNIDENTIFIED FEMALE 3:  Well, in general that notes

18  not completed on time or your H&Ps -- Dr. Walsh alluded to the

19  fact that repeatedly where he explained (unintelligible) --

20          DR. IRANI:  So -- so -- yeah.

21          UNIDENTIFIED FEMALE 3:  -- missing.

22          DR. IRANI:  So those are specific examples.  And Dr.

23  Walsh himself admitted this.  This was the last week of my

24  rotations was when he finally sat down and went over the H&Ps.

25  The H&Ps have specific things about -- there's a preoperative

81

1  slip, and for a given surgery you've got to put length of

2  surgery, you've got to put what pre-op labs, what equipment.

3          And I can do stuff -- like a carpal tunnel, I know

4  that.  We've done a bunch of them.  I know all the equipment; I

5  know all the time; I fill it in.  But when it's something like a

6  tendon transfer, I fill out the name of the procedure.  I don't

7  know how long it's -- because I've never done this before, so

8  I'll leave that blank.  So there's skips.

9          And I asked the -- his secretary what to do, and she

10 just said, "Oh, Dr. Walsh fills in what you don't know at the

11 end."  So what I would do is I'd fill in as much as I would

12 know.  And that's why some of them would be complete -- carpal

13 tunnels, I can do that -- some of them are not complete.  I

14 don't know what tray sets you do when you do a tendon transfer

15 and you do something else.

16         And, again, this conversation happened the last week

17 of my rotation with Dr. Walsh, and he actually -- I didn't know

18 -- there's one form that goes to the scheduler, one form goes to

19 Richland, one form goes here.  Nobody explained that to me.  And

20 he admitted himself that he had never broken it down for me.

21         But once I think he explained it, I got some insight

22 into that.  But I think that would explain the perception that I

23 was jumping around, was the fact that I would just fill in what

24 I knew in some cases and others I'd leave blank.  And I was told

25 he'd fill them in at the end of the day.

82

1    UNIDENTIFIED MALE:  So in issues of this magnitude

2    spanning this kind of time frame in a complicated business like

3    the one that we operate in, it's going to be impossible to get

4    complete agreement --

5    DR. IRANI:  Sure.

6    UNIDENTIFIED MALE:  -- on what happened.  There's

7    pretty good documentation here of some issues.  I would just

8    like to hear from you why you think we're here.  What ultimately

9    led us to this day?

10    DR. IRANI:  I -- you know, I think it snow-balled.

11    You know, I think initially there was something and -- I had to

12    make corrections at some point Dr. Koon (indiscernible).  The

13    spotlight is on you and things snowball.

14    You know, when I first came here, it was a rocky

15    start, and I was new to the area.  I think that the evaluation

16    that Dr. Koon laid out where I started the year rather rough,

17    and then at the end of that evaluation it will say "He showed

18    great improvement by the end of it and was a great resident."

19    I think that pattern went through initially with my

20    intern year.  And unfortunately when I got to orthopedics, I

21    wasn't -- it's -- I wasn't given the feedback or direction that

22    I came to expect.  It was a different environment.  I think Dr.

23    Koon became frustrated because I kept asking questions.  I

24    wanted more, and perhaps maybe I do lack insight, but I was

25    never given the opportunity to gain that.

Irani, M.D., Afraaz R. v.                                  Termination of Dr. Irani, Committee Meeing
Palmetto Health-Richland                                                            April 30, 2015

                                                                                              83

1              And I think at that point -- and, you know, I mean,

2    to be honest, Dr. Koon declared it was his personal vendetta

3    when I sent that e-mail.  He was upset and he kept on

4    referencing that he would fire me on the spot.  I think at that

5    point there was a very marked change in the tone, and it became

6    very personal, unfortunately.  I think we got off on the wrong

7    foot, and oftentimes in surgery that's all it takes,

8    unfortunately.

9              I think I've made my mistakes.  I'm not perfect.

10   But I think if you look at the remediation -- each of the

11   letters, if you notice, things aren't often repeated.  The

12   showing up late, stuff like that, all that stuff --

13   more work for other residents -- doesn't carry over to

14   follow-up letters, which shows I was striving to do better.

15             But I think at that point it just sort of

16   snow-balled and they had made up their mind that it wasn't --

17   like Dr. Koon and Walsh, it was a personal decision that they

18   weren't happy with my care and weren't able to work with me.

19             UNIDENTIFIED FEMALE:  Did you worry about the

20   patients?  I mean, like the one who called and said her knee was

21   (indiscernible).  Was there any -- I mean, do you worry about

22   your patients?

23             DR. IRANI:  Yeah.

24             UNIDENTIFIED FEMALE:  Do you worry about how they're

25   doing?

84

1            DR. IRANI:  And, I mean, that -- and that spine

2   patient, like I -- I mean, I texted Grabowski after I was off of

3   the service.  I said, "How is she doing?"  And that patient,

4   like -- you can talk to her -- she loves me.  She -- I think I

5   had great interaction with her.  You know, I've come back at

6   9:00 p.m. at night to post-op check my patients -- sometimes

7   gone home and come back.

8            Yeah, I definitely worry about my patients.  We all

9   do.  As physicians, we can't unless we don't.  So, absolutely.

10  I think that's part of being a physician.  It's part of

11  working hard.

12            UNIDENTIFIED FEMALE:  I mean, I agree you wonder

13  how we get there.  So a lot of what's in here (unintelligible)

14  lack of empathy or caring, that's not something I can say

15  "go buy a textbook and read it."  That's something that

16  you've got to have innately within you.

17            DR. IRANI:  Uh-huh.

18            UNIDENTIFIED FEMALE:  Do you feel that you have that

19  as a quality?  Because it doesn't always appear that you've

20  demonstrated it.

21            DR. IRANI:  I think where that came from were two

22  nursing complaints, is where it came from.  In that first

23  complaint, I learned that I need to demonstrate better.  I think

24  Dr. Bynoe and Dr. Jones also said this.  They said they had no

25  problems with my care, but you need to work on demonstrating it.

Irani, M.D., Afraaz R. v.                                    Termination of Dr. Irani, Committee Meeing
Palmetto Health-Richland                                                              April 30, 2015

85

1

2            And I think that's a little bit of my personality.

3   I think I'm a little bit laid back.  But if you -- again, you

4   are welcome to poll the ER nurses, and I'll stand by whatever

5   they say; you're welcome to poll the floor nurses, and I'll

6   stand by what they say.

7            But I think -- the ancillary staff gets along with

8   me.  I think -- you can pick patients I have seen.  You know,

9   I'll come back and see patients when they're off service.  I

10  really think that I have had positive patient interactions.  A

11  lot of them remember me.  This spine patient, you can call her

12  up.  I haven't talked to her in months.  You can call her up

13  right now and ask her what she thinks of me, and I'll stand by

14  whatever she says.

15           UNIDENTIFIED MALE:  Prior to this period in your life,

16  DR. Irani, have you ever had any other issues with professionalism,

17  empathy, accountability?  Have those ever come up in your

18  professional life?

19           DR. IRANI:  No, sir.

20           MS. HILL:  Any questions from the committee?  Dr.

21  Koon and Dr. Walsh, do you have questions for Dr. Irani?

22           DR. WALSH:  Afraaz, some of what I'm asking you

23  about is in response to what you were just saying a moment ago.

24  You mentioned that with the first patient with the arm injury,

25  you said you did not perform a fracture reduction.  Did you

86

1  touch the patient's arm?

2          DR. IRANI:  I touched the patient's arm as I did my

3  --

4          DR. WALSH:  What did you do?

5          DR. IRANI:  I did a sensory exam.

6          DR. WALSH:  Did you lift the patient's arm?

7          DR. IRANI:  I don't recall.  I did not do a

8  reduction.  I don't know if I lifted the arm or not.

9          DR. WALSH:  Okay.  One of the statements the nurses

10 made was that you had lifted the arm in a callous fashion, and

11 it was the same way that the former attending (unintelligible)

12 moved the patient's arm in a similar fashion.

13         You know, moving on the next (unintelligible) trauma

14 female 375.  Why do you think there's such an enormous

15 disconnect between your perception of events and the nurses'

16 perception?  You've shot holes in what they've had to say, but

17 why do you think that there's this, you know, 180-degree

18 diametrically opposed perception of what happened down there?

19         DR. IRANI:  I'm not disagreeing the patient's care

20 was not substandard.  I don't think the patient should've been

21 in the ER for three and a half hours without fractures being

22 reduced.

23         DR. WALSH:  I'm talking about during your management

24 of the patient, not prior, because the three and a half hours

25 was before you got there, right?

87

1          DR. IRANI:  Right.

2          DR. WALSH:  So I'm talking about the period of your

3    management, which is what they came to us about.  Why do you

4    think there's such a huge gap?

5          DR. IRANI:  Could you reference some specific

6    examples of their complaints?

7          DR. WALSH:  Well, their whole description of how you

8    manage the patients -- I don't want to sit them

9    side-by-side.

10          DR. IRANI:  Sure.

11          DR. WALSH:  Basically, you've challenged what

12    they've said about what took place.

13          DR. IRANI:  Right.  I mean, you can look in the

14    chart.  There is documentation of local and there's

15    documentation of systemic anesthesia, and there's -- I believe

16    there's documentation from Dr. Toussant about the pain.  So if

17    there's an allegation of pain management, that's in the chart.

18    That's one thing.  What else is there?

19          DR. WALSH:  I guess what I'm getting at is from a

20    more philosphical standpoint.  Why is a picture painted there

21    that is totally opposite of what you're describing?  You're

22    describing something that's totally opposite.  And let me ask a

23    follow-up question.  Was the trauma attending Dr. Jones called

24    to the trauma bay?

25          DR. IRANI:  I wasn't there when he was there.  I

Irani, M.D., Afraaz R. v.                          Termination of Dr. Irani, Committee Meeing
Palmetto Health-Richland                                              April 30, 2015

88

1    don't know.

2                DR. WALSH:  Was he called to the trauma bay?

3                DR. IRANI:  I don't know.

4                DR. WALSH:  You and I have talked about that,

5    Afraaz.

6                DR. IRANI:  I don't know.  You said he was, but I

7    don't know.  I wasn't there.  I never saw him down there.

8                DR. WALSH:  All right.  Are you aware that he was

9    called to the trauma bay?

10               DR. IRANI:  You told me that.  That's all I know.

11               DR. WALSH:  Are you aware of any other instances

12   where the orthopedic traumatologist was called to the trauma

13   bay because of concerns by the nurses about the resident's

14   care?

15               DR. IRANI:  No.

16               DR. WALSH:  I'm not either.  We've referenced a

17   number of patient scenarios here, two of Dr. Grabowski's

18   patients, the one who was in the staff clinic that there was

19   a discrepancy between when he asked you to get the MRI and

20   when you were actually going to get it; the second one, the

21   patient with the threatened paralysis.  There was the man with

22   the arm injury that I just referenced.  There was trauma female

23   375.  There was my patient with the pain medicine.  And there

24   was the hemophiliac with a possible compartment syndrome.

25               Is it your contention that in every single one of

89

1   those cases that you rendered appropriate care and that the

2   things that you're being challenged about your management by the

3   variety of people involved here today are -- they're all wrong?

4            DR. IRANI:  I don't think it's a black-and-white,

5   wrong-or-right.  I don't think -- the question can be asked that

6   way, I think there's always improvement in patient situations.

7            DR. WALSH:  Well, let's talk about mine in

8   particular that we haven't spent much time with.  This patient

9   had a shoulder reconstruction.  She phoned you -- or her husband

10  phoned the night of her surgery.  And can you just recount what

11  you told her regarding pain medicine?

12           DR. IRANI:  I asked her if there was any weakness,

13  pain, paresthesias, and assessed her if there were any worrisome

14  signs, and I was worried about a surgical complication.  And he

15  said -- she said no, so I okayed five more of oxycodone.

16           DR. WALSH:  Five more pills or five more milligrams?

17

18           DR. IRANI:  Five milligrams more.

19           DR. WALSH: And I talked to you about what the

20  patient explained to me.  Do you recall that?

21           DR. IRANI:  I do -- not completely.  I mean, if you

22  want to refresh my memory.  I guess.

23           DR. WALSH:  Well, when she -- the nurses told me

24  that she had pain problems the night before.  I called her, and

25  she said that yes, she had called the night before, that she was

90

1    having pain, and that she said you told her to take five

2    5-milligram pills of oxycodone every three hours.

3             And I said, "No.  Probably what happened there was

4    that -- that's 25 milligrams.  He probably said two 5-milligram

5    pills," giving you the benefit of the doubt.  She said, "No.  I

6    specifically asked, 25 milligrams, five pills?" and he said yes.

7     So is it your contention that she wasn't telling the truth?

8             DR. IRANI:  No.  I think you asked what happened on

9    the phone call, so the phone call happened and I okayed five

10   milligrams.  There was a second phone call, right -- there was a

11   second phone call that happened about an hour and a half, two

12   hours later.  The patient was now at 20 milligrams Q4, which is

13   Dr. Mazoue's standard naïve narcotic post-op shoulder pain dose.

14    So now she was at the naïve dose.

15            And she called again, and I again assessed her, just

16   as Dr. Hoover said -- any changes?  Said no.  And I okayed five

17   more.  And he said, "Where do I go from here?"  I said, "Just as

18   we were doing, you continue to dose as we were doing -- as we

19   had done.  We'll spread it out over four hours."

20            Now, this was like a three o'clock in the morning

21   conversation.  I can understand there was miscommunication.  And

22   from this -- after this, when patients call me, I have them

23   repeat it back to me, because I want to make sure this won't

24   happen again.

25            I don't know if the miscommunication happened on my

91

1   part or her part, but that's also why I told Dr. Justin Walker

2   the following morning on rounds -- I said, "Look, you're on the

3   service.  This patient called.  Here's what happened.  If you

4   can just follow-up and make sure everything went according to

5   plan.  Here's what I thought I told her."  And that's why the

6   call was made the following morning.

7           DR. WALSH:  Another question is, have I interacted

8   with you at all regarding possibilities for your future after

9   orthopedics?

10          DR. IRANI:  Sure.  Yes.

11          DR. WALSH:  Can you explain that to the committee?

12          DR. IRANI:  You just said if I don't want to do

13  orthopedics that -- and you want to do industry that here are

14  some options, if you want to do something else.

15          DR. WALSH:  Okay.  Who's actually the first

16  attending that brought it up to you?

17          DR. IRANI:  Dr. Guy.

18          DR. WALSH:  Dr. Guy.  So in terms of your statements

19  about the fact that your future has been irreparably harmed, et

20  cetera, there's actually been steps by the orthopedic faculty to

21  possibly help you in that area; is that true?

22          DR. IRANI:  I think it would be a smooth exit if I

23  quit and went to something else.  Yes.

24          DR. WALSH:  Out of curiosity, who is the third

25  resident you're referring to that is possibly being fired or

92

 1    investigated?  Who is that?

 2              DR. IRANI:  What are you talking about?  What do you

 3    mean?

 4              DR. WALSH:  You said the attrition rate in the

 5    program, if there was three residents --

 6              DR. IRANI:  Right.

 7              DR. WALSH:  -- there was one two years ago that was

 8    terminated for lying, your situation.  Who is the third person?

 9              DR. IRANI:  Oh, there was a person who went to

10    family medicine, right?

11              DR. WALSH:  There's a person who withdrew.  There

12    was never --

13              DR. IRANI:  Right.

14              DR. WALSH:  -- any academic issues.

15              DR. IRANI:  I understand, but that's still an

16    attrition rate.  When we talk about attrition rate, we talk

17    about people leaving a program, whether it be for personal

18    reasons, conflicts, or being forced out.  And my point was when

19    we talk about attrition in programs, they always say how many

20    people leave a given program?  And our rate is significantly

21    higher than the national average.

22              DR. WALSH:  And after your suspension, prior to your

23    termination, Dr. Hydorn (ph) and Dr. Hoover saw you in the

24    hospital at approximately 11:00 p.m. or 11:30.

25              DR. IRANI:  Uh-huh.

93

1              DR. WALSH:  Can you explain what you were doing

2    there?

3              DR. IRANI:  I was cleaning out my locker.

4              DR. WALSH:  At 11:00 p.m.?

5              DR. IRANI:  Yeah.  I was on the way back -- I forget

6    from where, but -- I think I was riding back from Ohio.

7              DR. WALSH:  And you said the program was under

8    investigation by the ACGME regarding duty hours.

9              DR. IRANI:  Uh-huh.

10             DR. WALSH:  Why would you say that?

11             DR. IRANI:  Just stating the facts.

12             DR. WALSH:  Okay.  Can you elaborate on that?

13             DR. IRANI:  ACGME is investigating duty hour

14   violations with our program.

15             DR. WALSH:  How are they aware of possible duty hour

16   violations in our program?

17             DR. IRANI:  You can ask them that.  I don't know.

18             DR. WALSH:  Okay.  Is it true that you sent them a

19   list of potential duty hour violations --

20             DR. IRANI:  I don't -- I don't --

21             DR. WALSH:  -- used our department's duty hour

22   violations?

23             DR. IRANI:  I don't see the purpose of this.  I

24   contacted ACGME to express my issues with the program.

25             DR. WALSH:  So a moment ago you said you didn't know

94

1    how they'd be aware of duty hour problems, and now you're

2    not wanting to talk about it?

3              DR. IRANI:  Well, I don't -- they did not disclose

4    to me what exactly they went to, if there was other stuff.  I

5    don't know all that's entailed.  I don't know.

6              UNIDENTIFIED FEMALE:  (unintelligible).

7              DR. IRANI:  Pardon?

8              UNIDENTIFIED FEMALE:  (unintelligible).

9              DR. WALSH:  He's the one that brought it up, and

10   that's the reason I wanted to ask.

11             DR. IRANI:  I just wanted to state the facts.

12             DR. WALSH:  I'm asking questions for the facts, too.

13

14             DR. IRANI:  Okay.

15             DR. WALSH:  And last questions.  Have you accessed

16   the hospital computer system after your suspension and prior to

17   your termination?

18             DR. IRANI:  Yeah.  I had notes that needed to be

19   signed.

20             DR. WALSH:  No other reasons?

21             DR. IRANI:  I don't recall all the reasons I

22   accessed the hospital system.

23             DR. KOON:  I've got a couple questions.

24             DR. IRANI:  Sure.

25             DR. KOON:  One is regarding that hemophiliac patient

95

1 | that was admitted on the 1st of March.

2 |         DR. IRANI:  Yeah.

3 |         DR. KOON:  And that admission occurred one day after

4 | you had a very long discussion with Dr. Grabowski and Dr. Voss

5 | on Tuesday regarding your treatment and encounter with the spine

6 | patient, who loves you; is that correct?

7 |         DR. IRANI:  It was a morning I was on call, so that

8 | evening.

9 |         DR. KOON:  So you met with Drs. Grabowski and Voss

10 | on Tuesday the 28th; is that correct?

11 |         DR. IRANI:  To be honest, I don't recall the exact

12 | date.  That sounds about right, but I don't recall the exact

13 | day.

14 |         DR. KOON:  There are e-mail documentations from Dr.

15 | Grabowski and Dr. Voss stating that you met with them on Tuesday

16 | the 28th.  Would you agree to that?

17 |         DR. IRANI:  It could be.  It's probably true.  I

18 | just don't remember off the top of my head, if you're asking me.

19 |  I'm sorry, I don't.  I don't recall that day, but --

20 |         DR. KOON:  Are you aware that Dr. Voss wrote a

21 | memorandum of record regarding that meeting that you had with

22 | Dr. Grabowski and (unintelligible)?

23 |         DR. IRANI:  Probably.  I don't recall specifically.

24 | Is it in the packet?

25 |         DR. KOON:  It's in 81.

96

1            DR. IRANI:  Okay.

2            DR. KOON:  About halfway down Dr. Voss says,

3    "Ultimately, Dr. Irani did admit shortcomings in terms of his

4    assessment and compulsiveness about thorough patient

5    examination, but I think he failed to have any true insight into

6    the level of concern that we would expect that he would

7    demonstrate in the care of a patient who was at risk for being

8    paralyzed."  Do you see that statement?

