# EXHIBIT Q

1              In The United States District Court

2              For the District of South Carolina

3                      Columbia Division

4              C.A. No. 3:14-cv-03577-CMC-KDW

5

6   AFRAAZ R. IRANI, MD,                    )
                                            )
7                      Plaintiff,           )
                                            )
8           vs.                             )
                                            )
9   PALMETTO HEALTH; UNIVERSITY OF          )
    SOUTH CAROLINA SCHOOL OF MEDICINE;      )
10  DAVID E. KOON, JR., MD, ETC.,           )
    JOHN J. WALSH, IV, MD, ETC.,            )
11                                          )
                       Defendants.          )
12  _____ )

13                   D E P O S I T I O N

14  WITNESS:              AFRAAZ IRANI, MD

15  DATE:                 June 30, 2015

16  TIME:                 9:00 a.m. - 7:05 p.m.

17  LOCATION:             Ogletree Deakins
                          1320 Main Street
18                        Columbia, South Carolina

19  TAKEN BY:             Attorneys for the Defendants

20

21  REPORTED BY:          KATHRYN J. LINDLER

22  _____

23                  COMPUSCRIPTS, INC.
              Client Focused. Deadline Driven.
24  CHARLESTON COLUMBIA HILTON HEAD GREENVILLE MYRTLE BEACH

25                   1-888-988-0086

Afraaz Irani 6/30/2015

13

1    things.

2        A.    Right.

3        Q.    You filed a common application that you used for

4    Palmetto Health, correct?

5        A.    Correct.  You're specifically mentioning the

6    Electronic Residency Application System?

7        Q.    Hm-hmm.  Correct.

8        A.    I did apply through that, correct.

9        Q.    Did you use any other form of application for the

10   residency program here in Columbia?

11       A.    I don't know if Palmetto Health required a

12   supplemental application.  I don't believe at the time they

13   did.  I know several programs did.  Maybe Dr. Koon could

14   answer that question better.

15       Q.    He's finished.  He doesn't have to answer anymore

16   questions.

17       A.    He doesn't have to answer.  I know.

18       Q.    Did you interview here?

19       A.    I did.

20       Q.    With whom did you interview?

21       A.    Dr. Hoover, Dr. Voss and Dr. Koon.

22       Q.    Dr. Hoover at the time was a chief resident or

23   about to become a chief resident?

24       A.    No, he was PGY3 I believe.

25       Q.    The residency program for orthopedics is a

Afraaz Irani 6/30/2015

14

```
1    five-year program, right?
2         A.    It's a five-year program, yes, ma'am.
3         Q.    One becomes a chief resident at PGY what?
4         A.    So at Palmetto Health one becomes a chief
5    resident at PGY5.  Chief resident can vary how they call
6    someone a chief resident from institution to institution,
7    but here the chief resident is synonymous with the PGY5
8    year has been my understanding.  I don't know if it's been
9    explicitly codified anywhere in writing that's what it is,
10   but my assumption has always been it's the PGY5 year, yes,
11   ma'am.
12                        (WHEREUPON, Defendant's Exhibit
13                        No. 1 was marked for
14                        identification only.)
15        Q.    The court reporter has handed you a document
16   marked as Defendant's Exhibit Number 1.  This was provided
17   I believe by USC in discovery.  Have you ever looked at
18   this?
19        A.    I have seen this.
20        Q.    Do you know what it is?
21        A.    So I've only reviewed the documentation.  I've
22   had no background.  So I'm assuming it's the -- at the top
23   it says orthopedic applicant interview review, and again I
24   guess what I'm doing is giving my interpretation.
25        Q.    Certainly.
```

Afraaz Irani 6/30/2015

38

1    troubling and not something that's a high point in my life.

2        Q.    But you don't think you were fairly terminated

3    from the program, do you?

4        A.    No.

5        Q.    So you chose not to explain to individuals why

6    you were --

7        A.    I took a three-day hearing in California and I

8    was on the stand for over eight hours just to go through

9    all the allegations.  It's, it's -- it gets me incredibly,

10   emotionally incredibly worked up to relive this each time.

11   It was probably the most traumatic event I've been through

12   in my life, central event in my life.  I still have

13   nightmares about it.  I'm not going to revisit it if I

14   don't have to.

15       Q.    You chose what you allowed these folks to know

16   then?

17            MR. ROTHSTEIN:  Object to the form of the

18   question.

19       A.    I chose what I allowed these folks to... I mean I

20   generally am in control of my own words.

21                        (WHEREUPON, Defendant's Exhibit

22                        No. 2 was marked for

23                        identification only.)

24       Q.    The court reporter has handed you a group of

25   documents marked as Defendant's Exhibit Number 2.  They're

www.compuscripts.com

Afraaz Irani 6/30/2015

47

1      A.    Family.

2      Q.    Was it a vacation or what?

3      A.    It was family.  I prefer not to get into the

4  details of it.

5      Q.    Were you aware that Dr. Koon served in the

6  military?

7      A.    He did his residency at Eisenhower I believe.  I

8  think -- so, okay.  My assumption I think is based on the

9  fact I believe that his residency -- I think it's at

10 Eisenhower and I believe that's a military institution.  So

11 that is my assumption, yes.

12     Q.    Were you aware that Dr. Walsh served in the

13 military?

14     A.    That is also my assumption.  I don't know if I've

15 ever seen it black and white, but I mean I was told that

16 this is a military program, we have military-trained

17 attendings, that's how it's run here.  So do I have

18 independent verifiable confirmation of that, I don't think

19 so, but I think it was repeated to me multiple times.

20     Q.    What does that mean it's a military program?

21     A.    So here it meant grin and bear it, yes, sir/no,

22 sir, don't open your mouth, sir.  Grin and bear it.  That's

23 what was said to me.

24     Q.    Did other residents think that?

25     A.    Yes, ma'am.

Afraaz Irani 6/30/2015

1    Q.    Tell me some examples where other residents said

2    grin and bear it.

3    A.    Dr. Finn told me that when I was -- I had just

4    got here, said this is a military program, this is a grin

5    and bear it program.  I was told by I believe Andy Duffy

6    don't ever open your mouth in conference, it only gets you

7    in trouble.  If you have a question, don't ever, don't ever

8    ask a question, it only gets you in trouble, don't open

9    your mouth.  Duffy told -- we were standing in the parking

10   lot, he turned to Goodno and said Goodno you're going to,

11   you're not going to finish the program, because you're

12   going to die from a heart attack and Irani you won't finish

13   the program because Dr. Koon won't let you.

14   Q.    Or did he say Dr. Koon will kill you?

15   A.    One of the two.  One of the two.  Now I don't

16   think -- Duffy didn't mean it literally.

17   Q.    I assume he didn't.  Did he mean that you would

18   challenge Dr. Koon?

19   A.    No.  Okay.  Again I'm speculating on why he said

20   that.  I don't know why he said that.  I have never

21   challenged Dr. Koon.  I -- in California -- it's yes,

22   sir/no, sir, yes, ma'am/no, ma'am.  It's something that I

23   have never said in my -- probably the first time I said it

24   was probably in my orthopedic surgery.  It almost just

25   sounds foreign when people say that.  I've had people -- it

Afraaz Irani 6/30/2015

50

1    those are some I can think of right now.

2        Q.    When did Duffy tell you this?

3        A.    Tell me what?

4        Q.    The comments that you said he made in the parking

5    lot.

6        A.    It was my PGY1 year.  Harrison and I were

7    together.  It was on the I believe the third floor of the

8    Palmetto Health parking garage.  It's the one that connects

9    right to the second floor of the hospital.  You walk out,

10   clinic parking level garage, we were, if I could draw it

11   out for you where we were standing.

12       Q.    That's not really --

13       A.    The door was --

14       Q.    I don't care where you were standing.

15       A.    The door was to my right.  Duffy was right here

16   and Harrison Goodno was right here.

17       Q.    I'm just asking when.

18       A.    I know it's in my PGY1 year.  I believe it was at

19   a time that I predated my rotation in orthopedics, but I

20   don't know exactly when in my PGY1 year.

21       Q.    In your PGY1 year do you really have much to add

22   to conversation as an intern?

23             MR. ROTHSTEIN:  Object to the form of the

24   question.

25       A.    So -- in medical school I would often give

Afraaz Irani 6/30/2015

51

1    presentations.  I would suggest articles for a journal

2    club.  I would present patients.  I would see them on my

3    own.  I think part of what encourages you to really take

4    your education serious and take ownership of your education

5    is knowing that you could read up on something and present

6    something.  When I rotated with medical students, I would

7    say what do you think about this and they would go home and

8    do a research -- they would research it.  If they read the

9    whole chapter on subcapital femoral fractures, something

10   like that, come back the next day, they might know more

11   than me, okay.  They might know more than me as a PGY5.  If

12   they read up on some really miniscule detail, they come

13   back and do a grand rounds presentation to hospital staff,

14   they might know more than me.  I'm not above that, and I

15   think it's important to take ownership of your education.

16   This was always preached to me in medical school.  This is

17   what was preached to me always.  Now who knows more.

18   Obviously the attendings.  They have seniority.  They've

19   been there far longer.  My chief residents know more, but

20   part of it is always asking questions when you want to

21   learn more so you learn what went behind the decision

22   making and always remember to bring something to the table.

