# EXHIBIT W

136

1                        DR. JOHN EADY,

2              CALLED AS A WITNESS AND SWORN IN BY

3                  THE COURT, WAS EXAMINED AND

4                    TESTIFIED AS FOLLOWS:

5

6              ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  Do you

7    solemnly swear or affirm under penalty of perjury that your

8    testimony in this proceeding will be the truth, the whole

9    truth and nothing but the truth?

10             THE WITNESS:  I do, Your Honor.

11             ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  Thank you.

12   Please state and spell your name for the record.

13             THE WITNESS:  John, J-O-H-N.  My middle name,

14   Lafon, is a family name, L-a-f-o-n.  Last name is Eady,

15   E-A-D-Y.

16             ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  Thank you.

17             Go ahead.

18

19                     DIRECT EXAMINATION

20   BY DR. FIRESTONE:

21      Q.   Good afternoon, Dr. Eady.  Tell me a little bit

22   about what kind of education and training have you had in

23   your field of expertise?

24      A.   Where would you like me to start, sir?

25      Q.   Well, why don't you start with college,

BEFORE THE

MEDICAL BOARD OF CALIFORNIA

DEPARTMENT OF CONSUMER AFFAIRS

STATE OF CALIFORNIA

---oOo---


| | |
|---|---|
| In the Matter of the Statement ) of Issues Against: ) ) AFRAAZ RUSTOM IRANI, ) ) ) ) RESPONDENT. ) _____) | CASE NO. 800-2013-000420 O.A.H. NO. 2014050866 |



Elihu Harris State Office Building,

1515 Clay Street, Hearing Room A

Oakland, California

---oOo---

Monday, September 29, 2014

9:00 a.m.

---oOo---

Reported by:  Rachael Dees, CSR No. 13815

DIAMOND COURT REPORTERS
1107 2nd St., Suite 210
Sacramento, CA  95814
916-498-9288

137

1  undergraduate school?

2      A.    Undergraduate school, I went to college in South

3  Carolina called College of Charleston in Charleston,

4  South Carolina.

5          I finished in three years, because I came from a

6  poor family and didn't have the money to go all four years.

7          I got accepted to medical school, and I completed

8  medical school with a Medical College of South Carolina, now

9  called Medical University of South Carolina in Charleston in

10  three years.

11          And in my last year, because I was running out of

12  money, the Air Force.  I got a sponsorship by the Air Force

13  in something called a "35-13 Program," which paid my last

14  year in medical school.

15      Q.    Did you grow up in South Carolina?

16      A.    I did.  Yes, sir.

17      Q.    And then after your completion of medical school --

18      A.    I did --

19      Q.    -- what did do you?

20      A.    -- my internship.  In those days, you did a general

21  internship at Malcolm Grove Air Force Base Hospital on an Air

22  Force base just on the south side of Washington DC.

23          I became a flight surgeon in the Air Force for

24  three years.  I flew in an F-4 squadron for those four years,

25  and because I was in my third year -- or last year of medical

138

1    school, I was asked by the chairman of the orthopaedics

2    department if I wanted to be an orthopaedist.

3         He was a great man, and I felt that will fit me.

4    But because the Air Force had sponsored me in the last year

5    of medical school, I had to serve a minimum of three years in

6    the Air Force.

7    Q.   And where did you take your orthopaedic surgery

8    residency training?

9    A.   Orthopaedic surgery residency was back at

10   Charleston, University of South Carolina Department of

11   Orthopaedics.

12   Q.   Did you stay at that University in any capacity?

13   A.   I did not at the time, because again, the Air Force

14   sponsored me through residency.  I had to go back in the

15   Air Force to serve time.

16        The rule was in the Air Force Code 10, you had to

17   pay back two years for the first year of residency training

18   and one year for every year thereafter.

19        So I went back in the Air Force and was stationed

20   at Lincoln Heath in England, and I fulfilled two jobs.  I was

21   an orthopaedist there.  I was also flight surgeon for the 494

22   Fighter Squadron, which was the last Air Force squadron in

23   Europe.  I ended that time because during my residency, I

24   fell in love with doing orthopaedic surgical oncology.

25        I applied to and got accepted to the University of

139

1    Florida orthopaedic fellowship, oncology and --

2            ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  I'm losing

3    you.  So you applied and were accepted at University of

4    Florida --

5            THE WITNESS:  Orthopaedic surgical oncology

6    program.  Those were the early days of developing orthopaedic

7    oncology for kids with sarcomas, bone sarcomas, a broad

8    spectrum of --

9    BY DR. FIRESTONE:

10       Q.    So that's essentially the specialty in orthopaedics

11   of operating on a various cancers of the bone?

12       A.    Yes, sir, both bone and soft tissue.

13       Q.    Doctor, are you board certified in orthopaedic

14   surgery?

15       A.    Yes, sir.

16       Q.    Have you held any academic positions as a board

17   certified orthopaedic surgeon?

18       A.    Yes.

19       Q.    What type of positions have you held?

20       A.    I was an assistant clinical professor at the

21   uniform -- University of Health Sciences when I was in the

22   Air Force.

23            I was also an associated professor of orthopaedics

24   when I retired from the Air Force at University of

25   San Antonio -- University of Texas at San Antonio, I don't --

140

1    Q.    What rank, by the way, were you when you retired?

2    A.    Colonel.

3    Q.    Full Colonel?

4    A.    Yes, sir.  Because my eldest daughter was found to

5    have kidney disease just as I was retiring, and she couldn't

6    get health insurance because of her kidney disease.

7         I left the University of Texas and came back to

8    South Carolina and worked for three years to help pay for her

9    kidney and gave her one of my kidneys.

10        At that point, it was 1990.  I was asked to come to

11   the University of South Carolina School of Medicine

12   Department of Orthopaedics and develop a state-wide

13   orthopaedic surgical oncology program, which I did.  And I

14   ran that program and was the only orthopaedic surgical

15   oncologist for the state for nine years.

16        And in 1999 the University -- the Medical

17   University of South Carolina was developing the designated

18   cancer center for South Carolina and I was asked to go down

19   there to help develop an orthopaedic oncology program and it

20   was very honorable position.  I thought it was the best thing

21   that could ever happen.  So I went down there about nine

22   months later.

23        But I went on the -- I went in December of 1998.

24   And in September of 1999, the University of South Carolina

25   dean or the director or vice president for education affairs

141

1    called me and asked me if I would come back to do the

2    University of South Carolina in Columbia as a chair, which I

3    did.

4         Q.   Well, let's clarify something, because there are

5    two University of South Carolina Medical Schools; is that

6    correct?

7         A.   Yes, sir.

8         Q.   Medical University of South Carolina the other is

9    just the University of South Carolina?

10        A.   It's a little funny the school in Charleston was

11   started 1824.  And it's like a school district, and it's

12   called the Medical University of South Carolina.  It's

13   actually an entity in and of itself.

14             And in Columbia it's University of South Carolina

15   School of Medicine.  It was started in 1978 with the help of

16   the VA law at that time that helped establish medical schools

17   across the United States in conjunction with the VA.

18        Q.   What was your role at the University of South

19   Carolina in Columbia?

20        A.   When I went there in 1989-90 time period, I was the

21   professor of surgical oncology.  I started off as an

22   associate professor but was promoted to professor in about

23   1994 somewhere in there.

24        Q.   Did you ever attain a position of chairman of the

25   Department of Orthopaedic Surgery at the University of South

142

1    Carolina Columbia?

2        A.    Yes, sir.  As I said, 1999 -- November of 1999.

3        Q.    What is your experience as it relates to

4    orthopaedic surgery residency programs, Doctor?

5        A.    I was the chair of the orthopaedic surgery

6    residency program at Wilford Hall Medical Center, which is

7    the Air Force's only training -- orthopaedic training

8    program.

9              I was consultant to the surgeon general in

10   orthopaedics the whole time I was there from 1983 until I

11   retired.

12       Q.    Now, the Air Force program at Wilford Hall, that's

13   associated with the University of Texas, is that correct?

