# EXHIBIT WW

Richard E. Grant, M.D.
Albert Einstein Medical Center
Department of Orthopaedic Surgery
Faculty, Specialty: Arthritis Surgery
60 Township Line Road, Ground Floor
Elkins Park, Pennsylvania 19027
(215) 456-7900

February 20, 2015

RE:   Afraaz R. Irani, M.D.

To Whom It May Concern:

This letter is being sent, by me, on behalf of Dr. Afraaz R. Irani. I am a board-certified orthopaedic surgeon. My current practice of orthopaedic surgery focuses upon primary and revision total joint arthroplasty procedures. I am also involved in the care of patients who require attention with respect to general orthopaedic concerns and trauma care. My professional career has been dedicated to orthopaedic residency education since 1986. I completed my residency with the United States Air Force in 1984. Once I completed my United States Air Force active duty tour in May of 1988, I was recruited to become a full-time faculty member of the Department of Orthopaedic Surgery at Howard University Hospital, in Washington, D.C., by my lifetime mentor and good friend, Dr. Charles H. Epps, Jr. By October of 1988, I was promoted to the position of Chair of the Department of Orthopaedic Surgery at Howard University Hospital, Howard University College of Medicine, and Orthopaedic Surgery Program Director. I served in that capacity for thirteen years, graduating sixty plus residents who successfully pursued post-residency fellowships and American Board of Orthopaedic Surgery certification. From 2001 to 2005, I established a private practice office in nearby Providence Hospital in northeast Washington, D.C., and continued to instruct and mentor Howard University Hospital residents in orthopaedic didactic sessions, journal clubs, and surgical procedures. During my academic orthopaedic career at Howard University Hospital, I was elected to become a member of the American Board of Orthopaedic Surgery, and served as one of the directors of the American Board of Orthopaedic Surgery from 1996 to 2007. I was nominated by my ABOS director peers to serve as President of the American Board of Orthopaedic Surgery from 2002 to 2003. I was also appointed to be a member of the Credentialing Committee of the American Board of Orthopaedic Surgery (ABOS), and served on that committee from 1996 to 2007. Also as a member and director of the American Board of Orthopaedic Surgery, I had an additional appointment to the Accreditation Council of Graduate Medical Education, ACGME/RRC for orthopaedic surgery. I served as a member of the ACGME/RRC from 2001 to 2007. That committee met at least three to four times per year, usually in the area of Chicago, Illinois.

My current full-time faculty appointment is with Albert Einstein Medical Center, Department of Orthopaedic Surgery, in Philadelphia, Pennsylvania. My current faculty appointment involves daily didactics, clinical, and surgical education of our PGY-I through PGY-V orthopaedic residents. We graduate two residents per year.

**My review of the case for Dr. Afraaz R. Irani includes the following data:**
1. Materials from University of South Carolina School of Medicine Orthopaedic Residency Program.
2. Dr. Irani's letters of recommendation.
3. Telephone interviews with Dr. Irani.
4. Dr. Irani's responses to the citations and concerns of the University of South Carolina Palmetto Orthopaedic Education Committee, with respect to his PGY-II clinical performance.
5. List of current and former residents from University of South Carolina School of Medicine Orthopaedic Residency Program.
6. Copies of electronic mail (e-mail) from Dr. Irani's former University of South Carolina co-residents.
7. Pertinent patient hospital charts.

8.     Veteran's Administration hospital guidelines.
February 20, 2015
RE:     Afraaz R. Irani, M.D.
Page 2

9.     Copies of Columbia, South Carolina public court filings regarding the litigation against Palmetto Health Center by an orthopaedic resident (Dr. Irani).

It is my understanding Dr. Afraaz R. Irani graduated from Stanford Medical School in good standing, in June of 2010. He entered his PGY-I orthopaedic residency at University of South Carolina Palmetto Health Center, in Columbia, South Carolina. Dr. Irani was expected to complete his PGY-V senior residency year by June of 2015. Dr. Irani completed his PGY-I year with no untoward events of record, and had satisfactory ratings for his ACGME-required PGY-I clinical rotations.

Dr. Irani's PGY-II year of orthopaedic residency rotations began in July of 2011. On August 15, 2011, Dr. Irani was summoned to a meeting with his program director and orthopaedic attending, Dr. Koon. Dr. Koon advised Dr. Irani of several clinical deficiencies and sub-par performances. Evidently, corrective action was to include a Level II Remediation Program, with probation specified for the period of August 15, 2011, through December 1, 2011. Dr. Irani filed a forma protest in hopes of overturning his probation. His grievance was denied.

Dr. Irani's residency status was further challenged on December 12, 2011. Issues were raised related to elective vacation days, and the handling of a patient care issue relevant to a perioperative surgical site infection. The orthopaedic Graduate Medical Education (GME) committee elected to place Dr. Irani on Level III remediation, or suspension. Dr. Irani's written appeal of the orthopaedic GME committee's decision was denied by the Palmetto V.I.O., and later by the hospital's Graduate Medical Education committee based upon a timing technicality.

Dr. Irani's Level III remediation was reduced to a Level II remediation by February 2, 2012. However, Level III remediation status was hastily reestablished on March 5, 2012, with a firm recommendation for termination of orthopaedic residency. The option for termination from his residency education program was accepted by the Palmetto Graduate Medical Education committee on April 15, 2012. All subsequent appeals for reinstatement by Dr. Irani, and for reconsideration of termination, were denied.

Review of orthopaedic care issues.
Level II remediation, December 12, 2011: Review of specific care issues published by orthopaedic program director, reflecting Dr. Koon's rationale for prescribed means of resident discipline.
1     .Inappropriate dose of narcotics.
     Evidently, a non-narcotic naive patient called the hospital at postoperative day number zero complaining of pain following outpatient same-day surgery. The patient's discharge medication included Oxycodone 20mg, prescribed for administration every four hours as needed for pain. Dr. Irani interviewed the patient by telephone and determined the patient would benefit from additional narcotic analgesics. Reportedly, the patient was found to be drowsy on clinical examination the following morning. Considered on balance, other than the alleged condition of drowsiness (or a drowsy state), the patient experienced no adverse outcome from the additional regimen of analgesics. Obviously, there was no evidence Dr. Irani's actions, or care of this patient, deviated from the standard of care or endangered the patient's well-being.

