# EXHIBIT GGG

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

Afraaz R. Irani, M.D.,        )
                             )    C/A No. 3:14-cv-03577-CMC-KDW
        Plaintiff,            )
                             )
vs.                          )
                             )
Palmetto Health;             )
University of South          )
School of Medicine;          )
David E. Koon, Jr.,          )
M.D., in his individual      )
capacity; and John J.        )
Walsh, IV, M.D., in his      )
individual capacity,         )
                             )
        Defendants.          )
_____)

DEPOSITION OF

FRANK R. VOSS, M.D.

*******************

Wednesday, April 15, 2015
1:01 p.m. - 3:48 p.m.


        The deposition of FRANK R. VOSS, M.D., taken on

behalf of the Plaintiff at the offices of the South Carolina

Bar Conference Center, 2nd Floor, 1501 Park Street,

Columbia, South Carolina, on the 15th day of April, 2015,

before Lyn A. Hudson, Court Reporter and Notary Public in

and for the State of South Carolina, pursuant to Notice of

Deposition and/or agreement of counsel.

1  A:  I might have once in twenty years.

2  Q:  Okay.  Did that have anything to do with Dr. Irani's

3      case?

4  A:  No.

5  Q:  Have you been named as a party to any lawsuits since

6      June of 2013 when I deposed you last?

7  A:  No.

8  Q:  Are you involved in any of the, I think there were

9      seven malpractice cases that were reported in The State

10     Newspaper a couple months ago involving the USC

11     Orthopaedics Surgery Department and some sort of knee

12     injections?  Do you know anything about that case?

13 A:  I know little bits and pieces about that case but I'm

14     not familiar with any of the allegations.

15 Q:  Did you provide any care to any of the plaintiffs or

16     their, I don't know if there are any wrongful death

17     cases, but any of the patients at issue in those cases?

18 A:  I did not.

19 Q:  Okay.  How many advisory meetings did you have with Dr.

20     Irani during his tenure in the residency program at

21     USC?

22 A:  I wouldn't know.

23 Q:  Okay.  Was it more than one?

24 A:  Likely it was more than one.

25 Q:  Okay.  Was it a policy of the department to have

Allen Court Reporting

```
 1        Dr. Grabowski?
 2   A:   Yes.
 3   Q:   Do you know why Dr. Walsh and Dr. Grabowski would have
 4        done this review instead of you?
 5   A:   We take turns.  It's not that I always do it.
 6   Q:   Okay.  Do you recall ever doing a review with Dr. Irani
 7        during his residency to go over a semi-annual
 8        evaluation or one of his evaluations for a particular
 9        rotation?
10   A:   I do not recall a specific semi-annual review with Dr.
11        Irani.  I do recall a separate meeting that I had with
12        Dr. Grabowski.
13   Q:   Okay.  Was Dr. Irani in the meeting with you and
14        Dr. Grabowski?
15   A:   Yes.
16   Q:   When did that occur?
17   A:   I don't remember the date.
18   Q:   Okay.  Do you see the Exhibit 1 has a Bates number on
19        the bottom, it's Palmetto Health 000018 --
20   A:   I do.
21   Q:   -- through 20?  And I'll represent to you that those,
22        that Bates numbering was put on this document to
23        indicate that it came from Palmetto Health.  Do you
24        know why I have not received a copy of this directly
25        from USC?
```

| | | |
|---|---|---|
| 1 | | forms electronically? |
| 2 | A: | Ever? |
| 3 | Q: | Yeah. |
| 4 | A: | Yes. |
| 5 | Q: | How are they transmitted to you for your electronic |
| 6 | | signature? |
| 7 | A: | Usually get an e-mail link that says you have a pending |
| 8 | | evaluation for signature. |
| 9 | Q: | Okay.  Do you recall receiving an e-mail link regarding |
| 10 | | Dr. Irani's semi-annual review that's copied as Exhibit |
| 11 | | 1? |
| 12 | A: | I do not. |
| 13 | Q: | Do you see at the third page again it says attached |
| 14 | | files, Irani.PDF?  Do you have any idea what that |
| 15 | | document is? |
| 16 | A: | No. |
| 17 | Q: | Did you do anything to look on your computer system at |
| 18 | | USC to see if you had any documents relating to Dr. |
| 19 | | Irani? |
| 20 | A: | I did not.  And the reason is that our file storage is |
| 21 | | so small that I delete everything that's more than |
| 22 | | about three months back.  And I don't save any e-mail |
| 23 | | files. |
| 24 | Q: | Okay.  Were you ever instructed to save anything with |
| 25 | | regard to Dr. Irani? |

Allen Court Reporting

1   A:   No.

2   Q:   So you weren't aware that in May of 2012 I sent a

3        letter requesting that all electronic information about

4        Dr. Irani be preserved?

5   A:   I don't recall that.

6   Q:   Have you ever looked for any, did you ever send or

7        receive any text messages about Dr. Irani?

8   A:   Not that I have any recollection of.

9   Q:   Did you take any steps to preserve any text messages

10       that you might have had regarding Dr. Irani?

