IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Afraaz R. Irani, M.D.,<br><br>            Plaintiff,<br><br>      v.<br><br>Palmetto Health, University of South Carolina School of Medicine, David E. Koon, M.D., in his individual capacity, and John J. Walsh, M.D., in his individual capacity,<br><br>            Defendants. | C/A No.  3:14-cv-3577-CMC<br><br><br>Opinion and Order<br>on Motions for Summary Judgment,<br>Motion to Compel, and Motion to Strike<br><br>ECF Nos. 136, 137, 139, 146, 175 |

Through this action, Plaintiff Afraaz R. Irani, M.D., ("Plaintiff" or "Dr. Irani") seeks relief relating to his treatment during and termination from an orthopaedic surgery medical residency program ("Residency Program" or "Program") and subsequent events related to that termination. Defendant Palmetto Health ("Palmetto Health") was the official sponsor of the Residency Program and operated the Program in affiliation with Defendant University of South Carolina School of Medicine ("USC-SOM") (collectively "Entity Defendants").[1]

Defendant David E. Koon, Jr., M.D. ("Dr. Koon"), a member of the USC-SOM faculty, was the Program Director for the Residency Program at all times relevant to this action.  Defendant John J. Walsh, IV, M.D. ("Dr. Walsh") was the Chair of the Orthopaedic Surgery Department at

---

[1]  The Amended Complaint characterizes the Residency Program as "jointly operated" by USC-SOM and Palmetto Health, alleges that Palmetto Health and USC-SOM are both employers covered by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e ("Title VII"), and asserts claims against the Entity Defendants based on legal conclusions that both entities were Dr. Irani's employers under Title VII and subject to contractual obligations to him. *E.g.*, Amended Complaint ("Am. Compl.") ¶¶ 4, 11, 12, 36, 37 (ECF No. 49).  USC-SOM denies that it was Dr. Irani's employer or owes him any duties imposed by contract.

USC-SOM during the same period. Both Drs. Koon and Walsh are sued in their individual capacities (collectively "Individual Defendants").

The matter is before the court on Defendants' motions for summary judgment, ECF Nos. 136, 137, 139, and two related evidentiary motions.[2] For the reasons set forth below, Defendants' motions for summary judgment are granted as to all causes of action, though not necessarily on all grounds argued. The two evidentiary motions are rendered moot by the summary judgment ruling.

## STANDARD

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987). The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Rule 56(c)(1) provides as follows:

(1) A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

---

[2] Dr. Irani has filed a motion to compel the Department of Veterans Affairs ("VA") to authorize John L. Eady, M.D. ("Dr. Eady"), to sign a declaration. ECF No. 146. Palmetto Health has moved to strike a transcript of Dr. Eady's testimony before the California Medical Board. ECF No. 175. For reasons explained below, the court concludes Defendants are entitled to summary judgment on all claims, whether or not Dr. Eady's potential testimony is considered.

(A)  citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers or other materials; or

(b)  showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

A party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995).

## FACTS

The following facts are presented in the light most favorable to Dr. Irani, the party opposing summary judgment.

**Dr. Irani Background.**  Dr. Irani, who was born and raised in California, is of Indian (or Indian and Iranian) descent and a member of the Zoroastrian faith.  Irani decl. ¶ 2 (ECF No. 148-2); Charge of Discrimination, ECF No. 136-5 at 36.  He received his undergraduate and medical degrees from Stanford University.  Irani decl. ¶ 3.

**Selection for Residency Program.**  In the fall of 2009, Dr. Irani interviewed for the Orthopaedic Surgery Residency Program sponsored by Palmetto Health in affiliation with USC-SOM.  Koon first aff. ¶ 7 (ECF No. 136-3); Walsh aff. ¶ 8 (ECF No. 136-4).  Drs. Koon and Walsh participated in Dr. Irani's interview, both rating Dr. Irani as one of the year's top ten candidates.  *Id.*; Interview Score Sheets. ECF No. 136-9 at 3, 4 (reflecting ratings of nine and ten on a ten-point scale).  Two other physicians participated in the process:  Dr. Guy placed Dr. Irani in the top ten

or top third (indicating he "could go either way"); and Dr. Hoover placed Dr. Irani in the top third. ECF No. 136-9 at 1, 2.  Based on these scores and his own preferences, Dr. Irani matched and accepted an offer for the Residency Program.  Walsh aff. ¶ 8; Koon first aff. ¶ 7.

**PGY-1 Year.**  Dr. Irani began his first ("PGY-1") year in the five-year Residency Program in July 2010.  Irani decl. ¶ 5; PGY-1 Resident Agreement of Appointment ("Resident Agreement") (ECF No. 136-5 at 4-10).  The only other resident in the PGY-1year was Dr. Goodno, a Caucasian male.  Irani decl. ¶¶ 5, 16, 75; Goodno dep. at 1, 25 (ECF No. 150-2).

Dr. Irani received mixed ratings his first year.  ECF No. 152-1 at 1-58 (individual evaluations); ECF No. 136-3 at 31-47 (summary report of evaluations).  While most raters gave him "satisfactory" or better ratings, a few gave him marginal or unsatisfactory ratings in certain areas.  Evaluation Summary, ECF No. 136-3 at 31.  Comments were, likewise, mixed, with most being positive but some not.  *Id.* at 32.  Negative comments from at least five physicians (Drs. Jones, Bynoe, Mastriani, Ross, and Koon) included concerns about legibility of handwriting, inadequate sense of urgency or decorum, sarcasm and inappropriate use of humor, failing to demonstrate he was "completely invested in caring for patients," a "lackadaisical" attitude toward the service, a need for improved motivation and people skills, and other similar concerns.  *Id.* at 32, 35, 36, 40, 43.

At least two raters (Drs. Jones and Bynoe) who gave negative comments early in the PGY-1 year noted improvement in later rotations, though one (Dr. Jones) stated Dr. Irani "still needs to take responsibility for total patient care[.]  . . . I think his improvements are promising but he still has a lot of room for further improvement."  *Id.* at 34, 36.  Dr. Koon noted he had "spoken with Dr. Irani at length about his performance thus far in his internship.  He needs significant improvement in several areas and he seems to understand these issues."  *Id.* at 35.  Dr. Irani himself

later described his PGY-1 year as a rocky start.  *See* Grievance Committee Hearing Transcript ("Hearing trans.") at 82 (ECF No. 150-1 at 83).

**Dr. Koon Comment about Residents in Other Programs.**  In December 2010, Dr. Koon commented to Dr. Irani that the Orthopaedic Surgery Department generally had the best residents and had high expectations for those residents.  Irani decl. ¶ 9.  Comparing residents in different departments, Dr. Koon added one department was "just happy to have someone who can speak English."  *Id.*; *but see* Hearing trans. at 48 (ECF No. 150-1) (Dr. Irani statement comment was made during a meeting in August 2011).

**PGY-2 Year.**  Dr. Irani was promoted to PGY-2 status.  Irani decl. ¶ 10.  He signed a new Resident Agreement for the year beginning July 1, 2011.  ECF No 136-5 at 11-17.

**July 2010 – Journal Club Article: "How to Swim with Sharks."**  At the beginning of his PGY-2 year, Dr. Irani was assigned to present "How to Swim with Sharks: A Primer" as a journal club article.  Irani decl. ¶ 11; *see also* ECF No. 152-2 (reprint of article from Perspectives in Biology and Medicine Summer 1987; Vol. 30 No. 4, pp. 486-89).  Dr. Koon commented the article was not randomly assigned.  Irani decl. ¶ 11.  Dr. Irani found the assignment and comment humiliating.  *Id.*  The article has been presented by other residents in other years in the Residency Program.  Goodno dep. at 52 (ECF No. 168-3 at 3); Koon dep. at 67 (ECF No. 149-3 at 19).

Later the same month, Dr. Irani sent Dr. Koon an email suggesting an article from the Archives of Internal Medicine as "a kinda fun/interesting article for journal club." ECF No. 136-8 at 37 (July 13, 2010 email exchange).  Dr. Koon emailed a response questioning why Dr. Irani was reading the Archives of Internal Medicine and stating "let me know if you are not satisfied with the articles selected for our journal clubs."  *Id.*

**August 10-12, 2011 – Nurse's Complaint about Treatment of "Mr. B."** On August 10, 2011, a nurse's report complaining about care provided to a "Mr. B" by Dr. Irani and an attending physician was forwarded to Drs. Walsh and Koon. ECF No. 136-3 at 49-51.[3] The reporting nurse initially made the report through her supervisors on July 11, 2011, the date Mr. B was treated for a severe injury to his arm. *Id.* at 50. The nurse's primary concern was Dr. Irani and the attending physician failed to treat the patient with compassion. *Id.* She reported she had experienced "many similar encounters with both of these physicians" and also suggested Dr. Irani had asked her to misrepresent the amount of saline used to irrigate the wound. *Id.*

Dr. Koon forwarded the nurse's report to Dr. Irani that same day, asking for Dr. Irani's version of events. *Id.* at 49. Dr. Irani's August 10, 2011 response recounted a more compassionate version, explaining he inspected the wound and evaluated the patient's "pain level before approving a possible overdose of narcotics to an 80+ year old male." *Id.* at 48-49. He stated he properly introduced himself to the patient, though the nurse may not have heard him do so, and remained with the patient rather than going to see the family based on the attending's instructions to remain at bedside. Dr. Irani noted the patient expressed appreciation for his care and they had "great interactions" when they saw each other on subsequent days. *Id.*; *see also* Irani decl. ¶ 14.

Dr. Koon invited the nurse's response to Dr. Irani's version of events. ECF No. 136-3 at 48. The nurse responded on August 12, 2011, stating she wished Dr. Irani had acted as he claimed. *Id.* (insisting she had to twice ask Dr. Irani to allow her to administer pain medication and he smirked at her request).

---

[3] The attending physician was an employee of Palmetto Health, not a member of the USC-SOM Orthopaedics Department or faculty of the Residency Program. Koon second aff. ¶¶ 51, 52 (ECF No. 169-1 at 2-3). He apparently left Palmetto Health shortly after this incident. *Id.*

**August 15, 2011 – Level II Remediation.**  On August 15, 2011, Dr. Irani was called into a meeting with Dr. Koon and told he was being placed on (or recommended for placement on) Level II remediation.  Irani decl. ¶¶ 12-13.  He was provided a memorandum signed by Drs. Walsh and Koon with a list of seven deficiencies.  ECF No. 136-3 at 52.  The deficiencies included:  (1) inappropriate care of Mr. B (lack of compassion, failure to give adequate pain medication, and asking the nurse to lie about initial irrigation and debridement); (2) poor communication with patients, families, peers and attendings; (3) time management and tardiness to conferences, clinics and the operating room; (4) ineffective prioritization; (5) two instances of substandard care (using Vicryl to close a wound and failing to evaluate a Veteran's Administration ("VA") patient with post-operative cellulitis who came to the VA emergency room); (6) substandard evaluations during his PGY-1 year, and (7) lack of attention to detail in initial PGY-2 rotations.  *Id.*  The memorandum also listed remediation measures in somewhat more specific terms and referred to prior counseling sessions between Dr. Irani, his chief resident, attending physicians, and Program Director (Dr. Koon).  *Id.* (recommending Level II remediation from August 15, 2011, to December 1, 2011).

Dr. Irani sought clarification of some of the listed deficiencies and remediation measures.  Irani decl. ¶ 13.  Dr. Koon responded the question showed Dr. Irani lacked insight.  *Id.*  According to Dr. Irani, Dr. Koon also stated he had fired residents before, including a resident in his PGY-5 year.  Irani decl. ¶ 12.

Approval of the Level II remediation was sought and obtained from the Executive Committee of the Graduate Medical Education Committee ("GMEC") [4] on August 15, 2011, after

---

[4]  The GMEC is the only entity with authority to approve Level II or III remediation or termination of a resident.  *E.g.*, Walsh aff. ¶ 7 (ECF No. 136-4); *see also* Irani memorandum at 44-45 (ECF

Dr. Koon's meeting with Dr. Irani. *See* ECF No. 136-3 at 53. In seeking approval, Dr. Stephens[5]

provided members of the Exececutive Committee information on the "action that precipitated" the

remediation and stated she was working with Dr. Koon to express remedial measures in terms of

specific outcome. *Id.*; *see also* ECF No. 136-9 at 22 (email to Dr. Koon seeking greater

specificity).

      **August 22, 2011 – Dr. Irani's Response.** On August 22, 2011, Dr. Irani sent Dr. Stephens

a detailed written response to each of the seven deficiencies noted. ECF No. 136-3 at 56-57

(indicating a number of the listed items were the result of miscommunication, committing to work

towards better communication, and concluding he took the matter seriously due to the potential

impact on fellowship and job opportunities). Dr. Stephens responded a few days later, thanking

Dr. Irani for his commitment to improvement and forwarding the response to Dr. Koon. *Id.* at 56.

On August 27 2011, Dr. Koon forwarded this email string to five faculty members and the practice

manager advising them Dr. Irani was on Level II remediation until December 1, 2011, and

---

No. 148) (explaining role of GMEC including that "[o]fficial decisions affecting residents are
made by the GMEC, upon recommendation of the program director for the relevant program" but
characterizing GMEC's role as "generally a 'rubber stamp' of program director's
recommendation"). On a temporary basis, these actions may be approved by the GMEC's
Executive Committee. Walsh aff. ¶ 7; *see also* ECF No. 148 at 45. The GMEC is made up of
representatives of the Residency Program including employees of Palmetto Health and USC-SOM.
Walsh aff. ¶ 6. Both Drs. Koon and Walsh served on the GMEC, but not its Executive Committee,
at times relevant to this action. *Id.*

[5]  Katherine Stephens, Ph.D. ("Dr. Stephens"), is Palmetto Health's Vice President of Medical
Education and served at all times relevant to this action as Designated Institutional Officer ("DIO")
for the Residency Program. *See, e.g.*, Koon first aff. ¶ 5 (ECF No. 136-3); *id.* Ex. A (ECF No.
136-3 at 133, letter from Dr. Irani's counsel to "Katherine G. Stephens, Ph.D., MBA, FACHE[;]
Vice President Medical Education and Research[;] ACGME Designated Institutional Official[;]
Palmetto Health[.]"). "ACGME" refers to the Accreditation Counsel for Graduate Medical
Education.

requesting their attention to Dr. Irani's clinical performance in future evaluations. ECF No. 136-9 at 31.

**September 2011 Grievance of Level II Remediation.** Dr. Irani unsuccessfully pursued grievance of the Level II remediation through the first three steps (review by Drs. Koon, Walsh, and Stephens). The remediation was upheld at each stage. ECF No. 136-3 at 60, 63; ECF No. 136-8 at 46, 47; ECF No. 136-9 at 34. Dr. Irani construed a comment from Dr. Walsh as discouraging pursuit of the grievance, although he did pursue it to the next step (review by Dr. Stephens). Irani decl. ¶ 21 (referring to Dr. Walsh's statement both he and Dr. Irani were busy orthopaedic surgeons and when he had "to sit here and answer questions about all this, it just gets in the way when [he] could be doing other things"); *but see* ECF No. 136-8 at 46 (September 7 email to Dr. Stephens indicating Dr. Koon "encouraged me to talk to you more and/or attempt to appeal the decision if I had concerns").

**Level II Remediation Meetings.** Periodic updates were scheduled and held throughout Dr. Irani's Level II remediation. *See*, *e.g.*, ECF No. 136-3 at 59 (Dr. Koon's September 19, 2011 email referring to meetings held September 7 and 10 and a six-month evaluation conducted on September 19, 2011, scheduling progress report meetings for October 3, November 7, and setting post-remediation review for December 5 faculty meeting). A September 22, 2011 report by Dr. Walsh summarized a September 20 meeting between Drs. Walsh, Grabowaski, and Irani, noting Dr. Irani's progress in his residency was satisfactory with a few exceptions. ECF No. 136-3 at 61-62 (addressing all deficiencies with particular attention to Mr. B. incident). This memorandum reports Dr. Irani's response as "clear and forthright," and acknowledging a "need to improve his performance." *Id.* at 62. Dr. Walsh still felt there was "a small gap in his level of insight" reflected in Dr. Irani's view that some listed deficiencies were simply others' misperceptions, but concluded

9

the noted shortcomings were "remediable in a straight forward fashion" and stated his expectation Dr. Irani would "put these issues behind him." *Id.*

Dr. Irani received and acknowledged receipt of a copy of the September 22, 2011 memorandum during an October 3, 2011 meeting with Drs. Walsh and Koon. *Id.* at 62, 63. Dr. Koon's brief summary of that meeting was similarly positive, indicating Dr. Irani was provided feedback on his remediation and "appear[red] to have gained some insight into his deficiencies." *Id.* at 63. It also noted Dr. Guy had provided constructive feedback and Dr. Irani was "working hard to improve in these areas." *Id.* (setting the next meeting for November 7, 2011).

**November 3, 2011 – Discharge Summary Emails.** In early November, Dr. Koon instructed Dr. Irani to dictate a discharge summary. There was a delay in completion of this task, which Dr. Irani attributes to a miscommunication regarding the patient for whom the discharge summary was to be prepared. Irani decl. ¶ 22-24. On November 3, 2011, Dr. Irani sent Dr. Koon an email explaining he had "actually never participated in the patient's care" and was "not sure how [he was] responsible for the discharge order" but had "gone ahead and dictated the summary[.]" ECF No. 136-3 at 65 (adding "the only thing I can think of is that Dr. Wood asked me to put in the discharge order").

Dr. Koon responded indicating substantial displeasure with Dr. Irani's email. ECF No. 136-3 at 65. He noted he had asked Dr. Irani to complete the task three times and stated he "would have NEVER in a million years sent a response like this to my program director, especially in the midst of academic remediation." *Id.* Dr. Koon copied the two senior residents, Drs. Hoover and Wood, stating he was "open to any suggestions." *Id.*

**November 7, 2011 – Email to Dr. Stephens.** On November 7, Dr. Irani emailed Dr. Stephens noting he had dropped his grievance and indicating he did so based on (1) positive

10

feedback during the October 3, 2011 meeting and (2) a statement by either Dr. Koon or Dr. Walsh leading him to believe continuing the grievance process would strain his relationship with them. ECF No. 136-8 at 50. Dr. Irani referred to an October 26, 2011 report from Dr. Koon that he had "heard increased complaints" recently. *Id.* Dr. Koon referred Dr. Irani to Drs. Wood and Mazoue for specifics, but neither physician indicated any concerns when Dr. Irani checked with them. *Id.*

**November 21, 2011 – Meeting with Drs. Koon and Wood.** On November 21, 2011, Dr. Irani met with Dr. Koon to review his progress on remediation. Irani decl. ¶ 25. Dr. Koon reported he would recommend Dr. Irani be moved to Level I when his Level II remediation ended. *Id.* Dr. Irani was encouraged that this meant he had corrected the deficiencies, but concerned Dr. Koon cited earlier incidents that "had long been resolved." *Id.*[6]

**November 25-27, 2011 – Thanksgiving Weekend Caller.** Over the Thanksgiving weekend, a recent surgical patient of Dr. Koon's called in three times regarding wound care. Dr. Irani spoke with the patient once and Dr. Goodno twice. Irani decl. ¶¶ 35, 36. The patient reported to Dr. Irani that a scab had come off her surgical wound and she had some drainage. *Id.* ¶ 35. Dr. Irani advised the patient he could not tell her anything without seeing the wound and encouraged her to come in. *Id.*[7] Dr. Irani understands Dr. Goodno's conversations with the patient were to

---

[6] In a memorandum of record prepared eight days later, Dr. Koon indicates Dr. Wood also participated in this meeting. ECF No. 136-3 at 64 (discussed below).

[7] Dr. Irani has made several statements about his conversation with the patient. While the statements vary in some respects, all indicate he at least encouraged the patient to come in. *See* ECF No. 136-8 at 54 (typed explanation provided to ACGME in May 2012 with notation it was prepared within three days of the call, providing detailed account of conversation including that he "told her that I am concerned and would like her to come into the ED."); ECF No. 136-8 at 62 (summary statement to ACGME that the "patient called me on Saturday, I told her to come in").

the same effect. *Id.* ¶ 36. The patient did not come in until the following Monday, at which time

she had an infection. *See, e.g.*, ECF No. 136-3 at 64 (Dr. Koon November 29, 2011 Memorandum

of Record); Koon first aff. ¶ 21.[8]

**November 28, 2011 – Alleged Failure to Follow Dr. Grabowski's Instructions to**

**Obtain Same-Day MRI.** On November 28, 2011, Dr. Grabowski directed Dr. Irani to obtain a

same-day MRI on an outpatient. *E.g.*, Irani decl. ¶ 32. Someone reported to Dr. Koon that Dr.

Irani had not followed instructions, instead scheduling the MRI for a later date, with the error not

being corrected until another physician intervened. *See* ECF No. 136-3 or 64 (Dr. Koon

memorandum). Dr. Irani maintains that the medical assistant was initially able only to schedule

the MRI for "later that week," an appointment Dr. Irani held while he conferred with his chief

resident to determine how to obtain an earlier MRI and then followed those instructions, ultimately

obtaining a same-day MRI for the patient. Irani decl. ¶ 32.[9]

**November 29, 2011 – Dr. Koon Memorandum of Record.** On November 29, 2011, Dr.

Koon prepared a memorandum of record addressing his November 21, 2011 meeting with Dr.

---

[8] Dr. Koon spoke with both Drs. Irani and Goodno about this incident. Koon second aff. ¶ 59.
He did not take further action against Dr. Goodno, such as pursuing remediation or preparing a
memorandum of record, because he "did not have the same concerns about Dr. Goodno's actions
or his response to my concerns" and Dr. Goodno was not on academic remediation at the time of
the incident. *Id.*

[9] Dr. Irani described this incident in his later submission to the ACGME somewhat differently:
> I was asked to get an MRI that day on a patient in the clinic. I told the nurse. She
> said we were not able to get it until the next day. I "accepted" this before going
> back and talking with the chief resident who told me to call over to radiology. Since
> I had never done this before, I was not familiar with the process. I called radiology
> and got the scan ordered that evening. Patient care was never compromised or in
> danger of being compromised.

ECF No. 136-8 at 62.

Irani, and the two intervening patient care incidents (Thanksgiving weekend caller and MRI instructions). ECF No. 136-3 at 64. Dr. Koon characterized the November 21 meeting less favorably than Dr. Irani, stating Dr. Wood raised several instances in which Dr. Irani was still performing below his level of training and Dr. Koon raised the inappropriateness of Dr. Irani's November 3 email about the discharge summary. *Id.* (also referring to verbal counseling about inappropriate pain management with one of Dr. Walsh's post-operative patients). Dr. Koon also described Dr. Irani's reaction to the anticipated recommendation he be moved to Level I as "a long sigh and a rolling of the eyes" followed by a comment this would only continue his "overhead," which Dr. Irani explained referred to time spent keeping a log of his activities while on probation. *Id.*; *see also* Koon first aff. ¶ 20; Irani decl. ¶ 25 (stating he asked for clarification when advised Dr. Koon would recommend Level I remediation but not denying Dr. Koon's characterization of his reaction).

Dr. Koon concluded: "Dr. Irani continues to display behaviors which are inappropriate and unprofessional. His progress will be re-evaluated at our next faculty meeting on Monday 05 DEC 11. We have asked for his presence at this meeting." ECF No. 136-3 at 64. Dr. Koon sent this memorandum to Drs. Walsh, Wood, Hoover and Stephens by email on November 29, 2011. ECF No. 136-9 at 45. Dr. Stephens responded the next day that Dr. Koon should be sure to "approach these deficiencies in terms of specific examples of what is not acceptable and expectations." ECF No. 136-9 at 47.

**December 5, 2011 – Faculty Meeting.** Dr. Irani attended the December 5, 2011 faculty meeting during which Dr. Koon recited a list of concerns (including items in the August 15 and November 29, 2011 memoranda) and stated Dr. Irani continued to lack insight into his problems. Irani decl. ¶ 26. Dr. Irani felt he was not given a chance to respond to these and other accusations

13

of more recent events, which he claims were patently false (*e.g.*, Dr. Koon's statements relating to the Thanksgiving weekend caller and inappropriate pain medication instructions to another post-surgical patient). *Id.* ¶¶ 26, 31, 35-37. Dr. Koon asked "very pointed questions in an intimidating manner" including whether Dr. Irani "wanted to do orthopaedics." *Id.* ¶¶ 27, 28.

The allegation Dr. Irani failed to follow Dr. Grabowski's instructions to obtain a same-day MRI was raised for the first time in this meeting. *Id.* ¶ 32. When Dr. Irani tried to explain the allegation was "entirely false," Dr. Koon responded this was exactly what he was talking about regarding Dr. Irani's lack of insight and refusal to accept fault. *Id.* ¶ 33. Dr, Koon also raised new allegations of lack of professionalism and complaints of poor patient management from trauma case managers, which surprised Dr. Irani as he had received positive feedback from these individuals. *Id.* ¶ 39.

The faculty voted unanimously to recommend to the GMEC that Dr. Irani be placed on Level III remediation, with suspension of clinical duties. Koon first aff. ¶ 22; Walsh aff. ¶ 18. Dr. Irani apparently was not informed of this recommendation at that time. Dr. Koon did, however, email Dr. Irani on December 7, 2011, stating Dr. Irani was required to attend a psychological evaluation to better structure the remediation. ECF No. 136-3 at 77 (indicating evaluation was scheduled for December 12, 2011 at 4:30 p.m.).

**December 7-9, 2011 – Trauma Patient Incident ("TF375").** On December 7, 2011, Dr. Irani was involved in the care of a trauma patient ("TF375"). Two nurses complained to their supervisors about the care provided by Dr. Irani and a first year orthopaedic resident, Dr. Nathe.

