IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

COLUMBIA DIVISION

| | | |
|---|---|---|
| Afraaz R. Irani, M.D., | ) | C/A No. 3:14-cv-03577-CMC |
| | ) | |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM OF LAW IN** |
| vs. | ) | **SUPPORT OF PLAINTIFF'S MOTION** |
| | ) | **TO ALTER OR AMEND JUDGMENT** |
| Palmetto Health; University of South | ) | **AND FOR RECONSIDERATION** |
| Carolina School of Medicine; David E. | ) | **OF ORDER ON DEFENDANTS'** |
| Koon, Jr., M.D., in his individual | ) | **MOTIONS FOR SUMMARY** |
| capacity; and John J. Walsh, IV, M.D., | ) | **JUDGMENT** |
| in his individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Plaintiff, Afraaz R. Irani, M.D., by and through his undersigned counsel, hereby files this

Memorandum of Law in Support of Plaintiff's Motion to Alter or Amend Judgment and for

Reconsideration of Order on Defendants' Motions for Summary Judgment, pursuant to Rule 59(e)

of the Federal Rules of Civil Procedure.  With all due respect, the Court failed to take all of the facts

in the record in the light most favorable to Plaintiff as the non-moving party, but repeatedly

presented material, disputed facts and inferences in favor of Defendants.  The Court disregarded the

Fourth Circuit's admonition that on a motion for summary judgment, "[t]he court . . . cannot weigh

the evidence or make credibility determinations."  Jacobs v. N.C. Admin. Office of the Courts, 780

F.3d 562, 569 (4th Cir. 2015).  Viewed in the proper perspective, the record evidence demonstrates

that numerous issues of material fact exist on many of Plaintiff's causes of action.  Accordingly,

Defendants' motions for summary judgment should have been denied, at least in part.

### A.  Hostile Work Environment

With regard to Plaintiff's hostile work environment claims, the Court incorrectly determined that Defendant Koon's statements were not "sufficiently sever or pervasive to alter Dr. Irani's conditions of employment or create an abusive work environment." (Order, at 51).  In reaching this conclusion, the Court misapplied the Fourth Circuit's holding in Boyer-Liberto v. Fontainbleu Corp., 786 F.3d 264 (4th Cir. 2015) (en banc), and unfairly minimized the severity and hostility of the racial slurs at issue in this case.  The Court also failed to appreciate the full context in which the alleged slurs were made, which was far more intimidating and threatening than what the plaintiff in Boyer-Liberto faced, especially since the racial or ethnic slurs here were made by the program director, the highest-ranking member of the orthopaedic surgery program.  Significantly, none of the Defendants in this case ever mentions the Boyer-Liberto case in any of their summary judgment briefs–not in their initial briefs or even in their reply briefs–nor did they make any attempt whatsoever to distinguish the Boyer-Liberto case from the facts presented here.

The Court attempts to distinguish the facts of this case from those in the Boyer-Liberto case by observing that the "porch monkey" comment occurred at the end of a threatening rant where the perpetrator (Clubb) screamed at the plaintiff and invaded her personal space such that the plaintiff could feel Clubb's breath and spittle on her face.  The Court misses the key point of the Boyer-Liberto opinion, which held that the court must look to the totality of the circumstances surrounding the challenged discriminatory conduct to determine whether the work environment was objectively hostile or abusive.  Boyer-Liberto, 786 F.3d at 277.  The determinative factor in Boyer-Liberto was not the fact that Clubb got in the plaintiff's fact and sprayed saliva on her as she berated her; the key fact was that Clubb implied to the plaintiff that she (Clubb) was close to the restaurant's owner and

could have the plaintiff fired.  Id. at 279.

Here, the Court failed to examine the totality of the threatening and intimidating environment in which the deplorable comments were made by Defendant Koon.  The first incident that contributed to the abusive and intimidating environment was the statement that Defendant Koon made to Dr. Irani that the internal medicine residency program is "just happy if they have someone [who] can speak English." (Koon Depo., at 89, ll. 23-25) (Dkt. No. 149-3).[1]  The second incident was the Journal Club meeting in July 2011, where Dr. Irani was made the butt of a joke by being assigned the "How to Swim with Sharks" article.[2]  Third, during the August 15, 2011 meeting where Dr. Irani was first placed on Level II academic remediation, Dr. Koon stated that he has fired residents from the program before, and he reminded Dr. Irani that he (Koon) would have to sign off

---

[1]Whether this statement was made part-way through Dr. Irani's PGY-1 year, as Dr. Irani stated in his Declaration (Irani Decl. at ¶ 9), or during the Aug. 2011 meeting where Dr. Irani was placed on Level II academic remediation (Grievance Hearing Tr., at 48), or whether it was repeated on both occasions is immaterial.  Dr. Koon admitted to making the disparaging remarks about foreign residents, and he expressed his regret in making them in Dr. Irani's presence.  (Dkt. No. 149-3, at 89, l.23 to p. 90, l.1).

[2]Although the Court attempts to minimize the significance of this event by observing that the article was also presented in other years, (Order, at 5), Dr. Irani would not have been aware of the recurring nature of this hazing ritual in the program, because this was his first journal club meeting in the Department.  Dr. Irani testified that he was humiliated and embarrassed by being made the butt of Dr. Koon's joke, when Dr. Koon stated that "This article was not randomly assigned to you."  (Irani Decl. at ¶ 11).  Dr. John Iaquinto, one of the orthopaedic surgeons who was formerly employed by Palmetto Health, testified in his Declaration, "I witnessed this unsavory interaction by Dr. Koon and I could tell that this sophomoric exercise assigned to Dr. Irani by Dr. Koon and the comments made by Dr. Koon were obviously humiliating and embarrassing for Dr. Irani."  (Dkt. No. 148-7).  Dr. Koon's reply affidavit in which he states that Dr. Iaquinto was not a member of the department or a member of the faculty, (Dkt. No. 169-1, at ¶ 51), is immaterial, especially for purposes of summary judgment.  Dr. Iaquinto clearly testified that he attended the journal club meeting and that the he had frequent interactions with Dr. Irani. (Dkt. No. 148-6).

3

on any graduation papers for a resident to graduate from the program. (Irani Decl. at ¶ 12).[3] Fourth, the e-mail response Dr. Irani received on November 3, 2011, e-mail regarding the VA patient dictation was very hostile and intimidating. (Dkt. No. 153-8). Dr. Irani testified that in a follow-up phone conversation about this matter, Dr. Koon stated to Dr. Irani, "You were lucky you were on vacation because I would have fired you on the spot." (Irani Decl., at ¶ 24). Fifth, the faculty meeting on December 5, 2011, was incredibly threatening and intimidating, with Dr. Koon (primarily) and other faculty members berating Dr. Irani for over an hour and repeatedly questioning his commitment to the program and asking if he (Irani) had retained an attorney. (Irani Decl., at ¶¶ 26-39). Although Dr. Irani was not able it identify the precise dates of Dr. Koon's referring to him as "Achmed the Terrorist" and similar comments implying that he was a terrorist and might "blow the place up," those comments had to have occurred contemporaneously with the events listed above, during Dr. Irani's latter portion of his PGY-2 year in late 2011. He was suspended on December 9, 2011, only four days after the faculty meeting, and he complained to Dr. Stephens on January 3, 2012, about Dr. Koon's outrageous statements. (Irani Decl., at ¶ 53).

