IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Afraaz R. Irani, M.D., | C/A No.  3:14-cv-3577-CMC |
| Plaintiff, | |
| v. | |
| Palmetto Health, University of South Carolina School of Medicine, David E. Koon, M.D., in his individual capacity, and John J. Walsh, M.D., in his individual capacity, | Opinion and Order On Motion to Alter or Amend Judgment ECF No. 198 |
| Defendants. | |

This matter is before the court on Plaintiff's motion to alter or amend judgment pursuant to Rule 59(e) of the Federal Rules of Civil Procedure.  ECF No. 198 ("Rule 59(e) Motion").  For reasons set forth below, the motion is denied.

## BACKGROUND

Through this action, Plaintiff, Afraaz R. Irani, M.D., ("Plaintiff" or "Dr. Irani"), challenges his treatment during and dismissal from the Orthopaedic Surgery Residency Program ("Residency Program") sponsored by Defendant Palmetto Health ("Palmetto Health") and operated in conjunction with Defendant University of South Carolina School of Medicine ("USC-SOM") (collectively "Entity Defendants").  Plaintiff's Amended Complaint asserts six causes of action against the Entity Defendants and an additional seven causes of action against either or both David

E. Koon, M.D. ("Dr. Koon"), Director of the Residency Program, and John J. Walsh, IV, M.D. ("Dr. Walsh"), Chair of USC-SOM's Orthopaedic Residency Program.[1]

Judgment was entered on June 1, 2016, following consideration of Defendants' three separate motions for summary judgment and two related motions. ECF No. 189 (Judgment); ECF No. 188 ("Summary Judgment Order"). While the court did not accept all arguments for summary judgment, it did, ultimately, conclude all Defendants were entitled to judgment as a matter of law on all claims. ECF No. 188.

On June 28, 2016, Plaintiff moved to extend time to file a memorandum in support of his intended motion to alter or amend. ECF No. 196. This extension was sought based on the length and complexity of the underlying order and counsel's health. *Id.* The motion stated: "Plaintiff will file his motion to alter or amend the judgment outlining the basic grounds for his request for reconsideration before the 28-day deadline expires; however, Plaintiff requests an additional 28-days to file the supporting memorandum of law." *Id.* at 2. The court granted this request. ECF No. 197.

Plaintiff filed his Rule 59(e) Motion within the deadline for doing so. ECF No. 198. The motion lists nine areas in which Plaintiff believes the court erred. Collectively, the alleged errors challenge the court's determinations Plaintiff failed to raise a genuine issue of material fact on the following issues:

    I.       Whether Plaintiff was subjected to a hostile environment (*id.* ¶¶ (1), (2));

---

[1] The remainder of this order does not refer to Dr. Walsh as a defendant in any claim because the present motion does not challenge judgment in favor of this Defendant. *See generally* ECF No. 95 (June 23, 2015 order dismissing all but one claim to the extent asserted against Dr. Walsh); ECF No. 188 at 95, 96 (June 1, 2016 order granting summary judgment on the remaining claim against Dr. Walsh).

II.     Whether the Entity Defendants were joint employers and breached contractual obligations to Plaintiff under first and third-party contracts (*id.* ¶¶ (3)-(6));

III.     Whether Defendants violated Plaintiff's contractual and constitutional rights to due process (*id.* ¶ 7);

IV.     Whether the Entity Defendants retaliated against Plaintiff for complaining about racially-charged comments made by Dr. Koon (*id.* ¶ 8); and

V.     Whether Defendants improperly concluded Plaintiff provided substandard care during his residency (*id.* ¶ 9).

ECF No 198.

Plaintiff filed his memorandum in support of these arguments on July 27, 2016. ECF No. 210 ("Memorandum in Support").[2] After seeking and receiving an extension of time to do so, Defendants filed memoranda in opposition on September 7, 2016. ECF Nos. 212, 213. Plaintiff filed a reply on September 19, 2016. ECF No. 214 ("Reply"). The matter is now ripe for resolution.

## STANDARD

The Fourth Circuit recognizes three grounds for altering or amending a judgment pursuant to Rule 59(e): "'(1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct clear error of law or prevent manifest injustice.'" *United States ex rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 290 (4th Cir. 2002) (quoting *Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998)). "Rule 59(e) motions may not be used, however, to raise arguments which could have been raised prior to issuance of the judgment, nor may they be used to argue a case under a novel theory that

---

[2] Some arguments in Plaintiff's later-filed Memorandum in Support and Reply assert errors neither identified in nor reasonably predicted by the nine errors identified in his Rule 59(e) Motion. Such arguments are not properly preserved.

3

the party had the ability to address in the first instance." *Pac. Ins. Co.*, 148 F.3d at 403. Relief under Rule 59(e) is "an extraordinary remedy which should be used sparingly." *Id.* (internal marks omitted).

## DISCUSSION

Plaintiff does not address the standard applicable to motions to alter or amend judgment either in his motion or memoranda. This is true even of his reply memorandum and despite Defendants noting this in their opposition memoranda. For reasons explained below, Plaintiffs arguments do not, in any event, demonstrate clear error, manifest injustice, or any other basis for altering or amending judgment.

## I.     Hostile Environment Arguments

**Specification of Error.** Plaintiff's first two specifications of error relate to his hostile environment allegations. In his Rule 59(e) Motion, Plaintiff asserts the court "misapplied the Fourth Circuit's holding in *Boyer-Liberto v. Fontainbleu Corp.*, 786 F.3d 264 (4th Cir. 2015) (en banc) and unfairly minimized the severity and hostility of the racial slurs at issue in this case." ECF No. 198 ¶ 1 (arguing the slurs were "far more intimidating and threatening" than those in *Boyer-Liberto*, "especially since the racial or ethnic slurs here were made by the program director"). Plaintiff also asserts the court "improperly accepted Defendant Koon's self-serving explanation of the context of the inflammatory slurs" and "unfairly dismissed as cumulative the testimony of independent witnesses who also overheard Defendant Koon make the offensive epithets." ECF No. 198 ¶ 2.[3]

---

[3] Plaintiff does not specify the causes of action implicated by these alleged errors. He did, however, rely on hostile environment allegations in support of his second and eleventh causes of

4

In his later-filed Memorandum in Support and Reply, Plaintiff relies on both *Boyer-Liberto* and *Guessous v. Fairview Prop. Investments, LLC*, 828 F.3d 208 (4th Cir. 2016), in arguing the court erred in granting judgment on his Hostile Environment Claims. ECF Nos. 210 at 1-6 and 214 at 1-4. Plaintiff also lists six incidents (or categories of incident), which he maintains should be considered in evaluating the totality of the circumstances: (1) a statement Dr. Koon made to Plaintiff that another department was "just happy to have [residents who] can speak English"; (2) assignment of the "How to Swim with Sharks" article to Plaintiff for presentation at a Journal Club meeting in July 2011 and Dr. Koon's comment the article was not assigned randomly; (3) Dr. Koon's statement to Plaintiff during the August 2011 meeting in which Plaintiff was placed on remediation that Dr. Koon had fired residents from the program and would have to sign off on any graduation papers; (4) Dr. Koon's hostile and intimidating November 3, 2011 email and related telephone conversation chastising Plaintiff for his response to a directive to complete dictation on a patient and stating he would have fired Plaintiff on the spot had Plaintiff not been on vacation; (5) a December 5, 2011 faculty meeting in which Plaintiff felt intimidated and threatened by, inter alia, an inquiry whether he was committed to the program and whether he had hired an attorney;

---

action which, respectively, asserted a hostile environment and disparate treatment claim against Palmetto Health under 42 U.S.C. § 1981 ("Section 1981"), and an equal protection claim against Dr. Koon under 42 U.S.C. § 1983 ("Section 1983"). *See* ECF No. 188 (Summary Judgment Order), Discussion §§ II, XI. For ease of reference, the court refers to the hostile environment aspects of these claims collectively as "Hostile Environment Claims." Plaintiff also relied on hostile environment allegations (as well as disparate treatment allegations) in support of his first cause of action, which was asserted against both Entity Defendants under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"). However, that cause of action was resolved primarily based on Plaintiff's failure to timely exhaust administrative remedies, a ruling that is not challenged through the Rule 59(e) Motion. Discussion § I at 40, 41.

and (6) instances in which Dr. Koon referred to Plaintiff as "Achmed the Terrorist" or commented he might blow something up, which occurred sometime in late 2011.

