**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 16-2439**

———————

AFRAAZ R. IRANI, MD,

                Plaintiff - Appellant,

        v.

PALMETTO HEALTH; UNIVERSITY OF SOUTH CAROLINA SCHOOL OF
MEDICINE; DAVID E. KOON, JR., MD, in his individual capacity; JOHN J.
WALSH, IV, MD, in his individual capacity,

                Defendants - Appellees.

———————

Appeal from the United States District Court for the District of South Carolina, at
Columbia.   Cameron McGowan Currie, Senior District Judge.  (3:14-cv-03577-CMC)

———————

Argued:  September 27, 2018                        Decided:  April 10, 2019

———————

Before DIAZ, THACKER, and HARRIS, Circuit Judges.

———————

Affirmed by unpublished per curiam opinion.

———————

**ARGUED:**  Jason Ehrenberg, BAILEY & EHRENBERG, PLLC, Washington, D.C., for
Appellant.   Katherine Dudley Helms, OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C., Columbia, South Carolina, for Appellee Palmetto Health.  Fred Adam
Williams, GIGNILLIAT, SAVITZ & BETTIS, Columbia, South Carolina, for Appellees
John Walsh, University of South Carolina School of Medicine, and David E. Koon, Jr.
**ON BRIEF:**  Kathryn Thomas, GIGNILLIAT, SAVITZ & BETTIS, Columbia, South
Carolina, for Appellees University of South Carolina School of Medicine, David E.
Koon, Jr., MD, and John Walsh, MD.

———————————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Afraaz R. Irani ("Appellant") filed suit against Palmetto Health ("Palmetto"), the University of South Carolina School of Medicine ("USCSOM" or the "Medical School"), David. E. Koon, M.D., and John J. Walsh, M.D. (collectively, "Appellees"), alleging wrongful termination.  Appellant appeals the district court's award of summary judgment to Appellees on his claims of race discrimination and retaliation pursuant to 42 U.S.C. § 1981, breach of contract, libel per se, and retaliation pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*  For the following reasons, we affirm.

## I.

## A.

### The Palmetto Residency Program

Appellant's claims underlying this appeal stem from his participation in a medical residency program sponsored by Palmetto, in affiliation with USCSOM.  This affiliation was memorialized by an Affiliation Agreement, which provides that the parties "will actively collaborate to ensure that [Palmetto's] graduate medical education programs operate in an effective manner and in compliance with regulatory and accreditation standards."  J.A. 294.[1]  The relevant accreditation standards are the guidelines promulgated by the Accreditation Counsel for Graduate Medical Education ("ACGME").

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

Various Palmetto departments, including the orthopedic surgery department, entered into Program Letters of Agreement ("PLAs") with "Participating Institutions"[2] pursuant to which "residents enrolled in [Palmetto's] Residency Program will receive educational experiences and supervision through scheduled rotations at the Participating Institution." J.A. 314. The PLAs provide, in relevant part, "the educational experiences of the resident . . . will be provided in a manner consistent with applicable [ACGME requirements]." *Id.* at 304.

## B.

## Appellant's Residency

### 1.

### *Appellant's Residency Interview*

Appellant, who is of Indian descent, was born and raised in California. In the fall of 2009, Dr. Koon, Dr. Walsh, Dr. Jeffrey Guy, and Dr. Justin Hoover interviewed Appellant for Palmetto's orthopedic surgery residency program. At all relevant times, Dr. Koon was the director of the orthopedic surgery program, Dr. Walsh was the chair of the orthopedic surgery department, and Drs. Guy and Hoover were physicians in the orthopedic surgery department. As part of the interview process, the interviewers ranked applicants for their "fit within the program" and then rated them as (1) a "#1 applicant,"

---

[2] Participating Institutions are generally local hospitals that agree to work with Palmetto and appoint a qualified faculty member to "assume overall supervisory, administrative, and educational responsibility for the resident(s) on rotation at the Participating Institution." J.A. 314. As a result of these agreements, Palmetto's residents have the opportunity to train at multiple institutions in the area.

(2) "top 10," (3) "top third," (4) "middle third," or (5) "no go." J.A. 1017. Appellant's top ratings came from Drs. Koon and Walsh, who each rated him a top 10 applicant. Dr. Koon also evaluated Appellant as an excellent fit for the program. Drs. Guy and Hoover each ranked Appellant as a top third candidate. Subsequently, Appellant was offered and accepted a position in the Palmetto residency program.

2.

*Appellant's First Year of Residency*

Appellant began his residency in July 2010, along with one other resident, Dr. Harrison Goodno, who is white. Around four months later, in December 2010, Dr. Koon told Appellant that the Palmetto orthopedic surgery program had the best residents and added that the internal medicine attending physicians were "just happy to have someone who can speak English." J.A. 1409; *see also id.* at 1591–92.

Residents in the Palmetto residency program were regularly assessed "based on documented evaluation of the resident's level of achievement in the six general competency areas, including clinical experience, judgment, knowledge, and technical skill." J.A. 493. Palmetto has an online system "that allows attendings, residents, and staff to submit online evaluations of residents." *Id.* at 87. This system also allows the resident to see his or her evaluations as they are submitted, and thus have an opportunity to cure any issues before remediation is necessary.

During the evaluation process, Dr. Koon noted that Appellant's first year of residency was "a rough year for him." J.A. 87. Indeed, throughout his first year, Appellant received a mix of positive and negative comments from other physicians and

hospital staff.  Overall, the evaluations reflect that Appellant was a bright individual with above average knowledge, but he consistently fell below average in terms of respect for patient privacy and autonomy, respect and consideration in interactions with patients, and prioritization of patient wellbeing and care.  According to Dr. Koon, these types of negative comments are "very, very unusual" for an orthopedic surgery resident.  *Id.* at 1740.

3.

*Appellant's Second Year of Residency*

Appellant did not fare much better in his second year of residency.  Appellant's relationship with Dr. Walsh, Dr. Koon, and others became strained.  Further, the record reflects that Appellant was involved in three serious patient care incidents and, in August of 2011, was placed on Academic Remediation[3] in an effort to cure his performance issues.

---

[3] Residency programs are expected to have "written guidelines concerning resident accountability, monitoring, discipline, and dismissal, all of which are subject to approval and periodic review by the [Graduate Medical Education Committee (the "Evaluation Committee")]."  J.A. 2300.  This includes a uniform remedial program that aims to improve residents' academic or performance deficiencies.  Palmetto's Academic Remediation Program consists of three levels:

(1) Level I Remediation: "may occur for deficiencies for which some degree of academic or professional remediation is necessary.  The resident will have the opportunity to remediate the deficiency within a defined period of time."  J.A. 2300.  "If the deficiency is corrected, no further action may be taken."  *Id.* [Evaluation Committee] approval is not required to place a resident on Level I remediation.

(Continued)

a.

*Journal Club*

Shortly after the start of his second year of residency, Appellant was required to

present an article at a journal club meeting.[4] "[W]hile other residents were assigned to

---

(2) Level II Remediation: "may be imposed for more serious academic or professional deficiencies. The resident will have an opportunity to remediate the deficiency within a defined period of time. The deficiency and required remediation measures will be specified in writing and will be monitored." *Id.* This level of remediation is imposed for a minimum of three months to a maximum of twelve months. "If the deficiency is corrected, no further action may be taken." *Id.* To place a resident on Level II Remediation, the Director must submit "a recommendation to the [Evaluation Committee] for official action." *Id.* at 2301.

(3) Level III Remediation: "may occur for serious academic or professional deficiencies. During Level III Remediation, the resident will be removed from his/her clinical rotations and curriculum credit will be withheld." *Id.* "This suspension will be for a specified time and specific remediation measures will be required." *Id.* If the deficiency is corrected, "the resident may be placed on Level II remediation for a specified period of time." *Id.* And, "[p]rior remediation may be considered in determining appropriate actions to address further deficiencies, if any." *Id.* To place a resident on Level III Remediation, the Director must submit "a recommendation to the [Evaluation Committee] for official action." *Id.* at 2301.

[4] Many residency programs offer journal clubs, which are an organized way for residents to stay up to date on current medical literature. Specifically, residents will read, analyze, and present the contents of the article. The club may also teach residents how to read and analyze medical journal articles critically. The Palmetto orthopedic surgery residency program sponsors a journal club that "is conducted and coordinated by the Program Director" and meets once a month to discuss journal articles. J.A. 2026. "Each participant in Journal Club must discuss the contents of the article assigned to him/her and critique the article as to scientific methods, statistical analysis and validity of conclusions." *Id.* "After each resident's discussion, the teaching staff provides a critique of the resident's presentation and the article, then offers their perspective on the topic." *Id.*

present articles relevant to the practice of orthopaedics," Appellant was assigned to present a non-academic article called "Swimming with Sharks." J.A. 1409.[5]

According to Drs. Koon and Goodno, the article had "been around for quite some time" and a junior resident was typically assigned to present it each year. J.A. 1585; *see also id.* at 738. Dr. Koon intimated during the journal club meeting that the article had not been randomly assigned to Appellant. *See id.* at 1409 ("As [Appellant] stood to present [his] review of the article to the group of . . . peers and faculty from the department, Dr. Koon stated . . . 'This article was not randomly assigned to [Appellant].'"); *but see id.* at 1585 ("[Dr. Koon] did not assign the [journal] article to [Appellant]."). Rather, chief residents "assign articles to particular residents." *Id.* at 2491. Appellant considered his assignment to be humiliating and demeaning because of its lack of apparent relevance to orthopedics and "felt like Dr. Koon was making [him] the butt of a joke by assigning the Shark article to [him]." *Id.* at 1409.