9            DR. IRANI:  Uh-huh.

10           DR. KOON:  Do you agree with that statement?

11           DR. IRANI:  I think I understood there was a risk

12   for long-term paralysis, and that's why I called my attending.

13   If the question is did I understand the gravity of the situation,

14   I think I would say yes.

15           DR. KOON:  Would you agree that Dr. Voss and Dr.

16   Grabowski did not think you demonstrated that gravity --

17           DR. IRANI:  I don't know -- I don't know what their

18   thoughts were.  I mean, that might be their interpretation.

19           DR. KOON:  I'll read it again.

20           DR. IRANI:  Okay.

21           DR. KOON:  "Ultimately, Dr. Irani did admit

22   shortcomings in terms of his assessment and compulsiveness about

23   thorough patient examination, but I think that he failed to have

24   any insight -- any true insight into the level of concern that

25   we would expect that he would demonstrate in the care of a

97

1  patient who was at risk for becoming paralyzed."  Do you see

2  that sentence?

3            DR. IRANI:  Yeah.

4            DR. KOON:  And it continues, "It seemed

5  Dr. Irani's description of the events were consistent, but there

6  failed to be a recognition or a demonstration of true care for

7  the patient's condition in this situation."  Do you see that

8  sentence?

9            DR. IRANI:  Uh-huh.

10           DR. KOON:  Do you agree that that was

11  Dr. Grabowski's and Dr. Voss' concern, and that's why he put

12  that in this statement?

13           DR. IRANI:  I don't know how you want me to

14  interpret Dr. Voss' letter any different than you can, sir.  But

15  if that's what -- I believe that was his contention if that's

16  what he's writing.

17           DR. KOON:  How about the next-to-the-last sentence,

18  "My sense and that of Dr. Grabowski was that there is a failure

19  of recognition of the amount of care required for orthopedic

20  spine patients"?  Do you see that sentence?

21           DR. IRANI:  I do.  Yes, sir.

22           DR. KOON:  Do you now recognize that Dr. Grabowski

23  and Dr. Voss had very grave concerns that you failed to

24  recognize the amount of care required for an orthopedic spine

25  patient?

98

1           DR. IRANI:  That's their statement.

2           DR. KOON:  Did you subsequently enter a delayed

3    clinical note in the computer about your evaluation of that

4    patient?

5           DR. IRANI:  Uh-huh.

6           DR. KOON:  How long after that did it occur?

7           DR. IRANI:  I think within 72 hours -- or 48 or 72

8    hours.

9           DR. KOON:  So they met with you on the 28th of

10   February and you went into the computer and put that note in

11   there on the 1st of March; is that correct?

12          DR. IRANI:  I don't recall the exact dates, but if

13   that's what the computer shows, it's probably correct.

14          DR. KOON:  Can you give me a little -- can you tell

15   me why you went into the computer 72 hours later and put a

16   delayed clinical note in the computer?

17          DR. IRANI:  They had requested documentation.

18   Initially, I was told my documentation was inaccurate, so I

19   could not put a note in.  But they still wanted documentation,

20   so I decided I should put it in.  I don't think it would cause

21   any harm.

22          DR. KOON:  You say that -- you said that your

23   documentation was inaccurate?

24          DR. IRANI:  No, I didn't say that.  They wanted more

25   documentation afterwards.  I was told that my physical exam was

99

1  incorrect; however, after looking back, I know my physical exam

2  was the exact same one Dr. Grabowski had actually written down

3  at a six o'clock note, therefore accordingly I could write down

4  the same thing.

5          DR. KOON:  Actually, your note did not include any

6  measure of neurosensory testing or strength testing; is that

7  correct?

8          DR. IRANI:  Which note?

9          DR. KOON:  Your note of the morning of the -- the

10 morning the patient went to surgery.

11         DR. IRANI:  Do you have it?

12         DR. KOON:  I do not have it in front of me.  No.

13         DR. IRANI:  I'd have to see it.  I don't know.  I

14 thought I did.  That's per Dr. Grabowski's note.  My --

15         DR. KOON:  So when you called Dr. Grabowski and --

16 you told him your findings he said, "That's inaccurate.  Don't

17 write it in the chart"; is that correct?

18         DR. IRANI:  He said, "That doesn't make any sense."

19

20         DR. KOON:  Okay.  What else did he say?

21         DR. IRANI:  I don't recall the entire conversation.

22 It's been a couple months ago.

23         DR. KOON:  Did he say, "Are you sure?"

24         DR. IRANI:  I don't recall.

25         DR. KOON:  Did he ask you that three times?

100

1              DR. IRANI:  I'm not sure.

2              DR. KOON:  Well, he said, "Are you sure?  Because

3    that's a profound change from her pre-op -- from her

4    postoperative status."  Does that ring a bell?

5              DR. IRANI:  I don't recall the exact conversation,

6    but I know I told him my physical exam findings.  He was

7    concerned and came by and examined the patient.  I don't know

8    what exactly he did or did not say, but I do know I conveyed to

9    him that there was a grave finding, so --

10             DR. KOON:  So you're not sure exactly what he said

11   on the telephone?

12             DR. IRANI:  I know that he told me my physical exam

13   doesn't make sense.

14             DR. KOON:  But there have been other telephone

15   conversations that you remember in detail and that you

16   documented for us today; is that correct?

17             DR. IRANI:  I don't know which -- what you're

18   referring to.  Could you please explain?

19             DR. KOON:  I have a couple questions about the

20   hemophiliac patient.

21             DR. IRANI:  Okay.

22             (Audio cuts out briefly)

23             DR. KOON:  Dr. Voss and Grabowski had a long

24   discussion with you about documentation and thoroughness and so

25   forth, and then the following day at 11 -- the next day at 11:00

101

1  p.m. there was a patient who was admitted to the hospital for

2  hemophilia and an enlarging and painful calf.

3          You had a written note dated 29 February at 11:00

4  p.m., and you dictated a note at midnight on the 1st of March.

5  Dr. Wood wrote a note at one o'clock in the morning -- 1:06 and

6  directed you to see the patient at four o'clock the next

7  morning.  And that e-mail is Page 82.  "I finished writing my

8  consult note" -- one, two, three -- four paragraphs up.

9          "I spoke with Dr. Irani at 1:15 a.m. and informed

10  him that the patient needed to be admitted, and I would like the

11  patient checked in a few hours.  I then went to further clarify

12  to give a more specific time frame of 4:00 p.m.  I left the ER

13  where the patient was at approximately 1:15.  I informed Dr.

14  Irani of my physical findings and told him that if the patient

15  had worsening of symptoms that I wanted to be contacted

16  immediately."  Is that your -- is that consistent with your

17  recollection of those events that night?

18          DR. IRANI:  Sounds about right.

19          DR. KOON:  Okay.  Subsequently in the chart there's

20  a note from SCOA at 2:29 a.m. and another note at 3:39 a.m.  And

21  then the next note in the chart is a chief resident note at 6:05

22  on the 1st of March.  Did you have any notes that were missing

23  in the computer from your dictated note at midnight through the

24  Dr. Wood's note at 6:05?

25          DR. IRANI:  So the question is do I have any missing



102

1    notes in the chart?

2                DR. KOON:  Right.  Is there -- if that's -- if

3    that's my --

4                DR. IRANI:  No.  I think --

5                DR. KOON:  -- findings in the record, are there any

6    notes in there that I'm missing that you wrote?

7                DR. IRANI:  Dr. Koon, I think we already addressed

8    this, that ideally I would've written the note at that time.  I

9    examined the patient at midnight.  The morning exam was at 6:00

10   a.m.  An interval check, Dr. Wood told me 4:00, but I did it at

11   2:30, which was close to the halfway mark.

12               I had to apologize to Dr. Wood because I did not do

13   it at 4:00 a.m. like you had asked me to, and I left it at that.

14    And I think we already talked about that I think we all make

15   mistakes, and I've made my share of mistakes.  I did not deny

16   that to you when I met with you.  I did not deny that to Dr.

17   Walsh when I met with him.  I think that's part of learning.

18               DR. KOON:  So you did not follow your chief

19   resident's instructions that night; is that correct?

20               DR. IRANI:  I did an interval exam.

21               DR. KOON:  Okay.  And you subsequently put a delayed

22   clinical note in the computer and that note was put in on the 3rd

23   of March at 12:20 that night; is that correct??

24               DR. IRANI:  I don't know exactly what time it was,

25   but if that's what the computer shows, I'm sure it's accurate,

103

1   sir.

2         DR. KOON:  And you documented a physical exam that

3   you performed at 2:30 in the morning on the 1st of March; is

4   that correct?

5         DR. IRANI:  If that's what the record shows, sir.

6         DR. KOON:  Did you oversleep that morning?

7         DR. IRANI:  I was late to rounds.  I think that's

8   it.  I apologized.

9         DR. KOON:  Was that one of the remediation measures

10  that we had put in place?

11        DR. IRANI:  In December you told me that I was doing

12  fine in terms of my being on time.  You said you would let me

13  know if I'm being tardy.  That was at our November 21st meeting.

14

15        UNIDENTIFIED FEMALE:  Dr. Koon, are these questions

16  for clarification based on his testimony?

17        DR. KOON:  Yes, ma'am.

18        DR. IRANI:  I would also add that I'd been late to

19  rounds three times my PGY 2 year.  All patients have always been

20  seen.

21        DR. KOON:  You were very specific very early in your

22  presentation that I boasted about firing Dr. Lamoreaux.  Do you

23  remember that conversation?

24        DR. IRANI:  I remember you boasting about firing Dr.

25  Lamoreaux.

Irani, M.D., Afraaz R. v.                          Termination of Dr. Irani, Committee Meeing
Palmetto Health-Richland                                                     April 30, 2015

104

1              DR. KOON:  And I used that word, "firing Dr.

2    Lamoreaux"?

3              DR. IRANI:  I don't know which exact words you used.

4     I did not quote you in my testimony.  I simply said you boasted

5    about firing him.  Whether it's firing or termination or trying

6    to get rid of -- that's why I didn't quotes when I addressed

7    you.

8              DR. KOON: If I did fire him, would that be an

9    accurate statement?  If I said -- if I was bragging about firing

10   Dr. Lamoreaux, would that be an accurate statement?

11             DR. IRANI:  I don't get -- I don't see what you're

12   getting at.

13             DR. KOON:  Dr. Lamoreaux, in fact, was not fired.

14   He finished his residency in a delayed fashion.

15             DR. IRANI:  Right.  Right.  Because he --

16             DR. KOON:  So if I said that he was fired, then

17   that's an inaccurate statement on my part.

18             DR. IRANI:  Could've been.  I don't know.  Could've

19   been.  I know Dr. Lamoreaux had to file a lawsuit in order to

20   get reinstated and you refused to educate him when he came back.

21

22             DR. KOON:  So you know that I refused to educate

23   him.  How would you know about that?

24             DR. IRANI:  Word gets around.

25             DR. WALSH:  I would add this: "incorrect

105

1  word -- "gets around" apparently."   That's not true.

2              MS. HILL:   I'm not sure this is pertinent to

3  today's decision.

4              DR. WALSH:  Okay.

5              DR. IRANI:  Okay.

6              (Unintelligible simultaneous speaking)

7              DR. WALSH:  That's fine.

8              DR. KOON:  But Dr. Irani stated that I boasted about

9  firing a former resident, and so I'm trying to clarify the fact

10 that if I boasted about that, it would've been inaccurate on my

11 part because he wasn't fired.  So for that -- for that comment to

12 have veracity, there would have to be some type of documentation.

13             You also admitted that -- earlier in your statement

14 you admitted to duty hour violations; is that correct?

15             DR. IRANI:  I'm sorry.  Come again.

16             DR. KOON:  You admitted to duty hour violations?

17             DR. IRANI:  Yeah.  And I wrote that in my initial

18 complaint addressed to Kathy Stevens, so, Dr. Koon, I imagine

19 (unintelligible).

20             DR. KOON:  I've got a log of the New Innovations

21 documentation report regarding duty hour violations.  Were those

22 reported in the New Innovations?

23             DR. IRANI:  (No verbal response).

24             DR. KOON:  They are?  So every duty violation that

25 you've ever had is included in that chart?

106

1          DR. IRANI:  I would say when all residents are

2    violating duty hours and all residents in New Innovations show

3    they are within duty hours, I think it's a system-wide problem.

4    It's not just me.  If it was just me, it would be a problem.

5    But all residents across the board are doing this, and it's a

6    system-based problem.  I brought it up to you earlier with that

7    e-mail.

8          DR. KOON:  So when you violated a duty hour, that is

9    not going to show up -- if you violate duty hour regulations, is

10   that going to show up on your documentation or your duty hour on

11   New Innovations?

12         DR. IRANI:  I'd have to review it.  I know there are

13   some in there.  I'll have to go through --

14         DR. WALSH:  Well, are you telling the truth, what

15   you're putting in New Innovations or not?

16         DR. IRANI:  Let me just say that all the residents

17   are allegedly following according to New Innovations, but the

18   violation rate is the same across all the junior residents.  So

19   if you can say -- if we're forced to be doing something, I don't

20   know if you can say we're reporting things inaccurate when we

21   don't really have a choice as residents.

22         DR. WALSH:  So are you saying that not only you are

23   not telling the truth in New Innovations but all the other

24   residents are?

25         DR. IRANI:  I'm not saying we're not telling the

107

        1

1   truth.  I'm saying that violations are occurring across all

2   residents.

3              DR. KOON:  Isn't it true that you wrote the ACGME in

4   Chicago and documented a 33 to 50 percent rate of duty hour

5   violations in post-call residents?

6              DR. IRANI:  I don't see how that's relevant.

7              DR. WALSH:  Did you do it or not?

8              DR. IRANI:  We have ACGME violations.  I think

9   that's ACGME's decision.

10             DR. KOON:  He's stating that he's violated duty

11  hour violations, but they're not recorded.  Now, he's saying

12  that all the residents do it.  And so he says everybody does it,

13  so I'm trying to establish how many of my residents are doing

14  that that I don't know --

15             DR. IRANI:  So if I give you --

16             DR. KOON: -- that.  He wrote a letter to the ACGME

17  and said 50 percent of my post-call residents are violating duty

18  hours.  So I --

19             DR. WALSH:  (unintelligible).  He's the one who

20  stated the entire program was under investigation.

21             DR. KOON:  I wasn't going to bring up the ACGME.

22             DR. IRANI:  Well, I think it's important to know

23  that a third party thinks that there's significant violations

24  of this program.

25             DR. KOON:  And why does a third party think there's

108

1  significant violations of this program?

2          DR. IRANI:  That's going to be their investigation.

3

4          DR. KOON:  Is their investigation going to be based

5  on the letter that you wrote to Chicago?

6          DR. IRANI:  I don't know what their investigation is

7  based on.  They might have other things.  I don't see how this is

8  relevant, ma'am.

9          DR. KOON:  Okay.

10          MS. HILL:  I don't think we're going to agree on an

11  answer to this and (unintelligible).

12          DR. KOON:  All right.  You also said that there was

13  false documentation in statements presented at the GMEC.  Were

14  you there at the GMEC meeting?

15          DR. IRANI:  No, but I saw a letter presented to the

16  GMEC.

17          DR. KOON:  Okay.  So you're -- you having knowledge

18  of false statements presented -- being presented at the GMEC is

19  not correct; is that a fair statement?

20          DR. IRANI:  If the letter that I received was not a

21  representation of what was presented at the GMEC, then I have

22  been misled.  But if that was the letter presented, then I stand

23  by what I said earlier.

24          DR. KOON:  You also stated in your presentation that

25  I said that I would have fired you on the spot.  Is that true?

Irani, M.D., Afraaz R. v.                           Termination of Dr. Irani, Committee Meeing
Palmetto Health-Richland                                                   April 30, 2015

1    Is that a true comment of what you said?

2              DR. IRANI:  Yes.  I said it in my statement, yes.

3              DR. KOON:  And you appear to be very knowledgeable

4    of the ACGME requirements for programs.  Is that something that

5    I would be able to do as a program director?

6              DR. IRANI:  I don't know all the ACGME guidelines

7    about how to fire to a resident.

8              DR. KOON:  Okay.  You also stated that he, meaning

9    me -- "he changed the level of remediation."  Is that a correct

10   statement?

11             DR. IRANI:  If it's what I said, yes, sir.

12             DR. KOON:  All right.  But in reality, that's not a

13   decision for the program director to do.  As stated in our

14   memorandum of record, these are faculty decisions that are

15   forwarded to the GMEC for approval.  These aren't individual

16   decisions.  Is that a fair statement?

17             DR. IRANI:  I don't know what happened at a faculty

18   meeting, Dr. Koon.

19             DR. KOON:  Okay.  You brought up a patient of Dr.

20   Grabowski's in a staff clinic where he wanted to get an MRI and

21   instructed you to do that, and you stated that you spoke

22   with the staff, couldn't get that done, spoke to the chief

23   resident Dr. Wood, and then you got the MRI that day.  Is that

24   true? Is that your recollection of those events?

25             DR. IRANI:  Radiology confirmed that we would get

110

1   the MRI today if I sent them across the street, and I sent them

2   across the street that day.  To be honest, I don't -- you know,

3   if something happened along the way and it didn't happen, I

4   don't know.  But to my recollection I got him an appointment, I

5   sent him across the street.  My understanding is he did get it

6   done that day.  His appointment was made.

7           DR. KOON:  Okay.  And when confronted -- when you

8   had that version of your story, what were Dr. Grabowski's and

9   Dr. Wood's response to you during that faculty meeting when you

10  presented your side of the story?

11          DR. IRANI:  I don't know if you have it written

12  down, but I don't recall exactly all the details.  I mean, I

13  think I would be just guessing.

14          DR. KOON:  You also stated that in February when you

15  came back on -- came back on Level 2 remediation, you said that

16  you were unsupervised on the service.  Could you explain that

17  comment?

18          DR. IRANI:  I just meant there was no senior

19  resident.  Oftentimes when I've worked, the programs have a

20  senior and a junior resident on the service.  I was the sole

21  resident, and that was my first spine patient I'd ever done as a

22  resident.

23          DR. KOON:  But you did have senior-level and

24  attending coverage for your care of that patient, correct?

25          DR. IRANI:  Well, there's always senior-level

111

1  residents and always attendings in the hospital.  The only

2  attending -- the only other person on that service was my

3  attending, Dr. Grabowski.

4          DR. KOON:  You also stated in your presentation that

5  you were illegally targeted.  Can you explain what you mean by

6  illegally targeted?

7          DR. IRANI:  I think I laid out some discrepancies

8  about my treatment as opposed to my colleague's and some of the

9  behaviors exhibited.  And I think, you know, any sort of

10 unfair treatment lends itself to that.

11         DR. KOON:  Okay.  You also stated multiple times

12 that you were being punished for doing right or punished for

13 doing wrong.  Can you give me an example of when you did

14 something right and you were punished?

15         DR. IRANI:  Well, to my understanding, you said the

16 trauma case managers complained about my behavior.  I've talked

17 to them.  And if you guys want to talk to them as well and get a

18 neutral third opinion -- they thought I did a great job and they

19 keep asking me to come back.  I thought I did -- I thought from

20 feedback that they personally gave me that I did a good job in

21 their rotation, but it was used as another incidence of poor,

22 substandard care.

23         DR. KOON:  You also stated several times in your

24 presentation that due process for the last 18 months has been

25 lacking.  Before your letter to the ACGME, was there any e-mail,

1   letter, any type of communication with anybody relating to your

2   lack of or unfair due process?

3            DR. IRANI:  I don't think I said over the past 18

4   months.  I think one of the examples I gave in my statement was

5   in regard to my filing a grievance within ten business days and

6   that being denied.  I think that happened in January -- fairly

7   recently.

8            DR. KOON:  So other than that one episode, is there

9   any other area where you've been lacking due process?

10           DR. IRANI:  I haven't done a thorough examination.

11  I just presented some -- what I thought were the easiest and

12  quickest-to-grab examples today.