23   Dr. Bynoe preached this as well.  Dr. Bynoe on rounds would

24   almost require us to bring journal club articles as an

25   intern and present it and -- I actually don't recall what

Afraaz Irani 6/30/2015

52

1    the specific one I brought was, but again it was something

2    that he didn't know and he was appreciative of medicine as

3    being a lifelong learner and you shouldn't be

4    discriminative of where that source of information comes

5    from.  You should respect those with more education and

6    more years than you, but you should also want to take

7    ownership and learn more yourself.  So to answer your

8    question, I would say if you asked that to almost any

9    faculty member at Stanford University where I trained

10    medical school, the way I was taught was everybody had

11    something to contribute to the team.

12        Q.    Did Stanford do its medical school grades

13    pass/fail?

14        A.    They do, yes, ma'am.

15        Q.    No letter grades?

16        A.    Uh-uh.

17        Q.    Do you know why they do that?

18        A.    So it's a little bit of a philosophical change

19    that medicine is a team sport, okay.  Everybody has to look

20    out for everybody else.  Now if it's a competitive

21    environment and let's say there's a patient who has, I

22    don't know, hypertriglyceridemia causing pancreatitis and

23    I've been seeing this patient all week and I know this

24    patient inside and out.  Now when that other medical

25    student comes on rotation, I can do two things.  I can say

www.compuscripts.com

Afraaz Irani 6/30/2015

54

1        A.    I think residency programs should engender

2  teamwork.

3        Q.    Does this residency program try to engender

4  teamwork?

5        A.    I think teamwork is necessary given the stress of

6  the program.  You can't do it without teamwork.

7        Q.    Does this residency program try to engender

8  teamwork?  Were you expected to be part of a team?

9        A.    I was expected to be part of a team, yes.  I

10 think it was --

11       Q.    You've answered my question, thank you.

12       A.    Okay.

13       Q.    Tell me about the time that Dr. Koon called you

14 Achmed the dead terrorist.

15       A.    He didn't.

16       Q.    He did not?  Do you know who Achmed the dead

17 terrorist is?

18       A.    So that was not what he called me.  So let me

19 take a step back.  You want to know about that time.  Let

20 me explain to you what this means to me.

21       Q.    No.  I'm asking you that question.  If there are

22 things that --

23       A.    He did not say the word dead.

24       Q.    Achmed the terrorist?

25       A.    Yes, ma'am.

Afraaz Irani 6/30/2015

55

1      Q.    Tell me about that.

2      A.    Well, it happened more than once.

3      Q.    Tell me each time that it happened.

4      A.    I don't remember each individual time, but I can

5    give you at least a couple illustrative examples.

6      Q.    And I want to know who was present each time.

7      A.    Okay.

8      Q.    I don't want illustrative times.  I want to know

9    the times.

10     A.    Ma'am, you're asking me about something that

11   happened on a recurring basis.  I don't think I'm going to

12   go home and catalog each time that somebody says something

13   to you.  I'm not going to go home and catalog each time

14   Dave calls me on the phone.  I am going to remember, I am

15   going to remember things that are very vivid to me and

16   things that I think are very insulting to my background and

17   history of my people and this was -- this was -- this is

18   not something to take lightly.  I will say what I remember,

19   but I'm just saying for the record that I cannot remember

20   every single episode.  Now to get back to your question.

21     Q.    How many times did he call you this?

22     A.    Probably a handful of times.  I'll give you a

23   couple of examples.  The first one --

24     Q.    I don't want a couple of examples.  You're saying

25   he called you this probably five times, correct?

www.compuscripts.com

Afraaz Irani 6/30/2015

1      A.   Yes, ma'am.

2      Q.   Time number one.

3      A.   Dr. Koon referred to an episode yesterday.  It
4  was in prison clinic.  Dr. Koon was sitting there at his
5  computer.  I believe Dr. Goodno and Dr. Hoover were there I
6  believe.  I do not know.  Franny was in the hallway.  I was
7  in the hallway.  So the question is was Hoover and Goodno
8  party to the conversation, I'm not a hundred percent sure.
9  And that's the incident.

10     Q.   That's not the incident.  Tell me about --

11     A.   What do you want to know?

12     Q.   -- what he said.  What led to it?

13     A.   First of all, I think calling somebody that is
14  kind of --

15     Q.   Did you have a beard?  Did you come in and not
16  previously have a beard and have a beard that day?

17     A.   I did not grow a beard in one day.

18     Q.   You could have been gone?

19     A.   I don't, I don't...

20     Q.   Did you have facial hair that was different than
21  it had been previously?

22     A.   I had facial hair and I think I had it for a
23  while.  Okay.  I don't know -- now Dr. Koon said yesterday
24  that Franny hadn't seen me in awhile.  I don't know if
25  Franny had seen me in a different appearance or not, but in

www.compuscripts.com

Afraaz Irani 6/30/2015

57

1    the residency program that wasn't the first day I showed up

2    with facial hair.  Dr. Koon is alleging that's the first

3    time Franny seeing and I'm not going to argue with that if

4    that's the case, but your question was was that the first

5    day and I would say no.

6         Q.    Do you recall Franny commenting on your facial

7    hair?

8         A.    She might have.

9         Q.    Do you know whether or not Dr. Koon commented at

10   that point?

11        A.    It probably was about the same time I believe.

12   It probably was, because he was saying, you know, he was

13   commenting -- he was attributing my appearance to that and

14   I think he incorrectly assumed some of the facial hair is

15   consistent with somebody who is at the height of human

16   depravity which I think is awful.

17        Q.    You're saying -- you're assuming that Dr. Koon

18   was attributing someone with facial hair to someone at the

19   height of depravity, is that what you just said?

20        A.    If you're -- your question is implicitly saying

21   that did he make that comment because I had facial hair,

22   okay, and I'm saying it could be and if he is, then he's

23   assuming facial hair and my appearance is attributable to

24   something that I hope we can all agree is not something

25   that should be tolerated.  Does that clarify?

Afraaz Irani 6/30/2015

58

1      Q.   Did he laugh?

2      A.   Did who laugh?

3      Q.   Did Dr. Koon laugh?

4      A.   I'm sure he did.

5      Q.   Did you tell him you didn't think it was funny?

6      A.   I cannot confront Dr. Koon.

7      Q.   You couldn't say that offended me?

8      A.   I can't even tell Dr. Koon to please look at the

9   chart and verify if your allegation is true.  You think I'm

10  going to confront him with something about as inflammatory

11  as I think that comment is racially insensitive when I

12  can't even say Dr. Koon please look at the chart to verify

13  the facts.

14     Q.   If it bothered you that much, you couldn't say

15  that?

16     A.   Ma'am, I don't think you understand how bad the

17  situation was.

18     Q.   When was this?

19     A.   This was my PGY2 year.

20     Q.   When in it?  You went from --

21     A.   This was towards the latter half.  I don't recall

22  when.

23     Q.   Was it after the beginning of the year of 2012?

24     A.   This specific incident?

25     Q.   Yes.

Afraaz Irani 6/30/2015

59

1      A.    I don't recall when exactly it was.  I know it
2  was the latter half of my PGY2 year.  I know you would like
3  more things, but as Dr. Koon alluded to yesterday this
4  happened several years ago.  I can remember the incident,
5  but I don't remember the exact date and time.  I'm sorry.
6      Q.    Had you been suspended yet?
7      A.    I don't know.  I was thinking about this
8  yesterday.  I don't know if it's before or after.
9      Q.    Is that the first instance?
10     A.    No.
11     Q.    When was the first instance?  Where does this
12 fall?
13     A.    Okay, let me take a step back.  You asked me to
14 list all five.  I don't know the chronology, okay.  So
15 another incident was when I was on I think 7 West, 7 West or
16 7 East.  It was the orthopedic floor.  And I was seeing a
17 patient there and Dr. Koon came in there and some of the
18 nurses were there and he made the same comment.
19     Q.    What comment did he make?  You can't just say
20 made the same comment.  Tell me what he said.  What did
21 anyone say prior to it and what did he say.  I want to know
22 the conversation.
23     A.    You know, if somebody calls you --
24     Q.    If someone calls me a whore, I'm going to
25 remember the conversation.  They may not remember it.

www.compuscripts.com

Afraaz Irani 6/30/2015

60

1    A.    And that's why I remember these --

2    Q.    But I'm going to remember it.

3    A.    That's why I remember this very explicitly, but

4    you're asking was there --

5    Q.    I'm asking the conversation.

6    A.    -- was there an extended conversation between

7    myself and Dr. Koon, no.

8    Q.    No, no, no.  That's not what I'm asking.

9    A.    There was not a conversation happening.  There

10   was no conversation.

11   Q.    Who was present?

12   A.    Dr. Koon and the -- it was the nurse's station.

13   Q.    There are normally nurses and sometimes other

14   doctors or residents in a nurse's station.

15   A.    There were no doctors or residents at that time.

16   Q.    It was just you and Dr. Koon?  No nurses?

17   A.    There might've been a few nurses.  It was not in

18   the morning.  It was towards the middle of the day.

19   Q.    You don't know if anyone else heard this or not?

20   A.    I know there were people in the general vicinity.

21   I think he may have been saying it as sort of a general

22   thing to the nurses, the tech, the staff in this sort of

23   work area, and the comment was hey look there is...