14       A.    It is a stand-alone program, but it has an

15   affiliation with the University of Texas, yes.

16       Q.    Similar to the affiliation with the program that

17   Dr. Irani was into the University of South Carolina?

18       A.    Probably not similar.  What the affiliation we have

19   in the department of orthopaedics is that the orthopaedic

20   residents from the University of Texas, San Antonio, rotated

21   with us out there for specific training education.

22             One was orthopaedic surgical oncology, because that

23   was the first, and for a while, the only orthopaedic surgical

24   oncology in the entire military.

25             So there was a time when I was doing 400 or

143

1   500 cases a year -- orthopaedic surgery on patients from all

2   the over the world.

3       Q.   And what was your position in the orthopaedic

4   surgery residency training program there?

5       A.   I was the chair, and I was also the program

6   director.  Because in those days, you're both chair and the

7   program director.

8       Q.   And then when you were at the University of South

9   Carolina after you left Texas, did you have any relationship

10  with the orthopaedic surgery program at Palmetto?

11      A.   Yes, I think I said that.  When I was originally

12  there, I developed the orthopaedic surgical oncology program

13  for the state.

14          As a said I went to the Medical University of South

15  Carolina in Charleston for nine months then back to the

16  University of South Carolina School of Medicine as the chair

17  of the orthopaedic surgery department.

18      Q.   What was your role in the orthopaedic residency

19  program in Palmetto when you were there?

20      A.   I was also the program director.

21      Q.   Okay.

22      A.   Again, in those days you were both.

23      Q.   At some point you left the University of South

24  Carolina and went to the VA six miles away; is that correct?

25      A.   That is correct.  The Palmetto Health and Medical

144

1   School are separated.  The medical school -- physically, it's

2   located actually on the VA campus.  So the medical students

3   for their first two years go to that school on the campus at

4   the VA hospital.

5        And then third and fourth years, they -- two thirds

6   of them rotate through the VA Hospital, Palmetto Richland.

7   The local area combined program a third are actually sent to

8   Greenville for their clinical rotations.

9        The reason for that is in the State of South

10  Carolina, each year, we -- the state needs about 180

11  physicians to replace attrition.

12       People that are -- that have decided to take other

13  training or move to another state, who have died, the state

14  of South Carolina can only produce in the two programs about

15  140.  They are raising that number.  Hopefully, it will get

16  up to 180, but because you can't -- you couldn't put -- and

17  there has been some effort to put all of the medical school

18  training in Charleston and all in Columbia.  If you look at

19  the state in either place, there are not enough clinicians to

20  train 140-150.

21       You have to break it up into areas across the state

22  and the Medical University does the same thing.  They send

23  students to private hospitals, Carolinas Medical Center, for

24  rotations, for educational training.

25     Q.    Doctor, in your field of orthopaedic surgery are

145

1    there such things as board certifications?

2        A.    Yes.

3        Q.    Have you ever been an examiner of candidates for

4    board certification in orthopaedics?

5        A.    I was an examiner for the Medical Board for

6    15 years.

7        Q.    Have you received any awards in your specialty?

8        A.    Yes, sir.  I think you'll see in my CV:

9    Outstanding Teacher of the Year, Outstanding Alumnus from

10   MUSC.  Two of the most important ones to me, because that's

11   what it's all about is being able to teach medical students,

12   residents, fellows to get it.

13       Q.    Doctor, you have authored more than 25

14   peer-reviewed articles and book chapters and books in your

15   field; is that true?

16       A.    Yes, sir.  And I've also produced instructional

17   course exhibits at the American -- Annual American Academy of

18   Orthopaedic Surgery.  I think I've done four.

19       Q.    Have you ever been involved in any programs

20   teaching orthopaedic surgeons and residents something about

21   communications skills?

22       A.    Yes, sir.  I am a communication skills mentor for

23   the American Academy of Orthopaedic Surgery, and I give

24   lectures across mostly the Southeast.  Because the way the

25   academy works is, they -- like, for people in the -- in the

146

1   region of the United States to teach in that region, but I

2   have given lectures here at San Francisco at the annual

3   meeting of orthopaedic surgery in communication skills.  My

4   most recent one was University of South Florida in June.

5       Q.   When was the most recent publication in a

6   peer-reviewed journal that you have submitted and been

7   accepted?

8       A.   I just published one in eMedicine last summer.

9       Q.   How long ago was that?

10      A.   I think I got the notification a week ago.

11           THE COURT REPORTER:  I just need clarification,

12  eMedicine, correct?

13           (Talking over each other.)

14           DR. FIRESTONE:  Your Honor, at this time I would

15  like to offer Dr. Eady's curriculum vitae.  It's exhibit S in

16  Binder 1.

17  BY DR. FIRESTONE:

18      Q.   Would you pull that up, Doctor?

19      A.   Yes.

20      Q.   And authenticate that that's a correct C.V. that's

21  current?

22      A.   Exhibit S.

23      Q.   Other than the journal that you got published a

24  week ago, is this a complete rendition of your curriculum

25  vitae?

147

1       A.   Yes, sir.

2            DR. FIRESTONE:  With that, I'd offer it, Your

3   Honor.

4            ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  All right.

5   I'm marking the CV as Exhibit S for identification.  Is there

6   any objection to Exhibit S?

7            MR. MERCER:  No objection.

8            ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  Exhibit S

9   will be received into evidence.

10      (Respondent's Exhibit S was marked of identification and

11      admitted into evidence.)

12  BY DR. FIRESTONE:

13      Q.   Doctor, in your participation in the program at the

14  University of South Carolina and the VA affiliated with the

15  University program, as well as a Palmetto Health Program, did

16  you become acquainted with a doctor by the name of

17  David Kuhn?

18      A.   Yes.

19      Q.   What is Dr. Kuhn's reputation there?

20           MR. MERCER:  Objection, Your Honor, relevancy.

21  Again, we're here to determine whether or not the Applicant

22  is competent.  The character of the various people involved

23  in the faculty at the University of South Carolina, while

24  possibly relevant to Dr. Irani's lawsuit in South Carolina

25  against that program, has only the vaguest and most remote

148

1  relevance to the key issue here whether Dr. Irani is

2  relevant.

3          And it seems to me that it -- and we would contend

4  that it's an undue consumption of time to spend time,

5  basically, sharing what's no more than gossip about persons

6  who are not before this tribunal, who are not the subject of

7  this case and whose character is irrelevant to it.

8          ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  Well, can

9  you narrow it down?  I mean, I don't know need to everything

10  about Dr. Kuhn.

11          DR. FIRESTONE:  I think this goes to the validity

12  and credibility of the information that Dr. Kuhn provided

13  with regards to Dr. Irani and the allegation that we are

14  making of it being prejudicial based on prejudice and bias.

15          ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  I think you

16  can still narrow the question so it's a little more relevant.

17  BY DR. FIRESTONE:

18      Q.   Dr. Eady, can you tell us whether or not you're

19  aware of whether or not Dr. Kuhn was in any way prejudiced

20  towards minorities --

21      A.   Yes, I can.

22      Q.   -- of patients or residents?

23      A.   Yes, I can.

24      Q.   And what is the basis --

25          MR. MERCER:  Same objection, Your Honor.

149

1          DR. FIRESTONE:  What's the basis for --

2          ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  Just a

3     minute.  Let me rule on the objection.

4          I'm going to overrule the objection, but I'm not

5     sure how relevant it will be at this time.  But I'll allow

6     some questions on the subject at this time.

7     BY DR. FIRESTONE:

8          Q.    What's the basis for your awareness of that issue?

9          A.    I have personal experience with Dr. Kuhn.

10         Q.    And what did you personally observe or hear or

11    experience?

12         A.    Well, perhaps I should first paint it directly at

13    Afraaz.

14              In his second year, Afraaz was supposed to come to

15    the VA Hospital in January for his orthopaedic VA rotation.