2.     Failure to evaluate postoperative total knee arthroplasty patient with possible wound care issues.
     The clinical scenario involves the perioperative care of a total knee arthroplasty patient who contacted the hospital over the course of a weekend. The first contact occurred on Saturday. The patient reported she was noting drainage from her total knee arthroplasty surgical incision site. Dr. Irani advised the patient to report to the Emergency Care Area (ECA); however, the patient elected not to report to the emergency care area for examination or assessment. Subsequently, the patient called the orthopaedic surgery service twice on Sunday. The patient was able to speak with a different orthopaedic resident on Sunday, who concurred with Dr. Irani's conclusion that the patient should report to the

Emergency Care Area.  Eventually, the patient elected to report for evaluation on Monday.  At that time, her surgical incision site was actively draining and appeared to be obviously infected or colonized.

February 20, 2015
RE:    Afraaz R. Irani, M.D.
Page 3

Dr. Irani's actions in this matter fulfilled his duties as the orthopaedic on-call surgeon. He did not deviate from the standard of care, since he correctly advised the patient in question to report to the ECA on Saturday for a full assessment of her surgical wound. Patient compliance is essential to achieving the goal of timely and appropriate care, especially in lieu of a possible perioperative joint arthroplasty infection. However, if a patient does not comply with specific instructions from the consulting physician, the fault does not reside within the purview of the resident surgeon on-call.

3.    Failure to abide by direct attending's instructions.
       Dr. Irani was tasked with obtaining a magnetic resonance imaging (MRI) study for a patient he evaluated in the outpatient clinic. His supervising attending requested the MRI be completed on the same day. Dr. Irani advised the support staff of the attending's request. However, due to certain technicalities, the support staff was not successful in scheduling the MRI for that day. Once Dr. Irani became aware of the scheduling delay, he intervened immediately, contacted radiology, and the test was done as requested by his attending. As the patient received the care (the specific imaging study) as directed by his attending, Dr. Irani did adhere to the specific orders of his supervising attending. Dr. Irani did not deviate from the standard of care for a PGY-II orthopaedic resident. His response time was appropriate given the circumstances.

4.    Inappropriate care of trauma patient TF375.
       Dr. Irani was called to assist in the management of a trauma patient with an open, unreduced fracture, approximately three hours after the patient reported to the Emergency Care Area. By the time Dr. Irani arrived at the ECA, the patient was in pain and, understandably, upset about the delay in treatment. Appropriate orthopaedic care was then administered by Dr. Irani in a careful and thoughtful manner, under the supervision of an attending. Any subsequent complaints relevant to the patient's orthopaedic care are obviously not related to Dr. Irani's therapeutic interventions and compassionate care. Dr. Irani's care of this trauma case did not deviate from the standard of care, and the outcome for the patient was satisfactory.

5.    Letter dated August 15, 2011.
       1.    Mr. B (metal lathe injury).
       The allegation against Dr. Irani, in this case, claims he exhibited a lack of compassion and empathy in the treatment of patient, Mr. B. Allegedly, with respect to his care in the initial trauma resuscitation, Dr. Irani supposedly manifested disregard for a patient's request for pain medication. Additional allegations are noted, indicating Dr. Irani supposedly coerced a nurse to lie about the incident regarding the initial wound care and irrigation and debridement, and his subsequent prescriptions for analgesics. The patient, Mr. B., was evaluated in conjunction with the orthopaedic attendant for this case, under the direct supervision of the attending surgeon. The patient was assigned to the general surgery trauma team at the time of Dr. Irani's evaluation of the patient. It is clear the patient was not assigned to the orthopaedic surgery team.

An orthopaedic reduction of the patient's fracture was not performed. Dr. Irani was not able to determine the antecedent dosage of narcotic analgesics prescribed by the general surgery trauma team. Out of concern for the possibility of inducing or contributing to narcotic-induced related respiratory depression, Dr. Irani did not prescribe additional pain medication or narcotics. His actions were witnessed by his orthopaedic attending, who concurred with his judgement. Dr. Irani did not deviate from the standard of care in the orthopaedic management of patient Mr. B.

       2.    Closing a wound with Vicryl suture.
       This incident was reviewed and deemed to be consistent with the orthopaedic residency PGY-II learning curve. Dr. Irani's use of Vicryl in this instance was based upon his experience with other attendings and other wound closure strategies.

When Dr. Irani realized there was an issue, he informed his attending surgeon of his error in selecting Vicryl for wound closure. Dr. Irani switched to the correct suture as instructed. The record does not reflect a long-term untoward outcome with respect to the patient's care.

February 20, 2015
RE:    Afraaz R. Irani, M.D.
Page 4

6.    Not evaluating a Veteran's Administration total joint arthroplasty patient with postoperative cellulitis.

Dr. Irani was advised by his senior resident that non-emergent Veteran's Administration Medical Center orthopaedic consultation patients were to be evaluated by the morning orthopaedic team. At the time of the request for an orthopaedic consultation, the Veteran's Administration patient had been admitted to the Veteran's Administration internal medicine service. The supervising medicine attending informed Dr. Irani that the patient did not need to be seen that evening. The Veteran's Administration orthopaedic attending, Dr. John Eady, who was in charge of the patient, confirmed that Dr. Irani's handling of the orthopaedic consult request was within the standard of care for the Veteran's Administration Medical Center, and within the standard of care for orthopaedic surgery.

7.    Orthopaedic Graduate Medical Education correspondence dated March 5, 2012.

Correspondence in March of 2012, from Dr. Irani's program director, et. al., consisted of a notification of suspension from clinical duties due, in part, to Dr. Irani's participation in the management of two specific patients: A hemophilic patient; and, an orthopaedic spine surgery patient.

1.    Hemophilic patient

A hemophilic patient was admitted to the hospital. Instructions were given by the attending orthopaedic surgeon requiring patient evaluations at regular intervals.

Dr. Irani discussed the management plan with his senior residents. Dr. Irani examined the patient periodically, as directed, but Dr. Irani failed to document his physical examination and clinical impressions at the conclusion of his periodic assessments. It is unfortunate that Dr. Irani did not document his physical examination and assessment of his patient's encounters until forty-eight (48) hours after the fact. Ultimately, the patient was monitored in accordance with the standard of care, and did not experience any adverse clinical outcomes in spite of the lack of clinical documentation.

2.    Orthopaedic spine surgery patient.

Dr. Irani was contacted by the nursing staff, who reported the patient in question was experiencing difficulty walking. On further examination, the nurse felt the patient was manifesting neurologic changes. After Dr. Irani spoke with the nurse via telephone, Dr. Irani reported to the patient's room to assess the patient's neurologic status. Unfortunately, the patient was indisposed (on the bathroom toilet). Dr. Irani notified his orthopaedic attending surgeon regarding the patient's status, his inability to examine the patient at that time, and clearly stated his reason for not obtaining immediate access to the patient. Once the patient emerged from the bathroom, Dr. Irani was able to assess the patient's ambulatory capacity by walking her to her bed. He then proceeded with his neurologic examination and assessment. Dr. Irani informed his attending orthopaedic surgeon of his physical examination findings. Evidently, the patient fully recovered.