11  A:   I don't think I've ever texted about Dr. Irani.

12  Q:   Okay.  What about e-mail messages?  Did you ever e-mail

13       between your colleagues or residents about Dr. Irani?

14  A:   I don't think so.

15  Q:   Do you think all your communications about Dr. Irani

16       would have been in person?

17  A:   To whom?

18  Q:   To anybody.

19  A:   Would have been in person.

20  Q:   Okay.

21            MS. THOMAS:  Object to the form.

22  BY MR. ROTHSTEIN:

23  Q:   What about between yourself and Dr. Koon or Dr. Walsh?

24       Do you think there were any e-mail communications

25       between the two of you about Dr. Irani?

```
 1  A:   I don't recall any that I would have sent about Dr.
 2       Irani.
 3  Q:   Okay.  What about receiving e-mails about Dr. Irani?
 4       Do you recall ever receiving any documents via e-mail
 5       about Dr. Irani?
 6  A:   I suspect that a notification went out when he received
 7       a suspension.  But I wouldn't remember the wording of
 8       it or the timing of it.
 9  Q:   Did you do anything to preserve those documents on your
10       computer?
11  A:   I did not.
12  Q:   How many advisees did you have in the orthopaedics
13       department in the fall of 2011?
14  A:   You're asking the number of people that I would have
15       done a semi-annual evaluation on?
16  Q:   Well, do you see on the first page of Exhibit 1 on the
17       top it says, Advisor:  Frank Voss?
18  A:   I do see that.
19  Q:   How many residents in the USC Palmetto Health
20       Orthopaedic Surgery Department would it say Advisor
21       Frank Voss at that time?
22  A:   I have no idea.
23  Q:   How many total residents did you have in the fall of
24       2011?
25  A:   Our usually complement is ten residents and likely it
```

Allen Court Reporting

```
 1        was a little bit less at that time.
 2   Q:   Okay.  So, and how many faculty members would be
 3        serving in the capacity as an advisor?
 4   A:   It could have been any of the faculty.
 5   Q:   In the fall of 2011 besides yourself who else was doing
 6        advising roles for residents?
 7   A:   Likely Dr. Walsh, likely Dr. Koon, likely Dr. Guy,
 8        likely Dr. Mazoue.  Trying to recall the timing of when
 9        some of my other partners started.  This would have
10        been fall of 2011?
11   Q:   Yes.
12   A:   I think Dr. Grabowski had started in 2011.  So he would
13        have been available as an advisor.
14   Q:   Okay.  So if there were ten residents and five or six
15        faculty members that were assigned to be advisors, you
16        would have one or two residents at a time if it was
17        distributed fairly evenly?  Would that be a fair --
18   A:   I think that's probably not correct.
19   Q:   Okay.  How many would you have had in the fall of 2011
20        if that's not correct?
21   A:   I wouldn't know why my name would be listed as his
22        advisor on this document.
23   Q:   Did you ever do anything as an advisor to Dr. Irani in
24        terms of a formal advisor as your name is listed on
25        this document?
```

```
 1   A:   Meaning give him advice or review his performance?
 2   Q:   In a more structured way.  I mean, did you ever have an
 3        advisor when you were coming through residency or
 4        medical school?
 5   A:   Rarely.
 6   Q:   Someone that was assigned to you as this is your
 7        advisor?
 8   A:   Yes.
 9   Q:   Okay.  Did you ever meet with Dr. Irani in that
10        capacity as his advisor?
11   A:   Only when he was the resident on my service.
12   Q:   Were you aware that you were assigned to be Dr. Irani's
13        advisor as reflected in Exhibit 1?
14   A:   No.
15   Q:   Is today the first time you've ever seen that your name
16        was listed as his advisor during his residency?
17   A:   Yes.
18   Q:   Do you believe that to be inaccurate?
19   A:   I don't know what led to putting that, putting my name
20        on to this semi-annual evaluation.
21   Q:   Do you know whether you were listed as any other
22        residents' advisors at that time?
23   A:   I wouldn't know.
24   (Plaintiff's Exhibit Number 2 was marked for identification
25   purposes.)
```

| | | |
|---|---|---|
| 1 | Q: | Would it specifically refer to the name of the |
| 2 | | resident? |
| 3 | A: | I don't recall.  I don't think so. |
| 4 | Q: | And when would that link appear in your in box on your |
| 5 | | computer? |
| 6 | A: | Usually toward the end of the rotation.  But it's |
| 7 | | variable.  Sometimes it's arrived even before the |
| 8 | | rotation is complete.  Sometimes after. |
| 9 | Q: | If you signed this document on December 28th, do you |
| 10 | | know about when you would have received it in blank, |
| 11 | | received the link to complete it in blank? |
| 12 | A: | No. |
| 13 | Q: | How long do you typically, how long does it typically |
| 14 | | take you between the time you receive the link and the |
| 15 | | time you complete the evaluation? |
| 16 | A: | A month or two. |
| 17 | Q: | Okay.  Does the department have any guidelines for how |
| 18 | | quickly these evaluations should be completed? |
| 19 | A: | I think it falls under the category of soon. |
| 20 | Q: | Okay.  Do you know why that would be? |
| 21 | A: | Well, it's for the purposes of the six-month evaluation |
| 22 | | so that there's enough data to review. |
| 23 | Q: | Is it important to provide timely feedback to residents |
| 24 | | during their residency? |
| 25 | A: | Yes. |