ECF No. 136-3 at 71-74.[10]  According to one nurse, the patient reported she was uncomfortable with the residents, felt they were unorganized, and she was scared and felt thrown around.  *Id.* at 74.  Both nurses' detailed statements were consistent with the patient's concerns, focusing on an absence of compassionate care.  ECF No. 136-3 at 71-74.  Other concerns included inappropriate comments in front of the patient, treating a nurse as "invisible," and the chaotic nature of the scene. *Id.*  One nurse concluded she had never, in her five years at Palmetto Health, "felt so uneasy, so upset, or like [she] had to help save the patient from what was going on."  *Id.* at 73 (noting she involved two other nurses to help address the situation including calling the attending physician). Dr. Koon was apparently first informed of the incident orally on December 8, 2011.  *Id.* at 71.  The nurses' emailed reports were forwarded to him the following day.  *Id.*

**December 9, 2011 – Suspension.**  On December 9, 2011, Dr. Walsh informed Dr. Irani by telephone he was being suspended pending an investigation into the TF375 incident.  Irani decl. ¶ 45; *see also* Walsh aff. ¶ 19 (averring GMEC Executive Committee approved immediate suspension on December 9, 2011, pending review by full GMEC on December 13, 2011).   Dr. Walsh assured Dr. Irani all sides of the story would be gathered, but Dr. Irani contends Dr. Walsh did not seek Dr. Irani's version of events or interview witnesses whose names Dr. Irani provided. *Id.* ¶¶ 45-48; *but see* ECF No. 136-3 at 68-70 (Dr. Nathe's December 11, 2011 written statement).[11]

---

[10]  The nurses who made the initial reports do not include the nurse who reported the Mr. B incident.  The nurse who reported the Mr. B incident was, however, one of two senior or supervisory nurses brought in to help address concerns during the TF375 incident.

[11]  Dr. Irani provided a written explanation of the TF375 incident to Dr. Stephens on January 5, 2012.  *See* ECF No. 136-3 at 86, 87 (January 5, 2012 email from Dr. Irani to Dr. Stephens referring to an attached explanation prepared the day after the incident); ECF No. 136-3 at 75, 76 (Dr. Irani's written explanation included in materials faculty presented to Grievance Committee, stating the

**December 12, 2011 – Cancellation of Appointment.** Dr. Irani cancelled his appointment with the psychologist approximately one hour before the scheduled time because he "wasn't feeling well enough . . . to do the testing." ECF No. 136-3 at 78 (December 12, 2011 email referring to events of preceding Friday, the day Dr. Irani was informed of his suspension).

**December 12, 2011 – Memorandum Recommending Level III Remediation.** Drs. Walsh and Koon signed a memorandum of record on December 12, 2011, reciting the history of Dr. Irani's remediation, summarizing the December 5, 2011 faculty meeting and incidents addressed in that meeting, and reporting the post-meeting TF375 incident. ECF No. 136-3 at 66, 67 (characterizing Dr. Irani's actions during the faculty meeting as refusing to give direct answers to several questions and failing to take responsibility for several patient-care incidents). The memorandum recommends to the GMEC that Dr. Irani be placed on Level III remediation with "suspension from patient care" and a leave of absence from December 9, 2011, through at least January 30, 2012. *Id.* at 67 (also recommending Dr. Irani be required to complete psychological

---

concerns with this patient's care arose before his arrival and he did everything "by the book."); *see also* ECF No. 136-8 at 59, 60 (nearly identical written statement provided to ACGME in May 2012); Grant dep. at 167-69 (Dr. Irani's expert opining Dr. Irani acted appropriately as to TF375 because the critical issue was reducing her fractures as quickly as possible).

Dr. Nathe also provided an explanation of events together with an email in which she apologize[d] for the situation[,] stated she had "certainly learned the reiterated value of communication[,]" and promised to "always make an effort to improve [her] relationship with nursing staff and . . . patients[.]" ECF No. 136-9 at 55. Dr. Koon subsequently counseled Dr. Nathe regarding "PH's core values, which could be improved in future patient interactions, . . . better communications with patients and ancillary staff, earlier attending involvement, and improved patient care re: pain management, earlier family consultation, and consent issues." ECF No. 140-8 at 2 (Dr. Koon's email to Dr. Nathe summarizing discussion and concluding he "appreciates [her] willingness to accept constructive advice and seek improvement in these areas."); *see also* Koon second aff. ¶ 63 (addressing counseling of Dr. Nathe and absence of any "history of similar concerns" warranting further action).

testing and any recommended counseling).   The memorandum states Dr. Irani will be given a copy and reminds him of his grievance rights.  *Id.*

On December 13, 2011, Dr. Koon advised Dr. Irani by email the GMEC had approved the Level III remediation and suspension through January 30, 2012.  ECF No. 136-3 at 79 (also advising Dr. Irani he must reschedule the cancelled appointment and of his grievance rights); *see also* Irani decl. ¶ 46 (stating he was given the December 12, 2011 memorandum when he was told of the suspension); ECF No. 136-3 at 80 (December 15, 2011 email from Dr. Koon advising Dr. Irani he will be terminated if he does not complete the psychological evaluation by January 15, 2012, and offering three alternative providers).

**December 16, 2011 – Dr. Irani Email Exchange with Dr. Stephens.**  On December 16, 2011, Dr. Irani emailed Dr. Stephens indicating he wanted to initiate the grievance process and stating he discontinued his prior grievance to avoid jeopardizing his relationship with his attendings.  ECF No. 136-3 at 81, 82.  He attributed the "derailed" relationship to Dr. Koon's reaction to his November 3, 2011 email regarding the discharge summary.  *Id.* at 81.  Dr. Irani asked for documents relating to the suspension, including TF375, so he can "better understand the situation."  *Id.* at 82.  Dr. Stephens responded reminding Dr. Irani of the proper grievance process. *Id.* at 81.  She did not provide documents.  *Id.*

**December 19, 2011 – Meeting with Dr. Walsh.**  On December 19, 2011, Dr. Irani met with Dr. Walsh.  Irani decl. ¶¶ 50-52.  Dr. Irani provided his recollection of the treatment of TF375 and asked Dr. Walsh to speak with witnesses including the family.  *Id.* ¶ 50.  Dr. Walsh responded Dr. Irani's version did not make sense and Drs. Irani and Nathe should have called for additional help.  *Id.* ¶ 51.  Dr. Irani stated they attempted to get help but none was offered.  *Id.*  Rather than accepting Dr. Irani's version, Dr. Walsh insisted Dr. Irani lacked insight, criticized the quality of

17

his work and presentations, and suggested they had reached a point where there was a "lack of trust." *Id.*; *see also* ECF No. 136-3 at 83 (Dr. Walsh's contemporaneous memorandum of record summarizing the meeting from his perspective, with Dr. Irani's January 18, 2012 acknowledgement of receipt).

**January 3, 2012 – Meeting with Dr. Stephens.**  Dr. Irani met with Dr. Stephens on January 3, 2012, as part of the grievance process. *E.g.*, Irani decl. ¶ 53; ECF No. 136-9 at 70 (Dr. Stephens' notes of the meeting).  Dr. Irani recalls complaining the faculty had not sought his side of the story before the suspension and relating a concern Dr. Koon was biased against him, treated him differently, and had called Dr. Irani "racially charged names like 'Achmed the Terrorist.'" Irani decl. ¶ 53.  He gave Dr. Stephens a list of witnesses relating to TF375 and "implored her to perform a careful review" of this incident.  *Id.*  He again requested documentation of the complaints.  *Id.*

According to Dr. Stephens' notes, Dr. Irani questioned Dr. Koon's "sudden change" from the November 21, 2011 meeting (when Dr. Koon indicated Dr. Irani would likely be moved to Level I remediation), pointed to four inaccuracies in the reasons given for his suspension (characterizing the reasons given as "inaccurate and false"), and offered an excuse for being late for rounds twice after November 21(a systemic failure in the Android phone).  ECF No. 136-9 at 70; *see also* ECF No. 136-3 at 86, 87 (Dr. Irani's January 4, 2012 email to Dr. Stephens reiterating his concerns, attaching his written summary of the TF375 incident, noting he has had only two complaints from ancillary staff and claiming both complaints involved the same individuals); *Id.* at 86 (Dr. Stephens' January 5, 2012 response reminding Dr. Irani he must complete psychological evaluation by January 15 and addressing concerns regarding rescheduling).

**January 5, 2012 – Dr. Stephens' Meeting with Dr. Koon.** On January 5, 2012, Dr. Stephens met with Dr. Koon as part of her investigation of Dr. Irani's grievance. *See* ECF No. 136-10 at 8 (Stephens' typed notes of the meeting). Dr. Koon's version of events, as set forth in Dr. Stephens' notes, indicates he provided details consistent with the December 12, 2011 memorandum of record. In addition, as to the TF375 incident, Dr. Koon reported interviews of the cast technician and Dr. Nathe, both of whose versions were "less caustic" than the nurses' versions. *Id.* He also reported interviewing Dr. Jones whose view was "the technical ortho[paedic] care was handled appropriately, but the communication had not been." *Id.* Dr. Koon also noted the faculty had recommended suspension before the TF375 incident occurred, which incident only reinforced the decision. *Id.*

**January 11-16, 2012 – Dr. Stephens' Denial of Grievance.** On January 11, 2012, Dr. Stephens emailed Dr. Irani advising him she was denying his grievance of his December 9, 2011 Level III remediation and suspension based on the information available to her and "further discussions with several others." ECF No. 136-3 at 88. She directed Dr. Irani to the Resident Manual for further steps in the grievance process. *Id.*

Dr. Irani emailed Dr. Stephens on January 13, 2012, again asking for documentation of the complaints relating to TF375 so he could "understand the complaints against me and . . . move forward." ECF No. 136-10 at 17. Dr. Stephens responded he had already "seen the issues specific to the trauma patient situation" and should be focusing on "meeting the terms of your remediation plan" rather than "gathering documents." *Id.*

**January 18, 2012 – Meeting with Dr. Walsh.** On January 18, 2012, Dr. Irani met with Dr. Walsh. Irani decl. ¶¶ 54-58. Dr. Irani advised Dr. Walsh his main concern was the effect the suspension would have on his graduation date and future opportunities and indicated his

19

willingness to drop his grievance if these concerns were resolved. *Id.* ¶ 54. Dr. Walsh responded he would discuss these concerns with Dr. Stephens. *Id. ¶* 58.

Dr. Irani also requested documentation regarding the TF375 incident from Dr. Walsh. *Id.* ¶ 55. Dr. Walsh responded the suspension would have occurred even without this incident and expressed disbelief about Dr. Irani's version of events. *Id.*

Dr. Irani expressed frustration at being told he lacked insight when no one would answer his questions or listen to his side. *Id.* ¶ 56. Dr. Walsh asked him to think about how he wanted to "'tell his side of the story'" and "explicitly said '[i]t didn't have to involve Dr. Koon.'" *Id.* ¶ 57 (Dr. Irani declaration quoting Dr. Walsh).

**January 20, 2012 – Psychological Evaluation.** The required psychological evaluation was completed on or before January 20, 2012, and considered timely. ECF No. 136-3 at 89-98 (heavily redacted report). The report does not appear to have had any significant influence on remediation. *E.g.*, ECF No. 136-10 at 19 (email referring to psychological report).

**January 26, 2012 – Missed Grievance Deadline.** Dr. Irani emailed Dr. Walsh on January 24 and 26, 2012, following up on their January 18 meeting, most critically inquiring whether the suspension might be recharacterized as a leave of absence. ECF No. 136-3 at 99; ECF No. 136-8 at 79, 80. Having not heard back from Dr. Walsh by January 26, 2012, the date Dr. Irani believed was the relevant deadline, Dr. Irani requested a Grievance Committee hearing. Irani decl. ¶¶ 58, 59. The request was denied as one day late. *Id.* ¶ 60 (noting Palmetto Health rejected Dr. Irani's argument the delay should be excused because he assumed Martin Luther King Day was not counted as a "business day," which term was not defined in the relevant policy).

**January 24-30, 2012 – Communications Regarding Remediation Plan.** Between January 24 and 28, Dr. Stephens, human resources staff, and Dr. Koon exchanged drafts of a new

or updated remediation plan. ECF Nos. 136-10 at 20-29. These efforts culminated in a January 31, 2012 memorandum of record and attached Level II remediation plan. *Id.* at 30-35, 39. On January 28, 2012, Dr. Koon emailed Drs. Irani, Voss, Wood, Hoover and Stephens setting a meeting date for January 31, 2012, to discuss the next step in the remediation process. ECF No. 136-3 at 100; ECF No. 136-10 at 36 (Dr. Irani response plan "[s]ounds good.").

Dr. Walsh also emailed Dr. Irani on January 29, 2012, responding to Dr. Irani's January 26, 2012 email inquiry regarding treating the suspension as a leave of absence. ECF No. 136-8 at 81. Dr. Walsh characterized his prior statement as explaining he lacked authority to change the wording of the suspension and "doubted it could happen at all." *Id.* (noting the deadline for further grievance had now passed). On January 30, 2012, believing it consistent with Dr. Walsh's instruction to think about how to tell his side, Dr. Irani emailed Dr. Walsh expressing a desire to have Dr. Guy handle the remediation process going forward and explaining the reasons for his request. ECF No. 136-8 at 83; Irani decl. ¶ 61.

**January 30-31, 2012 – Faculty Meeting and New Remediation Plan.** Dr. Irani's request to have Dr. Guy oversee his remediation was denied at a January 30, 2012 faculty meeting. Irani decl. ¶ 62 (describing Dr. Koon's reaction to the request as angry and confrontational). The faculty recommended Dr. Irani be placed on Level II remediation from February 6 through June 15, 2012, and proposed a detailed remediation plan, both subject to approval by the GMEC. ECF No. 136-3 at 101-05 (memorandum of record and attached detailed remediation plan). The proposed plan placed Dr. Irani on Dr. Voss's service and required bi-weekly meetings with Dr. Voss and monthly meetings with Dr. Koon. *Id.* Dr. Irani signed the memorandum of record on February 1, 2012, adding a notation that he attempted to appeal his suspension. *Id.* at 101, 105.

**February 1-23, 2012 – Return from Suspension.**  Dr. Irani returned from suspension on February 1, 2012.  ECF No. 136-10 at 47.  He was placed on Dr. Voss's service and received a positive report from Dr. Voss at his first bi-weekly meeting.  Irani decl. ¶ 64 (after two weeks, Dr. Voss reported Dr. Irani "was doing well" and should "just keep on doing what [he] was doing").  During the same period, Dr. Guy helped Dr. Irani explore alternative careers.  ECF No. 136-10 at 48-52 (emails between Drs. Irani and Guy and with potential employers).

**February 24-29, 2012 – Spine Patient "L.O." Incident.**  On February 24, 2012, Dr. Irani was assisting Dr. Grabowski in the care of post-surgical spine patient "L.O."  While details are disputed, it is undisputed Dr. Irani (1) received a call from a nurse reporting the patient was or might be experiencing difficulty walking, (2) did not immediately check on the patient after receiving this call, (3) discovered serious neurological deficits when he did examine the patient and (4) did not make a contemporaneous record of his findings.  Irani decl. ¶¶ 65-67 (explaining why he believes his actions were appropriate under the circumstances).  It is also undisputed Dr. Grabowski emailed Dr. Koon on February 27, 2012, complaining Dr. Irani's care of the patient was inappropriate both due to delay in examining the patient and in failing to document his findings.  ECF No. 136-3 at 113 (Dr. Grabowski report to Dr. Koon, indicating Dr. Irani was informed of concern at 11:30 a.m., had not seen the patient when he called Dr. Grabowski at 12:30 p.m., was further delayed because patient was in the bathroom, and ultimately reporting back at about 1:30 p.m.); ECF No. 136-10 at 53 (Dr. Koon's February 27 email forwarding Dr. Grabowski's report to Dr. Walsh, suggesting Dr. Walsh also ask Dr. Grabowski about Dr. Irani's "wrong site surgery" comment).

Drs. Grabowski and Voss met with Dr. Irani on February 28 or 29, 2012, to discuss the incident.  Irani decl. ¶¶ 65-67 (referring to meeting on February 29 and setting out a detailed

description of his actions with respect to L.O., but providing no detail as to the meeting); ECF No. 136-3 at 112 (March 5, 2012 memorandum referring to February 28 meeting); *Id.* at 114 (Dr. Voss's later, undated memorandum indicating meeting occurred on Tuesday two weeks earlier). In his post-meeting summary, Dr. Voss reported Dr. Irani's initial response to the nurse was somewhat flippant, he delayed for an hour and a half before seeing the patient, and he failed to demonstrate "any true insight into the level of concern [expected] in the care of a patient" at risk of paralysis. ECF No. 136-3 at 114. In his affidavit and other written explanations, Dr. Irani explained he asked the nurse to confirm there were signs of a neurological deficit before he went to see the patient (to rule out pain as the cause), was unable to immediately see the patient once he did go (because she was in the bathroom), and did not immediately document his findings (because comments from Dr. Grabowski combined with earlier instructions from Dr. Voss led him to believe he should not do so). Irani decl. 65-67; ECF No. 136-3 at 116 (Dr. Irani's March 8, 2012 explanation earlier instruction was from Dr. Voss and related to leg length discrepancies); ECF No. 136-8 at 32 (explaining in submission to ACGME previous instruction was to not document inaccurate examinations).

**February 29, 2012 – Emails re Non-Renewal and Dismissal.** On the morning of February 29, 2012, Dr. Koon wrote Dr. Stephens advising that the Department of Orthopaedic Surgery would recommend Dr. Irani's Resident Agreement not be renewed for the following year. ECF No. 136-10 at 54. That evening, Dr. Koon emailed Dr. Stephens, noting an additional failure by Dr. Irani to follow instructions regarding wound care on spine patient L.O. and that Dr. Irani "did not have a good answer as to why this was left undone" when Drs. Voss and Grabowski met with him. Dr. Koon asked whether "this behavior rises to the level of 'just cause' for dismissal." ECF No. 136-3 at 109.

**March 1, 2012 – Care of Hemophiliac –** On the morning of March 1, 2012, Dr. Koon emailed Drs. Stephens and Walsh relaying a report from Dr. Wood that Dr. Irani failed to evaluate a hemophiliac with possible compartment syndrome at 4:00 a.m. as instructed. ECF No. 136-3 at 108 (also reporting that Dr. Irani was late for rounds and had to be called by Dr. Hoover that same morning). Dr. Koon opined that Dr. Irani's actions were "putting our orthopaedic patients at risk." *Id.* He recommended they meet with Dr. Irani and, absent a reasonable explanation, opined they had "'just cause' to begin the dismissal process." *Id.*

That afternoon, Dr. Koon reported to Dr. Stephens that Dr. Walsh had met with Dr. Irani, who admitted he had not seen the hemophilia patient at 4:00 a.m. but stated he evaluated the patient at 2:30 a.m., though he had not documented that evaluation. ECF No. 136-10 at 59 (also stating the department's recommendation remained unchanged); *see also* ECF No. 136-3 at 108 (Dr. Koon's subsequent email to Drs. Stephens and Walsh referring to evening meeting with Drs. Irani and Hoover).[12]

**March 1, 2012 – Suspension.** Dr. Stephens emailed the GMEC Executive Committee shortly after receiving Dr. Koon's afternoon email. ECF No. 136-10 at 59-61 (forwarding emails regarding recent events). Dr. Stephens stated immediate action was needed and suggested two alternative courses: (1) dismissal; or (2) suspension without pay pending a decision by the full

---

[12]  In his affidavit, Dr. Irani explains that he completed an "interval physical examination at about 2:30" a.m. on this patient and that this examination was unchanged. Irani decl. ¶ 68. He states "as I was seeing another patient, and my exam was unchanged from before, I decided to treat the patient in the ER [in] an expeditious and caring manner." *Id.* Dr. Irani avers the allegation a senior resident had to call to wake him up is untrue and challenges the allegation he was late. *Id.* ¶ 69 (explaining "[o]ften times when we are on call we may be a few minutes late to rounds because of duties from overnight. However, I had made arrangements so that all my patients would be seen and there was no interruption in service.").

GMEC.  *Id.*  The Executive Committee elected to suspend Dr. Irani without pay immediately and recommend dismissal to the full GMEC at its April 10, 2012 meeting.  *See* ECF No. 136-10 at 62 (Dr. Koon's email), 65 (Dr. Stephens' email).  This decision was communicated to Dr. Irani that same evening.  Irani decl. ¶ 68 (stating he was told suspension and recommended termination related to his care of the spine patient and hemophiliac).

**March 5, 2012 – Level III Remediation.**  On March 5, 2012, Dr. Koon prepared and Dr. Stephens reviewed a memorandum of record summarizing events leading to Dr. Irani's suspension. ECF No. 136-10 at 71, 73.  Dr. Koon forwarded this memorandum to Dr. Irani that same day, asking Dr. Irani to provide his recollection of events surrounding the care of both patients by the end of the week.  ECF No. 136-3 at 111-13 (email and memorandum referring to Dr. Irani's February 28 or 29 meeting with Drs. Voss and Grabowski and attaching Dr. Grabowski's February 27 email regarding the spine patient and Dr. Wood's summary of events relating to the hemophiliac).  The memorandum recommends Level III remediation with immediate suspension from clinical duties and states the events will be investigated thoroughly and, absent reasonable explanation, the faculty will recommend Dr. Irani's dismissal at the April 10, 2012 GMEC meeting.  *Id.* at 112.

**March 8, 2012 – Meetings and Explanation.**  On March 8, 2012, Dr. Irani provided his written explanation of the two recent patient incidents to Dr. Koon.  ECF No. 136-3 at 116-17 (emailed summary).  Regarding the hemophiliac patient, Dr. Irani stated he was asked to examine the patient at "about four o'clock" on March 1, 2012, and did check at roughly the halfway point between the last exam and anticipated next (6:00 a.m.) exam.  *Id.*  He described his 2:30 a.m. exam in detail, but did not explain why he failed to check at 4:00 a.m. or why he failed to document his 2:30 a.m. exam.  *Id.*

Regarding the spine patient, Dr. Irani stated he received a call from a nurse sometime after 11:30 a.m. on February 24, 2012, who indicated the patient was having difficulty moving during physical therapy. He asked the nurse to verify whether it was a neurological deficit as opposed to compensation for pain. The nurse called back twenty to thirty minutes later, advising that the patient could not dorsiflex her foot. Dr. Irani then went to see the patient, but she could not be evaluated immediately as she was in the bathroom. At this point, Dr. Irani reported the situation to Dr. Grabowski, stating that he could not see the patient immediately because she was on the toilet. After "several repeated attempts[,]" Dr. Irani was able to see the patient. Dr. Irani detailed his finding of neurological defects, his efforts to console the patient, and his report to Grabowski. Dr. Irani reported that Dr. Grabowski's initial response was that Dr. Irani's "exam was incongruent with [his] observation of the patient walking [and] there was likely an error in [his] exam." Because of this response from Dr. Grabowski and prior instructions not to document incongruent findings (given in regard to leg length discrepancies), Dr. Irani did not document his findings. Dr. Grabowski ultimately found neurological deficits and scheduled the patient for further surgery. Dr. Irani acknowledged that "[t]here was obviously very real gravity to the case, and I did not ask any additional questions . . . or say anything in addition to the information I was required to communicate." *Id.* at 117.

**March 13-20, 2012 – Grievance Steps.** Dr. Irani met with Dr. Koon on March 13, 2012, satisfying the first step in the grievance process. ECF No. 136-3 at 119. Dr. Koon upheld the suspension and recommendation of dismissal. *Id.*

Dr. Irani also sought additional input regarding the spine patient from Dr. Grabowski who declined to provide additional feedback. ECF No. 136-3 at 120 (March 13-20 email exchange). He spoke with Dr. Walsh on March 14, 2012, apparently as his second step in the grievance

26

process. Irani decl. ¶ 71. According to Dr. Irani, Dr. Walsh declared there was no way the GMEC would go against the faculty and put pressure on Dr. Irani to "leav[e] the program 'with dignity.'" *Id.* Dr. Irani next met with Dr. Stephens, the third step in his grievance of the suspension. She also upheld the suspension. *Id.* ¶¶ 72, 73; ECF No. 136-3 at 122-23 (March 28, 2012 letter upholding suspension and specifying deadline to request a Grievance Committee hearing).

On April 2, 2012, Dr. Irani exchanged emails with Palmetto Health human resources representative Lin Hearne, regarding a Grievance Committee hearing then scheduled for April 11, 2012. ECF No. 136-10 at 89, 90. He ultimately cancelled that hearing, indicating he would reschedule it, if needed, after the GMEC met on April 10, 2012. *Id.* at 89 (noting Grievance Committee hearing would be unnecessary "if the GMEC decides to reinstate me").

On March 30, 2012, Dr. Irani sought documentation from Dr. Koon regarding incidents leading to his suspension and recommendation for dismissal. ECF No. 136-10 at 92 (seeking memoranda of meetings, documentation from Drs. Wood and Grabowski about two recent patient incidents, and documentation of nurses' complaints about TF375). On April 3 and 6, 2012, Dr. Koon provided the requested memoranda, summaries of recent incidents prepared by Drs. Wood and Grabowski, and emailed reports by nurses relating to TF375. ECF No. 136-10 at 92-106 (emailed responses with attachments).

**April 9, 2012 – Complaint to ACGME.** On April 9, 2012, Dr. Irani emailed the ACGME attaching a "signed formal complaint regarding the practices of the Palmetto Health Orthopaedics Department." ECF No. 136-8 at 13. The attached documents apparently included a two-page document addressed "[t]o whom it may concern" complaining of "unethical behavior and harassment I have been subjected to from both my program director and the chairman of my department." *Id.* at 15-16 (also referring to unwillingness of "local committees" to "listen to my

27

grievances"). Sixteen of the eighteen paragraphs in this letter deal exclusively with Dr. Irani's circumstances. The remaining two paragraphs refer to the program having "an unusually high attrition rate" and use of residents "to solve service needs[.]" *Id.* at 15-16.

**April 10-11, 2012 – GMEC Dismissal Decision and Grievance.** On April 10, 2012, the full GMEC met and voted to dismiss Dr. Irani immediately. *See* ECF No. 136-3 at 132; ECF No. 141-13 (minutes). Dr. Koon informed Dr. Irani of the decision and provided the deadline for filing a grievance, April 11, 2012. *Id.* Dr. Irani timely requested a Grievance Committee hearing. ECF No. 136-10 at 108 (April 11, 2012 email to Hearne).

**April 13, 2012 – Supplemental materials to ACGME.** On April 13, 2102, Dr. Irani provided supplemental documents to the ACGME adding complaints of duty hour violations and inadequate supervision. ECF No. 136-8 at 12-13. In this email, Dr. Irani referred to the fall-in-line culture of the program and stated "[a]fter last year's resident survey revealed some resident dissatisfaction, the residents commented on how it became a witch hunt . . . to see who had written disparaging comments about the program. Those that don't fall inline (like myself), it seems, are profiled and unfairly targeted." *Id.* at 13.