With all due respect, the factual context of the intolerable statements made by Dr. Koon about Dr. Irani were made in a much more intimidating and abusive environment than that in the Boyer-Liberto case, which the Fourth Circuit ruled should have survived summary judgment on a hostile work environment claim. The Boyer-Liberto case involved a fairly pedestrian encounter where Ms. Clubb was attempting to admonish the plaintiff, a cocktail waitress at a hotel restaurant, for cutting through the kitchen. Ms. Clubb apparently became upset because she mistakenly thought

---

[3]This paragraph of Dr. Irani's Declaration contains a typo about the date of the meeting, which occurred on August 15, 2011, not August 15, 2010.

that the plaintiff was ignoring her attempts to get her attention in the kitchen. 786 F.3d at 269. The plaintiff in the Boyer-Liberto case had only been working for defendant hotel for approximately six weeks and had almost no prior interactions with Ms. Clubb. Id. Here, by contrast, Plaintiff had been working in the orthopaedic surgery residency program for almost a year-and-a-half and had almost daily interactions with Defendant Koon during his PGY-2 year.

The most significant issue discussed in Boyer-Liberto was not the fact that Ms. Clubb got in the plaintiff's face and sprayed her with spittle, as the Court here seems to emphasize. The key issue in Boyer-Liberto was the status of the alleged harasser as a supervisor: "In measuring the severity of harassing conduct, the status of the harasser may be a significant factor–e.g., 'a supervisor's use of [a racial epithet] impacts the work environment far more severely than use by co-equals.'" Id. at 278 (quoting Rodgers v. W.-S. Life Ins. Co., 12 F.3d 668, 675 (7th Cir. 1993)). The Fourth Circuit quoted the United States Supreme Court's language from the landmark Ellerth case: "Simply put, 'a supervisor's power and authority invests his or her harassing conduct with a particular threatening character.'" Id. (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 763 (1998)). The evidence in Boyer-Liberto on this issue was scant compared to record here.

In Boyer-Liberto, there was a substantial disagreement about whether the plaintiff even believed Ms. Clubb was a supervisor or manager at all. Ms. Boyer-Liberto testified in her deposition that she thought Ms. Clubb was merely "a glorified hostess." Id. at 270. Ms Boyer-Liberto also testified that she "did not know that Clubb held a manager title and did not consider her to be her manager." Id. at 270-71. The Fourth Circuit actually stated that based on the record on appeal, it could not "determine whether Clubb was actually Liberto's supervisor or simply her co-worker." Id. at 279. Nonetheless, the court focused on that fact that Ms. Clubb indicated that she was close

to the hotel's owner and that she threatened to have the plaintiff fired.  Id.

Here, by contrast, there is no question that Defendant Koon was the program director and was the supervisory leader of the entire orthopaedic surgery residency program.  The fact that Defendant Koon's racial slurs were not actually used in the same conversations where he threatened Dr. Irani's termination from the program is not dispositive.  Defendant Koon's indisputable position as a supervisor amplified the severity of the harassing remarks.

Next, the actual epithets used here were at least as egregious and odious as those at issue in Boyer-Liberto.  The Boyer-Liberto case involved two alleged uses of the phrase "porch monkey" to refer to the plaintiff, who is African-American., by Ms. Clubb, who is Caucasian.  Ms. Clubb denied ever using the term "porch monkey," and there was no corroboration in the record of the plaintiff's testimony that Ms. Clubb used the offensive term. 786 F.3d at 270.  The Fourth Circuit held that the phrase "porch monkey" in referring to an African-American individual "is about as odious as the use of the word 'nigger,'" which "'is pure anathema to African-Americans.'" Id. at 280 (quoting Spriggs v. Diamond Auto Glass, 242 F.3d 179, 185 (4th Cir. 2001)).  The Court recognized that the "porch monkey" slur "is degrading and humiliating in the extreme."  Id.

Here, Defendant Koon's admitted use of the phrase "Achmed the Terrorist" was more than an offensive or unflattering remark.  As set forth in Plaintiff's Verified Complaint, "Defendant Koon's outrageous and insensitive comments were particularly hurtful to Plaintiff, because his Zoroastrian ancestors have historically been victims of religious persecution and terrorism in the middle eastern regions of ancient Persia near what is now Iran." (Verified Complaint, at ¶ 32-33).[4]

---

[4]Although Plaintiff filed an Amended Complaint, which was not actually verified, the only thing different about the Amended Complaint was the addition of a claim against the University Defendants for torious interference with contract.

Dr. Irani described Defendant Koon's slur as "somebody who is at the height of human depravity which I think is awful." (Irani Depo., at 57, ll. 15-16) (Dkt. No. 150-5). He also testified that Defendant Koon's use of the slur is "something that I hope we can all agree is not something that should be tolerated." (Id. at 57, ll. 23-25). Dr. Irani also testified, "Ma'am, I don't think you understand how bad the situation [during the latter half of his PGY-2 year] was." (Id. at 58, ll. 16-17). Dr. Irani further testified that "this is something that [he] found wholly unacceptable." (Id. at 64, l. 25 to p. 65, l. 2). The most analogous situation Plaintiff's counsel can come up with here would be a gentile supervisor calling a Jewish employee a Nazi. The similar histories of atrocities and religious persecution against both Jews and Zoroastrians would cause an immediate and visceral reaction in a member of either faith being called a Nazi or a terrorist by a supervisor, which reaction would be at least as palpable and intolerable as an African-American being called a "porch monkey" or similar slur.

The Court improperly down-played the severity of the discriminatory comments made by Defendant Koon. The Court appears to have accepted Defendant Koon's self-serving explanation of the context of the inflammatory slur, rather than viewing the offensive nature of the remarks from Plaintiff's perspective. Furthermore, the Court improperly disregarded as "cumulative" the testimony of nurse Tonya Hamby and Dr. John Eady, who corroborated Defendant Koon's repeated referring to Dr. Irani as "Achmed the Terrorist." Both Nurse Hamby and Dr. Eady negate Defendant Koon's argument that his comments were isolated to one single episode and were made in a light-hearted, joking manner. Furthermore, Dr. Irani testified that the nurse named Franny, to whom Defendant Koon indicates he directed the comment about Dr. Irani's facial hair, told Dr. Irani immediately afterward that she thought Defendant Koon's comment during the prison clinic "was

7

inappropriate."  (Irani Depo., at 62, ll. 15-17).

The very recent Fourth Circuit case of <u>Guessous v. Fairview Property Investments, LLC</u>, ____ F.3d ____, No. 15-1055, 2016 WL 315780 (4th Cir. July 6, 2016), which was decided after the Court's order, is particularly instructive.  The <u>Guessous</u> case involved an Arab-American Muslim woman from Morocco who was subjected to several inappropriate and unenlightened comments and questions from her immediate supervisor over a four-and-a-half year period.  For example, the supervisor stated that he previously "worked with 'a bunch of Middle Easterner and they are a bunch of crooks, [who] will stop at nothing to screw you.'" <u>Id.</u> at *1.  In another example, after news reports of an Islamic terrorist attack, he asked her, "Why do all Muslims hate America?"  When the plaintiff stated that "Muslims are not terrorists," he responded "Yeah, sure.  Like my buddy says . . . not all Muslims are terrorists, but most are." <u>Id.</u>  Later, when the plaintiff showed her supervisor a picture from Dubai showing a clean and modern Middle Eastern city, he said to her, "Despite all the buildings and modern [sic], they are just a bunch of camel people." <u>Id.</u> at *3.  Significantly, none of the offensive comments was actually directed towards the plaintiff specifically, nor did most of the comments have anything to do with Moroccan people; rather, the supervisor appeared to lump all Muslims and all Middle Easterners into the same stereotypes, regardless of which country they were actually from.  The comment that comes closest to impugning the plaintiff directly was after the supervisor asked the plaintiff if she had completed an assignments shortly after it was given to her.  When she told the supervisor it was not yet finished, he "looked at his watch, snapped his fingers, and said, '[T]his is not Moroccan time.'" <u>Id.</u> at *4.