**Discussion.** Plaintiff relied exclusively on the incidents in the sixth item above in opposing summary judgment on his Hostile Environment Claims. Thus, most of the incidents on which Plaintiff now relies were not timely advanced as a basis for these claims.[4]

Even if timely raised, the additional incidents would fail to support a hostile environment claim. As explained in more detail below, item one is a conceivably-ethnic comment, but there is no connection between the comment and Plaintiff's circumstances or between the comment and any otherwise adverse treatment of Plaintiff. Items two through five may involve adverse treatment, but there is no connection between these alleged actions and any racially or ethnically offensive comments, behavior, or evidence of motivation. The incidents in item six fail for reasons addressed in the Summary Judgment Order. ECF No. 188. at 50-52.

As explained in the Summary Judgment Order, a jury could find the comments addressed in item six were unwelcome (offensive), satisfying the first element of a hostile environment claim. The court also assumed for purposes of summary judgment that a jury could find the comments

---

[4] In opposing summary judgment on his Hostile Environment Claims, Plaintiff relied solely on Dr. Koon's "references to [Plaintiff] as 'Achmed the Terrorist,'" which Plaintiff argued occurred "on several occasions"; and Dr. Koon's single alleged statement "Plaintiff might 'blow the place up.'" ECF No. 148 at 5 (arguing these references were comparable to the offensive "porch monkey" comments addressed in *Boyer-Liberto*); *see also* ECF No. 148 at 57, 58 (relying on Plaintiff's declaration testimony he reported to Dr. Stephens that Dr. Koon "treated [Plaintiff] differently, and notably called [Plaintiff] racially charged names like 'Achmed the Terrorist.'"). Similarly, Plaintiff's Rule 59(e) Motion refers only to offensive comments as a basis for the Hostile Environment Claims. ECF No. 198 ¶ 1 (referring to racial slurs); *id.* ¶ 2 (referring to "inflammatory slurs" and "offensive epithets"). It is only through his subsequent Memorandum in Support that Plaintiff identifies the five additional incidents in support of his Hostile Environment Claims.

were made because of a protected characteristic (Plaintiff's ethnicity), and imputable to the employer, thus satisfying the second and fourth elements. This left the third element: whether the unwelcome comments were sufficiently severe or pervasive to alter the conditions of Plaintiff's employment. Focusing on the specific incidents on which Plaintiff relied in opposing summary judgment (the comments addressed in item six above), the court found insufficient evidence to raise a genuine issue of material fact as to this element.

Plaintiff's present argument points to five other incidents of adverse treatment. The first, Dr. Koon's comment that another department was just happy if its residents spoke English, may suggest Dr. Koon harbored some bias against foreign residents, at least those who had difficulty speaking English. The comment did not, however, suggest any hostility *towards Plaintiff* or any race or ethnicity to which he belonged. By Plaintiff's own description, Dr. Koon characterized residents of the Orthopaedic Surgery Residency Program (a group to which Plaintiff belonged) as superior to residents in other programs (a group to which Plaintiff did not belong), before stating faculty in another program were just happy to have residents who spoke English. Plaintiff has proffered no evidence that either Dr. Koon or Plaintiff himself perceived Plaintiff as having difficulty speaking English or otherwise falling within the category of persons to whom the comment referred. Thus, while the comment had an ethnic component and may have been unwelcome (offensive) in the general sense, there is no evidence it was directed to Plaintiff (or Plaintiff perceived it as directed to him) because of his race or ethnicity (third element).

For present purposes, the court will assume without deciding that a jury could find the four incidents addressed in items two through five were unwelcome in a general sense, collectively altered the conditions of Plaintiff's employment, and are imputable to the employer (first, third, and fourth elements). However, like the incident addressed above, nothing about these incidents

suggest they occurred *because of Plaintiff's race or ethnicity* (third element). For example, there is no evidence any conceivably-ethnic comment was made in connection with these incidents. Neither is there any evidence the comments, correction, discipline, or inquiries were ethnically or racially motivated or otherwise connected with the conceivably-ethnic comments addressed in the first and sixth item (references to residents who had difficulty speaking English or suggesting a connection to terrorism). The only connection between the conceivably-ethnic comments and adverse treatment is (1) Dr. Koon made the two conceivably-ethnic comments, (2) Dr. Koon is responsible for or was involved in the incidents addressed in items two through five; and (3) most of the incidents (exclusive of the comment in item one) occurred during the same six month period.[5]

The lack of connection between the ethnically-offensive comments and otherwise adverse treatment distinguishes this case from *Boyer-Liberto* and *Guessous*. The infrequency of the conceivably-ethnic comments also distinguishes the comments in the present case from those in

_____

[5] In his sworn declaration proffered in opposition to summary judgment, Plaintiff identified the statement addressed in item one as occurring during an impromptu meeting in December 2010 (during his first year of residency). Irani decl. ¶ 9 (stating discussion occurred when he was on his way to his car and averring Dr. Koon noted Plaintiff would start on the Orthopaedic Service soon and would need to bring his "A game" to that service). Nothing in this statement suggests the comment was made in connection with any disciplinary action or otherwise adverse treatment. During his Grievance Hearing, Plaintiff attributed the same statement to comments made during an August 2011 meeting in which he was placed on Level II Remediation (during his second year of residency). Hearing Trans. at 48 (ECF No. 150-1). Plaintiff's statement during the Grievance Hearing does not, however, appear to have been given under oath. Neither may Plaintiff create a genuine issue of material fact by presenting conflicting versions of the same event. *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984) ("A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct."). Thus, for purposes of summary judgment and this order, Plaintiff is bound by his sworn declaration testimony regarding the timing, content and context of the statement.

*Guessous.*  There the court addressed a course of conduct directed to "an Arab-American Muslim woman from Morocco," which occurred over a four-and-a-half year period and was characterized by a supervisor's frequent disparaging remarks about Muslims and people from the Middle East. The supervisor's comments included repeatedly characterizing Muslims as terrorists and people from the Middle East as untrustworthy.  The supervisor also directed multiple comments and actions to Guessous personally relating to her ethnicity and exercised an extreme level of supervision over her work, which was consistent with his negative comments about the untrustworthiness of people from the Middle East.[6]