---

[5] This article "is a classic, humorous article that has been presented in [the Palmetto] Journal Club by several residents and attendings over the years -- since before [Appellant's] residency and in years since." J.A. 2491. The article was purportedly written by "Voltaire Cousteau" some time before his death in 1812, and was translated from French to English because of the "broader implications" of the article. *Id.* at 2158. (In all likelihood, however, the article was actually written by Dr. Richard Johns, a professor of biomedical engineering at Johns Hopkins University and Hospital. *See id.*) "The article humorously reminds residents and attendings how to manage the training environment . . . [and] has been used by attorneys, fire fighters, doctors, reef divers, counselors, and motivational speakers to teach basic life lessons and survival skills for difficult life situations." *Id.* at 2491.

b.

*Arm Injury Patient*

In July 2011, Appellant treated a patient with a traumatic partial amputation of his left arm. One nurse reported to her supervisors that Appellant had not treated the patient with compassion or empathy and noted that she had experienced "many similar encounters with" Appellant. J.A. 133. The nurse reported that Appellant "barely acknowledged the [patient], did not introduce himself and proceeded to manipulate the fractured arm" without adequately managing the patient's pain. *Id.* The nurse reported that she and several others had "asked [Appellant] to wait before he moved the [patient's] arm so we could administer pain meds," but still she "had to ask [Appellant] twice to stop so [she] could give the meds." *Id.*

On receipt of the nurse's report, Dr. Walsh and Dr. Koon sought Appellant's account. A month after the incident, Appellant submitted his account. Appellant stated that he introduced himself to the patient and remained with him because the attending physician instructed him not to leave. Appellant also stated that he inspected the patient's wound to evaluate his "pain level before approving a possible overdose of narcotics to an 80+ year old male." J.A. 131. Appellant asserted that the patient had a positive perception of the treatment and later expressed appreciation for his care.

In response to Appellant's recitation of the encounter, the nurse stated that she "wish[ed] he had displayed the compassion and care he described." J.A. 131. In particular, the nurse noted that Appellant could not have been concerned about a potential overdose as he claimed, because at the time Appellant had not looked into the patient's

9

vital signs or past dosage. Further, the nurse noted that when Appellant did agree to allow medicine to be administered, he smirked and said, "it would only be painful briefly." *Id.* Dr. Koon considered Appellant's response to this incident to be "very superficial and showed a lack of concern for the patient." *Id.* at 88. Dr. Koon was also dissatisfied with Appellant's reliance on his alleged "great interactions" with the patient after Appellant treated him, as Dr. Koon noted that, given the medication the patient was on at the time, it was unlikely the patient truly remembered the care. *Id.* Moreover, Dr. Koon observed that Appellant's documentation was "fairly inadequate . . . for a patient in the trauma room" because there was "no mention of wound debridement, vital signs, pain medications, wound measurements, grade of open fracture, antibiotics given, tetanus, [or] splinting and there were inadequate radiographs . . . because there was only one single view." *Id.* at 1742–43. Rather, per Dr. Koon, Appellant's documentation was limited to "a very brief preoperative note that [Appellant] wrote the day before [the patient] was to go to surgery." *Id.*

c.

*Discharge Summary Issue*

On November 3, 2011, in response to repeated requests from Dr. Koon that Appellant dictate a discharge summary for a specific patient, Appellant sent Dr. Koon an email to explain he had "actually never participated in the patient's care" and was "not sure how [he was] responsible for the discharge order" but had "gone ahead and dictated the discharge summary." J.A. 148. Dr. Koon responded to the email and let Appellant know that he "would . . . NEVER in a million years sen[d] a response like this to [his]

10

program director, especially . . . in the midst of academic remediation." *Id.* Dr. Koon copied two senior residents, Dr. Hoover and Dr. Jennifer Wood, on the email and solicited any suggestions to address Appellant's behavior.

d.

*Wound Care Patient*

Over Thanksgiving weekend in 2011, Appellant answered a call from a surgical patient who was experiencing post-operative wound drainage. Appellant informed the patient that he could not evaluate her without actually seeing her and that she should come to the emergency room but noted "if [it] were a superficial scab that just came off it is probably OK." J.A. 431. Dr. Goodno also spoke to the patient that weekend and instructed her to come to the emergency room. However, the patient did not come to the emergency room and ultimately developed an infection.

After learning about this incident, Dr. Koon became concerned that Appellant "failed to properly assess and manage a patient . . . with post-operative wound drainage and infection." J.A. 90.[6]

---

[6] According to Dr. Koon, he "did not have the same concerns about . . . Dr. Goodno's actions or his response to [Koon's] concerns . . . [because Dr. Goodno] was not on academic remediation." *Id.* at 2494.

e.

*Same Day MRI Patient*

On November 28, 2011, Dr. Koon learned of an issue involving one of Dr. Grabowski's patients. Specifically, Dr. Grabowski instructed Appellant to schedule a patient for an MRI that day because the patient had travelled from another state for care and needed to be discharged. Appellant failed to do so. When a senior resident, Dr. Wood, confronted Appellant about this failure, Appellant became argumentative. Ultimately, Dr. Grabowski had to intervene and reinstruct Appellant to schedule the MRI for the same day.

In his defense, Appellant asserted that he spoke to a medical assistant about scheduling a same day MRI, who told Appellant that would not be possible. However, after Dr. Wood advised Appellant to call the radiology department directly for scheduling, Appellant was able to schedule an MRI for that day.

f.

*Pain Management Patient*

Additionally, around November 2011, Appellant mistakenly told a patient -- who called in the middle of the night after a shoulder surgery to seek advice on pain management -- to take "five more of oxycodone." J.A. 1822. Appellant alleges he intended for the patient to take "[f]ive milligrams more" of oxycodone, but the patient believed she was told "to take five 5-milligram pills of oxycodone every three hours." *Id.* at 1823. Appellant acknowledged "this was like a three o'clock in the morning conversation" and that he could "understand there was [a] miscommunication," but

12

averred he had learned from the incident. *Id.* Appellant did seek "clarification of what [he] had done wrong with regard to this patient," and Dr. Hoover stated he "would have asked the patient if she was having any weakness, parasthesias, or mental status changes" and would have instructed her to take more pain medicine only if no changes were present. *Id.* at 1414.

## C.

Academic Remediation

### 1.

*Level II Academic Remediation*

After Dr. Koon was made aware of the incident involving the elderly patient with the partial amputation discussed above, Appellant was placed on Level II Academic Remediation. At first, Appellant progressed positively, and Dr. Koon initially intended to recommend that Appellant be moved to Level I.

In September 2011, Appellant began the grievance process with regard to his placement on Level II remediation. But, in November of 2011, Appellant emailed Dr. Katherine Stephens, Palmetto's Vice President of Medical Education, to inform her that he no longer intended to pursue the grievance, because he expected to complete the remediation process successfully. Further, Appellant noted that he wished to avoid jeopardizing his professional relationship with his attending physicians, Dr. Walsh and Dr. Koon. Shortly after, Dr. Koon met with Appellant and informed him that he would be moved from Level II to Level I of Academic Remediation. But, ultimately, Dr. Koon changed course and recommended Appellant for Level III Academic Remediation and

suspension after the patient care issues with the same day MRI patient and the wound care patient occurred in November.

2.

*Level III Academic Remediation*

Following the November 2011 oxycodone pain management incident described above, at a meeting on December 5, 2011, Dr. Koon raised that issue -- along with the issues about the same day MRI patient and the wound care patient -- at a hearing before the orthopedic faculty.  Appellant was present for part of the hearing and had an opportunity to respond.  Subsequently, the faculty voted unanimously to recommend that Appellant be placed on Level III Academic Remediation with suspension of his clinical duties and a leave of absence until January 30, 2012.  The Graduate Medical Evaluation Committee (the "Evaluation Committee")[7] approved the recommendation on December 13, 2011.

3.

*Trauma Patient*

On December 7, 2011, while Appellant was still on Academic Remediation (but before his clinical duties were suspended), Appellant and orthopedic surgery resident Dr. Kristen Nathe were involved in caring for a patient who presented with several serious

---

[7] "The [Evaluation Committee] is an organization composed of various representatives of [Palmetto's] overall residency program, representatives of the individual residency programs within that program, and representatives of affiliated entities."  J.A. 85.  The Evaluation Committee has approximately 40 members, including Dr. Koon and Dr. Walsh.