13           DR. KOON:  You also mentioned that you brought your

14  concerns to appropriate local committees.  Can you tell me which

15  committees you brought that to, when you did it, how many, and

16  if there's any documentation of any of that?

17           DR. IRANI:  Sure.  I think the appropriate

18  committees is outlined in the grievance council.  There's Step

19  1.1, 1.2.  You go to yourself, Dr. Walsh, Stevens.  Then you go

20  to the grievance council.  I think I've outlined. I don't

21  think those addressed the issues.

22           DR. KOON:  Okay.  You also mentioned that all the

23  other residents are assigned to operate at the VA.  Are you

24  aware that starting in July none of the residents are going to

25  the VA?

Irani, M.D., Afraaz R. v.                              Termination of Dr. Irani, Committee Meeing
Palmetto Health-Richland                                                        April 30, 2015

113

1          DR. IRANI:  Last I heard it was still up in the air.

2   I don't know the details.  That could be the case.

3          DR. KOON:  It is the case.

4          DR. IRANI:  Okay.

5          DR. KOON:  So -- that's it.

6          MS. HILL:  Dr. Walsh?

7          DR. WALSH:  Just one other question.  Afraaz, Have

8   you tape-recorded anybody's conversations other than the one you

9   did with Dr. Abel?

10          DR. IRANI:  With Dr. Abel?  No.

11          DR. WALSH:  So no other conversations with

12   residents, attendings, or anybody else --

13          DR. IRANI:  No.

14          DR. WALSH:  -- you've tape-recorded?

15          DR. IRANI:  No.

16          DR. WALSH:  You've never left your phone on so

17   somebody else could listen or --

18          DR. IRANI:  No.

19          DR. WALSH:  -- anything like that?

20          DR. IRANI:  No.

21          MS. HILL:  Dr. Koon, you now have up to 5 minutes

22   give a concluding statement.

23          DR. WALSH:  I guess what I would say in conclusion

24   is -- I summarized things before at the end of our statement, and

25   I guess what I would say is that I think that Afraaz's responses

Irani, M.D., Afraaz R. v.                    Termination of Dr. Irani, Committee Meeing
Palmetto Health-Richland                                          April 30, 2015

114

1  here today speak for themselves regarding defensive, evasive

2  story-telling, avoidance of responsibility, patently false

3  statements that there's paperwork evidence to -- I'm really

4  shocked that you would make, quite frankly -- to the contrary.

5          And I guess I would end it like we began it.  This

6  is not somebody we wanted to fail.  This is somebody who I

7  wanted to succeed.  We worked hard to make him succeed.  You

8  know, we don't go through this kind of process in order to just

9  get rid of somebody, so to speak.

10          There was a point when Afraaz was on my service when

11  my wife stopped by the office and I was in examining a patient

12  or something like that and he said something to the effect of

13  being nervous about how things were going or something.  My wife

14  said, "No, no.  You've got to understand.  Dr. Walsh likes you.

15  I mean, you know, he enjoys having you on the service."  And I

16  did.  I mean, he's making mistakes and so forth, but these are

17  the things residents make, and those are things that I was

18  addressing.

19          The things that this is all about here has to do

20  with bigger issues that surfaced elsewhere and then began to

21  surface in one example we've already talked about was with one of

22  my patients.  And so, you know, the notion that there was -- in

23  some way there was a witch-hunt or personal issue or, you know,

24  some reason that we were -- Dave or I or anybody else on the

25  faculty was trying to drum somebody out of the program is just

Irani, M.D., Afraaz R. v.                              Termination of Dr. Irani, Committee Meeing
Palmetto Health-Richland                                                        April 30, 2015

115

1  -- it's bogus and I think that the documentation here speaks for

2  itself, that we were trying to do the right thing, trying to do

3  it in a fashion that was restorative.  There's a number of memos

4  in here from Dr. Stevens, another one from me.  It specifically

5  states that the whole process is not punitive, that it's

6  something that is -- the goal is remediation and return to the

7  program.  And, in fact, when it seemed like things weren't going

8  to work that way -- you know, he alluded to the one resident who

9  withdrew from the program a number of years ago.  He withdrew

10 as a PGY 2.  He basically came to us and told us that his

11 -- he had gone into orthopedics because his father and his older

12 brother were orthopedic surgeons.  He was doing it to please

13 them, and he concluded he didn't really want to do it, and he

14 entered family practice and completed a residency here, so --

15           DR. KOON:  Sports medicine.

16           DR. WALSH:  -- in sports medicine, ironically enough.

17

18           The -- so from the standpoint of there being sort of

19 a -- somehow a negative culture within the department that's

20 trying to get rid of residents, there isn't anything that

21 supports that whatsoever.  So --

22           MS. HILL:  (indiscernible) concluded?  Okay.  Dr.

23 Irani, you have up to five minutes to give your concluding statement.

24           DR. IRANI:  I think I already laid out my case in my

25 opening statement.  This has been treatment that's been

Irani, M.D., Afraaz R. v.                    Termination of Dr. Irani, Committee Meeing
Palmetto Health-Richland                                          April 30, 2015

116

1  substantiated by my co-residents.  It's been treatment that has

2  been different than compared to my co-residents.  It's been

3  derogatory and racially-based insensitive comments directed at

4  me.  I think I lay out all my stuff in the opening statement,

5  and -- again, I -- I'm encouraged I'm speaking in front of a

6  neutral third party.  Anything here you have questions about,

7  I'm more than happy to substantiate everything I told to you.

8  You're more than welcome to poll the trauma case managers, poll

9  any of the nurses and get their opinions of what they think

10  about me.  I'll stand by that.  I care about my patients.  I

11  care about my patients a lot.  I'd come back at night, checked

12  up on them; calling up on them.  And, you know, my goal

13  (indiscernible) orthopedic surgeon.  That was my goal when I

14  came here.

15         Dr. Walsh mentioned he was excited.  I was excited

16  to come here to operate, to get some hands-on experience.  I

17  loved it.  When I came back in February, I loved it.  You know,

18  I jumped in.  I created a handbook and I was excited to be back.

19   I was really happy.  And I just feel like the people charged

20  with my education haven't made that possible, so -- thank you

21  for your time.  I know you guys have places to be.

22  (indiscernible) probably later than you expected, so thank you.

23         MS. HILL:  Committee members do you have enough

24  information?  All right.  Just for the record, I just (indiscernible).

25         DR. IRANI:  Sure.

Irani, M.D., Afraaz R. v.                          Termination of Dr. Irani, Committee Meeing
Palmetto Health-Richland                                              April 30, 2015

117

1            MS. HILL:  All right.  Thank you for your time this

2    afternoon.  This (indiscernible).

3            (WHEREIN, the files were concluded.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

118

1          CERTIFICATE OF NOTARY PUBLIC

2               STATE OF MISSOURI

3          I, Sherri L. Jolley, within and for

4    the State of Missouri, do hereby certify that the tape

5    transcription in the witness whose testimony appears in the

6    foregoing transcript in the caption hereof and thereafter

7    transcribed by me; that said transcript is a record of the

8    testimony given by said witness; that I am neither counsel for,

9    related to, nor employed by any parties to the action; and

10   further that I am not a relative or employee of any counsel or

11   attorney employee of any counsel or attorney employed by the

12   parties hereto, nor financially or otherwise interested in the

13   outcome of the action.

14

15

16                          *Sherri Jolley*

17                    _____

18                      Sherri L. Jolley

19

20

21

22

23

24

25

Irani, M.D., Afraaz R. v.
Palmetto Health-Richland

Termination of Dr. Irani, Committee Meeing
April 30, 2015

---

**$**

**$800**
40:1

---

**1**

**1**
5:7 6:21 25:18
31:16 44:10 53:22
54:13

**1.1**
112:19

**1.2**
112:19

**1.5**
65:8

**10**
12:9 31:16,17

**10th**
39:23

**11**
10:11 65:15 77:16
100:25

**11:00**
60:19 92:24 93:4
100:25 101:3

**11:30**
92:24

**12**
5:10 7:11,12 8:10
32:11

**12:20**
102:23

**13**
8:14

**14**
31:16

**15**
14:10 77:16

**15th**
16:20 17:25 77:3

**17**
6:21 9:11

**174**
31:17

**18**
11:17 12:12
111:24 112:3

**18(A)**
31:16

**180**
10:23

**180-degree**
86:17

**19**
11:17 12:11 13:3

**1992**
4:19

**1999**
30:5

**1:06**
101:5

**1:15**
101:9,13

**1st**
22:16 69:2 95:1
98:11 101:4,22
103:3

---

**2**

**2**
9:10,12 10:8,9,11
14:19 16:9 18:24
25:18 36:4,7 37:11
40:8 47:17,18
50:13 54:24 56:21
64:8 67:8,21
73:12,19 76:25
77:2,5,8,17,19
103:19 110:15
115:10

**20**
11:14 31:2 90:12

**2002**
4:18,20 6:9 30:5

**2006**
4:17

**2010**
5:12 9:4 47:10

**2011**
9:10 10:6 22:12,16

**2015**
31:16,17

**20th**
11:17

**21st**
53:21 103:13

**22**
14:10

**223**
5:7

**22nd**
18:3

**23**
8:5 16:20 17:22

**24**
17:24

**24th**
35:19,20 37:13

**25**
90:4,6

**25th**
26:2

**26**
10:14 18:1

**26th**
51:21

**27**
18:25

**27th**
26:2

**28**
18:1

**28th**
26:9 95:10,16 98:9

**29**
21:12 101:3

**2:00**
61:1

**2:29**
101:20

**2:30**
39:9 43:5 61:1
69:7 102:11 103:3

---

**3**

**3**
19:4 27:25 28:1,4
29:25 36:7 40:8
44:25 54:13 62:12
67:12 79:8,10,15,
18,23 80:8,11,17,
21

**30**
21:25 31:16,17

**31**
22:7

**31st**
36:3

**32**
22:7

**33**
23:20 107:4

**34**
24:10

**35**
24:10,22

**36**
27:1

**375**
28:12 32:11,24
71:19 86:14 88:23

**38**
29:4

**3:39**
101:20

**3rd**
34:21 102:22

---

**4**

**4**
19:7 31:17

**40**
29:4

**41**
29:5

**44**
29:5

**45**
29:6

**46**
29:6

**47**
31:3

**48**
31:12 69:11 79:16
98:7

**4:00**
101:12 102:10,13

**4:30**
39:9

---

**5**

**5**
7:4 15:10 17:8
19:14 44:10 47:21
58:11 113:21

**5-milligram**
90:2,4

**50**
107:4,17

**51**
32:5

**52**
32:5

**53**
32:9

**54**
34:15

**55**
34:15

**56**
34:19

**57**
34:19

**58**
35:10

**59**
35:16

**5th**
26:24 28:11

---

**6**

**6**
7:24 16:6 19:17

**61**
64:1

**67**
45:25

**68**
35:16

**6:00**
102:9

**6:05**
101:21,24

**6th**
37:10 44:22

---

**7**

**7**
16:8 19:21

**70**
36:2

**71**
36:4,9

**72**
98:7,15

**76**
36:4 37:8

**7th**
28:11,16

---

**8**

**80**
38:15 49:4

**80-year-old**
12:24

**81**
95:25

---

Irani, M.D., Afraaz R. v.
Palmetto Health-Richland

Termination of Dr. Irani, Committee Meeing
April 30, 2015

**82**
101:7

**83**
39:15

**84**
39:15

**86**
39:15

**8th**
28:17

---

**9**

---

**9:00**
84:6

---

**A**

---

**a.m.**
60:19 101:9,20
102:10,13

**aback**
56:25 67:10

**Abel**
15:12,14 27:16
113:9,10

**abide**
19:12 26:9 63:22

**ability**
43:11

**abnormal**
38:13

**about-face**
54:10

**absolutely**
44:3 53:9 84:9

**abundantly**
62:21

**academic**
17:14 25:8 36:8
40:14 92:14

**academy**
37:12

**accept**
22:21,22 34:6
51:16

**accepting**
32:25 34:12 72:13

**accessed**
94:15,22

**accidentally**
66:11

**accordance**
40:6

**account**
30:13

**accountability**
85:17

**accountable**
7:25

**accounts**
28:21 29:4,5,6,9
30:16

**accurate**
102:25 104:9,10

**accusation**
18:12 22:5 57:22
80:14,15

**accusations**
34:24

**accused**
13:19 17:9 18:20

**ACGME**
37:6 49:7 75:19
93:8,13,24 107:3,
8,16,21 109:4,6
111:25

**ACGME'S**
107:9

**Achmed**
51:7 71:8 73:13

**acknowledge**
3:1 26:21

**act**
66:3 72:7

**acted**
46:7

**actions**
26:22 63:19 72:23
73:11 75:10

**active**
53:12,22

**activities**
70:20

**actual**
44:20

**acutely**
29:20 42:16

**adapt**
68:21

**add**
30:4 32:17 62:9
66:9 103:18
104:25

**added**
77:19,21

**addition**
10:1

**additional**
3:24 7:4 46:8 60:1
63:14 78:15

**additionally**
59:5 73:9 74:23

**address**
22:25 76:5

**addressed**
24:21 61:11 72:17
102:7 104:6
105:18 112:21

**addressing**
114:18

**adequate**
14:15 77:14

**administrator**
21:18

**admission**
53:2 95:3

**admit**
16:3 27:20 38:17
70:3,8 72:7,14
96:3,21

**admits**
19:15

**admitted**
27:15 53:19 69:5
79:23 80:2,23
81:20 95:1 101:1,
10 105:13,14,16

**admittedly**
48:1,4

**affect**
28:5

**afforded**
57:18

**Afraaz**
6:7,11,24 9:8 20:4,
12 21:1 22:9 23:5,
21 24:12 25:23
29:1 32:18 33:2
34:4,20 35:11 37:7
40:25 41:3 42:6
85:22 88:5 113:7
114:10

**Afraaz's**
4:14 113:25

**afraid**
52:5 55:18 59:3
60:14 72:2

**afternoon**
2:3 28:18 46:19
117:2

**agree**
17:1 84:12 95:16

**96:10,15 97:10**
108:10

**agreed**
17:7 28:8

**agreement**
27:20 28:21 29:18
82:4

**agrees**
19:18

**ahead**
2:4 9:13

**aid**
35:13

**air**
113:1

**alarming**
67:22

**albeit**
49:20

**alcohol**
31:6

**Alice**
12:7

**allegation**
57:10 60:3 63:2
87:17

**allegations**
26:1 40:10,12,14,
18,19 48:6,18
50:10 52:24 55:7
63:17 73:19,20,22
74:12,18

**alleged**
40:16 48:20 49:9,
13 58:8 65:1 74:2,
8

**allegedly**
106:17

**alleging**
73:25

**Allie**
2:20

**allotted**
36:11

**allowed**
5:14 17:15

**alluded**
32:3 80:18 115:8

**alludes**
22:1

**amnestic**
23:12

**amount**
13:20 97:19,24

**amputation**
14:2,14

**ancillary**
56:1 61:23 85:7

**anecdotes**
79:10

**anesthesia**
23:11 61:19 63:13
87:15

**ankle**
42:12

**answers**
45:23

**antibiotics**
11:3

**anybody's**
113:8

**apologize**
70:3 102:12

**apologized**
70:5 103:8

**apology**
44:4

**apparent**
67:22

**apparently**
105:1

**appeal**
24:8 36:9,10

**appealed**
24:7

**appeals**
22:1,2,5 31:23
40:11

**appeared**
17:3 24:1 37:25
66:3

**applicant**
5:2,10

**appointment**
31:12 34:8,17
110:4,6

**appreciated**
66:15

**appreciates**
19:1

**appreciative**
35:25

**approached**
60:9

**appropriately**
36:23 49:9

**approval**



16:17 17:24
109:15

**approve**
17:13

**approved**
16:23 17:23 36:15
39:23 62:13

**approving**
12:23

**approximately**
69:5 92:24 101:13

**April**
39:24

**area**
73:4 76:11 82:15
91:21 112:9

**areas**
8:7 28:21

**argue**
80:11

**argued**
17:5

**argumentative**
26:11,18

**Arlene**
28:18

**arm**
85:24 86:1,2,6,8,
10,12 88:22

**arms**
41:23

**Army**
4:20

**arrival**
63:6

**arrived**
47:9 61:3

**arthroplasty**
15:25 68:23

**ascertaining**
62:23

**assessed**
61:16 63:13 89:13
90:15

**assessment**
38:1 45:12 96:4,22

**assigned**
5:23 24:13 53:3
68:8 74:24 75:1
112:23

**assist**
31:10,11 74:10

**assisting**
2:15,18

**assure**
53:10

**assured**
62:3

**assures**
75:16

**astounding**
25:7

**attaches**
35:7

**attacks**
71:11,12

**attempt**
35:14 36:20 53:6
62:23 73:16,24

**attempted**
36:9,10 40:21 62:7
64:22 73:5

**attempting**
22:13 58:8

**attempts**
40:9 48:12 53:8

**attend**
5:23 54:15

**attended**
5:4

**attending**
5:18 7:10 14:21
25:8 26:10 31:20
37:4 40:7 41:9
42:25 43:25 47:13
49:12 51:11,20
54:22 55:22 56:10,
15,19,21 57:3,15
58:23 61:1 63:22
69:16,18,21 78:4
86:11 87:23 91:16
96:12 110:24
111:2,3

**attending's**
56:24 57:7

**attendings**
6:2,17 7:1 9:23
18:22 19:8 31:20
42:3 53:5 60:16
68:9 69:22 111:1
113:12

**attendings'**
18:8

**attention**
16:9 19:22 20:9,14
33:1,7 41:19 78:24

**attracted**
47:11

**attrition**

75:4 92:4,16,19

**audio**
64:7 100:22

**August**
4:10 12:10 14:10
16:20 17:25 18:3
54:6 77:3,16

**authoritatively**
57:6

**avail**
74:21

**average**
67:20 75:5 92:21

**avoid**
72:3

**avoidance**
114:2

**avoided**
63:9

**awake**
29:12

**awards**
5:5

**aware**
7:8 23:3 29:20
31:22 33:22 34:24
77:25 88:8,11
93:15 94:1 95:20
112:24

**Aww**
42:20 43:2

---

**B**

**B's**
17:10 18:18

**back**
3:7 9:14 11:17
12:2 25:5,19 27:25
28:10 32:1,23
35:14 36:5 37:3,10
44:22,25 47:8
54:3,6 56:4 61:21
68:14,19 79:15
80:5 84:5,7 85:3,9
90:23 93:5,6 99:1
104:20 110:15
111:19 116:11,17,
18

**backdrop**
42:9

**background**
72:13 73:14

**backwards**
11:16

**badly**
30:22,25

**balances**
75:13

**banks**
65:11

**Baptist**
68:7

**base**
8:24 50:12 67:17,
18,19 74:2

**based**
18:8 19:19 30:2
71:1 73:9,19
103:16 108:4,7

**basic**
36:18

**basically**
11:7,21 15:16 18:8
21:10 23:21 24:19
26:12 27:14 28:4
30:1 33:9 34:1
36:11 37:25 42:16
45:3,21 87:11
115:10