24   Q.    There is what?  There is matters.  The words

25   matter.

www.compuscripts.com

Afraaz Irani 6/30/2015

61

```
 1        A.    The words matter, but I don't think the words
 2   should be taken lightly.  I think people -- let me just
 3   finish --
 4        Q.    Listen, I am not taking anything lightly.  We
 5   wouldn't be here today if I took anything lightly.  So
 6   let's go ahead and take that one off the table, okay, and
 7   just move forward and I need you just to tell me what was
 8   said and in what context.
 9        A.    Okay.  The incident hey look there's, you know,
10   Achmed the terrorist again when I was at the nurse's
11   station and I was -- had a folder in my hand.
12              MS. THOMAS:  Dr. Irani, I cannot understand.  You
13   dropped your voice and I can't understand what you said.
14   It's very important that I hear you say what it is you
15   think you're saying that Dr. Koon said.  Would you
16   please --
17        A.    You want the actual phrase of what he called me?
18              MS. THOMAS:  I want the answer to her question
19   which is we want to hear the words that you say that
20   Dr. Koon said and I need you to say it loudly enough so
21   that everybody in the room can hear it please.
22        Q.    Did you turn and look at anyone?
23        A.    Do you want me to repeat that?
24        Q.    You can repeat it.  That's fine.
25        A.    So Dr. Koon said, I think it was along the lines
```

www.compuscripts.com

Afraaz Irani 6/30/2015

62

1    hey look there's Achmed the terrorist.

2        Q.    Did anyone respond?

3        A.    I think there was some sort of little nervous

4    chuckles here and there and then people just moved on.

5        Q.    Did you turn and look at anyone?

6        A.    I might've, I might've looked towards one of the

7    people, the nurses on the floor or something like that.

8        Q.    But you can't tell me who it was?  You don't have

9    a clue who it was?

10       A.    I think it was one of the case managers.

11       Q.    One of the case managers?

12       A.    Yes, ma'am.

13       Q.    Did you make any kind of remark back?

14       A.    No.

15       Q.    Did anyone say anything to you afterwards?

16       A.    No.  Franny told me actually at the prison clinic

17   that was inappropriate.

18       Q.    When did this instance fall on 7 West?

19       A.    I wish I had a better timeline for you.  I don't

20   have a specific date.

21       Q.    At this point you said this was late in your PGY2

22   year, right?

23       A.    I'm saying PGY2 year was when I was on active

24   clinical duty which is going to be June through the end of

25   February, okay, so.  I think that's about seven-eight month

Afraaz Irani 6/30/2015

63

1    period.  So it wasn't in the first I think three or four

2    months is my point.  So latter half would probably involve

3    November, December, January, February.

4        Q.    November through February?

5        A.    If I had to ballpark a guess, ma'am, that's when

6    I would say.

7        Q.    By this time were you starting to document things

8    within the program?

9        A.    Was I starting to document things within the

10    program.  I was documenting certain things.

11        Q.    What things were you documenting?

12        A.    I was documenting things that Dr. Koon had asked

13    me directly to -- had directly accused me of.  So he

14    accused me of being late so I started documenting my

15    attendance.  He accused me of acting inappropriately with

16    certain patients so I documented that.  So my documentation

17    was always in response to Dr. Koon's allegations.

18        Q.    You documented your attendance, but you didn't

19    document the instances when Dr. Koon called you Achmed the

20    terrorist?

21        A.    Well, this was not an issue with Dr. Koon that I

22    would go in front of him and say you -- part of my

23    remediation plan was to document when you say certain --

24    what I think are inconsiderate racial slurs.  His thing was

25    you do XYZ so I had to address what he was going to -- what

Afraaz Irani 6/30/2015

64

1  he wanted me to address.

2      Q.    That's two instances.  What's number three?

3      A.    Ma'am, I can't remember exactly the specifics.

4  There were a handful of them.  Those are two I can remember

5  specifically.

6      Q.    Where was number three?

7      A.    I don't have specifics.  I think they were in the

8  hospital somewhere.

9      Q.    Who was present with number three?

10     A.    I can't give you more specific details.  I really

11  would be reaching there.  I don't want to say anything on

12  the record that might be misleading or possibly false.

13     Q.    Why do you believe it was said five times if you

14  can't remember anything about it?

15     A.    I didn't say five times.  I said a handful.

16     Q.    Okay.

17     A.    I wish I could be more specific with you.

18     Q.    Well, I wish you could too, because --

19     A.    I wish I could too.  I'm sorry.

20     Q.    -- you know, it's pretty important.

21     A.    Listen, my job is to sit here and be as honest as

22  I can with you and that's what I'm doing with you today.

23  I'm sorry.  That's all I can do for you and I hope you can

24  understand that.

25     Q.    Okay, but this is something that you found wholly

Afraaz Irani 6/30/2015

65

1  unacceptable, correct?

2       A.   Yes, ma'am.

3       Q.   But you can't remember the other instances?

4       A.   If I knew that I was going to be sitting here and

5  there's a certain threshold of appropriate behavior based

6  on a number of specific instances, maybe I should have

7  documented it, but I thought this would be something that

8  is fairly obvious to most people that I would not have to

9  sit here and enumerate each individual time.

10      Q.   Do you know if Palmetto Health has an ombudsman?

11      A.   I've never spoken to an ombudsperson.  I'm not

12  exactly even sure what they are.  And I don't know if

13  Palmetto Health does.  They might.

14      Q.   Did you ever look into it?

15      A.   I don't believe I had much time to look into too

16  much of anything, but, no, I don't think I did.

17      Q.   Did you contact anyone at HR about Dr. Koon

18  making these comments?

19      A.   Did I comment to anyone at HR.  Is Dr. Stephens

20  in HR?

21      Q.   No, she's not.

22      A.   So who's in HR?  Like I know Lin Hearn, Gwen

23  Hill.

24      Q.   Did you investigate whether anyone in human

25  resources could help you?

Afraaz Irani 6/30/2015

66

1          A.    I did not contact -- so I did not -- so your

2    question is did I contact Palmetto Health HR about this?

3          Q.    Correct.

4          A.    I don't believe I contacted Palmetto HR about

5    this.  In the process of my grievance council I worked with

6    Palmetto HR in which those allegations became known.

7          Q.    I'm not --

8          A.    Yeah, I'm just being clear.  Okay.

9          Q.    I'm not going there.  At the time these comments

10   were made and you were deeply offended, did you contact

11   anyone in HR about the comments having been made?

12         A.    At that time Palmetto Health HR I believe no.

13         Q.    Did you go talk with Dr. Stephens?

14         A.    I spoke with Dr. Stephens I believe in about

15   January and at several points I had mentioned to her that

16   there is a cultural difference here, I'm being treated

17   disparately from my co-residents.  I said I believe it's my

18   cultural background and by, by January I had mentioned to

19   her -- I had given her the specific I believe of saying

20   there's Achmed, but the complaints about cultural

21   differences, the complaints about being treated differently

22   based upon that were existing with Ms. Stephens.

23         Q.    Cultural differences being South Carolina and

24   California?

25         A.    No, ma'am.  Cultural differences being comments

Afraaz Irani 6/30/2015

67

```
 1   that are alluded to when you're making bad comments related
 2   to someone's perceived I think background, i.e. Achmed the
 3   terrorist.
 4        Q.   Were there any other comments other than those?
 5        A.   You know, there's sort of underhanded comments
 6   about, you know, if Dr. Irani, the patient might see him or
 7   he might blow the place up, et cetera.  This comment
 8   happened at prison clinic as well with respect to the
 9   security scanners, because prison clinic has --
10        Q.   Who said that?
11        A.   I believe it was Dr. Koon as well.
12             MS. THOMAS:  Dr. Irani, I'm going to have to ask
13   you to speak up.  You know, a lot of people have to be in
14   attendance today and we all need to be able to hear.  Thank
15   you.
16        A.   I apologize.
17        Q.   You think it was Dr. Koon that said you might
18   blow the place up?
19        A.   So it was me with -- so when you go to prison
20   clinic, there are x-ray security machines and the comment
21   at that point was made that, you know, Dr. Irani will
22   either somehow sneak something by or find a way to blow the
23   place up, et cetera.
24        Q.   Again the comment was made by?
25        A.   By Dr. Koon, yes, ma'am.
```

Afraaz Irani 6/30/2015

68

1      Q.    When was this?

2      A.    I believe it was -- it was either that same one

3  or a different one.  I don't know.

4      Q.    I have no idea what you're talking about.  That

5  same one what?

6      A.    I'm sorry, the same -- because prison clinic --

7  the previous instance was at prison clinic with Franny.  So

8  it was either that same meeting with the comment with

9  Franny there or it was a different meeting.  Prison clinic

10  is usually held about once a week.  So this is not an every

11  day occurrence.  So it's going to be one of those prison

12  clinic days which are Monday or Wednesday I believe, or

13  Tuesday.

14      Q.    There are cultural differences in South Carolina

15  and California, aren't there?

16      A.    Sure.

17      Q.    Did you run into some problems with those?

18      A.    There's sort of a southern gentile way of

19  approaching patients and I think problem is a harsher, but,

20  yes, I had some ways to adjust in terms of how do I

21  approach patients, how do I communicate with patients and

22  that was conveyed to me by Dr. Bynoe and Dr. Mark Jones

23  about sort of the southern gentile.

24          MS. THOMAS:  Again, Dr. Irani, can you speak up

25  please.

Afraaz Irani 6/30/2015

74

1    A.    This document -- yeah.  This document is

2    addressing that time period, yes, ma'am.

3        Q.    There's nothing in this document, is there, that

4    causes it to automatically rollover for the next year?

5        A.    This document does not stipulate to an automatic

6    rollover, no, ma'am.

7        Q.    If you look at subsection number 10.

8        A.    Let me take a step back actually.  Do you mind if

9    I read through this document a little more?

10        Q.    Sure.

11        A.    Subsection 6 actually talks about promotion and

12    reappointment on the basis of acceptable periodic

13    competency-based evaluations.  So that is essentially to me

14    consistent with what we've been taught as long as you have

15    an acceptable performance that you are actually guaranteed

16    to go onto the next year.  That's how I'm reading section 6

17    actually.