16    I hadn't gotten any notification as to the site director

17    there of whether Afraaz was coming or not and Dr. Kuhn comes

18    or came -- he does not anymore.  He came to the VA Hospital

19    once a week for seeing patients, usually, general orthopaedic

20    patients that ran a gamut.

21              I asked Dr. Kuhn if he was going to let me know

22    about what was going to happen with Afraaz.  Was he coming?

23              And Dr. Kuhn's response to me, he said, "Well, you

24    mean Ahmed the Terrorist."

25              And I immediately told him that that was

150

1    considered -- I considered that a racist remark.  It was not

2    to be repeated in the VA system, at which point Dr. Kuhn quit

3    talking to me after that.

4                ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  I'm sorry.

5    After that that he what?

6                THE WITNESS:  He quit talking to me.

7                ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  Speaking to

8    you at all?

9                THE WITNESS:  Yes, Ma'am.

10               ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  What year

11   was this that you --

12               THE WITNESS:  That was 2000 and -- was it 2013,

13   January --

14               DR. FIRESTONE:  2012.

15               THE WITNESS:  2012, sorry.

16   BY DR. FIRESTONE:

17       Q.   I'm sorry, 2011.

18       A.   2011.  Well, it was -- actually, I think it was

19   2012, I believe.

20               MR. MERCER:  Your Honor, if it helps, Dr. Irani

21   entered his PGY-2 year in July of 2011.  So if this was

22   January, it would have been 2012.

23               DR. FIRESTONE:  Yes.

24               THE WITNESS:  2012 correct.

25               ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  Thank you.

151

1          THE WITNESS:  And to just give you some

2     explanation, PGY-2 and PGY-4 residents usually rotated at the

3     VA for 6 months at a time.  Because there were only two

4     residents each year, they split it up into six months for one

5     PGY-2, then it rotated to the other PGY-2.  The same way with

6     the senior residents.

7          Now, that sometimes varied, because the residency

8     program would sometimes get a special dispensation from the

9     Residency Review Committee to add a third resident, and in

10    the areas that they had a third=year resident at that level

11    it would be four months at the time.

12    BY DR. FIRESTONE:

13    Q.   Did you hear of any other prejudicial language that

14    related to racial discrimination from Dr. Kuhn?

15         MR. MERCER:  Objection, Your Honor.  This is way

16    overbroad, and I mean, we're talking about Dr. Irani -- and

17    at least that had some, although distant, relevance.  Now,

18    we're going to talk about his attitude towards people in

19    general.

20         ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  Yes.

21    What's the relevance of that?

22         DR. FIRESTONE:  Well, the relevance is Dr. Kuhn's

23    essential reputation for being a discriminate, prejudiced,

24    biased individual in this program.

25         MR. MERCER:  Again, Your Honor, Dr. Kuhn did not

152

1    make the licensing decision in this case.  Dr. Kuhn's not

2    applying for a medical license, Dr. Irani is.  This is simply

3    not relevant.

4              ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  Well, I'm

5    going to ask you to limit it to prejudices against this --

6    you know, against your client or maybe other residents in the

7    program, but not just against, you know, discrimination

8    against people.  I don't know how that would be relevant.

9    BY DR. FIRESTONE:

10        Q.   Have you heard Dr. Kuhn's racial prejudicial

11   remarks about other residents besides Dr. Irani?

12        A.   Yes, sir.

13        Q.   What have you heard?

14        A.   When I became the chair at the School of Medicine

15   Department of Orthopaedics at USC, one of my driving

16   forces -- because I felt the duty to South Carolina, which is

17   40 percent African American -- there have been few if any

18   African Americans ever accepted at an orthopaedic residency

19   program.

20             So I -- one of the orthopaedic residents we

21   accepted was Rodney Allan, who is a graduate of Morehouse,

22   graduate of Duke University, and we selected him as a

23   resident.

24             Each time a rotation occurred, I required the

25   attending staff -- most of time because there are only two

153

1   residents -- two or three attending staff to write reviews on

2   those folks that rotated on their program.  And it included

3   strengths, weaknesses, what they could do better, what things

4   were missing.

5          And Dr. Kuhn wrote Rodney's second year; he wrote

6   that:  "Rodney never showed up for operations on time in the

7   early morning.  Rodney was ill prepared for his conferences.

8   He was ill prepared for his surgeries.  He made mistakes in

9   surgery."

10         So I call Rodney in and asked him, "What's this all

11  about?"

12         And Rodney said, "He didn't know, because he was

13  late for conferences in the morning," because I required at

14  6:30 we always met morning, five days a week for a

15  conference.

16         On Mondays, it was a post-op conference.  What we

17  did right.  What we did wrong with surgery patients.

18  Tuesdays it was basic science.  Wednesdays it was anatomy.

19  Thursdays it was review of academy articles, based on review

20  of specific entities, and Friday it was tumor day, primarily

21  because I'm a tumor specialist.  I like tumors and I like to

22  teach that and I would.

23         Rodney said, "He didn't know, but he did show up

24  late for surgery in the mornings, because he was sometimes

25  dry comforts over."  The attendings who were supposed to

154

1    start the cases any way, so I didn't consider that a problem.

2            I asked him why he -- what was meant by the fact

3    that he was ill prepared, and Rodney had no idea.  So I

4    called Dr. Kuhn into my office and asked him a day or two

5    later -- asked him to give me some specific examples.

6            And as we went down each one, he kept saying, "You

7    take the side of residents over us.  You never take our word

8    for what we say."

9            And I said, "That's not the issue.  The issue is

10   give me some specific examples.  What was he not prepared

11   for?  What did he not know?"

12           And Dr. Kuhn said to me, "Well, you never take our

13   word for it anyway, but I'm telling you that little black

14   sambo should never graduate from this program."

15           And I immediately stopped the conversation and

16   said, "I am giving you a verbal warning.  That's racist, and

17   if you utter it again I will write you up."

18           After that, I got the same type of conclusionary

19   statements that Rodney was not prepared.  Rodney didn't show

20   up.  Rodney didn't go to the VA when he was called at night.

21   When I investigated it, it didn't happen.

22   Q.   Now --

23   A.   Now, to give you a follow-up, Rodney has since

24   graduated.  He has passed his boards.  He's been practicing

25   in Florence, South Carolina and well respected.

155

1   BY DR. FIRESTONE:

2       Q.   Dr. Eady, was it just male residents that he

3   expressed these kinds of opinions about?

4       A.   Again --

5            MR. MERCER:  Objection, Your Honor.  Now, we've

6   gone --

7            ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  I think

8   we're getting a little far afield.  Let's move onto something

9   else.

10  BY DR. FIRESTONE:

11      Q.   Did you observe the attendings in their supervision

12  of residents?

13      A.   Yes.

14      Q.   Did you observe Dr. Kuhn in his supervision of

15  residents in the Palmetto program?

16           MR. MERCER:  Objection, Your Honor, relevancy.

17  Again, I do keep saying the same thing over again, but

18  Dr. Kuhn's performance is not at issue here.  Dr. Kuhn is not

19  applying for a license.  Dr. Irani's performance is at issue

20  here.

21           So to the extent that we're going to engage into an

22  investigation of whether this witness felt that Dr. Kuhn was

23  or was not supervising other residents it has at best the

24  most remote relevance to whether or not Dr. Irani is

25  competent to practice medicine such that Dr. Irani and not

156

1   Dr. Kuhn should be licensed by the State of California.

2           ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  What would

3   be the relevance of this line of questioning?

4           DR. FIRESTONE:  The relevance is that Dr. Kuhn

5   indicates that he had or has the responsibility for

6   supervision.

7           One of the complaints that Dr. Irani had when he

8   wrote up in the grievance that lead to retaliatory behavior

9   by Dr. Kuhn was his lack of supervision in that program, and

10  his complaint that he was not adequately supervised by

11  Dr. Kuhn has a valid basis.

12          MR. MERCER:  Well, Dr. Kuhn has not testified in

13  this case.  So to say Dr. Kuhn said anything, is really kind

14  of a stretch.

15          The fact is that Dr. Irani is here.  He can testify

16  as to how he felt that he was supervised, and that would be

17  the only relevant information.