Dr. Irani was criticized for his failure to document his neurologic examination in a timely fashion. However, he entered his findings into the medical record on the following morning. Clinical issues raised by Dr. Irani's assessment of this case suggest that his actions delayed surgical decompression of a patient with spine pathology. Ostensibly, critical decision making regarding the timing of surgical decompression of spinal pathology rests solely in the hands of an experienced orthopaedic spine surgeon with post-residency fellowship experience and years of clinical experience with neurological emergencies.

A junior orthopaedic resident, at the PGY-II level, is not qualified to make critical decisions regarding the specific timing of procedures as complex as emergent spine decompression surgery. Both comprehensive supervision and

support are critical to the development of a positive PGY-II educational environment.

In reviewing the records made available to me regarding Dr. Afraaz R. Irani, and the remediation actions of the University of South Carolina School of Medicine Orthopaedic Residency Program, it should be noted the PGY residency expectations of performance, and level of clinical responsibility, seems to be remarkably high for any ACGME/RRC-approved orthopaedic residency education program.

February 20, 2015
RE:    Afraaz R. Irani, M.D.
Page 5

Having just completed his internship year (PGY-I), it appears that Dr. Irani was doing his best to function as an early PGY-II resident who was responding appropriately to accelerated clinical duties and responsibilities. Effective mentoring by a more senior orthopaedic resident, and an empathetic attending orthopaedic surgeon would have been a more effective method of achieving corrective remediation for Dr. Irani. At the PGY-II level, orthopaedic residents are working their way through a form of cultural shock, experiencing complex diagnostic and therapeutic challenges, extended administrative tasks, and a more comprehensive musculoskeletal science core curriculum, in addition to journal clubs and the beginning of either early clinical or basic science research projects. Their ascent from educational ground zero toward the top of the PGY-II learning curve requires appropriate clinical support, a positive learning/educational environment that surrounds the resident with guidance at all points, and time for adequate reflection and didactic emersion. Constructive learning environments surrounding a PGY-II orthopaedic resident helps that resident at the entry point to reduce the pressures he or she faces when completing a multitude of assigned clinical tasks within the ACGME prescribed restricted duty hours (REF: ACGME Program Requirement for Graduate Medical Education in Orthopaedic Surgery, Common Requirements Introduction A-B and IIA4-5(3); II.A.4.k; II.A.4.l; II.B.1.B; VI.D.4.b; VI.D.5.(a).1).

Unfortunately, hostile residency work environments that bring into play unfortunate comments or sarcastic remarks demeaning a resident's race, religious beliefs, ethnicity, or national origin destroys what should be an enhanced residency learning environment for any specialty, whether it be primary care or any surgical sub-specialty.

Considered on balance, any objective party analyzing the end product of the USC Palmetto Orthopaedic Residency Program [i.e., (1) ABOS Part I and II Board Passage Rate for PGY-V Graduates Taking the Examination For the First Time (2) Resident Attrition Rate For the Program of Approximately Sixty Percent).

The ABOS passage rates remain to be seen. However, it is clear that a sixty (60) percent attrition rate, with respect to the residency program for orthopaedic surgery at University of South Carolina Palmetto, does raise concerns about the comprehensive resident experience and, especially, concerns about their affective and cognitive domain experience over the five years of residency education. Clearly, the sixty (60) percent rate of instability is reflective of the program's leadership and the program's attitude toward each of its selected residents. Careful institutional dissection of the events leading to the accelerated march to residency dismissal for Dr. Irani may assist the Palmetto Graduate Education Committee in obtaining the needed insight for corrective action, which leads to the establishment of a productive orthopaedic residency program with an appropriate learning environment.

Respectfully Submitted,

Richard E. Grant, M.D.
Albert Einstein Medical Center
Department of Orthopaedic Surgery
60 Township Line Road, Ground Floor
Elkins Park, Pennsylvania  19027
(215) 456-7900

REG/keystrokes/REG0132

cc:   Mr. David Rothstein
      1312 Augusta Street
      Greenville, South Carolina 29605
      884-232-5870 office; 864-241-1386 fax
      <u>drothstein@rothsteinlawfirm.com</u>; <u>drothstein@minespring.com</u>; <u>www.rothsteinlawfirm.com</u>

Richard E. Grant, M.D.
Albert Einstein Medical Center
Department of Orthopaedic Surgery
Faculty, Specialty: Arthritis Surgery
60 Township Line Road, Ground Floor
Elkins Park, Pennsylvania 19027
(215) 456-7900

February 20, 2015

RE:    Afraaz R. Irani, M.D.

To Whom It May Concern:

This letter is being sent, by me, on behalf of Dr. Afraaz R. Irani. I am a board-certified orthopaedic surgeon. My current practice of orthopaedic surgery focuses upon primary and revision total joint arthroplasty procedures. I am also involved in the care of patients who require attention with respect to general orthopaedic concerns and trauma care. My professional career has been dedicated to orthopaedic residency education since 1986. I completed my residency with the United States Air Force in 1984. Once I completed my United States Air Force active duty tour in May of 1988, I was recruited to become a full-time faculty member of the Department of Orthopaedic Surgery at Howard University Hospital, in Washington, D.C., by my lifetime mentor and good friend, Dr. Charles H. Epps, Jr. By October of 1988, I was promoted to the position of Chair of the Department of Orthopaedic Surgery at Howard University Hospital, Howard University College of Medicine, and Orthopaedic Surgery Program Director. I served in that capacity for thirteen years, graduating sixty plus residents who successfully pursued post-residency fellowships and American Board of Orthopaedic Surgery certification. From 2001 to 2005, I established a private practice office in nearby Providence Hospital in northeast Washington, D.C., and continued to instruct and mentor Howard University Hospital residents in orthopaedic didactic sessions, journal clubs, and surgical procedures. During my academic orthopaedic career at Howard University Hospital, I was elected to become a member of the American Board of Orthopaedic Surgery, and served as one of the directors of the American Board of Orthopaedic Surgery from 1996 to 2007. I was nominated by my ABOS director peers to serve as President of the American Board of Orthopaedic Surgery from 2002 to 2003. I was also appointed to be a member of the Credentialing Committee of the American Board of Orthopaedic Surgery (ABOS), and served on that committee from 1996 to 2007. Also as a member and director of the American Board of Orthopaedic Surgery, I had an additional appointment to the Accreditation Council of Graduate Medical Education, ACGME/RRC for orthopaedic surgery. I served as a member of the ACGME/RRC from 2001 to 2007. That committee met at least three to four times per year, usually in the area of Chicago, Illinois.