| | |
|---|---|
| 1 | simple as tying knots I'd rescue the suture at the end |
| 2 | of the surgery, I would have them borrow a needle |
| 3 | holder from the OR, I would ask them to sew cloth or an |
| 4 | orange peel or a banana peel together to practice |
| 5 | handling the needler holder and tying knots. |
| 6 | Q: Did Dr. Irani have any difficulty in tying knots? |
| 7 | A: Not that I documented. |
| 8 | Q: Did he have any difficulty with suturing? |
| 9 | A: Not that I indicated. |
| 10 | Q: Okay. What types of skills was he having difficulty |
| 11 | with that led you to mark him as marginal in the OR |
| 12 | performance? |
| 13 | A: I haven't spelled it out. My suspicion is that they |
| 14 | were not the suture tying and the knot tying parts of |
| 15 | it. Those are tiny parts of the overall surgery. But |
| 16 | it's, it's a complex procedure. It might, you know, |
| 17 | and some of the people have tried to elucidate it into |
| 18 | steps. It might be 180 or 200 different steps. For me |
| 19 | to pinpoint one or two where it was difficult would be |
| 20 | challenging four years after the event. |
| 21 | Q: Would you say the joint rotation is one of the harder |
| 22 | or more difficult rotations for a junior resident? |
| 23 | A: Yes. |
| 24 | Q: Is there a certain order that the residents typically |
| 25 | progress through their rotations? |

1       year-long map will be made of who's going to be on

2       which rotation at which time.

3  Q:   Okay.  Looking at the specific items, it looks like if

4       my math is correct, out of the 20 different rating

5       categories you rated Dr. Irani satisfactory in 14 of

6       those.

7  A:   Okay.

8  Q:   Is that, is my math correct on that?

9  A:   I didn't count whether there were 20.  But there were

10      six that were listed as marginal and the rest were

11      satisfactory.

12 Q:   Okay.

13 A:   So assuming there are 20 total, yes, that would be

14      correct.

15 Q:   Okay.  So more than half of his evaluation categories

16      were at the satisfactory level; is that right?

17 A:   Yes.

18 Q:   And there were no ratings that were in the

19      unsatisfactory level; right?

20 A:   Not on my evaluation.

21 Q:   And your overall rating with Dr. Irani was marginal;

22      right?

23 A:   Yes.

24 Q:   Do you know whether Mary Finn was Dr. Irani's senior

25      resident when he was an intern?

```
 1   A:   I don't know.
 2   Q:   Do you ever recall Mary Finn telling Dr. Irani or were
 3        you aware that Mary Finn told Dr. Irani that he had
 4        some of the best surgical hands she's ever seen for a
 5        resident?
 6             MS. HELMS:  Objection to the form of the question.
 7             MS. THOMAS:  Object to the form.
 8   A:   Where would I have encountered that?
 9   BY MR. ROTHSTEIN:
10   Q:   I'm just asking if you're aware.
11   A:   No.
12   Q:   All right.  When a resident is marked down as marginal,
13        do you as an attending typically come up with some sort
14        of improvement plan or strategy for them to move from
15        the marginal category into the satisfactory category?
16   A:   Usually that's continuous.  Okay?  That means if I,
17        when we review at the end of the case how it went and
18        what things we need to work on that there's almost
19        every OR day feedback as to how we're doing.
20   Q:   Did you notice any progression in Dr. Irani's skills
21        from the beginning of his service on your rotation
22        until the --
23   A:   Yes.  But less than I would have expected.
24   Q:   Do you have pretty high expectations for the residents
25        in the program?
```

```
 1  A:   Yes.
 2  Q:   Now, in the specific comments if you will look at the,
 3       sort of the bottom of Exhibit 2.  I think --
 4  A:   Are you on 83, 82 or 81?
 5  Q:   81.
 6  A:   81.
 7  Q:   First page of Exhibit 2.
 8  A:   Okay.
 9  Q:   Looks like the first actual set of comments other than
10       bubbling in or clicking one of the circles is at the
11       bottom there under assessments; right?  What does the
12       assessments category rate?
13            MS. HELMS:  I'm sorry.  Where are you?
14            MR. ROTHSTEIN:  Exhibit 2 at the bottom of the
15       first page.
16  A:   You would like me to read the sentence?
17  BY MR. ROTHSTEIN:
18  Q:   Well, just generally what does that category
19       assessments mean?  What does that mean?  Is that --
20  A:   As a physician much of your skill is how well you make
21       an assessment of what a patient needs done, performed,
22       in terms of medication.  And so this is in response to
23       them developing sort of independent skills of
24       assessment and trying to do the right thing.
25  Q:   Okay.  Is this stuff that's done in the clinic or where
```

1           are the assessments or is that all the entire practice?