**April 27, 2012 – ACGME Letter to Drs. Stephens and Koon.** On April 27, 2012, the ACGME notified Drs. Stephens and Koon of Dr. Irani's complaints including racial harassment, disparate treatment, inadequate due process, lack of supervision, and duty hour violations. ECF No. 136-8 at 1-11 (summarizing Dr. Irani's complaints, listing corresponding ACGME requirements, and attaching Dr. Irani's emails). The Residency Program was given until May 28, 2012, to respond. *Id.* at 7.

**April 30, 2012 – Grievance Committee Hearing.** The Grievance Committee hearing was conducted on April 30, 2012. ECF No. 150-1 at 1-143 (transcript). At the outset, the moderator,

28

Gwen Hill (Palmetto Health's interim vice president of human resources), introduced the five committee members: two residents from general psychiatry and surgery and three faculty members from OB/GYN, internal medicine, and emergency medicine. *Id.* at 2.[13] Hill explained that management would speak first and have up to an hour; the committee could then ask questions, followed by any questions Dr. Irani wanted to pose. *Id.* at 3. Dr. Irani would then have the same amount of time, followed by committee questions and questions from management. After that, each side would have five minutes for a concluding statement. *Id.*[14]

The transcript reveals that this procedure was followed with Drs. Koon and Walsh presenting first, and apparently taking most of their allotted time. *Id.* at 4-44; *id.* at 31 (Hill advising management they had 20 minutes left). The committee then posed a few questions to Drs. Koon and Walsh. *Id.* at 44-46. Dr. Irani was offered but declined an opportunity to question Drs. Walsh and Koon. *Id.* at 46. Dr. Irani presented his case without reaching his time limit. *Id.* at 46-76. The committee then posed a number of questions to Dr. Irani, each of which he was allowed to fully answer. *Id.* at 76-85. Drs. Walsh and Koon were then offered and accepted the opportunity to pose questions of their own to Dr. Irani. *Id.* at 85-113. Both sides made very short closing statements. *Id.* at 113-15 (Dr. Walsh); *id* at 115-16 (Dr. Irani).

A few comments or inquiries from committee members and Hill during Drs. Walsh and Koon's questioning of Dr. Irani were apparently intended to limit certain lines of questioning as

---

[13] References are to the page number of the transcript rather than the number on the ECF header.

[14] Dr. Irani avers that he received a different explanation of the procedure from Hearne. Irani decl. ¶ 73. He did not expect to be questioned by Drs. Walsh and Koon. *Id.*

peripheral. *E.g.*, *id.* at 95 (question during brief inquiry about ACGME complaint); *id.* at 108 (same during later inquiry). There were no comments or inquiries that limited Dr. Irani's presentation in any manner.[15]

Dr. Irani's presentation addressed specific incidents from the various remediation memoranda as well as more general concerns with his treatment. The latter included a statement that he was "extremely concerned by the unethical behavior and harassment" he had been "subject[ed] to at the hands of [his] program director and the chairman of my department." *Id.* at 47. He specifically referred to Dr. Koon's statement that the medicine program would be happy just to have residents who spoke English as well as his reference to Dr. Irani as "Achmed the Terrorist." *Id.* at 48 (indicating the "sp[eak] English" comment was made in connection with the first remediation meeting in August 2011); *id.* at 51 (stating Dr. Koon "continued to escalate [by making] derogatory . . . comments, saying I was a terrorist, going so far as to label me 'Achmed the Terrorist'"); *id.* at 58 (stating, in addressing discussion of narcotics dosing allegations during a faculty meeting, he felt intimidated by Dr. Koon "calling me a terrorist and threaten[ing] me with discipline for minor infractions but for which he gave a pass to other residents"); *id.* at 70-72 (admitting he had made mistakes but alleging he was "illegally targeted" and "vilified" for actions for which his colleagues were not penalized; that, while "on remediation, Dr. Koon regularly taunted me, calling me Achmed the Terrorist[,]" and asserting he was subjected to "derogatory,

---

[15] Dr. Irani suggests concerns were raised for the first time during the Grievance Committee hearing. *See* Irani decl. ¶ 73 (averring "many allegations . . . [were] raised for the very first time" and identifying allegations (1) linking the inadequate attention to detail deficiency in the August 15, 2011 memorandum to inadequate history and physicals from his rotation with Dr. Walsh in July and August 2011; (2) accusing Dr. Irani of lying to Dr. Stephens; and (3) that he made an inappropriate joke in the operating room).

inappropriate, and insensitive racial taunting by those entrusted with my education"); *id.* at 74 (referring to "racially-based harassment" including referring to him as "Achmed the Terrorist" and "constant insinuations about my cultural background").

Dr. Irani also referred to inadequate specificity in the August 15, 2011 remediation plan. *Id.* at 48.  He noted he received contrary reports (positive views of his work) when he sought clarification from his fellow residents.  *Id.* at 48-49.

Dr. Irani stated it was "no secret we often violated duty hours" in making sure the work was done.  *Id.* at 49.  Without discussing the source of the complaint, he stated the Program was under investigation by the ACGME because of duty hour violations and lack of resident supervision.  *Id.*; *see also id.* at 75 (stating it was "noteworthy that this program is currently being investigated by the ACGME for work hour violations and lack of resident supervision").

During his comments, Dr. Irani made several requests that the Grievance Committee look beyond the presentations made during the meeting.  *Id.* at 76 (imploring the Committee to "investigate this pattern of targeted unfair behavior"); *id.* at 85 (inviting the Committee to "poll the ER [and floor] nurses, and I'll stand by whatever they say" about his care for his patients, making the same invitation as to the spine patient); *id.* at 112 (responding to a question from Dr. Koon about allegations of disparate treatment by noting the trauma case managers told Dr. Irani he was doing a good job, in contrast to Dr. Koon's reports, and suggesting the Committee should speak directly to the individuals involved to get a "neutral third opinion"); *id.* at 116 (stating in closing "[a]nything here you have questions about, I'm more than happy to substantiate . . . . You're more than welcome to poll the trauma case managers, poll any of the nurses and get their opinions of what they think about me.  I'll stand by that."); *see also* Irani decl. ¶ 73 (stating he

hoped "the grievance council would review charts, and objective evidence to determine which side was correct").

After Dr. Irani concluded his presentation, one Committee member asked what Dr. Irani believed "ultimately led us to this day." *Id.* at 82. In response, Dr. Irani conceded that "when I first came here, it was a rocky start, and I was new to the area." *Id.* He explained that he received better evaluations later in his first year, but the orthopaedics department (the locus of his second year), "was a different environment. I think Dr. Koon became frustrated because I kept asking questions. I wanted more, and perhaps I do lack insight, but I was never given the opportunity to gain that." *Id.* at 82, 83. Dr. Irani then referred to Dr. Koon's "personal vendetta" to fire him after Dr. Irani sent "that email." *Id.* at 84 (referring to the November 3, 2011 email regarding the discharge summary); *see also id.* at 83 (noting there was a "very marked change in the tone, and it became very personal" after that point).

Drs. Walsh and Koon's questions were generally directed to specific incidents. *Id.* at 87-88 (asking about the Mr. B and TF375 incidents); *id.* 88-89 (asking about six incidents discussed during the meeting and whether Dr. Irani's position was he was right and others were wrong as to all of them, to which Dr. Irani responded it wasn't an all wrong-or-right scenario as there was always room for improvement); *id.* at 89-91 (asking about advice to patient regarding pain medication, to which Dr. Irani responded that he asked another resident to follow up the next day because he realized there may have been a miscommunication with the patient); *id.* at 94-98 (asking about hemophiliac and spine patients, to which Dr. Irani responded he (1) was counseled about the spine patient one day before the incident with the hemophiliac, (2) delayed documenting both examinations for at least two days, and (3) was late to rounds on March 1, 2012 ).

**Post-Meeting Submissions to Grievance Committee.** Following the April 30, 2012 hearing, "the [G]rievance [C]ommittee indicated that Dr. Irani had discussed the support of several physicians, including Dr. Guy" and requested "additional information – including statements from Voss and Guy." Hill aff. ¶ 6 (ECF No. 168-8). This information was sought from the faculty and Dr. Irani was also invited to provide additional information. *Id.* ¶ 7.

The faculty submitted letters or statements from Drs. Guy and Voss, and possibly a statement from Drs. Walsh and Koon (discussed below). Dr. Guy's letter was very positive as to multiple aspects of Dr. Irani's abilities but stated Dr. Guy did not believe Dr. Irani would excel in any manner in clinical medicine and did not believe he belonged in an orthopaedic residency program. ECF No. 139-3 at 51-53 (letter dated May 2, 2012). Dr. Guy explained that these views were based on information obtained from Dr. Irani himself and impressions from other faculty as he had not personally witnessed Dr. Irani's clinical work. *Id.*

Dr. Voss's "Summative Statement" characterizes Dr. Irani as "often very friendly" in his interactions with patients, but falling "far short of what was expected" when care became "onerous or difficult." ECF No. 155-5 at 1. Dr. Voss briefly described four incidents in which Dr. Irani (1) discharged one patient without enough pain medication; (2) encouraged another to take too much pain medication; (3) failed to check on a patient (apparently referring to the hemophiliac); and (4) failed to premedicate a patient before manipulating the arm (apparently referring to Mr. B). Dr. Voss concluded that Dr. Irani "did not really care for the patient." *Id.*[16]

_____

[16] In his deposition, Dr. Voss conceded he lacked first-hand information on most of these incidents and was uncertain Dr. Irani was involved in one incident involving one of Dr. Voss's patients. *E.g.*, Voss dep. at 57, 104 (ECF No. 157-5). He recalled the incident in which Dr. Irani allegedly advised a patient to take too high a dosage of pain medication, noting his understanding of the

33

Dr. Koon also drafted a letter to the Grievance Committee. ECF No. 139-4 at 23-26. This letter is largely repetitive of information provided during the April 30, 2012 hearing and refers to (1) a failure to do follow up wound care on Dr. Grabowski's spine patient (after February 27, 2012); (2) an inadequate history and physical on a joint patient on February 27, 2012; and (3) an inappropriate joke about how to handle a wrong-site surgery (just charge extra). The court assumes for purposes of this order that this letter was provided to the Grievance Committee. [17]

Dr. Irani provided a statement titled "Clarification of a few points raised by Dr. Koon in his opening statement." ECF No. 168-8 at 4-5. Dr. Irani noted there were "several discrepancies in [Dr. Koon's] opening statement[,]" though "[m]ost are completely explained in my accompanying writeup." *Id.* at 4. Dr. Irani addressed three specific issues: preparation of the morning list, the decision to amputate Mr. B's arm, and the faculty's delay in seeking Dr. Irani's explanation as to TF375. *Id.* He also incorporated the body of an email from a fellow resident who described Dr. Koon's reaction to Dr. Irani's delay in dictating the discharge summary that led to the November 3 email exchange as "a witch hunt." *Id.* at 5. Dr. Irani also provided a letter from his attorney, which Hearne explained would not be forwarded and Dr. Irani agreed "might not be

_____

incident was based, in part, on his discussions with Dr. Irani. Voss dep. at 50. Dr. Voss was, however, unclear as to details including the gender of the patient and specific medication at issue. *Id.*

[17] There appears to be some question whether this letter was given to the Grievance Committee. *See* Koon second aff. ¶ 65 (indicating letter is an unsigned draft Dr. Koon prepared but is unsure was submitted to the Grievance Committee, though conceding he testified in his deposition he thought it was submitted). Dr. Koon's contemporaneous email addressing his understanding of what the Grievance Committee requested includes additional information from Drs. Voss and Grabowski as well as a memorandum from Dr. Walsh and himself regarding "deficiencies in competencies." ECF No. 141-11 at 42; *see also* Koon dep. at 252, 255, 256 (ECF No. 149-3) (addressing materials requested by and prepared for submission to Grievance Committee and identifying Exhibit 31 to deposition as document he and Dr. Walsh prepared).

appropriate in this setting." ECF No. 168-9 at 2. He also appears to have submitted an "explanation of exhibits," though it does not appear this document was forwarded to the committee. *Id.* at 1-2 (Dr. Irani email characterizing this explanation as "largely lifted from my talk that references and explains all the supplemental documentation and exhibits that the [G]rievance [Committee] was given" and Hearne's response indicating only the email from Dr. Irani's fellow resident and clarification of Dr. Koon's statement were "approved to move forward to the committee").

**May 4, 2012 – ACGME Supplement.** On May 4, 2012, the ACGME sent Drs. Stephens and Koon a "revised, more complete document" Dr. Irani had submitted in support of his complaint. ECF No. 136-8 at 14 -100.

**May 7, 2012 – Grievance Committee Decision.** On May 7, 2012, the Grievance Committee reconvened, considered the additional evidence, and voted by secret ballot, upholding Dr. Irani's termination. ECF No. 139-3 at 44 (notification letter).

**May 28, 2012 – Response to ACGME Complaint.** On May 28, 2012, Palmetto Health responded to Dr. Irani's complaint to the ACGME. ECF No. 136-8 at 102-05 (attaching multiple documents).

**June 1, 2012 – Denial of final step in grievance process.** Dr. Irani pursued his grievance through the final step, review by Palmetto Health's chief executive officer, Charles D. Beaman, Jr. Mr. Beaman wrote Dr. Irani on June 1, 2012, stating he had determined the termination was proper and was upholding the decision of the Grievance Committee. ECF No. 139-3 at 45.

**August 2, 2012 – ACGME Decision.** On August 2, 2012, the ACGME advised Palmetto Health that it found "no validity to [Dr. Irani's] complaint and will not pursue any further action related to the complaint." ECF No. 136-8 at 118, 119.

**August 12, 2012 – Summative Evaluation.**  On August 12, 2012, Dr. Koon completed a "Summative Resident/Fellow Evaluation Form (Non-Graduate)" in which he gave Dr. Irani "Poor" ratings (the lowest of four options) in three areas:  patient care and management, interpersonal and communication skills; and overall performance.  He ranked Dr. Irani "Fair" (third of four options) in practice-based learning and improvement and "Good" (the second option) in three areas:  basic medical knowledge, professionalism, and systems-based practice.  ECF No. 157-2 at 2.

**May-June 2013 – Submissions to California Medical Board.**  In late May 2013 Dr. Irani emailed Dr. Koon asking him to complete a two-page form needed to support Dr. Irani's application for a license to practice medicine in California.  ECF No. 136-3 at 136.  Because he was aware of communications from Dr. Irani's attorney to representatives of Palmetto Health in May and August of 2012, warning of potential liability for any impairment of Dr. Irani's educational and professional prospects, ECF No. 136-3 at 133-35, Dr. Koon sought legal counsel before responding.  Koon aff. ¶¶ 40-45.  The response Dr. Koon ultimately provided was found deficient by the California Medical Board because of lack of detail, prompting Dr. Irani to write Dr. Koon asking him to complete the form again.  Koon aff. ¶ 46; ECF No. 136-3 at 142-45.  Dr. Koon provided a more complete response after again consulting counsel.  Koon aff. ¶ 46; ECF No. 136-3 at 146-48.  Dr. Koon's cover letter, explaining affirmative responses to questions as required by the form, stated as follows:

> Dr. Irani underwent GMEC-directed academic remediation during his PGY-2 year.  He failed to complete the GMEC-directed remediation measures and was terminated from his position on 10 APR 11 (questions 3, 6, 8).  He was not offered a renewal of his contract for the following year (question 9).  Dr. Irani satisfactorily completed one month of his PGY-2 training from 01 JUL 11 – 10 APR 11 (question 1).  During his PGY-2 year he was placed on Palmetto Health Level III academic remediation which included a leave of absence from his clinical duties (question 2).

ECF No. 136-3 at 146 (letter dated June 13, 2013).

Dr. Koon also prepared a memorandum dated June 26, 2013, which he understood would be forwarded to the California Medical Board. Koon dep. at 246; ECF No. 157-3 at 2 (Memorandum of Record). This memorandum summarizes Dr. Irani's history of remediations and includes the following statement:

> During his first month on [his second] Level II Remediation, Dr. Irani was involved in two patient encounters that the faculty deemed below acceptable standards. Dr. Irani had failed to demonstrate immediate and sustained improvement as required by his remediation measures. He had failed in the competencies of patient care, interpersonal skills and communication, and professionalism.
>
> It was the recommendation of the orthopaedic faculty to place Dr. Irani immediately on Level III academic remediation (effective 01 MAR 12) and suspend him from clinical duties. We investigated these encounters thoroughly. No reasonable explanation could be identified for his actions, and the faculty recommended to the [GMEC] on 10 APR 12 that Dr. Irani be dismissed from the program. This decision was confirmed by the GMEC, the DIO, the Grievance Committee, and the Palmetto Health Chief Executive Officer during the appeals process.

ECF No. 157-3 at 2.[18]

## DISCUSSION

Through their three separate motions for summary judgment, Defendants collectively seek dismissal of all causes of action. The court addresses the various arguments in the order in which the causes of action are presented in the Amended Complaint.

## I.     Title VII – Disparate Treatment and Hostile Environment

**Amended Complaint.** The first cause of action asserts a Title VII claim against USC-SOM and Palmetto Health based on allegations they subjected Dr. Irani to disparate treatment and a hostile environment during his participation in the Residency Program. Am. Compl. ¶¶ 31-39.

---

[18]  As Dr. Irani notes, the listing of professionalism as a failed competency is at odds with Dr. Koon's August 2012 Summative Form, which rated Dr. Irani's professionalism as "good."

This claim is pursued against both Entity Defendants based on a theory of joint employment. The allegations germane to the joint-employment theory include that both are "employers" subject to Title VII (*id.* ¶¶ 11, 12), the Residency Program was "jointly operated" by both (*id.* ¶ 15), and Dr. Irani "was a good and valuable employee of the Program." (*id.* ¶ 16).

The alleged discriminatory acts include Dr. Koon "repeatedly refer[ing] to Plaintiff in front of others as 'Achmed the Terrorist' and jokingly suggest[ing] he might 'blow the place up,' in an offensive reference to Plaintiff's mistakenly perceived middle eastern ethnicity." *Id.* ¶ 33; *see also id.* ¶ 34 (alleging these comments created a hostile environment based on race, national origin, or religion). They also include allegations that Dr. Koon "repeatedly singled Plaintiff out in group discussions and magnified every misstep that Plaintiff made, while similar mistakes and behaviors by his colleagues in the Program were overlooked or minimized." *Id.* ¶ 35; *see also id.* ¶ 36 (alleging "disparate treatment . . . by allowing Defendant Koon to create a hostile work environment, and by terminating Plaintiff's employment from the Program without sufficient cause").

**Arguments for Summary Judgment.** Both Entity Defendants argue all Title VII claims are barred by Dr. Irani's failure to pursue a timely administrative charge.[19] *E.g.*, ECF No. 136-1 at 3; ECF No. 139-1 at 34-36. USC-SOM also argues it is not a proper defendant under any Title VII claim because it was not Dr. Irani's employer. ECF No. 136-1 at 2-3; ECF No. 170 at 3-5 (USC-SOM reply). In addition to challenging timeliness of the administrative charge, Palmetto Health argues the Title VII claim fails on the merits as to both the disparate treatment and hostile

---

[19] Dr. Irani relies on Title VII both in his first (disparate treatment and hostile environment) and third (retaliation) causes of action.

38

environment allegations.  ECF No. 139-1 at 36-46.  These arguments and Dr. Irani's response are addressed below.

### A.     Timeliness

**Defendants' Arguments.**  The Entity Defendants argue that Dr. Irani's Title VII claims are barred because he failed to file an administrative charge within 300 days of his termination. ECF No. 136-1 at 3-4; ECF No. 139-1 at 34.   Both maintain the relevant trigger date for the termination was April 10, 2012, the date the GMEC met and approved the faculty's recommendation that Plaintiff be dismissed from the Residency Program and Dr. Koon informed Dr. Irani of that decision.  ECF No. 136-1 at 3; ECF No. 139-1 at 17 (citing ECF No. 141-13 (minutes of GMEC meeting and related email) and ECF No. 141-14 (email from Dr. Koon to Plaintiff advising him of his dismissal)).  Palmetto Health asserts that the charge was not filed until May 23, 2013, apparently referring to the date the formal charge was signed, but cites no supporting evidence.  ECF No. 139-1 at 36.  USC-SOM does not expressly state when the charge was filed, but submits exhibits showing Dr. Irani made his first EEOC inquiry on March 26, 2013, and first office visit on March 29, 2013.  ECF No. 136-1 at 3 (memorandum); Thomas aff. Ex. K at 2 (ECF No.136-5 at 25); ECF No. 136-5 at 31 (Charge transmittal sheet listing March 29, 2013, as date of receipt).

**Dr. Irani's Response.**  Dr. Irani responds that his charge was timely because he filed it on "March 26, 2013, which is 298 days from June 1, 2012, the date Plaintiff was notified by the CEO of Defendant Palmetto Health that his termination from the program was *finalized*."  ECF No. 148 at 55 (emphasis added).   Dr. Irani's argument focuses on whether the date he filed his administrative charge was May 23, 2013 (as Palmetto Health argues), or March 26, 2013, the date he completed an intake questionnaire.  *Id.*  While this addresses a possible error in Palmetto

Health's argument as to when Dr. Irani's charge should be deemed filed, it ignores the more critical question of when the 300-day period began to run. If that date is April 10, 2012, as Defendants argue, the deadline for filing a charge fell in early February 2013. Thus, the charge would be untimely if filed on March 26, 2013, the earliest date argued.

**Discussion.** Dr. Irani offers no argument or authority in support of his premise that the 300-day filing period began to run on June 1, 2012, when he was informed Palmetto Health's Chief Executive Officer had upheld the termination at the final step in the grievance process. In contrast, the Entity Defendants point to controlling legal authority for using the date Dr. Irani was informed of his termination, April 10, 2012, as the starting date for the filing period.[20]

As Palmetto Health explains, "the general rule is that the filing period begins when the alleged discriminatory decision is made and communicated to the employee." ECF No. 139-1 at 35 (citing *Delaware State College v. Ricks*, 449 U.S. 250 (1980)). In *Ricks*, the Court held the limitations period began to run when Ricks was advised that he had been denied tenure, rather than when he lost his employment (the delayed result of the denial of tenure) or when his grievance of the tenure decision was denied. *Ricks*, 449 U.S. at 258, 260-61 (citing *Elec. Workers v. Robbins & Myers, Inc.*, 429 U.S. 229 (1976) as holding "the pendency of a grievance, or some other method of collateral review of an employment decision, does not toll the running of the limitations periods. . . . The existence of careful procedures to assure fairness in the tenure decision should not obscure the principle that limitations periods normally commence when the employer's decision is made."); *see also Hutson v. Wells Dairy, Inc.*, 578 F.3d 823, 826 (8th Cir. 2009) (filing period

---

[20] The Entity Defendants offer uncontroverted evidence that the full GMEC voted to dismiss Dr. Irani from the program on April 10, 2012, and that Dr. Irani was informed of this decision, and its immediate effectiveness, on the same day.

began to run when plaintiff was notified of her termination by her supervisor, not when she actually stopped work or received a letter stating the reasons for her termination); *Shockley v. Vermont State Colleges*, 793 F.2d 478, 482 (2d Cir. 1986) (filing period began to run when plaintiff received notice of her termination, not after completion of arbitration of termination decision); *Mezu v. Morgan State Univ.*, 367 F. App'x. 385, 388-89 (4th Cir. 2010) (holding pendency of internal appeal did not toll limitations period).

In light of this authority and the uncontroverted record, the court finds as a matter of law that the filing period for Dr. Irani's administrative charge began to run on April 10, 2012, when he was informed of the full GMEC's decision to dismiss him from the program, and expired in early February 2013. Dr. Irani's March 26, 2013 charge was, therefore, untimely as to his termination or any other claim that accrued before termination (e.g., his hostile environment claim or any claim of earlier disparate treatment). As the first cause of action is necessarily limited to incidents including and predating Dr. Irani's termination, the Entity Defendants are entitled to summary judgment on this claim due to Dr. Irani's failure to exhaust administrative remedies.

### B.    Proper Defendant

USC-SOM also argues that Dr. Irani cannot maintain his Title VII and various other claims against USC-SOM because Palmetto Health was Dr. Irani's only employer. In support of this argument, USC-SOM notes that both Resident Agreements Dr. Irani signed (for his PGY-1 and PGY-2 years) were with Palmetto Health and that his employment compensation and benefits were provided solely by Palmetto Health. USC-SOM also addresses the respective roles of Palmetto Health as sponsoring institution and USC-SOM as educational affiliate responsible for providing faculty but lacking authority to hire or fire residents. ECF No. 136-1 at 5 (citing affidavits, Dr. Irani's Resident Agreements with Palmetto Health, Affiliation Agreement between Palmetto

41

Health and USC-SOM, and Program Letters of Agreement ("PLAs") between Palmetto Health Residency Program and Participating Program Sites).

Dr. Irani responds that USC-SOM's argument, which he mischaracterizes as relying solely on the source of pay and benefits, "disregards the recent Fourth Circuit case of *Butler v. Drive Auto. Indus. of Am., Inc.*, 793 F.3d 404 (4th Cir. 2015)." ECF No. 148 at 55. As Dr. Irani notes, *Butler* established a nine factor test for determining whether there is a joint employment relationship. These factors include:

> (1) authority to hire and fire the individual; (2) day-to-day supervision of the individual, including employee discipline; (3) whether the putative employer furnishes the equipment used and the place of work; (4) possession of and responsibility over the individual's employment records, including payroll, insurance, and taxes; (5) the length of time during which the individual has worked for the putative employer; (6) whether the putative employer provides the individual with formal or informal training; (7) whether the individual's duties are akin to a regular employee's duties; (8) whether the individual is assigned solely to the putative employer; and (9) whether the individual and putative employer intended to enter into an employment relationship.

*Butler*, 793 F.3d at 414 (addressing whether individual who was paid by a temporary staffing agency but who worked at Drive Automotive was an employee of Drive Automotive for purposes of his Title VII claim). No one factor is dispositive and the common-law element of control remains the principal guidepost. *Id.* (also stating courts may "modify the factors to the specific industry context").