The district court granted summary judgment for defendant on all of plaintiff's claims.  The Fourth Circuit reversed in a unanimous, published opinion.  With regard to the hostile work

environment claim, the <u>Guessous</u> court stated, "on the question of whether the conduct was severe or pervasive, the district court erred by failing to take into account the totality of the circumstances as we have held it must do at this stage of the analysis." <u>Id.</u> at * 14. The court phrased the relevant question to be "whether Guessous reasonably perceived 'the work environment to be abusive.'" <u>Id.</u> (quoting <u>Amirmokri v. Baltimore Gas & Elec. Co.</u>, 60 F.3d 1126, 1131 (4th Cir. 1995)). The <u>Guessous</u> court stated, "We have long held that 'whether harassment was sufficiently severe or pervasive is quintessentially a question of fact.'" <u>Id.</u> at *15 (quoting <u>Walker v. Mod-U-Kraf Homes, LLC</u>, 775 F.3d 202, 208 (4th Cir. 2014)). The <u>Guessous</u> court also relied heavily on the <u>Amirmokri</u> case, which found sufficient evidence of a hostile work environment where an Iranian employee was called "the local terrorist, a camel jockey, and the 'Emir of Waldorf'" by white co-workers repeatedly throughout his employment. <u>Id.</u> at *14 (quoting <u>Amirmokri</u>, 60 F.3d at 1131).

Here, the Court erred in making the determination, as a matter of law, that Dr. Irani was not subjected to a hostile work environment based on his race, when the supervisor of the entire program, Dr. Koon, repeatedly referred to him as "Achmed the Terrorist" and stated that he "might blow the place up." This is a factual determination that must be made at trial, after the Court has a sufficient opportunity to examine whether Dr. Irani "reasonably perceived 'the work environment to be abusive.'" <u>Guessous</u>, at * 14. On a motion for summary judgment, when all facts and inferences must be taken in the light most favorable to Plaintiff, the record contains sufficient evidence to support such a finding in this case. Accordingly, Defendants' motion for summary judgment on this claim should have been denied.

### B. Contractual Documents

With regard to Plaintiff's contract claims (either directly or as third-party beneficiary), the

Court incorrectly found that Defendants did not have adequate notice of Plaintiff's theories which were based on three contractual documents that incorporated the ACGME standards, but which were not specifically mentioned in the Amended Complaint. Plaintiff's supplemental discovery responses clearly identified these documents, which were only produced by Defendants in discovery after Plaintiff had already sought leave to amend the complaint. Plaintiff also specifically identified all of these documents on the record during a discovery hearing in the case before Magistrate Judge West, well before the close of discovery.

In its reply brief, Defendant USC-SOM argued that Plaintiff's theories with respect to the direct contract claim and the third-party beneficiary contractual claim are not alleged in Plaintiff's Amended Complaint. (Dkt. No. 170, at 7-8). Similarly, Defendant Palmetto Health stated, "Dr. Irani claims for the first time that his alleged contract included two affiliation agreements, something that he raised in neither is Verified Complaint nor Amended Complaint which is now inappropriate." (Dkt. No. 168, at 3, n.3). The Court agreed, stating that Plaintiff's Amended Complaint "fails to give fair notice that he will rely on the PH Resident Manual, the USC-SOM Resident Manual, or the Orthopaedic Handbook in support of his contract claims." (Order, at 80). In addition, the Court stated that Plaintiff's identification of documents supporting his breach of contracts claim was "belated" and that "the Amended Complaint does not identify these documents as a source of contractual duties." (Order, at 81, 82). The Court also found that Plaintiff's reliance on the Affiliation Agreement and the PLA in his cause of action for third-party beneficiary breach of contract "fails because it is not fairly predicted by the Amended Complaint." (Order, at 94).

Defendants' assertions that they did not have notice of the nature of Plaintiff's claims for breach of contract and third-party beneficiary breach of contract because the specific documents were

not mentioned in Plaintiff's Amended Complaint are disingenuous. Plaintiff did not have an opportunity to rebut this argument, because it was first raised in Defendants' Reply Brief, and the Local Civil Rules of the District of South Carolina do not allow parties to file "surreply briefs." In addition, the Court reached its decision solely on the briefs, without affording Plaintiff an opportunity for oral argument in this case.

Plaintiff's reliance on the Affiliation Agreement, the PLA, and the USC Orthopaedic Department's Residency Manual was plainly not a surprise to Defendants, even if those documents were not specifically referenced in the Amended Complaint. The proposed Amended Complaint in this case was actually submitted before Plaintiff's counsel received or reviewed the documents in question. Plaintiff's motion for leave to file the Amended Complaint was filed on January 23, 2015 (Dkt. No. 27), largely in response to Defendant USC-SOM's first summary judgment motion, in which Defendant USC-SOM argued that it was not a party to any contract involving Plaintiff and, therefore, could not be held liable for breach of contract. Defendant USC-SOM relied primarily on an affidavit from Dr. Caughman Taylor, former dean of the USC-SOM, in which he stated in conclusory fashion that Plaintiff was never employed by USC-SOM, that there was no contract between Plaintiff and USC-SOM, and that there was no accreditation contract between USC-SOM and the ACGME. (Taylor Aff., ¶¶ 3-5) (Dkt. No. 136-2).

The first deposition Plaintiff took in this case was that of Dr. Taylor. In preparation for Dr. Taylor's deposition, Plaintiff's counsel found these three key documents, which had only recently been provided by Defendants in discovery, among more than 1,400 pages of documents in Defendants' first production. The USC Department of Orthopaedic Surgery Residency Manual was Exhibit 2 to Dr. Taylor's Deposition, the Affiliation Agreement between Palmetto Health and USC-

11

SOM was Exhibit 3 to the Taylor Deposition, and the PLA between Palmetto Health and the USC Orthopaedic Surgery Department was Exhibit 4 to the Taylor Deposition. On April 17, 2015, immediately following Dr. Taylor's deposition, the undersigned counsel for Plaintiff sent an e-mail to Defendants' counsel stating, "In light of Dr. Talyor's deposition from earlier this week and the new documents I was able to find in preparation for the depositions, I may need to amend the complaint again, because I believe that there are three additional contracts that need to be included in Dr. Irani's claims for breach of contract, third-party beneficiary breach of contract, and tortious interference." (A copy of the e-mail string is attached hereto as Exhibit A) (emphasis added). The e-mail then specifically identified the three documents mentioned above. The e-mail continued, "I suppose the causes of action in the Amended Complaint could be read to include these three contracts, but if you disagree, I will need to file a second amended complaint. Please let me know your position on this as soon as possible." (Id.). Defendant Palmetto Health's counsel responded on April 18, 2015, stating that the documents were produced on February 5, 2015, and incorrectly stating that the documents had been produced previously in the case of D. Chad Lamoreaux v. Palmetto Health et al., Case No. 2009-CP-40-1044 (Rich. Co. Ct. Common Pleas), which was settled in August 2009, almost 6 years earlier.[5] Defendant Palmetto Health's counsel did not indicate that a second amended complaint was necessary. The University Defendants' counsel did not respond