---

[6]  For example, during their first meeting, the supervisor asked Guessous where she was from. *Guessous*, 828 F.3d at 211.  When Guessous replied she was from the Middle East, the supervisor stated he had "worked with 'a bunch of Middle Easterners [in a prior job] and they are 'a bunch of crooks, [who] will stop at nothing to screw you.'"  *Id.*  Thereafter, the supervisor "exhibited a habit of discussing Moroccans, Muslims, and Middle Easterners in disparaging and offensive ways[,]" including multiple instances in which he walked to Guessous's desk to make negative statements about Muslims or people from the Middle East.  On one occasion, after reading about a terrorist attack, he walked to Guessous' desk and asked "Why do Muslims hate America?"  When Guessous responded they did not and "Muslims are not terrorists," the supervisor responded "Yeah, sure. Like my buddy says . . . not all Muslims are terrorists, but most are."  *Id.*  Guessous described her supervisor's body language during this exchange as making her feel cornered and intimidated. There were multiple other similar instances in which the supervisor initiated conversations relating to terrorism and characterized Muslims or Middle Easterners (with the exception of Israelis) as terrorists.  He also "consistently conflated Guessous' identity as a Moroccan Muslim with other Middle Eastern identities, spent several months using her Moroccan name despite her repeated request that he use the Americanized name, responded to Guessous's overtures at better understanding with negative comments including references to terrorism and a statement Muslims and Christians were not the same and did not believe in the same God, referred to Guessous as his "Muslim employee," and referred to people from Dubai as "a bunch of camel people."  *Id.* at 212-13.  The supervisor would frequently stand behind Guessous' desk and ask what she was working on "as many as forty times in a single day," which conduct was "specifically aimed at Guessous and not at other employees."  *Id.* at 213-14.  During one of these encounters, the supervisor looked at his watch, snapped his fingers, and said "this is not Moroccan time."  *Id.*  In finding the evidence sufficient to preclude summary judgment, the Fourth Circuit noted the connection between the close supervision and the supervisor's negative comments about "Muslims', Arabs', and Moroccans' trustworthiness and work ethic."  *Id.*

While Plaintiff complains Dr. Koon interfered with his ability to perform as a resident, the suggested interference has no connection to the ethnically-offensive comments or anything suggesting an ethnically-based motivation.[7]   Therefore, even considering the additional incidents Plaintiff now argues support his Hostile Environment Claims, that evidence would not raise a genuine issue of material fact for trial.

## II.     Contract and Joint Employment Arguments.

Plaintiff identifies four alleged errors underlying the grant of summary judgment on his contract claims.  He argues the court erred in holding:  (1) Plaintiff failed to give adequate notice of documents on which he relied for his third-party beneficiary claim; (2) Plaintiff was, at most, an incidental beneficiary of any third-party contract; (3) the decision of the Accreditation Council for Graduate Medical Education ("ACGME") precludes a finding Defendants breached ACGME standards; and (4) USC-SOM was not a joint employer with Palmetto Health.  These arguments are addressed separately below.[8]

---

[7]     Plaintiff also incorrectly suggests the court accepted Dr. Koon's characterization of the "Achmed" comment and his intent.  This ignores the fact the court accepted Plaintiff's testimony as true, concluded a jury could find the comments unwelcome (offensive), and assumed a jury might also find the comments race-based.  *See* ECF No. 188 at 49-51 (discussing Plaintiff's deposition testimony at 54-68 and Plaintiff's declaration ¶¶ 53, 76).

[8]   The first two alleged errors appear to challenge entry of judgment on Plaintiff's fifth cause of action (third-party beneficiary claim), though his later Memorandum in Support and Reply expand the argument to challenge judgment on both contract claims (fourth and fifth causes of action). The third alleged error assumes the court relied on an argument it did not reach. The fourth alleged error challenges one basis for entry of judgment in favor of USC-SOM on the fourth cause of action (first-party contract claim).  The same argument was addressed as an alternative basis for judgment on the first cause of action (Title VII claim), though the primary basis for that ruling (failure to exhaust administrative remedies) is not challenged through Plaintiff's Rule 59(e) Motion.

### A.    Notice of Documents Relied on for Third-Party Claim

**Specification of Error.**  In his Rule 59(e) Motion, Plaintiff asserts the court "incorrectly found that Defendants did not have adequate notice of Plaintiff's *third-party beneficiary contract theory*" because that theory rested on three documents "which were not specifically mentioned in the Amended Complaint."  ECF No. 198 at 2 (emphasis added).  Plaintiff asserts his "supplemental discovery responses clearly identified these documents, which were only produced by Defendants in discovery after Plaintiff had already sought leave to amend the complaint."  *Id.* (asserting he also identified these documents during a discovery hearing before the Magistrate Judge).

In his subsequent Memorandum in Support and Reply, Plaintiff expands these arguments to apply to both of his contract claims (first-party contract claim in addition to third-party beneficiary claim).  He also argues he gave fair notice of his intent to rely on five (rather than three) documents in support of these claims.[9]  Plaintiff also expands the sources of alleged notice, asserting he advised Defendants of his intent to rely on these documents *by email in mid-April 2015* in addition to reliance on supplemental discovery responses emailed on June 1, 2015.  ECF No. 210 at 10-13 (emphasis added); ECF No. 210-1 (April 17-18, 2015 email exchange); ECF No. 210-3 (June 1, 2015 email attaching unsigned supplemental discovery responses).

_____

[9]  *See* ECF No. 210 at 9-10 (applying argument to his "contract claims (either directly or as third-party beneficiary)"); ECF No. 214 at 5 (referring collectively, to his "contract claims" in arguing, on reply, Defendants were "not unfairly surprised by Plaintiff's reliance on the Affiliation Agreement, the Program Letters of Agreement [("PLA")], or the USC Orthopaedic Department Resident Handbook, even though they were not specifically cited" in either the original or Amended Complaint); ECF No. 210 at 10 (arguing he gave notice of his intent to rely on (1) "the [Palmetto Health] Resident Manual, the USC-SOM Resident Manual, [and] the Orthopaedic Handbook in support of his contract claims" and (2) the Affiliation Agreement and PLA in support of his third-party beneficiary claim).

11

Plaintiff attaches the April 17, 2015 email, which reads as follows:

In light of Dr. Taylor's deposition from earlier this week and the new documents I was able to find in preparation for the deposition, *I may need to amend the complaint again*, because I believe that there are three additional contracts that need to be included in Dr. Irani's claims for breach of contract, third-party beneficiary breach of contract, and tortious interference. Those contracts would be (1) the Affiliation Agreement between Palmetto Health and USC . . . , (2) the Department of Orthopaedic Surgery Residency Manual . . . , and (3) the PLA between Palmetto Health and the University Specialty Clinics—Orthopaedic Surgery . . . . I suppose the causes of action in the Amended Complaint could be read to include these three contracts, but *if you disagree, I will need to file a second amended complaint*. Please let me know your position on this as soon as possible."

ECF No. 210-1 (emphasis added).

Palmetto Health's counsel responded (1) the referenced documents had been produced on February 5, 2015, and (2) none were new to Plaintiff's counsel as they were produced in prior litigation (involving claims by a different resident). *Id.*[10] Palmetto Health's counsel did not expressly address whether Plaintiff would need to file a second amended complaint if he intended to rely on these documents. According to Plaintiff, USC-SOM's counsel did not respond at all. Plaintiff concedes he did not seek to "file a second amended complaint at that point, *because it seemed superfluous and because Defendants' counsel had raised such strenuous objection to the first Amended Complaint*." ECF No. 210 at 13 (emphasis added).

Plaintiff also proffers evidence his counsel emailed an unsigned version of supplemental discovery responses to defense counsel on June 1, 2015. ECF No. 210-3.[11] The underlying

_____

[10] Plaintiff challenges the second premise through his Memorandum in Support and Reply. For purposes of this order, the court assumes without deciding that Plaintiff's position as to production in the prior case is correct.