14

injuries from a head-on collision. Two nurses reported to their supervisors that the patient was uncomfortable with the care she received from Appellant and Dr. Nathe. One nurse reported that the residents "were talking about the patient as if she couldn't hear them. She was totally awake, totally alert with tears in her eyes." J.A. 1092–94. Another nurse reported the patient said, "she was very uncomfortable with the Ortho Residents that were just in her room" and "this was very unorganized and she was scared . . . she felt like she was just thrown around and it was very scary and she was very uncomfortable with the surgery doctors." *Id.* at 1202. A third nurse noted, "it was as if [Appellant] and Nathe were twisting and turning the limbs of a toy doll instead of a human being. Through this entire ordeal the patient was awake, oriented and fully aware about what was going on, as well as tearful." *Id.* at 1203. Finally, a nurse noted that the patient wanted to be transferred to a different hospital.

Due to the chaos of the scene with this patient, the nurses sought the assistance of two other nurses and an attending physician in order to deal with the situation. In reporting the incident to her supervisor, one of the nurses noted, "in my 5 years at [Palmetto] I have never felt so uneasy, so upset or like I had to help save the patient from what was going on." J.A. 156.

D.

Suspension

1.

*First Suspension*

Two days later, on December 9, 2011, the faculty unanimously voted to recommend Appellant be suspended pending an investigation into the care of the trauma patient. The Evaluation Committee approved the suspension recommendation and Appellant was notified of his suspension on December 13, 2011. Dr. Nathe was not suspended. Both Dr. Nathe and Appellant provided written statements of the event.

Appellant's account was diametrically opposed to the nurses' account. According to Appellant, he had appropriately managed the patient's pain by giving local and systemic anesthetic before manipulating the patient's arm. Further, Appellant stated that he had "[p]layed everything by the book because the nurses were upset when he arrived." J.A. 566 (internal quotation marks omitted). Finally, Appellant asserted that some of the issues (such as the general chaos of the scene) had predated his arrival to the scene. All in all, Appellant described generally pleasant interactions -- albeit under unfortunate circumstances -- with the trauma patient.

Dr. Nathe provided a detailed account of events. Dr. Nathe stated that she and Appellant told the patient "to tell [them] if she was having any pain and [they] would stop and get more pain medications" but the patient never showed signs of pain. J.A. 553. Dr. Nathe also stated that she was not aware of several of the events the nurses raised -- such as the attending physician arriving to help -- because she "can sometimes be unaware of

16

what else is going on" when she is focused on a patient. *Id.* at 554. Dr. Nathe's description of events generally reflected that there was little communication amongst the medical staff and that the environment was chaotic. *See id.* Dr. Koon counseled Dr. Nathe for the incident but did not otherwise discipline her because she had not had any prior performance issues.

On December 19, 2011, Dr. Walsh met with Appellant about the incident. Appellant asserted that he had followed the instructions of the attending physician and that the situation had been tense and chaotic before he arrived. Appellant then asked Dr. Walsh to interview the trauma patient's family and other witnesses to the incident in order to corroborate his account. Dr. Walsh declined to do so.

Dr. Walsh took issue with Appellant's failure to call for assistance during the ordeal. And, Dr. Koon considered Appellant's account of the events incongruent with the fact that the patient had asked to be transferred to a different hospital.

a.

*Grievance of Suspension*

After learning of his suspension on December 13, 2011, Appellant informed Dr. Stephens that he wished to file a grievance regarding his suspension. Appellant alleged that his relationship with Dr. Koon had "derailed" after the November 2011 discharge summary exchange. As part of the grievance process, Appellant met with Dr. Walsh and explained Appellant's account of the trauma patient's care. Dr. Walsh did not believe Appellant's account due to a "lack of trust" that had formed between him and Appellant. J.A. 1415. Dr. Walsh informed Appellant that he was not being punished per se because

remediation was not a punitive process. Instead, the end goal of remediation was to return him to good standing in the Palmetto residency program.

On January 3, 2012, Appellant continued the grievance process, and provided Dr. Stephens a written account of his treatment of the trauma patient. Further, for the first time, Appellant reported to Dr. Stephens that he believed Dr. Koon "was not an unbiased evaluator" and Dr. Koon had referred to Appellant as "Achmed the Terrorist." J.A. 1416.[8]

In response, Dr. Stephens held an "investigational meeting" with Dr. Koon regarding the grievance. According to Dr. Stephens, Dr. Koon attributed his use of "Achmed the Terrorist" to a comedy routine. *See* J.A. 1496 (Deposition of Dr. Stephens) ("[Dr. Stephens] asked Dr. Koon about it. [Dr. Koon] said . . . that it was the humorous character that -- what's the name of that comedian who has that puppet? I don't remember his name. You probably know what I'm talking about. But [that] he looked like him."). Ultimately, on January 11, 2012, Dr. Stephens denied Appellant's grievance and upheld his suspension. Specifically, Dr. Stephens noted she had "carefully review[ed] the information available to [her]" and had "further discussions with several others," and "decided to uphold the decision concerning [Appellant's] December 9, 2011 academic remediation." *Id.* at 171. Dr. Stephens emphasized that the goal of academic

---

[8] Later, at his deposition, Appellant testified that Dr. Koon called him "Achmed the Terrorist" a "handful" of times -- at least twice between November 2011 and February 2012. Appellant also recalled Dr. Koon stating that Appellant "might blow the place up" while they were at a prison medical clinic. J.A. 1920.

remediation was "to aid [Appellant] in meeting academic expectations and to have [him] complete [his] training." *Id.*

b.

*Appeal of Grievance*

Per applicable procedures, Appellant was required to file an appeal within ten business days of the grievance decision, which Appellant attempted to do. However, the tenth day was Martin Luther King, Jr., Day, which Appellant did not realize was not an institutional holiday at Palmetto. Therefore, Appellant did not file his appeal until the 11th day and Dr. Stephens denied the appeal as untimely. According to Dr. Stephens, an extension of the deadline could only occur if the request for extension was filed before the deadline had passed, and there was no such request.

On January 13, 2012, Appellant emailed Dr. Stephens and requested copies of all documents regarding the trauma patient. Dr. Stephens did not comply with the request but stated that Appellant had "already seen the issues specific to the trauma patient situation and should already know what they are." J.A. 583.

c.

*Return from Suspension*

Upon Appellant's return from suspension on February 1, 2012, Appellant was provided with a Remediation Plan. This plan was created by Dr. Koon and approved by the Evaluation Committee. Appellant initially did well under the Remediation Plan. For example, Dr. Frank Voss met with Appellant shortly after his return from suspension and found Appellant to be performing well. *See* J.A. 1417 (Dr. Voss informed Appellant he

19

"was doing well . . . and suggested that [Appellant] keep on doing what [he] was doing."). Appellant's progress did not last.

i.

*Spinal Patient*

In February 2012, another serious issue arose regarding Appellant's care of a post-operative spinal patient. A nurse informed Appellant the patient was possibly experiencing "an acute neurological change and deficit," based upon the patient's inability to lift the front part of her foot.[9] J.A. 1161. Rather than immediately check on the patient or pass the information along to the patient's primary doctor, Dr. Gregory Grabowski, Appellant responded to the nurse, "aww, she has a foot drop?" and asked the nurse to verify the observation. *Id.* Appellant did not promptly report the issue to Dr. Grabowski, nor did he promptly evaluate the patient when instructed to do so by Dr. Grabowski. Several hours after the nurse first reported the foot drop, Appellant finally evaluated the patient and reported to Dr. Grabowski that his own examination had revealed a profound neurological deficit.

Appellant did not, however, properly record his examination of the patient or his findings. According to Appellant, he did not do so because Dr. Grabowski had initially found Appellant's conclusion -- that the patient was having trouble walking -- to be inconsistent with Appellant's statement that he had seen the patient walking shortly

---

[9] This is a symptom commonly referred to as a "foot drop," and can be a sign of nerve compression.

before the examination.  Dr. Grabowski was seriously concerned by Appellant's failure to properly document the patient's symptoms, the delayed evaluation of the patient, and his general apathy towards a post-operative patient potentially presenting with a symptom of a serious problem.

Ultimately, Dr. Grabowski evaluated the patient and concluded that the patient was suffering a profound neurological deficit.  And within a few hours, the patient was taken to the operating room to drain a buildup of fluids from a cerebrospinal fluid leak that was compressing the patient's nerves and causing paralysis.  Due to concerns over the potentially serious effects of this leak, Dr. Grabowski instructed Appellant to personally change and document any wound drainage regularly.  Yet, "[d]espite these clear instructions, [Appellant] failed to perform this duty."  J.A. 201.

As to this incident, Dr. Voss, who had previously evaluated Appellant positively, noted that he and Dr. Grabowski felt "Appellant failed to have any true insight into the level of concern that we would expect that he would demonstrate in the care of a patient who was at risk for [paralysis]."  J.A. 197.

ii.