**basis**
26:16

**bay**
61:5 87:24 88:2,9,
13

**bear**
51:13

**bed**
61:24

**began**
5:17 22:11 40:25
50:4 52:4 54:2
114:5,20

**begin**
37:2,3

**beginning**
31:17 33:6 35:2
36:8 47:9 67:7
74:24

**behalf**
46:20,25

**behavior**
22:19,20,24 30:23
43:8 47:5 51:3
60:3 64:2 71:15
72:5 73:12,17
75:12,22 76:6
111:16

**behaviors**
111:9

**bell**
100:4

**benefit**
90:5

**big**
25:20 41:22 42:11

**bigger**
114:20

**binder**
53:9

**bit**
6:12 9:13 12:2
19:21 45:24 85:2,3

**black-and-white**
36:25 89:4

**blank**
81:8,24

**blood**
29:14

**board**
106:5

**boast**
47:19

**boasted**
53:15 103:22
104:4 105:8,10

**boasting**
103:24

**bogus**
115:1

**book**
15:14 40:2

**born**
5:3 72:8

**both-bone**
10:23

**bothered**
57:11 64:14

**bottom**
4:24 18:6,12 23:2
24:22 35:12

**bounce**
80:4

**bragging**
104:9

**brain**
50:25

**brand-new**
6:16 10:8,9

**briefed**
2:3

**briefly**
14:11 20:2 37:14



Irani, M.D., Afraaz R. v.
Palmetto Health-Richland

Termination of Dr. Irani, Committee Meeing
April 30, 2015

100:22

**bring**
73:5 107:21

**bringing**
58:14

**broached**
63:5

**broad**
78:10 79:3

**Brock**
2:20

**broken**
81:20

**brother**
41:22 115:12

**brother's**
55:4,9

**brought**
20:9,13 26:18
31:24 47:22 54:5
61:20 91:16 94:9
106:6 109:19
112:13,15

**Brown**
2:18,21

**bunch**
81:4

**burden**
19:10

**business**
2:16,17 16:19
21:18 64:6 65:6,
13,15,18 66:1 82:2
112:5

**busy**
9:19 46:22,24

**buy**
84:15

**Bynoe**
7:11 76:10 84:24

—————————

**C**

**Cadalano**
12:8

**calf**
38:18 101:2

**California**
5:3 28:9 72:9

**call**
15:7,12,23 33:19
38:16,23 55:5 56:6
60:23 61:25 62:17,
18 63:9 85:11,12
90:9,10,11,22 91:6

95:7

**called**
15:15 26:4 37:8
38:1 39:1 42:19
47:16 53:13 59:6,
12,20 60:21 69:2,
16 74:10 83:20
87:23 88:2,9,12
89:24,25 90:15
91:3 96:12 99:15

**calling**
27:13 58:23 71:8,
23 116:12

**callous**
72:23 86:10

**calls**
27:10,15 40:13
59:23 73:13

**cancel**
33:16

**cancelled**
31:12 33:24

**cancelling**
34:8

**care**
5:24 6:8 8:2,13,18
9:7,20 10:6 11:12
14:8,13 15:10
17:10 18:7,13,18
19:14 20:18 21:5,
6,8,11 23:4,16
24:25 25:12 27:22
28:15 29:10 30:2,
9,19 32:11 37:14
42:11 43:2,12,13
49:18,20 52:12,14,
15,20 56:10,12,14
57:2,15 58:14 62:2
64:25 69:4 71:4
73:25 74:6,9,18
83:18 84:25 86:19
88:14 89:1 96:7,25
97:6,19,24 110:24
111:22 116:10,11

**cared**
28:14

**career**
66:5 68:2 72:24

**careers**
66:5

**carefully**
54:21

**cares**
15:11

**caring**
7:6,21 69:11 84:14

**Carolina**
4:19 54:25

**carpal**
81:3,12

**carried**
56:10,15

**carry**
83:13

**case**
3:10,16 4:12 5:19
60:6 71:15 74:8
79:6 111:16 113:2,
3 115:24 116:8

**cases**
30:15,22 36:23
81:24 89:1

**casual**
21:6 30:24

**causing**
38:4

**CD**
64:8

**cellulitis**
16:1

**cetera**
91:20

**Chad**
47:19

**chair**
4:6 32:13

**chairman**
47:6 62:1,15
75:14,15

**challenged**
87:11 89:2

**challenging**
54:19

**chance**
6:16,18 64:13
74:23

**change**
21:21,24 41:24
61:24 72:15 76:6
83:5 100:3

**changed**
21:23 54:13 68:6
109:9

**changing**
21:10

**charged**
66:7 116:19

**chart**
69:23 87:14,17
99:17 101:19,21

102:1 105:25

**check**
13:9 31:2,8 38:22
43:15 66:10 84:6
102:10

**checked**
39:8,9,11 101:11
116:11

**checkered**
22:19

**checks**
75:13

**Chicago**
107:4 108:5

**chief**
6:5 8:15 9:4,6
21:18 24:11 26:11,
17 27:4 38:21
39:1,7 50:4 56:4,6
58:17 60:21
101:21 102:18
109:22

**choice**
29:21 76:23
106:21

**chronic**
38:11

**chronological**
11:15

**circle**
3:7

**circumstances**
65:23

**cite**
53:24 54:2

**cited**
58:14 71:17

**cites**
64:2

**claims**
60:11

**clarification**
48:12,17 53:24
73:20 78:12
103:16

**clarify**
79:8 101:11 105:9

**cleaning**
61:23 93:3

**clear**
48:17 50:19 55:17
57:23 58:4 59:24,
25 60:15 62:21
72:3,22 73:25
77:20

**clinic**
19:24 24:12 25:25
26:10,13 28:17
36:23 38:6 55:22
65:12 88:18
109:20

**clinical**
15:4 54:14 78:9,14
98:3,16 102:22

**clinics**
14:25 19:6 77:25

**close**
102:11

**closed**
15:11,18 17:8
65:12

**closure**
71:21

**co-residents**
58:1 116:1,2

**Coast**
47:9 72:10

**coincide**
54:22

**colleague**
58:21 67:22

**colleague's**
111:8

**colleagues**
9:25 63:21 70:21
71:18

**collegial**
33:14

**combative**
33:15

**combination**
36:17

**comment**
7:5,19 105:11
109:1 110:17

**comments**
5:18 7:5,10,22
9:12,16 15:2 51:6,
8 52:1 63:10 68:17
71:9 116:3

**commitment**
75:25

**committee**
2:3,10,11,18,23
3:11,17,23 16:14
17:13,25 31:9
36:12,16 39:23
44:5 70:24 76:2
85:20 91:11
116:23



Irani, M.D., Afraaz R. v.
Palmetto Health-Richland

Termination of Dr. Irani, Committee Meeing
April 30, 2015

committees
40:21 73:6 112:14,
15,18

common
57:18 62:21 64:16

commonly
33:2

communicates
21:10

communicating
24:4

communication
14:20 18:25 19:3
51:16 53:7,8 78:3
112:1

communicator
24:5

compared
116:2

compartment
38:19,20 69:6,8
79:13 88:24

compassion
11:19 14:12 18:7
49:18

compassionate
30:24

competencies
67:11,16,23

complain
27:21

complainant
64:5

complained
17:2 111:16

complaint
64:6,23 84:23
105:18

complaints
6:4 35:4 48:5
51:24 56:14 60:4
64:23 65:4 67:17
74:16 84:22 87:6

complete
19:9 21:15 36:22
37:4 74:14 81:12,
13 82:4

completed
53:2 72:9 80:18
115:14

completely
7:6 21:6 47:25
89:21

completing
5:23 24:13 35:13

37:5

complex
23:3 42:11

complicated
82:2

complication
89:14

compromised
68:10

compulsiveness
96:4,22

computer
94:16 98:3,10,13,
15,16 101:23
102:22,25

conceded
65:20

concern
9:18,19 14:21
37:25 38:18 96:6,
24 97:11

concerned
29:20 33:18 37:21
47:4 75:12 100:7

concerns
5:17 6:9 9:11 10:4
11:18 14:8 27:11
40:21 73:5 88:13
97:23 112:14

conclude
48:10

concluded
60:18 115:13,22
117:3

concludes
44:5

concluding
3:21,22 113:22
115:23

conclusion
8:19 40:24 45:23
59:22 113:23

conclusions
40:3 45:14

concur
30:12

condition
38:24 43:1 97:7

conduct
64:2

conference
77:24

conferences
14:25 19:5

conferred
59:13

confident
7:6 75:13

confidential
2:24 3:2 58:2

confirmed
27:14 109:25

conflict
51:11 56:19

conflicts
92:18

confrontational
54:17 57:22

confronted
26:11,17,19 70:2,5
110:7

confused
47:21 48:1 57:1,13
60:13 64:19

confusing
50:14 52:16

confusion
65:21

conscious
61:18 63:15

consent
63:1

consents
63:4

considerably
43:14

considered
3:2

consistency
8:17

consistent
12:14 30:16 97:5
101:16

consisting
52:1

constant
73:14 74:4

constantly
21:9 58:23 71:22

constituted
63:1

constructive
66:22

consult
101:8

contact
34:9 62:7

contacted
34:7 62:14 93:24
101:15

contention
76:5 88:25 90:7
97:15

context
30:10,14 34:11
35:23 41:25 42:7
45:24

continually
19:5

continue
7:24 21:3 90:18

continued
6:9 17:19 24:12
27:21,22 51:5

continues
97:4

continuing
51:19 68:1 74:7

contradict
56:23

contradicted
57:6

contrary
73:25 74:3 114:4

contribute
45:14

conversation
33:25 34:1 76:16
81:16 90:21 99:21
100:5 103:23

conversations
40:13 100:15
113:8,11

conveyed
100:8

copies
4:14

copy
17:20 62:11 64:24
65:3 77:6

core
8:22,24

correct
44:1 48:20 53:4
68:15,25 76:10
95:6,10 98:11,13
99:7,17 100:16
102:19,23 103:4
105:14 108:19
109:9 110:24

corrected
20:14 53:25

correcting
20:12

corrections
82:12

could've
7:11 42:21 104:18

council
36:10 65:5,15 71:1
74:22 112:18,20

counsel
66:14

counseled
25:11 42:23 76:5

counseling
16:11,12 41:20
46:1

count
65:12

Countless
20:13

couple
4:23 32:20 49:14
77:8 94:23 99:22
100:19

coupled
52:24

courtesy
57:18 62:21 63:9
64:16

coverage
110:24

covered
23:1

cowardly
71:12

create
52:22 54:23 68:21

created
48:24 116:18

creating
52:25 55:8 78:17

culminated
75:10

cultural
72:4 73:14

culture
115:19

curiosity
91:24

curious
54:5

current
24:18 69:10 72:11



Irani, M.D., Afraaz R. v.
Palmetto Health-Richland

Termination of Dr. Irani, Committee Meeing
April 30, 2015

**cut**
31:16

**cuts**
64:8 100:22

_____

**D**

_____

**dangerous**
29:2

**date**
28:5 95:12

**dated**
14:10 77:3 101:3

**dates**
98:12

**Dave**
4:11,16 23:1 40:25
114:24

**Dave's**
30:5

**David**
4:7

**Davinder**
2:21

**day**
5:20 10:16 11:5,10
13:9 14:6,8 20:7,
10 24:17 37:15
38:16,25 41:3
42:25 51:17 55:5,
10 56:2,3,4,7
57:11 58:10 59:12,
15 64:6 65:10,13,
16,18 81:25 82:9
95:3,13,19 100:25
109:23 110:2,6

**days**
10:11 13:6 16:5
23:19 32:11 49:14
52:10,15 54:21,22,
24 55:6,13,16
56:20 65:6,15 66:1
112:5

**deadline**
65:22

**deadlines**
65:23

**deal**
6:7 15:16

**dealing**
71:4

**dean's**
5:6

**debridement**
11:2

**deceitful**
63:10 75:12

**December**
6:9 53:23 67:4
103:11

**decency**
62:17,21

**decided**
22:3 26:15 30:3
51:14,15,16 68:21
69:10 78:1 98:20

**decision**
2:10 13:13 16:2
21:25 29:19 30:2
35:11 50:12 56:21
62:17 65:7 83:17
105:3 107:9
109:13

**decisions**
50:5 71:1 72:24
109:14,16

**declared**
56:18 57:6 58:6
83:2

**decompression**
37:15

**deeply**
71:9

**defensive**
26:18 43:7 45:24
50:20 114:1

**deficiencies**
17:5 24:2 47:24
48:9,20 53:5,24
54:1 67:10 68:16,
25 71:17 74:2
77:10,12

**deficient**
67:23

**defined**
65:18

**definition**
72:22

**degrade**
58:8

**degree**
16:12

**degrees**
10:24

**delayed**
98:2,16 102:21
104:14

**demeaning**
67:5

**demonstrate**
15:3 18:6 73:16
84:23 96:7,25

**demonstrated**
14:12,19,24 77:23
84:20 96:16

**demonstrates**
18:24

**demonstrating**
84:25

**demonstration**
97:6

**denied**
24:8 49:1 60:11
65:4,24 66:25
73:8,20 74:16,22,
23 75:1 112:6

**deny**
102:15,16

**department**
4:17 10:15 17:12
27:24 32:13 36:1
39:12 40:17 47:7
49:17 59:16 60:3,
25 61:21 72:24
75:10,14 115:19

**department's**
93:21

**departmental**
39:22

**derailed**
72:24

**derogatory**
51:5 71:5 116:3

**describe**
4:23 25:24 29:3

**describing**
87:21,22

**description**
87:7 97:5

**descriptions**
30:23

**designee**
64:5

**desire**
7:21 8:23

**detail**
16:9 19:22,23
41:20 78:24
100:15

**detailed**
22:10 28:20 36:16
79:11

**details**
4:12 42:24 56:16

110:12 113:2

**determine**
79:2

**determining**
29:25

**develop**
4:13 9:1 14:9

**developed**
15:25

**developing**
42:17

**development**
70:16

**deviated**
57:2

**diagnoses**
46:6

**diametrically**
86:18

**Diane**
10:13,14,15 11:13,
18,20,25 12:3,14,
20,24 13:10,16,19
17:9 18:20 28:19
35:6

**dictated**
24:24 52:20 101:4,
23

**dictating**
20:16

**dictation**
52:8,10,13

**dictations**
20:7

**difference**
22:23 38:23 45:13

**differences**
72:5

**differently**
40:19 56:22 58:16
72:7,8

**difficult**
27:5 73:1

**difficulty**
37:5

**dinner**
41:21

**DIO'S**
65:7

**direct**
3:13,19 23:15 52:1
56:19 63:22

**directed**
14:7 60:23 69:20,

21 70:3 101:6
116:3

**direction**
50:17 82:21

**directions**
26:10 52:2 68:22

**director**
4:7,17 12:8 21:17
47:6 48:21 49:5
50:18 51:3 53:11
62:10,16 64:5
66:14 72:21 73:10,
13,23 74:7,13
75:8,14 109:5,13

**disagree**
19:17

**disagreeing**
86:19

**disagreements**
35:21

**disappointed**
49:20 50:4 73:7
75:11

**disappointing**
50:14,15

**disarray**
61:3

**discharge**
25:3 52:20

**disciplinary**
73:11

**discipline**
57:14 58:24 71:23

**disclose**
94:3

**disconnect**
86:15

**discontinue**
31:21

**discontinued**
31:18

**discredit**
73:24

**discrepancies**
111:7

**discrepancy**
65:18 88:19

**discuss**
9:4 26:24

**discussed**
16:14,18,22 17:22
25:16 26:14 32:19

**discussion**
5:1 11:23 16:1



**A. WILLIAM ROBERTS, JR., & ASSOCIATES (800) 743-DEPO**
scheduledepo.com

Irani, M.D., Afraaz R. v.
Palmetto Health-Richland

Termination of Dr. Irani, Committee Meeing
April 30, 2015

28:1 32:18 63:5
95:4 100:24

**discussions**
28:3 79:11

**disenchanting**
50:14

**dismissal**
39:13

**disorders**
38:12

**displaced**
61:6

**display**
27:22

**displayed**
16:8

**disprove**
26:1

**dispute**
30:8

**disputes**
30:17

**disregard**
74:14

**disruptive**
64:2

**distribute**
46:17

**disturbing**
29:16

**doctor**
7:25 72:16

**doctors**
15:15

**document**
13:22 16:18 37:16
38:1 39:17 43:6
59:23 69:20,22

**documentation**
4:14 5:6 11:1,8
13:9 20:24 27:1
32:4 34:15 39:10
74:18 82:7 87:14,
15,16 98:17,18,19,
23,25 100:24
105:12,21 106:10
108:13 112:16
115:1

**documentations**
95:14

**documented**
10:16 11:13 13:6,
8,11 20:20 40:3,9
100:16 103:2
107:4

**documenting**
14:7 25:24 39:15

**documents**
73:15 74:19

**Donna**
2:18

**dosage**
63:18

**dose**
25:14 90:13,14,18

**dosing**
58:9 71:19

**double**
5:4

**doubt**
76:22 90:5

**downstairs**
6:11

**drain**
39:18

**drainage**
26:4 59:8

**dressings**
39:19

**drew**
45:14

**drivel**
53:13

**driven**
9:18

**drop**
37:20,22 42:19,20

**Drs**
46:21 50:3 51:23
67:18 70:23 95:9

**drug**
31:6

**drum**
114:25

**DSM-R**
46:5

**due**
22:5 32:6,7 40:11
65:7,23,24 67:1
72:25 73:8 74:17
75:21 111:24
112:2,9

**duties**
15:4,8 54:14 78:9,
14,15

**duty**
19:11,13 40:16
49:3 93:8,13,15,
19,21 94:1 105:14,

16,21,24 106:2,3,
8,9,10 107:4,10,17

_____

**E**

**E-care**
46:3

**e-mail**
18:2 21:13,25 22:7
24:22 33:20,23
34:2,19 35:10 36:2
38:14 39:14,16
52:25 53:13,15
58:2 66:9 83:3
95:14 101:7 106:7
111:25

**e-mails**
4:14 10:14 35:19
40:14

**earlier**
105:13 106:6
108:23

**early**
15:24 16:13 39:18
48:10 52:7 67:4
103:21

**earnestly**
68:16

**easiest**
112:11

**easily**
67:21,24

**ED**
10:17 30:6 59:11
61:2 74:11

**educate**
54:11 57:17
104:20,22

**educated**
74:25

**education**
58:5 62:22 66:8
68:10,17 70:14,17
71:1,6 72:10 74:5
75:24 116:20

**educator**
71:16

**effect**
114:12

**effective**
15:3 27:22 78:9

**effectively**
24:4

**efficiencies**
10:1

**efficiency**
70:12

**efficient**
15:7

**effort**
65:25 79:7

**efforts**
19:2 31:15 54:10
68:13

**egregious**
74:17

**EKG**
38:13

**elaborate**
48:3 93:12

**Elaine**
28:19

**elapsed**
65:15

**elective**
26:16

**else's**
18:14

**embarrassing**
67:4

**emergency**
2:22 10:12,14
15:7,23 18:21 42:8
49:16 59:16 60:25
61:21

**emergent**
63:4

**empathy**
10:3 14:12 18:7
30:21 41:19 84:14
85:17

**emphasized**
32:14 52:23 75:8

**emphatically**
60:12

**employee**
3:25 46:4

**empty**
50:8

**encounter**
10:15 13:11,21
14:16 28:20 29:6,
7,19 35:7 40:10
95:5

**encounters**
18:21

**encouraged**
17:14 47:2 53:25
59:10 116:5

**end**
4:1 20:6 32:18
33:13 44:8 61:12
64:8 67:4 76:21
81:11,25 82:17,18
113:24 114:5

**endorse**
70:4

**engage**
74:23

**English**
48:16

**enjoyed**
60:12

**enjoying**
24:3

**enjoys**
114:15

**enlarging**
101:2

**enormous**
86:14

**enraged**
53:14

**ensure**
53:6

**entailed**
94:5

**enter**
98:2

**entered**
115:14

**entire**
30:7 32:23 54:18
56:18 66:5 70:19
72:24 99:21
107:20

**entirety**
4:9

**entitlement**
25:7

**entrusted**
62:22 71:6,16
75:24

**environment**
72:11 82:22

**episode**
112:8

**equipment**
81:2,4

**ER**
11:7,15,24 28:18
85:4 86:21 101:12



Irani, M.D., Afraaz R. v.
Palmetto Health-Richland

Termination of Dr. Irani, Committee Meeing
April 30, 2015

**Eric**
2:21

**erosion**
43:11

**error**
18:11 20:18

**errors**
19:16

**escalate**
51:5

**essentially**
7:13

**establish**
107:13

**eval**
10:10

**evaluate**
55:23 59:5 63:18
80:6

**evaluated**
10:18 26:6 38:2
60:20 70:9 79:20

**evaluating**
7:2 10:21

**evaluation**
7:3 12:18 14:16
18:19 23:22 31:4,
10 33:16 34:18
39:2 44:15,20,24
45:13 67:12 71:20
75:2 76:8 78:22
82:15,17 98:3