18        Q.    But it qualifies it, doesn't it?

19        A.    Right.

20        Q.    Right.

21        A.    If you are proceeding appropriately, then you go

22    onto the next year.

23        Q.    But only, but only if you're proceeding

24    appropriately?

25        A.    Right.

Afraaz Irani 6/30/2015

98

1     Q.     You complained to the ACGME that Palmetto Health

2     was not meeting their obligations to the ACGME, didn't you?

3     A.     Obligations to the ACGME, yes, ma'am.

4     Q.     The ACGME replied what?

5     A.     They said they do not adjudicate individual

6     matters.

7     Q.     Didn't they also later on find that there were no

8     breaches, that Palmetto Health was in compliance?

9     A.     I was told that the ACGME does not adjudicate

10    individual matters and that was what I was told.   In

11    documentation that has been provided to me in discovery, I

12    have been provided documents that were sent in from the

13    ACGME to I believe Kathy Stephens.   In that document what

14    it was said was we're not proceeding any further.   That

15    document was not made available to me or at least I have no

16    knowledge of that prior to today.   My communication

17    response to ACGME when all this came down was simply we do

18    not adjudicate individual matters.

19    Q.     They also asked you to be able to share documents

20    with the program director and the DOI, did they not?

21    A.     They did.

22    Q.     So that they could go forward with things, did

23    they not?

24    A.     They did.

25    Q.     And get a response from the program director and

Afraaz Irani 6/30/2015

112

1      for me to look back and tell you three-four years later

2      down the road exactly what time I left the hospital a

3      specific time which is why I'm having a little difficulty

4      with the question.   I apologize.

5          Q.    But it was a big enough deal that you turned in a

6      report to the ACGME after you got in trouble, right?

7          A.    I think it was always a big enough problem.

8          Q.    But you didn't prior to being in --

9          A.    I wanted to finish my residency.   That's the only

10     way residency works.

11         Q.    Prior to that point you had not made any kind of

12     report to the ACGME, had you?

13         A.    Prior to -- I only made one report to the ACGME.

14     So prior to that report, I don't have any reports to the

15     ACGME.

16         Q.    I think you testified just a second ago, and

17     correct me if I'm wrong, but you talked to your brother,

18     one of your brothers who is a doctor?

19         A.    Correct.

20         Q.    In August of 2011 and he made the comment that

21     they're trying to fire you.

22         A.    Correct.

23         Q.    Or they're going to fire you, one of the two.

24         A.    Correct.

25         Q.    And that you better get to know the rules, right?

Afraaz Irani 6/30/2015

114

1    process of being targeted to be fired, I wonder if the

2    issue of tardiness had come up.

3        A.    Well, he read the document.  The document has the

4    accusations as set forth by Dr. Koon and he asked me what

5    happened and I got a chance to explain, got a chance to

6    discuss about it which is something I did not get a chance

7    to do with Dr. Koon and so after his discussion it sounds

8    like, he heard my side of the story, he has been through

9    residency, he understands what an internship is.  He

10   understands the demands of a PGY1, PGY2.  He understands

11   the structure.  So we were able to communicate on that

12   level and I don't have much more to offer.

13       Q.    You say that Dr. Koon -- what did you just say?

14   Dr. Koon never let you discuss?

15       A.    Correct.

16       Q.    How many times did Dr. Koon ask you for input

17   about specific issues that were of concern?

18       A.    Give me a moment to think.

19       Q.    Let me put it like this.  Was there ever an issue

20   serious enough that Dr. Koon and/or Dr. Walsh dealt with

21   with you that you weren't allowed to give your side of

22   things?

23       A.    Absolutely.  I mean broadly speaking I'd say

24   first of all the August 15, 2011, memo was presented to me

25   and my side of the story was not heard.  I asked for

Afraaz Irani 6/30/2015

115

1    clarification and clarification was refused.  So all those

2    accusations at that meeting I was never given the chance to

3    have a discussion and get feedback.  Now prior to that he's

4    going to reference the e-mail to Roy Butler, yes.  He

5    did -- I'm sorry.  That needs to be taken off the record.

6        Q.    It's not going to be taken off the record.

7        A.    Okay.  It's a patient's name.  Mr. B, the patient

8    was Mr. B, he asked me to send a response in a month after

9    the patient incident.  So with that patient incident he

10   told me to write up an explanation of what happened.

11   August 15, 2011, memo, no discussion, no explanation of any

12   of those conclusory statements.  The trauma female 375 he

13   never spoke with me.  There are other ones as well.

14       Q.    What do you mean he never spoke -- he never spoke

15   with you before the issue was raised with you or he never

16   spoke with you about it period?

17       A.    He never spoke with me before the issue was

18   raised?

19       Q.    Is that what you are saying?

20       A.    I'm trying to understand your question.

21       Q.    I'm trying to understand your answer.

22       A.    If the issue hasn't been raised, how can he speak

23   with me.

24       Q.    You're telling me that at different points --

25   never mind.  It will come clear as we go forward.

Afraaz Irani 6/30/2015

138

1  be how ACGME mandated it happens.  I mean he's a CEO.  In

2  general has the word chief in it.  So if you're asking in

3  general do I think CEOs are powerful.

4      Q.   No.  You've -- I did not ask that question.

5  You've answered my question.

6      A.   Okay.

7      Q.   When you were placed on remediation originally,

8  did you feel like you were watched more closely for errors?

9      A.   That's what Dr. Guy told me.  He said the

10  spotlight's on you, so.

11      Q.   Because you had been placed on remediation?

12      A.   Hm-hmm.

13          MR. ROTHSTEIN:  I'm sorry.  I'm just reminding

14  him try to say yes or no instead of uh-huh.

15      A.   I'm sorry.

16      Q.   Thank you.  What else did Dr. Guy tell you?

17      A.   So I had several meetings with Dr. Guy.  First,

18  so, you know, we spoke during -- so I had two months on

19  hand and then I had two months on sports.  We spoke during

20  sports rotation.  He said overall you're doing fine.

21  Surgical skills it's almost too early to tell at this

22  point, but you're doing fine.  Just work hard, you're on

23  remediations, spotlights are on you.  After my suspension I

24  spoke with Dr. Guy Sunday December 18 and I expressed to

25  him that I was really disappointed, because I was told that

Afraaz Irani 6/30/2015

139

1    I was being suspended to do an investigation with regards

2    to trauma female 375 and I get a letter dropped in my box,

3    not even a courtesy phone call, I get an e-mail saying

4    there's a letter in your box, it's a letter from Dr. Koon

5    saying you've been placed on suspension, and I was told

6    explicitly the purpose of my suspension was to hear my side

7    of the story and he said oh, it sounds like you feel like

8    you're not being heard.  He also said overall, Afraaz,

9    there's three things I look at when I look at residents.  I

10   rate them on surgical skills.  I rate them on their smarts,

11   their academic prowess, and also just how they get along

12   with their peers in terms of not getting into trouble.  He

13   said I think in terms of your academic smarts you're

14   probably -- you're really smart, probably one of the best

15   we've had.  He said in terms of your surgical skills you're

16   probably average, average-average minus, in that ballpark,

17   and he just said, you know, what I hear about you is what I

18   hear from Dr. Koon and others and it sounds like, you know,

19   there's some issue there in terms of working with him, et

20   cetera, and that's something you need to work on.  So again

21   that was my meeting with him on the 18th.  Subsequently

22   started the grievance process on December 19.  Dr. Koon

23   actually called -- I'm sorry.  Dr. Guy called Dr. Walsh to

24   help facilitate that and I started my grievance process on

25   the 19th, and I spoke with him over -- during the

Afraaz Irani 6/30/2015

1    program, it was very clear that Doctor -- we're not on the

2    same page and Dr. Guy was sort of substantiating that.

3        Q.    How was Dr. Guy substantiating that?  I mean he

4    said apparently you're having problems with Dr. Koon.  Is

5    there any other way other than that that he substantiated

6    that?

7        A.    Substantiating that you are having problems with

8    Dr. Koon?  So he substantiated it by saying it.

9        Q.    Did you ever meet with Dr. Walsh about your

10    difficulties?

11        A.    So talking about difficulties --

12        Q.    I'm not talking about formal grievance.  I'm

13    talking about did you meet with Dr. Walsh and talk with him

14    about your concerns?

15        A.    Outside the formal grievance process?

16        Q.    Correct.

17        A.    I have to think about that.  Give me a second.

18    So we had a six-month formal evaluation.  Are we counting

19    that?

20        Q.    That's outside the grievance process, isn't it?

21        A.    Correct.

22        Q.    Is that something everyone has?

23        A.    Right.

24        Q.    That would be counted then.

25        A.    Okay.  Then I met with him in January after I

Afraaz Irani 6/30/2015

142

1    program, it was very clear that Doctor -- we're not on the

2    same page and Dr. Guy was sort of substantiating that.

3         Q.    How was Dr. Guy substantiating that?  I mean he

4    said apparently you're having problems with Dr. Koon.   Is

5    there any other way other than that that he substantiated

6    that?

7         A.    Substantiating that you are having problems with

8    Dr. Koon?  So he substantiated it by saying it.

9         Q.    Did you ever meet with Dr. Walsh about your

10   difficulties?

11        A.    So talking about difficulties --

12        Q.    I'm not talking about formal grievance.  I'm

13   talking about did you meet with Dr. Walsh and talk with him

14   about your concerns?

15        A.    Outside the formal grievance process?

16        Q.    Correct.

17        A.    I have to think about that.  Give me a second.

18   So we had a six-month formal evaluation.  Are we counting

19   that?