18          This witness' information about other situations or

19  remotely from Adorn VA is simply not going to get us any

20  closer to Dr. Irani's competency.

21          DR. FIRESTONE:  The litany of the records that

22  Dr. Kuhn submitted is really the issue, because the Board as

23  well as Dr. Nuovo took it at face value.

24          And I think that it is relevant.  And it's relevant

25  to Dr. Irani, especially since he submitted a grievance

157

1    against Dr. Kuhn for not adequately supervising him.  And

2    there's been retaliatory behavior leading to his termination

3    from the program.

4           ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  Well, I

5    don't know -- I don't think that his -- you know, that this

6    that Dr. Eady's observations of Dr. Kuhn's behavior in other

7    situations is really going to get us anywhere here.

8           I understand the conversation with regard to

9    Dr. Irani, and what the comments were about that and maybe

10   some part of their background relationship; but I don't

11   think -- I'm going to sustain the objection to that question.

12   BY DR. FIRESTONE:

13   Q.   While you were chairman of the Palmetto program for

14   residents, what was the attrition rate at that time?

15   A.   We lost one resident in ten years.

16   Q.   Are you familiar with the attrition rate during the

17   period of time that Dr. Irani was in that program?

18   A.   Yes, sir.

19   Q.   What is that?

20   A.   Well, to give you some background, I am essentially

21   I'm a site collector.  There are two Graduate Medical

22   Committee functions.  One at the VA.  One at the Palmetto

23   Richland.  And they have to communicate the shared knowledge

24   with each other.

25           And I go to the JMCE meeting at the VA, because

158

1    it's my responsibility.  And they have to report what's

2    happened, and I know that last year they were both there --

3    Both PGY-1 residents left the program.  And a PGY-2 -- one

4    was a PGY-2 resident left the program within the last two

5    years --

6              ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  The last

7    thing you said, "Both the PGY-1s left the program last year,"

8    and the next thing --

9              THE WITNESS:  The next was the PGY-2 left two years

10   ago.  Of course, Dr. Irani and his year level Dr. Goodno both

11   left the program.  Obviously, you know about Dr. Irani for

12   other figures.

13   BY DR. FIRESTONE:

14        Q.   So in that four-year period how many out of the

15   eight residents that were rotating through left the program?

16        A.   Well, there's actually 10, because you have to

17   count PGY-1 as an orthopaedic year.

18        Q.   Okay.

19        A.   It is no longer a separate entity.  They start off

20   orthopaedic PGY-1 and go PGY-5.  So there were five residents

21   in that period of time that left, so 50 percent.

22        Q.   And the program has altogether 10 residents

23   including the interns, and they are PGY-1 right?

24        A.   Usually.  As I said, sometimes the program will get

25   a special approval, but -- and you have to apply to the RROC

159

1    to add a resident at a certain year level.  So occasionally

2    there will be 11, but they will never let it go beyond one

3    extra-year level.

4        Q.   This was during the period that Dr. Kuhn was

5    program director of the residency program; is that right?

6        A.   Yes, sir.  I retired in 2006, and they looked for a

7    chair for almost three years, could not find one, and named

8    Dr. Walsh -- he was acting chair for that period of time, and

9    then they named him permanent chair.

10       Q.   Who is Dr. Walsh?

11       A.   Dr. Walsh is the president chair of the orthopaedic

12   residents at Palmetto.

13       Q.   Is there a relationship between Dr. Walsh and

14   Dr. Kuhn?

15       A.   Yes, sir.

16           MR. MERCER:  Objection, irrelevant.

17           ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  I'm a

18   little confused about when Dr. Kuhn came in, and --

19   BY DR. FIRESTONE:

20       Q.   When did Dr. Kuhn take over the directorship of the

21   Palmetto program, Doctor?

22       A.   In June of 2006, because I left July -- July 31st

23   and so he took over as the program director in June of 2006.

24       Q.   And what's the relationship between Dr. Walsh, the

25   chairman of the department and Dr. Kuhn?

160

1       A.   They were residents together at Dwight D.

2  Eisenhower Medical Center.

3           I know that because I -- for 10 years I volunteered

4  my time both at the Dwight D. Eisenhower Medical Center to

5  teach orthopaedic surgical oncology at the Medical College of

6  Georgia, in Augusta at the Medical University of South

7  Carolina.  And in fact, the Army after ten years gave me the

8  Commanders -- Army Commanders Award for public service for

9  it.

10      Q.   So Dr. Kuhn and Dr. Walsh were friends before they

11 came to the University South Carolina, right?

12          MR. MERCER:  Objection, relevance.

13          ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  What is the

14 relevance of is this?

15          DR. FIRESTONE:  The relevancy, you'll notice on

16 many of the things that Dr. Kuhn signed, Dr. Walsh's name is

17 there as well.

18          MR. MERCER:  That's a huge leap of logic that we're

19 now going to get into, just how intimate the friendship was

20 and somehow this will relate to Dr. Irani's competency?

21          ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  Can you

22 respond to that?

23          DR. FIRESTONE:  Yes.  It certainly -- Dr. Kuhn and

24 Dr. Walsh were buddies for many years.  Dr. Walsh, actually

25 we'll find out had hired Dr. Kuhn, and therefore, endorsed

161

1    almost everything that Dr. Kuhn recommended.

2            MR. MERCER:  Your Honor --

3            DR. FIRESTONE:  They're both on the GMEC Counsel.

4            MR. MERCER:  None of these people are here or will

5    be here to testify, and we're really going way beyond the

6    purpose of the statement of issues.

7            ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  What -- are

8    there any --

9            DR. FIRESTONE:  It goes to the credibility of

10    Dr. Kuhn's statement here, that he's submitted to the Board

11    and some of these have Dr. Walsh's name as well.

12            And we've wondered why does the chairman of the

13    department have his name there, and I think we can get an

14    explanation from Dr. Eady because of the relationship.

15            ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  All right.

16    Well, I think, you know, we can just move on.

17            It suffices to say Dr. Walsh and Dr. Kuhn were

18    friends and longtime colleagues, and I don't think I need

19    more than that.

20    BY DR. FIRESTONE:

21    Q.    Did you ever witness Dr. Walsh have any prejudice

22    against residents?

23    A.    Yes.

24    Q.    And what did you witness?

25    A.    We had a Mormon resident that Dr. Walsh would ask,

162

1    "When are you going to get a real religion?"

2          Dr. Walsh is a very fundamentalist.  I don't have

3    anything against fundamentalist Christians, but very

4    fundamentalist Christians that don't believe that Mormonism

5    is a real religion.  So that answers your question.

6          Q.   In your role as the head of the VA orthopaedic

7    program, what is the usual practice when seeing VA patients

8    there?

9          A.   I'm sorry, I'm a little hard of hearing.

10         Q.   What's the usual practice when seeing VA patients

11   there as far as urgency, and you know, whether a patient has

12   to be seen 24 hours after admission or immediately.  What are

13   the procedures and rules at the VA in that regard?

14         A.   I think I submitted to you the outline of the

15   response that both attendings and residents must conform.

16         One is a level one which means has to be answered

17   within an hour, and there must be communication between the

18   requesting physician and the receiving physician or the

19   consulting physician.

20         The level two is urgent, but can be seen within

21   24 hours.  And the level three can be seen at -- usually, at

22   leisure, but certainly within several days.

23         And lastly is essentially a consultant opinion.  We

24   get -- we get a few consults nowadays with electronic medical

25   records that we have to answer promptly, usually within

163

1    48 hours.

2           The emergency room when they call us for a

3    consultation request, will either tell us that it is a

4    heads-up notice that they're getting the patient to medicine,

5    but the patient has an orthopaedic problem or they want us to

6    admit it with medicine as a consulting service.

7           Usually, those will go back to the emergency room

8    physicians.  By VA rules have the right to admit anybody from

9    the VA to any service they wish.

10          But I have a great relationship with them.  They

11   don't usually admit the patients to my service without

12   calling me and telling me.  But they will frequently admit to

13   medicine, because they think it's a medicine problem that

14   needs to be treated by medicine.