My current full-time faculty appointment is with Albert Einstein Medical Center, Department of Orthopaedic Surgery, in Philadelphia, Pennsylvania. My current faculty appointment involves daily didactics, clinical, and surgical education of our PGY-I through PGY-V orthopaedic residents. We graduate two residents per year.

My review of the case for Dr. Afraaz R. Irani includes the following data:
1. Materials from University of South Carolina School of Medicine Orthopaedic Residency Program.
2. Dr. Irani's letters of recommendation.
3. Telephone interviews with Dr. Irani.
4. Dr. Irani's responses to the citations and concerns of the University of South Carolina Palmetto Orthopaedic Education Committee, with respect to his PGY-II clinical performance.
5. List of current and former residents from University of South Carolina School of Medicine Orthopaedic Residency Program.
6. Copies of electronic mail (e-mail) from Dr. Irani's former University of South Carolina co-residents.
7. Pertinent patient hospital charts.

8.    Veteran's Administration hospital guidelines.
February 20, 2015
RE:    Afraaz R. Irani, M.D.
Page 2

9.    Copies of Columbia, South Carolina public court filings regarding the litigation against Palmetto Health Center by an orthopaedic resident (Dr. Irani).

It is my understanding Dr. Afraaz R. Irani graduated from Stanford Medical School in good standing, in June of 2010. He entered his PGY-I orthopaedic residency at University of South Carolina Palmetto Health Center, in Columbia, South Carolina.  Dr. Irani was expected to complete his PGY-V senior residency year by June of 2015.  Dr. Irani completed his PGY-I year with no untoward events of record, and had satisfactory ratings for his ACGME-required PGY-I clinical rotations.

Dr. Irani's PGY-II year of orthopaedic residency rotations began in July of 2011.  On August 15, 2011, Dr. Irani was summoned to a meeting with his program director and orthopaedic attending, Dr. Koon.  Dr. Koon advised Dr. Irani of several clinical deficiencies and sub-par performances.  Evidently, corrective action was to include a Level II Remediation Program, with probation specified for the period of August 15, 2011, through December 1, 2011.  Dr. Irani filed a forma protest in hopes of overturning his probation.  His grievance was denied.

Dr. Irani's residency status was further challenged on December 12, 2011.  Issues were raised related to elective vacation days, and the handling of a patient care issue relevant to a perioperative surgical site infection.  The orthopaedic Graduate Medical Education (GME) committee elected to place Dr. Irani on Level III remediation, or suspension.  Dr. Irani's written appeal of the orthopaedic GME committee's decision was denied by the Palmetto V.I.O., and later by the hospital's Graduate Medical Education committee based upon a timing technicality.

Dr. Irani's Level III remediation was reduced to a Level II remediation by February 2, 2012.  However, Level III remediation status was hastily reestablished on March 5, 2012, with a firm recommendation for termination of orthopaedic residency.  The option for termination from his residency education program was accepted by the Palmetto Graduate Medical Education committee on April 15, 2012.  All subsequent appeals for reinstatement by Dr. Irani, and for reconsideration of termination, were denied.

<u>Review of orthopaedic care issues.</u>
**Level II remediation, December 12, 2011**: Review of specific care issues published by orthopaedic program director, reflecting Dr. Koon's rationale for prescribed means of resident discipline.

1    .Inappropriate dose of narcotics.
    Evidently, a non-narcotic naive patient called the hospital at postoperative day number zero complaining of pain following outpatient same-day surgery.  The patient's discharge medication included Oxycodone 20mg, prescribed for administration every four hours as needed for pain.  Dr. Irani interviewed the patient by telephone and determined the patient would benefit from additional narcotic analgesics.  Reportedly, the patient was found to be drowsy on clinical examination the following morning.  Considered on balance, other than the alleged condition of drowsiness (or a drowsy state), the patient experienced no adverse outcome from the additional regimen of analgesics.  Obviously, there was no evidence Dr. Irani's actions, or care of this patient, deviated from the standard of care or endangered the patient's well-being.

2.    Failure to evaluate postoperative total knee arthroplasty patient with possible wound care issues.
    The clinical scenario involves the perioperative care of a total knee arthroplasty patient who contacted the hospital over the course of a weekend.  The first contact occurred on Saturday.  The patient reported she was noting drainage from her total knee arthroplasty surgical incision site.  Dr. Irani advised the patient to report to the Emergency Care Area (ECA); however, the patient elected not to report to the emergency care area for examination or assessment.  Subsequently, the patient called the orthopaedic surgery service twice on Sunday.  The patient was able to speak with a different orthopaedic resident on Sunday, who concurred with Dr. Irani's conclusion that the patient should report to the

Emergency Care Area.  Eventually, the patient elected to report for evaluation on Monday.  At that time, her surgical incision site was actively draining and appeared to be obviously infected or colonized.

February 20, 2015
RE:    Afraaz R. Irani, M.D.
Page 3

Dr. Irani's actions in this matter fulfilled his duties as the orthopaedic on-call surgeon. He did not deviate from the standard of care, since he correctly advised the patient in question to report to the ECA on Saturday for a full assessment of her surgical wound. Patient compliance is essential to achieving the goal of timely and appropriate care, especially in lieu of a possible perioperative joint arthroplasty infection. However, if a patient does not comply with specific instructions from the consulting physician, the fault does not reside within the purview of the resident surgeon on-call.

3.    Failure to abide by direct attending's instructions.
        Dr. Irani was tasked with obtaining a magnetic resonance imaging (MRI) study for a patient he evaluated in the outpatient clinic. His supervising attending requested the MRI be completed on the same day. Dr. Irani advised the support staff of the attending's request. However, due to certain technicalities, the support staff was not successful in scheduling the MRI for that day. Once Dr. Irani became aware of the scheduling delay, he intervened immediately, contacted radiology, and the test was done as requested by his attending. As the patient received the care (the specific imaging study) as directed by his attending, Dr. Irani did adhere to the specific orders of his supervising attending. Dr. Irani did not deviate from the standard of care for a PGY-II orthopaedic resident. His response time was appropriate given the circumstances.

4.    Inappropriate care of trauma patient TF375.
        Dr. Irani was called to assist in the management of a trauma patient with an open, unreduced fracture, approximately three hours after the patient reported to the Emergency Care Area. By the time Dr. Irani arrived at the ECA, the patient was in pain and, understandably, upset about the delay in treatment. Appropriate orthopaedic care was then administered by Dr. Irani in a careful and thoughtful manner, under the supervision of an attending. Any subsequent complaints relevant to the patient's orthopaedic care are obviously not related to Dr. Irani's therapeutic interventions and compassionate care. Dr. Irani's care of this trauma case did not deviate from the standard of care, and the outcome for the patient was satisfactory.