2   A:    All the time.

3   Q:    Okay.  And in the comments there you wrote, Afraaz is

4           very bright.  Do you believe that Dr. Irani is a bright

5           person?  I guess that's intellectual capacity?  Is that

6           what you are referring to?

7   A:    Yes.

8   Q:    And then it says his OR performance was made difficult

9           by the second year call requirements.  Tell me what you

10          mean by that.

11  A:    The beeper and being on call is a disruptive force in

12          terms of training a resident.  Okay?  You can't shut

13          the thing off if you're on call.  And your beeper goes

14          off and we're trying to learn how to do a surgery and

15          his pager is going off and he has to get a message

16          through the circulator in the room to figure out what

17          to do for a patient who's in the emergency room.

18  Q:    As a PGY 2 resident at that time, was Dr. Irani sort of

19          the low man on the totem pole in the residency?

20  A:    The junior residents share their call fairly equally.

21  Q:    This was, again, was this a trauma call during the day

22          Dr. Irani had to wear a pager that would alert him to

23          come down to the ER if there was a trauma?

24  A:    Pretty much all of us have a pager or a cell phone.

25  Q:    But it was Dr. Irani's responsibility at that time to

```
 1        respond to the pagers?
 2   A:   On certain days.
 3   Q:   Okay.  And sometimes he would get, the pager would go
 4        off in the middle of the surgical procedure and he
 5        would have to answer that because that took priority;
 6        correct?
 7   A:   Correct.
 8   Q:   And so that's what you're referring to there, the fact
 9        that he was carrying the pager and got interrupted made
10        it difficult for him to progress in the OR?
11   A:   It's not an uncommon difficulty but it requires
12        balancing a couple of different goals.
13   Q:   Okay.  And then the next sentence says, however beyond
14        that his improvement in the OR was somewhat slow and
15        seemed not to be driven by concern for the patient.
16        Tell me what you meant by that sentence.
17   A:   In general the, one of the ingredients to being a good
18        doctor is empathy for the patient or the ability to put
19        yourself in their situation.  And I didn't think that
20        he did that very well.
21   Q:   Did you ever notice any improvement in Dr. Irani's
22        empathy and compassion for the patients?
23   A:   No.
24   Q:   Do you recall a patient named GE (patient name
25        redacted) who had a joint replacement in February of
```

```
 1  BY MR. ROTHSTEIN:

 2  Q:  Dr. Voss, have you had a chance to look at Exhibit 3?

 3  A:  I have.

 4  Q:  Does this refresh your memory about a patient named,

 5      with the initial GE in February of 2012?

 6  A:  I know the patient.  And I have been his doctor for a

 7      while.

 8  Q:  Okay.  How, tell me how you know the patient.

 9  A:  I first met him playing tennis.

10  Q:  Okay.  How long had, or has he been a patient of yours?

11  A:  I don't recall.

12  Q:  Okay.  Do you believe this particular patient to be an

13      honest and trustworthy person?

14  A:  I'm sorry.  How are you asking me to judge that?

15  Q:  Well, I mean, do you have any reason to believe that he

16      would not be honest and trustworthy?

17  A:  No.

18  Q:  Okay.  And during your interactions with this

19      particular person both as a patient and a tennis

20      player, I mean, do you believe he is an intelligent

21      person?

22  A:  Yes.

23  Q:  Okay.  This particular affidavit that this patient

24      produced, if you will look at paragraph six says that

25      Dr. Irani had excellent bedside manner, interpersonal
```

1    skills and displayed genuine concern and empathy for my
2    well-being.  Do you have any reason to dispute this
3    particular patient's evaluation of Dr. Irani?
4  A:  No.
5  Q:  Paragraph seven says, he made sure that I was
6    comfortable and all my questions and concerns were
7    appropriately and quickly answered in a clear and
8    concise manner that made it easy to understand.  Do you
9    have any reason to dispute this patient's evaluation of
10    Dr. Irani in that regard?
11  A:  No.
12  Q:  Okay.  It appears that this patient had a very
13    favorable opinion of Dr. Irani based on the care that
14    Dr. Irani provided in February of 2012, doesn't it?
15        MS. HELMS:  Objection to the form of the question.
16        MS. THOMAS:  Object to the form.
17  A:  It does look like that.  Yes.
18  BY MR. ROTHSTEIN:
19  Q:  Did you ever discuss with this particular patient his
20    experience with Dr. Irani?
21  A:  No.
22  Q:  Assuming that this document is true, that would show at
23    least some improvement in empathy and compassion
24    between November of 2011 and February of 2012, wouldn't
25    it?

1    out it was the wrong thing to do.  I don't recall how

2    exactly it came to my attention.

3  Q:  What kind of procedure did this particular patient have

4    done on them?

5  A:  I don't think it was even, the, likely it was a joint

6    replacement.  But I don't remember the patient's name.

7  Q:  Do you even know if this was your patient?

8  A:  It was likely my patient.  But it wasn't necessarily

9    one of my patients.