Without directly addressing any of the nine factors, Dr. Irani argues that the *Butler* test is satisfied because of the interrelationship between Palmetto Health and USC-SOM, including that they "clearly hold themselves out as being jointly run by both entities, even though Palmetto Health

is technically designated as the 'sponsoring institution.'"[21]  ECF No. 148 at 56 (referring to (1) inclusion of both entities' logos and welcome messages from representatives of both entities on the Program's website, (2) a statement on the USC-SOM Orthopaedics Department's website that the Program is offered "in conjunction with Palmetto Health," (3) listing of USC-SOM faculty members on the Palmetto Health Residency Program website, and (4) a statement that the two entities "will share the responsibility for ensuring an appropriate learning environment and that clinical instruction occurs in an atmosphere of mutual respect and collegiality" found in the Affiliation Agreement between Palmetto Health and USC-SOM).

Dr. Irani's argument is not persuasive both because it fails to address the *Butler* factors and because it suggests only joint responsibility for *educational* aspects of the Residency Program. Nothing in the mutual responsibilities and representations identified by Dr. Irani suggests that USC-SOM either intended to or did take on the role of employer.  Dr. Irani has, therefore, failed to proffer evidence that USC-SOM was a joint employer with Palmetto Health.[22]

USC-SOM's proffered evidence, in contrast, fully supports the conclusion that Palmetto Health, rather than USC-SOM, was Plaintiff's employer.  This evidence includes the Resident Agreement Dr. Irani signed at the beginning of his PGY-2 year.  ECF No. 136-5 at 11-17.  The introductory paragraph of this Resident Agreement reads as follows: "This agreement is entered

_____

[21]  Plaintiff appears to mean that these two entities hold the *Residency Program*, rather than *themselves*, out as being jointly run.

[22]  In addressing his contract claims (fourth and fifth causes of action), Dr. Irani argues that a contract was created by, inter alia, a Resident Manual published by USC-SOM's Department of Orthopaedic Surgery.  For reasons discussed below (Discussion §§ IV. and V.), the Resident Manual is not a proper basis for either claim.  Further, even if the Resident Manual created some form of contract (*e.g.*, a contract governing education), there is no evidence it created an *employment* relationship between Dr. Irani and USC-SOM.

into this 1st day of July, 2011 between Palmetto Health or "Hospital", a multiple teaching hospital/health system located in Columbia, South Carolina (hereinafter "Palmetto Health") and AFRAAZ R. IRANI, MD (hereinafter "Resident")."  *Id.* at 11.  Following the first heading ("Appointment"), the Resident Agreement states "[t]he Resident is hereby employed by Palmetto Health as a PGY 2 Postgraduate in the Department of Education for Orthopaedics.").  *Id.* § 1. The Resident Agreement includes a section addressing termination, which provides as follows: "Palmetto Health has the option to immediately terminate this Agreement 'for cause[.]'"  *Id.* at 16 §18.

USC-SOM also relies on the "Affiliation Agreement for Medical Education, Research and Other Related Activities" ("Affiliation Agreement") between Palmetto Health and USC-SOM. ECF No. 136-5 at 48-61.  This agreement includes the following language:  "Except as may be agreed in the case of dual appointments, no person employed by Palmetto Health shall be considered an employee of the University[.]"  *Id.* at 56 § 13.3.  The Affiliation Agreement also provides that Palmetto Health assumes responsibility for the "direct costs of salaries, fringe benefits, and space requirements for its residents located at Palmetto Health[.]"  *Id.* at 52 § 6.1.  It defines "resident" as "[a] licensed physician *of Palmetto Health* enrolled in a graduate medical education program to receive residency training in a medical specialty[.]"  *Id.* at 49 § 1.14 (emphasis added).

The PLA between Palmetto Health and the "University Specialty Clinics-Orthopaedic Surgery" similarly provides that "Palmetto Health will be solely responsible for payment of the salary, fringe benefits, and professional liability insurance for the resident who rotates through [the Orthopaedic Surgery Clinic's] practice."  ECF No. 136-6 at 1.  The PLA refers to Residents as "residents in the Palmetto Health Graduate Medical Education Program(s)."  *Id.*  It identifies

44

Palmetto Health as the "Sponsoring Institution" and addresses employment and disciplinary responsibility as follows: "Incidents that may require academic or disciplinary action will be referred back to the Sponsoring Institution via the Program Director and will be handled in compliance with academic or disciplinary policies of the Sponsoring Institution." *Id.* at 2. Uncontroverted affidavit testimony from Drs. Koon and Walsh is consistent: that USC-SOM faculty could recommend action but Palmetto Health, through the GMEC, had sole authority to review and approve Level II or III remediation and termination. Koon aff. ¶¶ 4-6; Walsh aff. ¶¶ 4, 5, 7. Dr. Irani refers to this allocation of responsibility in his own memorandum, though he characterizes the GMEC as a rubber stamp for the Program Director's recommendations. ECF No. 148 at 44-45.

Dr. Irani points to no language in these or any other documents to support a finding of joint employment as opposed to joint responsibility for educational aspects of the Residency Program. Neither does he point to any other evidence to support a finding of joint employment. It follows that USC-SOM is entitled to summary judgment on the first cause of action for the additional reason it was not Dr. Irani's employer, a necessary requirement for a claim under Title VII.

**Conclusion.** For the reasons set forth above, the court grants USC-SOM and Palmetto Health's motions for summary judgment on Dr. Irani's first cause of action (Title VII). The court does so without reaching Palmetto Health's arguments for summary judgment on the merits.

## II.    Section 1981 – Racial Discrimination

Dr. Irani's second cause of action is asserted solely against Palmetto Health and alleges Palmetto Health impaired Dr. Irani's "ability to make and enforce contracts regarding the terms and conditions of his employment based on his race in violation of 42 U.S.C. § 1981." Am. Compl.

¶ 41.  Through incorporation of preceding allegations, he appears to rely both on allegations of disparate treatment and hostile environment in support of this claim.  *Id.* ¶¶ 40, 41.

Dr. Irani's opposition memorandum, likewise, indicates he is relying on both grounds in support of his "Discrimination Claims," which he addresses collectively.  *E.g.*, ECF No. 148 at 57, 59 (noting tests for hostile environment and disparate treatment are the same under Title VII and Section 1981).  As to his disparate treatment allegations, Dr. Irani relies on the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and its progeny.  ECF No. 148 at 59.  As to his hostile environment allegations, Dr. Irani relies most heavily on *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264 (4th Cir. 2015), which found a single incident involving the use of racial slurs in connection with threatening behavior and comments sufficient to support a hostile environment claim.  ECF No. 148 at 57-59.

Palmetto Health argues that it is entitled to summary judgment on both aspects of the Section 1981 claim.  The court agrees for reasons addressed below.

### A.    Section 1981 Hostile Environment

**Elements.**  To establish a Section 1981 hostile environment claim, Dr. Irani must establish four elements:  (1) unwelcome conduct; (2) based on his race; (3) which is sufficiently severe or pervasive to alter the conditions of his employment and create an abusive work environment; and (4) which is imputable to the employer.  *Boyer-Liberto*, 786 F.3d at 277; *see also Springs v. Diamond Auto Glass,* 242 F.3d 179, 184 (4th Cir. 2001) (same test applies to a hostile environment claim whether asserted under Title VII or Section 1981).  "A hostile environment exists '[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work

46

environment.'" *Boyer-Liberto*, 786 F.3d at 276 (quoting *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993)).

Hostile environment claims "often involve repeated conduct" because "a single act of harassment may not be actionable on its own." *Boyer-Liberto*, 786 F.3d at 277 (internal quotation marks and citations omitted). "For example, mere utterance of an epithet which engenders offensive feelings . . . does not sufficiently affect the conditions of employment to implicate Title VII. . . . The same goes for simple teasing and offhand comments." *Id.* (internal marks and citations omitted). A single incident of harassment may, nonetheless, suffice if it is "extremely serious[,]" particularly if the harasser is a supervisor. *Boyer-Liberto*, 786 F.3d at 277-280 (noting "a supervisor's use of [a racial epithet] impacts the work environment far more severely than use by co-equals" and quoting *Burlington Indus. Inc. v. Ellerth,* 524 U.S. 742, 763 (1998) for proposition supervisory harassment is invested with "a particular threatening character" due to the supervisor's power and authority).

**Palmetto Health's Argument.** Palmetto Health argues Dr. Irani cannot satisfy the third element, which considers whether the environment is objectively hostile or abusive. ECF No. 139-1 at 42-44.[23] This objective test considers the challenged conduct from the perspective of a reasonable person in the Plaintiff's positon. *Id.* at 139-1 at 42 (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)). To determine whether the unwelcome conduct is

---

[23] Palmetto Health assumes Dr. Irani's hostile environment arguments will be raised as evidence of pretext rather than as an independent claim for relief. ECF No. 139-1 at 42 ("Dr. Irani will attempt to show pretext by establishing that there was a hostile work environment."). In this regard, Palmetto Health misses the mark. Its substantive argument as to the insufficiency of the allegations to support a hostile environment claim is, nonetheless, persuasive.

sufficiently severe to support a hostile environment claim, the court looks to all circumstances including the frequency and severity of the comments, whether they were physically threatening or humiliating as opposed to merely an offensive utterance, and whether the comments unreasonably interfered with the employee's work performance. *Id.* at 42-43 (citing *Harris*, 510 U.S. at 23).

**Dr. Irani's Response.** Through his response, Dr. Irani confirms his hostile environment claim is "based on Defendant Koon's references to [Plaintiff] as 'Achmed the Terrorist.'" ECF No. 148 at 57. Dr. Irani argues that these references, even if few and isolated, suffice to support a hostile environment claim because they are comparable to the "porch monkey" comment addressed in *Boyer-Liberto*. *Id.* at 57-58. Relying on his declaration, Dr. Irani asserts Koon referred to him in this manner "on several occasions and also stated that Plaintiff might 'blow the place up.'" *Id.* at 58 (citing Irani decl. ¶ 53). The cited paragraph of Dr. Irani's declaration addresses his report to Dr. Stephens on January 3, 2012, that he "was concerned that . . . Dr. Koon was not an unbiased evaluator of me and treated me differently, and notably called me racially charged names like 'Achmed the Terrorist.'"[24]

**Additional Evidence of Challenged Comments.** In addition to the paragraph on which he relies, Dr. Irani states in his declaration he "felt constantly intimidated by Dr. Koon either

---

[24] Dr. Irani also cites the affidavit of Tonya Hamby, who avers she "heard Dr. Irani referred to as a terrorist by Dr. Koon" and testimony from Dr. Eady in a hearing before the California Medical Board that relates an incident in which Dr. Koon referred to Plaintiff as "Achmed the Terrorist." *Id.* at 58. Palmetto Health has moved to strike the Eady testimony on various grounds. At this stage, the court need not decide whether Dr. Eady's testimony should be excluded as it is merely cumulative to Dr. Irani's own testimony and declaration that Dr. Koon made the allegedly discriminatory comments, which the court accepts as true for purposes of summary judgment.

calling me a terrorist or threatening me with discipline[.]" Irani decl. ¶ 76. Dr. Irani's declaration does not provide detail as to the content or context of any specific comments.

The topic was, however, addressed during Dr. Irani's deposition, in which he was asked about the frequency, content, and context of Dr. Koon's alleged discriminatory comments. Irani dep. at 54-68 (ECF No. 150-5 at 11-25). Dr. Irani did not recall the precise number of instances, but described the frequency as "more than once," "on a recurring basis," and "[p]robably a handful of times." Irani dep. at 54; *see also* Irani dep. at 56, 59 (agreeing a "handful" might be five," referring to "five instances" counsel asked him to identify, but then returning to "a handful" as a more accurate characterization.). He was, however, able to provide specific content and context as to two instances of such comments. Both occurred during the "latter half" of Dr. Irani's PGY-2 year. *Id.* at 58, 63 (clarifying that, by "latter half," he was referring to November 2011 through February 2012).

The first incident Dr. Irani described occurred in the prison clinic and was a comment relating to Dr. Irani's facial hair. *Id.* at 56-57 (agreeing that a nurse may have first commented on his facial hair and that Dr. Koon made the "Achmed the Terrorist" comment "about the same time"). Dr. Irani testified that Dr. Koon "was attributing my appearance to that and I think he incorrectly assumed [someone with] facial hair is consistent with somebody who is at the height of human depravity which I think is awful." *Id.* at 57. Dr. Irani was "sure" Dr. Koon laughed when he made the comment. *Id.* at 58.

Dr. Irani also testified that someone made a comment about him "blowing the place up" when they were near the security scanners at the prison. *Id.* at 67. He first stated that he "believe[d]" Dr. Koon may have been the one to make a statement along these lines, but then

49

directly attributed the following statement to Dr. Koon: "Dr Irani will either somehow sneak something by or find a way to blow the place up, et cetera." *Id.*

The second incident Dr. Irani described occurred on the orthopaedic floor near the nurse's station. *Id.* at 59, 61. In this instance, Dr. Koon made a comment "along the lines hey look there's . . . Achmed the terrorist." *Id.* at 61-62. Dr. Irani recalls that others present may have responded with "some sort of little nervous chuckles here and there and then people just moved on." *Id.* at 62.

Although he believed there may have been other similar instances (a "handful"), Dr. Irani stated these were the only two incidents he could "remember specifically[.]" *Id.* at 64. He testified he would "really would be reaching" if he tried to provide more detail and he did not want to say something that "might be misleading or possibly false.". *Id.*[25]

**Discussion.** A reasonable jury could find Dr. Koon's references to Dr. Irani as "Achmed the Terrorist" as well as his comment Dr. Irani might blow the place up were unwelcome (first element of hostile environment claim). For purposes of this order, the court assumes without

_____

[25] Dr. Koon does not deny that he made a comment to Dr. Irani regarding "Achmed the Terrorist," although he claims the comment was made only once and consisted of a statement that Dr. Irani's "newly grown beard or goatee made him look like 'Achmed the Terrorist[.]'" Koon aff. ¶ 38 (ECF No. 136-3 at 11-12); *see also* Koon dep. at 236 (explaining that his comment was in response to a nurse complimenting Dr. Irani on "how great he looked," to which Dr. Koon responded "don't tell him that. He looks like Achmed the Terrorist. And he laughed, she laughed. It was just kind of a joking thing[.]").

In her deposition, Dr. Stephens testified that, at some point, Dr. Irani complained that Dr. Koon called him Achmed the Terrorist. Stephens dep. at 105-06 (ECF No. 149-1 at 56-57). Dr. Stephens later asked Dr. Koon about the allegation, though she did not recall when this occurred. *Id.* at 106-07. As Dr. Stephens recalled, Dr. Koon explained his intent was to be humorous and he was commenting on facial hair Dr. Irani had grown over a short break. *Id.* at 106 (stating Dr. Koon indicated he was referring to a comedian and his puppet).

deciding that a reasonable jury could also find the comments (1) were made because of Dr. Irani's race, the characteristic protected under Section 1981 (second element), and (2) may be imputed to Palmetto Health in light of Dr. Koon's role as Program Director (fourth element).

The evidence does not, however, support an inference that the comments were sufficiently severe or pervasive to alter Dr. Irani's conditions of employment or create an abusive work environment (third element). Dr. Irani has specifically identified two instances in which he was aware Dr. Koon referred to him as or compared his appearance to "Achmed the Terrorist." The reference to blowing the place up is only vaguely described but apparently occurred during the same prison clinic visit as one of the "Achmed" comments. Thus, the offending comments were infrequent. Moreover, Dr. Irani has failed to proffer evidence that any of the comments were made in connection with any other threatening, demeaning, or humiliating comments or actions.[26]

While this does not prevent the comments from being offensive, it does distinguish them from the incident at issue in *Boyer-Liberto*. That incident began with a "livid" managerial employee, Trudi Clubb ("Clubb") screaming at the plaintiff ("Liberto") while standing so close Liberto could feel Clubb's breath on her face and was sprayed with Clubb's saliva. *Boyer-Liberto*, 786 F.3d at 269. Clubb continued "loudly berating Liberto" after Liberto agreed she understood and walked away to continue her job as a waitress. When Liberto returned to the area, Clubb threatened Liberto that she would "get" Liberto and was going to "make [her] sorry." *Id.* at 270.

---

[26] Given Dr. Irani's claim that the comments were made during the latter half of his PGY-2 year, which he clarified referred to the November through February time frame, it appears they were made while he was on Level II remediation.

51

After making this threat, Clubb "turn[ed] to look at Liberto and call[ed] her either a 'damn porch monkey' or a 'dang porch monkey.'" *Id.*

The incident continued the following day when Clubb interrupted Liberto (who was meeting with the Food and Beverage Director to report Clubb's conduct) stating "I need to speak to you, little girl" and insisting Clubb was "more important" than the Food and Beverage Director. Clubb then "reprimanded Liberto [] in a raised and angry voice[.]" *Id.* Clubb concluded the discussion by again stating "I'm going to get you[,]" threatening to go to the hotel owner, and "looking directly at Liberto and again calling her a 'porch monkey'" in a "loud and angry" voice. *Id.*[27]

The Fourth Circuit determined these circumstances were sufficient to state a hostile environment claim because "Clubb employed racial epithets to cap explicit, angry threats that she was on the verge of utilizing her supervisory powers to terminate Liberto's employment." *Id.* at 280. In reaching this conclusion, the court found the "porch monkey" slur "about as odious as the use of the word 'nigger.'" *Id.*

While Dr. Koon used language a jury could find racially-based and offensive, there is no evidence the comments were made in the course of or connected to any otherwise hostile, angry, threatening or demeaning communication or behavior. As Dr. Irani proffers no other evidence of a racially-based hostile environment, Palmetto Health is entitled to summary judgment as to this aspect of Dr. Irani's Section 1981 claim.

---

[27] Liberto's report of this incident prompted the owner to inquire about Liberto's performance. *Id.* at 270. The resulting report was unfavorable and Liberto was terminated a few days after the incident. *Id.* These allegations were found sufficient to support a separate retaliation claim. *Id.* at 281-87.

### B.    Section 1981 Disparate Treatment

**Elements.**  To establish a Section 1981 disparate treatment claim under the *McDonnell Douglas* framework on which he depends, Dr. Irani must first make out a prima facie case consisting of four elements:  (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) he was meeting his employer's legitimate expectations at the time of the adverse action; and (4) similarly situated employees outside his class received more favorable treatment.  *See Holland v. Washington Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007) (stating elements in context of Title VII claim); *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 133 n.7 (4th Cir. 2002) (same elements apply to Section 1981 claim).[28]  If Dr. Irani establishes his prima facie case, the burden shifts to Palmetto Health "to articulate a legitimate, non-discriminatory justification for its allegedly discriminatory action."  *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010).  If Palmetto Health articulates such a justification, the burden shifts back to Dr. Irani to demonstrate that the articulated legitimate reason or reasons "were not [Palmetto Health's] true reasons, but were a pretext for discrimination."  *Id.*  "The final pretext inquiry 'merges with the ultimate burden of persuading the court that [Dr. Irani] has been the victim of intentional discrimination,' which at all times remains with [him]."  *Id.*

**Palmetto Health's Arguments.**  Palmetto Health argues Dr. Irani's disparate treatment claim fails because he cannot make out the third and fourth elements of his prima facie case:  that he was meeting his employer's (or the Residency Program's) legitimate expectations; and that he was treated less favorably than similarly situated individuals outside his protected class.  ECF No.

---

[28]  Because Section 1981 prohibits only race-based discrimination, these elements consider only race-based classes.  For purposes of this order, the court assumes without deciding that discrimination based on actual or perceived ethnicity constitutes race-based discrimination.

139-1 at 37-39.  Palmetto Health also argues Dr. Irani cannot show the reason given for his termination was pretext because he "cannot refute the issues with his performance."  *Id.* at 41-46.

In making these arguments, Palmetto Health notes the employer's perspective, rather than the employee's assessment of his performance, is the relevant focus.  *Id.* at 38 (citing *Evans v. Tech. Application & Serv. Co.,* 80 F.3d 954, 960-61 (4th Cir. 1996)).  It also notes the strong inference of non-discriminatory motivation arising when the same individual is responsible for hiring and terminating an employee within a relatively short time frame.  *Id.* at 40 (citing, *e.g., Evans*, 80 F.3d at 959).  Palmetto Health also cites cases applying a highly deferential standard of review to academic decisions.  *Id.* at 31-34 (characterizing cases as precluding a Title VII or Section 1981 claim).

**Dr. Irani's Response.**  Dr. Irani contests both the factual foundation and conclusions drawn by Palmetto Health (and other Defendants in related arguments).  He first challenges the characterization of his PGY-1 year evaluations as evidence of unsatisfactory performance.[29]  ECF

---

[29]  Dr. Irani characterizes the affidavits of Drs. Koon and Walsh as "distort[ing] the evidence . . . and cherry-pick[ing] negative comments out of Plaintiff's performance evaluations."  ECF No. 148 at 59 (suggesting negative comments are taken out of context).  This argument focuses on the overall ratings Dr. Irani received during his PGY-1 year.  Dr. Irani notes he received three overall "Excellent" ratings, five overall "Satisfactory" ratings, and only one overall "Marginal" rating, from a physician who gave him an overall "Satisfactory" rating in a later rotation.  *Id.* at 60.  Dr. Irani also challenges the significance of three specific negative comments quoted by Dr. Koon, noting that one of the comments was made by a physician who gave an overall "Excellent" rating, another was truncated in a way that made it sound worse than when read as a whole, and a third is explained in a declaration submitted in opposition to summary judgment by Dr. Ross, the physician who wrote the evaluation at issue.

These arguments do not counter the purpose for which the PGY-1 year evaluations were offered:  that concerns underlying Dr. Irani's PGY-2 year remediations and ultimate dismissal were *consistent with* concerns raised by some physicians during Dr. Irani's first year.  This point, which is somewhat peripheral to the critical issue of Dr. Irani's PGY-2 performance, is not defeated by evidence (1) one of the comments was made by a physician who otherwise gave Dr.

No. 148 at 60-61; *but see* Hearing trans. at 82 (Dr. Irani's reference to a "rough start" his PGY-1 year). As to his PGY-2 year, Dr. Irani states that he "strongly disputed the allegations about . . . the seven or eight patient care encounters underlying his various academic remediations, suspension, and termination." ECF No. 148 at 61. He notes that he received an overall satisfactory rating in the only PGY-2 evaluation prepared before the December faculty meeting, an evaluation from his sports rotation with Dr. Mazoue. *Id.* Dr. Irani suggests the less favorable evaluations prepared by Drs. Guy and Voss should be disregarded or discounted for purposes of summary judgment because both were prepared after Dr. Irani's December 5, 2011 meeting with the faculty. *Id.* at 61-62 (stating Drs. Guy and Voss "provided largely positive feedback" during the actual rotations and suggesting criticism of Dr. Irani during the faculty meeting tainted their later evaluations). Without citing specific evidence, Dr. Irani asserts the adequacy of his performance is supported by "contemporaneous, objective medical records and statements from attending physicians, nurses, and staff members who directly observed Dr. Irani's patient care" as well as by the opinion of Dr. Irani's proffered expert, Dr. Grant. *Id.* at 62 (citing expert report in its entirety).

As to the fourth element, Dr. Irani asserts he "was the only minority resident [in the Program] at the time of his adverse employment actions." *Id.* at 62. He identifies five residents outside his protected class he argues were treated more favorably as to specific incidents, Drs. Goodno, Nathe, Wood, Hoover, and Walker. *Id.*

---

Irani an excellent rating, (2) one of the comments included a further explanation in the same evaluation (which may minimize but does not eliminate the concern), and (3) one of the comments and related evaluation has been explained in a declaration submitted in opposition to summary judgment (clearly not a document available at the relevant time).

**Discussion.**  For reasons explained below, Dr. Irani has failed to proffer sufficient evidence to support the third and fourth elements of his prima facie case.  For related reasons, he has failed to proffer evidence sufficient to support a finding of pretext.  It follows that his Section 1981 claim fails as a matter of law to the extent it relies on allegations of disparate treatment.

**Academic Nature of Decision.**  In determining the viability of Dr. Irani's disparate treatment claim, the court considers the academic nature of his dismissal  As explained in *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214 (1985):

> When judges are asked to review the substance of a genuinely academic decision[,] . . . they should show great respect for the faculty's professional judgment.  Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.

*Id.* at 225 (applying test in finding substantive due process claim insufficient).  As Justice Powell emphasized in his concurring opinion: "Judicial review of academic decisions, including those with respect to the admission or dismissal of students, is rarely appropriate, particularly where orderly administrative procedures are followed[.]"  *Id.* at 230; *see also Bd. of Curators of the Univ. of Mo. v. Horowitz*, 435 U.S. 78, 92 (1978) (stating, in declining to remand procedural due process claim, "[c]ourts are particularly ill-equipped to evaluate academic performance.").

The Fourth Circuit has applied this deferential standard of review to claims of disability and gender discrimination in the context of medical school and residency programs.  *Halpern v. Wake Forest Univ. Health Servs.*, 669 F.3d 454 (4th Cir. 2012) (applying standard to medical student's claims under ADA and Rehabilitation Act for disability discrimination and failure to accommodate); *Nigro v. Va. Commonwealth Univ./Med. Coll. of Va.*, 492 F. App'x. 347, 359-60 (4th Cir. 2012) (applying standard to medical resident's claim for gender discrimination under Title VII).  In the most comparable case, *Nigro*, the Fourth Circuit explained its ruling as follows:

56

Nigro has not alleged that the faculty . . . departed from any accepted academic norms as to demonstrate that it was not exercising its professional judgment when it voted unanimously not to renew her contract. The record supports reading this vote as evidence that the faculty did not believe her performance as a resident to be satisfactory. Although Nigro received many average evaluations, significant concerns were expressed that she did not appear to care about her patients, that she was doing the bare minimum to pass, that her knowledge lagged behind her peers, and that she was unwilling to take responsibility for her shortcomings. . . . Since we must view the faculty's determination that Nigro performed unsatisfactorily with considerable deference, . . . and the record contains ample evidence that her performance in some rotations was deficient, we cannot conclude that she has met her burden of showing that she performed her job satisfactorily. Since Nigro has failed to state a prima facie case of discrimination, we affirm the district court's grant of summary judgment on this claim.

*Id.* at 360.

The court finds this deferential standard of review applicable at least to analysis of the third element of the prima facie case (whether Dr. Irani was meeting legitimate expectations) and the pretext determination. This is because the actions Dr. Irani challenges (remediations and termination) resulted from the GMEC's adoption of faculty recommendations, which recommendations were based on concerns Dr. Irani was not meeting required proficiencies. Thus, the underlying concerns were of an academic rather than a disciplinary nature.