---

[5]Dr. Lamoreaux was fired on or about December 18, 2008, approximately two weeks before the Affiliation Agreement was signed on January 1, 2009. The undersigned counsel for Plaintiff in this case also represented Dr. and Mrs. Lamoreaux in a lawsuit against Palmetto Health, USC School of Medicine, and Drs. Koon and Walsh in their individual capacities. Discovery in the Lamoreaux case also involved the exchange of thousands of pages of documents. Plaintiff's counsel does not recall whether the Affiliation Agreement or the USC Orthopaedic Surgery Department Resident Handbook were produced in discovery in the Lamoreaux case.

to the e-mail at all.

Plaintiff's counsel consciously decided not to file a second amended complaint at that point, because it seemed superfluous and because Defendants' counsel had raised such strenuous objection to the first Amended Complaint. Defendants' counsel had primarily complained that the motion to amend was untimely because it was filed after the amended scheduling order's deadline to join parties and amend the pleadings. Furthermore, Plaintiff's motion for leave to file the first Amended Complaint took over two months for the Court to rule on the motion. (Dkt. No. 47, April 3, 2015).

The issue of what documents Plaintiff was relying on for his direct breach of contract claim and his third-party beneficiary breach of contract claim was also specifically addressed during discovery in this case, again negating any claim of unfair surprise. Defendant Palmetto Health's First Requests for Production 21, 22, and 23 specifically requested Plaintiff to provide documents that demonstrate that there was a contract between Palmetto Health and ACGME, that Plaintiff was an intended beneficiary of any contract between Palmetto Health and ACGME, and that Plaintiff's contract with Palmetto Health was interfered with based on race in violation of 42 U.S.C. § 1981, respectively. Plaintiff's original response was that he had not responsive documents other than those documents he had received from Defendants in discovery in this case. Defendant Palmetto Health filed a motion to compel seeking to have the Court require Plaintiff specifically to identify such responsive documents. On May 26, 2015, Magistrate Judge West conducted a hearing on various discovery disputes, including Defendant Palmetto Health's challenge to the sufficiency of Plaintiff's responses about the contract documents. During that hearing, Plaintiff's counsel specifically identified, on the record, once again the same three documents that form the basis for Plaintiff's claims of breach of contract and third-party beneficiary breach of contract. Although Plaintiff did

13

not order a transcript of that hearing, the Minute Entry from that hearing states, "to the extent that Plaintiff can identify documents responsive to Request for Production Nos. 21-24 and 26-27, Plaintiff is to supplement his responses by providing the names of such documents." (Dkt. No. 88) (attached hereto as Exhibit B).

On June 1, 2015, Plaintiff's counsel e-mailed Defendant Palmetto Health's attorney, with a copy to the University Defendants' counsel, supplementing Plaintiff's discovery responses in accordance with Judge West's Order.  Plaintiff's counsel stated, "Plaintiff's breach of contract claims against Defendants are based on the following documents: Resident Agreement of Appointment, PH Resident Handbook; Affiliation Agreement between Palmetto Health and USC School of Medicine; Program Letter of Agreement between Palmetto Health and University Specialty Clinics–Orthopaedics Department; and the USC Department of Orthopaedics Resident Manual.  A number of these documents specifically incorporate applicable ACGME standards and program requirements, including specific RRC requirements."  (A copy of the e-mail of June 1, 2015, along with the .pdf attachment is attached hereto as Exhibit C).[6]  Accordingly, Defendants cannot seriously be heard to argue that they were not provided with adequate notice that Plaintiff intended to raise these documents in connection with his claims for direct breach of contract and third-party beneficiary breach of contract.  These documents are also relevant to the issue of whether Defendant USC-SOM can be considered a joint employer of Plaintiff's with regard to the residency programs, as discussed in Section D below.

---

[6]Plaintiff's counsel has not been able to find a signed copy of these discovery responses and does not recall if he ever actually provided to Defendants' counsel a hard-copy by mail as indicated in the draft certificate of service.  Nonetheless, Defendant Palmetto Health never raised any further concern about the supplementation of these responses, even during the in-person status conference before Judge West several weeks later on July 29, 2015. (See Dkt. No. 104).

As noted in Plaintiff's initial brief in opposition to Defendants' Motions for Summary Judgment, the Affiliation Agreement provides, in relevant part, as follows:

> Palmetto Health and the University's School of Medicine will underline actively collaborate to ensure that Palmetto Health's graduate medical education programs operate in an effective manner and in compliance with regulatory and accreditation standards. Palmetto Health and the School of Medicine will share the responsibility for ensuring an appropriate learning environment and that residency education occurs in an atmosphere of mutual respect and collegiality between faculty, residents, medical students, and staff.

(Affiliation Agreement [Dkt. No. 156-2], at 6, ¶ 6.6 ) (emphasis added).

Similarly, the PLA between Defendant Palmetto Health and Defendant USC-SOM's Orthopaedic Surgery Department provides, provides, in relevant part, "The purpose of this Letter of Agreement is to set forth the general terms and specific conditions under which University Specialty Clinics–Orthopedic Surgery has agreed to participate in the education and supervision of residents in the Palmetto Health Graduate Medical Education Program(s)." (PLA [Dkt. No. 153-4], at 1). The PLA also provides, "Further, the educational experiences of the resident while on rotation at our site will be provided in a manner consistent with applicable Accreditation Council for Graduate Medical Education (ACGME) Residency Review Committee (RRC) requirements, and other federal, state, and local laws, rules, and regulations." (Id. at 2) (emphasis added).

Defendant Palmetto Health's Resident Handbook contains a section entitled, "Institutional Commitment to Graduate Medical Education," which provides as follows:

> We therefore commit ourselves to providing graduate medical education programs that enable physicians in training to develop competence in patient care, medical knowledge, practice-based learning and improvement, interpersonal and communication skills, professionalism, and systems-based practice and to participate in a wide range of scholarly activities under the guidance and supervision

15

of the faculty and staff. <u>We further commit to conducting these programs in compliance with the Institutional, Common, and Program requirements of the Accreditation Council for Graduate Medical Education, [and] its Residency Review Committees.</u>

(Dkt. No. 155-6, at A-10) (emphasis added).

Finally, the Palmetto Health Resident Handbook specifically incorporates by reference department-specific residency manuals. (Dkt. No. 155-6, at "Palmetto Health - 000587). One such department-specific manual is the USC Department of Orthopaedic Surgery Residency Manual (Dkt. No. 151-1), which actually reproduces the relevant ACGME guidelines.