[11] It is unclear whether Plaintiff's counsel subsequently forwarded a signed version of this response to defense counsel. *See* ECF No. 210 at 14 n.6 (stating Plaintiff's counsel is unsure

discovery requests ask Plaintiff to identify the documents on which he relies for his claims (1) Palmetto Health had a contract with ACGME, (2) Plaintiff was a third-party beneficiary of a contract between Palmetto Health and ACGME, and (3) Palmetto Health prevented Plaintiff from entering any contract because of his race. ECF No. 210-3. Plaintiff provides the same response to each of these queries, listing a total of five documents (the three documents listed in the April 17, 2015 email and two additional documents) and stating his "*breach of contract claims* against Defendants are based on" the five listed documents. *Id.* (emphasis added).[12]

In addition to arguing Defendants had actual notice of his intent to rely on the five listed documents for his contract claims, Plaintiff argues he was unable to respond to Defendants' arguments regarding lack of notice. He asserts he could not do so because (1) Defendants first raised their notice arguments on reply, (2) the rules of this court "do not allow parties to file 'surreply briefs,'" and (3) the court resolved the motion without oral argument. ECF No. 210 at 11.

**Discussion.** To the extent they implicate his first-party contract claim, the arguments in Plaintiff's Memorandum in Support go beyond what is fairly predicted by the third alleged error

---

whether he did so). Plaintiff also claims his counsel advised Defendants of his intent to rely on the documents identified in this document during an earlier discovery conference before the Magistrate Judge. No transcript of this hearing has been provided. For purposes of this order, the court, nonetheless, assumes Plaintiff's version of the disclosures made during that hearing is accurate.

[12] The inquiry's request for documents supporting the existence of a contract between Palmetto Health and ACGME is consistent with what is alleged in the complaint: a claim or claims based on a contract between these two entities. The documents identified in the June 1, 2015 responses do not purport to be contracts between these two entities.

13

in his Rule 59(e) Motion. Plaintiff's arguments that Defendants had fair notice are also improper because they could have been but were not raised prior to entry of judgment.

Even without these concerns, Plaintiff's third specification of error fails to support alteration or amendment of the judgment. While Plaintiff's current proffer suggests he gave Defendants *some* notice of his intent to rely on additional documents in support of his contract claims, it does not change the result. This is, first, because Plaintiff elected not to seek leave to file a second amended complaint knowing Defendants would likely oppose such a motion. In addition, the notice Plaintiff did provide was both untimely and insufficient.

Plaintiff claims he first gave notice of the expanded bases for his contract claims through his counsel's April 17, 2015 email. This was roughly four months after the deadline to move to amend pleadings and less than two weeks after the court granted Plaintiff's first motion to amend. *See* ECF No. 13 (First Amended Scheduling Order setting a December 16, 2014 deadline to amend pleadings); ECF No. 47 (April 3, 2015 order granting motion to amend); ECF No. 49 (Amended Complaint filed April 6, 2015). The matter was, at that time, governed by a recently entered Second Amended Scheduling Order, which set a discovery deadline of June 8, 2015. ECF No. 55 (entered April 15, 2015). While discovery was extended for limited purposes by later orders, the general discovery deadline was never extended beyond June 8, 2015. ECF No. 90, 115, 127. Thus, this notice of an expanded basis for Plaintiff's contract-based claims was given less than two months before the close of discovery.

14

As Plaintiff acknowledges in his Memorandum in Support, he believed Defendants would oppose any motion to further amend the complaint in part based on untimeliness.[13]  Palmetto Health's response suggested additional related grounds on which it would have opposed further amendment (that Plaintiff or his attorney had the documents well prior to April 17, 2015).  Faced with this likely opposition, Plaintiff elected not to move to amend.

Plaintiff's June 1, 2015 supplemental discovery responses, while a more formal indication of intent (at least assuming a signed version was ultimately provided) do not fit the questions asked.  The underlying requests sought documents on which Plaintiff relied for particular allegations (most critically, allegations relating to a contract between Palmetto Health and ACGME).

In sum, neither the April 17, 2015 email nor the June 1, 2015 supplemental discovery responses gave adequate or timely notice of Plaintiff's intent to rely on documents beyond those identified under the relevant causes of action of the Amended Complaint.  Had Plaintiff intended to rely on these documents, the proper course would have been to move to amend and show good cause for the delay.  At that point, the basis for each of the proposed amended claims could have been clarified and Defendants would have had an opportunity to address any grounds for opposing amendment.  Plaintiff affirmatively elected not to pursue that course.  He concedes he did so because he anticipated opposition, not because he believed Defendants agreed to the informal amendment.  Having made this election, Plaintiff cannot now complain that Defendants or the court should have construed the Amended Complaint to include what Plaintiff never sought to add.

---

[13]  Defendants USC-SOM and Drs. Koon and Walsh had, in fact, opposed Plaintiff's first motion to amend, which was filed January 23, 2015, on various grounds including his delay in seeking amendment and the pendency of multiple dispositive motions.  ECF Nos. 18, 22, 27, 31, 33.

For the reasons stated above Plaintiff's third argument fails to the extent he challenges the ruling as to the first-party contract claim because he did not preserve that argument through his Rule 59(e) Motion.  His argument as to both the first-party contract and third-party beneficiary claims fails because he has not shown the decision not to allow him to rely on documents not identified in the Amended Complaint was clearly erroneous or resulted in manifest injustice.[14]

### B.     Incidental Beneficiary Ruling

**Specification of Error.**  Plaintiff's fourth specification of error challenges the ruling he "was an incidental beneficiary, instead of an intended third-party beneficiary of the Affiliation Agreement and the PLA."[15]  He asserts the court "overlooked the fact that Plaintiff is specifically listed by name in the attachment to the PLA and that he is included within the definition of 'resident' in the Affiliation Agreement."  ECF No 198 at 2.[16]  Plaintiff makes consistent arguments in his Memorandum in Support, adding that his failure to "locate any binding precedent precisely on point . . . should not have been fatal to [his] third-party beneficiary claim."  ECF No. 210 at 17.

---

[14] Lack of notice was not, in any event, the only basis for rejecting Plaintiff's first-party contract claim.  ECF No. 188 at 80-91 (rejecting variant of South Carolina's employee handbook theory to extent claims were asserted against USC-SOM and addressing various alleged breaches on the merits).

[15] This argument presumes Plaintiff is allowed to rely on the belatedly identified Affiliation Agreement and PLA, which arguments are rejected for reasons addressed above.  *Supra* Discussion § II.A.

[16] Plaintiff noted the same circumstances in his memorandum in opposition to summary judgment, followed by the conclusory statement "[a]s such, Plaintiff is allowed to bring an action as a third-party beneficiary of these two contracts, to enforce the obligations of the parties to those contracts." ECF No. 148 at 41, 42.

16

**Discussion.** In finding Plaintiff was no more than an incidental beneficiary, the court relied on the *nature of the promises* between Palmetto Health and USC-SOM. ECF No. 188 at 94 (citing *Johnson v. Sam English Grading, Inc.*, 722 S.E.2d 544 (S.C. Ct. App. 2015). It also noted Plaintiff's failure to cite any authority for the proposition agreements between entities engaged in joint educational efforts may be enforced by students under a third-party beneficiary theory.

Plaintiff's present arguments do not persuade the court it erred in holding Plaintiff was, at most, an incidental beneficiary. The promises in the Affiliation Agreement and PLA directly benefitted USC-SOM and Palmetto Health. This is true of the promise to abide by ACGME standards, as failure to abide by these standards could or would have resulted in loss of accreditation, which would have resulted in an injury to the Entity Defendants. While residents surely benefit from the program being accredited, as well as from compliance with the standards required for accreditation, nothing suggests that "third-party" benefit is the intended (as opposed to incidental) purpose of the agreement between USC-SOM and Palmetto Health, given these entities' independent interest in maintaining accreditation.