*Hemophiliac Patient*

Then, in March 2012, Dr. Wood instructed Appellant to check in on a patient with hemophilia who was at risk for compartment syndrome.[10]  Appellant did not check in on

---

[10] Compartment syndrome refers to the buildup of pressure in an enclosed space in the body (most commonly in the limbs) that results in decreased blood flow to the muscles and nerves in the area.  If untreated, compartment syndrome can result in serious (Continued)

the patient as instructed. The next morning, Appellant told Dr. Wood that he had forgotten to see the patient. When Dr. Koon learned of the incident, he arranged for a meeting between Dr. Walsh and Appellant to see if there was a "reasonable explanation" for his inaction. J.A. 1175. If Appellant did not present a reasonable explanation, Dr. Koon recommended immediate suspension because he believed Appellant's actions were "putting . . . patients at risk." *Id.*

In contrast to his earlier statement to Dr. Wood that he had forgotten to check on the patient, when Appellant spoke to Dr. Walsh, Appellant stated that he had not forgotten and had actually checked on the patient at 2:30 a.m. Appellant explained that there was no record of this examination because he had forgotten to document it.

2.

*Second Suspension*

After Dr. Walsh informed Dr. Koon of Appellant's explanation for his failure to check on the hemophiliac patient, Dr. Koon recommended to Palmetto's Executive Committee (the "Executive Committee") that Appellant be suspended without pay (or dismissed) pending a decision by the Evaluation Committee. Thus, Appellant was suspended a second time. Two days after his second suspension, Appellant entered a "delayed clinical note" to reflect that he had evaluated the hemophiliac patient.

---

damage to the affected area, limb loss, or death. *See, e.g.*, J.A. 191 (describing compartment syndrome as a "limb threatening problem").

On February 29, 2012, Dr. Koon notified Dr. Stephens that the orthopedic surgery department would be recommending that Appellant's residency contract not be renewed for a third year.  Later that same day, Dr. Koon sent Dr. Stephens another email about Appellant's care of the post-operative spine patient and asked whether Appellant's failure to follow instructions "rises to the level of 'just cause' for dismissal."  J.A. 192.  Then, after the incident with the hemophiliac patient, Dr. Koon emailed Dr. Stephens to state that he believed Appellant was "putting our orthopedic patients at risk" and expressed his belief that there was just cause to seek dismissal of Appellant.  *Id.* at 191.  After this, Appellant was suspended without pay.  The Executive Committee scheduled a meeting for April 10, 2012 with the Evaluation Committee, at which time the Executive Committee intended to recommend Appellant's termination.

In the interim, Appellant began the grievance process as to his second suspension.  The second suspension, like the first, was upheld.  Appellant asserted that, during this grievance process, Dr. Walsh told him that the Evaluation Committee would not go against the faculty's recommendation and pressured him to leave the residency program "with dignity."  J.A. 1418.  On March 30, 2012, Appellant requested copies of all documentation of the incidents underlying his suspension.  The documents were provided.

E.

Appellant is Terminated

On April 10, 2012, the Evaluation Committee met and voted to dismiss Appellant immediately.  Appellant requested a grievance hearing on his termination.

The hearing was held on April 30, 2012, and Appellant was given an opportunity to present evidence. Dr. Koon and Dr. Walsh presented a summary of the incidents leading up to Appellant's termination and noted that, despite various opportunities to remediate, Appellant had failed to alter his conduct. While Appellant had initially responded positively to the remediation process, as the process continued Appellant no longer sought to correct his behavior or understand why the behavior could be problematic. Instead, according to Drs. Koon and Walsh, Appellant began to record his communications with peers and to document events in an attempt to support his arguments that he had done nothing wrong. *See, e.g.*, J.A. 542 (Dr. Koon's November 29, 2011 Memorandum of Record) ("[Appellant] appeared to be completing a 'log' in order to disprove allegations of tardiness."); *id.* at 556 (Dr. Koon's December 12, 2011 Memorandum of Record) ("[Appellant] admitted to secretly recording phone calls with an attending surgeon . . . [has] repeatedly refused to give direct answers to several questions and failed to take responsibility for his actions in several patient care examples . . . [and has] steadfastly refused to admit any wrongdoing, even when faced with overwhelming evidence to the contrary.").

Appellant asserted that his termination was the result of Dr. Koon's personal vendetta against him and attributed his lack of success in the residency program to "a personal decision" on the part of Drs. Koon and Walsh "that they weren't happy with my care and weren't able to work with me." J.A. 1816. Appellant indicated that he had "the support of several physicians, including Dr. Guy," during the hearing. *Id.* at 2483. After

the hearing, the grievance committee requested additional documentation and statements from Dr. Guy (Appellant's mentor) and Dr. Voss to "fully assess the issues." *Id.*

Accordingly, Drs. Guy and Voss provided statements. Dr. Guy noted that while he had a positive perception of Appellant's intelligence, personality, and skills, he did "not believe that [Appellant] will excel in any manner in clinical medicine and [or that] he belongs in an orthopaedic residency program." J.A. 912. Dr. Guy believed that it was Appellant's "lack of desire and passion that translates into tardiness and ultimately poor patient care." *Id.* Dr. Voss expressed his belief that Appellant, while "very friendly" with patients, "fell far short of what was expected of him as a physician." *Id.* at 909. Specifically, Dr. Voss recounted two patient care issues -- the pain management patient and the hemophiliac patient -- that led him to believe Appellant "did not really care for the patient[s]." *Id.* Dr. Voss opined that, while these issues undermined patient care, "they really fall under the category of professionalism" and "ha[d] not been remediable." *Id.*

After considering the evidence, the grievance committee upheld Appellant's dismissal, as did Palmetto's CEO. Thereafter, Appellant unsuccessfully filed a complaint with the ACGME alleging "unethical behavior and harassment" by Drs. Koon and Walsh, including "racially-based harassment," denial of "due process," and "attempt[s] to discredit" Appellant. J.A. 372. The ACGME found no validity to Appellant's claims.

F.

<u>Appellant Applies for a California Medical License</u>

After his dismissal from the Palmetto residency program, Appellant obtained a new position in the Kern Medical Emergency Medicine Residency Program ("Kern Medical") in Bakersfield, California. Appellant was set to begin the residency program with Kern Medical in June 2013.

In May 2013, as part of the application for a medical license with the Medical Board of California (the "California Medical Board"), Appellant asked Dr. Koon to complete a "Certificate of Completion of ACGME/RCPSC Postgraduate Training." J.A. 223. The form had "[t]o be completed by the facility for every medical school graduate completing postgraduate training in the United States or Canada." *Id.* The form requested general information, like the facility's name and address, the applicant's specialty, and the applicant's dates of training. But the form also included a section titled "Unusual Circumstances," which asked, in relevant part, whether:

> (1)  "the applicant receive[d] partial or no credit for any postgraduate training year," J.A. 223 (question 1);
>
> (2)  "the applicant ever t[ook] a leave of absence or break from his/her training," *id.* (question 2);
>
> (3)  "the applicant was ever terminated, dismissed or expelled," *id.* (question 3);
>
> (4)  "the applicant [was] ever placed on probation," *id.* (question 5);
>
> (5)  "the applicant [was] ever disciplined or placed under investigation," *id.* (question 6); and,

> (6)    "any applications or special requirements [were] placed upon the applicant for clinical performance, professionalism, medical knowledge, discipline, or for any other reason." *Id.* (question 8).

Finally, the form requested "a signed and dated letter of explanation for any 'yes' response to [the questions]" from the program director.  J.A. 223.  Without the completed form and letter from Dr. Koon, Appellant could not obtain a California medical license.

Appellant's counsel had previously warned Palmetto of "their potential liability for defamation, tortious interference, and retaliation if they torpedo [Appellant's] efforts to further his medical career."  J.A. 218.  Accordingly, Dr. Koon sought legal advice before completing the certification form.    After receiving legal advice, Dr. Koon completed the form and indicated that Appellant had "take[n] a leave of absence or break from his . . . training"; been "terminated, dismissed or expelled"; been "disciplined or placed under investigation"; and "limitations or special requirements [were] placed upon [Appellant] for clinical performance, professionalism, medical knowledge, discipline, or for [another] reason."  *Id.* at 223.  In response to the question as to whether Appellant had ever been placed on probation, Dr. Koon noted that the "[p]rogram does not use 'probation.'"  *Id.*

Dr. Koon returned the form but did not provide an explanation for any "yes" responses.    *See* J.A. 260 ("This is tough when you have made it clear [Appellant] intend[s] to sue everyone if [w]e release this information").  Instead, in a separate signed and dated letter to the California Medical Board, Dr. Koon stated only,

> [Appellant] satisfactorily completed training from 01 July 2010 through 14 August 2011.

> We will be happy to respond to any further requests if
> accompanied by a release from [Appellant].

J.A. 222.

The California Medical Board determined that Dr. Koon's initial response was insufficient -- specifically, Dr. Koon's failure to provide explanations for "the questions [he] did answer positive[ly] . . . on a letterhead signed and dated by the current program director." J.A. 226. Therefore, Appellant again requested Dr. Koon complete the form.