**evaluations**
6:21,25 8:17 9:15
16:6 18:8 19:18
30:21 35:17 37:5
41:10 44:10 72:17
76:14

**evaluator**
8:10 9:21

**evasive**
34:10 43:7 114:1

**evening**
52:13 69:2 95:8

**event**
32:12

**events**
4:23 12:7,13,15
14:6 17:10 39:12
48:2 49:24 50:2
53:21 54:2 57:20
62:6,8 86:15 97:5
101:17 109:24

**eventually**
41:13

**evidence**
27:21 40:20,22
73:25 74:2 114:3

**evident**
73:12

**ex-fix**
55:24

**exact**
20:15 31:21 59:8
95:11,12 98:12
99:2 100:5 104:3

**exam**
13:25 20:24 69:9,
17,21 86:5 98:25
99:1 100:6,12
102:9,20 103:2

**examination**
10:20 52:19 69:7,8
96:5,23 112:10

**examinations**
19:24

**examined**
69:15 100:7 102:9

**examining**
114:11

**examples**
70:13 78:1,17,21
79:5 80:22 87:6
112:4,12

**exams**
69:19

**excellent**
5:6 8:22,25

**exception**
4:10

**excited**
47:10 51:17
116:15,18

**excitement**
47:15

**excruciating**
49:13

**excuse**
19:5 39:8,20 67:20

**excused**
3:25

**excuses**
17:4 70:7

**executive**
16:14 17:13,24
31:9 36:15 39:22

**Exhibit**
53:9 64:1,4 65:3,8
66:20 67:11

**exhibited**
111:9

**exit**
91:22

**expanded**
67:9

**expect**
82:22 96:6,25

**expected**
116:22

**expedition**
54:7

**expeditious**
69:10

**experience**
10:15,16 11:14
21:19 50:14 51:15
61:13 116:16

**experienced**
42:1

**experiences**
70:11

**explain**
18:23 45:20 57:18
81:22 91:11 93:1
100:18 110:16
111:5

**explained**
23:9 50:10 79:4
80:19 81:19,21
89:20

**explaining**
34:2

**explanation**
12:11,12

**explicit**
65:22

**explicitly**
67:19

**exploded**
67:14

**exposure**
5:16

**express**
93:24

**expressed**
53:12 66:12

**extend**
65:23

**extensive**
32:10

**extenuating**
65:23

**external**
32:16

**Externally**
15:19,20

**extra**
15:6

**extract**
51:14

**extremely**
47:4 50:19 73:1

**extremity**
11:20 12:5 20:24
55:25

**eyes**
25:20 51:20

---

**F**

**face**
30:13 62:20

**fact**
12:16 16:11 19:1
23:13,14 31:21
33:1,22 34:3,18,24
39:16 40:11 41:8
49:3,14 55:4 64:14
65:19,24 67:18
74:21 75:7 80:19
81:23 91:19
104:13 105:9
115:7

**fact-checking**
63:8

**factor**
29:25 45:20 54:11

**facts**
17:1 40:9 57:25
63:23 93:11 94:11,
12

**factually**
74:15

**faculty**
2:20,21,22 4:8
14:9,21 16:12,14
19:12 26:19,24
27:3,17,24 29:20
31:5 36:14,17
43:11 50:6 54:15,
18 56:17,18 58:8,
15 59:19 60:17
73:24 74:1 91:20
109:14,17 110:9
114:25

**fail**
8:12 44:9 114:6

**failed**

14:14 26:9 59:5
63:22 76:6 96:5,23
97:6,23

**failing**
44:7

**failure**
17:17 63:18 67:1
97:18

**fair**
57:24 74:16
108:19 109:16

**fairly**
5:15 10:25 112:6

**fairness**
66:13

**fallen**
59:7

**false**
34:23,25 35:2
49:25 62:5 63:2
67:2 71:2 73:15
74:7 108:13,18
114:2

**falsehoods**
62:25

**familiarity**
32:6

**family**
7:22 11:19 14:20
54:24,25 61:20,21
71:11,13 78:3
92:10 115:14

**fashion**
86:10,12 104:14
115:3

**father**
115:11

**faults**
54:8

**February**
37:10,13 58:15
67:7 68:14 98:10
101:3 110:14
116:17

**feedback**
23:23,24 35:25
42:1 50:17 51:25
52:3 54:6 60:7
66:15,23 70:15
72:20 76:11,16
78:25 79:1 82:21
111:20

**feel**
43:19 44:2 58:2
75:24 77:13,20
84:18 116:19



Irani, M.D., Afraaz R. v.
Palmetto Health-Richland

Termination of Dr. Irani, Committee Meeing
April 30, 2015

feeling
7:7 27:8 31:14

fellow
48:22 49:5 50:6
55:6 74:3

fellowships
28:7

felt
15:8 47:13 50:24
58:22 66:18,22
71:22 77:9,12

female
28:12 29:22,24
32:11,24 42:12
44:7,11,15,18,23
45:1,5 62:2,15
71:19 76:4,22,25
77:2,5,8,17,19
79:8,10,15,18,23
80:8,11,17,21
83:19,24 84:12,18
86:14 88:22 94:6,8
103:15

figure
50:25 51:1 52:17

figures
68:22

file
31:16,17 64:8
104:19

filed
66:1

files
117:3

filing
112:5

fill
20:4 81:5,6,11,23,
25

fills
81:10

films
61:22

final
45:23

finally
53:19 80:24

find
64:9

finding
100:9

findings
39:21 69:19,20,22
99:16 100:6
101:14 102:5

fine
5:24 46:17 67:19
103:12 105:7

fingers
10:24 14:4

finish
3:10,15,16 32:2

finished
3:12 4:19 68:14
101:7 104:14

fire
57:24 67:24 83:4
104:8 109:7

fired
53:18 91:25
104:13,16 105:11
108:25

firing
47:19 58:6 103:22,
24 104:1,5,9 105:9

firsthand
57:20

fishing
54:7

five-minute
3:21

fix
20:17 21:2,8 73:2

flaws
70:4

flesh
4:13

floor
6:10 7:9 13:5
49:15 85:5

floored
62:13

flustered
57:1

focus
70:17 72:5 74:5

follow
4:3 53:6 59:18
65:25 102:18

follow-through
22:21

follow-up
33:11 83:14 87:23
91:4

foot
26:12 37:20,22
42:19,20 83:7

forced
92:18 106:19

forearm
10:23 14:14 23:3
42:12

forget
42:13 93:5

forgetting
21:5

forgiveness
11:15

forgot
39:3,6,10,17 43:3,
15

form
2:25 81:18,19

formal
41:21

formally
32:20

forms
23:10

formulated
46:2

formulating
31:11

forward
3:8 35:25

forwarded
12:9,10,13 39:22,
23 109:15

forwards
35:8

found
51:8 55:3 59:2
66:16

four-week
28:8

fourth
18:5

fracture
10:23 11:3 85:25

fractures
42:15 61:6 86:21

frame
26:2 82:2 101:12

framework
27:23 68:1

frank
61:3 62:25 63:1

frankly
43:13 49:25 56:25
59:21 60:11 72:1
114:4

free
3:6 46:4

frequent
14:25 18:20 19:6
77:24

fresh
28:10

Friday
42:23 61:25

friend
10:12

friendly
72:4

frivolously
55:13

front
29:13 42:17 43:25
49:23 54:18 56:18
58:7,14 59:19
60:2,16 70:23
73:24 99:12 116:5

frozen
52:6

frustrated
82:23

frustrating
50:16 52:3

fulfill
40:17

full
16:24 17:13

full-time
22:12 41:13

functioned
32:15

fusion
37:16

future
22:24 28:6 91:8,19

_____

G

gain
24:1 82:25

gap
87:4

garner
66:6

gave
17:20 32:23 50:1
58:25 61:18 63:12
71:24 76:11
111:20 112:4

general
2:19 5:18 23:11
80:17

generally
20:6

gentleman
26:12 42:11

genuinely
68:13

get all
40:9 62:4

Giddings
2:20

give
3:20 7:7,15 21:13
32:12 45:12 62:18
98:14 101:12
107:15 111:13
113:22 115:23

giving
90:5

glaring
62:24

GME
22:2

GMEC
16:15,24 17:24
31:9 32:15 35:24
36:15 39:22 40:6,
11 49:24 50:12
62:11,13,19,24,25
63:10 67:3 70:24
73:15 74:8,16
75:16 108:13,14,
16,18,21 109:15

GMEC'S
71:1

goal
50:9,21 51:18
57:17,24 58:6
67:23,25 115:6
116:12,13

goals
64:21 72:18

good
14:3 23:13 46:19
76:11 82:7 111:20

good-faith
65:24

goofy
29:1

gotcha
66:4 68:2

Grabowski
4:10 22:9 26:13,20
37:17 38:2,14,15
39:17 42:24 55:22
56:10 84:2 95:4,9,
15,22 96:16 97:18,



Irani, M.D., Afraaz R. v.
Palmetto Health-Richland

Termination of Dr. Irani, Committee Meeing
April 30, 2015

22 99:2,15 100:23
111:3

**Grabowski's**
39:16 42:16 43:14
88:17 97:11 99:14
109:20 110:8

**grade**
11:3 44:8

**graduate**
4:18 47:21 66:7
70:25

**graduated**
40:5 44:1

**graduation**
28:5

**grant**
36:12 65:14

**grave**
97:23 100:9

**gravity**
37:25 96:13,16

**great**
13:5 23:7 31:14
82:18 84:5 111:18

**greater**
8:11,23 30:14

**greatly**
67:9

**grievance**
2:23 22:3 24:7
31:19,21 32:6 35:9
36:9,12 47:3 65:5,
7,15 74:21 112:5,
18,20

**grievances**
73:7

**grin**
51:12

**gross**
63:19

**grossly**
20:24 49:24

**ground**
57:23

**groundwork**
48:11

**guess**
40:24 87:19 89:22
113:23,25 114:5

**guessing**
110:13

**guidance**
48:21 50:17,24
66:18 76:19

**guide**
68:21

**guidelines**
63:25 64:10 65:25
67:2,6 109:6

**guy**
24:3,4 29:1 41:1,
21 66:15,20,23
67:19 91:17,18

**Guy's**
24:2

**guys**
6:7 33:4 111:17
116:21

**Gwen**
2:8

---

## H

**H&p**
20:25 21:4 25:1
38:8 52:14

**H&ps**
20:9,21 22:19
80:18,24,25

**half**
10:5 16:18 54:12
61:4 63:6,7 76:9
86:21,24 90:11

**halfway**
96:2 102:11

**hallway**
5:18 6:10 7:10

**hand**
2:6 10:23 49:15

**handbook**
64:1 65:8,19,22
66:1,2 116:18

**handed**
47:23 67:8

**handle**
6:6

**handled**
61:10

**hands**
47:6

**hands-on**
47:14 116:16

**handwrites**
36:8

**handwritten**
7:13

**happen**
90:24 110:3

**happened**
10:17 12:15 29:3,8
42:8 54:2 57:19
61:10 62:14 81:16
82:6 86:18 90:3,8,
9,11,25 91:3
109:17 110:3
112:6

**happening**
42:17

**happy**
5:9 21:23 27:8
48:14,15 49:17
68:14 83:18 116:7,
19

**harassment**
47:5 73:10 74:4

**hard**
7:15 36:21 45:6,8
51:19 68:25 70:16
72:5,19 75:23
84:11 114:7

**harm**
98:21

**harmed**
91:19

**harmful**
71:9

**harming**
60:17

**Harper's**
41:22

**head**
26:14 95:18

**health**
2:9 3:3 25:6 67:2,6

**Health's**
63:25 64:10

**Health-richland**
47:10

**hear**
3:1,9 4:8 41:5,7
53:25 82:8

**heard**
6:8 10:11 28:17
29:16 31:8 33:5
47:3 60:4 78:5
113:1

**hearing**
5:17 22:3 36:12
41:12 57:8,24 62:8
74:17 78:11 79:4

**Hearn**
2:16

**helped**

61:23

**helpful**
7:17

**helping**
61:24

**hemodynamically**
29:15

**hemophilia**
38:17 101:2

**hemophiliac**
69:5 79:12 80:16
88:24 94:25
100:20

**hepatitis**
38:8

**hesitant**
45:22

**hiatus**
70:10

**higher**
92:21

**highest**
18:6

**highly**
5:10,25 8:22 9:2,5
13:23 41:4 44:1

**Hill**
2:2,8 31:1 44:5
46:8,13,15 76:2
85:20 105:2
108:10 113:6,21
115:22 116:23
117:1

**history**
10:19 19:23 20:4
38:6,10 71:10

**hold**
30:18

**holes**
86:16

**holiday**
65:10,16,17

**holidays**
36:5

**home**
26:15 28:9 31:7
84:7

**honest**
83:2 95:11 110:2

**honestly**
64:19

**Hoover**
24:25 27:4 58:17,
18 90:16 92:23

**hope**
66:6

**horrible**
43:13

**horribly**
64:15

**horrified**
13:14,16

**hospital**
23:18 32:21 42:5
64:3 68:7 70:21,24
75:14,15 92:24
94:16,22 101:1
111:1

**hospital's**
74:15

**hour**
3:10,16 27:2 31:13
34:5 40:16 45:8
46:15 49:8 75:19
90:11 93:13,15,19,
21 94:1 105:14,16,
21 106:8,9,10
107:4,11

**hours**
19:10,11,13 49:4
61:4 63:6,7 69:11
74:11 79:16 86:21,
24 90:2,12,19 93:8
98:7,8,15 101:11
106:2,3 107:18

**HR**
2:17 21:19 65:5

**huge**
87:4

**human**
2:9,16 62:21

**humiliate**
50:9

**humiliating**
67:5

**hung**
29:14

**hunting**
33:21

**hurtful**
55:14 64:15

**husband**
89:9

**Hydorn**
92:23

---

## I

**Iaquinto**



10:16 12:5

**idea**
25:22

**ideally**
102:8

**identified**
21:2

**identify**
20:19 21:7

**identifying**
54:8

**illegal**
75:13

**illegally**
70:19 111:5,6

**illegible**
7:13

**illustrates**
22:1

**images**
11:6

**imagine**
105:18

**immediately**
12:10 34:11 37:22
61:1 70:5 101:16

**impact**
71:12

**implemented**
16:15,24

**implication**
33:11

**implore**
75:20

**importance**
80:9

**important**
38:9 107:22

**importantly**
65:11 71:3 75:18

**impossible**
74:5 82:3

**impression**
12:3

**impressive**
5:2,8 13:17

**improper**
58:8 63:11 73:25
74:9

**improve**
8:23 10:3 19:3
48:8,19 50:25
51:15,19 53:4 54:8

55:7 64:20 65:1,4
72:21,22 77:10,13
78:7 79:7

**improved**
72:18

**improvement**
8:6,18 9:5 37:9
52:2 70:15 76:15,
20 78:23 82:18
89:6

**improvements**
19:16,19

**improving**
49:23 53:8 70:12

**in-training**
67:20

**inaccurate**
69:19,21,22 98:18,
23 99:16 104:17
105:10 106:20

**inadequacies**
50:7

**inadequate**
10:25 11:4 20:24
29:13 38:8 40:20

**inappropriate**
25:12 40:16 58:22
63:18 64:2 71:5

**inbox**
52:12,13

**incidence**
111:21

**incident**
29:23,24 47:22
56:17 62:1

**incited**
56:17

**include**
99:5

**included**
13:7 15:9 21:18,20
25:10 27:3,4 29:18
35:17 105:25

**including**
20:23 27:5 61:23
62:5 67:16 71:19
74:1

**incongruous**
71:15

**inconsiderate**
29:12

**inconsistent**
9:20

**incorporating**
35:25

**incorrect**
34:14 41:11 57:21
69:19 74:15 99:1
104:25

**incorrectly**
20:20

**increase**
25:21

**increasingly**
57:14 59:25

**incredible**
8:25 53:10

**indecision**
52:6

**independent**
73:21

**India**
71:11

**indicating**
3:1

**indications**
14:1

**indignation**
53:13

**indiscernible**
76:23 82:12 83:21
115:22 116:13,22,
24 117:2

**individual**
35:3,5 46:1 109:15

**individually**
48:25 51:24 60:10
78:19

**industry**
91:13

**infection**
55:23

**inflammatory**
57:21

**inform**
62:17

**informal**
41:20

**informally**
32:20

**information**
3:1,2,6 23:16
40:22 56:13 57:5,
20 71:2 116:24

**informed**
17:11,17,20 39:14
52:10 61:1 63:1
101:9,13

**infraction**
71:24

**infractions**
57:14 58:24 73:11

**initial**
10:4,10 11:24
14:13,16,17,22
16:9 27:20 28:2,15
42:18 54:6 61:4,5
63:7 74:10 77:15
80:1 105:17

**initially**
16:25 17:2 18:19
22:22 76:20 82:11,
19 98:18

**initiate**
65:5

**initiated**
65:5

**initiative**
68:20

**injured**
30:22,25

**injuries**
28:13,14 29:13
61:16

**injury**
11:11 23:3 42:12
49:21 61:22 62:9
66:9 85:24 88:22

**innately**
84:16

**Innovations**
6:20 9:15 15:2
105:20,22 106:2,
11,15,17,23

**inordinate**
25:14

**inpatient**
23:7

**input**
36:17

**insensitive**
51:9 71:5,9 72:5
116:3

**insight**
24:1 32:25 41:19
48:8 76:18 78:8
79:6 81:21 82:24
96:5,24

**insinuated**
55:2

**insinuation**
55:3,12

**insinuations**
73:14

**insisted**
59:22

**inspect**
12:22

**inspecting**
13:1

**instance**
26:12

**instances**
24:18 26:25 88:11

**instructed**
25:14 51:10 56:6
109:21

**instruction**
63:22

**instructions**
59:18 102:19

**insult**
62:9 66:9

**insulting**
51:8 55:4

**intact**
10:21 14:3

**integral**
70:16

**intelligent**
8:22

**intent**
60:15

**intentions**
53:19

**interacted**
91:7

**interaction**
42:7 84:5

**interactions**
13:5,8 85:10

**interactive**
7:12

**interest**
66:4

**interested**
58:4 62:8,23

**interesting**
67:9

**Interestingly**
54:4

**interim**
2:8

**intern**
6:2 7:23 9:22



Irani, M.D., Afraaz R. v.
Palmetto Health-Richland

Termination of Dr. Irani, Committee Meeing
April 30, 2015

22:14,15 41:5
60:20,21,24 63:6
76:8,21 82:20

**internal**
2:21

**internally**
12:8 30:16

**interns**
5:13 6:1,5 7:3 9:3
36:19

**internship**
5:12 6:14 8:6
14:22 16:7,13

**interpersonal**
8:21

**interpret**
30:10 97:14

**interpretation**
48:2 96:18

**interval**
69:7 102:10,20

**interventions**
40:7

**interview**
5:8

**interviewed**
40:25 41:2 64:11,
12

**interviews**
64:5

**intimidated**
58:23 71:22

**introduce**
2:4,7,15 4:5

**introduced**
61:15

**invaluable**
68:24

**invested**
7:6,25

**investigate**
75:22

**investigated**
29:22 52:18 75:19
92:1

**investigating**
93:13

**investigation**
49:7 63:3,16 64:22
93:8 107:20 108:2,
4,6

**invited**
54:15 56:17

**involve**
74:12

**involved**
10:6 11:12 15:22
21:16,18 28:12,15
35:1,2,23 37:15
52:20 53:1 61:15
74:9 89:3

**involves**
30:19

**involving**
62:1

**Irani**
2:13,15,23 3:12
5:2,9,16 7:6 8:5,8,
15 9:4 10:6,16,18
11:9,21,25 12:3,
10,11,25 13:3,12,
19 14:2,11,14
16:2,19,25 17:23
21:20 22:2 24:12,
19 25:19 26:4,5,9,
14 27:2,12,25 29:1
30:18 31:4,8,10,
12,18 32:5,9
34:16,20 35:19,22
37:10,13,16,19,22,
24 38:5,15,16,20,
25 39:3,14,19,21
40:1,12,15,16,23
44:16 46:10,12,14,
16,19 64:9 76:3,4,
7,24 77:1,4,7,15,
18,22 79:9,14,17,
20,25 80:10,15,20,
22 82:5,10 83:23
84:1,17,21 85:16,
19,21 86:2,5,7,19
87:1,5,10,13,25
88:3,6,10,15 89:4,
12,18,21 90:8
91:10,12,17,22
92:2,6,9,13,15,25
93:3,5,9,11,13,17,
20,23 94:3,7,11,
14,18,21,24 95:2,
7,11,17,23 96:1,3,
9,11,17,20,21
97:3,9,13,21 98:1,
5,7,12,17,24 99:8,
11,13,18,21,24
100:1,5,12,17,21
101:9,14,18,25
102:4,7,20,24
103:5,7,11,18,24
104:3,11,15,18,24
105:5,8,15,17,23
106:1,12,16,25
107:6,8,15,22
108:2,6,15,20