20        Q.    That's outside the grievance process, isn't it?

21        A.    Correct.

22        Q.    Is that something everyone has?

23        A.    Right.

24        Q.    That would be counted then.

25        A.    Okay.  Then I met with him in January after I

Afraaz Irani 6/30/2015

143

1    talked to Kathy Stephens and after she denied my grievance
2    and I said that I would -- I met with Dr. Walsh on the 18th
3    of January and I spoke with him and I said look I want to
4    graduate from here.  I want to do a fellowship.  There are
5    two things that are really important to me and the two
6    things are I'm going to have to report a suspension on all
7    my licensures going forward, to medical board, et cetera,
8    that's going to be a problem in terms of getting a job,
9    that everything is taking six weeks, I think it was six
10   weeks of suspension, delay my graduation, can we work it
11   out so I can maybe substitute some vacation, et cetera, and
12   try to work it out so I can graduate.  So Dr. Walsh said,
13   well, that's, that's okay, then I will suspend -- I won't
14   go to the Grievance Council.  Dr. Walsh said I don't know
15   if that's all in my purview, but let me look at it.  I'm
16   actually meeting with Dr. Stephens tomorrow and I'll talk
17   to Dr. Stephens.  So he said in the meantime there's three
18   things I want you to think about.  And he said the first
19   thing is, first of all just think, you know, this is
20   generally a big picture, this is a break for you, go home,
21   figure out is this something you want to do is first thing.
22       Q.   Figure out if this is something you want to do?
23       A.   Yeah.  Same question Dr. Koon asked me at the
24   Grievance Council on December 5.  Is this something you
25   want to do.  Second thing is just so on a microscopic level

Afraaz Irani 6/30/2015

144

1    what you think is going wrong.  And the third thing which

2    is slipping my mind, but if you give me a second I could

3    probably come up with it.  Oh, the third thing was again he

4    talked to Dr. Guy.  He said it sounds like you don't feel

5    like you are being heard in this residency program.  So let

6    me know what you think you need in order to be heard in

7    this residency program.  And I said okay and in return,

8    Dr. Walsh, two things, one from you is can we change the

9    suspension to leave of absence and can we get those six

10   weeks so I can graduate on time.  Dr. Walsh was standing at

11   his table, he asked me again, there's a piece of paper to

12   his right, he wrote down on the piece of paper, he said I'm

13   going to see Kathy Stephens tomorrow, I'll talk to her.  So

14   I met with him then.  And then -- of course, I didn't hear

15   back from him for quite awhile until after he thought the

16   Grievance Council deadline had past.

17        Q.    Did he tell you that he didn't get back to you

18   until after he thought the grievance time had past?

19        A.    Yeah.  In his e-mail he said as you know the

20   deadline for a grievance council has already past.  In the

21   e-mail he finally got back from which I believe was --

22        Q.    What I'm asking you is did he tell you that was

23   the genesis of his timing or the reason that his timing was

24   as such?

25        A.    It wasn't explicit.  I sent him I think two

www.compuscripts.com

Afraaz Irani 6/30/2015

148

1    like you're being heard.

2        A.    Correct.

3        Q.    In response to that you said to call the

4    suspension something else and make the six weeks not impact

5    your graduation.

6        A.    No, that was -- these were separate issues.    I

7    came forward with one of these two things.    He said in

8    return I want you to think about these three things.

9    They're not related.    It was -- Dr. Walsh was -- here's

10    your assignment, and I was like Dr. Walsh here's two things

11    I came to you with and he said okay, I'll take care of

12    this.    This is what I want you in the interim to think

13    about.

14        Q.    What did you think about the things he wanted you

15    to think about?    What was your response to that?

16        A.    You know, my response has been consistent that I

17    always wanted to do orthopedics.    Dr. Koon asked me that.

18    I think he planted the seed in everyone's mind that for

19    some reason I didn't want to do orthopedics.    This is what

20    I've worked my entire adult life towards.    So I did not

21    respond to -- here's the thing.

22        Q.    That --

23        A.    I got to respect their opinion.

24        Q.    That's okay.    I don't need you to go into that.

25        A.    Okay.

Afraaz Irani 6/30/2015

167

1    issues -- it assumes that the following statements are

2    true.  So I will accept that I was placed on Level II

3    remediation.  I will disagree with four, because I don't

4    think those actually are correct.  I'm going to amend that.

5         Q.   Why were you placed on Level II remediation?

6         A.   Well, I wish I got better clarification from

7    Dr. Koon.

8         Q.   Why do you think you were placed on Level II

9    remediation?

10        A.   Well, because I was singled out and treated

11   disparately from my peers.

12        Q.   Why were you placed on Level II remediation?

13        A.   I think you want to ask Dr. Koon why he treated

14   me differently.

15        Q.   No, I'm asking you why you feel like you were

16   placed on Level II remediation.

17        A.   I think because incomplete and improper analysis

18   of the facts was performed.  The facts were mis, the facts

19   were misrepresented.

20        Q.   By whom?

21        A.   Well, the person who presented this document to

22   me was Dr. Koon.  So I don't know if somebody told him

23   something and he accepted it or he failed to perform an

24   adequate investigation.  I can't answer that specifically.

25        Q.   Go onto paragraph 3.

Afraaz Irani 6/30/2015

1    my mind what the setting was.

2        Q.    Did you do this when you talked to the attendings

3    about things?  Did you have to do this?  Did you go into --

4    or could you answer the questions like they asked you?

5        A.    -- they ask you this patient came in yesterday, I

6    don't have to go back and pull up a very -- a vignette that

7    is most likely -- if I asked you yesterday --

8        Q.    Could you directly answer questions when they

9    asked them?

10       A.    Absolutely.  Absolutely.

11       Q.    I'm asking you to the degree that you can do

12   that.

13       A.    Okay, but it's a little -- I will, but it's a

14   little --

15       Q.    I really don't need to know what left turns you

16   took.  I appreciate what you're saying.  I'm a very visual

17   person myself and I appreciate that, but you're also very

18   intelligent and to the degree that you can cut it to the

19   specific answer that would be very much appreciated.

20       A.    So Harrison Goodno, he was like, yeah, I don't

21   know, we all do the same things, but you got singled out.

22   So that's Harrison Goodno.  Let's go to Justin Hoover.

23   Justin Hoover actually at my January meeting, I think it

24   was January 28 if I recall correctly, at the faculty

25   meeting he was sitting to my left, Dr. Koon was sitting at

Afraaz Irani 6/30/2015

178

1    the end of the table, Dr. Walsh was between them.  Came to

2    the issue of the narcotic dosing and what I should have

3    done differently and I said, Dr. Koon, you know, I still

4    honestly could use a little guidance on what I'm supposed

5    to do properly.  Kathy Stephens was there too.  And

6    Dr. Koon turned to Dr. Hoover and said, well, Justin, what

7    would you do.  Justin Hoover said I would've asked the

8    patient if there were any side effects, if there were any

9    neurological concerns, if there's any issue and if there

10   was, would've okayed no more narcotics and that's exactly

11   what I had said and it was the exact same thing said by a

12   different person and that was the standard of care and my

13   thing was incorrect.

14        Q.   But wasn't the amount what was in issue?

15        A.   He asked him to say what would Justin Hoover do.

16   Justin Hoover said he would've approved more narcotic

17   dosages.  So you approve more and approving more you are

18   increasing the dosage.  So, yes, it is -- it comes down to

19   should you increase the dosage, are you getting to a

20   dangerously high amount and that's what the screening

21   questions are, are you medically safe --

22        Q.   And specifics matter there, don't' they?  When

23   you're talking about dosages, specifics matter?

24        A.   It's patient specific.

25        Q.   Anything else with Justin Hoover?

Afraaz Irani 6/30/2015

179

1      A.    Justin Hoover with respect to the knee patient of

2    Dr. Koon, he said -- I said -- Harrison and I were in the

3    room, it was Harrison, myself, Justin Hoover and we both

4    said, you know, Justin Hoover we don't know what to do, we

5    both told the patient to come in, the patient did not show.

6    He's like, yeah, I know, there's not much you could've

7    done, I would've done the same thing.  You just got to, you

8    know, roll with it, grin and bear it, et cetera.  This is

9    my senior resident saying he does and would do the exact

10   same thing again.  So that's a couple of vignettes with

11   Justin Hoover.

12      You know, when I -- when -- and then here's -- so

13   Harrison Goodno told me to my face that we all do the same

14   thing, you got singled out.  My senior resident Kenny

15   Lindley also said the same thing.  He said that this has

16   just turned into a witch hunt.  It's not about treating

17   fairly.  It's about singling somebody out.  That's Kenny

18   Lindley also telling me the same thing.

19      Q.    Did he say why?

20      A.    I talked to him personally.

21      Q.    And you've submitted an e-mail from him, right?

22      A.    Correct.

23      Q.    Did he say why you were singled out?

24      A.    Again I don't think you can take that e-mail as a

25   full capitulation of our conversation.  Did he say --

Afraaz Irani 6/30/2015

180

1     Q.   Did he say why you were singled out?

2     A.   Explicitly?  Not in that e-mail, no.

3     Q.   Did he ever in his entire life at any time he

4  ever spoke with you say why you were singled out?

5     A.   So you're asking specifically residents, correct?

6     Q.   I'm asking specifically Kenny Lindley.  It's A

7  pretty easy question.

8     A.   Well, because that's a little more generalizable

9  if you just ask for residents and residents would comment

10  on, oh, like pick on the brown guy, pick on that guy.  So,

11  yes, those comments were made by the residents.

12     Q.   Dr. Irani.

13     A.   Yes, ma'am.

14     Q.   I know your heritage may be one thing, but you're

15  no more brown than I am.