15       Q.   Doctor, I'd like to refer you to Exhibit P in

16   Binder 1.  What is Exhibit P?  Can you identify it?

17       A.   It says, "VA documentation" first documents.  It's

18   a VA policy to seeing patients in response to consultation

19   requests.  "Consultation" is what it reads.

20       Q.   Page 364, will you look at that?

21       A.   Yes.  Page 364 is the VA outline for inpatient

22   consultation.

23       Q.   Does that reflect what you just testified about?

24       A.   Yes, sir.

25       Q.   Doctor, you've reviewed the affidavits in this

164

1    matter; is that right?

2         A.   Yes, sir.

3         Q.   All 35 of them?

4         A.   Yes.

5         Q.   And as --

6         A.   As well as the dean's letter.

7         Q.   Have you also reviewed the packet that was

8    submitted to the Medical Board by Dr. Irani?

9         A.   Yes.

10        Q.   At the VA Dr. Irani as you said Was to rotate

11   through the VA; is that right?

12        A.   Yes.

13        Q.   Do senior residents have a responsibility for

14   teaching junior residents how to the appropriately handle

15   call duties?

16        A.   Yes.

17        Q.   Are you familiar with a resident by the name of

18   Dr. Jennifer Wood?

19        A.   Yes.

20        Q.   Was she Dr. Irani's senior resident?

21        A.   Yes.

22        Q.   Are you familiar with the events regarding a

23   patient who had cellulitis after a knee replacement surgery

24   that occurred on August 9, 2011?

25        A.   Yes.

165

1    Q.    Can you tell the Judge and the Medical Board what

2    transpired regarding Dr. Irani's involvement?

3    A.    Doctor -- Dr. Irani was called by the medical --

4    the E.R. doctors with a, "heads up notification" that they

5    were admitting this patient to the medicine service, and that

6    the -- it wasn't absolutely urgent that he come, but they

7    wanted to him to know about it.

8          Usually that means you see them the next morning

9    when you make rounds in the hospital.  I'm always there just

10   because I'm getting old and can't sleep all night, but I'm

11   always there in the morning by 6:30.

12         I start off my rounds in the SICU, then go through

13   wards.  So I know about every orthopaedic patient that was

14   admitted to the VA hospital every day.

15         And for four years I was the only orthopaedist over

16   there.  I have recently been successful in recruiting two

17   additional orthopaedists, two P.A.s, one nurse practitioners.

18   Primarily because of all the scandal that you've heard about

19   in the VA system.  They're very unaccommodating now to add

20   additional people.

21   Q.    What transpired involving Dr. Irani involvement in

22   that case?

23   A.    I'm not sure what I --

24   Q.    What was his participation in the care of -- as far

25   as his response time and so forth?

166

1      A.   He did not go over there that night.  The next

2   morning, he notified the resident that was supposed to come

3   to the VA, the residents have morning conference at Palmetto

4   Richland, and then come to the VA.

5           It's six miles across town and in the early morning

6   hours it's sometimes 25-30 minutes before you can get over to

7   the VA, but they get there usually by eight o'clock.

8           By that time, I've made rounds.  And I know about

9   the patients.  That patient was not an issue and as far as it

10  wasn't even an infection of the joint, it was actually a

11  cellulitis of the lower limbs and a patient that had

12  something called "chronic venostasis disease," which is where

13  the lower extremity soft tissues contract from scarring, and

14  the blood supply gets bad and they start getting infection.

15          Usually it's in a diabetic patients but can occur

16  in a very obese patient that has big limbs that tear in the

17  subcutaneous tissues.  It's called "epidermolysis" and it

18  scars in then the venous blood supply gets damaged, and they

19  end up getting significant breakdown in their skin.

20          That skin gets irritated.  It gets infected from

21  the skin bacteria, and they have to be admitted for elevation

22  and antibiotic treatment and then usually support hose.

23      Q.   Dr. Kuhn criticized Dr. Irani, and you can see that

24  in G, page 182?

25      A.   Say that again please, sir?

167

1    Q.    G182.  It's a 15 August 2011 notation.

2    A.    Yes.

3    Q.    He criticized Dr. Irani in number 4 there that he

4    did not evaluate the VA total joint patient with immediate

5    post-operative cellulitis in a timely fashion.  Do you see

6    that?

7    A.    Yes.  It also says:

8                "Closing wounds with Vicryl suture."

9          And when I looked at that, I don't know what he

10   means by that.  Vicryl suture is perfectly appropriate suture

11   material to use for deep tissues from the muscle periosteum

12   all the way to up subcutaneous tissues.

13         It's used almost routinely in the VA system.  It's

14   inappropriate to use in the skin, but I can't give you an

15   answer as to what he means by that.

16   Q.    Well, with regards to the patient with cellulitis

17   in her leg due to venostasis, was it within acceptable

18   standards for Dr. Wood who was the senior resident to advise

19   Dr. Irani that he did not need to come to see the patient

20   immediately but could wait until the next morning?

21   A.    I don't think it was Dr. Wood.  It was the E.R.

22   physician.

23   Q.    Oh, excuse me.  I guess the name is Debra Sunde?

24   A.    Yes.

25   Q.    And if Dr. Wood instructed Dr. Irani it would be

168

1  okay to the see patient the next day that would be within

2  acceptable standards, wouldn't it?

3      A.   Yes, sir.

4      Q.   And do you know of any care that he gave to this

5  patient that was not within the standard of care?

6      A.   I do not.

7      Q.   What is the role of a resident in a residency

8  training program?  What is their requirements?

9      A.   Progressive educational, professional knowledge

10 base, technical skills by that an orthopaedics, manual

11 skills, manual dexterity over the residency training period

12 until they are capable of functioning independently as a

13 practitioner.

14          It's usually immaterial whether they pass the Board

15 or not, because if, I as their mentor, teach them

16 appropriately, give them the broad spectrum of education

17 they're going to pass their Boards.

18          If you look at the American Board of Orthopaedic

19 Surgery, the statistics, they only have graduating rates of

20 residents, American trained residents have about a 96.

21 There's a little but average 94 percent success rate.

22 Foreign trained are around 65 percent success rate or on

23 their first time passing the Boards.

24          And that's a reflection of the adequacy and

25 competency of American orthopaedics.

169

1      Q.   What's the primary purpose of a residency training

2  program in orthopaedic surgery?

3      A.   To train orthopedists to take care of the

4  population.

5      Q.   What role does education and supervision play with

6  regard to that program?

7      A.   I think it's very critical.

8      Q.   If you turn to Exhibit F, page 175 please.  There's

9  some text messages between Dr. Sunde and Dr. Irani.

10         And Dr. Irani states to the emergency room doctor,

11  "Does it look like it may be more than simple cellulitis or

12  it might involve the surgical area?"

13         And department head, Dr. Sunde states, "No.  I was

14  just messing with you.  It looks like cellulitis to me.

15  Either way it's nothing that can't wait until tomorrow for

16  ya'll to check out."  Do you see that?

17     A.   Yes.

18     Q.   That's the evidence that's related to this case

19  that Dr. Irani was criticized about; do you understand that?

20     A.   Yes, sir.

21         MR. MERCER:  I'm going to object to that.

22         These are text messages that are without

23  foundation, and quite frankly, I don't even see doctor --

24  okay.  I'm just now seeing Dr. Sunde buried in here with a

25  lot of other text messages.  But these are not business

170

1    records.  They are not anything except apparently something

2    that was on Dr. Irani's telephone.

3              And to ask the expert -- I understand an expert can

4    give an opinion based on hearsay, but this is very far from

5    being reliable hearsay without a lot more foundation.

6              DR. FIRESTONE:  It has the exact date that we are

7    talking about this case, Your Honor.

8              MR. MERCER:  Many things have the same date.  I

9    don't think that establishes anything.

10             DR. FIRESTONE:  So there's evidence in rebuttal --

11   further evidence supporting what Dr. Eady had just testified

12   to.