5.    Letter dated August 15, 2011.
        1.    Mr. B (metal lathe injury).
        The allegation against Dr. Irani, in this case, claims he exhibited a lack of compassion and empathy in the treatment of patient, Mr. B. Allegedly, with respect to his care in the initial trauma resuscitation, Dr. Irani supposedly manifested disregard for a patient's request for pain medication. Additional allegations are noted, indicating Dr. Irani supposedly coerced a nurse to lie about the incident regarding the initial wound care and irrigation and debridement, and his subsequent prescriptions for analgesics. The patient, Mr. B., was evaluated in conjunction with the orthopaedic attendant for this case, under the direct supervision of the attending surgeon. The patient was assigned to the general surgery trauma team at the time of Dr. Irani's evaluation of the patient. It is clear the patient was not assigned to the orthopaedic surgery team.

An orthopaedic reduction of the patient's fracture was not performed. Dr. Irani was not able to determine the antecedent dosage of narcotic analgesics prescribed by the general surgery trauma team. Out of concern for the possibility of inducing or contributing to narcotic-induced related respiratory depression, Dr. Irani did not prescribe additional pain medication or narcotics. His actions were witnessed by his orthopaedic attending, who concurred with his judgement. Dr. Irani did not deviate from the standard of care in the orthopaedic management of patient Mr. B.

        2.    Closing a wound with Vicryl suture.
        This incident was reviewed and deemed to be consistent with the orthopaedic residency PGY-II learning curve. Dr. Irani's use of Vicryl in this instance was based upon his experience with other attendings and other wound closure strategies.

When Dr. Irani realized there was an issue, he informed his attending surgeon of his error in selecting Vicryl for wound closure. Dr. Irani switched to the correct suture as instructed. The record does not reflect a long-term untoward outcome with respect to the patient's care.

February 20, 2015
RE:    Afraaz R. Irani, M.D.
Page 4

6.    Not evaluating a Veteran's Administration total joint arthroplasty patient with postoperative cellulitis.

Dr. Irani was advised by his senior resident that non-emergent Veteran's Administration Medical Center orthopaedic consultation patients were to be evaluated by the morning orthopaedic team. At the time of the request for an orthopaedic consultation, the Veteran's Administration patient had been admitted to the Veteran's Administration internal medicine service. The supervising medicine attending informed Dr. Irani that the patient did not need to be seen that evening. The Veteran's Administration orthopaedic attending, Dr. John Eady, who was in charge of the patient, confirmed that Dr. Irani's handling of the orthopaedic consult request was within the standard of care for the Veteran's Administration Medical Center, and within the standard of care for orthopaedic surgery.

7.    Orthopaedic Graduate Medical Education correspondence dated March 5, 2012.

Correspondence in March of 2012, from Dr. Irani's program director, et. al., consisted of a notification of suspension from clinical duties due, in part, to Dr. Irani's participation in the management of two specific patients: A hemophilic patient; and, an orthopaedic spine surgery patient.

1.    Hemophilic patient
A hemophilic patient was admitted to the hospital. Instructions were given by the attending orthopaedic surgeon requiring patient evaluations at regular intervals.

Dr. Irani discussed the management plan with his senior residents. Dr. Irani examined the patient periodically, as directed, but Dr. Irani failed to document his physical examination and clinical impressions at the conclusion of his periodic assessments. It is unfortunate that Dr. Irani did not document his physical examination and assessment of his patient's encounters until forty-eight (48) hours after the fact. Ultimately, the patient was monitored in accordance with the standard of care, and did not experience any adverse clinical outcomes in spite of the lack of clinical documentation.

2.    Orthopaedic spine surgery patient.
Dr. Irani was contacted by the nursing staff, who reported the patient in question was experiencing difficulty walking. On further examination, the nurse felt the patient was manifesting neurologic changes. After Dr. Irani spoke with the nurse via telephone, Dr. Irani reported to the patient's room to assess the patient's neurologic status. Unfortunately, the patient was indisposed (on the bathroom toilet). Dr. Irani notified his orthopaedic attending surgeon regarding the patient's status, his inability to examine the patient at that time, and clearly stated his reason for not obtaining immediate access to the patient. Once the patient emerged from the bathroom, Dr. Irani was able to assess the patient's ambulatory capacity by walking her to her bed. He then proceeded with his neurologic examination and assessment. Dr. Irani informed his attending orthopaedic surgeon of his physical examination findings. Evidently, the patient fully recovered.

Dr. Irani was criticized for his failure to document his neurologic examination in a timely fashion. However, he entered his findings into the medical record on the following morning. Clinical issues raised by Dr. Irani's assessment of this case suggest that his actions delayed surgical decompression of a patient with spine pathology. Ostensibly, critical decision making regarding the timing of surgical decompression of spinal pathology rests solely in the hands of an experienced orthopaedic spine surgeon with post-residency fellowship experience and years of clinical experience with neurological emergencies.

A junior orthopaedic resident, at the PGY-II level, is not qualified to make critical decisions regarding the specific timing of procedures as complex as emergent spine decompression surgery. Both comprehensive supervision and

support are critical to the development of a positive PGY-II educational environment.

In reviewing the records made available to me regarding Dr. Afraaz R. Irani, and the remediation actions of the University of South Carolina School of Medicine Orthopaedic Residency Program, it should be noted the PGY residency expectations of performance, and level of clinical responsibility, seems to be remarkably high for any ACGME/RRC-approved orthopaedic residency education program.

February 20, 2015
RE:    Afraaz R. Irani, M.D.
Page 5

Having just completed his internship year (PGY-I), it appears that Dr. Irani was doing his best to function as an early PGY-II resident who was responding appropriately to accelerated clinical duties and responsibilities. Effective mentoring by a more senior orthopaedic resident, and an empathetic attending orthopaedic surgeon would have been a more effective method of achieving corrective remediation for Dr. Irani. At the PGY-II level, orthopaedic residents are working their way through a form of cultural shock, experiencing complex diagnostic and therapeutic challenges, extended administrative tasks, and a more comprehensive musculoskeletal science core curriculum, in addition to journal clubs and the beginning of either early clinical or basic science research projects. Their ascent from educational ground zero toward the top of the PGY-II learning curve requires appropriate clinical support, a positive learning/educational environment that surrounds the resident with guidance at all points, and time for adequate reflection and didactic emersion. Constructive learning environments surrounding a PGY-II orthopaedic resident helps that resident at the entry point to reduce the pressures he or she faces when completing a multitude of assigned clinical tasks within the ACGME prescribed restricted duty hours (REF: ACGME Program Requirement for Graduate Medical Education in Orthopaedic Surgery, Common Requirements Introduction A-B and IIA4-5(3); II.A.4.k; II.A.4.l; II.B.1.B; VI.D.4.b; VI.D.5.(a).1).