10  Q:  Okay.  Do you know when you would have heard about the

11    complaint?

12  A:  I think that day.  I mean, you know, after the phone

13    calls at night.

14  Q:  Okay.  Tell me how you first found out that a patient

15    believed that they were given an inappropriate

16    instruction by Dr. Irani about taking Percocet.

17  A:  It's a shocking amount.  It's not an amount that you

18    would give someone who was new to narcotics ever.

19  Q:  Okay.

20  A:  Sort of makes your hair stand on end.

21  Q:  Did you do anything to investigate whether the report

22    you had received was actually true or not?

23  A:  I think I spoke to Dr. Irani about it.

24  Q:  Okay.

25  A:  And asked him.  And he said, yes, I told him to take

1    five.  I was sort of shocked.

2  Q:  Do you know whether this was an, actually a patient of

3      Dr. Walsh or Dr. Grabowski's?

4  A:  I don't think I have a way to tell right now.

5  Q:  So sitting here today, tell me how you first learned

6      about this issue about Dr. Irani prescribing an

7      inappropriate dosage of Percocet.

8  A:  I don't know how it came to my attention.

9  Q:  Okay.  Is it possible this wasn't even one of your

10     patients?

11 A:  I've answered that it is possible.

12 Q:  Okay.  And tell me what's wrong with a doctor

13     prescribing five Percocet tablets at once.

14 A:  Respiratory depression.

15 Q:  Okay.  Who told you that Dr. Irani prescribed five

16     Percocet tablets for this patient at one time?

17 A:  It's about the third time you've asked.  I don't know

18     who told me.

19 Q:  Okay.  Tell me what, what is Percocet?

20 A:  It's a narcotic pain medicine that goes by the name of

21     Oxycodone.

22 Q:  Okay.  Does it also have Acetaminophen in it?

23 A:  Yes.

24 Q:  Okay.  Is there a guideline or a guidance about how

25     many tablets of Percocet you can prescribe at one time?

1      there would be one of the phone call.

2  Q:  And what was Dr. Irani's response?

3  A:  He thought that that was the appropriate amount to give

4      for a patient who's having pain.

5  Q:  Was this, this was a post-op patient that had already

6      been sent home?

7  A:  I believe so.

8  Q:  Wouldn't the patient's discharge instructions tell the

9      patient how much pain medicine to take?

10  A:  Presumably, yes.

11  Q:  Did you look at the discharge instructions in

12      connection with this particular patient?

13  A:  I don't think so.

14  Q:  Is it possible that what Dr. Irani told the patient was

15      to take an additional five milligrams of Oxycodone

16      instead of five tablets of Percocet?

17  A:  Not according to his response.

18  Q:  What was, tell me what his response was.  I mean, did

19      he acknowledge that he had messed up?

20  A:  After we had discussed it with him I think he

21      understood why it generated anxiety for us.