**Third Element – Satisfactory Performance.** It is uncontroverted that multiple faculty members as well as a chief resident found Dr. Irani's performance unacceptable in a number of specific instances, the faculty collectively recommended to the GMEC that Dr. Irani be placed on remediation on several occasions, and the faculty ultimately unanimously recommended he be dismissed from the Program. [30] It is also uncontroverted that the initial reports of concerns and

---

[30] The faculty first recommended Level II remediation in an August 15, 2011 memorandum of record. ECF No. 136-3 at 52. It then recommended Level III remediation (suspension) in a December 12, 2011 memorandum of record. *Id.* at 66-67. At the conclusion of the second

57

problems leading to the remediations and dismissal came from a number of sources within and outside the faculty.[31]

Dr. Irani asserts the faculty's investigations into the various patient-care incidents that led to remediation and dismissal were not as thorough as they should have been or did not reach the appropriate conclusion. Dr. Irani proffers evidence and predicts opinion testimony in support of both premises. For example, Dr. Irani proffers evidence he presented his more favorable version of a number of incidents to the faculty, providing a basis on which the faculty could consider and might accept his version of events. *E.g.*, ECF No.136-3 at 48, 49 (Dr. Irani's explanation for Mr. B's care); ECF No.136-3 at 56, 57 (Dr. Irani's email addressing each deficiency in the August 15, 2011 memorandum of record); ECF No. 136-3 at 75, 76, 86, 87 (Dr Irani's explanation of events surrounding his care of TF375, indicating many of the concerns arose before his involvement and he did the best he could under difficult circumstances).

Dr. Irani also proffers evidence through his declaration that some grounds stated for remediation may have been based on an erroneous understanding of the facts. *See*, *e.g.*, Irani decl.

---

remediation, the faculty recommended a second Level II remediation. *Id.* at 101 (January 31, 2012 memorandum of record). On March 5, 2012, the faculty recommended Level III remediation (suspension) pending investigation and dismissal if the investigation failed to result in a reasonable explanation for Dr. Irani's actions. *Id.* at 112. The GMEC adopted each of these recommendations.

[31] As detailed in the fact section of this order, the complaints about Dr. Irani's performance during his PGY-2 year came from a number of sources including faculty members Drs. Grabowski, Voss, Walsh, and Koon and chief resident Dr. Wood. Other complaints were made by two sets of nurses involving two distinct incidents. Even Dr. Guy, who Dr. Irani suggested was his greatest supporter, advised the Grievance Committee that Dr. Irani should not continue in the Residency Program. The concerns that led to Dr. Irani's Level II and III remediations, as well as his ultimate dismissal, were, moreover, consistent with concerns noted in evaluations from a number of other physicians during his PGY-1 year.

¶¶ 14, 15, 32, 33, 35-37 (presenting his explanations of his efforts to obtain a same-day MRI as instructed by Dr. Grabowski, his telephone conversation with the Thanksgiving weekend caller, and his instructions to the patient's husband who called regarding pain management).[32]

Dr. Irani also proffers Dr. Grant's opinion that Dr. Irani's care of TF375 was appropriate because the most critical concern was reducing her fractures as quickly as possible. ECF No. 148 at 26 (Grant dep. at 167-69). Dr. Irani also cites the Grant report (in its entirety) for the proposition the care he provided patients was, in Dr. Grant's opinion, appropriate for Dr. Irani's PGY-2 level of experience. ECF No. 148 at 42, 61 (also relying on Dr. Grant's opinion Defendants failed to provide an environment conducive to learning as required by ACGME standards).

For present purposes, the court will assume without deciding that this evidence and opinion testimony might raise a genuine issue of material fact *if the question was whether the faculty and GMEC were correct* in their understanding of the facts and *reached the most appropriate*

---

[32] Dr. Irani also proffers affidavits from two nurses (one of whom was involved in ordering the same-day MRI for Dr. Grabowski's patient), the attending physician involved in the Mr. B incident, a cast technician who participated in the care of TF375, and a physician who gave Dr. Irani a somewhat unfavorable evaluation during his PGY-1 year. ECF Nos. 148-3 -148-8. The proffered affidavits are consistent with and largely cumulative of Dr. Irani's declaration regarding his performance and specific incidents. One nurse also states, generically, that [t]he orthopaedic attendings seemed to emphasize faults with Dr. Irani more than his colleagues." ECF No. 148-3. The physician involved in the Mr. B incident refers obliquely to knowledge of "very important dynamics . . . between Dr. Irani and some of his superiors" in the Program, and specifically refers to Dr. Koon's comments about the article on swimming with sharks as "particularly disturbing." ECF No. 148-8 (this physician's affidavits were apparently prepared for submission to the California Medical Board). The other physician explains that his PGY-1 evaluation of Dr. Irani was not intended as an indictment of Dr. Irani's competency or ability to practice medicine. All speak favorably of Dr. Irani's skills, professionalism, compassion and patient care. The opinions held by these individuals may suggest the faculty could have reached a different conclusion as to Dr. Irani's performance generally or in specific incidents. It does not support an inference that the faculty failed to exercise its professional judgment in concluding otherwise.

*conclusions* as to whether Dr. Irani was in need of remediation or should be dismissed. These are not, however, the appropriate questions. As explained in *Ewing*, the court must "show great respect for the faculty's professional judgment" and "may not override [that judgment] unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Ewing*, 474 U.S. at 255.

Dr. Irani points to no evidence that even a single faculty member's view or vote was the result of "such a substantial departure from accepted academic norms as to demonstrate that the [faculty member] did not actually exercise professional judgment." *Id.* Neither does he point to any evidence that that the collective faculty failed to exercise its professional judgment in recommending remediation and dismissal or the GMEC failed to exercise its professional judgment in accepting those recommendations.

**Fourth Element – Less Favorable Treatment.** Dr. Irani also fails to proffer evidence sufficient to raise a genuine issue of material fact as to the fourth element, that he was treated less favorably than similarly situated persons outside his protected class. Dr. Irani briefly addresses five comparators in his opposition memorandum: Drs. Goodno, Nathe, Wood, Hoover, and Walker. He asserts Dr. Goodno was not counseled for "using Vicryl suture on a patient" or about the Thanksgiving caller, Dr. Nathe "was not placed on academic remediation for her involvement in [the TF375 patient care incident,]" Dr. Wood was not counseled for suggesting Dr. Nathe page Dr. Irani to assist in the care of TF375, "a very complicated trauma obviously beyond either junior resident's abilities or expertise," Dr. Hoover gave an explanation of how he would have handled the call from a patient's husband regarding pain management that was consistent with how Dr. Irani states he handled the incident, and Dr. Walker "was not disciplined for performing or

documenting an inadequate neurological evaluation on the spine patient shortly before Plaintiff's final suspension."[33]

Dr. Irani refers to four of these comparators in his declaration, explaining "at least five of the deficiencies cited [in support of his remediations or dismissal] were either performed or verified by my white colleagues without retribution[.]"  He identifies the following incidents and comparators:  (1) "treatment of trauma patient TF375 (Drs. Nathe and Wood)," (2) "dosing of narcotics (Dr. Hoover)," (3) "medical knowledge (Dr. Goodno)," (4) "evaluation of post-op knee patient (Dr. Goodno)"; and (5) "wound closure with Vicryl suture (Dr. Goodno)."  *Id.*   He also refers to disparate treatment in more general terms, including by stating he "was unfairly singled out throughout his residency . . . [and] believe[s] the facts have been misrepresented."  Irani decl.

¶ 75.    Dr. Irani also refers generally to disparate treatment:

> During most of my PGY-2 year, I felt constantly intimidated by Dr. Koon either calling me a terrorist or by threatening me with discipline for some minor infraction but *for which he gave a pass to other residents who had done the same or similar things*.  This was not an environment to learn as the defense has portrayed, and it was not one that was fair and equitable and allowed me a chance to become an orthopaedic surgeon.

---

[33]  Dr. Irani identified only Drs. Nathe, Hoover and Goodno as comparators during his deposition. Irani dep. at 174.  While he apparently did not identify Dr. Wood as a comparator, the court will assume for purposes of this order that Dr. Nathe's references to Dr. Wood's peripheral involvement in her summary of the TF375 incident gave notice Dr. Wood might be relied on as a comparator.  The court finds no similar basis for considering Dr. Walker as a potential comparator. Dr. Irani does not direct the court to any evidence Dr. Walker has been identified as a potential comparator or as someone involved in any of the incidents underlying Dr. Irani's remediation.  The only evidence Dr. Irani cites are pages from Dr. Grabowski's deposition that were not filed in support of his motion.  *See* ECF No. 148 at 63 (citing Dr. Grabowski dep. at 152 lines 5-18).

Irani decl. ¶ 76 (emphasis added).[34]

Dr. Irani's proffered evidence and argument does not support a finding he was treated differently from similarly situated persons outside his protected class.

**Dr. Goodno.** Dr. Goodno was similarly situated to Dr. Irani in that he was in the same year of residency and was also accused of failing to advise the Thanksgiving weekend caller to come in for evaluation of her wound. Dr. Goodno was, however, counseled regarding that call. Koon second aff. ¶ 59. Dr. Goodno denies he ever used Vicryl, a dissolving suture, for the purpose for which Dr. Irani was counseled (to close the top layer of a wound), and Dr. Irani offers no evidence to the contrary. *See*, *e.g.*, Goodno dep at 53; Koon second aff. ¶ 59 (stating he is not aware of any instance in which Dr. Goodno used Vicryl to close a wound). Thus, Dr. Goodno is not a comparator for purposes of any discipline relating to that usage. There is, likewise, no

---

[34] Although he alleges disparate treatment on the basis of race in this cause of action, Dr. Irani has, at other times, attributed his difficulties with Dr. Koon to other motivations. For example, in a December 16, 2011 email to Dr. Stephens, Dr. Irani suggested his "derailed" relationship with Dr. Koon resulted from to Dr. Irani's November 3, 2011 email about the discharge summary for a VA patient. ECF No. 136-3 at 81-82.

His response to a question from a Committee member during his Grievance Committee hearing also suggested non-discriminatory reasons behind his difficult dealings with Dr. Koon. The Committee member asked "[w]hat ultimately led us to this day?" Hearing trans. at 82. Dr. Irani responded by conceding he got off to a rocky start his PGY-1 year, but stated he improved during the year. *Id.* When he "got to orthopaedics," he felt he "wasn't given the feedback or direction" he had come to expect and "Dr. Koon became frustrated because [Dr. Irani] kept asking questions." *Id.* After Dr. Irani sent Dr. Koon the November 3, 2011 email, "Dr. Koon declared [a] personal vendetta[,]" suggesting he intended or wanted to fire Dr. Irani. *Id.* at 83 (explaining there was "a very marked change in the tone" after Dr. Irani sent this email and he "got off on the wrong foot" with Dr. Koon). Dr. Irani also acknowledged he had "made . . . mistakes," though he did not repeat the same mistakes often. He felt the situation "snow-balled" and Drs. Koon and Walsh had made a "personal decision that they weren't happy with [Dr. Irani's] care and weren't able to work with [him]." *Id.*

evidence that Dr. Goodno had a history of multiple incidents similar to those addressed in Dr. Irani's August 15, 2011 Memorandum of Record (relating to his first Level II remediation) or any subsequent remediation or dismissal. Thus, Dr. Goodno is not a valid comparator for Dr. Irani's remediations and dismissal.[35]

**Dr. Nathe.** Dr. Nathe was somewhat similarly situated to Dr. Irani as to the TF375 incident because she was involved in that incident. She was, however, a first-year resident with no history of remediation or other patient incidents or deficiencies similar to those for which Dr. Irani was subject to remediation. She was counseled for this incident as explained in Dr. Koon's second affidavit and as evidenced by their contemporaneous email exchange. Koon second aff. ¶ 63; ECF No. 140-8 at 2. Thus, she is not a valid comparator as to Dr. Irani's remediations and dismissal, which arose from multiple incidents.

**Dr. Wood.** Dr. Wood's suggestion or instruction that Dr. Nathe page Dr. Irani to assist with TF375 does not make Dr. Wood a comparator for purposes of Dr. Irani's care of TF375. To the extent Dr. Irani was disciplined with respect to TF375, it was for his actual care of that patient (most critically concerns with whether he had provided compassionate care), and related issues involving interactions with nurses, communication with the family, and informed consent. There is no suggestion he was disciplined either for giving an instruction similar to that Wood gave Nathe or for responding to Nathe's request for assistance.

––––––––––––––––––––––––––

[35] It is, nonetheless, notable that Dr. Goodno described the Program as a tough one, in which faculty was hard on all residents. Goodno dep. at 56. Dr. Goodno testified he was called into a faculty meeting in which his deficiencies were discussed. *Id.* at 65-67. Either in that meeting or at some other time, Dr. Koon asked if he wanted to remain in the Program (a question he ultimately answered in the negative). *Id.* at 66-67.

**Dr. Hoover.**  Dr. Hoover is, likewise, not a valid comparator based on his response to a query during a faculty meeting.  At most, Dr. Hoover's response is evidence Dr. Irani acted appropriately in his telephone communication with a patient's husband *if his actions were the same as the hypothetical response given by Dr. Hoover*.  It is, however, undisputed that multiple faculty members including at least Drs. Walsh, Koon, and Voss believed Dr. Irani had not acted in the manner Dr. Hoover described, instead believing he had approved a dangerously large dose.[36]

Even if Drs. Wood and Hoover's actions (or comments) were comparable to Dr. Irani's actions as to the specific incidents described, these residents would not be valid comparators.  This is because there is no evidence either had a history of multiple deficiencies similar to those of Dr. Irani.

**Dr. Walker.**  Dr. Irani has failed to proffer evidence as to the incident in which Dr. Walker was allegedly involved, which he describes only very generally (as an insufficient neurological examination).  It follows that Dr. Irani has failed to proffer evidence that Dr. Walker was a valid comparator.  Even were he to proffer evidence as to this one incident, it would be insufficient for reasons explained above as to Drs. Goodno, Nathe, Wood, and Hoover:  none of the potential comparators is alleged to have been involved in multiple incidents of a similar nature, particularly despite multiple remediations.

---

[36]  Drs. Walsh, Koon and Voss apparently believed Dr. Irani told the patient's husband (or the patient) she could take five more pills (of five milligrams each) rather than five more milligrams of the drug (one pill).  *E.g.*, Voss dep. at 50-53 (indicating his belief was based, in part, on information Dr. Irani provided); Walsh dep. at 33-34 (stating his belief based on a conversation with the patient that Dr. Irani approved a "massive dose"); ECF No. 136-3 at 66-67 (Dec. 12, 2011 memorandum of record signed by Drs. Walsh and Koon referring to "lack of appropriate pain management").  Dr. Irani himself testified he spoke to a fellow resident about the call the following morning, because he was concerned about a miscommunication.

**Pretext.** Palmetto Health has proffered a non-discriminatory explanation for the decisions to place Dr. Irani on remediation and, ultimately, to dismiss him from the Residency Program. Its arguments as to these decisions are essentially the same as its arguments on the third element of Dr. Irani's prima facie case. For the same reasons as to that element and in light of the same (academic-decisions) standard, the court finds that Dr. Irani has failed to proffer evidence that Palmetto Health's proffered legitimate reasons for Dr. Irani's remediations and termination were pretextual.

**Conclusion.** For reasons addressed above, Dr. Irani has failed to raise a genuine issue of material fact as to either the hostile environment or disparate treatment aspects of his Section 1981 claim and Palmetto Health has shown that it is entitled to judgment as a matter of law. The court, therefore, grants Palmetto Health's motion for summary judgment as to the second cause of action.

### III.    Title VII and Section 1981 – Retaliation

**Amended Complaint.** Dr. Irani's third cause of action is asserted against Defendants Palmetto Health and USC-SOM and alleges both violated Title VII and Section 1981 by retaliating against him for opposing unlawful discrimination. The Amended Complaint identifies three protected activities: (1) making complaints to his supervisors and other employees of Defendants Palmetto Health and USC-SOM; (2) filing grievances challenging unwarranted disciplinary actions against him by Dr. Koon and his termination; and (3) filing a charge of racial discrimination with the EEOC. ECF No. 49 ¶ 46. The Amended Complaint also identifies three retaliatory actions: (1) "imposing additional, unwarranted disciplinary actions"; (2) "terminating [Dr. Irani's]

employment," and . . (3) "submitting false and defamatory information about [him] to the California Medical Board[.]" ECF No. 49 ¶ 48.[37]

**USC-SOM Arguments.** Defendant USC-SOM argues it is entitled to summary judgment on this retaliation claim on multiple grounds including that any Title VII claim is barred as untimely and unavailable against USC-SOM because it was not Dr. Irani's employer. As to Section 1981, USC-SOM argues there is neither an employment relationship nor any other contractual relationship between it and Dr. Irani, thus there is no basis for a Section 1981 claim. It also argues both legal theories fail because there is no evidence USC-SOM was aware Dr. Irani engaged in any activity protected under Section 1981 (complaint of racial discrimination) or Title VII (complaint of discrimination based on race, national origin, or religion), precluding a finding of but-for causation. ECF No. 136-1 at 6 (citing, *e.g.*, *Univ. of Texas Sw. Med. Ctr. v. Nassar*, ___ U.S. ___, 133 S. Ct. 2517, 2528 (2013)). Finally, USC-SOM argues Dr. Irani cannot demonstrate the proffered legitimate reasons for the complained-of adverse actions were pretextual. ECF No. 136-1 at 7.

**Palmetto Health Arguments.** Palmetto Health, likewise, argues the retaliation claim fails to the extent based on Title VII because Dr. Irani did not file a timely administrative charge. As to the merits, it argues the claim fails under both Title VII and Section 1981 because Dr. Irani must establish but-for causation and there is no evidence "tying [his] performance reviews or termination to his use of the grievance procedure." ECF No. 139-1 at 48. Palmetto Health also

---

[37] As discussed below, Dr. Irani now advances narrower allegations of retaliation.

argues that neither placement on academic remediation nor subsequent reports to the California Medical Board are adverse employment actions. ECF No. 139-1 at 47-48.

**Irani Response.** In response, Dr. Irani identifies a single report as the protected activity: his January 3, 2012 report to Dr. Stephens that Dr. Koon referred to Dr. Irani as "Achmed the Terrorist." ECF No. 148 at 64. In support, Dr. Irani cites his declaration averment that he met with Dr. Stephens as part of the grievance process on January 3, 2012, and reported his belief "that Dr. Koon was not an unbiased evaluator of me and treated me differently, notably call[ing me] racially charged names like 'Achmed the Terrorist.'" Irani decl. ¶ 53. Dr. Irani also relies on his deposition, in which he conceded he had not reported discrimination or harassment concerns to Human Resources but explained as follows:

> I spoke with Dr. Stephens I believe in about January and at several points I had mentioned to her that there is a cultural difference here, I'm being treated disparately from my co-residents. I said I believe it's my cultural background and . . . by January I had mentioned to her – I had given her the specific I believe of saying there's Achmed, but the complaints about cultural differences, the complaints about being treated differently based upon that were existing with [Dr.] Stephens.

Irani dep. at 66 (ECF No. 150-5 at 23) (conceding he did not report the concern to Human Resources); *see also id.* at 67 (explaining that, by cultural differences, he was referring to "bad comments related to someone's perceived I think background, i.e. Achmed the terrorist.").

Dr. Irani identifies three specific adverse actions taken against him after his January report of the "Achmed the Terrorist" comments: (1) Dr. Stephens' denial of his (January) grievance; (2) Dr. Stephens' failure to provide requested documents; and (3) Dr. Stephens' refusal to allow a one-day-late grievance to proceed. ECF No. 148 at 64. He argues that the "short time span" between his complaint and Dr. Stephens' actions, all of which occurred in January 2012, support an inference of causation.

**Reply Arguments.**  On reply, USC-SOM notes that Dr. Irani now relies solely on a "new allegation that he reported the 'Achmed the Terrorist' comment to [Dr. Stephens]" who, shortly thereafter, took three allegedly adverse actions against him.  ECF No. 179 at 6.  USC-SOM also notes Dr. Irani's failure to suggest a basis for imputing Dr. Stephens' knowledge, motivation, or specifically alleged retaliatory actions to USC-SOM.  *Id.*  Finally, it argues Dr. Irani has failed to proffer evidence Defendants' collective reasons for their actions were pretextual.  *Id.* at 6-7.

In its reply, Palmetto Health proffers an explanation for Dr. Stephens' failure to provide documents:  her understanding Dr. Irani was already aware of the allegations and had access to any documents he needed regarding patient care.  ECF No. 168 at 6.  It also explains the reasons Dr. Irani's January request for a grievance hearing was denied:  that Dr. Irani's request was late because Palmetto Health did not treat Dr. Martin Luther King, Jr. Day as a holiday.  *Id.*  Palmetto Health also argues all steps in the grievance policy were followed.  *Id.* at 4-5 (addressed in context of claim for contractual due process violation).[38]

**Elements.**  To establish a retaliation claim under the *McDonnell Douglas* burden-shifting framework, Dr. Irani must first establish a prima facie case by showing (1) he engaged in protected activity, (2) his employer took adverse action(s) against him; and (3) a causal relationship exists between the protected activity and adverse action(s).  *Foster v. Univ. of Maryland-Eastern Shore*,

---

[38]  Under the heading "Retaliation," Palmetto Health addresses Dr. Irani's argument that the post-hearing submission of ex parte documents to the Grievance Committee was improper.  While Dr. Irani makes such an argument in his responsive brief, it does not appear to be in support of his retaliation claim.

787 F.3d 243, 249 (4th Cir. 2015).[39]  If Dr. Irani meets this burden, the employer may proffer a legitimate, non-retaliatory reason for its actions, shifting the burden back to Dr. Irani to prove the legitimate reason offered was not the true reason, but a pretext for discrimination.  *Id.* at 250.  If Dr. Irani meets this burden, a jury may draw an inference of retaliatory intent.  *Id.* (holding *Nassar* did not modify the proof required under the *McDonnell Douglas* framework because that "framework has long demanded proof at the pretext stage that retaliation was a but-for cause of a challenged" retaliatory action).[40]

     An adverse action may support a retaliation claim only if it is "materially adverse, which . . . means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *E.g., Burlington N. & Sante Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (addressing retaliation claims under Title VII); *Boyer-Liberto*, 786 F.3d at 281 (noting Section 1981 retaliation claims are subject to the same standards as Title VII retaliation claims) (internal quotation marks omitted).  The adverse action need not, however, rise to the level of an "adverse employment action" as required for a disparate treatment claim.  *Lettieri v. Equant, Inc.*, 478 F.3d 640, 650 n. 2 (4th Cir. 2007) (acknowledging change in standard following *White*).[41]

---

[39]  Dr. Irani's arguments in opposition to summary judgment, most critically his causation argument, which depends solely on a temporal link, demonstrate that he is relying on a burden-shifting framework.

[40]  In light of the holding in *Foster* and Dr. Irani's reliance on the burden-shifting framework, the court need not decide whether *Nassar*, which required but-for causation in light of Title VII's statutory language, applies to a Section 1981 retaliation claim.

[41]  Palmetto Health argues this retaliation claim fails because Dr. Irani was not subjected to an adverse *employment* action.  ECF No. 139-1 at 47-48.  This argument rests on an incorrect legal standard despite citing *Jensen-Graf v. Chesapeake Employers' Ins. Co.*, 616 F. App'x. 596, 598

**Discussion – USC-SOM's Arguments.** As explained above (Discussion § I), Dr. Irani's Title VII claim is untimely and he has failed to proffer evidence sufficient to support a finding that USC-SOM was his employer. The present claim, therefore, fails as to USC-SOM on both grounds to the extent it relies on Title VII. The absence of evidence of an employment contract also precludes pursuit of this claim against USC-SOM under Section 1981 to the extent based on a contract of employment.

Even if construed as resting on a non-employment contract (e.g., a contract for education), Dr. Irani's Section 1981 retaliation claim would fail on the merits as to USC-SOM. This is because Dr. Irani fails to argue or direct the court to any evidence *USC-SOM* retaliated for activity protected under Section 1981. He, instead, expressly relies on his report to Dr. Stephens, a Palmetto Health employee, and her alleged subsequent retaliatory actions. ECF No. 148 at 64. He proffers no evidence or argument that would support an inference his report to Dr. Stephens constituted a report to USC-SOM or was otherwise passed on to USC-SOM. Neither does he identify any subsequent action by USC-SOM or its employees that was allegedly taken in retaliation for Dr. Irani's report of Dr. Koon's "Achmed" comments to Dr. Stephens. He, instead, relies on three actions he attributes to Dr. Stephens, her denial of a grievance and failure to provide requested documents as well as her (or possibly Palmetto Health's) refusal to excuse his delay in requesting a Grievance Committee hearing.

_____

(4th Cir. 2015), which distinguishes between the standards applied to retaliation and disparate treatment claims.

USC-SOM is, therefore, entitled to summary judgment on Dr. Irani's third cause of action both to the extent it rests on Title VII and to the extent it rests on Section 1981.[42]

**Discussion – Palmetto Health's Arguments.**  This cause of action fails to the extent it rests on Title VII due to Dr. Irani's failure to file a timely charge.  *See* Discussion § I.  It fails on the merits under both legal theories for reasons addressed below.

**Narrowed Allegations.**  Dr. Irani, for the most part, fails to respond to Palmetto Health's opening arguments, including that some of the retaliatory actions alleged in the complaint were not sufficiently adverse to support such a claim.[43]  He, instead, narrows his claim by relying on a single incident of protected activity, his January 3, 2012 alleged report to Dr. Stephens that Dr. Koon was biased against him and had referred to Dr. Irani as "Achmed the Terrorist."  He also identifies three specific events, all of which occurred during January 2012, as retaliatory actions that followed that report:  (1) Dr. Stephens' subsequent denial of his appeal (of the December Level III remediation); (2) Dr. Stephens' failure or refusal to provide requested documents; and (3) Dr. Stephens' (or Palmetto Health's) refusal to excuse his one day delay in filing a request for a Grievance Council hearing.  ECF No. 148 at 64.  By advancing this narrowed claim and failing to address Palmetto Health's arguments as to other allegations, Dr. Irani abandons any claim of other protected activity or retaliatory action as alleged in the Amended Complaint.