The Court's summary rejection of Plaintiff's contractual claims based on these documents because they were not specifically referenced in the Amended Complaint was grossly unfair. Defendants clearly had notice that Plaintiff intended to rely on all of these documents as part of his claims. All three of these documents contain unambiguous promises, on the part of both Defendants Palmetto Health and USC-SOM that the residency programs, and specifically the orthopaedic surgery residency program, would be conducted in accordance with the ACGME guidelines.

## C. Third-Party Beneficiary Claim

Next, the Court erroneously ruled that Plaintiff was, at most, an incidental beneficiary, instead of an intended third-party beneficiary of the Affiliation Agreement and the PLA. The Court correctly cites the applicable case of <u>Johnson v. Sam English Grading, Inc.</u>, 772 S.E.2d 544 (S.C. Ct. App. 2015), which recognized that "if a contract is made for the benefit of a third person, that person may enforce the contract if the contracting parties intended to create a direct, rather than an incidental or consequential, benefit to such third person." <u>Id.</u> at 552. However, the Court completely overlooked the fact that Plaintiff is specifically listed by name in the attachment to the PLA and that

he is plainly included within the definition of "resident" in the Affiliation Agreement. Plaintiff submits that the inclusion of his name in an attachment to the PLA and his being in the class of persons under the definition of "resident" in the Affiliation Agreement, strongly indicate that he was an intended third-party beneficiary of both agreements, not an incidental or consequential beneficiary.[7] The fact that Plaintiff's counsel was unable to locate any binding precedent precisely on point, where a resident or student was allowed to enforce a similar agreement as an intended, third-party beneficiary, should not have been fatal to Plaintiff's third-party beneficiary claim. Plaintiff cannot imagine a stronger third-party beneficiary claim than where the plaintiff's name is actually listed as an attachment to the contract in question or where the underlying contract includes a specific definition of the group to which the plaintiff clearly belongs.

The Court also erred in ruling that the ACGME's decision not to take any action on Plaintiff's written complaints about the orthopaedic surgery residency program precludes a finding that the program breached the accreditation standards. The ACGME repeatedly and consistently indicated to Plaintiff that it does not adjudicate individual residents' complaints, but only analyzes systemic problems that could impact the program's accreditation status. (Irani Depo., at 98, ll. 1-10, 16-18) (Dkt. No. 150-5, at 27). The fact that the ACGME did not actually revoke the accreditation of Defendants' residency program in response to Plaintiff's complaints does not mean that the program was compliant with its obligations under the ACGME guidelines. The Court mistakenly concluded that the ACGME's dismissal of Plaintiff's complaints without any adverse action towards

---

[7]A good example of an <u>incidental</u> beneficiary, who cannot bring a third-party beneficiary breach of contract claim under common law, is a patient who was injured by a resident who was working in violation of ACGME requirements. See <u>Garamella v. New York Medical College</u>, 23 F. Supp. 2d 153, 167 (D. Conn. 1998).

Defendants operates almost as a form of res judicata or collateral estoppel on these issues.

Withdrawal of accreditation by the ACGME is a very involved process.  As described by a court of appeals judge for the Third Circuit,

> before an accreditation can be withdrawn the ACGME must conduct a seven stage process: 1) the program director submits documents to the ACGME; 2) a site visit is made by a member of the ACGME field staff; 3) the ACGME's Residency Review Committee ("RRC") assembles the information and decides whether to withdraw accreditation; 4) the RRC may reconsider an adverse ruling; 5) the ACGME's appeals panel decides whether the adverse ruling was supported by substantial or credible evidence; 6) the ACGME's Executive Committee reviews the appeals panel's ruling, and, if it agrees with the adverse ruling, informs the full ACGME; and 7) the ACGME, at a plenary session, makes the final decision whether to withdraw accreditation. Throughout the process the residency program may submit additional information about the program as long as the information relates to the status of the program before the review began.

McKeesport Hosp. v. Accreditation Council for Graduate Med. Educ., 24 F.3d 519, 530 (3d Cir. 1994) (Becker, J., concurring in judgment).  The fact that the ACGME did not revoke the accreditation of the Palmetto Health/USC School of Medicine Orthopaedic Surgery Residency Program's accreditation in response to Dr. Irani's complaints does not mean that Defendants complied with their obligations under the ACGME guidelines and, therefore, their contractual promises.  The accreditation process is only concerned with a program's "substantial compliance" with the ACGME guidelines.  See United States v. Partners Healthcare Sys., Inc., 591 F. Supp. 2d 116, 117, n.2 (D. Mass. 2008) ("The ACGME promulgates requirements for residency training programs, and provides accreditation for those programs that are in substantial compliance with its standards.").

The Court here should have denied Defendants' summary judgment motions on Plaintiff's third-party beneficiary claims.

18

### D.  Joint Employment

Next, the Court disregarded the underlying principle behind the joint employment doctrine of Butler v. Drive Auto. Indus. of Am., Inc., 793 F.3d 404 (4th Cir. 2015), in ruling that Defendant USC School of Medicine was not a joint employer of Plaintiff's in the residency programs, both under the discrimination and retaliation claims, as well as the breach of contract claims.  Although Plaintiff did not address each element of the nine-factor "hybrid test" adopted by the Fourth Circuit in the Butler case, the "principal guidepost" in this analysis is the extent of control exercised by the putative employer over the employee in question.   Id. at 414.

With all due respect, the Court here omitted from its analysis the fact that the University Defendants exercised complete control and supervision over Plaintiff's day-to-day participation in the orthopaedic surgery residency program.  Every Memorandum of Record regarding Dr. Irani's participation in the program was on USC-SOM and University Specialty Clinics letterhead.  (See, e.g., Dkt Nos. 153-5, 154-1, 157-3).  The Department of Orthopaedic Surgery Residency Manual governs everything from scheduling and work hours to leave and dress code.  (See Table of Contents, Dkt. No. 151-1).  University employees are responsible for hiring and evaluating residents in the program.  Even the program's web-site describes the orthopaedic surgery residency program as operated principally by the USC-SOM.  (Dkt. No. 156-1, at 3) ("The University of South Carolina School of Medicine . . . is proud to offer two fully accredited five-year orthopaedic residency program positions in Columbia, SC.").  The web-site also uses the first-person pronouns in the phrases "we accept," "our program," "our residents" and "our faculty" to refer to the antecedent USC-SOM, not to Defendant Palmetto Health.

Furthermore, the language quoted above from the Affiliation Agreement (Dkt. No. 156-2),

19

the PLA (Dkt. No. 153-4), and the "Institutional Commitment to Graduate Medical Education" in the Palmetto Health Resident Physician Manual, ( Dkt. No. 155-6, at A-10), all speak in terms of joint responsibility between Defendants USC-SOM and Palmetto Health, for running the residency programs and ensuring that the programs are conducted in an appropriate environment and in accordance with ACGME guidelines. This is analogous to a "joint venture" under the common law. See Tompkins v. Commissioner of Internal Revenue, 97 F.2d 396, 399 (4th Cir. 1938 ("'A joint venture is defined as: "An association of two or more persons to carry out a single business enterprise for profit."'") (quotations omitted).