As Plaintiff acknowledges, he has failed to direct the court to any authority addressing even a comparable scenario. He, instead, directs the court to one case with a more remote connection between the "contract" and claimant in which the court held the plaintiff (a patient injured by a resident) was, at most, an incidental beneficiary of ACGME standards. ECF No. 210 at 17 n.7. That this more-remote connection did *not* support a third-party beneficiary claim does not mean that a somewhat closer connection *does* support such a claim.

In sum, Plaintiff has, at best, pointed to the novelty of his theory. This is not enough to persuade the court its decision was clearly erroneous or resulted in manifest injustice.

### C.     Reliance on ACGME Decision

17

**Specification of Error.** Plaintiff's fifth specification of error asserts the court "erred in ruling the ACGME's decision not to take any action on Plaintiff's written complaints about the orthopaedic surgery residency program precludes a finding that the program breached the accreditation standards." ECF No. 198 at 2; *see also* ECF No. 210 at 17, 18.

**Discussion.** This argument rests on a misreading of the summary judgment order. Rather than ruling on this basis, the court found it unnecessary to "reach Defendants' additional arguments for summary judgment, including that there was no breach given the Program never lost accreditation and the ACGME found no merit to Dr. Irani's multi-faceted complaint." ECF No. 188 at 94. Thus, the fifth specification of error does not support alteration or amendment of the judgment.

### D.     Joint Employer Ruling

**Specification of Error.** In his sixth specification of error, Plaintiff asserts the court "disregarded the underlying principle behind the joint employment doctrine of *Butler v. Drive Auto. Indus. of Am., Inc.*, 793 F.3d 404 (4th Cir. 2015), in ruling that Defendant USC School of Medicine was not a joint employer of Plaintiff's in the residency programs." ECF No. 198 at 2-3. He maintains the court failed to consider the "complete control" USC-SOM and Drs. Koon and Walsh exercised over his participation in the Residency Program and improperly apportioned "the educational component of the residency program to Defendant USC-SOM and the employment component to Defendant Palmetto Health." *Id.*

In his subsequent Memorandum in Support, Plaintiff argues the control element of *Butler* is satisfied because USC-SOM "exercised complete control and supervision over Plaintiff's day-to-day participation in the orthopaedic surgery residency program." ECF No. 210 at 1. He notes all memoranda of record regarding Plaintiff's participation were on USC-SOM letterhead, the

18

Department of Orthopaedic Surgery Residency Manual governed scheduling, work hours, and dress code, USC-SOM employees were responsible for hiring and evaluating residents, the Program's website spoke in terms of a program offered by USC-SOM, and other documents spoke in terms of joint responsibility for the program. *Id.* at 19-20. Plaintiff characterizes the court's allocation of educational and employment components to USC-SOM and Palmetto Health, respectively, as arbitrary and lacking in factual or legal authority. *Id*. at 20.[17]

**Discussion.** While Plaintiff cited *Butler* in his memorandum in opposition to summary judgment, he failed to address *any* of its nine factors (including control). He, instead, relied on evidence Palmetto Health and USC-SOM held the Program out as being jointly run including by placing the logos of both entities and welcome messages from the heads of both on the Residency Program's website. Plaintiff also relied on the Affiliation Agreement's statement the Entity Defendants shared "responsibility for ensuring an appropriate learning environment." ECF No. 148 at 55, 56.

The court found Plaintiff's argument unpersuasive "both because it fails to address the *Butler* factors and because it suggests only joint responsibility for *educational* aspects of the

---

[17] Plaintiff suggests the ruling on joint employment contributed to the grant of summary judgment on his discrimination, retaliation, and breach of contract claims. ECF No. 210 at 19 (presumably referring to the first through fourth causes of action). However, as noted above, judgment on the first cause of action (Title VII) and third cause of action to the extent it relied on Title VII was also granted based on Plaintiff's failure to timely exhaust administrative remedies, rulings not challenged through the present motion. The second cause of action (Section 1981) was asserted solely against Palmetto Health, thus raised no joint employment issue. Modification of the ruling on joint employment would not, therefore, modify the result as to the first and second causes of action or third cause of action to the extent it relies on Title VII. Modification of this ruling could impact the third (retaliation) and fourth (first-party contract) causes of action but only if other challenged bases for these rulings are also modified.

Residency Program."  ECF No. 188 at 43.  The court noted the substantial and uncontroverted evidence Palmetto Health, rather than USC-SOM, assumed the responsibilities of employer.  *Id.* at 43-45 (concluding Plaintiff "points to no language in these or any other documents to support a finding of joint employment as opposed to joint responsibility for educational aspects of the Residency Program.").

Plaintiff's present argument fails to address the multiple documents the court considered in concluding Plaintiff had not raised a genuine issue of material fact as to joint employment.  These documents include (1) Plaintiff's Resident Agreement, which expressly stated he was "employed by Palmetto Health" and gave Palmetto Health authority to terminate him for cause, (2) the Affiliation Agreement, which provided "no person employed by Palmetto Health shall be considered an employee of the University" and placed responsibility for salaries and fringe benefits on Palmetto Health, and (3) the PLA, which also placed responsibility for paying salary, fringe benefits, and professional liability insurance on Palmetto Health and provided "[i]ncidents that may require academic or disciplinary action will be referred back to [Palmetto Health] via the program Director[.]"

To the extent Plaintiff now offers argument as to the *Butler* factors, his argument as to joint employment is an improper attempt to raise a new argument that could have been made prior to entry of judgment.  Even if properly raised, it is ineffective because Plaintiff fails to address the clear and uncontroverted evidence that Palmetto Health, not USC-SOM, acted as employer in the hybrid student-employee relationship resulting from his participation in the Residency Program.

**III.    Due Process**

**Specification of Error.**  In his seventh specification of error, Plaintiff asserts the court disregarded or misconstrued evidence supporting his due process allegations.  He identifies two

20

alleged errors: (1) the court disregarded evidence the Graduate Medical Education Committee ("GMEC") "act[ed] as an official rubber stamp for whatever the program director of a particular residency program requests about his or her residents"; and (2) the court misconstrued evidence relating to the USC-SOM Defendants' post-hearing, ex parte submissions to the Grievance Committee including by finding Plaintiff invited the Grievance Committee "to solicit additional information from the program" and was, himself, "invited to submit additional material." ECF No. 198 at 3.[18]

In his subsequent Memorandum in Support, Plaintiff first argues the court improperly relied on a constitutional standard in analyzing the due process aspects of his contract claim(s). ECF No. 210 at 21 ("Although the Court relies on case-law that affords lesser due process protections to academic or educational decisions, as opposed to regular employment decisions, Plaintiff submits that a contractual promise of due process is materially different than a constitutional guarantee of due process."). Most critically, Plaintiff argues "[t]he doctrine from *Board of Curators of Univ. of Md. v. Horowitz*, 435 U.S. 78, 85 (1985), that dismissals in the academic arena are subject to a lesser amount of due process[,] . . . simply does not govern

_____

[18] Plaintiff's due process arguments appear to challenge entry of judgment on his first-party contract claim (fourth cause of action) and possibly his third-party beneficiary claim (fifth cause of action) to the extent these claims rest on allegations Plaintiff was denied contractual due process rights. Although less clear, particularly in light of his subsequent arguments regarding improper application of a constitutional standard to his contract-based claims, they may also challenge judgment on Plaintiff's eighth cause of action, which asserts a claim against Dr. Koon under Section 1983 for deprivation of a constitutional right to procedural due process.