Dr. Koon again consulted an attorney and prepared a signed letter that explained why he had checked yes for the boxes on the certificate form. *See* J.A. 226. This letter summarized Appellant's academic remediation period and stated,

> [Appellant] satisfactorily completed his [first year] from 01
> JUL 10 – 30 JUN 11.
>
> [Appellant] underwent [Evaluation Committee]-directed
> academic remediation during his [second] year. He failed to
> complete the [Evaluation Committee]-directed remediation
> measures and was terminated from his position on 10 APR 11
> (questions 3, 6, 8). He was not offered a renewal of his
> contract for the following year (question 9). [Appellant]
> satisfactorily completed one month of his [second year of]
> training from 01 JUL 11–10 APR 11 (question 1). During his
> [second] year he was placed on [Palmetto] Level III academic
> remediation which included a leave of absence from his
> clinical duties (question 2).

J.A. 229.

On June 26, 2013, Dr. Koon also sent a memorandum to the California Medical Board that provided a more expansive explanation of Appellant's remedial history. Dr. Koon noted, "During his first month on [his second round of Level II remediation,

Appellant] was involved in two patient encounters that the faculty deemed below acceptable standards." J.A. 972. Specifically, "[Appellant] had failed in the competencies of patient care, interpersonal skills and communication, and professionalism." *Id.* Finally, Dr. Koon explained that,

> It was the recommendation of the orthopaedic faculty to place [Appellant] immediately on Level III academic remediation (effective 01 MAR 12) and suspend him from clinical duties. We investigated [the patient] encounters thoroughly. No reasonable explanation could be identified for his actions, and the faculty recommended to the [Evaluation Committee] on 10 APR 12 that [Appellant] be dismissed from the program. This decision was confirmed by the [Evaluation Committee], the DIO, the Grievance Committee, and the [Palmetto] Chief Executive Officer during the appeals process.

J.A. 972.

The California Medical Board initially denied Appellant's application for a medical license in California but, after hearings on the issue, the state granted Appellant a medical license. However, because of the initial denial of his license, Appellant lost his position in the Kern Medical residency program.

## G.

### Procedural History

#### 1.

*Appellant Files Suit*

In his amended complaint dated April 6, 2015, Appellant asserted thirteen claims -- five against USCSOM and Palmetto together, five against Drs. Koon and Walsh together, one against Palmetto individually, and two against Dr. Koon individually.

As to USCSOM and Palmetto, Appellant asserted claims of: (1) disparate treatment and hostile work environment, pursuant to Title VII; (2) retaliation, pursuant to 42 U.S.C. § 1981 and Title VII; (3) breach of the residency agreement Appellant signed entering his second year; (4) breach of the Accreditation Agreement by an intended third party beneficiary; and (5) wrongful discharge in violation of South Carolina public policy.

With respect to Drs. Koon and Walsh, Appellant asserted claims of: (1) tortious interference with Appellant's employment contract with Palmetto; (2) procedural due process violations, pursuant to 42 U.S.C. § 1983; (3) substantive due process violations pursuant to § 1983; (4) First Amendment retaliation pursuant to § 1983; and (5) equal protection violations pursuant to § 1983. As to Palmetto, Appellant asserted a claim of racial discrimination in violation of § 1981 and alleged that Palmetto had "impaired [Appellant's] ability to make and enforce contracts regarding the terms and conditions of his employment, based on his race, in violation of 42 U.S.C. § 1981." J.A. 35.

As to Dr. Koon, Appellant alleged claims of libel per se and tortious interference with contract, predicated upon Dr. Koon's statements to the California Medical Board.

In essence, Appellant alleged that during his time in the Palmetto residency program he was subject to discrimination and harassment from his program director, Dr. Koon, and the department chair, Dr. Walsh. Appellant contended that he was subjected to discrimination and disparate treatment because of his race, and that this resulted in a hostile work environment. Appellant contended that other physicians who were similarly

situated to him -- Drs. Goodno, Nathe, and Hoover -- were punished less severely for the same or similar infractions.

2.

*Dismissal of Appellant's Suit*

After discovery, Appellees moved for summary judgment on all causes of action. By Memorandum Opinion and accompanying Order entered on June 1, 2016, the district court granted Appellees' motions for summary judgment as to all counts.  In an extensively detailed order, the district court concluded Appellant had failed to demonstrate that Dr. Koon's "comments [alluding to Appellant as a terrorist] were sufficiently severe or pervasive" to impact Appellant's "conditions of employment or create an abusive work environment" to support Appellant's § 1981 hostile work environment claim. J.A. 2552.  The district court acknowledged, as do all parties to this action, that Dr. Koon's comments were "racially-based and offensive" in nature -- specifically, Dr. Koon's references to Appellant as "Achmed the Terrorist" -- but noted "there [was] no evidence the comments were made in the course of or connected to any otherwise hostile, angry, threatening or demeaning communications or behavior." *Id.* at 2553.

As to Appellant's § 1981 disparate treatment claim, the district court concluded first that the Evaluation Committee was entitled to academic deference to its decision to accept the recommendation of dismissal.  In light of this deference, the faculty was not required to be absolutely correct or to make the "most appropriate conclusions," but to exercise its "professional judgment" within the accepted academic norms.  J.A. 2561.

The district court noted that there were uncontroverted concerns presented by multiple faculty members and the chief resident about several specific patient-care incidents, and Appellant had simply not identified any evidence "that even a single faculty member's view or vote was the result" of a substantial departure from accepted norms, nor that the "collective faculty" or the Evaluation Committee failed to exercise its professional judgments. *Id.* Further, the district court concluded that Appellant had failed "to proffer evidence sufficient to raise a genuine issue of material fact as to the fourth element, that he was treated less favorably than similarly situated persons outside his protected class." *Id.* While Appellant argued that he had presented several comparators -- Drs. Goodno, Nathe, and Hoover -- the district court observed that there was no real equivalency between them. While others may have made the same mistakes, only Appellant presented a consistent pattern of such mistakes that required remediation. Finally, the district court concluded that Appellant had failed to establish a genuine issue of material fact as to the falsity of Dr. Koon's statement -- that "[d]uring [Appellant's] first month on . . . Level II Remediation, [Appellant] was involved in two patient encounters that the faculty deemed below acceptable standards," *id.* at 972 -- to the California Medical Board.

On June 29, 2016, Appellant timely filed a motion to amend the judgment pursuant to Rule 59(e) of the Federal Rules of Civil Procedure and raised new theories as

to his due process claims.  Specifically, Appellant argued a "cat's paw" theory[11] of causation for the first time.  The district court denied the motion, concluding that Appellant had waived the majority of his arguments and that, even if the arguments were not procedurally foreclosed, none justified application of Rule 59(e).

Appellant appeals both the order granting summary judgment and the order denying reconsideration.

## II.

We review a district court's grant of summary judgment de novo.  *See Strothers v. City of Laurel, Md.*, 895 F.3d 317, 326 (4th Cir. 2018).  A district court may grant summary judgment only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  While we take the facts in the light most favorable to the non-moving party, "it is ultimately the nonmovant's burden to persuade us that there is indeed a dispute of material fact.  [He] must provide more than a scintilla of evidence -- and not merely conclusory allegations or speculation -- upon which a jury could properly find in [his] favor."  *CoreTel Va., LLC v. Verizon Va., LLC*, 752 F.3d 364, 370 (4th Cir. 2014) (citation omitted).  "A dispute is genuine if a reasonable jury could return a verdict for

---

[11] This theory provides, "[w]hen a formal decisionmaker acts merely as a cat's paw for or rubber-stamps a decision, report, or recommendation actually made by a subordinate, it is not inconsistent to say that the subordinate is the actual decisionmaker." *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 290 (4th Cir. 2004), *abrogated in part on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013).

the nonmoving party." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568 (4th Cir. 2015) (internal quotation marks omitted).

"We review the denial of a motion to reconsider for abuse of discretion." *Hickerson v. Yamaha Motor Corp.*, 882 F.3d 476, 481 (4th Cir. 2018).   Under this standard, we will not reverse a district court's judgment "merely because [we] would have come to a different result in the first instance." *Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 322 (4th Cir. 2008).

III.

A.

Hostile Work Environment Claims

1.

We begin by addressing Appellant's hostile work environment claims.  Title VII provides it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

A hostile work environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citation and internal quotation marks omitted).  The test for a hostile work environment claim pursuant to both Title VII and 42 U.S.C. § 1981 is the same: "a plaintiff must show that there is (1)

34

unwelcome conduct; (2) that is based on the plaintiff's . . . race; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." *Okoli v. City of Balt.*, 648 F.3d 216, 220 (4th Cir. 2011) (alterations and internal quotation marks omitted).

To be sufficiently severe or pervasive, the plaintiff must demonstrate "the environment would reasonably be perceived, and is perceived, as hostile or abusive." *Harris*, 510 U.S. at 22. "Whether the environment is objectively hostile or abusive is 'judged from the perspective of a reasonable person in the plaintiff's position.'" *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)). This objective determination requires consideration of all circumstances, which "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. The severity of the conduct can vary depending upon its source, because "a supervisor's power and authority invests his or her harassing conduct with a particular threatening character." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 763 (1998).

"[V]iable hostile work environment claims often involve repeated conduct . . . because 'in direct contrast to discrete acts, a single act of harassment may not be actionable on its own.'" *Boyer-Liberto*, 786 F.3d at 277 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002)). "[S]imple teasing, offhand comments, and

isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citations and internal quotation marks omitted).  Title VII is not intended to become "a general civility code."  *Oncale*, 523 U.S. at 80.