109:2,6,11,17,25
110:11,18,25
111:7,15 112:3,10,
17 113:1,4,10,13,
15,18,20 115:23,
24 116:25

**Irani's**
2:13 4:9 10:5,10
11:18 12:15,18
18:1,5 29:7,9
32:10 97:5

**ironically**
115:16

**irreparable**
73:1

**irreparably**
60:17 91:19

**irrigation**
11:23 13:20

**irrigation/**
**debridement**
14:18

**irritate**
25:19

**issue**
20:21 21:17 27:10
51:22 69:13
114:23

**issues**
5:21,22 8:7 9:5
32:24 42:11 51:22
52:23 54:4,5 67:16
76:19 82:1,7 85:16
92:14 93:24
112:21 114:20

**item**
17:7,8,15 19:7

**IV**
46:5

---

**J**

**January**
34:21 35:19 41:16
67:4 74:24 112:6

**Jennifer**
24:11

**jeopardize**
31:19

**job**
73:3 111:18,20

**John**
4:6

**join**
5:9

**joint**
16:5 38:7

**Jones**
7:5,20 8:1 76:10
84:24 87:23

**judge**
49:18

**July**
5:12 9:10 10:6,11
22:12,16 41:15
54:3 112:24

**jumped**
116:18

**jumping**
9:13 81:23

**June**
54:3

**junior**
9:7 15:5 25:6
106:18 110:20

**justifiably**
13:14,16

**Justin**
91:1

---

**K**

**Kathy**
18:3 33:20 34:7
65:19 74:19,20
105:18

**keeping**
25:24

**kind**
4:12,22 6:13 9:13
20:24 21:9 25:19
29:1 33:12 41:5,11
43:24 45:24 82:2
114:8

**King**
65:10

**knee**
15:25 59:6,8 63:19
68:23 71:20 83:20

**knew**
23:6 53:1 55:5
81:24

**knowing**
27:13 52:23

**knowledge**
8:22,24 13:23 22:1
57:20 65:18 67:17,
18,19 71:20 74:2
108:17

**knowledgeable**

109:3

**Koon**
2:17 4:7,16 5:20
10:9 15:20 21:12
23:20 28:23,25
31:1,3,18 34:15
39:6 42:14 44:6,
10,12,17,21,24
45:2,8,11,16,22
46:10,21 47:16,23
48:3,7 50:1,3 51:4,
21,25 52:9,14,23
53:7,14 54:15,18
55:2,10,16,21
56:12,17 57:4,19,
24 58:7,13,16
59:5,18,24 60:2,15
62:22 64:18 66:19,
25 67:3,8 68:5
69:2,13 70:23
71:7,22 78:18 80:2
82:12,16,23 83:2,
17 85:21 94:23,25
95:3,9,14,20,25
96:2,10,15,19,21
97:4,10,17,22
98:2,6,9,14,22
99:5,9,12,15,20,
23,25 100:2,10,14,
19,23 101:19
102:2,5,7,18,21
103:2,6,9,15,17,21
104:1,8,13,16,22
105:8,16,18,20,24
106:8 107:3,10,16,
21,25 108:4,9,12,
17,24 109:3,8,12,
18,19 110:7,14,23
111:4,11,23 112:8,
13,22 113:3,5,21
115:15

**Koon's**
43:13 50:8 58:5
67:23

---

**L**

**label**
51:6

**Labor**
55:5,10

**labs**
24:18 38:13 81:2

**lack**
8:17 14:12 16:8
22:5 27:22 30:21
32:7 35:8 37:25
40:10 41:19 48:7
49:8 75:20 76:18

---



Irani, M.D., Afraaz R. v.
Palmetto Health-Richland

Termination of Dr. Irani, Committee Meeing
April 30, 2015

78:8,24 79:6 82:24
84:14 112:2

**lacked**
62:20 64:15

**lacking**
52:1,8 67:18
111:25 112:9

**lady**
42:21

**laid**
65:25 78:25 82:16
85:3 111:7 115:24

**Lally**
2:21

**lambasted**
59:19

**Lamoreaux**
47:19 103:22,25
104:2,10,13,19

**language**
53:17

**large**
37:15 38:17

**largely**
72:17

**Lastly**
50:1 60:2 68:5
71:3

**late**
9:19 19:5 83:12
103:7,18

**lathe**
11:12

**Lathey**
16:19 21:18 27:4

**laugh**
51:3 71:8

**laughed**
17:3

**laundry**
67:10

**lawsuit**
104:19

**lay**
116:4

**learned**
70:11 84:23

**learning**
51:14 70:17
102:17

**leave**
81:8,24 92:20

**leaving**
21:4 92:17

**led**
14:9 44:3 82:9

**left**
2:14 48:9 101:12
102:13 113:16

**leg**
16:1

**legitimate**
68:15

**lends**
111:10

**length**
8:5 81:1

**letter**
5:6 44:19 47:23
48:23 49:9 62:11
67:8 77:16 97:14
107:16 108:5,15,
20,22 111:25
112:1

**letters**
40:13 83:11,14

**level**
12:23 13:1 18:6
25:18 27:25 28:1,4
29:25 36:4,7 40:8
42:6 44:25 47:17,
18 50:13 53:22
54:13 62:12 63:14
67:8,12 96:6,24
109:9 110:15

**levels**
40:5 63:2

**libel**
63:1 70:23 71:15

**libelous**
63:10

**lie**
14:17

**life**
42:22 66:5 85:15,
18

**lift**
86:6

**lifted**
86:8,10

**light**
5:19 10:21 37:11

**likeable**
41:1

**likes**
114:14

**Likewise**
3:16

**limb-threatening**
38:24 43:1

**limited**
5:15

**list**
24:17 36:24 41:4
67:10,13,23 93:19

**listed**
10:13 67:16

**listen**
73:7 113:17

**listened**
70:7

**lists**
36:23

**liters**
12:4

**live**
33:12

**local**
61:18 63:12 73:6
87:14 112:14

**locker**
93:3

**locum**
15:15

**locums**
27:17

**log**
25:24 105:20

**logical**
65:12

**long**
28:1 44:12 54:4
81:7 95:4 98:6
100:23

**long-term**
96:12

**looked**
15:2 39:3

**losing**
75:6

**lot**
78:19 84:13 85:11
116:11

**loved**
116:17

**loves**
84:4 95:6

**lucky**
53:18

**Luther**
65:10

**lying**
13:19 17:9 18:12
92:8

**Lynn**
2:16 46:17,18

---

**M**

**made**
7:16 8:9 12:18
16:2 19:18 22:23
30:1 31:22 34:16,
24 43:16,25 45:13
50:16 56:21 58:7
60:3 62:22 64:21,
23 65:24 66:16
70:8 72:5,14 80:2
83:9,16 86:10 91:6
102:15 110:6
116:20

**magnitude**
82:1

**major**
23:10 41:17

**majored**
5:4

**majority**
27:3 48:4

**make**
3:18 13:20,22
19:2,16 20:23 21:3
36:20 43:21 46:24
49:6 67:24 70:6
72:15 76:6,15
77:20 82:12 90:23
91:4 99:18 100:13
102:14 114:4,7,17

**maker**
2:10

**makes**
34:21 51:12 65:22
73:14 74:4

**making**
36:22,24 41:3,17
51:5 66:18 114:16

**male**
12:24 45:6,10,12
82:1,6 85:15

**malicious**
71:2

**man**
88:21

**manage**
87:8

**management**
2:17,18 3:9,17,20,

24 5:22 10:1 11:7,
24 14:24 25:12
58:22 63:12 77:24
86:23 87:3,17 89:2

**manager**
16:19

**managers**
5:19 42:1 60:6
111:16 116:8

**managing**
7:9

**mandate**
49:4

**manipulates**
12:5

**manipulating**
11:20

**manipulation**
11:19 26:3,4 63:13

**manner**
57:22 63:20 69:11

**manual**
24:8

**March**
69:2 95:1 98:11
101:4,22 102:23
103:3

**mark**
102:11

**marked**
8:18 76:14 83:5

**Martin**
65:10

**mass**
38:4

**matter**
2:12 33:3,9

**matters**
33:4

**Mazoue**
9:23 51:23 58:12
67:18

**Mazoue's**
90:13

**meaning**
109:8

**means**
12:25

**meant**
18:16 19:22
110:18

**measure**
23:23 99:6



measurements
  11:3 38:20
measures
  17:18 18:2 22:4
  27:19,21 31:11
  32:1 35:18 36:21
  40:5 44:1 46:2
  77:12 103:9
medical
  8:22 24:20 41:2
  66:7 70:25 71:20
  72:9
medication
  29:14
medications
  11:2 12:19,20,21,
  25 14:15 23:10
  29:11
medicine
  2:21,22 4:19 5:5
  16:3 18:18 48:15
  88:23 89:11 92:10
  115:15,16
medicines
  11:21
meet
  17:17 24:9 26:24
  36:3
meeting
  16:24 22:8 26:19
  27:2,18,24 32:9
  33:13,25 35:20,22
  47:19 48:18 50:1
  53:21 54:12,15,17,
  18 56:17 60:18
  65:6 75:16 80:1
  95:21 103:13
  108:14 109:18
  110:9
meetings
  21:21
member
  2:11
members
  2:19,23 4:8 23:18
  44:5 73:24 76:2
  116:23
memo
  17:20 22:10,13
  27:1 32:10 62:19
memoranda
  14:9
memorandum
  17:1,15 22:8 23:20
  24:10 25:10 77:2
  95:21 109:14

memory
  89:22
memos
  115:3
mental
  58:11,19
mention
  11:2 32:7 35:8
  39:15
mentioned
  23:6 69:13 85:24
  112:13,22 116:15
mentions
  77:9
mentorship
  68:12
mere
  54:12
message
  24:24
messages
  52:16
met
  9:4 23:21,24 24:12
  27:2 34:20 36:6
  38:15 48:12 67:11,
  16 76:11 79:25
  95:9,15 98:9
  102:16,17
metal
  11:12
Michelle
  62:10
middle
  8:4 16:21 40:2
midnight
  38:21 69:5 101:4,
  23 102:9
midst
  25:8 39:25 53:12
milligrams
  58:12 89:16,18
  90:4,6,10,12
million
  53:10
mind
  12:17 41:15 83:16
mine
  10:12 15:22 43:13
  48:15 89:7
minor
  57:14 58:24 71:24
  73:11
minutes

3:20 31:2 113:21
  115:23
miscommunication
  52:22 53:3 90:21,
  25
misinterpretation
  18:13,15
misinterpreted
  18:10
misled
  108:22
misrepresentations
  71:2
misrepresented
  70:25
missed
  55:4,9
missing
  72:21 80:21
  101:22,25 102:6
misstatement
  34:16
misstatements
  34:21
misstep
  67:24
mistake
  26:21
mistakes
  20:9,13,15,23 21:3
  41:17 50:23 70:4,
  8,15 72:14,22 80:2
  83:9 102:15
  114:16
misunderstood
  17:6 19:2,7,21
mitigating
  45:20
MLK
  65:13,16,17
moderator
  2:10 3:5
modifiable
  35:24
Mohan
  2:19
moment
  22:18 85:23 93:25
Monday
  38:5
money
  40:2
monitor
  39:19

month
  12:16 14:23
months
  5:15 16:18 22:13
  26:7 28:3 43:18
  44:16,20 47:20
  55:24 85:12 99:22
  111:24 112:4
morning
  24:17,21 36:24
  37:16,19 42:24
  43:2,4 90:20 91:2,
  6 95:7 99:9,10
  101:5,7 102:9
  103:3,6
Mostriani
  8:11
motivation
  8:17 9:1
motive
  48:10 66:3
move
  3:8 14:4 51:16
  54:19 80:5
moved
  61:5 79:22 86:12
moving
  10:24 57:13 75:11
  86:13
MRI
  26:14,15 38:3
  55:23 56:3,7,9,20
  57:10 88:19
  109:20,23 110:1
MRSA-POSITIVE
  38:10
multi-trauma
  60:19
multiple
  5:5 21:17 28:13
  42:14,15 74:17
  111:11
Mumbai
  71:11

_____

N

names
  64:12
narcotic
  63:18 90:13
narcotic-naïve
  58:13
narcotics
  12:23 25:15 58:9,
  20 71:20

Nathy's
  29:5
nation
  75:6
national
  65:10,17 75:5
  92:21
nature
  2:24 32:1 72:23
naïve
  58:9 90:13,14
necessarily
  6:18 30:12 41:7
needed
  15:8 16:3 20:10
  21:23 26:24 51:15
  60:1,22 61:11
  77:20 94:18
  101:10
Needless
  50:3 74:4
negative
  52:1 64:3 115:19
neglect
  63:1
nerves
  10:21 14:3
nervous
  114:13
neurologic
  37:17 69:14,15
neurosensory
  99:6
neurosurgery
  61:17 63:15
neutral
  47:3 111:18 116:6
newborn
  55:1
next-to-the-last
  97:17
niece
  55:1
night
  11:13 12:12 13:11,
  22 15:23 24:23
  29:16 38:3 41:21
  84:6 89:10,24,25
  101:17 102:19,23
  116:11
nine-tenths
  41:15
non-narcotic
  58:9



Irani, M.D., Afraaz R. v.
Palmetto Health-Richland

Termination of Dr. Irani, Committee Meeing
April 30, 2015

**non-negotiable**
19:11

**non-treated**
61:6

**normal**
45:25

**notably**
63:1 67:15

**notation**
10:3

**notations**
10:19

**note**
5:25 8:4,9 9:2,11
11:9,16 12:9,15,18
13:7 24:6 25:8
31:20 38:8,10,11,
12 45:22 69:11
79:16 80:7,9 98:3,
10,16,19 99:3,5,8,
9,14 101:3,4,5,8,
20,21,23,24 102:8,
22

**noted**
7:12 10:20,22
11:22 14:2 15:1
17:5 20:6 38:13

**notes**
7:13,16,17 8:11
9:17,23 12:18,24
13:10,16 16:21
32:5 35:24 39:14
80:17 94:18
101:22 102:1,6

**noteworthy**
69:24 70:9 75:4,18

**notice**
7:4 83:11

**noticed**
20:8 37:21 68:5

**notification**
35:10

**notified**
19:15 34:9 37:19
39:21

**noting**
9:21 21:25

**notion**
114:22

**November**
26:9 52:7 53:21
103:13

**number**
14:19 15:10 16:6,8
17:8 18:24 19:14,
17,21 20:5 30:20

32:19 88:17 115:3,
9

**numbered**
4:25

**numbers**
4:25

**numerous**
31:25

**nurse**
10:12 14:17 26:14
37:20,22 42:1,18
61:8 69:14

**nurses**
28:14,20,25 29:11,
17 35:5,6 42:1
61:14 85:4,5 86:9
88:13 89:23 116:9

**nurses'**
29:6 86:15

**nursing**
10:15 12:8 14:15
42:4 61:7,23 63:5
84:22

**O**

**OB/GYN**
2:20

**obligations**
40:18

**observation**
23:16 69:6

**observers**
40:4

**obtain**
26:15

**obtained**
11:5

**occasion**
8:16

**occasions**
8:9

**occur**
98:6

**occurred**
4:23 75:17 95:3

**occurring**
107:1

**October**
51:21

**off-service**
5:15

**offer**
17:4

**office**
6:12 16:20 20:3
47:16 65:11
114:11

**offices**
65:11

**oftentimes**
83:7 110:19

**Ohio**
93:6

**okayed**
58:11,20 89:15
90:9,16

**older**
115:11

**omit**
20:22,23

**omitted**
20:20

**on-call**
15:8

**on-site**
37:7

**one-on-one**
32:20 47:12

**ongoing**
27:22

**op**
13:7

**open**
6:18 10:22 11:3
61:6 71:14

**opening**
115:25 116:4

**openly**
53:17 58:6

**operate**
47:12 82:3 112:23
116:16

**operating**
15:1 19:6 38:3

**opinion**
23:22 64:19 77:11
111:18

**opinions**
116:9

**opportunities**
47:12

**opportunity**
3:17,18 32:12,23
47:13 64:7 68:11
75:2 82:25

**opposed**
34:8 86:18 111:8

**opposite**
31:22 87:21,22

**option**
63:16

**options**
91:14

**order**
2:6 11:15 25:3
72:21 73:16
104:19 114:8

**ordered**
38:2

**original**
53:16

**orthopedic**
5:2,14 6:1,15,17
9:3 11:5 18:22
27:3,6,16 28:13
41:14 42:3 47:10
50:22 51:19 60:2,
20,24 63:6 65:12
75:3,23 76:17
88:12 91:20 97:19,
24 115:12 116:13

**orthopedics**
4:7,8,17 5:13
20:25 22:12,16
76:23 82:20 91:9,
13 115:11

**outcome**
75:16

**outline**
21:13

**outlined**
24:7 54:1 57:16
65:7 66:2 112:18,
20

**outlines**
77:11

**outpace**
74:3

**outpaced**
67:21

**over-communicate**
52:24

**overdose**
12:23

**overhead**
25:21

**oversee**
66:17,20

**overseeing**
66:24

**oversleep**
103:6

**overslept**
38:25

**overstated**
49:25

**overstatements**
63:19

**oxycodone**
58:12 89:15 90:2

**P**

**p.m.**
61:1 84:6 92:24
93:4 101:1,4,12

**packet**
95:24

**packets**
46:16

**PACS**
61:22

**pages**
4:24 6:21,23 18:1
24:10 25:25 29:4,5
32:5 34:15,19
35:16 36:4

**paid**
66:11

**pain**
11:2,21 12:19,20,
21,23,25 13:1
14:15 18:18 25:12
29:11,13 49:10,13
61:17 63:12 87:16,
17 88:23 89:11,13,
24 90:1,13

**painful**
101:2

**painted**
87:20

**Palmetto**
2:9 3:2 47:9 63:25
64:10 67:2,6

**panel**
47:2

**paper**
41:14

**paperwork**
114:3

**paragraph**
13:4 18:5,11

**paragraphs**
101:8

**paralysis**
38:4 42:17 88:21
96:12



Irani, M.D., Afraaz R. v.
Palmetto Health-Richland

Termination of Dr. Irani, Committee Meeing
April 30, 2015

**paralyzed**
42:21 96:8 97:1

**Pardon**
94:7

**paresthesias**
58:11,19 89:13

**part**
20:19 22:17 25:10
73:17 84:10 91:1
102:17 104:17
105:11

**partake**
68:8

**participated**
24:25

**parties**
61:15

**partner**
2:16,18

**parts**
42:5 70:16

**party**
42:7 47:3 107:23,
25 116:6

**pass**
44:9 58:25 71:24

**passed**
33:8

**past**
4:23 64:21 71:10
75:7 112:3

**patently**
34:23,25 35:1
73:15 114:2

**patient**
8:2,12,13,17 9:18,
20 10:4,7,10,22
11:1,11 13:4 14:2,
7 15:22,24,25
16:3,4 18:13 20:2
23:3,9,13,17 24:23
25:1,12,14 26:3,4,
6,13,15 27:22
28:12,13,15,20
29:10,12,13,15
30:2,9 37:14,20,
23,24 38:2,3,6,8,
10,11,12,17,18,22,
23 39:8,9,11
42:11,12,16,19
43:1,2,13 49:10,
11,13,14,19 52:7,
8,14,17,18 53:1
55:21,23 56:13,14
57:15 58:9,18,20
59:6,18,20 60:5
61:4,7,8,16 69:5,9,