16     A.   I've spent a lot of time indoors in the last few

17  years.  I usually am very brown, okay.  I haven't gone

18  out --

19     Q.   Residents --

20     A.   -- situations.

21     Q.   Residents spend time indoors, don't they?

22     A.   Okay, I don't want to discuss about our skin

23  color please.

24     Q.   Pardon me.  That's what you're suing my client

25  over.  We're going to discuss it.

Afraaz Irani 6/30/2015

190

1    as Defendant's Exhibit Number 18, Irani 517 through 519.

2    Are you familiar with this document?

3        A.    It looks like an e-mail from myself to Kathy

4    Stephens trying to explain the remediation I guess.

5        Q.    Is it fair to say that you go through very

6    specifically each of the issues brought up in the

7    remediation?

8        A.    I go through the issues to the best of my

9    ability.  I think that's a fair statement.

10       Q.    Was there anything that restricted you from

11   stating anything further?

12       A.    You don't want to walk the line of upsetting

13   Dr. Koon.  He told me in this meeting, he said less you

14   forget, I sign your final evaluation.  If I don't sign off

15   on it, you won't graduate from this program.  He brought up

16   the issue of firing Chad Lamoreaux.  So.  And a few months

17   before that I had been assigned an article about sharks and

18   if you upset the sharks, you're in big trouble, don't

19   bleed.

20       Q.    Did Dr. Koon assign you that article?

21       A.    It is my understanding that he did.  The e-mail

22   was sent by Justin Hoover, but it's my understanding that

23   Dr. Koon actually assigned it.

24       Q.    On what is that based?

25       A.    It's based on what -- his comments he said when

www.compuscripts.com

Afraaz Irani 6/30/2015

191

1  he stood up at Za's Pizza for our journal club, and again I

2  remember exactly where I was standing.  I remember where

3  Dr. Koon was.  I think I was either at the last or second

4  last --

5        Q.    You don't really -- don't have to describe it.

6  I'm fine with that.

7        A.    I stood up and he said, you know, this is -- I've

8  not assigned this article to you randomly.  So it was.

9        Q.    He said -- now wait.  He said I have not assigned

10 this to you randomly or this has not been assigned

11 randomly?

12       A.    I believe -- he used a passive voice.

13       Q.    Do you know whether or not Dr. Koon had any

14 information about the assignment?

15       A.    Well, I mean, implicit in that is that, you

16 know --

17       Q.    Do you know?  I'm asking for factual knowledge.

18 What do you know to be fact?

19       A.    It is my strong suspicion, but I do not have

20 anything beyond my very strong suspicion and the assumption

21 of other people in the room as well.

22       Q.    Who else and how do you know it was their

23 assumption?

24       A.    Well, I think Dr. Iaquinto also was very apparent

25 to him and pretty much everybody else in the room although

Afraaz Irani 6/30/2015

193

1    statement of Dr. Iaquinto.

2        Q.   It may well have been on purpose.  Do you know

3    what that purpose was?  Do you know if it was a positive

4    purpose?

5        A.   I don't think it was a positive purpose.  I think

6    it was seen by everybody as a threat.  I mean Dr. Iaquinto

7    felt that way.  I think talking to my co-residents at the

8    end, they're like, yeah, you know, whatever.  Nobody told

9    me it's a positive.

10       Q.   Was there anything that could have been presented

11   from that that could have been a positive?

12       A.   I mean if somebody gives you a warning, you can

13   take that as a positive.

14       Q.   Did Dr. Koon give you a warning?

15       A.   I think this was a warning.  I think this was a

16   warning not to mess with him.  Not to upset him.

17       Q.   If you're wrong in that?

18            MR. ROTHSTEIN:  Object to the form of the

19   question.

20       Q.   If that's an incorrect assumption, how does it

21   impact everything else?

22       A.   I mean you're speculating.

23       Q.   You're speculating, are you not?

24       A.   I'm telling you what my assumption was reading

25   that article and I'm telling you what other people told me

Afraaz Irani 6/30/2015

201

1      A.    October, I'm sorry.  10/3.  October 3, 2011, and

2  he said, not saying you're agreeing with anything, just

3  need you to sign it saying that you have received and

4  reviewed it.  So I wrote received and reviewed.

5                    (WHEREUPON, Defendant's Exhibit

6                     No. 24 was marked for

7                     identification only.)

8      Q.    You've been handed a two-page document marked as

9  Defendant's Exhibit Number 24 and it's Bates stamped Irani

10  526 and 527.  Are you familiar with this document?

11      A.    Yes.  This appears to be an e-mail response from

12  Dr. Koon to myself after I had sent Dr. Koon an e-mail

13  about a patient that we had some miscommunication about

14  regarding dictation.

15      Q.    Did Dr. Koon have miscommunication?

16      A.    Dr. Koon told me to take care of the VA patient's

17  dictation and I got a VA patient dictation in my in-box and

18  I went ahead and dictated it and so that led to

19  communication upon which patient we're talking about.  I

20  think in situations like this, it's not good to point the

21  finger at one person.  Could Dr. Koon have said the name,

22  yes.  Could I have asked him for the name, yes.  So.  But I

23  just wanted to clear up a miscommunication we had.

24      Q.    You sent him an e-mail to clear up -- prior to

25  this you had sent him an e-mail clearing up the

Afraaz Irani 6/30/2015

1    miscommunication?

2        A.    Yes.

3                        (WHEREUPON, Defendant's Exhibit

4                        No. 25 was marked for

5                        identification only.)

6        Q.    The court reporter has handed you a two-page

7    document marked as Defendant's Exhibit Number 25 and it's

8    Bates stamped Irani 524 and 525.  Are you familiar with

9    this document?

10       A.    I'm familiar with it.  If I could review it if

11   you want me to comment on it.

12       Q.    I'm just asking if you're familiar with it.

13       A.    Yeah, I'm familiar.  This seems to be an e-mail

14   that I sent Kathy Stephens outside of the grievance process

15   just to update her on things on how I thought I was

16   progressing and especially because I had gotten a few

17   vagaries from Dr. Koon regarding my performance, but the

18   direct feedback I got said my performance was okay.

19       Q.    You did go ahead and contact her with regard to

20   those things, correct?

21       A.    Yes.  This is my e-mail to her.

22       Q.    A number of these documents that I'm putting in

23   have had both cover sheets and some of them have had added

24   commentary at the very top that's typed on.  Is that your

25   cover sheet that's on the various documents?

Afraaz Irani 6/30/2015

205

1      Q.     You've just been handed a document marked as
2   Defendant's Exhibit Number 27, and it's Bates stamped Irani
3   533 through 535.  Can you tell me what this document is?
4      A.     This is a write-up that I did to memorialize what
5   happened with regard to trauma female 375 which I was
6   informed was the purpose of my suspension in December.
7      Q.     Do you recall when you wrote this up?
8      A.     It says within three days of the incident.
9      Q.     When you wrote it up, what did you do with this?
10  What did you do with it at that time?
11     A.     I believe I eventually ended up sending a copy to
12  Kathy Stephens at some point if I'm correct.  I could be
13  wrong on that.
14     Q.     Did you ever provide Dr. Koon or Dr. Walsh with a
15  write-up of the events?
16     A.     Dr. Koon never asked me what happened.  Dr. Walsh
17  never asked me what happened.  I initiated the grievance
18  council on December 19 was the first time I spoke with him
19  about it and it was an in-person meeting.  He did not ask
20  me to provide written -- a write-up and it seems like I was
21  able to say all this when I spoke with him personally.
22     Q.     You did speak to him about this?
23     A.     I spoke with him December 19 as the first step in
24  my grievance policy.
25     Q.     Does this contain any facts other than what you

Afraaz Irani 6/30/2015

206

1    told Dr. Koon?

2         A.    I didn't speak with Dr. Koon about trauma patient

3    375.

4         Q.    Dr. Walsh?

5         A.    Dr. Walsh.

6         Q.    This contain -- I didn't know who he was then.

7    Does this contain any facts other than what you spoke with

8    Dr. Walsh about?

9         A.    So, and I'm sorry if I misunderstood.  Is your

10   question that every point in here was discussed with

11   Dr. Walsh?  Is that the question?

12        Q.    Is there anything in this document that you

13   wanted to discuss with Dr. Walsh that you didn't have the

14   opportunity to discuss with him?

15        A.    Well, when I initiated the meeting with him, I

16   had the opportunity to meet with him and tell him what I

17   wanted to tell him.

18        Q.    You initiated that meeting as part of the

19   Palmetto Health grievance, residency grievance program,

20   correct?

21        A.    Yes, ma'am.

22                    (WHEREUPON, Defendant's Exhibit

23                     No. 28 was marked for

24                     identification only.)

25        Q.    You've been handed a one-page document marked as

Afraaz Irani 6/30/2015

214

1    remediation?

2        A.    Specifically as going through the grievance

3    process as laid out in the resident manual 1.1 through 1.5,

4    no.

5        Q.    Let me ask you before I have it marked.   Does

6    this document belong with the other?

7        A.    I believe so.

8        Q.    Let me ask you about one more and we can just

9    attach them all together if I've done it again.   Does the

10   remediation plan belong with it, and if not, we'll have the

11   court reporter mark these documents.   You were handed not

12   yet marked Irani 923 and then 924 through 927.   If you look

13   at the very back of 927 is the resident verification.   I've

14   reviewed and discussed the contents of this form.   I don't

15   know if that's what you were referring to.

16       A.    Right.

17       Q.    These two parts belong with Defendant's 32?

18       A.    I believe so.

19           MS. HELMS:   If you all don't mind, we'll attach

20   those and make Defendant's 32 Irani 922 through Irani 927.