13             ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  All right.

14   You're saying that you're going to present testimony that

15   this -- we're talk about the bottom right?

16             DR. FIRESTONE:  Yes.  The bottom right --

17             ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  That this

18   is --

19             DR. FIRESTONE:  -- e-mail.

20             ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  There will

21   be testimony by your client that this was a text message that

22   he exchanged with regard to the patient with cellulitis?

23             DR. FIRESTONE:  That's right.  That Dr. Irani, the

24   resident, exchanged with the emergency room physician.

25             ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  We have

171

1  that evidence he.  Why can't he comment on that?

2              MR. MERCER:  Well, we don't have that evidence at

3  this point, and it's hearsay.  There's a lot of other stuff

4  in here like, "Where I can get good samosas?"  Is all of this

5  going to come in?

6              DR. FIRESTONE:  Well, we certainly can certainly

7  redact the others if you object to the samosas.

8              ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  I'm not

9  going to rule on the entire exhibit at this time, but if he

10  wants to make a representation as an officer of the Court

11  that he's going to provide testimony from his client.  This

12  is fine.

13             DR. FIRESTONE:  I will make a representation that

14  Dr. Irani will be testifying about the text message and what

15  influence it had on him.

16             ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  Then the

17  expert can assume that that's correct and give us his

18  opinions on that.  Why wouldn't he be able to do that?

19             MR. MERCER:  For the reasons I've stated.  It just

20  seems fairly remote.  He's already testified from his

21  understanding based upon being there.

22             If they want to submit it as hearsay and

23  corroborating later on, they can without his offering opinion

24  that this person actually said that, which he apparently

25  doesn't know.

172

1            ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  All right.

2    Well, I'm going to overrule the objection, and you can -- you

3    know, you're going to have to assume that this was something

4    that was said and base your opinion on that.

5            Obviously, you weren't party to this text message.

6    I think that's fair.

7    BY DR. FIRESTONE:

8        Q.   Is this consistent with the way the VA emergency

9    room calling the resident deals with whether the doctor needs

10   to come there immediately or whether it can wait?

11       A.   Yes, sir.  The VA is now heavily reliant on e-mail

12   messages but between physician.  Primarily because the

13   physicians are off in different places.

14           It works best for the VA in which we can

15   communicate with each other, and so it is consistent with the

16   way the VA does business with each other.

17       Q.   Doctor, how well do you know Dr. Irani?

18       A.   I know Dr. Irani from -- well, let me go back.

19   The surgical ICU unit at the VA is far as from here, my

20   office at the time, is that back door.

21           And I make my rounds at the surgical ICU unit every

22   morning.  First thing I did when I get there is hung up my

23   coat.  And the SICU nurses are very quick to tell you if

24   something is going on with any resident that is rotating on

25   that service, and they love to tell me about any -- they love

173

1  to tell me in the past tense because there's no residents

2  there now -- but they loved to tell me about any problem they

3  were having with the orthopaedic surgery residents.

4          They also love to tell me about the ones that they

5  like and the things that they admired in a resident.  And I

6  got many comments on him when he was there in rotation from

7  those nurses that he was always there, that he did good at

8  exams.  He was careful with managing the patient.

9          My observations of him was at a distance primarily

10  because he was on the surgical ICU service and the chief of

11  the surgical service, the director of surgical services, was

12  actually his direct supervisor.

13          But that position's office was as far as from here

14  to you (indicating), and we always talked.  Certainly if

15  Dr. Brown had any problems with any of the orthopaedic

16  residents, he was right there to tell me.

17          Also, if there was a problem with a resident since

18  I am the site director, I think I've given you already they

19  send me about the residents not doing the chart work.

20          I never got one on Dr. Irani never.  As you can

21  see, I got a lot on some of the others.

22     Q.   Now, you have also reviewed some of the affidavits

23  and other statements that were provided to the Board, and

24  you've reviewed these as well.

25          You've reviewed the packet that he submitted to the

174

1    Medical Board, including the dean's report of his care, and

2    you've reviewed some of the statements about the

3    participation that Dr. Irani had in the emergency medicine

4    residency at UCLA.  You've also talked with Dr. Irani.

5           Do you feel you have enough information about

6    Dr. Irani to give an opinion as to whether he is a safe

7    doctor?

8        A.    I believe as much as anybody.  Yes, sir.

9        Q.    Do you have any opinion about whether he'd be a

10   danger to the public if he were to practice?

11       A.    I do.

12       Q.    What is that opinion?

13       A.    I think he will not be.

14       Q.    And why do you say that?

15       A.    One, my personal experience reviewing the --

16   knowing about him at the VA, talking with Dr. Brown, who's

17   now retired from the VA.  But when Dr. Brown supervised him,

18   and looking at the data in which there is an overwhelming

19   evidence to me in reviewing the those 35 letters, I didn't

20   see on discriminatory -- one negative comment about him.

21       Q.    Doctor, are you familiar with the disciplinary

22   process that Dr. Irani went through that led to his

23   termination?

24       A.    I am not in so far as his specific disciplinary

25   process.  I know the process.

175

1      Q.   Is the disciplinary process at Palmetto, as much as

2   you know it, a process that provides an adequate safeguard as

3   far as due process and fair procedure?

4      A.   I found that it was not.

5      Q.   And why not?

6      A.   There was a previous resident that wasn't afforded

7   due process, who sued.  One of our orthopaedic residents who

8   sued and was reinstated, because he was not afforded due

9   process.

10          MR. MERCER:  Objection, Your Honor, Relevancy.

11          ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  What's the

12   relevance of that?  That could be a different situation.

13          DR. FIRESTONE:  Well, the same program, same

14   disciplinary process.

15          ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  I don't

16   think we know enough about that issue.  You can ask him about

17   the process, as he knows it.  If he participated in it.

18   BY DR. FIRESTONE:

19      Q.   Are you familiar with the process with that

20   person --

21          ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  No.  I just

22   mean the process in general.

23   BY DR. FIRESTONE:

24      Q.   Could you tell us about the process, in general,

25   that you know of that program?

176

1              MR. MERCER:  Your Honor, I think there needs to be

2      some specification in time.  This witness retired from

3      Palmetto in 2006, which would have been four years before

4      Dr. Irani even arrived, and the program was taken over by a

5      different program director.

6              So I would object on the basis that there's simply

7      a lack of personal knowledge as to how the program was run

8      four years after he left it.

9              DR. FIRESTONE:  May I establish a foundation?

10             ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  Yes.

11     BY DR. FIRESTONE:

12     Q.   Doctor, how are you familiar with the process of

13     discipline in that Palmetto program during the period of time

14     that Dr. Irani was there?

15     A.   I don't know.

16     Q.   Oh, you don't?  Okay.  Thank you.

17             In a program at Palmetto, would it have been

18     appropriate to not allow Dr. Irani to provide written

19     responses or verbal responses to the allegations that were

20     made against him?

21             MR. MERCER:  Objection, incomplete hypothetical,

22     and the witness has just testified he doesn't know anything

23     about the process that either Irani went through or the

24     disciplinary process when Irani was there.

25             So to ask him hypotheticals when he's just very

177

1  forthrightly states that he has no information is irrelevant

2  and beyond the scope.

3          ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  Well, if

4  he's familiar with the disciplinary process, and so --

5          MR. MERCER:  As of 2006.

6          ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  Right.  But

7  I think he can say whether he feels that a person who is

8  going through that process should be allowed to submit

9  responses to the allegations that are made.

10          MR. MERCER:  Okay.  If that was the question.

11          Was that the question?

12          DR. FIRESTONE:  That's the question, yes.  You

13  asked a similar questions of Dr. Nuovo.

14          THE WITNESS:  Would you repeat the question,

15  please?

16          DR. FIRESTONE:  Could the court reporter read it

17  back, please?

18      (Whereupon, the last question was read back by the

19      Court Reporter.)

20          THE WITNESS:  If I understand the question, it is

21  no.  The answer is no.