Unfortunately, hostile residency work environments that bring into play unfortunate comments or sarcastic remarks demeaning a resident's race, religious beliefs, ethnicity, or national origin destroys what should be an enhanced residency learning environment for any specialty, whether it be primary care or any surgical sub-specialty.

Considered on balance, any objective party analyzing the end product of the USC Palmetto Orthopaedic Residency Program [i.e., (1) ABOS Part I and II Board Passage Rate for PGY-V Graduates Taking the Examination For the First Time (2) Resident Attrition Rate For the Program of Approximately Sixty Percent).

The ABOS passage rates remain to be seen. However, it is clear that a sixty (60) percent attrition rate, with respect to the residency program for orthopaedic surgery at University of South Carolina Palmetto, does raise concerns about the comprehensive resident experience and, especially, concerns about their affective and cognitive domain experience over the five years of residency education. Clearly, the sixty (60) percent rate of instability is reflective of the program's leadership and the program's attitude toward each of its selected residents. Careful institutional dissection of the events leading to the accelerated march to residency dismissal for Dr. Irani may assist the Palmetto Graduate Education Committee in obtaining the needed insight for corrective action, which leads to the establishment of a productive orthopaedic residency program with an appropriate learning environment.

Respectfully Submitted,

Richard E. Grant, M.D.
Albert Einstein Medical Center
Department of Orthopaedic Surgery
60 Township Line Road, Ground Floor
Elkins Park, Pennsylvania 19027
(215) 456-7900

REG/keystrokes/REG0132
cc:    Mr. David Rothstein
        1312 Augusta Street
        Greenville, South Carolina 29605
        884-232-5870 office; 864-241-1386 fax
        drothstein@rothsteinlawfirm.com; drothstein@minespring.com; www.rothsteinlawfirm.com

Richard E. Grant, M.D.
Albert Einstein Medical Center
Department of Orthopaedic Surgery
Faculty, Specialty: Arthritis Surgery
60 Township Line Road, Ground Floor
Elkins Park, Pennsylvania 19027
(215) 456-7900

February 20, 2015

RE:    Afraaz R. Irani, M.D.

To Whom It May Concern:

This letter is being sent, by me, on behalf of Dr. Afraaz R. Irani. I am a board-certified orthopaedic surgeon. My current practice of orthopaedic surgery focuses upon primary and revision total joint arthroplasty procedures. I am also involved in the care of patients who require attention with respect to general orthopaedic concerns and trauma care. My professional career has been dedicated to orthopaedic residency education since 1986. I completed my residency with the United States Air Force in 1984. Once I completed my United States Air Force active duty tour in May of 1988, I was recruited to become a full-time faculty member of the Department of Orthopaedic Surgery at Howard University Hospital, in Washington, D.C., by my lifetime mentor and good friend, Dr. Charles H. Epps, Jr. By October of 1988, I was promoted to the position of Chair of the Department of Orthopaedic Surgery at Howard University Hospital, Howard University College of Medicine, and Orthopaedic Surgery Program Director. I served in that capacity for thirteen years, graduating sixty plus residents who successfully pursued post-residency fellowships and American Board of Orthopaedic Surgery certification. From 2001 to 2005, I established a private practice office in nearby Providence Hospital in northeast Washington, D.C., and continued to instruct and mentor Howard University Hospital residents in orthopaedic didactic sessions, journal clubs, and surgical procedures. During my academic orthopaedic career at Howard University Hospital, I was elected to become a member of the American Board of Orthopaedic Surgery, and served as one of the directors of the American Board of Orthopaedic Surgery from 1996 to 2007. I was nominated by my ABOS director peers to serve as President of the American Board of Orthopaedic Surgery from 2002 to 2003. I was also appointed to be a member of the Credentialing Committee of the American Board of Orthopaedic Surgery (ABOS), and served on that committee from 1996 to 2007. Also as a member and director of the American Board of Orthopaedic Surgery, I had an additional appointment to the Accreditation Council of Graduate Medical Education, ACGME/RRC for orthopaedic surgery. I served as a member of the ACGME/RRC from 2001 to 2007. That committee met at least three to four times per year, usually in the area of Chicago, Illinois.

My current full-time faculty appointment is with Albert Einstein Medical Center, Department of Orthopaedic Surgery, in Philadelphia, Pennsylvania. My current faculty appointment involves daily didactics, clinical, and surgical education of our PGY-I through PGY-V orthopaedic residents. We graduate two residents per year.

My review of the case for Dr. Afraaz R. Irani includes the following data:
1.    Materials from University of South Carolina School of Medicine Orthopaedic Residency Program.
2.    Dr. Irani's letters of recommendation.
3.    Telephone interviews with Dr. Irani.
4.    Dr. Irani's responses to the citations and concerns of the University of South Carolina Palmetto Orthopaedic Education Committee, with respect to his PGY-II clinical performance.
5.    List of current and former residents from University of South Carolina School of Medicine Orthopaedic Residency Program.
6.    Copies of electronic mail (e-mail) from Dr. Irani's former University of South Carolina co-residents.
7.    Pertinent patient hospital charts.

8.    Veteran's Administration hospital guidelines.
February 20, 2015
RE:    Afraaz R. Irani, M.D.
Page 2

9.    Copies of Columbia, South Carolina public court filings regarding the litigation against Palmetto Health Center by an orthopaedic resident (Dr. Irani).

It is my understanding Dr. Afraaz R. Irani graduated from Stanford Medical School in good standing, in June of 2010. He entered his PGY-I orthopaedic residency at University of South Carolina Palmetto Health Center, in Columbia, South Carolina. Dr. Irani was expected to complete his PGY-V senior residency year by June of 2015. Dr. Irani completed his PGY-I year with no untoward events of record, and had satisfactory ratings for his ACGME-required PGY-I clinical rotations.

Dr. Irani's PGY-II year of orthopaedic residency rotations began in July of 2011. On August 15, 2011, Dr. Irani was summoned to a meeting with his program director and orthopaedic attending, Dr. Koon. Dr. Koon advised Dr. Irani of several clinical deficiencies and sub-par performances. Evidently, corrective action was to include a Level II Remediation Program, with probation specified for the period of August 15, 2011, through December 1, 2011. Dr. Irani filed a forma protest in hopes of overturning his probation. His grievance was denied.