22  Q:  When you say us, who are you talking about?

23  A:  I don't, I don't have enough records here to tell me

24      who might have been aware of this and precisely whose

25      patient this is.  And the, I think he understood after

```
 1   A:   It's been a little bit of a moving target with the
 2        electronic records.  Some of it's gotten easier.  Some
 3        of it's gotten a little bit more tedious.  But none of
 4        that combination of things probably doesn't take more
 5        than about ten minutes.
 6   Q:   Okay.  Are the residents encouraged to work sort of as
 7        a team or help each other out in certain circumstances?
 8   A:   I'm not sure what you're getting at.
 9   Q:   Well, is it possible that one of the, another resident
10        on the rounds that particular day with this particular
11        patient actually wrote the prescription instead of Dr.
12        Irani?
13   A:   It's possible.
14   Q:   Okay.  Do you have, I mean, have you actually seen the
15        copy of the prescription that you claim was
16        inappropriate in that it prescribed 40 tablets instead
17        of 100?
18   A:   I talked to the patient who was irate.
19   Q:   Okay.  Would that prescription still be in that
20        particular patient's medical records?  Would a copy of
21        that prescription still be in the patient's medical
22        records?
23   A:   It came from the hospital.  That prescription wouldn't
24        go in the patient's medical record.
25   Q:   Is there a record of what the prescription was actually
```

```
 1        sent home with the patient?
 2   A:   Of course ultimately I'm responsible for every piece of
 3        it.  Can I hover over every minute piece?  No.
 4   Q:   When did you make Dr. Irani aware that he only wrote 40
 5        tablets when he should have written 144 or so tablets?
 6        Or is that --
 7   A:   Probably within a day or two.
 8   Q:   Was there any medical problem with this particular
 9        patient in terms of -- I mean, did the patient suffer
10        any adverse outcome because he was only given 40
11        tablets instead of 144 tablets?
12   A:   I don't think so.  But he could have withdrawn from
13        narcotics.
14   Q:   Okay.  Forty tablets would be about, does the patient
15        stay on twelve per day after they're discharged from
16        the hospital?
17   A:   Hopefully not.  But that might have lasted four days.
18   Q:   And do you recall how soon after the discharge the
19        patient called you and said I ran out of medicine?
20   A:   I do not.
21   Q:   Do you even recall the name of this particular patient?
22   A:   No.
23   Q:   Do you know what kind of procedure he was in for?
24   A:   Likely a total hip or a total knee.
25   Q:   Okay.  And what did you do once you found out that the
```

```
1         patient needed additional pain medicines?
2    A:   Presumably they called my office.  My office called me.
3         And I ordered another hundred tablets to carry them
4         until they come back into the office to do it.
5    Q:   Other than the inconvenience of having to come back and
6         pick up another prescription, are you aware of any
7         problems that the 40-tablet prescription presented for
8         this patient?
9    A:   I'm not aware of an adverse medical reaction.
10   Q:   Okay.  How did these two episodes with the patient with
11        the prescriptions indicate that Dr. Irani was, or not,
12        marginal in his assessment of these patients?
13   A:   I think what's integral to providing good care for the
14        patient is to be able to put yourself in their
15        situation and say, what would I want someone to do for
16        me.  Okay?  And I don't feel like that that was what
17        happened.
18   Q:   Did you explain the errors to Dr. Irani?
19   A:   I did.  I went over it.  And I said look, five is more
20        than a standard patient can usually tolerate.  Okay?
21        And if we do the math for how many tablets this patient
22        was taking. they're going to run out possibly on the
23        weekend when it would have been even more difficult to
24        fill a prescription.  And so I did go over this with
25        him.
```

```
 1        was drainage, you would likely see the drain.
 2   Q:   Okay.  So tell me how you brought this issue to Dr.
 3        Irani's attention about the drain output.
 4   A:   I try to do my interactions with the residents as
 5        constructively as possible which is, I would ask him
 6        and I would ,say, Afraaz, what did you think of the
 7        drain output.  And he might have said, oh, I forgot
 8        they had a drain.  Or he might say, I didn't think it
 9        was important.  I don't remember his response.  But the
10        goal is to be constructive so that he would become more
11        aware of it so he could help manage it as we had a
12        drain the next time.
13   Q:   Did you mention it to him immediately that, hey, you
14        know, this is an important issue, you need --
15   A:   Presumably that day.
16   Q:   Did Dr. Irani have any problems after you brought it to
17        his attention, any continuing problems with the drain
18        output, or paying attention to the drain output?
19   A:   I don't recall.  All I have is what I've documented
20        here.
21   Q:   But there's no documentation of Dr. Irani messing up
22        again with regard --
23   A:   There is not.
24   Q:   So presumably he got the message and improved in that
25        area?
```

| | |
|---|---|
| 1 | intuitively and it's hard to sort of acquire.  But I |
| 2 | encouraged him to try to focus his effort and help |
| 3 | toward the patient. |
| 4 | Q:  Okay.  At least with GE, he seemed to have taken that |
| 5 | advice to heart; right?  He connected pretty well with |
| 6 | GE? |
| 7 | A:  This looks great. |
| 8 | Q:  Okay.  Is empathy something that is, in your opinion as |
| 9 | a medical educator, something that's remediable?  Can |
| 10 | you teach empathy? |
| 11 | A:  I think it's challenging.  I think it's more |
| 12 | challenging than teaching a surgical skill.  And from |
| 13 | what I understand it's harder to teach.  But people can |
| 14 | acquire this skill. |
| 15 | Q:  All right.  Then the concern for others under |
| 16 | professionalism, you put that he was satisfactory in |
| 17 | showing concern for others; right? |
| 18 | A:  Yes. |
| 19 | Q:  Would that include empathy as well? |
| 20 | A:  I think it covers a broader path than just empathy |
| 21 | toward the patient because it would also be |
| 22 | interactions with other physicians, other medical |
| 23 | personnel.  So it's broader than just the doctor |
| 24 | patient relationship. |
| 25 | Q:  Okay.  And your evaluation of Dr. Irani on that |

| | | |
|---|---|---|
| 1 | | the meeting with Dr. Grabowski and Dr. Irani? |
| 2 | A: | I don't think so. |
| 3 | Q: | Did you tape record it or record it in any way? |
| 4 | A: | No. |
| 5 | Q: | Do you know if Dr. Grabowski or Dr. Irani recorded it? |
| 6 | A: | I wouldn't have any idea. |
| 7 | Q: | All right.  If you look at sort of the first paragraph, |
| 8 | | it says, we carefully reviewed the circumstances under |
| 9 | | which Dr. Irani was called by the nurse where she |
| 10 | | informed him that the patient had a new foot drop in |
| 11 | | the morning.  What is a foot drop? |
| 12 | A: | That means you don't have the strength to pull the foot |
| 13 | | up, upward against gravity. |
| 14 | Q: | Did you ever speak with the nurse? |
| 15 | A: | I did not. |
| 16 | Q: | It said Dr. Irani's initial response was somewhat |
| 17 | | flippant to the nurse.  Do you recall what -- I take it |
| 18 | | you didn't hear Dr. Irani's response to the nurse? |
| 19 | A: | I think Dr. Grabowski had gone through the whole thing |
| 20 | | in detail as to the phone calls with the nurse and had |
| 21 | | sort of tried to figure out what had transpired. |
| 22 | Q: | What did you mean by the response was flippant to the |
| 23 | | nurse? |
| 24 | A: | To put this in perspective, this is an emergency. |
| 25 | | Nerves are one of the least able tissues in the body to |

Allen Court Reporting

1    withstand deficits and recover.  So this is something

2    that needed or demanded immediate attention.  And I

3    don't think that the nurse thought that Dr. Irani's

4    response to this was okay.