---

[42]  Dr. Irani's argument that Dr. Koon retaliated against him for complaining to the Accreditation Counsel for Graduate Medical Education ("ACGME") is not germane to the Title VII and Section 1981 retaliation claims.  These allegations are, instead, addressed below as to his tenth cause of action for First Amendment retaliation.

[43]  As noted above, Palmetto Health relies on an incorrect standard in making this claim.  However, as discussed below, Dr. Irani's now-claimed actions fail to satisfy the correct standard.

**Merits of Narrowed Claim – Not Materially Adverse.**   As narrowed, the alleged retaliatory actions fail to support a Section 1981 (or Title VII) retaliation claim.  This is because an adverse action may support a retaliation claim only if it is "materially adverse, which . . . means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *E.g., White*, 548 U.S. at 68 (2006).

As noted above, Palmetto Health argues in its opening brief (albeit based on an incorrect standard) that a number of Dr. Irani's alleged retaliatory actions (e.g., discipline that did not result in termination) are insufficient to support a retaliation claim.  Rather than responding to this argument, Dr. Irani raises three new allegations of adverse actions:  denial of a grievance, failure to provide requested documents, and refusal to excuse a delay in filing a grievance.  These allegations are substantially less detrimental than any of the adverse actions alleged in the Amended Complaint.  Dr. Irani offers no authority for the proposition that actions of this sort, which essentially preserve the status quo, might well dissuade a reasonable worker from complaining about a comment such as that allegedly made by Dr. Koon.

**Causation.**   As Palmetto Health argues, Dr. Irani must establish but-for causation to support his retaliation claim.  *Nassar*, 133 S. Ct. at 2528 (2013) (addressing Title VII claim); *Foster*, 787 F.3d at 252 (addressing proof under the *McDonnell Douglas* framework).  Dr. Irani's only argument as to causation is that the retaliatory actions followed soon after his report of the "Achmed" comments to Dr. Stephens on January 3, 2012.  The identified retaliatory actions occurred on January 11, 2012 (denial of Dr. Irani's grievance, ECF No 136-3 at 88), January 13,

2012 (denial of request for underlying complaints about TF375 incident, ECF No 136-8 at 71),[44] and on or about January 26, 2012 (refusal to accept Dr. Irani's late request for a Grievance Committee hearing, Irani decl. ¶¶ 59, 60).

The timing of the incidents is close in time, which may support an inference of causation for purposes of Dr. Iran's prima facie case. *See, e.g.*, *Clark Co. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (noting cases finding causation based on a temporal link require that the link be "very close"). That said, any inference of causation that may arise from the temporal connection in this case is quite weak given the absence of any evidence Dr. Stephens' attitude toward and actions regarding Dr. Irani were different before and after he complained of the "Achmed" comments.[45]

_____

[44] Dr. Irani asked for "a copy of all the original documents/complaints/allegations against me regarding Trauma F375 . . . so that I may understand the complaints against me and I can move forward." ECF No. 136-8 at 71. Dr. Stephens responded that Dr. Irani had "already seen the issues specific to the trauma patient situation and should already know what they are[.]" After summarizing those issues she stated "[r]ather than focusing on gathering documents, your focus should be on meeting the terms of your remediation plan." *Id.*

[45] The evidence, instead, suggests her views and actions were consistent before and after the January 3, 2012 meeting. For example, Dr. Stephens had previously denied Dr. Irani's grievance of his August 15, 2011 remediation. She also expressed a less than favorable view of Dr. Irani's progress in a November 30, 2011 email to Dr. Koon: "From what you've told me and my own unscientific assessment, it appears that lack of humility and maturity are underlying issues with [Dr. Irani]." ECF No. 136-9 at 47. On December 16, 2011, she responded to an email from Dr. Irani relating to the same grievance that the next step in the process was to contact Dr. Walsh, not her. ECF No. 136-3 at 81. The underlying email from Dr. Irani requested the same documents Dr. Irani later sought and did not receive from Dr. Stephens. She did not address this request in her December 16, 2011 response. Dr. Stephens' subsequent denial of Dr. Irani's grievance, refusal to provide documents relating to TF375, as well as any part she played in Palmetto Health's refusal to accept Dr. Irani's late request for a Grievance Committee hearing are consistent with these prior actions.

Assuming without deciding that the temporal link is enough to raise an inference of causation for purposes of Dr. Irani's prima facie case, that inference falls away in light of Palmetto Health's uncontroverted evidence of legitimate reasons for each of the allegedly retaliatory actions. As to the failure to provide documents, Palmetto Health notes Dr. Stephens' understanding (as expressed in her contemporaneous email) that Dr. Irani had been told of the underlying concerns. Dr. Stephens' email also suggested Dr. Irani should be focused on his remediation, rather than "gathering documents" and reiterated the intended legitimate purpose of remediation. Palmetto Health also notes Dr. Irani had access to relevant medical records if he needed additional information. Dr. Irani proffers no evidence that the reasons stated in Dr. Stephens' contemporaneous email were not her true reasons for denying the request.

Similarly, Palmetto Health explains Dr. Irani's January request for a Grievance Committee hearing was denied as late because Palmetto Health does not observe a holiday on Dr. Martin Luther King, Jr. Day. In her deposition, Dr. Stephens acknowledged that Human Resources could extend a deadline for extenuating circumstances. Stephens dep. at 121-22 (indicating this could be done if requested before the deadline passed). Dr. Irani proffers no evidence that his hearing request (or argument for extension) was denied for any reason other than he missed the deadline and did not seek an extension before the deadline passed.

As to the denial of Dr. Irani's grievance, the record reveals Dr. Stephens investigated the grievance by meeting with both Drs. Irani and Koon, and receiving additional written input from Dr. Irani. ECF No. 136-9 at 70 (Dr. Stephens' notes of her meeting with Dr. Irani); ECF No. 136-10 at 3-6 (supplemental email and written explanation from Dr. Irani to Dr. Stephens); ECF No. 136-10 at 8 (Dr. Stephens' notes of her meeting with Dr. Koon). After completing her investigation, she issued her decision stating she was upholding the decision. She noted that "[a]n

74

action like this is never simple, and I want to make it clear that our intent in initiating academic remediation is to aid you in meeting academic expectations and to have you complete your training." ECF No. 136-10 at 16. Nothing in Dr. Stephens' notes, letter denying the grievance, or any other evidence presented by any party suggests her reasons for denial of the grievance were other than that she believed the remediation warranted.[46]

## IV.     Breach of Contract – Direct Beneficiary

**Amended Complaint.** Dr. Irani's fourth cause of action (breach of contract) is asserted against USC-SOM and Palmetto Health. This cause of action specifically identifies Dr. Irani's Resident Agreement of Appointment for the period July 1, 2011, to June 30, 2012 ("Resident Agreement"), as the operative contract and alleges it is an agreement between Dr. Irani and Defendants USC-SOM and Palmetto Health. Am. Compl. ¶ 53. Dr. Irani alleges this agreement incorporates two other documents by reference: the Policies, Procedures, Rules and Regulations of Palmetto Health ("PH Policies"); and the Institutional and Program Requirements of the ACGME as well as that entity's duty hour requirements (collectively "ACGME Requirements"). *Id.* ¶¶ 54, 55.

Dr. Irani alleges the Entity Defendants breached their contractual obligations under the Resident Agreement and incorporated PH Policies and ACGME Requirements in seven ways. These include (a) terminating his employment prior to the end of the term without just cause, (b) violating the GMEC's policies on academic remediation, (c) violating the GMEC's policies for

---

[46] Palmetto Health appears to argue the absence of any reference to the "Achmed" comments in Dr. Stephens' notes of her meetings with Drs. Irani and Koon is evidence the comments were not reported to her. ECF No. 168 at 13 (Palmetto Health reply); ECF No. 136-9 at 70 & 136-10 at 8 (Dr. Stephens' contemporaneous typed notes). At this stage, the court must credit Dr. Irani's declaration averment that he reported such comments to Dr. Stephens. *See* Irani decl. ¶ 53.

dismissal of residents, (d) terminating his employment without due process as guaranteed by the Resident Agreement and GMEC policies, (e) requiring or permitting him to work hours in excess of ACGME and GMEC limits, (f) failing to provide adequate supervision and instruction, and (g) violating GMEC policies on working environment which require, inter alia, an environment free from harassment and conducive to education, in which residents may raise and resolve issues without fear of intimidation and retaliation. *Id.* ¶ 57.

**Arguments for Summary Judgment.**  USC-SOM argues that it cannot be in breach of the Resident Agreement (or incorporated PH Policies and ACGME Requirements) because it is not a party to it.  ECF No. 136-1 at 7.  Palmetto Health concedes it is a party to the Resident Agreement, but argues there has been no breach of that agreement because it is indisputable that "the faculty and GMEC all had a good faith belief that Dr. Irani was failing to demonstrate, meet or maintain satisfactory levels of performance."  ECF No. 139-1 at 25 (citing *Conner v. City of Forest Acres,* 560 S.E.2d 606, 611 (S.C. 2002) (where contract allows termination for cause, issue is "whether employer had a reasonable, good faith belief that sufficient cause existed")); *see also id.* at 27 ("There has never been a question that Palmetto Health had a reasonable, good faith belief that sufficient cause for Dr. Irani's discharge[] existed.").  Anticipating a potential argument based on Resident Manuals, Palmetto Health argues the Resident Manuals do not give rise to contractual duties and, even if they did, those duties were not breached.   ECF No. 139-1 at 24 n.13.

**Dr. Irani's Response.**  In response, Dr. Irani argues the Entity Defendants were joint employers because both "have undertaken contractual obligations to comply with the accrediting mandates and standards of the [ACGME]."  ECF No. 148 at 34-35.  This argument rests on statements in the separate Resident Manuals of Palmetto Health and the USC-SOM Department of Orthopaedic Surgery (respectively "PH Resident Manual" and "USC-SOM Resident Manual"

76

and collectively "Resident Manuals"). *Id.* at 35; *see also id.* at 37, 38 (relying on Institutional Commitment to Graduate Medical Education ("Institutional Commitment") found in PH Resident Manual). [47] Dr. Irani argues the Resident Manuals impose contractual obligations because they fail to include disclaimers in compliance with S.C. Code § 41-1-110. *Id.* at 36, 37 (also relying on two additional documents for breach of contract claim based on third-party beneficiary theory).

Dr. Irani also relies on an Orthopaedic Surgery Department Handbook ("Orthopeadic Handbook"). *Id.* at 36, 37. The Orthopaedic Handbook states the Resident Program will adhere to practices, policies and procedures of USC-SOM and Palmetto Health and incorporates ACGME standards. Dr. Irani argues cross references between the Orthopaedic Handbook and the PH Resident Manual "creat[e] contractual obligations of both [Entity] Defendants to comply with each other's policies and procedures" including the incorporated ACGME Requirements. *Id.* at 37, 38. Thus, in addition to (or in lieu of) the three sources of contractual duties identified in the Amended Complaint (Resident Agreement, PH Policies, and ACGME Requirements), Dr. Irani identifies and seeks to rely on three additional sources through his response to summary judgment (PH Resident Manual, USC-SOM Resident Manual, and Orthopaedic Handbook).

Dr. Irani argues the various standards in these six documents, including incorporated ACGME standards, were violated in several respects. *Id.* at 38, 39. First, he argues a contractual obligation to "ensure [an] appropriate learning environment" was breached by the "hostile and intimidating" environment in the USC-SOM Orthopaedic Surgery Department, which included

_____

[47] This one page document is signed by four representatives of Palmetto Health and includes a statement committing to conduct its physician training "programs in compliance with" requirements of the ACGME and certain other institutions or entities. ECF No. 155-6 at 6.

"bullying and hazing." *Id.* at 38. He specifically identifies the assignment of the article on swimming with sharks, the "feeding frenzy" in the December 5, 2011 faculty meeting, and "Dr. Koon's outrageous racial slurs and sarcastic, biting emails" to Dr. Irani as evidence of this breach. *Id.* at 39.[48]

Second, Dr. Irani argues there was no good faith effort at academic remediation. *Id.* at 39. He points to the Entity Defendants' failure to fully investigate alleged deficiencies, including a refusal to consider his explanations, as evidence of these breaches. Dr. Irani also argues that, once he "got on Dr. Koon's bad side," his missteps were looked at as "grounds for dismissal rather than teachable moments." *Id.*

Finally, Dr. Irani argues Defendants breached contractual duties by failing to provide due process. *Id.* As to this alleged breach, he refers to the "Department's deliberate distortion of the facts and demonstrable misrepresentations to the GMEC and [G]rievance [C]ommitee" and the post-hearing, ex parte submissions. *Id.* (also incorporating separate due process arguments made jointly as to contractual and constitutional claims).

**USC-SOM Reply.** On reply, USC-SOM notes Dr. Irani does not respond to USC-SOM's argument it is not a party to the Resident Agreement, but instead advances a joint-employer theory based on "handbooks and manuals that reference[] one another." ECF No. 170 at 7. USC-SOM characterizes Dr. Irani's theory as "amorphous" and "novel," and notes that it is "not alleged in the Amended Complaint." *Id.* (also arguing theory is "not supported by South Carolina law").

---

[48] Under his separate third-party beneficiary claim, Dr. Irani cites his expert's report for the general proposition Defendants failed to provide an environment conducive to resident learning. ECF No. 148 at 42 (citing expert report in its entirety).

**Palmetto Health Reply.** In its reply, Palmetto Health points to evidence Dr. Irani was heard in either written or oral form as to each remediation, either prior to institution of remediation or in the remediation process, and was afforded all steps in the grievance process that were timely sought. ECF No. 168 at 3-5. It also points to substantial evidence Palmetto Health and Program faculty made good faith efforts at remediation including by providing feedback during regularly scheduled meetings and documenting Dr. Irani's progress, which included providing some favorable comments. *Id.* at 4-5.

As to the post-hearing, ex parte submissions, Palmetto Health notes Dr. Irani's multiple references during the Grievance Committee hearing to physicians, including Dr. Guy, who supported him. ECF No. 168 at 14. It characterizes the Grievance Committee's request for additional post-hearing submissions as an action taken "out of an abundance of fairness to Dr. Irani." *Id.* (citing the affidavit of Gwen Hill who averred "the [G]rievance [C]ommittee indicated that Dr. Irani had discussed the support of several physicians, including Dr. Guy, and in order to fully assess the issues, they would like additional information–including statements from Voss and Guy." (ECF No. 168-8 at 2-3)). Palmetto Health also notes Dr. Irani was offered and accepted the opportunity to make his own post-hearing submission to the Grievance Committee. *Id.* (citing Hill aff. ¶¶ 7, 8; Hearne-Irani email exchange (ECF No. 168-9 at 2-3)).[49]

**Discussion – USC-SOM Arguments.** For reasons explained above (Discussion § I), it is indisputable that USC-SOM is not a party to the Resident Agreement. It follows that USC-SOM

---

[49] As in its opening brief, Palmetto Health also denies it owes Dr. Irani contractual duties arising from documents other than the Resident Agreement. ECF No. 168 at 3 n.3 (arguing Dr. Irani may not rely on affiliation agreements that were not relied on in the Amended Complaint); *id.* at 4 n.4 (stating it "does not admit that any of its policies create a contract").

cannot be found liable for breach of this agreement, including based on terms incorporated from other documents. Dr. Irani's other arguments suggesting a contractual relationship with USC-SOM are unavailing for reasons explained below.

The first difficulty with Dr. Irani's arguments is they substantially expand the theories predicted by his extensive and detailed Amended Complaint. The fourth cause of action, the claim at issue here, expressly relies on the Resident Agreement and terms from the PH Policies and ACGME Requirements, which Dr. Irani alleges are incorporated into the Resident Agreement. This cause of action does not mention or even allude to any other basis for the contract claim. Thus, it fails to give fair notice he will rely on the PH Resident Manual, the USC-SOM Resident Manual, or the Orthopaedic Handbook in support of his contract claim.[50]

Dr. Irani's legal arguments for reliance on these documents are, in any event, unavailing. Dr. Irani argues the Resident Manuals impose contractual duties on Defendants because they do not contain disclaimers meeting the requirements of S.C. Code Ann. § 41-1-110. *See* ECF No. 148 at 37 (citing S.C. Code Ann. § 41-1-110; *Anthony v. Atlantic Group*, 900 F. Supp. 2d 455 (D.S.C. 2012)). Section 41-1-110 provides that a "handbook, personnel manual, . . . or other document issued by an employer . . . , shall not create an express or implied contract of employment if it is conspicuously disclaimed." *Id.* (providing specific requirements for conspicuous disclaimers). Thus, this section provides a safe harbor from the judicially-created "handbook

---

[50] These documents are not, in fact, mentioned at any point in the Amended Complaint. While there is one reference to an otherwise unidentified "resident handbook," that reference relates to the definition of "business day" for purposes of calculating grievance deadlines. Thus, it does not give notice Dr. Irani will rely on the Resident Manuals in support of his contract claim. Amended Complaint ¶ 25.

exception" to South Carolina's at-will employment doctrine.  *See, e.g., Smalls v. Springs Indus., Inc.*, 357 S.E.2d 452 (S.C. 1987) (recognizing exception that allows at-will employees, under some circumstances, to rely on affirmative assurances of progressive discipline set out in an employee handbook).  Section 41-1-110 does not support reliance on a handbook to *create* an employment relationship in the first instance.  Neither does the underlying case law or the statute speak to enforcement of promises in non-employment handbooks, such as student handbooks.  Thus, neither Section 41-1-110 nor related case law support imposition of contractual duties (or employer status) on USC-SOM based on the content of any of the documents on which Dr. Irani now relies.[51]

For these reasons, the court finds USC-SOM is entitled to summary judgment on Dr. Irani's direct contract theory.

**Discussion – Palmetto Health's Arguments.**  As noted above, Palmetto Health does not contest the existence of contractual duties *arising from the Resident Agreement*.  It does, however, deny that it owes Dr. Irani contractual duties arising from other documents and objects to Dr. Irani's belated identification of documents not referenced under this cause of action as a source of

---

[51] Dr. Irani's legal argument expands the handbook theory adopted in *Smalls v. Springs Indus*. in several ways.  First, it applies the handbook theory to an individual who has a written employment contract allowing termination for just cause.  Second, it imposes contractual duties beyond promises of progressive discipline.  Third, it reaches beyond the handbook itself to impose duties based on third-party standards referenced in the handbook.  Fourth, as to USC-SOM it applies the theory to a student handbook (and student rather than employee).  As to Palmetto Health, it applies the theory in a hybrid employee-student setting.  Dr. Irani has not directed the court to authority in support of expansion of the handbook theory in any of these respects.  Available authority suggests South Carolina would not follow this approach.  *See Hessenthaler v. Tri-County Sister Help, Inc.*, 616 S.E.2d 694, 698-99 (S.C. 2003) (holding non-discrimination policy in employee handbook did not support breach of contract claim because it did not create an expectation that employment was guaranteed for any specific duration or a particular process must be followed before employee could be terminated; also noting that, to be enforceable, policy statements in handbook "must be definitive in nature, promising specific treatment in specific situations").

contractual duties.  Palmetto Health also argues there has been no breach of any alleged contractual duty, even if duties might be imported from other documents.  Each of these arguments is well founded.

For reasons explained above as to USC-SOM's motion, Dr. Irani may not rely on the Resident Manuals or Orthopaedic Handbook in support of his contract claim:  (1) the Amended Complaint does not identify these documents as a source of contractual duties; and (2) South Carolina law does not support extension of the "handbook" theory to allow reliance on these documents under the circumstances of this case.[52]  Even if these documents could be relied on as a source of contractual duties, Dr. Irani's claim would fail for reasons explained below.[53]

**Promise of Environment Conducive to Learning.**  Palmetto Health characterizes Dr. Irani's arguments regarding the duty to provide an environment conducive to learning, specifically his allegations of bullying and intimidation, as an argument Palmetto Health violated its harassment policy.  ECF No. 168 at 7.[54]  It argues no such claim is available because the

---

[52]  The court assumes one exception to the latter basis for limiting this claim.  Specifically, the court assumes without deciding that Palmetto Health's written grievance procedures could support a handbook-based contract claim if the source of those procedures was properly identified in the Amended Complaint.  Such a claim would, however, be limited to the specific assurances contained in the written grievance procedures.  As explained below ("Promise of Due Process"), Dr. Irani's contractual due process arguments are not so limited.

[53]  Palmetto Health's opening brief focuses on what should be the central issue under the contract claim:  whether Palmetto Health had a good faith belief that it had just cause to terminate Dr. Irani's employment.  Dr. Irani fails to address this issue in his response, instead focusing on three asserted "promises" of (1) an environment conducive to learning; (2) good faith efforts at remediation; and (3) procedural due process.

[54]  The Resident Agreement's only reference to harassment is as follows:  "Palmetto Health provides a work environment free from sexual and other forms of harassment and will discipline any House Officer guilty of committing such conduct.  (See Harassment Policy)."  ECF No. 136-

harassment policy required any form of harassment be reported to a supervisor or the Human Resources Department ("HR") and Dr. Irani made no such complaint to Dr. Koon or HR.  *Id.* (citing ECF No. 155-6 at 20 (Harassment Provisions of PH Resident Manual)).

This argument is not entirely persuasive given that Dr. Koon was the alleged source of the harassment and Dr. Irani claims he reported Dr. Koon's biased treatment and "Achmed" comments to Dr. Stephens in January 2012.  While Dr. Stephens was not Dr. Irani's direct supervisor, she might reasonably have been perceived as an appropriate person to whom to make a complaint given her role in the Program.  Thus, the court will assume for purposes of this order that this aspect of Dr. Irani's breach of contract claim is not barred by a failure to properly report concerns to the right person or department.

Dr. Irani's claim of breach of this promise, nonetheless, fails for much the same reason his hostile environment claim fails:  the frequency and context of the actions on which this claim depends do not support an inference that he was subjected to a hostile environment or deprived of an appropriate learning environment based on any conduct prohibited by the Resident Agreement or any aspect of the Harassment Policy that might be read into the Resident Agreement.

The specific events Dr. Irani identifies in his responsive brief as supporting this breach include the assignment of the article on swimming with sharks, Dr. Koon's negative response to Dr. Irani's November 3, 2011 or other emails, and the faculty's questions and comments during

---

5 at 16 ¶ 14. The Harassment Policy is found in the Palmetto Health Resident Manual and prohibits "verbal or physical" harassment "relating to a person's race, color, age, religion, gender, sex, disability or national origin" that "unreasonably interfere[s] with the person's work or create[s] an intimidating work environment."  ECF No. 155-6 at 20.  A heading at the top of this page states nothing in the policy creates a contract right.  Similarly, the first page of the Resident Manual states, albeit in a footnote, that "Nothing in the policies contained in this Manual shall be construed to constitute a contract[.]"  ECF No. 155-6 at 3.

the December 5, 2011 faculty meeting. These, however, are just the sort of faculty-student interactions that are beyond the scope of judicial review. *See* Discussion § II.B. (discussing *Ewing*, 474 U.S. at 225 (applying deferential standard of review for academic decisions to due process challenge); *Halpern*, 669 F.3d at 463-64 (applying deferential standard to disability discrimination claim); *Nigro*, 492 F. App'x at 360 (applying deferential standard to Title VII claim)). Moreover, it is notable that Dr. Irani's co-resident, Dr. Goodno, described the Residency Program as being tough on all residents and testified he was called into a faculty meeting where he faced tough questions including whether he wished to continue in the program. Drs. Goodno and Koon also indicated the swimming with sharks article was assigned to a junior resident each year.

**Promise of Good Faith Efforts at Remediation.** As to the second alleged breach, Dr. Irani argues there "was no bona fide effort at academic remediation to enable [him] to successfully complete the program" because "[t]here was never any effort to verify or validate reported problems with [his] performance, and the department's leadership refused to consider Dr. Irani's side of the story or explanation of the events in question." ECF No. 148 at 39. Instead, once he "got on Dr. Koon's bad side, the department began to look for missteps by Dr. Irani as grounds for his dismissal rather than as teachable moments to help his development as a physician." *Id.*

This alleged breach, like the alleged failure to provide an environment conducive to resident education, rests on ACGME requirements Dr. Irani argues are incorporated into the Resident Agreement. The particular duty he would read in is, moreover, not directly related to the remediation process itself. Rather, it relates to whether he should have been placed on remediation.

Even if the claimed duty (to make reasonable efforts to validate complaints including hearing the resident's side) may be read into the Resident Agreement, it would not support a claim here because Dr. Irani has failed to proffer evidence Palmetto Health breached any such duty. The

84

record establishes that the faculty affirmatively sought Dr. Irani's version of events as to most incidents giving rise to remediation and did not prevent him from presenting his side as to any incident. The only instance in which Dr. Irani's side was not elicited prior to a recommendation for remediation relates to his involvement in the care of TF375. This incident arose after the faculty voted to recommend Level III remediation (based on other incidents) and before the memorandum of record recommending this remediation was finalized. *E.g.*, Koon first aff. ¶ 22; Walsh aff. ¶¶ 18, 19; Irani decl. ¶ 45. Ultimately, Dr. Irani was able to present his version of all events, including the TF375 incident, during the remediation process and multiple levels of grievance proceedings.[55]

In any event, Dr. Irani has not directed the court to any contractual or other authority supporting the existence of any specific duty that was breached. He, instead, asks the court to second guess (or allow a jury to second guess) what are inherently academic decisions.[56]

---

[55] With regard to TF375, Dr. Irani was informed by Dr. Walsh on December 9, 2011, the day of his suspension, that the matter was being investigated and Dr Walsh wanted to get all sides. Irani decl. ¶ 45. Dr. Irani apparently prepared a written memorandum describing his version of these events shortly thereafter but did not present it to anyone until January 4, 2012, when he sent it to Dr. Stephens. ECF No. 136-3 at 86, 87. Dr. Irani does not suggest he was prevented from offering his version of events at an earlier time, only that his side was not affirmatively sought as to this particular incident.