As noted previously in this case, the Answers of both Defendants Palmetto Health and USC-SOM admitted Plaintiff's allegations that the Orthopaedic Surgery Residency Program is " jointly operated by Defendants Palmetto Health and USC-SOM." (Verified Complaint, at 4, ¶ 14) (emphasis added). See Answer of Defendant Palmetto Health [Dkt. No. 5], at 3, ¶ 14 ("Admit."); Answer of Defendants USC-SOM, Koon, and Walsh [Dkt No. 6], at 4, ¶ 14 ("Admitted."). The Court unfairly apportions the educational component of the residency programs to Defendant USC-SOM and the employment component to Defendant Palmetto Health, despite the fact that both entities have expressly undertaken joint responsibilities regarding the conduct of the residency programs. There is nothing in the factual record to support the Court's determination in this regard, nor does the Court cite any legal authority for making such an arbitrary assignment of responsibility, especially on Defendants' motions for summary judgment, when all facts and inferences are supposed to be taken in the light most favorable to Plaintiff.

## E.  Due Process

Plaintiff's claims that he was denied due process in connection with his employment in the

20

residency program are based not only on the constitutional guarantee under the Fourteenth Amendment, but also on promises within the residency contract to provide "due process" in connection with resident discipline, including termination from the program. Although the Court relies on case-law that affords lesser due process protections to academic or educational decisions, as opposed to regular employment decisions, Plaintiff submits that a contractual promise of due process is materially different than the constitutional guarantee of due process.

First of all, the phrase "due process" is not defined by the Palmetto Health Residency Manual or the applicable ACGME guidelines. Dr. Kathy Stephens, the DIO in charge of all of Defendant Palmetto Health's residency programs, testified that she is the person who is responsible for ensuring that residents are afforded their due process rights under the policy. (Stephens Depo., at 44, ll. 18-22) (Dkt. No. 149-1). She agreed that the fundamental purpose behind the grievance and due process policy of Palmetto Health is "a matter of fairness." (Id at 45, ll. 19-20).

In Small v. Springs Industries, Inc., 357 S.E.2d 452 (S.C. 1987), the South Carolina Supreme Court first recognized that the issuance of an employee handbook can modify the at-will employment relationship and can create implied contractual terms of employment. As the Small court stated, "It is patently unjust to allow an employer to couch a handbook, bulletin, or other similar material in mandatory terms and then allow [it] to ignore these very policies as 'a gratuitous, nonbinding statement of general policy' whenever it works to [its] disadvantage." Id. at 455. Ambiguities in an employee handbook are construed in favor of the employees, consistent with the general rule of contract construction that ambiguous terms are construed in favor of the non-drafter. See Southern Atl. Fin. Servs., Inc. v. Middleton, 356 S.E.2d 444, 447 (S.C. 2003) ("Ambiguous language in a contract . . . should be construed liberally and interpreted strongly in favor of the non-drafting

party."). The implied covenant of good faith and fair dealing that exists in every contract under South Carolina common law also extends to implied contracts based on employee handbooks. Williams v. Reidman, 529 S.E.2d 28, 36 (S.C. Ct. App. 2000).

The South Carolina statutory safe harbor for employee handbooks, S.C. Code Ann. § 41-1-110, requires a valid disclaimer to be in underlined, capital letters on the first page of handbook or personnel manual, signed by employees. For other employer-issued documents, such as individual policies and procedures, the disclaimer must be in underlined capital letters on the first page of the document to be effective. The Palmetto Health Resident Physician Manual does not contain a general disclaimer that meets the statutory requirements of Section 41-1-110. (Stephens Depo., at 61, ll. 7-24) (Dkt. No. 149-1). Some individual policies within the Manual, such as the "Harassment" policy, attempt to comply with the statutory disclaimer requirements (Dkt. No. 155-6, at "Palmetto Health - 000720"); however, the Grievance and Due Process policy does not contain any disclaimer. (Id. at "Palmetto Health - 00718"). Significantly, the Grievance and Due Process policy does not differentiate between academic and employment-related issues: "Residents are provided a process for resolving academic and job-related complaints." (Id.) (emphasis added).

It is incongruous for the Court to have parsed out the academic vs. employment components of the residency program, which the Court assigned to Defendants USC-SOM and Palmetto Health respectively in one part of its decision, and then state that because Dr. Irani's termination involved an academic matter, he is entitled to a lesser measure of due process under Palmetto Health's policies in another part of the decision. The doctrine from Board of Curators of Univ. of Md. v. Horowitz, 435 U.S. 78, 85 (1978), that dismissals in the academic arena are subject to a lesser amount of due process than is available in terminations from public employment, simply does not govern Plaintiff's

contractual due process claim here. Unlike the plaintiff in the <u>Horowitz</u> case, the residents in the Palmetto Health residency programs are actually provided with a policy manual that guarantees them due process and a fair grievance. The Palmetto Health Resident Physician Manual does much more than incorporate the constitutional standard for due process.

Merely providing the rote steps enumerated in the grievance policy is clearly not enough for the employer to avoid contractual liability under an employee handbook. In <u>Connor v. City of Forest Acres</u>, 560 S.E.2d 606 (S.C. 2002), the South Carolina Supreme Court stated, "it appears that the City followed its handbook procedures in effectuating [the plaintiff's] termination." <u>Id.</u> at 611. Nevertheless, the court determined that "reasonable minds can differ as to whether just cause existed to support [the plaintiff's] termination." <u>Id.</u> The <u>Connor</u> Court ruled that this ultimate question should not have been resolved on summary judgment. <u>Id.</u>

Here, Plaintiff identified a number of deficiencies in the process that was afforded to him that ultimately led to his termination from the program. First, it was grossly unfair for Defendant Palmetto Health to refuse to accept Plaintiff's request for a grievance hearing in January 2012 regarding his Level III suspension based on the untimeliness of the request because he did not include the Martin Luther King holiday as a "business day" in calculating the 10-business-day deadline for requesting a grievance. The Court improperly defines the term "business day" as all days other than "recognized holidays" by the hospital.[8] This was clearly an ambiguous provision in

---

[8]Weekends are obviously not considered "business days" under the Palmetto Health policies, but they are not listed as among the five observed "holidays." Plaintiff clearly expressed his interest in pursuing his grievance to the hearing level; however, Ms. Stephens refused to consider Plaintiff's reasonable explanation for believing he had an additional day to submit his request. In any event, the grievance policy has a specific provision that allows the Human Resources Department to extend the deadlines based on "extenuating circumstances." (Dkt. No. 155-6, at "Palmetto Health - 000719," ¶ 3.1). Although Ms. Stephens was not a

the PH Resident Handbook, which should have been construed in Dr. Irani's favor. The fact that Martin Luther King Jr.'s Birthday is a recognized state and federal holiday, and that the USC Orthopaedic Clinic was closed on that day, amply demonstrates that Plaintiff's belief was reasonable.