Plaintiff's contractual due process claim here." *Id.* at 22. Plaintiff relies on four (previously uncited) employee handbook cases in support of this argument. [19]

Plaintiff also argues there were a "number of deficiencies in the process" and related "errors" by the court. As to the two concerns raised in his Rule 59(e) Motion, Plaintiff argues the post-hearing, ex parte submissions were the "most egregious violation of due process[.]" He asserts he "did not 'invite' the committee to solicit additional information from the program[,]" because his comments during the hearing only requested the Grievance Committee "conduct an independent review and contact nurses, staff, and patients." *Id.* at 25, 26 (likening the actions that were taken to allowing a prosecutor in a criminal trial to present ex parte information to a jury that had reached an impasse). As to the GMEC's role as "rubber stamp" Plaintiff argues (1) he "never had an opportunity to provide any input until after the GMEC had already accepted Dr. Koon's recommendation," (2) the grievance process offered only post-deprivation review, with only the fourth step providing any "ostensibly independent review," and (3) no one was able to identify any instance, prior to Plaintiff's termination, in which a resident's termination was overturned. *Id.* at 26, 27; *see also id* at 28 (arguing "Dr. Koon's animus towards Plaintiff, which was evidenced by the obviously inappropriate and intolerable comments . . . , tainted the decision-making process"

---

[19] *See* ECF No. 210 at 21-23 (citing *Southern Atl. Fin. Servs., Inc. v. Middleton*, 356 S.E.2d 444 (S.C. 2003), for premise ambiguous language should be construed against the drafting party; *Connor v. City of Forest Acres*, 560 S.E.2d 606, 611 (S.C. 2002) for premise summary judgment is not warranted simply because employer follows the steps enumerated in the employee handbook where "reasonable minds can differ as to whether just cause existed to support . . . termination"; *Small v. Springs Industries, Inc.*, 357 S.E.2d 452 (S.C. 1987), for premise an employee handbook may modify an employee's at-will employment; *Williams v. Reidman*, 529 S.E.2d 28, (S.C. Ct. App. 2000) for premise covenant of good faith and fair dealing applies to implied contracts based on employee handbooks).

and the "GMEC clearly acted as a 'cat's paw' for [Dr. Koon's] underlying decision prematurely to drum him out of the program.").

Plaintiff also points to three additional alleged errors which were not referenced in his Rule 59(e) Motion. These include the following: (1) it was "grossly unfair for Defendant Palmetto Health to refuse to accept Plaintiff's request for a grievance hearing in January 2012," and the court erred in improperly defining the term "business day"; (2) the court "mistakenly determined that Dr. Irani had an adequate opportunity during the grievance hearing to challenge the truthfulness and accuracy of the statements made by Drs. Koon and Walsh, but he declined to do so; and (3) the court improperly gave Dr. Koon a same-actor inference. *Id.* at 23-28.

**Discussion.** To the extent Plaintiff's Memorandum in Support raises due process concerns relating to issues other than the two raised in his Rule 59(e) Motion (the GMEC's alleged role as rubber stamp and propriety of post-hearing, ex parte submissions), his arguments are not within the scope of what was preserved by that motion. Plaintiff's argument as to application of the *Horowitz* standard is also foreclosed by his memorandum in opposition to summary judgment, which disavowed the need to distinguish between the potentially applicable standards.[20]

---

[20] Plaintiff's memorandum in opposition to summary judgment, included a combined introduction to all claims alleging due process violations. ECF No. 148 at 42, 43. Despite noting the underlying rights arose from different sources (contractual and constitutional), Plaintiff did not argue for application of different standards. He, instead, stated "[t]he analysis of the due process issues here does not require the court to delve too deeply into the intellectually demanding question of whether the residency program is primarily an academic endeavor or a matter of public employment; nor does it require the court to define carefully the specific quantum of process that is actually due, such as the length of the hearing, use of evidentiary rules, or the right to counsel." *Id.* Plaintiff then argued the process was tainted, under any standard, "by deliberate, patent misrepresentations . . . [and] the ex parte submission of evidence . . . after the hearing was closed and after the grievance committee had reached an impasse." *Id.*

Even if all of Plaintiff's present arguments were properly raised, they would fail for reasons explained in the summary judgment order. Key aspects of that order are summarized below. Because they were raised in Plaintiff's Rule 59(e) Motion, the court also addresses Plaintiff's arguments as to the GMEC's role and post-hearing, ex parte submissions in further detail.

**Summary Judgment Order on Contractual Due Process.** In discussing Plaintiff's contractual due process claims, the summary judgment order noted Plaintiff had neither "identif[ied] any specific contractual promise of a due process step or protection that was breached" nor "cite[d] any legal authority in support of his theory that the alleged deficiencies . . . constitute a breach of a contractual promise of due process." ECF No. 188 at 86. The court then addressed the specifically-alleged deficiencies including those now advanced in Plaintiff's Rule 59(e) Motion and Memorandum in Support. *Id*. at 86-89 (addressing alleged misrepresentations to the GMEC and Grievance Committee, post-hearing ex parte submissions, argument GMEC acted as a "rubber stamp," absence of and alleged defects in procedures provided, and denial of Plaintiff's January 2012 request for a hearing).

Thus, in addressing the due process aspects of Plaintiff's contract claim(s), the court initially looked to whether any alleged deficiency violated any provision of a document Plaintiff relied on for his contract claims. The court *also* gave Plaintiff the benefit of the doubt by assuming constitutional standards might be incorporated into the contract(s) and, therefore, addressed his due process allegations under the *Horowitz* standard in addition to addressing Plaintiff's specific arguments. *Id.* at 89-91 (finding no violation of the constitutional standard).

**Summary Judgment Order on Constitutional Due Process.** The court separately addressed Plaintiff's constitutional procedural due process claim. *Id.* at 96-102. There the court noted Plaintiff's incorporation of his arguments as to his contractual due process claims and further

24

addressed Plaintiff's specific arguments of "deliberate patent misrepresentations" during the Grievance Committee hearing and the post-hearing, ex parte submission of evidence by Drs. Koon and Walsh, finding none of the alleged deficiencies violated the *Horowitz* standard.

**No Clear Error in Summary Judgment Order.**    Although not entirely clear, Plaintiff does not now appear to challenge the ruling on his constitutional due process claim.  He has not, in any event, pointed to any clear error in that ruling and the court finds none.

While Plaintiff does challenge the ruling on the due process aspects of his contract claim(s), he fails to point to any clear error in the primary basis for the court's ruling: that he failed to identify any specific contractual promise breached by the alleged deficiencies.  *See* ECF No. 188 at 86-89.  This ruling necessarily focused on the terms of the "contracts," not the *Horowitz* standard.  Thus, Plaintiff's argument the court erred in applying *Horowitz* to his contract-based claims is misplaced.  Neither does he now identify any contractual provision breached.  He, instead, acknowledges that neither the Palmetto Health Residency Manual nor ACGME guidelines define due process.  ECF No. 210 at 21.

As noted above, Plaintiff now cites four employee handbook cases.  *See supra* n.19.  He argues these cases provide the appropriate standard because the Palmetto Health Resident Manual does not contain either a general disclaimer or a disclaimer specific to the Grievance and Due Process policy.  *Id.* at 22 (also relying on S.C. Code Ann. § 41-1-110).  Plaintiff does not, however, point to any specific language or holding in these cases that supports finding the now-alleged procedural deficiencies constitute a breach of a contractual promise of due process.  To the contrary, they state general principles the court applied including that, where a contract only allows termination for cause, the issue is "whether the employer had a reasonable good faith belief that

25

sufficient cause existed for termination[,]" not "whether the employee actually committed misconduct[.]" *Connor*, 560 S.E.2d 611.

**Specific Issues Raised in Rule 59(e) Motion.** Because they are specifically raised in the Rule 59(e) Motion, the court addresses two of Plaintiff's present arguments in more detail. These include his arguments the GMEC acted as a cat's paw for the Program Director's (Dr. Koon's) recommendations and the court misconstrued the record relating to the post-hearing, ex parte submissions.