2.

Appellant argues that the district court erroneously granted summary judgment on his hostile work environment claim because there was a genuine issue of fact as to whether Dr. Koon's actions were sufficiently severe or pervasive to create an abusive work environment.  Appellant asserts that Dr. Koon's assignment of the "How to Swim with Sharks" article to him for presentation, Dr. Koon's use of "racial slurs and offensive language," Dr. Koon's "unilateral[] stacking" of disciplinary complaints against Appellant, and Palmetto's tolerance of Dr. Koon's actions were sufficient to create a genuine issue of fact as to whether Appellant's work environment was abusive.

First, as the district court correctly observed, the racist comments in this case -- Dr. Koon's reference to Appellant as "Achmed the terrorist" -- are not of the same character as those in *Boyer-Liberto*.  In *Boyer-Liberto* we emphasized that the context in which the harassing conduct occurs is relevant to the issue of whether the harassment satisfies the third element of the plaintiff's hostile work environment claim.  *See Boyer-Liberto*, 786 F.3d at 277 (directing courts to "look[] at all the circumstances"); *see also Okoli*, 648 F.3d at 220 (third element requires conduct "which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment").  In *Boyer-Liberto*, we observed that the supervisor had "employed racial

36

epithets to cap explicit, angry threats that she was on the verge of utilizing her supervisory powers to terminate" the employee, had berated the employee's job performance before threatening and directing racial epithets at her, and, when the employee attempted to report the harassment, threatened her again.  786 F.3d at 279–80.

In contrast, while the comments made in this case are odious, there is no evidence to suggest that the infrequent comments -- two comments over an 18 month period -- were so severe or pervasive as to be actionable.  *See Faragher*, 524 U.S. at 788.  And, significantly, unlike in *Boyer-Liberto*, Dr. Koon did not make racist comments in connection with employment decisions, or during the assertion of his authority over Appellant.  Rather, the comments are more akin to the "simple teasing" and "offhand comments" that Title VII does not reach.  *See Faragher*, 524 U.S. at 788.  Indeed, in the hiring process, Dr. Koon ranked Appellant as a top ten candidate and an excellent fit for the Palmetto residency program.

Appellant has also failed to establish that there was any overlap between the racist comments and much of the harassment alleged.  It is not enough for a plaintiff to demonstrate that (1) there was racism in the workplace and (2) the workplace was also hostile.  Instead, to present an actionable hostile work environment claim, the work environment must be *racially* hostile.  *See Pryor v. United Air Lines, Inc.*, 791 F.3d 488, 495 (4th Cir. 2015).  In this case, there was indisputably a strained relationship between Appellant and his superior, Dr. Koon, and that strained relationship certainly had an impact on the workplace.  But, as Appellant himself stated, that strained relationship was based upon negative workplace interactions between Appellant and Dr. Koon, *not race*.

J.A. 164 ("I believe that Dr. Koon's displeasure with me started with an e-mail exchange on November 3 involving a discharge dictation for a VA patient."). In essence, Appellant's claim requires the inference that because Dr. Koon used racially insensitive language a couple of times during Appellant's residency, every encounter that he -- and, indeed, his Palmetto/USCSOM coworkers -- had with Appellant was infected by racial hostility. No evidence justifies that massive inferential leap.

Considering the entire record and circumstances, while it is true that Dr. Koon made unwelcome racist comments and the relationship between Dr. Koon and Appellant was fraught at best, Appellant has failed to establish a genuine issue of material fact as to the severity of the comments or that the racist comments created a hostile work environment. Thus, we affirm the district court's judgment on this claim.

## B.

### Disparate Treatment Claim[12]

We next address Appellant's § 1981 disparate treatment claim. Appellant argues that the district court improperly granted summary judgment on this claim by improperly according academic deference to Palmetto. However, because Appellant failed to

---

[12] As a preliminary matter, while Appellant now seeks to present this claim under both the *McDonnell Douglas* framework and a mixed motive theory, Appellant only raised his disparate treatment claim before the district court under *McDonnell Douglas*. We, therefore, decline to consider Appellant's newly raised theories. *See Agra, Gill & Duffus, Inc. v. Benson*, 920 F.2d 1173, 1176 (4th Cir. 1990) ("We will not accept on appeal theories that were not raised in the district court except under unusual circumstances that would result in a miscarriage of justice.").

establish the requisite elements of a disparate treatment claim, we need not reach the matter of academic deference.

1.

The *McDonnell Douglas* framework was initially developed for Title VII discrimination cases but has since been expanded to apply to both discrimination cases pursuant to § 1981 and retaliation cases pursuant to both Title VII and § 1981. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the *McDonnell Douglas* burden shifting framework, the plaintiff employee "must first establish a prima facie case of employment discrimination or retaliation." *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). If the plaintiff succeeds, the burden of production "shifts to the employer to articulate a non-discriminatory or non-retaliatory reason for the adverse action." *Id.* The burden then returns to the plaintiff employee "to prove by a preponderance of the evidence that the stated reason for the adverse employment action is a pretext and that the true reason is discriminatory or retaliatory." *Id.*

To establish a prima facie case of racially disparate treatment pursuant to § 1981, the plaintiff employee must demonstrate that (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) his job performance was satisfactory at the time of the adverse employment action; and (4) he was treated differently from similarly situated employees outside his protected class. *See Goode v. Cent. Va. Legal Aid Soc'y, Inc.*, 807 F.3d 619, 626 (4th Cir. 2015). "[I]n cases where the hirer and the firer are the same individual and the termination of employment occurs within a relatively short time

span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer." *Proud v. Stone*, 945 F.2d 796, 797 (4th Cir. 1991).

2.

Appellant argues that the district court erroneously dismissed his disparate treatment claim because he had successfully established a prima facie case of disparate treatment under the *McDonnell Douglas* burden shifting framework. Specifically, Appellant contends that there is a genuine issue of material fact as to whether he was meeting his employer's legitimate expectations at the time he was terminated. Appellant asserts that the district court erroneously "completely disregard[ed]" his expert's testimony. And, further, Appellant argues that he presented valid comparators -- Drs. Nathe, Goodno, and Hoover -- and the district court erroneously concluded that they were not similarly situated because the comparators did not have Appellant's disciplinary record. Rather, Appellant argues, the fact that the comparators did not have the same disciplinary record supports his prima facie case -- the comparators, he asserts, "made the same perceived mistakes" but were not "as frequently disciplined" and, therefore, Appellant "was treated differently." Appellant's Br. 31–32.

3.

As the district court held, Appellant's disparate treatment claim fails because he is unable to establish a prima facie case. Specifically, Appellant cannot establish a genuine issue of material fact as to the third prong of a disparate treatment claim (that he was

40

meeting his employer's legitimate expectations) or as to the fourth prong (that he was treated differently from similarly situated employees). *See Guessous*, 828 F.3d at 216.

a.

*Employer's Legitimate Expectations*

First, Appellant cannot establish a prima facie claim of disparate treatment because Appellant was not meeting his employer's legitimate expectations at the time of his termination.

i.

Below, Appellant presented expert testimony to demonstrate that his performance was within the standard of care for a second year resident -- but that is not the question. Rather, the question of import here is whether Appellant's employer believed Appellant's performance was sufficient. That is to say, whether an employee is satisfying his employer's legitimate expectations does not depend on the retrospective analysis of an expert witness or the employee's own perception, but instead depends on "the perception of the decision maker." *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000) (internal quotation marks omitted). Accordingly, Appellant cannot create a genuine issue of material fact merely by arguing that his performance was sufficient.

ii.

It is clear that Appellant was not meeting his employer's legitimate expectations at the time of his termination. The record in this case reflects that numerous members of the faculty and hospital staff were concerned about Appellant's job performance. Of note, even those individuals with a generally positive view of Appellant noted concerns

41

about his patient care. Indeed, Appellant's mentor, Dr. Guy, noted "I do not believe that [Appellant] will excel in any manner in clinical medicine and do not believe he belongs in an orthopaedic residency program." J.A. 1012. Similar concerns were reported by other members of the staff during Appellant's first and second years of residency -- one doctor noted he "[w]as not confident that [Appellant] was completely invested in caring for our patients" and that Appellant "[d]id not give [him] the feeling that he was always truly aware of what was going on with the patients he was managing on the trauma floor." *Id.* at 1027. Another noted, Appellant "[n]eeds to take greater responsibility for the welfare of the patient, too often would fail to recognize need for urgency in patient care." *Id.* at 1034.

The record amply demonstrates that nurses, doctors, and faculty members had concerns about Appellant's compassion and empathy toward patients, his attention to detail, and his failure to document interactions with and examinations of patients. Appellant views these errors as simple mistakes that could have been corrected, but Appellees clearly viewed Appellant's errors as a continuous pattern that did not improve over several months of remediation and that put patients at risk. As in *Hawkins*, Appellant's arguments and expert testimony "prove only the unremarkable fact that [he] and [the doctors, nurses, and staff] disagreed about the quality of [his] work." *Hawkins*, 203 F.3d at 280; *see also Evans v. Tech. Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996) (the plaintiff's "unsubstantiated allegations and bald assertions concerning her own qualifications . . . fail to disprove [the employer's] explanation or show discrimination."). And, further, while a plaintiff can demonstrate that he was meeting his

42

employer's legitimate expectations through expert testimony that applies legitimate expectations to the plaintiff's actual performance, this expert's opinion was based solely on Appellant's recounting of events. This is insufficient.