10,11,12,14,15,25
71:4 74:5,9,11
79:10,20,22 80:6,
16 84:2,3 85:10,
11,24 86:20,24
88:17,21,23 89:6,
8,20 90:12 91:3
94:25 95:6 96:4,7,
23 97:1,25 98:4
99:10 100:7,20
101:1,6,10,11,13,
14 102:9 109:19
110:21,24 114:11

**patient's**
14:13,20 18:7
23:18 24:25 29:21
30:19 52:20 53:2
56:8,14 63:13
64:25 69:23 74:10
86:1,2,6,12,19
97:7

**patients**
7:7,8 8:1,3 20:10
25:13 26:8 29:2
58:13 69:4 70:2,5,
9 78:3 83:20,22
84:6,8 85:8,9 87:8
88:18 90:22 97:20
103:19 114:22
116:10,11

**pattern**
51:2 60:4 71:14
73:11,16 75:22
82:19

**Paul**
16:19 21:18 27:4

**pay**
33:1,7 39:25 40:2

**paycheck**
66:11

**peers**
8:21 14:20 48:24
49:23 60:16 78:4

**penalized**
70:21

**pending**
16:24 17:13

**people**
2:5 7:2,18 9:1
21:13,16,18 30:7,
16 32:20 36:15
41:6 71:10 89:3
92:17,20 116:19

**perceived**
19:8 53:5 68:25

**percent**
107:4,17

**perception**
18:10,15 81:22
86:15,16,18

**perceptions**
33:7

**perfect**
50:22 83:9

**perfectly**
29:9

**perform**
85:25

**performance**
8:5 22:14,15,19
51:22 60:12 68:25
75:2

**performances**
40:4

**performed**
62:3,16 63:20
71:18 103:3

**performing**
61:19 78:14

**performs**
68:23

**period**
15:24 22:16 25:15
41:16 48:8 64:13
79:19 85:15 87:2

**Periodically**
30:7

**persecution**
71:10

**persisted**
9:11

**person**
72:4 92:8,9,11
111:2

**personal**
50:2,8 70:4 83:2,6,
17 92:17 114:23

**personalities**
30:8

**personality**
8:20 85:2

**personally**
46:22 49:17 55:15,
16 56:7 61:20,21
62:15 111:20

**personnel**
9:25

**pertinent**
105:2

**perversion**
63:22

**PGY**
9:10,12 10:8,9,11
16:9 37:11 47:21
54:24 56:21 67:21
73:12,18 103:19
115:10

**ph**
2:16 8:11 12:8
15:12 16:19 29:5
92:23

**philosphical**
87:20

**phone**
27:10,15 52:16
59:23 61:25 62:9
69:18 90:9,10,11
113:16

**phoned**
89:9,10

**phrases**
33:2

**physical**
10:20 13:25 19:23
20:4 37:20 38:6
69:18 98:25 99:1
100:6,12 101:14
103:2

**physician**
11:24 16:2 47:13
66:23 72:6 73:2
84:10

**physicians**
64:17 72:15 78:4
84:9

**pick**
62:19 85:8

**picture**
87:20

**pictures**
68:22

**pills**
89:16 90:2,5,6

**place**
27:25 28:4 59:24
87:12 103:10

**places**
47:14 116:21

**placing**
47:17,18 67:8,12

**plan**
16:15 27:13 36:7,
16,18 53:6,25
55:13 56:10,19
57:2 58:21 66:17,
24 70:3 91:5

**planned**
56:20

**plans**
8:18

**play**
66:4 68:1

**player**
68:20

**pleased**
49:20 60:11

**plethora**
47:12

**point**
3:24 17:5 20:4,6,
13,25 22:11 23:12
43:10 44:3 56:8
64:18 76:7 80:12
82:12 83:1,5,15
92:18 114:10

**pointed**
49:10 65:16

**points**
17:2 51:14 58:7

**policies**
22:6 40:12

**policy**
17:14 22:2 32:7
36:11 40:6 70:22
74:15 75:15

**poll**
85:4,5 116:8

**poor**
14:19,24 18:24
60:3,5 74:18 77:23
78:3 111:21

**popular**
64:19

**position**
32:15

**positive**
60:7 85:10

**possibilities**
91:8

**possibly**
91:21,25

**post**
55:24 58:10 65:11

**post-call**
21:22 107:5,17

**post-op**
37:15,23 58:10,13
59:6 63:18 71:20
84:6 90:13

**post-reduction**



Irani, M.D., Afraaz R. v.
Palmetto Health-Richland

Termination of Dr. Irani, Committee Meeing
April 30, 2015

11:6

**postoperative**
13:9 15:24 25:13,
15 26:3,8 100:4

**potassium**
43:15

**potential**
8:25 93:19

**potentially**
75:6

**practice**
64:17 115:14

**pre-op**
81:2 100:3

**preliminarily**
56:3

**preoperative**
11:9 80:25

**preparing**
36:23

**present**
4:9,12 23:18 30:17
46:15 49:23 56:12
57:4 74:7 76:12

**presentation**
67:2 103:22
108:24 111:4,24

**presented**
16:25 45:18 49:24
62:24,25 63:10,17
108:13,15,18,21,
22 110:10 112:11

**presenting**
50:11 71:15

**president**
2:8

**pressure**
31:20

**pretty**
77:11 79:11 82:7

**prevented**
74:25

**previous**
47:20 59:7 67:12
74:21

**previously**
69:22

**primary**
14:2 49:11 66:3

**print**
24:17

**prior**
23:12,15 34:7
52:24 63:13 85:15

86:24 92:22 94:16

**prioritization**
15:3 78:9

**prison**
24:12

**private**
50:2

**privately**
48:25 49:1 60:10
78:19

**privilege**
46:21

**proactively**
19:16

**probation**
17:19 44:13 50:6,
15 51:16 53:23
55:3,9 60:24 73:18

**problem**
25:12 26:7,13 31:6
43:20 51:4 57:8
106:3,4,6

**problems**
5:21 9:7,22 24:13,
14 37:4 84:25
89:24 94:1

**procedure**
63:8 64:4 81:6

**procedures**
40:11 63:4

**proceed**
46:13

**proceeded**
17:4

**proceedings**
2:25 3:7 75:17

**process**
4:2 21:14,20 22:1,
2,5 24:7 29:20
31:23,25 32:6,8
35:9 40:11 45:6,15
62:18 65:7,24 67:1
70:19 72:25 73:8
74:17 75:21
111:24 112:2,9
114:8 115:5

**profession**
73:2 76:23

**professional**
9:25 42:7 63:9
67:6 85:18

**professionalism**
85:16

**profound**
100:3

**program**
4:7,16 5:3 6:3
17:19 21:17 27:6
39:13 47:6,11,12
48:14,15,21 49:5,6
50:17 51:12 53:11
62:10,16 63:4 64:5
66:14 72:21 73:10,
13,23 74:7,13
75:4,8,14,18 92:5,
17,20 93:7,14,16,
24 107:20,24
108:1 109:5,13
114:25 115:7,9

**programs**
92:19 109:4
110:19

**progress**
23:23 40:15 64:21
66:16,18,21 76:15

**progressed**
40:8

**promise**
50:8

**promised**
62:15

**proof**
20:8

**proper**
53:7 57:25

**proposed**
66:20

**prospects**
73:3

**protect**
60:1

**protested**
74:20

**proud**
75:8

**provide**
14:15 19:14 27:21
43:11 67:25

**provided**
15:10 19:20 23:24
34:25 38:20 43:12
78:1,12,13

**providing**
64:12

**proving**
43:6

**provisions**
65:22

**provoke**
56:22

**psychiatric**
38:12

**psychiatry**
2:19

**psychological**
31:4,10 33:16
34:18 35:16 45:13

**publications**
5:5

**publicly**
50:9

**pulled**
39:18

**pulse**
10:22 14:3

**Punctuality**
9:18

**punished**
52:5 55:18 59:3
60:14 68:4 72:2
111:12,14

**punishment**
72:3

**punitive**
31:25 32:15 35:14
115:5

**purpose**
62:4 93:23

**purview**
56:23

**put**
25:2 69:11 79:21
80:6 81:1,2 97:11
98:10,15,19,20
102:21,22 103:10

**putting**
106:15

**puzzled**
48:8 60:6

**Q**

**Q4**
90:12

**quality**
30:19 84:19

**question**
76:25 79:12 87:23
89:5 91:7 96:13
101:25 113:7

**questioned**
54:18

**questions**
3:11,12,13,15,17,
18,19,24 4:2 12:17

17:16 27:5 44:6
46:9,10 76:3 82:23
85:20,21 94:12,15,
23 100:19 103:15
116:6

**quickest-to-grab**
112:12

**quickly**
47:15 51:9

**quit**
91:23

**quote**
104:4

**quotes**
104:6

**R**

**racial**
71:6

**racially**
73:9

**racially-based**
116:3

**racist**
71:15

**racked**
50:25

**radial**
10:22 14:3

**radiographs**
11:4

**radiology**
56:6 109:25

**raise**
2:6

**raised**
72:8

**ran**
6:11

**rank**
41:3

**ranking**
5:10 41:4

**rate**
75:5 92:4,16,20
106:18 107:4

**rationalize**
17:4

**Raymond**
16:23

**re-doubled**
54:10



Irani, M.D., Afraaz R. v.
Palmetto Health-Richland

Termination of Dr. Irani, Committee Meeing
April 30, 2015

reached
48:21

reaching
51:18

read
7:17 15:14 36:18
84:15 96:19

readily
72:14

reading
12:17 36:23

ready
3:23 6:15 36:24
46:13

real
20:20 23:15

reality
109:12

realize
33:3

realized
33:8 51:10,17

reason
9:13 94:10 114:24

reasonable
36:22 43:12 79:19

reasons
92:18 94:20,21

recall
86:7 89:20 94:21
95:11,12,19,23
98:12 99:21,24
100:5 110:12

receive
7:23

received
16:6 44:7 57:15
60:6,25 61:25 62:9
66:9 68:17 108:20

receiving
7:3 64:6 66:13

recent
44:16 71:11

recently
75:10 112:7

recognition
97:6,19

recognize
6:25 8:13 50:22
97:22,24

recollected
13:11

recollection
12:13,20 23:19

62:8 101:17
109:24 110:4

recommend
29:21 30:3 39:13

recommendation
54:13 56:24 57:7
62:11

recommendations
17:12,21 35:12,23
36:14 39:22

recommended
16:14,17 19:9,13
31:9 46:1 53:22

recommending
69:3

reconcile
48:2

reconstruction
89:9

record
14:9 23:20 39:11
41:2 95:21 102:5
103:5 109:14
116:24

recorded
107:11

recording
27:10,15,16

records
64:24

recount
89:10

recourse
39:13

recruit
6:3

redoubled
68:13

reduced
86:22

reduction
49:12 85:25 86:8

reductions
61:19

reevaluated
50:21

refer
4:25

reference
55:21 87:5

referenced
88:16,22

referencing
83:4

referring
91:25 100:18

reflects
64:3

refresh
89:22

refused
11:22 26:21 65:14
74:13,19 104:20,
22

regard
112:5

regrettable
13:12

regularly
49:4 71:7 74:24
75:15

regulations
106:9

reinstated
67:7 104:20

reinstatement
36:4

reiterate
29:24

related
22:20,21 23:17

relating
112:1

relationship
23:8,13 31:19

relationships
8:21

relative
22:25

relevant
3:6 107:6 108:8

relied
56:13 57:4

religious
71:10

reluctantly
44:4

relying
57:19

remaining
31:2

remediation
15:9 16:15,18
17:14,18 18:2
21:14 22:4 23:23
25:8,17 27:19,20
28:1 29:19,25
31:11 32:1,14

35:17 36:6,16,18,
21 40:5 46:2
47:17,18 48:23
50:13 53:6,12,22,
25 54:1,3,13,16,20
55:12 62:12 64:21
66:17,21,24 67:9,
13 68:1 70:3 71:7
72:16,18 83:10
103:9 109:9
110:15 115:6

remediations
36:8

remember
41:3 85:11 95:18
100:15 103:23,24

remembered
49:15,16,19

removal
55:24

removed
13:2 68:8

rendered
89:1

reneged
75:24

repeat
3:7 90:23

repeated
20:9 24:18 40:3
41:17 65:2 83:11

repeatedly
14:19,24 23:6
52:23 58:13 73:13,
15 76:5 77:23
80:19

replied
58:18

report
105:21

reported
105:22

reporting
106:20

representation
57:25 108:21

Representing
2:16

reputation
60:17 70:22

request
10:18 22:3 31:3
40:1 65:4,5 66:1,
24 74:21

requested
14:17 55:5 56:11
98:17

requesting
66:10

requests
14:15 65:2 73:20

required
14:25 49:2 77:24
97:19,24

requirements
37:6 109:4

requires
7:21

research
5:6

reservations
66:12,21

residency
4:9 27:23 32:2,14
41:14 43:19,22
47:11,16,22 50:16
51:3 73:19 75:9
104:14 115:14

resident
2:19,20 7:16 8:15
10:9 11:5 19:13
20:3 21:17 24:8,11
25:6 26:11,17
36:1,17 38:21
39:1,7 40:4,7,20
43:15 47:20,21
48:24 49:8 50:4
54:9 56:4,6 58:17
59:13,14,15 60:8,
21,24 63:3 64:1,7
65:8,19,22,25 66:2
68:21 69:25 70:1,
13,15,16 71:18
74:4 75:7,20 78:18
82:18 91:25
101:21 105:9
109:7,23 110:19,
20,21,22 115:8

resident's
66:4 88:13 102:19

residents
5:21 6:6 7:14 9:4,
6,7,8 15:5,18
16:12 19:10,11
20:7 21:18 27:4,11
30:6 31:5 36:19
40:17,19 41:9
42:2,4 43:23 44:2
48:13,16,22 49:5
50:6,23 51:10
55:7,8 57:17 58:25
59:17,19 63:4



68:8,24 71:25 74:1
75:1,5 78:15 83:13
92:5 106:1,2,5,16,
18,21,24 107:2,5,
12,13,17 111:1
112:23,24 113:12
114:17 115:20

**resides**
71:12

**resolved**
54:4

**resource**
2:16

**resources**
2:9

**respect**
64:16 66:6

**respectable**
5:7

**respond**
17:15,21 33:10
47:25 57:21 64:7,
13 80:13

**responded**
53:8

**responding**
33:25 34:10 51:12

**response**
18:1,2,5,9 25:5
42:18 48:7,13 49:6
53:11 80:15 85:23
105:23 110:9

**responses**
113:25

**responsibilities**
2:3

**responsibility**
8:2,11 22:22 26:22
32:25 34:6,12
72:12 114:2

**responsing**
51:11

**rest**
42:21 46:23 54:23
58:7

**restorative**
115:3

**restore**
32:14 43:21

**result**
17:18

**resulted**
15:4

**results**
4:1 67:20

**resuscitation**
14:13 74:10

**retribution**
71:19

**retrospect**
51:2

**return**
115:6

**returned**
56:8 70:10

**review**
12:14 13:17 14:11
17:14 32:10,16
36:6 46:8 106:12

**reviewed**
13:25 23:22,23
27:19 36:7

**reviews**
76:20

**Richland**
52:8 68:9 81:19

**rid**
104:6 114:9
115:20

**riding**
93:6

**right-hand**
4:24

**ring**
100:4

**risk**
55:10 96:7,11 97:1

**Robinson**
11:22

**rocky**
82:14

**role**
2:9 3:5 23:4 68:12
71:16

**rolled**
25:20

**room**
2:25 10:12 11:1
15:1,7,23 18:21
19:6 26:20 38:3
42:8 56:4,8 70:14

**Ross**
8:14

**rotate**
30:6 41:9

**rotated**
10:23 20:5 68:10

**rotating**
22:15 68:6

**rotation**
5:13 8:19 16:9
41:10 44:8 74:25
81:17 111:21

**rotations**
5:14 68:7 74:24
80:24

**rough**
6:14 8:15 82:16

**rounds**
9:18,20 39:1 91:2
103:7,19

**routed**
52:9

**rumblings**
41:6,12

---

**S**

**sacrificed**
75:23

**sacrifices**
46:25

**saddened**
62:6

**safeguards**
60:1

**safety**
29:21

**salvageable**
43:20

**sat**
20:12 25:19 34:4
80:24

**Saturday**
59:7

**Savage**
10:13 11:13 13:16
28:19 35:6

**scab**
59:7

**scale**
6:24

**scattershot**
21:9

**scenarios**
88:17

**schedule**
5:13 21:15 56:3
57:12 68:6

**scheduled**
31:13 34:17 54:16,
21 56:2,7 57:11
68:6

**scheduler**
81:18

**schedules**
46:22

**school**
4:19 5:5 41:2 72:9

**SCOA**
101:20

**scored**
5:7

**scores**
74:3

**second-to-the-last**
10:3

**second-year**
60:23

**secondhand**
56:13 57:5,19

**secret**
49:3

**secretary**
62:18 81:9

**secretly**
27:16

**sedation**
61:18 63:15

**sedative**
23:10

**seek**
9:5

**selection**
76:9

**send**
53:11

**senior**
27:14 40:7 51:10
69:25 110:18,20

**senior-level**
110:23,25

**sensation**
10:20

**sense**
25:6 97:18 99:18
100:13

**sensory**
86:5

**sentence**
97:2,8,17,20

**separate**
25:9

**separately**
28:22,23

**September**
22:17

**seriousness**
2:24

**serve**
68:12

**served**
4:19

**service**
6:15 7:12,18,23
9:19 10:19 14:23
24:2 37:1,2,3
40:17 45:3 67:12
68:9,19 70:1,11
84:3 85:9 91:3
110:16,20 111:2
114:10,15