21       Q.    I'm going to ask you if you look at the third

22   page that's Bates stamped as Irani -- beginning with 924

23   through 927, is that the remediation plan that was

24   presented to you?

25       A.    This is the remediation plan that was presented

Afraaz Irani 6/30/2015

215

1    to me at my January meeting which changed from my December

2    one, yes.

3        Q.    How did it change from your December one?

4        A.    Well, all of a sudden there's a list of new

5    competencies not being met that were not previously

6    identified.

7        Q.    Does this remediation plan have -- what level of

8    detail would you consider it having as far as the plan?

9        A.    The plan is pretty much a copy and paste of what

10   I understand is ACGME guidelines.  I don't think in terms

11   of implementing this what I look at is for specific

12   incidents and how I can improve from those.  As a

13   resident -- there are a lot of words here.  I think there

14   were a lot of words and was short on specifics as related

15   to, for instance, I think, I think I would have been more

16   beneficial if they had just discussed specifics in more

17   detail.

18       Q.    But in laying out a remediation plan, what did

19   you want?

20       A.    So for instance, competency is not being met.

21   This is just a copy and paste of ACGME guidelines.  Medical

22   knowledge, that's a copy and paste of ACGME guidelines.

23   These are stuff that has never been alleged and there's no

24   examples of why all of a sudden -- I was on suspension

25   following the December 5 memo and I was gone for six weeks

Afraaz Irani 6/30/2015

216

1    and not once has there been any allegation that my medical
2    knowledge was lacking.  I was told my OITE scores were
3    fine.  I was told by Dr. Guy my medical knowledge is great.
4    Then I come back six weeks later and all of a sudden my
5    medical knowledge is all of a sudden suspect and so it
6    really begs the question is this really an individualized
7    evaluation or is he just copying and pasting pretty much
8    every single complaint that he can come up with or copied
9    and pasted somebody else's evaluation.
10        Q.    Do you know if this is the way that the ACGME
11   expects remediation plans to list competencies?
12        A.    I think the ACGME has listed competencies.  I
13   don't think they have a certain way that it should be
14   listed.  This is I think a copying and pasting of --
15        Q.    Do you know if there is a manner in which
16   remediation plans should be done?
17        A.    I don't know if there is specific, you know,
18   guidelines for table structure format.  I know that the
19   resident is supposed to be given adequate notification,
20   adequate details, and adequate due process.  However that
21   is implemented on paper, I don't know if there's structural
22   guidelines.
23        Q.    You don't know whether or not the form utilized
24   by the residency process or the residency program whether
25   or not this remediation plan meets the criteria of the

Afraaz Irani 6/30/2015

1     ACGME or not?

2          A.     Yeah, I don't know if the ACGME has certain forms

3     they use.

4          Q.     You just don't like this one?  You didn't like

5     what was done?

6          A.     Well, I think new allegations were levied without

7     actually providing specifics and so I found, I found it

8     actually to be a copy and paste and I asked Dr. Hoover for

9     clarification.  He said don't fight it, just sign it.

10         Q.     Have specifics been discussed with you as far as

11    patient care incidents?

12         A.     I don't think they were.  I don't think my side

13    of the story was listened to, and I don't think proper

14    investigations were done.  So when you say discussed, I

15    think a discussion should be coming with a sort of unbiased

16    view and willing to consider the facts and so using that

17    definition, I think significant patient care incidents had

18    not properly been discussed.

19         Q.     You didn't have an unbiased view, did you?

20         A.     I think there are other ways you can look at it.

21    You can read the patient chart.  You can talk to the

22    patients.  I know in several instances I gave Kathy

23    Stephens a list of witnesses to talk to who might provide a

24    more balanced view.

25         Q.     Is it the norm to call up patients and ask them

Afraaz Irani 6/30/2015

236

1    Q.    You've been handed a one-page document marked as
2    Defendant's Exhibit Number 42.

3    A.    Yes, ma'am.

4    Q.    USC295.  Are you familiar with this document?

5    A.    Yes.  This is a letter after I grieved, grievance
6    1.2 which is Dr. Walsh and Dr. Walsh at that time informed
7    me there's no way the GMEC will rule against me.  I
8    proceeded to 1.3 meeting with Kathy Stephens and then Kathy
9    Stephens told me that she would get back with me within ten
10   business days and she said -- she stood up and went to her
11   calendar and she said I think we should be clear, because
12   you're right, business, a business day is not explicitly
13   defined in the handbook or anywhere.  So let's say it's
14   April 11, 2012, and that's why there's a specific date.  So
15   after our conversation previously about this issue, she
16   made it very clear the date, and I'm sorry, this is the
17   date for my grievance, I apologize.  But in our meeting she
18   made it very clear what ten days business days would be.

19   Q.    On the other instance when you're referring to
20   that you didn't go forward -- you could not go forward on
21   the grievance because you were late on the ten days for the
22   Martin Lutheran King holiday.

23   A.    I don't believe I was late.  I believe I was --

24   Q.    It was deemed to be late.

25   A.    Kathy Stephens deemed it to be late.  I believe

Afraaz Irani 6/30/2015

237

1    that Martin Lutheran King Day is a federal holiday so I

2    believed it to be in keeping with ten business days.

3        Q.    Do you know if the entire grievance system

4    follows with your interpretation of that?

5        A.    There actually is no guidelines in the handbook

6    or anywhere that specifies what a business day is.

7        Q.    Did you go over this issue with anyone in human

8    resources who regularly --

9        A.    I did.

10       Q.    -- sets forth these --

11       A.    I did.

12       Q.    -- dates.  And did they inform you that --

13       A.    I said this is, this is ten days.  She said,

14   yeah, I know, it makes sense.  So we talked -- we had to

15   talk to Kathy Stephens.  So they deferred then -- I forget

16   who I called, but HR told me we're going to talk to Kathy

17   Stephens.  HR called me back and told me that Kathy

18   Stephens said that it is -- that they're that going to be

19   able to proceed.

20       Q.    Do you know if that was a business holiday for

21   the residents?

22       A.    I wasn't there that day.  Residents, we don't

23   tend to count holidays, because we have to take call

24   anyway.  Our orthopedic clinic would be closed.  So by that

25   definition if we were on call that day and we go -- we

Afraaz Irani 6/30/2015

240

1   were terminated?

2         A.    Somebody told me I'm terminated?

3         Q.    Do you recall when you found out that you were

4   terminated?

5         A.    Yes, I found out.  When I was terminated, it was

6   June 1, 2012.  This is the letter in Exhibit 44 that says

7   you are -- the decision is final, everything is done with.

8         Q.    Were you ever told you were terminated prior to

9   this?

10        A.    You know what, I don't think so, because this was

11  not conveyed to me via spoken word.  Dr. Koon did not say

12  you are terminated and this was only via e-mail.  I don't

13  believe I have, hmm, been told.

14        Q.    What were you grieving?  Were you grieving a

15  suspension?

16        A.    I was grieving an action to have me removed from

17  the program.  So I was grieving the proposal to have me

18  terminated.

19        Q.    From what you understand you had not been removed

20  from the -- there had not been a vote to remove you?

21        A.    In my mind termination is terminal, final.

22        Q.    No, no, no.

23        A.    It is not final.

24        Q.    I'm asking -- well, what does -- okay.  We'll get

25  into that in just a minute.  What were you told after the

Afraaz Irani 6/30/2015

249

1      A.    It was Dr. Hanypsiak.

2      Q.    Were these people contacts that Dr. Guy deals

3  with?

4      A.    Yeah.  He put me in touch with them.

5      Q.    Following your termination did you ever reach out

6  to these folks again and look for a job with them?

7      A.    I don't believe I did, no.

8      Q.    Did you ever have a conversation with Dr. Walsh

9  about pursuing areas other than orthopedic surgery?

10     A.    I had a conversation with Dr. Walsh in the

11 grievance process to grieve my decision.  During that

12 meeting Dr. Walsh said I'll just tell you right now that

13 GMEC Council is never going to vote against you, you should

14 think about leaving this program with dignity, i.e. quit

15 right now and at that time he was saying you should do

16 something else, because he made it clear to me that I was

17 going to be terminated.  So at that point he said you

18 should consider doing something else, because we're going

19 to make sure you don't stay here.

20     Q.    He said we're going to make sure you don't stay

21 here?

22     A.    No, that is my summarization, but he said, his

23 specific words if you're asking was there is no way,

24 absolutely no way that GMEC would ever go against us.  So

25 you should think about leaving the program with dignity.

Afraaz Irani 6/30/2015

250

1    Those were his exact words.  The rest of it I am actually

2    telling you the -- summarizing.

3        Q.    Your impression?  You're giving me your

4    impression, aren't you?

5        A.    The exact words I quoted you should leave with

6    dignity, the GMEC will not rule against us, so you should

7    consider --

8        Q.    Did he feel like that they had a strong case?

9        A.    Did he feel like it?

10       Q.    Did he state?

11       A.    Yeah, of course, he thought he felt like he had a

12   strong case.

13       Q.    Did Dr. Walsh ever discuss with you other

14   alternatives to practicing medicine?

15       A.    Right.  So at that meeting he was like you should

16   look into doing something else besides medicine and that is

17   the meeting where he said -- I think he again actually

18   referenced, you know, you should talk to some guys in

19   industry or something like that.

20       Q.    Did he offer to help you?

21       A.    I think if I had asked him for contacts --

22       Q.    No.  Did he offer?  Did he offer to help you?

23       A.    I don't remember him specifically, but again my

24   gestalt would be if, if I was going to leave and not pursue

25   termination, he would try and put me in touch with some

Afraaz Irani 6/30/2015

263

1    depth of the supervision issue?