22  BY DR. FIRESTONE:

23      Q.  And why not?

24      A.  Due process is to notify the person of the

25  allegations against him, give them a chance to respond,

178

1    usually in writing, to the allegations with specific data to

2    refute the allegations or to confirm them.

3        Q.    Doctor, are you familiar with the GMEC?

4        A.    Yes, sir.

5        Q.    Could you describe for the Judge and the

6    Medical Board what is the role of GMEC, and how does that

7    relate to a resident who might be disciplined?

8        A.    The GMEC means Graduate Medical Education

9    Community, and at Richland when I was there, it was composed

10   of all the chairs, the program directors, if there was a

11   separate program director, the D.I.O. or the Designated

12   Institutional Official, the dean, who always came, the

13   Adorned VA Medical Center Designated Official.

14            And if there was an issue that got to the level of

15   the GMEC, which I was a member of, the chair or the program

16   director presented their case first, and the resident was

17   allowed to present their rebuttal.

18            And then it was the GMEC -- the members of the

19   GMEC's prerogative to vote on whether that was the chair or

20   the program director's recommendation was appropriate.

21            Most of the time the chairs or the program

22   director's recommendation was accepted, but there are been

23   times that it was not.

24       Q.    Do you have anything else you would like to say to

25   the Judge or the Medical Board that would bring justice in

179

1  this matter?

2      A.    I came because I think it's important to right a

3  wrong, and I think a wrong was done here.

4            And I also, I got subpoenas from both of you.

5            DR. FIRESTONE:  I have no further questions, Your

6  Honor, at this time.

7            ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  Okay.  Did

8  you want to take a recess now?

9      (Whereupon, a recess was held from 2:54 until 3:14 p.m.)

10           ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  Let's go

11 back on the record.

12           Cross-Examination?

13           MR. MERCER:  Thank you, Your Honor.

14

15                     CROSS-EXAMINATION

16 BY MR. MERCER:

17     Q.    Good afternoon, Doctor.

18     A.    Hi, sir.

19     Q.    I'd like to talk about the cellulitis patient for a

20 minute now.  That patient wasn't your patient, correct?

21     A.    No.

22     Q.    But you just knew that the patient was there?

23     A.    Yes.

24     Q.    Did you examine the patient?

25     A.    I looked at the patient's leg.  I didn't listen to

180

1   the heart and lungs.

2       Q.   Uh-huh.  And that patient did have cellulitis,

3   correct?

4       A.   Yes.

5       Q.   So cellulitis is a potentially serious condition?

6       A.   Potentially, yes.

7       Q.   Isn't it true that Dr. Irani provided a statement

8   saying that he should have gone to the VA sooner?

9       A.   He did.

10      Q.   He also stated that his use of Vicryl suture was

11  inappropriate?

12      A.   I don't think he -- I don't remember he said that.

13  I remember he saying that he would change the suture.

14      Q.   But if he said that, you wouldn't have a reason to

15  disagree with him?

16      A.   No.

17      Q.   Do you have --

18          MR. MERCER:  May I approach, Your Honor?

19          ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  Yes.

20  BY MR. MERCER:

21      Q.   There are so many binders here, I thought it would

22  be easier if I just pointed it out.  I have, for the record,

23  opened Exhibit 6, and I have turned it to page 6.

24          And Doctor, you have that before you, yes?

25      A.   Yes.

181

1    Q.   And if I can find my copy.

2         Dr. Irani states at line 16:

3              "Additionally I was chastised for

4         closing a wound with Vicryl.

5         While this is inappropriate care, I'm

6         still upset that I grabbed the wrong

7         suture.  It is important to know that

8         I was still early in my training."

9         So if that's Irani's explanation of it, you

10   wouldn't have a reason to disagree with that?

11   A.   If you read further down -- if I can add to that,

12   he said he viewed his care plan with the attending and told

13   me to advise a closure with different sutures.

14   Q.   That's right.  He had to go back and redo it;

15   didn't he?

16   A.   Yes.

17   Q.   And when he was required to redo it, he did redo

18   did?

19   A.   Yes.

20   Q.   But the initial choice of the Vicryl was considered

21   by himself and his attending to be inappropriate?

22   A.   That's what he said, yes.

23   Q.   Now, as you've mentioned, I sent you a subpoena?

24   A.   Yes, sir.

25   Q.   And with the materials you provided me a letter.

182

1    Do you happen to have that?

2        A.    I do not.

3        Q.    Okay.  Well, let me just ask you about it.  I don't

4    know that we necessarily need to read it line by line.

5            But in that letter you indicated that Dr. Irani had

6    come to see you.  Was it this year?

7        A.    Yes, sir.

8        Q.    To meet with you personally in South Carolina?

9        A.    Yes.

10        Q.    That was to discuss this case?

11        A.    Yes.

12        Q.    And whether you would testify for him?

13        A.    If I would help him.  Yes, sir.

14        Q.    And then subsequent to that -- was it subsequent to

15    that, you had approximately eight conversations with

16    Dr. Irani?

17        A.    I don't remember the exact number, but that sounds

18    about right.  Yes, sir.

19        Q.    In your letter you said as best you can recall

20    eight, and that's sounds right now?

21        A.    Yes, sir.

22        Q.    Before you met with Dr. Irani in June of this year,

23    had you maintained contact with him from time to time over

24    the years?

25        A.    He knew my wife was sick.  He called and asked me

183

1    about the health of my wife earlier in the year.

2           My wife has been sick for about three years.  She

3    had found to have colon cancer, had to have chemotherapy,

4    radiation therapy, then a colon resection with an endoscopy.

5    So he knew about that and asked about how she was doing, if

6    that's what you're asking.

7        Q.    That's somewhat what I'm asking about.  Had you

8    communicated socially over the years?

9        A.    No, sir.

10       Q.    Did you have a relationship when he was at the VA?

11       A.    As his supervisor, yes, as the site director for

12   the orthopaedic program.

13       Q.    So you feel that you're relationship was remotely

14   enough that you can be completely objective enough about this

15   case?

16       A.    I hope I can, yes.

17       Q.    There's nothing about this case that raises any

18   kind of bias on your part?

19       A.    I don't think so, sir.

20       Q.    Okay.  Well, you know that in August of 2011,

21   Dr. Irani was placed on remediation?

22       A.    Yes, sir.

23       Q.    That would have been August 15th.  I don't know if

24   you know the date.

25       A.    I don't.

184

1      Q.   But on August 11th, you yourself had your surgical

2    privileges suspended, correct?

3      A.   I did not have them suspended.  They were summarily

4    suspended while an investigation was conducted.  The VA

5    rules, the federal rules suspension, unless it's proven --

6    the allegations are proven the suspension does not exists.

7      Q.   Well, it remained in place until November, didn't

8    it?

9      A.   It did.

10      Q.   And then the following year there was a

11    reinvestigation and your surgical privileges were suspended

12    again?

13      A.   That is correct.

14      Q.   As of the date of the Court order I have in March

15    of 2013 the Judge says that the surgical privileges are still

16    suspended.  So I have -- my questions is:  When did your --

17    the suspension -- when was the suspension lifted, if ever?

18      A.   January of 2013, I think.  I got -- I got -- it was

19    not a judge.  It was the director of the VA hospital.

20      Q.   Well, there was a judge involved, because you filed

21    a lawsuit against Dr. Kuhn, didn't you?

22      A.   There was a judge involved, and she -- if you wish,

23    that information I'll show you.  She decreed that I acted at

24    all times within the boundaries and limitations of any duties

25    at the VA.

185

1    Q.   Well, the parameters of that decision was that you

2  sued Dr. Kuhn, correct?

3    A.   That is correct.

4    Q.   And you sued Dr. Walsh?

5    A.   That is correct.

6    Q.   And you sued Dr. Voss?

7    A.   Yes.

8    Q.   And you alleged that they made defamatory

9  statements that resulted in your being suspended in 2011?

10    A.   That is correct.

11    Q.   That lawsuit resulted in a counterclaim against you

12  for defamation by the USC surgeons, correct?