Dr. Irani's residency status was further challenged on December 12, 2011. Issues were raised related to elective vacation days, and the handling of a patient care issue relevant to a perioperative surgical site infection. The orthopaedic Graduate Medical Education (GME) committee elected to place Dr. Irani on Level III remediation, or suspension. Dr. Irani's written appeal of the orthopaedic GME committee's decision was denied by the Palmetto V.I.O., and later by the hospital's Graduate Medical Education committee based upon a timing technicality.

Dr. Irani's Level III remediation was reduced to a Level II remediation by February 2, 2012. However, Level III remediation status was hastily reestablished on March 5, 2012, with a firm recommendation for termination of orthopaedic residency. The option for termination from his residency education program was accepted by the Palmetto Graduate Medical Education committee on April 15, 2012. All subsequent appeals for reinstatement by Dr. Irani, and for reconsideration of termination, were denied.

Review of orthopaedic care issues.
Level II remediation, December 12, 2011: Review of specific care issues published by orthopaedic program director, reflecting Dr. Koon's rationale for prescribed means of resident discipline.
1    .Inappropriate dose of narcotics.
        Evidently, a non-narcotic naive patient called the hospital at postoperative day number zero complaining of pain following outpatient same-day surgery. The patient's discharge medication included Oxycodone 20mg, prescribed for administration every four hours as needed for pain. Dr. Irani interviewed the patient by telephone and determined the patient would benefit from additional narcotic analgesics. Reportedly, the patient was found to be drowsy on clinical examination the following morning. Considered on balance, other than the alleged condition of drowsiness (or a drowsy state), the patient experienced no adverse outcome from the additional regimen of analgesics. Obviously, there was no evidence Dr. Irani's actions, or care of this patient, deviated from the standard of care or endangered the patient's well-being.

2.    Failure to evaluate postoperative total knee arthroplasty patient with possible wound care issues.
        The clinical scenario involves the perioperative care of a total knee arthroplasty patient who contacted the hospital over the course of a weekend. The first contact occurred on Saturday. The patient reported she was noting drainage from her total knee arthroplasty surgical incision site. Dr. Irani advised the patient to report to the Emergency Care Area (ECA); however, the patient elected not to report to the emergency care area for examination or assessment. Subsequently, the patient called the orthopaedic surgery service twice on Sunday. The patient was able to speak with a different orthopaedic resident on Sunday, who concurred with Dr. Irani's conclusion that the patient should report to the

Emergency Care Area.  Eventually, the patient elected to report for evaluation on Monday.  At that time, her surgical incision site was actively draining and appeared to be obviously infected or colonized.

February 20, 2015
RE:    Afraaz R. Irani, M.D.
Page 3

Dr. Irani's actions in this matter fulfilled his duties as the orthopaedic on-call surgeon. He did not deviate from the standard of care, since he correctly advised the patient in question to report to the ECA on Saturday for a full assessment of her surgical wound. Patient compliance is essential to achieving the goal of timely and appropriate care, especially in lieu of a possible perioperative joint arthroplasty infection. However, if a patient does not comply with specific instructions from the consulting physician, the fault does not reside within the purview of the resident surgeon on-call.

3.    Failure to abide by direct attending's instructions.
        Dr. Irani was tasked with obtaining a magnetic resonance imaging (MRI) study for a patient he evaluated in the outpatient clinic. His supervising attending requested the MRI be completed on the same day. Dr. Irani advised the support staff of the attending's request. However, due to certain technicalities, the support staff was not successful in scheduling the MRI for that day. Once Dr. Irani became aware of the scheduling delay, he intervened immediately, contacted radiology, and the test was done as requested by his attending. As the patient received the care (the specific imaging study) as directed by his attending, Dr. Irani did adhere to the specific orders of his supervising attending. Dr. Irani did not deviate from the standard of care for a PGY-II orthopaedic resident. His response time was appropriate given the circumstances.

4.    Inappropriate care of trauma patient TF375.
        Dr. Irani was called to assist in the management of a trauma patient with an open, unreduced fracture, approximately three hours after the patient reported to the Emergency Care Area. By the time Dr. Irani arrived at the ECA, the patient was in pain and, understandably, upset about the delay in treatment. Appropriate orthopaedic care was then administered by Dr. Irani in a careful and thoughtful manner, under the supervision of an attending. Any subsequent complaints relevant to the patient's orthopaedic care are obviously not related to Dr. Irani's therapeutic interventions and compassionate care. Dr. Irani's care of this trauma case did not deviate from the standard of care, and the outcome for the patient was satisfactory.

5.    Letter dated August 15, 2011.
    1.    Mr. B (metal lathe injury).
        The allegation against Dr. Irani, in this case, claims he exhibited a lack of compassion and empathy in the treatment of patient, Mr. B. Allegedly, with respect to his care in the initial trauma resuscitation, Dr. Irani supposedly manifested disregard for a patient's request for pain medication. Additional allegations are noted, indicating Dr. Irani supposedly coerced a nurse to lie about the incident regarding the initial wound care and irrigation and debridement, and his subsequent prescriptions for analgesics. The patient, Mr. B., was evaluated in conjunction with the orthopaedic attendant for this case, under the direct supervision of the attending surgeon. The patient was assigned to the general surgery trauma team at the time of Dr. Irani's evaluation of the patient. It is clear the patient was not assigned to the orthopaedic surgery team.

An orthopaedic reduction of the patient's fracture was not performed. Dr. Irani was not able to determine the antecedent dosage of narcotic analgesics prescribed by the general surgery trauma team. Out of concern for the possibility of inducing or contributing to narcotic-induced related respiratory depression, Dr. Irani did not prescribe additional pain medication or narcotics. His actions were witnessed by his orthopaedic attending, who concurred with his judgement. Dr. Irani did not deviate from the standard of care in the orthopaedic management of patient Mr. B.

    2.    Closing a wound with Vicryl suture.
        This incident was reviewed and deemed to be consistent with the orthopaedic residency PGY-II learning curve. Dr. Irani's use of Vicryl in this instance was based upon his experience with other attendings and other wound closure strategies.

When Dr. Irani realized there was an issue, he informed his attending surgeon of his error in selecting Vicryl for wound closure. Dr. Irani switched to the correct suture as instructed. The record does not reflect a long-term untoward outcome with respect to the patient's care.