5  Q:  Okay.  Do you know if the, I mean, if this was such an

6    emergent situation do you know if she tried to contact

7    Dr. Grabowski about it?

8  A:  I don't know the time lines of the phone calls.  I

9    don't know who called which person when.  And I think

10    it transpired during the day.  But you're asking many

11    things that weren't immediately reviewed by me other

12    than to hear it presented in that room.

13  Q:  Okay.  So your statement that Irani's initial response

14    was somewhat flippant, you're just recording what

15    Dr. Grabowski told you he had heard from the nurse?

16  A:  Presumably, yes.

17  Q:  So that's a second or third-hand statement about Dr.

18    Irani's interactions with the nurse?

19  A:  You can ask Dr. Grabowski when you have his deposition.

20  Q:  Okay.  Do you recall Dr. Irani saying what his response

21    to the nurse was?

22  A:  I do not.

23  Q:  Do you know what Dr. Irani was doing at the time the

24    nurse called him about this particular spine patient?

25  A:  My note doesn't say what he was doing at the time.

Allen Court Reporting

|    |    |                                                              |
|----|----|--------------------------------------------------------------|
| 1  |    | best for the patient.  And I think that the timing of        |
| 2  |    | taking pressure off of nerves is critical.  And I think      |
| 3  |    | it was mostly the time to recognize this as a problem        |
| 4  |    | was what caused anxiety for Dr. Grabowski.                   |
| 5  | Q: | Okay.                                                        |
| 6  | A: | You can ask him.  He's going to have a deposition from       |
| 7  |    | what I understand.                                           |
| 8  | Q: | So you really don't know much about the situation           |
| 9  |    | involving the spine patient?                                 |
| 10 | A: | You have what I've written and what my recall is.           |
| 11 | Q: | Okay.                                                        |
| 12 | A: | But it was not my patient.  It was not a patient that I     |
| 13 |    | ever evaluated.                                              |
| 14 | Q: | You said you were more of a scribe in this, in              |
| 15 |    | preparing this memo; right?  You didn't look at the         |
| 16 |    | patient's records; right?                                    |
| 17 | A: | Correct.                                                     |
| 18 | Q: | You didn't talk to any of the nurse or the staff           |
| 19 |    | involved --                                                  |
| 20 | A: | Correct.                                                     |
| 21 | Q: | -- in the patient's care?  And you're not a spine           |
| 22 |    | surgeon; right?                                              |
| 23 | A: | I am not.                                                     |
| 24 | Q: | Do you know whether this patient had any adverse            |
| 25 |    | outcome as a result of this incident?                        |

```
 1   A:   My note indicates that the patient improved.  I don't
 2        know if that's to normal.  That would be conjecture.
 3   Q:   Did Dr. Grabowski, do you recall whether Dr. Grabowski
 4        took issue with Dr. Irani's documentation of his
 5        assessments in the patient's chart?
 6   A:   Honestly I have not reviewed the chart record of this.
 7        So I don't know what he had written into the chart.
 8   Q:   Okay.  Have you previously spoken with Dr. Irani about
 9        not writing certain types of complications in a
10        patient's chart?
11   A:   I'm sorry.  Whether I should --
12   Q:   Well, especially, I think it was as to either a hip or
13        a knee replacement patient.  Do you recall instructing
14        Dr. Irani not to write that the patient had a leg
15        length discrepancy, that he should not write that in
16        the chart?
17   A:   I don't specifically recall that.  But I'm sure that it
18        wasn't as simple as that.  The, detecting a leg length
19        discrepancy after hip replacement is very common.
20        Because the alteration in the mechanics of the hip,
21        many patients feel that their leg is long.  Sometimes
22        that's an abduction contracture or how it feels.  It's
23        very challenging to measure it accurately by any way
24        that we can do, meaning a measuring tape, standing them
25        up because it's awkward for them to stand up straight
```

```
 1        after surgery.  It's very hard to do it; okay?  And he
 2        and I may have discussed it.  And I said it's really
 3        premature to indicate that they have a leg length
 4        discrepancy.  We will evaluate it as time goes on.  In
 5        most cases those resolve which means they weren't true
 6        leg length discrepancies.
 7   Q:   Do you recall telling Dr. Irani not to put such an
 8        observation in the patient chart?
 9   A:   I may have told him that because I didn't think it was
10        correct.
11   Q:   Okay.  Did you chastise Dr. -- I mean, did Dr. Irani
12        put that in the chart on one of your patients that he
13        noticed a leg length discrepancy?
14   A:   I don't recall.
15   Q:   Okay.  Do you know when you had that discussion with
16        Dr. Irani --
17             MS. HELMS:  Object to the form of the question.
18   BY MR. ROTHSTEIN:
19   Q:   -- about not prematurely putting or commenting about
20        the leg length, or alleged leg length discrepancy?
21             MS. HELMS:  Object to the form of the question.
22   A:   We likely discussed leg length differences multiple
23        times in my clinic and probably at the hospital.  But
24        the exact date or timing during our rotation I have no
25        immediate recollection.
```

```
 1        first night.  And they had asked for additional
 2        information.  Does that refresh your memory at all
 3        about what the course of events was?
 4   A:   I'm not on the e-mail trail to even know who was in the
 5        grievance committee hearing.
 6   Q:   Okay.
 7   A:   And maybe this was asked in response to that.
 8   Q:   So you have a quote in there from Sir William Osler.
 9        Who is Sir William Osler?
10   A:   He's a famous physician from many years ago.
11   Q:   And then it said that you believe that his quote
12        captured the essence of Dr. Irani's problem; right?
13   A:   That's what I wrote.
14   Q:   That Dr. Irani is not, does not care for the patients
15        and doesn't know the secret to caring for the patients;
16        right?
17   A:   You say that with a little bit of a smirk.  I think
18        it's critical that you care for the patient.  And that
19        didn't always come through.
20   Q:   Okay.  And then you said in the interaction with
21        patients he was often very friendly but as the care
22        became onerous or difficult, Dr. Irani fell far short
23        of what was expected of him as a physician.  And then
24        you list some examples.  The first thing is the heavy
25        narcotic user was discharged with enough pain
```