[56] Dr. Irani does not and cannot argue that the faculty and GMEC were obligated to accept his version of events. Such an argument would ignore the deferential standard applied to review of academic decisions involving students (discussed above) as well as standards applied to employment decisions in the academic field. *See Smith v. Univ. of N.C.*, 632 F.2d 316, 345-46 (4th Cir. 1980) (noting "decisional dilemma" university-employment cases present due to court's reluctance to "interfere with the subjective and scholarly judgments which are involved" and noting courts, consequently, limit their review to whether "appointment or promotion was denied because of a discriminatory reason"). It would also ignore the standard applied to employment decisions outside the academic setting, which consider "the perception of the decision maker . . . not the self-assessment of the plaintiff." *See, e.g.*, *Evans.*, 80 F.3d at 960-61.

**Promise of Due Process.**  Dr. Irani also argues Defendants breached contractual promises of due process.  In his initial discussion of alleged due process violations, which combines contractual and constitutional arguments, Dr. Irani identifies two general categories of breach:  (1) distortions and misrepresentations of facts to the GMEC and Grievance Committee; and (2) post-hearing, ex parte submissions to the Grievance Committee.  ECF No. 148 at 39.  In his contract-specific discussion, he identifies four additional concerns:  (1) a belief the GMEC acted as a rubber stamp for faculty recommendations; (2) the absence of certain procedural protections (e.g., pre-deprivation hearing and right to counsel), (3) defects in some protections that were provided (e.g., conflict of interest inherent in providing assistance through an HR employee), and (4) problems he encountered in pursuing his grievances (e.g., Dr. Stephens' failure to provide requested documents, his missed deadline due to the policy's failure to explain what constitutes a business day, and faculty discouragement of his pursuit of one or more grievances).  *Id.* at 43-51.  Nowhere in either discussion does he identify any specific contractual promise of a due process step or protection that was breached.  Neither does he cite any legal authority in support of his theory that the alleged deficiencies (individually or collectively) constitute a breach of a contractual promise of due process.  In any event, as explained below, the record demonstrates Dr. Irani was afforded whatever process was due.

**Grievance Procedure – Missed Deadline.**  In addition to having access to the written procedure, Dr. Irani was repeatedly informed of his grievance rights and how to proceed to the next step in the process.  He identifies only one instance in which he was not allowed to proceed to the next level despite a request to do so.  That request, for a Grievance Committee hearing as to his December 2011 Level III remediation (suspension), was denied because Dr. Irani failed to request a hearing within the time allowed by the grievance procedure.  Dr. Irani points to an

86

arguably reasonable explanation for his late request, his erroneous assumption Dr. Martin Luther King Jr. Day was not a business day. He also points to possible ambiguity as to what constitutes a business day (the failure to list recognized holidays)[57] and a provision that might have allowed Palmetto Health to excuse his error. He does not, however, point to any provision of the grievance procedure that was violated by enforcing the deadline as written and declining to waive the lateness of his request. Neither does he point to any legal authority for his apparent premise that strict enforcement of a grievance deadline violates a contractual promise of due process.

**Alleged Discouragement.** Dr. Irani also suggests interference with his contractual rights because Dr. Walsh twice made comments that may have discouraged Dr. Irani from pursuing grievances.[58] Neither comment included any form of threat or *precluded* Dr. Irani from pursuing his grievances, even though he elected not to pursue the first of the two grievance beyond the third step. (He was not deterred from proceeding by the second comment.) Dr. Irani points to no

---

[57] Palmetto Health proffers uncontroverted evidence that it observed only five holidays, which did not include Dr. Martin Luther King, Jr. Day. Dr. Irani points to no action by Palmetto Health that led him to believe otherwise.

[58] Dr. Irani argues Dr. Walsh discouraged him from pursuing his first grievance (of the August 15, 2011 remediation) to the fourth step by stating they were both busy surgeons and grievance proceedings only got in the way of their work. *Id.* at 46 (citing Irani decl. ¶ 21). Dr. Walsh also stated he was "not going to tell [Dr. Irani] what to do[.]" *Id.* Although Dr. Irani did not pursue this grievance to the fourth step, he did pursue it to the third step, one step beyond Dr. Walsh's level (and after his comments).

Dr. Irani also argues Dr. Walsh sought to discourage his grievance of his second suspension and ultimate dismissal by stating there was no way the GMEC or Grievance Committee would rule against the Orthopaedic Surgery Department and encouraging him to "leave with dignity." *Id.* at 47 (citing Irani decl. ¶ 71). Dr. Irani pursued this appeal through the fifth step despite Dr. Walsh's comment.

contractual provision breached by the comments or any authority in support of the premise such comments may breach an express or implied term of the Resident Agreement.

**Alleged Bias.**  Dr. Irani also suggests he was denied due process because Dr. Stephens was biased against him.  He does not, however, point to any contractual or other authority for the premise that due process requires review at the third level of the five-step process by a neutral party with no prior knowledge of the matter being grieved.  To the contrary, the contractual steps make it highly likely that Dr. Stephens, the DIO, would be aware of the circumstances and involved in the process being grieved and, consequently, could well have formed an opinion of the propriety of the remediation before her involvement in the grievance process.

**Missing Protections.**  A number of Dr. Irani's arguments rely on the absence of certain protections (e.g., a right to be heard before the GMEC votes, or the right to counsel at the Grievance Committee hearing).  These arguments suggest disagreement with the terms of the alleged contract. They do not suggest a breach of any contractual promise.

**Alleged Misrepresentations.**  Dr. Irani also challenges the veracity of statements Drs. Koon and Walsh made during the Grievance Committee hearing.  The hearing itself provided him the opportunity to challenge the truthfulness or accuracy of these statements, including by questioning Drs. Koon and Walsh, an opportunity he declined, and by presenting his own testimony and supporting documents, an opportunity he fully exercised.

**Ex Parte Submissions.**  Finally, Dr. Irani challenges the post-hearing submission of summary statements by Drs. Koon, Walsh, Guy and Voss, which he maintains violated due process

because he was not afforded an opportunity to respond.  ECF No. 148 at 50.[59]  The grievance procedures are silent as to whether the Grievance Committee may request additional documents or how such a request should be handled.  Thus, the ex parte submission did not violate any express term of the contract.

Even if some term to the contrary might be implied, it was waived under the facts of this case.  This is, first, because Dr. Irani repeatedly asked the Grievance Committee to go beyond the hearing record to inquire as to various incidents and his general performance. Hearing Trans. at 76, 85, 112, 116.  Despite suggesting the Grievance Committee seek additional information, Dr. Irani never requested an opportunity to respond to what it might learn from other sources.  Instead, he stated at least twice that he would "stand by" whatever the Committee was told by the sources he suggested they consult.  *Id.* at 85, 116.

Second, Dr. Irani was, himself, provided an opportunity to submit additional materials to the Grievance Committee.  He accepted the opportunity without questioning whether the faculty was being given a corresponding opportunity or raising a concern as to whether either side would be given an opportunity to respond to any post-hearing submissions by the other.  In light of these circumstances, Dr. Irani has waived any objection to the post-hearing, ex parte submissions.

**Constitutional Procedural Due Process Requirements.**  As noted above, for purposes of this order the court assumes without deciding that the Resident Agreement incorporated

---

[59]  Drs. Walsh and Koon prepared a summary that was mostly duplicative of testimony presented during the hearing.  For purposes of this order, the court assumes this summary was presented to the Grievance Committee.  The Grievance Committee was also provided statements by Drs. Voss and Guy, both of which supported dismissal.

constitutional due process requirements.[60]  This favorable assumption does not, however, aid Dr. Irani as the process provided did not violate constitutional standards.

The Residency Program is an academic program and Dr. Irani's dismissal was based on a failure to meet academic standards.  Academic dismissals meet constitutional standards so long as (1) the student is fully informed of the faculty's dissatisfaction with his progress, (2) the student is notified of the dangerous consequences that such deficiencies pose to his continued enrollment, and (3) the ultimate decision is "careful and deliberate."  *Board of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78. 85 (1978) (applying standard to dismissal of medical student on academic grounds).  Academic dismissals do not require even a formal hearing, much less the type of protections (e.g., right to examine evidence and confront witnesses) typical in judicial proceedings. *Id.*

There is no question Dr. Irani was fully and repeatedly informed of the faculty's dissatisfaction with his progress and the risk of dismissal.  By the time of the Grievance Committee hearing, he had, in fact, been dismissed from the Program.  What Dr. Irani challenges is the collective and consistent judgment of the faculty and GMEC that he should be dismissed and the decisions of the Grievance Committee and Palmetto Health's CEO upholding his dismissal.  He was, however, afforded more process than *Horowitz* requires because he was afforded a formal hearing before a Grievance Committee comprised of faculty and residents from other departments. *See infra* Discussion § VIII (discussing constitutional claim).  Thus, even if constitutional due

---

[60]  Dr. Irani incorporates his constitutional due process arguments into his arguments on the due process aspect his contract claim.

process requirements are read into the Resident Agreement, the resulting promise was not breached.

## V.     Breach of Contract – Third-Party Beneficiary of ACGME Standards

**Amended Complaint.**  The fifth cause of action alleges breach of contract based on a third-party beneficiary theory and is asserted against both Entity Defendants.  ECF No. 49 ¶¶ 61-63.  Dr. Irani alleges "Palmetto Health and USC-SOM applied for and received accreditation from the ACGME for the Program" and, "[i]n receiving accreditation," these Defendants "agreed to comply with certain practices, policies, and procedures including the ACGME's Institutional Requirements and . . . Common Program Requirements."  *Id.* ¶ 63.  He alleges "[t]hese standards for accreditation amount to a contract between Defendants Palmetto Health/USC-SOM and the ACGME" and that, as a resident, he was an intended third-party beneficiary of this contract.  *Id.* ¶¶ 63, 64.

Dr. Irani alleges that the Entity Defendants breached the alleged contract and his rights as third-party beneficiary through six failures.  *Id.* ¶ 65.  These failures include failing to  (a) provide an education that facilitates residents' professional, ethical, and personal development; (b) inform residents of and adhere to established educational and clinical practices, policies and procedures; (c) provide fair, reasonable, and readily available written institutional policies and procedures for grievances and due process and failing to minimize conflicts of interest in adjudication of academic or disciplinary matters; (d) follow ACGME duty hour requirements; (e) provide adequate supervision of residents; and (f) provide an educational and work environment in which residents may raise and resolve issues without fear of intimidation or retaliation.  *Id.*

**Arguments for Summary Judgment.**  USC-SOM argues it cannot be liable on this claim because there is no evidence it was a party to any contract or agreement with ACGME.  ECF No.

136-1 at 8.  It also argues there was no breach because the Program never lost its accreditation.  *Id.* (also noting that the ACGME considered Dr. Irani's allegations regarding non-compliance but rejected them as without merit, citing Koon first aff. ¶ 36, Walsh aff. ¶ 33, Thomas aff. Ex. S). Finally, USC-SOM argues that accreditation standards are not a proper basis for any contract-based claim.  ECF No. 136-1 at 9 n. 4 (citing *Castrillon v. St. Vincent Hosp. and Health Care Center, Inc.*, 51 F. Supp. 3d 828, 842-43 (S.D. Ind. 2014) (rejecting resident's third-party beneficiary claim based on sponsoring institution's alleged failure to comply with ACGME standards)).

Palmetto Health argues that the statute of frauds precludes enforcement of any alleged contract between it and the ACGME because the agreement spans a period in excess of one year and there is no signed writing.  ECF No. 139-1 at 28 (relying on S.C. Code Ann. § 32-3-10 (2012)). It also argues accreditation standards do not constitute a contract.  *Id.*  Next, Palmetto Health argues the ACGME's failure to find a breach or to remove accreditation precludes any finding of breach. *Id.*   Finally, Palmetto Health argues that, even if there was a breach, Dr. Irani was at most an incidental rather than an intended beneficiary and, consequently, may not seek damages for the breach.  *Id.* at 28-31.

**Dr. Irani's Response**.  Dr. Irani does not address Defendants' arguments.  Most critically, he does not address arguments Defendants (1) were not in a contractual relationship with the ACGME and (2) even if the relationship with ACGME were deemed a contract, there was no breach because the Program never lost accreditation.

He, instead, advances a new argument that he is a third-party beneficiary of "one or more agreements *between Palmetto Health and the USC-SOM* to abide by the ACGME accreditation guidelines."  ECF No. 148 at 39 (emphasis added).  Dr. Irani identifies the following two

92

agreements as supporting this claim:  an Affiliation Agreement between USC-SOM and Palmetto Health ("Affiliation Agreement"); and a Program Letter of Agreement between Palmetto Health and the University Specialty Clinics, Department of Orthopaedic Surgery ("PLA").  ECF No. 148 at 40-42.

The Affiliation Agreement states the two entities will collaborate to ensure "Palmetto Health's graduate medical education programs operate . . . in compliance with regulatory and accreditation standards."  Affiliation Agreement ¶ 6.6.  The PLA states educational experiences "will be provided in a manner consistent with the applicable [ACGME] requirements, and other federal, state and local laws, rules and regulations."  PLA at 2, ECF No. 153-4 at 3.

**Discussion.**  Dr. Irani's failure to address Defendants' arguments is a concession of any claim based on contracts or contractual obligations flowing between either Defendant and the ACGME.  Any direct reliance on ACGME standards would fail in any event for reasons explained in *Castrillon*:

> [S]tandards that ACGME has established for all of its accredited institutions . . . are akin to regulations established by an administrative body, rather than a contract governing a relationship between two entities. If [the sponsoring institution] fails to substantially comply with ACGME's requirements, ACGME can revoke its accreditation; that would not be a "breach" of any "contract" by [the sponsoring institution], but rather a decision by ACGME, as a regulatory institution, that [the residency program] is no longer entitled to accreditation.  In other words, Dr. Castrillon has produced nothing that demonstrates that [the sponsoring institution] promised ACGME that it would follow its requirements.  Rather, it has produced a set of regulations that ACGME requires [sponsoring institution] to follow *if [it] wishes to retain accreditation.  Cf. Chicago School of Automatic Transmissions, Inc. v. Accreditation Alliance of Career Schools & Colleges*, 44 F.3d 447, 449 (7th Cir. 1994) ("[A]ccrediting bodies are not engaged in commercial transactions for which state-law contract principles are natural matches. The 'contract' the School wants to enforce is not a bargained-for exchange but a set of rules developed by an entity with many of the attributes of an administrative agency.").

*Castrillon*, 51 F. Supp. 3d at 842-43) (emphasis in original).

Dr. Irani's new argument, that he is a third-party beneficiary of the Affiliation Agreement and PLA, fails because it is not fairly predicted by the Amended Complaint, which expressly relies on third-party beneficiary rights arising out of a contract or contracts *between the Entity Defendants and the ACGME*, not on contracts between the Entity Defendants themselves. The Affiliation Agreement and PLA are not, in fact, mentioned at any point in the Amended Complaint.

Even if not barred for this reason, the new argument would fail because the nature of the promises between the Entity Defendants does not give rise to an inference residents are intended third-party beneficiaries rather than incidental beneficiaries of these agreements in general or any promises relating to ACGME standards in particular. *See Johnson v. Sam English Grading, Inc.*, 772 S.E.2d 544, 552 (S.C. Ct. App. 2015) (stating third party may enforce contract if the contract is "intended to create a direct, rather than an incidental or consequential, benefit to such third party"). Critically, Dr. Irani fails to cite a single case holding that agreements of a similar nature (agreements between entities engaged in joint educational efforts) may be enforced by students under a third-party beneficiary theory.

The court finds both Defendants are entitled to summary judgment on these grounds. It need not, therefore, reach Defendants' additional arguments for summary judgment, including that there was no breach given the Program never lost accreditation and the ACGME found no merit to Dr. Irani's multi-faceted complaint.

## VI.     Wrongful Discharge in Violation of Public Policy

**Amended Complaint.**  The sixth cause of action for wrongful discharge in violation of public policy is asserted against USC-SOM and Palmetto Health. ECF No. 49 ¶¶ 69-77. Both Entity Defendants moved for summary judgment on this claim.

94

Dr. Irani responded by "conced[ing] that the recent case of *Cunningham v. Anderson County.*, 778 S.E.2d 884 (S.C. 2015), appears to preclude" this claim and his counsel "has determined that this cause of action is no longer viable." ECF. No. 148 at 68 (stating he "withdraws [this] cause of action"). In light of the pendency of motions for summary judgment, the court treats Dr. Irani's "withdraw[al]" of this claim as a concession Defendants Palmetto Health and USC-SOM are entitled to summary judgment on this cause of action and grants both Entity Defendants' motions as to this claim.

## VII.    Tortious Interference with Contract (Employment Contract with Palmetto Health)

**Amended Complaint.** The seventh cause of action for tortious interference with contract is asserted against both Drs. Koon and Walsh. ECF No. 49 ¶¶ 78-88. It is asserted in the alternative to Dr. Irani's claim for breach of contract against USC-SOM and, consequently, rests on allegations these Defendants interfered with Dr. Irani's contract with Palmetto Health.

Both Individual Defendants moved for summary judgment on this claim. They raise multiple arguments including the following: (1) Dr. Irani cannot establish his contract with Palmetto Health was breached; (2) Drs. Koon and Walsh's alleged actions were privileged as the exercise of legal responsibilities pursuant to contractual agreements with Palmetto Health; and (3) the claim is barred by the South Carolina Tort Claims Act, S.C. Code § 15-78-10 *et. seq.* ECF No. 137-1 at 5-9.

In response, Dr. Irani explains this cause of action "was added as an alternative theory to [his] direct breach of contract claims" based on "USC-SOM's argument that there was no privity of contract between USC-SOM and Plaintiff." ECF No. 148 at 67, 68. Based on his view that "discovery in this case solidified Defendant USC-SOM's contractual obligations to Plaintiff," Dr. Irani concludes that this tortious interference claim "appears to be somewhat superfluous at this

point." *Id.* at 68. Dr. Irani neither expressly concedes this claim nor offers any opposition to the arguments for summary judgment.

By failing to offer opposing arguments, Dr. Irani has waived or abandoned this claim. *See Eady v. Violia Transp. Services, Inc.*, 609 F. Supp. 2d 540, 560-61 (D.S.C. 2009) ("The failure of a party to address an issue raised in summary judgment may be considered a waiver or abandonment of the relevant cause of action."). The claim would fail, in any event, due the absence of evidence of a breach by Palmetto Health. *See* Discussion § IV. The court, therefore, grants Drs. Koon and Walsh's motion for summary judgment on this cause of action.

## VIII.   Section 1983 – Procedural Due Process Violation

**Amended Complaint.** The eighth cause of action seeks relief under 42 U.S.C. § 1983 ("Section 1983") for alleged violation of Dr. Irani's constitutional right to procedural due process. ECF No. 49 ¶¶ 89-99. Although initially asserted against both Individual Defendants, it now proceeds solely against Dr. Koon. *See* ECF No. 95 at 2, 6, 7 (dismissing claim to extent asserted against Dr. Walsh).

Dr. Irani alleges he "had a constitutionally protected property interest in continued employment as a resident of the Program, in light of his employment Agreement and the written policies and procedures of the GMEC, . . . absent sufficient cause for termination." ECF No. 49 ¶ 90 (also alleging a property interest in graduating and obtaining credentials to become an orthopaedic surgeon). He also alleges he "had a constitutionally protected liberty interest in his good name, reputation, honor, and integrity in his chosen professional career as a physician." *Id.* ¶ 91. Dr. Irani alleges Defendants have publicly disclosed or he will be forced to disclose the reasons for his termination in future applications for licenses, employment and training and that his abrupt removal creates a harmful professional stigma. *Id.* ¶¶ 92, 93.

96

Dr. Irani alleges that the process provided was defective in sixteen respects.  These defects include (a) failing to provide notice of the charges or a hearing before termination; (b) failing to provide adequate notice termination was being considered as a disciplinary action; (c) refusing to allow representation by counsel during the grievance process or hearing; (d) refusing to allow him to review all relevant files and evidence being used against him; (e) failing to provide the opportunity to appear in person and be heard before the GMEC; (f) failing to allow cross examination and confrontation of witnesses at the GMEC meeting prior to his termination or meaningful opportunity for the same at the post-termination grievance hearing; (g) failing to allow discovery prior to termination; (h) failing to provide the right to compel witnesses to testify on his behalf; (i) failing to assure witnesses they would not be subject to retaliation for testifying truthfully; (j) failing to allow him a reasonable time to defend himself at the post-termination grievance hearing; (k) using prior allegations of misconduct against him despite prior, full remediation of those allegations; (l) considering irrelevant, prejudicial evidence that should have been excluded; (m) failing to inform him or the decision-makers of the applicable burden and quantum of proof necessary to support the decision or the standard of review for the grievance; (n) failing to follow the GMEC's written policies regarding time frames for a decision; (o) failing to follow the GMEC's written policies about acting on a recommendation of termination from the resident's department; and (p) failing to provide impartial and independent decision-makers for review of the termination decision.  *Id.* ¶ 94.[61]  Dr. Irani alleges that Dr. Koon acted under color

---

[61]  As with other causes of action, Dr. Irani advances narrower allegations of deficiencies in opposing summary judgment.

of state law in depriving Plaintiff of his constitutionally guaranteed rights to due process in these particulars.

**Dr. Koon's Motion.**  Dr. Koon argues this claim should be analyzed under the deferential standards applied to academic dismissals.  ECF No. 137-1 at 11, 12 (citing, *e.g.*, *Davis v. Mann*, 882 F.2d 967 (5th Cir. 1989)).  Dr. Koon also notes he did not control the grievance process, though he participated in it.  *Id.* at 13.  Finally, he argues he is entitled to qualified immunity because his actions with respect to the grievance process did not violate Dr. Irani's clearly established constitutional or statutory rights.  *Id.* at 13-14.

**Dr. Irani's Response.**  In his joint discussion of his contractual and constitutional due process claims, Dr. Irani states the court need not "delve too deeply into the intellectually demanding question of whether the residency program is primarily an academic endeavor or a matter of public employment" because "the process employed . . . was tainted by deliberate patent misrepresentations about Dr. Irani to the [G]rievance [C]ommittee."  ECF No. 148 at 43.  Dr. Irani also complains of "the *ex parte* submission of evidence by Defendants Koon and Walsh after the hearing closed and after the [G]rievance [C]ommittee had reached an impasse in its deliberations, without providing a copy of such information to [Dr. Irani] and without allowing him any opportunity to contest it" as "[t]he most egregious violation of [his] due process" rights.  *Id.*

In argument specific to his constitutional due process claim, Dr. Irani first addresses whether he was deprived of a cognizable liberty or property interest.  *Id.* at 52, 53.  He then argues that the process afforded violated the standard for academic dismissals, making it unnecessary to determine whether a less deferential standard applies.  *Id.* at 53, 54 (citing *Board of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78 (1978)).  Finally, he argues Dr. Koon is not entitled to

qualified immunity, relying on the prior order denying Dr. Koon's motion for judgment on the pleadings. *Id.* at 54.[62]

**Discussion.** For purposes of this order, the court assumes without deciding (1) Dr. Koon's actions relevant to this claim constituted state action and (2) Dr. Irani had a cognizable property interest in continuing in the Residency Program, at least through his PGY-2 year, and a cognizable liberty interest in his reputation. *See* ECF No. 148 at 51-53 (Dr. Irani's arguments on protected interests). Dr. Irani's procedural due process claim, nonetheless, fails for reasons explained below.

**Standard.** As noted above with respect to Dr. Irani's contract claim, the Residency Program is an academic program subject to the deferential standard discussed in *Horowitz*. That standard requires (1) the student be fully informed of the faculty's dissatisfaction with his progress, (2) the student be notified of the dangerous consequences that such deficiencies pose to his continued enrollment, and (3) the ultimate decision be "careful and deliberate." *Horowitz*, 435 U.S. at 85.

In *Horowitz*, the Court addressed dismissal of a medical student, noting the dismissal "rested on the academic judgment of school officials that [the student] did not have the necessary

---

[62] Dr. Irani's reliance on the court's prior order denying qualified immunity ignores the scope of and basis for that ruling. The relevant portions of the prior order addressed Drs. Koon and Walsh's motion for judgment on the pleadings and relied on the stage of the proceedings in reserving a ruling until the rights allegedly violated were defined with greater specificity. ECF No. 95 at 9-11 (discussing qualified immunity generally and relying on the flexible approach allowed by *Pearson v. Callahan*, 555 U.S. 223 (2009) ("When qualified immunity is asserted at the pleading stage, the precise factual basis for the plaintiff's claim or claims may be hard to identify.")); *id.* at 16-19 (discussing qualified immunity in context of the procedural due process claim and concluding "[t]he precise nature of the process, by whom it was provided, and whether it implicates due process considerations, cannot be determined on the pleadings.").

clinical ability to perform adequately as a medical doctor and was making insufficient progress toward that goal." *Id.* at 89-90. The court explained:

> Such a judgment is by its nature more subjective and evaluative than the typical factual questions presented in the average disciplinary decision. Like the decision of an individual professor as to the proper grade for a student in his course, the determination whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decisionmaking.

*Id.* at 90. The court, therefore, "decline[d] to ignore the historic judgment of educators and thereby formalize the academic dismissal process by requiring a hearing." *Id.* (noting less formal proceedings were particularly appropriate "as one advances through the varying regimes of the educational system, and the instruction becomes both more individualized and more specialized" and "declin[ing] to further enlarge the judicial presence in the academic community and thereby risk deterioration of many beneficial aspects of the faculty-student relationship").

**First and Second Requirements.** Dr. Irani does not address the first two *Horowitz* requirements. Thus, he effectively concedes he was provided adequate notice of the faculty's dissatisfaction and the potential consequences of failure to cure noted deficiencies.[63]

**Third Requirement.** As to the third requirement, Dr. Irani argues "Defendants simply cannot show that the ultimate decision to terminate Plaintiff from the residency program was 'careful and deliberate.'" ECF No. 148 at 54. His only specific discussion of this requirement is as follows: "As set forth in detail [as to the contractual due process claim], the deliberate or

---

[63] Were Dr. Irani to argue otherwise, his arguments would fail in light of the multiple memoranda and other documents establishing that he was informed of the reasons for each remediation, was counseled during the course of each remediation, and was informed of the risk of termination from the Program if he failed to cure the noted deficiencies. *See*, *e.g.*, Irani decl. ¶ 12 (referring to Dr. Koon's statement during the August 15, 2011 meeting that Dr. Koon had "fired" residents before, including one in his fifth year).

reckless nature of the allegations made against Dr. Irani during the grievance hearing, plus the *ex parte* submissions of additional information after the hearing deprived Dr. Irani of due process in this case." *Id.* at 53. Thus, Dr. Irani focuses his constitutional claim on allegations (1) Dr. Koon made deliberately or recklessly false statements during the Grievance Committee hearing and (2) the Grievance Committee improperly sought and accepted post-hearing, ex parte submissions.