Second, the Court mistakenly determined that Dr. Irani had an adequate opportunity during the grievance hearing to challenge the truthfulness and accuracy of the statements made by Drs. Koon and Walsh, but he declined the opportunity to do so. The evidence, viewed in the light most favorable to Plaintiff, reveals that Palmetto Health human resources representative, who was assigned to assist Dr. Irani during the grievance, misinformed him that there would be no cross examination either by or against the faculty members during the grievance hearing. Dr. Irani did not have any advanced opportunity to prepare for cross examination of Drs. Koon and Walsh, and he was taken aback when Drs. Koon and Walsh started to cross examine him during the hearing. (Irani Decl., at ¶ 73) (Dkt. No. 148-2). As noted in Plaintiff's initial brief in opposition to the summary judgment motions, both Drs. Koon and Walsh submitted information to the grievance committee about various patient encounters, which information was demonstrably false, including the following: that the amputation of the metal lathe patient's arm did not appear to be justified; that Dr. Irani disregarded Dr. Grabowski's instructions to obtain an MRI stat, but instead allowed the patient to go home and obtain the MRI on an elective basis; that Dr. Irani failed to perform any neurological exam on Dr. Grabowski's spine patient; and that Dr. Irani made light of the nurse's statement that the spine patient had developed a foot drop. (Pl.'s Br., at 48-49). Dr. Irani was also very surprised that Drs. Koon and Walsh raised a number of new allegations against him, for the first time, during

---

member of Palmetto Health's Human Resources Department, she made the decision to disallow one additional day's extension of the deadline. (Stephens Depo., at 128, ll. 10-14).

the grievance hearing.  (Dk. No. 148-2, at ¶ 73).

The most egregious violation of due process occurred when the grievance committee sought additional information following the hearing from the faculty, without notifying Plaintiff and without giving him an opportunity to respond to the later submissions.    The Court misconstrues the facts and circumstances surrounding the ex parte submissions by Defendants to the Grievance Committee following the conclusion of the grievance hearing.  Plaintiff did not "invite" the committee to solicit additional information from the program, nor was Plaintiff ever actually "invited" to submit additional material to the grievance committee following the hearing.  As Dr. Irani explained, he was informed that the Grievance Committee had reached an impasse and that they had requested additional information from Drs. Koon and Walsh.  At that point, Dr. Irani requested that if Drs. Koon and Walsh were being allowed to submit additional documentation, he would also like to submit additional documents.  If Dr. Irani had not made the inquiry and request, he never would have known about any post-hearing submissions at all.  There is no dispute that Dr. Irani was never provided with a copy of Defendants' post-hearing submissions, nor was he allowed any opportunity to rebut the new information.

Dr. Irani also did not invite the Grievance Committee to seek ex parte submissions from the other side.  What he actually requested during the hearing was for the Grievance Committee to conduct an independent review and contact nurses, staff, and patients about his care and professionalism.  (Hearing Trans., at 85, ll. 3-14; at ) (Dkt. No. 105-1).  This was not a blanket invitation for the Grievance Committee to solicit ex parte information from the faculty of the orthopaedics department, nor was it a waiver of any objection to the ex parte submissions he knew nothing about.  The Court improperly accepted Ms. Hill's rebuttal affidavit in which she describes

the course of events that occurred after the hearing, which is materially different than Dr. Irani's testimony. Although the Court acknowledges that Dr. Voss's Summative Statement and Dr. Guy's supplemental letter were not based on first-hand information, but were primarily based on impressions from other faculty, (Order, at 33, and n.16), that information clearly enabled the Grievance Committee to rule against Dr. Irani when it previously was unable to reach a decision. The process employed by the Grievance Committee is akin to a jury in a criminal trial having difficulty in their deliberations and asking just the prosecutor to provide and ex parte submission of additional evidence, without providing notice to the defendant or an opportunity for the defendant to challenge or rebut such evidence. As noted in the previous brief, the Grievance Committee's actions were not authorized by the Palmetto Health Grievance Policy, and also deprived Plaintiff of notice and an opportunity to be heard with respect to this crucial information.

In evaluating Plaintiff's due process claims, the Court also completely disregarded the GMEC's clear history of acting as an official rubber stamp for whatever action the program director of a particular residency program requests about his or her residents. Defendant Koon's overt animosity towards Dr. Irani cannot be insulated by the fact that the ultimate decision to terminate his employment was made through the GMEC, with review by the Grievance Committee and ultimately the CEO of Defendant Palmetto Health. Plaintiff's counsel cannot imagine a more obvious example of a "cat's paw" situation than that presented here.

Dr. Koon as the program director made the various recommendations to his faculty colleagues and requested the Executive Committee of the GMEC to take interim action; Dr. Koon later presented the recommendation to the GMEC at its next regularly scheduled meeting, where resident issues are taken up at the very end of the meeting in executive session. Both Dr. Koon and

Dr. Taylor, who have been involved in the GMEC for years, testified that they have never seen a program director's recommendation to terminate a resident rejected by the GMEC. (Koon Depo., at 64, l. 10 to p. 65, l.3) (Dkt. No. 149-3); (Taylor Depo., at 62, l. 24 to p. 63, l.1) (Dkt. No. 149-2). Dr. Irani never had an opportunity to provide any input into his academic remediation, suspension, or termination until after the GMEC had already accepted Dr. Koon's recommendations as the program director. Residents are not allowed to appear before the GMEC to state their side of the case. (Stephens Depo., at 64, l. 5 to 65, l. 2) (Dkt. No. 149-1). The grievance process thus operates entirely as a post-deprivation review process. The first three steps of the grievance process involve asking the program director to change his mind; then asking the department chair to overrule the program director; then asking the DIO to overrule the decisions of the program director and department chair (and also her own preliminary decision if she acted as part of the Executive Committee of the GMEC on an interim basis until the next regular, bi-monthly meeting of the full GMEC). (Dkt. No. 155-6, at "Palmetto Health - 000718, ¶¶ 1.1 to 1.4) Only at the fourth step of the grievance process is an ostensibly independent review conducted, finally with an opportunity for the resident to be heard. The glaringly obvious problem with the grievance process is that no one could identify a single incident where a resident had his or her termination overturned at the grievance hearing level prior to Dr. Irani's case. Both Dr. Taylor and Dr. Stephens testified that they are aware of, or could recall, only one incident where the Grievance Committee overturned the termination of a resident, and that occurred after Dr. Irani had filed his lawsuit raising due process complaints. (Taylor Depo., at 63, ll. 16-22) (Dkt. No. 149-2); (Stephens Depo., at 48, l. 3 to p. 49., l. 1) (Dkt. No. 149-1).

The Court also unfairly determined that Defendant Koon is entitled to the same-actor

inference recognized by the Fourth Circuit cases of Proud v. Stone, 945 F.2d 796, 798 (4th Cir. 1991), and Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 959 (4th Cir. 1996). The Court found that because Defendant Koon interviewed Plaintiff and rated him favorably on his interview, that there is an inference that his subsequent treatment towards Dr. Irani was not racially motivated. There are two significant problems with Defendants' arguments in this regard. First, there is no evidence in the record, other than the interview sheets, to support a finding that Defendant Koon actually made the hiring decision of Dr. Irani. The residency match process is based on computer a algorithm that takes into account various factors, including candidate preferences, program rankings, and other criteria. Second, there is no data in the record about any other candidates, such as their race, color, or educational background, to make a meaningful comparison or draw any conclusion that Defendant Koon rated Dr. Irani highly despite his race. More importantly, Defendant Koon repeatedly attempted to disclaim any responsibility for making the decision to terminate Plaintiff's employment from the program; instead, he was very careful to clarify that the recommendations were made by the faculty as a whole, rather than himself, and that the GMEC actually made the termination decision. The same-actor inference only applies where the hiring and firing decisions are made by the same decision-maker within a fairly short period of time, and the employee's protected characteristic (race, color, gender) is readily apparent.

Plaintiff submits that Defendant Koon's animus towards Plaintiff, which was evidenced by the obviously inappropriate and intolerable comments discussed above, tainted the decision-making process that culminated with Plaintiff's termination from the program. The GMEC clearly acted as a "cat's paw" for Defendant Koon underlying decision prematurely to drum him out of the program.