**Cat's Paw Argument.** While Plaintiff did not use the phrase "cat's paw" in opposing summary judgment, he did refer to the GMEC as a "rubber stamp" in describing the grievance process. He supported this characterization by noting three witnesses testified they could not recall any time when the GMEC rejected a program director's recommendation to terminate or discipline a resident or where a resident was allowed to address the GMEC before a disciplinary (or termination) decision was made. ECF No. 148 at 44. Plaintiff did not address the rubber stamp allegation further in his subsequent argument. Thus, he did not explain why, even if the GMEC acts as a "rubber stamp," it would constitute a violation of his contractual (or constitutional) right to due process. Most critically, he did not point to any provision in a contractual document requiring greater independence by the GMEC. Neither did he address the significance of subsequent review of GMEC decisions by the Grievance Committee, a body comprised of faculty and residents from other departments.

The Summary Judgment Order acknowledged Plaintiff's characterization of the GMEC's role as a rubber stamp. ECF No. 188 at 8 n.4 (discussing background); *id*. at 45 (discussing joint employment allegations under Title VII claim); *id*. at 86 (discussing contractual due process claim). The court did not address the concern in greater detail given Plaintiff's failure to advance

26

any specific argument based on this alleged role. The court did, however, address a related concern that Dr. Stephens, who was the decision-maker at the third level of the grievance process, was biased against Plaintiff. As to this argument, the order noted " the contractual steps make it highly likely that Dr. Stephens, the DIO, would be aware of the circumstances and involved in the process being grieved and, consequently, could well have formed an opinion of the propriety of the remediation before her involvement in the grievance process." ECF No. 188 at 88. The same can be said of the GMEC's role as the contractual steps do not appear to envision, much less promise, that a resident will be given an opportunity to address the GMEC before it decides whether to place a resident on remediation or terminate the resident.

Plaintiff's present cat's paw argument seems to be offered as a basis for (1) imputing Dr. Koon's "overt animosity towards [Plaintiff]" to the GMEC and all levels of review in the grievance process, and (2) suggesting the process is deficient because there was no evidence the GMEC had ever failed to accept or a Grievance Committee had ever overturned a program director's recommendation to terminate a resident, at least prior to Plaintiff's termination. *See* ECF No. 210 at 26-28. While this turns Plaintiff's prior characterization of the GMEC as a rubber stamp into something of an argument, it fails to demonstrate that the characterization, even if correct, violates any contractual promise of due process. Most critically, it fails to point to any contractual promise a resident will have input or any independent review will be conducted before the GMEC makes an initial decision on remediation or termination. Likewise, Plaintiff points to no promise faculty opinion will not carry great weight throughout the process. Thus, Plaintiff's present "cat's paw" argument suggests only disagreement with the terms of the alleged contract rather than a breach of those terms.

**Ex Parte Communication.** Plaintiff addressed his concerns regarding Drs. Koon and Walsh's post-hearing, ex parte communications with the Grievance Committee at several points in opposing summary judgment. *See* ECF No. 148 at 39, 43, 49-53. He characterized the ex parte submission as "clear violation of due process and fundamental fairness," but pointed to no contractual provision violated or constitutional prohibition on such submissions in the context of an academic decision. *Id.* at 39. The court fully considered and addressed these concerns in evaluating Plaintiff's contractual due process allegations, noting (1) the submission did not violate any express terms of the contract, (2) any objection to the submission was waived by Plaintiff's request that the Grievance Committee "go beyond the hearing record to inquire as to various incidents and his general performance," and (3) Plaintiff himself was provided and took the opportunity to make a post-hearing submission. ECF No. 188 at 88, 89.

The court addressed the concern again in analyzing Plaintiff's constitutional due process arguments, finding the process satisfied *Horowitz*. The court also found Dr. Koon, though a participant, was neither responsible for establishing nor administering the process that was provided. ECF No. 188 at 101.

Plaintiff's present arguments do not point to any clear error in these conclusions. In his Rule 59(e) Motion, Plaintiff argues the court improperly held he "invite[d] the Grievance Committee to solicit additional information *from the program*" and asserts he was not "*invited* to submit additional material." ECF No. 198 at 3. It is, however, clear Plaintiff suggested the Grievance Committee solicit additional information regarding his performance. While he may have suggested (or at least intended) that body seek the information from different sources than it elected to pursue, it remains that Plaintiff requested the Committee make further inquiry after the hearing closed and did not place any specific limitations on that request or indicate he was

28

reserving a right to respond. To the contrary, Plaintiff stated he would "stand by" what the Grievance Committee was told, suggesting a waiver of any right to respond. Hearing Trans. at 85, 116. Plaintiff was also informed the Grievance Committee was seeking additional information from the faculty, but did not raise an objection. He, instead, chose to provide his own additional information.

In sum, what occurred after the hearing may not have been what Plaintiff intended. It was, however, a reasonable interpretation of what he requested during the hearing and consistent with his own actions, which raised no objection to and, in fact, joined in making a post-hearing submission. In any event, Plaintiff points to nothing in any contractual document (or constitutional standard applicable to review of educational decisions) that precludes the Grievance Committee from considering post-hearing, ex parte submissions.

## IV.     Retaliation

**Specification of Error in Motion.** In his eighth specification of error, Plaintiff asserts the court "overlook[ed]  a number of adverse employment actions [taken] immediately following [Plaintiff's] complaints about Defendant Koon calling him 'Achmed the Terrorist,' eventually culminating in his termination." ECF No. 198 at 3. He also argues the court failed to "give sufficient consideration to the liberal standard established . . . in *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006), that retaliation claims should be analyzed in terms of whether the challenged actions might discourage a reasonable person under the same circumstances from making a complaint of discrimination or otherwise engaging in protected activities." *Id.*[21]

---

[21]  These arguments challenge judgment on Plaintiff's third cause of action, which alleges Defendants Palmetto Health and USC-SOM retaliated against Plaintiff for opposing unlawful

In his Memorandum in Support, Plaintiff argues there is evidence USC-SOM became aware of the complaint and retaliated by: (1) refusing to allow Dr. Guy to take over responsibility for monitoring Dr. Irani's remediation (during a January 30, 2012 faculty meeting); and (2) recommending Plaintiff be suspended for alleged inappropriate care of a spine patient less than a month later (on February 29, 2012). ECF No. 210 at 30 (citing Plaintiff's declaration). Plaintiff argues causation is supported by a temporal link between his complaint to Dr. Stephens, which he argues must have occurred on or before January 3, 2012, and these actions by agents of USC-SOM (in late January and late February 2012). Plaintiff also challenges the court's conclusion Dr. Stephens' actions did not constitute adverse action. *Id.* at 30 (arguing Dr. Stephens' preexisting negative impression of him should not preclude his retaliation claim because that impression was not justified, "demonstrates that she did not perform her responsibilities under the grievance process," and "should not have been used as a basis for defending against a claim of retaliation").

**Discussion.** To the extent Plaintiff relies on (1) denial of his request to have his remediation supervised by Dr. Guy, (2) the complaint about his care of a spine patient, or (3) any other alleged retaliatory action by USC-SOM or its agents, his arguments are foreclosed by his

---

discrimination in violation of Title VII and Section 1981. As noted above, judgment on the Title VII aspect of the claim was granted on grounds not challenged in the present motion. While Plaintiff also asserted a separate retaliation claim against Dr. Koon (tenth cause of action), that cause of action is not implicated by the present arguments because it rests on a distinct factual and legal basis (alleged violation of the First Amendment based on Plaintiff's complaints to the ACGME about duty hour violations and inadequate supervision).

failure to raise them before judgment.[22]  Even if properly raised, the arguments would fail for reasons addressed below.