Even considering all the facts in the light most favorable to Appellant, it is clear that Appellant was not fulfilling his job duties satisfactorily from "the perception of the decision maker." *Hawkins*, 203 F.3d at 280. Accordingly, we affirm.

b.

*Similarly Situated Comparators*

Moreover, Appellant did not present any similarly situated comparators within the meaning of § 1981 and thus cannot establish the fourth element of a prima facie claim. Specifically, Appellant failed to adduce any proof that he was treated differently from similarly situated employees outside of his protected class.

i.

"The similarity between comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful." *Lightner v. City of Wilmington, N.C.*, 545 F.3d 260, 265 (4th Cir. 2008) (concluding that the difference in positions between two police officers "makes the purported comparison in this case too loose"). This similarity can be demonstrated by evidence that the employees "dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct *without such differentiating or mitigating circumstances* that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992) (emphasis supplied). "The most important variables in the

disciplinary context, and the most likely sources of different but nondiscriminatory treatment, are the nature of the offenses committed and the nature of the punishments imposed." *Moore v. City of Charlotte*, 754 F.2d 1100, 1105 (4th Cir. 1985).

ii.

In this case, there is a significant distinguishing factor between Appellant and each of the comparators he presented. Specifically, Appellant's infraction was not a single misstep, but a part of a larger pattern of patient care issues.

First, as to Dr. Nathe, while Appellant asserts that Dr. Nathe was treated differently for the same infraction, Appellant fails to address the differences between himself and Dr. Nathe. Critically, at the time Dr. Nathe and Appellant treated the trauma patient, Dr. Nathe was a first year resident without any disciplinary history. On the other hand, Appellant was a second year resident and was already on a Remediation Plan for prior patient care issues.

As to Dr. Goodno, Appellant offered no evidence to show that the two were similarly situated. Again, Appellant fails to recognize the significance of his disciplinary history -- unlike Appellant, Dr. Goodno did not have a documented record of similar patient care issues. In contrast, Appellant was on a Remediation Plan at the time of the incident involving the wound care patient.

As to Dr. Hoover, Appellant has failed to adduce evidence to demonstrate that the two are similarly situated. First, Dr. Hoover and Appellant again did not have comparable disciplinary histories. Further, Dr. Hoover did not commit any infraction. Rather, Dr. Hoover simply responded to a hypothetical question about when he would

approve more narcotics for a post-surgical patient. Appellant argues, based on Dr. Hoover's response to this hypothetical, that Dr. Hoover would have taken the same course of action Appellant alleges he took -- directing the post-operative patient to take more pain medication -- and thus Appellant's punishment was based on his status. However, Appellant addresses only the core of his advice to the patient, while failing to address the meat of the issue. Appellant informed a post-operative patient at three in the morning to take "5 milligrams more" without confirming the patient's understanding of the appropriate dose. The distinction between Appellant's actual actions and Dr. Hoover's hypothetical actions is quite clear in this regard: while in this hypothetical world, Dr. Hoover *may* have directed the patient to take more medication, Appellant *actually* did so in a manner that created a risk of overdose for the patient.

Finally, each of the mistakes Appellant committed establish a meaningful distinction between Appellant and his proposed comparators, because a single violation presents an entirely different issue than a pattern of violations that have not been remedied despite continuous counseling. Therefore, Appellant did not present a clearly established comparator and cannot demonstrate a prima facie case of race discrimination and the district court's grant of summary judgment on this ground is affirmed.

## C.

### Retaliation Claim

#### 1.

Appellant has also failed to establish a prima facie case of retaliation pursuant to Title VII or 42 U.S.C. § 1981. *See, e.g.*, *Boyer-Liberto*, 786 F.3d at 281 ("A prima facie

retaliation claim under 42 U.S.C. § 1981 has the same elements [as a Title VII retaliation claim].").

To establish a prima facie case of retaliation under Title VII or § 1981, a plaintiff employee must demonstrate that (1) he engaged in protected activity; (2) he suffered an adverse action; and (3) there is a causal nexus between the protected activity and the adverse action. *See Guessous*, 828 F.3d at 217. To establish causation pursuant to Title VII, an employee must prove "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013); *see also Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 252 (4th Cir. 2015) (concluding "*Nassar* does not alter the legal standard for adjudicating a *McDonnell Douglas* retaliation claim."). An action is "materially adverse" if it might "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

2.

The district court first found that Appellant's Title VII claim failed due to the failure to file a timely administrative charge. Next, the district court held that none of the three adverse actions raised by Appellant -- (1) Dr. Stephens' denial of his grievance, (2) her failure to provide him the documents he requested, and (3) her failure to excuse the delay in his request for a grievance hearing -- were sufficiently adverse to support a

§ 1981 retaliation claim or, if it was not barred, a Title VII retaliation claim.[13]   And, finally, the district court concluded that the temporal proximity between Appellant's January 3, 2012 report to Dr. Stephens about Dr. Koon's "Achmed the terrorist" comments, and the alleged adverse actions -- the denial of Appellant's grievance on January 11, 2012; the January 13, 2012 denial of Appellant's request for documents regarding a patient care issue; and the January 26, 2012 refusal to allow Appellant an extension to request a grievance hearing -- was insufficient to establish causation.

Appellant argues that the district court erroneously granted summary judgement under the *McDonnell Douglas* framework.[14]   Specifically, Appellant argues that the district court erroneously found that Dr. Stephens' actions -- the denial of Appellant's January 2012 grievance, failure to provide the requested documents relevant to the remediation process, and failure to grant an extension of the appeal deadline -- were not

---

[13] Appellant identifies two additional adverse actions as a result of his complaint to Dr. Stephens' about Dr. Koon's comments -- his suspension and his dismissal.  However, Appellant failed to raise these issues as part of his retaliation claim before the district court, although they were available.  Accordingly, we will not address these newly presented issues. *See Zoroastrian Ctr. & Darb-E-Mehr v. Rustam Guiv Found.*, 822 F.3d 739, 753 (4th Cir. 2016) ("Issues raised for the first time on appeal are generally not considered by this Court.").

[14] Appellant also attempts to raise a mixed motive retaliation claim for the first time on appeal.  It is well accepted that issues raised for the first time on appeal are waived, absent exceptional circumstances.  As such, we decline to consider Appellant's retaliation claim under the mixed motive framework. *See Pornomo v. United States*, 814 F.3d 681, 686 (4th Cir. 2016); *see also Benson*, 920 F.2d at 1176 ("We will not accept on appeal theories that were not raised in the district court except under unusual circumstances that would result in a miscarriage of justice."); *Zoroastrian Ctr.*, 822 F.3d at 753.

materially adverse.  And, finally, Appellant argues that he established a presumption of causation because of the short temporal proximity between his complaint to Dr. Stephens about Dr. Koon's comments and Dr. Stephens' alleged adverse actions.

3.

We need not address Appellant's arguments regarding whether the alleged adverse actions were, in fact, materially adverse.  This is the case because, even if Appellant suffered an adverse action, he has wholly failed to adduce sufficient proof to establish a causal connection between his complaint to Dr. Stephens and any adverse action. Appellant's argument rests solely upon the temporal proximity between his report to Dr. Stephens that Dr. Koon had called him "Achmed the terrorist" and the adverse actions.[15] To be sure, Appellant's complaint and the adverse actions all occurred in January 2012. This close temporal proximity, however, simply cannot bear the weight Appellant places upon it because of the nature of Palmetto's grievance process.  The grievance process requires Dr. Walsh to resolve the matter within five days of being approached with a grievance.  If his response is unsatisfactory, the complainant may request a meeting with the Designated Institutional Official, Dr. Stephens, who must arrange such a meeting within ten days.  After that meeting, Dr. Stephens must reply within ten days.  And finally, if the response is unsatisfactory, the complainant must contact human resources

---

[15] While Appellant also argued causation under a cat's paw theory, we decline to address this argument, because it was never raised before the district court.  *See, e.g.*, *Zoroastrian Ctr.*, 822 F.3d at 753–54 ("Issues raised for the first time on appeal are generally not considered by this Court.").

48

within ten days.  In total, the grievance process dictates a quick resolution of grievances. *See* J.A. 2308 (describing multi-step grievance process).

Thus, the fact that Appellant initiated the grievance process and reported Dr. Koon's offensive comments during the grievance process, after which his grievance was denied does not demonstrate that the denial of his grievance was *because* of some retaliatory animus.  Instead, it demonstrates that Dr. Stephens was merely complying with Palmetto's grievance policies.  Therefore, Appellant has failed to establish a causal connection between the adverse action and his complaint about Dr. Koon's statements, and the district court's award of summary judgment on the retaliation claims is affirmed.