**services**
5:18 22:14 30:7
41:6,8 42:3,4

**sessions**
52:3

**set**
8:24 21:22 37:6
48:10 72:18

**sets**
81:14

**setting**
42:20 72:11

**severe**
28:14

**share**
3:6 50:23 102:15

**sheets**
61:24

**shine**
6:17

**shocked**
54:17 62:5 65:14
72:23 114:4

**shook**
49:15

**short**
11:11 41:16

**shortcomings**
96:3,22

**shortly**
66:10

**shot**
50:20 86:16

**should've**
57:8,18 58:16
79:21,22 80:3
86:20



shoulder
58:10,13 89:9
90:13

shoulders
41:23

show
11:19 43:1 59:16
68:16,20 106:2,9,
10

showed
30:20 45:17 52:13
54:10 61:22 76:14,
20 78:22 82:17

showing
83:12

shown
7:20 52:11 79:7

shows
48:7 52:11 76:18
78:8 83:14 98:13
102:25 103:5

shucks
43:3

sic
51:11 63:11

side
4:24 6:13 32:12
34:22 57:5 64:14
74:13 110:10

side-by-side
87:9

sides
3:25 62:4

sigh
25:20

sign
2:25 3:4

signed
37:8 55:16 94:19

significant
8:6 14:12 16:8
19:19 29:25
107:23 108:1

significantly
53:16 92:20

signs
11:2 24:18 89:14

similar
7:9 26:7 60:4
71:25 86:12

Similarily
63:11,21

Simon
28:19

simple
24:16 63:7

simply
48:12 51:23 59:19
61:11 104:4

simultaneous
105:6

single
11:6 30:13 43:20
50:7 88:25

singled
40:13 73:10

singling
71:14

sinister
53:21

sir
85:19 97:14,21
103:1,5 109:11

sit
47:4 87:8

sitting
2:13 26:20

situation
38:1 41:25 42:10
43:16 55:18 59:2
60:13,22,25 61:3
64:20 68:3 72:1
75:21 92:8 96:13
97:7

situations
89:6

six-month
23:22

skill
8:24 22:25

skills
9:1,24 14:20 60:5
78:3

skips
81:8

slander
70:23 71:14

slandered
73:1

slandering
60:16

slap
62:20

sleep
31:15

slightly
42:6

slip
81:1

slow
9:17

smacks
43:7

small
47:11

smallest
75:6

smart
41:1

smooth
91:22

snow-balled
82:10 83:16

snowball
82:13

social
9:24 42:6

sole
110:20

solicited
23:22 34:22

soliciting
72:20

solidifying
39:16

sort
30:8 41:22 42:6
80:12,14 83:15
111:9 115:18

sought
5:10 66:14

sounds
27:12 95:12
101:18

south
4:18 54:25 72:8

spanning
82:2

speak
28:18 51:23 53:14
64:24 114:1,9

speaking
13:15 20:6 28:22,
23 66:16 105:6
116:5

speaks
48:16 115:1

specific
77:9,25 80:22,25
87:5 101:12
103:21

specifically
5:19 90:6 95:23
115:4

specifics
22:24

sped
30:1

speed
29:19

Spencer
11:22

spent
89:8

spine
37:14 69:13,25
84:1 85:11 95:5
97:20,24 110:21

splint
13:2

splinting
11:4

spoke
32:22 48:24 51:23
60:9 66:15 78:18
101:9 109:21,22

spoken
8:5,8 55:15 58:22

sports
9:23 115:15,16

spot
53:19 56:2 83:4
108:25

spotlight
82:13

spread
90:19

Sridaran
2:19

stack
41:14

staff
4:18 8:21 13:13
23:18 26:10,13
28:17 38:5 42:4
56:1 60:3 61:7,23
63:5 70:24 75:3
79:1 85:7 88:18
109:20,22

stage
48:10

stand
57:23 85:4,6,13
108:22 116:10

standard
63:8 70:21 90:13

standpoint
38:9 87:20 115:18

Stanford
5:4 72:10

start
4:22 5:16 6:14,18,
19 7:2,16 8:15
28:10 47:1,8,10
82:15

started
2:4 4:4,10 5:12
24:20 46:17 54:23
68:19 76:17 82:16

starting
6:24 39:15 112:24

starts
41:5

stat
26:14

state
3:10,16 12:4 94:11

stated
11:25 12:1 13:24
15:6 56:20 60:4,12
63:25 66:19 105:8
107:20 108:24
109:8,13,21
110:14 111:4,11,
23

statement
3:21,22 48:23
56:25 96:8,10
97:12 98:1 104:9,
10,17 105:13
108:19 109:2,10,
16 112:4 113:22,
24 115:23,25
116:4

statements
50:12 59:25 62:24,
25 63:11,21 67:3
74:8 78:10 79:3
86:9 91:18 108:13,
18 114:3

states
4:20 13:24 18:17
31:18 35:12 64:4
115:5

stating
16:22 23:21 24:24
25:5 93:11 95:15
107:10

station
61:22

status
55:24 58:10,11,19
100:4



Irani, M.D., Afraaz R. v.
Palmetto Health-Richland

Termination of Dr. Irani, Committee Meeing
April 30, 2015

**stay**
19:9,13

**step**
5:7 7:24 36:3 47:8
63:14 112:18

**step-by-step**
68:21,22

**steps**
91:20

**Stevens**
12:9 16:23 18:3
24:9 33:20 34:2,7,
9,16,20,21 35:8
55:15 65:19 74:19,
20 105:18 112:19
115:4

**Stevens'**
21:25

**sticky**
60:22,25

**stone**
21:22

**stop**
7:16 11:20 50:11

**stopped**
41:10 79:22 80:4
114:11

**story**
6:13 28:19 32:13
34:22 57:6 62:4
64:15 74:13 110:8,
10

**story-telling**
114:2

**street**
6:11 56:9 110:1,2,
5

**strength**
37:17 99:6

**stress**
70:17 71:4

**strived**
68:16 72:19

**striving**
55:7 83:14

**stronger**
53:17

**students**
24:20

**stuff**
77:23 81:3 83:12
94:4 116:4

**stunned**
58:21 62:6

**stunning**
64:9

**subject**
47:5 70:23 72:25
73:9

**submitted**
62:12 73:15

**subsequent**
20:21 23:4 26:19
72:17 76:14

**subsequently**
22:3 24:8 98:2
101:19 102:21

**substandard**
15:10,11 16:6
19:14,17 40:4
43:12 58:14 78:22
86:20 111:22

**substantiate**
116:7

**substantiated**
50:11 63:20 67:21
116:1

**succeed**
9:1 114:7

**success**
41:2

**successful**
44:2

**successfully**
64:18 67:3

**suggestions**
19:19

**summarily**
66:24

**summarize**
22:13

**summarized**
113:24

**summary**
24:24 25:3 52:21
73:5

**superiors**
58:4 63:24

**supervise**
60:24 68:11

**supervision**
40:20 49:8 70:15
75:20

**support**
7:21 23:14 50:9
57:17

**supporting**
4:14

**supportive**
41:4

**supports**
115:21

**supposed**
33:17

**suppressed**
47:15

**surface**
114:21

**surfaced**
114:20

**surgeon**
8:25 50:22 51:19
75:23 116:13

**surgeon's**
26:10

**surgeons**
115:12

**surgery**
2:20 11:10 13:12
20:3,11 38:24
47:10 48:14 58:10
65:12 76:17 81:1,2
83:7 89:10 99:10

**surgical**
8:24 22:25 38:9
89:14

**surprise**
53:13

**surprised**
18:4

**surprising**
54:11 63:24

**surrounding**
17:10

**surviving**
50:20

**suspended**
36:5 40:2 62:2
67:3 69:3

**suspension**
28:8 29:22 30:3
39:25 54:14 62:4
65:6 66:12 68:15
74:16 92:22 94:16

**sustained**
14:14 37:9

**suture**
15:12

**swollen**
38:18

**symptoms**
101:15

**syndrome**
38:19 69:6,8 79:13
88:24

**system**
59:23 94:16,22

**system-based**
106:6

**system-wide**
106:3

**systemic**
61:18 63:12 87:15

———————

**T**

**tail**
32:17

**takes**
35:22 83:7

**taking**
30:13 52:3 55:10
59:10 75:5

**talk**
6:7 41:23 43:24
61:9,12 63:9 84:4
89:7 92:16,19 94:2
111:17

**talked**
6:12 23:5 32:24
34:5 43:4 56:4
61:17,20 62:7
78:22 79:1 85:12
88:4 89:19 102:14
111:16 114:21

**talking**
15:17 25:22,23
27:12 29:12 40:25
42:10 49:5 63:14
72:20 77:15 86:23
87:2 92:2

**talks**
41:20,21

**tape-record**
27:17

**tape-recorded**
113:8,14

**tardiness**
14:25 19:6,8 26:1
77:24

**tardy**
103:13

**target**
57:13

**targeted**
70:20 75:22 111:5,
6

**tarnished**
73:3

**task**
3:6 53:3

**tasks**
5:23 24:13

**taunted**
71:7

**taunting**
71:6

**team**
25:6 49:11 54:23
68:20

**teams**
44:12

**teamwork**
27:23

**tee**
40:12

**telephone**
16:1 100:11,14

**telling**
24:19 34:7 52:25
90:7 106:14,23,25

**temper**
8:23

**ten**
4:19 16:4 65:6
66:1 112:5

**tender**
38:18

**tendon**
81:6,14

**tenums**
15:15

**terminated**
92:8

**terminating**
44:4

**termination**
2:13 4:15 17:19
48:11 69:4 75:11
92:23 94:17 104:5

**terms**
22:23 76:16 91:18
96:3,22 103:12

**terribly**
51:8,9 55:3

**terrorist**
51:6,7 58:23 71:8,
11,23 73:13

**terse**
25:5



Irani, M.D., Afraaz R. v.
Palmetto Health-Richland

Termination of Dr. Irani, Committee Meeing
April 30, 2015

**testimony**
103:16 104:4

**testing**
37:17 99:6

**tetanus**
11:4

**text**
52:16

**textbook**
84:15

**texted**
52:14 84:2

**thanked**
49:17

**thankful**
13:4

**theme**
41:18

**therapist**
37:21

**thing**
13:25 14:5 18:14
20:15 21:9 22:11,
18 23:15 25:2,9
30:8,20 32:17
35:14 43:20 45:25
51:18 59:1,13
64:22 80:12 87:18
99:4 115:2

**things**
4:13 5:23 6:4,19,
22 9:22 16:13 18:4
20:17,19,22,23
21:2 23:1,5,8
24:15 28:7 30:10
31:24 32:19 34:5
36:18,22,25 42:8
44:1 45:20 49:8
51:12 54:7 67:15
71:25 77:13 80:25
82:13 83:11 89:2
106:20 108:7
113:24 114:13,17,
19 115:7

**thinks**
85:13 107:23

**thoroughness**
100:24

**thought**
9:15 26:23 33:6,14
37:6 56:23 60:10
62:18 68:23 80:4
91:5 99:14 111:18,
19 112:11

**thoughts**
25:17 96:18

**thread**
34:19

**threads**
11:15

**threatened**
53:17 58:24 88:21

**threatening**
71:23

**three-month**
28:8

**thrombocytopenia**
38:11

**throw**
41:22

**Thursday**
24:23

**time**
2:2 3:6,13 5:22
7:15 10:1 11:13
14:24 17:17 22:16
25:13 26:2 30:7
31:2,22 32:22
33:5,8 36:10,13
41:11,17 46:8,11
52:5 53:2,3 66:12
67:8 70:6 72:16
74:20 77:24 78:4,
11 79:2,3,19,25
80:3,18 81:5 82:2
89:8 101:12 102:8,
24 103:12 116:21
117:1

**time-out**
28:9

**timeframe**
28:2

**timely**
37:4

**times**
9:20 25:9 30:21
31:25 32:3,19
35:3,5 59:20 74:17
77:9 99:25 103:19
111:11,23

**tired**
33:17

**today**
2:9,17 3:1 4:1,22
31:14 47:2 78:11
89:3 100:16 110:1
112:12 114:1

**today's**
2:18 3:7 105:3

**toed**
61:14

**told**
6:13 34:16 38:21
39:7,17 42:18
43:15 47:17 51:21
52:15 56:1,21
59:7,8,13,14,17,20
61:17 63:15 67:15,
17,19 68:3 69:3,
15,18 81:24 88:10
89:11,23 90:1
91:1,5 98:18,25
99:16 100:6,12
101:14 102:10
103:11 115:10
116:7

**toll**
52:4

**tone**
54:17 83:5

**toned**
53:16

**tool**
68:24

**top**
5:10 7:5 18:11,25
95:18

**topic**
18:20

**total**
8:2 15:25 16:5
38:7 59:6 68:23

**totally**
87:21,22

**touch**
10:21 86:1

**touched**
86:2

**Toussant**
63:14 87:16

**track**
32:2 35:15

**trade**
48:14

**training**
10:5 35:13 47:14
50:21 74:3

**transfer**
24:24 81:6,14

**transferred**
25:1 52:8

**transition**
9:10

**transparency**
21:15

**transpired**
62:6

**trauma**
5:19 7:9 9:19 10:7,
19 11:1 14:13
23:10 27:16,17
28:12,15 29:18,22,
24 32:11,24 49:10
60:6 61:5 62:2,14
63:7 71:19 74:9
86:13 87:23,24
88:2,9,12,22
111:16 116:8

**traumatologist**
88:12

**tray**
81:14

**treat**
49:10 69:10

**treated**
51:1 66:22

**treating**
7:25 40:18

**treatment**
58:21 66:13 70:18
71:19 95:5 111:8,
10 115:25 116:1

**tremendous**
43:10

**trick**
34:1,7

**troubling**
48:6 51:2

**true**
48:10 50:4 53:19
54:5 91:21 93:18
95:17 96:5,24 97:6
105:1 107:3
108:25 109:1,24

**trust**
41:6,7 43:11

**truth**
43:8 63:19 90:7
106:14,23 107:1

**Tuesday**
38:16 42:23 95:5,
10,15

**tunnel**
81:3

**tunnels**
81:13

**turn**
6:18 7:4 8:10,14
53:21 74:19

**turned**

**transpired**
62:6

20:14 31:22 54:7
62:5,19 64:18
74:15

**tutelage**
37:7

**two-month**
68:14 70:10

**twos**
6:25

**type**
7:3 37:16 41:23
43:12 105:12
112:1

**typing**
7:16

---

**U**

**Uh-huh**
84:17 92:25 93:9
96:9 97:9 98:5

**ultimate**
49:18 50:21 62:20

**ultimately**
52:2 82:8 96:3,21

**unable**
53:14 73:21

**unanimously**
27:25

**unbiased**
75:2

**uncaring**
55:14

**unchanged**
69:8,9

**unclear**
12:19 59:4

**uncompetencies**
67:13

**uncouth**
55:14

**undergo**
71:5

**undergraduate**
72:9

**understand**
2:24 8:7 33:6 48:4,
9,19 60:7 64:20,25
65:3 72:12 80:8
90:21 92:15 96:13
114:14

**understandably**
61:7,9

**understanding**



Irani, M.D., Afraaz R. v.
Palmetto Health-Richland

Termination of Dr. Irani, Committee Meeing
April 30, 2015

21:8 29:8 56:9
57:2 65:17 66:7
110:5 111:15
**understood**
96:11
**unethical**
47:5 64:15 75:12
**unfair**
22:5 32:7 35:9
40:10 75:22
111:10 112:2
**UNIDENTIFIED**
44:7,11,15,18,23
45:1,5,6,10,12
76:4,22,25 77:2,5,
8,17,19 79:8,10,
15,18,23 80:8,11,
17,21 82:1,6
83:19,24 84:12,18
85:15 94:6,8
103:15
**unintelligible**
2:2,13 3:4 20:7
44:8,9 80:19 84:13
86:11,13 94:6,8
95:22 105:6,19
107:19 108:11
**unique**
8:20
**United**
4:20
**university**
4:18,21 64:3 72:10
**unjustly**
73:3
**unmerited**
70:18
**unprofessional**
51:9
**unprofessionalism**
60:5
**unsatisfactory**
40:14 73:16
**unsolicited**
58:1
**unstable**
29:15
**unsubstantiated**
52:2 73:19
**unsupervised**
70:10 110:16
**unsure**
13:2
**untrue**
59:21 63:12

**unusual**
5:25 6:5 7:2,22
9:2,5,6,8 13:23
40:1 64:10
**unwillingness**
73:7
**uphold**
35:11
**upper**
55:25
**upset**
61:7,9 83:3
**upsetting**
55:10
**urgency**
8:13
**usual**
51:25

---

**V**

**VA**
8:15,16 15:24 25:1
26:7 37:4 52:7,14,
17 68:6 74:24 75:3
112:23,25
**vacation**
53:18 54:20,21,22
55:13,16
**vague**
17:2 52:1
**validated**
72:17
**Vance**
28:18
**varied**
29:9
**variety**
89:3
**vary**
29:4
**vast**
27:3
**vendetta**
83:2
**veracity**
59:25 62:23
105:12
**verbal**
16:11,12 40:6
41:20 65:2 105:23
**verbalized**
57:24
**verbally**

22:23 25:11
**verification**
73:21
**verified**
71:18
**verify**
37:22
**version**
12:15 14:6,7 29:5
32:11,24 35:7
110:8
**versus**
21:17
**vice**
2:8
**Vicryl**
15:12,18 17:9
**view**
11:6 12:7
**vilified**
70:20
**vilify**
54:10
**violate**
75:15 106:9
**violated**
49:3 63:25 64:11
106:8 107:10
**violating**
106:2 107:17
**violation**
67:1,5 74:14
105:24 106:18
**violations**
40:17 49:8 75:20
93:14,16,19,22
105:14,16,21
107:1,5,8,11,23
108:1
**visit**
13:6 54:25
**vital**
11:2 24:18
**volunteered**
49:16
**Voss**
9:17 10:2 38:15
42:25 45:2 68:23
95:4,9,15,20 96:2,
15 97:23 100:23
**Voss'**
37:1,2,3,7 43:14
44:16 68:19 97:11,
14

**vote**
3:23 4:1 16:24
17:13
**voted**
27:24
**voting**
2:11 50:13

---

**W**

**Walker**
91:1
**walking**
6:10,11
**Walsh**
2:17 4:5,6 10:8
11:12 15:19 16:10,
22 19:23 20:2
22:8,10 23:24
28:22 30:4 31:1
32:9,10,13,17
34:23,25 35:20,22
39:3,5 40:24 42:15
44:6 45:17 46:11,
21 50:3 62:1,3
67:18 68:5 70:23
80:18,23 81:10,17
83:17 85:21,22
86:4,6,9,23 87:2,7,
11,19 88:2,4,8,11,
16 89:7,16,19,23
91:7,11,15,18,24
92:4,7,11,14,22
93:1,4,7,10,12,15,
18,21,25 94:9,12,
15,20 102:17
104:25 105:4,7
106:14,22 107:7,
19 112:19 113:6,7,
11,14,16,19,23
114:14 115:16
116:15
**Walsh's**
25:13
**wanted**
12:3,22 13:14,15
19:25 21:14,15,16,
17 28:4 43:21
48:19 56:15 60:7
64:20 82:24 94:10,
11 98:19,24
101:15 109:20
114:6,7
**wanting**
27:13 94:2
**ward**
24:14

**waste**
41:11
**water**
30:18
**ways**
7:1 54:8
**weakness**
58:11,19 89:12
**wedding**
55:4,10
**Wednesday**
33:24
**week**
31:14 37:11 45:3
49:4 53:23 60:19
80:23 81:16
**weekend**
26:5
**weeks**
20:5 28:3 34:23
45:4 47:16,22
50:15 53:20 54:12
73:18 75:8
**Wehunt**
62:10
**weird**
27:12
**welfare**
8:12
**West**
47:9 72:10
**wet**
61:24
**whatsoever**
22:23 33:15
115:21
**wife**
53:15 114:11,13
**willingness**
22:21
**wise**
54:19
**wished**
68:19
**witch-hunt**
58:2 114:23
**withdrew**
92:11 115:9
**withholding**
40:22
**witnesses**
13:10 64:6,11
**wondering**
56:23

Irani, M.D., Afraaz R. v.
Palmetto Health-Richland

Termination of Dr. Irani, Committee Meeing
April 30, 2015

**Wood**
24:11,15,19 25:2
26:20 27:4 38:21
39:5,6 51:23
60:21,23 101:5
102:10,12 109:23

**Wood's**
101:24 110:9

**word**
50:2,7 104:1,24
105:1

**words**
59:9 104:3

**work**
4:20 8:16 9:24
10:1 15:6 19:9,10
37:10 48:24 49:6,
8,22 51:17,19
52:25 54:23 55:6,8
68:15 70:12 75:19
78:1 83:13,18
84:25 115:8

**worked**
46:1 66:5 68:24
75:23 110:19
114:7

**working**
24:3 46:21 58:5
60:12 84:11

**worried**
52:22 57:14 89:14

**worrisome**
89:13

**worry**
83:19,21,24 84:8

**worse**
43:14,16 51:12

**worsening**
101:15

**worst**
13:17 49:25

**worthwhile**
9:16

**would've**
58:17 102:8
105:10

**wound**
11:2,3,7,18,24
12:22 13:1,17
14:18 15:11,18
17:9 26:3 59:9
71:21

**write**
25:7 66:10 99:3,17

**writes**
7:11

**writing**
17:21 53:9 64:7
97:16 101:7

**written**
2:5 7:19 40:7
41:20 48:3 63:25
65:2 80:3 99:2
101:3 102:8
110:11

**wrong**
33:10,12 43:7
52:4,6 55:19 57:12
59:3 60:14 68:4
72:2 78:7,17 80:1
83:6 89:3 111:13

**wrong-or-right**
89:5

**wrote**
11:10 23:21 24:11
35:4 44:19 58:1
79:15,16 95:20
101:5 102:6
105:17 107:3,16
108:5

---

**Y**

**year**
9:10,12 10:5,11
41:16 54:24 73:12
75:6 76:8,21
82:16,20 103:19

**years**
4:20,24 5:3,8
10:14 41:9 42:2
47:20 53:10 75:7
92:7 115:9

**young**
72:15

---

**Z**

**Zach**
2:19