2        A.    So the issue of supervision was raised by me

3    before this I think back in -- starting PGY2.  Specifically

4    I can give you one example that's illustrative.  I

5    complained about inadequate supervision with one of our

6    trauma attendings, Dr. Able who refused to come and take

7    care of a patient to which I requested his direct

8    involvement.  Issues like this were very common.  I

9    complained actually, this was at the hearing, I complained

10    about that to Dr. Koon.  I complained about that to Dr. Guy

11    that I don't feel there's adequate resident supervision

12    here.  Regularly at the Monday clinics, you know, Dr. Koon

13    would routinely show up --

14        Q.    I don't need you to explain the supervision.  I'm

15    just asking you --

16        A.    You just asked me if I complained about it prior,

17    yes, ma'am.

18        Q.    Other than the instances that you told me with

19    Dr. Able?

20        A.    Yeah, I can go on.  I was trying to give you more

21    specifics.

22        Q.    But I don't need you to describe what you

23    complained about.  I just need to know when you complained.

24        A.    There were more incidents beyond that.

25        Q.    When else did you complain about it?

Afraaz Irani 6/30/2015

1      A.    So again I have to go into specific incidents

2  that Dr. Voss when he came to clinic at 1801 on Mondays

3  would always show up on time.  He would say you guys got to

4  make sure that your attendings are seeing Medicare and

5  Medicaid patients and not show up late, because that's

6  Medicare fraud and I said Dr. Voss, you know, Dr. Koon and

7  Dr. Walsh routinely don't show up when we're doing your

8  patients by ourselves and he said that needs to be changed,

9  because that actually would constitute I believe at that

10  time he said, but Medicare and Medicaid rules mandate that,

11  I believe they mandated that the patient must be seen by an

12  attending and he pointed out and my comment back to him was

13  we're not getting that kind of supervision.  That was

14  earlier on in my PGY2 year.  I think it was actually the

15  first time Dr. Voss was staffing an 1801 clinic as a PGY2.

16  And that was a similar complaint that I raised.

17      Q.    Anything else?

18      A.    So specifically I can give you -- this complaint

19  was known to my co-residents.  Greg Hertzog, we were on

20  call, a patient came in with a chainsaw versus leg and his

21  leg was opened.  He needed to go to the OR and we couldn't

22  find Dr. Mazaway.  We paged him, we paged him.  Took over

23  three-four hours, he never called back.  We called his

24  house.  We just couldn't get hold of our attending and a

25  patient needs -- is requiring operative intervention, we

Afraaz Irani 6/30/2015

274

1  A. I was told that the presentation would function

2 in a vastly different way than actually it played out.  So

3 I don't think I was given a fair understanding of what was

4 going to happen and I was a little disappointed in how

5 things were carried out.

6  Q. Did you prepare a script of basically what you

7 wanted to say in the grievance meeting before the Grievance

8 Committee?

9  A. Yeah, I believe I had an outline of what I was

10 going to read.

11  Q. Was that document something that you actually put

12 in with your other documents --

13  A. No.

14  Q. -- before the Grievance Committee?

15  A. No.

16  Q. Was that document approximately 20 pages?

17  A. Sounds about right.

18  Q. Were you able to provide the full contents of

19 that document in your presentation to the Grievance

20 Committee?

21  A. I think I was time limited so I don't -- I wasn't

22 able to provide -- I was only able to provide so much, but

23 everything I had prepared I was able to present.

24  Q. Were you able to put in before the Grievance

25 Committee all documents that you felt like were important

Afraaz Irani 6/30/2015

1   to put forward?

2       A.    See, this gets back to what I was told by Lin

3   Hearn.  The structure of it was going to be that Dr. Koon

4   and whoever else, in this case Dr. Walsh, would present

5   their side of the story, after which I would present my

6   side of the story after which we would respond to questions

7   from the Grievance Council.  Instead that did not happen.

8   Instead Dr. Koon and Dr. Walsh turned to me and it was a

9   cross examination.  It was accusations.  It was Catch-22

10  questions which is not what I was told.  The other thing

11  Lin Hearn said this was sort of an investigation panel.  So

12  my hope was I'd say look guys he's saying this, I'm saying

13  that's not true, please go look at the records, and my

14  understanding was that week interim was hopefully these

15  guys would go back and look at the primary evidence.  If

16  there's an accusation that I didn't do X, Y and Z, let's just

17  not take what Dr. Koon said versus Dr. Irani, let's go back

18  and look at the evidence in the chart and I was led to

19  believe that would happen and so I didn't go and present

20  charts and all this other sort of stuff that I think would

21  have been -- I think would be very persuasive to an

22  independent panel.  So I was disappointed that what I was

23  represented to go on was or the way the meeting would

24  happen was actually very polar opposite of how it actually

25  happened.

Afraaz Irani 6/30/2015

293

1    lawsuit?

2        A.    Did I stall my -- no, actually I -- no,

3    absolutely not.  It's -- trust me, it's not fun being

4    employed -- unemployed for almost three years.  That is not

5    a fun process, okay.  What I've gone through has been

6    extremely traumatic, okay.  I still -- it is unimaginable

7    that I would want that to continue for any while longer.  I

8    absolutely did not do anything to stall.  The only thing I

9    had to stall was because my depositions got pushed back.  I

10   had a January start date for my new job and I was looking

11   forward to starting that.  But I was informed that these

12   depositions would be pushed back to a later day.  Because

13   of that, I had to push it back.  I did not stall --

14       Q.    Why?  Why would you have to push it back?  Why

15   couldn't you go ahead and start your new job?

16       A.    Because we had multiple depositions and working

17   in a job that requires me to work a lot, I'm not going to

18   compromise the first job I've had in a long time.  I want

19   to go in that and I'm going to give them my all and make

20   sure they have no reason to doubt anything but the best and

21   this is going to jeopardize it and take away from my job

22   performance.

23       Q.    When were you given the job offer for the job

24   you're starting?

25       A.    I believe last year.

www.compuscripts.com

Afraaz Irani 6/30/2015

300

1    would, would be a fair assumption that I would've gone on

2    to be a spine surgeon.  I think this was known.

3         Q.    Would Dr. Grabowski have been the -- is

4    Dr. Grabowski the spine surgeon who trained residents at

5    Palmetto Health?

6         A.    Dr. Parrott was when I entered.  Dr. Grabowski

7    had just started for a couple months.  At that time people

8    were still rotating with Dr. Parrott.  I don't know --

9         Q.    Did you ever rotate with Dr. Parrott?

10        A.    I didn't rotate with Dr. Parrott.  I don't

11   believe I ever rotated with Dr. Grabowski either.

12        Q.    But you saw one of Dr. Grabowski's patients,

13   correct?

14        A.    I saw one of Dr. Grabowski's patients, because I

15   believe Dr. Voss was out of town and Dr. Hoover told me to

16   cover Dr. Grabowski's patients.

17        Q.    If Dr. Grabowski did not believe you were

18   qualified for a fellowship in spine, would it be more

19   difficult to obtain one?

20        A.    Well, again, I don't know.  If I worked with

21   Dr. Parrott, it's definitely possible that I could've had

22   Dr. Parrott trying to match me with a spine fellowship

23   program and so I don't think it's outside the realm of

24   possibility.

25        Q.    If Dr. Parrott was not working with residents

Afraaz Irani 6/30/2015

303

1        A.    Average/average minus.

2        Q.    And that he understood communication wise that

3    you had some difficulties with Dr. Koon.

4        A.    Correct.

5        Q.    So of the three categories it was positive with

6    regard to you being smart?

7        A.    And I was, you know, at that point he also told

8    Dr. Walsh it's too soon to -- he told me it's too soon to

9    tell somebody's surgical skills.  So I think Dr. Guy did

10   not think that this was something -- his evaluation at that

11   time clearly could have gone 360.  Dr. Hydorn they always

12   talked about had a horrible evaluation, horrible PGY2 year,

13   did excellent by the end.  So I can't sit here and say that

14   if those issues were not corrected I couldn't have -- I

15   think if the truth had come forward and I could have gone

16   on, maybe Dr. Grabowski and everybody would really see that

17   I'm an asset to the program.  I don't think that's outside

18   the realm of possibility.  I think when people are fed

19   factual inaccuracies it really clouds their vision and

20   that's what I was trying to clarify so that I can get a

21   fair shot and actually have a chance to shine.

22       Q.    What were the factual inaccuracies?

23       A.    You can start with the August 5, 2011, memo if

24   you would like.

25       Q.    The content of the various disciplines you

Afraaz Irani 6/30/2015

1    that we put in today, when Dr. Koon would ask you to please

2    write things up, did you -- are we missing any documents

3    where he then followed up with an e-mail and said I'm just

4    kidding don't you dare submit anything or did he ask you to

5    actually write up your side of things?

6        MR. ROTHSTEIN:  I object to the form of the

7    question.

8        A.   I'm trying -- so.  I think we've turned over

9    everything relevant.

10        Q.   Is there any instance when you were disciplined

11    that you were not asked to give a write-up or to give your

12    side of things?

13        A.   Absolutely.

14        Q.   Which ones are those?

15        A.   Okay.  So we can -- so.  We have to again go from

16    the top in the documentation --

17        Q.   Well, we don't have time for that.  So your

18    testimony is that there are instances where you were not

19    allowed to give your side of the story?

20        A.   That has been my consistent testimony, yes,

21    ma'am.

22        Q.   The documents would reflect if we go through and

23    compare the documents to the remediation and to your

24    written responses we can tell what the accusations were and

25    what you actually responded to, correct?