13    A.   That is correct.

14    Q.   And the order that we're taking about was whether

15  or not the United States could substitute in on the

16  counterclaim because you made these statements in the course

17  of your functioning as a surgeon at the VA?

18    A.   Well, actually it's a whistleblower.

19    Q.   Well, ultimately the suit was settled by everyone

20  giving everyone a mutual dismissal, correct?

21    A.   Well, I was paid $49,000 and I got a written

22  apology from the dean and director of the Graduate Medical

23  Education, vice president for medical affairs at Palmetto,

24  Richmond.  So yes, it was settled, and I'm happy about it.

25    Q.   In the course of that lawsuit, you sent a number of

186

1    letters, and that was what got the counterclaim going.

2              In one of them you referred to Doctors Kuhn, Voss

3    and -- Kuhn, Voss and Walsh as your accusers?

4         A.   Yes.

5         Q.   And in another one of them you stated that while

6    management of these acts of inappropriate behavior,

7    especially Dr. Kuhn's, it is within your purview, it is my

8    duty to state that no action will -- that no action will in

9    bold in these two physicians to acts in even worse conduct?

10        A.   That is correct, which that indeed happened.

11        Q.   So would it be fair to say that you have a long

12   standing biased against Dr. Kuhn?

13        A.   No -- not be.

14             MR. MERCER:  May I approach, Your Honor?

15             ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  Yes.

16             MR. MERCER:  I would request this be marked as our

17   next in order, which I believe is Number 10.

18             ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  Yes.

19        (Department's Exhibit Number 10 was marked for

20        identification.)

21   BY MR. MERCER:

22        Q.   Doctor, I'm going to show you an order of the

23   Federal Court in South Carolina.  Is that the matter we've

24   been discussing?

25        A.   Yes.

187

1          MR. MERCER:  I would ask that the order be

2   judicially noticed as a Court of the United States, and it's

3   findings taken note of.

4          DR. FIRESTONE:  No objection.

5          ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  Okay.  And

6   judicial notice will be --

7          DR. FIRESTONE:  What is the number of that exhibit?

8          MR. MERCER:  10.

9          ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  Exhibit 10.

10       (Department's Exhibit Number 10 was marked for

11        identification.)

12  BY MR. MERCER:

13       Q.   I actually don't have any more questions about that

14  document, Doctor.

15          I'm going to ask you to look at Exhibit 6 again,

16  but look at the initial page of this type-written document.

17  Is this a document you've seen before?

18       A.   Yes.

19       Q.   And that's something that Dr. Irani showed you?

20       A.   Yes.

21       Q.   When did he first show it to you?

22       A.   It was two days ago when I got here.

23       Q.   Now, in this statement on pages -- on page 1, line

24  17 and 18.  It states that -- I'm sorry.  It's lines 14 and

25  15.  It states:

188

```
 1              I was encouraged to contact you

 2         by a physician who is sympathetic to

 3         my plight.

 4         Do you know who that physician was?

 5    A.   No.

 6    Q.   Now, in the course of your activities with regard

 7  to Dr. Irani, you filed a complaint with the ACGME, correct?

 8    A.   No.

 9    Q.   You did not contact a manager with the ACGME?

10    A.   I did, but it was not a complaint.

11    Q.   How would you describe it?

12    A.   It was concern that the orthopaedic residency

13  program was pulling the residency from Adorn VA and denying

14  them the chance of a comprehensive education.

15    Q.   And did the ACGME decline to pursue your

16  information?

17    A.   That -- the letter I got back from them was that

18  that concern had to be raised by the residents.

19    Q.   Okay.  And was one of residents that you were

20  concerned about Dr. Irani?

21    A.   All of them I was concerned about, yes.

22    Q.   Did you ever encourage Dr. Irani to file a

23  complaint with the ACGME?

24    A.   I don't remember that.

25    Q.   So far as you know, today as we sit here, is the
```

189

1     USC still ACGME accredited?

2          A.    As far as I know, yes.

3          Q.    And Dr. Kuhn is still the program director?

4          A.    As far as I know.

5                MR. MERCER:  I don't have anything else.

6                ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  Any

7     Redirect?

8                DR. FIRESTONE:  Just briefly Your Honor.

9

10                     REDIRECT EXAMINATION

11    BY DR. FIRESTONE:

12         Q.    Is it reasonable for the E.R. doctor in that

13    cellulitis case to have told Dr. Irani he did not have to

14    come until the next morning?

15         A.    Yes.

16         Q.    Why's that reasonable?

17         A.    The physician's assessment of the seriousness of

18    the condition.

19         Q.    It was the E.R. doctor who examined the patient,

20    correct?

21         A.    Yes, sir.

22         Q.    And this cellulitis was not related to the surgical

23    site of the surgery on the patient's knees, correct?

24         A.    No.  It was not.

25         Q.    Now, the type suture material that's used by a

190

1   physician, it is sort of a matter of choice.  In this case in

2   our residency, the attending physician's choice; is that

3   right?

4       A.   With the caveat of where it's put.  If it's in the

5   skin, it's inappropriate, but in the deep tissues from the

6   periosteum to subcutaneous, it's an appropriate suture.

7       Q.   Is there any evidence that you're aware of

8   regarding the location these Vicryl sutures?

9       A.   I could not find it.  No, sir.

10      Q.   This lawsuit that we -- is in Exhibit 10 that was

11  admitted by Mr. Mercer -- or by the Judge, excuse me.  That's

12  a lawsuit that you essentially won, correct?

13      A.   Yes, sir.

14      Q.   And that started off with some defamation by

15  Dr. Kuhn against you; is that right?

16      A.   What happened was is that on the 11th of August of

17  2011 Dr. Kuhn, Dr. Walsh and Dr. Voss went to the chief of

18  staff and said that I was practicing medicine below the

19  standard of care.

20      Q.   In fact, you were found that your care was

21  completely within the standards; is that right?

22           MR. MERCER:  Well, objection that's not supported

23  by the evidence.

24           DR. FIRESTONE:  We have no evidence other than that

25  Court order.

191

1          MR. MERCER:  If you're asking the witness if that's

2     what happened --

3          DR. FIRESTONE:  Yes.

4          MR. MERCER:  But you were basically suggesting

5     that's what happened.  So I guess my objection is, it's

6     leading and suggestive.

7          ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  All right.

8     Would you rephrase?

9     BY DR. FIRESTONE:

10         Q.   Were you found to practice below acceptable

11    standards in that lawsuit?

12         A.   I was not.

13         Q.   And your privileges were completely reinstated

14    after the lawsuit was resolved?

15         A.   Without restriction, yes, sir.

16         DR. FIRESTONE:  Okay.  I have no further questions,

17    Your Honor.

18         ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  Anything

19    further?

20

21                    RECROSS EXAMINATION

22    BY MR. MERCER:

23         Q.   In fact, the case never went to trial, correct?

24         A.   Yes.  That is correct.

25         Q.   So there is no judgment that one person was guilty

192

1  and another person was not guilty?

2       A.   After many years of very productive service to the

3  University of South Carolina and the Palmetto Richland, I

4  didn't want to hurt them any more.  I wanted my name cleared.

5  I got that.  I got my lawyer's fees paid for.  That's all I

6  was looking for.

7            MR. MERCER:  Nothing further.

8            DR. FIRESTONE:  No further questions, Your Honor.

9            ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  Okay.

10  Thank you for your testimony.  You're released.

11            DR. FIRESTONE:  We have some time, but our next

12  witness is not scheduled until tomorrow morning.  I would be

13  glad to put on Dr. Irani at this time and then take him off

14  the witness stand when our expert Dr. Graw arrives tomorrow

15  morning if that's okay with you.

16            ADMINISTRATIVE LAW JUDGE SCHLICHTMANN:  Is that

17  agreeable to you, Mr. Mercer?

18            MR. MERCER:  Sure.

19            DR. FIRESTONE:  At this time we'll call Dr. Afraaz

20  Irani, M.D.

21

22

23

24  ///

25                    (Time noted:  9:04 a.m.)