February 20, 2015
RE:   Afraaz R. Irani, M.D.
Page 4

6.    Not evaluating a Veteran's Administration total joint arthroplasty patient with postoperative cellulitis.

Dr. Irani was advised by his senior resident that non-emergent Veteran's Administration Medical Center orthopaedic consultation patients were to be evaluated by the morning orthopaedic team. At the time of the request for an orthopaedic consultation, the Veteran's Administration patient had been admitted to the Veteran's Administration internal medicine service. The supervising medicine attending informed Dr. Irani that the patient did not need to be seen that evening. The Veteran's Administration orthopaedic attending, Dr. John Eady, who was in charge of the patient, confirmed that Dr. Irani's handling of the orthopaedic consult request was within the standard of care for the Veteran's Administration Medical Center, and within the standard of care for orthopaedic surgery.

7.    Orthopaedic Graduate Medical Education correspondence dated March 5, 2012.

Correspondence in March of 2012, from Dr. Irani's program director, et. al., consisted of a notification of suspension from clinical duties due, in part, to Dr. Irani's participation in the management of two specific patients: A hemophilic patient; and, an orthopaedic spine surgery patient.

1.    Hemophilic patient

A hemophilic patient was admitted to the hospital. Instructions were given by the attending orthopaedic surgeon requiring patient evaluations at regular intervals.

Dr. Irani discussed the management plan with his senior residents. Dr. Irani examined the patient periodically, as directed, but Dr. Irani failed to document his physical examination and clinical impressions at the conclusion of his periodic assessments. It is unfortunate that Dr. Irani did not document his physical examination and assessment of his patient's encounters until forty-eight (48) hours after the fact. Ultimately, the patient was monitored in accordance with the standard of care, and did not experience any adverse clinical outcomes in spite of the lack of clinical documentation.

2.    Orthopaedic spine surgery patient.

Dr. Irani was contacted by the nursing staff, who reported the patient in question was experiencing difficulty walking. On further examination, the nurse felt the patient was manifesting neurologic changes. After Dr. Irani spoke with the nurse via telephone, Dr. Irani reported to the patient's room to assess the patient's neurologic status. Unfortunately, the patient was indisposed (on the bathroom toilet). Dr. Irani notified his orthopaedic attending surgeon regarding the patient's status, his inability to examine the patient at that time, and clearly stated his reason for not obtaining immediate access to the patient. Once the patient emerged from the bathroom, Dr. Irani was able to assess the patient's ambulatory capacity by walking her to her bed. He then proceeded with his neurologic examination and assessment. Dr. Irani informed his attending orthopaedic surgeon of his physical examination findings. Evidently, the patient fully recovered.

Dr. Irani was criticized for his failure to document his neurologic examination in a timely fashion. However, he entered his findings into the medical record on the following morning. Clinical issues raised by Dr. Irani's assessment of this case suggest that his actions delayed surgical decompression of a patient with spine pathology. Ostensibly, critical decision making regarding the timing of surgical decompression of spinal pathology rests solely in the hands of an experienced orthopaedic spine surgeon with post-residency fellowship experience and years of clinical experience with neurological emergencies.

A junior orthopaedic resident, at the PGY-II level, is not qualified to make critical decisions regarding the specific timing of procedures as complex as emergent spine decompression surgery. Both comprehensive supervision and

support are critical to the development of a positive PGY-II educational environment.

In reviewing the records made available to me regarding Dr. Afraaz R. Irani, and the remediation actions of the University of South Carolina School of Medicine Orthopaedic Residency Program, it should be noted the PGY residency expectations of performance, and level of clinical responsibility, seems to be remarkably high for any ACGME/RRC-approved orthopaedic residency education program.

February 20, 2015
RE:    Afraaz R. Irani, M.D.
Page 5

Having just completed his internship year (PGY-I), it appears that Dr. Irani was doing his best to function as an early PGY-II resident who was responding appropriately to accelerated clinical duties and responsibilities. Effective mentoring by a more senior orthopaedic resident, and an empathetic attending orthopaedic surgeon would have been a more effective method of achieving corrective remediation for Dr. Irani. At the PGY-II level, orthopaedic residents are working their way through a form of cultural shock, experiencing complex diagnostic and therapeutic challenges, extended administrative tasks, and a more comprehensive musculoskeletal science core curriculum, in addition to journal clubs and the beginning of either early clinical or basic science research projects. Their ascent from educational ground zero toward the top of the PGY-II learning curve requires appropriate clinical support, a positive learning/educational environment that surrounds the resident with guidance at all points, and time for adequate reflection and didactic emersion. Constructive learning environments surrounding a PGY-II orthopaedic resident helps that resident at the entry point to reduce the pressures he or she faces when completing a multitude of assigned clinical tasks within the ACGME prescribed restricted duty hours (REF: ACGME Program Requirement for Graduate Medical Education in Orthopaedic Surgery, Common Requirements Introduction A-B and IIA4-5(3); II.A.4.k; II.A.4.l; II.B.1.B; VI.D.4.b; VI.D.5.(a).1).

Unfortunately, hostile residency work environments that bring into play unfortunate comments or sarcastic remarks demeaning a resident's race, religious beliefs, ethnicity, or national origin destroys what should be an enhanced residency learning environment for any specialty, whether it be primary care or any surgical sub-specialty.

Considered on balance, any objective party analyzing the end product of the USC Palmetto Orthopaedic Residency Program [i.e., (1) ABOS Part I and II Board Passage Rate for PGY-V Graduates Taking the Examination For the First Time (2) Resident Attrition Rate For the Program of Approximately Sixty Percent).

The ABOS passage rates remain to be seen. However, it is clear that a sixty (60) percent attrition rate, with respect to the residency program for orthopaedic surgery at University of South Carolina Palmetto, does raise concerns about the comprehensive resident experience and, especially, concerns about their affective and cognitive domain experience over the five years of residency education. Clearly, the sixty (60) percent rate of instability is reflective of the program's leadership and the program's attitude toward each of its selected residents. Careful institutional dissection of the events leading to the accelerated march to residency dismissal for Dr. Irani may assist the Palmetto Graduate Education Committee in obtaining the needed insight for corrective action, which leads to the establishment of a productive orthopaedic residency program with an appropriate learning environment.

Respectfully Submitted,

*Richard Grant MD*

Richard E. Grant, M.D.
Albert Einstein Medical Center
Department of Orthopaedic Surgery
60 Township Line Road, Ground Floor
Elkins Park, Pennsylvania  19027
(215) 456-7900

REG/keystrokes/REG0132

cc:  Mr. David Rothstein
     1312 Augusta Street
     Greenville, South Carolina 29605
     884-232-5870 office; 864-241-1386 fax
     drothstein@rothsteinlawfirm.com; drothstein@minespring.com; www.rothsteinlawfirm.com