| | |
|---|---|
| 1 | medication to last one to two days.  That was patient |
| 2 | number two we talked about in this, that you had listed |
| 3 | on the evaluation of Dr. Irani; right? |
| 4 | A: That is correct. |
| 5 | Q: And I think you actually testified earlier that it was |
| 6 | about four days' worth of medicine, not one to two? |
| 7 | A: Probably four days. |
| 8 | Q: All right. |
| 9 | A: That's correct.  But as I said I didn't have that note |
| 10 | pulled up. |
| 11 | Q: Okay.  The next patient you identified says the |
| 12 | relatively narcotic-naive patient was encouraged to |
| 13 | take five Percocet at once.  That was the second -- |
| 14 | A: That was the -- |
| 15 | Q: -- first one we talked about; right? |
| 16 | A: -- first one. |
| 17 | Q: And then it says the concern about compartment syndrome |
| 18 | did not lead him to ask the nurse to get him from the |
| 19 | call room to recheck the patient or sleep fitfully.  Is |
| 20 | that Dr. Grabowski's patient? |
| 21 | A: I don't recall whose patient it was.  There was a |
| 22 | patient who had been admitted who was at risk for |
| 23 | developing a compartment syndrome.  And that's |
| 24 | something that requires both monitoring from nurses and |
| 25 | physicians.  And the patient hadn't been checked on |

1    during the night as arranged.

2  Q:  Okay.  That wasn't the spine patient we talked about a

3    minute ago with Dr. Grabowski; right?

4  A:  It was not.

5  Q:  That wasn't your patient; right?

6  A:  Also not my patient.

7  Q:  How did you find out about the problem with this

8    compartment syndrome?

9  A:  As I discussed, we have a number of faculty meetings

10   where we discuss resident issues and how we can improve

11   things and how we can help things.  And this is likely

12   discussed by us as a group.

13  Q:  And the Percocet patient, you testified earlier you

14   weren't sure that was, you weren't positive that that

15   was your patient; right?

16  A:  That's correct.

17  Q:  But you believe that the heavy narcotic user was your

18   patient?

19  A:  Yes.

20  Q:  And then the next one says the concern for the patient

21   did not lead him to pre-medicate the trauma patient

22   before he manipulated the alarm.  Is that a different

23   --

24  A:  That was a different patient entirely that had also

25   been discussed or reviewed.

1      they assisting an attending physician in doing that?

2  A:  In general it's, obviously they're not the primary

3      person providing the care for any of those patients

4      because they're residents in training.  They're doing

5      that on the orthopedists' behalf and on the emergency

6      department's behalf.

7  Q:  Okay.  Do you know --

8  A:  So both are supervising.

9  Q:  Do you know if that -- first of all, do you know

10     anything about the injury to that particular patient,

11     the trauma patient with the arm?

12  A:  It was a fracture that involved a reduction is all that

13     I recall.

14  Q:  Do you know if that patient's arm was eventually

15     amputated?

16  A:  I don't know about that.

17  Q:  Okay.  Do you know if that patient, you don't know

18     anything about that particular patient?

19  A:  I have read a distant review of that case.  But it was

20     not my patient nor my care nor my chart to explore.

21  Q:  Okay.  And then so you, so of the four, I'm sorry, five

22     patients that you mentioned in this summative

23     statement, you're only certain that one of those was

24     your patient which was the heavy narcotic user?

25  A:  That one I'm certain of was mine.