Both arguments ignore the fact that a formal hearing is not required under *Horowitz*. *Id.* at 85 (finding school went beyond constitutionally required procedural due process by affording student the opportunity to be examined by independent physicians in order to be absolutely certain the grading of her medical skills was correct). Moreover, as *Horowitz* explained, even in the case of disciplinary dismissals (which warrant greater protections than academic dismissals) all that is required is "'that the student be given oral or written notice of the charges against him and, *if he denies them*, an explanation of the evidence the authorities have and *an opportunity to present his side* of the story.'" *Id.* at 85. (quoting *Goss v. Lopez*, 419 U.S. 565, 581, 584 (1975) (emphasis added)). *Horowitz* also notes *Goss* simply required an "'informal give-and-take'" between the student and the administrative body that would give the student "'the opportunity to characterize his conduct and put it in what he deems the proper context.'" *Id.* at 86 (quoting *Goss*, 419 U.S. at 584).

Dr. Koon was a member of the faculty and served as Program Director. He did not, however, establish the grievance procedure or control any aspect of it beyond his responsibility for the first-level review. His only other role was to act as a witness and representative of the faculty/management by answering Dr. Stephens' questions during the third-level review, providing testimony during the Grievance Committee hearing, and, possibly, submitting a post-

hearing ex parte summary of the faculty's position in response to a request by the Grievance Committee.

The process, in any event, more than satisfied *Horowitz*. It is undisputed that Dr. Irani was provided the opportunity to cross examine Dr. Koon during the Grievance Committee hearing, which he declined, and to present his own version of events and supporting documentation, which he accepted. Thus, Dr. Irani was provided a full opportunity to challenge any information he believed was false, which is more than *Horowitz* requires as to this aspect of his constitutional due process claim.

Similarly, even if the ex parte nature of the post-hearing submissions could be attributed to Dr. Koon, it would not support a finding the ultimate decision was not "careful and deliberate." To the contrary, the Grievance Committee's request for and acceptance of post-hearing submissions supports a finding the ultimate decision was "careful and deliberate" because it demonstrates the Grievance Committee wanted to ensure it considered all available evidence. This inference is particularly strong when viewed in light of Dr. Irani's repeated requests that the Committee inquire beyond what was presented during the hearing and his own submission of post-hearing materials.

For reasons explained above, Dr. Irani has failed to proffer evidence that he was deprived of his constitutional right to procedural due process either as a general matter or, more critically, based on any action by Dr. Koon. Dr. Koon's motion for summary judgment is granted on this ground. Given the claim's failure on the merits, the court does not reach Dr. Koon's qualified immunity defense.

## IX.     Section 1983 – Substantive Due Process

**Amended Complaint.**  The ninth cause of action seeks relief under Section 1983 for alleged violation of Dr. Irani's constitutional right to substantive due process.  This cause of action was dismissed in full by prior order.  *See* ECF No. 95 at 2, 19-21, 25 (dismissing claim in full).

## X.     Section 1983 – First Amendment Retaliation

**Amended Complaint.**  The tenth cause of action asserts a claim under Section 1983 for alleged retaliation in violation of Dr. Irani's right to free speech.  ECF No. 49 ¶¶ 107-17.  It now proceeds solely against Dr. Koon.  *See* ECF No. 95 at 2, 6-7 (dismissing claim to the extent asserted against Dr. Walsh).

This cause of action rests on allegations Dr. Irani was subjected to retaliation after he objected to excessive duty hour requirements and reported his concerns to coworkers, supervisors, the ACGME, and the Grievance Committee.  *Id.* ¶ 110.  The Amended Complaint also relies on Dr. Irani's reports of inadequate resident supervision to the ACGME and the Grievance Committee.  *Id.* ¶ 111.  Dr. Irani alleges his reports of duty hour violations and inadequate supervision were a matter of public concern because they impact health and well-being of residents with potential serious negative effects on patient care and learning.  *Id.* ¶ 109.  He, therefore, alleges these reports constitute protected speech "under the Constitutions of the United States and the State of South Carolina."  *Id.* ¶ 112.  Finally, Dr. Irani alleges that he was *terminated* in retaliation for speaking out about these matters of public concern.  *Id.* ¶ 113 (emphasis added).

**Dr. Koon's Argument.**  Dr. Koon argues he cannot be found to have engaged in First Amendment retaliation because was not aware Dr. Irani engaged in any constitutionally protected speech at the time he took any complained-of action and because Dr. Irani would have been terminated regardless of any protected speech.  ECF No. 137-1 at 17.  Dr. Koon also argues he is

entitled to qualified immunity because the right at issue was not clearly established. *Id.* (arguing, in part, there is no clear guidance whether residents should be treated as employees, who are entitled to greater protections, or students, who are entitled to lesser protections).

**Dr. Irani's Response.** In his opposition memorandum, Dr. Irani characterizes this claim as resting on allegations Dr. Koon retaliated against him for "speaking out on a matter of public concern by complaining to the ACGME about excessive working hours and inadequate resident supervision." ECF No. 148 at 65 (emphasis added).[64] Dr. Irani argues that questioning by Dr. Koon about his reports to the ACGME during the Grievance Committee hearing supports a finding Dr. Koon opposed his grievance in retaliation for his reports to the ACGME in violation of his right to free speech under the First Amendment. ECF No. 148 at 66 ("A permissible inference is that Defendants Koon and Walsh's overt hostility towards Plaintiff during the grievance hearing and their manipulation and distortion of the evidence during the grievance hearing . . . was causally related to Plaintiff's complaint to the ACGME.").

**Elements.** To establish a retaliation claim for exercising First Amendment rights, Dr. Irani must show: (1) that he was speaking as a citizen upon a matter of public concern rather than as an employee (or student) about a matter of personal interest; (2) that his interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public; and (3) that his speech was a substantial factor in the decision to take action

---

[64] Plaintiff mistakenly captions this argument as "First Amendment Retaliation – 42 U.S.C. § *1981*." ECF No. 148 at 65 (emphasis added). The reference to Section 1981 is, however, clearly a scrivener's error as First Amendment retaliation is not actionable under Section 1981 and the allegations addressed in this section of Dr. Irani's opposition memorandum correspond with those asserted under his tenth cause of action (Section 1983 retaliation claim). ECF No. 49 ¶¶ 107-17.

against him. *Smith v. Gilchrist*, 749 F.3d 302, 308 (4th Cir. 2014) (addressing test in employment

context).

> [T]he Supreme Court has allocated the burden of proof regarding causation between
> the parties in a first amendment discharge case in the following manner. The initial
> burden lies with the plaintiff, who must show that his protected expression was a
> "substantial" or "motivating" factor in the employer's decision to terminate him. .
> . . If the plaintiff successfully makes that showing, the defendant still may avoid
> liability if he can show, by a preponderance of the evidence, that the decision to
> terminate the plaintiff would have been made even in the absence of the protected
> expression, more simply, the protected speech was not the but for cause of the
> termination.

*Wagner v. Wheeler*, 13 F.3d 86, 90 (4th Cir. 1993) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ.*

*v. Doyle*, 429 U.S. 274, 286–87 (1977)); *see also Hartman v. Moore*, 547 U.S. 250, 260 (2006)

(citing *Mt. Healthy* in explaining "[i]f there is a finding that retaliation was not the but-for cause

of the discharge, the claim fails for lack of causal connection between unconstitutional motive and

resulting harm, despite proof of some retaliatory animus in the official's mind. . . . It may be

dishonorable to act with an unconstitutional motive and perhaps in some instances be unlawful,

but action colored by some degree of bad motive does not amount to a constitutional tort if that

action would have been taken anyway."); *Smith v. Co. of Suffolk*, 776 F.3d 114 (2d Cir. 2015)

(relying on *Mt. Healthy* in stating employer may be entitled to summary judgment, despite

employee's proof of a prima facie case, if it demonstrates it would have taken the adverse action

even in the absence of the protected conduct).

Where the employer proffers a legitimate reason for the termination, the employee may not

rely on temporal proximity alone to show pretext. *Wagner*, 13 F.3d at 91 (finding temporal

connection "too slender a reed" to establish causation). This is true even where the evidence shows

the protected speech "in some way irritated [the employer] and caused [the employer] to monitor

[the employee's] performance more closely" or the protected speech made "the employer more certain of the correctness" of its termination decision. *Id.*

**Discussion.** As with Dr. Irani's Section 1983 due process claim, the court assumes without deciding that Dr. Koon's actions constituted state action. The claim, nonetheless, fails because Dr. Irani cannot establish causation.[65]

It is undisputed Dr. Koon first became aware of the speech on which the claim is based on April 27, 2012. ECF No. 136-8 at 1-11 (ACGME communication to Drs. Koon and Stephens notifying them of Dr. Irani's complaints). The hearing at which the alleged retaliatory conduct (opposing Dr. Irani's grievance) occurred was on April 30, 2012. Thus, there is a close temporal link between the speech and the challenged conduct. As in *Wagner*, however, this is too slender a reed on which to establish Dr. Koon's opposition to Dr. Irani's grievance was a pretext for retaliation given the proffered legitimate reasons for Dr. Koon's actions during that hearing.

It is undisputed Dr. Koon, the only Defendant in this claim, expressed concerns with Dr. Irani's performance multiple times prior to April 27, 2012, and had either personally recommended or joined in recommending Dr. Irani be placed on various levels of remediation between August 15, 2011, and March 10, 2012. On February 29, 2012, Dr. Koon advised Dr. Stephens the faculty would recommend Dr. Irani's resident agreement not be renewed and, later that day, inquired whether a recent incident (care of spine patient L.O.) constituted just cause for immediate dismissal. ECF No. 136-3 at 109; ECF No. 136-10 at 54. The following day, March 1, 2012, Dr. Koon reported a second incident (care of hemophilia patient) to Dr. Stephens and opined that,

---

[65] Because Dr. Irani cannot establish causation, the court need decide whether the speech constitutes protected speech.

absent a reasonable explanation, just cause existed for dismissal. ECF No. 136-3 at 108; ECF No. 136-10 at 59 (indicating Dr. Walsh had met with Dr. Irani and the faculty's recommendation remained unchanged). Dr. Stephens relayed the concerns to the GMEC Executive Committee, which suspended Dr. Irani on March 1, 2012, pending a decision by the full GMEC on whether he should be dismissed. ECF No. 136-10 at 59-62, 65; Irani decl. ¶ 68.

On March 5, 2012, Dr. Koon prepared a memorandum summarizing events leading to the dismissal recommendation. ECF No. 136-10 at 73. Dr. Koon provided a copy to Dr. Irani, sought his feedback, and informed him that, absent a reasonable explanation for the recent incidents, the faculty would recommend dismissal at the April 10, 2012 GMEC meeting. ECF No. 136-3 at 112. Dr. Koon subsequently received Dr. Irani's written explanation and later met with him on March 13, 2012, as the first step in the grievance process, but declined to change the recommendation. ECF No. 136-3 at 116-17, 119. The GMEC voted to dismiss Dr. Irani on April 10, 2012. ECF No. 141-13 (minutes).

Dr. Koon's defense of the faculty's recommendation and GMEC's dismissal decision is entirely consistent with these prior actions. Dr. Irani does not suggest otherwise, but argues the ACGME complaint prompted Dr. Koon to take a more adversarial approach to the Grievance Committee hearing than he otherwise would have. Dr. Irani argues Dr. Koon treated him with overt hostility and manipulated and distorted evidence during this hearing in retaliation for the ACGME complaint.

Dr. Irani does not, however, point to any specific evidence or incident that Dr. Koon presented differently (in substance or tone) during the hearing than in Dr. Koon's prior memoranda and communications. Neither does Dr. Irani point to any evidence Dr. Koon ever waivered from his recommendation of termination or the reasons supporting termination. Under these

circumstances, any inference that Dr. Koon's approach to the hearing was motivated by Dr. Irani's ACGME complaint would be purely speculative.

Dr. Koon did question Dr. Irani about the ACGME complaint during the April 30, 2012 Grievance Committee hearing. This questioning confirms Dr. Koon was aware of the complaint by that time and raises an inference *these particular questions* would not have been asked if Dr. Koon did not know of the complaint. This is not, however, evidence of retaliation because Dr. Irani has not identified any harm flowing from the questions themselves or any change in Dr. Koon's position on the termination recommendation as a result of such knowledge.

For reasons explained above, Dr. Irani cannot establish the causation element. It follows that Dr. Koon is entitled to summary judgment on this claim. Given this ruling on the merits, the court does not reach Dr. Koon's qualified immunity defense.

## XI.  Section 1983 – Equal Protection

**Amended Complaint.** The eleventh cause of action seeks relief under Section 1983 for alleged violation of Dr. Irani's right to equal protection. ECF No. 49 ¶¶ 118-25. It now proceeds solely against Dr. Koon. ECF No. 95 at 7 (dismissing claim to extent asserted against Dr. Walsh).

This cause of action rests on allegations Dr. Irani was "singled out for overly harsh treatment and criticism that was not provided to similarly situated individuals in the Program." *Id.* ¶ 119. He alleges "his disparate treatment was motivated by discriminatory animus based on his race, religion, national origin, or ethnic background." *Id.* ¶ 120.[66]

---

[66] The Amended Complaint alleges (1) Dr. Irani is of Indian/Zoroastrian heritage, (2) Dr. Koon made offensive comments based on Dr. Irani's "mistakenly perceived middle eastern ethnicity[,]" and these comments created "a hostile work environment based on Plaintiff's race, national origin,

108

**Dr. Koon's Argument.** Dr. Koon notes that the proof necessary to support a Section 1983 equal protection claim mirrors that required under Title VII, thus allowing Dr. Irani to proceed either based on direct evidence or under the *McDonnell Douglas* burden-shifting framework. ECF No. 137-1 at 18. Dr. Koon argues Dr. Irani cannot establish this claim under either framework given the substantial evidence of performance deficiencies that persisted despite remediation and the multiple sources of complaints about Dr. Irani's performance. *Id.* at 19-20. He also notes that Dr. Irani's performance must be judged from the perspective of the decision-makers. *Id.* (citing *Evans v. Technologies Applic. & Serv. Co.*, 80 F.3d 954, 960-61 (4th Cir. 1996)).

Dr. Koon points to insufficiencies in Dr. Irani's evidence that he was treated less favorably than others outside his protected class. *Id.* at 23 (noting Dr. Goodno, a Caucasian, was also called before the faculty and questioned whether he wanted to be a surgical resident and the "terminated" fifth-year resident was also Caucasian). Dr. Koon also notes his own role in recruiting Dr. Irani, which he argues raises a "powerful inference" his subsequent actions relating to remediation and dismissal were not motivated by discriminatory animus. *Id.* at 25 (citing *Evans*, 80 F.3d at 959).

Finally, Dr. Koon argues he is entitled to qualified immunity because the right at issue was not clearly established in the particularized sense necessary to defeat qualified immunity . *Id.* at 25-26. He characterizes the relevant right as a right to be free from criticism "for legitimate performance issues that were also discussed by many of his peers." *Id.*

**Dr. Irani's Response.** Dr. Irani's one paragraph response incorporates his argument in support of his Section 1981 and Title VII disparate treatment claims. He also refers to "[Dr.]

---

or religion." ECF No. 49 ¶¶ 32-34; *see also id.* ¶ 36 (alleging disparate treatment by both USC-SOM and Palmetto Health based on the same three protected characteristics).

Koon's racial animus, as reflected in his admitted slurs towards Plaintiff or in Plaintiff's presence[.]" As to the qualified immunity defense, Dr. Irani relies exclusively on the order denying Dr. Koon's motion for judgment on the pleadings.

**Discussion.** As Dr. Koon argues and Dr. Irani concedes by relying on earlier arguments, Dr. Irani's equal protection claim turns on the same evidence and legal standards as his Section 1981 disparate treatment claim. It follows that it fails for the reasons discussed above. *See* Discussion § II.B.[67]

Dr. Koon's involvement in Dr. Irani's recruitment for the Program is also significant. Dr. Koon gave Dr. Irani one of the two highest ratings of the four interviewers. This raises an inference his subsequent treatment of Dr. Irani was not racially motivated. *See Evans*, 80 F.3d at 959.

Dr. Koon's motion for summary judgment on this cause of action is granted for these reasons. The court does not reach Dr. Koon's qualified immunity defense.

## XII.     Libel Per Se

**Amended Complaint.** The twelfth cause of action asserts a state law libel claim against Dr. Koon. ECF No. 49 ¶ 126-33. This claim relies on allegations Dr. Koon made false statements that Dr. Irani was "incompetent to practice medicine, that he had persistent patient care issues, that he failed to complete remediation measures, that he departed from acceptable standards of care in at least two patient encounters, and that he failed in the competencies of patient care, interpersonal skills and communication, and professionalism." *Id.* ¶ 127. Dr. Irani alleges that Dr. Koon "published these statements to third parties, including the Medical Board of California." *Id.* ¶ 128

---

[67] The Title VII disparate treatment claim was resolved on procedural grounds inapplicable to the equal protection claim.

(no third parties other than the California Medical Board are identified).  He alleges resulting damages, specifically identifying injuries that appear to flow from communications with the California Medical Board.  *Id.* ¶ 131 (referring to injuries flowing from the initial denial of his license to practice medicine in California).

**Dr. Koon's Arguments.**  Dr. Koon notes that the only allegedly defamatory statements identified are statements to the California Medical Board and the only alleged damages involve denial of Dr. Irani's license to practice medicine in California.  ECF No. 137-1 at 27.  He argues Dr. Irani cannot maintain a claim for libel *per se* based on Dr. Koon's communications with the California Medical Board because "Dr. Irani . . . specifically asked Dr. Koon to submit information to the California Medical Board" and signed a release covering "any information, files or records, including medical records, [and] educational records[.]"  *Id.* at 28 (citing *Martin v. Shank*, 1978 WL 38797 (4th Cir. Oct. 13, 1987) (affirming dismissal of defamation claim based on allegations of "false" medical records where plaintiff signed release allowing defendant to provide his medical records to Board of Law Examiners in support of his application for admission to bar)).

**Dr. Irani's Response.**  In response, Dr. Irani argues Dr. Koon committed libel by providing false information to the California Medical Board.  He identifies a memorandum Dr. Koon prepared in June 2013, more than a year after Dr. Irani's residency ended, as the libelous communication.  ECF No. 148 at 66-67 (citing *Holtzcheiter v. Thomson Newspapers, Inc.*, 506 S.E.2d 497, 510 (S.C. 1998) ("Libel is actionable per se if it involves "written or printed words which tend to degrade a person, that is, to reduce his character or reputation in the estimation of his friends or acquaintances, or the public or to disgrace him, or to render him odious, contemptible or ridiculous.")).

Dr. Irani points specifically to the disparity between a statement in this memorandum that he "failed" the competency of professionalism and an August 2012 summative evaluation in which Dr. Koon gave Dr. Irani a "good" rating on professionalism. ECF No. 148 at 67 (contrasting ECF No. 157-2 at 2 and ECF No. 157-3 at 2). Dr. Irani also argues the June 2013 summary included "false, defamatory statements that Dr. Irani had 'persistent patient care issues'; that the patient encounters were 'investigated . . . thoroughly'; and that '[n]o reasonable explanation could be identified for his actions.'" *Id.* Dr. Irani argues that the June 2013 memorandum contributed to the California Medical Board's initial denial of his license to practice medicine in California.

Dr. Irani argues his release does not preclude the libel claim because it was "nothing more than a privacy waiver[.]" It did not release Defendant from liability for providing false information. *Id.* at 67.

**Dr. Koon's Reply.** On reply, Dr. Koon notes Dr. Irani's failure to address the effect of the release other than through a boilerplate argument that the release did not bar a claim for submitting false information. ECF No. 169 at 13 (stating evidence is undisputed that both Dr. Irani and his attorney made "requests and demands" that Dr. Koon prepare a memorandum and Palmetto Health send that memorandum and Dr. Irani's entire file to the California Medical Board). He argues that it is "uncontroverted that Dr. Koon was trying to truthfully present . . . the reasons [Dr.] Irani was terminated from the residency program in the most politic way he could manage while still reflecting the fact that Irani's residency file had multitudinous examples of [Dr.] Irani's failures in various competencies (including . . . "professionalism" . . .)." *Id.*

**Elements.** To succeed on his defamation claim, Dr. Irani must establish four elements: (1) a false and defamatory statement was made; (2) an unprivileged publication of the statement to a third party; (3) the publisher was at fault; and (4) the statement is either actionable irrespective

112

of special harm or special harm resulted from the publication. *Erickson v. Jones Street Publishers, LLC.*, 629 S.E.2d 653, 664 (S.C. 2006).

**Discussion.** Dr. Koon's opening argument turns primarily on the second element, whether the publication was privileged either as a result of the release Dr. Irani signed or due to his requests and demands (some communicated through counsel) that Dr. Koon and Palmetto Health provide information to the California Medical Board. Dr. Irani's response relies on the narrowness of the release, which he characterizes as a privacy release and argues does not preclude a claim for providing false information.

The court agrees that the release is not so broad as to preclude a claim for providing false information that otherwise satisfies the elements of a defamation claim. The release and course of communications leading to Dr. Koon's preparation of the June 26, 2013 memorandum is, nonetheless, dispositive of this claim as Dr. Koon argues on reply. This is because Dr. Irani has pointed to no evidence that the June 26, 2013 memorandum contained any false statement of fact.

It is notable here that Dr. Koon first attempted to provide a more neutral response to the California Medical Board, in part because he was aware of threatened legal action. Koon aff. ¶ 40-45; ECF No. 136-3 at 139-41. Dr. Irani subsequently advised Dr. Koon that the California Medical Board found this response insufficient and asked Dr. Koon to complete the form again. Koon aff. ¶ 46; ECF No. 136-3 at 142-45.

In addition to completing the form and preparing a cover letter explaining certain responses as required by the form (neither of which Dr. Irani challenges), Dr. Koon prepared the June 26, 2013 memorandum of record, knowing and intending that it be provided to the California Medical Board. Koon dep. at 246; ECF No. 157-3 at 2. This memorandum summarizes Dr. Irani's history of remediation, noting, inter alia, that he was placed on Level III remediation in December 2011

113

due to "persistent patient care issues" and, after his return from that remediation and placement on Level II remediation, "Dr. Irani was involved in two patient encounters that the faculty deemed below acceptable standards." ECF No. 157-3 at 2. The memorandum also states Dr. Irani "failed in the competencies of patient care, interpersonal skills and communication, *and professionalism*." *Id.* (emphasis added). The memorandum concludes by stating the faculty (1) recommended Dr. Irani be placed on Level III remediation based on these concerns, (2) investigated the incidents "thoroughly[,]" (3) found no reasonable explanation for Dr. Irani's actions, and (4) recommended Dr. Irani be dismissed from the program, which recommendation was accepted by the GMEC and upheld at all levels of the grievance process. *Id.*

Dr. Irani argues that four of these statements are untrue, that (1) he failed in the competency of professionalism, (2) he had persistent patient care issues, (3) the faculty conducted a thorough investigation of two referenced patient incidents; and (4) the faculty could identify no reasonable explanation for Dr. Irani's actions. While Dr. Irani may disagree with the faculty's conclusions as to the second through fourth items, he points to no evidence that these statements were untrue viewed from the perspective of the faculty. As the purpose of the memorandum was to summarize the grounds for remediation, this was the proper focus.

The only evidence Dr. Irani proffers of falsity is the disparity between Dr. Koon's August 2012 summative evaluation, which gave Dr. Irani a "good" rating as to professionalism, and the June 2013 memorandum, which stated Dr. Irani failed this competency. However, there is overwhelming evidence that the faculty raised concerns with Dr. Irani's professionalism on multiple occasions beginning no later than November 2011. *See*, *e.g.,* Irani decl. ¶ 39 (asserting Dr. Koon raised allegations of lack of professionalism during the December 5, 2011 faculty meeting; ECF No. 136-3 at 64 (November 29, 2011 memorandum of record stating "Dr. Irani

114

continues to display behaviors which are inappropriate and unprofessional"); Koon second aff. ¶ 72 (summarizing contemporaneous documentation of multiple instances of unprofessional behavior by Dr. Irani).  Dr. Koon also listed professionalism as a failed competency in the March 5, 2012 memorandum recommending dismissal.  ECF No. 136-10 at 73 (stating Dr. Irani "has failed in the competencies of patient care, interpersonal skills and communication, and professionalism and the faculty is acutely concerned with our patient[s'] safety.").  Thus, while Dr. Koon may have given Dr. Irani a more favorable rating on professionalism in August 2012, there is no evidence he misstated the faculty's view in his June 2013 memorandum of record.

Dr. Koon's motion for summary judgment as to the libel claim is granted for the reasons explained above.

### XIII.    Tortious Interference with Contract (California Residency Program)

**Amended Complaint.**  The thirteenth cause of action, for tortious interference with contract, is asserted solely against Dr. Koon and alleges interference with Dr. Irani's contract to participate in a residency program in California.  Dr. Koon moved for summary judgment on this claim.  Dr. Irani responded by conceding "discovery has not produced sufficient evidence to continue prosecution of this cause of action."  ECF No. 148 at 68.  He, therefore, stated he was "withdraw[ing] the claim."  *Id.*  In light of the pendency of a motion for summary judgment directed to this claim and Dr. Irani's concession that he had not adduced evidence to support it, the court deems this response a concession that Dr. Koon is entitled to summary judgment on this claim.  Accordingly, summary judgment is granted on this claim.

### CONCLUSION

For the reasons stated above, the court grants Defendants' motions for summary judgment as to all claims (ECF Nos. 136, 137, 139).  In reaching this conclusion, the court has assumed

without deciding that Dr. Irani would be allowed to present all evidence on which he specifically

relies in opposing summary judgment, including proffered testimony from Dr. Eady.  Given this

assumption, the court need not resolve either Dr. Irani or Palmetto Health's separate motions

relating to Dr. Eady's testimony (ECF Nos. 146, 175).  Those motions are, therefore, mooted by

the grant of summary judgment.

**IT IS SO ORDERED.**

s/ Cameron McGowan Currie
CAMERON MCGOWAN CURRIE
Senior United States District Judge

Columbia, South Carolina
June 1, 2016