28

## F.  Retaliation

With regard to Plaintiff's retaliation claims, the Court overlooked a number of adverse employment actions that were taken against Plaintiff immediately following his complaints about Defendant Koon calling him "Achmed the Terrorist," eventually culminating in his termination.  The Court does not give sufficient consideration to the liberal standard established by the U.S. Supreme Court in Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006), that retaliation claims should be analyzed in terms of whether the challenged actions might discourage a reasonable person under the same circumstances from making a complaint of discrimination or otherwise engaging in protected activities.

First of all, the record on summary judgment, taken in the light most favorable to Plaintiff, is sufficient to establish that Plaintiff complained about Defendant Koon's atrocious comments on or about January 3, 2012, when Plaintiff met with DIO Kathy Stephens as part of the grievance over his suspension.  The Court incorrectly determines that there is no evidence that Dr. Irani's report to Ms. Stephens was passed on to the USC-SOM.  The court overlooks the deposition testimony of Ms. Stephens, where she clearly states, "I also asked Dr. Koon about it."  (Stephens Depo., at 105, l. 23 to p. 106, l. 15) (Dkt. No. 149-1).  There is certainly a material dispute about when this exchange occurred.  Ms. Stephens testified that she does not know when she had her conversation with Dr. Koon about Dr. Irani's complaint.  (Stephens Depo., at 107, ll. 9-11).  Defendant Koon's Reply Affidavit on this issue contains rank speculation that should be disregarded on summary judgment: "I think it is more likely that Dr. Stephens learned of the comment in a post-termination communication, because it was only after Dr. Irani's termination that Dr. Stephens and I had any discussion about it."  (Koon Reply Aff., at ¶ 67) (emphasis added).

Plaintiff's initial brief describes how, shortly after the complaint about Dr. Koon's inappropriate comments was made, Ms. Stephens denied his grievance, refused to provide to him documents regarding the investigation of Trauma Female 375, and disallowed his request for a grievance hearing for being one day late in light of the Martin Luther King, Jr. Holiday issue as described above. Dr. Irani also requested that Dr. Guy be allowed to take over responsibility for monitoring his mediation, which Dr. Koon angrily rejected during the January 30, 2012 faculty meeting in connection with Plaintiff's return to the program. (Dkt. No. 148-2, ¶¶ 61-62). Less than a month later, Dr. Irani was suspended again based on allegations of inappropriate care or treatment towards his first spine patient, which eventually led to his termination. The course of events following Plaintiff's complaints about Dr. Koon's racially inappropriate comments in early January 2012 was sufficiently contemporaneous as to provide a strong inference of causation. The Court down-plays the significance of the adverse employment actions identified above, which are plainly more than efforts to "preserve the status quo." The fact that Ms. Stephens already had a negative impression of Dr. Irani–based solely on what Defendant Koon had told her about Dr. Irani as well as her "own scientific assessment," that Dr. Irani suffered from a "lack of humility and maturity" (Dkt. No. 136-9, at 47)–should not have precluded Plaintiff's retaliation claim. Ms. Stephens's pre-existing (and unjustified) negative impression of Dr. Irani demonstrates that she did not perform her responsibilities under the grievance process to provide a fair and unbiased review; it should not have been used as a basis for defending against a claim of retaliation. Issues such as motivations, attitudes, and prejudices should not be decided on summary judgment, but only after the Court has a full and fair opportunity to observe the demeanor of the relevant witnesses at trial.

### G.  Plaintiff's Actual Job Performance

Finally, the Court unfairly accepts Defendants' premise that Plaintiff had a chronic history of sub-standard care in the patient encounters underlying his various disciplinary actions and termination.  Plaintiff's expert witness determined that Plaintiff's care was appropriate for a second-year orthopaedic surgery resident; the California Medical Board ultimately determined that Plaintiff had not deviated from standards of acceptable care with regard to these patients; and even one of Plaintiff's senior residents described the treatment towards Plaintiff as a "witch hunt" in a contemporaneous e-mail to his colleagues.

The record before the Court contains insufficient evidence, when properly taken in the light most favorable to Dr. Irani, to support a finding as a matter of law that Dr. Irani's job performance during his residency was sufficient to justify his termination.  Although Defendants attempt to pile on numerous, unsubstantiated allegations of deficient patient care and lack of empathy, as well as "cherry-picked" phrases from Dr. Irani's performance reviews from his PGY-1 year, a careful examination of the medical records and supportive statements from other, independent staff members and nurses, paints an entirely different picture.  Dr. Irani did not describe his entire PGY-1 year as a "rocky start," as unfairly portrayed by the Court.  (Order, at 4-5).  Dr. Irani's actual testimony from the Grievance Committee clearly indicates that he was talking about the first one or two rotations, where he received evaluations from Drs. Jones and Bynoe that were lower than he had expected.  (Grievance Hearing Tr., at 82, ll. 14-18) (Dkt. No. 150-1).  The Court also unfairly accepted a number of statements from Defendant Koon's Reply Affidavit, which is largely comprised of self-serving argument, his personal "beliefs" and conclusions, and uncorroborated assertions that actually highlight many of the disputed issues of material fact in this case.  These are clearly not proper for

31

a Rule 56 affidavit, which is supposed to recite facts based on personal knowledge, not suppositions, innuendos, deductions, beliefs, hopes, or arguments.

Under the completely deferential standard articulated by the Court, no resident could ever successfully challenge his or her termination through the legal system, regardless of how egregious the underlying facts were. All a program would have to do is articulate a plausible-sounding, uncorroborated opinion that the resident in question was not cut out to be a doctor and had to be dismissed. This is precisely what Dr. Voss's "Summative Statement" to the Grievance Committee did. (Dkt. No. 155-5). Plaintiff's expert witness, Dr. Richard Grant, who has over thirty-five years' experience in educating orthopaedic surgery residents, opined that Dr. Irani's termination only half-way through his PGY-2 year was clearly premature. (Grant Depo., at 228-231) (Dkt. No. 149-5).

The California Medical Board, which actually took the time to review this matter in a contested hearing, determined that Dr. Irani did not have persistent patient care issue and did not deviate from the standard of care in connection with the same patient encounters at issue here. Although the legal standards between the California Medical Board proceeding and this case are obviously different, the underlying patient encounters were identical, because the California Medical Board made its initial decision to deny Dr. Irani's medical license in California entirely on Dr. Irani's file it received from the Palmetto Health/USC-SOM program.

## Conclusion

For all of the foregoing reasons, Plaintiff implores the Court to reconsider its Order of June 1, 2016, granting summary judgment in favor of Defendants on all of Plaintiffs' claims.  Plaintiff requests an opportunity to address any remaining issues in this important case during an in-person hearing on this motion.

Respectfully submitted,

 s/ David E. Rothstein
David E. Rothstein, Fed. ID No. 6695
ROTHSTEIN LAW FIRM, PA
1312 Augusta Street
Greenville, South Carolina  29605
Office: (864) 232-5870
Facsimile: (864) 241-1386
E-mail: drothstein@rothsteinlawfirm.com

Attorney for Plaintiff, Afraaz R. Irani, M.D.

July 27, 2016

Greenville, South Carolina.