Plaintiff's argument that USC-SOM or its agents retaliated against him rests on a flawed theory of causation.  Plaintiff argues an inference of causation may arise from evidence (1) he made his complaint to Dr. Stephens on January 3, 2012, (2) the denial of his request Dr. Guy oversee his remediation and the complaint about the spine patient occurred within two months following his complaint to Dr. Stephens, and (3) Drs. Stephens and Koon discussed the comment at some point in time.  As to the third point, Plaintiff argues there is "a material dispute about when this exchange occurred" because Dr. Stephens testified she did not know when she discussed the issue with Dr. Koon.  Plaintiff acknowledges that Dr. Koon testified he *believed* Dr. Stephens may have received the complaint after Plaintiff was terminated, but argues this statement is speculative. Plaintiff does not address Dr. Koon's stated basis for this belief, *that he learned of the complaint from Dr. Stephens after Plaintiff's termination*.  ECF No. 210 at 29 (citing Koon Reply Aff. ¶ 67).

Plaintiff is correct that Dr. Koon's statement of belief as to when Dr. Stephens may have learned of the complaint is speculative.  He is also correct that a jury might not credit Dr. Koon's testimony as to when he learned of the complaint.  This would not, however, establish that Dr.

---

[22]  In opposing summary judgment on this claim, Plaintiff asserted he complained to Dr. Stephens about Dr. Koon's "Achmed the Terrorist" comments in January [2012] and, "[s]hortly thereafter, Dr. Stephens denied his grievance, refused to provide him documents he requested about the investigation of Trauma Female 375, and denied his request for a grievance hearing."  He argued "[t]he relatively short time span between Plaintiff's complaint to [Dr.] Stephens and *her actions* in refusing his grievance hearing request is sufficient evidence of causation to survive summary judgment on this claim."  ECF No. 148 at 63, 64 (emphasis added).  Plaintiff did not argue Dr. Stephens took any other actions in retaliation for his complaint.  Neither did he point to any adverse action by USC-SOM or its agents that might have been in retaliation for his complaint or argue the complaint was passed on to USC-SOM.

Koon learned of the complaint prior to the two allegedly retaliatory actions taken by USC-SOM or its agents. It would, instead, leave an absence of evidence as to when the complaint was communicated to Dr. Koon or any other agent of USC-SOM.

Plaintiff's arguments as to Dr. Stephens' actions and motivation also fail to support alteration or amendment of judgment. Plaintiff effectively concedes Dr. Stephens had a preexisting negative view of him. He argues this viewpoint "demonstrates that she did not perform her responsibilities under the grievance process to provide a fair and unbiased review" but does not explain why such a failure would support an inference of causation for purposes of a retaliation claim. Thus, this argument fails to persuade the court that its grant of summary judgment on this claim was the result of clear error or worked a manifest injustice..

## V.     Plaintiff's Job Performance.

**Specification of Error in Motion.** In his ninth specification of error, Plaintiff argues the court "unfairly accepts Defendants' premise that Plaintiff provided sub-standard care in the patient encounters underlying his various disciplinary actions and termination." ECF No. 198 at 3-4. Plaintiff asserts that his "expert witness determined that Plaintiff's care was appropriate for a second-year orthopaedic surgery resident; the California Medical Board ultimately determined that Plaintiff had not deviated from standards of acceptable care with regard to these patients; and even one of Plaintiff's senior residents described the treatment towards Plaintiff as a "witch hunt" in a contemporaneous e-mail to his colleagues." *Id.*[23]

---

[23] Plaintiff does not indicate the causes of action implicated. Neither is it entirely clear from his argument. The court, nonetheless, construes this argument as a challenge to summary judgment on Plaintiff's second and fourth causes of action for disparate treatment (under Section 1981) and breach of contract.

32

In his Memorandum in Support, Plaintiff argues the record is insufficient "to support a finding as a matter of law that Dr. Irani's job performance during his residency was sufficient to justify his termination."  ECF No. 210 at 31.  He challenges comments Defendants' relied on as "cherry-picked" phrases from his first-year evaluations, denies he described "his entire PGY-1 year as a 'rocky start'" during the Grievance Hearing, and argues the court unfairly accepted statements from Dr. Koon's reply affidavit that represented his personal beliefs, conclusions, and uncorroborated negative assertions of fact.  He argues the court applied an improperly deferential standard of review under which "no resident could ever successfully challenge his or her termination through the legal system, regardless of how egregious the underlying facts were."  *Id.* at 32.  Plaintiff notes his own expert "opined [Plaintiff's] termination . . . was clearly premature." *Id.*  He also notes the "California Medical Board, which actually took the time to review this matter in a contested hearing, determined that Dr. Irani did not have persistent patient care issues and did not deviate from the standard of care in connection with the same patient encounters at issue" in this case.  *Id.*

**Discussion.**  The court relied, in part, on the deference applied to academic decisions in ruling on one component of Plaintiff's second cause of action (disparate treatment component of Section 1981 claim).  ECF No. 188 at 56-60 (discussing and relying on, inter alia, *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214 (1985); *Halpern v. Wake Forest Univ. Health Servs.*, 669 F.3d 454 (4th Cir. 2012); *Nigro v. Va. Commonwealth Univ./Med. Coll. of Va.*, 492 F. App'x. 347 (4th Cir. 2012)).  Specifically, the court relied on this standard in concluding Plaintiff could not establish that he was performing satisfactorily at the time of his termination from the Program.  *Id.* at 57-60.  In reaching this conclusion, the court noted Plaintiff proffered evidence the faculty erred in concluding he provided substandard care.  *Id.* at 58, 59.  However, contrary to Plaintiff's current

33

argument, the court assumed for purposes of the order that Plaintiff's "evidence and opinion testimony might raise a genuine issue of material fact *if the question was whether the faculty and GMEC were correct* in their understanding of the facts and *reached the most appropriate conclusions* as to whether Dr. Irani was in need of remediation or should be dismissed." *Id.* at 59, 60. The court, nonetheless, found summary judgment appropriate under the deferential standard announced in *Ewing*, which directed courts to "show great respect for the faculty's professional judgment" and not to override that judgment "unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Id.* at 60 (quoting *Ewing*, 474 U.S. at 255). The court also referred to this standard in ruling on one aspect of Plaintiff's breach of contract claim. *See* ECF No. 188 at 85 n.56 ("Dr. Irani does not and cannot argue that the faculty and GMEC were obligated to accept his version of events. Such an argument would ignore the deferential standard applied to review of academic decisions involving students . . . as well as standards applied to employment decisions in the academic field.").

In reaching these conclusions, the court did not "accept[] Defendants' premise that Plaintiff provided sub-standard care in the patient encounters underlying his various disciplinary actions and termination" as true. The court, instead, applied the deferential standard applicable to academic decisions. While Plaintiff suggests the standard itself is overly deferential, he points to no law supporting a less deferential standard of review. Plaintiff has, therefore, failed to persuade the court that entry of judgment on this claim was clearly erroneous or worked a manifest injustice.

## CONCLUSION

For reasons explained above, many of Plaintiff's present arguments are procedurally foreclosed because they were either (1) not raised prior to judgment or (2) not reasonably predicted

34

by his Rule 59(e) Motion. Even if not foreclosed, his arguments fail to establish grounds for alteration or amendment of the judgment because they do not establish the judgment was clearly erroneous or worked a manifest injustice. Plaintiff's motion to alter or amend judgment is, therefore, denied.

IT IS SO ORDERED.

s/ Cameron McGowan Currie
CAMERON MCGOWAN CURRIE
Senior United States District Judge

Columbia, South Carolina
November 22, 2016