D.

Third Party Beneficiary Claim

Appellant argues that he, as a resident physician, is a third-party beneficiary to the Affiliation Agreement and the PLAs.  In this regard, Appellant asserts that the district court erred in determining that (1) he waived this claim because "it is not fairly predicted by the Amended Complaint"; and (2) even if the claim was not barred, Appellant was not a third-party beneficiary to the contracts.

1.

Appellant asserted for the first time in response to summary judgment that "he is a third-party beneficiary of 'one or more agreements *between* [*Palmetto*] *and the USC-SOM* to abide by the ACGME accreditation guidelines."  J.A. 2593 (emphasis in original).  But Appellant failed to address Appellees' arguments in support of summary judgment, and thus the district court found Appellant had conceded those arguments.  We

49

need not address whether Appellant was in fact a third-party beneficiary, because the district court correctly concluded that this claim is procedurally barred by Appellant's failure to raise this argument prior to the motion to amend, despite the argument being available prior to the issuance of the judgment. Thus, the district court correctly declined to amend the judgment.

2.

A district court may grant a Rule 59(e) motion "(1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." *Sloas v. CSX Transp., Inc.*, 616 F.3d 380, 385 n.2 (4th Cir. 2010) (quoting *Hutchinson v. Staton*, 994 F.2d 1076, 1081 (4th Cir. 1993)). Rule 59(e) motions "may not be used . . . to raise arguments which *could have been* raised prior to the issuance of the judgment, nor may they be used to argue a case under a novel legal theory that the party had the *ability to address* in the first instance." *Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998) (emphases supplied). A party cannot get a second bite at the apple by raising new arguments or legal theories after judgment has been issued.

"[A] plaintiff may not raise new claims after discovery has begun without amending his complaint." *Cloaninger ex rel. Estate of Cloaninger v. McDevitt*, 555 F.3d 324, 336 (4th Cir. 2009). "A complaint is meant to state the issues of a case so that the parties can conduct discovery and present their cases intelligently. Hinting at a claim in an expert witness statement leaves the opposing party guessing at one's real intentions." *Deasy v. Hill*, 833 F.2d 38, 41 (4th Cir. 1987). In essence, this is a rule of fairness

because without this notice, a defendant is deprived of "a fair opportunity to prepare her case or to take anything more than the most minimal precautionary measures." *Id.*

3.

Appellant argues, however, that even if the amended complaint does not encompass claims based on the Affiliation Agreement and the PLAs, Appellees had sufficient notice of the claims because the contracts were produced in discovery and Appellant questioned one of Appellees' witnesses about the contracts. The district court denied Appellant's Rule 59(e) motion and rejected these arguments because (1) Appellant conceded that he chose not to file an amended complaint because Appellees likely would have opposed the motion; and (2) Appellant gave notice of the claims at the eleventh hour in litigation, identifying them "roughly four months after the deadline to move to amend the pleadings and less than two weeks after the court granted [Appellant's] first motion to amend." J.A. 2646. Accordingly, the district court concluded that Appellant had failed to demonstrate "the decision not to allow him to rely on documents not identified in the Amended Complaint was clearly erroneous or resulted in manifest injustice." *Id.* at 2648.

As the district court correctly noted, the amended complaint does not encompass a claim as to the Affiliation Agreement and the PLAs. The amended complaint alleges a claim for "Breach of Contract -- Intended Third Party Beneficiary of Accreditation Agreement." J.A. 40. Specifically, Appellant alleges, "[a]s a resident, [Appellant] was an intended, third-party beneficiary of the contract between Defendant [Palmetto]/USC-SOM and the ACGME." *Id.* Appellant does not, however, allege at any point in the

amended complaint that he is a third party beneficiary to any agreement between Palmetto and USCSOM -- the parties to the Affiliation Agreement -- or between the orthopedic surgery department and the institutions that are parties to the PLAs. The amended complaint, therefore, does not fairly predict a claim based upon the Affiliation Agreement or the PLAs. Appellant's counsel acknowledged as much in an email to Appellees' counsel, in which he stated he "may need to amend the complaint again, because . . . there are three additional contracts that need to be included in [Appellant's] claims for . . . third party beneficiary breach of contract" and referenced the Affiliation Agreement and the PLAs. *Id.* at 2623. Appellant did not file a second amended complaint.

Appellant was aware that the amended complaint did not include the Affiliation Agreement and PLAs and acknowledged the need for a second amended complaint, but explicitly chose not to move to amend because he anticipated opposition. As the district court eloquently put it, Appellant "cannot now complain that [Appellees] or the court should have construed the Amended Complaint to include what [Appellant] never sought to add." J.A. 2647. Because the district court did not abuse its discretion, we affirm.

E.

Libel Per Se Claim

Below, Appellant asserted a claim of libel per se, based upon Dr. Koon's statement to the California Medical Board that "[d]uring [Appellant's] first month on this Level II Remediation, [Appellant] was involved in two patient encounters that the faculty deemed below acceptable standards." Appellant's Br. 47 (emphasis omitted). Appellant

52

argued that this statement was a false representation to the California Medical Board, because "the faculty" never found Appellant's care of the two patients to be "below acceptable standards," nor did the Evaluation Committee specifically find that Appellant's care for two patients was "below acceptable standards." *Id.* at 48–49.

### 1.

Appellant contends that the district court erred when it determined that Appellant failed to demonstrate the falsity of Dr. Koon's statement to the California Medical Board that "the faculty" had deemed two of Appellant's patient care incidents "below acceptable standards." Specifically, Appellant equates "the faculty" with the Evaluation Committee and, accordingly, argues that Dr. Koon's statement was false because the Evaluation Committee did not make a "specific" finding as to Appellant's conduct. Therefore, per Appellant's construction, Dr. Koon's statement that Appellant "was involved in two patient encounters that the faculty deemed below acceptable standards" was false. J.A. 972.

### 2.

Under South Carolina law, "[t]he tort of defamation allows a plaintiff to recover for injury to her reputation as the result of the defendant's communication to others of a false message about the plaintiff." *Holtzscheiter v. Thomson Newspapers, Inc.*, 506 S.E.2d 497, 501 (S.C. 1998). "[L]ibel is a written defamation or one accomplished by actions or conduct." *Id.* A plaintiff must establish that (1) a false and defamatory statement was made; (2) the unprivileged statement was published to a third party; (3) the publisher was at fault; and (4) either the statement was actionable irrespective of harm or

the publication of the statement caused special harm." *Fleming v. Rose*, 567 S.E.2d 857, 860 (S.C. 2002). "[P]urely conjectural interpretations" of a statement are insufficient to withstand summary judgment. *Fountain v. First Reliance Bank*, 730 S.E.2d 305, 310 (S.C. 2012).

### 3.

Appellant's argument fails on the merits, because his assignment of error relies upon two tenuous constructions of the facts that are insufficient to withstand summary judgment. *See Fountain*, 730 S.E.2d at 310.

### a.

First, as to Appellant's contention that "the faculty" refers to the Evaluation Committee, it is clear that "the faculty" was not used to refer to the Evaluation Committee based upon the express language of Dr. Koon's memorandum to the California Medical Board as a whole. In that memorandum, Dr. Koon specifically states "the faculty" recommended *to the Evaluation Committee* that Appellant be dismissed. J.A. 972. In order to accept Appellant's construction of Dr. Koon's statement -- and thereby find the statement false -- we would have to assume that the faculty made a recommendation to itself that Appellant be dismissed. It is clear that Dr. Koon's did not intend "the faculty" and "the Evaluation Committee" to refer to the same body, and it would defy logic to construe "the faculty" to refer to or include "the Evaluation Committee." It is clear, then, Dr. Koon's statement that "[Appellant] was involved in two patient encounters that the *faculty deemed* below acceptable standards," Appellant's Br. 47 (emphasis supplied), is not a false statement.

54

b.

Second, as to Appellant's contention that the Evaluation Committee did not make a specific finding about Appellant's conduct, Appellant has again failed to demonstrate that Dr. Koon's statement was false.  Specifically, it is clear that numerous individuals on (and outside of) the Evaluation Committee found Appellant's patient care to be below acceptable standards, given the volume of reports stemming from multiple people that raise concerns about Appellant's patient care.  The record reflects that faculty members Drs. Grabowski, Koon, Walsh, and Voss all believed Appellant was falling below acceptable patient care standards, as did Drs. Guy and Wood.  Further, it is clear that the Evaluation Committee did consider Appellant's patient care to fall below acceptable standards, because the Evaluation Committee accepted the faculty's recommendation to place Appellant on multiple stages of academic remediation and ultimately to terminate Appellant's employment.  Thus, even if Appellant correctly construed Dr. Koon's use of "the faculty" to refer to "the Evaluation Committee," it is clear that both the Evaluation Committee and the faculty found Appellant's patient care to be below acceptable standards.

Accordingly, construing the facts in the light most favorable to Appellant, there is no genuine issue of material fact as to the truth of Dr. Koon's statement and we affirm the district court's dismissal of his libel claim.

IV.

For the foregoing reasons, the order of the district court is

*AFFIRMED*.

55